FILED

DEC 06 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

Sergeant Major DANIEL R. AUXIER,

                                        Plaintiff,

v.

SECURITIES & EXCHANGE COMMISSION,
FINANCIAL INDUSTRY REGULATORY
AUTHORITY, DEPOSITORY TRUST & CLEARING
CORPORATION, CHARLES SCHWAB & CO., INC.,
formerly TD AMERITRADE, GTS SECURITIES LLC,
EQUINITI TRUST COMPANY, formerly AMERICAN
STOCK TRANSFER & TRUST COMPANY, NEXT
BRIDGE HYDROCARBONS, INC., JOHN BRDA,
GREGORY MCCABE,

                                        Defendants.

Case No.: 7:24-CV-318

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

## I.     **INTRODUCTION**

1. This action arises from a far-reaching scheme of market manipulation, regulatory negligence, breaches of fiduciary duties, and constitutional violations that collectively undermined the integrity of U.S. financial markets. The Plaintiff, Sergeant Major Daniel R. Auxier, a retail investor and active duty servicemember, brings this action to hold the Defendants accountable for their roles in perpetuating systemic misconduct that caused widespread financial harm. Through deceptive practices, improper trading mechanisms, and unconstitutional regulatory structures, the Defendants created an environment that disproportionately harmed retail investors while benefitting institutional participants.

a) At the heart of this case are the Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), intended to represent private ownership in Next Bridge Hydrocarbons (NBH) following a corporate spin-off. Instead of facilitating an orderly transition to private ownership, market makers, broker-dealers, and regulatory entities manipulated MMTLP shares

through practices such as synthetic share creation and naked short selling. These practices flooded the market with counterfeit shares, suppressed legitimate share prices, and deprived shareholders of the true value of their investments. Regulatory entities, including FINRA, the SEC, and the DTCC, failed to exercise their statutory oversight responsibilities, enabling these abuses to persist unchecked.

b) A pivotal event in this scheme was FINRA's issuance of a U3 trading halt on December 9, 2022, which indefinitely froze trading in MMTLP shares. Citing an undefined "extraordinary event," FINRA imposed the halt without providing transparency or resolution, leaving tens of thousands of investors unable to access their assets. This action was not only procedurally flawed but also unconstitutional. FINRA, a private self-regulatory organization, exercised quasi-governmental powers without the oversight required by the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine. Recent decisions, including Alpine Securities Corp. v. FINRA and SEC v. Sloan, provide critical legal authority highlighting these constitutional and statutory deficiencies.

c) The systemic misconduct extends beyond FINRA's governance flaws. Broker-dealers, including Charles Schwab, and market makers such as GTS Securities, engaged in coordinated efforts to manipulate the trading of MMTLP shares, profiting from artificial supply while retail investors suffered financial losses. Vertically aligned regulatory bodies, including the SEC and DTCC, neglected to enforce compliance, investigate irregularities, or resolve discrepancies in shareholder accounts. These failures allowed market manipulation to flourish unchecked, in violation of antitrust laws and federal securities statutes.

d) Corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons also bear significant responsibility for failing to address trading irregularities, reconcile shareholder discrepancies, or ensure accountability. Executives misled investors about the financial prospects of their assets while neglecting the fiduciary duties owed to shareholders. Their inaction compounded the harm caused by Defendants' manipulative practices, further destabilizing investor confidence and the integrity of the market.

e) The Plaintiff asserts that FINRA's unilateral U3 halt and the inaction of other regulatory bodies violated fundamental investor protections, statutory mandates, and constitutional principles. The indefinite nature of the trading halt mirrors the statutory violations

2

identified in Sloan, where the Supreme Court condemned the SEC for extending a trading halt beyond the ten-day statutory limit without congressional authorization. Similarly, FINRA's unchecked powers, as scrutinized in Alpine, violate the constitutional principle that private entities must remain subject to meaningful governmental oversight when wielding delegated authority.

f) Despite nearly two years having passed since the U3 halt, no meaningful action has been taken by Defendants to resolve these systemic failures or remedy investor harm. Retail investors remain in financial and legal limbo, unable to trade their positions or reconcile share discrepancies. This prolonged inaction has not only caused significant financial harm but also underscored the vulnerabilities in the current market oversight framework. The disparity in regulatory responses to the MMTLP and GameStop trading episodes further highlights the inequities in the treatment of retail investors.

g) This case seeks to recover damages for the financial and emotional harm suffered by the Plaintiff and to challenge the structural and constitutional flaws in FINRA's governance. By addressing these systemic deficiencies, this Court has an opportunity to restore fairness and transparency to U.S. financial markets, protect the rights of retail investors, and reinforce the constitutional principles that govern regulatory authority. Such action is necessary to rectify the failures that have jeopardized investor confidence and market integrity.

## II.    JURISDICTION AND VENUE

2.  Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.

3. Diversity jurisdiction is also proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff, a resident of New Jersey, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, New York, and Washington, D.C.

4. Venue is appropriate in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5. Despite nearly two years having passed since the U3 trading halt, none of the regulatory or governance bodies responsible for ensuring the fair operation of markets—including FINRA, the SEC, the DTCC, transfer agents, broker-dealers, market makers, and the leadership of the involved publicly traded companies—have effectively resolved or remedied the resulting challenges. This failure has resulted in violations of federal securities and antitrust laws, causing significant financial harm to the Plaintiff, whose damages exceed $245,671.

6. The Defendants' inaction, despite ample time and resources to investigate systemic irregularities and take corrective action, underscores a failure to address synthetic shares, unresolved trade settlements, improper account reconciliations, and the financial harm inflicted on retail investors.

## III.    **PARTIES**

7.  Plaintiff: Sergeant Major DANIEL R. AUXIER (hereinafter referred to as "Plaintiff" or "Auxier") has at all times mentioned herein been a resident and citizen of the Town of Wantage, in the County of Sussex, in the State of New Jersey. He is an active-duty Sergeant Major in the United States Army and shareholder of Meta Materials and Next Bridge Hydrocarbons.

8.  Defendant Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

9.  Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry Regulatory Authority (hereinafter "FINRA") is a self-regulatory organization authorized by the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006.

4

10. Defendant Depository Trust & Clearing Corporation (DTCC): The Depository Trust & Clearing Corporation (hereinafter "DTCC") is a financial services organization responsible for providing clearing, settlement, and information services for securities trading in the United States. DTCC is headquartered at 55 Water Street, New York, New York, 10041.

11. Defendant Next Bridge Hydrocarbons, Inc. (NBH): Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") was formed as part of the corporate spin-off from Meta Materials, Inc., intended to provide MMTLP shareholders with private ownership of its oil and gas assets. NBH is a private oil and gas exploration, and development company incorporated in the State of Nevada with its principal place of business located at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116.

12. Defendant Greg McCabe: Greg McCabe (hereinafter "McCabe") is the CEO and Chairman of Next Bridge Hydrocarbons (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

13. Defendant John Brda: John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources. Brda played a significant role in structuring the merger between Torchlight Energy Resources and Meta Materials and in the subsequent creation of MMTLP shares. The company's last known address is 5700 W. Plano Parkway, Suite 3600, Plano, Texas, 75093.

14. Defendant GTS Securities: GTS Securities (hereinafter "GTS") is a market maker operating on the New York Stock Exchange, headquartered at 545 Madison Avenue, 15th Floor, New York, New York, 10022.

15. Defendant Charles Schwab & Co., Inc.: Charles Schwab & Co., Inc. (hereinafter "Schwab"), headquartered at 3000 Schwab Way, Westlake, Texas, 76262, operates as a broker-dealer and financial services provider.

16. Defendant American Stock Transfer & Trust Company/Equiniti Group (AST/EQ): American Stock Transfer & Trust Company, now Equiniti Group (hereinafter "AST/EQ"), is the transfer agent responsible for managing the transition of MMTLP shares to Next Bridge Hydrocarbons (NBH). AST/EQ is headquartered at 6201 15th Avenue, Brooklyn, New York, 11219.

## IV.    **STATEMENT OF FACTS**

17. John Brda is the former CEO of Torchlight Energy Resources and was instrumental in the corporate merger with Metamaterial Technologies Inc., which resulted in the creation of Meta Materials, Inc. Brda played a significant role in preparing for the spin-off of Next Bridge Hydrocarbons and the registration of associated shares.

18. Clifton DuBose was the CEO of Next Bridge Hydrocarbons (NBH) during the transition of MMTLP shares to private shares. He is also a partner at Lynch, Chappell & Alsup, P.C., a law firm located in Midland, Texas. DuBose was positioned to facilitate the corporate transition of NBH, a process critical to addressing shareholder concerns related to the spin-off and the reconciliation of share discrepancies. He resigned this position in January of 2024.

19. Gregory McCabe is a corporate executive who held leadership roles within Torchlight Energy Resources and later Next Bridge Hydrocarbons. As part of his responsibilities, McCabe was involved in the valuation and management of NBH's oil and gas properties during its spin-off from Meta Materials, Inc., later he succeeded DuBose as the CEO of the company.

20. Jo Palmer serves as President and Chief Executive Officer of EQ U.S., the designated transfer agent for Next Bridge Hydrocarbons. EQ U.S. is responsible for managing shareholder records and facilitating the issuance and reconciliation of shares, ensuring compliance with corporate actions and regulatory requirements.

21. Ari Rubenstein, in his capacity as Chief Executive Officer of GTS Securities, oversees operations at a market-making firm that facilitates liquidity and trading in financial markets. GTS operates under regulatory frameworks designed to maintain orderly markets and fulfill market maker responsibilities.

22. Rick Wurster, as President of The Charles Schwab Corporation, manages the company's operations, including those related to securities brokerage and customer account services. Schwab, along with its subsidiary TD Ameritrade, provides brokerage services to retail and institutional clients and participates in the clearing and settlement of securities trades.

23. Frank La Salla, in his official capacity as President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC), manages the organization's clearing and

settlement processes for securities trades. The DTCC plays a critical role in ensuring the accurate recording and settlement of transactions across financial markets.

24. Robert W. Cook, in his official capacity as President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA), oversees the organization's regulatory functions, which include enforcing compliance with FINRA's rules and promoting fair market practices. Cook's leadership aligns with FINRA's mission to protect investors and maintain market integrity.

25. Gary Gensler, in his official capacity as Chairman of the Securities and Exchange Commission (SEC), is responsible for overseeing the agency's enforcement of federal securities laws. Under his leadership, the SEC monitors market practices and works to ensure transparency, fairness, and compliance with securities regulations.

26. On or about May 2, 2008, Pole Perfect Studios began filing as a private company under Central Index Key (CIK) number 0001431959. Following its merger with Torchlight Energy Resources on November 23, 2010, this CIK number transferred to Torchlight, making it responsible for subsequent filings.

27. On June 28, 2021, Torchlight transferred its CIK to Meta Materials upon its merger. The shared use of CIK number 0001431959 between Meta Materials and MMTLP constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities. Such actions could obscure transaction records and mislead investors, contravening Rule 10b-5's prohibition on deceptive practices in securities transactions.

28. Additionally, improper use of a CIK undermines the record-keeping and internal control provisions under the Securities Exchange Act, which mandate precise tracking of securities filings and transactions.

29. A CUSIP (Committee on Uniform Securities Identification Procedures) number is a unique nine-character alphanumeric code assigned to financial securities in the United States and Canada. It is used to uniquely identify securities such as stocks, bonds, and mutual funds, facilitating accurate processing, clearing, and settlement of trades.

30. Additionally, CUSIP numbers simplify record-keeping and reduce transaction errors, providing a reliable identifier for both investors and institutions.

31. Unlike Central Index Key (CIK) numbers, which identify entities filing with the SEC, CUSIP numbers specifically identify individual financial securities, ensuring clarity and accuracy in trading and tracking within financial markets.

32. From 2010 to 2020, Torchlight Energy Resources (TRCH) traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with Meta Materials, Inc. The trading history highlights the scale of its operations and shareholder engagement during this period.

33. On or about April 23, 2020, John Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH.

34. They announced that a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

35. Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

36. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

37. These statements, from NBH corporate officers and social media influencers regarding the probable reserve inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

38. On March 1, 2020, Torchlight Energy presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects.

39. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

40. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

41. In June 2020, Brda, along with the members of Torchlight Energy Resources' board of directors, resolved to pursue a strategic initiative aimed at salvaging the company through a merger with Meta Materials Inc., a corporation focused on advanced technological innovations.

42. This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market.

43. These short positions were portrayed as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

44. Shareholders were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these short shares while transitioning the company toward a future in high-tech innovation.

45. On December 14, 2020, Torchlight Energy Resources Inc. (TRCH), a Texas-based oil exploration company, initiated a merger plan with Meta Materials Inc. (MMAT), a Canada-based high-technology materials firm.

46. The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of Meta Materials, Inc.

47. From January 1, 2021, to June 21, 2021, Torchlight Energy Resources (TRCH) traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity.

48. A 'Z-test' statistical analysis was performed to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021 (analysis was conducted on July 14, 2024).

49. The analysis considered an average daily variation of 5% over 10 years and concluded that it was statistically impossible for 3.6 billion shares to have been traded in TRCH during this six-month period without manipulation or an unpredictable, non-uniform event influencing the market.

50. Upon information and belief, during the first six months of 2021, naked shorts were added to TRCH by Ari Rubenstein, in concert with others. These actions likely contributed to the anomalous trading volumes observed during this time, further indicating market manipulation.

51. On March 5, 2021, the Plaintiff, signed a self-directed broker agreement with TD Ameritrade, and on November 6, 2023, with Charles Schwab following its acquisition of TD Ameritrade. Both agreements include a mandatory arbitration clause in Section 10, requiring disputes to be resolved through arbitration, such as through FINRA, and waiving the right to sue in court, including a jury trial, except as allowed by the arbitration forum's rules.

52. However, under the Clayton Act, Section 3 (15 U.S.C. § 14), and the Sherman Antitrust Act, Sections 1 and 2 (15 U.S.C. §§ 1–2), such agreements may be rendered null and void when they are tied to or facilitate anticompetitive conduct, including monopolistic behaviors that restrain trade or suppress competition.

53. In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the "Series A Preferred Stock" for trading on the Over-The-Counter (OTC) market for NASDAQ, without the authorization or permission of MMAT or TRCH executives.

54. GTS and Canaccord relied on outdated, decade-old information in violation of FINRA rules and submitted falsified Form 211 filings to facilitate the tradability of what would later become MMTLP.

55. In a letter dated June 21, 2021, the OCC explicitly stated that the "Series A Preferred Shares" would not trade.

56. However, that letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the OTC market. This directive directly contradicted the intentions and filings of the merged companies.

57. The OCC memorandum dated June 21, 2021, was exclusively shared with market makers and hedge funds, including GTS and Ari Rubenstein.

58. GTS, under the supervision of Ari Rubenstein, had a duty to record all short sales, including naked shorts, and was granted additional time to close out fails-to-deliver under the "market maker exemption" rule.

59. Pursuant to FINRA Rule 204(b), market makers engaged in bona fide market-making activities are provided exceptions allowing additional time to close out fails-to-deliver resulting from such activities.

60. However, they are also required to maintain daily records of their fails-to-deliver and report them as necessary to ensure transparency and regulatory oversight.

61. The Depository Trust & Clearing Corporation (DTCC) is obligated to maintain precise and comprehensive records of securities trades and ensure the efficient electronic recovery and dissemination of information related to securities transactions within U.S. stock markets, as part of its role in promoting transparency and regulatory compliance.

62. On June 25, 2021, the CIK number 0001431959 transitioned again when Torchlight conducted a reverse takeover (RTO) with Meta Materials.

63. The shared use of CIK number 0001431959 between Pole Perfect, then Torchlight, now Meta Materials constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities.

64. Such actions may obscure transaction records and mislead investors, contravening Rule 10b-5 prohibition on deceptive practices in securities transactions.

65. During the merger of Torchlight Energy Resources and Metamaterial Technologies Inc., Gregory McCabe, a key executive and shareholder, publicly underscored the significant potential value of the Orogrande Basin oil and gas assets. He emphasized the probable oil reserves and the presence of other unproven assets within the basin, drawing attention to its strategic importance in the merger.

66. However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—an amount significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves.

67. Subsequent disclosures during the Next Bridge Hydrocarbons spin-off brought to light notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

68. On June 28, 2021, MMTLP shares were created during the spin-off in which TRCH transitioned specific assets into Next Bridge Hydrocarbons (NBH).

