# First Amended Complaint

## 22 DEC 24

# Auxier v. SEC

## 7:24-CV-318

## 06 DEC 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS

FILED

DEC 2 7 2024

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____DEPUTY

DANIEL R. AUXIER,
MARCOS E. MONTEIRO,

                       Plaintiffs,

    v.

SECURITIES & EXCHANGE COMMISSION,

                       Defendants.

Case No.: 7:24-cv-318

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

1ST AMENDED COMPLAINT

## I.    **INTRODUCTION**

1. This case arises from a pervasive scheme of market manipulation, regulatory negligence, breaches of fiduciary duty, and constitutional violations that collectively eroded the integrity of U.S. financial markets. The Plaintiffs, Sergeant Major Daniel R. Auxier, a retail investor and active duty servicemember, and Mr. Marcos E. Monteiro, a retail investor and small business owner, bring this action to hold the Defendants accountable for enabling systemic misconduct that has caused significant financial and emotional harm to retail investors. Through their actions and omissions, the Defendants fostered an environment where institutional participants profited while retail investors were left to bear the consequences of a fundamentally flawed and inequitable system.

    a) Central to this case are the Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), which were issued as part of a corporate spin-off intended to provide private ownership in Next Bridge Hydrocarbons, Inc. (NBH). Instead of facilitating an orderly transition to private ownership, market participants, including broker-dealers, market makers, and transfer agents, engaged in manipulative practices such as synthetic share creation and naked short selling. These actions flooded the market with counterfeit shares, suppressed legitimate share

1

prices, and deprived shareholders, including the Plaintiffs, of the fair value of their investments. Regulatory bodies, including FINRA, the SEC, and the DTCC, failed to fulfill their statutory oversight duties, enabling these abuses to persist unchecked.

b) A defining moment occurred on December 9, 2022, when FINRA issued a U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This unilateral and indefinite halt froze all trading activity, leaving tens of thousands of investors, including the Plaintiffs, unable to access their assets, reconcile their positions, or trade their shares. Despite the extraordinary impact of this halt, FINRA failed to provide proper notice, justification, or resolution, violating statutory obligations and investor protections.

c) The U3 halt raises serious constitutional concerns about the unchecked powers of private self-regulatory organizations. As highlighted in key legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine, as there was no meaningful government oversight or statutory authority to justify its actions.

d) Beyond FINRA's governance flaws, other regulatory bodies exacerbated the systemic failures in this case. The SEC, tasked with overseeing FINRA and ensuring market integrity, neglected its statutory duties by allowing the U3 halt to persist and failing to investigate widespread irregularities. The DTCC, responsible for clearing and settlement, permitted unresolved failures to deliver (FTDs) and synthetic shares to proliferate, violating Section 17A of the Securities Exchange Act. Together, these regulatory failures enabled institutional participants to manipulate the market and profit at the expense of retail investors, including the Plaintiffs.

e) Broker-dealers and market makers, including GTS Securities and Canaccord Genuity, further contributed to the harm by engaging in manipulative practices designed to suppress the price of MMTLP shares. These entities exploited regulatory loopholes to create and trade synthetic shares, artificially inflating supply while profiting from the resulting market instability. Transfer agents, such as AST/EQ, failed to reconcile legitimate share ownership during the MMTLP-to-NBH transition, compounding investor harm and creating prolonged financial uncertainty.

2

f) Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons also played a significant role in enabling these systemic failures. Executives, including Greg McCabe, John Brda, and Clifton DuBose, failed to address share discrepancies, trading irregularities, and systemic market manipulation. Instead, they misrepresented the financial prospects of key assets, such as the Orogrande Basin, and neglected their fiduciary duties to shareholders, including the Plaintiffs.

g) Nearly two years have passed since the U3 halt, and the Defendants have taken no meaningful steps to resolve these systemic failures or mitigate the harm caused to retail investors. Shareholders, including the Plaintiffs, remain in financial and legal limbo, unable to trade their positions, reconcile their holdings, or recover the fair value of their investments. This prolonged inaction underscores critical vulnerabilities in the existing regulatory framework and highlights the urgent need for judicial intervention.

h) The disparity between the regulatory response to the MMTLP case and other market disruptions, such as the GameStop trading episode, illustrates the inequities faced by retail investors. While GameStop shareholders benefited from swift regulatory and Congressional action, MMTLP investors have endured prolonged neglect. This inconsistency underscores systemic bias in favor of institutional participants and the urgent need for equitable treatment of all market participants under the law.

i) Through this action, the Plaintiffs seek to hold the SEC ultimately responsible for its failure to oversee and hold FINRA and the DTCC accountable, as well as for neglecting to enforce compliance with securities laws and protect the public interest. The Plaintiffs request compensatory and punitive damages to redress the financial and emotional harm they have suffered.

j) Equally important, this case seeks to challenge the structural and constitutional flaws within FINRA's governance and advocate for systemic reforms. These reforms include enforcing greater transparency, requiring accountability for regulatory bodies, and implementing mechanisms to prevent future abuses, such as synthetic share creation, prolonged trading halts, and failures to deliver.

k) By addressing the systemic deficiencies and constitutional violations described herein, this Court has the opportunity to restore fairness, integrity, and transparency to U.S. financial markets. The Plaintiffs urge the Court to hold the Defendants accountable for their actions, reaffirm the principles of constitutional governance, and protect the rights of retail investors whose trust in the financial system has been eroded.

## II.    JURISDICTION AND VENUE

2.  Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.

3. Diversity jurisdiction is also proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs, a resident of New Jersey, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, New York, and Washington, D.C.

4. Venue is appropriate in the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5. Despite nearly two years having passed since the U3 trading halt, none of the regulatory or governance bodies responsible for ensuring the fair operation of markets— the SEC, including FINRA, the DTCC, transfer agents, broker-dealers, market makers, and the leadership of the involved publicly traded companies—have effectively resolved or remedied the resulting challenges. This failure has resulted in violations of federal securities and antitrust laws, causing significant financial harm to the Plaintiffs, whose baseline damages exceed $377,346.96.

4

## III.  **PARTIES**

6.  Lead Plaintiff: Sergeant Major DANIEL R. AUXIER (hereinafter referred to as "Plaintiffs" or "Auxier") has at all times mentioned herein been a resident and citizen of the Town of Wantage, in the County of Sussex, in the State of New Jersey. He is an active-duty Sergeant Major in the United States Army and shareholder of META II and NBH.

7.  Co-Plaintiff: Mr. MARCOS E. MONTEIRO (hereinafter referred to as "Plaintiffs" or "Monteiro") has at all times relevant herein, been a resident and citizen of the City of Orlando, County of Orange, State of Florida. He is a small business owner, a shareholder of NBH, and a former shareholder of META II.

8.  Defendant Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

## IV.  **STATEMENT OF FACTS**

9.  The following statements of fact chronicle significant events, regulatory actions, and market irregularities involving MMTLP shares, the transition to NBH, and the ensuing financial and legal implications for shareholders.

10. This timeline emphasizes the actions of regulatory bodies such as the SEC, FINRA, and DTCC, highlighting the extraordinary U3 trading halt in December 2022, unresolved failures to deliver, synthetic share allegations, and systemic lapses in oversight that exacerbated investor harm *(See Appendix 1)*.

11. Furthermore, it explores corporate governance issues, shareholder disputes, and the broader implications for the integrity and transparency of U.S. financial markets. These events provide a foundation for understanding the legal and economic challenges faced by affected shareholders.

12. Auxier is a 27-year veteran of the United States Army, serving as a Senior Enlisted Leader at the United States Military Academy at West Point, New York *(See Appendix 2)*.

13. From August 2022 through May 2024, Auxier honorably completed an unaccompanied deployment to Europe, where he served as the G3 Operations Sergeant Major and subsequently as the Headquarters and Headquarters Battalion Command Sergeant Major. In these roles, he supported U.S. Army Europe and Africa Command, as well as NATO forces, during the ongoing Russia-Ukraine conflict *(See Appendix 3)*.

14. This prior deployment confers additional legal protections under federal statutes applicable to servicemembers in civil litigation and financial matters, including protections under the Servicemembers Civil Relief Act (SCRA) *(See Appendix 4)*.

15. On March 1, 2020, Torchlight Energy Resources presented an investor presentation focusing on its assets in the Permian Basin, including the Orogrande, Hazel, and Winkler projects.

16. This presentation emphasized the company's exploration activities and provided a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting *(See Appendix 5)*.

17. Torchlight management valued the Orogrande asset's reserves at approximately $209.51 billion, using the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel. Based on industry-standard valuations of 10–20% of the market price for oil in the ground, the estimated below-ground value ranged between $20.96 billion and $41.92 billion, reflecting the fair market value prior to extraction.

18. Statements from Torchlight's executives, including Brda and McCabe, and social media influencers consistently referenced the Orogrande asset's potential, fostering shareholder expectations of significant financial returns. These projections were frequently cited in discussions leading up to the transition to NBH *(See Appendix 23)*.

19. Torchlight's presentation underscored the Orogrande project's capacity to attract major industry players for acquisitions or partnerships, citing its size and resource estimates as key advantages. While acknowledging market risks, Torchlight framed the central question as not whether oil exists in the Orogrande asset but determining the precise recoverable quantity.

6

20. In June 2020, Torchlight's board of directors, led by Brda, resolved to pursue a strategic initiative to stabilize the company through a merger with META I, a Canadian corporation specializing in advanced technological innovations and cleantech solutions. This merger was presented to shareholders as a critical measure to address alleged illegal short shares and counteract the systemic challenges posed by naked short selling in the market.

21. The merger, finalized on December 14, 2020, sought to combine Torchlight's oil and gas assets with META I's advanced materials technology, with the aim of enhancing shareholder value and diversifying operations. This corporate action marked a pivotal shift for both companies and laid the foundation for the creation of META II, which officially formed on June 28, 2021, and began trading on Nasdaq under the ticker symbol MMAT *(See Appendix 7)*.

22. During this process, Torchlight issued Preferred Stock, later known as MMTLP, as restricted shares. Although these shares were initially intended to remain non-tradable, they began trading on OTC markets on October 6, 2021 *(See Appendix 8)*.

23. This trading activity implied a conversion to free-trading status, which typically requires a registration statement declared effective by the SEC or an exemption, such as Rule 144 or a 3(10)(a) exemption.

24. It is believed, based off these documents, that the issuance of MMTLP shares suggest that Brda or other corporate officers may have structured the issuance to leave room for the shares to trade on the OTC markets, despite public assurances that these shares would not be traded.

25. This discrepancy raises significant questions about transparency, corporate intent, and the overall integrity of the MMTLP trading process, directly impacting shareholder trust and financial outcomes.

26. Also, in or around Q4 of 2020, another ticker symbol, MMATF, began trading on various exchanges in the U.S. and internationally. This MMATF ticker was representative of META I, which, at the time, was trading on the Canadian junior exchange (CSE) under the symbol MMAT.CN and was not DTC eligible *(See Appendix 9)*.

