# Case Evidentiary 1

## 22 DEC 24

# Auxier v. SEC

## 7:24-CV-318

## 06 DEC 24

APPENDIX 1

| Date | Event |
|---|---|
| May 2, 2008 | Pole Perfect Studios began filing as a public company under CIK number 0001431959 |
| November 23, 2010 | Following its merger with Torchlight, the CIK number transferred to Torchlight, making it responsible for filings |
| 2010 | Torchlight Energy engaged in oil exploration activities leading up to its public trading |
| From 2010 to 2020 | Torchlight Energy traded a cumulative total of 745 million shares on public markets |
| March 1, 2020 | Torchlight presented an Investor Presentation highlighting its assets in the Permian Basin |
| April 20, 2020 | Relevant corporate communications regarding the Orogrande asset surfaced |
| June 2020 | Corporate leadership at Torchlight explored strategic options due to financial pressures |
| Q4 of 2020 | META I's shares started trading internationally |
| December 14, 2020 | Torchlight initiated a merger plan with META I |
| January 1, 2021 – June 25, 2021 | TRCH traded over 3.6 billion shares, raising concerns about unusual trading activity |
| January 2021 | The merger process between Torchlight and META I gained traction |
| March 5, 2021 | Plaintiffs signed a self-directed broker agreement with TD Ameritrade |
| June 15, 2021 | Plant claimed the Orogrande asset held 3.7 billion barrels of oil, suggesting a dividend payout |
| June 21, 2021 | The OCC stated that the Series A Preferred Shares would not trade publicly |
| June 25, 2021 | Torchlight conducted a reverse takeover with META I, transitioning CIK number 0001431959 |
| June 2021 | Torchlight Energy Resources (TRCH) enters into a reverse merger with Meta Materials (MMAT), resulting in the creation of Series A Preferred shares representing TRCH assets. These assets include a 137,000 acre property in Texas' Permian Basin which is believed to contain the single largest onshore oil and natural gas discovery in the last 35 years. |
| June 28, 2021 | Torchlight transferred its CIK to META II, completing its merger with META I |
| July 14, 2021 | A Z-test analysis highlighted statistically improbable trading volumes of TRCH shares. |
| August 16, 2021 | Allegations of outdated or missing Form 211 filings by GTS and Canaccord emerged |
| October 6, 2021 | MMTLP shares were listed for trading on the OTC Market |
| October 7, 2021 | MMTLP begins unauthorized trading. MMTLP, a symbol created to represent the Series A Preferred Shares, is listed and made tradable on the OTC market without authorization from Meta Materials. The party that made this security tradable is still unknown, and FINRA refuses to shed light on their identity(s). Shortly after this, John Brda informs OTC Markets that this security is trading without proper authorization. OTC Markets tells Mr. Brda that he has to "take it up with FINRA because they approved it". John Brda then does so and is told by FINRA that he has no standing to bring this type of complaint because he is no longer the CEO. |
| October 7, 2021, to December 9, 2022 | MMTLP trading activity saw volumes far exceeding the authorized share count |
| Pre-November 29, 2021 | Patricia Cassimates (FINRA) contacts SEC regarding MMTLP |
| November 29, 2021 | FOIA email confirms FINRA/SEC communications regarding MMTLP |
| January 21, 2022 | Gensler meets with FINRA representatives: Robert Cook (CEO), Nathaniel Stankard (Senior Advisor), Bob Colby (CLO), Stephanie Dumont (EVP Market Regulation), Jonathan Sokobin (SVP & Chief Economist), Racquel Russell (SVP & Director of Capital Markets), Gregory Dean (SVP Government Affairs). |
| February 17, 2022 | Gensler meets again with FINRA representatives Robert Cook, Robert Colby, Jonathan Sokobin, and Stephanie Dumont. |
| April 1, 2022 | FOIA reveals 2021 FINRA/SEC emails related to MMTLP. |

| Date | Event |
|---|---|
| April 12, 2022 | Off-calendar meeting between FINRA and Gensler's policy counsel. Attendees from FINRA: Stephanie Dumont Racquel Russell |
| July 15, 2022 | The first S/1, stating MMAT's intention to spin out the TRCH/MMTLP assets into a private company, is issued. NBH received its CIK number 0001936756 in preparation for its planned spin-off from META II. |
| July 22, 2022 | Off-calendar meeting between FINRA and Gensler's staff (CAT data security). |
| May 16-20, 2022 | Gensler attends the FINRA conference and meets FINRA CAT staff (May 16) and core FINRA group (May 20). |
| August 19, 2022 | Gensler meets with the core FINRA group. |
| October 1, 2022 – December 8, 2022 | MMTLP experienced significant price volatility and market cap swings |
| November 9, 2022 | After undergoing 4 revisions due to comments by the SEC, the final S/1 is issued. |
| November 18, 2022 | A notice of effectiveness related to the S/1 is filed after the SEC offers no further comments or questions. |
| November 23, 2022 | November 25th, 2022: A form 424b4, which provides information on the dates the spin-out is to occur, is filed. |
| November 23, 2022 | MMTLP shareholders were advised to transfer shares to AST for share distribution |
| November 28, 2022 | Gensler meets with the core FINRA group. George Palikaras (Meta CEO) tweets |
| November 30, 2022 | George Palikaras, CEO of Meta Materials, tweets the following: "Today, META requested FINRA to halt $MMTLP on Dec 14th at close (current distribution date)... OR to freeze trading on Dec 12th at close (current record date). Please take the time to READ the S1. NO public trading after the distribution date, i.e. there is NO ex-dividend date." |
| November 30, 2022 (or around) | McCabe sold 6.8 million MMTLP shares, generating proceeds estimated up to $68 million |
| December 2, 2022 | The FINRA email mentions SEC conversations and provides tips regarding MMTLP |
| December 5, 2022 | FOIA-released emails revealed regulatory awareness of fraudulent activities in MMTLP trading. Sam Draddy, a Senior VP at FINRA sends communication to the SEC stating that he was requesting the comprehensive trading data (known as "blue sheets") on MMTLP and MMAT. |
| December 6, 2022 | After no corporate action notice is issued, Congressman Peter Sessions (R-TX) sends a letter to FINRA requesting that they do their jobs and send out the corporate action notice to explain to brokers and the investing public how this spinout will occur. FINRA responds by doing so. This corporate action notice states that the shares will be CANCELLED on 12/13, and that shares of Next Bridge would be paid to clients in exchange for their MMTLP shares on the same date. |
| December 7, 2022 | Jeff Mendl, Vice President of OTC Markets, goes on the "Trader TV" broadcast, and states numerous times, along with the host, that trading will occur through December 12th AS PER FINRA, and that at Midnight on December 13th, the shares will be DELETED (not the shares will be CANCELLED). |
| December 7, 2022 | FINRA confirmed an approved corporate action for MMTLP but did not act transparently |
| December 8, 2022 | Unhappy with the corporate action notice put out by FINRA, the DTCC calls a meeting with them after the first corporate action, and attorneys from Meta Materials. FINRA NO SHOWED THIS MEETING. It was later revealed that DTCC and FINRA did meet, but without the issuer present (need citation). |
| December 8, 2022 | FINRA issues ANOTHER corporate action notice, changing the wording from "MMTLP shares will be cancelled", to "symbol will be DELETED". They also REMOVED the pay date of 12/14. |
| December 8 and 9, 2022 | Major broker dealers in the United States send out communications to their clients who inquire delineating the guidance that they received from FINRA stating that this was to trade on the 9th and the 12th in "position close only" fashion. Meaning, no new buying orders would be accepted. |
| December 9, 2022 | After being allowed to trade for 14 months and with two trading days left, trading of MMTLP is halted by FINRA five days before the assets are to be spun out into Next Bridge Hydrocarbons |
| December 11, 2022 | Dumont (FINRA) emails SEC regarding an MMTLP update |
| December 12, 2022 | Original NBH distribution record date |
| December 12, 2022 | Roza Tawil's Florida Lawsuit filed. Case Number: 4:22-cv-00440, US District Court for the Northern District of Florida |
| December 13, 2022 | MMTLP symbol deleted by FINRA |
| December 14, 2022 | The date of the most distribution is from the initial corporate action |

| Date | Event |
|---|---|
| December 14, 2022 | META II completed its spin-off of oil and gas assets to NBH, distributing shares to Preferred Stock shareholders |
| December 22, 2022 | Gensler meets with a large FINRA CAT-related group |
| December 23, 2022 | Gensler meets with an expanded FINRA (CAT) group; redacted subject matter |
| January 11, 2023 | Wes Christian says "death of all shorts" in video interview |
| January 18, 2023 | Brda announced the formation of Flamethrower, a group aimed at investigating MMTLP market manipulation |
| February 6, 2023 | Cromwell Coulson, President of OTC Markets, admits in a tweet that short positions still exist in Next Bridge Hydrocarbons, which is now a private company with no intention of being tradable. He also states it "would be easier if Next Bridge shares became publicly tradable. |
| February 24, 2023 | Dave Lauer, an expert on securities manipulation and member of FINRA's Market Regulation Committee, calls on FINRA to address the problem, stating that "FINRA screwed up this entire situation", and "FINRA needs to come out and be radically transparent. They need to explain exactly what happened & what the full share count or audit shows, even if under investigation. If the books are reconciled, that needs to be shown - if they're not, then it needs to happen." |
| March 16, 2023 | FINRA releases a FAQ statement on the situation, believed to be full of misrepresentations and omissions, with NO full share count or audit to back it up. |
| March 24, 2023 | Members of the investing public release a rebuttal to FINRA's FAQ, which FINRA later had to go back and edit due to the misrepresentations they were caught in making. |
| Mid-March 2023 – Present | Concerted efforts to bring the MMTLP issue to Congress's attention |
| April 1, 2023 | A FOIA request reveals emails indicating that FINRA and the SEC were aware of the MMTLP issue at the highest levels as early as November 2021. This includes Robert W. Cook, and possibly Gary Gensler. |
| April 18, 2023 | Clifton Dubose, CEO of Next bridge Hydrocarbons, sends FINRA a letter requesting assistance to address ongoing issues resulting from the spin-off from Meta Materials, Inc. The letter outlines concerns related to uncovered short positions in NBH Common Stock, the trading halt, and the adverse impact that this situation has had on the investing public. Moreover, Next Bridge sought FINRA's cooperation in facilitating a temporary trading process to settle unresolved short positions, and maintain fair and orderly markets, while advising "[their] Company has contacted OTC Markets, which has indicated that [they] can apply to trade on an OTC Markets exchange for a limited period of time", and "DTCC has indicated that it is willing to help the Company have the CUSIP deleted after our delisting" |
| May 19, 2023 | Robert Colby, Chief Legal Officer of FINRA, responds to Mr. Dubose with a letter indicating that FINRA refuses to allow NBH to facilitate a market based reconciliation of the imbalance that FINRA created by halting the security shortly before the exchange was to occur, erroneously stating that the request to do so "does not comport with FINRA's understanding of its authority and applicable regulations, processes, or market practice". All while knowing that to allow this situation to stand without reconciliation goes against their mandate and the fundamental purpose for which their institution was created. |
| June 7, 2023 | FINRA rejected DuBose's request for a trading window to reconcile share discrepancies. Following a phone call with Mr. Dubose, Robert L. Colby sends a follow up letter. Seemingly sidestepping accountability, Colby makes the statement that FINRA lacks authority to compel specific investors to close short positions. Moreover, Colby's refuses to grant NBH access to blue sheet data for trading activity in MMTLP, raising further questions about transparency and the organization's intentions. Colby's response downplays concerns and omits crucial details intensifies doubts about FINRA's credibility and commitment to investor protection. |
| June 2023 | In June of 2023, FINRA delivered a briefing to what we are told was possibly 17 staffers for different members of the House Committee on Financial Services where it is believed that they refused to provide a share count, but acknowledged that there is indeed an imbalance. |
| July 14, 2023 | Congressman Eli Crane, representing Arizona's 2nd District, sends a letter to SEC Chairman Gary Gensler, expressing constituent concerns about the MMTLP trading halt and alleged illegal share sales. The letter requests that a briefing be provided to his office, and highlighted the need for investor protection in light of the MMTLP situation. |
| June 20, 2023 | New York Supreme Court Petition by Basile Law Firm, Case Number: 153819/23, New York County Supreme Court |
| July 28, 2023 | 15 Members of the United States House of Representatives' Committee on Financial Services, send a letter to SEC Chairman Gary Gensler requesting a thorough review and substantive briefing of the MMTLP situation. The letter calls for an examination of the trading timeline, actions by regulatory bodies and relevant parties, and the transaction that produced the Next Bridge Hydrocarbons shares. The SEC is asked to provide findings by August 11, 2023, in order to address investor concerns and enhance market integrity. Chair Gensler has yet to deliver this briefing, but as of this writing, has requested to be able to do so in person in September. |
| August 21, 2023 | Congresswoman Norma J. Torres, representing California's 35th District, sends a letter to SEC Chairman Gary Gensler, and FINRA President Robert Cook, expressing constituent concerns about the MMTLP trading halt and alleged illegal share sales. Among the requests, Congresswoman Torres asks for a briefing by the SEC and FINRA, and a written response about what constituents can expect to occur with regard to their current holdings and under what timeline would such a resolution take place |
| September 17, 2023 | Senator Mike Crapo (R-ID) questions SEC Chairman Gary Gensler about the MMTLP situation during a Senate hearing, seeking confirmation that the SEC is reviewing the December 2022 trading halt and requests a commitment to publicly release the SEC's findings. In a stunning display of evasion, Chairman Gensler avoids direct answers, stating that FINRA initiated the trading halt independently and did not seek the SEC's advice or permission. When pressed about the possibility of naked short selling and fraud in MMTLP, Gensler cites the need for public protection as the reason for not disclosing any current or possible investigations, and does not elaborate on the situation any further. |

| Date | Event |
|---|---|
| September 19, 2023 | Congressman David G. Valadao (R-CA), expresses deep concerns in a formal letter to SEC Chairman Gary Gensler and FINRA President Robert W. Cook regarding the suspension of trading for Meta Materials Series A Preferred Shares (MMTLP) on December 8, 2022. The letter demands transparency and accountability from both regulatory bodies, seeking information about the circumstances surrounding the trading halt, confirmation of FINRA's jurisdiction, a clear plan of action for affected constituents, and an audited count of shares held by the investing public as of December 9th, 2022. |
| September 26, 2023 | U.S. Senator Mike Crapo, along with Senator and Vice Presidential Candidate JD Vance (R-OH), send a formal letter to Gary Gensler, Chairman of the U.S. Securities and Exchange Commission (SEC), requesting an examination of events related to the trading halt of MMTLP. The letter highlights that MMTLP shares began trading on the OTC market in 2021 and that the SEC approved a Form S-1 to spin off part of Meta Materials into Next Bridge Hydrocarbons in 2022. Furthermore, the senators draw attention to the trading halt that was issued by FINRA on December 9, 2022, which complicated the distribution of Next Bridge shares and caused confusion among investors. The senators urged the SEC to review these events and corporate filings to determine if any misconduct occurred and to provide detailed information and analysis to Senate offices. |
| September 27, 2023 | During a congressional hearing, Congressman Ralph Norman (R-SC) questions SEC Chair Gensler about the audited share count of MMTLP. Chair Gensler responds by stating that this information is public record. However, it is noted that the number of aggregate shares of MMTLP held by each brokerage, including their clients and various capacities, on the date of December 12, 2023, is not a matter of public record. The question sought this specific information, highlighting a discrepancy in Chair Gensler's response regarding the availability of this data. |
| September 29, 2023 | The SEC acknowledged receiving 246 complaints related to the MMTLP U3 trading halt. |
| October 2, 2023 | The SEC reported receiving 848 complaints about META II's MMTLP shares through a FOIA disclosure |
| October 2023 | Palikaras was removed as President and CEO of META II by the company's Board of Directors |
| October 16, 2023 | Senator Mike Crapo (R-ID), in a letter sent to FINRA President Robert W. Cook, expresses concerns regarding the suspension of trading for Meta Materials' Series A Preferred Shares (MMTLP) on December 8, 2022. The letter, similar to that sent by Congressman David Valadao, demands transparency and accountability, seeking information about the circumstances surrounding the trading halt, confirmation of FINRA's jurisdiction, a clear plan of action for affected constituents, and an audited count of shares held by the investing public as of December 9th, 2022. |
| November 6, 2023 | FINRA releases a "supplemental update" to their FAQ regarding the MMTLP situation. Critics argue that this update fails to address concerns raised by Congress and the public, highlighting its failure to cover key areas such as liabilities to deliver shares, the temporary trading period requested by Next Bridge Hydrocarbons, the FOIA emails, and tax implications. Of particular note, FINRA categorizes "counterfeit shares" as being nothing more than a social media myth. Critics see the FAQ as a delaying tactic rather than a sincere attempt to address valid concerns, emphasizing the ongoing call for transparency, accountability, and fairness. |
| November 15, 2023 | MMTLP investors discover that the SEC deleted a document on their website that was being used as reference material to refute FINRA's mischaracterization of counterfeit shares being nothing more than a social media term. The document, which delves into share counterfeiting and quotes 2007 SEC Chairman Harvey Pitt stating that "Phantom shares created by naked shorting are analogous to counterfeit money," was previously available at https://www.sec.gov/comments/s7-08-09/s70809-407a.pdf. However, the document can still be accessed through the internet archive at the following web address: https://web.archive.org/web/20221022103620/https://www.sec.gov/comments/s7-08-09/s70809-407a.pdf. |
| November 15, 2023 | Congressman Jared Huffman (D-CA) addresses a letter to SEC Chairman Gary Gensler and FINRA President Robert W. Cook expressing concerns on behalf of affected constituents regarding the corporate action taken by FINRA on Meta Material's Series A Preferred Shares (MMTLP). The letter seeks information on the reasons behind the trading halt of MMTLP on December 9, 2022, just days before the announced deletion of the MMTLP symbol. Congressman Huffman requests affirmation of SEC and/or FINRA's regulatory authority and standard practices, along with a written response outlining the future state of his constituents' investments and expected timelines. |
| November 15, 2023 | Congressman Vicente Gonzalez (D-TX), a Member of the House Financial Services Committee, writes a letter to SEC Chairman Gary Gensler, urging the SEC to examine the events surrounding the FINRA decision to implement a trading halt of Metamaterials' Series A Preferred Shares (MMTLP). Congressman Gonzalez expresses concern on behalf of adversely affected constituents, emphasizing the need for transparency in the process. The letter highlights the history of MMTLP's trading, the SEC-approved spin-off, and the subsequent trading halt by FINRA. Congressman Gonzalez requests an investigation to ensure no wrongdoing and urges Chairman Gensler to make the findings available to the public. |
| November 30, 2023 | In a letter to SEC Chairman Gary Gensler, Congressman Josh Harder (D-CA) calls for a thorough investigation into the MMTLP trading halt by FINRA, seeking assurance of no wrongdoing. He urges the SEC to release findings, including an audited share count, publicly. Congressman Harder emphasizes the need for clear guidance to constituents on their current holdings and a resolution timeline. Specifically, Congressman Harder requests details on the SEC's steps to collaborate with Next Bridge Hydrocarbons for a swift resolution. |
| December 4, 2023 | Congresswoman Barbara Lee (D-CA), addresses a letter to SEC Chairman Gary Gensler, expressing concerns about FINRA's actions on Meta Material's Series A Preferred Shares (MMTLP). Congresswoman Lee requests a thorough investigation, transparency in findings, clear guidance of what can be expected for constituents affected by the MMTLP trading halt, and a timeline by which this situation will be resolved. She emphasizes the SEC and FINRA's responsibility to protect investors and uphold market integrity, urging identification of any regulatory gaps for enhanced investor protection. |

| Date | Event |
|---|---|
| December 22, 2023 | In an effort prompted by the receipt of over 40,000 letters from concerned investors, Congressman Ralph Norman (R-SC), as part of a group of 74 U.S. Congress Members, addresses a letter to the SEC Chairman Gary Gensler and FINRA President Robert W. Cook. This letter urges a review of events concerning Meta Materials Series A Preferred Shares (MMTLP) emphasizing concerns about a trading halt and possible nefarious short selling. Additionally, the Congressional Members pose specific questions regarding the trading timeline, regulatory authority, and circumstances leading to the halt. This letter seeks transparency to dispel misinformation and protect investors, while specifically requesting responses to be delivered by January 31, 2024. |
| December 29, 2023 | Bolstering the MMTLP community's claim of a massive imbalance in shares, news spreads that TradeStation has made stunning admissions to their clients that they do not have enough shares allotted to them to provide each of their clients with a physical share of Next Bridge Hydrocarbons. This admission comes in the context of TradeStation customers seeking to participate in the non-transferable subscription rights offering for NBH shares. Participation requires NBH holders to register and record ownership with AST within 60 days from the effective date of a Form S-1 Registration Statement filed by NBH with the SEC on July 26, 2023. However, under the guise of their "inability to recall tell-out shares", TradeStation informs clients of their inability to fulfill customers requests to register and record ownership with AST. |
| January 1, 2024 | University Lands Royalty Payment Due |
| January 9, 2024 | Congressman Mark DeSaulnier (D-CA), sends a letter, addressed to regulatory bodies including the SEC and FINRA, expresses concerns about the situation surrounding his constituents holdings related to MMTLP following the December 2022 trading halt due to a corporate spinoff. The letter states that multiple constituents report dissatisfaction with the resolution process and non-receipt of expected compensation (in the form of shares) from the spinoff of Next Bridge Hydrocarbons. The letter urges regulatory bodies to take affirmative steps to address retail investors' concerns and provide more information on avenues for resolution, emphasizing the importance of maintaining investor confidence and accessible financial markets for all income levels. |
| January 15, 2024 | NBH executives, including CEO DuBose and CFO Hawkins, resigned amid unresolved shareholder issues |
| January 19, 2024 | Next Bridge Hydrocarbons issues a press release expressing deep concerns about the circumstances surrounding the U3 halt of trading in MMTLP prior to the Next Bridge spinout. Notably, the statement highlights the short sellers have approached Next Bridge about buying considerably more shares than the approximate aggregate short interest position in MMTLP reported by FINRA, which was 2.65 million shares as of December 12, 2023. Next Bridge emphasizes the need for transparency, accurate information, and cooperation with regulatory agencies. The company has offered to discuss its data with FINRA and the SEC, seeking clarity on the conflicting data. In addition, Next Bridge praises the efforts of its shareholders and the "MMTLP ARMY" for bringing attention to this serious problem. Chairman and new CEO, Greg McCabe, expresses gratitude for the support and hopes that Congress and the SEC will oversee a fair and equitable solution to the situation. |
| January 23, 2024 | Greg McCabe letter to Robert Colby, Chief Legal Officer, Finra, stating the investment banking firm representing Next Bridge has received several inbound calls from financial institutions needing to buy shares, multiples more that 2.65mm, to get their books in balance. One of the inquiries was of a size so large that McCabe requested to be on a call with this group. |
| January 31, 2024 | The SEC disclosed receiving 848 MMTLP-related complaints through a FOIA request. FINRA's insufficient response to Rep. Norman. In a response letter to Rep. Ralph Norman, FINRA President Robert L. Cook addresses concerns surrounding the Meta Materials corporate action and subsequent trading halt of MMTLP. However, the letter raises several questions about the efficacy of the regulatory process and the level of investor protection provided. While outlining the steps taken by FINRA, including notification of the corporate action and implementation of a trading halt, the letter fails to address fundamental issues such as investor harm created under the corporate action which FINRA released, and share distribution discrepancies. Additionally, FINRA's response lacks concrete evidence or detailed explanation in MMTLP is conduct a certified audit or share count is in direct contradiction to FINRA rule 4140, which ironically is titled "Audit" (https://www.finra.org/rules-guidance/rulebooks/finra-rules/4140). This contradiction raises doubts about FINRA's culpability in the issue, and regulatory transparency and accuracy of the share distribution process. While quite voluminous, the letter completely failed to address many questions from Rep. Ralph Norman's initial correspondence, including, but not limited to questions 4, 5, 6, 7, 8, and of paramount importance, question 9, which requested the audited consolidated count of shares held in each brokerage. Overall, the letter's tone and content leave much to be desired in terms of addressing investor concerns and ensuring market integrity. |
| February 6, 2024 | SEC's insufficient response to Rep. Norman. In response to Rep. Ralph Norman's inquiry regarding MMTLP, SEC Chair Gary Gensler issues a letter that lacks substantive answers or actual steps taken by the organization itself. Despite Norman's request for share count information and inquiries about potential violations of securities laws or SEC rules, Gensler's response remains vague, citing confidentiality and enforcement protocol. Ralph Norman expressed his frustration with this response on the X platform, characterizing it as "empty" and "worthless," underscoring its arrival six days after the deadline requested and lack of meaningful information. |
| February 7, 2024 | The SEC acknowledged receiving 55,490 MMTLP-related emails, responding to only 35 complaints |
| February 8, 2024 | Next Bridge Hydrocarbons, Inc. issues a statement expressing differing perspectives on certain key points raised by FINRA and the SEC regarding the U3 halt of the MMTLP security and outstanding short positions in Next Bridge. The company called for transparency in accounting for total outstanding uncovered short positions and urged FINRA and the SEC to take proactive steps to ensure comprehensive data collection. Next Bridge raised concerns about potentially misleading information and emphasized the need for clarity regarding the limitations of FINRA's data. Additionally, they questioned the decision-making process behind the U3 halt, highlighting discrepancies between FINRA's regulatory powers as enumerated under Rule 6490, their actions and the issuers' intentions (see August 16th, 2022 entry below). This statement underscores Next Bridge's commitment to transparency and collaborative efforts to address ongoing investor concerns and regulatory challenges. |

