# Case Evidentiary 2

## 22 DEC 24

# Auxier v. SEC

## 7:24-CV-318

## 06 DEC 24

# Appendix 31

**Quote:**

68. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022

69. Although the U3 halt was technically lifted on December 13, 2022, the practical effect of this halt remains unresolved, as investors have not regained access to trading their shares or resolving their holdings. As of December 4, 2024, the matter remains unresolved, leaving investors without resolution for a total of 726 days.

**Evidence:**

**Image 1:**

# 14 / 14

## FINRA.

**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

HALT REASON

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

NO MORE TRADING/NO SETTLEMENT HALT + DELETION

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

NOTES

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that "...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled." Available here: https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

# UPC "Halted" Timeframe Comparison

| | | | Timeframe Comparison: | | |
|---|---|---|---|---|---|
| UPC # | Security | HALT Date | Resolution Date | Time to Resolution | Notes |
| 23-09 | Motors Liquidation (GMGMQ/MTLQQ) | 7/10/2009 | 7/15/2009 | 5 days | Symbol change; significant investor concerns remained. |
| 18-12 | Scotoil Petroleum Limited (OILXF) | 3/20/2012 | 4/3/2012 | 14 days | No confirmation of share distribution issue resolution. |
| 41-12 | Capmark Financial Group (CPMK) | 10/5/2012 | 10/8/2012 | 3 days | Trades canceled. |
| 38-13 | Tweeter Home Ent. (TWTRQ/THEGQ) | 10/4/2013 | 10/8/2013 | 4 days | Symbol change. |
| 39-13 | Tweeter Home Ent. (TWTRQ/THEGQ) | 10/4/2013 | 10/8/2013 | 4 days | Confirmed symbol change details from #38-13. |
| 47-13 | All OTC Equity Securities | 11/7/2013 | 11/7/2013 | <1 day | Technical issue resolved quickly. |
| 48-13 | All OTC Equity Securities | 11/7/2013 | 11/7/2013 | <1 day | Confirmed resumption details from #47-13. |
| 33-14 | ATP Oil & Gas Corp. | 8/20/2014 | N/A | N/A | SEC suspension, not FINRA action. |
| 37-14 | All OTC Equity Securities | 10/17/2014 | 10/17/2014 | <1 day | Technical issue resolved quickly. |
| 38-14 | All OTC Equity Securities | 10/17/2014 | 10/17/2014 | <1 day | |
| 35-15 | Riviera Tool Company (RVT) | 5/7/2015 | 12/7/2015 | 213 days | |
| 22-15 | Calissio Resources (CRGP) | 8/26/2015 | 9/9/2015 | 14 days | |
| 24-15 | SWK Holdings (SWKH) | 9/16/2015 | 9/17/2015 | 1 day | Trades canceled, resumed on pre-split basis. |
| 25-15 | SWK Holdings (SWKH) | 9/16/2015 | 9/17/2015 | 1 day | Confirmed cancellation of trades and resumption details from #24-15. |
| 31-16 | Jetcom Inc. (JTCMF) | 8/5/2016 | 8/9/2016 | 4 days | |
| 33-16 | Jetcom Inc. (JTCMF) | 8/5/2016 | 8/9/2016 | 4 days | |
| 24-17 | Newmarkt Corp. (NWMT) | 5/17/2017 | 6/2/2017 | 16 days | Trading halt lifted. |
| 26-17 | Newmarkt Corp. (NWMT) | 5/17/2017 | 6/2/2017 | 16 days | Confirmed resumption details from #24-17. |
| 29-19 | European Metals (KMTCF) | 9/19/2019 | 9/24/2019 | 5 days | |
| #10-20 | Zoom Technologies (ZOOM/ZTNO) | 4/9/2020 | 4/14/2020 | 5 days | Symbol change; assumed trading resumed as indicated. |
| #12-20 | Zoom Technologies (ZOOM/ZTNO) | 4/9/2020 | 4/14/2020 | 5 days | Update notice, referring to resolution date in #10-20. |
| #11-22 | Lobe Sciences (LOBEF) | 6/9/2022 | 6/10/2022 | 1 day | |
| 13-22 | Lobe Sciences (LOBEF) | 6/9/2022 | 6/10/2022 | 1 day | Resumption notice. |
| 35-22 | Meta Materials (MMTLP) | 12/9/2022 | N/A | ~638 days | Unresolved since the U3 HALT. |

# Appendix 32

**Quote:**

77. In the week after the FINRA U3 halt, Charles Schwab & Co. sent emails to MMTLP shareholders, Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that, even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares.

**Evidence:**

**Images:**

## AFFIDAVIT

STATE OF _New York_

COUNTY OF _Erie_

BEFORE ME, the undersigned authority, personally appeared _Anthony Erbacher_, who, being duly sworn by me, deposed and said:

1. I, _Anthony Erbacher_ am over the age of eighteen (18) years, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are true and correct.

2. My address is: 24 Huntington ct, Amherst, NY 14221.

3. I am a shareholder in MMTLP security, which I purchased through Charles Schwab and Co. on or about 3/4/2021 – 12/6/2022.

4. On 12/11/2022, Charles Schwab and Co. informed me that even if FINRA ordered trading to resume in MMTLP, Schwab would not allow me to trade it in my account.

6. I have attached the following documents to this affidavit as Exhibits and they are described as follows:

   Exhibit A: A copy of the communication from Charles Schwab and Co. through Schwab's live chat feature on 12/11/2022.

8. I understand that I am signing this affidavit under pains of perjury and that all of the foregoing is truthful.

SIGNATURE: _[signature]_
[Your Full Name]

SWORN TO AND SUBSCRIBED BEFORE ME on this 14th day of August, 2024, by _Anthony Erbacher_, who is personally known to me or has produced as identification/a _NY State Driver License_.

NOTARY PUBLIC SIGNATURE: _[signature]_

PRINTED NAME: _Stephanie E Schmid_

MY COMMISSION EXPIRE: _06/13/2027_

STEPHANIE E SCHMIED
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01SC000951
COMM. EXP. 06/13/2027



**Refresh**     **Help**    ↓ **Export**     **Print**

## 💬 Live Chat      — ✕

for you.

Inez E, 5:10 PM

ty

5:12 PM

**You are very welcome. Thank you for your patience Anthony. I have confirmed that Schwab is no longer trading this security after 12/8/2022. Going forward no orders will be accepted at Schwab for this security MMTLP.**

Inez E, 5:12 PM

For more information on this share

What can I help you with?

 **Live Chat** 

5:17 PM

**This was a business decision by upper management. The only information we have is that Schwab will not be trading this security even if FINRA does allow trading to resume. Right now the asset is halted for trading.**

*Inez E, 5:17 PM*

**Was there anything else I could assist you with today Anthony?**

*Inez E, 5:19 PM*

What can I help you with?

 

**Assistant**

) Refresh     Help    ↓ Export     Print

💬 **Live Chat**                                — ✕

message.

Inez E, 5:23 PM

**The information provides was that
As of 12/09 FINRA has halted
MMTLP due to the upcoming
Corporate Action
o   https://otce.finra.org
/otce/tradingHalts**

Inez E, 5:23 PM

Yes but. you just said even if the
halt was removed Schwab would
not allow trading

5:24 PM



Refresh    Help    ↓ Export    Print

### 💬 Live Chat                                        — ✕

Yes but you just said even if the halt was removed Schwab would not allow trading

5:24 PM

That is correct. I have confirmed that this was the guidelines set by Schwab going forward.

*Inez E, 5:25 PM*



*I have saved conversations from representatives on thursday where they informed me I would be able to sell my shares through the 12th.*

5:25 PM

## AFFIDAVIT

STATE OF _____Florida_____

COUNTY OF _Hillsborough County_____

BEFORE ME, the undersigned authority, personally appeared _____TD Ameritrade_____, who, being duly sworn by me, deposed and said:

1. I, _____Gwendolyn Y. Mickens_____ am over the age of eighteen (18) years, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are true and correct.

2. My address is: 4318 Cross Ridge Ct., Valrico, FL 33594.

3. I am a shareholder in MMTLP security, which I purchased through TD Ameritrade, INC. on or about. 10-17-2022.

4. On _12-12-2022 at 9:12 a.m. and on _12-13-2022 at 10:08 a.m. __, TD Ameritrade, INC. informed me that even if FINRA ordered trading to resume in MMTLP, Schwab would not allow me to trade it in my account.

6. I have attached the following documents to this affidavit as Exhibits and they are described as follows:

Exhibit A: [Describe the document, e.g., "a copy of the communication from Charles Schwab and Co. received on [Date]"].

Exhibit B**: [Describe any other attached documents, if applicable].

8. I understand that I am signing this affidavit under pains of perjury and that all of the foregoing is truthful.

SIGNATURE: _Gwendolyn Yvette Mickens_
[Your Full Name]

SWORN TO AND SUBSCRIBED BEFORE ME on this _20_ day of _September_, 2024, by _Gwendolyn Y. Mickens_____, who is personally known to me or has produced as identification a _____FL DL_____.

NOTARY PUBLIC SIGNATURE: _____

PRINTED NAME: _Ashley Johnson_
MY COMMISSION EXPIRE: _02.13.2028_

ASHLEY JOHNSON
Notary Public - State of Florida
Commission # HH 492016
My Comm. Expires Feb 13, 2028

# Appendix 33

**Quote:**

78. Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

**Evidence:**

**Images:**

Robinhood Sign up

October 8, 2021

Cloudera, Inc. (CLDR) performed a cash merger. This means that shares were removed and shareholders will receive $16.0000 per share in cash.

Industrial Tech Acquisitions, Inc. (ITAC) performed a 1:1 CUSIP change and performed a ticker change to ARBE.

Ziff Davis, Inc. (JCOM) performed a spinoff of CCSIV. For every 1 share of JCOM held, shareholders will receive 0.3333 share of CCSIV. Fractional shares from the spinoff will be paid as cash in lieu.

Itau Unibanco Holding S.A. (ITUB) performed a spinoff of XP. For every 1 share of ITUB held, shareholders will receive 0.0230878461 share of XP. Fractional shares from the spinoff will be paid as cash in lieu.

Ziff Davis, Inc. (JCOM) performed a ticker change to ZD.

CLEARDAY INC (SCOND) performed a ticker change to CLRD.

Meta Metals Inc (MMTLP) is now set to Position



Meta Metals Inc (MMTLP) is now set to Position Closing Only (PCO). This means that you can sell or hold your existing position, but not purchase additional shares. Please also note that you may currently place limit orders, but not market orders.

# October 7, 2021

LifeSci Acquisition II Corp. (LSAQ) changed its corporate name to Science 37 Holdings Inc., and

 **Ameritrade**

Wed Mar 8 2023 12:08:00 am ET

**Re: MMTLP Finra Corporate Action Notice**
From: Institutional Message Center | Date: 12/09/22 9:30 AM  Message available until 12/08/24.

Hello Tim,

Good Morning!  Thank you for taking the time to respond to our message and I hope you are having a wonderful day so far!  My name is Bob, and I am happy to continue helping you with your account today!

We did receive some information from MMTLP.  These are the details and guidance they provided.

MMTLP shareholders with settled positions as of 12/12/22 (Record Date) will receive one share of Next Bridge Hydrocarbons, Inc for every one share of MMTLP. Scheduled Pay Date for this distribution is 12/14/22.

New long purchases (BUYS) of MMTLP executed after 12/08/22 will NOT receive Next Bridge Hydrocarbons, Inc shares. As such, after market close on 12/8/2022:
New long BUY orders of MMTLP placed after market close on 12/8/2022 will be routed for review and canceled.
New closing SELL orders of MMTLP should be routed normally, but there may be liquidity issues on 12/9/22 and 12/12/22.
Current open long BUY orders that are GTC will be canceled after market close on 12/8/22.
In addition, MMTLP shares will be canceled 12/13/22 and no trading will occur.
Clients should trade or hold this security at their own risk.

 **Ameritrade**                          Secured 🔒

# Close/Cover Short Position

From: **Message Center Client Services**
To: ▮▮▮▮▮
Date: **1:19pm ET 7/22/2022**

Hello James,

Thank you for your message! My name is Bryson and it's my pleasure to assist you today.

Good question! If you had a short position in a company that decided to go private, <u>you would indeed need to cover your position beforehand or you would most likely be forced to buy back the shares at a certain rate.</u>

If you have any additional questions or concerns, please don't hesitate to reach back out to us by replying to this message or calling us anytime at Client Services 800-669-3900.

Thank you for contacting us here at TD Ameritrade! As always, we greatly appreciate your business and hope for you to stay safe and healthy out there!

Respectfully,

Bryson V.
Client Services

TD Ameritrade

# Appendix 34

**Quote:**

88. In February of 2023, Christian interviewed publicly, regarding MMTLP he said, "You're going to see the mother lode of all, you know, shares that have been issued -that you know don't exist- come to the forefront. It's going to- it's going to pale GameStop, it is going to pale AMC".

**Evidence:**

**Link:** https://youtu.be/KuNm8Ij5V3k?si=H5CbhHS55np98ae0&t=1055



**Quote:**

"you're going to see the mother lode of all uh uh you know shares that have been

issued that uh you know don't exist uh come to the Forefront uh it is gonna it

is going to pale GameStop it is going to pale AMC it's going to pale any of it"

# Appendix 35

**Quote:**

90. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading.

**Evidence:**

**Image:**



**Cromwell Coulson** ✔ @cromwellc · 1h
The ongoing question is how do short position holders resolve their liability for the Next Bridge common stock if it is not easily transferable or tradable publicly?  I have no control or input on that.  It would be easier if Next Bridge shares became publicly tradable.

