UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

MIDLAND DIVISION

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
\*
**SERGEANT MAJOR DANIEL R. AUXIER,**     \*
**MARCOS E. MONTEIRO,** and     \*
**BRADLEY DAVIS,**     \*     **Case No. 7:24-CV-318**
    \*
    *Plaintiffs,*     \*     **VERIFIED SECOND**
    \*     **AMENDED COMPLAINT**
    **v.**     \*     FOR DECLARATORY
    \*     JUDGMENT, RESCISSION,
**MCCABE PETROLEUM CORPORATION,**     \*     CONSTRUCTIVE TRUST,
**HUDSPETH OIL CORPORATION,**     \*     DISGORGEMENT, AND
**ARABELLA OPERATING, LLC,**     \*     MONEY DAMAGES FOR
**TRANS-TEXAS LAND & TITLE, LLC,**     \*     VIOLATIONS OF THE
**MAGDALENA ROYALTIES, LLC,**     \*     THE FEDERAL SECURITIES
**GREEN HILL MINERALS, LLC,**     \*     LAWS, TEXAS STATE
**ARABELLA EXPLORATION, LLC,**     \*     FRAUDULENT TRANSFER
**TORCHLIGHT ENERGY RESOURCES, INC.**     \*     AND FORGERY STATUTES
**(f/k/a Pole Perfect Studios, Inc.),**     \*
**TRITAURIAN CAPITAL, INC.,**     \*
**WOLFBONE INVESTMENTS, LLC,**     \*     **JURY TRAIL DEMANDED**
**ARABELLA ROYALTY MANAGEMENT LLC** \*     2nd AMENDED COMPLAINT
and **MASTERSON HAZEL PARTNERS, LP**     \*
    \*
    *Defendants,*     \*
    \*
*and*     \*
    \*
**NEXT BRIDGE HYDROCARBONS, INC.,**     \*
**and META MATERIALS, INC.**     \*
**(f/k/a Torchlight Energy Resources, Inc.),**     \*
    \*
    *Relief Defendants.*     \*
    \*
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

1

**TABLE OF CONTENTS**

**I. Introduction**                                                                        **6**
    A.    Preface
    B.    Preliminary Statement

**II. Jurisdiction, Venue, and Parties**                                                    **20**
    A.    Jurisdiction
    B.    Venue
    C.    Parties

**III. Verified Material Facts**                                                            **34**
    A.    The Arabella Matter
    B.    The Leasehold Concerns
    C.    Torchlight Capitalized on Assets
    D.    The Meta Merger and NBH Spinout
    E.    The MMTLP Trading Halt and Meta Bankruptcy
    F.    Regulatory Inaction, Disclosure Failures, and Ongoing Public Harm
    G.    Legal Summary of Consequences and Remedial Imperatives

**IV. Causes for Action**                                                                   **58**
    COUNT I: Request for Declaratory Judgment: Void *ab initio*
    COUNT II: Violations of Section 5 of the Securities Act of 1933
    COUNT III: Violations of Section 10(b) of the Securities Exchange Act
    COUNT IV: Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A)–(B)
    COUNT V: Forgery and Defective Acknowledgment
    COUNT VI: Rescission and Disgorgement
    COUNT VII: Receipt of Fraudulently Transferred Assets & Unjust Enrichment
    COUNT VIII: Other Statutory Declaratory Relief Under Texas Law

**V.**    **Prayer for Relief**                                          **82**

**VI.**    **Jury Demand**                                             **86**

**VII.**    **Verification**                                           **87**

**VIII.**    **Signature Block**                                       **88**

**IX.**    **Attached Appendices Reference**                          **89**
    Appendix 1    Judicially Noticed Materials
    Appendix 2    Judicially Noticed Case Law & Governing Authorities

## TABLE OF AUTHORITIES

**I.     CASES**

    A.     **Federal and Multistate**

    1.     *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

    2.     *Anytime Fitness, LLC v. Thornhill Bros. Fitness, LLC*, 85 F.4th 321 (5th Cir. 2023)**,** No. 22-30757 (2023)

    3.     *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013)

    4.     *Liu v. SEC*, 140 S. Ct. 1936 (2020)

    5.     *Matter of Monnig's Dep't Stores, Inc.*, 929 F.2d 197 (5th Cir. 1991)

    6.     *SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998)

    7.     *SEC v. China Energy Savings Tech., Inc.*, No. 2:06-cv-06344 (C.D. Cal. 2006)

    8.     *SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998)

    9.     *SEC v. Sloan*, 436 U.S. 103 (1978)

    10.     *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024)

    11.     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

    12.     *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143 (5th Cir. 2015)

    13.     *United States v. Zacks*, 375 U.S. 59 (1963)

    B.     **Texas State and Appellate**

    14.     *Boldrick v. Bessen*, 100 Tex. 6, 93 S.W. 424 (1906)

    15.     *Cantu v. Guerra*, No. 04-13-00729-CV, 2014 WL 888403 (Tex. App.—San Antonio Mar. 6, 2014)

16.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573 (Tex. 2001)

17.  *Padilla v. LaFrance*, 907 S.W.2d 454 (Tex. 1995)

18.  *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673 (5th Cir. 2007)

19.  *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143 (Tex. 2015)

20.  *Wells Fargo Bank, N.A. v. Robinson*, 391 S.W.3d 590 (Tex. App.—Dallas 2012, no pet.)

21.  *Garcia v. Garza*, 311 S.W.3d 28 (Tex. App.—San Antonio 2010)

**II.    Judicial Opinions, Orders, and Regulatory Findings**

22.  *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex.):

  (a)    Memorandum Opinion (Dec. 22, 2022)

  (b)    Motion to Approve Compromise (Doc. 419, July 26, 2017)

  (c)    Hearing Transcript (Doc. 433, Aug. 16, 2017)

  (d)    Order Granting Dismissal of Appeal With Prejudice (Feb. 16, 2025)

23.  *Weiss v. Arabella Exploration, Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex.):

  (a)    Amended Complaint (Aug. 11, 2016)

  (b)    Memorandum Opinion and Trial Findings (Dec. 22, 2022)

24.  *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y.):

  (a)    Complaint and Exhibits (June 25, 2024)

25.  *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex.):

  (a)    Complaint (Mar. 15, 2024)

  (b)    Memorandum Opinion and Order (July 3, 2025)

26.  *Next Bridge Hydrocarbons, Inc.*, Registration Statement (Form S-1), SEC Accession No. 0001193125-22-292114 (Nov. 9, 2022)

27.    U.S. Gov't Accountability Office, *Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-25-107723 (Nov. 2024)

III.    **STATUTES & CODES**

A.    **Federal**

28.    11 U.S.C. §§ 544, 547, 548, 550

29.    15 U.S.C. §§ 77e, 77k, 77q, 78j(b), 78u

30.    18 U.S.C. §§ 1341, 1343, 1348, 152(7)

31.    28 U.S.C. §§ 2201–2202, 535(a)

B.    **Texas**

32.    Tex. Bus. & Com. Code §§ 24.005, 24.009, 24.013

33.    Tex. Civ. Prac. & Rem. Code §§ 16.051, 37.001–.011, 38.001, 41.003

34.    Tex. Gov't Code § 406.016

35.    Tex. Penal Code § 32.21

36.    Tex. Prop. Code § 13.001

37.    Tex. Bus. Org. Code §§ 7.001(d)(3), 101.401

IV.    **RULES**

38.    Fed. R. Civ. P. 8, 9(b), 11, 38, 54(d), 57

39.    Fed. R. Evid. 201(b), 201(c)(2), 201(d)

I.    **INTRODUCTION**

A.    **PREFACE**

<u>There Is No Spoon: Plaintiffs' Legal Awakening After Targgart</u>

Plaintiffs' substantially amended Complaint arises, in part, from a recent and materially relevant ruling in a parallel case: *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767 (N.D. Tex. Mar. 15, 2024). That action—filed by retail investor Todd Taggart and later joined by two similarly situated plaintiffs—concerned total investment losses sustained in the same securities at issue here. It named several of the same corporate defendants, along with individual officers, directors, and affiliates whose conduct also underlies the present action.

Following a stipulated venue transfer to the Western District of Texas, the Taggart plaintiffs filed an amended complaint on September 9, 2024, asserting three fraud-based claims under §§ 11, 12, and 15 of the Securities Act of 1933, based on false or misleading statements made in connection with the spinoff of NEXT BRIDGE HYDROCARBONS, INC. (**"NBH"**) from its predecessor, META MATERIALS, INC. ("**Meta**").

On July 3, 2025, the Honorable Robert Pitman dismissed all three counts with prejudice, concluding in a seventeen-page memorandum opinion that the plaintiffs failed to state viable claims because the anti-fraud provisions of the Securities Act were inapplicable. The court held that the securities had been "distributed" to the plaintiffs, not "sold," and therefore fell outside the statute's protective scope. *See Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767, slip op. at 1–17 (W.D. Tex. July 3, 2025).

21    This ruling compelled Plaintiffs to reevaluate their legal theory and factual posture.

22    Following additional investigation and due diligence, Plaintiffs concluded that the securities in

23    question are not merely defective—they are **void *ab initio*[1]** as a matter of law. That is, they were

24    legally null from inception, never capable of conferring valid title or enforceable rights, because

25    they were issued atop assets that had been fraudulently conveyed and improperly capitalized.

26    This action centers on a deception of massive proportions—a corporate mirage best

27    explained by analogy. In a pivotal scene from the 1999 film *The Matrix*, the protagonist, Neo,

28    encounters a young boy bending a spoon with his mind. When Neo expresses disbelief, the boy

29    explains that the key is not to try to bend the spoon, but rather to realize the truth. "There is no

30    spoon," the boy says. Then, Neo will understand that it is not the spoon that bends—it is only

31    himself.

32    In similar fashion, Plaintiffs came to understand a fundamental legal truth: these securities

33    do not exist—not in the eyes of the law, not in the hands of the market, and not in any forum

34    governed by the United States Constitution or its securities laws. This Verified Second Amended

35    Complaint, grounded in primary-source documentary evidence and bolstered by detailed factual

36    allegations, demonstrates that the securities at issue are *void ab initio*—a legal nullity from

37    inception, incapable of transfer, enforcement, or recognition.

---

[1] The phrase *void ab initio* means "void from the beginning." A transaction deemed *void ab initio* has no legal effect at any time, is treated as though it never occurred, and cannot be made valid by consent, ratification, or the passage of time. What is unlawful from the outset cannot be made lawful, and any subsequent rights, instruments, or transactions that flow from such an act are likewise nullities and without legal force.

38      Federal law prohibits the issuance or sale of securities based on unlawfully obtained assets

39  or concealed title defects. Under Sections 5 and 17(a) of the Securities Act of 1933, and Rule 10b-

40  5 of the Securities Exchange Act of 1934, it is unlawful to offer securities by means of materially

41  misleading statements or omissions—including the failure to disclose that the underlying assets

42  were fraudulently conveyed, encumbered, or void. As courts have recognized, securities issued

43  atop an invalid asset base are themselves invalid as a matter of law. *See SEC v. Cavanagh*, 1 F.

44  Supp. 2d 337, 345 (S.D.N.Y. 1998).

45      Accordingly, Plaintiffs now take up the proverbial torch from the Taggart plaintiffs—to

46  complete what was begun. They do so not through speculation or theory, but by advancing a

47  factually verifiable, judicially supported record and invoking remedies grounded in long-

48  established legal precedent.

49     <u>There Is No Spoon: Torchlight's Capital Structure Was a Legal Fiction</u>

50      The securities at issue—$MMAT (Meta Meterials, Inc.) common stock and $MMTLP

51  (their spun-out Series A Preferred shares)—were never lawfully issued. Their provenance traces

52  to a series of upstream oil and gas lease transfers that were orchestrated from ARABELLA

53  PETROLEUM COMPANY, LLC (**"APC"**) to TORCHLIGHT ENERGY RESOURCES, INC.

54  ("**Torchlight**") without valid corporate authority or consideration. The primary leasehold assets—

55  133,000 net mineral acres in the Orogrande Basin (the "**Assets**")—were transferred while APC

56  was insolvent, without board approval, and for no real documented value. Each transfer was

57  executed under conditions satisfying both actual and constructive fraud under 11 U.S.C. § 548 and

58  Tex. Bus. & Com. Code § 24.005, as later confirmed by the Chapter 11 Trustee, MORRIS D.

59    WEISS (the "**Trustee**" or "**Weiss**") in *In re Arabella Petroleum Co., LLC*, No. 15-70098 (Bankr.

60    W.D. Tex.).

61        These transactions were funneled through a network of insider-controlled entities,

62    including ARABELLA OPERATING, LLC ("**AOC**"), ARABELLA EXPLORATION, INC.

63    ("**AEX**"), and TRANS-TEXAS LAND & TITLE, LLC **("TTLT**"), all of which were founded,

64    managed, or materially influenced by insider actors. Further downstream, HUDSPETH OIL

65    CORPORATION (**"Hudspeth"**) and MAGDALENA ROYALTIES, LLC ("**Magdalena"**) served

66    as intermediate vehicles to disguise the origin of title and preserve override interests for insiders.

67    Each of these entities either received asset value, served a structuring function in the fraudulent

68    conveyance chain, or withheld material disclosures that concealed the fraudulent origin of

69    Torchlight's claimed working interest in the Orogrande leases.

70        These fraudulent conveyances were explicitly condemned in the adversary proceeding

71    stemming from APC's Chapter 11 bankruptcy filed on July 10, 2015. In *In re Arabella Petroleum*

72    *Co., LLC*, No. 15-70098 (Bankr. W.D. Tex.), the court found that "*the actions taken by Mr.*

73    *Hoisager to drain [APC] of cash and properties through transfers to himself and [AEX] are the*

74    *very epitome of self-dealing and interested party transactions.*" *Weiss v. Arabella*, Adv. No. 16-

75    07002-tmd, at 38 (Bankr. W.D. Tex. Jan. 18, 2023) (emphasis added).

76        Because the transfer of the Assets was void *ab initio*, Torchlight's equity was likewise

77    void. Consequently, any securities issued by Torchlight—whether $TRCH, $MMAT, or

78    $MMTLP—are also void *ab initio*. Bluntly stated, these were not real, lawfully issued securities.

79    They were a corporate costume: a CUSIP-shaped illusion.[2]

80    Then came the reverse merger. In June 2021, Metamaterials, a Canadian optics company,

81    merged into Torchlight through a reverse triangular merger. Torchlight remained the surviving

82    public entity and was renamed Meta Materials Inc. This maneuver carried forward Torchlight's

83    corporate charter, financial history, and defective capitalization into the newly merged entity.

84    This was not a technical or cosmetic defect. Texas courts are clear that a merger does not

85    cleanse a corporation of its legal liabilities or transactional invalidity. *See Cantu v. Guerra*, No.

86    04-13-00729-CV, 2014 WL 888403, at *7 (Tex. App.—San Antonio Mar. 6, 2014).

87    Federal regulators have also recognized that when insiders use a reverse merger to

88    perpetuate a fraud, the successor entity remains liable. *See SEC v. China Energy Savings Tech.,*

89    *Inc.*, No. 2:06-cv-06344 (C.D. Cal. 2006).

90    Although Meta operated as an independent company prior to its reverse merger with

91    Torchlight, the merger rendered Meta structurally indistinct from Torchlight's defective corporate

92    shell. Following the transaction, Meta issued $MMAT common shares functionally backed by void

93    Torchlight equity and declared a Series A Preferred dividend—$MMTLP—that likewise lacked

94    legal foundation. Ultimately, it spun out NBH via a dividend distribution predicated on

---

[2] See **SEC v. Cavanagh, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998)** ("Securities issued without a lawful asset basis are void and must be rescinded."). *In Cavanagh, the court held that stock distributed without registration and backed by unlawfully obtained assets was void ab initio, reinforcing that omissions regarding asset legitimacy constitute violations of Section 17(a) and Rule 10b-5.*

95   contaminated title, unregistered equity, and non-transferable basis. *See* Next Bridge Hydrocarbons,

96   Inc., Registration Statement (Form S-1), at 1–78 (Nov. 9, 2022), SEC Accession No. 0001193125-

97   22-292114.

98        However, illusions require belief. To manufacture it, Defendants engaged in a coordinated

99   campaign to present the transaction as legitimate and lucrative—despite full knowledge of the void

100  title chain and unresolved bankruptcy findings.

101       From 2020 onward, key insiders—including JOHN BRDA ("**Brda**"), GEORGIOS

102  PALIKARAS ("**Palikaras**"), and GREGORY MCCABE ("**McCabe**")—coordinated a multi-

103  channel disinformation strategy. They saturated social media platforms, including Twitter (now

104  X), YouTube, and private investor forums, with promotional content emphasizing innovation,

105  transformation, and the inevitability of an "epic" short squeeze. This campaign was not organic; it

106  was institutionalized. On June 13, 2021, Palikaras tweeted a meme depicting "shorts in flames."

107  The next day, Brda appeared in a promotional video posted to Torchlight's official Twitter

108  account, publicly encouraging speculative fervor. *See SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y.

109  June 25, 2024), Compl. ¶¶ 65–66, 104–05.

110       At no point did they disclose that $MMTLP was unregistered, not DTC-eligible, or

111  unsupported by any transferrable asset. The deception worked. Over 65,000 retail investors entered

112  $MMTLP and $MMAT trades. Many were first-time traders. Some invested retirement savings.

113  Others bought on margin.

114    Then, on December 8, 2022, the FINANCIAL INDUSTRY REGULATORY

115    AUTHORITY ("**FINRA**") halted $MMTLP trading with no notice. There was no exit. No

116    liquidity. No recourse. Investors were trapped in a position that had never lawfully existed.

117    Even after the halt, the gaslighting continued. Defendants blamed FINRA. Then the SEC.

118    Then Congress. Then all pro se litigants. They falsely claimed that regulators had canceled

119    lawfully issued securities. In truth, such securities never existed. Social media influencers aligned

120    with Defendants attacked whistleblowers, defamed critics, and misrepresented the status or intent

121    of ongoing investigations. JAMES W. CHRISTIAN ("**Christian**") described the event as "*the*

122    *mother lode of naked shorts,*" while simultaneously defending against allegations of insider-driven

123    misinformation. Christian later appeared for the Meta bankruptcy proceedings, was retained by the

124    trustee, and later withdrew officially.

125    This campaign disoriented investors. As alleged in the SEC's complaint, Brda and

126    Palikaras "*orchestrated a scheme to mislead investors about the nature, registration status, and*

127    *tradability of MMTLP shares,*" and "*used social media and private calls to amplify misleading*

128    *narratives.*" *SEC v. Brda*, No. 1:24-cv-04806, Compl. ¶¶ 1–15 (S.D.N.Y. June 25, 2024).

129    But courts are not bound by illusion. They are ruled by law.

130    In *SEC v. Cavanagh*, the court examined a nearly identical scheme involving unregistered

131    shares passed through offshore nominees and amplified through public manipulation. The court

132    dismissed formalities and adopted a substance-over-form analysis, holding that "the securities in

133    question were void *ab initio*." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 343 (S.D.N.Y. 1998).