69. These shares, designated as "Preferred Stock Dividend," were intended to represent private ownership in NBH and were not meant to trade publicly.

70. On October 6, 2021, GTS Securities and Canaccord Genuity began trading MMTLP "Series A Preferred" shares publicly.

71. This activity occurred despite directives in TRCH's proxy statement, which prohibited public trading of the Series A Preferred Shares.

72. Despite the regulatory requirement for independent CIKs, MMTLP began trading on OTC markets on October 7, 2021, under the same CIK number 0001431959, as Pole Perfect, then Torchlight, then Meta Materials, now MMTLP.

73. This use of a shared CIK raises questions of compliance with SEC filing rules, including potential violations of Regulation S–T Rule 10(b) and Rule 10b-5.

74. On or about October 7, 2021, GTS Securities and Canaccord Genuity facilitated public trading of MMTLP shares on the OTC market. These actions were not authorized by TRCH or Meta Materials executives.

75. When John Brda, former CEO of Torchlight Energy, notified OTC Markets of this unauthorized trading, OTC Markets directed him to FINRA. FINRA subsequently informed Brda that he lacked standing to bring a formal complaint, as he was no longer the CEO. This unauthorized listing initiated significant trading irregularities and confusion among investors.

76. From October 7, 2021, to December 9, 2022, GTS Securities engaged in trading activities that resulted in the creation of synthetic shares, exceeding the authorized float of MMTLP shares.

77. Between October 2021 and December 2022, GTS Securities, under its market maker exemption, participated in trading activities involving synthetic MMTLP shares. These shares were created without the required "locates," exceeding the authorized float of legitimate shares.

78. Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

79. During this period, the market capitalization for MMTLP, a relatively unknown oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

80. Given the company's total authorized share count of 165.5 million, this level of market capitalization and volatility suggests the potential influence of synthetic (rehypothecated) shares or naked short selling.

81. Between November 15 and December 5, 2022, John Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000.

82. Publicly available social media posts from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

83. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt.

84. On November 23, 2022, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company, to facilitate the distribution of Next Bridge Hydrocarbons shares.

85. This transfer was intended to streamline the corporate action and ensure shareholders received their Next Bridge shares directly.

86. Additionally, shareholders were informed they would receive bonus shares of NBH Newco as an incentive for transferring their shares to AST; however, these bonus shares were never delivered, raising concerns about the representations made to shareholders.

87. On November 30, 2022, Gregory McCabe sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float. On that date, the trading price of MMTLP ranged between a low of $7.76 and a high of $10.00.

88. Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

89. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of MMAT and MMTLP shares.

90. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

91. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC were being used as early as this date mentioned, if not before this.

92. These reports contain detailed trade information, including the identity of the buyer and seller, trade size, trade price, and other transaction-specific details. The purpose of Blue Sheets is to assist regulators in monitoring the markets, detecting suspicious trading activity, and investigating potential securities violations like market manipulation or insider trading.

93. Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

94. On December 7, 2022, both FINRA and Meta Materials (MMAT) corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022.

95. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for Next Bridge Hydrocarbons (NBH) shares or dividends set for December 14, 2022.

96. On December 7, 2022, John Mendall, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action. Mendall confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

97. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from Meta Materials regarding unresolved issues with the MMTLP corporate action.

98. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to Next Bridge Hydrocarbons shares.

99. This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

100. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe short squeeze.

101. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont).

102. Many MMTLP traders, including the Plaintiff, were holding their shares with the intent to execute opportunity trades—to sell, rather than buy—on December 9 and 12, 2024. They were prepared to accept the best possible offers for their trades before the close of all trading on December 12, 2024, as specified in the approved corporate action referenced above.

103. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided.

104. FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

105. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2024.

106. Any subsequent reference to the FINRA U3 halt, after December 13, 2024, is acknowledged as accurate in form. However, for the purposes of this complaint, it is considered a matter of semantics, as the halt was officially lifted by FINRA on December 13, 2024. Despite this, no further action, remedy, or resolution has been undertaken as of December 4, 2024, leaving the matter unresolved for a total of 726 days.

107. FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across U.S. financial markets.

16

108. While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

109. As a privately governed organization, FINRA's Board of Governors is not appointed by the President or subject to the checks and balances typically applied to federal agencies, prompting constitutional considerations relevant to its governance and actions.

110. From its establishment as an SRO under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers, including the ability to enact rules, conduct investigations, and impose sanctions, functions typically reserved for federal agencies.

111. These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action that had significant financial and legal implications for investors.

112. However, FINRA's governance by a private membership-based Board of Governors raises structural questions about its authority to take such impactful actions. This board is neither appointed by the President nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

113. In the week after the FINRA U3 halt, Charles Schwab & Co. sent emails to MMTLP shareholders, Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that, even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares.

114. Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

115. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in Next Bridge Hydrocarbons, despite its status as a private company not intended for public trading.

116. Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

117. FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt.

118. Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

119. On February 20, 2023, Fleming, a TD Ameritrade (Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging institutional interests rather than retail investor protection as the motive. (Traudt v. Rubenstein, 2024, Docket Number: 2:34-cv-782, United States District Court for the District of Vermont.)

120. This conversation, which was recorded by TD Ameritrade (TDA), later Schwab, was initially made available for playback at Traudt's request but was later denied (Traudt v. Rubenstein, 2024).

121. In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TDA, but Schwab also refused to release the audio. These refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt (Traudt v. Rubenstein, 2024).

122. On April 1, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

123. High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm.

124. On April 18, 2023, Clifton DuBose, CEO of Next Bridge Hydrocarbons, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets.

125. In the context of Meta Materials (MMAT) and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic share creation.

126. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic ones.

127. Given the allegations of naked short selling and the creation of synthetic shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

128. If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

129. For instance, these sheets might highlight unusually high trade volumes that exceed the total outstanding shares, corroborating claims of synthetic shares.

130. Furthermore, they could reveal whether broker-dealers and market makers engaged in practices like failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

131. The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

132. The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of the trading activity, allowing allegations of irregularities, such as synthetic share creation or naked short selling, to be substantiated or disproven.

133. Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct.

134. DuBose outlined concerns regarding outstanding short positions in Next Bridge shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

135. The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

136. FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023.

137. On or about July 15, 2022, Next Bridge Hydrocarbons (NBH) received its own CIK number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK used for Pole Perfect, then Torch Light, then Meta Materials, now NBH (while MMAT still exists as a legal entity).

138. A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

139. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

140. To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

141. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

142. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2023. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

143. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

144. On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning Meta Materials Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

145. On January 15, 2024, NBH executives, including Clifton DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty.

146. On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

147. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

148. After Meta Materials declared bankruptcy on August 9, 2024, its final filing under this CIK occurred on September 20, 2024.

149. The Plaintiff has submitted a valid Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada, concerning 800 MMATQ shares, as of November 13, 2024, via Registered Mail.

150. On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (HudOp), a subsidiary of Next Bridge Hydrocarbons (NBH), citing breaches of the Development Unit Agreement (DUA) due to the non-payment of annual royalties and HudOp's refusal to fulfill its drilling obligations for the 2024 operational year.

151. The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the

agreement. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

152. In response to the October 2, 2024, termination of the Orogrande lease, Greg McCabe, Chairman and CEO of Next Bridge Hydrocarbons, expressed disappointment with University Lands' decision, framing it as a setback for the company.

153. However, NBH has not taken any formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This lack of action has further fueled concerns about NBH's management and the viability of its core assets.

154. On November 8, 2024, the plaintiff, a shareholder of Next Bridge Hydrocarbons (NBH), submitted a formal Request for Information (RFI) to NBH. The RFI raised critical questions regarding corporate governance, the total share count, discrepancies in share delivery, and the resolution of potential naked short selling.

155. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide a comprehensive response to the RFI within the 14-day deadline specified.

156. The RFI was sent via email to NBH Investor Relations at nextbridge@dennardlascar.com, where it was confirmed received on November 11, 2024. The same RFI was also sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116 on November 8, 2024; however, it was not received at that location.

157. This lack of response obstructed the shareholder's ability to assess management practices and investigate discrepancies, raising concerns about transparency and adherence to fiduciary obligations.

158. A formal Books and Records Check was demanded from McCabe and NBH on November 19, 2024, by the Plaintiff, and seven other shareholders. This letter requesting lawful shareholder access to records held by McCabe and NBH was officially served to McCabe at 500 W Texas Ave Ste 890, Midland, TX 79701.

159. To date, no response to the Books & Records check has been received from McCabe or NBH.

160. On November 22, 2024, the plaintiff, issued a formal demand letter to NBH's Board of Directors, reiterating his entitlement to corporate records under Texas Business Organizations Code Section 21.218 and federal securities laws.

161. The letter specifically sought explanations for the withdrawal of the SEC S-1 filing, the termination of the University Lands lease, and the justification for a $2 million loan at above-average interest rates.

162. The letter was sent via email to NBH Investor Relations at nextbridge@dennardlascar.com, on November 22, 2024 where receipt was never confirmed. The same RFI was also sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116 on November 23, 2024; however, it was not received at that location.

163. On November 25, 2024, Next Bridge Hydrocarbons (NBH) issued an official communication via investor relations email stating that the company had relocated its corporate offices from 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, to Midland, Texas, within the offices of McCabe Petroleum Corporation (MPC) under a rent-free agreement.

164. The announcement omitted the full address of the new location and contradicted existing public records, including NBH's most recent SEC Form 10-Q filed on September 30, 2024, and its last EDGAR filing on October 8, 2024, which both listed the Fort Worth address as its business location.

165. Additionally, USPS records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters.

166. USPS Registered Mail, with the RFI and Demand letter was also sent to the MPC address, 500 W Texas Ave Ste 890, Midland, TX 79701 on November 26, 2024. To date, no response has been received.

167. NBH did not provide the requested documentation or address the substantive inquiries within the seven-day response period stipulated in the letter. This failure further compounded

concerns about NBH's transparency and potential violations of fiduciary duties to its shareholders.

168. As of December 04, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

169. While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

170. Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

171. Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares.

172. Throughout 2021 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

173. From late 2022 through early 2023, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to Next Bridge Hydrocarbons. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved.

174. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

175. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

176. As of the present date, Next Bridge Hydrocarbons has not been assigned a CUSIP number for its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

177. This absence creates challenges in identifying and managing transactions involving Next Bridge Hydrocarbons' common stock, complicating compliance with financial reporting standards and market transparency.

178. The lack of a CUSIP number for Next Bridge Hydrocarbons highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

179. In fact, it has been well established that over 18 different internal CUSIPs are/ have been used to track MMTLP holdings in various Broker/ Dealers; such as Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.

180. TD Ameritrade used internal CUSIP 6DA993019, and Charles Schwab uses internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/ EQ almost two years after the spin-off to NBH.

181. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single unreconciled share highlights a significant issue.

182. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

183. The inability to reconcile all MMTLP shares to NBH shares, years later at AST/ EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

184. In January 2021, the Gamestop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to Gamestop's stock price surging over 1,000% within days.

185. Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

186. Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

187. The Gamestop event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

188. In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on Meta Materials' Series A Preferred Shares (MMTLP) just two days before their planned transition into Next Bridge Hydrocarbons, a private company.

189. Unlike Gamestop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

190. The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key concerns, including the allegations of synthetic shares or the systemic failures affecting retail investors.

191. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

192. Unlike Gamestop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

193. In contrast, the GameStop trading episode and the NBH Fiasco highlights significant disparities in the public and governmental engagement with market regulation issues, prompting questions about the consistency and fairness of responses to events affecting retail investors and market integrity.

194. Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

195. These institutional participants stand to make considerable profits by not closing their short positions, particularly when synthetic shares or naked short selling is used as a trading tactic. If Next Bridge Hydrocarbons (NBH) were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

196. Public records and shareholder complaints from 2023 and 2024 indicate systemic delays in resolving trading discrepancies related to MMTLP shares. Retail investors were left without a clear resolution or recourse for their financial losses.

197. The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

198. Institutional market participants engaged in trading practices involving synthetic MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

199. Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

200. To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

201. This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

202. FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

203. Shareholders have repeatedly requested audits of MMTLP share discrepancies to distinguish legitimate shares from synthetic ones. To date, no comprehensive audit has been conducted, leaving unresolved questions about the status of outstanding shares.

204. Synthetic share creation and trading irregularities during the MMTLP-to-NBH transition have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

205. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass safeguards designed to promote transparency and oversight.

206. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

207. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the nondelegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

208. This doctrine restricts Congress from delegating legislative powers without clear and specific guidance, yet FINRA operates with broad authority to create rules, enforce them, and adjudicate disputes, including halting trading activities that significantly impact investors.

209. Concerns arise as to whether FINRA's sweeping powers align with Article I of the U.S. Constitution, given its private governance structure and the lack of intelligible principles guiding its regulatory actions.

210. The application of these delegated powers during the U3 halt—where investors were left without access to their assets or meaningful resolution for nearly two years—exemplifies the constitutional considerations surrounding FINRA's role.

211. The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting consequences on market participants.

212. Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

## V.    **ALLEGATIONS**

213. The Plaintiff, Sergeant Major Daniel R. Auxier, has brought this action to address systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

214. FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. These organizations failed to investigate or remedy widespread irregularities such as synthetic share creation and naked short selling, which manipulated the market for MMTLP shares. The Defendants' inaction enabled institutional participants to profit at the

29

expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

215. The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability exacerbated the harm suffered by investors. These leaders neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

216. The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this case are emblematic of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

217. In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

218. This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

219. The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail

investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

220. In bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation, systemic negligence, and constitutional violations. By addressing these issues, this Court has the opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded.

221. The following legal and factual questions arise from the Plaintiff's claims and are critical to determining liability, damages, and appropriate relief in this matter:

a) Whether Defendants violated the Securities Exchange Act of 1934 and other applicable federal securities laws, particularly by failing to maintain market integrity, allowing manipulative practices such as the creation and trading of synthetic shares, and neglecting their statutory duties to protect investors.

b) Whether Defendants engaged in anticompetitive conduct or market manipulation in violation of the Sherman Antitrust Act and the Clayton Act, fostering a monopolistic and exploitative environment detrimental to retail investors.

c) Whether FINRA's issuance of the U3 halt on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA, SEC, and DTCC demonstrated the requisite diligence and transparency in resolving the trading halt and its consequences.

d) Whether the SEC, FINRA, and DTCC failed to fulfill their regulatory responsibilities by supervising one another, enforcing compliance with federal securities laws, and investigating and addressing synthetic share discrepancies during the MMTLP-to-NBH transition.

e) Whether FINRA's governance structure, as a private self-regulatory organization exercising significant quasi-governmental authority without sufficient oversight, violated constitutional principles, including the separation of powers, the Appointments Clause, and the private nondelegation doctrine.

f) Whether the Private Securities Litigation Reform Act of 1995 (PSLRA) unconstitutionally obstructs retail investors, such as the Plaintiff, from pursuing securities fraud claims by imposing heightened pleading standards and discovery stays that deny access to critical evidence, thereby preventing the resolution of claims related to systemic market manipulation, such as the proliferation of synthetic shares and the FINRA-imposed U3 halt on MMTLP.

g) Whether GTS Securities and other market participants violated their legal obligations by engaging in manipulative trading practices, including naked short selling, synthetic share creation, and other actions that suppressed legitimate share prices and exacerbated harm to retail investors.

h) Whether broker-dealers, including Charles Schwab, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from the proliferation of synthetic shares, and failing to reconcile oversold positions, despite their statutory obligation to safeguard customer securities and funds.

i) Whether AST/EQ and the DTCC failed to accurately reconcile synthetic shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

j) Whether Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons corporate leadership were aware of widespread trading irregularities, including synthetic share discrepancies, and whether their failure to act contributed to prolonged harm to shareholders.

k) Whether FINRA, SEC, and DTCC demonstrated negligence, incompetence, or apathy by failing to investigate and resolve market irregularities, discrepancies in share counts, and systemic failures to reconcile shareholder accounts, thereby fostering an environment of regulatory inaction and prolonged harm to retail investors.

l) Whether FINRA and other regulatory bodies acted beyond their statutory and procedural authority by imposing the U3 halt without providing transparent and timely justification, violating the principles articulated in SEC v. Sloan and other applicable precedents.

m) Whether the lack of coordination and communication between the SEC, FINRA, and DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity, resolution, or access to their assets.

n) Whether retail investors, including the Plaintiff, suffered a violation of their due process rights due to the lack of clarity, transparency, and recourse options provided during and after the U3 trading halt, and whether such deficiencies warrant compensatory, injunctive, and punitive relief.

o) Whether Defendants failed to disclose material information (e.g., trading irregularities, synthetic share creation, or share discrepancies) that would have informed investors, mitigated harm, and preserved market confidence.

p) Whether institutional market participants, including market makers and broker-dealers, engaged in unjust enrichment by profiting from trading irregularities, exploiting synthetic shares and naked short positions, and avoiding financial liabilities at the expense of retail investors.

q) Whether FINRA, SEC, DTCC, and associated broker-dealers violated investor protection laws by failing to address systemic vulnerabilities and permitting irregularities that undermined market transparency and fairness.

r) Whether retail investors, including the Plaintiff, are entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial and emotional harm suffered due to the Defendants' collective misconduct.

s) Whether Defendants' failures, omissions, and alleged misconduct reflect broader systemic flaws in the regulatory framework governing the securities markets, necessitating judicial intervention to safeguard market integrity and protect the rights of retail investors.

t) Whether the refusal to disclose critical trading data, such as Blue Sheets, impeded investors' ability to investigate claims of market manipulation and reconcile outstanding share discrepancies, further exacerbating financial harm.

u) Whether retail investors were disproportionately harmed compared to institutional participants, who avoided liabilities and profited from systemic market irregularities, creating an inequitable environment in violation of federal securities and antitrust laws.