27. A statistical analysis performed on July 14, 2024, evaluated trading volumes of Torchlight (TRCH) from 2010 to 2020 against its trading activity in the first half of 2021. The analysis

considered a historical daily variation of 5% and concluded that the 3.6 billion shares traded within six months of 2021 was statistically improbable without manipulation or an extraordinary market event.

28. This extreme volatility and unusual trading activity suggest the introduction of naked short positions in TRCH. A detailed investigation, particularly into the activities of GTS Securities, is warranted to uncover potential instances of naked short selling or other improper trading practices during this period.

29. In June 2021, GTS Securities, led by Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, filed paperwork to list the "Series A Preferred Stock" (MMTLP) for trading on the Over-The-Counter (OTC) market. This action was taken without authorization from Torchlight or META I executives, raising significant concerns about compliance *(See Appendix 11)*.

30. Rubenstein advocated for reduced regulatory burdens under Rule 15c2-11, suggesting exemptions for certain securities, such as preferred stocks, linked to primary shares listed on U.S. exchanges. This position underscores a potential loophole exploited during the MMTLP registration process.

31. Social-media allegations have surfaced that GTS and Canaccord relied on outdated, decade-old information in their Form 211 filings, or potentially bypassed filing entirely, as the SEC reportedly found no record of these submissions as of August 16, 2021. Such discrepancies may constitute violations of FINRA rules and merit further investigation.

32. A letter from the Options Clearing Corporation (OCC), dated June 21, 2021, explicitly stated that the "Series A Preferred Shares" would not trade. However, this directive was contradicted by instructions allowing options traders to defer closing short positions until MMTLP could trade on the OTC market. This inconsistency directly conflicted with the intentions of the merged companies *(See Appendix 30)*.

33. The OCC memorandum, distributed exclusively to market makers and hedge funds, including GTS and Rubenstein, provided additional time to close out fails-to-deliver under the "market maker exemption" rule, creating an uneven playing field for retail investors.

34. On June 25, 2021, Torchlight's Central Index Key (CIK) number, 0001431959, transitioned to META I during their reverse takeover (RTO). This shared use of the CIK among Pole Perfect, Torchlight, META I, and later META II could violate SEC rules requiring distinct identifiers for separate entities, potentially misleading investors, and obscuring transaction records *(See Appendix 13)*.

35. During the merger, McCabe, a key executive, publicly emphasized the potential value of Orogrande Basin's oil and gas assets, citing substantial reserves and strategic importance. However, public filings at the time valued these assets at $47 million—far below the estimated $20.96 billion to $41.92 billion derived from reserve-based valuations, highlighting discrepancies that later surfaced during the NBH spin-off *(See Appendix 14)*.

36. On June 28, 2021, MMTLP shares were created as a part of the spin-off transitioning Torchlight's assets into NBH. These shares were designated as "Preferred Stock Dividend" shares intended for private ownership and were not meant to trade publicly *(See Appendix 15)*.

37. Despite MMTLP's first official trading date on October 6, 2021, Schwab's Total Stock Market Index Fund (SWTSX) included MMTLP shares as of July 31, 2021. This premature inclusion raises systemic concerns about share recognition processes and suggests potential irregularities in their creation *(See Appendix 16)*.

38. On October 6, 2021, GTS Securities and Canaccord Genuity began public trading of MMTLP shares. META II executives were notified via email on the same day, marking the company's first and only awareness of this action. This trading occurred despite directives in Torchlight's proxy statement prohibiting public trading of the Series A Preferred Shares *(See Appendix 42)*.

39. MMTLP shares began trading on OTC markets under the shared CIK number 0001431959, which had been used by Pole Perfect, Torchlight, and META II. This practice created ambiguity regarding compliance with SEC regulations, including Regulation S–T Rule 10(b) and Rule 10b-5, and warrants a thorough review to ensure adherence *(See Appendix 13)*.

40. Former Torchlight CEO John Brda reported the unauthorized trading of MMTLP to OTC Markets, which redirected him to FINRA *(See Appendix 18)*.

41. FINRA informed Brda he lacked standing to file a complaint, as he was no longer CEO, further complicating shareholder recourse and adding to confusion over the listing process.

42. FOIA-released emails confirmed that the SEC and FINRA were aware of MMTLP trading concerns as early as November 2021 *(See Appendix 19).*

43. Despite this awareness, no action was taken to resolve trading irregularities or address discrepancies in share volume, leaving retail investors exposed to systemic risks.

44. From October 7, 2021, to December 9, 2022, MMTLP trading activity facilitated by GTS Securities exceeded the authorized float of 165 million shares. This abnormal trading volume warrants investigation into potential synthetic share creation and necessitates a comprehensive audit of fails-to-deliver records *(See Appendix 20).*

45. Between October 1, 2022, and December 8, 2022, MMTLP's stock price fluctuated from $2.85 to $12.50, with its market capitalization varying from $1.5 million to $6.5 billion. These discrepancies indicate potential rehypothecation or other trading irregularities requiring further examination *(See Appendix 21).*

46. On November 23, 2022, MMTLP shareholders were advised to transfer their shares to American Stock Transfer & Trust Company (AST/EQ) for the distribution of NBH shares. However, promised bonus shares were not delivered, raising concerns about shareholder misrepresentation and compliance with distribution agreements *(See Appendix 22).*

47. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of potential irregularities affecting the trading of META II and MMTLP shares *(See Appendix 23).*

48. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

49. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as this date mentioned, if not before this.

10

50. These reports contain detailed trade information, including the identity of the buyer and seller, trade size, trade price, and other transaction-specific details. The purpose of Blue Sheets is to assist regulators in monitoring the markets, detecting suspicious trading activity, and investigating potential securities violations like market manipulation or insider trading.

51. Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

52. On December 6, 2022, both FINRA and META II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, purchases of MMTLP executed after that date would not qualify for the distribution, and no new trades could be executed after December 8, 2022. However, shareholders were permitted to settle their positions, including all short sales (position close-only trades), through the end of trading on December 12, 2022 *(See Appendix 24)*.

53. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

54. On December 7, 2022, John Mendall, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action *(See Appendix 25)*.

55. Mendall confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

56. Prior to December 8, 2022, FINRA did not provide any notice, either privately or publicly, that a U3 halt on MMTLP trading would be issued. FINRA failed to inform the issuer or shareholders before the halt occurred, and no explanation was provided for this omission *(See Appendix 24)*.

57. On December 8, 2022, FINRA revised the original corporate action notice for MMTLP, altering key language and removing references to the December 14, 2022, pay date for NBH shares. These unilateral changes were made without notifying or justifying the decision to META II.

58. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from META II regarding unresolved issues with the MMTLP corporate action *(See Appendix 52)*.

59. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to NBH shares *(See Appendix 24)*.

60. This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

61. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions *(See Appendix 27)*.

62. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe share imbalance.

63. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024) *(See Appendix 28)*.

64. Many MMTLP traders, including the Plaintiffs, have expressed their intent to execute opportunity trades prior to the trading deadline on December 12, 2022, as specified in the approved corporate action *(See Appendix 29)*.

65. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided. *(See Appendix 30)*.

66. On December 9, 2022, counsel for META II and NBH contacted FINRA to seek clarification on whether the U3 halt was temporary or permanent. Despite these efforts, FINRA failed to provide a definitive response or explanation.

67. FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

68. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022 *(See Appendix 31)*.

69. Although the U3 halt was technically lifted on December 13, 2022, the practical effect of this halt remains unresolved, as investors have not regained access to trading their shares or resolving their holdings. As of December 4, 2024, the matter remains unresolved, leaving investors without resolution for a total of 726 days.

70. FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across U.S. financial markets.

71. While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

72. As a privately governed organization, FINRA's Board of Governors is not appointed by the President or subject to the checks and balances typically applied to federal agencies, prompting constitutional considerations relevant to its governance and actions.

73. From its establishment as an SRO under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers, including the ability to enact rules, conduct investigations, and impose sanctions, functions typically reserved for federal agencies.

74. These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action that had significant financial and legal implications for investors.

75. However, FINRA's governance by a private membership-based Board of Governors raises structural questions about its authority to take such impactful actions.

76. This board is neither appointed by the President nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

77. In the week after the FINRA U3 halt, Charles Schwab & Co. sent emails to MMTLP shareholders, Ms. Gwendolyn Mickens, and Mr. Anthony Erbacher, stating that, even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares *(See Appendix 32)*.

78. Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition *(See Appendix 33)*.

79. On December 13, 2022, FINRA deleted the MMTLP ticker entirely from its listings through its UPC Advisory system. This action was taken as part of the corporate action for NBH, but FINRA did not provide additional details or address ongoing shareholder concerns.

80. On December 14, 2022, META II completed the spin-off of the oil and gas assets to NBH and, as a result, holders of META II's Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

81. Shareholders who received NBH shares as a result of the Registration Statement and Spin-Off have been damaged as a result of Defendants' violations of the Securities Act.

82. Also, on December 14, 2022, META II completed the Spin-Off and distributed NBH's equity to the Preferred Stock shareholders as of December 12, 2022 (i.e., the record date).

83. In total, META II distributed 165,472,241 shares of NBH to the Preferred Stock shareholders.

84. On January 18, 2023, Brda, former CEO of Torchlight, announced the formation of Flamethrower, a shareholders' group aimed at investigating potential market manipulation involving MMTLP stock.

85. Flamethrower was established to investigate alleged market manipulation by market makers, broker-dealers, and other parties concerning MMTLP stock, particularly focusing on the events surrounding the spin-off of NBH from META II.

86. Brda led Flamethrower and retained legal counsel, with Christian among others, to assist in the investigation. The group sought to engage shareholders and the public to gather information and raise awareness about the alleged market manipulation.

87. Flamethrower successfully brought attention to the concerns of MMTLP shareholders regarding potential market manipulation. The group's efforts led to increased public awareness and discussions about the issue, prompting some media coverage and responses from regulatory bodies.

88. In February of 2023, Christian interviewed publicly, regarding MMTLP he said, "You're going to see the mother lode of all, you know, shares that have been issued -that you know don't exist- come to the forefront. It's going to- it's going to pale GameStop, it is going to pale AMC" *(See Appendix 34)*.

89. As of December 8, 2024, there is limited publicly available information regarding the current activities of Flamethrower. The last notable public mention of Flamethrower was in March 2023, discussing its formation and objectives.

90. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading *(See Appendix 35)*.

91. Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

92. Under 17 CFR 242.204, broker-dealers are required to close out failures to deliver (FTD) positions in equity securities resulting from short sales within the regulatory timeframe of T+4 (trade date plus four settlement days).

93. This rule is designed to minimize disruptions in the securities market caused by settlement failures and to prevent market abuses such as naked short selling.