| Tr Date | Event |
|---|---|
| February 26, 2024 | In the next Bridge/FINRA correspondence, McCabe requests a meeting with FINRA and SEC. Additional correspondence between Next Bridge Hydrocarbons and FINRA is released via FINRA's website. In these communications, CEO Greg McCabe continues to express concerns about the U3 trading halt of MMTLP and requests a meeting with representatives of FINRA and the SEC to address these issues. Of particular interest, CEO McCabe expresses his desire to share communications from short seller representatives seeking to purchase "many multiples" of the amount of shares that FINRA has reported short, raising serious concerns about the discrepancy between reported short positions and the actual interest from short sellers, as well as the potential impact on market stability and investor confidence. While FINRA has agreed to such a meeting, as of this writing, there has been no response from SEC representatives, including all five commissioners, regarding attendance of such a meeting. |
| February 29, 2024 | A promissory note for $2 million linked to NBH's corporate dealings was referenced in legal documents. |
| March 18, 2024 | Levi & Korsinsky Class Action Lawsuit against Next Bridge Hydrocarbons, Inc.; A class action lawsuit filed on behalf of investors who acquired shares of Next Bridge Hydrocarbons in connection with its spin-off from Meta Materials. The complaint alleges that the registration statement contained false and/or materially misleading statements concerning the value of the company's oil and gas assets and transactions with related parties, violating the Securities Act of 1933. |
| March 22, 2024 | ronstein, Gewirtz & Grossman LLC Class Action Lawsuit against Next Bridge Hydrocarbons, Inc.; A class action lawsuit filed on behalf of investors who acquired shares of Next Bridge Hydrocarbons in connection with its spin-off from Meta Materials. The lawsuit alleges violations of federal securities laws, claiming that the registration statement contained false or materially misleading statements regarding the value of the company's oil and gas assets and transactions with related parties. |
| April 15, 2024 | Next Bridge Hydrocarbons, Inc. filed a Verified Rule 202 Petition against TradeStation Securities, Inc. on April 15, 2024, in the District Court of Dallas County, Texas. |
| April 23, 2024 | Devin Nunes, former Congressman and current CEO of Trump Media & Technology Group sends a letter to Key House Committee Chairmen addressing concerns about potential manipulation of TMTG stock (traded as "DJT" on Nasdaq). In his letter, Nunes highlighted that DJT had appeared daily on Nasdaq's 'Reg SHO threshold list' since April 2, 2024, suggesting possible unlawful trading activities such as naked short selling. The letter underscores that these issues are reflective of a broader problem impacting financial markets, particularly regarding naked shorting and inadequate oversight of market participants. Nunes emphasized that this situation is part of a larger pattern highlighted by a recent open letter signed by 74 members of Congress, which specifically addressed the MMTLP situation and its implications for market manipulation. This connection illustrates that the problems faced by TMTG are part of systemic issues affecting the financial markets, reinforcing the need for increased regulatory scrutiny and policy reform, and further investigation into the MMTLP trading activity. |
| April 23, 2024 | Aaron Chow accused Clinton A. Plant of altering Texas Railroad Commission data to boost the perceived value of Orogrande assets |
| May 3, 2024 | Letter from University Lands to Next Bridge Hydrocarbons / Hudspeth Operating, LLC for late payment of lease due 1/1/2024 |
| May 24, 2024 | Inter–Coastal Waterways vs. FINRA and TradeStation, Case Number: 0:24–cv–60891, Florida Southern District Court |
| June 5, 2024 | A follow up letter is sent by 40+ Members of Congress in a bipartisan effort led by Ralph Norman and Pete Sessions, to SEC Chair Gary Gensler. The letter followed up on a previous request for the SEC to review the events surrounding MMTLP. The letter reiterates that these shares were created during the merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders. The letter further states that in contradiction to information relayed to the investing public, on December 9, 2022, FINRA issued a U3 halt on trading MMTLP shares, preventing further trades. The letter mentions that the trading halt has led to over 40,000 letters from concerned constituents being sent to Congress. The letter references statements made by the SEC related to investigations that are ongoing surrounding this issue, and requests the SEC to brief Congress on the results of their investigation into these events by June 15, 2024. |
| June 24, 2024 | Case: Securities and Exchange Commission v. John Brda and Georgios Palikaras; 1:24-cv-04806; U.S. District Court for the Southern District of New York; The SEC charged former CEOs of Meta Materials, John Brda and Georgios Palikaras, with market manipulation and fraud related to a scheme that allegedly raised $137.5 million from investors through an at-the-market offering in June 2021, prior to the merger of Torchlight Energy Resources and Metamaterial Inc. |
| July 14, 2024 | A Z-test analysis revealed statistically improbable trading volumes linked to TRCH shares. Corresponds to 2021 entry above, which is the timeframe of the data. |
| July 17, 2024 | Traudt vs. Schwab, Case Number: 2:24-cv-00782, US District Court for the District of Vermont |
| August 16, 2024 | Palikaras affidavit reveals more about FINRA's actions. Georgios Palikaras, former CEO of Meta Materials Inc., submits an affidavit in the case "Inter-Coastal Waterways LLC v. Tradestation Securities, Inc." (Case No. 0:24-cv-60891-AHS) in the Southern District of Florida. The affidavit details the events leading to and following the MMTLP trading halt. In his statement, Palikaras disclosed that on or about December 8, 2022, FINRA unilaterally revised the language of the Company's December 6, 2022 corporate action notice. This revision was made without the input or authorization of Meta Materials and took place after FINRA had a call discussion with DTCC on December 7, 2022, excluding Meta Materials and Next Bridge's counsel from the call. Palikaras described how the revised notice, published on FINRA's Daily List, altered the language to state, "MMTLP will be deleted effective 12/13/22" a change made without the Company's consent (a clear violation of FINRA Rule 6490). Despite Meta Materials' attempts to seek clarification and resolution through multiple inquiries and discussions with FINRA's Office of the Ombudsman, no satisfactory explanation for the changes that were made, or the subsequent trading halt was provided. Palikaras criticized FINRA for not disclosing the reasons behind the halt upfront, which he argued contributed to shareholder confusion and did not allow the Company to address the situation effectively. While the affidavit does not explicitly call for increased accountability and transparency, Palikaras' criticism of FINRA's lack of communication and the impact on shareholders implies a need for greater regulatory oversight and clarity. |
| August 9, 2024 | META II filed for Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of Nevada |

| Tr  Date | Event |
|---|---|
| August 27, 2024 | Meeting with University Lands and HudOp in which it was stated by HudOp to the UL team that it will not drill or complete any Development Unit Wells for the 2024 obligation year absent an agreement to extend the DUA. Pursuant to Article 4.2, failure to drill or complete the five (5) Development Unit Wells results in termination of the DUA. Given that HudOp has stated that it will not meet this requirement, it is in anticipatory breach of the DUA. |
| September 20, 2024 | META II's final bankruptcy filing occurred, marking the closure of its legal filings |
| October 2, 2024 | Letter from University Lands to Mr. Greg McCabe at Next Bridge Hydrocarbons / Hudspeth Operating, LLC terminating lease |
| October 8, 2024 | Next Bridge Hydrocarbons, Inc. announces that University Lands decided not to extend the Development Unit Agreement for the Orogrande asset, which was the largest underlying asset belonging to the company. The agreement is set to expire on December 31, 2024, with University Lands seeking to terminate it immediately, a decision Next Bridge has opposed. Chairman and CEO Greg McCabe expressed the company's dismay over the decision while assuring shareholders that despite the setback, Next Bridge would continue expanding and diversifying its portfolio beyond the Orogrande asset, promising future updates on the company's progress. Many believe that the loss of the Orogrande lease is tied to Next Bridge's failure to maintain its drilling obligations, which is seen as a direct result of the SEC's prolonged withholding of the company's ability to raise necessary funds through an S-1 offering. Since January 2023, the SEC has apparently hamstrung the offering, making it difficult for Next Bridge to secure the capital required to meet its drilling obligations and maintain the lease. Additionally, in light of McCabes statement Next Bridge had put forth what was believed to be a strong and fair proposal for renewal, there are allegations of third-party sabotage and regulatory involvement being contributing factors to Next Bridge's loss of the Orogrande lease. |
| November 8, 2024 | Auxier submitted a formal Request for Information (RFI) to NBH about its corporate governance and share count discrepancies |
| November 11, 2024 | NBH's investor relations confirmed receipt of Auxier's RFI via email |
| November 13, 2024 | Taggart v. Next Bridge Hydrocarbons; Case No. 4:24-cv-00767-P |
| November 19, 2024 | Plaintiffs and five other shareholders issued a formal Books and Records request to NBH, demanding corporate records. B&R served directly to McCabe in Midland, TX. |
| November 22, 2024 | Auxier sent a formal demand letter to NBH's Board of Directors regarding critical corporate actions and financial transparency |
| November 23, 2024 | Auxier's formal demand letter, sent via USPS Registered Mail, was not received at NBH's registered address |
| November 25, 2024 | NBH announced its relocation from Fort Worth, TX, to Midland, TX, within McCabe Petroleum Corporation's offices |
| November 26, 2024 | Follow-up USPS Registered Mail concerning corporate records went unanswered by NBH |
| December 4, 2024 | The ongoing lack of response from NBH prompted shareholder legal action. |
| December 6, 2024 | Auxier v. SEC et al; Case Number 7:24-CV-318 |
| December 10, 2024 | Auxier begins work on FAC. Adds, OTC Markets, Conaccord Guilty as Defenants. Removes Schwab. Evidence File added. |
| December 13, 2024 | Monteiro asks to be part of the Auxier complaint. Auxier accepts. Monteiro added to FAC. |
| December 17, 2024 | Auxier and Monteiro reach out to Schwab via memorandum to notify them that our complaint against them will be dropped in FAC. Asks for MMAT & MMTLP data germane to their complaint. |

| Tr. | Date: | | | Event |
|-----|-------|--|--|-------|
| | | | | |

APP EXHIBIT 2

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                          29 APR 2024
ORDERS: HR-4120-00011

AUXIER DANIEL ROBERT                    MM          SGM ▇▇▇▇▇▇▇
105 VALLEY RD                                       ACTIVE ARMY
WANTAGE NJ 07461-3632 US

YOU ARE ORDERED TO ACTIVE DUTY IN THE GRADE OF RANK SHOWN ABOVE FOR THE PERIOD SHOWN IN
ACTIVE DUTY COMMITMENT BELOW. YOU ARE ASSIGNED AS SHOWN AND WILL PROCEED FROM YOUR CURRENT
LOCATION ON THE REPORT DATE AS SHOWN BELOW.

RPT TO: W2H6 SCH USA WAR COLLEGE W2H6AA CARLISLE BARRACKS PA 17013-0000
 REPORT DATE: 07 MAY 2024 RPT BETWEEN 0800 AND 1700 HRS.
ASSIGN TO: W2H6 SCH USA WAR COLLEGE W2H6AA CARLISLE BARRACKS PA 17013-0000
PERIOD OF ACTIVE DUTY:451 DAYS                            END DATE: 31 JUL 2025
PURPOSE: TO OBTAIN 20 YRS OF ACTIVE FEDERAL SERVICE IAW 10 USC 12686,    SANCTUARY PROGRAM
 DUTY AT: CARLISLE BARRACKS, PA

ADDITIONAL INSTRUCTIONS:  THIS IS PERMANENT CHANGE OF STATION (PCS) DURING THIS ASSIGNMENT
AND IS AUTH MVMT OF DEPNS AND HHG IAW JTR. ATTACH FOR UCMJ, ADMIN, AND PAY. CONTACT
SUPPORTING TRANSPORTATION OFC IMMEDIATELY TO SHIP OR STORE HHG AT GOVT EXPENSE, WEBSITE:
HTTP://WWW.MOVE.MIL. CONTACT HOUSING SERVICES AT NEW DUTY STATION BEFORE ARRANGING TO RENT,
LEASE, OR PURCHASE HOUSING, WEBSITE: HTTPS://WWW.HOUSING.ARMY.MIL/. HAND CARRY COMPLETE
MPRJ, HEALTH/DENTAL, TNG/APFT, CLOTHING RECORDS, ANDCOPIES OF RENTAL/MORTGAGE AGREEMENT.
TAPDB RECSTA "G", SVC COMP IS "V" TO INCLUDE FOR DJMS-AC. SM NOT INDEF STATUS. SM NOT
COUNTED AS PART OF THE ACTIVE ARMY END STRENGTH. ALL RETIREMENT PROCESSING MUST BE
CONCLUDED BEFORE ORDERS EXPIRE. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE
COMPLETED BEFORE THE EXPIRATION OF THESE ORDERS. ALL OFCL TVL MUST BE ARRANGED THRU CARLSON
TVL (1-800-709-2190) OR THE NEAREST SATO. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB
W/O REQ JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. FOR THIS ORDER AT HRC
TRANSITION BRANCH, US ARMY HUMAN RESOURCES COMMAND (HRC- FTKNOX) 502-613-6856 (OFFICER
SANTUARY). SM WILL BE SEPARATED FROM DJMC-RC USING 900 TIN AND ACCESSED INTO DJMS-AC WITH
SVC COMP OF "V". THE LOCAL DMPO IS RESPONSIBLE FOR PERFORMING ACCESSION TRANSACTIONS. SM
REMAINS ON RASL. SUBJ TO AVAIL OF FUNDS (DFAS-IN REG 37-1).

FOR ARMY USE: AUTHORITY: 10 USC 12301(D)
ACCT CLAS: NONE


MDC: 1AE4          HOR: SAME AS SNL                              PMOS/AOC: 012A
SEX: M             PPN: NA          COMP: IRR        RES GR: SGM
DORRES: 01 AUG 2020                 PEBD: 20 JUN 1997  SCTY CL: TOP SECRET WITH SCI
AUX9187PG00011
FORMAT: 156
FOR THE SECRETARY OF THE ARMY:

**************                          RICHARD A. MEYER
*    AHRC    *                          CHIEF, OFFICER RETIREMENTS AND
*  OFFICIAL  *                          SEPARATIONS BRANCH
**************


DISTRIBUTION: 1 SOLDIER
1 W2H6 SCH USA WAR COLLEGE CARLISLE BARRACKS PA 17013-0000
1 W98Z NON DOC CONT CG REINF FT KNOX KY 40122-0000

```
                         DEPARTMENT OF THE ARMY
                    U.S. ARMY HUMAN RESOURCES COMMAND
                      1600 SPEARHEAD DIVISION AVENUE
                         FORT KNOX, KY 40122
```

AHRC-ROR-RSM                                                    30 APR 2024
ORDERS: HR-4120-00011A01

AUXIER DANIEL ROBERT              MM              SGM ████████████
105 VALLEY RD                                     ACTIVE ARMY
WANTAGE NJ 07461-3632 US


THE FOLLOWING ORDER IS AMENDED AS INDICATED:

SO MUCH OF: FORMAT: 172 HR-4120-00011 DATED 29 APR 2024 IS FURTHER AMENDED.

PERTAINING TO: ORDER TO ACTIVE DUTY
               AUXIER DANIEL ROBERT
               037 52 9187 SGM

AS READS:
    DUTY AT: CARLISLE BARRACKS, PA
    ATTACH UIC: W2H6AA        CARLISLE BARRACKS PA 17013-0000
    REPORT UIC: W2H6AA        CARLISLE BARRACKS PA 17013-0000

HOW CHANGED:
    DUTY AT: WEST POINT, NY
    ATTACH UIC: W6BMAA W6BM USAG WEST POINT     W POINT MIL RES NY 10996-0000
    REPORT UIC: W6BMAA W6BM USAG WEST POINT     W POINT MIL RES NY 10996-0000


FOR ARMY USE: AUTHORITY: 10 USC 12301(D)
ACCT CLAS: NONE
    AUX9187PG00011

AUX9187PG00011
FORMAT: 700

*************                      RICHARD A. MEYER
*   AHRC    *                      CHIEF, OFFICER RETIREMENTS AND
* OFFICIAL  *                      SEPARATIONS BRANCH
*************

DISTRIBUTION: 1 SOLDIER
 1 W6BM USAG WEST POINT W POINT MIL RES NY 10996-0000
 1 W98Z NON DOC CONT CG REINF FT KNOX KY 40122-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                                    07 MAY 2024
ORDERS: HR-4120-00011A02

AUXIER DANIEL ROBERT                    MM              SGM ▆▆▆▆▆▆▆▆
105 VALLEY RD                                           ACTIVE ARMY
WANTAGE NJ 07461-3632 US


THE FOLLOWING ORDER IS AMENDED AS INDICATED:

SO MUCH OF: FORMAT: 172 HR-4120-00011 DATED 29 APR 2024 IS FURTHER AMENDED.

PERTAINING TO: ORDER TO ACTIVE DUTY
              AUXIER DANIEL ROBERT
              037 52 9187 SGM

AS READS:
   ATTACH UIC: W6BMAA       W POINT MIL RES NY 10996-0000
   REPORT UIC: W6BMAA       W POINT MIL RES NY 10996-0000

HOW CHANGED:
   ATTACH UIC: W1FBAA W1FB HQ USMA STAFF FACULTY     UNITED STATES MILITARY ACADEMY   W POINT
MIL RES NY 10996-0000
   REPORT UIC: W1FBAA W1FB HQ USMA STAFF FACULTY     UNITED STATES MILITARY ACADEMY   W POINT
MIL RES NY 10996-0000


FOR ARMY USE: AUTHORITY: 10 USC 12301(D)
ACCT CLAS: NONE
   AUX9187PG00011

AUX9187PG00011
FORMAT: 700

**************                          RICHARD A. MEYER
*   AHRC   *                            CHIEF, OFFICER RETIREMENTS AND
*  OFFICIAL  *                          SEPARATIONS BRANCH
**************

DISTRIBUTION: 1 SOLDIER
1 W1FB HQ USMA STAFF FACULTY UNITED STATES MILITARY ACADEMY  W POINT MIL RES NY 10996-0000
1 W98Z NON DOC CONT CG REINF FT KNOX KY 40122-0000

**APP. EXHIBIT 3**



**DEPARTMENT OF THE ARMY**
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122-5300

AHRC-FSZ (RN 635-200b)                          5 February 2024

MEMORANDUM FOR Installation Management Agency, HQ US Army Garrison, West Point, 622 Swift Rd, West Point, NY 10996-1986

SUBJECT: Sanctuary Eligibility Status, SGM Auxier, Daniel R., DODID 1012621058

1. To date SGM Auxier, Daniel R., currently has 18 years, 00 months, and 28 days of Active Federal Service (AFS) and is eligible to enter Title 10, USC 12686 status to complete 20 years of AFS upon completion of current active-duty tour. Soldier is approved for assignment with the US Military Academy (W1FBAA), West Point, NY.

2. Upon issuance of DD Form 214 (Certificate of Release or Discharge from Active Duty) for this period of service, the Soldier will provide a copy of the DD Form 214 to HRC Enlisted Sanctuary at usarmy.knox.hrc.mbx.epmd-sanctuary-section@army.mil. This will ensure no break in service occurs prior to the Soldiers Sanctuary start date. Sanctuary assignment order will not be published without an official DD Form 214.

3. The following information is pertinent to the Soldier' processing:
   a. Early demobilization may cause the Soldier to lose Sanctuary status.
   b. Post Deployment Mobilization Respite Absence (PDMRA) leave must be taken prior to leaving mob status.
   c. Sanctuary orders take precedence over all other mobilization orders.
   d. There are no extensions for Sanctuary orders and all requests to revoke Sanctuary orders require approval from the Assistant Secretary of the Army

4. The Soldier will report to the gaining installation with all source documents used in the calculation of Active Federal Service.

5. Point of contact for this action is at usarmy.knox.hrc.mbx.epmd-sanctuary-section@army.mil or commercial (502) 613-5962.