💬 80        ↻ 21        ♡ 17        �𝗂𝗅𝗂 5,345        ⤴



10:41

**Cromwell Coulson** @cromwellc · 2d
Sometimes, when a security holder has rights to future distributions or the distribution is not set, security will trade with a due bill. This was not the case.

**Cromwell Coulson** @cromwellc · 2d
Investors focused on having SMMTLP trade for a few more days after the ex-dividend date are focusing on the wrong thing, as the security interest was canceled and had no value.

**Cromwell Coulson** @cromwellc · 2d
The ongoing question is how do short position holders resolve their liability for the Next Bridge common stock if it is not easily transferable or tradable publicly? I have no control or input on that. It would be easier if Next Bridge shares became publicly tradable.

**Cromwell Coulson** @cromwellc · 2d
I will add to this thread if I can add a thoughtful perspective and questions are asked politely.

**Cromwell Coulson** @cromwellc · 2d
To address confusion on how did SMMTLP

Tweet your reply

# Appendix 36

**Quote:**

102. FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt.

**Evidence:**

**Link:**https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt

# FAQ: MMTLP Corporate Action and Trading Halt

MARCH 16, 2023

FINRA has received a number of questions relating to a corporate action and trading halt in the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials) that traded under the symbol MMTLP. This *Investor Insights* article provides general information about how corporate actions and trading halts are processed as well as specific information related to MMTLP.

## Corporate Actions—FINRA's Role

A corporate action occurs when a company makes a change that has or could have an impact on its stock and shareholders. Corporate actions include issuing a dividend, engaging in a stock split, or effecting a merger.

When a company decides to engage in a corporate action that affects a security listed on a national securities exchange, the company must provide notice to the listing exchange and comply with all applicable listing standards and rules of the exchange concerning that security. In contrast, when a company decides to engage in a corporate action that affects an unlisted security that trades in the over-the-counter (OTC) market, federal law requires that the company submit notice of the corporate action to FINRA, and FINRA reviews the submission and publishes a notification about the corporate action to the marketplace (unless the submission is deemed deficient by FINRA). This function helps to keep investors and the market informed of corporate actions affecting OTC securities and of relevant dates.

A company can have both listed and unlisted securities, so different rules can apply to the same company depending on which security is the subject of a corporate action. In any event, FINRA does not initiate, approve, or conduct the underlying corporate action that the company is making, and the company itself is responsible for making sure the corporate action complies with all applicable laws and regulations.

FINRA regulates broker-dealers that facilitate investor access to the securities markets, including the OTC market. However, unlike securities exchanges that list securities, FINRA does not establish listing standards or otherwise regulate the companies that issue OTC securities.

## The MMTLP Corporate Action

Meta Materials' Series A Preferred Shares were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted. These unlisted shares later began trading in the OTC market under the symbol MMTLP (further discussion below).

On July 15, 2022, the company filed a Form S-1 registration statement with the Securities and Exchange Commission (SEC) to register the issuance of the common stock of Next Bridge Hydrocarbons, Inc. (Next Bridge), which at that time was a wholly owned subsidiary of Meta Materials. As disclosed in the registration statement, Meta Materials would distribute to MMTLP shareholders one share of Next Bridge common stock per one share of MMTLP held, and would cancel the Series A Preferred Shares trading under the symbol MMTLP. According to the Form S-1 filed, immediately after the corporate action, Next Bridge would be an independent public reporting company. After several amendments, the registration statement for the Next Bridge shares became effective on November 18, 2022.

On November 23, 2022, Meta Materials issued an announcement regarding the Next Bridge / MMTLP corporate action, stating that each holder of its Series A Preferred Shares—MMTLP—as of December 12, 2022, would become entitled to receive one share of the common stock of Next Bridge for every one share of MMTLP held. Meta Materials also stated that the Next Bridge shares would be distributed to MMTLP shareholders on December 14, 2022, at which time all MMTLP shares would be automatically cancelled and MMTLP holders would cease to have any rights with respect to those shares. In addition, the company stated that the Next Bridge shares received in the distribution would not be eligible for electronic transfer through The Depository Trust Company (DTC) (or through any other established clearing corporation).

As required by federal law, Meta Materials also notified FINRA of the Next Bridge / MMTLP corporate action. Consistent with the information provided by Meta Materials, on December 6 and 8, 2022, FINRA provided public notice of the corporate action on FINRA's website. FINRA's corporate action notice stated that the Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022, and further clarified that any purchasers after December 8, 2022, (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the corporate action distribution. FINRA's corporate action notice also stated that the MMTLP symbol would be deleted effective December 13, 2022 (*i.e.*, when an issuer cancels shares, FINRA will likewise delete the symbol; see the company's announcement stating that the MMTLP shares were to be cancelled as of the December 14, 2022, distribution date of the Next Bridge shares).

On December 9, 2022, FINRA halted trading in MMTLP. One of FINRA's roles in regulating the activities of broker-dealers trading OTC equity securities is exercising the authority to require such firms to halt quoting and trading activities when FINRA determines that doing so is necessary to protect investors and the public interest. Since imposing the halt, FINRA has received questions regarding the MMTLP trading halt and its impact on investors. Below are answers to some questions FINRA has received.

## 1. Why did FINRA halt trading in MMTLP?

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were the facts that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

## 2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge distribution?

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a

transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

### 3. Has the MMTLP trading halt ended?

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

### 4. How were MMTLP shares publicly quoted and traded in the first place?

The answer to the question of whether a security is tradeable is determined by the application of federal law, including any applicable SEC rules. Where a security is or becomes tradeable, a public market for the security may develop—as it did with MMTLP.

FINRA does not approve a company's issuance of securities or approve or determine when broker-dealers or customers may begin trading those securities. However, once a broker-dealer executes a transaction in an unlisted security, the firm is required by FINRA rules to report the executed transaction to FINRA. And where a symbol does not yet exist for the security, the broker-dealer must request a symbol from FINRA. Because the issuer obtained a CUSIP for the Series A Preferred Shares, FINRA assigned the MMTLP symbol in 2021 upon request by a broker-dealer to facilitate electronic reporting of an executed transaction that occurred in the security.

This trade reporting process is separate from the process by which a broker-dealer begins quoting a security in compliance with SEC Rule 15c2-11. Rule 15c2-11 requires a broker-dealer, prior to quoting a security on its own behalf, to review specified information about the company that issued the security (unless an exception applies). In some cases, a broker-dealer also must file a form with FINRA—a Form 211. In this case, FINRA did not receive a Form 211. Instead, broker-dealers relied on an exception to SEC Rule 15c2-11 that permits broker-dealers to publish a quotation for unsolicited customer orders.

### 5. Did FINRA cancel the MMTLP shares? Did FINRA delete the MMTLP symbol?

FINRA did not cancel the MMTLP shares. The issuer, Meta Materials, cancelled the shares effective December 14. In fact, FINRA does not and cannot cancel any securities that are issued by a company—this was an action of the issuer. However, just as FINRA assigns symbols to unlisted securities, FINRA also can unassign or "delete" a symbol, for example, where it is no longer needed to quote or

trade a security. In this case, FINRA deleted the MMTLP symbol on December 13 in light of the imminent cancellation of the shares as announced by the company in connection with the Next Bridge / MMTLP corporate action.

On December 8, FINRA amended its original December 6 corporate action announcement to clarify, among other things, that it would be deleting the MMTLP symbol on December 13 rather than cancelling the shares (because the issuer itself was responsible for cancelling the Series A Preferred Shares). Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.

### 6. What happened to investors who did not sell their MMTLP shares prior to the trading halt?

Investors who had settled positions in MMTLP on December 12 were holders entitled to receive shares of Next Bridge as part the Next Bridge / MMTLP corporate action. Thus, applying the standard settlement cycle of T+2, an investor who did not sell MMTLP by December 8 would receive Next Bridge shares in the distribution—and this would be the case even had FINRA not halted trading on December 9.

As described in the Next Bridge prospectus filed with the SEC, Next Bridge anticipated that the distribution process for the Next Bridge shares would take about two weeks and would be effected by its transfer agent, American Stock Transfer & Trust Company LLC. Transfer agents work for securities issuers to record changes of securities ownership, maintain security holder records, cancel and issue certificates, and distribute dividends. SEC rules and regulations include registration and other requirements for registered transfer agents. FINRA does not regulate transfer agents and does not have a role in distributing securities as part of a corporate action.

*See also* Question #10 regarding what investors should do if they have not received their Next Bridge shares and Question #11 regarding whether the Next Bridge shares are tradeable.

### 7. What would have happened to any trades executed after December 8 had FINRA not halted trading in MMTLP?

As mentioned above, applying the T+2 settlement cycle, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. Any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC. There also was concern that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 may not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution), and that the MMTLP shares purchased would imminently be cancelled.

### 8. Is there public data concerning short sale activity in MMTLP?

Yes, there are several data sets published by FINRA and the SEC about short sale activity that include data for MMTLP.

*Short Interest Data:* "Short interest" in a security is a snapshot of the total open short positions existing on the books and records of broker-dealers for that security on a given settlement date. FINRA's short interest reports reflect short positions held both in customer and proprietary accounts and are published twice each month. FINRA published short interest reports for MMTLP from October 15, 2021, through November 30, 2022 (the last short interest reporting settlement date available for MMTLP). These reports are available on FINRA's website. Short interest reports for Next Bridge are not available on FINRA's website because firms report short interest by security symbol and Next

Bridge does not have a symbol. FINRA is considering how it might enhance the usefulness of the short interest information available to investors, which could include changes to the content and frequency of the short interest reporting.

**Short Sale Volume:** FINRA also publishes daily short sale volume data by security for OTC equity securities. Importantly, while the two data sets are related in that short sale volume activity may ultimately result in a reportable short interest position, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reported in FINRA's short interest report. For example, while the total short sale volume for transactions in MMTLP that settled from November 16, 2022, through November 30, 2022, was 7,413,679 shares, the published short interest for MMTLP on settlement date November 30, 2022, was 4,658,068 shares.

Differences in the two data sets are expected and occur for a variety of reasons; for example, where a short sale has been covered (either on the same day or at another time prior to the short interest reporting settlement date), which means that there is no longer a short position to report as short interest by the reporting settlement date. As another example, the daily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest.

**Fails-to-Deliver:** The SEC publishes data on the total quantity of "fails-to-deliver" per security as of each reporting settlement date. As the SEC has explained, a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

### 9. What happens if short positions in MMTLP were not closed out before FINRA halted trading?

Broker-dealers have operational conventions in place for adjusting short positions following a corporate action. In this instance, FINRA understands that firms have adjusted short positions in MMTLP to reflect an equal size short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP now reflects a short position of 100 shares of Next Bridge). In other words, the corporate action did not compel short positions to be closed or extinguish any obligations associated with outstanding short positions.

**10. What should investors do if they believe they have not received their Next Bridge shares?**

If you held a settled position in MMTLP on December 12, 2022, your account should reflect your position in Next Bridge. Your broker-dealer is required to maintain possession or control of your shares in compliance with federal law. You also may request a transfer of shares from the broker-dealer's name to your name; however, this transfer may take time to achieve and your broker-dealer or the transfer agent may charge a fee for this service. If you believe that your shares are not properly reflected in your account or your broker-dealer has not been willing to transfer your shares pursuant to your instructions, you should contact your broker-dealer to understand the status of your Next Bridge shares.

Your broker-dealer may reflect your Next Bridge shares in your account using a numeric or alphanumeric identifier. Different firms may use different identifiers because an official CUSIP number, which is an identifier assigned by CUSIP Global Services at the request of the issuer—not FINRA— has not, to date, been assigned to Next Bridge common stock. The absence of an official CUSIP number does not affect the status of the Next Bridge shares reflected in your account. If you believe that your broker-dealer has not provided a satisfactory explanation to your questions, you may submit an investor complaint to FINRA.

**11. Are the Next Bridge shares tradeable?**

As discussed above, Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of 165,523,363 shares of common stock in connection with the Next Bridge / MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are freely tradeable under federal law.

As of the date of this article, the Next Bridge shares neither have a CUSIP number nor a security symbol. If Next Bridge were to obtain a CUSIP number, that would facilitate secondary market trading. Broker-dealers would be able to request that FINRA assign a symbol to the Next Bridge shares in connection with quoting and trading activity (where such request is consistent with FINRA rules and policies and with federal law). However, even without a CUSIP number, any trades in Next Bridge shares executed by a broker-dealer must be reported by the firm to FINRA for regulatory purposes through a file submission process.

As part of its mission, FINRA provides resources on its website to assist retail investors through the investment process. As relevant to the questions around trading in MMTLP, FINRA has published Investor Insight articles addressing short interest and short sale volume data, as well as corporate actions and the mechanics and risks of trading OTC securities. Visit FINRA's For Investors webpage for more information.

*Note: This article was modified on March 27, 2023, to remove references to the registration of the MMTLP shares, which raised questions that are not relevant to the main focus of this article. The registration status of the MMTLP shares is determined under the Securities Act of 1933 and applicable SEC rules and interpretive guidance thereunder, and not FINRA rules.*

© FINRA. All Rights Reserved.

# Appendix 37

**Quote:**

104. On March 30, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

**Evidence:**

**Note:** For FOIA emails go to Appendix 49.

**Image:**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

March 30, 2023

Mr. Howard ████████████████
████████████████████████
████████████████████████

Re:   Freedom of Information Act (FOIA), 5 U.S.C. § 552
      Request No. **23-00564-FOIA**

Dear Mr. ████████

This letter is in response to your request, dated and
received in this office on December 16, 2022, for information
from MMTLP Trading from Dec 1, 2022, through Dec 14, 2022, from
FINRA, and information leading up to the U3 Halt. You also
requested the short percentage, and all failure to delivery
information from Oct 1, 2022 through Dec 14, 2022.