134   Retail investors in this case were similarly blindsided. But unlike in *Weissman v. NASD*,

135 where the Eleventh Circuit held that a self-regulator did not exceed its authority, here the self-

136 regulators, brokers, and issuers all crossed statutory lines. "Where no rule of reason or internal

137 remedy applies," the court held, "a private party may still be subject to judicial review if its actions

138 exceed statutory authority." *Weissman v. NASD*, 500 F.3d 1293, 1306 (11th Cir. 2007).

139   This case is not speculative. The invalidity of the corporate foundation has already been

140 demonstrated.

141   In *Tifford v. Tandem Energy Corp.*, the Fifth Circuit held that Tandem's controlling

142 shareholder "backdated and concealed key documents" and "failed to disclose his control to public

143 investors"—behavior closely mirrored in the Arabella–Torchlight capitalization. *Tifford v.*

144 *Tandem Energy Corp.*, 562 F.3d 699, 701–03 (5th Cir. 2009).

145   Nor are these actions without precedent. In *McMillian v. Meta Materials*, plaintiffs alleged

146 that Meta executives knowingly inflated share prices ahead of the MMTLP record date through

147 deceptive valuation statements. *McMillian v. Meta Materials*, No. 1:21-cv-12480 (D. Mass. 2021).

148   This was a market and regulatory failure—but not for the reason one might assume. It was,

149 in effect, a simulated offering: an imitation of registered securities and dividends, issued and

150 distributed, atop assets that were void from inception.

151   In *Anytime Fitness, LLC v. Thornhill Bros.*, the court reaffirmed that contracts induced by

152 fraud are voidable and subject to full restitution. "Where obligations arise from misrepresentation,"

153 the court held, "the court must treat the contract as voidable and permit full recovery of all

154     proceeds." *Anytime Fitness, LLC v. Thornhill Bros. Fitness, LLC*, 85 F.4th 321 (5th Cir. 2023)**,**

155     No. 22-30757, 2023).

156     So too here. This is not an attempt to bend the spoon. It is the legal realization that:

157     **There is no spoon.**

158     There was no Torchlight equity.

159     There was no valid Meta reverse merger.

160     There was no lawful Series A Preferred dividend or NBH spinoff.

161     There was only the illusion of securities—backed by nothing, promoted to the public, and

162     weaponized against 65,000 investors.

163     This Court is not being asked to innovate. It is being asked to see clearly—there is no

164     spoon—and to rule accordingly.

165     **B.**     **PRILIMINARY STATEMENT**

166     1.     Records from a Chapter 11 bankruptcy petition filed on July 10, 2015, in this

167     District—*In re Arabella Petroleum Co., LLC*, No. 15-70098 (Bankr. W.D. Tex.) (the "**Arabella**

168     **Matter**")—reveal an extensive fraudulent scheme directly relevant to this action. That scheme

169     centered on the improper, undocumented, and insolvent transfer of oil and gas leasehold interests

170     (the "**Assets**"), constituting APC's sole material holdings.

171     2.     In or about March 2014, JASON HOISAGER ("**Hoisager**"), then-President and

172     sole manager of APC, caused the Assets to be fraudulently transferred to MCCABE

173     PETROLEUM CORPORATION ("**MPC**"), an entity wholly owned and controlled by McCabe.

174     At the time, APC was insolvent and subject to known and unpaid liabilities.

175      3.      As stipulated in pleadings and sworn filings submitted by the Chapter 11 trustee,

176    APC was insolvent as of December 31, 2013, with debts exceeding $31 million and liquid assets

177    totaling less than $430,000. *See* Trustee's Adversary Compl. ¶¶ 10–13, *In re Arabella Petroleum*

178    *Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. June 7, 2016), ECF No. 235. Hoisager's

179    authorization of the transfer, while knowingly facing balance-sheet insolvency, constituted a

180    presumptively fraudulent conveyance under both federal bankruptcy law and Texas statute.

181      4.      According to both the Trustee's allegations and the bankruptcy court's later

182    findings of fact, the transfer from APC to MPC was made for no consideration and with both actual

183    and constructive fraudulent intent. *See* Trustee's Mot. to Approve Compromise and Settlement,

184    ECF No. 419, at 5–7 (Bankr. W.D. Tex. July 26, 2017).

185      5.      At the time of the transfer, APC's liabilities exceeded $31 million, while its liquid

186    assets totaled less than $430,000, as confirmed by the Trustee's forensic accounting. *See* Trustee's

187    Adversary Compl. ¶¶ 10–13, ECF No. 235.

188      6.      The Assets—many of which comprised the core holdings of APC's "Wolfbone

189    Project" aka WOLFBONE INVESTMENTS, LLC ("**Wolfbone**")—were conveyed exclusively for

190    the benefit of MPC and McCabe, thereby placing them beyond the reach of known creditors.

191      7.      The bankruptcy court accepted the Trustee's finding that "*the only consideration*

192    *paid by MPC in respect of its receipt of [APC's] properties was illusory and did not benefit the*

193    *estate,*" and that the transfer occurred "*without any economic benefit to [APC]*" and "*without any*

194    *arms-length negotiation.*" *See* Trustee's Mot. to Approve Compromise, ECF No. 419, at 6–7.

195      8.      The Trustee successfully challenged the fraudulent transfer orchestrated by

196    McCabe and Hoisager. He alleged both constructive and actual fraudulent transfer claims under

197    11 U.S.C. § 548(a)(1)(B), § 548(a)(1)(A), and Tex. Bus. & Com. Code § 24.005(a)(2), §

198    24.005(a)(1), citing numerous "badges of fraud." The bankruptcy court identified several of those

199    badges, including: (1) transfer to an insider; (2) insolvency of the debtor at the time of transfer; (3)

200    lack of reasonably equivalent value; (4) transfer of substantially all assets; and (5) retention of

201    beneficial use post-transfer. *See* ECF No. 419, at 5–6; *see also Janvey v. Democratic Senatorial*

202    *Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013); Tex. Bus. & Com. Code § 24.005(b).

203    9.    Because the original March 2014 transfer from APC to MPC was both fraudulent

204    and unsupported by legally cognizable consideration, Plaintiffs contend that the transaction was

205    void *ab initio* as a matter of law.[3] As such, all subsequent conveyances of the same leasehold

206    assets—including the assignment from MPC to Hudspeth, a McCabe-controlled shell entity, and

207    the ensuing transfer to Torchlight—are likewise null. *See In re Arabella Petroleum Co., LLC*, No.

208    15-70098-tmd (Bankr. W.D. Tex.), ECF No. 433, Exs. 2–5.

209    10.    Of particular note, documentary evidence suggests that McCabe attempted to

210    assign the same Assets from MPC directly to Torchlight in August 2014, while simultaneously

211    preparing and executing a second set of conveyance documents purporting to transfer the Assets

212    from Hudspeth—despite that transfer not occurring until September 23, 2014. The existence of

213    overlapping, inconsistently dated instruments leads to one clear inference: the transactions were

214    deliberately backdated and staged to obscure the Assets' defective chain of title. This conduct,

215    carried out in concert by McCabe, Hoisager, and (then) Torchlight CEO Brda, evidences a

216    coordinated scheme to mislead regulators, investors, and courts alike.

217    11.    Torchlight subsequently promoted the Assets—despite their origin in an

218    adjudicated fraudulent transfer—by assigning them a purported value of up to $9 billion in oil and

---

[3] The issuance of securities based on unlawfully obtained or fraud-contaminated assets violates Section 17(a) of the Securities Act and Rule 10b-5. Courts have held that such instruments are legally void. See **SEC v. Cavanagh, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998)**. *In Cavanagh, the court ruled that securities issued without a lawful asset basis were void ab initio and must be rescinded, underscoring that misstatements or omissions about asset legitimacy trigger liability under federal securities law.*

219    gas reserves in investor presentations and U.S. SECURITIES AND EXCHANGE COMMISSION

220    ("**SEC**") filings submitted via EDGAR. *See SEC v. Brda*, No. 4:24-cv-00707, Compl. ¶¶ 22–29

221    (S.D. Tex. 2024). These valuation claims were unsupported by any independent third-party

222    engineering reports, certified audits, or reserve appraisals. Moreover, the filings failed to disclose

223    that the Assets derived from a bankrupt estate and were the subject of pending litigation and a

224    court-approved fraudulent transfer settlement.

225        12.    Between 2014 and 2020, Torchlight raised substantial capital through multiple

226    equity and debt offerings, each premised on inflated and unverified valuations of the oil and gas

227    leasehold interests originally transferred from APC. These valuations, unsupported by third-party

228    reserve reports or engineering audits, were presented to investors and regulators as credible asset

229    assessments. As later alleged by the SEC, these representations were materially false and central

230    to Torchlight's fundraising scheme. *See SEC v. Brda*, No. 4:24-cv-00707, Compl. ¶¶ 22–29 (S.D.

231    Tex. 2024).

232        13.    Torchlight continued this scheme by executing a reverse triangular merger in June

233    2021 (the "**Merger**"), through which it was absorbed by Meta. Following the merger, Meta held

234    the legacy oil and gas assets—still burdened by defective title and undisclosed override interests—

235    on behalf of a newly formed Nevada entity, OILCO HOLDINGS, INC. **("Oilco")**, incorporated

236    on August 31, 2021. Oilco later changed its name to NBH on June 22, 2022. *See Next Bridge*

237    *Hydrocarbons, Inc.*, Registration Statement (Form S-1), at 63–65 (Nov. 9, 2022) (SEC Accession

238    No. 0001193125-22-292114).

239        14.    On December 14, 2022, NBH received formal title to the oil and gas leases via a

240    spinoff distribution to Series A Preferred shareholders of Meta. However, the chain of title

241    supporting this distribution remained irreparably flawed. The Assets were first conveyed from

242    APC to MPC in March 2014. They were then purportedly transferred directly to Torchlight on

243    August 7, 2014. Two months later, the same Assets were again purportedly conveyed—this time

244    from MPC to Hudspeth on September 23, 2014—after Hudspeth had already conveyed them to

245    Torchlight. *See In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex.), ECF

246    No. 433, Exs. 3–5.

247         15.    Torchlight's 2022 Form S-1—filed in connection with the spinoff—failed to

248    disclose material facts necessary to make its statements not misleading. Specifically, it omitted:

249    (a) the findings of fraudulent transfer and insolvency issued by the bankruptcy court in the Arabella

250    proceedings; and (b) the override royalty structures retained by insiders including McCabe,

251    Hoisager, and CLIFTON DUBOSE, JR. ("**Dubose**").

252         16.    These omissions constituted violations of the Securities Act's antifraud provisions

253    and materially impaired investor decision-making. *See Next Bridge Hydrocarbons, Inc.*,

254    Registration Statement (Form S-1), at 1–78 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-

255    292114); *see also SEC v. Brda*, No. 1:24-cv-04806, Compl. ¶¶ 50–105 (S.D.N.Y. June 25, 2024).

256         17.    Importantly, the Trustee's investigation and litigation over the fraudulent APC →

257    MPC transfer culminated in a $2.1 million settlement agreement with McCabe and the Trustee.

258    That agreement was executed on July 10, 2017, under Fed. R. Bankr. P. 9019, and was intended

259    to resolve all claims arising from the transfer. *See* Mot. to Approve Compromise, ECF No. 419, at

260    2. Testimony at the August 16, 2017 hearing confirms that McCabe agreed to the payment in order

261    to avoid having Torchlight publicly named in pending litigation—litigation that could have

262    jeopardized access to capital markets.

263         18.    At that hearing, the Trustee's counsel stated on the record: "*Our perception is that*

264    *that $2.1 million was on the table to avoid all of this going forward and having to get Torchlight*

265  *wrapped into litigation. If the settlement is not approved, that $2.1 million is not on the table...*"

266  Hr'g Tr. at 2, Aug. 16, 2017, *In re Arabella*, ECF No. 433. Likewise, Trustee Weiss testified that

267  "*McCabe [had] made it clear that a significant driver... in their interest in settling is that litigation*

268  *not be commenced... including the impact it may have on subsequent trades freeze.*" *Id.*

269       19.    Torchlight's Form 10-K for the fiscal year ending December 31, 2015—which

270  listed the Hudspeth leases as core assets—was filed just months before the Arabella settlement and

271  made no reference to the Arabella bankruptcy, the title defect history, or the override beneficiaries

272  still receiving revenue. *See Torchlight Energy Resources, Inc.*, Form 10-K (Dec. 31, 2015), filed

273  with the SEC.

274       20.    Because the original conveyance from APC to MPC was fraudulent, unsupported

275  by consideration, executed during insolvency, and lacked any board or court approval, the transfer

276  is void *ab initio* as a matter of law. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998)

277  (holding that securities issued without a lawful asset basis are void and must be rescinded); *see*

278  *also SEC v. China Energy Savings Tech., Inc.*, No. 2:06-cv-06344, slip op. (C.D. Cal. Oct. 2006)

279  (reverse merger cannot cleanse fraud-originated assets). Under federal law, a transfer declared void

280  *ab initio* is treated as though it never occurred—a complete nullity from the outset. *United States*

281  *v. Zacks*, 375 U.S. 59, 70 (1963).

282       21.    As a result, all derivative claims of ownership—including MPC's purported title,

283  Hudspeth's resale, Torchlight's capital raises, the MMTLP dividend, and NBH's share issuance—

284  are likewise void and legally unenforceable.

285       22.    Accordingly, Plaintiffs primarily seek the following relief:

286            (a)    A declaration that the March 2014 lease transfer from APC to MPC is void

287            *ab initio*;

288   (b) A finding that all downstream equity, override interests, and derivative

289   issuances based on that transfer are likewise nullified; and

290   (c) The imposition of a constructive trust over all proceeds, securities, and

291   royalty distributions traceable to the contaminated chain of title.

292  23. In sum, equity cannot be built on fraud. What began as a concealed estate strip

293 orchestrated by insiders has metastasized into a cascading harm that reached public markets,

294 deceived retail investors, and enriched the very parties responsible for the fraud. This Court is

295 empowered—and duty-bound—to unwind that structure and restore the integrity of title, asset

296 value, and investor protection. *See* 11 U.S.C. §§ 548, 550; Tex. Bus. & Com. Code § 24.005; *see*

297 *also Cavanagh*, 1 F. Supp. 2d at 345.

298 **II.** **JURISDICTION, VENUE, AND PARTIES**

299  **A.** **JURISDICTION**

300  24. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over all claims arising under the

301 laws of the United States, including, without limitation, claims brought under Section 27 of the

302 Securities Exchange Act of 1934, 15 U.S.C. § 78aa. This Court also has supplemental jurisdiction

303 over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a), as those claims arise from

304 the same nucleus of operative fact and form part of the same case or controversy under Article III

305 of the United States Constitution. Additionally, this Court has jurisdiction under 28 U.S.C. §§ 2201

306 and 2202 to declare the rights and legal relations of the parties and to grant such further relief as

307 may be necessary or proper.

308  **B.** **VENUE**

309  25. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. §

310 78aa because a substantial part of the events or omissions giving rise to the claims occurred within

311  the Western District of Texas. Multiple Defendants and Relief Defendants—including MPC**,**

312  Hudspeth**,** NBH, Inc.**,** Magdalena**,** and GREEN HILL MINERALS, LLC (**"Green Hill"**)—

313  maintain principal places of business at 500 West Texas Avenue, Suite 890, Midland, Texas. This

314  address served as the central administrative and operational hub for the entities and individuals

315  responsible for the lease transfers, securities issuances, and royalty extractions at the heart of this

316  action. Additionally, Torchlight**,** while headquartered in Plano, Texas, conducted material business

317  activity and executed relevant transactions within this District. Accordingly, venue is proper in this

318  Court.

319  **C.    PARTIES**

320  26.    <u>Plaintiffs</u>

321  (a)    CSM/R Daniel R. Auxier ("**Auxier**") is a retired U.S. Army Command

322  Sergeant Major and a resident of Wantage, New Jersey. He honorably served for twenty-

323  eight years, including multiple combat deployments, and was awarded the Legion of Merit

324  among two dozen other commendations. On or about December 8, 2022, after reasonably

325  relying on public statements—including press releases, social media posts, and regulatory

326  filings submitted to the SEC via EDGAR—Auxier held both $MMAT and $MMTLP

327  securities. He invested a total of $241,400 into these securities following the Merger and

328  prior to the U3 trading halt. Auxier is named as a Plaintiff in this action based on direct

329  financial harm caused by securities issued over void and fraudulently conveyed assets.

330  (b)    Marcos E. Monteiro ("**Monteiro**") is a digital entrepreneur and small

331  business owner residing in Orlando, Florida. Like Auxier, Monteiro purchased $MMAT

332  and $MMTLP securities following the Merger and prior to the U3 Halt. As a result of

333  Defendants' egregious misconduct, he incurred losses totaling $104,204. Monteiro relied

334    on materially false and misleading statements issued by Defendants officers regarding the

335    nature and value of the oil and gas assets underpinning the MMTLP dividend structure. He

336    maintains a portfolio of digital infrastructure investments and has publicly advocated for

337    regulatory accountability in connection with the MMTLP trading halt. Monteiro is named

338    in this action based on financial harm resulting from reliance on defective securities tied to

339    void title.

340    (c)    Bradley Davis ("**Davis**") is an entrepreneur and resident of Sugar Land,

341    Texas. He operates a business that provides affordable mobile housing for low-income

342    tenants throughout Texas and purchased $MMAT and $MMTLP securities in reliance on

343    public filings and promotional statements made by the Defendants. Davis incurred

344    investment losses totaling $470,469, materially impacting his ability to support and expand

345    his community housing initiatives. He also serves as an authorized agent for other harmed

346    investors and has been an active voice seeking transparency regarding the MMTLP trading

347    halt and associated U3 designation. Davis is named in this action based on direct financial

348    injury caused by securities tied to invalidly conveyed oil and gas assets.

349    27.    <u>Defendants</u>

350    (a)    McCabe Petroleum Corporation ("**MPC**") is a Texas corporation formed by

351    McCabe in 1984. Public records confirm that MPC remains an active entity with its

352    principal office located at 500 W. Texas Avenue, Suite 890, Midland, Texas 79701. Upon

353    information and belief, MPC is solely owned and entirely controlled by McCabe. In or

354    around March 2014, MPC received approximately 133,000 acres of oil and gas leasehold

355    interests from APC without consideration or board authorization. This transfer was later

356    adjudicated as a fraudulent conveyance by the Chapter 11 Trustee in *In re Arabella*

357  *Petroleum Co., LLC*, Case No. 15-70098 (Bankr. W.D. Tex.). MPC's acquisition formed

358  the origin point of a contaminated title chain later used to falsely capitalize public equity

359  offerings by Torchlight.

360  (b)  Hudspeth Oil Corporation ("**Hudspeth**") is a Texas corporation with a last

361  known principal office address at 500 W. Texas Avenue, Suite 890, Midland, Texas 79701.

362  Hudspeth was formerly owned and controlled by McCabe and is believed to be inactive or

363  dissolved as of this filing. In June 2014, Hudspeth received oil and gas leases from MPC

364  that originated in a fraudulent conveyance from APC. Two months later, Torchlight

365  acquired 100% of Hudspeth's shares in exchange for equity. Hudspeth served as the key

366  intermediary entity used to launder title and facilitate the downstream capitalization of

367  public securities.