## COUNT I:

## Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

222. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in manipulative practices, including the proliferation of synthetic shares, creation of artificial supply, and failure to ensure market transparency.

223. Defendants further violated Section 9(a) (15 U.S.C. § 78i(a)) by manipulating the price of MMTLP shares through artificial trading conditions, including naked short selling and synthetic share creation, designed to suppress share value and harm retail investors.

224. FINRA, SEC, DTCC, and AST/EQ violated Section 17(a) (15 U.S.C. § 78q(a)) by failing to maintain accurate records and ensure market transparency during the MMTLP-to-NBH transition. Their negligence in reconciling discrepancies in share ownership allowed systemic irregularities to persist.

225. Corporate Defendants, including Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons leadership, violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and discrepancies in outstanding shares.

226. Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors or failing to maintain accurate financial records related to MMTLP share discrepancies.

## COUNT II:

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 12–27) – Against All Defendants

227. Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by colluding to facilitate synthetic share creation, naked short selling, and other anti-competitive practices that suppressed competition and harmed retail investors.

228. GTS Securities and other market participants violated Section 2 of the Sherman Act (15 U.S.C. § 2) by seeking to monopolize trading activity in MMTLP shares, engaging in predatory practices to gain control over supply and demand dynamics.

229. Regulatory bodies, including FINRA, SEC, and DTCC, violated Section 7 of the Clayton Act (15 U.S.C. § 18) by failing to prevent concentrated market power and anti-competitive acquisitions.

230. Defendants collectively violated Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for recovery of damages resulting from anti-competitive actions.

## COUNT III:

### Negligence – Against All Defendants

231. FINRA, SEC, and DTCC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to prevent manipulative practices and maintain orderly markets. Their inaction regarding synthetic share creation and trading irregularities enabled systemic harm.

232. AST/EQ, acting as the designated transfer agent, violated Section 17A(c)(1) (15 U.S.C. § 78q-1(c)(1)) by failing to reconcile share discrepancies during the MMTLP-to-NBH transition, leaving retail investors in legal and financial limbo.

233. Defendants collectively breached their duty of reasonable care (Restatement (Second) of Torts § 283), resulting in foreseeable and avoidable harm to retail investors, including the Plaintiff.

234. Charles Schwab violated Rule 15c3-3 (17 C.F.R. § 240.15c3-3) by failing to safeguard customer securities, reconcile oversold positions, and conduct trading in good faith.

## COUNT IV:

### Failure to Resolve the FINRA U3 Halt – Against FINRA, SEC, and DTCC

235. FINRA, SEC, and DTCC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt in a timely and transparent manner, depriving shareholders of access to their investments.

236. FINRA's issuance of the U3 halt violated its obligations under Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) to maintain fair and equitable trading standards.

237. The SEC and FINRA failed to enforce prompt resolution of the U3 halt, violating their statutory duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)).

### COUNT V:

### Unjust Enrichment – Against All Defendants

238. Defendants violated Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15 U.S.C. § 78cc(b)) by profiting from illegal contracts involving synthetic shares and oversold positions.

239. Institutional market participants unjustly enriched themselves at the expense of retail investors by manipulating trading conditions to benefit from suppressed share prices.

### COUNT VI:

### Breach of Fiduciary Duty – Against Charles Schwab and AST/EQ

240. Charles Schwab and AST/EQ violated their fiduciary duties under Section 36(a) of the Investment Company Act (15 U.S.C. § 80a-35(a)) by failing to act in the best interests of their clients during the MMTLP-to-NBH transition.

241. Charles Schwab violated Rule 15c3-3 (17 C.F.R. § 240.15c3-3) by failing to protect customer funds and securities from systemic discrepancies.

242. AST/EQ violated Section 17A(c)(1) (15 U.S.C. § 78q-1(c)(1)) by neglecting its responsibility to reconcile share ownership and ensure accurate records.

36

## COUNT VII:

### Conspiracy to Commit Fraud – Against All Defendants

243. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by conspiring to manipulate securities markets through synthetic share creation and suppressing MMTLP's value.

244. Defendants violated 18 U.S.C. § 371 by conspiring to defraud the U.S. government and regulatory systems, as well as 18 U.S.C. § 1349 by engaging in a scheme to commit wire and securities fraud.

## COUNT VIII:

### Failure to Supervise – Against FINRA and SEC

245. FINRA and SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices like synthetic share creation.

246. Defendants also violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to establish adequate controls to monitor market access and prevent trading abuses.

## COUNT IX:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

247. Defendants' reckless disregard for foreseeable harm caused emotional distress to Plaintiff, violating their obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) to protect investors.

248. Defendants acted with intentional or reckless disregard for the emotional and financial toll of the U3 halt and systemic irregularities, directly causing harm.

## COUNT X:

## Breach of Contract and Anticipatory Breach – Against Charles Schwab

249. Charles Schwab violated its contractual obligations to Plaintiff by failing to execute trades, reconcile share discrepancies, and provide accurate account information during the MMTLP-to-NBH transition, as required under Rule 15c3-3 (17 C.F.R. § 240.15c3-3) and U.C.C. § 8-505, which mandate the protection of customer funds and securities.

250. Schwab breached its implied covenant of good faith and fair dealing, inherent in its brokerage agreements with the Plaintiff, by refusing to take corrective action to address share discrepancies and by allowing systemic irregularities to persist.

251. Schwab further committed anticipatory breach of its contractual obligations by issuing emails and statements to customers indicating that, regardless of FINRA's resolution of the U3 halt, MMTLP would never trade again at Schwab. This unequivocal repudiation of its duty to comply with any potential market resolutions or reinstatement of trading rights constitutes an anticipatory breach, undermining Plaintiff's rights under the brokerage agreement.

252. As a direct result of Schwab's breaches, Plaintiff and other retail investors suffered significant financial harm, including the inability to trade or recover the value of their MMTLP investments, and incurred emotional distress due to prolonged financial uncertainty.

## Defendant Inclusion Summary

253. The following Defendants, through their actions, omissions, negligence, incompetence, or intentional misconduct, contributed to systemic market failures, suppressed retail investor rights, and enabled manipulative and anticompetitive practices. Their collective conduct resulted in violations of federal securities laws, breaches of fiduciary duty, unjust enrichment, and significant financial and emotional harm to the Plaintiff. While the specific roles of each Defendant are detailed throughout this Complaint, the Defendants share culpability for creating and sustaining the conditions that led to these violations:

254. FINRA, SEC, and DTCC: These regulatory entities are included in Counts I, II, III, IV, VII, and VIII for their collective failure to fulfill statutory oversight responsibilities under federal securities laws. Their negligence enabled the proliferation of synthetic shares, naked short selling, and systemic market manipulation. FINRA's issuance of the indefinite U3 halt, without

timely resolution or transparency, further violated its obligations under Sections 17A and 19 of the Securities Exchange Act. The SEC and DTCC compounded the harm by failing to enforce compliance with clearing and settlement standards, leaving retail investors in financial and legal limbo.

255. GTS Securities: Included in Counts I, II, V, and VII for engaging in naked short selling, creating synthetic shares, and manipulating market dynamics. GTS exploited regulatory exemptions to gain monopolistic control over trading activity in MMTLP shares, profiting from suppressed share prices to the detriment of retail investors.

256. Charles Schwab: Included in Counts I, III, V, VI, IX, and X for breaching its fiduciary and contractual obligations to safeguard customer securities, reconcile oversold positions, and execute trades in good faith. Schwab's anticipatory breach of its brokerage agreements, through explicit communications stating that MMTLP would never trade again regardless of FINRA's resolution, demonstrates a blatant disregard for its clients' rights and financial well-being.

257. AST/EQ (Equiniti): Included in Counts I, III, IV, V, and VI for failing to reconcile synthetic shares with legitimate beneficial ownership during the MMTLP-to-NBH transition. AST/EQ's failure to provide accurate records and resolve discrepancies violated statutory obligations under Section 17A(c)(1) of the Securities Exchange Act, contributing to systemic harm for shareholders.

258. Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership: Included in Counts I, III, V, and VII for their roles in perpetuating trading irregularities and synthetic share proliferation. Corporate executives, including Gregory McCabe and John Brda, knowingly made misleading public statements about the value of Orogrande Basin assets and failed to address discrepancies in MMTLP shares, exacerbating harm to retail investors.

259. Corporate Leadership and Market Participants: The specific acts of recklessness, negligence, and intentional misconduct by the leadership of the named entities, as outlined in the Acts of Scienter, underscore their collective culpability. Their roles in enabling synthetic share creation, engaging in naked short selling, and manipulating market conditions directly contributed to the harm suffered by the Plaintiff and other retail investors.

260. By their actions and omissions, all Defendants have demonstrated a pattern of negligence, misconduct, and disregard for their statutory and fiduciary duties. Their collective conduct has undermined market integrity, suppressed retail investor rights, and violated federal securities, antitrust, and consumer protection laws.

261. Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

a) FINRA (Leadership under Robert W. Cook)

i. Reckless issuance of the U3 halt (December 9, 2022): FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or justification, despite knowledge of synthetic share proliferation and trading irregularities.

ii. Failure to resolve the U3 halt: FINRA neglected its statutory obligation to resolve the halt in a transparent and timely manner, violating Section 19(c) of the Securities Exchange Act and causing prolonged financial harm to investors.

iii. Intentional inaction despite awareness: Despite documented evidence and public complaints about synthetic shares, FINRA failed to conduct meaningful investigations or enforce compliance with federal securities laws.

iv. Omission of material facts in public communications: FINRA misled the market by failing to disclose the reasons for the U3 halt or the steps necessary to resolve the trading discrepancies.

b) SEC (Leadership under Gary Gensler)

i. Failure to enforce compliance with federal securities laws: The SEC neglected its oversight duties by failing to investigate or address systemic market irregularities, including synthetic share creation and naked short selling.

ii. Complicity in FINRA's inaction: The SEC allowed FINRA's U3 halt to persist indefinitely without requiring transparency or resolution, violating its statutory responsibilities under Sections 15A and 17A of the Securities Exchange Act.

iii. Neglect of investor protection responsibilities: Despite knowledge of investor harm caused by synthetic shares, the SEC failed to act in a manner consistent with its mission to protect retail investors.

iv. Deliberate regulatory apathy: The SEC's lack of intervention, despite its authority and duty to supervise FINRA and the DTCC, indicates intentional disregard for systemic failures.

c) DTCC (Leadership under Frank La Salla)

i. Failure to enforce settlement standards: The DTCC permitted unresolved fails-to-deliver and synthetic shares to proliferate, violating Section 17A(a)(1) of the Securities Exchange Act.

ii. Neglect of reconciliation duties: Despite its role as a clearing agency, the DTCC failed to reconcile outstanding shares, leaving retail investors in financial limbo during the MMTLP-to-NBH transition.

iii. Omission of material discrepancies: The DTCC did not disclose known settlement issues or irregularities, allowing manipulative practices to persist.

iv. Facilitation of manipulative trading practices: By failing to enforce proper clearing and settlement standards, the DTCC knowingly enabled the creation and trading of synthetic shares.

d) GTS Securities (Leadership under Ari Rubenstein)

i. Naked short selling: GTS Securities engaged in illegal naked short selling, flooding the market with synthetic shares and suppressing the price of MMTLP stock.

ii. Manipulation of supply and demand: GTS intentionally created artificial trading conditions to benefit from suppressed share prices, directly harming retail investors.

iii. Exploitation of regulatory exemptions: GTS used loopholes and exemptions in trading regulations to evade accountability for its manipulative practices.

iv. Profiteering from synthetic shares: GTS knowingly profited from trading synthetic shares while concealing its role in market manipulation.

e) Charles Schwab (Leadership under Rick Wurster)

     i. Trading of synthetic shares: Schwab knowingly facilitated the trading of counterfeit shares, failing to reconcile oversold positions despite documented discrepancies.

     ii. Anticipatory breach of contract: Schwab explicitly informed clients that MMTLP would not trade again, regardless of FINRA's resolution, demonstrating intent to avoid its obligations under brokerage agreements.

     iii. Neglect of fiduciary duties: Schwab failed to safeguard customer securities and funds, violating Rule 15c3-3 and fiduciary standards.

     iv. Failure to address customer complaints: Despite investor concerns and complaints about trading irregularities, Schwab intentionally ignored its obligation to act in its clients' best interests.

f) AST/EQ (Leadership under Jo Palmer)

     i. Failure to reconcile shares during the MMTLP-to-NBH transition: AST/EQ neglected its duties as a transfer agent by failing to provide accurate ownership records, violating Section 17A(c)(1).

     ii. Omission of material information: AST/EQ failed to disclose share discrepancies or conduct due diligence, leaving shareholders in financial uncertainty.

     iii. Neglect of due diligence responsibilities: Despite its role as the designated transfer agent, AST/EQ did not investigate or address irregularities in the reconciliation process.

     iv. Facilitation of synthetic share persistence: By failing to provide accurate records, AST/EQ contributed to the systemic harm caused by synthetic shares.

g) Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership (John Brda, George Palikaras, Gregory McCabe respectively)

     i. Misrepresentation of asset valuations: Gregory McCabe knowingly overstated the valuation of Orogrande Basin assets to inflate shareholder expectations and attract investments.

ii. Encouraging trading despite irregularities: John Brda encouraged buy orders for MMTLP shares while offloading his own holdings during periods of trading irregularities.

iii. Failure to address trading irregularities: Both McCabe and Brda neglected their fiduciary responsibilities to investigate and resolve synthetic share discrepancies, despite awareness of the harm caused to retail investors.

iv. Misleading shareholders: Public communications from leadership failed to disclose critical information about trading irregularities, share discrepancies, and synthetic share creation, misleading investors about the true state of their holdings.

### Action for Declaratory Judgment & Injunctive Relief #1

### Finding the Private Securities Litigation Reform Act (15 u.s.c. § 78u-4)

### Unconstitutional As Applied

### 1st ISSUE: SEPARATION OF POWERS

262. Plaintiff incorporates by reference all preceding paragraphs, including FACTS 1 through 219, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case. The PSLRA's restrictive provisions exacerbate the systemic injustices suffered by Plaintiff and other retail investors, necessitating its invalidation and an injunction against its continued enforcement.

263. The PSLRA infringes upon the separation of powers doctrine by imposing heightened pleading standards and discovery stays that impede the judiciary's ability to adjudicate securities fraud cases effectively. In the context of the MMTLP trading halt, these restrictions prevent retail investors from holding FINRA, the SEC, and market participants accountable for fraudulent conduct and systemic failures. By legislatively dictating procedural and evidentiary burdens that obstruct access to justice, the PSLRA undermines the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions.

### 2ND ISSUE: VIOLATIONS OF THE 1ST, 4TH, AND 15TH AMENDMENTS

264. Plaintiff incorporates by reference all preceding paragraphs.

265. The PSLRA's stringent pleading requirements violate the First Amendment by chilling access to the courts. In this case, the requirement to plead fraud with particularity places an insurmountable burden on retail investors seeking to challenge the systemic manipulation of MMTLP shares, including synthetic share creation and naked short selling. These manipulative practices are concealed within the operations of broker-dealers, clearinghouses, and regulators, making critical evidence inaccessible to Plaintiffs without discovery. The PSLRA effectively denies investors their right to petition the government for redress of grievances, a core First Amendment guarantee.