94. The December 9, 2022, U3 trading halt on MMTLP, followed by the deletion of its ticker on December 13, 2022, prevented broker-dealers and market participants from closing out short positions within the regulatory timeframe mandated by Rule 204.

95. The inability to trade or settle these positions resulting in unresolved positions that may include short interest that is 'trapped' and non-compliant with Rule 204 requirements.

96. The halt and deletion of MMTLP shares exposed a regulatory gap, as Rule 204 does not provide a mechanism for addressing close-out obligations when trading in a security is abruptly halted and permanently deleted.

97. This gap has allowed broker-dealers with FTDs and short positions in MMTLP to remain in violation of close-out requirements without a viable resolution.

98. The inability to enforce Rule 204 close-out requirements for MMTLP has led to significant unresolved short interest, potentially involving synthetic shares and naked short selling.

99. This has caused substantial financial harm to retail investors, who have been denied access to their investments or the ability to liquidate positions, further eroding confidence in market fairness and integrity.

100. The MMTLP case illustrates the necessity for regulatory bodies, including the SEC and FINRA, to establish clear protocols to address close-out requirements during extraordinary circumstances, such as trading halts and ticker deletions.

101. Without such mechanisms, the enforcement of Rule 204 remains inadequate, leaving market participants and retail investors vulnerable to systemic failures.

102. FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt *(See Appendix 36)*.

103. Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

104. On March 30, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021 *(See Appendix 37)*.

105. High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm *(See Appendix 23)*.

106. On April 18, 2023, DuBose, then CEO of NBH, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets *(See Appendix 38)*.

107. In the context of META II and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic share creation.

108. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic ones.

109. Given the allegations of naked short selling and the creation of synthetic shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

110. If regulators were to release Blue Sheets for META II and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups or conclusively dispute them as a matter of fact.

111. For instance, these sheets might highlight unusually high trade volumes that exceed the total outstanding shares, corroborating claims of synthetic shares.

112. Furthermore, they could reveal whether broker-dealers and market makers engaged in practices like excessive failure-to-deliver (FTD) settlements or illegal short selling and spoofing, which may have depressed the stock price or caused financial harm to shareholders.

113. Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct.

114. McCabe outlined concerns regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt *(See Appendix 39)*.

115. The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

116. FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023 *(See Appendix 40)*.

117. A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt *(See Appendix 41)*.

118. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

119. To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

120. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP *(See Appendix 42).*

121. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2023. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

122. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

123. On September 29, 2023, the Securities and Exchange Commission (SEC) issued a FOIA response confirming that it had received 246 complaints specifically related to the U3 trading halt of MMTLP between December 9, 2022, and September 15, 2023. This demonstrates substantial investor concern regarding the halt and its regulatory implications *(See Appendix 43).*

124. In October 2023, Palikaras was removed from his position as President and CEO of META II by the company's Board of Directors *(See Appendix 44).*

125. On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning META II's Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress *(See Appendix 45).*

126. On January 15, 2024, NBH executives, including DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty *(See Appendix 46).*

127. On January 31, 2024, the Securities and Exchange Commission (SEC) issued a response to a Freedom of Information Act (FOIA) request submitted on October 2, 2023, regarding complaints received about META II's Series A Preferred Shares/Dividend, also known as MMTLP *(See Appendix 47).*

128. The SEC disclosed that a total of 848 complaints were received concerning MMTLP between December 9, 2022, and October 2, 2023. These disclosures highlight significant investor dissatisfaction and public concern over the regulatory handling of MMTLP.

129. On February 7, 2024, the Securities and Exchange Commission (SEC) acknowledged receiving 56,490 emails regarding MMTLP and related issues but has only officially responded to 35 of these complaints (0.0619%) *(See Appendix 48)*.

130. This demonstrates the significant level of investor concern and dissatisfaction, as well as the SEC's apparent failure to adequately address or resolve the grievances of affected shareholders, raising questions about regulatory oversight and accountability.

131. On February 8, 2024, a NBH press release stated, "Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of 'domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers' *(See Appendix 49)*.

132. Furthermore, it continued, "However, it repeated its assertion [FINRA] that the short interest position it saw was 'nominal.' Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares." FINRA has also confirmed this number as fact as well.

133. While unresolved short sales, under market-maker exceptions, are not uncommon and may be "nominal," this number is unacceptable two years after the stock was deleted by FINRA.

134. FINRA acknowledges the short interest as fact, but by the same token, claims nothing can be done to resolve this since the stock has been "deleted" after the U3 halt was lifted on December 13, 2022.

135. These two market rules, the halt (and subsequent deletion) and resolving short interest, conflict with each other.

136. The letter continues, "Since nothing regarding the corporate action and the issuers' contemplated record or distribution dates changed between when the corporate action was

submitted to FINRA for review, and when the U3 halt was issued (aside from the introduction of FINRA's own announcements), we remain confused as to why FINRA did not simply reject the corporate action announcement at the outset rather than issuing a halt for 'extraordinary circumstances' to the great surprise of the issuer and retail investors."

137. The letter concludes with, "The end result was mass confusion that persists to this day amongst our investor base, many of whom feel they were unnecessarily and unfairly denied two days of trading, which would have also given parties with millions of short positions an opportunity to cover or close."

138. On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies *(See Appendix 50)*.

139. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

140. In June 2024, the U.S. Securities and Exchange Commission (SEC) charged Torchlight and its successor META II and its former CEOs, including Brda, with market manipulation and fraud *(See Appendix 51)*.

141. The SEC's complaint alleges that Brda as CEO of Torchlight and co-defendant Palikaras as CEO of META I, orchestrated a scheme involving the issuance of a preferred stock dividend intended to create a "short squeeze," thereby artificially inflating the company's stock price *(See Appendix 52)*.

142. This manipulation allegedly enabled Torchlight to raise $137.5 million from investors in an at-the-market offering in June 2021, immediately prior to the merger of Torchlight and META I, which formed META II.

143. To the best of the Plaintiffs' knowledge and belief, the major difference between Palikaras and Brda or McCabe is that Palikaras did not sell any shares of META II or MMTLP during the

period in question. In other words, he did not profit from the run-up or the halt—if anything, he effectively lost millions of dollars during this time, unlike the other two Defendants.

144. Following these allegations, META II agreed to settle the SEC's charges in an administrative proceeding, resulting in a $1 million penalty. However, litigation against Palikaras and Brda is ongoing in federal district court (Securities and Exchange Commission v. John Brda and Georgios Palikaras (SEC v. Brda, 2024) *(See Appendix 51)*.

145. On August 9, 2024, META II filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada (Case No. 24-50792). This filing initiated the process of liquidating the company's assets to repay creditors *(See Appendix 53)*.

146. After META II declared bankruptcy on August 9, 2024, its final filing under this CIK occurred on September 20, 2024.

147. The Plaintiffs has submitted a valid Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada, concerning 800 MMATQ shares, as of November 13, 2024, via Registered Mail *(See Appendix 54)*.

148. As a result of the bankruptcy filing, all remaining employees, and executive officers, including President and CEO Uzi Sasson and Chief Legal Officer Dan Eaton, were terminated. Additionally, the entire Board of Directors, chaired by Jack Harding, resigned, effectively dissolving the board.

149. Within 12 months from the bankruptcy filing, Director and Audit committee member, Eugenia Moralles, and CFO Ahmed Shebl, and Palikaras' successor CEO Jim Fussaro resigned.

150. The bankruptcy proceedings are ongoing, with a Chapter 7 trustee appointed to oversee the liquidation of the company's assets in accordance with the Bankruptcy Code.

151. If META II's bankruptcy leads to the discharge of debts or obligations linked to the MMTLP situation, individuals like Brda or McCabe (depending on their involvement) might avoid legal or financial repercussions stemming from investor lawsuits or regulatory scrutiny.

152. A bankruptcy proceeding might complicate efforts to access critical financial or operational records. This could hinder investigations into trading irregularities, synthetic shares, or other

market manipulation allegations tied to MMTLP, providing plausible deniability for those involved.

153. Bankruptcy could allow participants with short positions or other financial entanglements to benefit from a market reset. If shares become delisted, worthless, or consolidated, short sellers might avoid covering their positions at higher costs, particularly if synthetic shares were involved.

154. Bankruptcy could enable some actors to shift blame onto external circumstances, including financial distress or mismanagement within META II, rather than acknowledging market manipulation, synthetic shares, or improper handling of the MMTLP spin-off and trading halt.

155. If META II's assets were sold off during bankruptcy, market participants might acquire valuable intellectual property or technology at a discount, potentially profiting from META's collapse while distancing themselves from the controversies surrounding MMTLP.

156. Bankruptcy could demoralize retail shareholders and reduce the resources available for lawsuits or advocacy campaigns. This would reduce pressure on market participants to address outstanding grievances or financial losses tied to MMTLP.

157. Christian has been frequently mentioned online in connection with the META II bankruptcy trustees, reportedly working to investigate whether shorting or spoofing activities took place.

158. Christian was publicly involved with Flamethrower, alongside Brda, in efforts to uncover evidence of alleged naked short selling in MMTLP.

159. However, there is no public record indicating that any claims of illegal activity were formally identified or brought before a court of law between March 2023 and the present.

160. Between August 1, 2007, and August 31, 2024, FINRA issued 1,040 UPC notices, with only 25 notices (2.4%) referencing trading halts, categorized under "Halted" *(See Appendix 55)*.

161. These notices typically applied to temporary suspensions governed by FINRA Rule 6440 and were issued to address short-term uncertainties surrounding a security. The indefinite nature of the U3 halt on MMTLP diverges sharply from this established pattern, making it highly unusual in comparison.

162. The MMTLP U3 halt was cited as being caused by an "extraordinary event," but FINRA provided no further explanation to shareholders or the public, a departure from standard practice under Rule 6440.

163. Unlike other notices involving "Significant Uncertainty," which appeared in 0.96% of UPC notices and were tied to clear settlement or clearance concerns, the reasons behind the U3 halt remain vague and insufficiently explained.

164. The overwhelming majority of UPC notices, 695 out of 1,040 (66.83%), referenced "Reorganization," reflecting standard regulatory actions tied to corporate mergers, bankruptcies, and share cancellations.

165. The absence of such a reorganization notice in the case of MMTLP indicates that the halt was not consistent with FINRA's usual handling of corporate transitions and further underscores the irregularity of the U3 halt.

166. As of February 8, 2024, the SEC acknowledged receiving 848 complaints related to MMTLP through FOIA disclosures, alongside approximately 56,490 emails regarding MMTLP sent by concerned investors.

167. This volume of complaints is unprecedented and reflects the extraordinary financial and emotional harm experienced by shareholders as a result of the U3 halt and the lack of transparency surrounding its implementation.

168. The indefinite suspension of MMTLP trading occurred during a critical corporate transition, as the security was set to convert into private shares of NBH.

169. Unlike typical halts tied to reorganizations or share cancellations, FINRA failed to provide the public with an adequate explanation or notice aligned with these established regulatory practices. This deviation created confusion and uncertainty among shareholders, amplifying their financial losses.