BRATCHER.MICHAEL  Digitally signed by
.GLENN.1104203953  BRATCHER.MICHAEL.GLENN.110
                   4203953
                   Date: 2024.02.05 14:18:56 -05'00'
MICHAEL G. BRATCHER
CIV HR Assistant
Retirement Separations Branch

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY
This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle)<br>AUXIER, DANIEL ROBERT | 2. DEPARTMENT, COMPONENT AND BRANCH<br>ARMY/USAR | 3. SOCIAL SECURITY NUMBER |
|---|---|---|

| 4a. GRADE, RATE OR RANK<br>SGM | b. PAY GRADE<br>E09 | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE<br>(YYYYMMDD)    00000000 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY<br>FT BLISS, TEXAS | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known)<br>105 VALLEY RD<br>WANTAGE NEW JERSEY 07461 |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND<br>0007 HQ HQ    MCP HQ (USAREUR FC | b. STATION WHERE SEPARATED<br>FORT BLISS TC, TX 79916-6816 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED<br>USAR CON GP (REINF) 1600 SPEARHEAD DIVISION AVE, FT KNOX, KY 40122 | 10. SGLI COVERAGE       NONE<br>AMOUNT: $ 500,000.00 |
|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in<br>specialty. List additional specialty numbers and titles involving periods of<br>one or more years.)<br>12A6O ENGINEER SENIOR SGT - 1 YRS 9 MOS//<br>NOTHING FOLLOWS | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 2022 | 08 | 10 |
| | b. SEPARATION DATE THIS PERIOD | 2024 | 05 | 06 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0001 | 08 | 27 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0013 | 06 | 15 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0011 | 07 | 05 |
| | f. FOREIGN SERVICE | 0001 | 08 | 02 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. INITIAL ENTRY TRAINING | 0000 | 00 | 00 |
| | i. EFFECTIVE DATE OF PAY GRADE | 2020 | 08 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN<br>RIBBONS AWARDED OR AUTHORIZED (All periods of service)<br>DEFENSE MERITORIOUS SERVICE MEDAL//<br>MERITORIOUS SERVICE MEDAL (7TH AWARD)//JOINT<br>SERVICE COMMENDATION MEDAL//ARMY<br>COMMENDATION MEDAL (8TH AWARD)//JOINT<br>SERVICE ACHIEVEMENT MEDAL//ARMY ACHIEVEMENT<br>MEDAL (10TH AWARD)//JOINT MERITORIOUS UNIT<br>AWARD (2ND AWARD)//CONT IN BLOCK 18 | 14. MILITARY EDUCATION (Course title, number of weeks, and months and<br>year completed)<br>NONE//NOTHING FOLLOWS |
|---|---|

| 15a. COMMISSIONED THROUGH SERVICE ACADEMY | YES | X NO |
|---|---|---|
| b. COMMISSIONED THROUGH ROTC SCHOLARSHIP (10 USC Sec. 2107b) | YES | X NO |
| c. ENLISTED UNDER LOAN REPAYMENT PROGRAM (10 USC Chap. 109) (If Yes, years of commitment: ___ ) NA | YES | X NO |

| 16. DAYS ACCRUED LEAVE<br>PAID  0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE<br>DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO<br>X |
|---|---|---|---|

| 18. REMARKS<br>SERVICE IN GERMANY 20220819-20221113//SERVICE IN TURKEY 20221113-20221118//SERVICE IN<br>GERMANY 20221118-20230117//SERVICE IN POLAND 20230117-20230124//SERVICE IN GERMANY<br>20230124-20240310//SERVICE IN FRANCE 20240310-20240314//INDIVIDUAL COMPLETED PERIOD FOR<br>WHICH ORDERED TO ACTIVE DUTY FOR PURPOSE OF POST SERVICE BENEFITS AND ENTITLEMENTS//<br>MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//SERVICE IN GERMANY 20240314-20240317//<br>SERVICE IN BELGIUM 20240317-20240319//SERVICE IN GERMANY 20240319-20240420//CO-ADOS<br>20220810-20230809(OPERATION ENDURING FREEDOM)IAW 10 USC//SEE ATTACHED CONTINUATION SHEET<br>The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification<br>purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program. |
|---|

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code)<br>105 VALLEY RD<br>WANTAGE NEW JERSEY 07461 | b. NEAREST RELATIVE (Name and address - Include ZIP Code)<br>MICHELE AUXIER<br>105 VALLEY RD<br>WANTAGE NEW JERSEY 07461 |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (Specify state/locality)<br>NJ OFFICE OF VETERANS AFFAIRS | | X | YES | NO |
|---|---|---|---|---|
| a. MEMBER REQUESTS COPY 3 BE SENT TO THE CENTRAL OFFICE OF THE DEPARTMENT OF VETERANS AFFAIRS<br>(WASHINGTON, DC) | | X | YES | NO |

| 21a. MEMBER SIGNATURE<br>SIGNED BY:<br>AUXIER.DANIEL.ROBERT.101<br>2621058 | b. DATE<br>(YYYYMMDD)<br>20240426 | 22a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature)<br>SIGNED BY:<br>GOMEZ.SHANDELLE.VIANCE.1507340071<br>SHANDELLE V GOMEZ, TRANSITIONS PA II | b. DATE<br>(YYYYMMDD)<br>20240426 |
|---|---|---|---|

## SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION<br>RELEASE FROM ACTIVE DUTY | 24. CHARACTER OF SERVICE (Include upgrades)<br>HONORABLE |
|---|---|

| 25. SEPARATION AUTHORITY<br>AR 635-200 | 26. SEPARATION CODE<br>MBK | 27. REENTRY CODE<br>NA |
|---|---|---|

| 28. NARRATIVE REASON FOR SEPARATION<br>COMPLETION OF REQUIRED ACTIVE SERVICE |
|---|

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD)<br>NONE | 30. MEMBER REQUESTS COPY 4<br>(Initials)   DRA |
|---|---|

DD FORM 214, AUG 2009         PREVIOUS EDITION IS OBSOLETE.         MEMBER - 4
GENERATED BY TRANSPROC

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY    *(Continuation Sheet)*
This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME *(Last, First, Middle)* | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| AUXIER, DANIEL ROBERT | ARMY/USAR | ⬛ ⬛ ⬛ |

*(Specify the item number of the block continued for each entry.)* ////////////////////////////////////////////////////////////
CONT FROM BLOCK 18: 12301(D)//OPADOS_G3 20230810-20240205(TO SERVE AS USAREUR-AF G33
SGM)IAW 10 USC 12301(D)//OPADOS_G3 20240206-20240506(TO SERVE AS USAREUR-AF COMMAND
SERGEANT MAJOR)IAW 10 USC 12301(D)//YRRP:0 DAYS//CONT FROM BLOCK 13: //MERITORIOUS UNIT
COMMENDATION (4TH AWARD)//USN MERITORIOUS UNIT COMMENDATION//ARMY GOOD CONDUCT MEDAL (4TH
AWARD)//ARMY RESERVE COMPONENT ACHIEVEMENT MEDAL (6TH AWARD)//NATIONAL DEFENSE SERVICE
MEDAL//AFGHANISTAN CAMPAIGN MEDAL W/ CAMPAIGN STAR//IRAQ CAMPAIGN MEDAL W/4 CAMPAIGN
STARS//GLOBAL WAR ON TERRORISM EXPEDITIONARY MEDAL//GLOBAL WAR ON TERRORISM SERVICE
MEDAL//KOREA DEFENSE SERVICE MEDAL//HUMANITARIAN SERVICE MEDAL//ARMED FORCES SERVICE
MEDAL (AFSM) (2ND AWARD)//NON COMMISSIONED OFFICER PROFESSIONAL DEVELOPMENT RIBBON (5TH
AWARD)//ARMY SERVICE RIBBON//OVERSEAS SERVICE RIBBON (6TH AWARD)//ARMY RESERVE COMPONENT
OVERSEAS TRAINING RIBBON//ARMED FORCES RESERVE MEDAL W/ M DEVICE//MILITARY OUTSTANDING
VOLUNTEER SERVICE MEDAL//NATO MEDAL//COMBAT ACTION BADGE//DRIVER AND MECH BADGE W/ DRIVER
- TRACKED VEHICLE(S) CLASP//DRIVER AND MECHANIC  BADGE W/DRIVER-WHEELED VEHICLE(S)
CLASP//ARMY STAFF IDENTIFICATION BADGE//NOTHING FOLLOWS

| 21.a. MEMBER SIGNATURE | b. DATE *(YYYYMMDD)* | 22.a. OFFICIAL AUTHORIZED TO SIGN *(Typed name, grade, title, signature)* | b. DATE *(YYYYMMDD)* |
|---|---|---|---|
| ESIGNED BY:<br>AUXIER.DANIEL.ROBERT.101<br>2621058 | 20240426 | ESIGNED BY:<br>GOMEZ.SHANDELLE.VIANCE.1507340071<br>SHANDELLE V GOMEZ, TRANSITIONS PA II | 20240426 |

**DD FORM 214C, AUG 2009**    GENERATED BY TRANSPROC    **MEMBER - 4**

DEPARTMENT OF THE ARMY
US ARMY INSTALLATION MANAGEMENT COMMAND
HEADQUARTERS, UNITED STATES ARMY GARRISON, FORT BLISS
1741 MARSHALL ROAD
FORT BLISS, TEXAS 79916

ORDERS 117-0503                                                26 April 2024

AUXIER, DANIEL R. ████████SGM 0007 HQ HQ MCP HQ (USAREUR, (WATLAA), FT
BLISS, TX 79916

You are released from active duty, not by reason of physical disability, and
assigned as indicated on the date immediately following release from active
duty.  Any temporary appointments held are terminated on your effective date of
release from active duty.

Effective date:  6 MAY 24
Assigned to:  HUMAN RESOURCES COMD, FT KNOX, KY 40121
Terminal date of Reserve obligation:  Not applicable
Additional instructions:  a.  You are authorized movement of household goods at
Government expense. Family members:  NO.  You have up to 180 days to complete
this action.  b.  Your final outprocessing appointment with the Retirement
Services Office/Transition Center is based on approved DA Form 31.   c.  You
will remain assigned to your present unit until separation date.  d.  Official
travel arrangements purchased through a commercial travel office (travel agency)
not under contract to the Government are not reimbursable.  e.  You are required
to report directly to your rear detachment prior to commencement of transition
leave.  f.  Soldier was REFRAD for contingency Operation Enduring Freedom and
the REFRAD is for demobilization of forces from a contingency operation.

FOR ARMY USE
HOR:  WANTAGE, NJ
Place EAD or OAD:  FT BLISS, TX
MDC:  7BE4
Comp: USAR
PEBD: Not applicable
FOR ADDITIONAL INFORMATION CONTACT:
FORT BLISS DEMOB SITE  roman.morales4.ctr@army.mil  (915) 568-6703
SDN:  AUX9187PG70503
Format:  523


FOR THE COMMANDER:

                              ****************************
                              *         OFFICIAL         *
                              ****************************
                              PEGGY R. BROWN
                              ADJUTANT GENERAL/CHIEF, MPD


DISTRIBUTION:
020 PLUS
svg

**PART I - REQUESTOR INFORMATION**

| | | |
|---|---|---|
| NAME (Last, First, Middle Initial) AUXIER, DANIEL R. | SSN 101 2621058 | RANK SGM | AFF YYYYMM 2024 04 22 |

6 LEAVE ADDRESS (Street, City, State, ZIP Code or Phone Number)
105 VALLEY ROAD
WANTAGE, NJ 07461

ORGANIZATION STATION (PHEMA and PCN N.N.M)
COINS REPLACEMENT CENTER
FORT BLISS, TX 99 6
ITS SSN 802

**8 TYPE OF ABSENCE**

[ ] CHARGEABLE   [ ] NON-CHARGEABLE   [X] COMBINATION

[ ] PCS Leave and House Hunting
[ ] PCS Leave and Proceed Time (OCONUS Restricted PDS)
[ ] PCS Leave and Parental Leave
[ ] Annual Leave and Convalescent Leave
[ ] Annual Leave and Parental Leave
[ ] Annual Leave and Bereavement Leave
[ ] Annual Leave and Legal Marriage

[X] Terminal Leave Transition Administrative Absence and Retirement/Involuntary Separation
[ ] Leave Awaiting Administrative Discharge
[ ] Leave Awaiting Punitive Discharge
[ ] Leave Pending Review by Officer Board of Inquiry
[ ] Leave Awaiting Orders Result of Disability Proceedings
[ ] PCS Annual Leave and Recruiting Assistance Leave

| 9a FROM (YYYYMMDD) 2024 04 28 | 9b TOTAL DAYS REQUESTED 9 | 9c TO (YYYYMMDD) 2024 0506 |
|---|---|---|

| 10a ACCRUED LEAVE (CR BAL) 39.5 | 10b CHARGEABLE LEAVE REQUESTED | | | | | 10c NON-CHARGEABLE ABSENCE REQUESTED | | |
|---|---|---|---|---|---|---|---|---|
| | FROM (YYYYMMDD) 20240428 | DAYS REQUESTED 9 | TO (YYYYMMDD) 2024050b | ADVANCE | EXCESS | FROM (YYYYMMDD) | DAYS REQUESTED 0 | TO (YYYYMMDD) |

**REQUESTOR / SUPERVISOR / APPROVING AUTHORITY SIGNATURES**

| 11 SIGNATURE OF REQUESTOR (Supervisor can sign for requestor when requestor is not available to sign) | | | | | SGM, USA | DATE 2024 04 22 |
|---|---|---|---|---|---|---|

| 12 SUPERVISOR NAME BARRANON, DIANA GARRISON, ALEXUS | TITLE ADMIN NCO | RANK/GRADE SGT E5 | RECOMMENDATION [X] APPROVAL [ ] DISAPPROVAL | SIGNATURE | DATE 20240425 |
|---|---|---|---|---|---|

| 13 APPROVING AUTHORITY NAME YANG, KOU | TITLE TEAM OIC | RANK/GRADE CPT O3 | ACTION [X] APPROVED [ ] DISAPPROVED | SIGNATURE | DATE 20240425 |
|---|---|---|---|---|---|

| 14 | | | **DEPARTURE - AUTHORITY SIGNATURE** | | |
|---|---|---|---|---|---|
| a DATE | b TIME | c NAME DEPARTURE AUTHORITY | d TITLE | e SIGNATURE | f DATE |

| 15 | | | **EXTENSION - APPROVAL AUTHORITY SIGNATURE** | | |
|---|---|---|---|---|---|
| a NUMBER DAYS | b DATE APPROVED | c NAME APPROVAL AUTHORITY | d TITLE | e SIGNATURE | f DATE |

| 16 | | | **RETURN - AUTHORITY SIGNATURE** | | |
|---|---|---|---|---|---|
| a DATE | b TIME | c NAME RETURN AUTHORITY | d TITLE | e SIGNATURE | f DATE |

**17 REMARKS**

**NON-CHARGEABLE ABSENCE:** Is not directed by any official of the US Government. I cannot conduct public business under this authorization and will not be reimbursed for travel, per diem, or any other expense. I may cancel this absence at any time and report back to my regular place of duty, reimbursed for travel per diem, or any other expense. I may cancel this absence at any time and report back to my regular place of duty

TRAVEL DAYS 20240427

YRRP DAYS FROM 0 TO

PDMRA DAYS FROM 0 TO

PATERNITY FROM 0 TO

**PERSONNEL/FINANCE ONLY:** Chargeable leave is from date (YYYYMMDD) 20240428 to date (YYYYMMDD) 20240506

DA FORM 31, OCT 2023     PREVIOUS EDITIONS ARE OBSOLETE     APD AEM 1 00E>

APP. EXHIBIT 4

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-MOB                                                              19 JUL 2022
ORDERS: HR-2200-00001

AUXIER DANIEL ROBERT              EF              SGM ●●●
105 VALLEY RD                                     USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT DUTY LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: W6F5 CONUS REPLACEMENT CTR W6F5AA 1001 PLEASONT RD  FT BLISS TX 79916-0000
REPORT DATE: 10 AUG 2022
PERIOD OF ACTIVE DUTY:365 DAYS INCLUDING ACCUM LEAVE END DATE: 09 AUG 2023
PURPOSE: CONTINGENCY OPERATION FOR ACTIVE DUTY OPERATIONAL SUPPORT (CO-ADOS) IN SUPPORT OF
OEF.
ATT TO: 0007 HQ HQ USAREUR-AF AUG WATL99 WIESBADEN CLAY KS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT.  MOVEMENT OF HHG/DEP NOT AUTH. POV SHIPMENT NOT AUTH. YOU ARE AUTHORIZED
REIMBURSEMENT FOR TWO PIECES OF EXCESS ACCOMPANIED BAGGAGE, NOT TO EXCEED 50LBS EACH.
STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE DEPLOYED, OR MARRIED TO SM AT
DIFFERENT DUTY LOCATION. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE
LOCATION INDICATED. UPON COMPLETION, SOLDIER WILL PROCEED TO DUTY LOCATION. ALL OFCL TVL
MUST BE ARRANGED THRU CARLSON TVL (1-800-709-2190) OR THE NEAREST SATO. TICKET PURCHASED AT
OWN EXPENSE WILL NOT BE REIMB W/O REQ JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS
ORDER. ATTACH FOR UCMJ, ADMIN, AND PAY. THIS AD PERIOD IS EXEMPT FROM THE 5 YEAR CUMLATIVE
SERV LIMIT ON REEMPLOYMENT RIGHTS UNDER TITLE 38, USC, SEC 4312(C)(4)(B). UPON APPLICATION,
SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE ACCOUNTING OF ALL AD OR FTNGD
SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO SO MAY RESULT IN EARLY
TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT OF SERVICE - FOR
COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS REQUIREMENT. CONTACT
HOUSING OFC OF THE GAINING INSTL BEFORE BUYING OR LEASING OFF POST. PAY STATUS REPORTED IN
DJMS-RC A24 TRANS MUST BE O (ALPHA CHAR). CBA AUTHORIZED FOR TRAVEL (VARIATION NOT
AUTHORIZED). SUBJ TO AVAIL OF FUNDS. SUBMIT CONTINGENCY CLAIM THRU DEFENSE TRAVEL SYSTEM
(DTS) BY CONTACTING LOCAL DTS ADMINISTRATOR OR DFAS-IN CONTINGENCY TRAVEL DEPARTMENT,
WHICHEVER IS APPLICABLE. RC SOLDIERS MUST RETURN TO DEMOB SITE TO REFRAD IAW CURRENT BOG
POLICY NLT 39 DAYS PRIOR TO END OF MOBILIZATION/ACTIVATION/TCS ORDERS IN ORDER TO OUT
PROCESS AND TAKE AUTHORIZED LEAVE. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE
COMPLETED BEFORE THE EXPIRATION OF THESE ORDERS. DIRECT QUESTIONS/CONCERNS REGARDING THIS
ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 2/3/4 2010.0000 01-1100 1A100000 11**/12** VFRE 01ENGU S12120 AUX9187PK00001 C
IC: 2F2AUX9187PK000

MDC: 4JE2          HOR: SAME AS SNL                              PMOS/AOC: 012A
SEX: M             PPN: N/A        COMP: USAR          RES GR: SGM
DORRES: 01 AUG 2020               PEBD: 20 JUN 1997    SCTY CL: TOP SECRET WITH SCI
FORMAT: 162
FOR THE SECRETARY OF THE ARMY:

**************
*   AHRC    *                                     BRIAN S. KANE
*  OFFICIAL *                                     COLONEL, AG,
**************                                    CHIEF, OPERATIONS
                                                 AND READINESS DIVISION

DISTRIBUTION: 1 SOLDIER
 1 W6F5 CONUS REPLACEMENT CTR 1001 PLEASONT RD  FT BLISS TX 79916-0000
 1 USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE  FT KNOX KY 40121-0000
 1 0007 HQ HQ USAREUR-AF AUG WIESBADEN CLAY KS DE 09014-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

NATO TRAVEL ORDER / ORDRE DE MISSION OTAN

COUNTRY OF ORIGIN: USA                        ORDER NUMBER: HR-2200-00001(N)
PAYS DE PROVENANCE: USA                       NUMERO DE SERIE: HR-2200-00001(N)

1. The bearer (and group as shown hereon or on attached list)
   Le porteur (et personnel porte ci-dessus ou sur la liste jointe)

   Social Security Number/No Mle    Grade of Rank/Grade    Name/Nom
   ██ ██ ████                        SGM                    AUXIER DANIEL ROBERT

2. Will travel from United States
   Fera mouvement de United States

   TO/A  ALBANIA, BELGIUM, BULGARIA, CANADA, CROATIA, CZECH REPUBLIC, DENMARK, ESTONIA,
   FRANCE, GERMANY, GREECE, HUNGARY, ICELAND, ITALY, LATVIA, LITHUANIA, LUXEMBOURG,
   MONTENEGRO, NETHERLANDS, NORTH MACEDONIA, NORWAY, POLAND, PORTUGAL, ROMANIA, SLOVAKIA,
   SLOVENIA, SPAIN, TURKEY, UNITED KINGDOM

   Date of Expected Return: 09 AUG 2023      Date of Departure: 10 AUG 2022
   Date Probable de Retour: 09 AUG 2023      Date du Depart:    10 AUG 2022

3. AUTHORITY IS GRANTED TO POSSES AND CARRY ARMS.
   AUTORISATION DE PORT D'ARMES ACCORDEE.

4. I HEREBY CERTIFY THAT THIS INDIVIDUAL IS A MEMBER OF A FORCE AS DEFINED IN THE NATO
   STATUS OF FORCES AGREEMENT, AND THAT THIS IS AN AUTHORIZED MOVE UNDER THE TERMS OF THIS
   AGREEMENT.
   JE SOUSSIGNE CERTIFIE QUE LE PERSONNEL VISE APPARTIENT A UNE ARMEE TELLE QUE DEFINIE
   DANSL'ACCORD OTAN SUR LE STATUT DES FORCES ARMEES ET QUE CE DEPLACEMENT EST OFFICIEL
   SELON LES TERMES DE CET ACCORD.

5. THIS TRAVEL ORDER IS TO BE PRODUCED TO CIVIL AND MILITARY AUTHORITIES ON REQUEST.
   CET ORDRE DE MISSION DEVRA ETRE PRESENTE SUR DEMANDE DES AUTORITES CIVILES ET MILTAIRES.


FOR THE COMMANDER

***************                               19 JUL 2022
*    AHRC     *
*  OFFICIAL   *
***************
BRIAN S. KANE
COLONEL, AG,
CHIEF, OPERATIONS
AND READINESS DIVISION

(Officer authorizing movement)                (Date of issue)
(Officier autorisant le mouvement)            (Date de l'autorisation)

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                    22 MAR 2023
ORDERS: HR-3081-00026

AUXIER DANIEL ROBERT                EF            SGM ⬛ ⬛ ⬛
105 VALLEY RD                                     USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
REPORT DATE/TIME: 10 AUG 2023
PERIOD OF ACTIVE DUTY: 180 DAYS INCLUDING ACCUM LEAVE END DATE: 05 FEB 2024
PURPOSE: ACTIVE DUTY FOR OPERATIONAL SUPPORT (OPADOS_G3) USAREUR EDI OPERATIONAL TO SERVE AS
USAREUR-AF G33 SGM
ATT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT. UPON APPLICATION, SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE
ACCOUNTING OF ALL AD OR FTNGD SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO
SO MAY RESULT IN EARLY TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT
OF SERVICE - FOR COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS
REQUIREMENT. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE LOCATION
INDICATED. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE COMPLETED BEFORE THE
EXPIRATION OF THESE ORDERS. ATTACH FOR UCMJ, ADMIN, AND PAY. SOLDIER WILL CONTACT SERVICING
FINANCE OFFICE FOR INPROCESSING ACCESSION INTO DJMS-RC. SUBJ TO AVAIL OF FUNDS. IBA
AUTHORIZED FOR TRAVEL. STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE
DEPLOYED, OR MARRIED TO SM AT DIFFERENT DUTY LOCATION. POV SHIPMENT NOT AUTH. MOVEMENT OF
HHG/DEP NOT AUTHORIZED. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB W/O REQ
JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. DIRECT QUESTIONS/CONCERNS REGARDING
THIS ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY. TO AVOID SPREADING THE
CORONAVIRUS (COVID-19) INFECTION, SOLDIER WILL NOT TRAVEL IF THEY ARE CURRENTLY
EXPERIENCING OR WITHIN THE PAST 14 DAYS HAVE EXPERIENCED FEVER, COUGH, SHORTNESS OF BREATH
OR HAVE HAD A CLOSE UNPROTECTED EXPOSURE TO A PERSON WITH COVID-19 . IF SOLDIER HAS OR IS
EXPERIENCING THESE SYMPTOMS THEY SHOULD CONTACT THE GAINING UNIT COMMANDER AND THEIR HEALTH
CARE PROVIDER FOR FURTHER INSTRUCTIONS AND WILL NOT TRAVEL. THIS IS A CONSECUTIVE ASG WITH
NO BREAK IN SERVICE. PLEAD REMAINS THE SAME.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 1/2/3 2010.0000 01-1100 2A200000 11**/12** PAMP 01EN30 S12120 AUX9187PF00026 C
IC: 2F3AUX9187PF000
MDC: 4JE3         HOR: SAME AS SNL                                    PMOS/AOC: 12A
SEX: M           PPN: N/A         COMP: IRR            RES GR: SGM
DORRES: 01 AUG 2020              PEBD: 20 JUN 1997     SCTY CL: TOP SECRET WITH SCI
FORMAT: 162

FOR THE SECRETARY OF THE ARMY:

**************
*   AHRC    *                      ARTHUR R. NOWELL
*  OFFICIAL *                      COLONEL, AG
**************                     CHIEF, OPERATIONS
                                  AND READINESS DIVISION


DISTRIBUTION: 1 SOLDIER
 1 0007 HQ HHB ARMY HQ AND HQ LUCIUS D CLAY KAS DE 09014-0000
 1 W6ED USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE  FT KNOX KY 40121-0000

DEPARTMENT OF THE ARMY
U.S. ARMY HUMAN RESOURCES COMMAND
1600 SPEARHEAD DIVISION AVENUE
FORT KNOX, KY 40122

AHRC-ROR-RSM                                                      04 JAN 2024
ORDERS: HR-4004-00006

AUXIER DANIEL ROBERT                    SAA          SGM ████ ████ ████
105 VALLEY RD                                        USAR CONTROL GROUP (REINF)
WANTAGE NJ 07461-3632


YOU ARE ORDERED TO ACTIVE DUTY FOR OPERATIONAL SUPPORT UNDER PROVISION OF SECTION 12301 (D),
TITLE 10 UNITED STATES CODE FOR THE PERIOD SHOWN PLUS THE TIME NECESSARY TO TRAVEL. YOU WILL
PROCEED FROM YOUR HOME OR CURRENT LOCATION IN TIME TO REPORT FOR DUTY ON THE DATE SHOWN
BELOW. UPON COMPLETION OF THIS DUTY, UNLESS SOONER RELEASED, YOU WILL RETURN TO YOUR HOME
AND UPON ARRIVAL BE RELEASED FROM ACTIVE DUTY.