Reference is made to our December 23, 2022, letter where
we addressed your request for expedited processing and a fee
waiver.

Some of the information you have requested is exempt from
disclosure under the FOIA pursuant to 5. U.S.C. § 552(b)(4).
Exemption 4 of the FOIA protects commercial or financial
information obtained from a person that is privileged or
confidential, and (a) is customarily treated as private by the
submitter, and (b) was provided to the Commission under an
assurance of confidentiality.

The enclosed 23 pages are released with the exception of
SEC staff names and email addresses. This information is
withheld under 5 U.S.C. § 552(b)(6) and (7)(C), for the
following reasons.

Under Exemption 6, the release of these records would
constitute a clearly unwarranted invasion of personal privacy.
Under Exemption 7(C), the release of the information could
reasonably be expected to constitute an unwarranted invasion of
personal privacy. Further, public identification of Commission
staff could conceivably subject them to harassment in the
conduct of their official duties and in their private lives.

Mr. Howard ███████                                          23-00564-FOIA
March 30, 2023
Page 2

        Please be advised that I have considered the foreseeable
harm standard in preparing this response.

        For your information, we are including a link to our
website, https://www.sec.gov/data/foiadocsfailsdatahtm, which
contains the National Securities Clearing Corporation's (NSCC)
aggregated fails-to-deliver data (by security), which may be
helpful.

        I am the deciding official with regard to this adverse
determination. You have the right to appeal my decision to the
SEC's General Counsel under 5 U.S.C. § 552(a)(6), 17 CFR §
200.80(f)(1). The appeal must be received within ninety (90)
calendar days of the date of this adverse decision. Your appeal
must be in writing, clearly marked "Freedom of Information Act
Appeal," and should identify the requested records. The appeal
may include facts and authorities you consider appropriate.

        You may file your appeal by completing the online Appeal
form located at https://www.sec.gov/forms/request_appeal, or
mail your appeal to the Office of FOIA Services of the
Securities and Exchange Commission located at Station Place, 100
F Street NE, Mail Stop 2465, Washington, D.C. 20549, or deliver
it to Room 1120 at that address.

        If you have any questions, please contact Gloria Walker of my
staff at walkergl@sec.gov or (202) 551-2336. You may also contact
me at foiapa@sec.gov or (202) 551-7900. You may also contact the
SEC's FOIA Public Service Center at foiapa@sec.gov or (202) 551-
7900. For more information about the FOIA Public Service Center
and other options available to you please see the attached
addendum.

                        Sincerely,

                        Adrienne M. Santos

                        Adrienne M. Santos
                        FOIA Branch Chief


Enclosure

# ADDENDUM

For further assistance you can contact a SEC FOIA Public Liaison by calling (202) 551-7900 or visiting https://www.sec.gov/oso/help/foia-contact.html.

SEC FOIA Public Liaisons are supervisory staff within the Office of FOIA Services. They can assist FOIA requesters with general questions or concerns about the SEC's FOIA process or about the processing of their specific request.

In addition, you may also contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA dispute resolution services it offers. OGIS can be reached at 1-877-684-6448 or via e-mail at ogis@nara.gov. Information concerning services offered by OGIS can be found at their website at Archives.gov. Note that contacting the FOIA Public Liaison or OGIS does not stop the 90-day appeal clock and is not a substitute for filing an administrative appeal.

# Appendix 38

**Quote:**

106. On April 18, 2023, DuBose, then CEO of NBH, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets.

**Evidence:**

**Image:**



**NEXT BRIDGE**
H Y D R O C A R B O N S

April 18, 2023

VIA EMAIL

Financial Industry Regulatory Authority
Attention: Corporate Actions Division

To Whom It May Concern:

Next Bridge Hydrocarbons, Inc. (the "Company") requests the assistance of the Financial Industry Regulatory Authority ("FINRA") to address a continuing public issue arising from the spin-off of the Company from Meta Materials, Inc. ("Meta"). Specifically, since the date of the spin-off, the Company has received numerous complaints and expressions of concern from a large number of Company stockholders regarding the following issues that we wanted to bring to FINRA's attention and ask for FINRA's cooperation:

1.  Many of our stockholders believe that a significant number of uncovered short positions exist in the Company's shares of common stock (the "NBH Common Stock"), which shares were received in the spin-off by holders of Meta's Series A Non-Voting Preferred Stock traded under the OTC Markets ticker symbol MMTLP (the "MMTLP Stock"). One basis for this belief is due to the large number of short positions were disclosed by FINRA as of November 30, 2022, and some short holders as of that date and any other investors who sold the MMTLP Stock short thereafter might not have had an opportunity to close their positions due to FINRA's U-3 trading halt of the MMTLP Stock on December 9, 2022, before the record date of the spin-off (December 12, 2022). Our stockholders believe any uncovered short positions (i) materially affect the value of their NBH Common Stock and (ii) may impact the Company's corporate governance and stockholder votes.

2.  Stockholders have complained that they believed that they would be able to trade the MMTLP Stock on December 9 and December 12, 2022 leading up to the December 12, 2022 record date of the spin-off. Because FINRA issued its U-3 trading halt prior to these trading days, stockholders did not have the opportunity to trade their MMTLP Stock on those two days. While FINRA addressed this in its March 16, 2023 publication addressing frequently asked question regarding the spin-off of the Company (the "FINRA FAQs"), the action of FINRA to eliminate these trading days is still a point of concern of many stockholders who believe that FINRA should have not issued the trading halt at all or informed brokerages and stockholders that FINRA intended to halt trading when FINRA made its announcement approving the spin-off.

Financial Industry Regulatory Authority
Attention: Corporate Actions Division
April 18, 2023

3. As noted in the FINRA FAQs, there was a coding issue with respect to the MMTLP Stock, FINRA incorrectly classified MMTLP Stock as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. Many of our stockholders have expressed frustration over their understanding that they made trading decisions based upon inaccurate information.

Stockholder complaints have grown in scope and intensity since the completion of the spin-off. Many of our stockholders have reported that their inability to sell some or all of their shares in MMTLP Stock due to the trading halt has brought substantial financial hardship to themselves and their families, and the Company is sympathetic to our stockholders who have found themselves in this position.

Some of our stockholders' anger or desperation has risen to such a level that a few stockholders have made threats against the Company's officers and directors, necessitating a heightened security measures at our offices. Due to the complaints and questions of our stockholders, our officers and directors have been spending substantial time addressing these pressing stockholder issues, which has also required significant additional cost on legal advice and investor relations support. Further, the Company has been contacted by Congressman Pete Sessions' office to explore what steps we can take to alleviate the concerns of our stockholders. As we hope you can see, our Company is under substantial pressure to address or even explain these issues outside of our control, which we did not cause and which we have limited power and funds to tackle on behalf of, and explain to, our stockholders, regulators, and the investing public. With that aside, we want to make clear that we are ready and willing to be part of a solution for a situation of great concern to our stockholders, but the Company cannot provide this solution by itself. We need the help of FINRA to provide the relief that our stockholders are seeking.

While we appreciate FINRA's explanation of its decision to halt trading in MMTLP Stock in the FINRA FAQs (and, to be clear, this request is not intended to address that decision, only the concerns of current Company stockholders), the Company respectfully requests that FINRA now take action to cause FINRA member firms to close out and settle any remaining uncovered short positions originating in MMTLP Stock that are now in the NBH Common Stock to ensure fair and orderly ownership of the NBH Common Stock and for the protection of Company stockholders. We join our stockholders in this request in order to ensure fair and orderly ownership of the NBH Common Stock and for the protection of Company stockholders. The Company believes that this request is appropriate under FINRA Rule 6490 because such action is necessary for the protection of investors and the public interest and to maintain fair and orderly markets.

To facilitate the orderly unwind of existing short positions and to allow stockholders the opportunity to sell their shares of the NBH Common Stock on a public exchange, the Company is prepared to apply for quotation of the NBH Common Stock over-the-counter for a limited period of time and is willing to work with FINRA, the Securities and Exchange Commission, and OTC Markets to facilitate an orderly process to allow these settlements to occur. Our request will be for the NBH Common Stock to be traded for only two trading days, and the Company plans to

Financial Industry Regulatory Authority
Attention: Corporate Actions Division
April 18, 2023

delist the NBH Common Stock after the completion of the second trading day. Our Company has contacted OTC Markets, which has indicated that we can apply to trade on an OTC Markets exchange for a limited period of time. The Company will need to go through their standard application process to do so, but we believe that we will meet its criteria to be traded. The Company may be willing to allow the NBH Common Stock to be traded for a longer period of time than two days if requested by FINRA, the Securities and Exchange Commission, or OTC Markets as part of the approval process.

As part of our application process to trade on the OTC Markets, we plan to arrange with the DTCC and FINRA that the CUSIP number and ticker symbol that will be assigned to the NBH Common Stock to allow for trading will be deleted after our delisting from trading on the OTC Markets, as it will be important that the NBH Common Stock is no longer publicly-traded. DTCC has indicated that it is willing to help the Company have the CUSIP deleted after our delisting. As was noted in the FINRA FAQs, the MMTLP Stock was applied to be traded on the OTC Markets not by our prior corporate parent Meta but by brokers. The Company's desire is to not be publicly-traded, and we intend to not allow the NBH Common Stock to continue to be traded other than for a very short, finite period of time.

At the time of the trading halt, 165,472,241 shares of MMTLP Stock had been issued and were tradeable. If we are to open a temporary trading window, it is paramount that only the 165,472,241 shares of NBH Common Stock that were distributed as a result of the spin-off are allowed to trade. We do not want to dilute our stockholders' opportunity during the trading period by allowing additional shares to trade. In order to allow this to occur, we note the following:

- The Company will not sell any new shares during the temporary trading period.

- The Company has filed of its certificate of merger with the Texas Secretary of State for the completion of its merger with Wolfbone Investments, LLC (the "Wolfbone Merger"), and the issuance of 56,297,638 shares of NBH Common Stock to the former owner of Wolfbone Investments, Gregory McCabe. Mr. McCabe has agreed to a six-month lock-up period for these 56,297,638 shares and will not be trading these shares during the proposed temporary trading period.

- The board members and management team of the Company were given stock options to acquire NBH Common Stock as consideration for taking our position with the Company and will be given additional stock options following the completion of the Wolfbone Merger. All board members, management and employees with stock options will agree not to exercise their stock options during the proposed temporary trading period. It is important to the management team and the Board that none of the shares of the NBH Common Stock related to our options are open to participate in the proposed temporary trading period. We do note that our board member Robert Lance Cook owned shares of MMTLP Stock and received shares of NBH Common Stock as a result of the spin-off, and Mr. Cook will not have restrictions on trading these shares during this proposed temporary trading period. None of NBH's employees or other board members own any NBH Common Stock other than their stock options.

3

Financial Industry Regulatory Authority
Attention: Corporate Actions Division
April 18, 2023

In order to execute this plan, the Company and FINRA must take action immediately. The Company is in the process of raising additional capital to continue its operations, which includes possibly issuing additional equity in the Company. If we do so by issuing additional equity to investors, then it may be difficult to ensure that only the 165,472,241 shares of NBH Common Stock issued in the spin-off will be tradeable in the proposed temporary trading window. We need FINRA's prompt cooperation in agreeing to cause FINRA member firms to close out and settle any remaining uncovered short positions originating in MMTLP Stock that are now in the NBH Common Stock.

If FINRA has a different preferred path to addressing the issues raised in this letter, the Company welcomes a discussion on these issues. We look forward to working with FINRA to resolve these issues in the best manner possible for our stockholders and for the Company.

Please do not hesitate to contact me at
at any time if you have any questions regarding this request.

Regards,

Clifton DuBose, Jr.
Chief Executive Officer
Next Bridge Hydrocarbons, Inc.

# Appendix 39

**Quote:**

114. McCabe outlined concerns regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

**Evidence:**

**Image:**



VIA EMAIL AND FEDERAL EXPRESS

November 21, 2023

Robert Colby
Executive Vice President
and Chief Legal Officer

Mr. Colby:

I write on behalf of Next Bridge Hydrocarbons, Inc. ("Next Bridge" or the "Company"), which as you know, is a privately held company that was a spin-off from Meta Materials, Inc. ("Meta Materials").[1]

Next Bridge appreciates that FINRA has continued to address the issues that followed FINRA's halt of trading in Meta Materials' Preferred Series A shares (OTC: MMTLP) on December 9, 2022.

We have read FINRA's November 6, 2023 Supplemental FAQ: MMTLP Corporate Action Trading Halt,[2] including FINRA's estimate "that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[] of approximately 2.65 million shares out of 165.47 million total shares outstanding...." Next Bridge has received information from financial firms since the spin-off that suggests that the number of short positions may be significantly higher than FINRA's estimated 2.65 million.

Despite FINRA's FAQs, investors continue to express concerns to Next Bridge concerning unresolved issues from the trading halt, including the lack of clarity around potentially unsettled positions. The ongoing uncertainty risks disrupting Next Bridge's corporate governance and creates a continuing burden on the Company's resources.

---

[1] *See* April 18, 2023, May 19, 2013, and June 7, 2023 letters between you and Next Bridge Hydrocarbons, Inc.'s Chief Executive Officer Clifton Dubose, Jr. (https://www.finra.org/media-center/newsreleases/2023/finra-correspondence-next-bridge-hydrocarbons-april-june-2023).
[2] https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt ("November 6 Supplemental FAQ").