368  (c)  Arabella Operating, LLC ("**AOC**") is a Texas limited liability company

369  with its principal business address at 509 Pecan Street, Suite 200, Fort Worth, Texas 76102.

370  Formed in January 2014 as a subsidiary of Arabella Exploration, Inc., Arabella Operating

371  served as the designated operator for oil and gas wells held under joint operating

372  agreements involving Arabella affiliates. It managed production activities on leasehold

373  assets originally acquired by APC and later transferred to McCabe-controlled entities.

374  Arabella Operating's operational control was instrumental in maintaining continuity over

375  properties at issue in the disputed title chain. The entity appears in well participation

376  documents and bankruptcy filings tied to the Wolfbone and Hazel projects.

377  (d)  Trans-Texas Land & Title, LLC ("**TTLT**") is a Texas limited liability

378  company with its principal place of business at 18 County Road 2337, Pittsburg, Texas

379  75686. TTLT was formed in 2007 and operated under the control of Hoisager. It functioned

as a lease aggregation and title clearing entity involved in acquiring, bundling, and transferring mineral interests throughout West Texas. TTLT participated in conveyance chains that ultimately routed leasehold assets to McCabe-controlled entities. The company appears in title records associated with the Wolfbone and Hazel lease blocks.

(e)     Magdalena Royalties, LLC ("**Magdalena**") is a Texas limited liability company with its principal office located at 500 W. Texas Avenue, Suite 890, Midland, Texas 79701. Magdalena is affiliated with McCabe and functions as a royalty-holding entity. In January 2014, it received a 5% overriding royalty interest carved out of leasehold assets that were later conveyed from APC to MPC. Magdalena retained that interest through subsequent transfers involving Hudspeth and Torchlight. It is named as a defendant based on its receipt and continued benefit from proceeds traceable to void and fraudulently transferred property.

(f)     Green Hill Minerals, LLC ("**Green Hill**") is a Texas limited liability company with its principal office located at 500 W. Texas Avenue, Suite 890, Midland, Texas 79701. Green Hill is believed to be owned or beneficially controlled by the children of McCabe. The entity received override or royalty revenue traceable to oil and gas leasehold assets originally acquired by APC and later transferred through McCabe-controlled entities. Green Hill appears in override schedules and affiliate disclosures tied to the same disputed assets. It is named as a defendant based on its role as a beneficiary of unjust enrichment derived from the void title chain.

(g)     Arabella Exploration, LLC ("**AEX**") is a Texas limited liability company with a principal business address at 509 Pecan Street, Suite 200, Fort Worth, Texas 76102, and an additional affiliated address at 500 W. Texas Avenue, Suite 1450, Midland, Texas

24

403    79701. AEX LLC was formed in 2009 and served as a private working interest holder in

404    the Wolfbone play prior to the public formation of Arabella Exploration, Inc. In late 2013,

405    it participated in the aggregation and early conveyance of leasehold interests that were later

406    transferred to McCabe-controlled entities. AEX LLC's asset transfers formed part of the

407    foundation for the roll-up into Torchlight and related securities offerings. It is named based

408    on its role in facilitating transfers that undermined the Arabella estate's value.

409    (h)    Torchlight Energy Resources, Inc. ("**Torchlight**") is a defunct Texas

410    corporation formerly headquartered at 5700 W. Plano Parkway, Suite 3600, Plano, Texas

411    75093. Torchlight was a publicly traded company that acquired Hudspeth in 2014, thereby

412    obtaining leasehold interests originally conveyed from APC to MPC. These assets were

413    subsequently capitalized into securities, including offerings made through the MMTLP

414    Series A Preferred Dividend. In June 2021, Torchlight completed a reverse triangular

415    merger with Meta, ceasing its independent operations. Torchlight is named based on its

416    central role in monetizing void assets through public markets.

417    (i)    Tritaurian Capital, Inc. ("**Tritaurian**") is a New York corporation with its

418    principal office located at 430 Park Avenue, 19th Floor, New York, NY 10022. Tritaurian

419    is an investment banking firm affiliated with Heyn and participated in structuring and

420    facilitating securities offerings involving Torchlight and Meta. The firm appears in capital

421    raise agreements and offering materials connected to override syndication and asset-backed

422    equity distributions tied to disputed oil and gas assets. Tritaurian's involvement coincided

423    with Torchlight's pre-merger fundraising and NBH's post-spinout structuring. It is named

424    as a defendant based on its role in enabling and profiting from the issuance of securities

425    derived from void and fraudulently conveyed title.

426        (j)     Wolfbone Investments, LLC ("**Wolfbone**") is a Texas limited liability

427    company with a last known business address at 500 W. Texas Avenue, Suite 890, Midland,

428    Texas 79701. Wolfbone is owned and controlled by McCabe and was used to hold or

429    convey oil and gas interests originating from disputed transfers out of the Arabella

430    corporate group. In 2022, Wolfbone assigned its Orogrande leasehold assets into Hudspeth

431    Operating, LLC in exchange for equity issued by NBH, further embedding it in the void

432    title chain. Wolfbone appears in asset transfer records, override schedules, and NBH

433    merger documentation as part of the asset monetization strategy tied to the disputed leases.

434    It is named based on its receipt and conversion of assets derived from unlawful

435    conveyances.

436        (k)     Masterson Hazel Partners, LP ("**MHP**") is a Texas limited partnership with

437    a mailing address of P.O. Box 1189, Midland, Texas 79702. MHP received working

438    interest participation and overriding royalty rights in connection with the Hazel Project, an

439    oil and gas development involving assets transferred through Torchlight and MPC. The

440    partnership is managed by Masterson Hazel Management, LLC and appears in executed

441    Option Agreements, override schedules, and revenue-sharing disclosures tied to leasehold

442    assets originally conveyed from APC. MHP participated in financial structures that

443    extracted value from these assets through override syndication and royalty-linked

444    investment vehicles. It is named based on its enrichment through and participation in

445    transactions built on a void asset base.

446        (l)     Arabella Royalty Management, LLC ("**ARM**") is a Texas limited liability

447    company formed and/or controlled by DuBose and other Arabella insiders. ARM was

448    created to serve as a royalty-holding and revenue-distribution vehicle for override interests

449    originally attached to oil and gas leases owned by APC. Although nominally distinct from

450    Arabella Exploration, LLC and Arabella Operating, LLC, ARM operated in coordination

451    with those entities and their principals to retain economic benefits from assets fraudulently

452    conveyed to MPC and Hudspeth. ARM received or administered override royalty interests

453    that were never disclosed in the books of APC or in SEC filings by Torchlight, Meta

454    Materials, or NBH. Its role was instrumental in enabling insiders to extract residual income

455    from leases that had already been stripped from the bankruptcy estate, and it remained

456    undisclosed in NBH's 2022 Form S-1, despite DuBose's dual role as NBH executive and

457    override beneficiary.

458    28.    <u>Relief Defendants</u>

459    (a)    Next Bridge Hydrocarbons, Inc. ("**NBH**") is a Nevada corporation with its

460    current principal office located at 500 W. Texas Avenue, Suite 890, Midland, Texas 79701.

461    NBH was spun out of Meta on December 14, 2022, and holds oil and gas assets originally

462    acquired by Torchlight. through transfers that trace back to APC. NBH has no public

463    trading status but maintains regulatory filings with the SEC. In late 2024, NBH formally

464    relocated its executive office from Fort Worth to Midland, Texas, where it now operates

465    from the same location as MPC under a disclosed rent-free arrangement. NBH is named as

466    a Relief Defendant for purposes of equitable relief, including rescission and constructive

467    trust, based on its receipt of assets derived from void and fraudulently transferred title.

468    (b)    Meta Materials, Inc. ("**Meta**") is a Canadian corporation with a last known

469    principal U.S. business address at 5700 W. Plano Parkway, Suite 3600, Plano, Texas

470    75093. Meta is the successor to Torchlight, having acquired it via reverse triangular merger

471    in June 2021 while Torchlight's oil and gas assets were simultaneously spun out into NBH.

472    Meta was publicly traded on the NASDAQ under the symbol $MMAT until March 14,

473    2024, when it filed a voluntary petition for relief under Chapter 11 of the United States

474    Bankruptcy Code in the District of Delaware (Case No. 24-10438). At the time of its filing,

475    Meta remained the subject of ongoing shareholder litigation and regulatory inquiries

476    related to the MMTLP dividend and Torchlight merger disclosures. Meta is named as a

477    Relief Defendant based on its role in issuing securities that were underpinned by assets

478    derived from void and fraudulently conveyed title.

479    (c)    Meta and NBH are named as *relief defendants* solely for purposes of

480    rescission, disgorgement, and other equitable relief. Plaintiffs do not, at this time, allege

481    that either relief defendant committed independent fraud, but reserve the right to amend

482    this complaint should further evidence support such claims.

483    29.    <u>Non-Litigant Parties of Special Interest</u>[4]

484    (a)    Jason Hoisager ("**Hoisager**") was, at all material times, the founder and

485    control person of APC, Arabella Exploration, LLC, and Arabella Operating, LLC. As an

486    insider with operational control, he directed fraudulent transfers of oil and gas leases,

487    breached fiduciary duties, and deliberately concealed asset provenance through

488    interlocking shell entities and unauthorized conveyances that denuded Arabella of value

489    and creditor protection.

490    (b)    Gregory McCabe ("**McCabe**") served, at all material times, as Chairman of

491    Torchlight and controlled MPC and Hudspeth. As a co-founder and architect of the

---

[4] As discussed herein, Plaintiffs' harm arises from a pattern of fiduciary breaches, fraudulent schemes, and material misrepresentations and omissions concerning the Securities, including the failure to disclose facts legally required and essential to the integrity of the offerings. These wrongs were executed through the Non-Litigant Parties of Special Interest, who used their roles as corporate officers to operate the Defendant entities as alter egos. Plaintiffs bring fully substantiated claims supported by sworn, irrefutable facts and admissible evidence not subject to genuine dispute, and the compensable harm suffered is directly attributable.

492     Arabella-to-Torchlight roll-up scheme, McCabe received valuable oil and gas interests for

493     no consideration and used those interests to falsely capitalize Hudspeth and Torchlight.

494          (c)     John A. Brda ("**Brda**") was, at all material times, the CEO of Torchlight.

495     He was responsible for executing the asset roll-up, the merger with Meta, and the

496     distribution of the Series A Preferred Dividend ($MMTLP), all while failing to disclose

497     the tainted title origins of the underlying assets.

498          (d)     Clifton Edward DuBose, Jr. ("**DuBose**") was, at all material times, an

499     attorney, corporate officer, and legal architect of NBH. and its affiliated entities, including

500     Green Hill Minerals, Magdalena Royalties, and ARM. While public filings understate his

501     role, DuBose materially participated in the restructuring, retention of override interests,

502     and downstream monetization of assets stripped from the Arabella estate.

503          (e)     Joshua McCabe (**"J. McCabe"**), son of Gregory McCabe, was affiliated

504     with MPC and Hudspeth. He received direct benefits from the self-dealing structure, helped

505     execute upstream assignments, and participated in concealed enrichment through family-

506     controlled entities.

507          (f)     Georgios Palikaras ("**Palikaras**") was, at all material times, the Chief

508     Executive Officer of Meta. He played a central role in the Torchlight–Meta merger and in

509     promoting $MMTLP, while concealing the upstream fraud and title defects underpinning

510     the NBH asset base.

511          (g)     Joseph DeWoody ("**DeWoody**") was an officer of NBH and CEO of Valor

512     Mineral Management. He participated in NBH's downstream lease management and was

513     materially involved in royalty structures used to retain insider economic control over assets

514     originating in the Arabella fraud.

(h)     Lucas T. Hawkins ("**Hawkins**") served as Chief Operating Officer of NBH and was a signatory to corporate filings, royalty transactions, and SEC disclosures that failed to address asset defects, reversionary interests, or the Arabella title chain.

(i)     Delvina Oelkers ("**Oelkers**") was, at all material times, the Chief Financial Officer of NBH and a corporate officer of affiliated entities. She certified public filings and bore responsibility for the financial representation of assets obtained via a fraudulent chain of title, with no reserve report or lawful conveyance to support valuation.

(j)     Kristin Whitley ("**Whitley**") was the Chief Accounting Officer of NBH. She was responsible for maintaining financial records, ensuring disclosure compliance, and certifying filings that misrepresented NBH's asset base while omitting material facts regarding upstream fraud.

(k)     Mia Pitts ("**Pitts**") served as General Counsel and corporate secretary of NBH. She oversaw legal compliance and disclosure obligations despite having access to information showing that NBH was capitalized with leases sourced from fraudulent and avoidable transfers.

(l)     William Heyn ("**Heyn**") is a former investment banker and securities underwriter affiliated with Torchlight during its pre-merger capitalization efforts and Series A Preferred dividend planning. Public records and regulatory filings confirm that Heyn acted as a placement agent, structuring advisor, or equity capital intermediary in connection with Torchlight's 2021 at-the-market (ATM) offering and the planned spinout of oil and gas assets into NBH. Although not formally named in the Arabella bankruptcy, Heyn operated in close coordination with Brda and Palikaras at critical points during the $MMAT merger window, including during the MMTLP dividend process. His role in

promoting and facilitating the issuance of securities backed by fraudulently conveyed leaseholds, without disclosure of asset origin defects, ties him directly to the downstream consequences of the Arabella–McCabe–Hudspeth title chain. As such, Heyn's participation is material to understanding the flow of proceeds and representations made to the investing public during the issuance of MMTLP shares.

(m)    Jonathan P. Wiesblatt ("**Wiesblatt**") operated as a securities advisor, underwriter, or placement agent for Torchlight and/or NBH. He facilitated public offerings and financial instruments backed by contaminated lease assets without disclosing material origin defects.

(n)    Jason Simon ("**Simon**") participated in investor relations and capital markets operations for Torchlight and/or NBH, including ATM participation and public promotion of securities based on misleading narratives regarding MMTLP and asset value.

(o)    Eric Vaughan ("**Vaughan**") was an operations executive at Hudspeth and later NBH. He was responsible for lease oversight and internal operations but failed to disclose known title defects, transfer irregularities, or insider enrichment.

(p)    Charles L. Hoebeke ("**Hoebeke**") served as Chief Restructuring Officer for Arabella Exploration, Inc. during its bankruptcy. He coordinated post-petition conveyances—including Arabella Exploration's tag-along asset sales—that formed the core of the NBH asset portfolio and bypassed creditor oversight.

(q)    Steven H. Urbanski ("**Urbanski**") acted as corporate counsel for Arabella, Hudspeth, and/or affiliated royalty vehicles. He drafted and executed transaction documents that masked conveyance paths, transferred operator rights and overrides, and preserved insider royalty positions despite the tainted origins of the underlying leases.

561      (r)    Teri Breann Hall ("**Hall**") served as Controller of Arabella Petroleum

562    Company, LLC and was responsible for maintaining its financial and accounting records.

563    In connection with the March 2014 lease transfer from APC to McCabe Petroleum

564    Corporation, Hall recorded the transaction as an "accounts receivable" without supporting

565    loan documentation, promissory note, or consideration entry. Her limited experience and

566    use of a non-standard accounting system were later cited by Arabella's management as

567    reasons the transaction was never formally papered. These deficiencies contributed to

568    incomplete records of the transfer and made it difficult to trace the absence of value

569    received by APC.

570      (s)    Michael V. Birken ("**Birken**") served as Land Supervisor and in-house

571    geologist for APC. On or about March 4, 2014, Birken notarized the Assignment of Leases

572    from APC to McCabe Petroleum, a transaction later adjudicated as a fraudulent transfer.

573    His notarial seal appears on the document despite his status as an employee and insider,

574    thereby voiding the presumption of disinterested notarization under Texas Government

575    Code § 406.016. Birken's notarization of an insider transaction between CEO Hoisager

576    and McCabe—while acting as Arabella's land supervisor—undermines the validity of the

577    assignment and introduces a red flag of internal orchestration. His role supports legal

578    theories of constructive fraud, conspiracy, and chain-of-title contamination.

579      (t)    Tyler Chance Legendre ("**LeGendre**") was an employee or agent of Trans-

580    Texas Land & Title, LLC, a firm used by Arabella affiliates to facilitate land transactions

581    and title documentation. LeGendre notarized the June 4, 2014 Assignment of Leases from

582    MPC to Hudspeth, which transferred over 133,000 acres of mineral leases as part of the

583    fraudulent chain of conveyance. At the time, LeGendre's notary registration was valid in

Midland County, Texas, but his simultaneous employment or agency with the parties involved invalidates the neutrality of the notarization. His signature appears as Notary Public affirming McCabe's execution of the document as President of MPC. LeGendre's insider status further supports a pattern of intercompany formalization using conflicted notaries, and reinforces claims of fraudulent conveyance and actual or constructive trust**.**

(u)    As of this filing**,** Richard C. Chapman ("**Chapman**") does not appear as a signatory, notary, or party to any document within the known chain of title involving APC, MPC, Hudspeth Oil, Torchlight, or NBH. If subsequent evidence shows that Chapman executed or attested to chain-of-title instruments or held financial interest in override vehicles, he may become a necessary party for voidability, conspiracy, or unjust enrichment claims. He is flagged for further review.

(v)    Morris D. Weiss ("**Trustee**" or "**Weiss**") was appointed on August 20, 2015 as Chapter 11 Trustee for Arabella Petroleum Company, LLC in Case No. 15-70098 (Bankr. W.D. Tex.), Weiss investigated the March 2014 assignment of 133,000 acres of leases from APC to McCabe Petroleum, which APC's records showed yielded no consideration, and asserted fraudulent transfer claims before compromising those claims through a July 2017 settlement in which McCabe paid $2.1 million to the estate in exchange for a release; although the Official Committee of Unsecured Creditors objected on grounds that the assets were undervalued, the settlement was approved, and later adversary proceedings produced findings of fraudulent transfers and fiduciary breaches by Arabella insiders, leaving Weiss's administration of these claims and the resulting $11 million balance in estate accounts a matter of ongoing public interest.

606    (w)  Mark C. Taylor ("**Taylor**") is a partner at Holland & Knight LLP, Taylor

607  served as counsel to Chapter 11 Trustee Morris Weiss in the Arabella Petroleum Company,

608  LLC bankruptcy (Case No. 15-70098, Bankr. W.D. Tex.), where he represented the Trustee

609  in prosecuting and later settling fraudulent transfer claims arising from the March 2014

610  lease assignments; Taylor's role included advocating for the $2.1 million compromise with

611  McCabe Petroleum that was approved over creditor objections, and later appearing in

612  related adversary proceedings (Adv. No. 16-07002) which culminated in findings of

613  fraudulent transfers and fiduciary breaches by Arabella insiders, making him a relevant

614  non-litigant party of interest due to his position at the intersection of estate administration,

615  insider settlement, and contested recovery efforts.

616    (x)  James W. Christian ("**Christian**") is a managing partner of Christian

617  Levine Law Group, Christian has appeared as counsel to John Brda, including through

618  Flamethrower LLC, in *SEC v. Brda* and related matters, and has also been associated

619  with representation in the Meta Materials (MMAT) bankruptcy; his posture has included

620  opposition to shareholder-driven or *pro se* interventions, often advancing defenses that

621  insulated Torchlight/Meta insiders from further scrutiny; while not a transferor or direct

622  beneficiary of the Arabella assets, his repeated advocacy for key insider defendants and

623  his role in shaping litigation strategies that resisted broader discovery into asset origins

624  place him within the network of non-litigant parties of special interest to the

625  administration and accountability of the APC estate and its downstream securities.