266. The PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability. In this case, the Act prevents Plaintiff from pursuing claims against FINRA, the SEC, DTCC, and market participants who profited from systemic manipulation. By insulating powerful financial entities, such as broker-dealers and market makers, from scrutiny, the PSLRA creates a two-tiered system of justice that favors well-resourced defendants at the expense of individual investors.

267. The PSLRA contravenes the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims. Its stay of discovery provisions prevent access to essential evidence—such as FINRA's decision-making process for the U3 halt and the DTCC's reconciliation records for synthetic shares—while simultaneously imposing heightened pleading standards. This procedural Catch-22 deprives investors of their right to a meaningful opportunity to be heard, a fundamental due process guarantee.

268. The PSLRA violates the Equal Protection Clause of the Fourteenth Amendment as it applies to state-law securities fraud claims. By preempting state-law remedies and imposing restrictive federal standards, the PSLRA limits access to justice for investors pursuing claims in state forums. This unequal treatment creates a de facto preference for corporate defendants, particularly broker-dealers and market makers, in violation of the Constitution's guarantee of equal protection under the law.

269. The PSLRA's safe harbor provision for forward-looking statements is particularly relevant to this case, as it incentivizes corporate malfeasance. Defendants, including market makers and corporate leadership, were shielded by this provision despite engaging in misleading conduct,

44

such as misrepresenting the value of MMTLP shares and suppressing shareholder access through the U3 halt. This legislative overreach disrupts the balance between investor protection and corporate accountability, directly undermining the goals of federal securities laws.

270. The PSLRA's legislative history demonstrates significant lobbying influence by industry groups, further evidencing regulatory capture. The Act's provisions favor institutional actors, such as those responsible for the manipulation of MMTLP shares, while denying retail investors a fair opportunity to pursue their claims. This systemic bias prioritizes the interests of financial entities over the public interest, violating principles of fairness and trust in the regulatory framework.

271. The PSLRA's impact on judicial economy is evident in this case. Its procedural barriers require Plaintiffs to meet heightened pleading standards based on incomplete information, increasing the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss without a full evidentiary record, leading to inefficiencies that undermine the objectives of federal procedural rules.

272. The PSLRA's limitations on joint and several liability exacerbate the harm caused by Defendants' collusive conduct. In this case, multiple market participants—including broker-dealers, FINRA, and the DTCC—acted in concert to manipulate MMTLP shares and suppress retail investor rights. By restricting liability to a proportional basis, the PSLRA shields culpable entities from full accountability and leaves victims inadequately compensated for their losses.

**WHEREFORE:**

273. For the reasons stated above, Plaintiff seeks:

    a) Declaratory Relief: A judicial declaration that the PSLRA is unconstitutional as applied in this case. Its provisions conflict with fundamental constitutional principles, including separation of powers, due process, and equal protection, and undermine the rights of retail investors harmed by systemic market manipulation.

    b) Injunctive Relief: An injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic manipulation and regulatory failures.

c) Restoration of Judicial Authority: An order affirming the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring that investors retain access to justice and a meaningful opportunity to hold Defendants accountable.

## Action for Declaratory Judgement & Injunctive Relief #2

## Constitutional Challenge to the Structure and Authority of the Financial Industry

## Regulatory Authority (FINRA)

274. The Plaintiff hereby challenges the constitutional authority and corporate structure of the Financial Industry Regulatory Authority (FINRA) on three grounds: separation of powers, the Appointments Clause, and unconstitutional delegation of legislative power. FINRA wields significant executive authority—such as suspending trading, enforcing securities laws, and imposing sanctions—without presidential oversight, violating the President's Article II duties. Its Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's members rather than through constitutionally required processes under the Appointments Clause. Furthermore, the SEC's delegation of broad regulatory powers to FINRA represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch, compounding the constitutional concerns surrounding its governance and operations.

### Allegation 1: Violation of the Separation of Powers

275. Plaintiff alleges that the Financial Industry Regulatory Authority (FINRA) operates in violation of the separation of powers doctrine established by the United States Constitution. Under Article II, Section 1, all executive power is vested in the President of the United States, and under Article II, Section 3, the President is tasked with ensuring that the laws are faithfully executed. These provisions centralize executive authority and require that any entity exercising executive powers must remain accountable to the President.

a) FINRA exercises significant executive powers, including suspending trading in securities, enforcing compliance with the Securities Exchange Act of 1934 (15 U.S.C. § 78), conducting investigations, enacting rules, and imposing sanctions. However, FINRA operates independently of presidential oversight. Its Board of Governors is not appointed or removable by the President but instead selected by its private membership. Even the Securities and Exchange

46

Commission (SEC), which oversees FINRA to a limited degree, can only remove FINRA's Board of Governors for willful violations of the law, abuse of authority, or unjustified failure to enforce regulations (15 U.S.C. § 78s(h)(4)(B)). This limited oversight underscores FINRA's insulation from presidential control.

b) In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must remain accountable to the President to preserve the separation of powers. Like the Public Company Accounting Oversight Board (PCAOB) in that case, FINRA wields executive power without sufficient accountability to the executive branch. This lack of accountability undermines the constitutional framework and impermissibly impedes the President's ability to fulfill their constitutional duties under Article II.

c) Therefore, FINRA's structure, which grants it significant executive powers while shielding it from presidential oversight, violates the separation of powers doctrine and the constitutional design for ensuring accountability in the exercise of governmental authority.

Allegation 2: Violation of the Appointments Clause

276. Plaintiff alleges that the structure and appointment process of the Financial Industry Regulatory Authority (FINRA) violate the Appointments Clause of the United States Constitution, which governs the selection of officers who exercise significant authority under federal law. Article II, Section 2, Clause 2 of the Constitution requires that principal officers of the United States be appointed by the President with the advice and consent of the Senate. Alternatively, Congress may vest the appointment of inferior officers in the President alone, courts of law, or heads of departments.

a) FINRA's Board of Governors wields substantial authority under federal law, including the power to enact rules, enforce securities regulations, conduct disciplinary proceedings, and impose sanctions. These functions qualify its Board members as "officers of the United States" under the criteria established in Buckley v. Valeo, 424 U.S. 1 (1976), which defined officers as individuals exercising significant authority under U.S. law. Despite this, FINRA's Board is not appointed by the President, nor is it confirmed by the Senate. Instead, Board members are

selected by FINRA's private membership, bypassing the constitutional process for appointing officers.

b) This appointment process violates the Appointments Clause. Under Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Edmond v. United States, 520 U.S. 651 (1997), officers exercising significant independent authority under federal law must be appointed in conformity with Article II. The Supreme Court has emphasized that the Appointments Clause is essential for maintaining accountability and separation of powers by ensuring that officers of the United States are appointed through constitutionally mandated procedures.

c) Furthermore, if members of FINRA's Board are deemed inferior officers, their appointments must still comply with the Appointments Clause. They must be appointed by the President, courts of law, or the head of a department. Since FINRA's private membership does not constitute a "department" under Article II, its process for appointing Board members remains unconstitutional, even if Board members are classified as inferior officers.

d) Accordingly, the selection of FINRA's Board of Governors by its membership violates the Appointments Clause of the United States Constitution and undermines the accountability required for individuals exercising significant authority under federal law.

<u>Allegation 3: Unconstitutional Delegation of Legislative Authority</u>

277. Plaintiff alleges that the delegation of broad regulatory and rulemaking authority to the Financial Industry Regulatory Authority (FINRA) violates the nondelegation doctrine enshrined in Article I, Section 1 of the United States Constitution, which vests all legislative powers in Congress. This doctrine prohibits Congress from delegating its legislative authority to any entity, particularly private organizations or entities outside the legislative branch, without clear and specific guidance.

a) Under the Securities Exchange Act of 1934 (15 U.S.C. § 78o-3(b)), Congress authorized the SEC to delegate significant rulemaking, enforcement, and disciplinary powers to FINRA. These powers include the ability to draft and enforce securities regulations, conduct investigations, impose sanctions, and govern the conduct of broker-dealers. However, Congress

provided only minimal guidance regarding the scope and limits of these powers, effectively granting FINRA quasi-legislative authority to create and enforce securities laws.

b) The delegation is further problematic because FINRA operates as a private, self-regulatory organization rather than a public entity directly accountable to the federal government. Unlike public agencies, FINRA lacks the safeguards of political accountability inherent in entities operating within the constitutional structure. In A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the Supreme Court invalidated a delegation of legislative authority to a private industry group, holding that Congress cannot abdicate its legislative responsibilities or allow private entities to govern in the absence of clear legislative standards. Similarly, in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928), the Court held that any delegation of legislative authority must include an "intelligible principle" to guide its exercise. Congress's delegation to FINRA fails this test by granting it sweeping, unsupervised authority with few meaningful constraints.

c) If FINRA is deemed part of the federal government, the delegation remains unconstitutional because it transfers legislative powers to an executive body without sufficient limitations, violating the separation of powers. If FINRA is considered a private entity, the delegation is even more constitutionally suspect because it grants quasi-legislative powers to a body entirely outside the constitutional framework.

d) Therefore, the SEC's delegation of legislative authority to FINRA violates the nondelegation doctrine and impermissibly allows a private, quasi-governmental entity to exercise powers reserved for Congress under Article I of the Constitution.

### Supplemental Authority from Alpine Securities Corp. v. FINRA

278. On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America, Case No. 1:23-cv-01506. This decision provides substantial support for Plaintiff's claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

279. The DC Circuit ruled that FINRA's expulsion orders violated the private nondelegation doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain ultimate authority to approve or disapprove the private entity's actions. The lack of such oversight rendered FINRA's actions unconstitutional.

280. In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions, including financial ruin and the destruction of Alpine's business before full SEC review and the balance of equities and public interest in ensuring fair regulatory processes.

Applicability to Plaintiff's Case

281. The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by FINRA on December 09, 2022 was similarly imposed without any prior validation or review by the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to Plaintiff.

282. As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. Plaintiff respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable Plaintiff and other investors to close their positions.

**Supplemental Authority from SEC v. Sloan**

283. In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

284. The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification. The ruling emphasized two central principles; 1. regulatory agencies must adhere to statutory and procedural limits in exercising their authority

and 2. prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

## Applicability to Plaintiff's Case

285. The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite U3 halt on [MMTLP or relevant stock]. While Sloan addressed the SEC's actions, the principles articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

286. The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

287. In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

## Reinforcing the Need for Injunctive Relief

288. The Sloan precedent reinforces Plaintiff's request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

## Integration of Sloan with Alpine

289. When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by Plaintiff.

**WHEREFORE**

290. For the reasons stated above, Plaintiff seeks:

a) Declaratory Judgment Regarding the Constitutionality of FINRA's Structure and Authority: The Plaintiff respectfully requests that this Court declare the structure and authority of the Financial Industry Regulatory Authority (FINRA) unconstitutional on the grounds of violating the separation of powers, the Appointments Clause, and the nondelegation doctrine. The Court is asked to hold that FINRA's structure, including its private membership-appointed Board of Governors, its lack of presidential oversight, and its delegated legislative authority, is inconsistent with the constitutional framework established by Articles I and II of the U.S. Constitution.

a) Declaratory Relief: The Plaintiff seeks a declaration that the SEC's delegation of legislative and quasi-legislative powers to FINRA is unconstitutional under the nondelegation doctrine, as it provides excessive and unsupervised authority to a private, self-regulatory organization without meaningful legislative guidance or oversight.

b) Declaration Mandating Structural Reforms to FINRA: The Plaintiff respectfully requests that the Court declare that FINRA's governance structure and processes must be reformed to comply with the Constitution, including the Appointments Clause, and to ensure accountability to the executive branch and adherence to legislative limits.

c) Declaration Regarding the Indefinite Nature of the Halt: The Plaintiff seeks a declaration that FINRA's indefinite U3 trading halt was inconsistent with statutory requirements and exceeded its regulatory authority, as defined in *SEC v. Sloan* and other applicable legal precedents.

d) Declaration Affirming FINRA's Overreach: The Plaintiff respectfully requests that this Court declare that FINRA's imposition of the U3 trading halt on December 9, 2022, was unconstitutional, improperly executed, and in violation of shareholders' rights under federal securities laws and constitutional principles.

e) Declaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the

Fifth Amendment by disproportionately burdening small investors and shielding institutional actors, thereby creating a two-tiered system of justice.

g) Injunction to Prevent Further FINRA Overreach: The Plaintiff respectfully requests that this Court issue an injunction barring FINRA from imposing indefinite or improperly justified trading halts in the future without explicit statutory authority and proper SEC review, in line with the precedents set forth in *Alpine Securities Corp. v. FINRA* and *SEC v. Sloan*. This injunction should also mandate procedural safeguards to ensure FINRA's compliance with constitutional and statutory limits.

h) Injunction to Reinstate Trading in MMTLP Shares: The Plaintiff respectfully requests injunctive relief directing FINRA to reinstate trading in MMTLP shares or to facilitate a resolution that allows investors to close their positions and realize the fair value of their holdings, addressing the irreparable harm caused by the improper U3 halt.

i) Injunction Requiring the Release of Blue Sheets: The Plaintiff respectfully requests that the Court order the release of Blue Sheet data for MMTLP and MMAT transactions to provide transparency into the allegations of market manipulation, including synthetic share creation and naked short selling, and to restore trust in the fairness of the market.

## VI.    **CONCLUSION**

291. The Plaintiff, Sergeant Major Daniel R. Auxier, has brought this action to address systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

a) FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and

ensure market integrity. These organizations failed to investigate or remedy widespread irregularities such as synthetic share creation and naked short selling, which manipulated the market for MMTLP shares. The Defendants' inaction enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

b) The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability exacerbated the harm suffered by investors. These leaders neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

c) The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this case are emblematic of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

d) In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

e) This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

f) The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

g) In bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation, systemic negligence, and constitutional violations. By addressing these issues, this Court has the opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded.

## VII.    **PRAYER FOR RELIEF**

**WHEREFORE,**

292. Plaintiff prays for judgment in his favor and relief as follows:

a) Declaratory Judgment 1 & Injunctive Relief: Issue a declaration and corresponding injunctive relief finding that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

b) Declaratory Judgment 2 & Injunctive Relief: Issue a declaration and corresponding injunctive relief challenging the structure and authority of the Financial Industry Regulatory Authority (FINRA) as unconstitutional, given its lack of adequate governmental oversight and accountability, which has resulted in improper and prejudicial actions, including the imposition and handling of the U3 trading halt on MMTLP shares.

c) A declaration that Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), and other applicable federal regulations, as well as the Sherman Antitrust

Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties owed to retail investors.

d) A declaration that FINRA's U3 trading halt on MMTLP shares, imposed on December 9, 2022, and lifted on December 13, 2024, was improper, prejudicial, and constituted a violation of regulatory responsibilities owed to the investing public, thereby causing material harm to over 65,000 shareholders, including Plaintiff.

e) An order awarding compensatory damages to Plaintiff in an amount to be determined at trial, including:

i. The loss of value and liquidity of Plaintiff's MMTLP shares resulting from Defendants' misconduct.

ii. Damages arising from the suppression of share prices and trading opportunities caused by synthetic share creation, naked short selling, and the improper U3 halt.

iii. Recovery of Plaintiff's documented financial losses exceeding $245,671, along with additional losses sustained from systemic harm to market value, including the unresolved status of Plaintiff's 800 MMATQ shares filed in a valid Statement of Interest with the U.S. Bankruptcy Court, Nevada.

f) An award of compensatory damages, not less than $250,000, for emotional distress and mental anguish caused by Defendants' prolonged misconduct, failure to resolve the U3 halt, and refusal to provide clarity or remedies for trading irregularities, particularly during Plaintiff's overseas deployment as Command Sergeant Major.

g) An order awarding treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act for Defendants' anticompetitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including the Plaintiff.

h) An order requiring injunctive relief to ensure market transparency and prevent similar systemic failures, including:

i. A full audit of all MMTLP and MMAT share transactions, including the identification and reconciliation of synthetic shares and beneficial ownership records.

ii. The public release of all records, communications, and trading data related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

iii. A mandate requiring Defendants, including regulatory bodies and corporate leadership, to implement and enforce enhanced oversight mechanisms to prevent the proliferation of synthetic shares, naked short selling, and other manipulative practices.

i) An order requiring the disgorgement of profits wrongfully obtained by Defendants through the trading of synthetic shares, naked short selling, and related market manipulation, including unjust enrichment by market makers, broker-dealers, and transfer agents.

j) An award of punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

k) An order requiring the Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA) to:

i. Establish clearer guidelines for regulatory intervention in cases of market irregularities.

ii. Improve oversight and accountability measures to ensure transparency in corporate actions, trading halts, and share reconciliations.

l) A declaration that the arbitration agreement entered into with Charles Schwab, formerly TD Ameritrade, be deemed null and void pursuant to violations of the Sherman Antitrust Act (15 U.S.C. § 1) and the Clayton Act (15 U.S.C. § 14), as the agreement was tied to and perpetuates anticompetitive practices and monopolistic behaviors that restrain trade and suppress competition.

m) An order affirming Plaintiff's entitlement to equitable relief for the market and procedural irregularities affecting MMTLP shares, including the submission of TD Ameritrade (Schwab) trade confirmations (sell orders), ranging from $43.21 to $417 per share, for 20,075 shares, as reward for the improper halting of trades intended for December 9 and 12, 2024.

n) An order affirming Plaintiff's entitlement to equitable relief for the market and procedural irregularities affecting MMAT shares, including the submission of TD Ameritrade

(Schwab) trade confirmations (sell orders), ranging from $13.45 to $26.78 per share, for 76,543 shares, as reward for the devaluation of MMAT after the improper halting of MMTLP trades intended for December 9 and 12, 2024.

o) An award of pre- and post-judgment interest on all compensatory damages to account for the time value of Plaintiff's losses and to ensure full recovery of the harm caused.

p) An award of Plaintiff's reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any costs associated with expert analysis or testimony.

q) Any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct and restore trust in U.S. financial markets.