170. The MMTLP U3 halt raises significant questions about FINRA's ability to fulfill its regulatory mandate of protecting investors and ensuring fair market conditions. The lack of transparency and procedural irregularities surrounding the halt stand in sharp contrast to

FINRA's documented focus on managing predictable corporate events like reorganizations, cancellations, and temporary disruptions, as reflected in the UPC notice data.

171. According to the November 2024 report titled SEC's Oversight of the Financial Industry Regulatory Authority by the Government Accountability Office (GAO), the SEC conducted 21 program inspections of FINRA between fiscal years 2021 and 2023. These inspections addressed eight of the ten issue areas outlined in Section 964 of the Dodd-Frank Act, including governance, transparency, and conflict-of-interest management.

172. The report emphasizes that Section 964 of the Dodd-Frank Act requires regular evaluations of FINRA's governance, operations, and compliance. This mandate underscores the importance of regulatory oversight in protecting investors and maintaining market integrity.

173. That report also states that in 2022, the SEC adopted new outcome-based performance measures for its oversight of FINRA, following prior GAO recommendations. These measures focused on ensuring FINRA takes corrective actions and improving operational transparency.

174. According to the same GAO report, the most frequently addressed issue in SEC inspections during the review period was FINRA's transparency and governance, highlighting persistent concerns regarding its accountability.

175. As detailed in the November 2024 GAO report, the SEC incorporates emerging risks into its oversight of FINRA through ongoing monitoring, including responding to tips, complaints, and referrals, as well as a risk-based priority planning process to guide inspections.

176. As of December 4, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

177. While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

178. Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

179. Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares.

180. To date, no publicly available information indicates that the DTCC has taken any action, either before or after the U3 halt by FINRA, to resolve share counts, address short interest, or reconcile and audit the numerous settlement concerns related to MMTLP shares.

181. From late 2022 through 2024, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved *(See Appendix 56)*.

182. To date, neither AST/EQ (Equiniti) nor NBH has produced a publicly available document reconciling the share count for MMTLP, despite nearly two years having passed since the NBH spin-off. This failure to provide a transparent accounting of outstanding and beneficially owned shares has left investors without critical information necessary to validate ownership and address systemic discrepancies.

183. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

184. To date, no formal or publicly available plan to remedy the "extraordinary event" involving MMTLP shares has been recommended or implemented by the SEC, FINRA, or DTCC, leaving investors without resolution or recourse.

185. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings *(See Appendix 57)*.

186. In fact, it has been well established that over 18 different internal CUSIPs are or have been used to track MMTLP holdings in various broker-dealers such as Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.

187. TD Ameritrade used internal CUSIP 6DA993019, and Charles Schwab uses internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ, almost two years after the spin-off to NBH.

188. To date, MMTLP shareholders continue to have internal CUSIP placeholders at Charles Schwab and other broker-dealers and have not received their NBH shares, despite nearly two years having passed since the spin-off.

189. As of the present date, NBH has not been assigned a CUSIP number for all its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

190. This absence creates challenges in identifying and managing transactions involving NBH's common stock, complicating compliance with financial reporting standards and market transparency.

191. The lack of a CUSIP number for NBH highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

192. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single unreconciled share highlights a significant issue.

193. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt *(See Appendix 58)*.

194. The inability to reconcile all MMTLP shares to NBH shares, two years later at AST/EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

195. Also worth considering is that in January 2021, the GameStop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to GameStop's stock price surging over 1,000% within days.

196. Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

197. Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

198. The GameStop event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

199. In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on META II's Series A Preferred Shares (MMTLP) just two days before their planned transition into NBH, a private company.

200. Unlike GameStop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

201. The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key concerns, including the allegations of synthetic shares or the systemic failures affecting retail investors.

202. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

203. Unlike GameStop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

204. Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

205. These institutional participants stand to make considerable profits by not closing their short positions, particularly when synthetic shares or naked short selling is used as a trading tactic. If NBH were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

206. Public records and shareholder complaints from 2023 and 2024 indicate systemic delays in resolving trading discrepancies related to MMTLP shares. Retail investors were left without a clear resolution or recourse for their financial losses.

207. The Securities Exchange Act of 1934 explicitly mandates that the SEC oversee all self-regulatory organizations (SROs), including FINRA, to ensure their compliance with securities laws and the fair functioning of financial markets. This statutory duty places the SEC at the apex of accountability, charged with protecting retail investors and maintaining market integrity.

208. Over the past three years, the SEC has been repeatedly informed of irregularities concerning MMTLP shares, including allegations of synthetic shares, naked short selling, and failures to deliver (FTDs). Despite these warnings, the SEC failed to take preventive measures or exercise its authority to intervene before the December 9, 2022, U3 trading halt.

209. FINRA's decision to impose a U3 halt on MMTLP, citing "extraordinary circumstances," lacked transparency and failed to include a clear explanation or timeline for resolution. This inaction resulted in the immediate freezing of tens of thousands of investors' assets, exacerbating uncertainty and financial harm.

210. The SEC's failure to act swiftly and decisively in this matter is a direct violation of its statutory obligations and responsibilities under the Administrative Procedure Act (APA). The APA requires federal agencies to act in a timely, reasoned, and transparent manner to avoid arbitrary or capricious decision-making.

211. By not compelling FINRA to provide a resolution or adequately investigating allegations of market manipulation, the SEC has disregarded these APA mandates. This prolonged failure

underscores a lack of accountability in addressing both regulatory and systemic issues tied to MMTLP.

212. The SEC's inaction has not only perpetuated the financial harm experienced by retail investors but has also undermined public confidence in its ability to oversee financial markets and fulfill its mission of investor protection.

213. For more than two years following the halt, the SEC has failed to ensure FINRA's compliance with its own rules or to enforce transparency regarding the trading halt and its aftermath. This ongoing delay signals a systemic failure of oversight and governance.

214. Furthermore, the SEC has neglected to address allegations of misconduct by other market participants, including broker-dealers and institutional investors. These allegations include deleting trade confirmations, failing to disclose synthetic share data, and benefiting from practices detrimental to retail investors.

215. Retail investors, including the Petitioner, have suffered significant financial losses due to the SEC's failure to act. The value of MMTLP shares remains frozen, and the systemic issues tied to this case remain unresolved.

216. This lack of resolution is compounded by the SEC's refusal to respond meaningfully to over 56,000 investor complaints and Freedom of Information Act (FOIA) requests. Investors have been left without answers or recourse, further eroding trust in the regulatory framework.

217. One of the SEC's primary missions is to protect retail investors, particularly from systemic market manipulation. Yet, its inaction regarding MMTLP reflects a troubling departure from this mission and a disregard for its statutory obligations.

218. Despite Congressional inquiries into this matter, the SEC has failed to provide an adequate explanation for its lack of intervention or oversight. This silence demonstrates a broader pattern of regulatory neglect.

219. The SEC's failure to ensure the accountability of FINRA and other market participants has created an environment where retail investors are vulnerable to exploitation, contradicting the core principles of the Securities Exchange Act.

220. By not enforcing its oversight authority, the SEC has enabled regulatory lapses by SROs like FINRA, which have directly contributed to the financial harm of tens of thousands of retail investors.

221. The SEC's inaction has allowed systemic market manipulation to continue unchecked, setting a dangerous precedent for future cases involving synthetic shares, naked short selling, and failures to deliver.

222. This case highlights the urgent need for the SEC to enforce the APA's procedural safeguards and ensure that SROs fulfill their obligations to protect investors and maintain transparent markets.

223. Until the SEC addresses these systemic failures and ensures a meaningful resolution, retail investors will continue to face significant financial harm, and the credibility of U.S. financial markets will remain deeply undermined.

224. The prolonged lack of accountability for the MMTLP event has not only shattered investor confidence but also exposed critical vulnerabilities in the regulatory system, threatening the fundamental assumption of fairness in U.S. financial markets.

## V.    **ALLEGATIONS**

225. The Plaintiffs bring this action to address systemic failures in U.S. financial markets, underscoring the SEC's critical role in maintaining fair, orderly, and transparent markets. These failures have harmed retail investors through regulatory negligence, manipulative practices, breaches of fiduciary duty, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, a decision that deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating with insufficient SEC oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, emphasize the statutory and constitutional violations in FINRA's actions and the SEC's failure to intervene effectively.

226. The SEC's statutory responsibility under the Securities Exchange Act of 1934 to oversee FINRA and the DTCC has been fundamentally neglected. Despite mounting evidence of synthetic share creation, naked short selling, and failures to deliver (FTDs) in violation of Regulation SHO, the SEC failed to investigate, monitor, or remedy these abuses. FINRA's issuance of the U3 halt exacerbated these issues, leaving retail investors unable to trade or access their holdings. The SEC's lack of timely and decisive intervention allowed manipulative practices to flourish unchecked, distorting market conditions and undermining public confidence in financial markets.

227. The DTCC shares responsibility for failing to enforce settlement obligations and address discrepancies in share counts tied to synthetic shares and FTDs during the MMTLP-to-NBH transition. As the clearing and settlement authority, the DTCC neglected its duty to maintain accurate records and ensure timely reconciliation of shares, enabling market participants to exploit systemic vulnerabilities for financial gain. The SEC's lack of oversight over the DTCC further compounded these failures, leaving retail investors in prolonged financial and legal uncertainty.

228. FINRA's role in issuing the U3 halt on December 9, 2022, highlights significant deficiencies in its governance and regulatory processes. The halt was imposed without adequate notice, transparency, or a clearly defined resolution, violating the principles of fair market operations. The SEC, tasked with ensuring FINRA's compliance with federal securities laws, failed to intervene or require accountability for the harm inflicted upon tens of thousands of retail investors. This inaction underscores systemic regulatory gaps that enabled institutional participants to profit while retail investors suffered.

229. Market participants, including broker-dealers and market makers, engaged in practices that manipulated trading conditions for MMTLP shares. Evidence of irregular trading volumes, unexplained discrepancies in outstanding share counts, and excessive FTDs points to the likelihood of synthetic share creation and market imbalance. The SEC and FINRA failed to investigate these irregularities or enforce compliance with securities laws, enabling these manipulative practices to disproportionately harm retail investors.

230. Corporate entities, including TRCH, META, and NBH, failed to address trading irregularities or reconcile discrepancies in share ownership. Their omissions and misleading

public statements contributed to market confusion and shareholder harm. The SEC failed to enforce Sarbanes-Oxley Act requirements for internal controls and disclosures, allowing these governance failures to persist unchecked.

231. The harm caused by systemic market manipulation and regulatory inaction has disproportionately impacted retail investors, including the Plaintiffs. Institutional participants, including broker-dealers and market makers, exploited regulatory loopholes and systemic deficiencies for financial gain, while retail investors were left unable to reconcile their holdings or access the fair value of their investments.