RPT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
REPORT DATE/TIME: 06 FEB 2024
PERIOD OF ACTIVE DUTY: 91 DAYS INCLUDING ACCUM LEAVE END DATE: 06 MAY 2024
PURPOSE: ACTIVE DUTY FOR OPERATIONAL SUPPORT (OPADOS_G3) USAREUR EDI OPERATIONAL TO SERVE AS
USAREUR-AF COMMAND SERGEANT MAJOR
ATT TO: 0007 HQ HHB ARMY HQ AND HQ WATLAA LUCIUS D CLAY KAS DE 09014-0000
DUTY AT: WIESBADEN, GERMANY

ADDITIONAL INSTRUCTIONS:  THIS IS AN UNACC PERMANENT CHANGE OF STATION (PCS) DURING THIS
ASSIGNMENT. UPON APPLICATION, SOLDIERS ARE RESPONSIBLE TO PROVIDE A FULL AND ACCURATE
ACCOUNTING OF ALL AD OR FTNGD SERVED BEFORE SUBMITTING FOR ADOS/FTNGDOS TOUR. FAILURE TO DO
SO MAY RESULT IN EARLY TERMINATION OF ORDERS. SOLDIERS MAY SUBMIT A DA FORM 1506 (STATEMENT
OF SERVICE - FOR COMPUTATION OF LENGTH OF SERVICE FOR PAY PURPOSES) TO SATISFY THIS
REQUIREMENT. EARLY REPORTING NOT AUTH. SOLDIER WILL REPORT FOR ACCESSION TO THE LOCATION
INDICATED. ALL PROCESSING TO INCLUDE TRANSITION LEAVE MUST BE COMPLETED BEFORE THE
EXPIRATION OF THESE ORDERS. ATTACH FOR UCMJ, ADMIN, AND PAY. SOLDIER WILL CONTACT SERVICING
FINANCE OFFICE FOR INPROCESSING ACCESSION INTO DJMS-RC. SUBJ TO AVAIL OF FUNDS. IBA
AUTHORIZED FOR TRAVEL. STORAGE OF HHG AND POV AUTH: IF SINGLE; DUAL MIL AND BOTH ARE
DEPLOYED, OR MARRIED TO SM AT DIFFERENT DUTY LOCATION. POV SHIPMENT NOT AUTH. MOVEMENT OF
HHG/DEP NOT AUTHORIZED. TICKET PURCHASED AT OWN EXPENSE WILL NOT BE REIMB W/O REQ
JUSTIFICATION. HRC DOES NOT FUND TRAVEL ON THIS ORDER. DIRECT QUESTIONS/CONCERNS REGARDING
THIS ORDER THROUGH THE CHAIN OF COMMAND OF YOUR GAINING SITE/AGENCY. TO AVOID SPREADING THE
CORONAVIRUS (COVID-19) INFECTION, SOLDIER WILL NOT TRAVEL IF THEY ARE CURRENTLY
EXPERIENCING OR WITHIN THE PAST 14 DAYS HAVE EXPERIENCED FEVER, COUGH, SHORTNESS OF BREATH
OR HAVE HAD A CLOSE UNPROTECTED EXPOSURE TO A PERSON WITH COVID-19 . IF SOLDIER HAS OR IS
EXPERIENCING THESE SYMPTOMS THEY SHOULD CONTACT THE GAINING UNIT COMMANDER AND THEIR HEALTH
CARE PROVIDER FOR FURTHER INSTRUCTIONS AND WILL NOT TRAVEL.

FOR ARMY USE: AUTHORITY: 10 USC 12301 (D)
ACCT CLAS: 21 2/3/4 2010.0000 01-1100 2A200000 11**/12** PAMP 01EN30 S12120 AUX9187PD00006 C
 IC: 2F4AUX9187PD000
MDC: 4JE4       HOR: SAME AS SNL                                  PMOS/AOC: 12A
SEX: M          PPN: N/A        COMP: IRR           RES GR: SGM
DORRES: 01 AUG 2020             PEBD: 20 JUN 1997   SCTY CL: TOP SECRET WITH SCI
FORMAT: 162

FOR THE SECRETARY OF THE ARMY:

**************
*   AHRC    *                              DANNY C. JENNEJOHN
*  OFFICIAL *                              COL, EN,
**************                             CHIEF, FORCE SHAPING DIVISION


DISTRIBUTION: 1 SOLDIER
1 0007 HQ HHB ARMY HQ AND HQ LUCIUS D CLAY KAS DE 09014-0000
1 W6ED USA HUMAN RESOURCES COMD 1600 SPEARHEAD DIVISON AVENUE  FT KNOX KY 40121-0000

# Appendix 5

**Quote:**

16. This presentation emphasized the company's exploration activities and provided a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

17. Torchlight management valued the Orogrande asset's reserves at approximately $209.51 billion, using the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel. Based on industry-standard valuations of 10–20% of the market price for oil in the ground, the estimated below-ground value ranged between $20.96 billion and $41.92 billion, reflecting the fair market value prior to extraction.

18. Statements from Torchlight's executives, including Brda and McCabe, and social media influencers consistently referenced the Orogrande asset's potential, fostering shareholder expectations of significant financial returns. These projections were frequently cited in discussions leading up to the transition to NBH

**Evidence: Power Point for Investors**

**Link:** https://drive.google.com/file/d/1-3AUCFWj0jih3dkhCcbIrWsxUnqDtbsn/view?usp=drive_link







# FORWARD-LOOKING STATEMENT

- This presentation of Torchlight Energy ("Torchlight" or "Company") contains forward-looking statements within the meaning of the federal securities laws. Any statements that express or involve discussions with respect to predictions, expectations, beliefs, plans, projections, objectives, and goals, assumption of future events or performance are not express of historical fact and may be deemed "forward-looking statements." Forward-looking statements can often be identified by the use of words such as "may," "will," "estimate," "intend," "continue," "believe," "expect," "plan," "propose," "projected," "seek," or "anticipate," although not all forward-looking statements contain these or other identifying words. Forward-looking statements are based on expectations, estimates, and projections at the time the statements are made that involve a number of risks and uncertainties which could cause actual results or events to differ materially from those presently anticipated. Such forward-looking statements relate to, among other things: expected revenue, cash flow and earnings growth; estimates regarding oil and gas reserves, future oil and gas prices and present values of such reserves; strategies and timelines for growth of the Company's business; and projected capital expenditures. These statements are qualified by important factors that could cause the Company's actual results to differ materially from those reflected by the forward-looking statements. Such factors include, but are not limited to: the Company's ability to locate and acquire suitable interests in oil and gas properties on terms acceptable to the Company; the Company's ability to obtain working capital as and when needed on terms acceptable to the Company; the ability to integrate, manage and operate acquired oil and gas properties; the ability of the Company to build and maintain a successful operations infrastructure and to retain key personnel; possible insufficient cash flows and resulting illiquidity; government regulations; lack of diversification; volatility in the prices of oil and/or natural gas; increased competition; stock volatility and illiquidity; the Company's potential failure or inability to implement fully its business plans or strategies; general economic conditions; and the risks and factors described from time to time in the Company's offerings, reports and filings with the U.S. Securities and Exchange Commission (the "SEC"). The Company cautions readers not to place undue reliance on any forward-looking statements. The Company does not undertake, and specifically disclaims any obligation, to update or revise such statements to reflect new circumstances or unanticipated events as they occur.

- The information contained in this presentation is provided by the Company for informational purposes only and does not constitute an offer to buy or an invitation to sell securities of Torchlight or other financial products. The information contained herein is not investment or financial product advice and is not intended to be used as the basis for making an investment decision. The views, opinions and advice provided in this presentation reflect those of the individual presenters, and are provided for information purposes only. The presentation has been prepared without taking into account the investment objectives, financial situation or particular needs of any particular person. No representation or warranty, expressed or implied, is made as to the fairness, accuracy, completeness or correctness of the information, opinions and conclusions in this presentation. To the maximum extent permitted by law, neither the Company nor any of its respective directors, officers, employees or agents, nor any other person accepts any liability, including, without limitation, any liability arising out of fault or negligence, for any loss arising from the use of the information contained in this presentation.

- Cautionary Note to Investors Concerning Oil and Gas Reserve Estimates: The SEC permits oil and gas companies, in their filings with the SEC, to disclose only "Proved" reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions, the company uses certain terms in this presentation such as "Probable" or "Possible" oil and gas reserves that are not recognized by the SEC and the Company cannot.

2

# INVESTMENT HIGHLIGHTS

**PERMIAN PURE PLAY**

- Torchlight's strategy is to execute within the Permian Basin to swiftly and confidently create shareholder value through the development of its assets
- The Company has entered the Permian Basin at attractive valuations and is continually seeking to expand its acreage position within the basin

**STRATEGICALLY DIVERSE**

- The Company's high potential and diverse asset base provides a strong base for continual development
- Core assets are located in the Orogrande (Orogrande Project), Midland (Project Hazel) and Delaware Basins (Winkler Project) and each asset has multi-bench optionality
- Within the three basins, the Company expects to drill and complete wells in the Wolfcamp A, B, C, Upper and Lower Second Bone Spring, Third Bone Spring, and the Pennsylvanian in the Orogrande

**CONSERVATIVE DEVELOPMENT PLAN**

- The Company has completed extensive due diligence on each of its prospects prior to and since acquiring including, drilling scientific wells and performing modern shale logs, imaging logs and coring across its plays
- Torchlight expects to drill and complete over 6 gross wells (horizontal and vertical) this year across its three different projects to leverage on the potential increase in commodity prices and further increase underlying value of each project for future M&A or asset sales

**WELL-ESTABLISHED LEADERSHIP**

- Leadership team has experience in exploring, operating, producing and financing oil and gas companies
- Rich Masterson, the Company's consulting geologist has deep domain experience in the Permian Basin and is responsible for leading acquisition, development, and technical efforts
- The team has experience with Anadarko, Chesapeake, Concho, Petrohawk/BHP, Occidental, Shell, Maverick, and McCabe Petroleum
- The leadership team is aligned with shareholders as there is collectively 27% insider ownership

**TORCHLIGHT**

3

# TORCHLIGHT OVERVIEW

## CORPORATE HIGHLIGHTS

- Focused on developing and producing Permian Basin assets, more specifically Orogrande

- Over 100,000+ net acres (not net effective, actual)

- 2019 - 2020 move to monetization of non-core assets and market the Company/Orogrande for sale to larger established public E&P (stock sale)

- Near term strategy:

  - Continue to define the Orogrande Projects potential and scalability

  - Hazel acreage being marketed to focus on Orogrande

  - Winkler acreage being monetized to focus on Orogrande



TEXAS

Orogrande Project

Winkler Project

Project Hazel

TORCHLIGHT

# TORCHLIGHT SNAPSHOT

## MARKET SUMMARY

| | |
|---|---|
| Shares Outstanding | $79.85 MM |
| Last Sale Price | $.69 |
| Market Cap | $55.11 MM |
| 52-Week Range | High: $1.96/Low: $.55 |
| Share Float | 73% |
| Insider Ownership | 27% |
| Average Daily Volume | 204,000 shares |

| PROJECT | GROSS ACRES | PARTNER(S) | 2018-2020 D&C WELLS |
|---|---|---|---|
| Orogrande Project | 134,000 | Wolfbone Investments | 5 |
| Hazel Project | 12,000 | Private Family Offices | 2 |
| Winkler Project | 1,000 | Meco IV | 1 |

TORCHLIGHT

5

# MANAGEMENT TEAM

**JOHN BRDA**
*Chief Executive Officer*
*President*
*Director*

Mr. Brda has been our President and Secretary and a member of the Board of Directors since January 2012. He was promoted to CEO in December of 2014 with the exit of our co-founder Tom Lapinski. Mr. Brda, who also co-founded the Company, has been the Managing Member of Brda & Company, LLC since 2002, which provides consulting services to public companies—with a focus in the oil and gas sector. Core competencies include capital formation, equity and debt financings, strategic business development and securities regulation matters. With over 20 years of investment banking experience, including 5 years as a fund manager prior to becoming a consultant, Mr. Brda has the knowledge and experience to execute and ensure success for his client companies. Over that time, Mr. Brda, either originated, invested in, or placed over $70 million in financings. He graduated college in 1988 with a B.S. in Finance from Southern Illinois University, Carbondale, IL.

**ROGER N. WURTELE**
*Chief Financial Officer*

Mr. Wurtele is a versatile, experienced finance executive that has served as Chief Financial Officer for several public and private companies. He has a broad range of experience in public accounting, corporate finance and executive management. Mr. Wurtele previously served as CFO of Xtreme Oil & Gas, Inc. from February 2010 to September 2013. Since May 2013 he has worked as a financial consultant for us. From November 2007 to January 2010, Mr. Wurtele served as CFO of Lang and Company LLC, a developer of commercial real estate projects. He graduated from the University of Nebraska and has been a Certified Public Accountant for 40 years.

**RICH MASTERSON**
*Consulting Geologist*

Originated the Hudspeth County Orogrande Prospect as well as the Wolfbone Unconventional Play in the Delaware Basin where he has prepared prospects totaling over 150,000 acres that have been leased, drilled and currently being developed by: TROX, Eagle Oil and Gas/Rosetta/Devon, Browning Oil/ J Cleo Thompson/OXY, CWEI/Noble, EXL/Samson, Piedra/Brigham, Atlantic Exploration/Centennial, Energen, Anadarko, Shell/Chesapeake, Arabella Exploration, Red Willow, Concho and Petrohawk/BHP. Rich has created numerous prospects and discoveries throughout the Permian Basin from 2500 TD to 17000' TD since he began his career as a Geologist with Texaco in 1974. Rich holds a BA in Geology from Trinity University in San Antonio, TX and is a member of the West Texas Geological Society.

# BOARD OF DIRECTORS

## GREGORY MCCABE
### Chairman of the Board

Mr. McCabe, from Midland, Texas, is an experienced geologist who brings over 32 years of oil and gas experience to the Company. He is a principal of numerous oil and gas focused entities including McCabe Petroleum Corporation, Manik Royalty, Masterson Royalty Fund, G-Mc Exploration. McCabe has been involved in numerous oil and gas ventures throughout his career and brings a vast experience in technical evaluation, operations and acquisitions and divestitures to the Torchlight Board. McCabe is Torchlight's largest shareholder and provided entry for the Company into its two largest assets, the Hazel Project in the Midland Basin and the Orogrande Project in Hudspeth County, Texas.

## ALEXANDRE ZYNGIER
### Director

Mr. Zyngier founded Batuta Advisors in 2013 to pursue high return investment opportunities in the distressed and turnaround sectors. Mr. Zyngier has over 20 years of investment, strategy, and operating experience. He is currently a director of Atari SA, AudioEye, Inc. and a director of GT Advanced Technologies Inc. Mr. Zyngier has worked as a Portfolio Manager, investing in public and private opportunities, at Alden Global Capital, Goldman Sachs & Co. and Deutsche Bank Co. He was also a strategy consultant at McKinsey & Company and a technical brand manager at Procter & Gamble. Mr. Zyngier holds an MBA in Finance and Accounting from the University of Chicago and a BSc. in Chemical Engineering from UNICAMP in Brazil.

## ROBERT LANCE COOK
### Director

Mr. Cook has more than 40 years of experience in the oil and gas industry where he held senior positions with Shell Oil as a Wells Engineer. Mr. Cook retired from Shell in 2016 after 36 years of service. He most recently held position as Chief Scientist for Wells and Production Technology. Mr. Cook helped conceive and develop the Sirius Well Manufacturing System (SWMS) IV, a Joint Venture company that builds specialized oilfield equipment for large scale development programs. Mr. Cook's role as Chief Scientist at Shell involved advising the Senior Executives on technical issues and working with leading internal and external scientists to help Shell stay at the forefront of energy technology innovation. During his career Mr. Cook has also been credited with over 100 oil and gas industry patents.

## MICHAEL J. GRAVES
### Director

Mr. Graves is a Certified Public Accountant, and since 2005 he has been a managing shareholder of Fitch & Graves in Sioux City, Iowa, which provides accounting and tax, financial planning, consulting and investment services. Since 2008, he has also been a registered representative with Western Equity Group where he has worked in investment sales. He is also presently a shareholder in several businesses involved in residential construction and property rentals. Previously, he worked at Bill Markve & Associates, Gateway 2000 and Deloitte & Touche. He graduated Summa Cum Laude from the University of South Dakota with a B.S. in Accounting.

TORCHLIGHT

7

# CONSULTING PARTNERS

## MICHAEL ZEBROWSKI
*Consultant*

Mr. Zebrowski has 43 years of experience in Geoscience Management for Amoco, Mitchell Energy & Development, and Hess Corporation. He has extensive management experience in on- and off-shore Conventional and Unconventional Hydrocarbon projects as well as leading exploration efforts; Mr. Zebrowski is a proven oil finder in the discovery of 40 oil and gas fields throughout his career. He is also a consultant with expertise in Management, Geology, Geophysics, Log Analysis, Petroleum Systems, Well Operations Economics, and Pore Pressure Global Hess Wells.

## DANIEL ZEBROWSKI
*Consultant*

Mr. Zebrowski has extensive experience in managing Conventional and Unconventional resource plays as well as exploration and geologic/geophysical consultation. He has served as Unconventional Team Lead for both Vaalco Energy (USA), Inc. and Southwestern Energy Production Company where he managed all domestic G&G activities for conventional and unconventional resource plays, executed exploration/exploitation programs for assigned areas, implement strategic technologies and best practices workflows for EGY core operating areas. He has also served as Sr. Vice President and Exploration Manager for Vermillion Companies where he directed exploration staff of which included geologists, geophysicists and support staff.

## MIKE MULLEN
*Consultant*

Mr. Mullen is the president and founder of Stimulation Petrophysics Consulting, LLC. He has over 42 years of oil field wireline logging and formation evaluation experience. Previously, during his 25-year career with Halliburton, Mr. Mullen developed techniques for the analysis of conventional and unconventional reservoirs with a stimulation treatment design and optimization from wireline logging measurements. He also was involved with the development of software models used by Halliburton throughout the world to evaluate Tight Sands, Shale Gas, Shale Oil, and Coalbed Methane. He has contributed to over 30 technical papers on formation evaluation and one textbook on Coalbed Methane.

# PERMIAN FOCUSED

INTERCONNECTED PERMIAN BASIN

TORCHLIGHT TARGET REGIONS



## Early Permian Paleogeography (275 Ma)

Pedernal Uplift

Orogrande Basin

Pedregosa Basin

Sacramento Delaware Basin

Diablo Pl.