**NEXT BRIDGE**
HYDROCARBONS

Accordingly, Next Bridge respectfully renews its request that FINRA continue to investigate the open short positions in MMTLP. Because we understand from prior correspondence that FINRA lacks the ability to order the close-out of all existing short positions, we respectfully request that FINRA take steps to facilitate those close-outs.

Please let me know if you have any questions or need additional information.

Sincerely,

Greg McCabe
Chairman of the Board
Next Bridge Hydrocarbons

# Appendix 40

**Quote:**

116. FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023.

**Evidence:**

**Image:**



Financial Industry Regulatory Authority

Robert L.D. Colby
Executive Vice President
and Chief Legal Officer

June 7, 2023

Dear Mr. DuBose,

Following our phone conversation last Friday, I am writing to provide you with responses to the three follow-up questions you asked after reviewing my letter of May 19, 2023 (which responded to your letter of April 18, 2023).

First, you indicated that shareholders of Next Bridge Hydrocarbons ("NBH") have asked whether the company has a legal right to force investors who hold short positions in the company's stock to close their short positions. I can only address FINRA's authority in this regard; as indicated in my letter of May 19, FINRA has jurisdiction only over its broker-dealer members and their associated persons, not investors. Neither FINRA Rule 6490 nor any other FINRA or SEC rule provides authority for FINRA to force particular investors to close out short positions. Whether other entities, such as NBH, have the means of effectively compelling this outcome is a question of corporate law that FINRA cannot answer. NBH would need to seek the advice of its own counsel on that question.

Second, you asked whether NBH could have access to blue sheet data for trading activity in MMTLP in December 2022. FINRA does not voluntarily provide its confidential records, including blue sheet data, to third parties. As you may know, FINRA blue sheet data comprises transaction information obtained upon request by FINRA from clearing broker-dealers and is used solely for regulatory and law enforcement purposes. *See* Draddy Affidavit, *Khorassani v. FINRA*, No. 153819/2023 (N.Y. Sup. Ct) [Dkt. No. 37], ¶¶ 8, 15. This data contains very sensitive trading information and highly confidential personal, financial, and other identifying information for individuals and other investors, much of which is subject to various data privacy laws. *Id.* ¶¶ 11-12. Indeed, FINRA restricts internal access to blue sheet data to its own examination and investigation teams and does not widely share such data even among its own staff. Consequently, FINRA is unable to provide blue sheet information for MMTLP trading to NBH.

Finally, you asked whether FINRA is reviewing the trading activity in MMTLP for irregular trades or buy/sell imbalances. In addition to the automated surveillance patterns FINRA routinely runs to identify potentially violative trading, FINRA takes any complaints or regulatory tips regarding potential trading violations seriously. FINRA focuses keen attention on identifying and pursuing trading activity that may violate FINRA rules, the federal securities laws or the rules and regulations thereunder (or referring this activity to other regulatory agencies, when the parties are not FINRA members or associated persons). In this case, although I cannot provide details on specific areas of inquiry, I would note our recent statement in *Khorassani* that FINRA "has initiated a number of investigations related to MMTLP, some of which remain open and ongoing." *See* Dumont Affidavit, *Khorassani v. FINRA*, No. 153819/2023 (N.Y. Sup. Ct.) [Dkt. No. 38], ¶ 11.

Investor protection. Market Integrity.



www.finra.org

Thank you for sharing your questions in our call, and I hope you find this letter responsive.

Very truly yours,

Robert Colby
Executive Vice President
and Chief Legal officer

# Appendix 41

**Quote:**

117. A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

**Evidence:**

**Image:**

FINra

## Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

### Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding those events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failure-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

**12. Were the right number of Next Bridge shares distributed in connection with the corporate action?**

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

**13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?**

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects transactions made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the position held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out its short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

**14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?**

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short interest, FINRA's daily short sale volume data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale volume data but did not result in a short position. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale volume data but did not result in a short position.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data and that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—i.e., 1.6% of total shares outstanding.

**15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?**

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17] While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

**16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?**

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

**17. Why did FINRA halt trading in MMTLP before December 12?**

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased were imminently to be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. See Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

**18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?**

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (i.e., an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. See March 16, 2023, MMTLP FAQs, Question No. 11.

**19. How can a holder of Next Bridge common stock liquidate their securities?**

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that Next Bridge shareholders would become holders of Next Bridge common stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[24] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[25]

1 See FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

4 "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

5 See https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

6 Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA, perform functions that include serving as a central securities depository and operating a centralized system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly on the books of the transfer agent (either in certificate form or through direct registration). See SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

7 See https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

8 See https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

9 For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. See Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory or law enforcement requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been available because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. See Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding], hitting its high of 109.26% on December 31, 2020." See SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control,

such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16 While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

17 *See* SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

18 On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19 *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

20 *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/83eea76071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

21 Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

22 *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23 *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24 It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public notice by FINRA.

25 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

26 *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

© FINRA. All Rights Reserved.

# Appendix 42

**Quote:**

120. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

121. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2023. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

122. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

**Evidence:**

**Link:** https://youtu.be/2SqHl-o4b0I?si=moRFok-MspFvmcKo

**Image:**



**Quote:**

"are you familiar with meta materials yeah yes I am sir I'm not very deeply but it is a company that uh I've heard Of um do you know what the aggregate chairs are audited chairs count of

MMTLP as of uh close a market on December 8th 22. I don't know I know that it's uh it's a company that then exchanged into something called Next bridge I believe

Okay um does SEC have this information on the audited shares it may be a matter of public record I mean it was a company that it did an exchange and create and

CR became another company we'll try writing you another letter and if you would look into it we would appreciate that thanks."

# Appendix 43

**Quote:**

123. On September 29, 2023, the Securities and Exchange Commission (SEC) issued a FOIA response confirming that it had received 246 complaints specifically related to the U3 trading halt of MMTLP between December 9, 2022, and September 15, 2023. This demonstrates substantial investor concern regarding the halt and its regulatory implications.

**Evidence:**

**Image:**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

September 29, 2023

Ms. Danielle Spears
201 S Greenfield Rd., Lot 300
Mesa, AZ 85206

RE: Freedom of Information Act (FOIA), 5 U.S.C. § 552
Request No. **23-03572-FOIA**

Dear Ms. Spears:

This letter is in response to your request, dated and received in this office on September 15, 2023, in which you asked "how many consumer/investor complaints were filed with the SEC in regard to the U3 Halt of MMTLP" between December 9, 2022 and September 15, 2023.

A search for the total number of complaints resulted in 246 complaints received regarding MMTLP.[1]

If you have any questions, please contact me at hansenjo@sec.gov or (202) 551-8377. You may also contact me at foiapa@sec.gov or (202) 551-7900. You may also contact the SEC's FOIA Public Service Center at foiapa@sec.gov or (202) 551-7900. For more information about the FOIA Public Service Center and other options available to you please see the attached addendum.

Sincerely,

Joel Hansen
FOIA Research Specialist

Enclosures

# Appendix 44

**Quote:**

124. In October 2023, Palikaras was removed from his position as President and CEO of META II by the company's Board of Directors.

**Evidence:**

**Link:**https://www.sec.gov/Archives/edgar/data/1431959/000095017023053582/mmat-20231010.htm

**Quote:**

Item 5.02.

Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On October 10, 2023, the Board of Directors (the "Board") of Meta Materials Inc. (also referred to herein as the "Company", "we", "us", or "our") removed George Palikaras as President and Chief Executive Officer ("CEO") of the Company, effective immediately.

In connection with the removal of Mr. Palikaras as CEO, on October 10, 2023, the Board appointed Jim Fusaro as the new CEO of the Company, effective immediately.

In addition, pursuant to the articles of incorporation and the bylaws of the Company (each as amended to date), the Board increased the size of the Board to nine members, and appointed Mr. Fusaro as member of the Board, effective October 10, 2023.

# Appendix 45

**Quote:**

125. On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning META II's Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

**Evidence:**

**Image:**

# Congress of the United States
## Washington, DC 20510

December 22, 2023

The Honorable Gary Gensler
Chair
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Mr. Robert W. Cook
President & Chief Executive Officer
Financial Industry Regulatory Authority
1735 K Street NW
Washington, D.C. 20006

Dear Chairman Gensler and Mr. Cook:

We write to request that the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) review events surrounding Meta Materials Series A preferred shares (MMTLP).

As you know, MMTLP was created during a merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders.[1] MMTLP shares began trading on the OTC market in 2021. In the summer of 2022, the SEC received and subsequently approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons (NBH).[2] On December 9, 2022, FINRA issued a U3 halt on trading in the company's stock, preventing shareholders from making further trades.[3] Since the halt, constituent investors have contacted Members of Congress regarding the spin-off transaction and the subsequent halt on trading. Specifically, we have received more than 40,000 letters from concerned investors.[4]

Many of our constituents have concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP. As you know, the securities industry is regulated by a disclosure-based regime, and transparency is paramount to FINRA's and the SEC's goals of protecting investors and ensuring market integrity. We believe it is appropriate that FINRA and

---

[1] *Securities and Exchange Commission, EDGAR,* "Torchlight Announces Payment of a Special Series A Preferred Stock Dividend, a 1:2 Reverse Stock Split and Planned Closing of the Arrangement Agreement with Meta Material, Inc." https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm (last visited Dec. 8, 2023).
[2] Press Release, Meta Materials, "Meta Materials Inc. Board of Directors Approves Planned Completion of the Spin-off of Next Bridge Hydrocarbons Inc.," https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last visited Dec. 8, 2023).
[3] Daily Notice, FINRA, "Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022," https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf, (last visited Dec. 8, 2023).
[4] CONGRESSIONAL RESEARCH SERVICE, Meme Stock MMTLP and FINRA Trading Halt, (Aug. 21, 2023) https://www.crs.gov/Reports/IN12228.

the SEC review these market events and determine what, if any, wrongdoing may have occurred in order to dispel misinformation and properly safeguard investors.

Please provide a response to the following questions and requests no later than January 31, 2024:

1. Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2. The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3. Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4. Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5. Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6. Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7. How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8. Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9. Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

---

[5] Brandon Kochkodin, *MMTLP: The Wild Saga of the Meme Stock That's Left Thousands of Shareholders with Noting*, Forbes Middle East, (Apr. 27, 2023) https://www.forbesmiddleeast.com/money/markets/mmtlp-the-wild-saga-of-the-meme-stock-thats-left-thousands-of-shareholders-with-nothing.

U.S. broker dealers, all shares held offshore that were traded and never settled through the appropriate clearing channels, and the ability to provide the location associated with each short position identified above.

10. Have all MMTLP shareholders received their NBH shares?

11. In your view, did MMTLP investors knowingly enter into a risk-taking transaction with full understanding of material information and without misleading guidance from social media or elsewhere? For example, the SEC has charged social media influencers with manipulation schemes in the past.[6]

12. In your view, are there better ways to provide transparency and clarity regarding risk disclosures that could enhance market integrity and reduce market disruptions? For example, retail investors and experts (e.g., OTC Markets Group's vice president) were reportedly confused about MMTLP's final trading date.[7] As such, investors may not have been able to optimize their investment decisions.

13. Do you have evidence to suggest the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares, that could distort the market?

14. Have you seen any indications of insider trading and/or pump and dump related to MMTLP transactions?

15. Are your organizations willing to work with NBH to determine a resolution for existing shareholders? For example, some investors have expressed concern that, even though their brokerage account statements include shares of NBH in their account, these shares may not have actually been delivered to their broker-dealers.

16. Identify any regulatory or legislative gaps that should be addressed to ensure the SEC, FINRA, and other regulated entities may better protect investors and strengthen market integrity.

We look forward to your response. Thank you for your attention to this important matter.

Sincerely,

Ralph Norman
Member of Congress

Pete Sessions
Member of Congress

---

[6] Press Release, Securities and Exchange Commission, "SEC Charges Eight Social Media Influencers in $100 Million Stock Manipulation Scheme Promoted on Discord and Twitter," (last visited December 8, 2023).
[7] *Supra*, note 5.