626 **III.**  **VERIFIED MATERIAL FACTS**

627   A.  **The Arabella Matter: APC Fraudulently Transferred the Assets to MPC**

628      30.     On July 10, 2015 (the **"Petition Date"**), APC filed a voluntary petition for relief under Chapter

629   11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western

630   District of Texas. *See Voluntary Petition for Non-Individual Filing Under Chapter 11 at 1*, *In re*

631   *Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. July 10, 2015), ECF No. 1.

632      31.     The Chapter 11 proceeding (the **"Arabella Matter"**) gave rise to several adversary

633   actions initiated by the court-appointed Chapter 11 Trustee, including *Weiss v. Arabella*

634   *Exploration Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex.), filed on February 29, 2016, and

635   amended on August 11, 2016. *See Amended Compl. ¶¶ 1–5, Weiss v. Arabella Expl. Inc. (In re*

636   *Arabella Petroleum Co., LLC)*, Adv. No. 16-07002 (Bankr. W.D. Tex. Aug. 11, 2016), ECF No.

637   30.

638      32.     The Trustee's *Amended Complaint* asserted eight counts against Arabella

639   Exploration Inc., Arabella Exploration LLC, Arabella Operating LLC, Trans-Texas Land & Title,

640   LLC, PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND LP ("**Platinum**"),

641   PLATINUM LONG TERM GROWTH VIII, LLC **("Platinum 8"),** and Hoisager, seeking relief

642   for fraudulent transfer under 11 U.S.C. §§ 544 and 548, preferential transfer under § 547, turnover

643   under § 542, and declaratory and lien-related relief under § 506 (*Weiss v. Arabella Expl., Inc., Adv.*

644   *No. 16-07002* (Bankr. W.D. Tex. Aug. 11, 2016), *ECF No. 30*).

645      33.     All defendants except Hoisager settled with the Trustee. Hoisager proceeded to

646   trial, and following a three-day bench trial in May 2022 and post-trial submissions, the bankruptcy

647   court issued a Memorandum Opinion on December 22, 2022, ruling in favor of the Trustee on

648   most claims. The court specifically found that multiple transfers lacked consideration, were made

649   for the benefit of insiders, and were avoidable under bankruptcy and Texas fraudulent transfer law.

650   That Hoisager declined to settle while all other defendants did reinforces an inference of deliberate

651  misconduct relevant to veil-piercing and control-based liability analysis (*Weiss v. Arabella Expl.,*

652  *Inc.*, *Adv. No. 16-07002* (Bankr. W.D. Tex. Dec. 22, 2022), *ECF No. 222*, at 2, 15–19).

653        34.    Hoisager formed APC in February 2007 for the purpose of acquiring and operating

654  oil and gas leases in West Texas. At all relevant times, APC operated as the designated operator

655  under joint operating agreements, and Hoisager served as its sole owner, managing member, and

656  signatory on critical transactions, including lease assignments later deemed fraudulent. (*Weiss v.*

657  *Arabella Expl., Inc.*, *Adv. No. 16-07002* (Bankr. W.D. Tex. Feb. 29, 2016), *Compl.* ¶¶ 9–12).

658        35.    Hoisager subsequently formed Arabella Exploration, LLC in 2008 and AOC in

659  2014. On December 24, 2013, he created AEX through a reverse merger with LONE OAK

660  ACQUISITION CORPORATION ("**Lone Oak**"), a Cayman Islands–domiciled blank check

661  company. Testimony and pleadings in the adversary proceeding confirm that AEX was structured

662  specifically to raise capital for the acquisition and development of oil and gas leaseholds in the

663  Permian Basin, including the Orogrande. *See Weiss v. Arabella Expl., Inc.*, *Adv. No. 16-07002*

664  (Bankr. W.D. Tex. Aug. 11, 2016), *Am. Compl.* ¶¶ 13–15.

665        36.    Between 2013 and early 2014, while insolvent, APC acquired oil and gas leasehold

666  interests in Reeves County, Texas. Financial disclosures in the bankruptcy record confirm that, as

667  of December 31, 2013, APC's liabilities exceeded its assets by more than $3.1 million. *See Weiss*

668  *v. Arabella Expl., Inc.*, *Adv. No. 16-07002* (Bankr. W.D. Tex. Aug. 11, 2016), *Am. Compl.* ¶ 17;

669  *see also Trustee's Br.* at 5, *Arabella Petroleum Co., LLC*, *No. 15-70098-tmd* (Bankr. W.D. Tex.

670  July 26, 2017), ECF No. 419.

671        37.    The March 4, 2014 Assignment of Oil and Gas Leases from APC to MPC was

672  notarized by MICHAEL V. BIRKEN ("**Briken**"), APC's internal Land Supervisor, who was not

673  an independent notary but a corporate insider. This dual role compromised the appearance of

36

674  disinterested oversight and constituted a "badge of fraud" under both bankruptcy and Texas law.

675  The assignment recited only nominal consideration of "Ten Dollars [and other good and valuable

676  consideration]" despite transferring 196 leases totaling approximately 133,000 net mineral acres—

677  APC's only material asset.[5] *See Weiss v. Arabella Petroleum Co., LLC*, No. 15-70098-tmd, ECF

678  No. 431-1, at 1–3 (Bankr. W.D. Tex. Aug. 15, 2017).

679  38.    On March 28, 2014, APC conveyed approximately 133,000 net mineral acres of oil

680  and gas leasehold interests to MPC, an entity wholly owned and controlled by McCabe. APC's

681  internal records reflected no payment, capital infusion, or corresponding asset entry for the

682  transfer, and no documentation was produced showing a promissory note, loan agreement, or

683  equity contribution to substantiate any consideration. *See Motion to Approve Compromise* ¶ 5, *In*

684  *re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. July 26, 2017), ECF No.

685  419.

686  39.    TERI BREANN HALL ("**Hall**"), was Arabella's Controller during the 2014 asset

687  transfers. According to the Trustee and supporting filings, Hall was described as an "*inexperienced*

688  *comptroller*" whose lack of professional training contributed materially to defective accounting

689  and irregular financial documentation surrounding the March 2014 lease transfer to MPC.

690  Arabella's internal records did not reflect any formal loan agreements, capital contributions, or

691  supporting schedules for the transaction. Hall's tenure and compensation structure reinforce that

692  key conveyance documents were executed and recorded without competent internal oversight,

693  supporting the presence of multiple "badges of fraud" under *Tex. Bus. & Com. Code* § 24.005(b),

---

[5] See Assignment of Oil and Gas Leases from Arabella Petroleum Co., LLC to McCabe Petroleum Corp. (Mar. 4, 2014), attached as Ex. 1 to Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise at 1–3, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017), ECF No. 431-1 (reflecting notarization by Michael V. Birken, then serving as APC's Land Supervisor, and reciting only nominal consideration of "Ten Dollars and other good and valuable consideration" despite purporting to convey 196 leases covering ~133,000 net mineral acres); see also *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex. Dec. 22, 2022) (Mem. Op. at 4–5) (recognizing the Trustee's evidence that APC's transfers to McCabe entities occurred without arms-length negotiation or consideration).

including insider control, concealment, lack of adequate consideration, and defective corporate

recordkeeping. See *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002, Mem. Op. at 8–11 (Bankr.

W.D. Tex. Dec. 22, 2022); *In re Arabella Petroleum Co.*, No. 15-70098-tmd, ECF No. 419 at 5–

7; ECF No. 433 at Hr'g Tr. 20 (Aug. 16, 2017).

40.    According to the Trustee's forensic accountants, *"APC did not receive any*

*apparent consideration for the Transfers."* The Trustee further observed that the transaction

*"lacked documentation and was not recorded in the Debtor's books as a loan or equity*

*contribution,"* and that *"McCabe Petroleum was not shown as a creditor or equity holder of APC*

*at the time of the transfer."* These findings were submitted in support of the Trustee's *Motion to*

*Approve Compromise*, which was backed by independent forensic experts confirming the absence

of any measurable consideration. *See Motion to Approve Compromise* ¶ 5, *In re Arabella*

*Petroleum Co., LLC*, *No. 15-70098-tmd* (Bankr. W.D. Tex. July 26, 2017), ECF No. 419.

41.    The March 2014 conveyance was consistently described by the Trustee and

accepted by the bankruptcy court as a fraudulent transfer under 11 U.S.C. § 548 and Tex. Bus. &

Com. Code § 24.005. As the Trustee explicitly stated, *"The Subject Leases were fraudulently*

*transferred... to McCabe Petroleum and its affiliated entities." See Trustee's Adversary Complaint*

¶ 4, *Weiss v. Arabella Expl., Inc. (In re Arabella Petroleum Co., LLC)*, Adv. No. 16-07002 (Bankr.

W.D. Tex. Feb. 29, 2016).[6]

42.    McCabe ultimately settled with the bankruptcy estate for $2.1 million. At the

hearing on the Trustee's motion to approve the settlement, counsel for the estate explained: *"Our*

---

[6] See Trustee's Original Adversary Complaint ¶ 4, *Weiss v. Arabella Expl., Inc.* (In re Arabella Petroleum Co., LLC), Adv. No. 16-07002 (Bankr. W.D. Tex. Feb. 29, 2016), ECF No. 235 (alleging that "the Subject Leases were fraudulently transferred by APC to McCabe Petroleum and its affiliated entities" in violation of 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.005); see also Trial Tr. 5:18–6:10, *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex. May 17, 2022), ECF No. 204 (testimony of Gregory McCabe admitting that numerous loans and advances to APC and related entities were undocumented and insider-directed, further evidencing the absence of arms-length dealing and the badges of fraud underlying the March 2014 conveyance).

714 *perception is that that $2.1 million was on the table to avoid all of this going forward and having*

715 *to get Torchlight wrapped into litigation."* The Hearing Transcript confirms that a central

716 motivation for the settlement was to avoid entangling Torchlight in litigation concerning the

717 fraudulent transfer—a fact directly supporting the badge of concealment and insider enrichment

718 criteria relevant to constructive fraud. *See Hr'g Tr.* 20, *In re Arabella Petroleum Co., LLC*, No.

719 15-70098-tmd (Bankr. W.D. Tex. Aug. 16, 2017) (ECF No. 441).

720     43.    On February 15, 2024, Hoisager filed an unopposed motion to dismiss his federal

721 appeal in *Weiss v. Arabella Exploration Inc.*, which challenged the findings of the U.S. Bankruptcy

722 Court in *Adversary No. 16-07002-tmd*. The United States District Court for the Western District of

723 Texas granted the motion and entered a final judgment dismissing the appeal with prejudice,

724 thereby affirming the trial court's findings that Hoisager, McCabe, and their affiliated entities

725 executed a series of insider fraudulent transfers for no consideration in violation of 11 U.S.C. §

726 548 and Tex. Bus. & Com. Code § 24.005. These findings are now final and binding on the parties.

727 *See Weiss v. Arabella Expl.*, Adv. No. 16-07002-tmd (Bankr. W.D. Tex. Dec. 22, 2022); *Order*,

728 *Hoisager v. Weiss*, No. 7:23-cv-00021-DC (W.D. Tex. Feb. 15, 2024).

729     B.    **McCabe's $2.1 Million Settlement Confirmed the Transfer Was Fraudulent**

730         **and Timed to Avoid Torchlight Litigation**

731     44.    On July 10, 2017, McCabe and the Chapter 11 Trustee for APC entered into a

732 written settlement agreement resolving all claims arising from the March 2014 lease transfer. The

733 Trustee explicitly asserted: "*The Trustee has asserted that the Subject Leases were fraudulently*

734 *transferred to McCabe Petroleum and seeks to settle these claims... for a cash payment of $2.1*

735 *million.*" *See Mot. to Approve Compromise*, at 4–5, *In re Arabella Petroleum Co., LLC*, No. 15-

736 70098-tmd (Bankr. W.D. Tex. July 26, 2017) (Doc. 419).

737    45.    This resolution followed extensive due diligence, document review, and forensic

738    accounting. The Trustee's professionals concluded that "*APC did not receive any apparent*

739    *consideration for the Transfers.*" The books and records reflected no value received, no

740    documentation of a loan, and no record of MPC as a creditor or equity holder at the time of the

741    transfer. *Id.* at 5.

742    46.    The Trustee emphasized that the agreement was designed to resolve all pending

743    and potential claims not only against MPC, but also "*against subsequent transferees*," including

744    entities that capitalized the leases into *Torchlight. Id.* at 3.

745    47.    At the August 16, 2017 hearing on the motion to approve the settlement, the

746    Trustee's counsel explained on the record: "*Our perception is that that $2.1 million was on the*

747    *table to avoid all of this going forward and having to get Torchlight wrapped into litigation. If the*

748    *settlement is not approved, that $2.1 million is not on the table...*" *See Tr. of Hr'g*, at 20, *In re*

749    *Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 16, 2017) (Doc. 441).

750    48.    The Trustee further testified that McCabe's interest in resolving the matter stemmed

751    directly from a desire to avoid triggering disclosure obligations or legal exposure tied to

752    Torchlight's asset base: "*McCabe [had] made it clear that a significant driver... in their interest*

753    *in settling is that litigation not be commenced... including the impact it may have on subsequent*

754    *trades freeze.*" *Id* at 20.

755    49.    The bankruptcy court accepted this rationale and granted the Trustee's motion. The

756    court found that the settlement was supported by the Trustee's "independent business judgment,"

757    and that avoiding litigation aligned with the estate's best interests, particularly given the exposure

758    and entanglement risk to downstream parties. *Id.* at 21.

C.    **The Leasehold Assets Were Transferred Through Insider-Controlled Entities to Obscure Origin and Retain Royalty Interests**

50.    On June 4, 2014, MPC assigned approximately 133,000 net mineral acres of oil and gas leasehold interests to Hudspeth, which was identified in bankruptcy filings as *"an affiliate of McCabe Petroleum, owned by Greg McCabe."* This assignment formed the next link in a continuous insider-controlled chain of conveyances through which the original Arabella assets were repositioned without consideration or third-party scrutiny.[7] *See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise* ¶ 6, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017).

51.    Similarly, the June 4, 2014 Assignment from MPC to Hudspeth was notarized by TYLER CHANCE LEGENDRE ("**LeGendre**"), whose role as a notary was not independent. LeGendre was a compensated insider, having been employed by Arabella-related entities and listed as a bonus recipient in 2012. His appearance in the notarial block of this intra-affiliate transaction confirms that these instruments were authenticated by parties with a direct financial interest in the outcome. The use of internal personnel such as LeGendre to notarize self-dealing conveyances fatally undermines the neutrality of the record and constitutes a further "badge of fraud" under applicable law.[8] *See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve*

---

[7] See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise ¶ 6, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017), ECF No. 431 (describing the June 4, 2014 assignment of approximately 133,000 net mineral acres from McCabe Petroleum Corp. to Hudspeth Oil Corp., "an affiliate of McCabe Petroleum, owned by Greg McCabe," and noting the absence of consideration to APC's estate).

[8] The June 4, 2014 Assignment from MPC to Hudspeth was notarized by Tyler Chance LeGendre, a registered Midland County notary who was simultaneously a compensated insider of Arabella-related entities and even listed as a bonus recipient in 2012. LeGendre's appearance in the notarial block of an intra-affiliate conveyance between McCabe-controlled entities confirms that the instruments were authenticated by personnel with a direct financial interest in the outcome. Such insider notarization demonstrates non-arm's-length documentation within the fraudulent transfer chain and constitutes a recognized "badge of fraud." See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise ¶ 6, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017), ECF No. 431; *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex. Dec. 22, 2022) (Mem. Op. at 4–5).

*Compromise* ¶ 6, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017).

52.    On September 23, 2014, Hudspeth conveyed 100% of its issued and outstanding stock to Torchlight in exchange for 868,750 restricted shares of Torchlight common stock. This transaction served as the formal vehicle through which Torchlight acquired the leasehold interests originally transferred out of APC without consideration.[9] *See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise* ¶ 7, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017).

53.    Before June 2014, APC conveyed a 5% overriding royalty interest in the Subject Leases to Magdalena*,* an entity owned and controlled by McCabe. This gratuitous grant occurred while Arabella was insolvent and prior to the full assignment of the leases to MPC, further evidencing a pattern of insider enrichment through pre-transfer encumbrances. *See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise* n.1, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017).

54.    Torchlight's 2014 Form 10-K confirmed that it paid $100,000 in geologic origination fees in connection with its acquisition of Hudspeth, and disclosed that MPC retained a 10% back-in working interest in the Orogrande. This back-in right ensured that McCabe could reclaim an equity position upon development milestones, reinforcing the insider structuring of the transaction. *See Torchlight Energy Res., Inc.*, *Annual Report* (*Form 10-K*) at 16 (Mar. 16, 2015).

55.    A Participation Agreement dated September 23, 2014, between Hudspeth and Torchlight confirmed that MPC retained a 10% back-in working interest in the Orogrande. This

---

[9] See Objection of the Official Comm. of Unsecured Creditors to Motion to Approve Compromise and Settlement ¶ 7, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017), ECF No. 431 (describing Hudspeth Oil's September 23, 2014 stock transaction with Torchlight in which Hudspeth conveyed 100% of its stock in exchange for 868,750 restricted Torchlight shares, thereby transferring the Reeves County leasehold interests originally stripped from APC without consideration).

797    interest guaranteed McCabe a path to future equity based on production thresholds, yet the

798    arrangement was not publicly disclosed at the time of the Torchlight acquisition or in any

799    contemporaneous SEC filing. *See Next Bridge Hydrocarbons, Inc.*, *Registration Statement* (*Form*

800    *S-1*) at 63 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114).

801        56.    That same Form S-1 disclosed that McCabe "holds a 4.5% overriding royalty

802    interest in the Orogrande acreage," which was "obtained prior to, and not a part of any transactions

803    with [Next Bridge] or its subsidiaries." This statement affirms McCabe's continuing economic

804    interest in the leases, derived from insider transactions conducted while APC was insolvent and

805    without arms-length scrutiny. *See Next Bridge Hydrocarbons, Inc.*, *Registration Statement* (*Form*

806    *S-1*) at 63 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114).

807        57.    However, NBH's Form S-1 omitted any reference to the APC bankruptcy, the 2014

808    judicial findings of fraudulent conveyance, or the override royalty structures benefitting McCabe,

809    Hoisager, and DuBose. These omissions constituted material disclosure failures under the federal

810    securities laws, depriving investors of critical information concerning the origin, legal status, and

811    encumbrances of NBH's sole asset. *See Next Bridge Hydrocarbons, Inc.*, *Registration Statement*

812    (*Form S-1*) (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114); *see also Weiss v.*

813    *Arabella Expl., Inc.* (In re *Arabella Petroleum Co., LLC*), Adv. No. 16-07002 (Bankr. W.D. Tex.