## VIII.  **DEMAND FOR JURY TRIAL**

293. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: 02 DEC 2024

SGM Daniel R. Auxier, pro se ipso
105 Valley Road
Wantage, NJ, 07461

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Sergeant Major Daniel R. Auxier, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 02 DEC 2024

Signature:

**Name:** Sergeant Major Daniel R. Auxier

FOIA TRAFFIC   SEC & FINRA
"pre-hast"

Non Responsive Record

# APPENDIX A

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, November 29, 2021 5:03 PM
**To:** (b)(6); (b)(7)(C)          @SEC.GOV>; (b)(6); (b)(7)(C)          @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C)          @SEC.GOV>; Casimates, Patricia
<Patricia.Casimates@finra.org>
**Subject:** RE: Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C)         I believe it was Patti Casimates from our Market Ops group who reached out
to (b)(6); (b)(7)(C) I have included her on the email so you can reach out to her directly. Hope all is
well!

Sam

Non Responsive Record

Non Responsive Record

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:07 AM
**To:** (b)(6); (b)(7)(C) @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C) @SEC.GOV>; (b)(6): (b)(7)(C) @SEC.GOV>; Boyle, Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
**Subject:** RE: Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C) -looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office—but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a zoom and feel free to let me know if (b)(6); (b)(7)(C) or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

Sam

Non Responsive Record

Non Responsive Record

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:29 AM
**To:** (b)(6); (b)(7)(C) @SEC.GOV>
**Cc:** Boyle, Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org> (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C) @SEC.GOV>
**Subject:** RE: Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C) I sent you and (b)(6); (b)(7)(C) the zoom invite for 1pm today. Look forward to talking to
you.

Non Responsive Record

| | |
|---|---|
| **From:** | Boyle, Richard |
| **To:** | (b)(6); (b)(7)(C) |
| **Cc:** | Gibbon, Jay |
| **Subject:** | Meta Materials Inc. (MMAT and MMTLP) / Next |
| **Date:** | Friday, December 2, 2022 10:46:34 AM |
| **Attachments:** | image001.png |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning (b)(6); (b)(7)(C) I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market Fraud Investigations team recently received several tips that appear to have also been sent to the SEC. Below are some proposed times to discuss but we can work around your schedules if these don't work for you. Thanks.

Monday – between 11:30 ET and 2:30 ET or between 4:30 ET and 5:30 ET
Tuesday – between 4:30 ET and 5:30 ET

**Rich Boyle**
National Cause and Financial Crimes Detection Programs | 15200 Omega Drive, Suite 210 | Rockville, MD 20850
Phone: (240) 386-5008 | richard.boyle@finra.org | www.finra.org

# FINCA

Confidentiality Notice:: Information contained in or attached to this email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error. If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.

# FINra.

**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc.
("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc.
(OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an
extraordinary event has occurred or is ongoing that has caused or has the potential to cause
significant uncertainty in the settlement and clearance process for shares in MMTLP and
that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and
the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective
Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8,
2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that
**"...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred
Stock of Meta shall be cancelled."** Available here:
https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.ht
m.

Questions regarding this notice can be directed to: FINRA Market Operations at
(866) 776-0800, Option 2.

22 DEC 23

CONGRESS oF INQUIREY
@ SEC & FINRA

# Congress of the United States
## Washington, DC 20510

December 22, 2023

The Honorable Gary Gensler
Chair
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Mr. Robert W. Cook
President & Chief Executive Officer
Financial Industry Regulatory Authority
1735 K Street NW
Washington, D.C. 20006

Dear Chairman Gensler and Mr. Cook:

We write to request that the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) review events surrounding Meta Materials Series A preferred shares (MMTLP).

As you know, MMTLP was created during a merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders.[1] MMTLP shares began trading on the OTC market in 2021. In the summer of 2022, the SEC received and subsequently approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons (NBH).[2] On December 9, 2022, FINRA issued a U3 halt on trading in the company's stock, preventing shareholders from making further trades.[3] Since the halt, constituent investors have contacted Members of Congress regarding the spin-off transaction and the subsequent halt on trading. Specifically, we have received more than 40,000 letters from concerned investors.[4]

Many of our constituents have concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP. As you know, the securities industry is regulated by a disclosure-based regime, and transparency is paramount to FINRA's and the SEC's goals of protecting investors and ensuring market integrity. We believe it is appropriate that FINRA and

---

[1] *Securities and Exchange Commission, EDGAR,* "Torchlight Announces Payment of a Special Series A Preferred Stock Dividend, a 1:2 Reverse Stock Split and Planned Closing of the Arrangement Agreement with Meta Material, Inc." https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm (last visited Dec. 8, 2023).
[2] Press Release, Meta Materials, "Meta Materials Inc. Board of Directors Approves Planned Completion of the Spin-off of Next Bridge Hydrocarbons Inc.," https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last visited Dec. 8, 2023).
[3] Daily Notice, FINRA, "Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022," https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf, (last visited Dec. 8, 2023).
[4] CONGRESSIONAL RESEARCH SERVICE, Meme Stock MMTLP and FINRA Trading Halt, (Aug. 21, 2023) https://www.crs.gov/Reports/IN12228.

the SEC review these market events and determine what, if any, wrongdoing may have occurred in order to dispel misinformation and properly safeguard investors.

Please provide a response to the following questions and requests no later than January 31, 2024:

1. Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2. The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3. Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4. Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5. Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6. Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7. How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8. Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9. Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

---

[5] Brandon Kochkodin, *MMTLP: The Wild Saga of the Meme Stock That's Left Thousands of Shareholders with Noting,* Forbes Middle East, (Apr. 27, 2023) https://www.forbesmiddleeast.com/money/markets/mmtlp-the-wild-saga-of-the-meme-stock-thats-left-thousands-of-shareholders-with-nothing.

U.S. broker dealers, all shares held offshore that were traded and never settled through the appropriate clearing channels, and the ability to provide the location associated with each short position identified above.

10. Have all MMTLP shareholders received their NBH shares?

11. In your view, did MMTLP investors knowingly enter into a risk-taking transaction with full understanding of material information and without misleading guidance from social media or elsewhere? For example, the SEC has charged social media influencers with manipulation schemes in the past.[6]

12. In your view, are there better ways to provide transparency and clarity regarding risk disclosures that could enhance market integrity and reduce market disruptions? For example, retail investors and experts (e.g., OTC Markets Group's vice president) were reportedly confused about MMTLP's final trading date.[7] As such, investors may not have been able to optimize their investment decisions.

13. Do you have evidence to suggest the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares, that could distort the market?

14. Have you seen any indications of insider trading and/or pump and dump related to MMTLP transactions?

15. Are your organizations willing to work with NBH to determine a resolution for existing shareholders?  For example, some investors have expressed concern that, even though their brokerage account statements include shares of NBH in their account, these shares may not have actually been delivered to their broker-dealers.

16. Identify any regulatory or legislative gaps that should be addressed to ensure the SEC, FINRA, and other regulated entities may better protect investors and strengthen market integrity.

We look forward to your response. Thank you for your attention to this important matter.

Sincerely,

Ralph Norman
Member of Congress

Pete Sessions
Member of Congress

---

[6] Press Release, Securities and Exchange Commission, "SEC Charges Eight Social Media Influencers in $100 Million Stock Manipulation Scheme Promoted on Discord and Twitter," (last visited December 8, 2023).
[7] *Supra,* note 5.

Bill Posey
Member of Congress

Alex Mooney
Member of Congress

Bryan Steil
Member of Congress

Mike Flood
Member of Congress

Bryon Donalds
Member of Congress

Erin Houchin
Member of Congress

Barry Loudermilk
Member of Congress

Scott Fitzgerald
Member of Congress

William Timmons
Member of Congress

Warren Davidson
Member of Congress

Michael V. Lawler
Member of Congress

John Rose
Member of Congress

Andy Ogles
Member of Congress

Marcy Kaptur
Member of Congress

Jeff Van Drew
Member of Congress

Joe Wilson
Member of Congress

Stephanie Bice
Member of Congress

Ron Estes
Member of Congress

Mike Ezell
Member of Congress

John Rutherford
Member of Congress

Eli Crane
Member of Congress

Raul M. Grijalva
Member of Congress

Delia Ramirez
Member of Congress

Betty McCollum
Member of Congress

Linda T. Sánchez
Member of Congress

Darren Soto
Member of Congress

Bill Johnson
Member of Congress

Daniel Webster
Member of Congress

Troy E. Nehls
Member of Congress

Jeff Duncan
Member of Congress

Russell Fry
Member of Congress

Brian Fitzpatrick
Member of Congress

Lisa McClain
Member of Congress

Andy Harris, M.D.
Member of Congress

Andy Biggs
Member of Congress

Tim Walberg
Member of Congress

Diana Harshbarger
Member of Congress

Virginia Foxx
Member of Congress

Randy Feenstra
Member of Congress

Randy Weber
Member of Congress

Adrian Smith
Member of Congress

Scott Franklin
Member of Congress

Marc Molinaro
Member of Congress

John Moolenar
Member of Congress

Paul A. Gosar, D.D.S.
Member of Congress

Doug Lamborn
Member of Congress

Nancy Mace
Member of Congress

Barry Moore
Member of Congress

Victoria Spartz
Member of Congress

Carlos A. Gimenez
Member of Congress

Beth Van Duyne
Member of Congress

Nick Langworthy
Member of Congress

Earl L. "Buddy" Carter
Member of Congress

Mike Carey
Member of Congress

Nicole Malliotakis
Member of Congress

Lance Gooden
Member of Congress

Gus M. Bilirakis
Member of Congress

John Joyce
Member of Congress

James Comer
Member of Congress

Maria Elvira Salazar
Member of Congress

Cory Mills
Member of Congress

W. Gregory Steube
Member of Congress

Matthew M. Rosendale
Member of Congress

Claudia Tenney
Member of Congress

Matt Gaetz
Member of Congress

Jenniffer Gonzalez-Colon
Member of Congress

August Pfluger
Member of Congress

Nick LaLota
Member of Congress

Rich McCormick, MD, MBA
Member of Congress

Jen Kiggans
Member of Congress

Max Miller
Member of Congress

Lauren Boebert
Member of Congress

08 NOV 24

SHAREHOLDER RFI

NBH

Unanswered

*From the Desk of:*
Sergeant Major Daniel R. Auxier, US Army
105 Valley Road
Wantage, NJ 07461

08 November 2024

**TO:** Mr. Greg McCabe et al, Next Bridge Hydrocarbons, 6300 Ridglea Place, Suite 650, Fort Worth, TX 76116.

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

## 1. BACKGROUND

On December 9, 2022, FINRA issued a U3 halt on Meta Materials Series A Preferred Stock (MMTLP), suspending trading due to an "extraordinary event." This decision prevented trading before the stock's planned delisting and conversion into private shares, leading to investor concerns about transparency and accountability. To date, and to my knowledge, no resolution or financial remedy has been actioned to address the shareholder impact.

## 2. PURPOSE

Under Texas law, shareholders have a right to request information from companies, especially in cases where corporate actions or inactions appear detrimental to shareholder value. Section 21.218 of the Texas Business Organizations Code specifically entitles shareholders to access company records to investigate possible misconduct, assess management practices, and protect investments.

## 3. DUTIES & RESPONSIBILITIES

Directors and officers of private companies must uphold fiduciary duties of loyalty, care, and good faith, acting in shareholders' best interests without conflicts of interest. Texas law, reinforced by federal securities regulations (e.g., the Securities Act of 1933), supports these obligations. As a shareholder, I am requesting access to information and documents to verify NBH's adherence to these fiduciary responsibilities.

## 4. RIGHTS FOR DISCOVERY

Texas law, specifically Texas Business Organizations Code Section 21.218, provides shareholders with the right to access company records to investigate potential mismanagement or

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

misconduct. Additionally, SEC Rule 10b-5 under the Securities Exchange Act of 1934 supports transparency, allowing shareholders to use such records to assess any potential fraud or negligence. Based on this legal framework, I request the following information and documents to evaluate NBH's recent actions and corporate governance.

## 5. REQUEST FOR INFORMATION

Please provide a response to the following questions and requests for documentation within **14 calendar days** of receipt of this memorandum.

**Question 1**

Has the transfer agent, American Stock Transfer & Trust Company (now Equiniti), confirmed to NBH that all 165 million shares of NBH (formerly MMTLP) have been delivered, transferred, and recorded under the names of rightful shareholders?

1. **Verification of Delivery**: If all shares have been delivered and recorded, on what date did NBH confirm this?
2. **Share Count Status:** If Equiniti has not confirmed that all 165 million shares are accounted for and assigned to shareholders, what is the total number of shares that have been delivered to date?
3. **Response to Potential Naked Short Selling**: Shareholders whose shares have not been accounted for by Equiniti may have received unregistered shares (potentially indicating "naked short selling"). What is NBH doing to resolve any discrepancies in share counts across broker-dealers such as Robinhood, Webull, E*TRADE, and others?
4. **Identification of Beneficial Owners**: What steps are being taken to identify any shareholders with broker-dealer accounts that may hold unaccounted shares? Is NBH considering further stock dilution to resolve any outstanding share imbalance?
5. **Remedial Actions**: If shares cannot be provided to certain shareholders due to all shares being accounted for by Equiniti, what legal or financial remedies is NBH exploring to resolve this issue?
6. **Supporting Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

**Question 2**

The NBH website advises that shareholder registration with Equiniti is currently optional. Please clarify:

1. **Rationale for SEC Involvement**: Why was the S-1 filing for the formation of Newco withdrawn at the SEC's request, and what led to this decision?
2. **Status of Newco Subsidiary**: What is the status of the Newco subsidiary? Are there plans to revisit or refile the S-1?
3. **Impact on Shareholder Value**: How does the delay in creating this subsidiary affect shareholder investments, particularly concerning assets like the Orogrande Prospect?