232. The SEC's failure to oversee FINRA and the DTCC reflects negligence and apathy in fulfilling its statutory mandate to protect investors and maintain market integrity. The prolonged inaction of the SEC in addressing the U3 halt, synthetic shares, and trading irregularities has fostered a regulatory environment where retail investors remain vulnerable to systemic abuses.

233. The issues raised in this case underscore broader vulnerabilities within U.S. financial markets, including synthetic share proliferation, naked short selling, and failures in regulatory oversight. While institutional participants have benefited from these irregularities, tens of thousands of retail investors continue to suffer unresolved harm. Judicial intervention is necessary to uncover the scope of these failures, ensure accountability for those responsible, and restore investor confidence in the financial system.

234. The Plaintiffs seek to hold the SEC ultimately responsible for its failure to exercise effective oversight and accountability over FINRA, the DTCC, and other market participants. By neglecting its statutory duty to supervise these entities and enforce compliance with federal securities laws, the SEC allowed systemic failures, market manipulation, and breaches of fiduciary duty to persist unchecked. This lack of oversight enabled FINRA's unjustified U3 halt, the DTCC's failure to reconcile share discrepancies, and the broader proliferation of synthetic shares and naked short selling, all of which disproportionately harmed retail investors. The Plaintiffs urge this Court to hold the SEC accountable for its failure to protect the public interest and ensure fair, transparent, and orderly markets, as required by its statutory mandate.

235. The following legal and factual questions arise from the Plaintiffs' claims and are critical to determining liability, damages, and appropriate relief in this matter:

a) Whether Torchlight (TRCH) corporate leadership knowingly exaggerated the valuation of the Orogrande Basin asset and failed to disclose material risks, including unresolved short positions and synthetic share discrepancies, in violation of SEC disclosure requirements.

b) Whether the merger between TRCH and Meta Materials (META) was structured in a way that intentionally facilitated the creation of synthetic shares or other manipulative trading practices.

c) Whether public statements by executives from TRCH, META, and NBH, particularly about oil and gas reserves, were materially misleading or false, causing investors to rely on inaccurate information to their financial detriment.

d) Whether corporate officers from META and NBH failed to take appropriate action to reconcile synthetic shares and legitimate beneficial ownership during the MMTLP-to-NBH transition.

e) Whether the issuance and trading of MMTLP shares were improperly authorized or facilitated by corporate insiders, leading to systemic trading irregularities and financial harm to shareholders.

f) Whether broker-dealers, including Charles Schwab and TD Ameritrade, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from synthetic shares, and failing to reconcile oversold positions.

g) Whether broker-dealers employed internal CUSIP numbers or similar mechanisms to obscure or perpetuate synthetic share discrepancies, circumventing transparency requirements under federal securities laws.

h) Whether broker-dealers, through omissions or active misrepresentation, failed to disclose the true status of MMTLP shares, causing financial harm and prolonged uncertainty for retail investors.

i) Whether broker-dealers sufficiently adhered to their obligations under SEC Rule 15c3-3 and FINRA Rules 3110 and 4511 to protect customer assets and maintain accurate records of share ownership.

j) Whether market makers, such as GTS Securities, engaged in manipulative trading practices, including naked short selling and synthetic share creation, which suppressed legitimate share prices and harmed retail investors.

k) Whether exemptions granted to market makers under Regulation SHO, including bona fide market-making exemptions, were improperly used to facilitate failures to deliver and the creation of synthetic shares.

l) Whether market makers knowingly contributed to the volatility and irregular trading patterns of MMTLP shares, violating federal securities laws and FINRA regulations.

m) Whether market makers acted in coordination with broker-dealers or other entities to exploit systemic vulnerabilities for financial gain, at the expense of retail investors.

n) Whether the OTC Markets, under the leadership of Cromwell Coulson, failed to provide sufficient oversight or transparency regarding the unauthorized public trading of MMTLP shares.

o) Whether OTC Markets adequately communicated with the SEC, FINRA, and issuers to address trading irregularities or systemic issues tied to MMTLP.

p) Whether OTC Markets' approval of MMTLP trading without issuer authorization violated its regulatory obligations or contributed to market manipulation.

q) Whether AST/EQ failed to accurately reconcile synthetic shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

r) Whether AST/EQ complied with its fiduciary duties and obligations under federal securities laws to provide accurate shareholder records and ensure the integrity of the transition process.

s) Whether AST/EQ's failure to provide timely or transparent communication about share discrepancies exacerbated investor harm during the MMTLP-to-NBH transition.

t) Whether AST/EQ adequately coordinated with the DTCC, broker-dealers, and FINRA to ensure accurate reconciliation of shares during the transition period.

u) Whether the DTCC failed to reconcile synthetic shares and legitimate beneficial ownership of MMTLP shares, prolonging harm to retail investors.

v) Whether the DTCC adequately enforced settlement obligations and addressed failures to deliver during the MMTLP-to-NBH transition.

w) Whether the DTCC communicated effectively with FINRA and the SEC to resolve discrepancies in share counts and settlement processes.

x) Whether the DTCC's records and systems were manipulated or negligently managed, contributing to unresolved trading irregularities tied to MMTLP shares.

y) Whether FINRA's issuance of the U3 halt on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA provided sufficient transparency and timely notice to issuers and shareholders.

z) Whether FINRA acted negligently or ultra vires (beyond its authority) by unilaterally altering the language of the MMTLP corporate action notice and imposing the halt without adequate justification.

aa) Whether FINRA failed to investigate or address allegations of synthetic shares, naked short selling, and unresolved failures to deliver tied to MMTLP during its oversight.

bb) Whether FINRA adequately communicated with the SEC and DTCC to address systemic issues tied to the MMTLP trading halt and subsequent events.

cc) Whether FINRA's governance structure, as a private self-regulatory organization, lacks sufficient oversight, accountability, and transparency, violating constitutional principles or statutory requirements.

dd) Whether the SEC failed to oversee FINRA, the DTCC, and other market participants in accordance with its statutory obligations under the Securities Exchange Act of 1934.

ee) Whether the SEC's inaction on over 56,000 investor complaints, FOIA requests, and Congressional inquiries related to MMTLP trading irregularities violated the Administrative Procedure Act (APA).

ff) Whether the SEC's failure to enforce Regulation SHO's T+4 close-out requirements for failures to deliver enabled systemic market manipulation and prolonged financial harm to retail investors.

gg) Whether the SEC adequately investigated allegations of synthetic shares, naked short selling, and market manipulation tied to MMTLP and NBH.

hh) Whether the SEC's refusal to release Blue Sheet data or other critical trading records constitutes a failure of transparency and accountability under federal securities laws and the Freedom of Information Act (FOIA).

ii) Whether the SEC's prolonged inaction in the MMTLP case reflects negligence, incompetence, or apathy, violating its core mandate to protect investors and maintain market integrity.

jj) Whether the SEC's lack of coordination and communication with FINRA and the DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity or recourse.

kk) Whether the SEC's failure to fulfill its oversight responsibilities under the Dodd-Frank Act and the Sarbanes-Oxley Act contributed to systemic vulnerabilities and regulatory gaps highlighted in the MMTLP case.

## Count I:

### Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.)

236. Failure to Oversee FINRA: The SEC violated its statutory obligation under 15 U.S.C. § 78s(g)(1), which requires the SEC to ensure that self-regulatory organizations (SROs), including FINRA, comply with the provisions of the Securities Exchange Act of 1934 and its rules. The SEC failed to properly oversee FINRA's issuance of the U3 trading halt and subsequent inaction.

237. Fraudulent and Deceptive Practices: The SEC failed to prevent violations of 15 U.S.C. § 78j(b) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), which prohibit deceptive and manipulative practices in securities transactions, including the creation and trading of synthetic shares and naked short selling tied to MMTLP.

37

## Count II:

### Violation of the Administrative Procedure Act (APA) (5 U.S.C. §§ 551–559, 701–706)

238. Arbitrary and Capricious Actions: The SEC's failure to act on over 56,000 investor complaints, investigate FINRA's U3 trading halt, and address systemic market manipulation violated 5 U.S.C. § 706(2)(A), which prohibits agency actions that are arbitrary, capricious, or an abuse of discretion.

239. Failure to Act in a Timely Manner: The SEC violated 5 U.S.C. § 555(b) by failing to provide timely responses to complaints, FOIA requests, and Congressional inquiries regarding the MMTLP trading halt and unresolved share discrepancies.

## Count III:

### Violation of Regulation SHO (17 C.F.R. § 242.200 et seq.)

240. Failure to Enforce Close-Out Requirements: The SEC failed to enforce 17 C.F.R. § 242.204, which requires broker-dealers to close out failures to deliver (FTDs) within T+4 settlement days. The SEC's inaction allowed unresolved FTDs tied to MMTLP shares to persist beyond the regulatory timeframe.

## Count IV:

### Violation of the Clayton Act (15 U.S.C. § 14)

241. Facilitation of Anticompetitive Practices: By failing to address the creation and trading of synthetic shares and other manipulative practices, the SEC allowed anticompetitive conduct that restrained trade, harming retail investors in violation of 15 U.S.C. § 14.

## Count V:

### Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2)

242. Permitting Monopolistic Behavior: The SEC's failure to intervene allowed monopolistic and collusive practices by institutional participants, in violation of 15 U.S.C. §§ 1–2, which prohibit conspiracies and monopolistic actions that restrain trade or commerce.

## Count VI:

## Violation of the Freedom of Information Act (FOIA) (5 U.S.C. § 552)

243. Failure to Provide Timely Responses: The SEC's failure to respond adequately and in a timely manner to FOIA requests regarding the MMTLP trading halt violated 5 U.S.C. § 552(a)(6), which mandates prompt disclosure of requested records.

## Count VII:

## Breach of Fiduciary Duty (Securities Exchange Act of 1934, 15 U.S.C. § 78d(a))

244. Neglect of Investor Protection Mandate: The SEC breached its fiduciary duty under 15 U.S.C. § 78d(a) to protect retail investors by failing to address systemic issues tied to synthetic shares, naked short selling, and the MMTLP U3 halt.

## Count VIII:

## Negligence (Common Law Claim)

245. Failure to Exercise Reasonable Care: The SEC's failure to enforce securities laws and its inaction in addressing market manipulation constitutes negligence, resulting in financial harm to retail investors.

## Count IX:

## Civil Conspiracy (Common Law Claim)

246. Collusion Among Market Participants: The SEC's failure to act allowed broker-dealers, market makers, and other participants to engage in manipulative practices, amounting to civil conspiracy under common law principles.

## Count X:

## Violation of the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 et seq.)

247. Failure to Ensure Corporate Transparency: The SEC failed to enforce transparency requirements and accountability measures in corporate disclosures tied to MMTLP and the NBH spin-off, violating the principles of the Sarbanes-Oxley Act.