Central Basin

Northern Shelf

Val Verde Basin

Midland Basin

Eastern Shelf

Ozona Arch

(Blakey, 2011)

Panthalassic Ocean

9

# TORCHLIGHT ENERGY RESOURCES
## OROGRANDE BASIN

### PROJECT OVERVIEW

- Orogrande Basin - 134,000 Acres Under Lease

- Very Large Upside in Potential Hydrocarbon Resource (Recoverable) – 3rd party valuation from Stimulation Petrophysics

  - **Low Side Case**      2.3 Billion Barrels
  - **Median BTC Case**      3.7 Billion Barrels
  - **High Side Case**      5.0 Billion Barrels

- 6 Pilot wells drilled for Technical Data Collection and 2 Short Horizontal Tests

- A25 #1H Well is Horizontal and Productive - produced at 2.2 MMCFPD initially

- A25 #2 Drilled to Woodford, cased and awaiting testing

- A35 #1H Horizontal Well – Established Oil and Gas Production (33 BOEPD)

- Unconventional and Conventional Reservoir Targets

- Independent Petrophysical Evaluation by Stimulation Petrophysics

- Independent Scoping Economics by Evolve Energy Services

- Interpretation Project – Digital Database, Workstations to Show Potential Buyers

- Scoping Economics depict each major zone makes significant NPV per well, which range from $4.6MM - $10.3MM (pre-tax)



TORCHLIGHT



10

# OROGRANDE PROJECT
## NEW FIELD DISCOVERY

### ASSET OVERVIEW

- 134,000 acres all under University Lands D&D Unit
- 72.5% working interest
- 6 vertical test wells and 2 horizontal successfully drilled to date
- Finished drilling 2 well program announced Q4
  - CONFIRMED BARNETT AND WOODFORD ACROSS ACREAGE
  - CONFIRMED OIL AND GAS FROM SHORT HORIZONTAL UPPER PENN WELL
- First 2018 horizontal well drilled, completed and in testing phase (initial tests positive with 22MMCFPD raw, choked back to 12MMCFPD)
- Second Horizontal (2020) 15 BOPD OIL 120 MCFPD gas (33 BOED) 100' horizontal interval
  - Potential for 1500 BOD and 12 MMCFPD from a 10,000 lateral
  - 37 to 41 API Oil
- Confirmation of petroleum system in place

### TARGET BENCH CHARACTERISTICS

- Oil and Gas confirmed
- Potential from Shallow Wolfcamp; Confirmed Penn Silt Package of over 600' to 800'; Confirmed structural pay from Azota
- Pay zone depths – 3,000' to 7,500' with primary Penn at 5,300' to 5,500'
- Based on similar Midland Basin EUR's – potential EUR's of 4 to 6 million barrels per section with horizontal potential of 12 -18 horizontal wells per section
  - *4 to 6 benches in the Upper Penn formation*
- Potential 3.7 Billion Barrel recoverable reserves includes: Wolfcamp, Upper Penn, Barnett and Woodford unconventional zones



TORCHLIGHT

# PENN ISOPACH MAP

This map integrating all the data shows the thickness of the Penn Interval on the Torchlight Energy Resources Acreage

Blue Colors Thickest Zones

Within this overall interval are 4-6 individual prospective zones for drilling Horizontal Wells

The Overall Interval Thickness ranges from 600-800 ft over most of the Acreage



12

# OROGRANDE CHECKLIST (UNIV. RICH A11)

| # | ITEMS | PRESENT | DESCRIPTION | MIDLAND COMPARISON |
|---|---|---|---|---|
| 1 | Huge Contiguous Acreage Block | ✓ | 134,000 acres | - |
| 2 | Low Initial Costs | ✓ | Deal Structure | - |
| 3 | Shallow Depth | ✓ | <6,200 ft. | 7,800' to 9,000' |
| 4 | Thickness of Reservoir | ✓ | ~700 ft. | 300' to 700' |
| 5 | Mud Log Chromatograph | ✓ | 200 to 700 GU w/C4 | 50 to 600 GU w/C4 |
| 6 | Sample Oil Cuts | ✓ | Fair to good flash white | Fair to good bwh flash |
| 7 | Porosity | ✓ | 4.5% to 9% | 3.5% to 8% |
| 8 | Permeability | ✓ | .001 to .05 md | .0001 to .05 md |
| 9 | High Resistivities / Invasion Profile | ✓ | 35 to 160 ohms RT | 25 to 200+ RT (in silt) |
| 10 | Brittleness | ✓ | No Ductile shale | Scattered Ductile high clay units |
| 11 | Low Clay | ✓ | 12% to 27% | 15% to 45% |
| 12 | Silica Rich | ✓ | 35% to 55% | 30% to 55% |
| 13 | Thin Carbonates | ✓ | Scattered throughout silt | Scattered throughout silt |
| 14 | Calcite Cement | ✓ | Calcite and Dolomite | Calcite |
| 15 | TOC | ✓ | 1.8 to 3.08 | .8 to 1.1 |
| 16 | Thermal Maturity | ✓ | .81 to .90 Oil Window | .8 to 1.1 Oil Window |
| 17 | Matrix Permeability | ✓ | 850 to 1,700 Nanodarcies | 400 to 1,300 Nanodarcies |
| 18 | Pore Throat Sizes | ✓ | 10 to 350 Nanometers | - |
| 19 | HI / Oil | ✓ | Type II Kerogen | Type II/III Kerogen |
| 20 | S1 / TOC | ✓ | 55 to 61 Oil Mature | - |
| 21 | S2 / TOC | ✓ | 2 to 2.8 | 2.05 to 2.5 |
| 22 | Gas-filled Porosity | ✓ | 2.65 | 2.08 |

13

TORCHLIGHT

# PROJECT HAZEL-MIDLAND BASIN
## MARKETED

### ACREAGE OVERVIEW

- 12,000 gross (9,600 net acres), 80% WI (operated)
- Rich Masterson (geologist) originated project
- 74-75% Net Revenue Interest
- 18 contiguous sections based in the AMI
- First two wells have been vertical to establish the science
- Targeting the Wolfcamp A & B
- Secondary targets include the Leonard and Dean and potential Wolfcamp D
- Lease requires one well every six months to hold the entire 12,000 acre block for 18 months, then two wells every six months starting summer of 2018
- Offset operators include Private Equity Backed and Public Operators

### TARGET BENCH CHARACTERISTICS

- Primary Target Wolfcamp A & B
  - excellent quality shown in full core samples for both A & B
  - 150 to 350 ft. of thickness
  - Likely require 6 to 8 laterals per bench
  - Potential for 12 to 16 horizontal wells per section
  - 200 long lateral locations, assuming only 2 benches
  - Excellent IRR's 40% to 65% depending on lateral length, costs, and commodity pricing
- High quality oil and 1,500+ BTU gas
- Excellent logs and cores showing significant pay potential
- First 5500' Horizontal well drilled and tested, currently shut in



# PROJECT HAZEL-MIDLAND BASIN

## OFFSET OPERATORS

- The Project Hazel acreage is surrounded by many successful oil and gas wells dating back to the 1960's

- Drilling and completion activity continues to approach the Project Hazel and as new locations are spud they will continue to de-risk Project Hazel

- Operators within Sterling, Tom Green, and Irion counties include private, private equity backed, and public independent companies such as:





# WINKLER PROJECT
# MARKETED

## ACREAGE OVERVIEW

- 1,080 gross acres, 12.5% WI (non-operated)
- Private Equity backed MECO IV to operate the leasehold
- Rich Masterson (geologist) originated project
- 10,000-foot laterals
- First well in production in Sec. 47
- Contains six prospective benches or "stacked pay zones" where as many as 20 long laterals can be drilled

## TARGET BENCH CHARACTERISTICS

- Primary Targets:
  - Wolfcamp A & B
  - Upper 2nd Bone Spring
  - Lower 2nd Bone Spring
- Secondary Targets:
  - Wolfcamp C
  - Third Bone Spring

TORCHLIGHT



16

# WINKLER PROJECT

## OFFSET OPERATORS

- The Winkler Project is located at a hotspot for horizontal development activity and is offset by more than 13,000[1] successful wells

- Offset Operators in Winkler county include:









1. Accounts for both horizontal and vertical wells in Winkler County, source Drilling Edge

17



# WINKLER PROJECT

## RECENT OFFSET INITIAL PRODUCTION ANNOUNCEMENTS

| OPERATOR | WELL NAME | INITIAL PRODUCTION (BOE/D) | TARGET BENCH | LATERAL LENGTH |
|---|---|---|---|---|
| EOG | Neptune 10 St Com 701H | 5,237 | Wolfcamp A | 8,842 |
| EOG | Hound 30 Federal 704 H | 4,528 | Wolfcamp A | 7,000 |
| Jagged Peak | UL 26-27 #1H | 2,272 | Wolfcamp B | 9,600 |
| Lilis Energy | Bison #1H | 2,014 | Wolfcamp B | 6,900 |
| Lilis Energy | Tiger #1H | 1,803 | Wolfcamp B | 4,108 |

Source: Drilling Info, Wood Mackenzie, RSP Permian Investor Presentation, Lilis Energy Investor Presentation

TORCHLIGHT

18

# INCREDIBLE UPSIDE
## MAJOR DISCONNECT

CURRENT VALUATION METRIC

- 100,000 net acres in the company
- Market cap of $55 million
- $550 per acre (unheard of in Permian Basin)

OROGRANDE UPSIDE ONLY

- 96,000 net acres
- 600' to 800' thick Penn section that will require minimum of two too three bench laterals to drain
- Newly discovered shallow section over 1,500' interval encompassing conventional and unconventional pay
- Newly discovered structural deep conventional pay zones under structure
- According to 2D, magnetic and gravity maps, can be as high as 20,000 acres under structure

*COMPANY ESTIMATES*

- Taking Orogrande only and attributing zero value for Hazel or Winkler
- $1,000 an acre = $96M market cap
- $2,500 an acre = $240M market cap
- $7,500 an acre = $720M market cap

ACREAGE VAULATION

- Torchlight's approach is to create value from relationship driven acquisition followed by scientific proving and industry marketing to exit. Management has prior experience in mineral and land acquisition and divestiture privately. This translates to greatest potential upside. Preferred target acquirer would be larger public E&P.

TORCHLIGHT

19

# SUMMARY

**PERMIAN FOCUSED**

- Orogrande Project – 133,000 Acres, Orogrande Basin
- Project Hazel – 12,000 Acres, Midland Basin
- Winkler Project – 1,080 Acres, Delaware Basin
- Transitioning to a take-out candidate

**GROWTH THROUGH OPERATIONAL SUCCESS**

- Focused on delineation of the Orogrande Project
- Hazel Project and Winkler Project to be divested
- Mitigating risk through advanced geological and engineering review
- Utilizing newest technology to increase Estimated Ultimate Recovery and Initial Production

**EXCELLENT MANAGEMENT TEAM**

- Team has the comprehensive skills to create shareholder value through successful organic growth utilizing science as the driver
- Individuals have experience at the highest levels with top tier independent and integrated oil and gas companies
- Aligned with shareholders with 27% insider ownership

TORCHLIGHT

20

21

# CORPORATE CONTACT INFORMATION

TORCHLIGHT ENERGY
5700 W. Plano Pkwy #3600
Plano, TX 75093
214-432-8002
www.torchlightenergy.com

INVESTOR RELATIONS
Derek Gradwell
Integrous Communications
512-270-6990
ir@torchlightenergy.com

TORCHLIGHT

# Appendix 6

**Quote:**

20. In June 2020, Torchlight's board of directors, led by Brda, resolved to pursue a strategic initiative to stabilize the company through a merger with META I, a Canadian corporation specializing in advanced technological innovations and cleantech solutions. This merger was presented to shareholders as a critical measure to address alleged illegal short shares and counteract the systemic challenges posed by naked short selling in the market.


**Evidence:**

**Link:** https://www.sec.gov/files/litigation/admin/2024/33-11292.pdf

**Quote:**

9.

Brda explained his plan—including the use of the Preferred Dividend to pressure

short sellers—to members of Torchlight's Board of Directors, its investment banker, and several

prospective merger partners, including Palikaras and the Meta I Board of Directors. From its

earliest conception, in brainstorming the plan with Torchlight's Chairman and its lead banker in

June 2020, Brda explained that, "[b]y issuing a Pref to [Torchlight] shareholders of record at

closing, and announcing it as part of the [merger agreement], the short position which is quite

extensive will be forced to cover." Also in June 2020, Brda explained to a potential merger partner

that he expected Torchlight's stock price to increase "temporarily because of the short squeeze"

while acknowledging that the resulting price increase would be "unsustainable." In initial merger

discussions, Brda explained to Palikaras how the deal structure could create a short squeeze and the

plan to "[p]lay up the [preferred share] dividend to make sure the shorts understand their

dilemma."

# Appendix 7

**Quote:**

21. The merger, finalized on December 14, 2020, sought to combine Torchlight's oil and gas assets with META I's advanced materials technology, with the aim of enhancing shareholder value and diversifying operations. This corporate action marked a pivotal shift for both companies and laid the foundation for the creation of META II, which officially formed on June 28, 2021, and began trading on Nasdaq under the ticker symbol MMAT.

**Evidence:**

**Link:** https://www.sec.gov/Archives/edgar/data/1431959/000119983520000329/ex99-1.htm

**Quote:**

Metamaterial and Torchlight sign DEFINITIVE AGREEMENT for business combination

Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing

PLANO, TX and HALIFAX, NS, December 14, 2020 – Torchlight Energy Resources, Inc. (NASDAQ: TRCH), an oil and gas exploration company ("Torchlight") and Metamaterial Inc. ("Metamaterial" or "META") (CSE: MMAT), a developer of high-performance functional materials and nanocomposite products, announced today the signing of a definitive agreement for a business combination of Torchlight and Metamaterial by way of a statutory plan of arrangement (the "Transaction"). Upon completion of the Transaction, shareholders of Metamaterial are expected to hold an approximate 75% equity interest in the combined company while Torchlight shareholders will retain an approximate 25% equity interest in the combined company, subject to the pre-closing financing described below.

Torchlight shareholders on the record date will be entitled to receive a preferred stock dividend, payable immediately prior to the closing of the Transaction, that entitles them to their pro rata share of any proceeds resulting from any sale of Torchlight's oil and gas assets that occurs on the earlier of December 31, 2021 or six months from the closing of the Transaction, and, after

such time if such sales are not complete, will be entitled to receive a pro rata equity interest in a spin-off entity that holds Torchlight's remaining oil and gas assets, subject to certain conditions.

"We are very excited to sign the definitive agreement with Metamaterial," stated John Brda, Torchlight's CEO. "We believe this Transaction provides our shareholders with the best opportunity moving forward. Metamaterial offers proven disruptive technology with strong environmental, social and governance (ESG) priorities. This Transaction provides our shareholders with access to the multi-billion-dollar markets that Metamaterial serves and new applications that are being revolutionized with their sustainable technologies, while still allowing our Shareholders at closing of the Transaction to participate in the proceeds of our oil and gas asset divestitures."

"META's management, led by George Palikaras, has built an extraordinary award-winning cleantech company whose proprietary advanced technologies address multiple markets and improve their customers' capabilities," said Greg McCabe, Torchlight's Chairman. "I am excited to work with the META team and equally excited about the outcome for our faithful Torchlight shareholders."

"NASDAQ is the world's premier technology exchange, providing us with the best platform to expand awareness of Metamaterial on the global stage and fully realize the value of our portfolio of innovative, sustainable products." commented Ram Ramkumar, Metamaterial's Chairman.

"It has been our goal for META to be a NASDAQ-listed company," stated George Palikaras, President & CEO of Metamaterial. "When the business combination with Torchlight closes, obtaining a national exchange listing in the United States is anticipated to provide META with significant value and increased access to global capital markets."

"This Transaction will expand our business' reach and attract additional world-class talent. We look forward to driving significant opportunity for the combined company and all shareholders in

our mission to make every product that we produce smarter and more sustainable by harnessing the power of light and advanced material innovations."

Transaction Summary:

The following is a summary of the key terms of the pending Transaction as contemplated by the Arrangement Agreement. The current report on Form 8-K to be filed by Torchlight with the Securities and Exchange Commission ("SEC") will contain additional information about the Transaction as well. The closing of the Transaction is subject to the satisfaction or waiver of customary closing conditions, including approvals by NASDAQ and the Canadian Securities Exchange ("CSE"), Canadian court approval, and approval by the shareholders of both companies. There can be no assurances that the Transaction will be consummated. Pertinent deal terms are as follows:

• Torchlight and Metamaterial will be combined such that at closing, the former equity holders of Torchlight would own approximately 25% of the combined company with the former equity holders of Metamaterial owning the remaining approximately 75% of the combined company.

• Prior to closing, Torchlight must raise gross proceeds of at least $10 million through the issuance of common stock or securities convertible into or exercisable for common stock, less the value of loans Torchlight has made to Metamaterial.

• Prior to closing, all debt of Torchlight is to be converted into common stock or repaid in full, excepting senior secured debt that may alternatively be modified such that the debtholders' sole recourse in respect thereof will be against Torchlight's pre-closing oil and gas assets.

- Metamaterial shareholders may elect to receive either shares of Torchlight common stock or shares of a Canadian subsidiary of Torchlight, which will be exchangeable into Torchlight common stock (the "Exchangeable Shares"). Holders of Exchangeable Shares will be entitled to cast votes on matters for which holders of Torchlight common stock are entitled to vote and will be entitled to receive dividends that are economically equivalent to the dividends declared by Torchlight with respect to its common stock.

- Torchlight will declare a dividend of preferred stock to its common shareholders on the record date, with such dividend being payable immediately prior to closing of the Transaction. The preferred share will provide shareholders of record, the right of participation in the net proceeds of the sale of Torchlight's oil and gas assets, subject to certain holdbacks and time constraints.

- The combined company, formerly known as Torchlight Energy Resources, Inc., will change its name and focus its business to align with the current business of Metamaterial.

- Following the closing of the Transaction, the board of directors of the combined company will be comprised of 7 members, one of whom is to be appointed by Torchlight, a second to be jointly appointed by Metamaterial and Torchlight and the remaining 5 to be appointed by Metamaterial.

- Metamaterial's CEO, George Palikaras will be appointed CEO of the combined company, along with the appointment of Kenneth L. Rice as CFO and Executive Vice President. Torchlight's management will remain, in an advisory role focused on winding down Torchlight's legacy business and maximizing the value obtained from the divestiture of Torchlight's oil and gas assets.

- Torchlight will loan to Metamaterial an additional US$500,000, in exchange for an unsecured promissory note in substantially the same form as the 8% unsecured convertible promissory note that evidences Torchlight's loan to Metamaterial of US$500,000 on September 20, 2020. Upon closing, these two bridge loans, including the aggregate principal and unpaid interest, are to be included in, and credited against, the $10 million pre-closing financing described above, with such notes to be deemed cancelled and paid in full.

- Certain stockholders of each of Torchlight and Metamaterial have executed customary voting and support agreement pursuant to which persons representing approximately 16% of Torchlight's and approximately 48% of Metamaterial's outstanding voting power have agreed to vote in favor of the Transaction, subject to customary applicable terms.

Torchlight and Metamaterial invite all interested parties to view a webcast introduction of George Palikaras, CEO of META and an overview on META. The webcast link will be made available and announced shortly.

In connection with the Transaction, Torchlight and Metamaterial respectively obtained fairness opinions. Torchlight has engaged Roth Capital Partners as financial advisor and Stikeman Elliott LLP and K&L Gates LLP as legal advisors, and Metamaterial has engaged Hamilton Clark and Cormark Securities as financial advisors and Fasken Martineau DuMoulin LLP and Wilson Sonsini Goodrich & Rosati P.C. as legal advisors.

# Appendix 8

**Quote:**

22. During this process, Torchlight issued Preferred Stock, later known as MMTLP, as restricted shares. Although these shares were initially intended to remain non-tradable, they began trading on OTC markets on October 6, 2021.

23. This trading activity implied a conversion to free-trading status, which typically requires a registration statement declared effective by the SEC or an exemption, such as Rule 144 or a 3(10)(a) exemption *(See Appendix 26)*.

25. This discrepancy raises significant questions about transparency, corporate intent, and the overall integrity of the MMTLP trading process, directly impacting shareholder trust and financial outcomes.

**Evidence:**

**Link:**

https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm

**Image:**

- 3 -



*Currency*

Unless otherwise indicated, all references to "$" or "dollars" set forth in this Circular are to Canadian dollars and all references to US$ are to United States dollars.

## NOTICE TO SECURITYHOLDERS IN THE UNITED STATES

**THE ARRANGEMENT AND THE SECURITIES TO BE ISSUED IN CONNECTION WITH THE ARRANGEMENT HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR THE SECURITIES REGULATORY AUTHORITIES OF ANY STATE OF THE UNITED STATES, NOR HAS THE SEC OR THE SECURITIES REGULATORY AUTHORITIES OF ANY STATE OF THE UNITED STATES PASSED UPON THE FAIRNESS OR MERITS OF THE ARRANGEMENT OR UPON THE ADEQUACY OR ACCURACY OF THIS CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE.**

*The following discussion is only a general overview of certain requirements of U.S. Securities Laws relating to the Arrangement that may be applicable to Shareholders, Meta Optionholders, Meta Warrantholders, and Meta DSU Holders. Each Securityholder is urged to consult such person's professional advisors to determine the U.S. conditions and restrictions applicable to trades in the Torchlight Shares issuable pursuant to the Arrangement.*

*Exemption from U.S. Registration*

The Torchlight Shares and the Replacement Options to be issued to Shareholders and Meta Optionholders, respectively, under the Arrangement have not been and will not be registered under the U.S. Securities Act, and are being issued in reliance upon the Section 3(a)(10) Exemption and exemptions provided in respect of the securities laws of the states of the United States in which U.S. Securityholders reside. The Section 3(a)(10) Exemption exempts from registration a security that is issued in exchange for one or more bona fide outstanding securities, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange have the right to appear, by a court of competent jurisdiction or by a Governmental Entity expressly authorized by law to grant such approval. The Court is authorized to conduct a hearing at which the substantive and procedural fairness of the terms and conditions of the Arrangement will be considered. The Court issued the Interim Order on February 8, 2021, and, subject to the approval of the Arrangement Resolution by the Securityholders, a hearing for a Final Order approving the Arrangement is currently anticipated to take place on March 17, 2021 at 12:00 p.m. in Toronto, Ontario. All Shareholders, Meta Optionholders, Meta Warrantholders, and Meta DSU Holders are entitled to appear and be heard at this hearing, provided that they satisfy the applicable conditions set forth in the Interim Order. Accordingly, the Final Order of the Court will, if granted, constitute the basis for the Section 3(a)(10) Exemption with respect to the securities to be issued under the Arrangement. See "*The Arrangement – Court Approval of the Arrangement and Completion of the Arrangement*".

The Section 3(a)(10) Exemption will not be available for the issuance of any Torchlight Shares that are issuable upon exercise of the Replacement Options or the Torchlight Shares issuable upon exercise of the Exchangeable Shares, the exercise of the Meta Warrants and the redemption Meta DSUs. Therefore, the Torchlight Shares issuable upon the exercise of the Replacement Options, the exercise of the Meta Warrants or redemption of the Meta DSUs will be "restricted securities" within the meaning of Rule 144, and may be issued only pursuant to an exemption from the registration requirements of the U.S. Securities

# Appendix 9

**Quote:**

26. Also, in or around Q4 of 2020, another ticker symbol, MMATF, began trading on various exchanges in the U.S. and internationally. This MMATF ticker was representative of META I, which, at the time, was trading on the Canadian junior exchange (CSE) under the symbol MMAT.CN and was not DTC eligible

**Evidence:**

**Image:**



**Metamaterial Inc**

[ LOG IN TO FOLLOW ]

—   N/A%   -

December 15, 2024 · USD · OTO · Disclaimer

| 52wk High | 18.00 | 52wk Low | 0.194 |
|---|---|---|---|
| Beta | -0.18325 | Total Shares | 105.53m |
| | | Shares Out | 105.53m |
| | | PB Ratio | 6,378.44 |
| VWAP | 13.58906 | Exchange | OTCPK |
| Dividend | - | Yield | N/A |
| Ex-Div Date | - | Div. Freq | - |

# Appendix 10

**Quote:**

27. A statistical analysis performed on July 14, 2024, evaluated trading volumes of Torchlight (TRCH) from 2010 to 2020 against its trading activity in the first half of 2021. The analysis considered a historical daily variation of 5% and concluded that the 3.6 billion shares traded within six months of 2021 was statistically improbable without manipulation or an extraordinary market event.

**Evidence:**

**Link:**

**Image:**

# Appendix 11

**Quote:**

29. In June 2021, GTS Securities, led by Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, filed paperwork to list the "Series A Preferred Stock" (MMTLP) for trading on the Over-The-Counter (OTC) market. This action was taken without authorization from Torchlight or META I executives, raising significant concerns about compliance *(See Appendix 29)*.

30. Rubenstein advocated for reduced regulatory burdens under Rule 15c2-11, suggesting exemptions for certain securities, such as preferred stocks, linked to primary shares listed on U.S. exchanges. This position underscores a potential loophole exploited during the MMTLP registration process.

**Evidence:**

**Image:**

>     This letter is in response to your request, dated and
> received in this office on August 16, 2022, for information
> regarding Form 2:1 (for MMTLP) filed October 6, 2021.
>
>     Based on the information you provided in your letter, we
> conducted a thorough search of the SEC's various systems of
> records, but did not locate or identify any information
> responsive to your request.
>
>     If you still have reason to believe that the SEC maintains
> the type of information you seek, please provide us with
> additional information, which could prompt another search.
> Otherwise, we conclude that no responsive information exists and
> we consider this request to be closed.
>
>     You have the right to appeal the adequacy of our search or
> finding of no responsive information to the SEC's General Counsel
> under 5 U.S.C. § 552(a)(6), 17 CFR § 200.80(f)(1). The appeal
> must be received within ninety (90) calendar days of the date of
> this adverse decision. Your appeal must be in writing, clearly
> marked "Freedom of Information Act Appeal," and should identify
> the requested records. The appeal may include facts and
> authorities you consider appropriate.

**Global Trading Systems, LLC**
545 Madison Avenue
New York, NY 10022
212.715.2830
www.gtsx.com



February 26, 2020

Vanessa Countryman, Secretary
United States Securities and Exchange Commission
100 F street, NE
Washington, DC 20549-1090

**Re: Release 34-87115; File No. S7-14-19**

Dear Ms. Countryman:

Global Trading Systems (GTS) is a New York-based automated market maker, financial technology firm and wholesale market maker currently making markets in virtually all National Market System ("NMS") and Over-the-Counter ("OTC") equity securities. We provide market making services both on exchanges and directly to over 60 U.S. broker-dealer clients. Collectively, the traders on our OTC trading desk have over 346 years of experience trading OTC equity securities.

GTS welcomes the opportunity to offer our comments to the Securities and Exchange Commission ("Commission") on the recent rule proposal which seeks to enhance the market structure for OTC equity securities by proposing amendments to 17 CFR 240.15c2-11.