Bill Posey
Member of Congress

Alex Mooney
Member of Congress

Bryan Steil
Member of Congress

Mike Flood
Member of Congress

Bryon Donalds
Member of Congress

Erin Houchin
Member of Congress

Barry Loudermilk
Member of Congress

Scott Fitzgerald
Member of Congress

William Timmons
Member of Congress

Warren Davidson
Member of Congress

Michael V. Lawler
Member of Congress

John Rose
Member of Congress

Andy Ogles
Member of Congress

Marcy Kaptur
Member of Congress

Jeff Van Drew
Member of Congress

Raul M. Grijalva
Member of Congress

Joe Wilson
Member of Congress

Delia Ramirez
Member of Congress

Stephanie Bice
Member of Congress

Betty McCollum
Member of Congress

Ron Estes
Member of Congress

Linda T. Sánchez
Member of Congress

Mike Ezell
Member of Congress

Darren Soto
Member of Congress

John Rutherford
Member of Congress

Bill Johnson
Member of Congress

Eli Crane
Member of Congress

Daniel Webster
Member of Congress

Troy E. Nehls
Member of Congress

Jeff Duncan
Member of Congress

Russell Fry
Member of Congress

Brian Fitzpatrick
Member of Congress

Lisa McClain
Member of Congress

Andy Harris, M.D.
Member of Congress

Andy Biggs
Member of Congress

Tim Walberg
Member of Congress

Diana Harshbarger
Member of Congress

Virginia Foxx
Member of Congress

Randy Feenstra
Member of Congress

Randy Weber
Member of Congress

Adrian Smith
Member of Congress

Scott Franklin
Member of Congress

Marc Molinaro
Member of Congress

John Moolenar
Member of Congress

Paul A. Gosar, D.D.S.
Member of Congress

Doug Lamborn
Member of Congress

Nancy Mace
Member of Congress

Barry Moore
Member of Congress

Victoria Spartz
Member of Congress

Carlos A. Gimenez
Member of Congress

Beth Van Duyne
Member of Congress

Nick Langworthy
Member of Congress

Earl L. "Buddy" Carter
Member of Congress

Mike Carey
Member of Congress

Nicole Malliotakis
Member of Congress

Lance Gooden
Member of Congress

Gus M. Bilirakis
Member of Congress

John Joyce
Member of Congress

James Comer
Member of Congress

Maria Elvira Salazar
Member of Congress

Cory Mills
Member of Congress

W. Gregory Steube
Member of Congress

Matthew M. Rosendale
Member of Congress

Claudia Tenney
Member of Congress

Matt Gaetz
Member of Congress

Jenniffer Gonzalez-Colon
Member of Congress

August Pfluger
Member of Congress

Nick LaLota
Member of Congress

Rich McCormick, MD, MBA
Member of Congress

Jen Kiggans
Member of Congress

Max Miller
Member of Congress

Lauren Boebert
Member of Congress

# Appendix 46

**Quote:**

126. On January 15, 2024, NBH executives, including DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty.

**Evidence:**

**Link:**

https://www.prnewswire.com/news-releases/next-bridge-hydrocarbons-inc-announces-preliminary-results-of-its-johnson-prospect-drilling-program-302039147.html

**Image:**

With the completion of these initial drilling results, the Company will phase in a new leaner management and operational model to build off of the positive developments while realizing cost savings and efficiencies. Accordingly, with many thanks for their valuable leadership and the dedication they have shown for Next Bridge's best interests in this transition phase, the Company announces the mutually agreed departure of both Clifton DuBose as CEO and board member and Luke Hawkins as CFO. Our Chairman of the Board, Greg McCabe, has agreed to bring his significant industry and Orogrande expertise to bear without additional compensation as the new CEO of Next Bridge. Roger Wurtele has accepted the role of CFO, bringing with him more than 40 years of experience and was the former CFO of Torchlight Energy Resources. The Company wishes both Mr. DuBose and Mr. Hawkins continued success in their future endeavors.

# Appendix 47

**Quote:**

127. On January 31, 2024, the Securities and Exchange Commission (SEC) issued a response to a Freedom of Information Act (FOIA) request submitted on October 2, 2023, regarding complaints received about META II's Series A Preferred Shares/Dividend, also known as MMTLP.

128. The SEC disclosed that a total of 848 complaints were received concerning MMTLP between December 9, 2022, and October 2, 2023. These disclosures highlight significant investor dissatisfaction and public concern over the regulatory handling of MMTLP

**Evidence:**

**Image:**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

January 31, 2024

Ms. Danielle Spears
12206 W. Harrison St.
Avondale, AZ 85323

     RE:  Freedom of Information Act (FOIA), 5 U.S.C. § 552
           Request No. **24-00010-FOIA**

Dear Ms. Spears:

    This letter is in response to your request, dated and received in this office on October 2, 2023, for "the total number of any and all complaints received regarding Meta Materials Series A Preferred Shares/Dividend also known as MMTLP," from December 9, 2022 to October 2, 2023.

    A search for the total number of complaints resulted in 848 complaints received regarding Meta Materials (MMTLP) Series A Preferred Shares/Dividend.[1]

    No fees have been assessed for the processing of this request.  If you have any questions, please contact Ms. Felecia Taylor of my staff at taylorf@sec.gov or (202) 551-8349.  You may also contact me at foiapa@sec.gov or (202) 551-7900.  You may also contact the SEC's FOIA Public Service Center at foiapa@sec.gov or (202) 551-7900.  For more information about the FOIA Public Service Center and other options available to you please see the attached addendum.

                Sincerely,

                Lizzette Katilius
                FOIA Branch Chief

# Appendix 48

**Quote:**

129. On February 7, 2024, the Securities and Exchange Commission (SEC) acknowledged receiving 56,490 emails regarding MMTLP and related issues but has only officially responded to 35 of these complaints (0.0619%).

130. This demonstrates the significant level of investor concern and dissatisfaction, as well as the SEC's apparent failure to adequately address or resolve the grievances of affected shareholders, raising questions about regulatory oversight and accountability

**Evidence:**

**Image:**

**From:** "Morrow, Alysia" <MorrowA@sec.gov>
**Date:** February 7, 2024 at 15:06:52 EST
**To:** ███████████████████████
**Cc:** "Hyde-Michaels, Carrie" <hyde-michaelsc@sec.gov>
**Subject: RE: 23-00213-FOPA - Phone Call Notes**

Mr. 

We have completed a new search for emails potentially responsive to your request. The volume is such that your request still qualifies for placement in the Complex track.

The volume of potentially responsive records are as follows:

- Emails to SEC – 56,490 – this is too voluminous to review for responsiveness
- Emails from SEC – reviewed for responsiveness, located 35 potentially responsive emails

You may wish to consider limiting your search to the TCR notes and emails in the "From SEC" portion of the search, which would capture the emails sent by SEC employees. These records are of a volume that could be processed without your request needing to be placed in Complex track.

Please also be advised that we have expended 13.5 hours of search time to date. There is a 32-hour limit on

# Appendix 49

**Quote:**

131. On February 8, 2024, a NBH press release stated, "Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of 'domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers.'"

**Evidence:**

**Link:**

https://www.prnewswire.com/news-releases/next-bridge-hydrocarbons-inc-releases-statement-302058038.html

**Image:**

Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of "domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers." However, it repeated its assertion that the short interest position it saw was "nominal." Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares.

# Appendix 50

**Quote:**

138. On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

**Evidence:**

**Link:** https://mmtlpresources.com/wp-content/uploads/2024/06/June52024-letter.jpg

**Image:**

<div align="center">

**Congress of the United States**

**Washington, DC 20515**

</div>

June 5, 2024

The Honorable Gary Gensler
Chair
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Dear Chairman Gensler:

We write to follow up a previous letter signed by over seventy Members of Congress requesting that the Securities and Exchange Commission (SEC) review events surrounding Meta Materials Series A preferred shares (MMTLP).

As you know, MMTLP was created during a merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders. MMTLP shares began trading on the OTC market in 2021. In the summer of 2022, the SEC received and subsequently approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons (NBH). However, on December 9, 2022, the Financial Industry Regulatory Authority (FINRA) issued a U3 halt on trading in the company's stock, preventing shareholders from making further trades. Since the halt, constituent investors have contacted Members of Congress with serious concerns about the spin-off transaction and the subsequent halt on trading. To date, more than 40,000 letters from concerned constituents have been sent to Congress.[1]

We have received information indicating that the SEC is investigating events related to MMTLP. Upon completion of your investigation, we request a briefing with the results of your investigation. We have an obligation to our constituents to provide oversight and ensure our markets are functioning fairly and efficiently.

Please respond by June 15, 2024, with confirmation of your commitment to brief Members of Congress and an estimated timeline for the completion of your investigation.

Thank you for your attention to this important matter.

<div align="center">Sincerely,</div>

Ralph Norman
Member of Congress

Pete Sessions
Member of Congress

---

[1] https://crsreports.congress.gov/product/pdf/IN/IN12228

# Appendix 51

**Quote:**

140. In June 2024, the U.S. Securities and Exchange Commission (SEC) charged Torchlight and its successor META II and its former CEOs, including Brda, with market manipulation and fraud.

144. Following these allegations, META II agreed to settle the SEC's charges in an administrative proceeding, resulting in a $1 million penalty. However, litigation against Palikaras and Brda is ongoing in federal district court (Securities and Exchange Commission v. John Brda and Georgios Palikaras (SEC v. Brda, 2024)

**Evidence:**

**Link:**  https://www.sec.gov/files/litigation/complaints/2024/comp-pr2024-77.pdf

**Image:**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN BRDA,
GEORGIOS PALIKARAS,

Defendants.

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

### COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

### I.   SUMMARY

1.       Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.       Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

# Appendix 52

**Quote:**

141. The SEC's complaint alleges that Brda as CEO of Torchlight and co-defendant Palikaras as CEO of META I, orchestrated a scheme involving the issuance of a preferred stock dividend intended to create a "short squeeze," thereby artificially inflating the company's stock price.

**Evidence:**

**Link:**  https://www.sec.gov/files/litigation/complaints/2024/comp-pr2024-77.pdf

**Image:**

<div align="center">

I.　　**SUMMARY**

</div>

1.　　Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

# Appendix 53

**Quote:**

145. On August 9, 2024, META II filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada (Case No. 24-50792). This filing initiated the process of liquidating the company's assets to repay creditors.

**Evidence:**

**Link:**

https://www.sec.gov/Archives/edgar/data/1431959/000095017024094376/mmat-20240807.htm

**Image:**

Item 1.03.     Bankruptcy or Receivership.

On August 9, 2024, after consideration of all strategic alternatives, Meta Materials, Inc., a Nevada corporation (the "Company"), ceased operations and filed a voluntary petition for relief under the provisions of Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), Case No. 24-50792 (the "Bankruptcy Filing").

As a result of the Bankruptcy Filing, a Chapter 7 trustee will be appointed by the Bankruptcy Court and will administer the Company's bankruptcy estate, including liquidating the assets of the Company in accordance with the Bankruptcy Code. Once a Chapter 7 trustee is appointed, an initial hearing for creditors will be scheduled, and the Notice of Bankruptcy Case Filing will be sent to known creditors.

Item 5.02.     Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On August 7, 2024, the Company terminated all of its remaining employees and executive officers, including Uzi Sasson, its President and Chief Executive Officer, and Dan Eaton, its Chief Legal Officer, with the terminations of Messrs. Sasson and Eaton effective concurrent with the Bankruptcy Filing. Following the Bankruptcy Filing, the Company does not have any executive officers or employees.

Effective concurrent with the Bankruptcy Filing, each of John R. Harding, Allison Christilaw, Steen Karsbo, Kenneth Hannah, Vyomesh Joshi and Philippe Morali tendered their resignations as members of the Board of Directors. Each of the directors resigned due to the Bankruptcy Filing, and such resignations are not the result of any disagreements with the Company regarding the Company's operations, policies, or practices. The resignation of the Company's directors effectively eliminates the powers of the Board of Directors, and following the director resignations, the Company does not have directors serving on the Board of Directors.

# Appendix 54

**Quote:**

147. The Plaintiffs has submitted a valid Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada, concerning 800 MMATQ shares, as of November 13, 2024, via Registered Mail.

**Evidence:**

**Image:**

Positions - Equities

| Symbol | Description | Quantity | Price($) | Market Value($) | Cost Basis($) | Unrealized Gain/(Loss)($) | Est.Ann. Income($) | Yld% | %of Acct |
|--------|-------------|----------|----------|-----------------|---------------|---------------------------|--------------------|------|----------|
| GME | GAMESTOP CORP NEW | 2,202.0000 | 22.1600 | 48,840.36 | 67,849.83 | (19,009.27) | N/A | 0.00 | 100% |
| MMATQ | META MATLS INC | 1600.0000 | 0.07100 | 56.80 | 186,249.25 | (186,192.45) | N/A | 0.00 | <1% |
| Total Equities | | | | (48,897.16) | 254,099.08 | (205,201.72) | | 90.00 | 100% |

NVB 3001 (Effective 1/21)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA | PROOF OF INTEREST |
|---|---|

| Name of Debtor: Meta Materials Inc. | Case Number: 24-50792 |
|---|---|

1. Name and address of holder of the Equity Interest (the person or entity holding an Equity Interest in the Debtor. Referred to hereinafter as the "Interest holder"):

SGM DANIEL R. AUXIER
105 VALLEY ROAD
WANTAGE, NJ 07461

Telephone Number:
(401) 523-7559

☐ Check box if you are aware that anyone else has filed a proof of interest relating to your interest. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court or the Debtors in this case.

☐ Check box if this address differs from the address on the envelope sent to you by the Debtors.

NOTE: This form SHOULD NOT be used to make a claim against the Debtor for money owed. A separate Proof of Claim form should be used for that purpose. This form should only be used to assert an Equity Interest in the Debtor. An Equity Interest is any right arising from any capital stock and any equity security in any of the Debtor. An equity security is defined in the Bankruptcy Code as (a) a share in a corporation whether or not transferable or denominated stock or similar security, (b) interest of a limited partner in a limited partnership, or (c) warrant or right other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subsection (a) or (b) herein.

COURT USE ONLY

Account or other number by which Interest holder identifies Debtor:
Charles Schwab MMATQ 800 shares

Check here if this claim:
☐ replaces a previously filed Proof of Interest dated:
☐ amends a previously filed Proof of Interest dated:

2. Name and Address of any person or entity that is the record holder for the Equity Interest asserted in this Proof of Interest:
Charles Schwab & Co. Inc.
ATTN: OOC, PO Box 2339, Omaha, NE 68103
Telephone Number: (800) 435-4000

3. Date Equity Interest was acquired:
o/a Jan 2021 thru present day.

4. Total amount of member interest: $186,249

5. Certificate number(s):

6. Type of Equity Interest:
Please indicate the type of Equity Interest you hold.
☒ Check this box if your Equity Interest is based on an actual number interest held in the Debtor.
☐ Check this box if your Equity Interest is based on anything else and describe that interest:
Description:

7. Supporting Documents: Attach copies of supporting documents, such as stock certificates, option agreements, warrants, etc.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. Date-Stamped Copy: To receive an acknowledgement of the filing of your Proof of Interest, enclose a stamped, self-addressed envelope and copy of this Proof of Interest.