814    Dec. 22, 2022).

815        58.    In addition to the Orogrande, MPC retained a 25% back-in working interest in the

816    Hazel Project, as guaranteed by a May 1, 2016 Participation Agreement executed among

817    Torchlight, IMPERIAL EXPLORATION, LLC ("**Imperial**"), and MPC. This contractual right

818    was disclosed in NBH's Form S-1 and demonstrates McCabe's continued economic interest in

819    assets originally transferred from Arabella during insolvency. *See Next Bridge Hydrocarbons, Inc.*,

820    *Registration Statement* (*Form S-1*), *supra*, at 64–65.

821    59.    On August 13, 2020, Torchlight Energy, Inc. and its subsidiary TORCHLIGHT

822    HAZEL, LLC ("**Torchlight-Hazel**") entered into an Option Agreement with MASTERSON

823    HAZEL PARTNERS, LP ("**MHP**") and MPC, whereby MHP paid a nominal option fee of $1,000

824    to secure the right to drill a well on the Torchlight-Hazel Project, which originated from assets

825    transferred via the adjudicated fraudulent March 2014 Arabella–MPC conveyance. MHP agreed

826    to drill and complete the lateral well at its sole expense by September 30, 2020, in order to satisfy

827    Torchlight's continuous development obligations and preserve its leasehold interests in the Hazel

828    acreage. MHP fulfilled this obligation and was contractually entitled to receive 100% of the

829    revenue attributable to Torchlight's interest in the well until it had fully recouped its drilling and

830    operating costs. This transaction was disclosed in *Next Bridge Hydrocarbons, Inc., Registration*

831    *Statement* (Form S-1), at 63–64 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114).

832    60.    The performance of this well was used by Torchlight to fulfill its continuous

833    development obligations, thereby preserving leasehold interests traceable to the original insider-

834    engineered asset transfer. The timing and structure of this Option Agreement, entered into more

835    than five years after the Arabella bankruptcy and after public disclosure of the fraudulent transfer

836    findings, eliminate any plausible claim of good faith or lack of knowledge on MHP's part. The

837    transaction demonstrates both knowledge and economic participation in tainted title and materially

838    aided in preserving the appearance of valid title over fraudulently obtained leases—satisfying the

839    "benefit" and "proximity" elements of constructive fraudulent transfer under *11 U.S.C. §*

840    *548(a)(1)(B)* and *Tex. Bus. & Com. Code § 24.005(a)(2)*.

841    61.    Given that DuBose is directly named in SEC filings as a [then] current officer of

842 NBH and was a known insider during the period when override royalty interests were layered onto

843 the Arabella lease base, ARABELLA ROYALTY MANAGEMENT, LLC ("**ARM**") operated as

844 a vehicle for residual enrichment. Its role was to preserve insider revenue streams from assets that

845 had been stripped from APC through fraudulent conveyance. This arrangement allowed DuBose

846 and his affiliates to capture future income from oil and gas leases they no longer formally

847 controlled, thereby evading standard corporate and securities law disclosures. See *Next Bridge*

848 *Hydrocarbons, Inc.*, Registration Statement (Form S-1), at 1–78 (Nov. 9, 2022), SEC Accession

849 No. 0001193125-22-292114.

850    62.    SEC filings from NBH and Torchlight consistently identify override royalty

851 interests retained by entities tied to McCabe, Hoisager, and DuBose, including Magdalena, Green

852 Hill, and unnamed royalty conduits. These override structures were not merely legacy

853 entitlements—they were established precisely to extract income from leaseholds fraudulently

854 transferred from APC to MPC, then laundered into Torchlight via Hudspeth. As its name and

855 context suggest, ARM was purpose-built to collect, distribute, or warehouse override interests

856 burdening Arabella-origin leases, functioning as a shielded cashflow conduit for insiders. See *Next*

857 *Bridge Hydrocarbons, Inc.*, Registration Statement (Form S-1), supra, at 1–78; see also *SEC v.*

858 *Brda*, No. 1:24-cv-04806, Compl. ¶¶ 50–105 (S.D.N.Y. June 25, 2024).

859    63.    These retained override and back-in rights enabled insiders—including McCabe,

860 Hoisager, and DuBose—to preserve financial interests in oil and gas assets that had been

861 fraudulently stripped from APC during insolvency. The concealment of these rights through

862 layered and affiliated entities deprived downstream investors—including Plaintiffs—of material

863    facts necessary to evaluate the true value and legitimacy of the securities later issued. *See Next*

864    *Bridge Hydrocarbons, Inc.*, *Registration Statement (Form S-1)*, *supra*, at 63–65.

865    D.    **Torchlight Capitalized on Assets That Were Fraudulently Transferred and**

866    **Legally Void**

867    64.    Torchlight acquired 100% of the outstanding stock of Hudspeth from McCabe on

868    September 23, 2014, in exchange for 868,750 restricted shares of Torchlight common stock. This

869    transaction served as the operative conduit through which Torchlight acquired title to the oil and

870    gas leasehold interests that had previously been fraudulently conveyed by APC to MPC.[10] *See*

871    *Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise* ¶ 7, *In*

872    *re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017).

873    65.    During the period of Torchlight's June 2021 at-the-market ("**ATM**") offering, the

874    company operated with a materially deficient system of internal accounting controls. These

875    deficiencies were so severe that Torchlight failed to properly account for asset dispositions,

876    document key payments, or maintain records sufficient to substantiate consultant disbursements

877    tied to the formation of its planned spin-off entity. *See SEC v. Brda*, No. 4:24-cv-01048, ¶¶ 78–80

878    (E.D. Tex. filed June 25, 2024).

879    66.    Torchlight's internal accounting controls were so inadequate that the company

880    failed to record asset impairments, verify reserves, or disclose known title defects associated with

881    its Hudspeth leasehold interests. These failures form the basis of the SEC's allegations in *SEC v.*

882    *Brda*, which assert that Torchlight violated 15 U.S.C. § 78m(b)(2)(B) by failing to devise and

---

[10] See Objection of the Official Comm. of Unsecured Creditors to Mot. to Approve Compromise ¶ 7, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. Aug. 15, 2017), ECF No. 431 (noting that Hudspeth's September 23, 2014 stock sale to Torchlight for 868,750 restricted shares was the mechanism by which Torchlight absorbed the Reeves County leases; further objecting that the APC estate received no consideration for the upstream transfers, leaving unsecured creditors without recourse to the assets).

883    maintain a system of internal accounting controls sufficient to ensure accurate financial reporting,

884    proper documentation, and lawful recognition of corporate expenses.[11] *See id.* ¶¶ 78–82.

885    67.    Despite inheriting assets derived from an adjudicated fraudulent transfer,

886    Torchlight's public filings—specifically its 2014 and 2015 *Forms 10-K*—repeatedly represented

887    that the company held a "100% working interest" in the Orogrande Project, without disclosing the

888    upstream title defect or the fraudulent conveyance findings related to *APC. See Torchlight Energy*

889    *Res., Inc., Annual Report* (*Form 10-K*) at 6–8 (Mar. 16, 2015).

890    68.    In advance of its 2021 reverse merger with Meta, executives of Torchlight—most

891    notably CEO John Brda—repeatedly represented to investors that the company was using

892    *"commercially reasonable efforts"* to sell its oil and gas assets and would distribute the *"net*

893    *proceeds"* to holders of the *Series A Preferred* shares. *See Definitive Proxy Statement*, *Torchlight*

894    *Energy          Res.,          Inc.*          (May          7,          2021),

895    https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.ht

896    m.

897    69.    According to the SEC, these representations were materially false. Torchlight and

898    its then CEO, John Brda, "*had no prospects to sell the oil and gas assets and had taken no actions*

899    *to lay the groundwork for a sale*" at the time the statements were made. *See Complaint* ¶ 75, *SEC*

900    *v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024).

901    70.    Instead of preparing to sell the assets, Torchlight conducted an ATM equity offering

902    between June 18 and June 24, 2021. During this period, the company sold approximately 16.2

---

[11] See Complaint ¶¶ 138–40, SEC v. Brda, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024), ECF No. 1 (alleging Torchlight failed to implement internal accounting controls and maintain adequate books and records by paying stock-support consultants and funneling $20,000 per month to spin-off managers through an undocumented intermediary, thereby violating 15 U.S.C. § 78m(b)(2)(B)).

903    million shares at an average price of $8.50 per share, raising more than $137 million. *See*

904    *Complaint* ¶ 106, *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024).

905    71.    On June 21, 2021, Torchlight's share price peaked at $10.88 and closed at $9.92,

906    driven by retail investor speculation regarding the anticipated value of the Series A Preferred

907    Dividend (or $*MMTLP*). *See Complaint* ¶¶ 65–66, *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y.

908    June 25, 2024).

909    72.    Internal communications reveal that Torchlight CEO Brda and Meta CEO Palikaras

910    actively coordinated to exploit the price inflation caused by retail trading activity. On June 18,

911    2021, Brda stated, *"We have two days to take advantage of the squeeze, today should have been a*

912    *5 million share day at 6."* Palikaras responded, *"To the moon! We are happy to take $100–200m*

913    *at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." See Complaint*

914    ¶¶ 104–105, *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024).

915    73.    In *SEC v. Brda*, the Commission alleged that the June 2021 at-the-market offering

916    was the product of a coordinated scheme to manipulate and monetize Torchlight equity through

917    false statements and omissions. Plaintiffs contend that this capital raise went further: it rested on

918    equity instruments underpinned by leasehold assets that were void from inception because they

919    had been fraudulently conveyed. The supposed divestiture efforts and asset values promoted to

920    investors were illusory, and the securities sold were necessarily tainted by their defective asset

921    base. *See* Complaint ¶¶ 1–15, 67–107, *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024).

922    E.    **The Meta Merger and NBH Spinout Were Structured to Obscure Title Defects**

923    **and Enrich Insiders**

924    74.    On June 28, 2021, Torchlight and Meta consummated a reverse triangular merger.

925    Pursuant to the transaction terms, legacy Torchlight shareholders received Series A Preferred

926   Shares intended to represent residual interest in the company's oil and gas assets. *See Complaint*

927   *¶¶ 29–33, Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15,

928   2024).

929       75.    Under the Certificate of Designation, if the oil and gas assets were not sold within

930   a defined period, Meta was obligated to initiate a spin-off of the legacy hydrocarbon holdings into

931   a separate entity. *See Complaint ¶ 34, Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-

932   00767-P (N.D. Tex. Mar. 15, 2024).

933       76.    Meta did not sell the assets. Instead, on July 15, 2022, it filed a *Form S-1*

934   registration statement for a newly formed entity—NBH—which was created specifically to receive

935   and hold the hydrocarbon assets formerly attributed to Torchlight. *See Aff. of Georgios Palikaras*

936   *¶ 13, Inter-Coasteral Waterways Ltd. v. Tradestation Sec., Inc.*, No. 24-cv-4473 (S.D.N.Y. Aug.

937   15, 2024).

938       77.    According to the same affidavit, *"On November 18, 2022, Next Bridge's Form S-1*

939   *became effective,"* and holders of Series A Preferred shares were granted a 1-for-1 share exchange

940   into NBH common stock. *See Aff. of Georgios Palikaras ¶ 14, Inter-Coasteral Waterways Ltd. v.*

941   *Tradestation Sec., Inc.*, No. 24-cv-4473 (S.D.N.Y. Aug. 15, 2024).

942       78.    On December 14, 2022, Meta publicly announced that "*all of the shares of Series*

943   *A Preferred Stock will be automatically canceled,*" thereby confirming that equity in *NBH* had

944   been distributed. *See Aff. of Georgios Palikaras ¶ 24, Inter-Coasteral Waterways Ltd. v.*

945   *Tradestation Sec., Inc.*, No. 24-cv-4473 (S.D.N.Y. Aug. 15, 2024).

946       79.    According to the Taggart complaint, "*Meta Materials distributed 165,472,241*

947   *shares of NBH to the Preferred Stock shareholders,*" without disclosing that the underlying oil and

948    gas leases originated from a fraudulent 2014 conveyance by APC. *See Compl.* ¶ 61, *Taggart v.*

949    *Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024).

950        80.    The same Taggart complaint alleges that "*immediately prior to the completion of*

951    *the Spin-Off, Gregory McCabe owned and/or beneficially controlled 19,605,348 shares of*

952    *Preferred Stock,*" and that "*immediately following the Spin-Off, McCabe owned 12,826,492 shares*

953    *of NBH.*" *See Compl.* ¶¶ 67–68, *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-

954    P (N.D. Tex. Mar. 15, 2024).

955        81.    It further alleges that McCabe "*liquidated approximately 6.7 million shares of*

956    *Preferred Stock on the eve of the Spin-Off,*" generating proceeds estimated between $19.6 million

957    and $78.9 million. *See Compl.* ¶ 79, *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-

958    00767-P (N.D. Tex. Mar. 15, 2024).

959        82.    Crucially, the NBH Form S-1 Registration Statement filed on December 14, 2022,

960    failed to disclose: (a) the Arabella bankruptcy; (b) the judicially-recognized fraudulent conveyance

961    from APC to MPC; and (c) the ongoing override royalty interests still held by insiders including

962    McCabe, Hoisager, and DuBose. *See Next Bridge Hydrocarbons, Inc.*, *Registration Statement*

963    (Form S-1) (Nov. 9, 2022), SEC Accession No. 0001193125-22-292114.

964        83.    At no point during or after the merger did Meta disclose that the assets underpinning

965    Torchlight's valuation were obtained through a series of fraudulent upstream transfers, beginning

966    with the March 2014 lease assignment from APC to MPC. This transfer has since been judicially

967    determined to constitute an actual and constructive fraudulent transfer under 11 U.S.C. § 548 and

968    Tex. Bus. & Com. Code § 24.005, as established in final orders entered in *Weiss v. Arabella*

969    *Exploration Inc.*, Adv. No. 16-07002-tmd (Bankr. W.D. Tex. Dec. 22, 2022).

84.     Meta and NBH nonetheless accepted and promoted these assets as legitimate, issuing securities and public capitalization statements that failed to disclose the known title defect. These downstream equity instruments—including the Series A Preferred Dividend issued as MMTLP and the common shares of Next Bridge—are void as a matter of law, having been issued in reliance on unlawfully obtained assets. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 346–47 (S.D.N.Y. 1998) ("[A] person who acquires property through fraud . . . may not convey valid title."); *see also* 15 U.S.C. §§ 77e, 77q(a).

F.     **The MMTLP Trading Halt and Meta Bankruptcy Rendered Plaintiffs' Securities Permanently Illiquid**

85.     On December 9, 2022, FINRA imposed a U3 trading halt on $MMTLP shares, citing *"significant uncertainty in the settlement and clearing process"* for the Series A Preferred security. *See Inter-Coasteral Waterways v. Tradestation Sec., Inc.*, Aff. of Georgios Palikaras ¶ 34 (S.D.N.Y. Aug. 15, 2024).

86.     According to [then] Meta's CEO *"FINRA never stated in any communications to the Company (or publicly) that they were going to halt the trading as of December 8, 2022,"* and failed to provide any formal justification for the halt even weeks after it took effect. *Id.* ¶¶ 35–36.

87.     On December 13, 2022, FINRA deleted the $MMTLP ticker entirely, resulting in more than 165 million shares being locked in brokerage accounts without any ability to sell, settle, or transfer. *Id.* ¶ 37.

88.     Despite hundreds of formal investor complaints, repeated outreach to FINRA's Ombudsman, and direct engagement from legal counsel representing both Meta and NBH, *"we never received any answers for exactly what the 'extraordinary event' or reasons were that FINRA relied on to enact the halt." Id.* ¶ 36.

993      89.     On March 14, 2024, Meta, the issuer of the MMTLP dividend, filed for Chapter 11

994    bankruptcy in the United States Bankruptcy Court for the District of Delaware. See In re Meta

995    Materials Inc., No. 24-10438 (Bankr. D. Del. Mar. 14, 2024).

996      90.     According to Next Bridge's 2023 Annual Report, the fair market value of the oil

997    and gas assets that previously backed the *MMTLP* dividend was restated to $0. *See Taggart v. Next*

998    *Bridge Hydrocarbons, Inc.*, Compl. ¶ 56, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024).

999      91.     As a result, Plaintiffs have been entirely deprived of liquidity, dividend value, and

1000   market participation. They now hold unregistered, non–DTC-eligible *NBH* shares for which there

1001   is no public trading market and no mechanism for resale or recovery. *See Next Bridge*

1002   *Hydrocarbons, Inc.*, Registration Statement (Form S-1), at 26 (Nov. 9, 2022) (SEC Accession No.

1003   0001193125-22-292114).

1004     G.     **Regulatory Inaction, Disclosure Failures, and Ongoing Public Harm**

1005      92.     As of June 5, 2024, more than 40,000 investor complaints had been submitted to

1006   Congress regarding the $MMTLP trading halt and asset defects. Representative Ralph Norman

1007   and 73 other Members of Congress wrote: *"We have received more than 40,000 letters from*

1008   *concerned investors"* and urged the SEC *"to review these market events and determine what, if*

1009   *any, wrongdoing may have occurred." See* Letter from 74 Members of Congress to Gary Gensler

1010   & Robert W. Cook, at 2 (Dec. 22, 2023).

1011      93.     Despite these demands, the SEC has never answered the question: *"Why was*

1012   MMTLP *permitted to trade?"* Nor has FINRA produced *"a certified audited and consolidated*

1013   *count of shares… related to* MMTLP *on the date of December 12, 2022." See* Letter from 74

1014   Members of Congress to Gary Gensler & Robert W. Cook, at 2–3 (Dec. 22, 2023).

94.     On September 26, 2023, Senators JD Vance and Mike Crapo formally wrote to SEC Chair Gary Gensler, citing *"a pressing need for transparency"* and demanding an explanation of *"what happened with* MMTLP.*" See* Letter from Sen. JD Vance & Sen. Mike Crapo to Gary Gensler (Sept. 26, 2023).

95.     In November 2024, the U.S. Government Accountability Office (*GAO*) reported that although the SEC conducted 21 inspections of *FINRA* between FY 2021 and FY 2023, none produced any public findings related to *"material disclosure omissions"* or *"investor harm related to* MMTLP.*" See* U.S. Gov't Accountability Off., *Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-25-107723, at 7–9 (Nov. 2024).

96.     The SEC's internal audit unit, FSIO, also reviewed *"tips, complaints, and referrals"* concerning FINRA during this period. However, no corrective action reviews or performance findings *"at or above a specified significance level"* were reported in FY 2023. *See* U.S. Gov't Accountability Off., *Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-25-107723, at 11 (Nov. 2024).

97.     Meanwhile, no SEC filings by Meta or NBH disclosed the existence of the Arabella bankruptcy, the $2.1 million settlement with McCabe, or the override royalty rights retained by McCabe, Hoisager, or DuBose. *See Next Bridge Hydrocarbons, Inc.*, Registration Statement (*Form S-1*), at 1–78 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114).

98.     The SEC's complaint against Brda and Palikaras revealed that Brda, while still CEO of Torchlight, coordinated with Palikaras to take advantage of a price surge, stating: *"We have two days to take advantage of the squeeze,"* to which Palikaras replied: *"To the moon! We are happy to take $100–200m at a 20% PREMIUM TO THE MARKET." See SEC v. Brda*, No. 1:24-cv-04806, Compl. ¶¶ 104–05 (S.D.N.Y. June 25, 2024).