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

4. **Optional Registration**: Why is registration with Equiniti Trust Co. optional, and what advantages or disadvantages exist for shareholders in choosing this option?
5. **Future Registration Triggers**: What specific event or timeline would necessitate a shift to mandatory registration with Equiniti?
6. **Direct Registration Benefits**: How does direct registration compare with registering with Equiniti in terms of shareholder protections, liquidity, and ease of transfer?
7. **Strategic Changes and Subsidiary Plans**: Have there been strategic changes affecting the formation of Newco or any dividends? If so, what is the revised plan for NBH's assets, and how does this impact shareholders?
8. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

## Question 3

NBH recently lost its lease to the "University Lands" related to the Orogrande asset. This decision could significantly impact company operations and revenue. Please address the following:

1. **Reason for Lease Termination**: Why did the University Lands System choose not to renew the lease? Were there proposals offered by NBH to maintain the agreement?
2. **Alternative Revenue Sources**: What specific steps is NBH taking to secure alternative sources of revenue to mitigate this asset loss?
3. **Impact on Strategy**: Will the loss of Orogrande impact NBH's strategic direction or planned investments?
4. **Short-Term Financial Impacts**: How does the current financial outlook reflect the loss of this asset, and what are the anticipated impacts on shareholder value?
5. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

## Question 4

NBH recently signed a Letter of Intent to acquire a 40% interest in the Louisiana Heritage Play (LHP) from McCabe Petroleum Corporation. Please clarify:

1. **Conflict of Interest**: Does acquiring LHP from McCabe Petroleum Corporation, given Mr. McCabe's role as NBH's Chairman of the Board, present any conflicts of interest?
2. **Synergies and Strategic Fit**: What specific synergies are expected from acquiring the Louisiana Heritage Play, and how does this acquisition align with NBH's long-term goals?
3. **Financial Risks**: What shareholder benefit and financial risks are associated with the Louisiana play?
4. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

3

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

## Question 5

In August 2023, NBH secured a $2 million loan from CAPCO Holding Inc., owned by Clinton Plant, at a 12% interest rate with an additional 250,000 stock options as collateral. Mr. Plant also secured a $10,000 per month consulting role. Please address the following:

1. **Justification for the Loan Terms:** What rationale and justification did NBH use to accept this loan and its terms, given the higher-than-average interest rate?
2. **Independent Oversight:** Was this loan arrangement reviewed by an independent board or financial advisor to prioritize shareholder interests?
3. **Alternative Financing Considered:** Were other lending institutions or terms considered?
4. **Consulting Services Provided:** What specific consulting services is Mr. Plant providing, and how do these services align with NBH's strategic goals?
5. **Documentation:** Please provide all public records and business documents that substantiate your responses to these questions.

---

## 6. DISCLAIMER

This memorandum is being sent both via registered US Mail and digitally to your official email addresses. Please confirm receipt via email immediately. Failure to acknowledge and/or respond fully within **14 calendar days** will prompt a formal demand letter and may lead to further action as outlined by Texas and federal law.

## 7. POINT OF CONTACT

For any questions or clarifications, please contact:
**Sergeant Major Daniel R. Auxier**
**Phone:** (401) 523-7559
**Email:** danforward14@gmail.com

AUXIER.DANIEL.RO
BERT.1012621058

Digitally signed by
AUXIER.DANIEL.ROBERT.1012621
058
Date: 2024.11.09 09:16:09 -05'00'

**DANIEL R. AUXIER**
Sergeant Major, US Army
Next Bridge Hydrocarbons Shareholder

4

*[Handwritten notes: "18 NOV 24" at left; at top right: "SHARE HOLDER B&R / NBH / Served to McCabe / 19 NOV 24 / Unanswered    1"]*

**November 18, 2024**

Greg McCabe
Chairman of the Board
Next Bridge Hydrocarbons
6300 Ridglea Place, Suite 950
Fort Worth, TX 76116

**Subject:** Formal Request for Access to Books and Records Pursuant to Texas Business Organizations Code Section 21.218

Dear Mr. McCabe,

We, as a group of shareholders of Next Bridge Hydrocarbons ("NBH"), formally invoke our rights under **Section 21.218 of the Texas Business Organizations Code** to request access to specific books and records of NBH. This request is made in good faith for the legitimate purpose of investigating potential mismanagement, breaches of fiduciary duty, and actions that may have detrimentally affected shareholder value.

---

## Requested Documents and Records

### 1. Board and Management Communications

a. Board meeting minutes, resolutions, and presentations related to:
 i. The reverse merger between Torchlight Energy and Meta Materials.
 ii. The spin-out of oil and gas assets into NBH.
 b. Internal communications, including emails, exchanged between board members and executive officers including but not limited to yourself, John Brda, George Palikaras and Clifton DuBose regarding these transactions.

### 2. Financial Records

a. Audited financial statements and annual reports for the preceding two fiscal years.
b. Documentation regarding stock issuances and allocations associated with the spin-out of NBH.

### 3. Consulting and Employment Agreements

a. Contracts or consulting agreements involving yourself, John Brda, George Palikaras, Clifton DuBose, Rich Masterson, Clinton Plant or any and all other executives with Torchlight, Meta Materials, or NBH, including terms of compensation and delineation of responsibilities.

**4. Lease and Asset Records**

a. Documentation and communications related to the loss of the University Lands lease, including:

1. Specific reasons for any missed payment or non-compliance with lease terms.

2. Internal correspondence or board discussions addressing risks to the lease.

3. Proposals or remedial actions considered to prevent termination.

4. Financial statements or cash flow records from the relevant period reflecting the company's ability (or inability) to meet payment obligations.

5. Agreements and due diligence materials related to the acquisition of the Louisiana Heritage Play, including any disclosures of conflicts of interest.

6. The exact locations, names, and production outputs of McCabe Petroleum Company's wells in Louisiana.

**5. Shareholder Records**

a. Records identifying individuals or entities that approached NBH to acquire shares, including details of initial approaches and subsequent negotiations.
b. Names and contact details of third parties expressing interest in purchasing NBH shares.
c. Summaries or descriptions of discussions or communications with third parties, including:

1. Meeting dates and locations.
2. Correspondence or exchanged documents (verbal or written).
3. Participants in these discussions, including, but not limited to any and all board members or executives.
4. Resolutions, agreements, or decisions made as a result of these discussions.
5. Verification of share counts and allocation records, including documentation addressing potential naked short selling or unregistered shares.

**6. SEC Filings and Withdrawals**

a. Correspondence and drafts associated with the withdrawn S-1 filing for Newco.
b. Documents detailing changes in strategy or corporate governance tied to Newco's postponement or abandonment.

### 7. Non-Disclosure Agreements and Related By-Laws

a. We request copies of any and all Non-Disclosure Agreements, Non-Compete/Non-Disclosure Agreements, Secrecy Agreements,any similar agreements relevant to NBH operations  or any reasonable facsimile thereof signed by you or any duly authorized officer or employee of NBH with any and all party or parties since the inception of NBH .

b. We request copies of any and all Non-Disclosure Agreements, Non-Compete/ Non-Disclosure Agreements, Secrecy Agreements, any similar agreements relevant to NBH operations  or any reasonable facsimile thereof signed by you or any duly authorized officer or employee of any company, business, or partnership you owned in whole or in part, or were an officer thereof, with any and all party or parties, if said agreements as delineated in the foregoing carried over into NBH operations, support   operations, social media campaigns, or other efforts .

c. We request you identify with particularity by name of the party and date of agreement any payment, compensation agreement, share distribution agreement, contract for shares or warrants in NBH or any other company, business, or investment for specific performance of   work of any kind to individuals, entities, businesses, lobbyists, or social media influencer .

---

## Detailed Explanation for Non-Compliance

If any requested documents are not provided, please include a comprehensive explanation for their unavailability or refusal to disclose.

---

## Summary of Requested Items (Checklist)

- Board and management communications.

- Audited financial statements and stock issuance documentation.

- Consulting and employment agreements.

- Lease and assets records.

- Shareholder records and share count verification.

- Correspondence related to SEC filings and withdrawals.

- NDAs and by-laws.

---

## Deadline for Compliance

In light of the urgency of this matter, I respectfully request the aforementioned documents be made available within **three (3) business days** of receipt of this correspondence. Should additional time be needed, please provide a detailed justification and a proposed timeline for compliance.

---

## Consequences of Non-Compliance

Failure to comply may result in legal remedies, including filing a petition to compel disclosure in accordance with Texas law.

---

## Point of Contact

For inquiries, please contact:
 **Danielle Spears**
 Phone: 480-476-1091
 Email: paymmtlpnow@gmail.com

Please confirm receipt of this correspondence.

Sincerely,

Signed by:
*Danielle Spears*
CAC0EAB17D654A1...                                              11/17/2024

**Danielle Spears**
Along with all undersigned shareholders.

DocuSigned by:
*Contique Willcot*
53D41D27E1DD4C9...
Contique Willcot

DocuSigned by:
B27B211DD21F472...
Dan Auxier

Signed by:
*Jason Rolo*
FD6F849F3C36466...
Jason Rolo

Signed by:
7025171B7C7047C...
Jennifer Vetrano

Signed by:
*W.W*
3ABCA87652A148E...
Marcos Montiero

DocuSigned by:
*Matthew Pease*
CD84D7D57EA544B...
Matthew Pease

Signed by:
*Scott Traudt*
410B1F008947497...
Scott Traudt

# DEMAND LETTER

**From:** Sergeant Major Daniel R. Auxier, 105 Valley Road, Wantage, NJ 07461

**To:** Board of Directors, Next Bridge Hydrocarbons, Inc., 6300 Ridglea Place, Suite 950 Fort Worth, TX 76116

**Date:** 22 November 2024

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 1. SALUTATIONS & RESTATED PROBLEM.

Members of the Board of Directors et al,

I, Sergeant Major Daniel R. Auxier, hold 20,075 shares in Next Bridge Hydrocarbons (NBH) and am writing to formally demand a complete and timely response to my previous Request for Information (RFI) submitted on November 8, 2024. As a shareholder, I am entitled under Texas and Nevada laws, as well as federal regulations, to request and receive information critical to understanding NBH's financial, operational, and governance practices.

## 2. LEGAL BASIS FOR SHAREHOLDER RIGHTS & REQUESTS.

Under **Texas Business Organizations Code § 21.218**, I am entitled to inspect and copy corporate records for a proper purpose, which includes investigating possible mismanagement and assessing NBH's compliance with fiduciary obligations. Additionally, **Nevada Revised Statutes Chapter 78.257** grants similar rights to shareholders of corporations incorporated in Nevada, such as NBH. Furthermore, **SEC Rule 10b-5 under the Securities Exchange Act of 1934** reinforces transparency by prohibiting fraudulent or misleading conduct that could impact shareholder investments.

## 3. RESTATED BACKGROUND & RESTATEMENT OF PURPOSE.

On December 9, 2022, trading of MMTLP, NBH's predecessor stock, was halted due to an "extraordinary event" by FINRA, suspending anticipated last trading days before delisting. The lack of resolution for affected shareholders has raised serious concerns regarding NBH's commitment to transparency and shareholder interests. This demand letter serves to reiterate the need for transparency, as the absence of full and substantiated responses from NBH contravenes both shareholder rights and fiduciary duties.

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 4. SPECIFIC DEMANDS.

In accordance with applicable Texas, Nevada, and Federal laws, I demand the following:

(a) **Delivery of Share Confirmation:** Verification and documentation on whether all 165 million shares of NBH have been fully delivered and recorded, as well as the total confirmed share count. Failure to do so may suggest unrecorded shares or unauthorized short selling.

(b) **Explanation of SEC S-1 Filing Withdrawal:** Explanation and supporting documentation regarding NBH's decision to withdraw the S-1 filing for the proposed Newco subsidiary, including the impact on assets like the Orogrande Prospect.

(c) **Disclosure on University Lands Lease Termination:** Details and records regarding the termination of the University Lands lease, clarifying NBH's efforts to secure revenue alternatives.

(d) **Conflict of Interest Inquiry:** Justification for acquiring interests in Louisiana Heritage Play from McCabe Petroleum Corporation, considering the involvement of NBH's Chairman, Greg McCabe, in the transaction.

(e) **Rationale for CAPCO Loan Terms:** Justification for the $2 million loan at a 12% interest rate from CAPCO Holding Inc., owned by Clinton Plant, including any independent oversight and justification for the higher-than-average terms.

## 5. PROPOSED LEGAL ACTION & REMEDIES.

If NBH fails to respond substantively and in full compliance with Texas, Nevada, and federal law, I will pursue the following legal actions:

(a) **Petition for Court-Ordered Inspection**: Under **Texas Business Organizations Code § 21.218** and **Nevada Revised Statutes Chapter 78.257**, I am prepared to file a petition in Texas or Nevada courts to compel NBH to allow inspection of corporate records. The court may order NBH to bear costs associated with this litigation, including my attorney's fees, should the company be found in violation of state inspection rights.

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

**(b) Derivative Suit**: Should I uncover evidence of fiduciary breaches or unauthorized transactions harmful to shareholders, I will consider filing a derivative lawsuit under **Texas Business Organizations Code § 21.563** or the equivalent Nevada statute, seeking damages on behalf of NBH. Remedies in

such cases may include financial restitution, removal of directors, or court-imposed corporate governance reforms.

**(c) SEC Complaint for Potential Rule 10b-5 Violations**: I will submit a formal complaint to the **Securities and Exchange Commission (SEC)** regarding NBH's potential non-compliance with **SEC Rule 10b-5**. Misleading shareholders by withholding material information may constitute a violation of federal securities laws, prompting further investigation and enforcement actions.

**(d) Claims for Damages**: Should legal action prove necessary, I will seek damages and restitution for losses incurred due to delays, failure to disclose material information, or other mismanagement affecting shareholder value. These damages may include any diminution in share value, potential lost profits, and recovery of court fees and legal expenses.

## 6. TIMELINE FOR RESPONSE.

Please provide a comprehensive response, to both the Demand Letter and the Request for Information memorandum with all relevant documentation within **7 calendar days** of receipt of this letter. Failing to provide a timely and complete response will initiate the legal steps and actions as outlined above.

## 7. CONCLUSION.

As a shareholder who has invested nearly $60,000 in NBH, I expect prompt, clear, and substantiated answers in line with statutory rights and fiduciary duties. NBH's lack of transparency in addressing these questions is unacceptable, and I am prepared to assert my rights through legal avenues if necessary.

I look forward to your prompt response.

## 8. ATTACHED DOCUMENTS.

See attached memorandum entitled, "Shareholder Request for Information" dated 08 November 2024.

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 9. DISCLAIMER.

This Demand Letter is being sent both via registered US Mail and digitally to your official email addresses. Please confirm receipt via email immediately. Failure to acknowledge and/or respond fully within **7 calendar days** will prompt a formal legal complaint and may lead to further action as outlined by Texas, Nevada, and federal law.

## 10. POINT OF CONTACT.

For any questions or clarifications, please contact:
**Sergeant Major Daniel R. Auxier**
**Phone:** (401) 523-7559
**Email:** danforward14@gmail.com

AUXIER.DANIEL.RO
BERT.1012621058

Digitally signed by
AUXIER.DANIEL.ROBERT.1012621
058
Date: 2024.11.22 08:46:33 -05'00'

**DANIEL R. AUXIER**
Sergeant Major, US Army
Next Bridge Hydrocarbons Shareholder

*[handwritten: last price 2700 @ 2.0075]*

*[handwritten: $58,217.50]*



**EQUINITI TRUST COMPANY, LLC**
OPERATIONS CENTER
6201 15TH AVENUE
BROOKLYN, NY 11219

10108.2316.001.002.381
DANIEL ROBERT AUXIER
105 VALLEY RD
SUSSEX NJ 07461

| | |
|---|---|
| **Company Number:** | 27067 |
| **Company Name:** | |
| NEXT BRIDGE HYDROCARBONS INC | |
| **CUSIP:** | 591994371 |
| **Company Ticker Symbol:** | |
| **Stock Exchange:** | |
| **Account Number:** | 0000010666 |
| **Statement Date:** | August 30, 2023 |

www.astfinancial.com
investors@astfinancial.com
800-937-5449

# Transaction Advice

**IMPORTANT: Retain this statement for your investment and tax records.**

| Account Balance | Restricted | Unrestricted | Total | Account Value | |
|---|---|---|---|---|---|
| DRS/Book Entry Shares | | 20,075.000 | 20,075.000 | Market Value Date | NA |
| Plan Shares | | | | Market Value Price | NA |
| Certificated Shares | | | | | |
| Total Shares | | | 20,075.000 | Total Market Value | NA |

The share prices provided are as of the close of the Market Value Date indicated in this letter and provided by third party. AST does not guarantee the accuracy of such information, and neither AST nor its provider will be liable for any informational errors or for any actions taken reliance on such prices.