## Count XI:

### Violation of the Dodd-Frank Act (12 U.S.C. § 5301 et seq.)

248. Failure to Address Systemic Risk: The SEC's inaction in the MMTLP case undermined financial stability and investor protections mandated by 12 U.S.C. § 5322, a core provision of the Dodd-Frank Act.

## Count XII:

### Unjust Enrichment (Common Law Claim)

249. Profit at Retail Investors' Expense: The SEC's failure to prevent market manipulation allowed institutional participants to profit from synthetic shares and unresolved FTDs, to the detriment of retail investors.

250. Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

   a) SEC (Leadership under Gary Gensler)

   i. Knowledge of Synthetic Shares and Market Manipulation: Internal communications obtained via FOIA requests demonstrate that SEC officials, including Chairman Gary Gensler, were aware of allegations concerning synthetic shares and naked short selling tied to MMTLP as early as November 2021.

   ii. Failure to Intervene Despite Awareness: Despite knowledge of the issues, SEC leadership chose not to act or compel FINRA to address these allegations, as evidenced by the lack of enforcement actions or investigations.

   iii. Conscious Decision to Ignore Investor Complaints: The SEC received over 56,000 investor complaints regarding MMTLP but responded to fewer than 0.1%. This indicates a willful disregard for the financial harm suffered by retail investors.

   iv. Delay in Releasing Blue Sheets: The SEC's refusal to release Blue Sheet data related to MMTLP trading suggests a deliberate effort to withhold information that could expose systemic trading irregularities.

v. Failure to Enforce Regulation SHO: By not compelling broker-dealers to close out FTDs within the required T+4 settlement period, the SEC allowed violations to persist, knowing this would harm retail investors.

vi. Permitting FINRA's Unjustified U3 Halt: The SEC failed to challenge FINRA's imposition of the U3 trading halt, despite the lack of a clear justification or alignment with FINRA's rules, thereby compounding investor harm.

vii. Allowing Continued Market Manipulation: By not investigating or addressing allegations of manipulative practices, the SEC knowingly enabled market participants to profit at the expense of retail investors.

viii. Withholding Transparency on FOIA Requests: The SEC's repeated delays and inadequate responses to FOIA requests further demonstrate an intent to conceal critical information from the public.

ix. Failure to Address Congressional Inquiries: The SEC's inadequate responses to Congressional letters and hearings reflect a knowing and intentional disregard for its regulatory obligations.

x. Neglecting Systemic Risk Indicators: The SEC's inaction, despite clear warning signs of systemic risk tied to MMTLP and the broader market, demonstrates willful indifference to its mandate to protect market integrity and investor interests.

xi. Intentional Mismanagement of the Administrative Procedure Act Requirements: The SEC's delay and lack of transparency in addressing the U3 halt and trading discrepancies reflect an intentional failure to comply with APA mandates.

## Action for Declaratory Judgment & Injunctive Relief #1

## Finding the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4)

## Unconstitutional As Applied

### Allegation 1: Separation of Powers

251. Plaintiffs incorporates by reference all preceding paragraphs, including FACTS 9 through 224, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is

41

unconstitutional as applied to this case. The PSLRA's restrictive provisions exacerbate the systemic injustices suffered by Plaintiffs and other retail investors, necessitating its invalidation and an injunction against its continued enforcement.

252. The PSLRA infringes upon the separation of powers doctrine by imposing heightened pleading standards and discovery stays that impede the judiciary's ability to adjudicate securities fraud cases effectively. In the context of the MMTLP trading halt, these restrictions prevent retail investors from holding FINRA, the SEC, and market participants accountable for fraudulent conduct and systemic failures. By legislatively dictating procedural and evidentiary burdens that obstruct access to justice, the PSLRA undermines the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions.

<u>Allegation 2: Violations of the 1st, 4th, & 15th Amendments</u>

253. Plaintiffs incorporates by reference all preceding paragraphs.

254. The PSLRA's stringent pleading requirements violate the First Amendment by chilling access to the courts. In this case, the requirement to plead fraud with particularity places an insurmountable burden on retail investors seeking to challenge the systemic manipulation of MMTLP shares, including synthetic share creation and naked short selling. These manipulative practices are concealed within the operations of broker-dealers, clearinghouses, and regulators, making critical evidence inaccessible to Plaintiffs without discovery. The PSLRA effectively denies investors their right to petition the government for redress of grievances, a core First Amendment guarantee.

255. The PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability. In this case, the Act prevents Plaintiffs from pursuing claims against FINRA, the DTCC, SEC and market participants who profited from systemic manipulation. By insulating powerful financial entities, such as broker-dealers and market makers, from scrutiny, the PSLRA creates a two-tiered system of justice that favors well-resourced defendants at the expense of individual investors.

256. The PSLRA contravenes the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims. Its stay of discovery provisions prevent access to essential evidence—such as FINRA's decision-making process for the U3 halt and the DTCC's reconciliation records for synthetic shares—while simultaneously imposing heightened pleading standards. This procedural Catch-22 deprives investors of their right to a meaningful opportunity to be heard, a fundamental due process guarantee.

257. The PSLRA violates the Equal Protection Clause of the Fourteenth Amendment as it applies to state-law securities fraud claims. By preempting state-law remedies and imposing restrictive federal standards, the PSLRA limits access to justice for investors pursuing claims in state forums. This unequal treatment creates a de facto preference for corporate defendants, particularly broker-dealers and market makers, in violation of the Constitution's guarantee of equal protection under the law.

258. The PSLRA's safe harbor provision for forward-looking statements is particularly relevant to this case, as it incentivizes corporate malfeasance. Defendants, including market makers and corporate leadership, were shielded by this provision despite engaging in misleading conduct, such as misrepresenting the value of MMTLP shares and suppressing shareholder access through the U3 halt. This legislative overreach disrupts the balance between investor protection and corporate accountability, directly undermining the goals of federal securities laws.

259. The PSLRA's legislative history demonstrates significant lobbying influence by industry groups, further evidencing regulatory capture. The Act's provisions favor institutional actors, such as those responsible for the manipulation of MMTLP shares, while denying retail investors a fair opportunity to pursue their claims. This systemic bias prioritizes the interests of financial entities over the public interest, violating principles of fairness and trust in the regulatory framework.

260. The PSLRA's impact on judicial economy is evident in this case. Its procedural barriers require Plaintiffs to meet heightened pleading standards based on incomplete information, increasing the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss without a full evidentiary record, leading to inefficiencies that undermine the objectives of federal procedural rules.

261. The PSLRA's limitations on joint and several liability exacerbate the harm caused by Defendants' collusive conduct. In this case, multiple market participants—including broker-dealers, FINRA, and the DTCC—acted in concert to manipulate MMTLP shares and suppress retail investor rights. By restricting liability to a proportional basis, the PSLRA shields culpable entities from full accountability and leaves victims inadequately compensated for their losses.

**WHEREFORE:**

262. For the reasons stated above, Plaintiffs seeks:

a) Declaratory Relief: A judicial declaration that the PSLRA is unconstitutional as applied in this case. Its provisions conflict with fundamental constitutional principles, including separation of powers, due process, and equal protection, and undermine the rights of retail investors harmed by systemic market manipulation.

b) Injunctive Relief: An injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic manipulation and regulatory failures.

c) Restoration of Judicial Authority: An order affirming the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring that investors retain access to justice and a meaningful opportunity to hold Defendants accountable.

## Action for Declaratory Judgement & Injunctive Relief #2

## Constitutional Challenge to the Structure and Authority of the Financial Industry

## Regulatory Authority (FINRA)

263. Plaintiffs incorporates by reference all preceding paragraphs, including FACTS 9 through 224, and hereby challenges the constitutional authority and corporate structure of the Financial Industry Regulatory Authority (FINRA) on three grounds: separation of powers, the Appointments Clause, and unconstitutional delegation of legislative power. FINRA wields significant executive authority—such as suspending trading, enforcing securities laws, and imposing sanctions—without presidential oversight, violating the President's Article II duties. Its Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's members rather than through constitutionally required processes under the Appointments Clause.

44

Furthermore, the SEC's delegation of broad regulatory powers to FINRA represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch, compounding the constitutional concerns surrounding its governance and operations.

<u>Allegation 1: Violation of the Separation of Powers</u>

264. Plaintiffs alleges that the Financial Industry Regulatory Authority (FINRA) operates in violation of the separation of powers doctrine established by the United States Constitution. Under Article II, Section 1, all executive power is vested in the President of the United States, and under Article II, Section 3, the President is tasked with ensuring that the laws are faithfully executed. These provisions centralize executive authority and require that any entity exercising executive powers must remain accountable to the President.

a) FINRA exercises significant executive powers, including suspending trading in securities, enforcing compliance with the Securities Exchange Act of 1934 (15 U.S.C. § 78), conducting investigations, enacting rules, and imposing sanctions. However, FINRA operates independently of presidential oversight. Its Board of Governors is not appointed or removable by the President but instead selected by its private membership. Even the Securities and Exchange Commission (SEC), which oversees FINRA to a limited degree, can only remove FINRA's Board of Governors for willful violations of the law, abuse of authority, or unjustified failure to enforce regulations (15 U.S.C. § 78s(h)(4)(B)). This limited oversight underscores FINRA's insulation from presidential control.

b) In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must remain accountable to the President to preserve the separation of powers. Like the Public Company Accounting Oversight Board (PCAOB) in that case, FINRA wields executive power without sufficient accountability to the executive branch. This lack of accountability undermines the constitutional framework and impermissibly impedes the President's ability to fulfill their constitutional duties under Article II.

c) Therefore, FINRA's structure, which grants it significant executive powers while shielding it from presidential oversight, violates the separation of powers doctrine and the constitutional design for ensuring accountability in the exercise of governmental authority.

## Allegation 2: Violation of the Appointments Clause

265. Plaintiffs alleges that the structure and appointment process of the Financial Industry Regulatory Authority (FINRA) violate the Appointments Clause of the United States Constitution, which governs the selection of officers who exercise significant authority under federal law. Article II, Section 2, Clause 2 of the Constitution requires that principal officers of the United States be appointed by the President with the advice and consent of the Senate. Alternatively, Congress may vest the appointment of inferior officers in the President alone, courts of law, or heads of departments.

a) FINRA's Board of Governors wields substantial authority under federal law, including the power to enact rules, enforce securities regulations, conduct disciplinary proceedings, and impose sanctions. These functions qualify its Board members as "officers of the United States" under the criteria established in Buckley v. Valeo, 424 U.S. 1 (1976), which defined officers as individuals exercising significant authority under U.S. law. Despite this, FINRA's Board is not appointed by the President, nor is it confirmed by the Senate. Instead, Board members are selected by FINRA's private membership, bypassing the constitutional process for appointing officers.

b) This appointment process violates the Appointments Clause. Under Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Edmond v. United States, 520 U.S. 651 (1997), officers exercising significant independent authority under federal law must be appointed in conformity with Article II. The Supreme Court has emphasized that the Appointments Clause is essential for maintaining accountability and separation of powers by ensuring that officers of the United States are appointed through constitutionally mandated procedures.

c) Furthermore, if members of FINRA's Board are deemed inferior officers, their appointments must still comply with the Appointments Clause. They must be appointed by the President, courts of law, or the head of a department. Since FINRA's private membership does not constitute a "department" under Article II, its process for appointing Board members remains unconstitutional, even if Board members are classified as inferior officers.

d) Accordingly, the selection of FINRA's Board of Governors by its membership violates the Appointments Clause of the United States Constitution and undermines the accountability required for individuals exercising significant authority under federal law.