The Commission stated in the proposing release that the proposed amendments:

> "are intended to modernize the Rule and in so doing better protect retail investors from incidents of fraud and manipulation in OTC securities, particularly securities of issuers for which there is no or limited publicly available information, and facilitate more efficient trading in certain more widely followed OTC securities."

GTS fully supports the objectives of the Commission to protect retail investors from fraud and manipulation and to enhance trading in OTC securities. However, the proposed rule amendments will have unintended material, adverse effects on the OTC equity market and will not achieve the Commission's stated goal of reducing fraud.

**The OTC Marketplace**

In order to properly regulate the OTC marketplace, it is important to have a thorough understanding of its macro- and micro-structure, and the key role it plays in the capital formation process. The current OTC equity market is a competitive dealer market where non-listed securities are quoted, with numerous dealers participating and representing customer interests. The breadth of securities that trade OTC is more extensive than perhaps any other organized equity securities marketplace. The investors that buy and sell OTC equity securities are as diverse as the securities that trade on the OTC market. In our experience, investors in OTC securities are not just retail investors but run the gamut from self-directed individual investors to hedge funds, pension funds, and Registered Investment Advisors. Thus, the experience-level and sophistication of investors in the OTC marketplace many times exceeds that of other more traditional marketplaces. This is further evidenced by the range of comment letters submitted on this proposal.

As many commenters have pointed out, the OTC market is full of high-quality companies whose financials may or may not be easily obtained. Examples include:

- Fannie Mae (FNMA) and Freddie Mac (FMCC) are perhaps the two highest profile companies whose shares trade OTC. Although the companies' financials are publicly available, the actual value of the companies to shareholders is an unknown because the companies have been in Government conservatorship for over a decade.
- Hanover Foods Corp. (HNFSA, HNFSB), founded in 1924, is a company whose products are well-known in grocery stores on the East Coast and that reliably pays dividends to shareholders. Even though the company's financials are hard to come by, the difficulty in tracking down that information should not preclude or impede upon an established marketplace from continuing to serve buyers and sellers.
- Decker Manufacturing Company (DMFG) was founded in 1878 and today is a major supplier of American-made agricultural and equine products. However, its financial information also is difficult to obtain.
- Massachusetts Electric Company (MSSEL), a company founded in 1887 with over $2 billion in current revenue. The company issued preferred shares in 1953 and has paid $1.11/share quarterly dividends on those preferred shares going back decades.
- Kopp Glass, Inc. (KOGL), has been manufacturing high-performance glass for mission critical applications since 1926. Once again, this company does not make its financial information available publicly. Nevertheless, although its shares are infrequently traded, the company has a strong following in the OTC market.
- North State Telecom (NORSA, NORSB) another example of a company with difficult, if not impossible, to obtain financials. These stocks have traded OTC in the $50-$65 range over the last few years. Should investors not have access to an active marketplace in these shares? Lumos Networks recently agreed to acquire NORSA, NORSB for $80/share in cash! That's over a 30% return versus where NORSA and NORSB were trading OTC before the announcement.
- The Tile Shop (TTSH) recently disclosed that it has filed a Form 15 with the SEC to deregister its stock. Consequently, the company is no longer required to publicly disclose corporate

information after the deregistration becomes effective. Should investors be deprived of an active marketplace because of this?

- Hanger Inc. (HNGR), Tangoe Inc. (TNGO) (since acquired), Super Micro Computer (SMCI), MiMedx Group Inc. (MDXG) are examples of companies whose financials became deficient due to a need to restate. Some of these remain trading OTC while others have gotten their financials back in order and re-listed back on Exchanges. Again, depriving investors of a continuous market due to a lack of financials seems a mistake and would effectively deprive investors of an active marketplace in which they can decide to stick with a company going through turmoil or close an investment. Having a continuous active marketplace enables investors the ability to make their investment decision and execute upon it in an efficient and effective manner.

Although information about a company may be hard to come by, investors should not be deprived of opportunities to trade the stock with market makers. Such opportunities are likely to disappear if the Commission adopts the proposed amendments to the "piggyback" provisions of Rule 15c2-11. Further, this would impact the current system which provides a mechanism for enhanced price discovery through competitive market making, and without which would cause an immediate degradation on the overall quality of the marketplace.

**Fraud and Manipulation**

Rooting out fraud in a complex market is not a trivial exercise. As with any rule change, the cost vs. benefit analysis is a critical part of the rule assessment. Any rule change must balance the potential to deter fraud with any unintended harm that may be caused to the marketplace, investors, or underlying issuers.

The uniqueness and complexity of the OTC market make it difficult to draw a causal relationship between delinquent or unavailable company financial information and fraud. Fraud and manipulation are typically the result of bad actors intent on creating schemes to enrich themselves at the expense of unsuspecting investors. Identifying these fraudsters and freezing their money flows is far more impactful and will directly reduce fraud in the marketplace – whether in the OTC market or national exchanges.

The Commission already has powerful tools it can use if it believes that an issuer's securities are the subject of fraud or manipulation. For example, Exchange Act Section 12(k)(1) authorizes the Commission to suspend trading in any security if "in its opinion the public interest and the protection of investors so require."[1]  The Commission already uses this authority extensively.[2]

The proposed amendments to Rule 15c2-11, specifically those that address the "catch all" issuers, are not likely to eliminate fraud or manipulation. Eliminating the actively quoted and public marketplace where investors can get published electronic quotes for "catch all" issuers will instead make it more difficult to value assets. Publishing a quote is not an enticement to trade. It is in fact information which

---

[1] The Commission issued more than 80 trading suspension orders in 2019 relating to approximately 100 issuers. https://www.sec.gov/litigation/suspensions/suspensionsarchive/susparch2019.shtml.
[2] https://www.sec.gov/litigation/suspensions.shtml.

investors can use to make better buying and selling decisions, determine best execution of their trades, as well as help value their holdings. Precluding or terminating quotations for "catch all" issuers will lead to unintended consequences including the reduction of transparency, distortion of price discovery, and general obfuscation of the marketplace, impacting brokers' ability to provide and measure best execution.

As career criminal Willie Sutton once said, "I rob banks because that's where the money is." Capital markets will continue to be targeted and criminals will become more sophisticated in evolving their methods. Because of this, we fully agree and support the Commission's efforts to root out fraud and vigorously pursue those individuals who perpetrate illicit acts. However, adding unnecessary friction can permanently damage the OTC marketplace, bona-fide issuers, and the ability of investors to participate in the OTC space.


**Information**

In the 1984 amendments to Rule 15c2-11, the Commission recognized that the existence of priced quotes reflects "independent supply and demand forces, thereby indicating that sufficient information about the issuer of the quotes security is reaching the marketplace," and provided the basis for the "piggyback" exception in the rule.[3]

The principles behind these amendments continue to ring true today. While the Commission acknowledges and appears to accept the continuing validity of this policy rationale in the present proposing release,[4] the Commission would undermine the ability of market makers to provide liquidity by piggybacking if information about the issuer were not "current" and "made publicly available within six months before the date of publication or submission of such quotation."[5] We respectfully suggest this requirement would have considerable negative consequences, and would effectively suspend trading in such securities even in the absence of any indication that the public interest or investor protection is endangered.

The piggyback exemption is vital to the efficient operation of the OTC marketplace. By allowing for continuity of liquidity provisioning and enabling more robust competition, the exemption significantly enhances the price discovery process. Making it more difficult or removing it altogether will undoubtedly add friction to the marketplace and lead to worse outcomes for investors and issuers. Reviewing the Rule's exceptions is a healthy exercise but, as proposed, the modifications will be akin to the proverbial "throwing the baby out with the bathwater".

---

[3]*See* Release 34-21470, 49 FR 45117, 45121 (November 15, 1984),
   https://s3.amazonaws.com/archives.federalregister.gov/issue_slice/1984/11/15/45116-45123.pdf#page=2

[4] Release 34-87115, 84 FR at 58222.
[5] 84 FR at 58266 (proposed paragraph (f)(3)(ii) to Rule 15c2-11).

The Commission asks in Q6 of the proposal, *"Are there any circumstances where proposed paragraph (b) information is unnecessary for an investor to be able to make an informed investment decision? What are they?"*

We believe the minimum information an investor needs is the following:

- Market data - bid price, ask price, last sale, volume, and historical trading data
- The number of shares outstanding
- The quality of basic disclosures about the company

Transparent quality, depth, and price of a security helps investors determine fair value and realistic prices where securities can be bought or sold.

The number of shares outstanding combined with the current market price provides investors with information about the total value of the company's shares. And a large issuance of additional shares can be a "red flag" about dilution of share value.

Knowing the amount and type of disclosures a company makes about its business and assets ensures an investor enters into any transaction with "eyes wide open".

Importantly, most of this information is readily accessible to investors. For example, (i) market data is typically available online and via any brokerage firm; (ii) the number of shares outstanding may not be as easily attainable as market data, but the information can be tracked down from other sources such as from the state in which a company is incorporated or directly from transfer agents; and (iii) in terms of disclosure, OTC Markets Group's standards and designations in its system for company information is a great publicly available tool which provides investors with relevant data regarding the classification of companies' disclosure status.[6]


**Suggestions**

**Piggyback Expansion**

Importantly, there is room to reduce the burden of Rule 15c2-11 by expanding the criteria for the types of securities which would be eligible for exemption from the rule, allowing market makers to quote immediately without diminishing investor protections.

For example,

- Additional classes of shares if the primary shares are listed on a U.S. securities exchange;
- Derivative securities such as warrants, rights, units, contingent value rights, preferred, and convertibles if the primary shares are listed on a U.S. securities exchange;

---

[6] See OTC Markets, FAQs, https://www.otcmarkets.com/learn/faqs.

- American Depositary Receipts and Ordinary Shares of foreign companies whose primary shares are listed on a foreign securities exchange;[7]
- New equity securities of companies that have emerged from bankruptcy; and
- When-issued securities of the types listed above.

**Task Force**

A key component to combatting fraud is the establishment of a task force, comprised of various industry participants assigned with addressing issues on a real-time basis. This construct would allow for a more rapid and effective response to potential issues. Such a task force would include members from brokerage and market making firms, transfer agents, DTC, FINRA, the SEC, Exchanges, and IDQS and ATS operators.

**Transfer Agents**

As noted above, our view is the promulgation of current and accurate information regarding an issuer's outstanding shares would be tremendously impactful in deterring fraud in the marketplace.

Accordingly, Transfer Agents should be required to disclose the outstanding share count for all companies they provide recordkeeping services for. The disclosure should be disseminated on a periodic basis. Any prospective increases in outstanding share count should be reported in advance, analogous to certain disclosures currently being provided by FINRA on the Daily List for Corporate Actions.

**Broker Disclosure**

Along the lines of the OTC Market disclosure standards, brokers should be required to inform their clients about the level of public disclosure a company makes.[8] This requirement should apply to all broker-dealers and should be mandated on a pre-order entry basis.

This requirement will help to ensure that investors, retail and institutional, are explicitly informed about the quality of issuer information prior to making investment decisions. Rather than prohibiting a broker-dealer from publishing quotations if an issuer is delinquent in its reporting obligations but is not the subject of adverse SEC action, this disclosure would put the investor on notice that they should take the quality of issuer information into account in making investment decisions. This is consistent with the foundational principles of the federal securities laws -- i.e., disclosure and transparency. Regulators should be very wary of injecting their views as to whether an investor should buy/sell a security. Rather, ensuring full and accurate information is available to investors to allow them to make informed investment decisions is the cornerstone of our capital markets.

---

[7] Perhaps listed on foreign markets meeting certain standards. See, e.g., Regulation S, Rule 901(b) (defining "Designated Offshore Securities Market").

[8] See footnote 4 above.

**Regulation SHO**

As a registered market maker in thousands of stocks, we stand ready to provide continuous liquidity to broker dealer clients and non-client contra-parties. Our trading counterparties value and depend on our liquidity provisioning. In less liquid securities, however, our ability to meet liquidity demands when acting as a bona-fide market maker are made significantly more difficult by the close-out requirements of Rule 204 of Regulation SHO. The financial exposure posed by the existing T+5 closeout period is an impediment to efficient price discovery and continuous liquidity. As supported by the academic paper, "Squeezing the Shorts in Small Cap Stocks" by Roberto Ricco, Regulation SHO, as currently constituted, may in fact be more of a catalyst for manipulation of securities than the piggyback exemption is.[9]

**Conclusion**

Thank you for providing the industry with the opportunity to comment on this rule proposal. We commend the Commission for its efforts to enhance OTC market structure and protect investors from fraud and manipulation.

As expressed, our principal concern with the proposed rule changes is that they are overly broad and sweeping in nature and will undoubtedly have unintended consequences which will have a negative impact on the marketplace and will not optimize the deterrence of fraudulent activity. As noted above, a better balance can be achieved by targeting specific segments of the market as well as engaging industry participants to take a more active role focused on addressing and remediating potential issues.

GTS would welcome the opportunity to discuss and elaborate on our comments with the Commission and the Staff.

Sincerely yours,

Ari Rubenstein

Co-Founder and Chief Executive Officer

---

[9]https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3484847







Ameritrade Account: [redacted] My Profile Support English Log Out Dock

My Account | Trade | Research & Ideas | Planning & Retirement | Education | Client Services | Search

Fri Dec 30 2022 1:53:31 am ET

Page help

## Message Center [redacted]

View messages | Compose

Folders | Add/Edit — Inbox — Sent — Trash — [redacted]

Linked Accts | What's this? [redacted]

Client services Back to SENT

< Previous | Next >

Download | Print | New window

From: [redacted] | Date: 10/03/21 1:31 AM Message available until 10/03/23.

2 Attachments | F7DC3308-0AE5-4734-9E44-AEA5B51C301E.png (299k) | EC772F0F-63EE-4252-EDA8-AA1575464C87.png (264k)

Form Message

[redacted] I know you guys have probably received a ton of inquiries on this subject already, but I would like to know what is going on with ticker symbol 'MMTLP'? These have seemingly started trading and I'm not quite sure why? The issue I have with this suddenly trading is that these were nothing more than placeholders that were in our accounts and are not supposed to trade, nor were they supposed to show any value until TRCH finishes the sale of their assets post merger. I currently hold 72,000 of these special dividend/series A preferred shares through TD, so it's particularly concerning to me when I see that it's showing tradeable as an OTC pinky and holds a value of $0.70 per share? This screams of a fraudulent act, and is most certainly illegal given the information issued in the SEC filings as per the Torchlight/Metamaterials merger/reverse split that finalized a few months ago. I believe this needs to be investigated on behalf of the true and actual holders of these preferred shares due to the fact that TD is allowing clients to close their positions on your platforms, but we are currently not able to actually purchase these shares on the OTC markets via any TD platform. Unfortunately, as a result of this, I'm reading on various outlets that clients who have been holding these placeholders in their accounts, and are now seeing this fabricated value attached to them, are mistakenly believing that the TRCH assets have been sold, and they are selling their positions for pennies on the dollar. Both the CEO's of Metamaterials and Torchlight respectively have stated publicly that they did not approve these for trade, and this is NOT the dividend we're going to receive, as the TRCH assets have in fact NOT been sold yet. As a matter of fact, this dividend was only issued to a finite number of investors who purchased TRCH shares before the June 22 cut off date. Please explain to me how a finite number of shares being held as placeholders in a finite number of accounts, suddenly became a tradeable security on the OTC marketplace? I phoned TD earlier regarding this matter and was told that they had no knowledge of this 'MMTLP' ticker being traded, even as I was watching it trade institutionally on level 2 in real-time, and have screen recorded this action for my records? I'm very confused how a Market Maker would go about creating a market for a special dividend/preferred share that held no value, and for which a market should not feasibly exist due to this supposedly being non-tradeable? And to add insult to injury, all of these investors who purchased Torchlight shares and held through the merger/reverse split as the price ran up to $12, gave up easy profits in lieu of the anticipation of a greater payout by the end of the year when TRCH assets are sold, now it seems as though we never really needed to hold these through the merger at all if we can theoretically just purchase them for $0.70 because someone has created a market for them regardless? I will also be sending all of my records regarding this matter to the regulatory agencies pertinent to the aforementioned issues. Finally, most relevant to TD Ameritrade, let me say that because I own these placeholders in a fully cash account and have never purchased anything with margin on TD, I emphatically DO not give my consent nor my permission for TD to lend out, or sell any of my shares of 'MMTLP' or whatever this placeholder is in my account. If you know what is going on with this issue, I would very much appreciate some more information please? I have plenty of friends and associates who have prematurely sold their positions, and are seeking information as to why they are trading, even though no TRCH assets have been sold? Thank you. Attached are pics of the stock in question trading on the OTC markets. Good Day [redacted]

Ameritrade Account: [redacted] My Profile Support English Log Out Dock

My Account | Trade | Research & Ideas | Planning & Retirement | Education | Client Services | Search

Fri Dec 30 2022 2:52:12 pm ET

Page help

## Message Center [redacted]

View messages | Compose

Folders | Add/Edit — Inbox — Sent — Trash — [redacted]

Linked Accts | What's this? (0) [redacted]

Re: Client services Back to INBOX

< Previous | Next >

Download | Print | New window

From: Message Center Client Services | Date: 10/14/21 2:51 PM Message available until 10/14/23.

Good afternoon [redacted]

I apologize for the delay in response and for the frustration this, as well as the rejected trades for MMTLP, has caused you. I have discussed the issue with our Order Room and was able to confirm why these trades were rejected.

Currently, there is only one market destination accepting orders for MMTLP, which is GTS OTC. Unfortunately, our platform is not connected to this specific market destination for clients utilizing the thinkorswim platform and advanced trading features, which is why the orders you placed we rejected. Orders can be placed for this security, however, they would need to be completed through a broker, as the orders have to be manually routed to this destination. You can reach our Trade Desk at 800-672-2098 and we can force the order through to GTS OTC. Please note, however, that the order will not show up in thinkorswim until we have confirmed a fill and our Order Room has updated the platform with the fill. As this is an OTC stock, only limit orders would be accepted for opening transactions.

There was one order that was filled on 10/8/2021, and I was able to confirm that our Order Room directly worked with a market destination, Canaccord (listed as CStewart in the details of that specific order), to confirm that they would be accepting orders for this security. However, during that trading day they stopped taking orders on it altogether. Unfortunately, we do not have information as to why they, or other market destinations, have chosen not to accept orders for MMTLP at this time.

I hope that this provides some clarity regarding this matter, but if you have any further questions, please do not hesitate to contact our Trade Desk (800 672 2098).

Sincerely,

Aaron [redacted]
Resolution Manager
Client Advocacy Team
Tel 800-669-3900
TD Ameritrade

This electronic message transmission contains information from TD Ameritrade Holding Corporation which may be confidential or privileged. The information is intended for the use of the individual or entity whose electronic mail address is named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (800-669-3900) immediately.

John Brda

the MMTLP profile is all from 2012. This smells like something nefarious from people who are not good people. I will get to the bottom of this as they are using my information in error as well.

John Brda

Not exactly. We don't know who signed the 211 to get the MMTLP to trade on OTC Markets. However, we DO know that all the info given to OTC Markets was fraudulent, false and from 2012. I tried to get OTC to take it down and they said that FINRA approved it. I have receipts

16.5K

# Appendix 12

**Quote:**

32. A letter from the Options Clearing Corporation (OCC), dated June 21, 2021, explicitly stated that the "Series A Preferred Shares" would not trade. However, this directive was contradicted by instructions allowing options traders to defer closing short positions until MMTLP could trade on the OTC market. This inconsistency directly conflicted with the intentions of the merged companies.

33. The OCC memorandum, distributed exclusively to market makers and hedge funds, including GTS and Rubenstein, provided additional time to close out fails-to-deliver under the "market maker exemption" rule, creating an uneven playing field for retail investors.

**Evidence:**

**Image:**



**OCC** THE FOUNDATION
FOR SECURE
MARKETS

#48884

Date:                June 21, 2021

Subject:             **Torchlight Energy Resources, Inc. – Distribution**
                     **Option Symbol: TRCH**
                     **New Symbol: TRCH1**
                     **Date: 06/23/21**

Background

Torchlight Energy Resources, Inc. (TRCH) has announced a distribution of (New) Torchlight Energy Resources, Inc. Series A Preferred Shares ("Series A Preferred Shares"). The distribution ratio is 1 Series A Preferred Share for each TRCH share held. The record date is June 24, 2021; the payable date is June 25, 2021. The NASDAQ has set June 23, 2021 as the ex-distribution date for this distribution.

The trading status for Series A Preferred Shares is not yet known. Per the TRCH Proxy Statement dated May 5, 2021 and filed May 7, 2021, it is not expected that the Series A Preferred Shares will be listed on a national securities exchange.

Possible Settlement Procedures

OCC anticipates that if an OTC or OTCBB (Bulletin Board) market develops, NSCC will accept transactions in the Series A Preferred Shares which arise as a result of option exercise and assignment activity. In that event, TRCH1 option exercise and assignment activity will settle in the normal fashion through NSCC. However, if a market does not develop or NSCC does not accept transactions in the Series A Preferred Shares, OCC anticipates requiring broker to broker settlement for TRCH1 options. Pursuant to customary OCC broker to broker settlement procedures, inability to effect delivery may subsequently occasion cash settlement as determined by OCC.

Contract Adjustment

Effective Date:      June 23, 2021

Option Symbol:       TRCH changes to TRCH1

Strike Prices:       No Change

Number of
Contracts:           No Change

Multiplier:          100 (e.g., a premium of 1.50 yields $150; a strike of 7.50 yields $750.00)
New Deliverable
Per Contract:        1) 100 Torchlight Energy Resources, Inc. (TRCH) Common Shares
                     2) 100 (New) Torchlight Energy Resources, Inc. Series A Preferred Shares
                     (subject to delayed settlement until the trading status can be determined)

| | |
|---|---|
| Settlement<br>Allocation: | TRCH: 95%<br>Series A Preferred Shares: 5% |
| CUSIPs: | TRCH: 89102U103<br>Series A Preferred Shares: TBD |

THE SETTLEMENT ALLOCATION OF THE TOTAL STRIKE PRICE AMOUNT IS BEING PROVIDED SOLELY FOR THE PURPOSE OF THE INTERFACE BETWEEN OCC AND THE NATIONAL SECURITY CLEARING CORPORATION (NSCC), AND IS NOT INTENDED TO BE USED FOR ANY OTHER PURPOSE, TRANSACTION OR CUSTOMER ACCOUNT STATEMENTS.

**Delayed Settlement**

The TRCH component of the TRCH1 deliverable will settle through National Securities Clearing Corporation (NSCC). OCC will delay settlement of the Series A Preferred Share component of the TRCH1 deliverable until the trading status of Series A Preferred Shares is determined. Upon determination of the trading status of Series A Preferred Shares, OCC will require Put exercisers and Call assignees to deliver the appropriate number of shares.

**Disclaimer**

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed options or futures prepared for the convenience of market participants. OCC accepts no responsibility for the accuracy or completeness of the summary, particularly for information which may be relevant to investment decisions. Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A. The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable. For both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

For questions regarding this memo, call Investor Services at 1-888-678-4667 or email investorservices@theocc.com. Clearing Members may contact Member Services at 1-800-544-6091 or, within Canada, at 1-800-424-7320, or email memberservices@theocc.com.