9. Signature:
Check the appropriate box.
☒ I am the creditor.  ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any)  ☐ ... guardian, surety, endorser, or other codebtor. (See Bankruptcy Rule 3005)

I declare under penalty of perjury that the information provided in this Proof of Interest is true and correct to the best of my knowledge, information and reasonable belief.

Print Name: DANIEL R. AUXIER
Title: SERGEANT MAJOR USARMY
Company: Address and telephone number (if different from notice address above): NA See above

(Signature)  03 NOV 24
(Date)

DRA021@gmail.com

Penalty for presenting fraudulent claim...

# Appendix 55

**Quote:**

160. Between August 1, 2007, and August 31, 2024, FINRA issued 1,040 UPC notices, with only 25 notices (2.4%) referencing trading halts, categorized under "Halted".

161. These notices typically applied to temporary suspensions governed by FINRA Rule 6440 and were issued to address short-term uncertainties surrounding a security. The indefinite nature of the U3 halt on MMTLP diverges sharply from this established pattern, making it highly unusual in comparison

162. The MMTLP U3 halt was cited as being caused by an "extraordinary event," but FINRA provided no further explanation to shareholders or the public, a departure from standard practice under Rule 6440.

163. Unlike other notices involving "Significant Uncertainty," which appeared in 0.96% of UPC notices and were tied to clear settlement or clearance concerns, the reasons behind the U3 halt remain vague and insufficiently explained.

164. The overwhelming majority of UPC notices, 695 out of 1,040 (66.83%), referenced "Reorganization," reflecting standard regulatory actions tied to corporate mergers, bankruptcies, and share cancellations.

165. The absence of such a reorganization notice in the case of MMTLP indicates that the halt was not consistent with FINRA's usual handling of corporate transitions and further underscores the irregularity of the U3 halt.

**Evidence:**

**Image:**

# UPC NOTICE NUMBERS

| Keyword | Count | 1040 UPC Notices |
|---|---|---|
| Reorganization | 695 | 66.83% |
| Cancelled | 480 | 46.15% |
| When Issued | 114 | 10.96% |
| Canceled | 101 | 9.71% |
| Halted | 25 | 2.40% |
| HALT | 24 | 2.31% |
| 6440 | 20 | 1.92% |
| Concurrent | 10 | 0.96% |
| Significant Uncertainty | 10 | 0.96% |
| Trading and Quoting Halt | 3 | 0.29% |
| Deletion | 2 | 0.19% |
| Deleted | 2 | 0.19% |



FINRA UPC Notices by Keyword

# UPC "Halted" Timeframe Comparison

| UPC # | Security | HALT Date | Resolution Date | Time to Resolution | Notes |
|---|---|---|---|---|---|
| | | | **Timeframe Comparison:** | | |
| 23-09 | Motors Liquidation (GMGMQ/MTLQQ) | 7/10/2009 | 7/15/2009 | 5 days | Symbol change; significant investor concerns remained. |
| 19-12 | Scotoil Petroleum Limited (OILXF) | 3/20/2012 | 4/3/2012 | 14 days | No confirmation of share distribution issue resolution. |
| 41-12 | Capmark Financial Group (CPMK) | 10/5/2012 | 10/8/2012 | 3 days | Trades canceled. |
| 33-13 | Tweeter Home Ent. (TWTRQ/THEGQ) | 10/4/2013 | 10/8/2013 | 4 days | Symbol change. |
| 39-13 | Tweeter Home Ent. (TWTRQ/THEGQ) | 10/4/2013 | 10/8/2013 | 4 days | Confirmed symbol change details from #33-13. |
| 47-13 | All OTC Equity Securities | 11/7/2013 | 11/7/2013 | <1 day | Technical issue resolved quickly. |
| 48-13 | All OTC Equity Securities | 11/7/2013 | 11/7/2013 | <1 day | Confirmed resumption details from #47-13. |
| 33-14 | ATP Oil & Gas Corp. | 9/20/2014 | N/A | N/A | SEC suspension, not FINRA action. |
| 37-14 | All OTC Equity Securities | 10/17/2014 | 10/17/2014 | <1 day | Technical issue resolved quickly. |
| 38-14 | All OTC Equity Securities | 10/17/2014 | 10/17/2014 | <1 day | |
| 35-15 | Riviera Tool Company (RIVT) | 5/7/2015 | 12/7/2015 | 213 days | |
| 22-15 | Calissio Resources (CRGP) | 8/26/2015 | 8/9/2015 | 14 days | |
| 24-15 | SWK Holdings (SWKH) | 9/16/2015 | 9/17/2015 | 1 day | Trades canceled, resumed on pre-split basis. |
| 25-15 | SWK Holdings (SWKH) | 9/16/2015 | 9/17/2015 | 1 day | Confirmed cancellation of trades and resumption details from #24-15. |
| 31-16 | Jetcom Inc. (JTCMF) | 8/5/2016 | 8/9/2016 | 4 days | |
| 33-16 | Jetcom Inc. (JTCMF) | 8/5/2016 | 8/9/2016 | 4 days | |
| 24-17 | Newmarks Corp. (NWMH) | 5/17/2017 | 6/2/2017 | 16 days | Trading halt lifted. |
| 26-17 | Newmarks Corp. (NWMH) | 5/17/2017 | 6/2/2017 | 16 days | Confirmed resumption details from #24-17. |
| 29-19 | European Metals (MNTCF) | 9/19/2019 | 9/24/2019 | 5 days | |
| #10-20 | Zoom Technologies (ZOOM/ZTNO) | 4/6/2020 | 4/14/2020 | 5 days | Symbol change; assumed trading resumed as indicated. |
| #12-20 | Zoom Technologies (ZOOM/ZTNO) | 4/6/2020 | 4/14/2020 | 5 days | Update notice, referring to resolution date in #10-20. |
| #11-22 | Lobe Sciences (LOBEF) | 6/9/2022 | 6/10/2022 | 1 day | |
| 13-22 | Lobe Sciences (LOBEF) | 6/9/2022 | 6/10/2022 | 1 day | Resumption notice. |
| 35-22 | Meta Materials (MMTLP) | 12/9/2022 | N/A | ~745 days | Unresolved since the U3 HALT. |

# 14 / 14

## FINΓA.

**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: <ins>https://otce.finra.org/otce/dailyList</ins>.

**HALT**
**REASON**

**NO MORE**
**TRADING/NO**
**SETTLEMENT**
**HALT +**
**DELETION**

**NOTES**

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that "...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled." Available here: <ins>https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.ht m</ins>.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

# Appendix 56

**Quote:**

181. From late 2022 through 2024, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved.

**Evidence:**

**Link:** https://x.com/JunkSavvy/status/1742717807383506965

**Image:**

We understand that some TradeStation customers may seek to participate in the non-transferable subscription rights offering for shares of common stock in the future subsidiary of Next Bridge Hydrocarbons, Inc. ("NBH"). Such participation requires NBH holders to register and record ownership of their NBH shares in book entry form with the transfer agent, the American Stock Transfer & Trust Company ("AST"). Registration must be completed within sixty (60) days (the "record date") from the effective date of a Form S-1 Registration Statement that NBH filed with the SEC on July 26, 2023. NBH will issue a press release notifying shareholders of the record date once the Registration Statement is declared effective by the SEC. TradeStation will be transmitting its requested list of clients' shares to AST, but will not be able to send any additional shares once that list has been sent.

Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security. This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate. If the Registration Statement is declared effective by the SEC, TradeStation will fulfill its obligation to transfer the current list of clients who own NBH of record to AST. In the meantime, we must decline your request to transfer a physical certificate reflecting your ownership interest to AST.

# MMTLP SHAREHOLDER/AST BULK RECONCILIATION

| MMTLP SHARE SURVEY META DATA : | |
|---|---|
| MMTLP Survey Shares TOTAL: | 99,282,190 |
| MMTLP Survey Accounts TOTAL: | 6,364 |
| | |
| MMTLP Survey Shares (Top 7 Accts): | 61,026,656 |
| | |
| MMTLP Survey Shares (Remaining): | 38,255,534 |

| MMTLP TRADESTATION (TS) SURVEY DATA: | |
|---|---|
| MMTLP TS Survey Shares TOTAL: | 205,880 |
| MMTLP TS Survey Accounts: | 88 |
| | |
| MMTLP TS Verified Survey Shares: | 142,591 |
| MMTLP TS Verified Survey Shares in Book Entry @AST | 26,888 |
| MMTLP TS Verified Survey Shares NOT @ AST | 115,705 |
| MMTLP TS Verified Survey Accounts: | 61 |
| | |
| MMTLP TS Unverified Survey Shares | 63,289 |
| MMTLP TS Unverified Survey Accounts: | 27 |
| | |
| MMTLP TS AST Bulk Cert Allotment: | 122,622 |
| MMTLP TS Shares in Book Entry @AST | 122,222 |
| MMTLP TS Verified Survey Shares NOT @ AST | 115,705 |
| **MMTLP TS SHARES VERIFIED TOTAL:** | **237,927** |

NOTES:                    *ALL DATA As of 11:24am cst, Jan. 3, 2023
                          *Survey Shares reported from 74 financial institutions.

# Appendix 57

**Quote:**

185. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings

**Evidence:**

**Link:** https://x.com/ModyMarc/status/1795694895379743121

**Image:**



| | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | Data from @RussRace | | | | | Total Short shares per Pod needed to fill before going to next pod | | | | | |
| 2 | [IMACOMARG Data] | CUSIP per Broker reported | Shares Reported | Shares Reported | Average per Broker | Pod Average | Pod % | 300 million | 500 million | 750 million | 1 billion | 1.25 billion | 1.5 billion |
| 3 | CUSIPs that start with 59 (these shares breaking down 1% of total) | | | | | | 7.64% | | | | | | |
| 4 | Robinhood | 591994371 | 805 | 1,596,644 | 9,110 | 7,840 | 7.64% | | | | | | |
| 5 | Webull Simple (New broker data) | 591994371 | | | | | | | | | | | |
| 6 | Openbank (Spain) | 591994371 | | | | | | | | | | | |
| 7 | Interactive Brokers (IBKR) | 591994371 | 37 | 197,715 | 5,343 | | | | | | | | |
| 8 | Wealth Simple (New broker data) | 591994371 | | 12,864 | | | | | | | | | |
| 9 | Avanza (Sweden) | 591994371 | | | | | | | | | | | |
| 10 | Nordnet | 591994371 (previously 591994A) | 67 | 143,835 | 2,147 | | | | | | | | |
| 11 | Isolera Belgium | US591994371 | 3 | 36,800 | 12,267 | 2,844 | 0.32% | 950,403 | 1,584,006 | 2,376,008 | 3,168,011 | 3,960,014 | 4,752,017 |
| 12 | Trading 212 | US591994371 | 61 | 135,416 | 2,220 | | | | | | | | |
| 13 | Degiro (Netherlands) | US591994371 | 39 | 119,856 | 3,073 | | | | | | | | |
| 14 | ING Bank | US591994371 | 1 | 563 | 563 | | | | | | | | |
| 15 | Raiffeisen Bank (New broker data) | US591994371 | | | | | | | | | | | |
| 16 | Nordea Bank (New broker data) | US591994371 | | | | | | | | | | | |
| 17 | Pareto Bank Sweden / Norway | US591994371 | 8 | 25,938 | 3,242 | | | | | | | | |
| 18 | | | | | | | | | | | | | |
| 19 | CUSIPs that start with 62 | | | | | | 10.51% | | | | | | |
| 20 | Tirade | 629999590 | 588 | 3,985,041 | 6,775 | 10,577 | 10.51% | | | | | | |
| 21 | Merrill Lynch | 629999590 | 24 | 460,170 | 19,174 | | | | | | | | |
| 22 | Charles Schwab | 629999590 | 344 | | | | | | | | | | |
| 23 | CitiBank (New broker data) | 629999590 | | | | | | | | | | | |
| 24 | Alight Financial Solutions | 629999590 (previously PERSS2050) | 3 | 61,720 | 20,640 | | | | | | | | |
| 25 | Pershing (BNY Mellon) | 629999590 (previously PERSS2050) | 11 | 178,461 | 17,516 | | | | | | | | |
| 26 | Computer Brokerage | 629999590 | | | | | | | | | | | |
| 27 | Vanguard | 629999590 (previously NDTBADGG) | 97 | 349,583 | 3,606 | | | | | | | | |
| 28 | Park Avenue Sec (New broker data) | 629999590 | | 28,860 | | | | | | | | | |
| 29 | | | | | | | | | | | | | |
| 30 | CUSIPs that start with 99 | | | | | | 0.69% | | | | | | |
| 31 | J P Morgan Chase | 9933424 | 94 | 493,338 | 5,248 | 5,248 | 0.69% | 1,471,842 | 2,453,070 | 3,679,605 | 4,906,140 | 6,132,675 | 7,359,210 |
| 32 | Fentravest | DXOF942521489 | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | |
| 34 | CUSIPs that start with EA | | | | | | | | | | | | |
| 35 | Questrade | EAGS3AE9G | 65 | | | 4,687 | 0.31% | 927,347 | | | | | |
| 36 | Ally Invest | 8AQ9903 (previously M074S26) | 44 | 323,830 | 7,360 | | | | | | | | |
| 37 | Flatrade (New broker data) | 8AQ9903 | 37 | 141,923 | 3,836 | | | | | | | | |
| 38 | Webull | 8AQ9903 (previously 591994371) USBAQ9 | 672 | 1,071,506 | 1,595 | | | | | | | | |
| 39 | Sofi | 8AQ9903 (previously M074S26) | 20 | 48,237 | 2,412 | | | | | | | | |
| 40 | CIBC Investors Edge | EABS418 | | | | | | | | | | | |
| 41 | RBC Direct Investment | EARS424 | 57 | 525,493 | 9,219 | 9,219 | 0.57% | | | | | | |
| 42 | Sofia (Spain) | EA721C4 | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | |
| 44 | CUSIPs that start with 78 | | | | | | 19.32% | | | | | | |
| 45 | Fidelity | 786990491 | 1,056 | 7,327,499 | 6,939 | 18,286 | 19.32% | 57,660,005 | 96,100,008 | 144,150,011 | 192,300,015 | 240,250,019 | 288,300,023 |
| 46 | Tidelity (Whale - David - approx.) | 786990491 | 1 | 12,000,000 | | | | | | | | | |
| 47 | Mass Mutual Investments (New broker... | 786990491 | | | | | | | | | | | |
| 48 | | | | | | | | | | | | | |
| 49 | CUSIPs that start with 60 | | | | | | 90.0% | | | | | | |
| 50 | Vanguard | 60499301X | 1,124 | 11,195,184 | 9,870 | 19,742 | 90.0% | | | | | | |
| 51 | TD Ameritrade (Whale's TD-approx.) | 60499301X | 1 | 17,000,000 | | | | | | | | | |
| 52 | | | | | | | | | | | | | |
| 53 | Edward Jones | US591994105 | | | | 6,205 | 0.06% | | | | | | |
| 54 | BMO Investors | US591394N2026 | 8 | 53,768 | 6,721 | 6,721 | 0.05% | 160,407 | 267,345 | 401,017 | 534,689 | 668,362 | 802,034 |
| 55 | TD Waterhouse | HDITBREGEURROCKARBONS INC | 8 | 576,714 | 7,394 | 7,394 | 0.57% | | | | | | |
| 56 | Commerzbank (cond-irea) | OES338 | 8 | 8,500 | 3,834 | 2,834 | 0.01% | 25,234 | 42,264 | 63,206 | 84,627 | 105,689 | 126,791 |
| 57 | Aargita (Spain) | DAE0ENCALK11 | | | | | | | | | | | |
| 58 | Dhanat Brokerage (new broker data) | 48931-U | | | | | | | | | | | |
| 59 | Deutsche Bank (new broker data) | 92000612LOS1 | | | | | | | | | | | |
| 60 | Saxo Bank (New broker data) | DUNE00000076 | 6 | 43,405 | 7,234 | 7,234 | 0.04% | 129,491 | 215,818 | 323,727 | 431,636 | 539,545 | 647,454 |
| 61 | Lpl Financial (New broker data) | EAS2604 | | | | 3,200 | 0.20% | | | | | | |
| 62 | Left Over from Russ | | 243 | 1,268,732 | 5,221 | | 1.26% | 3,785,026 | 6,308,377 | 9,462,566 | 12,616,754 | 15,770,943 | 18,925,132 |
| 63 | | Total | 6,082 | 100,559,300 | | 100.00% | | | | | | | |