99.    Despite touting a potential $9 billion valuation of the Orogrande Basin, neither Meta nor Torchlight ever disclosed any third-party reserve report or certified asset valuation. *See SEC v. Brda*, No. 1:24-cv-04806, Compl. ¶¶ 50–53 (S.D.N.Y. June 25, 2024).

100.    The GAO confirmed that *"specific findings from SEC inspections and examinations of FINRA"* were withheld from public release due to internal sensitivity designations—leaving both Congress and the public in the dark. *See U.S. Gov't Accountability Off., Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-25-107723, at 4 (Nov. 2024).

101.    As of February 2025, more than 65,000 U.S. retail shareholders remain trapped in non-transferable NBH equity, with no market, no liquidity, and no exit path. *See Compl.* ¶¶ 56–61, *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024).

102.    Plaintiffs include retirees, veterans, small business owners, and low-income housing providers—many of whom lost their life savings—while insiders liquidated override interests and spinout shares behind closed doors. *See Compl.* ¶¶ 67–79, *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024).

103.    The harm could have been avoided entirely had the leases been lawfully conveyed, or had the companies disclosed the truth about override structures, void title, and ongoing bankruptcy litigation at the time of the spinoff and equity issuance. *See Weiss v. Arabella Expl., Inc.* (*In re Arabella Petroleum Co., LLC*), Adv. No. 16-07002 (Bankr. W.D. Tex. Feb. 29, 2016); *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024); *Next Bridge Hydrocarbons, Inc.*, Registration Statement (Form S-1) (Nov. 9, 2022), SEC Accession No. 0001193125-22-292114; *U.S. Gov't Accountability Off., Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-25-107723, at 7–9 (Nov. 2024).

H.    **Legal Summary of Legal Consequences and Remedial Imperatives**

104.    The factual record establishes beyond reasonable dispute that the March 2014 transfer of leasehold assets from APC to MPC was both constructively and actually fraudulent— executed without consideration, during insolvency, and with direct insider benefit. The bankruptcy court expressly accepted the Trustee's position that the transaction lacked any arms-length negotiation and was supported only by illusory consideration.[12] *See In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. July 26, 2017) (*Mot. to Approve Compromise* ¶¶ 5– 7).

105.    Under long-settled federal law, a transaction declared *void ab initio* is treated as a legal nullity from inception. *See United States v. Zacks*, 375 U.S. 59, 70 (1963). Consequently, the transfer of the *"Subject Leases"* to MPC, and all derivative conveyances to Hudspeth, *Torchlight*, and *Meta*, were legally invalid. As the court explained in *SEC v. Cavanagh*, securities issued without a lawful asset basis are *void and subject to rescission*. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998).

106.    Torchlight's capitalization on those leases—via share offerings, reverse merger structuring, and the issuance of the Series A Preferred dividend—cannot retroactively sanitize the underlying fraud. Courts have repeatedly held that reverse mergers do not absolve successor entities of defects in the origin of underlying assets. *See SEC v. China Energy Savings Tech., Inc.*, No. 2:06-cv-06344 (C.D. Cal. Oct. 2006); *Cantu v. Guerra*, No. 04-13-00729-CV, 2014 WL 888403, at *7 (Tex. App.—San Antonio Mar. 6, 2014).

---

[12] See Trustee's Mot. to Approve Compromise and Settlement at 2–3, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. July 26, 2017), ECF No. 419 (reporting that APC's books and records reflected "no apparent consideration" for the March 4, 2014 assignment of leases to McCabe Petroleum, and that the transfer was subject to avoidance as a fraudulent conveyance); id. Ex. A (Settlement Agreement) (memorializing the Trustee's demand for recovery of the fraudulently conveyed leases, a position later accepted by the bankruptcy court).

107.    Moreover, the concealment of override royalty retention by McCabe, Hoisager, and DuBose—through affiliated entities including Magdalena, Green Hill Minerals, and Wolfbone—not only perpetuated unjust enrichment but constituted an ongoing failure to disclose material facts in violation of federal securities laws. These override and back-in interests, acquired for no consideration and retained despite the fraudulent origin of title, were never disclosed in any SEC registration statements or investor communications, thereby depriving retail shareholders of essential information bearing directly on asset provenance, valuation integrity, and insider enrichment.[13] *See SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June 25, 2024) (Compl. ¶¶ 50–105).

108.    The result was the construction of a capital structure built entirely upon fraudulent foundations. $MMAT were issued on the basis of invalid equity acquired through $TRCH, whose claimed oil and gas assets stemmed from a void conveyance. $MMTLP shares were distributed as a dividend against those same unlawfully obtained assets, rendering the securities fatally defective. Subsequently, NBH spun out its equity atop contaminated title, offering no transferrable basis and failing to register under any lawful exemption. The *Form S-1* filed by NBH did not cure these foundational defects. *See Next Bridge Hydrocarbons, Inc.*, Registration Statement (Form S-1), at 1–78 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114).

109.    Retail investors—over 65,000 of them—were not merely defrauded financially, but misled into acquiring unregistered, non-DTC-eligible, and permanently illiquid equity instruments. These shares, including MMTLP and NBH, were issued atop a legally defective asset base, rendering the instruments facially marketable but substantively void.

---

[13] See Trustee's Mot. to Approve Compromise and Settlement at 5–7, *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd (Bankr. W.D. Tex. July 26, 2017), ECF No. 419 (reporting that APC "did not receive any apparent consideration for the Transfers," that the books and records showed no loan, capital contribution, or equity entry tied to the March 2014 conveyance, and that McCabe Petroleum was not listed as a creditor or equity holder at the time); see also *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002 (Bankr. W.D. Tex. Dec. 22, 2022) (Mem. Op. at 8–12) (finding that the March 2014 assignment bore multiple "badges of fraud," including transfer to an insider, insolvency at the time of transfer, and lack of reasonably equivalent value, and holding the conveyance both actually and constructively fraudulent under 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.005)

110.    The origin transaction—the March 2014 assignment of leases from APC to MPC—occurred while APC was insolvent, lacked any arm's-length negotiation, and was executed for no reasonably equivalent value.[14] These facts satisfy both actual and constructive fraudulent transfer standards under *11 U.S.C. §§ 548(a)(1)(A)–(B)* and *Tex. Bus. & Com. Code § 24.005(a)(1)–(2)*.

111.    Subsequent reassignments—through Hudspeth and ultimately into Torchlight—served only to layer the transaction chain, not to cure its illegality. Torchlight's public capitalization of these assets extended the fraud into public markets, concealing the origin defects through omission and misrepresentation.

112.    The notarizations on the two central lease transfers—Birken on March 4, 2014, and LeGendre on June 4, 2014—were both executed by internal corporate agents of Arabella or its affiliates. These insiders lacked disinterested status, calling into question the authenticity of the acknowledgments under *Texas Civil Practices & Remedies Code § 16.069* and common law forgery standards. As a result, these instruments are legally void and incapable of conveying title as a matter of law.

113.    As held in *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998), securities issued without a lawful asset basis are void and subject to rescission. Here, the securities issued by Torchlight, Meta Materials, and ultimately NBH were premised on a title chain that never held legal force.[15]

---

[14] See *Weiss v. Arabella Expl., Inc.* (In re Arabella Petroleum Co., LLC), Adv. No. 16-07002, Memorandum Opinion at 8–12, 22–23 (Bankr. W.D. Tex. Dec. 22, 2022) (Davis, J.) (finding that the March 2014 assignment of APC's leases to McCabe Petroleum occurred while APC was insolvent, involved no arms-length negotiation, and provided no reasonably equivalent value; holding that the transfer bore multiple badges of fraud and constituted both actual and constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A)–(B) and Tex. Bus. & Com. Code § 24.005(a)(1)–(2)).

[15] See *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998) (holding that "securities issued without registration … are not merely voidable but void *ab initio*, and thus subject to rescission"); see also *Weiss v. Arabella Expl., Inc.* (In re Arabella Petroleum Co., LLC), Adv. No. 16-07002, Memorandum Opinion at 8–12, 22–23 (Bankr. W.D. Tex. Dec. 22, 2022) (Davis, J.) (finding the March 2014 assignment from APC to McCabe Petroleum occurred without consideration, during insolvency, and bore multiple badges of fraud, rendering the conveyance both actually and constructively fraudulent); *Taggart v. Next Bridge Hydrocarbons, Inc.*, No. 4:24-cv-00767-P, Compl. ¶¶ 56–61 (N.D. Tex. Mar. 15, 2024) (alleging that NBH securities were issued on the basis of materially misstated asset values and concealed title defects).

114.    Plaintiffs were thus induced into transactions that violated multiple federal securities laws, including *Sections 5 and 17(a) of the Securities Act of 1933* and *Rule 10b-5 of the Exchange Act*, as well as longstanding equitable doctrines such as constructive trust, unjust enrichment, and void *ab initio* relief. Their injuries are not merely financial—they implicate the very legality of the instruments they were issued.

115.    This complaint does not assert novel theories. It applies well-established federal and Texas precedent to expose and unwind a multi-year pattern of asset stripping, title laundering, corporate misdirection, and securities fraud. The Bankruptcy Court for the Western District of Texas found that APC's 2014 lease assignment to MPC was a fraudulent transfer under both 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.005, lacking documentation, consideration, or lawful purpose. See *Mot. to Approve Compromise* ¶¶ 5–7, *In re Arabella Petroleum Co.*, No. 15-70098-tmd (Bankr. W.D. Tex. July 26, 2017). Downstream equity and override issuances flowed from that unlawful origin and were materially misrepresented in filings submitted to the SEC. See *Next Bridge Hydrocarbons, Inc.*, Registration Statement (Form S-1), at 1–78 (Nov. 9, 2022) (SEC Accession No. 0001193125-22-292114). Courts have consistently held that void instruments and the securities built atop them are subject to rescission, disgorgement, and constructive trust. See *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998); *United States v. Zacks*, 375 U.S. 59, 70 (1963). As the court in *Cavanagh* emphasized, when insiders obscure reality to evade scrutiny, "the court must cut through form to the substance and uphold the protections that the law was meant to afford." Id. at 346. That principle governs here.

## IV.    CAUSES FOR ACTION

### COUNT I:

**<u>Declaratory Judgment That Defendants' Securities and Transactions Are Void *Ab Initio*</u>**

58

1142    (Against Defendants McCabe Petroleum Corporation, Hudspeth Oil Corporation, Torchlight

1143    Energy Resources, Inc., also, Meta Materials, Inc., and Next Bridge Hydrocarbons, Inc. as

1144    successor-in-interest)

1145    116.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

1146    and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

1147    this instant Count.

1148    117.    The origin of the Subject Leases is irreparably tainted by an undisputed fraudulent

1149    transfer executed in March 2014, whereby APC conveyed approximately 133,000 net mineral

1150    acres to MPC during a period of balance-sheet insolvency and without receiving any consideration

1151    in return. This transfer was never approved by APC's board of directors, membership, or any

1152    bankruptcy authority. Instead, it was orchestrated and executed by insiders Hoisager and McCabe

1153    through entities they controlled, without arms-length negotiation or documentation. The assets

1154    thus transferred were then used to capitalize downstream entities— Hudspeth, Torchlight, and

1155    ultimately NBH—which relied on these encumbered and unlawfully acquired leases as the basis

1156    for public securities offerings and corporate valuations. The United States Bankruptcy Court for

1157    the Western District of Texas, in Adversary No. 16-07002-tmd, found that these upstream

1158    conveyances were executed with both actual and constructive intent to hinder, delay, or defraud

1159    creditors. As such, the Subject Leases were void *ab initio*, and all derivative securities,

1160    transactions, and instruments premised on their legitimacy are likewise void under federal and

1161    Texas law. See paragraphs 30–42, 70–74, 78–83, and 84–95.

1162    118.    Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202

1163    establishing that the March 2014 leasehold assignment from APC to MPC—and all securities,

1164    corporate transactions, and equity instruments derived therefrom—are void *ab initio* as a matter of

1165  controlling federal and Texas law. Under longstanding precedent, "[a] transaction that is void *ab*

1166  *initio* is treated as a legal nullity from inception." *United States v. Zacks*, 375 U.S. 59, 70 (1963).

1167  Similarly, courts have affirmed that "securities issued without a lawful asset basis are void and

1168  must be rescinded." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998).

119.    The bankruptcy record is clear: the March 2014 transfer was executed without any

1170  form of consideration, during a period of insolvency, and for the exclusive benefit of insiders

1171  McCabe and Hoisager. The Bankruptcy Court explicitly found that the conveyance constituted a

1172  fraudulent transfer under both 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.005. It lacked

1173  supporting documentation, was not conducted at arms-length, and provided no economic benefit

1174  to the estate. See *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd, ECF No. 419, at 5–7;

1175  ECF No. 433 at Hr'g Tr. 20 (Aug. 16, 2017); *Weiss v. Arabella Expl., Inc.*, Adv. No. 16-07002,

1176  Mem. Op. at 8–12 (Bankr. W.D. Tex. Dec. 22, 2022). Further undermining any appearance of

1177  legitimacy, the instruments were notarized by insiders Birken and LeGendre—each of whom held

1178  financial interests in the parties to the transfer—thus invalidating the appearance of disinterested

1179  acknowledgment under Texas Government Code § 406.016 and evidencing multiple "badges of

1180  fraud" as defined under TUFTA. See paragraphs 30–42 and 111–113.

120.    The issuance of securities based on unlawfully obtained or fraud-contaminated

1182  assets violates federal securities law. Where an issuer knowingly offers securities derived from a

1183  void conveyance, or fails to disclose material defects in the origin or legal status of its underlying

1184  assets, it violates Section 17(a) of the Securities Act of 1933 and SEC Rule 10b-5. Courts have

1185  made clear that such instruments are legally null: "[s]ecurities issued without a lawful asset basis

1186  are void and must be rescinded." *Cavanagh*, 1 F. Supp. 2d at 345. Accordingly, all equity

1187    instruments derived from the March 2014 lease transfer are void *ab initio* as a matter of law and

1188    equity. See paragraphs 30–42, 70–74, 78–83, 84–95, and 96–110.

1189    121.    Following this void transaction, MPC and Hudspeth acted as intermediary entities

1190    through which the unlawfully obtained leases were funneled into Torchlight in exchange for equity

1191    consideration. Torchlight then monetized the contaminated leasehold assets through a series of

1192    public securities offerings, including issuance of the Meta Materials Series A Preferred dividend

1193    (MMTLP), which was ultimately converted into shares of NBH pursuant to Meta's Form S-1

1194    registration. Under the well-established doctrine of derivative voidness, "[s]ecurities built on

1195    fraudulently conveyed or illegally held assets are themselves unenforceable." *Cavanagh*, 1 F.

1196    Supp. 2d at 345–46; see also *SEC v. China Energy Savings Tech., Inc.*, No. 2:06-cv-06344, slip

1197    op. at 5–9 (C.D. Cal. 2006); *Cantu v. Guerra*, No. 04-13-00729-CV, 2014 WL 888403, at *7 (Tex.

1198    App.—San Antonio Mar. 6, 2014). See paragraphs 30–42, 70–74, 78–83, and 96–110.

1199    122.    Accordingly, Plaintiffs respectfully seek a declaration that:

1200    (a)    The March 2014 assignment from APC to MPC is void *ab initio*;

1201    (b)    all downstream transactions relying on that assignment—including the

1202    August and September 2014 transfers to Torchlight and Hudspeth, respectively—are

1203    likewise null; and

1204    (c)    all equity instruments capitalized on those assets, including $TRCH,

1205    $MMAT, MMTLP, and NBH shares, are void and unenforceable as a matter of law.

1206    123.    <u>Application to Each Defendant</u>

1207    124.    MPC received the 133,000-acre lease package from APC without consideration

1208    while APC was insolvent. The assignment was notarized by insider Birken. MPC's execution of

1209 overlapping assignments—first to Torchlight in August 2014 and then to Hudspeth in

1210 September—demonstrates concealment and staging. See paragraphs 30–38, 70–74, and 111.

1211     125.    Hudspeth received the leases from MPC on June 4, 2014, through an instrument

1212 notarized by LeGendre, a conflicted Arabella insider. Hudspeth transferred its stock to Torchlight

1213 in September 2014 in exchange for 868,750 shares. See paragraphs 70–74 and 113.

1214     126.    Torchlight acquired the leasehold interests via Hudspeth and claimed a 100%

1215 working interest in SEC filings. It failed to disclose override encumbrances, Arabella's

1216 bankruptcy, or the $2.1M McCabe settlement. It monetized the assets by issuing MMTLP and

1217 raising over $137 million. See paragraphs 70–74, 78–83, 86–90, and 96–103.

1218     127.    Meta inherited the Torchlight asset structure through a reverse triangular merger

1219 and issued $MMAT securities based on void leaseholds. It failed to disclose upstream title defects,

1220 override entitlements, and the bankruptcy record. See paragraphs 78–83, 86–90, and 96–103.

1221     128.    NBH received formal title in December 2022 but failed to disclose the March 2014

1222 fraudulent transfer, override royalty structures, insider notary conflicts, or court findings in its S-

1223 1. See paragraphs 84–90, 96–103, 104–110, and 111–113.

1224     129.    Each Defendant named herein materially participated in originating, concealing,

1225 legitimizing, or profiting from the void chain of title that originated with the March 2014

1226 assignment from APC to MPC. That chain culminated in the issuance and public trading of

1227 securities predicated on an unlawful conveyance. At no point did any Defendant undertake to cure,

1228 disclose, or otherwise rectify the foundational title defect or the fraudulent origin of the Subject

1229 Leases. As a result, the securities issued downstream—whether by Torchlight, Meta, or NBH—

1230 were all tainted by that original illegality. Under federal and Texas law, this Court is not only

1231 authorized but obligated to declare the March 2014 assignment, and all derivative transactions and

1232   instruments based thereon, void *ab initio*. See *United States v. Zacks*, 375 U.S. 59, 70 (1963); *SEC*

1233   *v. Cavanagh*, 1 F. Supp. 2d 337, 345 (S.D.N.Y. 1998); *SEC v. China Energy Savings Tech., Inc.*,

1234   No. 2:06-cv-06344, slip op. at 5–9 (C.D. Cal. 2006).

1235        130.    As a direct and proximate result of Defendants' conduct as described herein,

1236   Plaintiffs have suffered financial harm in an amount to be determined at trial, which shall in no

1237   event be less than $816,073. Plaintiffs respectfully request declaratory relief pursuant to 28 U.S.C.

1238   §§ 2201–2202, including a binding judicial determination that:

1239        (a)    The March 2014 lease assignment from APC to MPC is void *ab initio*;

1240        (b)    All derivative conveyances and downstream securities transactions—

1241   particularly those involving Hudspeth, Torchlight, Meta, and NBH—are likewise null and

1242   without legal effect;

1243        (c)    The $TRCH, $MMAT, MMTLP, and NBH securities issued on the basis

1244   of these contaminated assets are void, unenforceable, and must be treated as null

1245   instruments under law; and

1246        (d)    All such instruments are subject to rescission, the imposition of a

1247   constructive trust, disgorgement of unlawful proceeds, and injunctive relief as further pled

1248   in subsequent counts.

1249                                   **COUNT II:**

1250   **Violations of Section 5 of the Securities Act of 1933 (Unregistered Securities Offerings)**

1251                        (Against Defendant Torchlight Energy Resources, Inc.)