# Transaction Details:

| Transaction Date | Transaction Number | Transaction Type | Shares Debited or Credited |
|---|---|---|---|
| 08/21/2023 | BK10001827 | BOOK SHARES CREDITED | 20,000.000 |

# NEXT BRIDGE HYDROCARBONS INC Shareowner Disclosure

A full copy of any rights, privileges, restrictions, and conditions which may be attached to the securities covered by this statement can be obtained by writing to the Secretary of the Company

## Access your stock accounts online

Visit astfinancial.com today to conveniently manage your stock accounts anytime, anywhere.
• View your account details including balances and transaction history
• Manage your payment method for dividends and sales proceeds
• Request check replacements
• Buy or sell shares
• Update your contact information
• Download statements and tax forms

**ONLINE ACCOUNT ACCESS:**
Accessing the AST website is designed to be simple and secure. In order to access your account online, please follow these steps:
Step 1: Go to www.astfinancial.com
Step 2: Click **Login** located at the top right hand corner of the page.
Step 3: Click **First Time Here? Register** under **Shareholder Central** and complete the short registration process to create your unique login ID. If you are a non – U.S. shareholder please select **Registration for Non-US Holders** on the top of the page and complete the short registration process. You will need to know the AST Company Number which is printed on the bottom right hand corner of this letter. Your PIN number will then be mailed to the address of record for the account.
If you are unable to log into your account, it may be that your Social Security Number/TIN is not on file with AST. You will need to complete and return the tax form, W9 form (domestic shareholders), W8 BEN (foreign individual), or W8 BEN-E (foreign entity). The forms are available at www.astfinancial.com/knowledge-center/forms. Once AST receives your tax form your Social Security Number/TIN will be updated and your account will become certified.

## Important Information

• If you have only fractional shares, they cannot be transferred.
• If you have at least one share:

    • If your broker is a participant in the Direct Registration System (DRS), your broker may request your shares from AST via the DRS. You must provide your broker with the Company's CUSIP, your shareholder account number, your taxpayer identification number, the name in which the shares are registered, and the number of shares you wish to transfer. Please note, your broker may request a copy of this Direct Registration Statement.

    • If your broker is not a participant in the Direct Registration System (DRS), please write to AST at the address listed above, instructing AST to credit your brokerage account. You must include your AST account number, the name of your brokerage institution, your brokerage account number, and the number of shares that you wish to transfer. Your letter of instruction must be signed by all owners listed in the account registration and the signatures must be medallion guaranteed by a bank, broker or other financial institution that is a member of a Securities Transfer Association-approved medallion program such as STAMP, SEMP, or MSP. Please include a copy of this Direct Registration Statement. Please coordinate with your broker to ensure that they will accept share delivery via the DRS.

02 DEC 24

Schwab Holdings $MMATQ
losses $186,241.25

## Position
Designated Benef...

# MMATQ ÷800

META MATLS INC Equity

## 0.000001

| | | |
|---|---|---|
| | 0.01 | 0.75 |
| | Bid Size: | Ask Size: |

| | | | |
|---|---|---|---|
| Trade Price: | 0.0274 | P/L Day: | ($40.00) |
| Net Liq: | $8.00 | P/L Open: | ($186,241.25) |

### 52-Week Range

⚠ **$0.03**
Trade Price

 ⬜

$0.06                                    $9.00

Close            Trade MMATQ            ⋮

```
                        DEPARTMENT OF THE ARMY
                  U.S. ARMY HUMAN RESOURCES COMMAND
                     1600 SPEARHEAD DIVISION AVENUE
                         FORT KNOX, KY 40122
```

AHRC-ROR-RSM                                                    07 MAY 2024
ORDERS: HR-4120-00011A02

AUXIER DANIEL ROBERT                    MM          SGM 037 52 9187
105 VALLEY RD                                       ACTIVE ARMY
WANTAGE NJ 07461-3632 US


THE FOLLOWING ORDER IS AMENDED AS INDICATED:

SO MUCH OF: FORMAT: 172 HR-4120-00011 DATED 29 APR 2024 IS FURTHER AMENDED.

PERTAINING TO: ORDER TO ACTIVE DUTY
               AUXIER DANIEL ROBERT
               037 52 9187 SGM

AS READS:
   ATTACH UIC: W6BMAA       W POINT MIL RES NY 10996-0000
   REPORT UIC: W6BMAA       W POINT MIL RES NY 10996-0000

HOW CHANGED:
   ATTACH UIC: W1FBAA W1FB HQ USMA STAFF FACULTY    UNITED STATES MILITARY ACADEMY  W POINT
MIL RES NY 10996-0000
   REPORT UIC: W1FBAA W1FB HQ USMA STAFF FACULTY    UNITED STATES MILITARY ACADEMY  W POINT
MIL RES NY 10996-0000


FOR ARMY USE: AUTHORITY: 10 USC 12301(D)
ACCT CLAS: NONE
   AUX9187PG00011

AUX9187PG00011
FORMAT: 700

***************                         RICHARD A. MEYER
*    AHRC    *                           CHIEF, OFFICER RETIREMENTS AND
*  OFFICIAL  *                           SEPARATIONS BRANCH
***************