<div align="center">Allegation 3: Unconstitutional Delegation of Legislative Authority</div>

266. Plaintiffs alleges that the delegation of broad regulatory and rulemaking authority to the Financial Industry Regulatory Authority (FINRA) violates the nondelegation doctrine enshrined in Article I, Section 1 of the United States Constitution, which vests all legislative powers in Congress. This doctrine prohibits Congress from delegating its legislative authority to any entity, particularly private organizations, or entities outside the legislative branch, without clear and specific guidance.

a) Under the Securities Exchange Act of 1934 (15 U.S.C. § 78o-3(b)), Congress authorized the SEC to delegate significant rulemaking, enforcement, and disciplinary powers to FINRA. These powers include the ability to draft and enforce securities regulations, conduct investigations, impose sanctions, and govern the conduct of broker-dealers. However, Congress provided only minimal guidance regarding the scope and limits of these powers, effectively granting FINRA quasi-legislative authority to create and enforce securities laws.

b) The delegation is further problematic because FINRA operates as a private, self-regulatory organization rather than a public entity directly accountable to the federal government. Unlike public agencies, FINRA lacks the safeguards of political accountability inherent in entities operating within the constitutional structure. In A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the Supreme Court invalidated a delegation of legislative authority to a private industry group, holding that Congress cannot abdicate its legislative responsibilities or allow private entities to govern in the absence of clear legislative standards. Similarly, in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928), the Court held that any delegation of legislative authority must include an "intelligible principle" to guide its exercise. Congress's delegation to FINRA fails this test by granting it sweeping, unsupervised authority with few meaningful constraints.

c) If FINRA is deemed part of the federal government, the delegation remains unconstitutional because it transfers legislative powers to an executive body without sufficient

limitations, violating the separation of powers. If FINRA is considered a private entity, the delegation is even more constitutionally suspect because it grants quasi-legislative powers to a body entirely outside the constitutional framework.

d) Therefore, the SEC's delegation of legislative authority to FINRA violates the nondelegation doctrine and impermissibly allows a private, quasi-governmental entity to exercise powers reserved for Congress under Article I of the Constitution.

<u>Allegation 4: Violation of Economic Liberties and</u>

<u>Unconstitutional Taking of Property Under the 9th, 5th, and 14th Amendments.</u>

267. Plaintiffs asserts that FINRA's indefinite U3 halt on MMTLP shares under Rule 6440 constitutes an unlawful interference with his property rights, protected under the 9th, 5th, and 14th Amendments to the United States Constitution. These shares represent a legally recognized property interest under UCC Article 8, Section 8-503, which entitles shareholders to exercise ownership, trade freely, and realize the value of their holdings.

a) The indefinite U3 halt deprived Plaintiffs of his ability to control, trade, or access the value of his MMTLP shares. This action, implemented without providing notice, evidence, or an opportunity to be heard, amounts to a significant taking of property. In Connecticut v. Doehr, 501 U.S. 1 (1991), the Supreme Court held that property cannot be interfered with arbitrarily and without procedural safeguards, affirming that "[t]he Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause" (Fuentes v. Shevin, 407 U.S. 67, 86 (1972)). FINRA's halt violated these principles by implementing a restriction on Plaintiffs' property without procedural fairness or justification.

b) The 9th Amendment guarantees the protection of unenumerated rights, including economic liberties, which encompass the ability to own, use, and dispose of property. These rights are deeply rooted in the Constitution, as evidenced by:

i) Article I, Section 8, which underscores the significance of economic activities through Congress's power to regulate commerce;

ii) Article I, Section 10, which prohibits laws impairing contractual obligations;

iii) The 5th Amendment, which protects against takings without just compensation;

iv) The 14th Amendment, which ensures due process protections against arbitrary government actions.

c) Plaintiffs' ownership of MMTLP shares and his corresponding rights to trade them fall squarely within the scope of these constitutional protections. FINRA's indefinite U3 halt represents an unconstitutional taking and seizure of property as described in In re 650 Fifth Ave. Co., No. 20-1212(L), 7-8 (2d Cir. Mar. 9, 2021), where the Court affirmed that meaningful interference with an individual's possessory interests constitutes a seizure. FINRA's halt deprived Plaintiffs of essential management rights over his property, including the right to transfer, trade, and access its economic value.

d) The indefinite halt implemented without transparency, proper evidence, or due process is arbitrary, unlawful, and unconstitutional. Just as criminal defendants have the right to know the charges and evidence against them, Plaintiffs is entitled to know the basis for FINRA's interference with his property rights. The absence of such procedural fairness renders FINRA's actions a violation of Plaintiffs' rights under the 9th, 5th, and 14th Amendments, necessitating judicial intervention to uphold constitutional safeguards and restore Plaintiffs' economic liberties.

### Supplemental Authority from Alpine Securities Corp. v. FINRA

268. On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America, Case No. 1:23-cv-01506. This decision provides substantial support for Plaintiffs' claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

269. The DC Circuit ruled that FINRA's expulsion orders violated the private nondelegation doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain

ultimate authority to approve or disapprove the private entity's actions. The lack of such oversight rendered FINRA's actions unconstitutional.

270. In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions, including financial ruin and the destruction of Alpine's business before full SEC review and the balance of equities and public interest in ensuring fair regulatory processes.

<u>Applicability to Plaintiffs' Case</u>

271. The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by FINRA on December 09, 2022, was similarly imposed without any prior validation or review by the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to Plaintiffs.

272. As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. Plaintiffs respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable Plaintiffs and other investors to close their positions.

<u>**Supplemental Authority from SEC v. Sloan**</u>

273. In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

274. The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification. The ruling emphasized two central principles; 1. regulatory agencies must adhere to statutory and procedural limits in exercising their authority and 2. prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

<u>Applicability to Plaintiffs' Case</u>

275. The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite U3 halt on [MMTLP or relevant stock]. While Sloan addressed the SEC's actions, the principles articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

276. The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

277. In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

<u>Reinforcing the Need for Injunctive Relief</u>

278. The Sloan precedent reinforces Plaintiffs' request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

<u>Integration of Sloan with Alpine</u>

279. When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by Plaintiffs.

**WHEREFORE:**

280. For the reasons stated above, Plaintiffs seeks:

        a) Declaratory Judgment Regarding the Constitutionality of FINRA's Structure and Authority: The Plaintiffs respectfully requests that this Court declare the structure and

authority of the Financial Industry Regulatory Authority (FINRA) unconstitutional on the grounds of violating the separation of powers, the Appointments Clause, and the nondelegation doctrine. The Court is asked to hold that FINRA's structure, including its private membership-appointed Board of Governors, its lack of presidential oversight, and its delegated legislative authority, is inconsistent with the constitutional framework established by Articles I and II of the U.S. Constitution.

a) Declaratory Relief: The Plaintiffs seeks a declaration that the SEC's delegation of legislative and quasi-legislative powers to FINRA is unconstitutional under the nondelegation doctrine, as it provides excessive and unsupervised authority to a private, self-regulatory organization without meaningful legislative guidance or oversight.

b) Declaration Mandating Structural Reforms to FINRA: The Plaintiffs respectfully requests that the Court declare that FINRA's governance structure and processes must be reformed to comply with the Constitution, including the Appointments Clause, and to ensure accountability to the executive branch and adherence to legislative limits.

c) Declaration Regarding the Indefinite Nature of the Halt: The Plaintiffs seeks a declaration that FINRA's indefinite U3 trading halt was inconsistent with statutory requirements and exceeded its regulatory authority, as defined in *SEC v. Sloan* and other applicable legal precedents.

d) Declaration Affirming FINRA's Overreach: The Plaintiffs respectfully requests that this Court declare that FINRA's imposition of the U3 trading halt on December 9, 2022, was unconstitutional, improperly executed, and in violation of shareholders' rights under federal securities laws and constitutional principles.

e) Declaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors and shielding institutional actors, thereby creating a two-tiered system of justice.

g) Injunction to Prevent Further FINRA Overreach: The Plaintiffs respectfully requests that this Court issue an injunction barring FINRA from imposing indefinite or improperly justified trading halts in the future without explicit statutory authority and proper

SEC review, in line with the precedents set forth in *Alpine Securities Corp. v. FINRA* and *SEC v. Sloan*. This injunction should also mandate procedural safeguards to ensure FINRA's compliance with constitutional and statutory limits.

h) Injunction to Reinstate Trading in MMTLP Shares: The Plaintiffs respectfully requests injunctive relief directing FINRA to reinstate trading in MMTLP shares or to facilitate a resolution that allows investors to close their positions and realize the fair value of their holdings, addressing the irreparable harm caused by the improper U3 halt.

i) Injunction Requiring the Release of Blue Sheets: The Plaintiffs respectfully requests that the Court order the release of Blue Sheet data for MMTLP and MMAT transactions to provide transparency into the allegations of market manipulation, including synthetic share creation and naked short selling, and to restore trust in the fairness of the market.