**THE FOUNDATION FOR SECURE MARKETS**

#48905

| | |
|---|---|
| **Date:** | June 25, 2021 |
| **Subject:** | Torchlight Energy Resources, Inc. - Reverse Split/Name/Symbol/CUSIP Change<br>Option Symbol: TRCH<br>New Symbol: MMAT2<br>Date: 6/28/21 |

Torchlight Energy Resources, Inc. (TRCH) has announced a 1-for-2 reverse stock split and a name, symbol, CUSIP change. As a result of the reverse stock split and underlying changes, each TRCH Common Share will be converted into the right to receive 0.5 (New) Meta Materials Inc. (MMAT) Common Shares. The reverse stock split and underlying changes will become effective before the market open on June 28, 2021.

<u>Contract Adjustment</u>

| | |
|---|---|
| **Effective Date:** | June 28, 2021 |
| **Option Symbol:** | TRCH changes to MMAT2 |
| **Contract Multiplier:** | 1 |
| **Strike Divisor:** | 1 |
| **New Multiplier:** | 100 (e.g., for premium or strike dollar extensions 1.00 will equal $100) |
| **New Deliverable Per Contract:** | 50 (New) Meta Materials Inc. (MMAT) Common Shares |
| **CUSIP:** | MMAT (New): 59134N104 |

<u>Pricing</u>

The underlying price for MMAT2 will be determined as follows:

MMAT2 = 0.50 (MMAT)

<u>Disclaimer</u>

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed options or futures prepared for the convenience of market participants. OCC accepts no responsibility for the accuracy or completeness of the summary, particularly for information which may be relevant to

investment decisions. Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A. The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable. For both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

For questions regarding this memo, call Investor Services at 1-888-678-4667 or email investorservices@theocc.com. Clearing Members may contact Member Services at 1-800-544-6091 or, within Canada, at 1-800-424-7320, or email memberservices@theocc.com.

https://drive.google.com/file/d/1AvcLZ-YW91UGWUk63USp0vYrEUKa_8qN/view?usp=sharing

https://drive.google.com/file/d/1T9emAqqm0p8VS6CyRN9cuVf-Q6VJFjWn/view?usp=sharing

# Appendix 13

**Quote:**

34. On June 25, 2021, Torchlight's Central Index Key (CIK) number, 0001431959, transitioned to META I during their reverse takeover (RTO). This shared use of the CIK among Pole Perfect, Torchlight, META I, and later META II could violate SEC rules requiring distinct identifiers for separate entities, potentially misleading investors and obscuring transaction records.

39. MMTLP shares began trading on OTC markets under the shared CIK number 0001431959, which had been used by Pole Perfect, Torchlight, and META II. This practice created ambiguity regarding compliance with SEC regulations, including Regulation S–T Rule 10(b) and Rule 10b-5, and warrants a thorough review to ensure adherence

**Evidence:**

**Image:**

# MMTLP
Meta Materials Inc.

**1.90 ↑**

1.90 / 1.94 (1 × 1)

## META MATERIALS INC.

1 Research Drive
Dartmouth NS B2Y 4M9
Canada

www.torchlightenergy.com
(902) 482-5729
ir@torchlightenergy.com

## BUSINESS DESCRIPTION

Torchlight Energy, headquartered in Houston, Texas, is positioned as a junior oil and gas player with a primary spotlight on oil.

## FINANCIAL REPORTING

| Reporting Status | U.S. Reporting: SEC Reporting |
|---|---|
| Audited Financials | Audited |
| Latest Report | 06/10/2021 |
| CIK | 0001431959 |
| Fiscal Year End | 12/31 |

# Appendix 14

**Quote:**

35. During the merger, McCabe, a key executive, publicly emphasized the potential value of Orogrande Basin's oil and gas assets, citing substantial reserves and strategic importance. However, public filings at the time valued these assets at $47 million—far below the estimated $20.96 billion to $41.92 billion derived from reserve-based valuations, highlighting discrepancies that later surfaced during the NBH spin-off.

**Evidence:**

**Link:** https://www.sec.gov/Archives/edgar/data/1936756/000119983523000181/nbh-10k.htm

**Image:**

NEXT BRIDGE HYDROCARBONS, INC.
CONSOLIDATED BALANCE SHEETS

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 569,298 | $ 1,989,419 |
| Accounts receivable | — | 74,310 |
| Accounts receivable, related party | 177,519 | 163,366 |
| Grants and other receivables | 150,000 | — |
| Prepaid expenses | 62,300 | 2,667 |
| Total current assets | 959,118 | 2,229,762 |
| Oil and natural gas properties, net | 79,695,928 | 45,663,470 |
| Other assets | 80,179 | 25,000 |
| TOTAL ASSETS | $ 80,735,224 | $ 47,918,232 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,891,649 | $ 2,828,326 |

# Appendix 15

**Quote:**

36. On June 28, 2021, MMTLP shares were created as a part of the spin-off transitioning Torchlight's assets into NBH. These shares were designated as "Preferred Stock Dividend" shares intended for private ownership and were not meant to trade publicly.

**Evidence:**

**Link:** https://www.sec.gov/Archives/edgar/data/1431959/000119983521000148/form-10k.htm

**Quote:**

ITEM 1. BUSINESS - continued


The Arrangement Agreement additionally makes provision for the conversion or amendment of other outstanding Meta securities, including options, deferred share units and warrants, such that they will be exercisable for shares of the common stock of the combined company, in each case with adjustments based on the Exchange Ratio.


Immediately following the Effective Time, based on the Exchange Ratio, the former shareholders of Meta are anticipated to own approximately 75% of the economic and voting interest of the combined company, with current Torchlight stockholders holding approximately 25% economic and voting interest. Following the Effective Time, the combined company's board of directors will be comprised of seven directors, with five of such directors to be nominees of Meta, one to be jointly nominated by Meta and Torchlight and one director to be a nominee of Torchlight, subject to the reasonable approval of Meta. Additionally, the current management of Torchlight will resign and be replaced by George Palikaras as Chief Executive Officer and Kenneth Rice as Chief Financial Officer.

Under the Arrangement Agreement, Torchlight will also submit to its stockholders a proposal to approve the issuance of stock under the Arrangement Agreement and amend Torchlight's articles of incorporation to effect a reverse split (the "Reverse Split"), to maintain compliance with the listing standards of Nasdaq. In connection therewith, on February 4, 2021, we filed a preliminary proxy statement (the "Proxy"), with the SEC.

Following the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a pro rata basis, of shares of Series A preferred stock, (the "Series A Preferred Stock"), with the rights set forth in the Series A certificate of designation, (the "Series A Certificate of Designation") which is attached as Annex H of the Proxy, to the holders of its common stock. Following the Effective Time, the holders of the Series A Preferred Stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in our oil and gas exploration business, (the "O&G Assets"), subject to certain holdbacks. Such asset sales must occur prior to the earlier of (i) December 31, 2021 or (ii) the date which is six months from the closing of the Arrangement, (the "Sale Expiration Date"). Following the Sale Expiration Date, subject to certain conditions, the combined company will effect a spin-off of any remaining O&G Assets with the Series A Preferred Stock holders to receive their pro rata equity interest in the spin-off entity.

The transaction has been unanimously approved by the board of directors of Meta, and shareholders representing 48.06% of Meta's common shares have entered into voting and support agreements in connection with the Arrangement. The transaction has also been unanimously approved by our board of directors, and stockholders representing 19.74% of our common stock have entered into voting and support agreements in connection with the Arrangement.

The consummation of the Arrangement is subject to certain closing conditions, including without limitation the requirement that (i) prior to the effective time of the Arrangement, we raise gross proceeds of at least $10 million through the issuance of common stock or securities convertible into or exercisable for common stock, less the aggregate principal amount and accrued interest on certain loans that we have made to Meta (the "Pre-Closing Financing") which condition has been met (ii) all of our debt is converted into shares of our common stock or repaid in full, with certain exceptions available and (iii) the shares

issuable in connection with the arrangement have been approved for listing on Nasdaq. Other closing conditions include without limitation the receipt of all required approvals from our stockholders and Meta's shareholders and from the Ontario Superior Court of Justice (Commercial List), (the "Court") and all other required regulatory approvals, as well as other customary closing conditions, including the absence of a material adverse effect with respect to either us or Meta. As of the date of this filing all of our notes payable have been retired.

The Arrangement is expected to close in the first half of 2021 and is to be implemented by way of an arrangement under the Business Corporations Act (Ontario). The Arrangement Agreement provides for customary representations, warranties and covenants, including covenants of each party to (i) subject to certain exceptions, carry on its business in the ordinary course of business consistent with past practice during the period between the execution of the Arrangement Agreement and the Effective Time and (ii) not solicit any alternate transactions or, subject to certain exceptions, to engage in any discussions or negotiations with respect thereto. Subject to certain terms and conditions, the Arrangement Agreement may be terminated by either party after May 15, 2021, and if the Arrangement Agreement is terminated prior to that date by either party as a result of obtaining a superior proposal from a third party, such terminating party is required to pay a termination fee of $2 million.

Under the Arrangement Agreement, we loaned Meta $500,000 on December 16, 2020, in exchange for an unsecured convertible promissory note in substantially the same form as the 8% unsecured convertible promissory note that evidences our loan to Meta of $500,000 on September 20, 2020. On February 18, 2021, Torchlight loaned to Meta $10,000,000, evidenced by an unsecured convertible promissory note issued by Meta (the "Promissory Note"), substantially in the same form as the previous bridge notes issued by Meta to us, to satisfy Torchlight's requirement to provide additional bridge financing to Meta pursuant to the Arrangement Agreement. These three bridge loans, including the aggregate principal and unpaid interest, will be included in, and credited against, the funds we are obligated to raise in the Pre-Closing Financing. Upon the closing of the Arrangement, all of the bridge notes will be deemed cancelled and paid in full.

# Appendix 16

**Quote:**

37. Despite MMTLP's first official trading date on October 6, 2021, Schwab's Total Stock Market Index Fund (SWTSX) included MMTLP shares as of July 31, 2021. This premature inclusion raises systemic concerns about share recognition processes and suggests potential irregularities in their creation.

**Evidence:**

**Image:**

| | | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | Symbol | Market Value | Percent of Assets | Name | BBG FIGI |
| 123 | 7/31/2021 | CELC | 53225 | | CELCUITY INC | BBG00HKBW0Q1 |
| 124 | 7/31/2021 | MITT | 53128.6 | | AG MORTGAGE INVESTMENT TRUST REIT | BBG001KKKYP6 |
| 125 | 7/31/2021 | PBPB | 52815.88 | | POTBELLY CORP | BBG0056HTPR8 |
| 126 | 7/31/2021 | CWBC | 52588.8 | | Community West Bancshares | BBG000JF5Q93 |
| 127 | 7/31/2021 | ASLE | 52475.28 | | AERSALE CORP | BBG00R2MWRL1 |
| 128 | 7/31/2021 | PTSI | 52467.36 | | PAM TRANSPORTATION SERVICES INC | BBG000BRQM91 |
| 129 | 7/31/2021 | MMTLP | 52426.44 | | META MATLS PREF INC | BBG012YNQGL9 |
| 130 | 7/31/2021 | MN | 52311.12 | | MANNING AND NAPIER INC CLASS A | BBG001VGY0R0 |
| 131 | 7/31/2021 | FNCH | 52168.22 | | FINCH THERAPEUTICS GROUP INC | BBG00ZGYN7R0 |
| 132 | 7/31/2021 | CZWI | 52004.16 | | Citizens Cmnty Ban | BBG000NFLJ78 |
| 133 | 7/31/2021 | UNTY | 51934.41 | | Unity Bancorp Inc | BBG000K0L0R3 |
| 134 | 7/31/2021 | SD | 51798 | | SANDRIDGE ENERGY INC | BBG000RKR5X8 |
| 135 | 7/31/2021 | TSHA | 51670.35 | | TAYSHA GENE THERAPIES INC | BBG00X3J3598 |
| 136 | 7/31/2021 | AKYA | 51656 | | AKOYA BIOSCIENCES INC | BBG00ZV1MVM8 |
| 137 | 7/31/2021 | INMB | 51604.84 | | INMUNE BIO INC | BBG00LW94LN2 |
| 138 | 7/31/2021 | VOR | 51551.7 | | VOR BIOPHARMA INC | BBG00YYCY3F1 |
| 139 | 7/31/2021 | OPTN | 51394.75 | | Optinose Inc | BBG00HS39GR1 |
| 140 | 7/31/2021 | ATNM | 51039.03 | | ACTINIUM PHARMACEUTICALS INC | BBG000RQZ2N4 |
| 141 | 7/31/2021 | ATNF | 51002.98 | | 180 LIFE SCIENCES CORP | BBG00H1CP0N1 |
| 142 | 7/31/2021 | LTRX | 50913.9 | | LANTRONIX INC | BBG000BW4N38 |



# Appendix 17

**Quote:**

38. On October 6, 2021, GTS Securities and Canaccord Genuity began public trading of MMTLP shares. META II executives were notified via email on the same day, marking the company's first and only awareness of this action. This trading occurred despite directives in Torchlight's proxy statement prohibiting public trading of the Series A Preferred Shares.

**Evidence:**

**Image:**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

INTER-COASTAL WATERWAYS LLC,

*Plaintiff,*

v.

CIVIL ACTION NO. 0:24-cv-60891-AHS

TRADESTATION SECURITIES, INC. and DOE DEFENDANTS 1-10,

*Defendants,*

and

THE FINANCIAL INDUSTRY REGULATORY AUTHORITY,

*Nominal Defendant.*

**DECLARATION OF GEORGIOS PALIKARAS IN SUPPORT OF PLAINTIFF INTER-COASTAL WATERWAYS LLC'S OPPOSITION TO DEFENDANT TRADESTATION SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND CROSS-MOTION FOR THE DISQUALIFICATION OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION**

14.     On October 6, 2021, Mr. Greg West, a Senior Corporate Actions Analyst at the Financial Industry Regulatory Authority ("FINRA") sent a basic "for your information" email to META II at investors@metamaterial.com which included a letter attachment from FINRA notifying the Company that they have assigned the ticker symbol MMTLP to the Series A Shares (the "MMTLP Shares") and the MMTLP Shares may be quoted and traded on the Over-The-Counter Market ("OTC Market").

15.     On October 7, 2021, META II's management responded to FINRA's letter via email and strenuously objected to the assignment of this new symbol in light of the false and misleading information regarding it and Meta Materials Inc. that was published on the OTC Market's website. We further requested that FINRA provide the Company with the contact information of the individual(s) or group(s) that requested the assignment of the symbol, and requested that the profile information shown on the OTC Markets site be immediately deleted and corrected to reflect the readily available information for META II which was contained in our Form 10-Q filing for the quarter that has ended June 30, 2021. The Company's financial

# Appendix 18

**Quote:**

40. Former Torchlight CEO John Brda reported the unauthorized trading of MMTLP to OTC Markets, which redirected him to FINRA.

41. FINRA informed Brda he lacked standing to file a complaint, as he was no longer CEO, further complicating shareholder recourse and adding to confusion over the listing process.

**Evidence:**

**Link:** https://x.com/johnbrda/status/1740529355648798842

**Image:**

 **John Brda** ✓

Just to get this correct, AGAIN!  The CEO and management of MMAT were in charge of the Series A Pref when it became tradable. I was the person who notified OTC that it wasn't supposed to trade.  I was the one who called the company to plead with them that this was not supposed to trade.

I was no longer CEO or in management, nor was McCabe.  I didn't sell a single share of TRCH in 12 years and only sold MMAT recently once they fired GP.  Sick of the BS.

I sold about 300,000 of my 2.2 million MMTLP towards the latter months it was trading for my own purposes which I was entirely in my right to do.  FIRST sale in 12+ years, btw.  Also, since there were times I had non-public info, I took off my GTC trades until such time as the info I had knowledge on was public.  These fuckers insinuating that me or McCabe scammed everyone is complete BS and we will not sit quietly and let it happen.

The scammers are the ones who sold short without borrows, got options trading in order to short further with fake locates and had to get the Series A Pref to trade in order to buy back the pref shares they had to deliver all with the help of an SRO, the OCC.  Do your homework, it is out there.  Why would the OCC postpone settlement by 4 months and assist the bad actors in getting the Series A Pref shares to trade against company wishes?  Is that not collusion?

Why has Trade Station told their clients that they do not have enough shares allocated to them in order to send shares to AST?  You read that correctly, THEY DON'T HAVE PEOPLES SHARES!  This is just one instance of what I believe to be a much bigger problem.

The reason they won't do a share count is it will tell the entire story.  I believe they (SEC) have it and don't want the real "plumbing" exposed.  If they did release the share count, we could compare that to the shares of NBH they were allocated by DTC and find out who has Failures to Receive and force the settlement of the trades.

Now that we have congress behind us all of this comes out and these people who have nothing to gain pile on is just a coincidence?  The articles only come out when we are getting too close.  Keep pushing for the truth.

I think the biggest joke is this belief that naked shorting doesn't happen.  Tell that to Sabby, tell that to Citadel, tell that to Goldman, tell that to South Korea, and money more of our "revered institutions".  A simple SEC search certainly tells a different story.

We will not quit this fight until everyone who had a hand in this potentially massive theft it is exposed.

Release the share count and all of this goes away.  No more BS and no more opinions.

# Appendix 19

**Quote:**

42. FOIA-released emails confirmed that the SEC and FINRA were aware of MMTLP trading concerns as early as November 2021.

43. Despite this awareness, no action was taken to resolve trading irregularities or address discrepancies in share volume, leaving retail investors exposed to systemic risks.

**Evidence:**

**Image:**



# PATRICIA CASIMATES TIMELINE



**October 7, 2021** - the MMTLP shares began trading on the OTC Market without the authorization of the Company. FINRA did not send its notice to the Company until less than 24 hours before the MMTLP Shares began trading on the OTC Market.

**October 14, 2021** - Patricia Casimates, left a voicemail for Mr. Ken Rice, META II's Chief Financial Officer, and emailed him asking Mr. Rice to call her regarding the Company's MMTLP complaint.





Later that day, Mr. Rice had a phone call with Ms. Casimates regarding META II's MMTLP complaint. During the call, Mr. Rice reported to me that **FINRA refused to provide the identity of the broker(s) or individual(s) that applied for the exemption.** Mr.Rice reported to me that **FINRA or the related broker(s) or individual(s)** who applied for the exemption **would not edit, delete or modify the false and outdated Company information that was listed on the OTC Market's website.**



**PATRICIA CASIMATES**

**KEN RICE**





**SAM DRADDY**




**November 29, 2021** - Sam Draddy, senior VP in Finra's National Cause and **Financial Crimes Detection Programs**, send a REPLY to an inquiry from an undisclosed party from the SEC and copies Patricia Casimates. The message reads:

*"I believe it was Patti Casimates from our Market Ops group who reached out to [name blank]. I have included her on the email so you can reach out to her directly. Hope all is well!"*

**PATRICIA CASIMATES FINRA**



**CHRIS STONE FINRA**


**JOHN MEEGAN HEFREN TOLLOTSON**


**TOM NICHOLSON D.A. DAVIDSON & CO**


**MATTHEW PRICE FIDELITY**


**JEFFREY SHEFTIC LINCOLN FINANCIAL**


**JOSEPH IRACI ROBINHOOD**


**CHRISTOPHER HAINES EDWARD JONES**


**KELLY BELL HILLTOP SECURITIES**


**STEVEN PAUL DAPCIC PERSHING LLC**

**December 9, 2022,** FINRA announced it had enacted a U3 halt on the trading of MMTLP Shares, claiming there was "significant uncertainty in the settlement and clearing process" for the security.

These people are the UPC committee members that decided to halt MMTLP.

# Appendix 20

**Quote:**

44. From October 7, 2021, to December 9, 2022, MMTLP trading activity facilitated by GTS Securities exceeded the authorized float of 165 million shares. This abnormal trading volume warrants investigation into potential synthetic share creation and necessitates a comprehensive audit of fails-to-deliver records

**Evidence:**

**Link:**

https://www.prnewswire.com/news-releases/next-bridge-hydrocarbons-inc-announces-filing-of-registration-statement-on-form-s-1-to-benefit-existing-shareholders-that-have-or-will-register-their-stock-directly-with-the-companys-transfer-agent-301886620.html

**Image:**

"Since taking over as Chairman of the Board of Next Bridge, I have had the opportunity to review the efforts by the Next Bridge management team to pursue a short-term trading window and to request that the Financial Industry Regulatory Authority ("FINRA") require all individuals and entities holding short positions in Next Bridge's common stock to be forced to close those positions. The efforts by Next Bridge were thorough, rigorous, and quite compelling. Unfortunately, FINRA did not find it had authority to issue a corporate action requiring all shorts positions to be closed if a trading period was to occur. While this decision may be disappointing to some of our shareholders, Next Bridge accepts the authority of FINRA on this matter and is going to move forward with the business of running our Company. In an effort to give Next Bridge and its shareholders the best chance for success, I have made the decision to assign proportionately my 10% working interest back-in after payout in the Orogrande Project, and my interest in the Bronco Prospect in Vermillion Parish, Louisiana, for the benefit of all shareholders that move or have already moved their Next Bridge shares to AST from their broker dealer accounts. I strongly believe that having all shares of Next Bridge at AST will provide significant value to the corporate governance and communications with Next Bridge's shareholders. I have personally begun the process of moving all of my shares to AST."

# Appendix 21

**Quote:**

45. Between October 1, 2022, and December 8, 2022, MMTLP's stock price fluctuated from $2.85 to $12.50, with its market capitalization varying from $1.5 million to $6.5 billion. These discrepancies indicate potential rehypothecation or other trading irregularities requiring further examination.

**Evidence:**

**Link:**

https://www.barchart.com/shared-chart/MMTLP?chart_url=i_1734499830_453038857&page_url=%2Fstocks%2Fquotes%2FMMTLP%2Finteractive-chart%3Fid%3D9701119

**Image:**



# Appendix 22

**Quote:**

46. On November 23, 2022, MMTLP shareholders were advised to transfer their shares to American Stock Transfer & Trust Company (AST/EQ) for the distribution of NBH shares. However, promised bonus shares were not delivered, raising concerns about shareholder misrepresentation and compliance with distribution agreements.

**Evidence:**

**Link:**

https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm

**Image:**

- *"Street name" or beneficial stockholders.* Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

26

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent on or prior to the Record Date such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our Transfer Agent.

# Appendix 23

**Quote:**

47. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of potential irregularities affecting the trading of META II and MMTLP shares.

48. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

49. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as this date mentioned, if not before this.

105. High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm.

**Evidence:**

**Link:**

**Image:**

| From: | Boyle, Richard |
| --- | --- |
| To: | (b)(6); (b)(7)(C) |
| Cc: | Gibbon, Jay |
| Subject: | Meta Materials Inc. (MMAT and MMTLP) / Next Bridge Hydrocarbons, Inc. |
| Date: | Friday, December 2, 2022 10:46:34 AM |
| Attachments: | image001.png |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning (b)(6); (b)(7)(C) I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market Fraud Investigations team recently received several tips that appear to have also been sent to the SEC. Below are some proposed times to discuss but we can work around your schedules if these don't work for you. Thanks.

Monday – between 11:30 ET and 2:30 ET or between 4:30 ET and 5:30 ET
Tuesday – between 4:30 ET and 5:30 ET


**Rich Boyle**
National Cause and Financial Crimes Detection Programs | 15200 Omega Drive, Suite 210 | Rockville, MD  20850
Phone: (240) 386-5008 | richard.boyle@finra.org | www.finra.org

# FINra.

Confidentiality Notice:: Information contained in or attached to this email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error. If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.



Non Responsive Record

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, November 29, 2021 5:03 PM
**To:** (b)(6); (b)(7)(C)                @SEC.GOV>; (b)(6); (b)(7)(C)                @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C)                @SEC.GOV>; Casimates, Patricia
<Patricia.Casimates@finra.org>
**Subject:** RE: Inquiry

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C)        —I believe it was Patti Casimates from our Market Ops group who reached out to
(b)(6);        I have included her on the email so you can reach out to her directly. Hope all is well!