# Appendix 58

**Quote:**

193. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

**Evidence:**

**Link:**

**Image:**











Position
danielauxier
6DA993019
NEXT BRIDGE HYDROCARBONS COM
-(-)
Bid Size:
Ask Size:
0.0000
$0.00
$0.00
$0.00

MMTLP
META MATERIALS INC PFD SER A *CLBL
2.895
0.00 (0.00%)
2.90
Bid Size:
3.40
Ask Size:
Trade Price:
1.33
P/L Day:
Net Liq:
P/L Open:

Orders
Working
Filled
Cancel...
All
Saved
Symbol
Time
MMAT
WORKING
MMAT
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING
MMTLP
WORKING

## Holdings

### Core Account

| Description | Beginning Market Value Sep 1, 2023 |
|---|---|
| FIDELITY GOVERNMENT MONEY MARKET (SPAXX) | unavailable |
| Total Core Account (100% of account holdings) | unavailable |

### Stocks

| Description | Beginning Market Value Sep 1, 2023 |
|---|---|
| Common Stock | |
| NEXT BRIDGE HYDROCARBONS INC $0.0001 NEVADA | unavailable |

**Carl Icahn's Pillow**

My Fidelity account STILL shows NBH after request made to transfer to AST over 2 months ago. Someone is not being honest with us. (Most recent statement) #MMTLP

144

| | |
|---|---|
| Statement Date: | June 7, 2024 |
| Company Name: | NEXT BRIDGE HYDROCARBONS INC |
| Company Number: | 27067 |
| Stock Exchange: | |
| Company Ticker Symbol: | |
| CUSIP: | 62999959O |

[redacted]

| | |
|---|---|
| W9/W8/W8BENE Certified: | No |
| Dividend Amount Paid YTD: | $0.00 |

| | |
|---|---|
| Company Number: | 27067 |
| Company Name: | |
| NEXT BRIDGE HYDROCARBONS INC | |
| CUSIP: | 591994371 |
| Company Ticker Symbol: | |
| Stock Exchange: | |

[redacted]

| | |
|---|---|
| Statement Date: | November 17, 2023 |

www.astfinancial.com
investors@astfinancial.com
800-937-5449





AST → EQ
AST is now EQ

EQUINITI TRUST COMPANY, LLC
OPERATIONS CENTER
PO BOX 500
NEWARK, NJ 07101

TIMOTHY A LANFORD

| | |
|---|---|
| Statement Date | JULY 10, 2024 |
| Company Name | NEXT BRIDGE HYDROCARBONS INC |
| Company Number | 2706T |
| Stock Exchange | |
| Company Ticker Symbol | |
| CUSIP | |
| Account Number | 65000050 |
| | 10000 |

www.astfinancial.com
help@equiniti.com
800-937-5449

## Transaction Advice

**IMPORTANT: Retain this statement for your investment and tax records.**

| Account Balance | Restricted | Unrestricted | Total | Account Value | |
|---|---|---|---|---|---|
| DRS/Book Entry Shares | | 3,000.000 | 3,000.000 | Market Value Date | NA |
| Plan Shares | | | | Market Value Price | NA |
| Certificated Shares | | | | | |
| Total Shares | | | 3,000.000 | Total Market Value | NA |

Stock quotes are provided for informational purposes only. The quotes are supplied by an independent third-party as of a particular date. AST does not guarantee the accuracy of such information as at the date of this statement or at any future date. Neither AST nor its provider will be liable for any errors, incompleteness or delays in the information herein, or for any actions taken in reliance thereon.

## Transaction Details:

| Transaction Date | Transaction Number | Transaction Type | Shares Opened or Issued |
|---|---|---|---|
| 07/10/2024 | BK0005920 | BOOK SHARES CREDITED | 3,000.000 |

*acknowledged email*
*on 11 NOV but*
*non answered to current date*
*23 DEC 24*

*From the Desk of:*
Sergeant Major Daniel R. Auxier, US Army
105 Valley Road
Wantage, NJ 07461

08 November 2024

**TO:** Mr. Greg McCabe et al, Next Bridge Hydrocarbons, 6300 Ridglea Place, Suite 650, Fort Worth, TX 76116.

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

## 1. BACKGROUND

On December 9, 2022, FINRA issued a U3 halt on Meta Materials Series A Preferred Stock (MMTLP), suspending trading due to an "extraordinary event." This decision prevented trading before the stock's planned delisting and conversion into private shares, leading to investor concerns about transparency and accountability. To date, and to my knowledge, no resolution or financial remedy has been actioned to address the shareholder impact.

## 2. PURPOSE

Under Texas law, shareholders have a right to request information from companies, especially in cases where corporate actions or inactions appear detrimental to shareholder value. Section 21.218 of the Texas Business Organizations Code specifically entitles shareholders to access company records to investigate possible misconduct, assess management practices, and protect investments.

## 3. DUTIES & RESPONSIBILITIES

Directors and officers of private companies must uphold fiduciary duties of loyalty, care, and good faith, acting in shareholders' best interests without conflicts of interest. Texas law, reinforced by federal securities regulations (e.g., the Securities Act of 1933), supports these obligations. As a shareholder, I am requesting access to information and documents to verify NBH's adherence to these fiduciary responsibilities.

## 4. RIGHTS FOR DISCOVERY

Texas law, specifically Texas Business Organizations Code Section 21.218, provides shareholders with the right to access company records to investigate potential mismanagement or

1

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

misconduct. Additionally, SEC Rule 10b-5 under the Securities Exchange Act of 1934 supports transparency, allowing shareholders to use such records to assess any potential fraud or negligence. Based on this legal framework, I request the following information and documents to evaluate NBH's recent actions and corporate governance.

## 5. REQUEST FOR INFORMATION

Please provide a response to the following questions and requests for documentation within **14 calendar days** of receipt of this memorandum.

**Question 1**

Has the transfer agent, American Stock Transfer & Trust Company (now Equiniti), confirmed to NBH that all 165 million shares of NBH (formerly MMTLP) have been delivered, transferred, and recorded under the names of rightful shareholders?

1. **Verification of Delivery:** If all shares have been delivered and recorded, on what date did NBH confirm this?
2. **Share Count Status:** If Equiniti has not confirmed that all 165 million shares are accounted for and assigned to shareholders, what is the total number of shares that have been delivered to date?
3. **Response to Potential Naked Short Selling:** Shareholders whose shares have not been accounted for by Equiniti may have received unregistered shares (potentially indicating "naked short selling"). What is NBH doing to resolve any discrepancies in share counts across broker-dealers such as Robinhood, Webull, E*TRADE, and others?
4. **Identification of Beneficial Owners:** What steps are being taken to identify any shareholders with broker-dealer accounts that may hold unaccounted shares? Is NBH considering further stock dilution to resolve any outstanding share imbalance?
5. **Remedial Actions:** If shares cannot be provided to certain shareholders due to all shares being accounted for by Equiniti, what legal or financial remedies is NBH exploring to resolve this issue?
6. **Supporting Documentation:** Please provide all public records and business documents that substantiate your responses to these questions.

**Question 2**

The NBH website advises that shareholder registration with Equiniti is currently optional. Please clarify:

1. **Rationale for SEC Involvement:** Why was the S-1 filing for the formation of Newco withdrawn at the SEC's request, and what led to this decision?
2. **Status of Newco Subsidiary:** What is the status of the Newco subsidiary? Are there plans to revisit or refile the S-1?
3. **Impact on Shareholder Value:** How does the delay in creating this subsidiary affect shareholder investments, particularly concerning assets like the Orogrande Prospect?

2

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

4. **Optional Registration**: Why is registration with Equiniti Trust Co. optional, and what advantages or disadvantages exist for shareholders in choosing this option?
5. **Future Registration Triggers**: What specific event or timeline would necessitate a shift to mandatory registration with Equiniti?
6. **Direct Registration Benefits**: How does direct registration compare with registering with Equiniti in terms of shareholder protections, liquidity, and ease of transfer?
7. **Strategic Changes and Subsidiary Plans**: Have there been strategic changes affecting the formation of Newco or any dividends? If so, what is the revised plan for NBH's assets, and how does this impact shareholders?
8. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

**Question 3**

NBH recently lost its lease to the "University Lands" related to the Orogrande asset. This decision could significantly impact company operations and revenue. Please address the following:

1. **Reason for Lease Termination**: Why did the University Lands System choose not to renew the lease? Were there proposals offered by NBH to maintain the agreement?
2. **Alternative Revenue Sources**: What specific steps is NBH taking to secure alternative sources of revenue to mitigate this asset loss?
3. **Impact on Strategy**: Will the loss of Orogrande impact NBH's strategic direction or planned investments?
4. **Short-Term Financial Impacts**: How does the current financial outlook reflect the loss of this asset, and what are the anticipated impacts on shareholder value?
5. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

**Question 4**

NBH recently signed a Letter of Intent to acquire a 40% interest in the Louisiana Heritage Play (LHP) from McCabe Petroleum Corporation. Please clarify:

1. **Conflict of Interest**: Does acquiring LHP from McCabe Petroleum Corporation, given Mr. McCabe's role as NBH's Chairman of the Board, present any conflicts of interest?
2. **Synergies and Strategic Fit**: What specific synergies are expected from acquiring the Louisiana Heritage Play, and how does this acquisition align with NBH's long-term goals?
3. **Financial Risks**: What shareholder benefit and financial risks are associated with the Louisiana play?
4. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

3

**SUBJECT:** Next Bridge Hydrocarbons (NBH) Shareholder Request for Information (RFI) from Sergeant Major Daniel R. Auxier, US Army (AST/EQ for 20,075 Shares).

**Question 5**

In August 2023, NBH secured a $2 million loan from CAPCO Holding Inc., owned by Clinton Plant, at a 12% interest rate with an additional 250,000 stock options as collateral. Mr. Plant also secured a $10,000 per month consulting role. Please address the following:

1. **Justification for the Loan Terms**: What rationale and justification did NBH use to accept this loan and its terms, given the higher-than-average interest rate?
2. **Independent Oversight**: Was this loan arrangement reviewed by an independent board or financial advisor to prioritize shareholder interests?
3. **Alternative Financing Considered**: Were other lending institutions or terms considered?
4. **Consulting Services Provided**: What specific consulting services is Mr. Plant providing, and how do these services align with NBH's strategic goals?
5. **Documentation**: Please provide all public records and business documents that substantiate your responses to these questions.