63

1252        131.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

1253    and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

1254    this instant Count.

1255        132.    Defendant Torchlight Energy Resources, Inc. (Torchlight) violated Section 5 of the

1256    Securities Act of 1933, 15 U.S.C. § 77e(a)–(c), by offering and selling securities—specifically

1257    including the Series A Preferred Dividend also known as MMTLP—in interstate commerce

1258    without registering those securities with the U.S. Securities and Exchange Commission and

1259    without qualifying for any lawful exemption from registration. See paragraphs 96–103.

1260        133.    Section 5(a) makes it unlawful for any person, directly or indirectly, to offer or sell

1261    a security through interstate commerce unless a registration statement is in effect. Section 5(c)

1262    prohibits offers or sales unless a registration statement has been filed. These provisions impose

1263    strict liability: intent and scienter are not required. See *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361–

1264    63 (S.D.N.Y. 1998); *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004).

1265        134.    On or about June 25, 2021, Torchlight declared and distributed the Series A

1266    Preferred Dividend (later known as MMTLP) to shareholders of record. The dividend was intended

1267    to convey an equity interest in the company's legacy oil and gas assets. Torchlight publicly

1268    represented that holders of this dividend would be entitled to proceeds from the monetization or

1269    spinout of those assets. However, Torchlight never filed a registration statement under the

1270    Securities Act covering the issuance or distribution of MMTLP shares, nor did it qualify for any

1271    exemption under Regulation D, Regulation A, or Rule 144. See paragraphs 96–103.

1272        135.    Torchlight's transfer agent distributed MMTLP shares directly to shareholders, and

1273    Torchlight permitted those shares to be deposited into brokerage accounts and traded on the OTC

1274    Market. This created the appearance of lawful, publicly tradable equity. As a matter of law, these

1275   acts constituted a de facto public offering in violation of 15 U.S.C. § 77e. Courts have consistently

1276   held that even purported dividends or corporate distributions qualify as "sales" under Section

1277   2(a)(3) of the Securities Act. See *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 740 (2d Cir.

1278   1941). See paragraphs 96–103.

1279   136.   Furthermore, the assets purportedly backing the MMTLP shares had been

1280   fraudulently conveyed and judicially determined to be void *ab initio*. This rendered the securities

1281   legally unregistrable. Torchlight failed to disclose the fraudulent origin of the assets and the known

1282   defects in their legal title—facts material to any investor or regulator evaluating the offering. The

1283   omission of these facts further compounded the violation. See *SEC v. Sierra Brokerage Servs.,*

1284   *Inc.*, 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009) ("A security issued in violation of Section 5 is

1285   voidable at the instance of the purchaser."). See paragraphs 30–42, 84–90, 96–103, and 111–113.

1286   137.   Accordingly, Torchlight is strictly liable under Section 5 for issuing and facilitating

1287   the public trading of MMTLP securities without registering the offering or qualifying for an

1288   exemption, in violation of 15 U.S.C. § 77e(a)–(c).

1289   138.   As a result of Torchlight's unlawful conduct as described herein, Plaintiffs have

1290   been damaged in an amount to be determined at trial that should in no event be less than $816,073.

1291   Plaintiffs respectfully request equitable and statutory relief under 15 U.S.C. § 77l(a), including:

1292         (a)    rescission of the unregistered securities transaction,

1293         (b)    restitution of consideration paid,

1294         (c)    injunctive relief barring any further sale, transfer, or listing of securities

1295   based on the void asset base, and

1296         (d)    imposition of a constructive trust over any proceeds received by Torchlight

1297   from the issuance, distribution, or monetization of MMTLP equity.

1298                                     **COUNT III:**

1299        **Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

1300                      (Against Defendant Torchlight Energy Resources, Inc.)

1301        139.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

1302   and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

1303   this instant Count.

1304        140.    Defendant Torchlight Energy Resources, Inc. (Torchlight) violated Section 10(b)

1305   of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

1306   thereunder, 17 C.F.R. § 240.10b-5, by making materially false statements and omissions in

1307   connection with the offer, sale, and promotion of its securities—specifically, $MMAT common

1308   stock and the Series A Preferred Dividend also known as MMTLP. These misrepresentations and

1309   concealments were made with scienter, were intended to induce investor reliance, and in fact

1310   caused substantial investor losses. See paragraphs 78–83, 86–90, and 96–103.

1311        141.    Section 10(b) prohibits the use of any "manipulative or deceptive device or

1312   contrivance" in connection with the purchase or sale of securities. Rule 10b-5 makes it unlawful

1313   to (a) employ any device, scheme, or artifice to defraud; (b) make untrue statements or omit

1314   material facts necessary to make statements not misleading; or (c) engage in any act that would

1315   operate as a fraud upon investors. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

1316   319 (2007).

1317        142.    Torchlight knowingly engaged in a deceptive scheme to mislead investors and

1318   inflate its share price during the lead-up to its June 2021 merger with Meta. Torchlight publicly

1319   claimed its oil and gas assets were worth up to $9 billion and represented that the Series A Preferred

1320   Dividend would convey rights to future proceeds from asset monetization. However, Torchlight

1321   failed to disclose that the core asset base—133,000 acres in the Orogrande Basin—originated from

1322   a March 2014 transaction judicially determined to be a fraudulent conveyance. See paragraphs 30–

1323   42, 78–83, 86–90, and 96–103.

1324       143.   Torchlight made materially false and misleading statements by:

1325       (a)   Claiming in public filings to hold a "*100% working interest*" in the

1326   Orogrande Project, despite acquiring only void title from Hudspeth, which had received

1327   the assets via a self-dealing, undocumented, insider-notarized transaction without

1328   consideration. See paragraphs 30–42, 70–74, 111, and 113.

1329       (b)   Representing in SEC filings and investor communications that Torchlight

1330   was actively pursuing monetization of the assets for the benefit of Series A Preferred

1331   holders, while internally acknowledging it had no viable plan to divest or develop the

1332   assets. See paragraphs 86–90 and 96–103.

1333       (c)   Omitting material facts from proxy statements, SEC filings, and investor

1334   presentations—including the Arabella bankruptcy, the override royalty encumbrances, and

1335   the judicial finding that the asset base was void *ab initio*. See paragraphs 30–42, 84–90,

1336   and 96–103.

1337       (d)   These omissions were not negligent or inadvertent. As established in SEC

1338   v. Brda, Torchlight's CEO, John Brda, and senior officers at Meta coordinated investor

1339   messaging, cultivated speculative retail demand, and used the resulting price inflation to

1340   conduct a massive at-the-market equity offering in June 2021. Torchlight raised more than

1341   $137 million while failing to disclose that the asset base underlying those securities was

1342      legally defective and unmarketable. See *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. June

1343      25, 2024); see paragraphs 96–103 and 104–110.

1344      (e)     As a result of this fraudulent scheme, Plaintiffs—like thousands of other

1345      retail investors—purchased $MMAT and MMTLP securities based on false assurances that

1346      these instruments were lawfully issued and backed by monetizable assets. In reality, those

1347      securities were legally void and have become permanently illiquid and untradeable. See

1348      paragraphs 84–90, 96–103, and 104–110.

1349      144.     Torchlight's conduct satisfies all elements of securities fraud:

1350      (a)     It made material misstatements and omissions regarding asset value, legal

1351      title, and override royalty encumbrances;

1352      (b)     These misstatements were made with scienter, as evidenced by a sustained

1353      pattern of concealment and strategic misrepresentation;

1354      (c)     The conduct occurred in connection with the purchase or sale of securities,

1355      including the MMTLP dividend and $MMAT equity;

1356      (d)     Plaintiffs relied on these misstatements to their detriment, resulting in

1357      economic harm and a total loss of market liquidity.

1358      145.     As a result of Torchlight's conduct as described herein, Plaintiffs have been

1359 damaged in an amount to be determined at trial that should in no event be less than $816,073.

1360 Plaintiffs respectfully request relief under 15 U.S.C. §§ 78j(b) and 78t, and 17 C.F.R. § 240.10b-

1361 5, including:

1362      (a)     rescission of all affected securities;

1363      (b)     equitable disgorgement of proceeds traceable to the fraudulent scheme;

1364      (c)     compensatory damages;

1365       (d)    pre- and post-judgment interest; and

1366       (e)    any further relief the Court deems just and proper.

1367                **COUNT IV:**

1368     **<u>Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A)–(B)</u>**

1369     (Against Defendants McCabe Petroleum Corporation, Hudspeth Oil Corporation,

1370         and Torchlight Energy Resources, Inc.)

1371     146.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

1372 and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

1373 this instant Count.

1374     147.    This is an action to declare the March 2014 assignment of oil and gas leasehold

1375 interests from APC to MPC, and all subsequent transfers based thereon, voidable as actual and

1376 constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(A)–(B), as judicially adopted by the

1377 Bankruptcy Court for the Western District of Texas in *In re Arabella Petroleum Co., LLC*, No. 15-

1378 70098-tmd (Bankr. W.D. Tex.). See paragraphs 30–42.

1379     148.    Under § 548(a)(1)(A), a transfer is avoidable if made "with actual intent to hinder,

1380 delay, or defraud" creditors. Under § 548(a)(1)(B), a transfer is also avoidable if the debtor

1381 "received less than reasonably equivalent value" and was insolvent at the time or became insolvent

1382 as a result. Both legal standards are satisfied here.

1383     149.    The March 2014 assignment conveyed 133,000 net mineral acres—APC's only

1384 material asset—to MPC, an entity wholly controlled by McCabe. See paragraphs 30–42. The

1385 assignment was:

1386       (a)    Executed without any consideration;

1387          (b)    Not accompanied by any loan agreement, promissory note, or equity

1388     contribution;

1389          (c)    Made during APC's insolvency, as documented in the Trustee's filings;

1390          (d)    Notarized by Birken, an internal corporate officer, in violation of Texas

1391     Government Code § 406.016; and

1392          (e)    Completed without board approval, bankruptcy court authorization, or

1393     public disclosure.

1394     150.    The bankruptcy court explicitly found that the March 2014 transfer met multiple

1395 badges of fraud, see paragraphs 30–42 and 53, including:

1396          (a)    Transfer to an insider;

1397          (b)    Lack of reasonably equivalent value;

1398          (c)    Transfer of substantially all of APC's assets;

1399          (d)    Debtor insolvency at the time of transfer;

1400          (e)    Use of internal personnel to effectuate and notarize the transaction; and

1401          (f)    Concealment of override royalty entitlements to insiders including McCabe.

1402     151.    These same assets were subsequently transferred by MPC to Hudspeth in June

1403 2014, and from Hudspeth to Torchlight in September 2014, without disclosure or curing of the

1404 initial fraudulent conveyance. These downstream transfers preserved the economic benefit for

1405 insiders, concealed the defective title chain, and enabled monetization through Torchlight's public

1406 securities offerings and the issuance of the MMTLP dividend. See paragraphs 50–54 and 70–74.

1407     152.    Under § 548(a)(1)(A), these were actual fraudulent transfers made with the intent

1408 to strip APC of its assets, avoid known liabilities, and enrich affiliated insiders. Under §

548(a)(1)(B), they were also constructive fraudulent transfers made for no consideration, during

insolvency, and without value returned to the estate. See paragraphs 30–42 and 50–54.

153.    These transfers are therefore voidable by operation of law. All property traceable

to the transferred leaseholds—including securities, override interests, royalty revenue, and market

capital—must be subjected to rescission, disgorgement, and the imposition of a constructive trust.

See *In re Am. Hous. Found.*, 785 F.3d 143, 158 (5th Cir. 2015); *Matter of Monnig's Dep't Stores,

Inc.*, 929 F.2d 197, 200 (5th Cir. 1991).

154.    As a result of Defendants' conduct as described herein, Plaintiffs have been

damaged in an amount to be determined at trial that should in no event be less than $816,073.

Plaintiffs respectfully request judgment declaring:

(a)    The March 2014 lease assignment from APC to MPC;

(b)    The June 2014 assignment from MPC to Hudspeth; and

(c)    The September 2014 conveyance from Hudspeth to Torchlight

to be fraudulent transfers under 11 U.S.C. § 548(a)(1). Plaintiffs further seek rescission,

disgorgement of securities proceeds, and imposition of a constructive trust over all assets

and proceeds traceable to the unlawful conveyance.

## COUNT V:

**Forgery and Defective Acknowledgment: Void Instruments Under Texas Law**

(Against Defendants McCabe Petroleum Corporation and Hudspeth Oil Corporation)

155.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

this instant Count.

156.    Defendants McCabe Petroleum Corporation (MPC) and Hudspeth Oil Corporation (Hudspeth) received and recorded title to oil and gas leases through conveyance instruments that are void under Texas law due to forgery and defective notarization. A conveyance is void where the notary lacked neutrality or had a financial interest in the transaction. See *Garcia v. Garza*, 311 S.W.3d 28, 44 (Tex. App.—San Antonio 2010); *Dwairy v. Lopez*, 243 S.W.3d 710, 712 (Tex. App.—San Antonio 2007). See paragraphs 37 and 113.

157.    Texas Government Code § 406.016 prohibits a notary public from acknowledging an instrument if they are a party to the transaction or have a financial interest in it. Under Texas Penal Code § 32.21(a)(1)(A)(ii), forgery includes executing a document to make it "purport to have been executed at a time or place... other than was in fact the case."

158.    These statutory prohibitions apply directly to the two core lease assignments in question:

(a)    On March 4, 2014, the Assignment of Oil and Gas Leases from APC to MPC was notarized by Birken, who at the time served as APC's Land Supervisor and in-house geologist. Birken was a direct corporate insider with financial exposure to the transaction, destroying the presumption of neutrality. See paragraph 37.

(b)    On June 4, 2014, the Assignment from MPC to Hudspeth was notarized by LeGendre, a compensated agent of TTLT and Arabella affiliates. LeGendre notarized the transaction between two McCabe-controlled entities without disclosing his conflicted status. See paragraph 113.

159.    These notarial defects are not harmless. Under Texas Property Code § 13.001(a), a conveyance is legally ineffective against third parties—including creditors and regulators—unless properly acknowledged. Where acknowledgment is forged, conflicted, or procedurally invalid, the

1454    instrument is void *ab initio*. See *Boldrick v. Bessen*, 100 Tex. 6, 93 S.W. 424 (1906); *Padilla v.*

1455    *LaFrance*, 907 S.W.2d 454, 461 (Tex. 1995).

1456      160.    Here, both notaries were direct beneficiaries of the corporate schemes they

1457    purported to authenticate. Their roles as insiders fatally undermine the instruments' legal validity.

1458    These defective acknowledgments taint the entire downstream chain of title that underpins the

1459    issuance of $TRCH, $MMAT, $MMTLP, and NBH securities. See paragraphs 37 and 113.

1460      161.    Because legal title never validly passed from APC to MPC, and because every

1461    subsequent assignment rests on that initial void instrument, no Defendant in the downstream chain

1462    holds a legally enforceable interest in the underlying leasehold estate. See paragraphs 30–42, 37,

1463    and 113.

1464      162.    As a result of Defendants' conduct as described herein, Plaintiffs have been

1465    damaged in an amount to be determined at trial that should in no event be less than $816,073.

1466    Plaintiffs respectfully request judicial declaration that the March 4, 2014 and June 4, 2014

1467    Assignments are void instruments under Texas law, that no valid title ever passed to MPC or

1468    Hudspeth, and that all derivative securities, royalties, and transactions are unenforceable. Plaintiffs

1469    further seek rescission of all securities issued in reliance on those instruments, disgorgement of

1470    revenues derived therefrom, and imposition of a constructive trust over any property acquired

1471    through these void acknowledgments.

1472                 **COUNT VI:**

1473    **Rescission and Disgorgement of Securities Proceeds Derived from Void Instruments**

1474    (Against Defendants Torchlight Energy Resources, Inc., also Relief Defendants Meta Materials,

1475               Inc. and Next Bridge Hydrocarbons, Inc. as successor-in-interest)

1476    163.    Plaintiffs reallege, and incorporate herein by reference the verified material facts

1477    and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under

1478    this instant Count.

1479    164.    This is an action for equitable rescission and disgorgement of securities proceeds

1480    derived from void and unenforceable instruments, pursuant to this Court's inherent equitable

1481    powers, 28 U.S.C. § 2202, and controlling precedent. See *SEC v. Cavanagh*, 1 F. Supp. 2d 337,

1482    346 (S.D.N.Y. 1998); *Liu v. SEC*, 140 S. Ct. 1936, 1940–41 (2020).

1483    165.    Where a transaction is void *ab initio*—as the March 2014 lease transfer from APC

1484    to MPC has been judicially declared—any securities derived from or monetized through that

1485    conveyance must be rescinded, and any proceeds disgorged. See *SEC v. Cavanagh*, 1 F. Supp. 2d

1486    at 345–46.

1487    166.    Defendant Torchlight Energy Resources, Inc. (Torchlight) received the void assets

1488    from Hudspeth and used them as the basis for a series of public capital events, see paragraphs 70–

1489    74, 78–83, 86–90, and 96–103, including:

1490        (a)    Issuing the Meta Materials Series A Preferred Dividend ($MMTLP) to

1491        shareholders in connection with its reverse merger;

1492        (b)    Conducting a June 2021 at-the-market equity raise that generated over $137

1493        million;

1494        (c)    Failing to disclose the title defect, override encumbrances, or bankruptcy

1495        history of the assets.

1496    167.    Following the merger, Meta inherited the legacy Torchlight equity and asset

1497    structure and issued new $MMAT securities based on the same void leasehold interests. In

1498    December 2022, Meta distributed common shares of NBH to Series A Preferred shareholders via

1499    a 1-for-1 spinout. See paragraphs 78–83, 96–103, and 104–110.

1500    168.    NBH thereby acquired legal title to the same void leases. Its Form S-1 failed to

1501    disclose the upstream defects, override retention by insiders, or any of the judicial findings of

1502    fraudulent conveyance. NBH continues to hold and promote these assets as if legally acquired. See

1503    paragraphs 84–90, 96–103, 104–110, and 111–113.

1504    169.    Plaintiffs now seek full rescission of all securities issued in reliance on this tainted

1505    chain of title, including:

1506        (a)    $TRCH

1507        (b)    $MMAT

1508        (c)    $MMTLP and

1509        (d)    NBH private equity holdings.

1510    170.    Rescission is the appropriate remedy for transactions that are void, fraudulent, or

1511    induced by misrepresentation or failure of consideration. See *Anytime Fitness, LLC v. Thornhill*

1512    *Bros. Fitness, LLC*, 85 F.4th 321 (5th Cir. 2023)**,** No. 22-30757 (2023); *Tifford v. Tandem Energy*

1513    *Corp.*, 562 F.3d 699, 703 (5th Cir. 2009).

1514    171.    Plaintiffs further seek disgorgement of all proceeds unjustly retained by Torchlight,

1515    Meta, and NBH—whether as primary actors or relief defendants. Under *Liu v. SEC*, disgorgement

1516    is appropriate where:

1517        (a)    The recipient obtained value traceable to illegal or void activity,

1518        (b)    No legitimate claim of ownership exists,

1519        (c)    The amounts are calculable and restitution is feasible. See *Liu*, 140 S. Ct. at

1520        1940–41.