 DISTRIBUTION: 1 SOLDIER
  1 W1FB HQ USMA STAFF FACULTY UNITED STATES MILITARY ACADEMY  W POINT MIL RES NY 10996-0000
  1 W98Z NON DOC CONT CG REINF FT KNOX KY 40122-0000
```

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                       29 APR 2024
ORDERS: HR-4120-00011

AUXIER DANIEL ROBERT                  MM          SGM 037 52 9187
105 VALLEY RD                                     ACTIVE ARMY
WANTAGE NJ 07461-3632 US


YOU ARE ORDERED TO ACTIVE DUTY IN THE GRADE OF RANK SHOWN ABOVE FOR THE PERIOD SHOWN IN
ACTIVE DUTY COMMITMENT BELOW. YOU ARE ASSIGNED AS SHOWN AND WILL PROCEED FROM YOUR CURRENT
LOCATION ON THE REPORT DATE AS SHOWN BELOW.

RPT TO: W2H6 SCH USA WAR COLLEGE W2H6AA CARLISLE BARRACKS PA 17013-0000
 REPORT DATE: 07 MAY 2024 RPT BETWEEN 0800 AND 1700 HRS.
ASSIGN TO: W2H6 SCH USA WAR COLLEGE W2H6AA CARLISLE BARRACKS PA 17013-0000
PERIOD OF ACTIVE DUTY:451 DAYS                         END DATE: 31 JUL 2025
PURPOSE: TO OBTAIN 20 YRS OF ACTIVE FEDERAL SERVICE IAW 10 USC 12686,    SANCTUARY PROGRAM
DUTY AT: CARLISLE BARRACKS, PA

ADDITIONAL INSTRUCTIONS:  THIS IS PERMANENT CHANGE OF STATION (PCS) DURING THIS ASSIGNMENT
AND IS AUTH MVMT OF DEPNS AND HHG IAW JTR. ATTACH FOR UCMJ, ADMIN, AND PAY. CONTACT
SUPPORTING TRANSPORTATION OFC IMMEDIATELY TO SHIP OR STORE HHG AT GOVT EXPENSE, WEBSITE:
HTTP://WWW.MOVE.MIL. CONTACT HOUSING SERVICES AT NEW DUTY STATION BEFORE ARRANGING TO RENT,
LEASE, OR PURCHASE HOUSING, WEBSITE: HTTPS://WWW.HOUSING.ARMY.MIL/. HAND CARRY COMPLETE
MPRJ, HEALTH/DENTAL, TNG/APFT, CLOTHING RECORDS, ANDCOPIES OF RENTAL/MORTGAGE AGREEMENT.
TAPDB RECSTA "G", SVC COMP IS "V" TO INCLUDE FOR DJMS-AC. SM NOT INDEF STATUS. SM NOT
COUNTED AS PART OF THE ACTIVE ARMY END STRENGTH. ALL RETIREMENT PROCESSING MUST BE
CONCLUDED BEFORE ORDERS EXPIRE. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE
COMPLETED BEFORE THE EXPIRATION OF THESE ORDERS. ALL OFCL TVL MUST BE ARRANGED THRU CARLSON
TVL (1-800-709-2190) OR THE NEAREST SATO. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB
W/O REQ JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. FOR THIS ORDER AT HRC
TRANSITION BRANCH, US ARMY HUMAN RESOURCES COMMAND (HRC- FTKNOX) 502-613-6856 (OFFICER
SANTUARY). SM WILL BE SEPARATED FROM DJMC-RC USING 900 TIN AND ACCESSED INTO DJMS-AC WITH
SVC COMP OF "V". THE LOCAL DMPO IS RESPONSIBLE FOR PERFORMING ACCESSION TRANSACTIONS. SM
REMAINS ON RASL. SUBJ TO AVAIL OF FUNDS (DFAS-IN REG 37-1).

FOR ARMY USE: AUTHORITY: 10 USC 12301(D)
ACCT CLAS: NONE


MDC: 1AE4         HOR: SAME AS SNL                            PMOS/AOC: 012A
SEX: M            PPN: NA         COMP: IRR        RES GR: SGM
DORRES: 01 AUG 2020               PEBD: 20 JUN 1997   SCTY CL: TOP SECRET WITH SCI
AUX9187PG00011
FORMAT: 156
FOR THE SECRETARY OF THE ARMY:


**************
*   AHRC    *                                RICHARD A. MEYER
*  OFFICIAL  *                               CHIEF, OFFICER RETIREMENTS AND
**************                               SEPARATIONS BRANCH

 DISTRIBUTION: 1 SOLDIER
 1 W2H6 SCH USA WAR COLLEGE CARLISLE BARRACKS PA 17013-0000
 1 W98Z NON DOC CONT CG REINF FT KNOX KY 40122-0000



**DEPARTMENT OF THE ARMY**
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122-5300

AHRC-FSZ (RN 635-200b)                    5 February 2024

MEMORANDUM FOR Installation Management Agency, HQ US Army Garrison, West Point, 622 Swift Rd, West Point, NY 10996-1986

SUBJECT:  Sanctuary Eligibility Status, SGM Auxier, Daniel R., DODID 1012621058

1.  To date SGM Auxier, Daniel R., currently has 18 years, 00 months, and 28 days of Active Federal Service (AFS) and is eligible to enter Title 10, USC 12686 status to complete 20 years of AFS upon completion of current active-duty tour. Soldier is approved for assignment with the US Military Academy (W1FBAA), West Point, NY.

2.  Upon issuance of DD Form 214 (Certificate of Release or Discharge from Active Duty) for this period of service, the Soldier will provide a copy of the DD Form 214 to HRC Enlisted Sanctuary at usarmy.knox.hrc.mbx.epmd-sanctuary-section@army.mil. This will ensure no break in service occurs prior to the Soldiers Sanctuary start date. Sanctuary assignment order will not be published without an official DD Form 214.

3. The following information is pertinent to the Soldier' processing:
    a.  Early demobilization may cause the Soldier to lose Sanctuary status.
    b.  Post Deployment Mobilization Respite Absence (PDMRA) leave must be taken prior to leaving mob status.
    c.  Sanctuary orders take precedence over all other mobilization orders.
    d.  There are no extensions for Sanctuary orders and all requests to revoke Sanctuary orders require approval from the Assistant Secretary of the Army

4. The Soldier will report to the gaining installation with all source documents used in the calculation of Active Federal Service.

5.  Point of contact for this action is at usarmy.knox.hrc.mbx.epmd-sanctuary-section@army.mil or commercial (502) 613-5962.

BRATCHER.MICHAEL.GLENN.1104203953    Digitally signed by BRATCHER.MICHAEL.GLENN.110 4203953
Date: 2024.02.05 14:18:56 -05'00'

MICHAEL G. BRATCHER
CIV HR Assistant
Retirement Separations Branch

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY
This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle)  AUXIER, DANIEL ROBERT | 2. DEPARTMENT, COMPONENT AND BRANCH  ARMY/USAR | 3. SOCIAL SECURITY NUMBER  037 52 9187 |
|---|---|---|

| 4a. GRADE, RATE OR RANK  SGM | b. PAY GRADE  E09 | 5. DATE OF BIRTH (YYYYMMDD)  19790429 | 6. RESERVE OBLIGATION TERMINATION DATE  (YYYYMMDD)  00000000 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY  FT BLISS, TEXAS | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known)  105 VALLEY RD  WANTAGE NEW JERSEY 07461 |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND  0007 HQ HQ     MCP HQ (USAREUR FC | b. STATION WHERE SEPARATED  FORT BLISS TC, TX 79916-6816 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED  USAR CON GP (REINF) 1600 SPEARHEAD DIVISION AVE, FT KNOX, KY 40122 | 10. SGLI COVERAGE     NONE  AMOUNT: $ 500,000.00 |
|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.)  12A6O ENGINEER SENIOR SGT - 1 YRS 9 MOS//  NOTHING FOLLOWS | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 2022 | 08 | 10 |
| | b. SEPARATION DATE THIS PERIOD | 2024 | 05 | 06 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0001 | 08 | 27 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0013 | 06 | 15 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0011 | 07 | 05 |
| | f. FOREIGN SERVICE | 0001 | 08 | 02 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. INITIAL ENTRY TRAINING | 0000 | 00 | 00 |
| | i. EFFECTIVE DATE OF PAY GRADE | 2020 | 08 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)  DEFENSE MERITORIOUS SERVICE MEDAL//  MERITORIOUS SERVICE MEDAL (7TH AWARD)//JOINT  SERVICE COMMENDATION MEDAL//ARMY  COMMENDATION MEDAL (8TH AWARD)//JOINT  SERVICE ACHIEVEMENT MEDAL//ARMY ACHIEVEMENT  MEDAL (10TH AWARD)//JOINT MERITORIOUS UNIT  AWARD (2ND AWARD)//CONT IN BLOCK 18 | 14. MILITARY EDUCATION (Course title, number of weeks, and months and year completed)  NONE//NOTHING FOLLOWS |
|---|---|

| 15a. COMMISSIONED THROUGH SERVICE ACADEMY | YES | X NO |
|---|---|---|
| b. COMMISSIONED THROUGH ROTC SCHOLARSHIP (10 USC Sec. 2107b) | YES | X NO |
| c. ENLISTED UNDER LOAN REPAYMENT PROGRAM (10 USC Chap. 109) (If Yes, years of commitment: _____ ) NA | YES | X NO |

| 16. DAYS ACCRUED LEAVE  PAID  0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES  X | NO |
|---|---|---|---|

18. REMARKS ///////////////////////////////////////////////////////////////////////////
SERVICE IN GERMANY 20220819-20221113//SERVICE IN TURKEY 20221113-20221118//SERVICE IN
GERMANY 20221118-20230117//SERVICE IN POLAND 20230117-20230124//SERVICE IN GERMANY
20230124-20240310//SERVICE IN FRANCE 20240310-20240314//INDIVIDUAL COMPLETED PERIOD FOR
WHICH ORDERED TO ACTIVE DUTY FOR PURPOSE OF POST SERVICE BENEFITS AND ENTITLEMENTS//
MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//SERVICE IN GERMANY 20240314-20240317//
SERVICE IN BELGIUM 20240317-20240319//SERVICE IN GERMANY 20240319-20240420//CO-ADOS
20220810-20230809(OPERATION ENDURING FREEDOM)IAW 10 USC//SEE ATTACHED CONTINUATION SHEET
The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code)  105 VALLEY RD  WANTAGE NEW JERSEY 07461 | b. NEAREST RELATIVE (Name and address - include ZIP Code)  MICHELE AUXIER  105 VALLEY RD  WANTAGE NEW JERSEY 07461 |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (Specify state/locality) ____ NJ OFFICE OF VETERANS AFFAIRS | X YES | NO |
|---|---|---|
| a. MEMBER REQUESTS COPY 3 BE SENT TO THE CENTRAL OFFICE OF THE DEPARTMENT OF VETERANS AFFAIRS (WASHINGTON, DC) | X YES | NO |

| 21a. MEMBER SIGNATURE  ESIGNED BY:  AUXIER.DANIEL.ROBERT.101  2621058 | b. DATE (YYYYMMDD)  20240426 | 22.a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature)  ESIGNED BY:  GOMEZ.SHANDELLE.VIANCE.1507340071  SHANDELLE V GOMEZ, TRANSITIONS PA II | b. DATE (YYYYMMDD)  20240426 |
|---|---|---|---|

## SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION  RELEASE FROM ACTIVE DUTY | 24. CHARACTER OF SERVICE (Include upgrades)  HONORABLE |
|---|---|

| 25. SEPARATION AUTHORITY  AR 635-200 | 26. SEPARATION CODE  MBK | 27. REENTRY CODE  NA |
|---|---|---|

| 28. NARRATIVE REASON FOR SEPARATION  COMPLETION OF REQUIRED ACTIVE SERVICE |
|---|

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD)  NONE | 30. MEMBER REQUESTS COPY 4  (Initials)  DRA |
|---|---|

| DD FORM 214, AUG 2009 | PREVIOUS EDITION IS OBSOLETE.  GENERATED BY TRANSPROC | SERVICE - 2 |
|---|---|---|

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD. SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY    (Continuation Sheet)
This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle) AUXIER, DANIEL ROBERT | 2. DEPARTMENT, COMPONENT AND BRANCH ARMY/USAR | 3. SOCIAL SECURITY NUMBER 037 \| 52 \| 9187 |
|---|---|---|

(Specify the item number of the block continued for each entry.)    ///////////////////////////////////////////

CONT FROM BLOCK 18: 12301(D)//OPADOS_G3 20230810-20240205(TO SERVE AS USAREUR-AF G33 SGM)IAW 10 USC 12301(D)//OPADOS_G3 20240206-20240506(TO SERVE AS USAREUR-AF COMMAND SERGEANT MAJOR)IAW 10 USC 12301(D)//YRRP:0 DAYS//CONT FROM BLOCK 13: //MERITORIOUS UNIT COMMENDATION (4TH AWARD)//USN MERITORIOUS UNIT COMMENDATION//ARMY GOOD CONDUCT MEDAL (4TH AWARD)//ARMY RESERVE COMPONENT ACHIEVEMENT MEDAL (6TH AWARD)//NATIONAL DEFENSE SERVICE MEDAL//AFGHANISTAN CAMPAIGN MEDAL W/ CAMPAIGN STAR//IRAQ CAMPAIGN MEDAL W/4 CAMPAIGN STARS//GLOBAL WAR ON TERRORISM EXPEDITIONARY MEDAL//GLOBAL WAR ON TERRORISM SERVICE MEDAL//KOREA DEFENSE SERVICE MEDAL//HUMANITARIAN SERVICE MEDAL//ARMED FORCES SERVICE MEDAL (AFSM) (2ND AWARD)//NON COMMISSIONED OFFICER PROFESSIONAL DEVELOPMENT RIBBON (5TH AWARD)//ARMY SERVICE RIBBON//OVERSEAS SERVICE RIBBON (6TH AWARD)//ARMY RESERVE COMPONENT OVERSEAS TRAINING RIBBON//ARMED FORCES RESERVE MEDAL W/ M DEVICE//MILITARY OUTSTANDING VOLUNTEER SERVICE MEDAL//NATO MEDAL//COMBAT ACTION BADGE//DRIVER AND MECH BADGE W/ DRIVER - TRACKED VEHICLE(S) CLASP//DRIVER AND MECHANIC  BADGE W/DRIVER-WHEELED VEHICLE(S) CLASP//ARMY STAFF IDENTIFICATION BADGE//NOTHING FOLLOWS

| 21.a. MEMBER SIGNATURE ESIGNED BY: AUXIER.DANIEL.ROBERT.101 2621058 | b. DATE (YYYYMMDD) 20240426 | 22.a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature) ESIGNED BY: GOMEZ.SHANDELLE.VIANCE.1507340071 SHANDELLE V GOMEZ, TRANSITIONS PA II | b. DATE (YYYYMMDD) 20240426 |
|---|---|---|---|

DD FORM 214C, AUG 2009                    GENERATED BY TRANSPROC                    SERVICE - 2

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                      28 MAR 2024
ORDERS: HR-4004-00006A01

AUXIER DANIEL ROBERT                    JB          SGM 037 52 9187
105 VALLEY RD                                       USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


THE FOLLOWING ORDER IS AMENDED AS INDICATED:

SO MUCH OF: FORMAT: 162 HR-4004-00006 DATED 04 JAN 2024 IS FURTHER AMENDED.

PERTAINING TO: ORDER TO ACTIVE DUTY
               AUXIER DANIEL ROBERT
               037 52 9187 SGM

AS READS:
  DEMOBSTATION: N/A

HOW CHANGED:
  DEMOBSTATION: FT BLISS
ADD INSTRUCTIONS:
  YOU WILL REPORT TO CRC, FT BLISS, FOR DEMOBILIZATION AND OUT-PROCESSING.


FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 2/3/4 2010.0000 01-1100 2A200000 11**/12** PAMP 01EN30 S12120
  AUX9187PD00006 CIC:
FORMAT: 700

FOR THE SECRETARY OF THE ARMY:

**************         DANNY C. JENNEJOHN
*   AHRC    *         COL, EN,
* OFFICIAL  *         CHIEF, FORCE SHAPING DIVISION
**************

  DISTRIBUTION: 1 SOLDIER
  1 0007 HQ HHB ARMY HQ AND HQ LUCIUS D CLAY KAS DE 09014-0000
  1 W6ED USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE   FT KNOX KY 40121-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                    04 JAN 2024
ORDERS: HR-4004-00006

AUXIER DANIEL ROBERT              SAA          SGM 037 52 9187
105 VALLEY RD                                 USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
REPORT DATE/TIME: 06 FEB 2024
PERIOD OF ACTIVE DUTY: 91 DAYS INCLUDING ACCUM LEAVE END DATE: 06 MAY 2024
PURPOSE: ACTIVE DUTY FOR OPERATIONAL SUPPORT (OPADOS_G3) USAREUR EDI OPERATIONAL TO SERVE AS
  USAREUR-AF COMMAND SERGEANT MAJOR
ATT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT. UPON APPLICATION, SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE
ACCOUNTING OF ALL AD OR FTNGD SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO
SO MAY RESULT IN EARLY TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT
OF SERVICE - FOR COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS
REQUIREMENT. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE LOCATION
INDICATED. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE COMPLETED BEFORE THE
EXPIRATION OF THESE ORDERS. ATTACH FOR UCMJ, ADMIN, AND PAY. SOLDIER WILL CONTACT SERVICING
FINANCE OFFICE FOR INPROCESSING ACCESSION INTO DJMS-RC. SUBJ TO AVAIL OF FUNDS. IBA
AUTHORIZED FOR TRAVEL. STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE
DEPLOYED, OR MARRIED TO SM AT DIFFERENT DUTY LOCATION. POV SHIPMENT NOT AUTH. MOVEMENT OF
HHG/DEP NOT AUTHORIZED. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB W/O REQ
JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. DIRECT QUESTIONS/CONCERNS REGARDING
THIS ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY. TO AVOID SPREADING THE
CORONAVIRUS (COVID-19) INFECTION, SOLDIER WILL NOT TRAVEL IF THEY ARE CURRENTLY
EXPERIENCING OR WITHIN THE PAST 14 DAYS HAVE EXPERIENCED FEVER, COUGH, SHORTNESS OF BREATH
OR HAVE HAD A CLOSE UNPROTECTED EXPOSURE TO A PERSON WITH COVID-19 . IF SOLDIER HAS OR IS
EXPERIENCING THESE SYMPTOMS THEY SHOULD CONTACT THE GAINING UNIT COMMANDER AND THEIR HEALTH
CARE PROVIDER FOR FURTHER INSTRUCTIONS AND WILL NOT TRAVEL.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 2/3/4 2010.0000 01-1100 2A200000 11**/12** PAMP 01EN30 S12120 AUX9187PD00006 C
  IC: 2F4AUX9187PD000
MDC: 4JE4        HOR: SAME AS SNL                              PMOS/AOC: 12A
SEX: M           PPN: N/A       COMP: IRR         RES GR: SGM
DORRES: 01 AUG 2020             PEBD: 20 JUN 1997   SCTY CL: TOP SECRET WITH SCI
FORMAT: 162

FOR THE SECRETARY OF THE ARMY:

**************                    DANNY C. JENNEJOHN
*   AHRC    *                    COL, EN,
* OFFICIAL  *                    CHIEF, FORCE SHAPING DIVISION
**************


DISTRIBUTION: 1 SOLDIER
1 0007 HQ HHB ARMY HQ AND HQ LUCIUS D CLAY KAS DE 09014-0000
1 W6ED USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE  FT KNOX KY 40121-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                    22 MAR 2023
ORDERS: HR-3081-00026

AUXIER DANIEL ROBERT              EF          SGM 037 52 9187
105 VALLEY RD                                 USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
REPORT DATE/TIME: 10 AUG 2023
PERIOD OF ACTIVE DUTY: 180 DAYS INCLUDING ACCUM LEAVE END DATE: 05 FEB 2024
PURPOSE: ACTIVE DUTY FOR OPERATIONAL SUPPORT (OPADOS_G3) USAREUR EDI OPERATIONAL TO SERVE AS
  USAREUR-AF G33 SGM
ATT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT. UPON APPLICATION, SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE
ACCOUNTING OF ALL AD OR FTNGD SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO
SO MAY RESULT IN EARLY TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT
OF SERVICE - FOR COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS
REQUIREMENT. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE LOCATION
INDICATED. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE COMPLETED BEFORE THE
EXPIRATION OF THESE ORDERS. ATTACH FOR UCMJ, ADMIN, AND PAY. SOLDIER WILL CONTACT SERVICING
FINANCE OFFICE FOR INPROCESSING ACCESSION INTO DJMS-RC. SUBJ TO AVAIL OF FUNDS. IBA
AUTHORIZED FOR TRAVEL. STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE
DEPLOYED, OR MARRIED TO SM AT DIFFERENT DUTY LOCATION. POV SHIPMENT NOT AUTH. MOVEMENT OF
HHG/DEP NOT AUTHORIZED. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB W/O REQ
JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. DIRECT QUESTIONS/CONCERNS REGARDING
THIS ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY. TO AVOID SPREADING THE
CORONAVIRUS (COVID-19) INFECTION, SOLDIER WILL NOT TRAVEL IF THEY ARE CURRENTLY
EXPERIENCING OR WITHIN THE PAST 14 DAYS HAVE EXPERIENCED FEVER, COUGH, SHORTNESS OF BREATH
OR HAVE HAD A CLOSE UNPROTECTED EXPOSURE TO A PERSON WITH COVID-19 . IF SOLDIER HAS OR IS
EXPERIENCING THESE SYMPTOMS THEY SHOULD CONTACT THE GAINING UNIT COMMANDER AND THEIR HEALTH
CARE PROVIDER FOR FURTHER INSTRUCTIONS AND WILL NOT TRAVEL. THIS IS A CONSECUTIVE ASG WITH
NO BREAK IN SERVICE. PLEAD REMAINS THE SAME.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 1/2/3 2010.0000 01-1100 2A200000 11**/12** PAMP 01EN30 S12120 AUX9187PF00026 C
  IC: 2F3AUX9187PF000
MDC: 4JE3        HOR: SAME AS SNL                              PMOS/AOC: 12A
SEX: M           PPN: N/A        COMP: IRR        RES GR: SGM
DORRES: 01 AUG 2020              PEBD: 20 JUN 1997   SCTY CL: TOP SECRET WITH SCI
FORMAT: 162

FOR THE SECRETARY OF THE ARMY:

***************                          ARTHUR R. NOWELL
*    AHRC    *                           COLONEL, AG
*  OFFICIAL  *                           CHIEF, OPERATIONS
***************                          AND READINESS DIVISION


DISTRIBUTION: 1 SOLDIER
1 0007 HQ HHB ARMY HQ AND HQ LUCIUS D CLAY KAS DE 09014-0000
1 W6ED USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE   FT KNOX KY 40121-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-MOB                                                        19 JUL 2022
ORDERS: HR-2200-00001

AUXIER DANIEL ROBERT              EF          SGM 037 52 9187
105 VALLEY RD                                 USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT DUTY LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: W6F5 CONUS REPLACEMENT CTR W6F5AA 1001 PLEASONT RD  FT BLISS TX 79916-0000
REPORT DATE: 10 AUG 2022
PERIOD OF ACTIVE DUTY:365 DAYS INCLUDING ACCUM LEAVE END DATE: 09 AUG 2023
PURPOSE: CONTINGENCY OPERATION FOR ACTIVE DUTY OPERATIONAL SUPPORT (CO-ADOS) IN SUPPORT OF
 OEF.
ATT TO: 0007 HQ HQ USAREUR-AF AUG WATL99 WIESBADEN CLAY KS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT.  MOVEMENT OF HHG/DEP NOT AUTH. POV SHIPMENT NOT AUTH. YOU ARE AUTHORIZED
REIMBURSEMENT FOR TWO PIECES OF EXCESS ACCOMPANIED BAGGAGE, NOT TO EXCEED 50LBS EACH.
STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE DEPLOYED, OR MARRIED TO SM AT
DIFFERENT DUTY LOCATION. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE
LOCATION INDICATED. UPON COMPLETION, SOLDIER WILL PROCEED TO DUTY LOCATION. ALL OFCL TVL
MUST BE ARRANGED THRU CARLSON TVL (1-800-709-2190) OR THE NEAREST SATO. TICKET PURCHASED AT
OWN EXPENSE WILL NOT BE REIMB W/O REQ JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS
ORDER. ATTACH FOR UCMJ, ADMIN, AND PAY. THIS AD PERIOD IS EXEMPT FROM THE 5 YEAR CUMLATIVE
SERV LIMIT ON REEMPLOYMENT RIGHTS UNDER TITLE 38, USC, SEC 4312(C)(4)(B). UPON APPLICATION,
SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE ACCOUNTING OF ALL AD OR FTNGD
SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO SO MAY RESULT IN EARLY
TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT OF SERVICE - FOR
COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS REQUIREMENT. CONTACT
HOUSING OFC OF THE GAINING INSTL BEFORE BUYING OR LEASING OFF POST. PAY STATUS REPORTED IN
DJMS-RC A24 TRANS MUST BE O (ALPHA CHAR). CBA AUTHORIZED FOR TRAVEL (VARIATION NOT
AUTHORIZED). SUBJ TO AVAIL OF FUNDS. SUBMIT CONTINGENCY CLAIM THRU DEFENSE TRAVEL SYSTEM
(DTS) BY CONTACTING LOCAL DTS ADMINISTRATOR OR DFAS-IN CONTINGENCY TRAVEL DEPARTMENT,
WHICHEVER IS APPLICABLE. RC SOLDIERS MUST RETURN TO DEMOB SITE TO REFRAD IAW CURRENT BOG
POLICY NLT 39 DAYS PRIOR TO END OF MOBILIZATION/ACTIVATION/TCS ORDERS IN ORDER TO OUT
PROCESS AND TAKE AUTHORIZED LEAVE. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE
COMPLETED BEFORE THE EXPIRATION OF THESE ORDERS. DIRECT QUESTIONS/CONCERNS REGARDING THIS
ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 2/3/4 2010.0000 01-1100 1A100000 11**/12** VFRE 01ENGU S12120 AUX9187PK00001 C
 IC: 2F2AUX9187PK000

MDC: 4JE2          HOR: SAME AS SNL                        PMOS/AOC: 012A
SEX: M             PPN: N/A        COMP: USAR        RES GR: SGM
DORRES: 01 AUG 2020                PEBD: 20 JUN 1997  SCTY CL: TOP SECRET WITH SCI
FORMAT: 162
FOR THE SECRETARY OF THE ARMY:

**************
*   AHRC   *                              BRIAN S. KANE
* OFFICIAL *                              COLONEL, AG,
**************                            CHIEF, OPERATIONS
                                         AND READINESS DIVISION

DISTRIBUTION: 1 SOLDIER
 1 W6F5 CONUS REPLACEMENT CTR 1001 PLEASONT RD  FT BLISS TX 79916-0000
 1 USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE  FT KNOX KY 40121-0000
 1 0007 HQ HQ USAREUR-AF AUG WIESBADEN CLAY KS DE 09014-0000





















UNITED STATES POSTAL SERVICE®

U.S. POSTAGE PAID
PME
SUSSEX, NJ 07461
DEC 02, 2024
$62.15
S2324M604048-05

PRIORITY MAIL EXPRESS®

MAILING ENVELOPE
FOR DOMESTIC AND INTERNATIONAL USE

FOR DOMESTIC AND INTERNATIONAL USE
PLACE MAILING LABEL HERE

■ Guaranteed delivery date*
■ Guaranteed delivery time.†

RDC 07

EI 537 142 145 US

EP13C July 2022
OD: 15 x 11.625

PS10000132900

FROM: SGM DANIEL R. AUXIER
105 VALLEY ROAD
WANTAGE, NJ 07461
PHONE (201) 523-7559

TO: US DISTRICT COURT
WESTERN TEXAS DIV
ATTN: CLERK'S OFFICE
200 EASTWALL, RM 222
MIDLAND TX
79701
PHONE (432) 686-4001

RECEIVED
DEC 06 2024
DEPUTY CLERK
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL
EXPRESS®

VISIT US AT
ORDER FREE SU

MAILING ENVELOPE
FOR DOMESTIC AND INTERNATIONAL USE

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

GUARANTEED* ▪ TRACKED ▪ INSURED

EP13C July 2022
OD: 15 x 11.625



PS10000132900