## VI.   **CONCLUSION**

281. The Plaintiffs, Sergeant Major Daniel R. Auxier and Mr. Marcos Monteiro, bring this case to confront systemic failures in the U.S. financial markets that have caused significant harm to retail investors. Central to the action is FINRA's indefinite U3 trading halt on MMTLP shares, which deprived tens of thousands of investors of access to their holdings without sufficient notice, explanation, or resolution. This unprecedented halt underscores the unchecked authority of a private self-regulatory organization (SRO) operating without meaningful government oversight, raising constitutional concerns under the separation of powers doctrine and the Appointments Clause. Legal precedents such as *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA* illustrate the statutory and constitutional violations inherent in FINRA's actions.

a) The Plaintiffs assert that FINRA's governance failures were magnified by the negligence of the SEC and DTCC, which failed to fulfill their statutory responsibilities to ensure market integrity. Despite their obligations under Regulation SHO, these regulatory bodies neglected to investigate or resolve systemic abuses, including synthetic share creation, naked short selling, and unresolved failures to deliver (FTDs). This inaction allowed institutional participants to manipulate MMTLP share trading while retail investors endured financial and emotional harm. The failure to enforce critical close-out requirements, reconcile trading

discrepancies, or release essential Blue Sheets data highlights the regulatory breakdown that facilitated market manipulation and left investors without recourse.

b) Broker-dealers and market makers, including GTS Securities and Canaccord Genuity, further contributed to this systemic harm by exploiting regulatory gaps to create counterfeit shares, distort supply and demand, and suppress share prices. These practices, enabled by regulatory inaction, exemplify a coordinated effort to manipulate market conditions while profiting at the expense of retail investors. Meanwhile, transfer agents such as AST/EQ (Equiniti) compounded the harm by failing to reconcile outstanding share discrepancies during the MMTLP-to-NBH transition. Their negligence prolonged investor uncertainty facilitated the persistence of synthetic shares and undermined the integrity of the reconciliation process.

c) Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons played a significant role in exacerbating investor harm. Executives including Greg McCabe, John Brda, and Clifton DuBose failed to address trading irregularities or fulfill their fiduciary obligations to shareholders. Misleading public statements regarding the valuation of the Orogrande Basin fostered unrealistic expectations while leaving retail investors exposed to systemic manipulation. Their collective inaction and misrepresentation aggravated the financial losses experienced by shareholders, including the Plaintiffs.

d) The harm inflicted on retail investors has been substantial and ongoing. Tens of thousands of shareholders have been denied the ability to trade their shares, reconcile their positions, or recover the fair value of their investments for nearly two years. Institutional participants who engaged in manipulative practices, including naked short selling, have faced no meaningful accountability. This stark imbalance highlights the vulnerabilities in the regulatory framework and the urgent need for judicial intervention to restore transparency, fairness, and accountability in financial markets.

e) The contrasting regulatory responses to the MMTLP and GameStop cases further expose systemic inequities. In the aftermath of the GameStop trading disruptions, swift Congressional hearings and regulatory actions ensured market stability and accountability. In contrast, MMTLP investors have endured prolonged inaction and neglect, reflecting a bias that prioritizes institutional interests over the rights of retail investors. This disparity underscores the

need for consistent regulatory enforcement to protect all market participants equally and uphold investor confidence.

f) The Plaintiffs seek both immediate relief and systemic reform. They call upon the Court to address FINRA's unconstitutional governance structure, enforce statutory limits on trading halts, and ensure greater government oversight of private entities exercising delegated authority. In addition to compensatory and punitive damages for the financial and emotional harm suffered by retail investors, the Plaintiffs seek systemic reforms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and guarantee accurate reconciliation of shareholder positions.

g) By adjudicating this case, the Court has a unique opportunity to establish critical legal precedents that promote regulatory accountability and restore public trust in the financial markets. A decision in favor of the Plaintiffs would reaffirm the principles of constitutional governance, hold the Defendants accountable for systemic misconduct, and safeguard the rights of retail investors. Such a ruling would not only deliver justice to those harmed but also strengthen the integrity and transparency essential for the continued confidence and fairness of U.S. financial markets.

## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE,**

282. Plaintiffs pray for judgment in their favor and request relief as follows:

a) Declaratory Relief:

i. Issue a declaration that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

ii. Issue a declaration that the structure and authority of the Financial Industry Regulatory Authority (FINRA) are unconstitutional due to its lack of meaningful governmental oversight, which enabled improper and prejudicial actions, including the indefinite U3 trading halt on MMTLP shares.

iii. Issue a declaration that the Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and applicable fiduciary duties.

iv. Issue a declaration that FINRA's U3 trading halt on December 9, 2022, was improper, prejudicial, and a violation of regulatory responsibilities, resulting in material harm to over 65,000 shareholders, including Plaintiffs.

b) Injunctive Relief to Restore Transparency and Prevent Future Abuses:

i. Comprehensive Market Audit: Order a full audit of all TRCH, MMTLP, MMATF, MMAT, and MMATQ share transactions, including the identification and reconciliation of synthetic shares, fails-to-deliver (FTDs), and beneficial ownership records.

ii. Public Disclosure of Data: Mandate the release of all trading data, records, and communications related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

iii. Injunction to Reinstate Trading or Equitable Resolution: Require an expedited and transparent process for the reinstatement of trading of MMTLP shares, or in the alternative, mandate an equitable shareholder resolution that provides compensation or recovery of value for all affected investors. This process must include independent oversight, shareholder participation, and clear timelines to ensure fairness and accountability.

iv. Independent Oversight: Appoint an independent special master or neutral third-party overseer to monitor the full audit, reconciliation, and implementation of systemic reforms to ensure transparency, accountability, and compliance.

v. Congressional and Regulatory Review: Require Congressional and regulatory review of policies related to trading halts, synthetic share creation, and oversight of self-regulatory organizations (SROs) to prevent future systemic failures.

c) Compensatory Damages to Redress Financial and Emotional Harm:

i. Award compensatory damages for the loss of value and liquidity of Plaintiffs' MMTLP shares and MMAT shares caused by Defendants' misconduct.

56

ii. Award damages arising from the suppression of share prices and trading opportunities caused by synthetic share creation, naked short selling, and the improper U3 halt.

iii. Award recovery of Plaintiffs documented financial losses, as well as additional losses caused by systemic harm to market value.

iv. Award compensatory damages for emotional distress and mental anguish resulting from Defendants' prolonged misconduct, refusal to resolve the U3 halt, and failure to provide clarity or remedies for trading irregularities.

d) Treble Damages for Antitrust Violations:

i. Award treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act, to redress Defendants' anti-competitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including Plaintiffs.

e) Disgorgement of Ill-Gotten Gains:

i. Order the disgorgement of profits wrongfully obtained by Defendants, including market makers, broker-dealers, and transfer agents, through the trading of synthetic shares, naked short selling, and related market manipulation.

f) Establishment of Restitution Fund for Retail Investors:

i. Require the creation of a structured restitution fund to compensate all affected shareholders for financial harm caused by synthetic share discrepancies, naked short selling, and manipulative trading practices.

g) Punitive Damages:

i. Award punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

h) Audit of META II's Chapter 7 Bankruptcy Proceedings:

i. Order an independent audit of META II's Chapter 7 bankruptcy proceedings to ensure transparency, identify any irregularities, and determine whether institutional participants unfairly benefited from liquidation or market resets.

i) Regulatory Oversight Improvements:

  i. Require the Securities and Exchange Commission (SEC) and FINRA to establish clearer guidelines for regulatory intervention in cases of market irregularities, including; improved oversight and enforcement mechanisms to prevent synthetic share proliferation, naked short selling, & prolonged trading halts and enhanced accountability and transparency measures regarding corporate actions, share reconciliations, and market-making practices.

j) Pre- and Post-Judgment Interest:

  i. Award pre- and post-judgment interest on all compensatory damages to account for the time value of Plaintiffs' losses and to ensure full recovery of the harm caused.

k) Costs and Expenses:

  i. Award Plaintiffs their reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any associated costs.

l) Other Relief:

  i. Grant any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct, restore trust in U.S. financial markets, and prevent future harm to retail investors.


## VIII. <u>DEMAND FOR JURY TRIAL</u>

283. The Plaintiffs hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  **12/23/2024**

SGM Daniel R. Auxier, pro se ipso

105 Valley Road

Wantage, NJ 07461

Dated:  **12/23/2024**

Mr. Marcos E. Monteiro, pro se ipso

5321 Dove Tree Street

Orlando, FL 32811

**CERTIFICATION OF PLAINTIFFS PURSUANT TO FEDERAL SECURITIES LAWS**

I, Sergeant Major Daniel R. Auxier, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on

**Signature:**

**Name:** Sergeant Major Daniel R. Auxier

**CERTIFICATION OF PLAINTIFFS PURSUANT TO FEDERAL SECURITIES LAWS**

I, Mr. Marcos E. Monteiro, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on

**Signature:**

**Name:** Mr. Marcos E. Monteiro

59

Generated: Dec 6, 2024 9:46AM                                                                                    Page 1/1



## U.S. District Court

### Texas Western - Midland

Receipt Date: Dec 6, 2024 9:46AM

Daniel R. Auxier
105 Valley Road
Wantage, NJ 07461

Rcpt. No: 1171                          Trans. Date: Dec 6, 2024 9:46AM                          Cashier ID: #JB

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|----------------------|-----|-------|-----|
| 200 | Civil Filing Fee- Non-Prisoner | | 1 | 405.00 | 405.00 |

| CD | Tender | | | | Amt |
|----|--------|--|--|--|-----|
| MO | Money Order | #29633680596 | 12/2/2024 | | $405.00 |

Total Due Prior to Payment: $405.00

Total Tendered: $405.00

Total Cash Received: $0.00

Cash Change Amount: $0.00

**Comments:** CIVIL FILING FEE FOR CASE #7:24-CV-00318

Clerk, U.S. District Court - Midland Division - 200 East Wall Street, Room 222, Midland, TX 79701 (432) 686-4001 - www.txwd.uscourts.gov

Team,

Please add this entire document & evidentiary to my case as the first amended complaint. Let me know if you want a digital copy, I can provide that easily through your drop box.

Merry Christmas!

— SGM Daniel Auxier
(401) 523.7559

SGM DANIEL AUXIER
105 VALLEY ROAD
WANTAGE, NJ 07461

Retail

79701

RDC 07

U.S. POSTAGE PAID
PME
SUSSEX, NJ 07461
DEC 24, 2024

$98.70

S2324M504048-05

TIME SENSATIVE – FIRST AMENDED COMPL

EWR

WGT: 006 TOTAL: 00035
AR: LBB AT 07:09 ORG:NJI 05
LV: EWR AT 21:49 12/24/24

LBB

J4TE6L90BJ

E

07

79701

POSTAL SERVICE® | EXPRESS®

EI 367 366 465 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE (401) 523 7559

SGM DANIEL R. AUXIER
105 VALLEY ROAD
WANTAGE, NJ 07461

DELIVERY OPTIONS (Customer Use Only)

☒ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options

☐ No Saturday Delivery (delivered next business day)

☐ Sunday/Holiday Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE (432) 686 4001

US DISTRICT CLERK'S OFFICE
200 EAST WALL, RM 222
MIDLAND, TX 79701

ZIP + 4® (U.S. ADDRESSES ONLY) 79701

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (if applicable)

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
| --- | --- |
| DEC 27 2024 | |

ORIGIN (POSTAL SERVICE USE ONLY)

☐ 1-Day ☒ 2-Day ☐ Military ☐ DPO

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage | |
| --- | --- | --- | --- |
| 07461 | 12/27/24 | $ 98.70 | |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
| 12/21/24 | ☒ 6:00 PM | $ | $ |
| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
| 10:11 ☒ AM ☐ PM | | $ | $ |
| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees | |
| $ | $ | 98.70 | |
| Weight ☐ Flat Rate | Acceptance Employee Initials | | |
| 5 lbs. 15 ozs. | TO | $ | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| --- | --- | --- |
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021 PSN 7690-02-000-9996

DNJ2

5.2 Lbs

BJ4RKMD4/1/3042

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
UNITED STATES COURTHOUSE
200 E. WALL STREET, RM 222
MIDLAND, TX 79701

RECEIVED
DEC 27 2024

FAC