Sam

Non Responsive Record

| | |
|---|---|
| **From:** | Cook, Robert |
| **To:** | (b)(6); (b)(7)(C) |
| **Subject:** | Fwd: FINRA Operating Status (1 of 2) |
| **Date:** | Sunday, December 11, 2022 6:38:18 PM |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi (b)(6); (b)(7)(C)

You may be aware already, but we have received a large number of complaints (on social media and directly to FINRA) related to a trade halt that we issued on Friday.

Some of these communications have included threats related to FINRA in general, as well as to certain of our employees. Out of an abundance of caution, we are asking our team to work from home tomorrow and the rest of the week, unless there is a particular business need to be in the office.

I have forwarded below the first of two emails we sent to our staff today. I will send the second one separately.

We would be happy to provide you and your team with a more detailed briefing on this if that would be helpful.

Kind regards,
Robert


**Robert W. Cook**
President and CEO
Financial Industry Regulatory Authority
1735 K Street NW
Washington, DC 20006
t: 202-728-8425
f: 202-728-8075
robert.cook@finra.org
www.finra.org

| | |
|---|---|
| **From:** | Cook, Robert |
| **To:** | (b)(6); (b)(7)(C) |
| **Subject:** | Fwd: FINRA Operating Status (Message 2 of 2) |
| **Date:** | Sunday, December 11, 2022 6:39:02 PM |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This is the second of the two emails I mentioned in my other email to you just now.

Kind regards,
Robert.

**Robert W. Cook**

**President and CEO**

**Financial Industry Regulatory Authority**

1735 K Street NW

Washington, DC 20006

t: 202-728-8425

f: 202-728-8075

robert.cook@finra.org

www.finra.org

| From: | Dumont, Stephanie |
| --- | --- |
| To: | (b)(6); (b)(7)(C) |
| Cc: | Russell, Racquel |
| Subject: | MMTLP |
| Date: | Sunday, December 11, 2022 8:33:02 PM |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi (b)(6); (b)(7)(C) I hope you're doing well. We wondered if you had a few minutes tomorrow for us to give you an update on what's been happening with MMTLP and the recent trading halt. Would Monday/tomorrow at 9 am work?

Confidentiality Notice:: Information contained in or attached to this email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error. If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.

---

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:07 AM
**To:** (b)(6); (b)(7)(C) @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C) @SEC.GOV>; (b)(6); (b)(7)(C) @SEC.GOV>; Boyle, Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
**Subject:** RE: Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C) --looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office—but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a zoom and feel free to let me know if (b)(6); (b)(7)(C) or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

Sam

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:07 AM
**To:** (b)(6); (b)(7)(C)          @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C)          @SEC.GOV>;(b)(6); (b)(7)(C)          @SEC.GOV>; Boyle,
Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
**Subject:** RE: Inquiry

> **CAUTION:** This email originated from outside of the organization. Do not click links or open
> attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C) —looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and
seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our
General Counsel's office—but was wondering if it made sense for my Fraud team to have a
conversation directly with you and your folks working on the matter so we are not duplicating
efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting
both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a
zoom and feel free to let me know if (b)(6); (b)(7)(C) or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

Sam

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 10:14 AM
**To:** (b)(6); (b)(7)(C)          @SEC.GOV>
**Subject:** RE: Inquiry

> **CAUTION:** This email originated from outside of the organization. Do not click links or open
> attachments unless you recognize the sender and know the content is safe.

Moved it to 2-2:30pm ET.

On Dec 11, 2022, at 6:33 PM, Dumont, Stephanie
<Stephanie.Dumont@finra.org> wrote:

> CAUTION: This email originated from outside of the organization. Do not click links or
> open attachments unless you recognize the sender and know the content is safe.

Hi (b)(6); (b)(7)(C) I hope you're doing well. We wondered if you had a few minutes
tomorrow for us to give you an update on what's been happening with MMTLP
and the recent trading halt. Would Monday/tomorrow at 9 am work?
Confidentiality Notice:: Information contained in or attached to this email may be
non-public, privileged, or confidential. Do not use, save, or copy any of that
information, and do not share it with anyone else, unless you are the intended
recipient. The sender has not authorized you to save, copy, use, or share any
information provided to you in error. If the sender sent you this email or any
attachment by mistake, please let the sender know by replying to this email and
then deleting it.

# Appendix 24

**Quote:**

52. On December 6, 2022, both FINRA and META II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, purchases of MMTLP executed after that date would not qualify for the distribution, and no new trades could be executed after December 8, 2022. However, shareholders were permitted to settle their positions, including all short sales (position close-only trades), through the end of trading on December 12, 2022.

53. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

56. Prior to December 8, 2022, FINRA did not provide any notice, either privately or publicly, that a U3 halt on MMTLP trading would be issued. FINRA failed to inform the issuer or shareholders before the halt occurred, and no explanation was provided for this omission.

57. On December 8, 2022, FINRA revised the original corporate action notice for MMTLP, altering key language and removing references to the December 14, 2022, pay date for NBH shares. These unilateral changes were made without notifying or justifying the decision to META II.

59. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to NBH shares.

60. This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

**Evidence:**

**Link:**

**Image:**

| Daily List Events | ✕ |
|---|---|

**Summary**

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/06/2022 14:53:29 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

**Comments**

MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. MMTLP shares will be canceled effective 12/13/22.

**Details**

| | Current Value |
|---|---|
| Daily List Date/Time | 12/06/2022 14:53:29 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class | |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| Daily List Comment | MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. MMTLP shares will be canceled effective 12/13/22. |

**Daily List Events** ✕

### Summary

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/08/2022 13:11:45 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

### Comments

See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22.

### Details

| | Current Value |
|---|---|
| Daily List Date/Time | 12/08/2022 13:11:45 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class | |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| Daily List Comment | See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22. |

# Appendix 25

**Quote:**

54. On December 7, 2022, John Mendall, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action.

55. Mendall confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

**Evidence:**

**Link 1:** https://x.com/marcosmonteiro/status/1825341208799170791



**Image:**

**Link 2:**https://x.com/marcosmonteiro/status/1825341205972234685    **Image:**



**Marcos**
@marcosmontero

📊 #MMTLP 📊

🧵 1/2

JEFF MENDL – FORMER VP OF OTC MARKET
December 7th, 2022.

Watch Day Trading Live - December 7, NYSE & NASDAQ Stocks - Live
Trading by TraderTV Live channel on YouTube.

A couple of points.

1. This interview was on December 7, 2022. The Corporate action from
the day before said the #MMTLP ticker was going to be "canceled," but
Jeff Mendl said it was going to be "deleted."

"From the OTC standpoint, if someone is a holder of the stock, what
does that mean? Okay, so so basically per finra's, corporate action or
corporate action, right. That came out, basically what that means is.
MMTLP is being 👉 DELETED 👈 as a ticker, after the trading day on the
12th. So it's deleted on the 13th."

The "deleted" term only appeared on the second corporate action
revised by @FINRA, which wasn't released by the time of the interview
with Jeff Mendl.

So he knew more than everybody else.

2. Then he says that #MMTLP would trade until December 12.

"But what I can say, though is. MMTLP as of the END OF TRADING on the
12th, well will no longer be on the OTC markets. And that's the most
important point to come across here if you are holding these shares on
the OTC markets guys. Again, end of trading on the 12th. it's coming off
of the OTC. "

**Why is nobody calling JEFF MENDL to ask him questions** about

# Appendix 26

**Quote:**

58. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from META II regarding unresolved issues with the MMTLP corporate action.

**Evidence:**

**Link 1:**

**Image:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

INTER-COASTAL WATERWAYS LLC,

*Plaintiff,*

v.

TRADESTATION  SECURITIES,  INC.  and
DOE DEFENDANTS 1-10,

*Defendants,*

and

THE FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

*Nominal Defendant.*

CIVIL ACTION NO. 0:24-cv-60891-AHS

**DECLARATION OF GEORGIOS PALIKARAS IN SUPPORT OF PLAINTIFF INTER-
COASTAL WATERWAYS LLC'S OPPOSITION TO DEFENDANT TRADESTATION
SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND
CROSS-MOTION FOR THE DISQUALIFICATION OF
THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY
<u>ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION</u>**

31.     Further, on or about December 8, 2022, FINRA notified the Company that it had

unilaterally revised the language of the Company's December 6, 2022 corporate action and

required the revised notice to be published on the Daily List. This revision was made without the

input or authorization of the Company and took place on or about December 7, 2022, *after* FINRA

had a call discussion with DTCC. I was informed that META II and Next Bridge's counsel were

not invited to participate in the call between FINRA and DTCC.[14]

# Appendix 27

**Quote:**

61. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions.

62. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe share imbalance.

**Evidence:**

**Link 1:** https://x.com/RareDealsHere/status/1784321399274033444

**Image 1:**



**Image 2:**

<div align="center">

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

</div>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SCOTT TRAUDT,                \*
Traudt                       \*

                         \*

v.                             \*      Docket Number: 2:24-cv-782
                         \*      **JURY TRIAL DEMANDED**

ARI RUBENSTEIN           \*
Defendant                 \*      1st Amended Complaint

                         \*

GTS SECURITIES LLC       \*
GTS EQUITY PARTNERS LLC   \*
GTS EXECUTION SERVICES LLC   \*
Defendant                 \*

                         \*

CHARLES W. SCHWAB AND CO. INC.   \*
SCHWAB HOLDINGS, INC.      \*
Defendant                 \*

                         \*

FINANCIAL INDUSTRY        \*
REGULATORY AUTHORITY     \*
Defendant                 \*

                         \*

GARY GENSLER             \*
US SECURITIES AND EXCHANGE   \*
COMMISSION              \*
Respondent               \*

                         \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The loss of this electronic data, communications, and audio recordings, particularly the emails detailing Traudt's claims and notice of legal action, as well as the 20 March 2023 audio recordings from TDA, severely prejudices Traudt's ability to litigate his case. These emails and audio recordings were critical in documenting Traudt's claims for damages and providing formal notice of litigation to Schwab, impairing Traudt's ability to substantiate his claims, oppose the Schwab motion attempting to stay this case and put Traudt in arbitration, and undermining the fairness of the proceedings. Since in the audio TDA's Ron Fleming states that MMTLP was trading at over "100 times" the lit market price, Traudt can quickly calculate that the *de minima* share price that TDA/Schwab was seeing on 8 December 2022 was the closing price on 8 December 2022 of $2.90 a share multiplied by 100 to $290 a share.[9]

**5. Dereliction and culpable mindset proving the spoliation was intentional**

The following fact pattern establishes the appropriate state of mind evidencing that this was no random act of simple negligence:

a. Schwab knew it was oversold in MMTLP at the time of the U3 halt and told MMTLP holders that under no circumstances and despite a FINRA order (potentially) to get MMTLP trading again, Schwab would not do so.[10] **(See Appendix G)** This is specific anticipatory non-performance of the contract with not just Traudt, but all Schwab shareholders in MMTLP, and it

# Appendix 28

**Quote:**

63. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024)

**Evidence:**

**Image 1:**

Is "too late to cancel" the same as a "market reject" at E-Trade?

 Show drafts ⌄ 🔊

**"Too Late to Cancel" vs. "Market Reject" at E-Trade**

**No, "too late to cancel" and "market reject" are not the same at E-Trade.**

**Too Late to Cancel**

This typically means that your order has already been executed or partially executed. You cannot cancel the order in its entirety, but you might be able to cancel any remaining portion.

**Market Reject**

A market reject indicates that your order couldn't be filled due to market conditions. This could be due to:

- **Insufficient liquidity:** There weren't enough buyers or sellers for your order.
- **Price restrictions:** Your limit price was too far from the current market price.
- **Order size:** Your order was too large for the available liquidity.
- **Other market factors:** Unusual market conditions, system errors, etc.

**In essence:**

- **Too late to cancel** means your order has already started processing.
- **Market reject** means your order couldn't be processed at all.

**If you encounter either of these messages, it's essential to review your order details and market conditions to understand the reason.**

**Would you like to know more about how to prevent these issues or what to do if you encounter them?**

**Image 2:**

| | Order type | Quantity | Symbol | Price type | Term | Price | Reasons |
|---|---|---|---|---|---|---|---|
| TF | Sell | 1,000 | MMTLP | Limit | GT 60 | 6,998.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 1,114.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 1,998.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 1,235.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 1,494.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 969.00 | Too Late To Cancel |
| TF | Sell | 500 | MMTLP | Limit | GT 60 | 1,355.00 | Too Late To Cancel |
| TF | Sell | 10 | MMTLP | Limit | GT 60 | 69,420.00 | Too Late To Cancel |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 799.00 | Too Late To Cancel |
| TF | Sell | 10 | MMTLP | Limit | GT 60 | 999,111.00 | Market Reject |
| TF | Sell | 1,000 | MMTLP | Limit | GT 60 | 150,000.00 | Market Reject |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 1,001.00 | Too Late To Cancel |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 3,325.00 | Too Late To Cancel |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 1,420.00 | Too Late To Cancel |
| TF | Sell | 1,000 | MMTLP | Limit | GT 60 | 200,000.00 | Too Late To Cancel |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 698.00 | Too Late To Cancel |
| TF | Sell | 100 | MMTLP | Limit | GT 60 | 550.00 | Too Late To Cancel |
| TF | Sell | 10 | MMTLP | Limit | GT 60 | 1,233.33 | Too Late To Cancel |
| TF | Sell | 1,000 | MMTLP | Limit | GT 60 | 9,992.00 | Too Late To Cancel |
| TF | Sell | 1,000 | MMTLP | Limit | GT 60 | 9,995.00 | Too Late To Cancel |



## Orders

Open   Executed   Cancelled   Saved   Individual fills   Expired   Rejected   All   Bond quotes

**Account**

| Individual Brokerage -l    ID | ▾ |

| From date | To date | Symbols | Order number | Order type | Order status | Security type | Results per page | |
|---|---|---|---|---|---|---|---|---|
| 📅 03/01/2022 | 📅 01/03/2024 | mmtlp | | All ▾ | Rejected ▾ | All ▾ | 20 ▾ | Apply filters |

Brokerage Update Disclosure ⟳

| | Date | Order | Type | Order type | Quantity | Symbol | Price type | Term | Price | Reasons |
|---|---|---|---|---|---|---|---|---|---|---|
| › | 12/12/22 | 748 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 6,252.00 | Too Late To Cancel |
| › | 12/12/22 | 745 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 1,114.00 | Too Late To Cancel |
| › | 12/12/22 | 744 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 1,053.00 | Too Late To Cancel |
| › | 12/12/22 | 743 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 1,235.00 | Too Late To Cancel |
| › | 12/12/22 | 742 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 1,494.00 | Too Late To Cancel |
| › | 12/12/22 | 741 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 962.00 | Too Late To Cancel |
| › | 12/12/22 | 740 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 1,393.00 | Too Late To Cancel |
| › | 12/12/22 | 739 | Stock/ETF | Sell | 10 | MMTLP | Limit | GT 60 | 69,400.00 | Too Late To Cancel |
| › | 12/12/22 | 738 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 799.00 | Too Late To Cancel |
| › | 12/12/22 | 736 | Stock/ETF | Sell | 10 | MMTLP | Limit | GT 60 | 999,111.00 | Market Reject |
| › | 12/11/22 | 734 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 150,000.00 | Market Reject |
| › | 12/11/22 | 733 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 1,001.00 | Too Late To Cancel |
| › | 12/11/22 | 732 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 3,125.00 | Too Late To Cancel |
| › | 12/11/22 | 730 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 1,430.00 | Too Late To Cancel |
| › | 12/11/22 | 729 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 200,000.00 | Too Late To Cancel |
| › | 12/11/22 | 725 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 692.00 | Too Late To Cancel |
| › | 12/11/22 | 724 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 550.00 | Too Late To Cancel |
| › | 12/11/22 | 723 | Stock/ETF | Sell | 10 | MMTLP | Limit | GT 60 | 1,233.33 | Too Late To Cancel |
| › | 12/10/22 | 722 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 9,992.00 | Too Late To Cancel |
| › | 12/10/22 | 721 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 9,993.00 | Too Late To Cancel |

Next ›



| | Date | Order | Type | Order type | Quantity | Symbol | Price type | Term | Price | Reasons |
|---|---|---|---|---|---|---|---|---|---|---|
| › | 12/12/22 | 1912 | Stock/ETF | Sell | 50 | MMTLP | Limit | GT 60 | 500.00 | Too Late To Cancel |
| › | 12/12/22 | 1911 | Stock/ETF | Sell | 4,500 | MMTLP | Limit | GT 60 | 813.73 | Too Late To Cancel |
| › | 12/12/22 | 1910 | Stock/ETF | Sell | 7,500 | MMTLP | Limit | GT 60 | 1,000.00 | Too Late To Cancel |
| › | 12/12/22 | 1909 | Stock/ETF | Sell | 7,500 | MMTLP | Limit | GT 60 | 1,016.66 | Market Reject |
| › | 12/12/22 | 1904 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 742.42 | Too Late To Cancel |
| › | 12/12/22 | 1903 | Stock/ETF | Sell | 5,000 | MMTLP | Limit | GT 60 | 5,000.00 | Too Late To Cancel |
| › | 12/12/22 | 1902 | Stock/ETF | Sell | 5,000 | MMTLP | Limit | GT 60 | 1,429.42 | Too Late To Cancel |
| › | 12/11/22 | 1898 | Stock/ETF | Sell | 2,500 | MMTLP | Limit | GT 60 | 4,000.00 | Market Reject |
| › | 12/11/22 | 1895 | Stock/ETF | Sell | 3,930 | MMTLP | Limit | GT 60 | 2,500.00 | Market Reject |
| › | 12/09/22 | 1885 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 2,000.00 | Too Late To Cancel |
| › | 12/09/22 | 1882 | Stock/ETF | Sell | 5,000 | MMTLP | Limit | GT 60 | 1,700.00 | Market Reject |
| › | 12/09/22 | 1881 | Stock/ETF | Sell | 2,500 | MMTLP | Limit | GT 60 | 2,000.00 | Market Reject |
| › | 12/09/22 | 1880 | Stock/ETF | Sell | 5,000 | MMTLP | Limit | GT 60 | 2,400.00 | Market Reject |
| › | 12/09/22 | 1877 | Stock/ETF | Sell | 18,884 | MMTLP | Limit | GT 60 | 1,429.00 | Market Reject |
| › | 12/09/22 | 1875 | Stock/ETF | Sell | 46 | MMTLP | Limit | GT 60 | 175.00 | Too Late To Cancel |
| › | 12/09/22 | 1871 | Stock/ETF | Sell | 8,884 | MMTLP | Limit | GT 60 | 3,000.00 | Market Reject |
| › | 12/09/22 | 1870 | Stock/ETF | Sell | 10,000 | MMTLP | Limit | GT 60 | 1,429.42 | Market Reject |
| › | 12/08/22 | 1854 | Stock/ETF | Sell | 8,884 | MMTLP | Limit | GT 60 | 3,499.00 | Too Late To Cancel |
| › | 12/08/22 | 1835 | Stock/ETF | Sell | 8,884 | MMTLP | Limit | GT 60 | 4,299.42 | Market Reject |
| › | 12/07/22 | 1832 | Stock/ETF | Sell | 8,884 | MMTLP | Limit | GT 60 | 1,500.42 | Market Reject |

Next ›

* = Share-weighted Average

# Appendix 29

**Quote:**

64. Many MMTLP traders, including the Plaintiffs, have expressed their intent to execute opportunity trades prior to the trading deadline on December 12, 2022, as specified in the approved corporate action.

**Evidence:**

**Image 1:**

# 1. NBH Prospectus 424B4

<div align="center">Summary of the Spin-Off</div>

| | |
|---|---|
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,472,241 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution.<br><br>Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled contemporaneously with the Spin-Off. |
| Record Date | The Record Date is the close of business on December 12, 2022. |
| Distribution Date | The Distribution Date is the close of business on December 14, 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates, other than upon request. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Distribution Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions:<br><br>• the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to the holders of Meta's Series A Preferred Stock; |

<div align="center">November 18, 2022</div>

Image 2:

# 2. Meta Materials PR

- ***Registered stockholders*** If the shares of Series A Preferred Stock are owned directly through META's transfer agent, American Stock Transfer & Trust Company LLC ("AST") such holder is a registered stockholder. In this case, the distribution agent, which is also AST, will credit the whole number of shares of Next Bridge common stock to be received in the distribution by such record stockholder by directly registering such shares in book-entry form in a new AST account in the name of such record stockholder. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the distribution. Registered stockholders will be able to access information regarding their book-entry account holding Next Bridge common stock at the transfer agent. Commencing on or shortly after the distribution date, the transfer agent will mail an account statement to each registered stockholder that indicates the number of whole shares of Next Bridge common stock that have been registered in book-entry form in their name.
- ***"Street name" or beneficial stockholders*** Most META stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker or other nominee holds the shares in "street name" and records such ownership on its books. If a holder owns shares of the Series A Preferred Stock through a bank, broker or other nominee, the bank, broker or other nominee will credit the holder's account with the whole shares of Next Bridge common stock received in the distribution on or shortly after the distribution date, however, shares of Next Bridge common stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, META encourages these holders to contact their bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to META's transfer agent on or prior to the record date such that each such holder of Series A Preferred Stock is then the registered holder of the distributed shares of Next Bridge common stock in a new account with META's transfer agent.

Holders of Series A Preferred Stock who sell their shares on or before the record date will not be entitled to receive the shares of Next Bridge common stock in the distribution in respect of such shares of Series A Preferred Stock sold. Holders of Series A Preferred Stock who sell their shares after the record date but before the distribution date will be required to transfer the shares of Next Bridge common stock received in the distribution to the subsequent purchaser of Series A Preferred Stock.

## November 23, 2022

Image 3:

# 3. George Palikaras



**George Palikaras** ✔
@palikaras

Today, META requested FINRA to halt $MMTLP on Dec 14th at close (current distribution date)... OR to freeze trading on Dec 12th at close (current record date). Please take the time to READ the S1. NO public trading after the distribution date, i.e. there is NO ex-dividend date.

10:27 PM · Nov 30, 2022

💬 148          🔁 794          ♡ 1.7K          🔖 79          ⬆️

**November 30, 2022 - 10:27 PM**

# Appendix 30

**Quote:**

65. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided.

66. On December 9, 2022, counsel for META II and NBH contacted FINRA to seek clarification on whether the U3 halt was temporary or permanent. Despite these efforts, FINRA failed to provide a definitive response or explanation.

67. FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

**Evidence:**

**Image 1:**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

INTER-COASTAL WATERWAYS LLC,

          *Plaintiff,*

    v.

TRADESTATION  SECURITIES,  INC.  and
DOE DEFENDANTS 1-10,

          *Defendants,*
   and

THE FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

          *Nominal Defendant.*

CIVIL ACTION NO. 0:24-cv-60891-AHS

**DECLARATION OF GEORGIOS PALIKARAS IN SUPPORT OF PLAINTIFF INTER-
COASTAL WATERWAYS LLC'S OPPOSITION TO DEFENDANT TRADESTATION
SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND
CROSS-MOTION FOR THE DISQUALIFICATION OF
THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY
<u>ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION</u>**

     35.     Prior to the U3 halt, FINRA never stated in any communications to the Company

(or publicly) that they were going to halt the trading as of December 8, 2022. META II's counsel

reached out again on the Morning of December 9, 2022 to ask Ms. Gill whether the halt was

permanent or temporary. Only *after* the halt, FINRA added a note on their UPC Advisory page.