---

## 6. DISCLAIMER

This memorandum is being sent both via registered US Mail and digitally to your official email addresses. Please confirm receipt via email immediately. Failure to acknowledge and/or respond fully within **14 calendar days** will prompt a formal demand letter and may lead to further action as outlined by Texas and federal law.

## 7. POINT OF CONTACT

For any questions or clarifications, please contact:
**Sergeant Major Daniel R. Auxier**
**Phone:** (401) 523-7559
**Email:** danforward14@gmail.com

AUXIER.DANIEL.RO BERT.1012621058   Digitally signed by AUXIER.DANIEL.ROBERT.1012621058
Date: 2024.11.09 09:16:09 -05'00'

**DANIEL R. AUXIER**
Sergeant Major, US Army
Next Bridge Hydrocarbons Shareholder

4

*[handwritten: no Page acknowledge at all / Non answered to date / 23 DEC 24]*

# DEMAND LETTER

**From:** Sergeant Major Daniel R. Auxier, 105 Valley Road, Wantage, NJ 07461

**To:** Board of Directors, Next Bridge Hydrocarbons, Inc., 6300 Ridglea Place, Suite 950 Fort Worth, TX 76116

**Date:** 22 November 2024

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 1. SALUTATIONS & RESTATED PROBLEM.

Members of the Board of Directors et al,

I, Sergeant Major Daniel R. Auxier, hold 20,075 shares in Next Bridge Hydrocarbons (NBH) and am writing to formally demand a complete and timely response to my previous Request for Information (RFI) submitted on November 8, 2024. As a shareholder, I am entitled under Texas and Nevada laws, as well as federal regulations, to request and receive information critical to understanding NBH's financial, operational, and governance practices.

## 2. LEGAL BASIS FOR SHAREHOLDER RIGHTS & REQUESTS.

Under **Texas Business Organizations Code § 21.218**, I am entitled to inspect and copy corporate records for a proper purpose, which includes investigating possible mismanagement and assessing NBH's compliance with fiduciary obligations. Additionally, **Nevada Revised Statutes Chapter 78.257** grants similar rights to shareholders of corporations incorporated in Nevada, such as NBH. Furthermore, **SEC Rule 10b-5 under the Securities Exchange Act of 1934** reinforces transparency by prohibiting fraudulent or misleading conduct that could impact shareholder investments.

## 3. RESTATED BACKGROUND & RESTATEMENT OF PURPOSE.

On December 9, 2022, trading of MMTLP, NBH's predecessor stock, was halted due to an "extraordinary event" by FINRA, suspending anticipated last trading days before delisting. The lack of resolution for affected shareholders has raised serious concerns regarding NBH's commitment to transparency and shareholder interests. This demand letter serves to reiterate the need for transparency, as the absence of full and substantiated responses from NBH contravenes both shareholder rights and fiduciary duties.

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 4. SPECIFIC DEMANDS.

In accordance with applicable Texas, Nevada, and Federal laws, I demand the following:

**(a) Delivery of Share Confirmation:** Verification and documentation on whether all 165 million shares of NBH have been fully delivered and recorded, as well as the total confirmed share count. Failure to do so may suggest unrecorded shares or unauthorized short selling.

**(b) Explanation of SEC S-1 Filing Withdrawal:** Explanation and supporting documentation regarding NBH's decision to withdraw the S-1 filing for the proposed Newco subsidiary, including the impact on assets like the Orogrande Prospect.

**(c) Disclosure on University Lands Lease Termination:** Details and records regarding the termination of the University Lands lease, clarifying NBH's efforts to secure revenue alternatives.

**(d) Conflict of Interest Inquiry:** Justification for acquiring interests in Louisiana Heritage Play from McCabe Petroleum Corporation, considering the involvement of NBH's Chairman, Greg McCabe, in the transaction.

**(e) Rationale for CAPCO Loan Terms:** Justification for the $2 million loan at a 12% interest rate from CAPCO Holding Inc., owned by Clinton Plant, including any independent oversight and justification for the higher-than-average terms.

## 5. PROPOSED LEGAL ACTION & REMEDIES.

If NBH fails to respond substantively and in full compliance with Texas, Nevada, and federal law, I will pursue the following legal actions:

**(a) Petition for Court-Ordered Inspection**: Under **Texas Business Organizations Code § 21.218** and **Nevada Revised Statutes Chapter 78.257**, I am prepared to file a petition in Texas or Nevada courts to compel NBH to allow inspection of corporate records. The court may order NBH to bear costs associated with this litigation, including my attorney's fees, should the company be found in violation of state inspection rights.

2

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

**(b) Derivative Suit**: Should I uncover evidence of fiduciary breaches or unauthorized transactions harmful to shareholders, I will consider filing a derivative lawsuit under **Texas Business Organizations Code § 21.563** or the equivalent Nevada statute, seeking damages on behalf of NBH. Remedies in

such cases may include financial restitution, removal of directors, or court-imposed corporate governance reforms.

**(c) SEC Complaint for Potential Rule 10b-5 Violations**: I will submit a formal complaint to the **Securities and Exchange Commission (SEC)** regarding NBH's potential non-compliance with **SEC Rule 10b-5**. Misleading shareholders by withholding material information may constitute a violation of federal securities laws, prompting further investigation and enforcement actions.

**(d) Claims for Damages**: Should legal action prove necessary, I will seek damages and restitution for losses incurred due to delays, failure to disclose material information, or other mismanagement affecting shareholder value. These damages may include any diminution in share value, potential lost profits, and recovery of court fees and legal expenses.

## 6. TIMELINE FOR RESPONSE.

Please provide a comprehensive response, to both the Demand Letter and the Request for Information memorandum with all relevant documentation within **7 calendar days** of receipt of this letter. Failing to provide a timely and complete response will initiate the legal steps and actions as outlined above.

## 7. CONCLUSION.

As a shareholder who has invested nearly $60,000 in NBH, I expect prompt, clear, and substantiated answers in line with statutory rights and fiduciary duties. NBH's lack of transparency in addressing these questions is unacceptable, and I am prepared to assert my rights through legal avenues if necessary.

I look forward to your prompt response.

## 8. ATTACHED DOCUMENTS.

See attached memorandum entitled, "Shareholder Request for Information" dated 08 November 2024.

3

# DEMAND LETTER

**Subject:** Demand for Response to Shareholder Inquiry and Compliance with Fiduciary Obligations.

## 9. DISCLAIMER.

This Demand Letter is being sent both via registered US Mail and digitally to your official email addresses. Please confirm receipt via email immediately. Failure to acknowledge and/or respond fully within **7 calendar days** will prompt a formal legal complaint and may lead to further action as outlined by Texas, Nevada, and federal law.

## 10. POINT OF CONTACT.

For any questions or clarifications, please contact:
**Sergeant Major Daniel R. Auxier**
**Phone:** (401) 523-7559
**Email:** danforward14@gmail.com

AUXIER.DANIEL.RO Digitally signed by
AUXIER.DANIEL.ROBERT.1012621
BERT.1012621058 058
Date: 2024.11.22 08:46:33 -05'00'

**DANIEL R. AUXIER**
Sergeant Major, US Army
Next Bridge Hydrocarbons Shareholder

4

Docusign Envelope ID: 24623FAF-207E-4F4B-83D8-0B4364D638B7

*[handwritten: served to McCabe (NBH) at MIDLAND (MPC) address*
*Non answered to date 23 DEC 24.]*

**November 18, 2024**

Greg McCabe
Chairman of the Board
Next Bridge Hydrocarbons
6300 Ridglea Place, Suite 950
Fort Worth, TX 76116

**Subject:** Formal Request for Access to Books and Records Pursuant to Texas Business
Organizations Code Section 21.218

Dear Mr. McCabe,

We, as a group of shareholders of Next Bridge Hydrocarbons ("NBH"), formally invoke our rights
under **Section 21.218 of the Texas Business Organizations Code** to request access to
specific books and records of NBH. This request is made in good faith for the legitimate purpose
of investigating potential mismanagement, breaches of fiduciary duty, and actions that may
have detrimentally affected shareholder value.

---

## Requested Documents and Records

### 1. Board and Management Communications

a. Board meeting minutes, resolutions, and presentations related to:
i. The reverse merger between Torchlight Energy and Meta Materials.
ii. The spin-out of oil and gas assets into NBH.
 b. Internal communications, including emails, exchanged between board members and
executive officers including but not limited to yourself, John Brda, George Palikaras and Clifton
DuBose regarding these transactions.

### 2. Financial Records

a. Audited financial statements and annual reports for the preceding two fiscal years.
b. Documentation regarding stock issuances and allocations associated with the spin-out of
NBH.

### 3. Consulting and Employment Agreements

a. Contracts or consulting agreements involving yourself, John Brda, George Palikaras, Clifton
DuBose, Rich Masterson, Clinton Plant or any and all other executives with Torchlight, Meta
Materials, or NBH, including terms of compensation and delineation of responsibilities.

Docusign Envelope ID: 24623FAF-207E-4F4B-83D8-0B4364D638B7

## 4. Lease and Asset Records

a. Documentation and communications related to the loss of the University Lands lease, including:

1. Specific reasons for any missed payment or non-compliance with lease terms.

2. Internal correspondence or board discussions addressing risks to the lease.

3. Proposals or remedial actions considered to prevent termination.

4. Financial statements or cash flow records from the relevant period reflecting the company's ability (or inability) to meet payment obligations.

5. Agreements and due diligence materials related to the acquisition of the Louisiana Heritage Play, including any disclosures of conflicts of interest.

6. The exact locations, names, and production outputs of McCabe Petroleum Company's wells in Louisiana.

## 5. Shareholder Records

a. Records identifying individuals or entities that approached NBH to acquire shares, including details of initial approaches and subsequent negotiations.
b. Names and contact details of third parties expressing interest in purchasing NBH shares.
c. Summaries or descriptions of discussions or communications with third parties, including:

1. Meeting dates and locations.
2. Correspondence or exchanged documents (verbal or written).
3. Participants in these discussions, including, but not limited to any and all board members or executives.
4. Resolutions, agreements, or decisions made as a result of these discussions.
5. Verification of share counts and allocation records, including documentation addressing potential naked short selling or unregistered shares.

## 6. SEC Filings and Withdrawals

a. Correspondence and drafts associated with the withdrawn S-1 filing for Newco.
b. Documents detailing changes in strategy or corporate governance tied to Newco's postponement or abandonment.

Docusign Envelope ID: 24623FAF-207E-4F4B-83D8-0B4364D638B7

**7. Non-Disclosure Agreements and Related By-Laws**

a. We request copies of any and all Non-Disclosure Agreements, Non-Compete/Non-Disclosure Agreements, Secrecy Agreements,any similar agreements relevant to NBH operations  or any reasonable facsimile thereof signed by you or any duly authorized officer or employee of NBH with any and all party or parties since the inception of NBH .

b. We request copies of any and all Non-Disclosure Agreements, Non-Compete/ Non-Disclosure Agreements, Secrecy Agreements, any similar agreements relevant to NBH operations  or any reasonable facsimile thereof signed by you or any duly authorized officer or employee of any company, business, or partnership you owned in whole or in part, or were an officer thereof, with any and all party or parties, if said agreements as delineated in the foregoing carried over into NBH operations, support   operations, social media campaigns, or other efforts .

c. We request you identify with particularity by name of the party and date of agreement any payment, compensation agreement, share distribution agreement, contract for shares or warrants in NBH or any other company, business, or investment for specific performance of   work of any kind to individuals, entities, businesses, lobbyists, or social media influencer .

---

## Detailed Explanation for Non-Compliance

If any requested documents are not provided, please include a comprehensive explanation for their unavailability or refusal to disclose.

---

## Summary of Requested Items (Checklist)

- Board and management communications.

- Audited financial statements and stock issuance documentation.

- Consulting and employment agreements.

- Lease and assets records.

- Shareholder records and share count verification.

- Correspondence related to SEC filings and withdrawals.

- NDAs and by-laws.

Docusign Envelope ID: 24623FAF-207E-4F4B-83D8-0B4364D638B7

## Deadline for Compliance

In light of the urgency of this matter, I respectfully request the aforementioned documents be made available within **three (3) business days** of receipt of this correspondence. Should additional time be needed, please provide a detailed justification and a proposed timeline for compliance.

## Consequences of Non-Compliance

Failure to comply may result in legal remedies, including filing a petition to compel disclosure in accordance with Texas law.

## Point of Contact

For inquiries, please contact:
**Danielle Spears**
Phone: 480-476-1091
Email: paymmtlpnow@gmail.com

Please confirm receipt of this correspondence.

Sincerely,

Signed by:
*Danielle Spears*
—CAC0EAB17D654A1...

11/17/2024

**Danielle Spears**
Along with all undersigned shareholders.

DocuSigned by:
*Contique Willcot*
—53D41D27E1DD4C9...
Contique Willcot

Signed by:
*[signature]*
—3ABCA87852A148E...
Marcos Montiero

DocuSigned by:
*[signature]*
—B27B211DD21F472...
Dan Auxier

DocuSigned by:
*Matthew Pease*
—CD84D7D57EA544B...
Matthew Pease

Signed by:
*Jason Rolo*
—FD6F848F3C36466...
Jason Rolo

Signed by:
*Scott Traudt*
—4108 1E008947497...
Scott Traudt

Signed by:
*Jen Vetrano*
—7025171B7C7047C...
Jennifer Vetrano