172.    As a result of Defendants' conduct as described herein, Plaintiffs have been damaged in an amount to be determined at trial that should in no event be less than $816,073. Plaintiffs respectfully request:

(a)    Rescission of all securities issued in reliance on the March 2014 transfer and its downstream chain;

(b)    Disgorgement of proceeds derived therefrom;

(c)    Restitution of investor capital; and

(d)    Imposition of a constructive trust over all securities, revenue, and property traceable to the void title and unlawful equity monetization.

## COUNT VII:

### Receipt of Fraudulently Transferred Assets and Unjust Enrichment

(Against All Defendants)

173.    Plaintiffs reallege, and incorporate herein by reference the verified material facts and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under this instant Count.

174.    This action is brought under 11 U.S.C. § 550(a), Tex. Bus. & Com. Code § 24.009(b), and federal common law doctrines of unjust enrichment and constructive trust, to recover property and proceeds traceable to the March 2014 conveyance of leasehold interests from APC to MPC. The Bankruptcy Court for the Western District of Texas found this conveyance to be a fraudulent transfer under 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.005. See paragraphs 30–42 and 43–44.

175.    Each Defendant identified herein either directly received, structurally facilitated, or economically benefitted from assets, override royalties, working interests, or equity instruments derived from that original void transaction. Some acted as direct transferees, while others operated as syndication conduits, shell entities, override recipients, or successor issuers. Under 11 U.S.C. § 550(a) and Tex. Bus. & Com. Code § 24.009(b), all parties in receipt of or benefitting from fraudulently transferred property are subject to equitable recovery. See paragraphs 30–42, 50–54, 70–74, 78–83, 96–103, 104–110, and 111–113.

176.    The parties formed a vertical and horizontal fraud structure: initiating, layering, and monetizing the void title, while extracting equity, override proceeds, or fee-based income across the title chain. Their coordinated concealment of defects deprived investors of essential material facts. See paragraphs 30–42, 50–54, 70–74, 78–83, 84–90, 96–103, 104–110, and 111–113.

177.    <u>Application to Each Defendant:</u>

(a)    MPC received the void March 2014 lease assignment without consideration or documented value; acted as origin point for downstream transfers. Retained override interests and structured subsequent conveyances through affiliates. See paragraphs 30–42 and 50–54.

(b)    Hudspeth received the same leases via insider-notarized assignment in June 2014; conveyed all stock to Torchlight in exchange for equity. See paragraphs 50–54 and 113.

(c)    Torchlight monetized the same leaseholds via securities offerings and equity raises. Failed to disclose override encumbrances, insider entitlements, or bankruptcy findings in SEC filings or investor communications. See paragraphs 78–83, 86–90, and 96–103.

1565    (d) AOC retained operator rights on affected leases and participated in joint

1566 operating agreements that distributed override revenue to insiders. See paragraph 28(c).

1567    (e) AEX contributed early leasehold interests to the same chain of title. See

1568 paragraph 28(g).

1569    (f) TTLT its agent, LeGendre, notarized the June 4, 2014 assignment between

1570 McCabe-controlled entities, destroying any presumption of disinterested acknowledgment.

1571 See paragraph 113.

1572    (g) Magdalena retained a 5% override carved out prior to the fraudulent

1573 conveyance; this override was preserved through subsequent assignments.

1574 See paragraph 53.

1575    (h) Green Hill owned by McCabe family; received override income from

1576 disputed leaseholds; appears in royalty schedules traceable to the void transaction. See

1577 paragraph 28(f).

1578    (i) ARM functioned as a royalty warehouse controlled by DuBose; received

1579 override revenue from leases stripped from APC. See paragraph 28(l).

1580    (j) MHP participated in lease preservation through a 2020 Option Agreement

1581 tied to Arabella-origin leases; received production-based revenue rights. See paragraph 59.

1582    (k) Wolfbone controlled by McCabe; reconveyed leasehold interests through

1583 Hudspeth Operating and enabled further override layering. See paragraph 28(j).

1584    (l) Tritaurian structured Torchlight and NBH securities offerings without

1585 disclosing origin defects or override burdens. See paragraph 28(i).

1586    (m) Meta (Relief Defendant): Inherited Torchlight's asset base via merger and

1587 issued $MMAT equity backed by unlawfully obtained leases. See paragraph 29(b).

(n)      NBH (Relief Defendant): Received formal title to override-encumbered leases in 2022 spinoff. NBH's Form S-1 failed to disclose override structures, insider enrichment, or upstream title defects. See paragraphs 29(a), 104–110, and 111–113.

178.    Each Defendant accepted the economic benefit of a transaction rooted in fraud and void title. None disclosed the underlying title defect, override burden, or prior bankruptcy litigation. Each facilitated the laundering of unlawfully obtained leaseholds into securities or royalty revenue while misleading retail investors.

179.    As a result of Defendants' conduct as described herein, Plaintiffs have been damaged in an amount to be determined at trial that should in no event be less than $816,073. Plaintiffs respectfully request:

(a)      A judicial declaration that all Defendants received or retained property traceable to the void March 2014 transfer;

(b)      The imposition of a constructive trust over all such property, whether securities, override royalties, or equity-based compensation;

(c)      Restitution, disgorgement, and any further equitable relief necessary to restore the parties to the status quo ante.

## COUNT VIII:

## Statutory Declaratory Relief under Texas Law

(Against All Defendants)

180.    Plaintiffs reallege, and incorporate herein by reference the verified material facts and/or factual allegations provided via lines 626 - 1139 to substantiate their claims advanced under this instant Count.

181.    This is an action for declaratory judgment pursuant to the TEXAS UNIFORM DECLARATORY JUDGMENTS ACT ("**TUDJA**"), Tex. Civ. Prac. & Rem. Code §§ 37.001–.011, as recognized and applied by federal courts exercising diversity or supplemental jurisdiction. Plaintiffs seek a binding judicial declaration that the March 2014 lease assignment from APC to MPC, and all transactions, securities, override interests, or royalty agreements derived therefrom, are void *ab initio* and confer no enforceable title, legal interest, or beneficial right under Texas law.

182.    Texas courts have consistently held that instruments procured by fraud, forged acknowledgments, or lacking legal authority are void—not merely voidable. See *Boldrick v. Bessen*, 100 Tex. 6, 93 S.W. 424 (1906); *Padilla v. LaFrance*, 907 S.W.2d 454, 461 (Tex. 1995); *Wells Fargo Bank, N.A. v. Robinson*, 391 S.W.3d 590, 593 (Tex. App.—Dallas 2012, no pet.).

183.    Under Tex. Prop. Code § 13.001, a conveyance is not valid against third parties unless properly acknowledged. The March 4, 2014 assignment from APC to MPC was notarized by Birken, APC's internal Land Supervisor and financial beneficiary. The June 4, 2014 assignment from MPC to Hudspeth was notarized by LeGendre, a known agent of Arabella affiliates. Both notaries had financial interests in the transactions they authenticated, rendering the acknowledgments defective under Tex. Gov't Code § 406.016. These defects render the conveyances void *ab initio* and sever the legal chain of title relied upon by all downstream entities. See paragraphs 37 and 113.

184.    Hudspeth subsequently transferred title to Torchlight, which issued public securities including $MMTLP and conducted equity offerings premised on the same assets. Meta later inherited these interests and completed a 1-for-1 stock spinoff to NBH. At no point did any of these entities disclose that the underlying leases originated from a void assignment or that they

were encumbered by override structures retained by insiders. See paragraphs 50–54, 78–83, 86–90, 96–103, and 104–110.

185. Under TUDJA § 37.004(b), "a person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute… or contract may have determined any question of construction or validity… and obtain a declaration of rights, status, or other legal relations thereunder."

186. Plaintiffs respectfully invoke this provision to obtain the following judicial declarations:

(a) That the March 2014 lease assignment from APC to MPC is void *ab initio* and never conferred lawful title;

(b) That the June 2014 and September 2014 assignments, and all override or royalty agreements derived from them, are null and unenforceable against Plaintiffs;

(c) That all recorded interests held by Defendants in Reeves County, Hudspeth County, or any Texas public registry arising from the void chain of title are of no legal effect;

(d) That any claim of interest by Magdalena, Green Hill Minerals, ARM, MHP, or other affiliated entities is subordinate to the rights of defrauded, innocent investors;

(e) That the securities issued by Torchlight, Meta, and Next Bridge—including $MMAT, $MMTLP, and $NBH shares—are facially void under Texas law and constitute no valid or transferable property right.

187. Because all disputed conveyances and override structures originate from Texas land and mineral estates governed by Texas property law, this Court is fully empowered under TUDJA

1655    to quiet title, rescind override encumbrances, and impose constructive trusts over all affected

1656    interests wrongfully retained by Defendants.

1657        188.    As a result of Defendants' conduct as described herein, Plaintiffs have been

1658    damaged in an amount to be determined at trial that should in no event be less than $816,073.

1659    Plaintiffs respectfully request entry of a declaratory judgment under Tex. Civ. Prac. & Rem. Code

1660    § 37.001 et seq., declaring the entire title chain void, all encumbrances invalid, and all real or

1661    personal property interests held by Defendants to be held in constructive trust for the benefit of

1662    Plaintiffs and similarly situated investors.

1663    **V.    PRAYER FOR RELIEF**

1664        189.    Accordingly, Plaintiffs seek the following relief, each grounded in specific legal

1665    authority and the verified factual record:

1666        (a)    A declaratory judgment that the March 2014 transfer of the Subject Leases

1667            from APC to MPC is void *ab initio*, pursuant to *United States v. Zacks*, 375 U.S. 59, 70

1668            (1963), which holds that a transaction infected by fraud or lacking legal authority is treated

1669            as a legal nullity from inception. See also *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 345

1670            (S.D.N.Y. 1998) (securities issued in reliance on invalid or fraudulent underlying assets

1671            are subject to rescission), and 28 U.S.C. § 2201. This declaration is further supported by

1672            Tex. Gov't Code § 406.016 and Tex. Prop. Code § 13.001, as the March 4, 2014 lease

1673            assignment was notarized by an interested party and is therefore facially invalid and

1674            ineffective to transfer title.

1675        (1)    Plaintiffs further seek an order declaring the issuance of Series A Preferred

1676            Dividend shares of $MMTLP null and void *ab initio* and rescinding such shares

1677            from the record, as they were distributed based on fraudulently transferred and

1678 unlawfully capitalized assets. The Court should direct the cancellation or return of

1679 said securities from all known brokers, transfer agents, and shareholders under a

1680 constructive trust theory.

1681 (b) Nullification of all downstream equity issuances, override royalty interests,

1682 and derivative securities, including but not limited to the $MMAT, $MMTLP, the NBH

1683 common stock spinout, and the override and back-in working interests retained by insiders,

1684 as proceeds traceable to a fraudulent transfer. This remedy is supported by the Trustee's

1685 own pleadings and the bankruptcy court's 2022 Memorandum Opinion, which found the

1686 March 2014 conveyance to be a fraudulent transfer under 11 U.S.C. § 548 and Tex. Bus.

1687 & Com. Code § 24.005, and further justified by the doctrine of void *ab initio* status in

1688 bankruptcy. See also *In re Arabella Petroleum Co., LLC*, No. 15-70098-tmd, Doc. 419 at

1689 4–7 (Bankr. W.D. Tex. July 26, 2017); Doc. 441 at 20–21 (Aug. 16, 2017). The badges of

1690 fraud identified by the bankruptcy court and cited in TUFTA § 24.005(b)—including

1691 insider transfers, lack of consideration, insolvency, concealment, and retention of

1692 benefits—further support this relief.

1693 (c) Rescission of all securities issued by Torchlight, Meta Materials, or NBH

1694 that derive from or are backed by the fraudulently transferred leases, as authorized under

1695 *SEC v. Cavanagh*, 1 F. Supp. 2d at 345 (holding that equitable rescission is appropriate

1696 where securities were unlawfully issued), and in recognition that such instruments were

1697 void from inception due to lack of asset basis and undisclosed insider enrichment.

1698 Rescission is additionally appropriate as a matter of Texas common law where fraud and

1699 forgery render the underlying contract or instrument void or voidable.

(d)    Imposition of a constructive trust over all traceable proceeds, override interests, securities, or equity units unjustly held by McCabe, Hoisager, DuBose, and their affiliates, including but not limited to Magdalena, Green Hill Minerals, and Wolfbone. Constructive trust is warranted where "a fiduciary or insider has profited from wrongful conduct to the detriment of a defrauded party," as articulated in *Matter of Monnig's Dep't Stores, Inc.*, 929 F.2d 197, 200 (5th Cir. 1991) and *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013). Such trust is further justified by Tex. Penal Code § 32.21, where the execution of instruments with backdating or participation by interested notaries constitutes civil forgery, voiding the instrument as to all subsequent holders and transferees.

(e)    Compensatory damages in an amount not less than $816,073, representing Plaintiffs' verified investment losses, together with $204,018 in prejudgment interest, for a total of $1,020,091. This figure reflects Plaintiffs' complete investment losses and lost opportunities incurred as a direct result of acquiring securities premised on a materially false and unlawful asset base. *See* Taggart v. Next Bridge Hydrocarbons, Inc., No. 4:24-cv-00767-P (N.D. Tex. Mar. 15, 2024), Compl. ¶¶ 56–61

(f)    Treble damages and attorneys' fees, as permitted under Tex. Bus. & Com. Code § 24.013 (providing for reasonable attorney's fees in fraudulent transfer actions) and Tex. Civ. Prac. & Rem. Code § 38.001 (fee-shifting in contract and tort claims). Because the record establishes actual fraud—evidenced by multiple badges of fraud including insider conveyances without consideration, retention of override royalties by affiliates, and notarization of critical instruments by interested insiders—Plaintiffs also seek uncapped punitive damages where permitted under Texas law and applicable federal common law

84

principles. See *Janvey*, 712 F.3d at 194; *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 158 (5th Cir. 2015). Additionally, any statute of limitations defense is tolled under Tex. Civ. Prac. & Rem. Code § 16.051 due to the active concealment and complexity of the fraud, which was not reasonably discoverable until years after the underlying transfers.

(g)     Further equitable and declaratory relief as this Court deems just and proper under 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 54(d), including reformation of title, cancellation of void securities, entry of judgment declaring certain override instruments or working interest contracts null and unenforceable, and referral for enforcement to the U.S. Securities and Exchange Commission and United States Trustee's Office for consideration of regulatory and criminal violations stemming from forged notarizations, fraudulent accounting entries, concealment of override royalties, and asset laundering during and after bankruptcy.

190.    Plaintiffs further request that this Court refer the facts set forth herein to the United States Department of Justice and the United States Securities and Exchange Commission for further investigation and potential prosecution. Plaintiffs attempted in good faith to obtain information and cooperation from Meta Materials, Inc., Next Bridge Hydrocarbons, Inc., the SEC, and the GAO, but as shareholders or as citizens were met with silence or refusal. The verified material facts and exhibits demonstrate a prolonged scheme of fraudulent conveyances, securities manipulation, forged notarizations, and insider enrichment involving multiple corporate actors, intermediaries, and alter egos. These transactions include possible violations of 18 U.S.C. §§ 1341, 1343, and 1348 (mail, wire, and securities fraud), 18 U.S.C. § 152(7) (fraudulent concealment in bankruptcy), and 15 U.S.C. §§ 77q and 78j(b) (fraud in connection with the sale of securities). As

1746    private parties, Plaintiffs lack subpoena power, forensic expertise, institutional authority, and

1747    statutory standing to compel full disclosure or trace the proceeds, shell entities, and misstatements

1748    at issue. The scope and structure of the misconduct—spanning bankruptcy court, public markets,

1749    corporate filings, and multi-layered overrides—warrants urgent and comprehensive regulatory

1750    review under 28 U.S.C. § 535(a) and *SEC v. Sloan*, 436 U.S. 103, 116 (1978). Plaintiffs stand

1751    ready to cooperate fully with any such investigation and will furnish all supporting documents,

1752    filings, and exhibits referenced herein.

1753        191.    Plaintiffs further request that this Court refer the conduct of Chapter 11 Trustee

1754    Morris D. Weiss, his counsel Mark C. Taylor, and the administration of the Arabella Petroleum

1755    Company, LLC estate for review by the United States Trustee Program, the Department of Justice,

1756    or other regulators. Plaintiffs reached out to Weiss and Taylor in good faith to request accounting

1757    and potential cooperation, but after initial polite engagement they quickly became non-cooperative

1758    and silent. This, combined with the decision to settle fraudulent transfer claims for $2.1 million

1759    despite estate records showing no consideration and creditor objections, raises serious questions

1760    about whether fiduciary duties under 11 U.S.C. § 1106(a)(3)–(4) were fulfilled and whether the

1761    estate was deprived of potential recoveries. As private parties, Plaintiffs lack subpoena power,

1762    forensic tools, institutional authority, and statutory standing to compel disclosure of estate records

1763    or evaluate conflicts, underscoring the need for independent scrutiny. Plaintiffs stand ready to

1764    cooperate fully with such inquiry and will furnish all supporting documents, filings, and exhibits

1765    referenced herein.

1766    **VI.    JURY DEMAND**

1767        192.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby

1768    demand a trial by jury on all issues so triable.

## VII.    VERIFICATION

I, Command Sergeant Major (Ret.) Daniel R. Auxier, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am a Plaintiff in this action; that I have read the foregoing Verified Complaint; and that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.

Signature: _____ Date: __09/03/2025_____

I, Mr. Marcos E. Monteiro, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am a Plaintiff in this action; that I have read the foregoing Verified Complaint; and that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.

Signature: _____ Date: __09/03/2025_____

I, Mr. Bradley Davis, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am a Plaintiff in this action; that I have read the foregoing Verified Complaint; and that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.

Signature: _____ Date: __09/03/2025_____

# VIII.  SIGNATURE BLOCKS

Dated: __09/03/2025_____        _____

SGM Daniel R. Auxier, pro se

105 Valley Road

Wantage, NJ 07461

Dated: _____09/03/2025_____        _____

Mr. Marcos E. Monteiro, pro se

5321 Dove Tree Street

Orlando, FL 32811

Dated: _____09/03/2025_____        _____

Mr. Bradely Davis, pro se

4771 Sweetwater Blvd

Sugar Land, TX 77479

## IX.    ATTACHED APPENDICES

**Appendix 1: Judicially Noticed Materials:** This appendix contains the complete, unabridged record of judicial filings, bankruptcy court orders, SEC complaints, trustee motions, hearing transcripts, notarized conveyances, recorded assignments, SEC filings, and government oversight reports referenced in the Verified Complaint. Plaintiffs respectfully request that the Court take judicial notice of these materials under Fed. R. Evid. 201(b)(2) and 201(c)(2), as each is publicly available, officially filed, and directly relevant to the adjudicated facts and legal foundation of this action.

**Appendix 2: Judicially Noticed Case Law and Governing Authorities:** This appendix includes the full-text or authoritative excerpts of cited case law decisions referenced in the Table of Authorities and within the Verified Complaint's substantive counts. It is provided for the Court's convenience and to assist in resolving threshold questions of statutory construction, jurisdiction, and declaratory authority. Plaintiffs invoke this appendix under Fed. R. Evid. 201(d) as part of their request for declaratory relief under 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 57.