# Appendix 1 - Table of Contents

| Item | Date | Description | Page |
|---|---|---|---|
| 001 | 07-26-2017 | 2017 07 26 - Trustee s Motion to Approve Compromise In re Arabella Petroleum Co LLC No 15 70098 tmd Bankr W D Tex July 26 2017 ECF No 419 | 001-009 |
| 002 | 07-26-2017 | 2017 07 26 Weiss v. Arabella, McCabe Settlement | 010-029 |
| 003 | 08-16-2017 | 2017 08 16 - Hearing Transcript In re Arabella Petroleum Co LLC No 15 70098 tmd Bankr W D Tex Aug 16 2017 ECF No 433 or 441 | 030-085 |
| 004 | 05-24-2022 | 2022 05 24 Weiss v. Arabella, Hearing Transcript, McCabe Testifying | 086-207 |
| 005 | 11-09-2022 | 2022 11 09 - Next Bridge Hydrocarbons Inc Registration Statement Form S 1 A Amendment No 4 SEC Accession No 0001193125 22 281275 Nov 9 2022 | 208-350 |
| 006 | 12-22-2022 | 2022 12 22 - Memorandum Opinion Weiss v Arabella Exploration Inc Adv No 16 07002 tmd Bankr W D Tex Dec 22 2022 ECF No 222 | 351-393 |
| 007 | 12-22-2022 | 2022 12 22 Weiss v. Arabella, Memorandum Opinion | 394-436 |
| 008 | 04-21-2023 | 2023 04 21 Weiss v. Arabella, McCabe Affidavit | 437-452 |
| 009 | 04-21-2023 | 2023 04 21 Weiss v. Arabella, McCabe Declaration | 453-468 |
| 010 | 03-15-2024 | 2024 03 15 Taggart v. NBH, Complaint | 469-482 |
| 011 | 06-25-2024 | 2024 06 25 SEC v. Brda | 483-528 |
| 012 | 11-01-2024 | 2024 11 01 GAO Report to Congress ref SEC & FINRA | 529-545 |
| 013 | 11-13-2024 | 2024 11 13 Taggart v. NBH, Plaintiff's Opposition to Motion to Dismiss | 546-578 |
| 014 | 01-17-2025 | 2025 01 17 SEC v. Brda, Motion to Dismiss (Brda) | 579-629 |
| 015 | 01-17-2025 | 2025 01 17 SEC v. Brda, Motion to Dismiss (Palikaras) | 630-679 |
| 016 | 01-17-2025 | 2025 01 17 Sec v. Brda, Motion to Dismiss (Ex A, His Lawyer Landry) | 680-681 |
| 017 | 02-16-2025 | 2025 02 16 Judge Counts Order Granting Dismissal With Prejudice of Arabella Appeal (Establishing Facts and Conclusions of Law) (1) | 682-682 |
| 018 | 07-01-2025 | 2025 07 01 SEC v. Brda, Motion to Dismiss (Ex B, Italian Call) | 683-691 |
| 019 | 07-01-2025 | 2025 07 01 SEC v. Brda, Motion to Dismiss (Ex C, Stock Opinion) | 692-695 |
| 020 | 07-03-2025 | 2025 07 03 Taggart v. NBH, Memorandum Opinion | 696-707 |

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | CASE NO. 15-70098-TMD-11 |
| | § | |
| Debtor. | § | CHAPTER 11 |

## MOTION TO APPROVE COMPROMISE AND SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019

**A hearing will be conducted on this matter on August 16, 2017, at 1:30 p.m. in Courtroom 1 at the United States Bankruptcy Court, Homer J. Thornberry Federal Judicial Building, 903 San Jacinto Blvd., Austin, Texas.**

**If you object to the relief requested, you must respond in writing, specifically answering each paragraph of this pleading. Unless otherwise directed by the court, you must file your response with the clerk of the bankruptcy court within 21 days from the date you were served with this pleading. You must serve a copy of your response on the person who sent you the notice; otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Morris D. Weiss, Chapter 11 Trustee (the "**Trustee**" or "**Weiss**") for Arabella Petroleum Company, LLC ("**APC**") files this Motion:

### Jurisdiction and Venue

1.      The court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(H) and (O).  Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Overview of Relief Sought

2.      Trustee seeks approval of a "Settlement Agreement," dated effective July 10, 2017 (the "**Agreement**"), between the Trustee and McCabe Petroleum Corporation

("**McCabe**")[1], which resolves certain disputes between the Trustee and McCabe (as set forth below), resulting in a payment by McCabe of $2.1 million to the Trustee for the benefit of the estate of APC ("**Estate**"). A copy of the Agreement is attached hereto as **Exhibit "A."**

### Procedural Background

3.      On July 10, 2015 (the "**Petition Date**"), APC commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.

4.      On August 20, 2015, Morris D. Weiss was appointed as Chapter 11 Trustee of APC.

### Overview of Dispute

5.      In the course of examining various transfers of property interests made by APC, the Trustee learned that certain lease interests owned by APC were transferred to McCabe pursuant to an "Assignment of Oil & Gas Leases" dated March 4, 2014 (the "**Transfers**"). The Trustee's accountants, Lain Faulkner & Co., P.C., reviewed the books and records of APC and determined that APC did not receive any apparent consideration for the Transfers. Accordingly, the Trustee contends that McCabe and any subsequent transferees are subject to fraudulent transfer claims under the Bankruptcy Code and applicable state law (the "**Claims**").

6.      Counsel for the Trustee made demand on McCabe pursuant to a letter dated June 16, 2017. Thereafter, counsel for the Trustee engaged in a series of discussions with counsel for McCabe concerning the nature of the transfers and potential resolutions. McCabe provided additional information to the Trustee regarding the Transfers, and the Trustee and counsel conducted appropriate due diligence concerning the Transfers and the Claims. After extensive negotiations and offers, the Trustee and McCabe reached agreement on a settlement (subject to

---

[1] McCabe and the Trustee are referred to collectively as the "Parties."

Return to TOC                                                                                          APP1-003

Court approval) on July 10, 2017 (the 2-year anniversary of the Petition Date), and also entered a Tolling Agreement which tolled the applicable statute of limitations until July 28, 2017.

7.      McCabe disputes liability, and has provided background information to the Trustee concerning the nature of the Transfers. McCabe contends, among other things, that it provided reasonably equivalent value for the Transfers, and that the Transfers represented a return of excess capital contributions made by McCabe to a general partnership or joint venture between McCabe and APC.

### Overview of Agreement

8.      As set forth more fully in the Agreement[2], the Parties have agreed to resolve the issues and conflicts between them on the terms set forth in the Agreement. The terms generally include:

    a.    Payment by McCabe of $2.1 million to the Trustee, for the benefit of the Estate, within two (2) business days after an order approving the Agreement becomes final and non-appealable.

    b.    Mutual releases between the Trustee and McCabe, including releases by and against APC and a release by the Trustee of any claims against subsequent transferees.

    c.    An additional tolling of the date on which the Trustee may bring claims, pending approval of the Agreement by this Court.

---

[2] To the extent of any inconsistency between the Agreement and the summary of the Agreement set forth in this Motion, the Agreement shall control. **This outline is not intended to repeat all terms of the Agreement**. **Any person reading this Motion is encouraged to read the Agreement**

Return to TOC      APP1-004

### Basis for Approval

9.      Federal Rule of Bankruptcy Procedure 9019(a) allows a debtor in possession to seek approval of a settlement affecting the bankruptcy estate.  The decision whether or not to approve a particular settlement lies within the discretion of the Bankruptcy Court.  *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 607 (5th Cir. 1980).  "A proposed settlement must be 'fair and equitable' and in the best interests of the estate."  *Cadle Co. v. Moore (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Jackson Brewing*, 624 F.2d at 608).

10.     Courts consider the following factors in determining whether a settlement is fair and equitable:

(1)     the probability of success in the litigation, with due consideration for the uncertainty in fact and law;

(2)     the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

(3)     the paramount interest of the creditors and a proper deference to their respective views;

(4)     the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

(5)     all other factors bearing on the wisdom of the compromise.

*Id*.

11.     These factors all support granting the Motion. First, with respect to items (1) and (2) the Claims are hotly contested and would require lengthy, expensive litigation.  McCabe has made it clear that part of the desire to settle is to avoid litigation, and that the settlement would not occur quickly, if at all, if an adversary proceeding is filed.  Moreover, the litigation would involve complex factual issues regarding the value of the property transferred.  With respect to

Return to TOC

the factor (3), resolution of these disputes will provide almost $2.1 million to the APC estate. The resolution will also significantly reduce costs going forward. As for factor (4), the Agreement was the result of difficult and contentious, arms-length negotiations and in good faith. With respect to factor (5), the Trustee was able to achieve this result expeditiously and without the incurrence of significant professional fees. Finally, given the extent and complexity of the disputes and the uncertainty of the outcome, the Trustee believes that the Agreement should be approved.

12.     In sum, the Trustee believes that the Agreement is in the best interest of the Estate and should be approved.

13.     A proposed Order is attached hereto as **Exhibit "B"**.

WHEREFORE, based on the foregoing, the Trustee requests that the Court approve the proposed settlement, and that the Trustee have such other and further relief as to which he may be justly entitled.

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By: */s/ Mark C. Taylor*
      Eric J. Taube
      State Bar No. 19679350
      Mark C. Taylor
      State Bar No. 19713225
100 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone: (512) 685-6400
Telecopier: (512) 685-6417
E-mail: Eric.Taube@wallerlaw.com
      Mark.Taylor@wallerlaw.com

ATTORNEYS FOR TRUSTEE

Return to TOC                                                                                                              APP1-006

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was served electronically on all parties receiving the Court's ECF notices in this case and by United States First Class Mail on all persons on the attached Service List (unless ECF service is indicated) on July 26th, 2017.


*/s/ Mark C. Taylor*

Mark C. Taylor

## SERVICE LIST

**Counsel to Debtor**
Bernard R. Given, II (*via ECF*)
Loeb & Loeb
10100 Santa Monica Blvd,
Ste. 2200
Los Angeles, CA 90067

**United States Trustee**
Office of the U.S. Trustee
Attn: James W Rose, Jr (*via ECF*)
615 E. Houston, Ste. 533
P.O. Box 1539
San Antonio, TX 78295-1539

**Counsel for Committee**
Kenneth Green (*via ECF*)
Snow Spence Green LLP
2929 Allen Parkway, Suite 2800
Houston, TX 77019

**Creditors' Committee**
Buckeye, Inc.
Attn: Marty Inge
P.O. Box 5564
Midland, TX 79704

Baker Hughes Oilfield
Operations, Inc.
Attn: Christopher J. Ryan
2929 Allen Parkway, Suite 2100
Houston, TX 77019-2118

Jet Specialty, Inc.
Attn: Ted Williams
211 Market Avenue
Boerne, TX 78006

Crossfire, LLC
Attn: Derek D. McCoy
820 Airport Road
Durango, CO 81303

**20 Largest Unsecured Creditors**
Nomac Drilling, LLC
P.O. Box 650840
Dallas, TX 75265-0840

Trans-Pecos Instruments &
Supply Inc.
1024 S Cedar St
P.O. Box Drawer 71
Pecos, TX 79772

Jet Specialty, Inc
P.O. Box 678286
Dallas, TX 75267-8286

Sooner Pipe, L.L.C.
Dept 26 P.O. Box 4346
Houston, TX 77210-4346

Bickel & Brewer
1717 Main Street, Suite 4800
Dallas, TX 75201

McClinton Energy Group, LLC
P.O. Box 677292
Dallas, TX 75677

Culberson Construction, Inc.
P.O. Box 1379
Granbury, TX 76048

RWI Construction, Inc.
Attn: Jeff Chick
10700 State Hwy 191
Midland, TX 79707

M3P Directional Services, Ltd.
c/o Mike Mayer
P.O. Box 2552
Midland, Texas 79702

Viking Coil Tubing
P.O. Box 1989
Addison, TX 75001-1989

Friendly Trucking
1705 S. Stockton
Monahans, TX 79756

TESSCO Energy Services, Inc
P.O. Box 1999
Midland, TX 79702

A & C Farms Calvin & Ava Gerke
P.O. Box 44
Pecos, TX 79772

Stellar Oilfield Rentals, LLC
P.O. Box 1839
Angleton, TX 77516

Pipe Pros
P.O. Box 9787
Corpus Christi, TX 78469

Crossfire LLC
820 Airport Road
Durango, CO 81303

CMA Welding and Construction
P.O. Box 1155
Kermit, TX 79745

Independence Oilfield Chemicals
Dept. 623
P.O Box 4652
Houston, TX 77210-4652

SDS Petroleum Consultants, LLC
P.O. Box 456
Troup, TX 75789-0456

**Parties Requesting Notice**
(***VIA ECF EXCEPT AS NOTED***)
David G. Aelvoet
Linebarger Goggan et al.
711 Navarro, Ste 300
San Antonio, TX 78205

Evan R. Baker
Gardere Wynne Sewell LLP
1601 Elm Street, Ste. 3000
Dallas, TX 75201

Roy Byrn Bass, Jr.
4716 4th Street, Suite 100
Lubbock, TX 79416

Michael E. Baum
Jason L. Weiner
Nicholas Marcus
Brendan G. Best
Schafer and Weiner, PLLC
40950 Woodward Ave. , Ste. 100
Bloomfield Hills, MI 48304

Shane M Bebout
Todd, Barron, Thomason, et al
3800 E. 42nd St., Suite 409
Odessa, TX 79762

Steven W. Bugg
McAfee & Taft
Tenth Flr, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102

Fernando M. Bustos
Bustos Law Firm, P.C.
P. O. Box 1980
Lubbock, TX 794408-1980

Michael J Collins
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, TX 75201

Andrew B. Curtis
Craig, Terrill, et al
9816 Slide Rd., Suite 201
Lubbock, TX 79424

Douglas D. D'Arche
Baker & Hostetler LLP
811 Main Street, #1100
Houston, TX 77002

Carl Dore, Jr
Dore Law Group, PC
17171 Park Row, Suite 160
Houston, TX 77084

Angela Ferrante
Garden City Group, LLC
1985 Marcus Avenue, Suite 200
Lake Success, NY 11042

Randal W Hill
Randal W. Hill PC
802 N. Carancahua, Suite 450
Corpus Christi, TX 78401

Ronald Hornberger
Plunkett and Griesenbeck, Inc.
Catholic Life Building
1635 N.E. Loop Suite 900
San Antonio, TX 78209

Patrick L. Huffstickler
Dykema Cox Smith
112 E. Pecan St., Ste. 1800
San Antonio, TX 78205

Blue Hyatt
Lynch, Chappel & Allsup, P.C.
300 N Marienfeld Ste #700
Midland, TX 79701

Amber L James
Atkins, Hollmann, Jones, et al
3800 E. 42nd Street, Suite 500
Odessa, TX 79762

Todd J. Johnston
McWhorter, Cobb & Johnson, LLP
1722 Broadway
Lubbock, TX 79401

Michael G. Kelly
P.O. Box 1311
Odessa, TX 79760-1311

Zachary S McKay
Dore' Law Group, P.C.
17171 Park Row, Suite 160
Houston, TX 77084

Ryan J. McNeel
Brockett & McNeel LLP
24 Smith Road, Suite 400
Midland, TX 79705

Laura J. Monroe
Perdue Brandon Fielder et al
P.O. Box 817
Lubbock, TX 79408-0817

Jeanne Morales
PO Box 11043
Midland, TX 79702-8043

Randall L. Rouse
Lynch Chappell & Alsup
The Summit Ste 700
300 N Marienfeld
Midland, TX 79701

Vincent P. Slusher
DLA Piper, LLP (US)
1717 Main Street, Suite 4600
Dallas, TX 75201

William R. Sudela
Crady, Jewett & McCulley, LLP
2727 Allen Parkway, Suite 1700
Houston, TX 77019-2125

H. Elizabeth Weller
Linebarger Goggan et al
2777 N. Stemmons Frwy, Ste 1000
Dallas, TX 75207

Elliott S. Cappuccio
Pulman, Cappuccio, Pullen, Benson
& Jones, LLP
2161 NW Military Hwy, Ste. 400
San Antonio, TX 78213

Weldon L. Moore, III
Sussman & Moore L.L.P.
4645 N. Central Expwy., Ste. 300
Dallas, TX 75205

G. Wade Caldwell
Zachary J. Fanucchi
Barton, East & Caldwell, P.L.L.C.
700 North St. Mary's St., Ste.1825
San Antonio, TX 78205

Greg M. Wilkes
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201

Heather H. Jobe
Bell Nunnally & Martin LLP
3232 McKinney Avenue, Ste. 1400
Dallas, TX 75204

Courtney J. Hull
Kimberly A. Walsh
Office of the Attorney General
300 W. 15th St.
Austin, TX 78701

Trey A. Monsour (*via ECF*)
Elizabeth A. Gilman (*via mail*)
K&L Gates LLP
1000 Main Street, Suite 2550
Houston, TX 77002

Cleve J. Glenn (*via mail*)
McClinton Energy Group, L.L.C.
1850 Westpark Drive
Grand Prairie, TX 75050

Craig E. Power (*via mail*)
Misty A. Segura (*via ECF*)
Cokinos, Bosien & Young
Four Houston Center
1221 Lamar St., 16th Floor
Houston, TX 77010

Angelia B. Lee
Craig, Terrill, Hale & Grantham
9816 Slide Road, #201
Lubbock, TX 79424

Soham D. Naik
750 Town & Country Blvd., #300
Houston, TX 77024

Return to TOC

Daniel P. Callahan and
Howard C. Rubin
Kessler & Collins PC
2100 Ross Ave., Suite 750
Dallas, TX 75201

Joseph F. Postnikoff
Goodrich Postnikoff & Assocs.
801 Cherry St., Ste. 1010
Fort Worth, TX 76102

John Melko
Sharon Beausoleil
Gardere Wynne Sewell LLP
1000 Louisiana, Ste. 2000
Houston, TX 77002

Randall C. Johnson
Harris, Finley & Bogle PC
777 Main St., Ste. 1800
Fort Worth, TX 76102

Rachel L. Hillegonds
Miller Johnson
P.O. Box 306
Grand Rapids, MI 49501-0306

Jay H. Ong
Munsch Hardt Kopf & Harr P.C.
303 Colorado St., Ste. 2600
Austin, TX 78701

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | CASE NO. 15-70098-TMD-11 |
| | § | |
| Debtor. | § | CHAPTER 11 |

### MOTION TO APPROVE COMPROMISE AND SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019

**A hearing will be conducted on this matter on August 16, 2017, at 1:30 p.m. in Courtroom 1 at the United States Bankruptcy Court, Homer J. Thornberry Federal Judicial Building, 903 San Jacinto Blvd., Austin, Texas.**

**If you object to the relief requested, you must respond in writing, specifically answering each paragraph of this pleading. Unless otherwise directed by the court, you must file your response with the clerk of the bankruptcy court within 21 days from the date you were served with this pleading. You must serve a copy of your response on the person who sent you the notice; otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Morris D. Weiss, Chapter 11 Trustee (the "**Trustee**" or "**Weiss**") for Arabella Petroleum Company, LLC ("**APC**") files this Motion:

### Jurisdiction and Venue

1.      The court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(H) and (O). Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Overview of Relief Sought

**2.**      Trustee seeks approval of a "Settlement Agreement," dated effective July 10, 2017 (the "**Agreement**"), between the Trustee and McCabe Petroleum Corporation

Return to TOC                                                                                                              APP1-011

("**McCabe**")[1], which resolves certain disputes between the Trustee and McCabe (as set forth below), resulting in a payment by McCabe of $2.1 million to the Trustee for the benefit of the estate of APC ("**Estate**"). A copy of the Agreement is attached hereto as **Exhibit "A."**

## Procedural Background

3.      On July 10, 2015 (the "**Petition Date**"), APC commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.

4.      On August 20, 2015, Morris D. Weiss was appointed as Chapter 11 Trustee of APC.

## Overview of Dispute

5.      In the course of examining various transfers of property interests made by APC, the Trustee learned that certain lease interests owned by APC were transferred to McCabe pursuant to an "Assignment of Oil & Gas Leases" dated March 4, 2014 (the "**Transfers**"). The Trustee's accountants, Lain Faulkner & Co., P.C., reviewed the books and records of APC and determined that APC did not receive any apparent consideration for the Transfers. Accordingly, the Trustee contends that McCabe and any subsequent transferees are subject to fraudulent transfer claims under the Bankruptcy Code and applicable state law (the "**Claims**").

6.      Counsel for the Trustee made demand on McCabe pursuant to a letter dated June 16, 2017. Thereafter, counsel for the Trustee engaged in a series of discussions with counsel for McCabe concerning the nature of the transfers and potential resolutions. McCabe provided additional information to the Trustee regarding the Transfers, and the Trustee and counsel conducted appropriate due diligence concerning the Transfers and the Claims. After extensive negotiations and offers, the Trustee and McCabe reached agreement on a settlement (subject to

---

[1] McCabe and the Trustee are referred to collectively as the "Parties."

Return to TOC

Court approval) on July 10, 2017 (the 2-year anniversary of the Petition Date), and also entered a Tolling Agreement which tolled the applicable statute of limitations until July 28, 2017.

7.      McCabe disputes liability, and has provided background information to the Trustee concerning the nature of the Transfers.  McCabe contends, among other things, that it provided reasonably equivalent value for the Transfers, and that the Transfers represented a return of excess capital contributions made by McCabe to a general partnership or joint venture between McCabe and APC.

### **Overview of Agreement**

8.      As set forth more fully in the Agreement[2], the Parties have agreed to resolve the issues and conflicts between them on the terms set forth in the Agreement.  The terms generally include:

    a.      Payment by McCabe of $2.1 million to the Trustee, for the benefit of the Estate, within two (2) business days after an order approving the Agreement becomes final and non-appealable.

    b.      Mutual releases between the Trustee and McCabe, including releases by and against APC and a release by the Trustee of any claims against subsequent transferees.

    c.      An additional tolling of the date on which the Trustee may bring claims, pending approval of the Agreement by this Court.

---

[2] To the extent of any inconsistency between the Agreement and the summary of the Agreement set forth in this Motion, the Agreement shall control.  **This outline is not intended to repeat all terms of the Agreement**. **Any person reading this Motion is encouraged to read the Agreement**

Return to TOC                                        APP1-013

## Basis for Approval

9.    Federal Rule of Bankruptcy Procedure 9019(a) allows a debtor in possession to seek approval of a settlement affecting the bankruptcy estate. The decision whether or not to approve a particular settlement lies within the discretion of the Bankruptcy Court. *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 607 (5th Cir. 1980). "A proposed settlement must be 'fair and equitable' and in the best interests of the estate." *Cadle Co. v. Moore (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Jackson Brewing*, 624 F.2d at 608).

10.    Courts consider the following factors in determining whether a settlement is fair and equitable:

(1)    the probability of success in the litigation, with due consideration for the uncertainty in fact and law;

(2)    the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

(3)    the paramount interest of the creditors and a proper deference to their respective views;

(4)    the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

(5)    all other factors bearing on the wisdom of the compromise.

*Id.*

11.    These factors all support granting the Motion. First, with respect to items (1) and (2) the Claims are hotly contested and would require lengthy, expensive litigation. McCabe has made it clear that part of the desire to settle is to avoid litigation, and that the settlement would not occur quickly, if at all, if an adversary proceeding is filed. Moreover, the litigation would involve complex factual issues regarding the value of the property transferred. With respect to

Return to TOC                                                                                      APP1-014

the factor (3), resolution of these disputes will provide almost $2.1 million to the APC estate. The resolution will also significantly reduce costs going forward.  As for factor (4), the Agreement was the result of difficult and contentious, arms-length negotiations and in good faith.  With respect to factor (5), the Trustee was able to achieve this result expeditiously and without the incurrence of significant professional fees.  Finally, given the extent and complexity of the disputes and the uncertainty of the outcome, the Trustee believes that the Agreement should be approved.

12.      In sum, the Trustee believes that the Agreement is in the best interest of the Estate and should be approved.

13.      A proposed Order is attached hereto as **Exhibit "B"**.

WHEREFORE, based on the foregoing, the Trustee requests that the Court approve the proposed settlement, and that the Trustee have such other and further relief as to which he may be justly entitled.

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By: */s/ Mark C. Taylor*
        Eric J. Taube
        State Bar No. 19679350
        Mark C. Taylor
        State Bar No. 19713225
100 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone:  (512) 685-6400
Telecopier:  (512) 685-6417
E-mail: Eric.Taube@wallerlaw.com
        Mark.Taylor@wallerlaw.com

ATTORNEYS FOR TRUSTEE

Return to TOC                                                                                                          APP1-015

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was served electronically on all parties receiving the Court's ECF notices in this case and by United States First Class Mail on all persons on the attached Service List (unless ECF service is indicated) on July 26th, 2017.


*/s/ Mark C. Taylor*_____
Mark C. Taylor

Return to TOC                                                                                APP1-016

## SERVICE LIST

**Counsel to Debtor**
Bernard R. Given, II (*via ECF*)
Loeb & Loeb
10100 Santa Monica Blvd,
Ste. 2200
Los Angeles, CA 90067

**United States Trustee**
Office of the U.S. Trustee
Attn: James W Rose, Jr (*via ECF*)
615 E. Houston, Ste. 533
P.O. Box 1539
San Antonio, TX 78295-1539

**Counsel for Committee**
Kenneth Green (*via ECF*)
Snow Spence Green LLP
2929 Allen Parkway, Suite 2800
Houston, TX 77019

**Creditors' Committee**
Buckeye, Inc.
Attn: Marty Inge
P.O. Box 5564
Midland, TX 79704

Baker Hughes Oilfield
Operations, Inc.
Attn: Christopher J. Ryan
2929 Allen Parkway, Suite 2100
Houston, TX 77019-2118

Jet Specialty, Inc.
Attn: Ted Williams
211 Market Avenue
Boerne, TX 78006

Crossfire, LLC
Attn: Derek D. McCoy
820 Airport Road
Durango, CO 81303

**20 Largest Unsecured Creditors**
Nomac Drilling, LLC
P.O. Box 650840
Dallas, TX 75265-0840

Trans-Pecos Instruments &
Supply Inc.
1024 S Cedar St
P.O. Box Drawer 71
Pecos, TX 79772

Jet Specialty, Inc
P.O. Box 678286
Dallas, TX 75267-8286

Sooner Pipe, L.L.C.
Dept 26 P.O. Box 4346
Houston, TX 77210-4346

Bickel & Brewer
1717 Main Street, Suite 4800
Dallas, TX 75201

McClinton Energy Group, LLC
P.O. Box 677292
Dallas, TX 75677

Culberson Construction, Inc.
P.O. Box 1379
Granbury, TX 76048

RWI Construction, Inc.
Attn: Jeff Chick
10700 State Hwy 191
Midland, TX 79707

M3P Directional Services, Ltd.
c/o Mike Mayer
P.O. Box 2552
Midland, Texas 79702

Viking Coil Tubing
P.O. Box 1989
Addison, TX 75001-1989

Friendly Trucking
1705 S. Stockton
Monahans, TX 79756

TESSCO Energy Services, Inc
P.O. Box 1999
Midland, TX 79702

A & C Farms Calvin & Ava Gerke
P.O. Box 44
Pecos, TX 79772

Stellar Oilfield Rentals, LLC
P.O. Box 1839
Angleton, TX 77516

Pipe Pros
P.O. Box 9787
Corpus Christi, TX 78469

Crossfire LLC
820 Airport Road
Durango, CO 81303

CMA Welding and Construction
P.O. Box 1155
Kermit, TX 79745

Independence Oilfield Chemicals
Dept. 623
P.O Box 4652
Houston, TX 77210-4652

SDS Petroleum Consultants, LLC
P.O. Box 456
Troup, TX 75789-0456

**Parties Requesting Notice**
(*VIA ECF EXCEPT AS NOTED*)
David G. Aelvoet
Linebarger Goggan et al.
711 Navarro, Ste 300
San Antonio, TX 78205

Evan R. Baker
Gardere Wynne Sewell LLP
1601 Elm Street, Ste. 3000
Dallas, TX 75201

Roy Byrn Bass, Jr.
4716 4th Street, Suite 100
Lubbock, TX 79416

Michael E. Baum
Jason L. Weiner
Nicholas Marcus
Brendan G. Best
Schafer and Weiner, PLLC
40950 Woodward Ave. , Ste. 100
Bloomfield Hills, MI 48304

Shane M Bebout
Todd, Barron, Thomason, et al
3800 E. 42nd St., Suite 409
Odessa, TX 79762

Steven W. Bugg
McAfee & Taft
Tenth Flr, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102

Return to TOC                                                                APP1-017

Fernando M. Bustos
Bustos Law Firm, P.C.
P. O. Box 1980
Lubbock, TX 794408-1980

Michael J Collins
Brewer, Attorneys & Counselors
1717 Main Street, Suite 5900
Dallas, TX 75201

Andrew B. Curtis
Craig, Terrill, et al
9816 Slide Rd., Suite 201
Lubbock, TX 79424

Douglas D. D'Arche
Baker & Hostetler LLP
811 Main Street, #1100
Houston, TX 77002

Carl Dore, Jr
Dore Law Group, PC
17171 Park Row, Suite 160
Houston, TX 77084

Angela Ferrante
Garden City Group, LLC
1985 Marcus Avenue, Suite 200
Lake Success, NY 11042

Randal W Hill
Randal W. Hill PC
802 N. Carancahua, Suite 450
Corpus Christi, TX 78401

Ronald Hornberger
Plunkett and Griesenbeck, Inc.
Catholic Life Building
1635 N.E. Loop Suite 900
San Antonio, TX 78209

Patrick L. Huffstickler
Dykema Cox Smith
112 E. Pecan St., Ste. 1800
San Antonio, TX 78205

Blue Hyatt
Lynch, Chappel & Allsup, P.C.
300 N Marienfeld Ste #700
Midland, TX 79701

Amber L James
Atkins, Hollmann, Jones, et al
3800 E. 42nd Street, Suite 500
Odessa, TX 79762

Todd J. Johnston
McWhorter, Cobb & Johnson, LLP
1722 Broadway
Lubbock, TX 79401

Michael G. Kelly
P.O. Box 1311
Odessa, TX 79760-1311

Zachary S McKay
Dore' Law Group, P.C.
17171 Park Row, Suite 160
Houston, TX 77084

Ryan J. McNeel
Brockett & McNeel LLP
24 Smith Road, Suite 400
Midland, TX 79705

Laura J. Monroe
Perdue Brandon Fielder et al
P.O. Box 817
Lubbock, TX 79408-0817

Jeanne Morales
PO Box 11043
Midland, TX 79702-8043

Randall L. Rouse
Lynch Chappell & Alsup
The Summit Ste 700
300 N Marienfeld
Midland, TX 79701

Vincent P. Slusher
DLA Piper, LLP (US)
1717 Main Street, Suite 4600
Dallas, TX 75201

William R. Sudela
Crady, Jewett & McCulley, LLP
2727 Allen Parkway, Suite 1700
Houston, TX 77019-2125

H. Elizabeth Weller
Linebarger Goggan et al
2777 N. Stemmons Frwy, Ste 1000
Dallas, TX 75207

Elliott S. Cappuccio
Pulman, Cappuccio, Pullen, Benson
& Jones, LLP
2161 NW Military Hwy, Ste. 400
San Antonio, TX 78213

Weldon L. Moore, III
Sussman & Moore L.L.P.
4645 N. Central Expwy., Ste. 300
Dallas, TX 75205

G. Wade Caldwell
Zachary J. Fanucchi
Barton, East & Caldwell, P.L.L.C.
700 North St. Mary's St., Ste.1825
San Antonio, TX 78205

Greg M. Wilkes
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201

Heather H. Jobe
Bell Nunnally & Martin LLP
3232 McKinney Avenue, Ste. 1400
Dallas, TX 75204

Courtney J. Hull
Kimberly A. Walsh
Office of the Attorney General
300 W. 15th St.
Austin, TX 78701

Trey A. Monsour (*via ECF*)
Elizabeth A. Gilman (*via mail*)
K&L Gates LLP
1000 Main Street, Suite 2550
Houston, TX 77002

Cleve J. Glenn (*via mail*)
McClinton Energy Group, L.L.C.
1850 Westpark Drive
Grand Prairie, TX 75050

Craig E. Power (*via mail*)
Misty A. Segura (*via ECF*)
Cokinos, Bosien & Young
Four Houston Center
1221 Lamar St., 16th Floor
Houston, TX 77010

Angelia B. Lee
Craig, Terrill, Hale & Grantham
9816 Slide Road, #201
Lubbock, TX 79424

Soham D. Naik
750 Town & Country Blvd., #300
Houston, TX 77024

Daniel P. Callahan and
Howard C. Rubin
Kessler & Collins PC
2100 Ross Ave., Suite 750
Dallas, TX 75201

Joseph F. Postnikoff
Goodrich Postnikoff & Assocs.
801 Cherry St., Ste. 1010
Fort Worth, TX 76102

John Melko
Sharon Beausoleil
Gardere Wynne Sewell LLP
1000 Louisiana, Ste. 2000
Houston, TX 77002

Randall C. Johnson
Harris, Finley & Bogle PC
777 Main St., Ste. 1800
Fort Worth, TX 76102

Rachel L. Hillegonds
Miller Johnson
P.O. Box 306
Grand Rapids, MI 49501-0306

Jay H. Ong
Munsch Hardt Kopf & Harr P.C.
303 Colorado St., Ste. 2600
Austin, TX 78701

8738-3\00531850.000

Return to TOC

APP1-019

# EXHIBIT A

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is entered into by and between Morris D. Weiss, Chapter 11 Trustee for Arabella Petroleum Company, LLC ("**Trustee**") and McCabe Petroleum Corporation ("**McCabe**") effective July 10, 2017 (the "**Effective Date**"). Each of the entities described above are collectively referred to as the "**Parties**."

### RECITALS

**WHEREAS**, Trustee is the duly-appointed Chapter 11 Trustee for Arabella Petroleum Company, LLC ("**Debtor**") in Case No. 15-70098 (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the Western District of Texas, Midland Division (the "**Bankruptcy Court**"); and

**WHEREAS**, the Trustee has made various allegations concerning certain conveyances (pursuant to applicable State and Federal law) made by the Debtor to or for the benefit of McCabe and any subsequent transferees; and

**WHEREAS**, McCabe contests and denies such allegations; and

**WHEREAS**, McCabe has agreed to pay the Trustee, for the Estate of the Debtor, the amounts set forth below, for a release of McCabe and subsequent transferees, and the Parties have agreed to settle the matters described herein;

**IT IS THEREFORE AGREED**:

1. The Parties hereby acknowledge and agree that each and all of the recitals set forth herein are true and correct and are incorporated by this reference and made a part hereof for all purposes.

2. The Parties hereto agree that there is adequate consideration for their entry into this Agreement, and that each benefits mutually by the other's entry into this Agreement.

1

3.     This Agreement is binding on the Parties and is not subject to revocation or modification by any Party hereto, but it is subject to approval by the Bankruptcy Court.

4.     McCabe shall pay the sum of two million one hundred thousand dollars cash ($2,100,000) ("**Settlement Amount**") to the Trustee by wire transfer within two (2) business days after the date on which an order by the Bankruptcy Court approving the 9019 Motion becomes final and non-appealable (as defined herein) (the "**Settlement Date**") .

5.     Upon the Settlement Date, (a) the Trustee, on behalf of the Debtor, hereby forever releases and discharges McCabe and any subsequent transferees (and all of their affiliates, attorneys, employees, officers and directors, and agents) from any and all claims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, from the beginning of time through the Settlement Date, including but not limited to any claims and causes of action that have been or could be asserted by the Debtor and any claims and causes of action under sections 544, 548 and 550 of the Bankruptcy Code and Tex. Bus. & Com. Code §24.001 *et seq.*; and (b) McCabe hereby forever releases and discharges the Trustee and the Debtor (and all of their attorneys, employees, officers, and agents) from any and all claims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, from the beginning of time through the Effective Date of this Agreement .

6.     Within three (3) days from the date of execution of this Agreement, the Trustee agrees to file a motion to approve this Agreement under Bankruptcy Rule 9019 ("**9019 Motion**") with the Bankruptcy Court in the Bankruptcy Case, and the Trustee and McCabe shall diligently seek approval of this Agreement by the Bankruptcy Court.  In the event that the Bankruptcy Court denies approval of this Agreement, this Agreement shall be null and void, and no

Return to TOC

APP1-022

statements made by the Parties in this Agreement, the 9019 Motion, or at the hearing on the 9019 Motion, may be used for any purpose whatsoever by the Parties.

7.     Without in any way waiving any plea of limitations which McCabe could assert or could have asserted against any Claims (as defined below) filed on the day before the Effective Date stated above, the Parties agree that any claim, lawsuit, cause of action, damage or other remedy (the "**Claims**") that the Trustee has against McCabe in any way relating to the Claims and whether or not such claim is specifically described hereinabove, shall be deemed to be _timely filed_, without any assertion by McCabe of any plea of limitations or limitations defense, if (A) such Claim or Claims is filed in a court of competent jurisdiction on or before fifteen (15) days after entry of an order by the Bankruptcy Court denying approval of this Agreement (the "**Filing Deadline**"), AND (B) such Claim or Claims would not have been conclusively defeated by a plea of limitations had the same been filed on the day prior to the Effective Date; and that the limitations period(s) for each and every of the Claims described above is hereby tolled from the Effective Date and extended by agreement of the Parties to the Filing Deadline above. Without limiting the above, the Parties agree that to the extent a given Claim or Claims would be time-barred and subject to a valid limitations defense if filed on the day immediately prior to the Effective Date, such Claim or Claims shall continue to be time-barred and McCabe does not, by signing this Agreement, waive such defense.

8.     Without limiting the generality of the foregoing, the Parties agree that, in the event that the Trustee files a complaint or otherwise initiates any lawsuit or, if applicable, arbitration proceeding, against McCabe complaining of the matters described herein, and within the Filing Deadline set forth above, then McCabe will not assert a plea or defense of limitations against the allegations in such proceeding. The Parties acknowledge that each of them is

3

reasonably relying on this Agreement, and McCabe acknowledges and agrees that the Trustee is relying upon this Agreement and that otherwise the Trustee would immediately commence an action in lieu of entering into this Agreement. Nothing in this Agreement shall be construed to prohibit any Party from availing themselves of any other defenses, case law or statutory law which may be enforced at the time any proceeding, if any, is initiated.

9. Each of the Parties understands and agrees that this is a full, final and complete mutual release and that this Agreement may be pleaded as an absolute and final bar to any or all suit or suits pending or which may hereafter be filed or prosecuted by any one or more of the Parties or anyone claiming, by, through or under any one or more of the Parties in respect of any of the matters released hereby, and that no recovery on account of the matters described herein may hereafter be had from any of the parties included herein; and that the consideration given for this Agreement is not an admission of liability, and that none of the parties or those claiming by, through or under any of them, will ever claim that it is.

10. The Parties each hereby represent and warrant that they are the current legal and beneficial owner of the Claims released hereby and have not assigned, pledged or contracted to assign or pledge any such Claims to any other person.

11. The Parties acknowledge that each have had an opportunity to retain independent counsel of their own choosing before entering into this Agreement, that they have had an opportunity to review this Agreement with such counsel and to obtain independent review of its terms and its effect before the signing of this Agreement, and that no promise of representation has been made to cause them to enter into this Agreement except as expressly set forth herein.

12. <u>Miscellaneous</u>. It is further agreed as follows:

4

     a.     This Agreement may be executed in several counterparts, each of which shall be fully effective as an original and all of which together constitute one and the same instrument, but only after all of the Parties have executed counterparts of this Agreement.

     b.     If for any reason any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

     c.     Nothing in this Agreement, express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective permitted successors, assigns, and subsequent transferees, nor is anything in this Agreement intended to relieve or discharge any obligation of any third person or any party hereto or give any third person any right to subrogation or action over or against any party to this Agreement.

     d.     This Agreement supersedes all prior agreements or understandings, written or oral, of the Parties relating to the subject matter of this Agreement, and this Agreement, incorporates the entire understanding of the Parties. This Agreement may be amended or supplemented only by a written instrument signed by the party against whom the amendment or supplement is sought to be enforced.

     e.     This Agreement shall inure to the benefit of and be binding upon the Parties hereto and the agents, representatives, predecessors, heirs, successors, assigns, subsequent transferees, insurers and affiliates of the respective Parties.

     f.     This Agreement shall be construed by the laws of the State of Texas and applicable federal bankruptcy statutes and common law. The Bankruptcy Court shall have sole and exclusive jurisdiction and venue to interpret and enforce this Agreement, and the Parties stipulate and agree to such jurisdiction and venue.

<div align="center">5</div>

g.     This Agreement may not be modified except in writing signed by all Parties.

Signed to be effective as of the Effective Date stated above.

*[Signatures on next page]*

6

**AGREED:**

_____

**MORRIS D. WEISS, CHAPTER 11 TRUSTEE FOR
ARABELLA PETROLEUM COMPANY, LLC**
Date: **7/25/17**

**McCABE PETROLEUM CORPORATION**

By: _____
Its: _____
Date: _____

7

# EXHIBIT B

APP1-028

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | CASE NO. 15-70098-TMD-11 |
| | § | |
| Debtor. | § | CHAPTER 11 |

## ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019

Came on for consideration the Motion to Approve Compromise and Settlement Pursuant to Bankruptcy Rule 9019, filed by Morris Weiss, Chapter 11 Trustee for Arabella Petroleum Company, LLC. After considering the Motion, the Court is of the opinion that the Motion should be granted. for the reasons stated on the record. It is, therefore

ORDERED that the Motion is granted, the Settlement Agreement is approved, and the Trustee is authorized to effectuate the terms of the Settlement Agreement.

###

Return to TOC                                                                                          APP1-029

Entry Requested By:

Mark C. Taylor
WALLER LANSDEN DORTCH & DAVIS LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone: (512) 685-6400
Facsimile: (512) 685-6417
mark.taylor@wallerlaw.com

Return to TOC

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION


IN RE:                              )      CASE NO: 15-70098-TMD
                                    )      CHAPTER 11
                                    )
ARABELLA PETROLEUM COMPANY, LLC, )         Austin, Texas
                                    )
                                    )   Wednesday, August 16, 2017
            Debtor.                 )
_____ )   (1:30 p.m. to 2:42 p.m.)


HEARING RE: MOTION TO APPROVE COMPROMISE
UNDER RULE 9019 FOR TRUSTEE MORRIS D. WEISS, DE #149


BEFORE THE HONORABLE TONY M. DAVIS,
UNITED STATES BANKRUPTCY JUDGE


Appearances:        See page 2

Courtroom Deputy:   Jennifer Lopez

Court Recorder:     Adam Wallace

Transcribed by:     Exceptional Reporting Services, Inc.
                    P.O. Box 18668
                    Corpus Christi, TX 78480-8668
                    361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Return to TOC
                                          APP1-031

2

APPEARANCES FOR:


Chapter 11 Trustee:        MARK C. TAYLOR, ESQ.
                           MORRIS D. WEISS, ESQ.
                           Waller Lansden Dortch & Davis
                           100 Congress Ave., Suite 1800
                           Austin, TX 78701

Official Committee of      BLAKE HAMM, ESQ.
Unsecured Creditors        KENNETH P. GREEN, ESQ. (via phone)
                           Snow Spence Green
                           2929 Allen Parkway, Suite 2800
                           Houston, TX 77019

McCabe Petroleum:          JERROD L. RINEHART, ESQ.
                           Brackett & Ellis
                           100 Main St.
                           Fort Worth, TX 76201

Return to TOC                                                          APP1-032

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MORRIS WEISS | 21 | 33 | 40 | |
| MARK TAYLOR | | | | |
| (PROFFER) | 41 | | | |

| COMMITTEE EXHIBITS | | RECEIVED |
|---|---|---|
| 1 THROUGH 8 | | 24 |

| DEBTOR'S EXHIBITS | | RECEIVED |
|---|---|---|
| 1 THROUGH 6 | | 24 |

ARGUMENT

| BY MR. TAYLOR | 44 |
|---|---|
| BY MR. GREEN | 47 |

| RULING | 50 |
|---|---|

Return to TOC

APP1-033

1        **Austin, Texas; Wednesday, August 16, 2017; 1:30 p.m.**

2              **(Call to Order)**

3         **(Telephonic and courtroom appearances)**

4       **THE CLERK:** All rise.

5       **THE COURT:** Please be seated.

6       Okay. *Arabella Petroleum Companies*, 15-70098.

7       Appearances in the courtroom?

8       **MR. TAYLOR:** Good afternoon, your Honor. Mark Taylor

9 here on behalf of Morris Weiss, the Chapter 11 trustee for

10 Arabella.

11       **THE COURT:** Okay.

12       **MR. TAYLOR:** Mr. Weiss is here with me, as well.

13       **MR. HAMM:** Your Honor, Blake Hamm for the Official

14 Committee of Unsecured Creditors. I believe Mr. Kenneth Green

15 is calling in.

16       **THE COURT:** Okay.

17       **MR. RINEHART:** Your Honor, Jerrod Rinehart on behalf

18 of McCabe Petroleum Corporation.

19       **THE COURT:** Okay. On the telephone?

20       **MR. GREEN:** Good afternoon, your Honor. This is Ken

21 Green from the Committee, and I had asked Mr. Hamm to attend in

22 person today because I was out of town, not going to be able to

23 be there, but I have personally handled most of the details

24 relating to the Hudspeth County transaction, which is the

25 subject of the 9019 motion and today's hearing, and would like

15-70098-smr Doc#318-1 Filed 08/20/17 Entered 08/20/17 16:09:59 Main Document Pg 5 of 54
15-70098-smr Doc#304 Filed 08/20/17 Entered 08/20/17 16:09:59 Main Document Pg 85 of 708

5

1    to participate, to the extent that's permissible, by telephone.

2         THE COURT:  Okay.  Sure.  That's fine.  I don't know

3    about examining witnesses, but we'll -- we'll see how it goes.

4         MR. GREEN:  Understood.

5         MR. TAYLOR:  All right.  Again, Mark Taylor here for

6    the trustee, your Honor.  And, your Honor, the basis and the

7    factual reasons and legal reasons that we believe the

8    settlement should be approved, I will have Mr. Weiss testify to

9    that; as opposed to giving an opening where I'm laying out

10   our -- everything that -- that is already in the record that

11   we're going to present, I wanted to give the Court kind of an

12   overview of where we are and how we got here and what this

13   really involves.

14        THE COURT:  I mean, I kind of have the sense -- and

15   maybe I'm -- I don't -- I've got apples and oranges or

16   something, but it looks like the debtor bid $1.3 million for

17   196 leases back in April of 2013 when crude was 92.70.  And

18   I'll just let everybody know that we looked up the crude price

19   on Nasdaq.  I'm not sure which -- there are a lot of different

20   crude prices, but I think -- I think in big, large-number

21   terms, I think this is roughly -- and you're going to get

22   paid -- and the debtor gave that away, so far -- at least

23   that's the allegation.

24        MR. TAYLOR:  That's the -- that's the allegation,

25   which is strongly contested by McCabe --

Return to TOC

```
 1            THE COURT:  Uh-huh.

 2            MR. TAYLOR:  -- and we'll kind of go through with the

 3   Court what their positions were and why we thought the

 4   settlement was reasonable.

 5            THE COURT:  But, in any event --

 6            MR. TAYLOR:  But, of course, Mr. Rinehart's here.

 7            THE COURT:  -- McCabe's going to pay you back

 8   today --

 9            MR. TAYLOR:  Yes.

10            THE COURT:  -- with crude at about 50 --

11            MR. TAYLOR:  Yes.

12            THE COURT:  -- 2.1 million.

13            MR. TAYLOR:  Correct.

14            THE COURT:  Okay.

15            MR. TAYLOR:  The Court has those numbers correct.

16            THE COURT:  Yeah.

17            MR. TAYLOR:  And, your Honor, the overview I was just

18   going to give, you've read it, so you understand --

19            THE COURT:  Uh-huh.

20            MR. TAYLOR:  -- the transaction involved, so I won't

21   bore you with that.  I do have just a short timeline, to put

22   the settlement in context, about what happened and how we got

23   here.

24            THE COURT:  Okay.  Can you email this to Mr. Green?

25            MR. TAYLOR:  Uh, I -- it's not saved on this
```

Return to TOC

1    computer, so I can -- I can take a picture of it and text it to

2    him.

3        **MR. WEISS:**  I'll send it.

4        **THE COURT:**  Yeah.  Let's do that.

5        **MR. WEISS:**  I'll send it to him.

6        **MR. TAYLOR:**  Mr. Weiss is going to do that.

7        **THE COURT:**  Okay.

8        **MR. TAYLOR:**  Following discussions with the

9    committee, on June 16th of 2017, we sent a demand letter to

10   McCabe Petroleum regarding what we viewed as the fraudulent

11   transfers that had occurred back in 2014.  We did not make a

12   specific demand.  That exhibit is in -- I didn't mark it as an

13   exhibit, but it is in Mr. Hamm's -- the committee's exhibit

14   book that will be before the Court.  They contain just a copy

15   of the leases and the assignment -- not the leases, but the

16   assignment that was done.

17        Had a number of discussions with Mr. Rinehart, both

18   by email and by telephone, over the next couple of weeks and

19   asked them for a formal response, which we received on

20   July 5th.  That was a multi-page letter with about 40 pages of

21   backup that laid forth their position.  And essentially their

22   position was, we did pay a lot of money to Arabella; you just

23   need to look and see where it's booked; it was paid as a return

24   of excess capital contributions to a partnership, a general

25   partnership between McCabe and Arabella, for development of

Return to TOC

8

1    certain leases that never got developed, but they took our

2    money, and so this was really -- when the leases were returned

3    to us, they were repaying our partnership balance sheet side

4    for the excess paid in capital that we put into the

5    partnership, because we put all of the money in and Arabella

6    put in nothing.  I'm just stating what their position was.

7             I also went through a pretty complex analysis of --

8             **THE COURT:**  That wouldn't fare too well under Occam's

9    razor.

10            **MR. TAYLOR:**  Yeah.  But I just -- I'm just the

11   messenger, your Honor.

12            So -- so, that was going to be their position, along

13   with -- and their response letter is in the exhibits that will

14   be before the Court today, along with a lot of analysis about

15   what the value of these properties really were and what they

16   were worth at the time of the transfer, what had to be put into

17   them to make them worth anything, and things of that nature.

18   So, that was on the 5th.  We had a number of additional

19   discussions between the 5th and the 10th, both by email and

20   directly by telephone, and during this entire process we were

21   keeping the committee informed with what was going on.

22            The offer history was -- the first offer we received

23   was $275,000 on July 7th.  After a back and forth, we received

24   another offer of 1.33 million on the 10th, and then after we

25   analyzed what we thought the value was, we went back with a

Return to TOC

1    demand of 2.1 million, which was accepted; and the 10th was

2    important, your Honor, because that was the two-year

3    anniversary of this case.  We did enter a tolling agreement,

4    which was subsequently extended under the settlement agreement.

5    At the time this offer was made and accepted, counsel for the

6    committee, Ms. Carollo, was actually at our office.  And, so,

7    we were conferring with the committee counsel on everything

8    that went back and forth on that day with her there in the

9    office and were of the understanding the committee would

10   support this offer and this -- this demand.

11            **THE COURT:**  Understanding --

12            **MR. TAYLOR:**  Was the committee supported this demand,

13   this -- this settlement amount --

14            **THE COURT:**  Okay.

15            **MR. TAYLOR:**  -- of $2.1 million, that the settlement

16   that was made was -- was supported by the committee.  In fact,

17   I think the words Ms. Carollo used were the committee would

18   defer to the trustee's judgment and she was sure the committee

19   would go along with whatever we thought was in the best

20   interests of the estate.

21            **THE COURT:**  Okay.

22            **MR. TAYLOR:**  The settlement agreement draft was

23   circulated on the 18th, and, of course, it went to the

24   committee to review.  On the 20th and 21st is when we had the

25   first indication that the committee was still reviewing the

10

1    deal.  That's what Mr. Green told us, and -- and we had

2    discussions with him early the next week, essentially

3    indicating he was still trying to get committee approval for

4    the deal, which we thought we had, but he -- he needed more

5    time to get that done --

6              **MR. GREEN:**  Ken Green.

7              **MR. TAYLOR:**  -- and would work with them.

8              On the 25th a settlement agreement was signed; on the

9    26th we filed the 9019 motion.  At the time we filed them

10   Mr. Green essentially said, you know, I'm still working with

11   the committee; we understand you need to go ahead and file it;

12   because pursuant to the terms of the settlement agreement, both

13   parties were bound subject to court approval, and we had agreed

14   to diligently pursue --

15             **THE COURT:**  Uh-huh.

16             **MR. TAYLOR:**  -- approval of the settlement agreement.

17   So, we felt we had to go forward.

18             Between the 26th and yesterday at 4:29, we didn't

19   hear anything from the committee indicating that there was

20   going to be a problem with the settlement.  So, although

21   Mr. Green had certainly indicated that he was still trying to

22   sell this to the committee, we were somewhat surprised to find

23   out at 4:30 yesterday that there was going to be an objection

24   filed.

25             As we read the objection, the committee's primary

Return to TOC

1   objection is that -- that the case law says that you don't just

2   measure what the value of the property was at the time of the

3   transfer; if there is an enhancement in the value of the

4   property that the estate did not receive, we're entitled to

5   that enhancement, as well, which I'm not sure exactly what the

6   enhancement was in this case.  I don't disagree with that, as a

7   general proposition of -- of law on the recovery of damages in

8   a fraudulent transfer case.  As I read it, what they want is

9   some portion, some undefined portion, of the $868,000 --

10  868,000 restricted shares that went to McCabe or Hudspeth in

11  connection with the --

12          **THE COURT:**  Torchlight.

13          **MR. TAYLOR:**  -- Torchlight transaction.  It's our

14  understanding, and I don't think the committee disputes this,

15  that the assets that went to Torchlight included substantial

16  other assets, other than these leases, so we had to figure out

17  what portion of the value would be attributable to these

18  leases, if there was going to be an enhancement; and the other

19  thing I would point out to the Court, and we have the stock

20  quote to present to the Court today for the Court to take

21  judicial notice, is that stock is trading at 97 cents this

22  morning.  So, some portion of eight hundred and fiftyish

23  thousand dollars' worth of value, that we don't believe is

24  worth risking this entire settlement; I know from my

25  discussions with Mr. Rinehart -- and he can let the Court know

Return to TOC

12

1    what he thinks -- is they're not interested in increasing their

2    offer, and their offer is not going to be on the table anymore

3    if this deal goes away.  And although, you know, we're not --

4    certainly not afraid to litigate this matter and we'll be happy

5    to do so, we've actually had the complaint drafted and ready to

6    go before we settled, our view is that the substantial cost

7    that would be incurred if they actually pursue this litigation

8    and the year or so time delay before getting resolution, plus

9    any appeal from that, is not worth the risk of losing the $2.1

10   million.  Our perception is that that $2.1 million was on the

11   table to avoid all of this going forward and having to get

12   Torchlight wrapped into litigation, and once all of that

13   happens, if the settlement is not approved, that $2.1 million

14   is not on the table and we're going to start negotiate -- this

15   is not a situation where we are negotiating additional value.

16   The situation is we're going to be negotiating a whole new

17   settlement.

18            **THE COURT:**  Uh-huh.

19            **MR. TAYLOR:**  And we're not willing to risk losing the

20   2.1 -- $2.1 million, and we hope that somewhere months down the

21   road that we'll get a better deal.

22            So, that's essentially the trustee's position, and

23   Mr. Weiss, again, will -- I'll put him on the stand to testify

24   as to his reasons and his thought process, why he believes this

25   is in the best interests of the estate and satisfies the

Return to TOC                                                    APP1-042

```
 1   Jackson Brewing factors.

 2              THE COURT:  Okay.

 3              MR. TAYLOR:  Thank you, your Honor.

 4              THE COURT:  Okay.  Well, Mr. Green, I guess, before

 5   we get into testimony, why should I not accept the trustee's

 6   business judgment?

 7              MR. GREEN:  That's correct, your Honor.  And, really,

 8   the issue of disagreement between the committee and the

 9   trustee, I believe, is fairly narrowly confined to the value of

10   what we termed as the "subject leases," which is the 196 leases

11   covering university lands in Hudspeth County, and in our

12   pleading we've laid out,  you know, some more detail regarding

13   those leases, the original acquisition of the leases by the

14   debtor, the initial transfer to McCabe Petroleum, and then

15   subsequent transactions involving those subject leases.

16              I don't dispute Mr. Taylor's recitation of the facts,

17   you know, starting with the pre-demand investigation that was

18   done, and the committee was a part of that, or committee

19   counsel, at least, participated in that.  We had the landman

20   that was jointly retained by the trustee and the committee

21   perform lease search on these leases.  The trustee's financial

22   firm, Lain Faulkner, worked on the financial side of analyzing

23   these transactions, and -- and we were -- committee counsel was

24   kept in the loop on the negotiations and leading up to the

25   settlement.  And I can tell you that I, personally, have had
```

Return to TOC

14

1    multiple phone calls with the committee members to review this

2    settlement.  I've answered questions about the properties, gone

3    back and done additional research on the properties.  You know,

4    that's been a process in which I've continually attempted to

5    provide information and be responsive to the inquiries by the

6    committee members.

7           At the end of the -- at the end of the day, though,

8    the committee members reached the conclusion and informed me

9    that they did not agree with the proposed settlement, and if

10   you look at it in terms of an implied value per acre at

11   $2.1 million for 132,000 net mill acres that were originally

12   transferred by the debtor to McCabe Petroleum, that's

13   approximately $15.80 per acre.  And while that's more than the

14   at $10.00 that we understand per acre was the acquisition cost,

15   the committee's view is that that is not commensurate with the

16   value of those properties during 2014 or thereafter.  And we've

17   looked at some data points in terms of subsequent transactions,

18   but at the end of the day, we believe that in order to present

19   a proper valuation to the Court we would need to retain an

20   expert to do that.

21          We've spent several weeks now trying to locate an

22   expert and provide information to the expert and determine if,

23   in fact, they would be able to give an expert opinion on value.

24   We just learned yesterday that, in fact, there is a firm in

25   Houston, PLS, Inc., that is able to and willing to serve as a

Return to TOC

1    valuation expert in this case.  Of course, it would be subject

2    to court approval, and that puts us where we are now.  That's

3    why we have asked for a continuance of the evidentiary hearing.

4    We are prepared to move quickly.  We understand that POS has

5    obtained and aggregated all the data that they would need to

6    formulate a fair-market-value analysis, but we have to go

7    through the steps of filing a motion, and we would be prepared

8    to do that as early as tomorrow to retain them and go forward.

9            And I understand that Mr. Taylor is prepared to offer

10    the testimony of Mr. Weiss in support of the 9019 factors, and

11    much of that really would not be in dispute.  We're not

12    contending that there was bad faith or that the parties didn't

13    negotiate at arm's length; nothing like that.  This is really

14    just about valuation.  And I think Mr. Taylor would tell you,

15    as would Mr. Weiss, that there was no independent third-party

16    valuation done for these properties, and that -- that's where

17    we are now.  And, so, that's -- that's what the committee is

18    requesting.

19            **THE COURT:**  Well, how much does this PLS, how much do

20    they want to charge for the valuation?

21            **MR. GREEN:**  Well, my understanding from -- I received

22    a rate structure from them last night -- would be $10,000 up

23    front, and that is to -- that is for the, basically, the access

24    charge for their database, because they have all of the data

25    necessary to do the fair-market-value analysis, and then,

16

1   again, my understanding is the -- the $10,000 payment would

2   also cover the preparation of the fair-market-value analysis,

3   and then there is a rate schedule for professionals for

4   additional hours required for deposition or hearing testimony,

5   and it ranges from, I believe it's 500 to 700 an hour for

6   testimony time.

7           **THE COURT:** Deposition and hearing. So, I mean, the

8   data points that I recited at the start of the hearing were in

9   April of 2013 debtor pays 1.3 million and crude oil is 90

10  bucks. Debtor is now going to get back 2.1 million and crude

11  oil is almost half that. Well, what are the data points that

12  suggest that -- I mean, I -- these -- typically, the -- the

13  Founders transaction, it's hard to really get anything from

14  that. I mean, they're going to commit to pay $50 million to

15  develop these leases and other leases. Well, what --

16          **MR. GREEN:** I agree. So, let -- if I may kind of

17  step through our position on that, there's really three data

18  points. The first one is the transaction between Hudspeth Oil

19  and Torchlight Energy Resources. So, remember Hudspeth Oil is,

20  at that time, a wholly-owned affiliate of McCabe Petroleum; I

21  believe it may have actually been owned by Mr. McCabe, but it's

22  an affiliate. Mr. McCabe owns all of Hudspeth either

23  individually or through another entity. So, in that

24  transaction, Hudspeth transfers a hundred percent of its stock

25  to Torchlight; Torchlight conveys back 868,750 shares of

Return to TOC

17

1   Torchlight stock.

2           **THE COURT:**  Restrict -- restricted.

3           **MR. GREEN:**  Restricted stock.  The two groups of

4   leases that are involved are the University Lands leases, which

5   are the subject leases, the 133,000 acres, and an additional

6   set of leases totaling approximately 38,000 acres that are

7   referred to as the Cerro Alta -- C-E-R-R-O  A-L-T-A -- Cerro

8   Alta.

9           **THE COURT:**  And those are -- is that other acreage --

10          **MR. GREEN:**  And, then --

11          **THE COURT:**  This Cerro Alta, is that additional

12  acreage that Hudspeth then owned?

13          **MR. GREEN:**  I believe that Hudspeth did own that

14  acreage.  It is unclear to me where Hudspeth acquired the

15  acreage from.  Those leases are referenced on exhibits to

16  letter agreements between Mr. Hoisager, who is the principal of

17  the debtor, and Mr. McCabe, but it's unclear to me where record

18  title ownership resided prior to those leases going to -- into

19  Hudspeth and then into Torchlight.

20          Now, with respect to the reported value of the

21  consideration, in the Torchlight 10-K for 2014, Torchlight had

22  reported that the stock was valued at between 1.9 and

23  2.2 million.  But that's not all that Mr. McCabe received in

24  that transaction.  There was also a prior five-percent override

25  conveyance that was made to Magdalena Royalties, which is

Return to TOC                                                                          APP1-047

18

another McCabe entity, and McCabe retained a 10-percent back-in after payout working interest. So, if you're looking at the totality of the consideration, you have to factor those in, as well. So, that's one data point.

 THE COURT: Well, but what --

 MR. GREEN: Another data point --

 THE COURT: What does that data point --

 MR. GREEN: Go ahead, your Honor.

 THE COURT: What -- what does that tell me about value?

 MR. GREEN: Sure. Well, we -- well, you can't value, as we sit here today, the five-percent override or the 10 percent back-in working interest. If we have a full-market valuation on an 8-H basis for the 133,000 acres during that time period, I think we could then -- I don't want to use the word "back in," but back in to a valuation number for the override and the back-in after payout working interest. But as we stand here today, I can't put a number on that for the same reason that I can't put a fair market value on the leases themselves. That would require a third-market -- or a third-party fair-market-value analysis.

 THE COURT: Okay.

 MR. GREEN: Now, in the first quarter of 2015 there was an additional transaction -- and this is referenced in paragraph eight of our objection -- where Torchlight sold a

Return to TOC

19

1    five-percent working interest to a company called Pandora for

2    500,000.  Now, they also issued 250,000 warrants in connection

3    with that transaction, and if you were looking to establish an

4    implied value for the property, the calculation there would be,

5    if a five-percent working interest is worth 500,000, that would

6    be approximately 10 million on an 8-H basis, but then you would

7    also back out the value of the warrants, which, again, that's

8    not a number that I can pinpoint for the Court.  But that's the

9    -- that's the methodology that -- that you would use.

10           And, then, the final data point is what the Court had

11    referenced, which is the Founders farmout agreement and

12    development agreement, and -- and that is a complicated

13    transaction.  It involves multiple obligations on the part of

14    Founders, and there's different figures for when those

15    obligations have to be satisfied.  If you -- if you want --

16    if -- for argument sake, if you wanted to oversimplify it and

17    say that from Torchlight's perspective the most they would

18    ultimately realize from that transaction would be $50 million;

19    any number of scenarios where it could ultimately be less, but

20    if they -- but on the -- in the best-case scenario for

21    Torchlight, if they realized $50 million in value from Founders

22    in exchange for a 50-percent working interest, well, that's an

23    implied value of 100 million on an 8-H basis.  And I'm not

24    suggesting that that is, in fact, the value; it's certainly

25    going to be a number less than that.  But that's just simply

Return to TOC

20

1   what the math would be.

2            At the end of the day -- and these are -- these are

3   data points, each of which are not subject to a, you know,

4   precise reduction to exact dollars, and that's really the point

5   of why we have requested to be able to have a third party do a

6   fair-market-value analysis based on comparable sales for the

7   subject leases during the relevant time period.

8            **THE COURT:**  Okay.

9            **MR. TAYLOR:**  Your Honor, I think that just went

10  through the headache that we're facing in trying to redo all of

11  this and potentially wind up litigating it.  So, if the

12  committee says we want some portion of stock that's currently

13  worth about $850,000, by my estimate, based upon spending a

14  quarter million dollars in legal fees and a hundred to a

15  hundred and fifty thousand dollars in expert witness cost,

16  another fifty grand in out-of-pocket cost, we'd have to get

17  half of that stock to be the hurdle to increase over the

18  $2.1 million.  And that's not a risk that the estate thinks

19  that, and the trustee thinks, that he's in a position to take.

20  This isn't really -- this isn't really just an issue of

21  revaluing everything.  The issue is, if we lose the settlement,

22  what are we left with?  And we're left with nothing, and we're

23  left with restarting, and hoping we get back to $2.1 million,

24  and then hoping that we get over the hurdle that it's going to

25  take us to get to the two point -- to -- on top of the

Return to TOC

1   $2.1 million to get there.  And that's something we don't

2   believe that we can do.  And I'm happy to put Mr. Weiss on the

3   stand to -- for his testimony on why he believes this

4   settlement is in the best interest of the estate and should be

5   approved.

6           THE COURT:  Yeah, I would say let's go ahead and --

7           MR. TAYLOR:  Okay.  We'll call Morris Weiss.

8           THE COURT:  Yeah, Mr. Weiss is already sworn to tell

9   the truth, as a practicing attorney, so we won't --

10          MR. WEISS:  Thank you, your Honor.

11          THE COURT:  -- issue the oath.

12          **MORRIS WEISS, WITNESS, PRACTICING ATTORNEY**

13                  **DIRECT EXAMINATION**

14  **BY MR. TAYLOR:**

15  Q    Mr. Weiss, how long have you been practicing law?

16  A    Thirty-two years.

17  Q    And, I'm sorry; you probably need to go ahead and state

18  your full name.

19  A    Morris Dean Weiss.

20  Q    Okay.  Mr. Weiss, prior to -- how long have you been at

21  Waller?

22  A    About 18 months.

23  Q    And before that you were with the predecessor firm.

24  A    Correct.

25  Q    And what did you do before that?

         1      **(Pause)**

         2    Q    I'll shorten it.  From law school -- after law school, you

         3    worked for Weil Gotshal and were a partner there, correct?

         4    A    That's correct.

         5    Q    And what did you do after that?

         6    A    I went in-house with a client, became general counsel to

         7    several different entities, including a bank holding company, a

         8    broker dealer, and -- and also just a -- a manufacturing

         9    company, a holding company.

        10    Q    And at some point were you also involved in investment

        11    banking?

        12    A    Yes.

        13    Q    What did you do?

        14    A    After the client was sold I joined a brokerage firm,

        15    and -- well, let me back up.  When I was the in-house GC of the

        16    bank, I also helped found the broker (indiscernible) subsidiary

        17    and obtained my securities licenses, my Series 7, 24, and 63,

        18    and after we sold the bank, I joined the brokerage firm in

        19    Austin and specialized in distressed bond investments, and then

        20    morphed into co-founding the investment banking group there in

        21    2004.

        22    Q    How long were you there?

        23    A    I joined in 2002 and left towards the end of 2008.

        24    Q    I want to talk now about the settlement that we're here on

        25    today.  How -- how did you go about -- or how did you even

1  learn about the potential for an action against McCabe

2  Petroleum and its affiliates and potentially subsequent

3  transferees?

4  A    We -- one of the things that I've tried to do as trustee

5  is to make sure to communicate with all the various

6  constituents and parties and try to be aware of all the

7  potential rights, claims, causes of action that we might have.

8  We learned of transfers in Hudspeth County that -- as we were

9  getting closer and closer to the two-year anniversary, as you

10 noted earlier.  I reached out to committee counsel, because

11 they were the catalyst to help find the expert that Mr. Green

12 mentioned earlier that is jointly retained by the trustee and

13 the committee to do title work, to have them analyze the -- the

14 filings in Hudspeth County; and also, as Mr. Green noted,

15 reached out to Mr. Crisp at Lain Faulkner, who is the

16 accountant for the trustee, who had access to the books and

17 records of Arabella Petroleum at the time, to look at the

18 general ledger and see what consideration, if any, had been

19 paid by McCabe at or around the time of the transfers.

20 Q    Did you discuss this with your counsel, as well?

21 A    Spoke to my counsel, spoke to committee counsel, spoke to

22 the accountant, spoke to Mr. Hoisager.

23 Q    Did you authorize your counsel to send a demand letter?

24 A    I did.

25 Q    Look at --

Return to TOC

1          May I approach, your Honor?

2          **THE COURT:**  Yes.

3   **BY MR. TAYLOR:**

4   Q    -- Exhibit 8 in the committee's book; is that the demand

5   letter that was sent to McCabe?  It's the black binder.

6   A    Yes.

7          **THE COURT:**  I don't have the --

8          **MR. HAMM:**  Your Honor, Blake Hamm for the committee.

9   We'd offer Committee Exhibits 1 through 8.

10         **THE COURT:**  One through how many?

11         **MR. HAMM:**  Eight, your Honor.

12         **MR. TAYLOR:**  No objection, your Honor.

13         **THE COURT:**  They're admitted.

14     **(Committee Exhibits 1 through 8 were received in evidence)**

15         **MR. HAMM:**  Your Honor, may I approach?

16         **THE COURT:**  Sure; and how about the Debtor's Exhibits

17  1 through 6?

18         **MR. HAMM:**  No objection, your Honor.

19         **THE COURT:**  Debtor's Exhibits 1 through 6 are also

20  admitted.

21     **(Debtor's Exhibits 1 through 6 were received in evidence)**

22         **MR. TAYLOR:**  Thank you, your Honor.

23         **THE COURT:**  So --

24  //

25  //

1   **BY MR. TAYLOR:**

2   Q    So, this is the -- this is the letter that was sent to

3   McCabe and Mr. Rinehart on June 16th; is that right?

4   A    Correct.

5   Q    Did you have your counsel engage in further discussions

6   with McCabe's counsel following this -- the time this letter

7   was sent?

8   A    I did.

9   Q    And did McCabe send you a response?

10  A    I believe all communications were through you, but the

11  answer is yes.

12  Q    If you look at the Exhibit 1 in the white notebook there

13  in front of you, trustee's exhibits, is that the response

14  letter that you received?

15  A    Yes.

16  Q    And did you review the materials -- the response letter

17  and the materials that were attached?

18  A    Most definitely.

19  Q    Did you discuss them with me?

20  A    Most definitely.

21  Q    And Mr. Crisp?

22  A    Yes.

23  Q    And with the committee?

24  A    Yes.

25  Q    And did you forward this to -- provide this to the

Return to TOC

1   committee or have your counsel provide it?

2   A     Yes.  Counsel of the committee.

3   Q     What other -- once you received this, what other

4   background information did you look at in connection with the

5   assertions that were being made by McCabe as to the value of

6   the property that was transferred and what they had paid for it

7   and what the nature of the relationship was between McCabe and

8   APC?

9   A     I -- I looked at the SEC filings on -- made under EDGAR,

10  looked at what stock may have been owned or what affiliation,

11  if any, there had been between McCabe and Torchlight prior to

12  the transaction, looked at -- and I can't remember now if it

13  was an 8-K or if it was at or around the time of a filing of a

14  10-Q -- that had the deal transaction, and looked at the

15  subsequent filings for purposes of determining if there were

16  reg. rights associated with the shares that we received, that

17  the shares were, in fact, registered or not; looked at the

18  change in asset value from quarter to quarter on the Torchlight

19  records and the balance sheet; and -- but -- and also had

20  discussions with my -- the accountant for the firm, or for --

21  for the trustee, I should say -- and also with Mr. Hoisager,

22  because, as you had noted in your argument, one of the

23  allegations made by McCabe was that this was part of a

24  partnership, and attached to this letter that you pointed out

25  here as Exhibit 1, it lists the other assets that were the

Return to TOC

1   subject of the partnership.  So, those are the steps that I

2   took.

3   Q    And the -- I believe there is also attached as an exhibit

4   the letter on Mr. Greg McCabe's letterhead to Jason Hoisager

5   that discusses how this purported partnership was going to work

6   in kind of general terms; is that right?

7   A    Yes.

8   Q    Did you discuss these -- the issues regarding the

9   valuation issues and the potential legal issues with the

10  committee?

11  A    Counsel to the committee.

12  Q    Yes.  I'm sorry; with counsel for the committee?

13  A    Yes.

14  Q    What, and just in general terms, from your standpoint, did

15  you view as the hurdles that would have to be overcome to try

16  to prevail if a lawsuit had to be filed?

17  A    So, initially it was the value of the property that was --

18  at the time that the transfer took place, and the other factors

19  that we learned about were that when these leases were acquired

20  by Arabella Petroleum they were the only bidder on the

21  property, that there was some development that was required to

22  be conducted, and that McCabe had to take certain actions as

23  the assignee -- well, initially, APC is the assignee, which

24  didn't have the resources to be able to develop the leases;

25  then had to get them in the hands of McCabe, which then had to

1   develop the leases; then put them in the hands of Torchlight,

2   which had to develop the leases.  There was the question of the

3   value of the consideration then that McCabe received and

4   whether or not -- and it was unclear from the public filings if

5   the aggregation of these leases were the only asset that was in

6   the Hudspeth entity that McCabe controlled that was conveyed to

7   Torchlight.  We were advised that there were other assets that

8   were aggregated by McCabe into that Hudspeth entity, but we

9   didn't have visibility into this, we didn't know how to

10  apportion the value from one to the other.

11          The other issue was what the value was of the stock,

12  because the stock at the time that McCabe received it was

13  trading, as I recall, at about 3.65 or 3.75 or so per share.

14  There was a -- and there was the overrides and back-ins, as

15  Mr. Green had noted, as well, which would also be difficult to

16  value.  But at 800 something thousand shares at 3.65 or so a

17  share, that was about 3.25 million.  I did note that shortly

18  thereafter, maybe six months later, there were some additional

19  options that were granted to Mr. McCabe -- or to McCabe --

20  whichever the selling entity was; I didn't mean to say

21  Mr. McCabe, whatever the entity was that conveyed it -- order

22  of magnitude of, like, 600,000 options struck at 36 cents,

23  which then caused me to look at what had happened in the stock

24  trading price in the time between the initial transaction and

25  the subsequent issuance of options, thinking it looked like he

1    got a bunch of in-the-money options, but, in fact, the stock

2    price had dropped by 90 percent in that six-month period, so it

3    had gone from about 3.65 a share to 36 cents a share.  So,

4    there was the whole question of what value could be retained,

5    which I'll -- is a variation of the same theme, which is,

6    what's the -- what's the value of the consideration McCabe

7    received.

8            The other thing was that I didn't see any

9    registration rights in the conveyance agreement and later

10   learned that McCabe was relying on Rule 144 to be able to sell

11   the shares, which would have required him to have held the

12   shares for a year; then there would have been volume

13   limitations.  And looking at the trading history of the stock,

14   it would have taken an extended period of time.  So, the

15   combination of stock losing 90 percent of its value and having

16   to be held for a year and being subject to the trading

17   limitations under Rule 144, all were factors that -- that

18   weighed.  And, then, so, in terms of hurdles, there was the

19   initial transferee issues relative to McCabe; then there was

20   the subsequent transferee issues relative to Hudspeth and

21   Torchlight.

22   Q    How did you ultimately get to the $2.1 million?  We've

23   looked at the timeline, the history.  Was that the back-and-

24   forth on the offers that were made?

25   A    It was.

1  Q    And -- and without going into your litigation thought

2  processes, in general, why did you believe the $2.1 million

3  made sense?

4  A    The rejoinder from McCabe was that they were essentially

5  going to put us back in -- put the APC estate back in the place

6  it would have been had this transfer not taken place, and that

7  they -- and 1.33 million was that amount.  Our analysis was he

8  had received 3.25 million in stock, plus the other

9  consideration that we couldn't really value.  There was an

10 increase in that from quarter to quarter and $7 million in

11 investment in oil and gas properties but had no way of knowing

12 if that increase was attributable solely to this or not.  Some

13 of the information that's actually attached to this Exhibit 1

14 would suggest that about 1.8 or 1.9 million -- there's two

15 different numbers, and a little bit inconsistent; within

16 $100,000 of each other, so close enough -- that it was not just

17 1.33, it was more like 1.8 or 1.9.  So, to the extent that we

18 were going to be put back in the position that we were in, if

19 we got back that money, plus some amount in excess of that for

20 things that we -- just to take into account matters that we may

21 have overlooked, recognizing that there was at least some

22 possibility that the difference between the 1.33 million and

23 the 1.8 or 1.9 may not have been amounts that were incurred or

24 expended by APC.  So, that was all -- those were all factors

25 that were taken into account.

Weiss - Direct / By Mr. Taylor                    31

1   Q    And were these arm's-length negotiations?

2   A    Most definitely, yes.

3   Q    Did you discuss these with the committee as the -- as the

4   offers were being made?

5   A    Yes.

6   Q    And on the day of the offer, the demand for $2.1 million

7   being made, did you vet that with the committee --

8   A    Yes.

9   Q    -- before you made it?

10  A    Yes.

11  Q    And did you vet the settlement with the committee before

12  you agreed to it on that day --

13  A    Yes.

14  Q    -- with the committee counsel?

15  A    Yes.

16  Q    If you look at -- I know we've talked about the issues

17  relating to the stock.  You understand the committee is saying

18  you ought to get -- that the estate also has to get some of the

19  868,000 shares of stock that went to McCabe from Torchlight,

20  correct?

21  A    Yes, I understand that.

22  Q    Do you know if that stock would be tradable if it came to

23  the estate immediately?

24  A    I guess it depends on what form it would come in, if it

25  just came in freely tradable stock or not.

Return to TOC

1  Q    Do you know at this point whether it is?

2  A    I don't know.

3  Q    If you'd turn to Exhibit 6 in the white book, what is the

4  Torchlight Energy stock trading at today?

5  A    Did you say stock price?

6  Q    Yes.  Yes.

7  A    Ninety-six cents.

8  Q    And what's -- what was the trading range over the last

9  year?

10  A    Fifty-two week range is 66 cents to a dollar ninety-six.

11  Q    Now, if the agreement is not approved and we have to go

12  through this process, are you concerned about losing the

13  $2.1 million offer?

14  A    Yes.

15  Q    And why is that?

16  A    McCabe made it clear that a significant driver, from their

17  perspective, and their interest in settling is that litigation

18  not be commenced for a variety of reasons, including the impact

19  it may have on subsequent trades freeze, and we had the statute

20  of limitations issues that you've referenced, and, fortunately,

21  had reached out with enough runway in advance to be able to

22  have productive conversations with McCabe prior to being forced

23  to have to file something.  But there can be no certainty that

24  if we were compelled -- if this were to fall apart and we were

25  compelled to file suit -- and I don't have any reason to

1   disbelieve McCabe's view that the avoidance of litigation is

2   important to them -- I don't know that we're going to see this

3   number again anytime soon, if ever.

4   Q    On the other hand, if it does fall apart, are you willing

5   to litigate this matter?

6   A    Absolutely.

7   Q    Do you believe that this settlement is in the best

8   interests of the estate and the creditors?

9   A    I do.

10  Q    And is it for the reasons we've discussed on the stand

11  today or some other reason?

12  A    All those reasons.

13            **MR. TAYLOR:**  Pass the witness, your Honor.

14                        **CROSS EXAMINATION**

15  **BY MR. HAMM:**

16  Q    Good afternoon, Mr. Weiss.

17  A    Good afternoon.

18  Q    I'm Blake Hamm for the committee.

19  A    Yes.

20  Q    I know we haven't -- haven't met in person until today.

21  A    I'm glad we finally have that chance.

22  Q    Yes, sir.  So, now, your testimony that it's your

23  understanding when the debtor acquired, originally acquired,

24  these leases, it was the only bidder on that property?

25  A    That's what I understand, yes.  And it was a -- it was a

1   process that was run by the state, I believe, so it was

2   intended to be a competitive process.

3   Q    And is it okay with you if I refer to the property at

4   issue here as the "subject leases"?

5   A    That's fine.

6   Q    And you did not retain anyone to value the subject leases

7   as of any point in time, did you?

8   A    I did not.  That's correct.

9   Q    Do you have the expertise necessary to value the subject

10  leases on your own?

11  A    I do not.

12  Q    Do you know if the price of oil at any given time is the

13  only already determinative factor in the value of the subject

14  leases?

15  A    I would not know.

16  Q    And is it true that you believe, essentially, that

17  $2.1 million is a fair settlement because McCabe Petroleum

18  advised you that it would pull the deal off the table unless

19  you accepted it?

20  A    That's not the only reason though.

21  Q    Okay.  Did you account for a valuation of the subject

22  leases in your determination?

23  A    It would have been a factor that would have been taken

24  into consideration.  I think that's fair.

25  Q    But you don't know what the fair-market value of those

Weiss - Cross / By Mr. Hamm                                    35

1    leases was at any point in time, do you?

2    A    I -- I don't, I guess, except insofar as the fact that the

3    state had run a process and they got the price that they got

4    from APC at the point in time that that -- that the subject

5    leases were conveyed.

6    Q    But aside from information you obtained from McCabe, the

7    initial transferee of the subject leases, you're not aware of

8    any valuations -- of any fair-market value of the subject

9    leases as of the time they were transferred from debtor to

10   McCabe.  Is that right?

11   A    I'm not sure I followed your -- your --

12   Q    Let me rephrase.  So --

13   A    Yeah, because -- and I'll tell you what was troubling me,

14   is the premise that other than the information I was provided

15   by McCabe, because it wasn't just information I got from McCabe

16   that I relied upon, if that helps you.

17   Q    Okay.  Well, what information did you rely upon to value

18   the subject leases at the time they were transferred from

19   debtor to McCabe?

20   A    I think I already testified that I didn't have valuation

21   data, but why don't I --

22   Q    And that's --

23   A    I tried to clarify.  Why don't I let you try to rephrase,

24   as you -- as you had offered, so I might be able to do my best

25   to answer your question.

Return to TOC                                              APP1-065

1  Q    You were not in possession of a fair or have knowledge of

2  a fair market valuation of the value of the subject leases at

3  the time they were transferred from debtor to McCabe, did you?

4  Is that correct?

5  A    That's correct.

6  Q    And would you agree that at the time of the transfer of

7  the subject leases from the debtor to McCabe the debtor and

8  McCabe were engaged in a joint venture or some other form of

9  partnership together?

10 A    Can I actually have you repeat?

11 Q    Yes.  At the time of the -- at the time the debtor

12 transferred the subject leases to McCabe, McCabe and the

13 debtor, to your knowledge, were involved in a joint venture or

14 some form of general partnership with regard to the subject

15 leases.  Is that correct?

16 A    I understood that those were the allegations of McCabe.

17 Q    So, that's what McCabe said to you, right?

18 A    That's what was in the communication we got from McCabe,

19 yes.

20 Q    And if that's true -- and at the time of the transfer

21 McCabe would have been an insider of the debtor, would you

22 agree with that?

23 A    I'd have to take a look at 101.31.  I'd have to look at

24 the -- I'd have to look at the code.

25 Q    It would at least require a hard look, wouldn't it?

Weiss - Cross / By Mr. Hamm                                    37

1    A    It's a statutory definition, so I'd just have to figure

2    out -- but there's, I think, a couple of hurdles there, because

3    the debtor itself is an LLC, I guess would be part one; but the

4    analysis kind of goes beyond that, because I'm not so sure that

5    you'd be considered a insider of the -- of the debtor LLC, but

6    what I really haven't thought about is the extent to which, if

7    true, that the debtor was joint venture partner or co-G.P.,

8    that the venture itself would not have been a debtor, so I --

9    I'd have to think about it.  I'd have to have my counsel advise

10   me.

11         **THE COURT:**  Is the joint venture this -- this letter

12   from Greg McCabe to Jason Hoisager?  Is that what you're

13   referring to?

14       **(Pause)**

15         **MR. HAMM:**  Your Honor, I'm looking -- I think -- I

16   think, yes, that is one point.  I'm also looking at Committee

17   Exhibit Number 7, this -- basically, the second page of this

18   letter from Mr. Rinehart with McCabe -- I believe is McCabe's

19   attorneys to Mr. Taylor dated July 5th, 2017.  And on the

20   second page, in the first full, non-bolded paragraph, it

21   states:

22             "MPC (McCabe) and APC (the debtor) participated in a

23             general partnership whereby both companies agreed to

24             contribute equally to the purchase of select oil and

25             gas properties."

Return to TOC

1          Which it's my understanding include the subject

2    leases.

3          **THE COURT:**  Okay.

4    **BY MR. HAMM:**

5    Q    So, Mr. Weiss, you would agree that at least there is

6    investigation as to whether or not McCabe and the debtor -- let

7    me rephrase.  It at least bears investigation as to whether or

8    not McCabe was an insider of the debtor, whether statutory or

9    non-statutory, at the time the subject leases were transferred

10   to McCabe, right?

11   A    Bears looking into whether or not McCabe was an insider of

12   the debtor, statutory or not --

13   Q    Let me rephrase.  Would you consider whether or not McCabe

14   was an insider of the debtor at the time of the transfer of the

15   subject leases to be a factor you would consider when

16   exercising your business judgment as to whether or not this was

17   a fair settlement that you're now proposing?

18   A    You -- I -- I think I've stepped into the time-space

19   continuum here, because at what point -- what I understood your

20   questions prior to that one to be driving at was whether or not

21   McCabe was an insider at the time of the transfer.

22   Q    Yes, sir.

23   A    But your most recent questions seem to suggest that --

24   whether or not McCabe was an insider of the debtor at the time

25   of the settlement.  So, help me.  Maybe I --

Return to TOC

1  Q    Yes, sir.

2  A    Maybe I'm -- I'm not following.

3  Q    Sure, Mr. Weiss.  Let me -- let me just rephrase.

4        Have you examined or undertaken any investigation to

5  determine whether or not McCabe Petroleum was an insider of the

6  debtor at the time of the transfer of the subject leases?

7  A    I have not done that analysis.

8  Q    Do you think that that analysis would be important with

9  respect to whether or not the estate should settle its

10 fraudulent transfer claims against McCabe for the transfer of

11 the subject leases?

12 A    I guess that the answer is I'm not sure, because I -- I --

13 when I think of insider, I think about extended reach back

14 periods for preferential transfer actions, I think about not

15 arm's-length negotiations, and I -- I think it would be fair to

16 say that it would be a factor, but I'm -- but I don't know how

17 much of a -- of a -- of a weight it would be given, because the

18 fact is that McCabe, as best as we could tell, hadn't paid any

19 consideration to APC in exchange for the transfer of the

20 leases.  So, whether or not they were an -- McCabe was an

21 insider at the time, that's what I'm -- I'm struggling with

22 conceptually.  Maybe I'm missing something.

23 Q    Understood.  So -- so, is it your opinion that the value

24 of the subject leases at the time of the transfer is the

25 most -- most important consideration with respect to whether or

1   not the proposed settlement is reasonable?

2   A    It certainly is a whole lot more important than whether or

3   not McCabe was an insider at the time.

4   Q    But you haven't performed a valuation of the leases at the

5   time they were transferred, have you?

6   A    I think I already testified that I had not.

7         **MR. HAMM:**  Okay.  Thank you, your Honor.  No further

8   questions.

9         **THE COURT:**  Okay.

10        **MR. TAYLOR:**  Just a brief follow-up.

11                    **REDIRECT EXAMINATION**

12  **BY MR. TAYLOR:**

13  Q    Mr. Weiss, prior to the time the June 16th demand letter

14  was sent, how long was it before that that you learned about

15  the potential for there being a fraudulent transfer action to

16  be brought?

17  A    I think it could be counted in weeks; maybe --

18  Q    Couple of weeks?

19  A    -- four weeks, at most.

20  Q    Okay.  And were you facing a two-year deadline to get

21  something on file if you didn't reach a settlement?

22  A    Yes.

23  Q    You -- at the very end Mr. Hamm was asking you about what

24  was the most important factor in your decision to make the

25  settlement letter was the value of the leases.  Did you also

Return to TOC

1    take into account things such as the time value of money?

2    A    Yes.

3    Q    And the litigation costs that were going to be involved?

4    A    Yes.

5    Q    And the risk of the litigation.

6    A    Yes.

7             **MR. TAYLOR:**  Thank you.

8             Pass the witness, your Honor.

9             **MR. HAMM:**  Your Honor, no questions.

10            **THE COURT:**  You may step down.

11            **THE WITNESS:**  Thank you.

12        **(Witness stepped down)**

13        **(Pause)**

14            **MR. TAYLOR:**  Next, your Honor, I was going to proffer

15   my testimony.

16            **THE COURT:**  Okay.

17                **PROFFER OF TESTIMONY BY MARK TAYLOR**

18            **MR. TAYLOR:**  Your Honor, if called to testify, I

19   would testify that I've been practicing litigation in

20   commercial business bankruptcy for 30 years, where there have

21   been a number of both fraudulent transfer lawsuits and trials,

22   as well as other complex commercial litigation and complex

23   bankruptcy litigation, so I'm very familiar with the attorneys'

24   fees and costs involved with this type of litigation.  If

25   called to testify, I would testify that the attorneys' fees for

Return to TOC

Proffer of Mark Taylor                                    42

1   pursuing this matter through trial would exceed $250,000 and

2   take, even on a fast-track, nine months to get to trial, and

3   more likely, over a year.  Expert witness costs would involve

4   an expert on solvency and solvency analysis, an expert on the

5   valuation of what was conveyed by the debtor to McCabe, and an

6   expert to analyze what McCabe says was provided in return

7   through the course of dealing between the parties those --

8            **THE COURT:**  The joint venture.

9            **MR. TAYLOR:**  Yes; in connection with the purported

10  joint venture.  And, your Honor, those costs would exceed,

11  based upon very recent costs that I've been seeing in a couple

12  of other cases, it would easily exceed $100,000, and more

13  likely $150,000, including deposition time, the time to review

14  the other experts' reports, and things of that nature.

15            Finally, your Honor, I believe that the out-of-pocket

16  expenses for depositions and copying and, most importantly,

17  what has become extremely expensive is the electronic ESI

18  information, that the storage of that information and the

19  processing of that information is incredibly expensive, and so

20  this cost would exceed -- deposition cost, copying cost, and

21  ESI processing and storage -- would exceed $50,000 and probably

22  be closer to $75,000 for a case such as this.  So, overall cost

23  would be somewhere between four and five hundred thousand

24  dollars to the estate to pursue this litigation if it was

25  vigorously contested by McCabe and the other target defendants,

Proffer of Mark Taylor                                    43

1   which would include Torchlight, and, therefore, I believe that

2   they would vigorously defend it.

3          It's also my impression, based on my conversations

4   and experience, that this offer will not be on the table for

5   some period of time if it's rejected and not approved by this

6   Court, and we'll have to spend a considerable amount of money

7   to get something even close to this offer back onto the table

8   for discussion.

9          That would be my testimony, your Honor.

10         **THE COURT:**  Okay.  Do you want to cross examine

11  Mr. Taylor?

12         **MR. HAMM:**  No, your Honor, I don't.

13         **THE COURT:**  Okay.

14         **MR. HAMM:**  That's --

15         **MR. TAYLOR:**  Your Honor, the only thing I would point

16  out to the Court -- didn't really go through this, and there

17  wasn't a need to; I've put these in evidence.  Exhibit 2 is

18  just some of the email chain that went back and forth between

19  Mr. Rinehart and his partner and me, and you'll see the

20  committee is copied on these emails, as well, going back and

21  forth, with the discussion of the offers, the analysis of the

22  issues, and ultimately the settlement.  Exhibit 3 is -- I

23  didn't attach the draft of this, but it was the -- where I sent

24  the draft of the settlement agreement to counsel for the

25  committee on July 13th.  On July 18th we resent -- was where I

44

1  sent it to Mr. Rinehart after some revisions had been done, and

2  a copy of that agreement was -- was Exhibit 5 of the draft,

3  just showing essentially that we were -- not only that we were

4  working closely with the committee, and keeping them advised of

5  the process throughout this.

6          And, your Honor, that's all of the evidence that we

7  have to present today.  So, we rest.

8          THE COURT:  Okay.

9          MR. HAMM:  No further evidence, your Honor.

10          THE COURT:  Okay.

11          MR. TAYLOR:  All right.  Your Honor, very briefly,

12  this is governed by the line of cases going back to the Fifth

13  Circuit's opinion in *Jackson Brewing* and, more recently than

14  that, the *Cadle Company* opinion.  There are five factors to

15  look at.  If you turn --

16          THE COURT:  I've got them on a chart right here.

17          MR. TAYLOR:  Okay.

18          THE COURT:  So, you don't have to repeat them.

19          MR. TAYLOR:  I won't repeat them, your Honor.  Then,

20  I'll simply say that we believe that this -- the -- there is a

21  chance of success if this litigation went to trial, but it's

22  going to take a year to get there and cost four to five hundred

23  thousand dollars, when we have a $2.1 million offer on the

24  table, and the alternative is to get --

25          THE COURT:  The partnership defense looks pretty real

45

 1  to me.

 2          **MR. TAYLOR:**  Well, it's -- it's going to be --

 3          **THE COURT:**  I just -- I disparaged it when I first

 4  heard you state it, but --

 5          **MR. TAYLOR:**  There are -- there are a couple of

 6  letters that they have produced to us, your Honor, and they've

 7  said that, you know, they have -- the financial records show

 8  that, at least on the McCabe side, that's the way it was

 9  accounted for.  In all candor with the Court, I don't think

10  that's the way it was accounted for in the APC side.  We

11  haven't seen any K-1's issued, any evidence of a partnership.

12  But it's going to be hotly contested, and it's not going to be

13  a summary judgment case.  So, it's going to be -- it's going to

14  be a fight.  So, we think there is --

15          **THE COURT:**  And you're -- you're having to rely on

16  Arabella's records?  Is that --

17          **MR. TAYLOR:**  We're actually not happy to rely upon

18  Arabella's records, and the reason we're not happy to rely upon

19  those is they've been -- as our accountant has gone through

20  them and we've gone through them, there are gaps.  There were

21  things done in ways that -- that weren't done properly just

22  for -- I don't want to disparage anyone unnecessarily, but for

23  reasons to benefit certain people at certain times.

24          **THE COURT:**  Right.

25          **MR. TAYLOR:**  And there are items that are missing,

Return to TOC                                                    APP1-075

46

1    and we don't have a lot of faith in the veracity of everything

2    that's in Arabella's records.

3            **THE COURT:**  Uh-huh.

4            **MR. TAYLOR:**  But that's what we're going to be forced

5    to rely on.

6            **THE COURT:**  Right.

7            **MR. TAYLOR:**  Secondly, your Honor, this is going to

8    be complex litigation, and we've already gone through the --

9    the costs and delay.  The creditors in this case, we want to

10   give proper deference to the committee, and we've worked

11   closely with the committee, and this is actually the first time

12   we've had a divergence of views.  And I also want to make it

13   clear that I don't think that this is anything that -- that

14   Mr. Green or Ms. Carollo or Mr. Hamm have done improperly.

15   It's simply a matter of they have had --

16           **THE COURT:**  And I don't think so either.

17           **MR. TAYLOR:**  -- but they -- their committee is -- is

18   looking at it and second guessing, and that happens; because

19   different people have different views.  And they're here

20   representing their clients, as they should, and we, you know,

21   commend them for doing that, and we'll continue to work with

22   them closely on everything going forward.  But we think the

23   interest of the creditors is to get the two point -- well, our

24   77 and a half percent of the $2.1 million into the estate,

25   because under our sharing agreement with AEX, they'll get 22

1   and a half percent of the -- of these proceeds.

2           This was clearly an arm's-length negotiation, and

3   we've gone through that, I think, with the exhibits and with

4   the testimony, and the -- the other factors bearing upon the

5   wisdom of the compromise is, primarily, we think this offer is

6   not going to be on the table if the Court enters an order

7   declining it.  We understand the committee's desire for

8   another -- for an extension of time.  We have committed in the

9   settlement agreement to move this forward.  And beyond that, we

10  think it's a good settlement.  And, so, we think it ought to be

11  approved, that there ought not to be a delay in approving the

12  settlement, because the most that's going to happen is we're

13  going to come back here and fight over whether or not we should

14  spend four or five hundred thousand dollars to get some portion

15  of the $850,000 in stock.

16          **THE COURT:**  Uh-huh.

17          **MR. TAYLOR:**  Thank you, your Honor.

18          **THE COURT:**  Mr. Green, did you want to close?

19          **MR. GREEN:**  Yes, your Honor, if I may.

20          **THE COURT:**  Go ahead.

21          **MR. GREEN:**  Thank you.  Just to sort of go through

22  quickly and dispense with a couple of things that are really

23  not in dispute, the committee does not dispute that the

24  negotiations were conducted by Mr. Weiss and Mr. Taylor at

25  arm's length and they have acted in good faith.  Really, I

Return to TOC                                                    APP1-077

1  think where it comes down to is on the probability of success.

2  Oh, and I should also mention I don't dispute any of what

3  Mr. Taylor said with respect to the expected cost and duration

4  of litigation.  But if you -- if you take that and you just

5  assume that you're likely to spend $500,000, then you move to

6  the analysis of, if you spend five hundred, how likely is it

7  that you will achieve a meaningfully better result.

8         So, the way I look at it, right now, for 2.1 million

9  you've got an implied per-acre value of $15.80.  If you -- and

10  if you assume that's correct, that the leases were acquired for

11  $10, that's a $5.80 improvement on a per-acre basis.  We've

12  spent a lot of time talking about the stock, and it's relevant,

13  I think, because it's -- it's available data, because we know

14  that's what Mr. McCabe received in connection with the

15  Torchlight transaction, in addition to the 10-percent back-in

16  working interest, and the buyer conveyed 5-percent override,

17  which was preserved in connection with the Torchlight

18  transaction.

19         But I think when the Court goes to look at this base

20  fraudulent transfer claim, critical question is going to be did

21  APC receive reasonably equivalent value for assigning 133,000

22  acres to McCabe.  And I understand there's this partnership

23  defense, but at the end of the day, the committee's view is

24  that it is likely that the trustee would obtain a favorable

25  finding that there was not reasonably equivalent value given to

1   the debtor, thus making the transfer avoidable. Then, if we

2   move forward from there, Section 550 tells us that the debtor

3   is then entitled to recover the property or the value of the

4   property. So, if the trustee proves -- or the committee, let's

5   say, whoever, comes in with a third-party fair-market-value

6   analysis and that analysis shows -- and committee thinks it

7   will -- that the price per acre in March of 2014, when the

8   leases were initially assigned to McCabe, as well as in June,

9   2014, when the leases were assigned from McCabe to Hudspeth,

10   that the per-acre value is meaningfully higher than $15.80,

11   then that, in turn, is going to prove the additional value that

12   we think the estate would be entitled to if this matter was

13   litigated.

14        So, really, that's the crux of the objection. And,

15   as I've said, and I know the Court is aware, we are not able to

16   put that testimony on today. But we think that is the

17   appropriate analysis that should be undertaken to properly

18   measure the first factor, which is probability of success, both

19   on the merits of the claim and the recoverable damages for the

20   claim, and then we measure that against what would be obtained

21   in the settlement.

22        That's all I have, your Honor.

23   //

24   //

25   //

1          **THE COURT:**  Okay.  Thank you.

2          And I'm going to approve the settlement.  I do want

3    to make it very clear that -- I'm sure the trustee

4    appreciates -- I'm going to just say this.  I appreciate the

5    committee's due diligence.  And I respect the business

6    expertise that they bring to -- to the table in considering

7    these matters, and -- and I don't discount that at all, and I

8    hope everybody understands that.  But the reason I'm going to

9    approve the settlement really gets down to -- Mr. Green, you

10   said the probability of success in litigation.  But the rest of

11   that factor is with due consideration for the uncertainty in

12   fact and law.  And I do see claims that are hotly contested.  I

13   do think lengthy and expensive litigation's going to be

14   required to get to the end of the day.  I think there is

15   uncertainty in the outcome.  As I mentioned before, I mean,

16   just looking at the information before me, I don't think you

17   can lightly discount, or at least as lightly as I discounted,

18   this partnership defense.  And -- and then, coupled with the

19   fact that the trustee has to rely on Arabella's records.  And I

20   think those are pretty meaningful hurdles and represent a lot

21   of uncertainty.  It may be that the trustee can cut through

22   that and at the end of the day can establish a pretty good

23   case; I mean, it may be, you know, like, another month will

24   give us the valuation data point, another three or four months

25   might -- might -- and some depositions might give us a greater

51

1   certainty on these other things, but that's the whole point of

2   an early settlement.  You don't have to risk that uncertainty.

3   And -- and that's the value of an early settlement.  I mean,

4   value is important; there is no question about that, but it's

5   only one factor in connection with a lot of others that the

6   trustee has had to consider in considering the settlement.  So,

7   I think factor one is met.

8           I think the complexity and likely duration of

9   litigation and the attendant expense, I think, if anything,

10  Mr. Taylor has underestimated the costs -- of course, lawyers

11  do tend to do that -- and the time to get to trial.  I mean,

12  we -- we -- in bankruptcy court I like to think that we could

13  run a rocket docket if we had to, but it always seems like both

14  sides are coming in and asking for more time, and every time

15  they ask for more time, that increases the expense of -- of

16  getting to the end of the day.  So, I think maybe nine months

17  is probably optimistic, as well, on that.

18          You look at the -- the paramount interest of

19  creditors and proper deference for their respective views,

20  and -- and, again, I think the committees bring valuable

21  business judgment, but with all due respect, the committee is

22  not -- not the one that has to actually try this case; it's

23  Mr. Taylor, and Mr. Weiss has the responsibility of making

24  prudent decisions at every step along the way in investigating

25  and -- and pursuing litigation.  I think that for the estate to

52

1   collect 2.1 million for something -- to get back something that

2   once paid $1.3 million is, in itself, a significant benefit.  I

3   think to avoid all of the costs and uncertainty, the 500,000

4   and the uncertainty, again, that gets back to the benefit of a

5   prompt settlement.  Yes, there are a lot of things that are

6   unknown, in addition to value, but -- but that's why -- that's

7   why the compromise makes sense at this point in time.

8        It's stipulated that the agreement was the result of

9   difficult and contentious arm's-length negotiations and that

10  all parties negotiated in good faith.

11       And, then, as to all other factors bearing on the

12  wisdom of the compromise, well, that's what I -- I guess I

13  wrote that in; the exact -- I've already said the exact market

14  valuation is unknown, but so are other items, and that's,

15  again, the value of the early settlement.

16       So, I appreciate the committee's desire to have

17  greater certainty as to that important data point, but I think,

18  considering everything, the total package, everything that

19  you're supposed to consider in connection with a settlement, I

20  think on balance I'm going to go with the trustee's business

21  judgment and, primarily for that reason, approve the

22  settlement.

23       **MR. TAYLOR:**  Your Honor, this is the order I

24  uploaded.  I'll let you see it and make sure you're okay with

25  that.

Return to TOC

53

1        **(Pause)**

2              **THE COURT:**  This is the one that's already uploaded?

3              **MR. TAYLOR:**  Yes, your Honor.

4              **THE COURT:**  Okay.  I'll sign it.

5              **MR. TAYLOR:**  All right.  Thank you, your Honor.

6        That's all we have today.

7              **THE COURT:**  We're adjourned.

8              **MR. TAYLOR:**  Okay.  Thank you, your Honor.

9              **COURTROOM ATTENDANT:**  All rise.

10       **(Proceeding was adjourned at 2:42 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXCEPTIONAL REPORTING SERVICES, INC**

Return to TOC

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                              <u>August 18, 2017</u>

         Signed                                                                                    Dated

*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas

Bankruptcy Case No.: 15−70098−tmd

Chapter No.: 11

Judge: Tony M. Davis

IN RE: **Arabella Petroleum Company, LLC** ,
Debtor(s)

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript of the proceeding held on **8/16/2017** was filed on **8/20/2017**. The following deadlines apply:

The parties have until **August 28, 2017** to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is **September 11, 2017**.

If a request for redaction is filed, the redacted transcript is due **September 20, 2017**.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is **November 20, 2017** unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber **Toni Hudson, Exceptional Reporting Services, Inc., 361−949−2988**, or you may view the document at the clerk's office public terminal.

Dated:  8/21/17

Yvette M. Taylor
Clerk, U. S. Bankruptcy Court
BY: Adam Wallace

**[Notice of Filing of Transcript and of Deadlines Related to Restriction and Redaction (BK)]** [NtcftddlrrBKap] ]

Return to TOC

Kenneth Green; SBN 24036677
kgreen@snowspencelaw.com
Blake Hamm; SBN 24069869
blakehamm@snowspencelaw.com
Carolyn Carollo; SBN 24083437
carolyncarollo@snowspencelaw.com
SNOW SPENCE GREEN LLP
2929 Allen Parkway, Suite 2800
Houston, TX 77019
Telephone: (713) 335-4800
Facsimile: (713) 335-4848

COUNSEL FOR OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Arabella Petroleum Company, LLC** | § | **CASE NO. 15-70098-rbk** |
| | § | **CHAPTER 11** |
| **Debtor.** | § | |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## AMENDED EXHIBIT AND WITNESS LIST FOR AUGUST 16, 2017 HEARING
### [Relates to Docket Nos. 419 & 431]

The Official Committee of Unsecured Creditors (the "Committee") files this Amended

Witness and Exhibit List for the hearing scheduled on August 16, 2017 at 1:30 p.m. (the "Hearing")

on the below matters:

1.  Motion to Approve Compromise and Settlement Pursuant to Bankruptcy Rule 9019 [Dkt. 419].

2.  Official Committee of Unsecured Creditors' Objection and Request to Reset Hearing on Motion to Approve Compromise and Settlement Pursuant to Bankruptcy Rule 9019 [Dkt. 431].

1

APP1-086

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| MORRIS D. WEISS, | ) | CASE NO:  16-07002-TMD |
| | ) | ADVERSARY |
| Plaintiff, | ) | |
| | ) | Midland, Texas |
| vs. | ) | |
| | ) | Tuesday, May 17, 2022 |
| ARABELLA EXPLORATION, INC, | ) | |
| ET AL., | ) | 9:30 a.m. to 12:04 p.m. |
| | ) | 12:57 p.m. to  1:33 p.m. |
| Defendants. | ) | |

LEAD CASE: 15-70098-TMD / CH 11
ARABELLA PETROLEUM COMPANY, LLC

TRIAL

BEFORE THE HONORABLE TONY M. DAVIS,
UNITED STATES BANKRUPTCY JUDGE

**APPEARANCES**:          See page 2

Courtroom Deputy:      Jennifer Lopez

Court Reporter [ECRO]:  Estella Benitez Jurado

Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Return to TOC

2

<u>APPEARANCES FOR:</u>

Plaintiff:                    MARK C. TAYLOR, ESQ.
                              Waller Lansden Dortch & Davis
                              100 Congress Ave.
                              Suite 1800
                              Austin, TX 78701


Defendants:                   ROBERT A. SIMON, ESQ.
                              Whitaker Chalk Swindle & Schwartz
                              301 Commerce Street
                              Suite 3500
                              Ft. Worth, TX 76102

Return to TOC

3

                                 INDEX

| DEFENDANTS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GREG McCABE | | 5 | 15 | -- |
| BRIAN CRISP | 20 | 38 | 48 | 50 |
| WILLIAM HEYN | | 52 | 59 | |
| JASON HOISAGER | | 61 | 82 | 96 |

| REBUTTAL WITNESSES | | | | |
|---|---|---|---|---|
| JASON RAE | 99 | 102 | -- | -- |
| BRIAN CRISP | 102 | 114 | -- | -- |

| TRUSTEE'S EXHIBIT | | | | RECEIVED |
|---|---|---|---|---|
| 85 | | | | 47 |

Return to TOC                                                          APP1-089

4

1          **Midland, Texas; Tuesday, May 17, 2022; 9:30 a.m.**

2                              **(Call to Order)**

3          **THE COURT:**  This is the Arabella adversary, *Weiss v.*

4     *Hoisager.*

5          Mr. Simon, I see you're on?

6          **MR. SIMON:**  Yes, Your Honor.

7          **THE COURT:**  Thank you.

8          Mr. Taylor?

9          **MR. TAYLOR:**  Good morning, Your Honor.  Mark Taylor

10    along with Evan Atkinson here on behalf of the Plaintiff.

11         **THE COURT:**  All right, thank you.

12         Mr. Simon, who's your first witness?

13         **MR. SIMON:**  Your Honor, Jason Hoisager calls Greg

14    McCabe by Declaration.

15         **THE COURT:**  Mr. McCabe?

16         **MR. McCABE:**  Yes.

17         **THE COURT:**  Would you please raise your right hand.

18            **GREG McCABE, DEFENDANTS' WITNESS, SWORN**

19         **THE COURT:**  And have you read the Declaration that's

20    been submitted in this case on your behalf?

21         **THE WITNESS:**  Yes.

22         **THE COURT:**  Are the factual statements contained in

23    that Declaration true and correct?

24         **THE WITNESS:**  Yes.

25         **THE COURT:**  Okay, go ahead, Mr. Taylor.

Return to TOC

1        **MR. TAYLOR:**  Thank you, Your Honor.

2                    **CROSS EXAMINATION**

3    BY MR. TAYLOR:

4    Q    Good morning, Mr. McCabe.  How are you today?

5    A    Fine.

6    Q    Good.  I can't -- it's kind of hard to hear you, so you

7    might want to speak up a little bit.

8    A    Okay.

9    Q    Perfect.  Mr. McCabe, in your Declaration in the last

10   paragraph, Paragraph 29, you talk about a claim that the

11   Trustee made against McCabe Petroleum relating to potential

12   fraudulent transfers or preferential transfers.  Do you recall

13   that testimony?

14   A    Yes.

15   Q    You settled that with the Trustee, correct?

16   A    Correct.

17   Q    Are you aware that Mr. Hoisager is the person that

18   provided the information to the Trustee to be able to pursue

19   that claim?

20   A    No.

21   Q    Going back earlier in your Declaration, at Paragraph 9 you

22   talked about an oral line of credit with Mr. Hoisager.  That

23   was not documented in any -- by a promissory note or a loan

24   agreement, was it?

25   A    Correct, it was not.

McCabe - Cross / By Mr. Taylor                      6

1    Q    And similarly, in Paragraph 16 you talked about an advance

2    of funds for the Roark project.  That was also not documented

3    by a promissory note or loan agreement or any other document,

4    was it?

5    A    Correct.

6    Q    Now, in addition to the transactions that you had with APC

7    you were a shareholder of AEX Incorporated, weren't you?

8    A    Yes.

9    Q    About a -- I think about a 20 percent shareholder, is that

10   right?

11   A    Just a little over a million shares.  I don't remember

12   what percent that was.

13   Q    In Paragraph 18 of your Declaration you discuss a sale of

14   the Wolfbone 2 working interest and go on to say that there was

15   a -- some money paid for an assumption of the Debtor's

16   obligation to repay Hoisager the money he advanced to allow the

17   Debtor to purchase Wolfbone 1 and Wolfbone 2.  Are you aware

18   that there was never a loan booked on APC's books and records

19   from APC to Mr. Hoisager?

20   A    I'm not familiar with their books.  I haven't reviewed

21   them.

22   Q    So you don't know what the nature of the obligation was on

23   the books and records of APC from APC to Mr. Hoisager, do you?

24   A    Correct, I do not.

25   Q    Now, in Paragraph 19 you discussed the Roark prospect,

EXCEPTIONAL REPORTING SERVICES, INC

Return to TOC

McCabe - Cross / By Mr. Taylor                                    7

1    correct?

2    A    Correct.

3    Q    Now, you actually -- this says you advanced funds or your

4    company, McCabe Petroleum, advanced funds to the Debtor to

5    purchase the Roark prospect, correct?

6    A    Correct.  At the direction of Hoisager.

7    Q    So Mr. Hoisager told you to -- or asked you to loan the

8    money to the Debtor?

9    A    No.  I've always loaned the money just directly to

10   Hoisager and have him direct me where he wants the money to go.

11   Q    Well, in Paragraph 19 you say you advanced funds to the

12   Debtor, correct?  MPC advanced funds to the Debtor, isn't that

13   what you said?

14   A    Yeah, I said I advanced --

15   Q    That's all I'm asking, Mr. McCabe.  My question is you say

16   you advanced funds to the Debtor, correct?

17   A    Correct.

18   Q    And that was for the Roark prospect, correct?

19   A    Correct.

20   Q    Now, in Paragraph 20 you say that you directed -- you say,

21   "I, acting for McCabe Petroleum, directed the Debtor to

22   transfer the Roark prospect to Arabella Exploration," correct?

23   A    Correct.

24   Q    Now, you weren't a manager or an officer of the Debtor,

25   were you?

**EXCEPTIONAL REPORTING SERVICES, INC**

McCabe - Cross / By Mr. Taylor                    8

1   A    Correct.

2   Q    You also make the statement that the Debtor did not spend

3   any of its own funds in the Roark prospect.  But you had

4   advanced the funds, as we noted in your prior paragraph, to the

5   Debtor, correct, for the Roark prospect?

6   A    Correct.

7   Q    Now, in Paragraph 21 you talked about two other leases,

8   the Cannon lease and the Johnson 6 and 20 lease, and you also

9   make the statement that you directed the Debtor to transfer

10  those leases to AEX, correct?

11  A    Correct.

12  Q    In exchange you got some stock in AEX, right?

13  A    Correct.

14  Q    In Paragraph 23, and this is relating to the Cox prospect,

15  again your company directly wired about $328,000 to the

16  Debtor's bank account, correct?

17  A    Correct.

18  Q    And this says that was to allow the Debtor to acquire the

19  Cox prospect leases, correct?

20  A    Correct.

21  Q    Mr. McCabe, you are familiar, are you not, with the

22  proposed transaction with Legacy?

23  A    Yes.

24  Q    And that was a proposed transaction between Arabella

25  Exploration Inc. and Legacy, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Return to TOC

McCabe – Cross / By Mr. Taylor                                    9

1   A    Well, it was a three-legged stool.  I was a part of it

2   too.

3   Q    That's right.  But the Hoisager side entity was Arabella

4   Exploration Inc.

5   A    Correct.

6        **MR. TAYLOR:**  Could I have the share screen function,

7   please, Ms. Lopez?

8      **(Pause)**

9           Let's see if I can do something here.

10     **(Pause)**

11  **BY MR. TAYLOR:**

12  Q    Mr. McCabe, I want to take a look at the Purchase and Sale

13  Agreement regarding -- for the Legacy transaction.  Now, the

14  parties that are listed on here again are Arabella

15  Exploration Inc. and Legacy Reserves Operating, correct?

16  A    Correct.

17  Q    It doesn't say McCabe Petroleum, does it?

18  A    No.

19  Q    And there is no provision that you're aware of in this

20  agreement, is there, that provides for -- requires payments to

21  be made to Arabella Petroleum Company, is there?

22  A    Not directly to Arabella Petroleum.

23  Q    Now, this proposed transaction is subject to certain

24  contingencies, isn't it?

25  A    Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

McCabe - Cross / By Mr. Taylor                          10

1    Q    If we go down to what's the red numbers there at the

2    bottom, 2213, you see conditions precedent to obligations of

3    buyer at the top?

4    A    Yes.

5    Q    And one of those -- sorry.  One of those is a financing

6    contingency, correct?

7    A    (Indisc.)

8    Q    11.6.

9    A    Yes, I'm reading it.  Okay.

10   Q    So the deal was subject to a financing contingency by the

11   buyer, correct?

12   A    Correct.

13   Q    And it was also subject in 11.7 to Court approval and it

14   says:

15            "In the event of a bankruptcy filing by or against

16            any -- by or against seller or any of its -- (and

17            I've got to go to the next page) -- any of its

18            affiliates, the issue of a final and non-appealable

19            Court order approving the transaction contemplated by

20            this agreement and vesting in the buyer good and

21            marketable title in and to the assets free and clear

22            of all liens, claims, burdens, interests and/or

23            encumbrances."

24            Did I read that correctly?

25   A    Yes.

Return to TOC

1  Q    And so would it be your understanding that since Arabella

2  Petroleum Company had filed bankruptcy that approval by

3  Arabella Petroleum Company's Bankruptcy Court would be

4  necessary for this agreement to be effective?

5  A    I don't know if Arabella Petroleum is an affiliate.  I

6  mean I don't know the legal definition.

7  Q    Well, let's assume with me that it's an affiliate.  Would

8  that be your understanding then, that it would require approval

9  of Arabella Petroleum Company's Bankruptcy Court?

10         **MR. SIMON:**  Objection, Your Honor.  That's -- that

11  assumption is beyond the evidence, outside of the evidence, and

12  Mr. McCabe is not an expert.  So as a person who is not

13  testifying as an expert, he does not have to testify as to

14  hypotheticals.

15         **THE COURT:**  I'm going to sustain the objection on the

16  grounds that the question is argumentative.

17  **BY MR. TAYLOR:**

18  Q    In addition, Mr. McCabe, there were certain payments that

19  were required.  And by the way, this was a $15 million purchase

20  price, correct?

21  A    Correct.

22  Q    If we look at Page 2191, Section 3.2, start at 3.2, and

23  these are seller deliverables at closing.  Do you see that

24  section?

25  A    Yes.  Is there any way you could make it a tiny bit

1  larger?

2  Q    Yeah, I can, and I -- when I get to the places I'm going

3  to show you.  See this 3.2, delivery by seller?

4  A    Yes (inaudible) I see it.

5  Q    And we'll flip to the next page, so Section 3.2(F),

6  required satisfaction of certain payables related to the assets

7  that are being purchased, correct?

8  A    Correct.

9  Q    Including all realty obligations and working interest

10  owner obligations, correct?

11  A    Correct.

12  Q    And payment to any third parties who provide goods and

13  services related to the assets, is that right?

14  A    Correct.

15  Q    And it also provided in Section 3.2(E) that there be a

16  release of all mortgages and security interests and financing

17  agreements encumbering the assets, correct?

18  A    Correct.

19  Q    And Platinum Partners had a lien on these assets that were

20  being proposed to be transferred, didn't it?

21  A    I believe they did.

22  Q    And that (inaudible) about $16 million?

23  A    I don't know specifically.  Don't recall.  I never saw the

24  Platinum documents.

25  Q    The purchase price was also subject to certain downward

Return to TOC

1  adjustments, wasn't it?

2  A    Yes.

3  Q    In fact, if we look at -- this is Paragraph 2.2(B), the

4  base purchase price was subject to adjustments for the items

5  listed in the Romanette numbers (i) through Romanette (vi),

6  correct?

7  A    Yes.

8  Q    And that included certain proceeds from the -- derived

9  from the sale of oil and gas produced by the assets, it

10  included expenditures, liabilities, and costs relating to the

11  assets that weren't paid at closing, title defects, property

12  and severance taxes, cash in suspense accounts, and any other

13  amounts agreed to by the parties in this agreement.  Is that a

14  fair characterization?

15  A    Yes.

16  Q    The purchase price was also subject to an escrow, wasn't

17  it?

18  A    I don't recall specifically.

19  Q    If you look at Paragraph 3.3 just below (E).

20  A    Okay.

21  Q    The buyer could require that 20 percent of the purchase

22  price be set in escrow pending the occurrence of certain

23  events, couldn't it?

24  A    Yes.  Okay.  Yes, I agree.

25  Q    The purchase price was also subject to certain post-

Return to TOC

1   closing adjustments, wasn't it?

2   A     I'm sure it was.

3   Q     Let's look at Section 4.4.  Do you see that?

4   A     Yes.

5   Q     So, you know, for any of the items that are listed in (A)

6   through (D) the base purchase price could be adjusted on a

7   post-closing basis, couldn't it?

8   A     Yes.

9   Q     It was also subject to a reduction as we noted for title

10  defects, correct?

11  A     Correct.

12  Q     If we look at 21, Page 2199, we see there is a provision

13  for adjusting the base purchase price for title defect issues,

14  correct?

15  A     Correct.

16  Q     In Section 22 -- if we go to Page 2201, see the section

17  there on preferential rights?

18  A     Yes.

19  Q     And what are preferential rights?

20  A     That usually means that you have a right to either

21  tagalong or dragalong or if anybody else has any preferential

22  rights to purchase they can match the offer.

23  Q     And in Section Romanette (ii) of this provision the buyer

24  could terminate it if more than 10 percent of the value of the

25  base purchase price was exercised by preferential rights

McCabe - Redirect / By Mr. Simon                    15

1    holders, correct?

2    A    Correct.

3    Q    Finally, on Page 2204 if we look at Section 6.4, there is

4    also the ability for the buyer to adjust downward the purchase

5    price for adverse environmental conditions, isn't that correct?

6    A    Correct.

7    Q    To your knowledge, was this agreement ever the subject of

8    a motion filed in the Debtor's bankruptcy case to approve the

9    sale?

10   A    I don't recall specifically.

11           **MR. TAYLOR:**  Thank you for your time today,

12   Mr. McCabe.

13           Pass the witness.

14           **MR. SIMON:**  Very well.

15                        **REDIRECT EXAMINATION**

16   **BY MR. SIMON:**

17   Q    Mr. McCabe, good morning.  I'm Robert Simon and I

18   represent Jason Hoisager.  How are you today?

19   A    Fine.

20   Q    Thank you very much.  It's good to see you.

21           All right, Mr. McCabe, you testified that MPC was

22   going to participate in the Legacy transaction?

23   A    Correct.

24   Q    And how would it have participated?

25   A    Well, several months process to get to the finish line.  I

Return to TOC

1  was going to provide an asset called the Hazel (phonetic)

2  property to Arabella Exploration because they needed an asset

3  because they were giving assets to Legacy.  That's why it was a

4  three-legged stool.  All three pieces of the puzzle needed to

5  be put together for it to work.

6  Q    All right.  And is it your belief that MPC would have

7  benefited from this transaction?

8  A    Yes.  We would have sold the deal to Arabella Exploration,

9  Arabella Exploration would have benefited by selling the deal

10 to Legacy, and Legacy would have benefited by buying an asset,

11 which they were a multibillion-dollar company at the time

12 (inaudible) assets.

13 Q    At the time did you view this transaction as a win-win for

14 everyone involved?

15 A    Oh, absolutely.

16 Q    And would the Debtor have benefited from this transaction?

17 A    Yes.  Part of the deal was it was a $15 million offer but

18 we knew there was a lot of contingencies and that offer would

19 reduce.  One of the ways it would have reduced was Legacy was

20 going to be charged with clearing up a lot of the unpaid bills

21 by some of the non-op working interest owners, which I think

22 they were a lot better equipped to do than Hoisager was.

23 Hoisager at that time had gotten adversarial with some of the

24 non-op working interest partners and he was not in the best

25 position financially to take on the legal battles, whereas

1   Legacy was very well equipped to do it.

2   Q    All right.  And would this transaction have involved

3   paying off liens on wells the Debtor had operated?

4   A    Yeah, the deal would have never happened had not the liens

5   been paid off.

6   Q    And would that have benefited the Debtor's creditors?

7   A    Yes, to roughly the tune of about $3 million.

8   Q    All right.  Okay, at this time the actual parties -- the

9   actual parties to the agreement, as Mr. Taylor pointed out,

10  were AEX, Arabella Exploration LLC, and Legacy, correct?

11  A    Correct.

12  Q    All right.  Although Arabella Exploration Inc. and AEX did

13  file bankruptcy several years later, were they in bankruptcy at

14  the time the Legacy transaction was proposed?

15  A    No.

16  Q    Did you believe this transaction was likely to close?

17  A    Yes.  I was -- I'm very good friends with Kyle McGraw.  He

18  was the vice president of business development for Legacy and

19  he and I were in constant communication about it.  When he

20  called me after Dan LeRoy told him about the letter from Snow

21  Spence and Green he said the deal was going to --

22           MR. TAYLOR:  Objection, Your Honor.  Hearsay.  Move

23  to strike.

24           THE COURT:  Sustained.

25  //

1   **BY MR. SIMON:**

2   Q    Did you believe the transaction would close?

3   A    Yes.

4   Q    Did you work to make it close?

5   A    We worked very hard to make it close, as did Hoisager, as

6   did McGraw.

7   Q    Was the transaction moving along toward closure?

8   A    Yes.

9   Q    And at one point did it suddenly abort?

10  A    Yes, it was like a light switch.

11  Q    All right.  And at what point did it suddenly abort?

12  A    When Legacy received the letter from Snow Spence and Green

13  saying that there was fraudulent transfers involved.

14         **MR. SIMON:**  All right.  And that letter is Exhibit --

15  make sure we have this one -- 55.  I think he referenced it in

16  his Declaration.

17  **BY MR. SIMON:**

18  Q    Yeah, you referenced the letter in your Declaration,

19  Debtor's Exhibit 55?

20  A    Yes.

21  Q    Okay.  And that's when you say the transaction aborted,

22  when or shortly after Snow Spence and Green sent that letter to

23  Legacy?

24  A    It was the very next day Kyle called me and told me the

25  deal was off.

 1          MR. TAYLOR:  Objection, Your Honor.  Move to strike.

 2   Hearsay.

 3          MR. SIMON:  May I respond --

 4          THE COURT:  Sustained.

 5          MR. SIMON:  -- to that, Your Honor?  That's not.

 6   When he said the deal's off, that's not hearsay, that's an act.

 7          MR. TAYLOR:  It's a statement he made to him saying

 8   the deal is off.  That is a hearsay statement.

 9          MR. SIMON:  No, it is not.  The statement the deal is

10   off is not hearsay.  It is an act.

11          THE COURT:  No, it's a statement.  Sustained.

12   BY MR. SIMON:

13   Q    Did the deal die right after that letter was sent?

14       **(No audible response)**

15          Did Legacy pursue close -- pursue the transaction at

16   any time after that letter was sent?

17       **(No audible response)**

18          Was Legacy actively pursuing closure before that

19   letter was sent?

20   A    Yes.

21   Q    Did the Debtor work to close this transaction?

22   A    The Debtor and Hoisager, I assume they both worked very

23   hard to get it done.

24          MR. SIMON:  All right.  Pass the witness, Your Honor.

25          MR. TAYLOR:  No further questions, Your Honor.

Return to TOC

Crisp - Direct / By Mr. Simon                                    20

1          **THE COURT:**  Okay.  Who's next, Mr. Simon?

2          **MR. SIMON:**  Your Honor, we recall Brian Crisp.

3      **(Voices overlap)**

4          **THE COURT:**  Yes, he should.  Thank you, Mr. McCabe.

5          **THE WITNESS:**  Thank you.

6      **(Witness excused)**

7          **THE COURT:**  Mr. Crisp?

8      **(No audible response)**

9          **MR. SIMON:**  Do we need to go find him?

10         **MR. TAYLOR:**  Well, he's on the line.

11         **THE COURT:**  Mr. Crisp, can you hear us?

12     **(No audible response)**

13         You're on mute.

14         **MR. CRISP:**  Sorry about that.

15      **BRIAN CRISP, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**

16         **THE COURT:**  Okay.  And you understand that you're

17 still under oath.

18         **THE WITNESS:**  I do.

19                    **DIRECT EXAMINATION**

20 BY MR. SIMON:

21 Q   Good morning, Mr. Crisp.  How are you?

22 A   Good morning, Mr. Simon.  I'm fine.

23 Q   Thank you.  Mr. Crisp, do you recall testimony yesterday

24 about whether the Debtor was the operator of most or all of

25 Arabella Exploration's leases?

Return to TOC

Crisp - Direct / By Mr. Simon                    21

1   A    We talked about a lot of things yesterday.  I am aware

2   that the Debtor was the operator of wells until they were

3   transferred to Arabella Operating.

4   Q    All right.  And I asked you wasn't the Debtor the operator

5   of all the wells or almost all the wells and you said you

6   didn't know, is that correct?

7   A    Are we talking about just for AEX?

8   Q    Yes.  For Arabella Exploration Inc. --

9        **(Voices overlap)**

10            -- Arabella Exploration LLC, which actually was the

11   working interest owner.

12  A    Yeah, I think the comment I made was I was pretty sure

13  that Brigham was operating some wells that AEX receives revenue

14  from.

15  Q    Okay.  Would you please take a look at, this will be

16  Debtor's Exhibit D6 and this will be at Page 39 of Debtor's

17  Exhibit -- 39 of 51 of Debtor's Exhibit D6, and Ms. Peck will

18  bring that up.

19            **MS. PECK:**  D6?

20            **MR. SIMON:**  Yeah.

21            **MS. PECK:**  Which page?

22            **MR. SIMON:**  39 of 51.

23            **MS. PECK:**  (Indisc.)

24            **THE COURT:**  Just for the record, when we refer to

25  Debtor's Exhibit, we really mean Defendants' Exhibit.

**EXCEPTIONAL REPORTING SERVICES, INC**

Crisp - Direct / By Mr. Simon                    22

1      **MR. SIMON:**  Yes.  We -- yeah.  Your Honor, I -- I'm

2  usually Debtor's counsel.  It's a matter of habit.  But, yes,

3  it is Defendants' Exhibit -- Hoisager's Exhibit D6.

4      **MS. PECK:**  The document (indisc.)

5      **MR. SIMON:**  Yeah, this document.  Copies we made last

6      **(Pause)**

7  BY MR. SIMON:

8  Q    All right, can you see that, Mr. Crisp?

9  A    I cannot.

10 Q    We'll work on solving this problem.

11     **(Pause)**

12          Can you see it now?

13 A    I can now, yes.

14 Q    All right.  And you see where it says Arabella

15 Petroleum LLC is the operator of record for all properties with

16 the Texas Railroad Commission?

17 A    The highlighted portion?  Yes, I see that.

18     **MR. SIMON:**  All right.  Bonnie, would you please go

19 to Page 41 -- Hoisager -- Defendants' Exhibit D6, Page 41 of

20 151.

21          Yeah, that's it right there.

22 BY MR. SIMON:

23 Q    You see the high -- do you see the highlight --

24     **THE COURT:**  Mr. Simon, could I ask a question about

25 is this the 20-F for '13 or the 10-K?

Return to TOC

1          **MR. SIMON:**  Yes, sir.

2          **THE COURT:**  Okay.

3          **MR. SIMON:**  Yes, sir.  It is the 20-F.

4          **THE COURT:**  Okay.

5     **BY MR. SIMON:**

6     Q     Do you see where it says, "The table below summarizes

7     Arabella's working interest in each well's performance"?

8     A     I do.

9     Q     And then it lists six horizontal wells?

10    A     Yes.  All six of those wells I would agree were operated

11    by Arabella, by the Debtor.

12    Q     Okay.  Thank you.

13         **MR. SIMON:**  All right.  Would you please now go to

14    Page, Bonnie, Page 104 of 50 -- yeah, this will be -- yes.

15    This will be D7.

16         **MS. PECK:**  D7?

17         **MR. SIMON:**  Yeah, this is D7.

18         **MS. PECK:**  (Indisc.)

19         **MR. SIMON:**  Yeah, this is D7, Defendants' Exhibit D7.

20         **MS. PECK:**  Which is the 10-K.

21         **MR. SIMON:**  The 10-K.

22    **BY MR. SIMON:**

23    Q     Do this, Mr. Crisp, is the 10-K.

24    A     So this is 2014, correct?

25    Q     Yes, sir.  Yes, sir.  Yes, sir.  And this is regarding not

1    operatorship necessarily, but production.

2          Do you see where it says at the bottom -- in this

3    case Arabella Petroleum Company, the Debtor, is defined here as

4    Petroleum, so when you see the name Petroleum that's what it's

5    referring to.  You understand that?

6    A    Okay.  I understand that.  I understand it.

7    Q    Yeah.  And it says at the beginning Arabella Petroleum,

8    which was the operating company for substantially all the wells

9    the company has a working interest in.  Do you see that?

10   A    Are we in the last paragraph?

11   Q    No, the first highlighted portion.  I'm sorry.  Under

12   Paragraph 12, Related Party Transactions --

13   A    Yes.

14   Q    -- the very first highlighted paragraph.

15   A    It says substantially all the wells.  I understand that.

16   Q    Okay.  And then it goes on to say as Petroleum drilled and

17   completed the wells Petroleum billed the company for the

18   working ownership percentage of the capital costs.  Do you see

19   that?

20   A    I do.

21   Q    And that after the completion of each well Petroleum sold

22   the oil and gas provided by the company its working interest

23   revenue, net of production taxes and charges for lease

24   operating expenses.  Do you see that?

25   A    I do.

Return to TOC

Crisp - Direct / By Mr. Simon                                    25

1    Q    And would that indicate to you that the Debtor generated

2    the revenue that was paid from those wells and then paid

3    that -- and then made production payments to Arabella

4    Exploration LLC?

5    A    Could you repeat that?

6    Q    Sure.  This would -- would this indicate to you that the

7    Debtor sold the oil and gas that was produced by the wells,

8    generated the production revenue, and then paid to Arabella

9    Exploration LLC its portion of the production revenue?

10   A    For substantially all the wells, yes.

11   Q    Okay.  Thank you.

12          And you see the next sentence where it says Petroleum

13   was responsible for collecting the revenues and providing

14   accounts receivable to Arabella Exploration LLC?

15   A    Are we in the second paragraph now?

16   Q    Yes, sir.  Same paragraph.

17   A    Same paragraph?

18   Q    Yes.

19          **THE COURT:**  And it says expense sharing agreement

20   between the companies?

21   **BY MR. SIMON:**

22   Q    I'm going to ask you about that.  That's the next

23   sentence.

24   A    So we're -- so the previous question was the last half of

25   the last sentence in the first paragraph and now you're asking

EXCEPTIONAL REPORTING SERVICES, INC

Crisp - Direct / By Mr. Simon                                          26

1    me about the first part?

2    Q    No, actually it says -- it says Petroleum was responsible

3    for collecting the revenue from the purchasers and providing

4    the company its accounts receivable and then it says which

5    totaled 814,689 and 425,372 at December 31, 2014, and 2013,

6    respectively.  Do you see that?

7    A    So that's the first sentence of the --

8    Q    Yes.

9    A    -- second paragraph.  I see that, yes.

10   Q    Okay.  It's the third sentence.  All right, one more point

11   on this paragraph.  Remember yesterday I asked you if it was --

12   if there was -- try again -- if there were an expense sharing

13   agreement between the Debtor and Arabella Exploration LLC and

14   you said it was likely but you didn't know, is that correct?

15   A    I don't know if I used the word likely, but I said there

16   could be.

17   Q    Okay.  And does this last sentence indicate that in fact

18   there was an expense sharing agreement?

19       **(Pause)**

20   A    That's what that last sentence says.

21   Q    Okay.

22           **THE COURT:**  And is that -- I mean JOA?

23           **MR. SIMON:**  No, Your Honor, separate from JOAs.

24           **THE COURT:**  Providing the company its accounts

25   receivable?

**EXCEPTIONAL REPORTING SERVICES, INC**

1      **MR. SIMON:**  Yes, Your Honor.  Accounts receivable

2  means accounts receivable for production payments.  That is,

3  under the JOA that generates an obligation to pay Arabella

4  Exploration LLC as the working interest owner.  And then as

5  those payments are made, that's a production payment.

6      **THE COURT:**  Okay.

7      **(Voices overlap)**

8      **THE COURT:**  -- look at these documents?

9      **MR. SIMON:**  Um -- well -- okay.  One more important

10  point on this.

11      Bonnie, would you go to Trustee's Exhibit Number 3

12  and go to Page 31.

13      Trustee's Exhibit Number 3 is the Debtor's Statement

14  of Financial Affairs from its bankruptcy.

15      Yeah.  There we go.

16  **BY MR. SIMON:**

17  Q    Mr. Crisp, do you recall yesterday your testimony about

18  production payments being round numbers?

19  A    Yes, I was --

20      **(Voices overlap)**

21      -- I was saying that they would not be round numbers.

22  Q    Correct.  I misspoke.  That is correct.  Your statement

23  was production payments are calculated to the penny, they would

24  not be round numbers, and if round numbers appeared on your

25  exhibit of payments to Arabella Exploration LLC by the Debtor,

1    those would not be production payments.  Does that fairly

2    characterize what you said yesterday?

3    A    I don't know if I was as absolute it cannot be, as you

4    said, but it would surprise me if a production payment to a

5    working interest owner came down to exactly a round dollar

6    payment.  It would be to the pennies.

7    Q    Okay.  All right.  This is Debtor's Exhibit 3 -- excuse

8    me, Trustee's Exhibit 3, which is the Debtor's Statement of

9    Financial Affairs from its bankruptcy, and if you'll look at it

10   you will see a list of payments.  We'll have four pages of

11   them.  And you'll see that the payee for these payments is

12   Arabella Exploration LLC and it's being paid as a working

13   interest investor and it's payment towards the distribution of

14   oil and gas revenues.  Do you see that?

15   A    I do.

16   Q    All right.  These are just basically -- this is payments

17   in the last year before the bankruptcy because they're

18   bankruptcy Schedules do it just goes back a year.  Do you see

19   that?

20   A    I recognize this is for the one-year period before the

21   petition date, if that's what you're asking.

22   Q    Yes.  Thank you.

23        All right, and if you look at the production payments

24   you'll see that the first one is 5,000, correct?

25   A    The first one on the list?  Yes.

Crisp - Direct / By Mr. Simon                                    29

1   Q    And the second one is 5,000?

2   A    Yes, sir.

3   Q    And the next one is 25,000?

4   A    Yes, sir.

5   Q    And the next one is 40,000?

6   A    And the next one's 3800, then 8,000, then 4,000.

7   Q    Correct.  I won't take you through every single one of

8   these this late because in the interest of time, but does it

9   appear that the Debtor made production payments in round

10  numbers?

11  A    This is not what's reflected in the Debtor's books,

12  Mr. Simon.

13  Q    But this is what's reflected in the Debtor's Schedules,

14  right?

15  A    That's what it says on the Schedules, yes.

16  Q    Okay.

17       **MR. SIMON:**  Bonnie, would you scroll down a little

18  further.

19  **BY MR. SIMON:**

20  Q    Do you see the same pattern of round dollar payments on

21  this page as well?

22  A    I do, with the same description.

23  Q    The same -- same -- same round dollar payments here?

24  A    And my same comment would be the Debtor's records don't

25  reflect it this way.

Return to TOC

1   Q    Okay.  But the Debtor's Schedules do, correct?

2   A    The Debtor's Schedules do.

3   Q    All right.

4         **MR. SIMON:**  Next one.

5   **BY MR. SIMON:**

6   Q    And so we do see on March the 23rd of 2015 there is a

7   payment that is -- it is -- there is one that's calculated to

8   the penny, correct?

9   A    The 97,856.01?  Yes.

10  Q    Yeah, then --

11  A    And by the way, I would agree that that one is a

12  production payment.

13  Q    Okay.  Well, the others are all characterized as

14  production payments too, aren't they?

15  A    Again, I'm telling you what I've seen in the Debtor's

16  records.  I would confirm that that one in the Debtor's

17  records, the 97,856.01 is recorded as a distribution payment to

18  AEX.

19  Q    Okay.

20  A    A revenue payment.  Excuse me.

21  Q    Revenue payment.

22        **MR. SIMON:**  Bonnie, would you go to the next page.

23  **BY MR. SIMON:**

24  Q    And there is the last one -- the last two you see are also

25  calculated to the penny, correct?

Return to TOC

1        **(No audible response)**

2              The one for $248,834.09 and $246,808.09.

3    A    They are.

4    Q    Okay.  Did you attempt to calculate the amount of payments

5    that were made, production payments, to the Debtor in the

6    last -- well, from the Debtor to Arabella Exploration LLC in

7    the last year before the bankruptcy?

8    A    I did.

9    Q    Okay.  And what was your calculation?

10   A    Can I refer to a note here?

11   Q    Yes.

12   A    Okay.

13       **(Pause)**

14             So in the year before the bankruptcy petition --

15   well, I'm going to exclude -- I looked at it two ways, I need

16   to caveat.  There were a few production payments that were

17   netted in the one-year period.  Do I need to explain the

18   netting?  In other words, a cash payment did not go to AEX, it

19   was applied to the joint interest billing.

20   Q    Okay.

21   A    Okay.  But cash payments in the one year that I have been

22   able to see:  on 10/19/14, $248,834.09; on 11/20/14,

23   246,808.09; on 1/21/15, 26,852.90; and on 3/23/15, 97,856.01.

24   I believe that one appeared on the Schedule on the previous

25   page that we just talked about.

Return to TOC

Crisp - Direct / By Mr. Simon                                    32

1  Q    So you left off all of the ones that end in round numbers.

2  A    That's because the Debtor's records don't reflect those as

3  distribution -- as revenue payments, sir.

4  Q    Okay.  Although the Debtor's Schedules do.

5  A    I agree.

6  Q    Yeah.  Okay.  We did attempt to add up, in fact we did add

7  up the payments that were made according to these Schedules in

8  the year before the bankruptcy, that is, just the payments that

9  appear on this Schedule.  And those payments come out to --

10 okay.  All the payments that appear on this Schedule, that is,

11 in the last year before the bankruptcy, $1,816,424.13.  Now,

12 your number doesn't come anywhere close to that, does it?

13 A    Actually, my number goes all the way back to when the

14 wells started and I came within $77,000 of what Mr. Hoisager

15 reported in Paragraph 35 of his Declaration.  And I didn't use

16 any of the round dollar payments to get there.

17 Q    Okay.  So your numbers and Mr. Hoisager's numbers are

18 actually very close.

19 A    In total, but how we get there is completely different.

20 Q    All right.  We did look also at just the payments that

21 were made in the last ten months before the bankruptcy --

22 excuse me, the last -- I misspoke -- just the payments made in

23 2015.  And just the payments made in 2015 came to $518,231.95.

24 Did you attempt to calculate the payments made just in 2015?

25 A    I did.

Return to TOC

Crisp - Direct / By Mr. Simon                                    33

1   Q    And what number did you get?

2   A    I have a -- I only have two transfers.  One was on 1/21/15

3   in the amount of 26,852.90 and I had one on 3/23/15 in the

4   amount of 97,856 and one cent.

5   Q    Okay.  So you have -- you do not include a number of the

6   transfers on the Debtor's Schedules that are listed as

7   production payments.  Otherwise, your numbers would be a lot

8   closer.

9   A    I did not use the Debtor's Schedules to come to my

10  numbers.  I used the Debtor's general ledger and the JIB AR

11  statement between the Debtor and AEX.

12  Q    All right.  And did you come to an -- sorry, you said you

13  came to a number -- let me look at Mr. Hoisager's Declaration.

14  A    Paragraph 35.

15  Q    I believe you.  I just need to see it.

16       **MS. PECK:**  Here it is.

17       **MR. SIMON:**  Page 12?

18  **BY MR. SIMON:**

19  Q    Okay.  So in Paragraph 35 Mr. Hoisager says that Arabella

20  Exploration earned royalties of $5,619,222.07, correct?

21  A    That's -- I don't have that in front of me, but 5.6 sounds

22  right.  The number I was reconciling to, Mr. Simon, was the

23  amount paid listed in there.

24       **THE COURT:**  Mr. Simon, I assume those are working

25  interest royalties -- I mean working interest revenues as

Return to TOC

1    opposed to royalties.

2            **MR. SIMON:**  Yes, Your Honor.

3            **THE COURT:**  Thank you.

4            **MR. SIMON:**  Correct.  Arabella Exploration, to my

5    knowledge, was not a royalty owner, it was a working interest

6    owner.

7            **THE WITNESS:**  I concur.

8    **BY MR. SIMON:**

9    Q    All right.  Did you calculate -- excuse me.  You were

10   talking about Paragraph 35.  That is Mr. Hoisager's calculation

11   of the -- of the production payments that were earned by

12   Arabella Exploration LLC and you said you came within 75 --

13   $76,000 of Mr. Hoisager's number.  Now, did you calculate any

14   significant difference in the payment, the payments actually

15   made from the royalties earned?  Not royalties, production

16   payments earned.

17   A    I think I understand your question.  If you'll give me --

18   if you'll give me the liberty to tell you what I did to satisfy

19   myself with the 5.3 million maybe that will answer your

20   question.

21   Q    Okay.

22   A    So during the bankruptcy case actually working with

23   Mr. Hoisager we did a reconciliation of all revenues that were

24   received by the Debtor from first production back in early '13

25   on the very first well all the way through the petition date.

1   So we used first purchaser statements.  We came up with every

2   single dollar of revenue that had been received by the Debtor.

3   We then allocated that using the ownership what we call decks,

4   so we -- you know, we allocated all that revenue to all the

5   working interest owners and to the royalty owners and part of

6   that process would indicate that Arabella Exploration had

7   earned a number that's really, really close, I mean we're

8   talking about within a few thousand bucks of what Mr. Hoisager

9   had in Paragraph 35 of his Declaration.

10           So in big picture, I did not disagree how much AEX

11  earned in revenues from the wells that it owned while the

12  Debtor operated them.

13  Q    Okay.

14  A    Sorry about the longwinded answer, but I wanted to --

15  Q    Oh, no.  No.  I do appreciate the longwinded answer

16  because it is helpful.

17           And so that -- and the significance of all that is

18  that narrows the gap very significantly between the

19  $6.2 million that you say the Debtor paid to Arabella

20  Exploration LLC over four years and the amount of money that

21  Arabella Exploration earned as a result of production of wells

22  in which it owned a working interest, correct?

23  A    It does -- it does put a light on it, but I wouldn't say

24  that it narrows it.  Because you're not taking into account the

25  netting that doesn't show up in the 6.2 million paid to AEX.

1    The 6.2 is only cash, Mr. Simon.  It's not the amount of

2    revenue that was netted against the joint interest billings.

3    That doesn't show up as a cash payment because it wasn't.

4    Q    And netting results from expenses that are incurred,

5    right?

6    A    No.  Netting results from a joint interest billing being

7    outstanding and instead of paying that working interest owner

8    money when they owe you money you net it against the bill.  So

9    their joint interest billing -- the expenses they've incurred

10   as a working interest owner are being reduced by the revenue

11   they earned on that well, but you're netting it because they

12   owe you money.

13   Q    Correct.  Correct.  And in fact, Arabella Exploration paid

14   the Debtor over $17 million in JIBs just for 2017, correct?

15   A    I don't know that number for that one year -- or for

16   the -- I don't know the total number, Mr. Simon.

17   Q    Okay.

18   A    I can tell you the netting number.  Here's the problem I

19   have.  The netting number's $2 million, by my calculations.  So

20   the 6.2 -- so the 5.4 million of revenue of cash paid, there's

21   2 million of netting.  So that would indicate that of the 6.2

22   paid -- at best I'm coming up with 3.3 of the 6.2 million of

23   cash paid to AEX was actually revenue.

24   Q    Now, AEX's Schedules don't reflect that.  They reflect --

25   excuse me.

Return to TOC

1          **MR. SIMON:**  Bonnie, do you want to bring up the SEC.

2          **MS. PECK:**  The last one that we had?

3          **MR. SIMON:**  Yeah.

4          **THE WITNESS:**  If I could clarify for you.  I'm not

5    disputing what the revenue number is.  I think I've tried to

6    explain that the amount of revenue that AEX earned as a working

7    interest owner on these wells, we are really close to the same

8    number.

9    **BY MR. SIMON:**

10   Q    Okay.

11   A    Okay?  It's the  -- when we're looking at the cash

12   transferred to AEX, that's where I have the problem.  My

13   analysis showed that only 3., let's call it 3.3 million of cash

14   that's in that 6.2 million of transfers was actually revenue

15   production payments.  So there's $3 million of cash on that

16   AEX -- transfers from the Debtor to AEX that are not revenue

17   payments.

18   Q    Now, at the end of this case -- excuse me.  By the time

19   the Debtor filed bankruptcy Arabella Exploration still owes the

20   Debtor about $3 million, correct?

21   A    I think these very Schedules that you've been referring to

22   say 3.1 and change.

23   Q    Okay.  However, they had paid, as we see here, it looks

24   like $17 million just in 2014, correct?

25   A    What are you referring to?

Crisp - Cross / By Mr. Taylor                                    38

1   Q    If you look at --

2   A    Oh, you're back in the 10-K?

3   Q    Yes.

4   A    You're right.  And the first part of that sentence or the

5   first sentence in that paragraph says how much they still owed

6   after making those payments.

7        **MR. SIMON:**  We have the -- okay.

8        **(Pause)**

9             Pass the witness.

10                    **CROSS EXAMINATION**

11  **BY MR. TAYLOR:**

12  Q    Thank you, just a few questions, Mr. Crisp.

13           Number one, when you -- if the Debtor had -- the

14  Debtor.  If APC had netted fully AEX, would there have been a

15  balance owed by AEX to the Debtor on the date of the filing of

16  the bankruptcy?

17  A    No, Mark, because they received -- by my calculations,

18  they received almost 3.3 million of revenue payments and the

19  balance owed at the petition date per the Debtor's Schedules

20  was 3.1 and change.

21  Q    And how do you reach the conclusion that approximately

22  $3 million of the payments were not revenue payments?

23  A    By going through -- what I did was I took the $6.2 million

24  exhibit to the Trustee's Complaint and then I went through the

25  Debtor's records and I went -- and I went to all the revenue

Return to TOC

1  payments, found them in the ledger to AEX, and so if a transfer

2  in the $6.2 million of cash appeared as cash I basically, you

3  know, identified that as a revenue payment.  So I just went

4  through the process.  I actually prepared -- you know, I added

5  a couple of columns to that exhibit and just went one by one.

6           And then I also had to identify a few more that were

7  netted.  So they were not cash transfers so they did not appear

8  as cash transfers, but they were applied to the joint interest

9  billing of AEX.  So I picked those up off of the joint interest

10  billing.

11  Q    When you said the amounts of approximately 3 million --

12  the even number amounts of the approximately $3 million amounts

13  were not reflected as production payments in the Debtor's books

14  and records, what were you referring to?

15  A    The general ledger specifically.

16  Q    What does the general ledger reflect?

17  A    So the general ledger, I was looking at the -- the Debtor

18  had an account that was titled revenue and so I could go to

19  that account and I could find transfers to AEX, you know,

20  actual checks written.

21           In some cases, Mark, the entry in that bank account

22  was just a gross number for all working interest owners that

23  month, so I had to go find a revenue, you know, find a

24  corresponding same date of that transfer -- I'm rambling a

25  little bit.  Let's say there was a million-dollar entry in the

Return to TOC

Crisp - Cross / By Mr. Taylor                    40

1   revenue account that said -- it was a negative million dollars

2   and it says revenue payments issued -- revenue checks issued on

3   "X" date.  I could go to the AEX schedule, the transfers to

4   AEX, and on that very same date there would be a, you know, to

5   the penny number of a check written to AEX.

6   Q    Would it be helpful to look at the general ledger?

7   A    I think it would be helpful to share my analysis.

8   Q    Well, so this is something that you did when?

9   A    I looked at it before, Mark, but I actually put this

10  together last night.

11  Q    Let me pull up a -- give me just a moment here before I

12  share the screen.

13        **(Pause)**

14             Now, Exhibit E, do you see this on the screen in

15  front of you now?

16  A    I do.

17  Q    Okay, so Exhibit E, if you take off the stuff to the

18  right, is the listing of payments that was attached to the

19  original -- or the Complaint in this case, correct?

20  A    The original Complaint.

21  Q    And it is Exhibit -- Exhibit 79 -- no, I'm sorry,

22  Exhibit 78.

23             **THE COURT:**  Trustee's 78?

24             **MR. TAYLOR:**  No, this -- I'm just talking about the

25  parts on the left-hand side.

Return to TOC

1          **THE COURT:**  Mr. Taylor?

2          **MR. TAYLOR:**  Yes, Your Honor.

3          **THE COURT:**  Is this Trustee's Exhibit 78?

4          **MR. TAYLOR:**  Trustee's Exhibit 78, I'm referencing

5    the left-hand portion that shows the actual payments.  Yes,

6    that's Trustee's Exhibit 78.

7          **THE COURT:**  Okay, thank you.

8          **MR. TAYLOR:**  The right-hand side is a graphical

9    representation of what he's been testifying to.

10   **BY MR. TAYLOR:**

11   Q    And can you explain to the Court what you did here,

12   Mr. Crisp?

13         **MR. SIMON:**  Objection, Your Honor.  I think the

14   witness is actually testifying now as to a document that is not

15   an exhibit in evidence.

16         **MR. TAYLOR:**  I haven't offered it.

17         **MR. SIMON:**  It's not in evidence.

18         **MR. TAYLOR:**  I haven't offered it and I'm only going

19   to use it as a demonstrative to represent his -- to say how he

20   got to his conclusion that he just testified to, Your Honor.

21         **MR. SIMON:**  Correct, but the demonstrative is an

22   exhibit and it was not provided until --

23         **MR. TAYLOR:**  I'm not asking for it -- I'm not even

24   asking for it to be admitted, I'm trying to have him -- we

25   could go through this in testimony --

Crisp - Cross / By Mr. Taylor                                    42

1          **THE COURT:**  The objection is overruled.

2          **MR. TAYLOR:**  -- and try to explain what this means.

3          Thank you, Your Honor.

4     **BY MR. TAYLOR:**

5     Q    Go ahead, Mr. Crisp.

6     A    All right.  So, as you've explained, the left-hand section

7     is -- has already been -- it's Trial Exhibit 78 I believe you

8     said.  So last night I added the three columns to the right.

9     The one that's titled well revenues paid, the process I went

10    through is I went to the Debtor's general ledger, I went to the

11    revenue account, that's the actual bank account, and I found

12    what dates were revenue payments made.  Okay?  So the first one

13    there listed is 22 -- 2/22/13 and there was a entry in the

14    ledger about revenue payments being made on that date so I put

15    that in that column, well revenues paid.

16          And we can continue down the page and you can also

17    see that these pretty much track month by month.  If you look

18    at the dates of each one of these transfers -- if you want to

19    go back up, Mark, I'll kind of walk through that.  See how the

20    first one's in February of '13, the next one's in March of '13,

21    the next one's in April of '13 --

22    Q    And just to stop you there, Mr. Crisp.  As I recall, your

23    testimony yesterday was that that's what you would normally see

24    in a production payment, the once-a-month payment.

25    A    That's correct.

Return to TOC

Crisp - Cross / By Mr. Taylor                                    43

1  Q    I'm sorry, go ahead.

2  A    Yeah, they would gather all the revenues for the previous

3  month and then process them the following month.  So you'll see

4  a March, you'll see an April, you'll see a May, you'll see a

5  June.  There's actually two in June.  For whatever reason, they

6  had two revenue runs that month.  There's one in July, August,

7  September, October.  That's 391.  You'll see November,

8  December.  There's actually two in December of '13.  Then

9  you'll see January, February.  It looks like there's also two

10  in February.  There's March, April.  There's actually two in

11  March.  Again, I don't know why they did two in one.  It could

12  be that these correspond with when a well came online and they

13  got a significant chunk of money and they decided to do a

14  separate production run for that one well.  I'm -- that is

15  speculation.  I don't know why they would have done it more

16  than once.

17  Q    Okay.  And on the next -- we don't have to go through

18  every one of these, but what is the next column?

19  A    Okay.  So the second column is well revenues netted.

20  Okay, that's the concept of instead of paying cash, so it

21  doesn't appear in the left-hand side of this schedule.  I had

22  to -- I put it on this page because I was trying to reconcile

23  total revenue payments.  So the first time that AEX was netted

24  was on 7/7/14 in the amount of 214,780.66.  And I put a date on

25  there because sometimes on the left-hand side there's not a

Return to TOC

Crisp - Cross / By Mr. Taylor                    44

1    date that corresponded to it.

2            **THE COURT:**  So Mr. Crisp, excuse me, so the

3    214,780.66 are actual revenues but they weren't paid to AEX,

4    instead they were retained by APC and the JIB, I always call

5    them J-I-Bs, the J-I-B account would be reduced by that amount.

6            **THE WITNESS:**  You are correct, sir.

7            **THE COURT:**  All right.

8            **THE WITNESS:**  And that particular one also appears in

9    other places.  In the description of the July -- June 2014

10   transactions that particular netting shows up otherwise.  But I

11   digress.

12           The next one, the next netting payment was 857,000

13   the next month.  And then there was another one is September of

14   312,631.  And then we go back, we're not netting anymore, so

15   you've got 248 and the 248, I think I believe both of those

16   appeared on the Schedules that Mr. Simon brought up and

17   asked --

18   **BY MR. TAYLOR:**

19   Q    Just real quick, Mr. Crisp.  On all of these ones in

20   between, were there JIBs owed by AEX to APC at the time those

21   other payments went out that were not netted?

22   A    There were JIB payments owed on every -- all dates back to

23   '12, 2012.

24           **(Voices overlap)**

25   Q    Well, I'll just skip forward to the end and so what is it

Return to TOC

1   that you're trying to demonstrate here?

2   A    Okay.  So the total of the well revenues paid comes to

3   3,270,436.55, the total well revenues netted 2,001,121.28, I

4   add those two together and that's where you get the

5   5,271,557.81.  And I compared that to what Mr. Hoisager put in

6   his Declaration at Paragraph 35 of 5,349,334 and I have a

7   difference of 77,777 rounded.

8   Q    So and to tie this together with your issue with the

9   $3 million that you say was not a revenue payment, how does

10  this tie to that conclusion?

11  A    Okay.  So of the 6. -- of the 6.1951 -- 6,195,195 paid in

12  the original exhibit, that's the cash paid, only 32 -- my

13  amounts showed that only 3,270,436.55 of that was revenue

14  production payments.  That's significant -- I'm sorry.  There's

15  almost $3 million paid to AEX mostly in round dollars that are

16  not revenue production payments.

17      **(Voices overlap)**

18          **MR. TAYLOR:**  I'm sorry.  Go ahead, Your Honor.

19          **THE COURT:**  I'm sorry.  So if the general ledger --

20  so the 131,000 on April 3rd, you're telling us the general

21  ledger would not reflect that as a production payment.  What

22  did it reflect it as?

23          **THE WITNESS:**  April 3rd of 2015?

24          **THE COURT:**  Any of these.  Any of the round numbered

25  payments.

Return to TOC                                                          APP1-131

Crisp - Cross / By Mr. Taylor                                    46

1          **THE WITNESS:**  Okay.  So in most cases -- well, I

2      shouldn't say most cases.  There are -- they have a joint

3      interest billing account, Your Honor, that reflects some of

4      these round off payments as just in addition to their JIB, but

5      they're not coming from a joint interest billing.  It's because

6      there was a cash transfer from APC to AEX and they just put it

7      in there as an amount owed by AEX. They're increasing the

8      Debtor's receivable from -- due from AEX.  But it's not your

9      traditional joint interest billing process.

10         Some of these did not run through the JIB account.

11     They're just transfers that we found in the bank account that

12     have no corresponding -- you know, it's just a -- I had to

13     think about which -- what was the offsetting entry.  It was a

14     cash payment to them and I'm not sure where it showed up.

15         **THE COURT:**  Go ahead, Mr. Taylor.

16     BY MR. TAYLOR:

17     Q    And again, Mr. Crisp, because I forgot to write it down,

18     what was the JIB balances owed on the petition date by AEX to

19     APC?

20     A    Mark, I don't have the exact number in front of me, but it

21     was like 3.1 million.  It's on Page 8 of the Amended Schedule B

22     that --

23     Q    Okay, we'll go to that real quick.

24         **MR. TAYLOR:**  Your Honor, I'd intended to put this on

25     as rebuttal testimony but it came out, it came out earlier than

**EXCEPTIONAL REPORTING SERVICES, INC**

Crisp - Cross / By Mr. Taylor                                    47

1   what I anticipated.  I would like to go ahead and move for

2   admission of Exhibit E, which is a graphical representation of

3   Mr. Crisp's testimony.  There's nothing new added, he just

4   added up the amounts that are reflected in here and put in the

5   netting amounts from the general ledgers and JIB statements

6   that are already in evidence.

7          **MR. SIMON:**  I have never had the opportunity to see

8   this before now.  There is no way to check it.  He has -- he's

9   given his testimony.  But to say -- if you're going to use a

10  demonstrative like this you're supposed to put it out there.

11         **MR. TAYLOR:**  It's rebuttal.

12         **THE COURT:**  I'm going to -- I've already anticipated

13  this, so what I'm going to do is I'm going to go ahead and

14  admit it, but Mr. Simon will have an opportunity overnight to

15  examine it and if he wants to rebut it in some form or fashion,

16  including with an exhibit of his own, he'll be allowed to do

17  it.

18         **MR. TAYLOR:**  That's fine, Your Honor.  That would be

19  Exhibit -- I'm sorry.  Exhibit 85.

20         **THE COURT:**  Okay, 85 is admitted on the condition

21  that I just stated.

22     **(Trustee's Exhibit Number 85 was received in evidence as**

23  **stated)**

24         **MR. TAYLOR:**  Thank you, Your Honor.

25         **MR. SIMON:**  Could you please send a copy?

Return to TOC                                    APP1-133

Crisp - Redirect / By Mr. Simon                           48

1          **MR. TAYLOR:**  Yeah, I'll do that as soon as I finish

2    up this testimony.

3    **BY MR. TAYLOR:**

4    Q    And then let's go just real quick to the Amended

5    Schedules, because that's the document you were just talking

6    about that reflects the JIB balance.  This is Exhibit 2 and

7    I'll go back up to the top and show you the First Amended

8    Schedules filed by the Debtor and I'm going down to Page 8 of 9

9    and it's the working interest owner accounts receivable.  Pull

10   it up here.  And what's the balance that's reflected as owed by

11   Arabella Exploration?

12   A    It is 3,170,762.70.

13          **MR. TAYLOR:**  Thank you, Mr. Crisp.

14          Pass the witness, Your Honor.

15          **MR. SIMON:**  Just a couple questions.

16                      **REDIRECT EXAMINATION**

17   **BY MR. SIMON:**

18   Q    Mr. Crisp, you simply -- if any of the payments were not

19   round number payments you simply disregarded them as revenue

20   payments, correct?  If any of the payments were round number

21   payments and were not calculated to the penny you did not count

22   them as revenue payments, correct?

23   A    On that analysis I strictly went with what the ledger was

24   telling me.  You're --

25   Q    Okay.

Return to TOC

Crisp - Redirect / By Mr. Simon                    49

1   A    -- you're correct, there is no -- there's no round

2   dollar -- well, I say that.  There is one round dollar payment

3   in my analysis but that's because it was on the date that it

4   said revenue payments were made so I had to count that one.

5   Q    Okay.  And if the Debtor were making partial payments,

6   partial revenue payments that were not calculated to be exactly

7   the amount of a revenue payment but simply to reduce the

8   balance of revenue payments owed, you wouldn't pick that up,

9   would you?

10  A    If it wasn't reflected -- if it wasn't specifically

11  mentioned, Mr. Simon, as a partial payment of revenue, I

12  wouldn't have known to pick it up.

13  Q    Exactly.  The payment would be there, you would see the

14  round number payment, but you wouldn't pick that up as a

15  revenue payment because it was not a -- not specifically

16  calculated to the penny and not designated that way?

17  A    Because it wasn't designated that way.

18  Q    Okay.  But is -- but when we look at this in terms of how

19  it shakes out, everything that is not calculated to the penny,

20  with the one exception that you point out apparently, was just

21  left out and not considered a revenue payment?

22  A    If it didn't fall on a revenue date and it didn't say

23  revenue, I did not count it.

24  Q    Right.  And you weren't there so you don't know what the

25  Debtor's practice was in terms of making partial payments, not

Return to TOC                                          APP1-135

1    intending to pay off the whole balance but intending simply to

2    reduce balances?

3    A    Well, there's two answers to that question.  No, I was not

4    there during the time and I'm testifying to what I see in the

5    Debtor's records.

6              **MR. SIMON:**  Right.  Okay.

7              Pass the witness, Your Honor.

8                      **RECROSS EXAMINATION**

9    **BY MR. TAYLOR:**

10   Q    Just to clean up real quick, Mr. Crisp.  Did you disregard

11   the entries or did you do your analysis based upon what the

12   books and records said?

13   A    To be clear, I did it based on what the books and records

14   said.

15   Q    And secondly, even if there were partial payments, if

16   there were outstanding JIBS could those have been netted?

17   A    They could have, yes.

18             **MR. TAYLOR:**  Thank you.

19             Pass the witness.

20             **MR. SIMON:**  No further questions at this time.

21             **MR. TAYLOR:**  Thank you, Mr. Crisp.

22             **THE WITNESS:**  Thank you.

23             **THE COURT:**  Do we feel like we need a break?

24             **MR. SIMON:**  Sure.

25             **MR. TAYLOR:**  I think a short break would be good,

Return to TOC

51

1    Your Honor.

2         **THE COURT:**  Let's make it very brief, like return at

3    10:50.

4         **MR. TAYLOR:**  Thank you, Your Honor.

5         **THE COURT:**  We're in recess.

6         **MR. SIMON:**  Thank you.

7        **(Recess taken from 10:41 a.m. to 10:50 a.m.)**

8         **THE COURT:**  Go ahead, Mr. Simon.

9         **MR. SIMON:**  (No audible response)

10        **THE COURT:**  Mr. Simon.

11        **MR. SIMON:**  (No audible response)

12        **THE COURT:**  Mr. Simon, you're on mute.

13        **MR. SIMON:**  There we go.  Sorry about that, Your

14   Honor.  Oh, Mr. Hoisager calls Bill Heyn by declaration,

15   William Heyn.

16        **THE COURT:**  Mr. Heyn.

17        **MR. HEYN:**  Yes, sir, Your Honor.

18        **THE COURT:**  Could you please raise your right hand?

19         **WILLIAM HEYN, DEFENDANTS' WITNESS, SWORN**

20        **THE COURT:**  And have you read the declaration that's

21   been submitted in this case on your behalf?

22        **THE WITNESS:**  Yes, sir.

23        **THE COURT:**  Are the factual statements contained in

24   that declaration true and correct?

25        **THE WITNESS:**  They are, Your Honor.

Return to TOC

1          **THE COURT:**  Okay.  Go ahead, Mr. Taylor.

2          **MR. TAYLOR:**  Thank you, Your Honor.  Good morning,

3     Mr. Heyn, how are you?

4          **THE WITNESS:**  (Indisc.)

5          **MR. TAYLOR:**  Just fine, thanks.  Just a few questions

6     for you from your declaration testimony.

7                          **CROSS EXAMINATION**

8     BY MR. TAYLOR:

9     Q    In paragraph 12, on page seven, you discuss the status of

10    the Debtor's books and records as you reviewed them, correct?

11    A    Yes, sir.

12    Q    You're not an accountant, are you?

13    A    No.  I'm an investment banker.

14    Q    And you did not direct or supervise the creation or

15    maintenance of the Debtor's books and records, did you?

16    A    No, sir.

17    Q    In paragraph 13, your first statement is that you're

18    directly aware of a transaction in which the Debtor was

19    forgiven approximately $6 million in debt owed to Hoisager.

20    Are you aware that the Debtor's books and records do not

21    reflect any debt ever owed to Mr. Hoisager?

22    A    I'm aware that the books and records were not in perfect

23    shape.

24    Q    That's not my question, Mr. Heyn.  My question was, are

25    you aware that the Debtor's books and records never reflected

1    any debt owed to Mr. Hoisager?

2    A    I'm not aware of that, sir.

3    Q    Now, in paragraph 14, towards the end of the -- that

4    paragraph on page eight, you talk about how certain

5    transactions you thought would have or should have appeared in

6    the Debtor's books and records, correct?

7    A    Yes, sir.

8    Q    And, again, you did not supervise or direct any of the

9    accounting activities or bookkeeping activities for APC, did

10   you?

11   A    I did not.

12   Q    In paragraph 18, on page 11, about three-fourths of the

13   way down, you make a statement, the Debtor did not make any

14   gratuitous payments to Arabella Exploration; do you see that?

15   A    I do, sir.

16   Q    You're aware, aren't you, that AEX had a running JIB

17   balance that was owed to APC, correct?

18   A    Yes.

19   Q    And payments were made to Arabella Exploration by APC,

20   when at the same time AEX owed APC JIB balances, didn't it?

21   A    Yes.

22   Q    In paragraph 22, you talk about on behalf of AEX,

23   directing AEX's counsel, Giovanni Caruso of Loeb and Loeb to

24   draft some documents; do you see that?

25   A    Yes, sir.

1    Q    Now, Loeb and Loeb was also the Debtor's counsel for APC

2    initially in the underlying bankruptcy case, wasn't it?

3    A    Yes.  But this is not at the same time.

4    Q    I'm -- that wasn't my question.  My --

5    A    Yes, the --

6    Q    -- question was --

7    A    -- initial, yes, sir.

8    Q    Thank you.  In paragraph 27 -- actually starts in

9    paragraph 25 you talk about it and it goes on to paragraph 27

10   about the mid-2004 transaction.  You referred to it as an

11   integrated transaction in a couple of places; you recall that?

12   A    Yes, sir.

13   Q    There's no document documenting this as an integrated

14   transaction, is there?

15   A    No.  They're all just part of the transaction.

16   Q    But there's not a document tying them all together saying,

17   here's the transaction we're going to do, is there?

18   A    No.  And there wouldn't have been.

19   Q    That's -- there's not, is there, sir?

20   A    No.

21   Q    Okay.  Finally, Mr. Heyn, want to talk to you about the

22   Legacy transaction that you testified about in your

23   declaration.  You're familiar with that, right?

24   A    Yes, sir.

25   Q    In fact, I think you even -- in your testimony and

Return to TOC

Heyn - Cross / By Mr. Taylor                                    55

1    declaration, you said you even tied in my phone and answered

2    some questions for the Court at a hearing in Arabella Petroleum

3    bankruptcy where that transaction or proposed transaction was

4    discussed; is that right?

5    A    I did, yes.

6           **MR. TAYLOR:**  I'm going to share my screen.  Going to

7    go to exhibit -- Debtor's exhibit -- not Debtor's.  Now I'm

8    doing it.

9    Q    Go to Defendants' Exhibit D-54.  And is this the purchase

10   and sale agreement that you're referring to?

11   A    Yes, sir.  I can't see your screen but I have that same

12   exhibit.

13          **MR. TAYLOR:**  You can't see the screen.

14          **THE WITNESS:**  I can see it.  It's hard to read, sir.

15          **MR. TAYLOR:**  Okay.  Here.  Does that help?

16   **BY MR. TAYLOR:**

17   A    It does.  Yes, that appears to be the same document.

18   Q    Okay.  And APC was not a party to this agreement, was it?

19   A    No.

20   Q    This agreement was subject to certain contingencies

21   (indisc.) buyer's obligation under this agreement was subject

22   to certain contingencies; is that correct?

23   A    I don't recall.

24   Q    Well, --

25   A    (Indisc.)

Heyn - Cross / By Mr. Taylor                                    56

1  Q    -- you're testifying that you think this was a done deal

2  and was going to be done, and you don't recall what the

3  agreement provided for.

4  A    It would have provided for those, yes.

5  Q    Okay.  Let's go to page 2213.  And I'm looking at the red

6  numbers at the bottom.

7  A    Yes, sir.

8  Q    Okay.  So 2213, I'll pull this out.  Do you see Section

9  11, Conditions Precedent to Obligations of Buyer?

10 A    Yes, sir.

11      THE COURT:  I hope we're going to make this pretty

12 brief.

13      MR. TAYLOR:  I don't want to go through all the same

14 testimony, Your Honor, if that's what you're hinting at.  So I

15 tell you what, I will -- I'll shorthand what I did with

16 Mr. McCabe.

17      THE COURT:  Yes.  That's what I was fearful of.

18      MR. TAYLOR:  Thank you.

19 BY MR. TAYLOR:

20 Q    It was -- the buyer's obligations was subject to a

21 financing contingency, wasn't it?

22      MR. TAYLOR:  Let's pull that out real quick.

23 A    It did -- says that.  This was quite some time ago but,

24 yes, that would make sense.

25 Q    Okay.  Do you recall there being certain payments that had

Return to TOC

Heyn - Cross / By Mr. Taylor                                57

1   to be made for the agreement to be effective?

2   A    I don't.  I'm sorry.  This was quite some time ago.  I

3   remember it being done but don't recall the absolute minutia.

4   Q    Well just in general.

5   A    Yes.  There was a 15 million-ish payment that was to be

6   made, yes.

7   Q    Well, the $15 million payment was the purchase price,

8   correct?

9   A    Correct.

10  Q    And one of the things that the seller had to do is make

11  sure that all the liens against the assets being purchased had

12  been satisfied, correct?

13  A    Yes.  We had to clear those before we could transfer, yes.

14  Q    And you had to pay off certain amounts owed to providers

15  of goods and services, correct?

16  A    Yes.  I don't recall the numbers or who and that sort of

17  thing, but yes.

18  Q    So there was liens -- so there were certainly liens

19  outstanding in favor of Platinum for the financing (indisc.)

20  AEX, correct?

21  A    Yes.

22  Q    Do you recall the amount?

23  A    They had a lien for the whole amount but we were

24  negotiating a lower payment.

25  Q    Okay.  So the lien, though, was for about $16 million,

Return to TOC

Heyn - Cross / By Mr. Taylor                                    58

1    correct?

2    A    It would have been 16, yes.

3    Q    Okay.  Do you recall that the price was subject to certain

4    downward adjustments?

5    A    Yes.  This is standard in oil and gas, I believe; is that

6    what you're referring to?

7    Q    Yes.  And just again, I'm not going to belabor the

8    (indisc.) you can see here in paragraph -- this paragraph that

9    the purchase price is subject to downward adjustments, correct?

10   A    Yes, sir.

11   Q    And there were also a provision providing for post-closing

12   adjustments, correct?

13   A    Yes.

14   Q    And you recall there being a provision that allowed the

15   purchaser to terminate if more than ten percent in the value of

16   the transaction of preference rights holders exercise their

17   preference rights.

18   A    I don't recall specifically at that -- at this time that

19   specific number.  But if it's in that document, that would be

20   accurate.

21        **MR. TAYLOR:**  All right.  Thank you, Mr. Heyn.  Pass

22   the witness.

23        **MR. SIMON:**  Very well.  Thank you, Mr. Heyn.  Good

24   morning, Mr. Heyn.  I guess where you are in Connecticut I

25   guess it's noon so good afternoon.

Return to TOC

1      **THE WITNESS:**  Just noon, yes.

2      **MR. SIMON:**  Okay.  Just a couple questions.

3      **THE WITNESS:**  Sure.

4      **MR. SIMON:**  Yeah.

5                        **REDIRECT EXAMINATION**

6   BY MR. SIMON:

7   Q     Mr. Heyn, AEX had -- by "AEX," I mean Arabella

8   Exploration, LLC -- excuse me, Arabella Exploration, Inc.  That

9   entity had audited financials, correct?

10  A     Yes, sir.

11  Q     And Arabella Exploration, LLC was a subsidiary of Arabella

12  -- of AEX, correct?

13  A     Yes.  So they would have been audited together.

14  Q     Okay.  And they were -- those audits were done regularly.

15  A     Absolutely (indisc.) was a publicly reporting company so

16  we're required to do annual audits and quarterly reviews.

17  Q     And did it have clean books and records?

18  A     Absolutely, yes, sir.

19  Q     Okay.  Did Arabella Exploration, LLC or Arabella or AEX

20  ever receive a gratuitous payment by the Debtor, a payment it

21  (indisc.)?

22  A     No, sir.  That was rigorously reviewed by the accounts

23  because of the concentration of that revenue.  So the

24  accountants drilled down on everything received to the check.

25  It was very well-reviewed, and there was nothing ever off

Return to TOC

1  kilter.

2  Q    Everything that was received from the Debtor was -- your

3  testimony is everything received from the Debtor was received

4  appropriately pursuant to some contractual obligation.

5  A    Yes, sir.

6           MR. SIMON:  Pass the witness.

7           MR. TAYLOR:  No further questions, Your Honor.

8           THE COURT:  Thank you, Mr. Heyn.  You may --

9           THE WITNESS:  Thank you, Your Honor.  Thank you.

10          THE COURT:  Have a good lunch.

11          THE WITNESS:  Thanks.

12          MR. SIMON:  Your Honor, I guess now we're up to the

13  main event.

14          THE COURT:  Okay.

15          MR. SIMON:  Mr. Hoisager calls Mr. Hoisager by

16  declaration.

17  **JASON HOISAGER, DEFENDANTS' WITNESS, RECALLED, PREVIOUSLY SWORN**

18          THE COURT:  Okay.  Mr. Hoisager, you understand that

19  you're still under oath.

20          THE WITNESS:  (No audible response)

21          THE COURT:  Okay.  Go ahead, Mr. Taylor.

22          MR. TAYLOR:  Thank you, Your Honor.  Mr. Hoisager,

23  I'm going to try not to plow through anything that we went

24  through yesterday.

25  //

Return to TOC

                          **CROSS EXAMINATION**

1

2    **BY MR. TAYLOR:**

3    Q    Mr. Hoisager, would you remind us when the merger that

4    created AEX, Inc. occurred?

5    A    I believe it was Christmas Eve, 2013.

6    Q    And by that time all of the properties had been

7    transferred from APC to AEX, LLC, correct?

8    A    The transfer dates of the properties were September, 2012

9    and March, 2013, respectively.

10   Q    And so it was nine months later whenever this merger

11   occurred, correct?

12   A    That's correct.

13        **(Pause)**

14   Q    When you became the -- what was your title with AEX, Inc.?

15   A    CEO and president, I believe.  Could be just CEO.

16   Q    And you entered an employment agreement with AEX, didn't

17   you?

18   A    I did.

19        **MR. TAYLOR:**  Let's pull that up.  I want to turn to

20   Defendants' Exhibit 52.  Okay (indisc.) with it yesterday.

21   Still not (indisc.).  Yeah, it's -- there we go.  It had

22   dropped me like it did yesterday from being able to share a

23   screen for some reason.  So let me re-share the screen.

24   Q    Okay.  Exhibit Number D-52.  It's just the employment

25   agreement we were just discussing.

Return to TOC

1   A    Yes, sir.

2   Q    And if we look at paragraph three, it provides that for

3   the extent of your service, you are to devote your full

4   business time, attention, and energy to the business of the

5   employer; is that correct?

6   A    (No audible response)

7   Q    Is that right?

8   A    That's correct.  I'm reading for context, but yes.

9   Q    And during the same time that you were employed by AEX

10  under this agreement, you were still receiving payments that

11  you characterized as salary and other reasons from APC; isn't

12  that correct?

13  A    That's correct.

14       **(Pause)**

15  Q    Now, Mr. Hoisager, there's been some testimony about the

16  Legacy transaction.  And I'm not going to go through everything

17  that we've gone through with two other witnesses.  But you

18  heard their testimony, didn't you?

19  A    I did.

20  Q    And this was the pulled-up exhibit, D-54.  This is the

21  purchase and sale agreement between AEX, LLC and Legacy

22  Reserves, correct?

23  A    Yes, that's the exhibit.

24  Q    And would you agree with the testimony you heard before

25  that this contained a financing contingency in favor of the

1   buyer?

2   A    The document does, yes.

3   Q    That it required court approval of the Bankruptcy Court

4   for any affiliate of AEX, correct?

5   A    The document does say, yeah, that it requires --

6   Q    (Indisc.)

7   A    -- approval from the Bankruptcy Court of any affiliate,

8   correct.

9   Q    And you had to pay off the liens in favor of Platinum

10  Partners, correct?

11  A    It doesn't specifically state Platinum Partners.  It says

12  that payoff the liens.  And I think the (indisc.) --

13  Q    (Indisc.)

14  A    -- marketable title.

15  Q    Well that would be -- you'd have to pay off -- you would

16  have to pay off the Platinum Partners lien, though, wouldn't

17  you?  (Indisc.) lien on all the assets, correct?

18  A    I don't believe you had to pay it off.  You had to have a

19  release of lien to be able to transfer the title.

20  Q    Okay.  So do you think -- well, unless Platinum Partners

21  gratuitously released their lien, it would have to be paid off,

22  correct?

23  A    That's not correct.  And, as a matter of fact, we worked

24  the deal, as Mr. McCabe said, where he contributed properties

25  so that the (indisc.) --

Return to TOC

1   Q    Well, again -- okay, go ahead.

2   A    I'm sorry.  The amounts owed by Platinum, as it was

3   contemplated and agreed to, were going to shift onto the new

4   asset that we were buying from McCabe, the Hazel property, so

5   that we could sell the Arabella Exploration properties, we

6   could pay off the three million that Arabella Exploration owed

7   the Debtor, and take care of all the liens filed in the

8   courthouse.

9   Q    That's not part of this agreement, is it?

10  A    It is not part of that agreement.  It was --

11  Q    And there's nothing before the Court indicating that

12  Platinum Partners was willing to do anything, other than get

13  full payment of their debt, correct?

14  A    There's nothing before the Court regarding Platinum

15  Partners at all, to my knowledge.

16  Q    Okay.  They did hold a lien on these assets that were

17  transferred, didn't they?

18  A    It was a deed of trust which I believe to be a lien, so

19  yes.

20  Q    And the debt owed to them was approximately $16 million.

21  A    I believe that was the amount of the deed of trust, yes.

22  Q    Now, you've heard the testimony that the purchase price

23  was subject to certain downward adjustments, correct?

24  A    I did hear that testimony, correct.

25  Q    And isn't it true that Arabella's counsel at the hearing

Return to TOC

1  for this when this sale was discussed indicated to Judge King

2  that those downward adjustments could be in the amount of $1.5

3  to $2 million.

4  A    I don't know if that's true or not.  I think there's a

5  transcript but I haven't read it or reviewed it.  I don't know

6  for certain.

7  Q    It's in the record and we can refer to that.  But it -- do

8  you have any -- if your counsel made that representation to the

9  Court, would you disagree with that?

10       **MR. SIMON:**  Objection, Your Honor, that's

11  speculation.

12  Q    Okay.  Do you disagree that there could be as much as 1.5

13  to $2 million downward adjustment of the purchase price?

14  A    I know there were downward and upward adjustments.  I

15  believe it would have been net downward.  But I don't recall

16  the amount (indisc.) apologize.

17  Q    That's okay.  Want to turn briefly to Debtor's exhibit --

18  Debtor's -- Defendants' Exhibit 7.  This is the Form 10-K for

19  2014 for AEX, Inc.; is that correct?

20  A    Form 10-K, it would be for AEX, Inc.  And it says 2014.

21       **MR. TAYLOR:**  Okay.  And if we turn to the number --

22  red numbers down on the bottom, page 2103 -- I got close.  On

23  the consolidated statement of cashflows, in first column that

24  I'm going to pull up -- well, here, we'll just pull up the

25  whole thing.

Return to TOC

1   Q   So for the year ending 2014, AEX, Inc. had a net income of

2   -- or a loss of approximately $4.7 million, correct?

3   A   That's what this table shows correct.

4   Q   Well, you submitted this to the SEC, didn't you,

5   Mr. Hoisager?

6   A   I did, yes.

7   Q   And on December 31st, 2013, it reflects that AEX, Inc. had

8   a net income of about $192,000, correct?

9   A   That's correct.

10   Q   Okay.  Turn to page 2118.  On the cashflows from investing

11   activities, you had a significant deficit in each of those

12   years, three and a half million dollars and then 14 and a half

13   million dollars, correct?

14   A   I'm sorry, can you repeat the question again?  I want to

15   make sure I understand that.

16   Q   Yes.  So on the cashflows from investing activities, in

17   2014 it was a negative 14 and a half million dollars, correct?

18   A   That's correct.

19   Q   And --

20   A   Approximately.

21   Q   -- 2013, it was a negative three and a half million

22   dollars, correct?

23   A   Approximately, yes.

24   Q   And the cash and cash equivalents on those years, you had

25   about a little over $2.1 million at yearend 2013, correct?

Return to TOC

1   A    That's correct.

2   Q    And $3,000 in the yearend 2014, correct?

3   A    That's correct.

4   Q    Now, Mr. Hoisager, in --

5        **MR. TAYLOR:**  Won't return to the meeting, okay.

6   Q    In your declaration, this is in paragraph 40, --

7        **THE COURT:**  What page, please?

8        **MR. TAYLOR:**  Paragraph 40 is page -- paragraph 40 is

9   on page 25.

10       **THE COURT:**  Thank you.

11       **MR. TAYLOR:**  And it starts on page, yeah, 24.

12  **BY MR. TAYLOR:**

13  Q    But you're talking about the transaction, the merger

14  transaction, the transfer of assets.  Do you generally recall

15  that testimony in your declaration?

16  A    Yes.  I do.  I'm looking at it as well.

17  Q    Yeah, go ahead, that's fine.

18       **THE COURT:**  You mean paragraph --

19       **MR. TAYLOR:**  Paragraph 40.

20       **THE COURT:**  Okay.

21  **BY MR. TAYLOR:**

22  Q    Why don't you take another look at that paragraph, tell me

23  when you're done.

24  A    I'm finished.

25  Q    I'm sorry, you're finished?

1   A    Yes, sir.

2   Q    Now, your statement on the first full sentence on page 25

3   is that my work helped the Debtor execute that legitimate

4   business strategy -- my work to help the Debtor execute that

5   legitimate business strategy falls in the scope of my duties as

6   the Debtor's manager.  Did I read that correctly?

7           **THE COURT:**  Sorry, Mr. Taylor, I'm still lost.

8           **MR. TAYLOR:**  I'm at the top of page 25, Your Honor,

9   and the first full sentence.

10          **THE COURT:**  Okay.

11          **MR. TAYLOR:**  My work, starts with my work.

12          **THE COURT:**  My work, got it.

13  **BY MR. TAYLOR:**

14  Q    My work to help the Debtor execute that legitimate

15  business strategy falls within the scope of my duties as the

16  Debtor's manager.  That's your testimony, correct?

17  A    Yes, sir.

18  Q    And if you look at paragraph 49, and this is on page 30 --

19  are you there?

20  A    I am, yes.

21  Q    And you're again generally discussing your reasoning

22  behind the transfer of the assets to -- originally to AEX, LLC,

23  and then the ultimate merger transaction with Lone Oak that

24  created AEX, Inc.; is that right?

25  A    Generally speaking, yes.

1   Q    We turn to the next page, on page 31, still on paragraph

2   49, --

3   A    Yes, sir.

4   Q    -- you make the -- and this is one, two, three, four, five

5   lines up from the bottom, page 49.  You said my hope and the

6   future success of the AEX motivated me to achieve that goal.

7   And if you look back up before that, you're referring to the

8   goal of getting the Debtor to pivot back to its original

9   business model, correct?

10  A    I'm sorry.  Can you repeat the question?  Are you asking

11  me to confirm that that's what the sentence says or --

12  Q    Well I'm just (indisc.) that's what your hope was.  Your

13  hope was to get the Debtor to be able to pivot back to its

14  original business model of purchasing leases, packaging them

15  (indisc.) and reselling them at a profit.

16  Q    Just at first glance, I don't think that's what it's

17  referring to.  But if I could read it for a moment, I --

18  Q    Yeah.  Tell me what you were hoping for.

19  A    Okay.  It says my hope in the future success of AEX

20  motivated me to work to achieve the -- so if you're asking what

21  my hope was, it was for the future success of AEX.  I'm sorry.

22  I kind of feel like I'm missing something.

23  Q    So you didn't have -- it wasn't the hope for success for

24  APC.

25  A    Are you asking if I had hope for the success of APC or if

1  that's what this paragraph says.

2  Q    I'm asking you what your goal was.  It says right here, to

3  achieve -- motivated me to work to achieve that goal.  What

4  goal are you talking about?

5  A    I believe in the sentence above it, it says, allow the

6  Debtor to pivot back to its original business model of

7  purchasing leases, packaging them, and reselling them for a

8  profit.

9  Q    And that was what I stated and that was my question.

10 A    I'm sorry.

11 Q    So the way you were going to achieve this goal, you

12 transferred out all the interest that APC had to AEX, LLC in

13 September of 2012 and early 2013, correct?

14 A    I transferred all of the interest or properties that came

15 with drilling obligations.  The Debtor retained other certain

16 properties (indisc.) I have to worry about the drilling

17 obligations.

18 Q    Can you -- I'd like you to answer my question,

19 Mr. Hoisager.  You transferred (indisc.) --

20      MR. SIMON:  Objection, Your Honor.  I think he was

21 answering the question.

22      MR. TAYLOR:  No, he's elaborating, Your Honor.  My

23 question was, did you transfer out all of the interest -- and

24 we can pull up the sheet from Exhibit 7 that we looked up

25 earlier.  Let's go ahead and do that.  Share the screen -- I

1   need the share screen function back, please.  Oh, there we go.

2   Thank you, Ms. Lopez.  Go to Trustee --

3   **BY MR. TAYLOR:**

4   Q    This is Trustee's Exhibit 77.  Mr. Hoisager, all of the

5   interests that were owned by APC that are reflected on this

6   table were transferred to AEX in either 2015 or early -- I'm

7   sorry, 2012 or early 2013, correct?

8   A    All of the interests on this table were transferred by the

9   Debtor to Arabella Exploration, LLC in late 2012 or early 2013,

10  correct.

11  Q    Now (indisc.) property which was in November, correct?

12  And I'll call that out for you.  Just -- I'll just call it

13  (indisc.) --

14  A    That's correct, November, 2013.

15  Q    Right.  And the merger that occurred was not until

16  December of 2013, correct?

17  A    The merger of Arabella Exploration, LLC and Lone Oak was

18  in December of 2013, correct.

19  Q    And at the time in October of 2012 and March of 2013, AEX,

20  LLC did not have any substantial liquidity, did it?

21  A    I suppose that would depend on your definition of

22  substantial.  But I wouldn't characterize that as such.

23  Q    You would what?

24  A    I would not say that Arabella Exploration, LLC had

25  substantial liquidity.

Return to TOC

1  Q    Do you recall how much cash it had in the bank in October

2  of 2012?

3  A    I do not recall.

4  Q    What about in March of 2013?

5  A    I don't recall that either.

6  Q    And how many employees did it have?

7  A    I'm not sure that it had any salaried employees at all.

8  Q    This is the company in which you were the sole member and

9  manager; is that correct?

10  A    That is correct, prior to the merger of course.

11       **(Pause)**

12  Q    I'm looking for the statement in your declaration, and for

13  some reason didn't write it down, but my understanding is that

14  you thought that the end result of these transactions, the

15  transfers to AEX, and the merger, that would be that the

16  creditors got paid and, if not, they could pursue their legal

17  remedies or foreclose their liens; is that right?

18  A    I don't recall saying that at all.  I always believed that

19  all the creditors would be paid 100 percent.

20       **MR. TAYLOR:**  Give me just a moment then.

21  Q    So you're saying you didn't say that in your declaration,

22  Mr. Hoisager.

23  A    Not the way that you characterize it.  When I made the

24  transfer, I believe it was for proper consideration.  But I

25  never doubted that any creditors would go unpaid.

**EXCEPTIONAL REPORTING SERVICES, INC**

1  Q    So the consideration was a receivable in favor of APC,

2  correct?

3  A    No.  What had happened was I borrowed money from Greg

4  McCabe personally --

5  Q    No.  Mr. Hoisager.  As booked on the records of APC, the

6  consideration was a receivable that was booked in favor of APC,

7  wasn't it?

8        MR. SIMON:  Objection, Your Honor, argumentative.  He

9  needs to ask the witness the question.

10        THE COURT:  Overruled.  He asked what the books and

11  records say.

12        MR. SIMON:  That was his second question, that wasn't

13  the first one, but (indisc.) --

14        THE COURT:  I assume we're on to the second question.

15  BY MR. TAYLOR:

16  Q    Mr. Hoisager, what's your answer?

17  A    I'm sorry, do you mind asking again?  I lost the question

18  in --

19  Q    The consideration that was booked on the books and records

20  of APC in return for the transfer of these properties to AEX

21  was a receivable from AEX, correct?

22  A    Originally that is correct.

23     (Pause)

24  Q    Take a look for a moment at your Exhibit 72, Defendants'

25  Exhibit 72.  It's hard to read, but this is the document that's

Return to TOC

1   called, Table Reflecting Value of All Properties Transferred by

2   Debtor to Arabella Explorations; do you see that?

3   A    That's correct.

4   Q    And what is it you're -- I read your declaration, but

5   explain to me what -- not what the values are but what it is

6   that you're intending to reflect in this chart.

7   A    Clarity and transparency is the short answer.  But I

8   wanted to make sure that the Court knew the total amount paid

9   for all the leases, undeveloped leases at that.  I wanted to

10  show also what Arabella Exploration's portion of the leasehold

11  was for each of them, what their portion of the drilling

12  obligations were, and the portions of the revenues that were

13  associated with those drilling obligations.

14       But I also wanted to make clear, and I believe everyone

15  knows this so it's a little redundant, but an undeveloped lease

16  depreciates over time, perhaps linearly, as you get closer to

17  the expiration date.  Absolutely some of the leases were six

18  months, seven months, very short-term, so they had to be

19  developed or a complete loss on behalf of whoever owned the

20  lease, which originally was the Debtor.

21  Q    So if you look at this, just so I understand it, the first

22  column is the original lease cost paid by the Debtor.

23  A    That's correct.

24  Q    So that's just the -- what's reflected on the books for

25  the lease cost.

Return to TOC

1   A    So insofar as the books and records are clear, yes.

2   Q    And, again, if they're not clear, is that your

3   bookkeeper's fault?

4   A    Ultimately I take responsibility for it.  But I believe

5   that she made the mistake.

6   Q    Okay.  And the next columns reflect depreciated lease

7   costs; is that right?

8   A    That's correct.  And, again, what I did is I took the

9   number of days and the term of the lease --

10  Q    I didn't ask that.  I said does it reflect the depreciated

11  lease cost.

12  A    Yes.  But by -- from the lease date to effective date in

13  the first column you're showing me, and from the lease date to

14  the filed date of that same lease in the second column you're

15  showing me.

16  Q    And that's just book value depreciation.

17  A    Perhaps you can call it book value.  But it just shows the

18  total lease prorated for the number of days left in the lease

19  at those two points in time.

20  Q    And to be clear, Mr. Hoisager, you don't have any

21  certifications or licenses in any valuation disciplines, do

22  you?

23  A    I do not.

24  Q    You have not received any training, formal training, in

25  valuation of any types of property, have you?

1  A    No, not that I would consider formal training, no, sir.

2  Q    Okay.  There was some discussion yesterday about the

3  payments to Arabella Operating.  And if you look at exhibit I

4  believe it's -- yeah, Exhibit 79, the Trustee's Exhibit 79,

5  there's the listings of the payments to Arabella Operating over

6  time of about $882,000.  And in general terms, what types of

7  things was APC paying Arabella Operating for?

8  A    We had a spreadsheet built at the time.  I could not find

9  that in preparation for this.  But what I generally recall is

10 there were amounts that were held in suspense for royalty

11 owners.  They were things of that nature.  And I'm sorry I

12 don't recall the exact (indisc.) but generally along those

13 lines.

14          **MR. TAYLOR:**  Okay.  Thank you.  I'm going to stop

15 sharing now.  Let's go back to the screen.  Mr. Hoisager, I

16 have a few questions for you from your declaration itself.

17 Q    Mr. Hoisager, you would agree with me that the Debtor's

18 books and records did not ever reflect a debt owed to you, did

19 they?

20 A    I don't know if I would agree with that.  I would say that

21 the Debtor's books and records don't make it abundantly clear

22 that there's a debt owed to me.

23 Q    Okay.  There was not a promissory note executed for the

24 amount that you claim the Debtor owed you, was there?

25 A    Unfortunately, no.

Return to TOC

1  Q    Paragraph 27, on page 14, do you have that in front of

2  you?

3  A    Just a moment, please.  I'm ready.

4  Q    If you go about halfway down to paragraph 27, you talk

5  about the way things were booked on the Debtor's books.  And

6  you said this nontraditional accounting result from the

7  inexperience of Brianne Hall (phonetic); is that right?

8  A    I do talk about that, yes.

9  Q    And --

10 A    And the limitation of the Debtor's accounting software.

11 Q    And, again, you were the manager of the Debtor, correct?

12 A    That's correct.

13    **(Pause)**

14 Q    You would agree with me, wouldn't you, Mr. Hoisager --

15 well, let's turn to page -- paragraph 20.  I'm sorry, page 20,

16 paragraph 35, and go down about two-thirds of the way in that

17 column, in that paragraph.  You say similar statement that

18 Mr. Heyn made.  Debtor made no gratuitous payments to Arabella

19 Exploration; do you see that?

20 A    That is correct.

21 Q    You agree with me, as Mr. Heyn did, that Arabella

22 Exploration had a running JIB balance that was owed to Arabella

23 Petroleum, correct?

24 A    There was a running JIB balance, correct.

25 Q    And APC made payments to AEX, notwithstanding the fact

1   that JIBS were owed at the same time, correct?

2   A    That is correct.

3   Q    Turn to paragraph 40, if you would.  That's on page -- go

4   to page 25.

5   A    Yes, sir.

6   Q    Mr. Hoisager, I know you make the statement that you never

7   caused the Debtor to make an assignment for the purpose of

8   harming the Debtor or placing assets beyond the reach of

9   creditors.  It was your belief that if they didn't get paid in

10  -- the creditors didn't get paid in full, they could have

11  recourse through liens or other legal methods, correct?

12  A    That is the last sentence of that paragraph.

13  Q    That's what I was referring to earlier.  So if they didn't

14  get paid, you're saying, well then come sue APC, or they can

15  foreclose liens, notwithstanding the fact that the property's

16  been transferred, correct?

17  A    That is not what I meant.  What I meant by that -- and,

18  sorry, in the context when you asked me before, you were

19  stating at the time of the transfer from the Debtor to AEX, LLC

20  I believed that they could do this.  I never believed there

21  would be an unpaid creditor so that thought hadn't entered my

22  mind.

23       But I do know as we've seen from the records that when

24  vendors (indisc.) they file liens.  I hoped that none of them

25  would ever be foreclosed on.  But I also know that to transfer

Return to TOC

1    marketable title, liens would have to be removed.  So I hope

2    that answers (indisc.) --

3    Q    Okay.  Let's --

4    A    Sorry.

5    Q    Let's back up.  So third line, your statement is that each

6    of the assignments resulted from a business decision that I

7    made as the Debtor's manager with the honest intention at the

8    time to benefit the Debtor and serve its interest, correct?

9    A    That's correct.  That's the sentence.

10   Q    And then at the end, you said if they didn't get paid in

11   full, they had recourse through liens or other legal methods,

12   correct?

13   A    That is the last sentence, yes.

14   Q    Okay.  Paragraph 66, --

15             **THE COURT:**  Page.

16             **MR. TAYLOR:**  It's on page 39.

17             **THE COURT:**  Thank you.

18   **BY MR. TAYLOR:**

19   Q    Do you see that?

20   A    I found it.

21   Q    Now, you have claimed that Baker Hughes, for lack of a

22   better term, did back work and caused damages on the SM Prewitt

23   1H well, correct?

24   A    That's a summary.  I can go into detail, if you like.

25   Q    No.

Return to TOC

Hoisager - Cross / By Mr. Taylor                    80

1    A    But that's a summarization.

2    Q    No.  That's just your contention that they didn't do good

3    work, correct?

4    A    I'm specifically claiming that Baker Hughes was

5    responsible for the loss of the SM Prewitt.

6    Q    Right.  And you entered an arbitration proceeding with

7    Baker Hughes over that, didn't you?  "You" being APC.

8    A    Yes.  But prior to that --

9    Q    I --

10   A    -- we were sued.  AEX was trying to consummate the merger

11   with --

12   Q    No, I'm not asking about that.  I'm saying you had an

13   arbitration proceeding with Baker Hughes, didn't you?

14   A    Ultimately, yes.

15   Q    In that arbitration proceeding there was an agreed award

16   that you entered for $1.35 million; isn't that correct?

17   A    With the early payment option if a check was mailed in the

18   amount of 130,000 within so many days, yes.

19   Q    Which didn't happen, did it?

20   A    It did happen.  The check was put in the mail.  Baker

21   Hughes said that it was received late.  I did not have a chance

22   to fight the fight honestly.  I asked that a trustee be put

23   over the Debtor after the bankruptcy filing.  But --

24   Q    Okay.  Let's back up a minute.  You had the dispute with

25   Baker Hughes over the SM -- over their work on the SM Prewitt

Return to TOC

1  well, correct?

2  A    That is correct.

3  Q    You -- there was an arbitration proceeding between you and

4  Baker Hughes over that work, correct?

5  A    Ultimately there was an arbitration over the work.

6  Q    And in that arbitration, you agreed, APC agreed, to a

7  $1.35 million arbitration award in favor of Baker Hughes,

8  correct?

9  A    Yes.  I think the original amount of the unpaid invoices

10  was --

11  Q    I'm not saying that.  I asked what the amount of the award

12  was, the agreed award was, sir.  What was it?

13  A    It was 1.35 if we didn't take advantage of the early

14  payment option.

15  Q    Okay.  I know you keep wanting to answer other questions,

16  but I'm just asking about the amount of the award.  It was an

17  agreed award for $1.35 million, wasn't it?

18  A    It was an agreed award for 1.35 million.

19       **(Pause)**

20       **MR. TAYLOR:**  That's all I have at this time.  Thank

21  you, Mr. Hoisager.  Pass the witness.

22       **MR. SIMON:**  We can begin now, Your Honor, or we can

23  take our lunchbreak, either way.

24       **THE COURT:**  Go ahead.  Let's begin.

25       **MR. SIMON:**  Very well.  All right.

Return to TOC

1                        **REDIRECT EXAMINATION**

2    **BY MR. SIMON:**

3    Q    Mr. Hoisager, you recall your -- the testimony that you

4    just gave a moment or two ago about Baker Hughes.

5    A    I do, yes, sir.

6    Q    And there was an answer you wanted to give that Mr. Taylor

7    cut you off of.  What was that answer?

8    A    I just wanted to be clear and as transparent as I can

9    around this process.  I believe, as well as the people who

10   worked for me and the Debtor believed, that Baker Hughes caused

11   the damage on the well.

12   Q    Okay.

13   A    The damage on the well happened, the well ultimately

14   failed.  I was in communication with Baker Hughes at the time

15   about all -- everything going on.

16        Ultimately they decided that I owed them 3.2 million

17   for invoices for work on the well that failed.  They made this

18   assertion right at the time we were trying to do the merger

19   from Arabella Exploration with Lone Oak.

20        And it was on the even of the -- of that merger

21   consummation, they had an emergency hearing where they tried to

22   become appointed receiver over the properties.  That ultimately

23   failed in Reeves County, is what I remember.

24        **MR. TAYLOR:**  Objection, hearsay as to what happened

25   in Reeves County, Your Honor.

1          **THE COURT:**  Sustained.

2          **THE WITNESS:**  Sorry.

3          **MR. SIMON:**  All right.  I'll continue.

4     BY MR. SIMON:

5     Q    So, Mr. Hoisager, was there -- did Baker Hughes sue the

6     Debtor?

7     A    Baker Hughes sued the Debtor, yes.

8     Q    After that lawsuit was filed, did it go through an

9     arbitration proceeding?

10    A    It did go to an arbitration proceeding, yes.

11    Q    And what was the -- was there an initial arbitration

12    agreement?

13    A    Yes.  We -- the initial dispute was on $3.2 million worth

14    of unpaid invoices.  The arbitration award, as Mr. Taylor

15    pointed out, was the 1.35 million.  And I forget the timeframe,

16    but if we paid within so many days 130,000 satisfied the

17    arbitration award.

18    Q    Okay.  And was the Debtor able to pay the 130,000 in time?

19    A    I believe that Arabella Exploration mailed a check on

20    behalf of the Debtor to Baker Hughes.  And I remember that

21    either Arabella Exploration or Arabella Petroleum, the Debtor,

22    could have made the payment from the arbitration award.  I'm a

23    little fuzzy.  It's been a while.  And they may have both been

24    sued at the time but, yes, payment was made.

25          Specifically it said it had to be placed in the mail

Hoisager - Redirect / By Mr. Simon                84

1   by the certain date.  I think that date fell on a weekend.  I

2   made sure it was in the mailbox.  I had supporting affidavits

3   from all the people that were there and (indisc.) --

4           **MR. TAYLOR:**  Objection, hearsay, Your Honor.

5           **THE WITNESS:**  Sorry.

6           **THE COURT:**  Sustained.

7   **BY MR. SIMON:**

8   Q    Ultimately was the Debtor late in making the $130,000

9   payment, at least as far as Baker Hughes was concerned?

10  A    Not as far as I'm concerned.  But, yes, as far as Baker

11  Hughes was concerned, it was late.

12  Q    Al right.  And if the Debtor had made that $130,000 under

13  the agreement, would that have satisfied the claim for $3.2

14  million?

15  A    That is correct, yes.

16  Q    Okay.  And so the ultimate award resulted from the Debtor

17  failing to make the payment on time.

18          **MR. TAYLOR:**  Objection, argument.  Objection, that's

19  testimony from counsel.

20          **THE COURT:**  Overruled.

21  A    I think I understand the question to be, yes, because the

22  payment wasn't received on time, Baker Hughes claims that

23  they're entitled to $1.35 million from the arbitration award.

24  Q    Okay.  And did that just turn out to be a claim in the

25  Debtor's bankruptcy?

Return to TOC

 1   A    It did, yes.

 2   Q    Okay.  All right.  You recall questioning from Mr. Taylor

 3   about the Debtor offsetting or having the right to offset JIBS

 4   owed by -- offset -- try again.  Offset production payments

 5   against JIBS owed by Arabella Exploration, LLC?

 6   A    I do recall him speaking of that, yes.

 7   Q    Okay.  I'm going to ask you a little more general

 8   question.  Under a joint operating agreement, is there an

 9   obligation to offset JIBS or is there an -- or is there a right

10   to offset JIBS?

11   A    I believe it is the right of the operator.

12   Q    Is the operator required to offset JIBS?

13   A    I do not believe so.

14   Q    Do operators -- from your experience, do operators

15   sometimes offset JOBS?

16   A    Sometimes they do, yes.

17   Q    And operators sometimes elect not to offset JIBS.

18   A    That is certainly true as well.

19   Q    And has that frequent -- is that a business decision as to

20   whether to offset or not offset?

21   A    That is a business decision, yes.

22   Q    And is that something on which reasonable minds can

23   differ?

24   A    I believe so.  I can think of examples why you'd want to

25   do it and why you'd certainly not want to do it.

Return to TOC

Hoisager - Redirect / By Mr. Simon                    86

1   Q    Okay.  All right.  Do you recall that Mr. Taylor asked you

2   some questions about Arabella Operating, about the money

3   transferred to Arabella Operating?

4   A    I do.

5   Q    Okay.  Now, you said that your memory was that the money

6   that was transferred was money that was held in suspense

7   accounts; is that correct?

8   A    I think it was money due to royalty owners that weren't

9   receiving payments, and other such things.  I don't recall with

10  enough specificity to tell you exactly.  But that was my main

11  recollection.

12  Q    You've anticipated my question.  Money that is held in a

13  suspense account is money held for the benefit of whom?

14  A    For whomever -- whoever's the suspended royalty owner.

15  Q    Okay.  Is that money held for the benefit of the operator

16  or is it money held for the benefit of the royalty owner or

17  working interest owner?

18  A    The royalty owner.

19  Q    Okay.  So if the Debtor's holding that money in its

20  suspense account, is that the Debtor's money or is that money

21  that's really owed to royalty owners or working interest

22  owners?

23  A    It would be owed to other people.

24  Q    Okay.  And could the Debtor set that off and just take it

25  for itself?

Return to TOC                                                    APP1-172

Hoisager - Redirect / By Mr. Simon                              87

1   A    I would not think so.  I don't know.

2   Q    Okay.  Now, when the Debtor -- now, in January of 2015

3   more or less, the Debtor transferred operator status from wells

4   to Arabella Operating, LLC; is that correct?

5   A    That is correct.

6   Q    And when the Debtor did that, you say the Debtor

7   transferred the money in the suspense accounts to Arabella

8   Operating, LLC?

9   A    That is correct.

10  Q    Would the Debtor have any right whatever to hold onto that

11  money and not transfer it to the new operator?

12  A    I don't believe so by my understanding of the joint

13  operating agreements.

14  Q    And is that because the money that's held in those

15  suspense accounts really belongs to the working interest owners

16  and royalty owners and not to the Debtor?

17  A    I would say to the royalty -- suspended royalty owners and

18  not the Debtor.

19  Q    And regarding Arabella Exploration, LLC, did you own that

20  company?

21  A    Arabella Exploration, LLC --

22  Q    I misspoke.  I meant Arabella Operating, LLC.  Did you own

23  Arabella Operating, LLC?

24  A    I've never owned Arabella Operating, LLC.

25  Q    And did any of that money from the suspense accounts make

Return to TOC

Hoisager - Redirect / By Mr. Simon                          88

1   it way -- make its way to you?

2   A     No.  It did not.

3   Q     Did Arabella Operating, LLC ever pay you anything other

4   than the repayment of some loans you made to it?

5   A     No.  They've never paid me any payment that wasn't a

6   repayment of a loan that I made to it.

7   Q     And is Arabella -- did you loan Arabella Operating, LLC

8   more money than it ever repaid to you?

9   A     That's correct.

10  Q     Did Arabella Operating, LLC ever make a distribution to

11  you?

12  A     No, sir.

13  Q     (Indisc.)

14  A     I'm sorry?

15  Q     Did it ever pay you a salary?

16  A     No.  It did not.

17        **(Pause)**

18  Q     How long have you been in the oil and gas business?

19  A     I think since approximately 2005.

20  Q     All right.  And in that time period have you been involved

21  in the business of buying and selling leases?

22  A     I have almost since the beginning of my time in the

23  business.

24  Q     And regardless of whether you have any formal training in

25  the valuation of leases, do you think you have a general

Return to TOC                                              APP1-174

Hoisager – Redirect / By Mr. Simon                89

1  understanding of the value of leases?

2  A    I have a very general, yes.  I would say more than general

3  experience in the valuation of leases, not from a formal

4  standpoint but from somebody who's done it for 17 years.

5  Q    Right.  And you can be right or you can be wrong like

6  everyone else, correct?

7  A    That's very certainly true.

8  Q    Okay.  But you do generally understand how leases are

9  valued.

10  A    I do, yes.

11  Q    Okay.  And is it your experience that over the course of

12  time, as leases approach their expiration date, the value

13  declines?

14  A    So long as the lease is undeveloped or has a drilling

15  obligation, the closer you get to the expiration date, the less

16  value it has, simply because if it does not get drilled, which

17  is -- involves a huge capital expenditure, then the lease is

18  completely valueless.

19  Q    Right.  And say the day before a lease expires, it would

20  have no value because there'd be no way to go drill it in that

21  time period; is that correct?

22        MR. TAYLOR:  Your Honor, objection.  One, it's

23  leading.  And, objection number two, this really now is getting

24  into Rule 702, expert testimony.  It's one thing for a business

25  owner to talk about the value of his business.  He's now giving

1    testimony as to what the industry does and how the industry

2    views it, which is Rule 702 testimony.

3              **THE COURT:**  Sustained.

4    **BY MR. SIMON:**

5    Q    So your understanding and your experience is the value

6    declines as you approach the expiration date.

7    A    That's correct, on undeveloped leases, yes.

8    Q    Okay.  Very well, fair enough.  Now, when would

9    Arabella -- when was Arabella Exploration, LLC formed?

10   A    I don't recall the exact date but I remember it being in

11   2008.

12   Q    And when did it start operations?

13   A    Arabella Exploration, LLC.

14   Q    Yes, sir.

15   A    Business operations as --

16   Q    Yes, sir.

17   A    -- opposed to well operations, probably shortly after it

18   was formed.

19   Q    Did it acquire leases?

20   A    It acquired interest in leases that I would characterize

21   as working interest.  And I'm drawing a definition between any

22   lease you take creates a leasehold interest.  I define a

23   working interest as a fractional leasehold interest that has

24   exposure to well costs.  So I'm splitting hairs a bit but I

25   want to do so to be 100 percent clear and candid.

Return to TOC

1  Q    Did Arabella Exploration, LLC already have an asset base

2  before it received the assignment of the Wolfbone 1 leases?

3  A    It did, yes.

4  Q    All right.  And generally speaking, what was that asset

5  base?

6  A    It had investments in the individual wells and properties

7  where it was participating in the development of leases with

8  other operators by other companies.  They were all, you know,

9  fractional working interests.

10 Q    And did it have any substantial debts?

11 A    It did not.

12 Q    At that time.

13 A    At that time it did not, prior to September, 2012,

14 thereabout.

15 Q    And did it have at least greater access to capital than

16 the Debtor had?

17 A    It did have a lot greater access to capital than the

18 Debtor had, yes.

19 Q    Did it have better books and records?

20 A    It had far better books and records.  But in addition, and

21 along with the books and records, just it was not a participant

22 in hardly any transactions, the number of transactions.  So the

23 volume, if it would have been involved in the same number of

24 transactions at Arabella Exploration, I would suspect that the

25 books would have trended the same way.  But because the fewer

1    number of transactions and how clean they were, the books and

2    records were far better at Arabella Exploration.

3    Q    All right.  Now, do you remember Mr. Taylor asking you --

4    showing you Exhibit 77, Trustee's Exhibit 77, asking you if the

5    Debtor had transferred all of the leasehold interest reflected

6    on Exhibit 77 to Arabella Exploration, LLC?

7    A    I do remember that, yes.

8    Q    And your testimony was, yes, the Debtor did transfer all

9    of the interest shown on Exhibit 77, correct?

10   A    That was my testimony, yes.

11   Q    Did the Debtor have leasehold interests that it did not

12   transfer to Arabella Exploration, LLC?

13   A    It did, yes, sir.

14   Q    And would you give the Court some examples of some of

15   those?

16   A    I think the biggest, most important one is the Cox

17   prospect --

18   Q    And --

19   A    -- because one section of the land that the -- I don't

20   recall the Debtor's ownership as of the time over certain

21   dates, but the Debtor was able to acquire 100 percent of the

22   leasehold interest in one section of Reeves County that

23   constituted the Cox prospect.

24   Q    And that one was not transferred to Arabella Exploration,

25   LLC.

Hoisager - Redirect / By Mr. Simon                    93

 1  A     It was not.

 2  Q     How about Thunder Valley?

 3  A     Thunder Valley's another great example.

 4  Q     Would you tell the Court a little bit about that one?

 5  A     Thunder Valley was another leasehold acquisition prospect,

 6  similar to everything the Debtor had done prior to the

 7  Wolfbone 1 and Wolfbone 2 programs, where it put together a

 8  working investor group to go acquire leases.  Thunder Valley

 9  happened to be in Scurry County.  I think ultimately the gross

10  leasehold acquired was roughly 7,000 acres.  Those acres were

11  later sold to a company and generated a cash profit on the sale

12  of the leasehold.

13  Q     And about how much money did the Debtor make on the sale

14  of that leasehold?

15  A     I don't have the exact amount but I remember the number

16  being somewhere around six or $700,000.

17  Q     And approximately when was that leasehold sold?

18  A     Again, I don't recall the particulars.  I remember that

19  being late 2014.

20  Q     So was that after all the transfers had been made to

21  Arabella Exploration, LLC?

22  A     Yes.  I'm -- I recall the proceeds of that sale going to

23  pay down creditors of the Debtor as well, for whatever that's

24  worth.

25  Q     Do you remember Mr. Taylor showing you a copy of your

Return to TOC

1   employment agreement?

2   A    I do, yes.

3   Q    Okay.  And the employment agreement required you to work

4   fulltime diligently for Arabella Exploration, Inc., correct?

5   A    It does, yes.

6   Q    Did you also work fulltime and diligently for the Debtor?

7   A    I very much did, yes.

8   Q    All right.  Did the work you did for one entity ever keep

9   you doing work for the other?

10  A    Perhaps a time, yes.

11  Q    (Indisc.)

12  A    (Indisc.) on a day-by-day basis, not like globally.

13  Q    Were you generally able to do your job for both entities?

14  A    Yes, sir, I was.

15  Q    Did you work fulltime and diligently for both?

16  A    I did, yes.

17  Q    And did the efforts that you expended on behalf of the

18  Debtor prevent you from doing your work as CEO of Arabella

19  Exploration, Inc.?

20  A    No.  It did not.

21  Q    And did the work that you did on behalf of AEX or Arabella

22  Exploration, Inc. prevent you from doing your work as manager

23  of the Debtor?

24  A    It did not.

25  Q    Want to talk just a little bit about Platinum Partners.

Return to TOC

1   Would you tell the Court a little bit about the negotiation of

2   Platinum Partners and with regard to the Legacy transaction?

3   A    Of course.  The Legacy transaction was very important,

4   both to the Debtor and to Arabella Exploration, and to Platinum

5   Partners.

6         **MR. TAYLOR:**  Objection, Your Honor, to anything that

7   Mr. Hoisager says about what was important to Platinum Partners

8   or what Platinum Partners said as hearsay.

9         **THE COURT:**  Sustained.

10        **MR. SIMON:**  All right.

11  **BY MR. SIMON:**

12  Q    Did Platinum Partners negotiate with you for that

13  transaction?

14  A    They did, yes.

15  Q    And did that transaction, did the negotiations continue --

16  did the negotiation with Platinum Partners continue up until

17  the time that Snow, Spence, counsel for the Creditors

18  Committee, sent its letter to Legacy?

19  A    The discussion with Platinum Partners continued up until

20  the time Legacy gave notice to us that they were not going to

21  proceed with the transaction, which was shortly after the Snow,

22  Spence, and Green letter was received by Legacy.

23        **MR. SIMON:**  Pass the witness, Your Honor.

24        **MR. TAYLOR:**  Just a couple of follow-up questions,

25  Your Honor.

Return to TOC

1      **RECROSS EXAMINATION**

2   **BY MR. TAYLOR:**

3   Q    As I understand your testimony from yesterday,

4   Mr. Hoisager, you don't recall exactly when APC acquired

5   interest in Thunder Valley, do you?

6   A    I don't know the date of that.  And it would have been

7   several dates over several months.

8   Q    And you don't know exactly when the Debtor acquired all of

9   its interest on the Cox prospect, do you?

10  A    I believe it started in 2012 and went all the way until

11  middle of 2013.  But I don't know the exact dates.  And, again,

12  it would have been several transactions spread over several

13  months.

14  Q    Well, again, it's your testimony, isn't it, that the

15  Debtor owned no real property interests or, if they did, it was

16  minimal as of early 2014, correct?

17  A    That was my testimony in my 2004 deposition.

18  Q    Thank you.  Now, with respect to AEX, LLC, at the -- in

19  September of 2012 and March of 2013, when the interests were

20  transferred by the Debtor, AEX, LLC did not have a bank line of

21  credit in place, did it?

22  A    No, it did not.

23  Q    Did not have a loan agreement with the bank, did it?

24  A    Not with the bank, no, sir, it did not.

25  Q    It did not have an investment agreement with investors in

Return to TOC

1   place, did it?

2   A    With the caveat that I had a loan agreement established

3   with McCabe and I had the ability (indisc.) loan agreement to

4   cause those funds to be deposited in their account, which would

5   be a loan from me.  I don't know if that qualifies as an

6   investor.  But they had that access.

7   Q    Let's -- I'm talking about an investor investing equity to

8   AEX, LLC.  You didn't have that in place, did you?

9   A    I'm sorry, Mr. Taylor (indisc.) --

10  Q    Did you have any agreement with any -- did you have -- did

11  AEX have any agreement with any party to provide an equity

12  investment or equity capital to AEX in September, 2012 or

13  March, 2013?

14  A    No, it did not.

15  Q    And the loan agreement that you're talking about with

16  Mr. McCabe or McCabe Petroleum, that was this oral loan that

17  was undocumented, correct?

18  A    There was no promissory note.  There's documentation on

19  the amounts and dates but --

20  Q    It was not documented by a note or a loan agreement, was

21  it?

22  A    That's correct.

23        **MR. TAYLOR:**  Thank you.  Pass the witness, Your

24  Honor.

25        **MR. SIMON:**  No further questions.

Return to TOC

98

1          **THE COURT:**  Okay.

2          **MR. SIMON:**  And no further witnesses.  We have

3    presented all of our declarations.  So we -- the -- we would

4    rest subject to rebuttal testimony of -- that we probably would

5    present of Mr. Hoisager tomorrow morning based upon the new

6    exhibit that we received, that we I assume have just received

7    from Mr. Taylor.

8          **THE COURT:**  Okay.

9          **MR. TAYLOR:**  Your Honor, we do have rebuttal

10   testimony, short, from Mr. Rae, and longer but not lengthy from

11   Mr. Crisp.

12         **THE COURT:**  Okay.  Well we'll wait for -- wait until

13   1:00 o'clock for that.  Is 1:00 o'clock too soon to come back?

14         **MR. TAYLOR:**  That's fine with us, Your Honor.

15         **THE COURT:**  Mr. Simon.

16         **MR. SIMON:**  It's fine, Your Honor.

17         **THE COURT:**  Okay.  We'll be in recess until 1:00

18   o'clock.  Thank you.

19      **(Recess from 12:04 p.m. to 12:57 p.m.)**

20         **THE CLERK:**  This is Jennifer, Judge Davis' courtroom

21   deputy.  I just want to make sure that everyone can hear me.

22      **(Off record)**

23   //

24   //

25   //

Return to TOC

Rae - Direct / By Mr. Taylor                                    99

1          **(On the Record at 12:59 p.m.)**

2              **THE COURT:**  We're back on the record in the Arabella

3    Adversary 16-07002.

4              Go ahead, Mr. Taylor.

5              **MR. SPEAKER:**  Mark, you're on mute.

6              **THE COURT:**  Mr. Taylor, are you on mute?

7              **MR. TAYLOR:**  Yes.  It just told me I'm on mute.

8              Your Honor, Mark Taylor and Evan Atkinson here on

9    behalf of the Plaintiff.  We have a couple of rebuttal

10   witnesses.  The first will be Jason Rae.

11             **THE COURT:**  Mr. Rae?

12             **THE WITNESS:**  Yes, sir, Your Honor.

13             **THE COURT:**  Do you understand that you're still under

14   oath?

15             **THE WITNESS:**  Yes, sir.

16             **THE COURT:**  Okay.  Go ahead, Mr. Taylor.

17             **MR. TAYLOR:**  Thank you.

18             Ms. Lopez, could you share the screen with me,

19   please?  Thank you.

20       **JASON RAE, REBUTTAL WITNESS, RECALLED; PREVIOUSLY SWORN**

21                         **DIRECT EXAMINATION**

22   **BY MR. TAYLOR:**

23   Q    Mr. Rae, would you remind the Court of your credentials in

24   valuation?

25   A    Yes.  I --

Return to TOC                                                      APP1-185

1        **MR. SIMON:**  Objection, Your Honor.  Before we begin,

2  Mr. Rae filed an expert report.  He gave two opinions.  The

3  Debtor was insolvent as of December the 31st, 2013 and all

4  prior -- and all subsequent dates.  The other opinion he gave

5  was that it was impossible to value the backend after payouts

6  that the Debtor had transferred to Arabella Exploration in

7  2013.  Those are the only opinions he gave.

8        It is improper to bring him in as a rebuttal expert

9  to try to give opinions that are not in his declaration and

10  also not in his expert report.

11       **MR. TAYLOR:**  Your Honor, this is to rebut the direct

12  testimony of Mr. Hoisager that the Court allowed under Rule

13  7001 as to the chart, well values that he provided that he put

14  in evidence.

15       **MR. SIMON:**  Your Honor, this witness has not been

16  qualified to give expert testimony on valuation of oil and gas

17  leases.  We've never seen anything like that and he did not

18  give anything like that in his expert reports.

19       **MR. TAYLOR:**  Well, that's because we didn't get it

20  until three days before trial or five days before trial.

21       **MR. SIMON:**  Mr. Hoisager was not testifying as an

22  expert.  He was testifying as a lay witness as the owner.  This

23  is expert testimony.  It needed to be in an expert report.  It

24  cannot be brought in now as an on-the-fly expert report we wish

25  we had it before.

Return to TOC

Rae - Direct / By Mr. Taylor                                101

1          **MR. TAYLOR:**  That's simply not correct.

2          **THE COURT:**  In that five -- yeah, I'm going to allow

3    it.

4          **MR. TAYLOR:**  Okay, thank you, Your Honor.

5    **BY MR. TAYLOR:**

6    Q    Would you remind the Court of your credentials in

7    valuation?

8    A    Yes.  I'm accredited in Business Valuation through AICPA.

9    I also hold the Certified Distress Business Valuation

10   credential and I'm certified in Solvency and Restructuring

11   Advisor.

12   Q    Okay.  Mr. Rae, to be fair, do you consider yourself an

13   expert in well valuation?

14   A    No, I do not.

15   Q    Looking at Defendants' Exhibit 72, are you familiar with

16   any valuation methodology for valuing an asset that would rely

17   on book values from the books to reach that valuation?

18   A    No.  The general Peer Review Guidance suggests that book

19   value rarely, if ever, matches what a fair market value result

20   would be and if it does match, it's merely by coincidence.

21   Q    Thank you.

22         **MR. TAYLOR:**  Pass the witness.

23         **MR. SIMON:**  Sure.

24   //

25   //

Return to TOC

Rae - Cross / By Mr. Simon - Crisp - Direct / By Mr. Taylor 102

1                    **CROSS EXAMINATION**

2    **BY MR. SIMON:**

3    Q    Mr. Rae, you don't have any idea what these leases were

4    worth; do you?

5    A    I do not.

6    Q    All right.

7         **MR. SIMON:**  Pass the witness.

8         **MR. TAYLOR:**  That's all we had for this witness, Your

9    Honor.

10        **THE COURT:**  Okay.  Thank you, Mr. Rae.

11        **THE WITNESS:**  Thank you, Your Honor.

12        **MR. TAYLOR:**  And, Your Honor, we would now call Brian

13   Crisp.

14        And you probably want to go ahead and leave up my

15   screen-share function, Jennifer, if you don't mind.

16        **THE COURT:**  Mr. Crisp?

17        **MR. CRISP:**  Yes, sir.

18        **THE COURT:**  You understand that you're still under

19   oath?

20        **MR. CRISP:**  I do.

21     **BRIAN CRISP, REBUTTAL WITNESS, RECALLED, PREVIOUSLY SWORN**

22                    **DIRECT EXAMINATION**

23   **BY MR. TAYLOR:**

24   Q    Mr. Crisp, have you reviewed Mr. Hoisager's declaration?

25   A    I have.

Return to TOC

1   Q    And do you recall his testimony about the reasonableness

2   of the compensation you received from the Debtor?

3   A    I do.

4   Q    And do you have an opinion -- let's take a look.  I know

5   you expressed some opinions in your report but let's take a

6   look at a couple different exhibits and walk through those.

7        The first is -- it's in one of our exhibits as well

8   but I'll go ahead and just pull it up in the Debtor's exhibit

9   -- Defendants' exhibit.  And that's Exhibit Number 11.  Is this

10  a chart that you prepared?

11  A    It is and it was attached to my rebuttal report from

12  October of 2019.

13  Q    And without going through all the numbers, what was the

14  general purpose of this chart?

15  A    To demonstrate that any of Mr. Hoisager's compensation

16  that was related to the performance of the Debtor, i.e. profits

17  of the Debtor, was not reasonable.

18  Q    Okay.  Whether we call this a "performance bonus" or a

19  "profit split," would you walk the Court through your analysis

20  at the end about how those amounts that were categorized that

21  way compared to the net income of the Debtor for any given

22  year?

23       **MR. SIMON:**  Objection, Your Honor.  This testimony

24  goes beyond the scope of the direct.  It goes beyond the scope

25  of the expert reports, at least a portion of the expert reports

Return to TOC

1   that is admissible, the portion of the declaration that is

2   admissible.  And this witness was asked yesterday, "Do you have

3   an opinion as to what reasonable compensation would be?"  And

4   he said, "No."

5           MR. TAYLOR:  Your Honor, this is -- one, this is,

6   again, in response to direct testimony from Mr. Hoisager.  So

7   it's proper rebuttal testimony.  And, two, even without picking

8   a number, he can say whether or not the total compensation or

9   total amounts received were reasonable or unreasonable or

10  represented reasonably "one value."

11          THE COURT:  I'm going to allow it.

12  BY MR. TAYLOR:

13  Q    Go ahead, Mr. Crisp.

14  A    Okay.  Yeah, it'd be helpful if you could blow up that for

15  me.  So the first section of that exhibit is just taken

16  straight out of the Debtor's general ledger.  So, like,

17  basically it's by year from across various years and selected

18  income -- well, basically it's -- the first section is all the

19  income accounts that are reflected on the general ledger.

20          The second section are -- Mark, you have it blown up

21  but I think that has to do with the gain/loss numbers.  Is

22  that --

23  Q    The first section?

24  A    The second section.

25  Q    Okay, sorry.  Let me get out of it then.  And you can tell

Return to TOC

1  me what it is.

2  A     Operating expenses, that's what it was.  So basically this

3  is an income statement for the Debtor for the years '11, '12,

4  '13, '14 and '15.  So the -- all the -- so you'll see the GL

5  account numbers on the far left and you'll see the actual name

6  of the title of the account.  And those represent the amounts

7  that are in each of those accounts as of 12/31 of that

8  particular year.  So that's a full year's worth of income and

9  expenses.

10         So that comes down to that net income loss line.  The

11  first one is -- was 800 and something thousand dollars, five

12  hundred and something thousand going across the page.  In '12,

13  we had a loss of 4.5 million approximately; in '14, a loss of

14  1.7 million; and in '15, a loss of 817,000 approximately.  So

15  total losses for this period of time is 5.3 million

16  approximately.

17         So then what I did, dropping into the last three line

18  items, is I said, okay, how much of the income is attributable

19  to asset sales?  So not just what they might have earned as a

20  contract operator but what did they earn from buying and

21  selling leases?

22         So the first year, they had a very small profit of

23  133,000 but then you can see in the next three years, they've

24  lost almost a million dollars in '12, almost 1.2 million in

25  '13, again over a million dollars in '14 and then a negligible

1   95,000-dollar gain on selling assets in '15.

2           So then I -- the next line, I'm taking what

3   Mr. Hoisager had characterized as his compensation related to

4   performance bonuses, profit sharing, whatever you want to call

5   it.  And that -- those are the numbers that he was saying and

6   that come up $3.5 million over that five-year period.  And then

7   I'm calculating on the bottom line how much of his compensation

8   is a percentage of the income that the Debtor made and only the

9   first year could I compute that because all the rest of the

10  years there were losses.

11          **THE COURT:**  This is something, Mr. Crisp, that you

12  prepared?

13          **THE WITNESS:**  Yes, sir, this is my analysis.

14          **THE COURT:**  Where is this located?

15          **THE WITNESS:**  It's in my -- it's an exhibit to my

16  rebuttal report dated October 2019 and it's also a --

17          Mark, it may be a Plaintiff's exhibit as well.  I'm

18  not sure.

19          **MR. TAYLOR:**  It is.  Yes, Your Honor, this is -- it

20  was Defendants' Exhibit 11 and it is Plaintiff's Exhibit 64 --

21  no.  I'll find the correct Plaintiff's exhibit number, Your

22  Honor, but it's repeated.  There it is, Plaintiff's Exhibit 65.

23          **THE COURT:**  Okay.  And I'm -- I apologize to both

24  lawyers for the tediousness of my wanting to understand where

25  these things are in the record but -- so that you'll both know

1    as a preview of what I'm going to tell you when we wrap up.  I

2    don't kind of just paint with a broad brush.  I get pretty

3    granular and I need a lot of more granular information from

4    both of you going forward in order to wrap this up.

5              And so I will go back and I will look at these

6    documents when I make my decision.  And so I need to know where

7    they are so I can tie the documents to the testimony.

8              **MR. TAYLOR:**  Certainly, Your Honor.

9              **THE COURT:**  Go ahead, Mr. Taylor.

10             **MR. TAYLOR:**  Thank you.

11             **THE WITNESS:**  So can I --

12   **BY MR. TAYLOR:**

13   Q    Yeah, go ahead, Mr. Crisp.  I'm sorry.

14   A    -- can I finish?  So -- and here's why it's important.

15   The -- at the bottom you see how in 2014, it has compensation

16   to Mr. Hoisager of 2.25 million and that's only the 250,000-

17   dollar payment in late 2014 and the 2 million-dollar payment

18   that occurred in June of 2014.  That's -- those only two

19   numbers doesn't -- included in any of the other -- what he's

20   calling compensation.  This is just the profit splits.

21             I believe the $2 million he is tying to the sale of

22   the Cox asset in 2013.  So I'll direct the Court to the column

23   for 2013 and the Debtor lost $4.6 million in 2013 in total and

24   it lost 1.2 million approximately from selling assets.

25             So I don't think it's reasonable to think that

1   Mr. Hoisager earned $2 million from the sale of a property in

2   2013 when the Debtor did not realize any of those profits.  In

3   fact, they had a loss.

4   Q    Was that -- I'm sorry.  Was that '13 or '14 you're

5   referring to?

6   A    Well, '13 was the sale.

7   Q    Right.

8   A    But '14 is when it got paid out.

9   Q    Got it.  I'm sorry.  I misunderstood that, Mr. Crisp.

10          Now, let's take a look at Trustee's Exhibit 64.  And

11  is this a chart analysis that you did, Mr. Crisp?

12  A    It is.

13  Q    And does this -- what does this demonstrate?  What is it

14  designed to show before we talk about the numbers?

15  A    Let me give you one caveat to what I said.  It is an

16  analysis I prepared.  The top section of it came from --

17  Q    What I need to talk about can be --

18  A    Okay.

19  Q    So if you'll talk about what analysis you did.

20  A    Okay.

21        **MR. SIMON:**  Again, Your Honor, this is in response to

22  Baumgartner's (phonetic) report.  Baumgartner's report is not

23  in evidence.  Neither is his testimony.

24        **MR. TAYLOR:**  Your Honor, it doesn't matter whether

25  it's in evidence or not.  He's done an analysis of compensation

Return to TOC

Crisp - Direct / By Mr. Taylor                                    109

1   of executives for publicly traded large oil and gas companies

2   and he's going to make a comparison of that to what

3   Mr. Hoisager said that he received.  It doesn't matter who did

4   it initially.  This is his work and his analysis.

5           **THE COURT:**  So these are publicly held companies?

6           **THE WITNESS:**  Yes, sir.

7           **THE COURT:**  And so -- but what we're really trying to

8   rebut is whether or not the bonuses he paid himself by not AEX

9   but rather closely held APC, right?

10          **THE WITNESS:**  You're correct.

11          **MR. TAYLOR:**  Yes.

12          **THE COURT:**  So I don't think this is worth the

13  candle.

14          **MR. TAYLOR:**  Well, Your Honor, if I may, what it's

15  going to -- if you look at what it shows, you'll see that the

16  amounts he received are actually in excess of what executives

17  from large publicly traded companies were receiving.  So if we

18  look at the reasonableness, I think that this is important and

19  it is relevant.

20          **THE COURT:**  I think it's too tangential.

21          **MR. TAYLOR:**  Okay.  We'll move on then, Your Honor.

22  **BY MR. TAYLOR:**

23  Q   In a couple of paragraphs but certainly in Paragraph 115

24  of Mr. Hoisager's declaration on Page 66, he states that he had

25  a reasonable annual salary of $300,000.  That's on about the

Return to TOC

Crisp - Direct / By Mr. Taylor                              110

1  fourth line.  Did the Debtor's books and records, specifically

2  its general ledger, reflect that any amounts were paid to

3  Mr. Hoisager as salary or wages?

4  A    It did not.

5  Q    If you'll look at -- first at Defendants' Exhibit 4A --

6  D-4A and go to Page 202.  And do you see a column there for

7  Employees' Salary and Wages?

8  A    I do.  It would helpful if you could blow it up just a

9  little bit.

10  Q    Does that help?

11  A    It does tremendously.  Thank you.

12  Q    And in your review of this Section 7500, did you see any

13  amounts that were paid for salary and wages to Mr. Hoisager?

14  A    I did not.

15  Q    Let's look real quick at 2013.  That's the general ledger

16  which is Exhibit D-4B and turn to Page 570.  Do you see the

17  column there for salary and wages as well?

18  A    I do.

19  Q    And in reviewing this, did you find any amounts that were

20  attributable to Mr. Hoisager as salary and wages?

21  A    I did not.

22  Q    And very quickly, to Exhibit D-4F, which is the 2014

23  general ledger, and we'll go to Page 389.  I wrote the page

24  number down wrong.  Hold on.  Oh, that's the journal.  I'm

25  sorry.  It's D-4C -- now that I've corrected it, Exhibit D-4C.

Crisp - Direct / By Mr. Taylor                    111

1   So, again, on the category for Employee Wages, it just says,

2   "Payroll."  But is there any notation for anything going to

3   Mr. Hoisager?

4   A    No.

5   Q    And similarly, let's look at the Trustee's Exhibit 48 to

6   start.  I'll do 47 since I have it here.  Forty -- what is

7   Exhibit 47?

8   A    This is the 2013 tax return of the Debtor and just for

9   your Court -- for everyone's understanding, because

10  Mr. Hoisager owned 100 percent of the Debtor, it rolls up into

11  his personal tax return.  So what we're looking at is what we

12  call, "Schedule C" for -- which is where you list the profit

13  and loss from a business that you own a hundred percent of.  So

14  this is a copy -- this is his Schedule C for the Debtor for

15  2013.

16  Q    And -- I'm sorry.  Go ahead.

17           **THE COURT:**  This is what's commonly referred to -- or

18  at least I've heard it referred to as a "pass-through entity"?

19           **THE WITNESS:**  Yes, sir.

20  **BY MR. TAYLOR:**

21  Q    And so the Wages amount that's listed on Line 26 -- again,

22  were there any amounts listed as wages to Mr. Hoisager on the

23  general ledger?

24  A    No.

25  Q    So who would these be for?

Return to TOC

Crisp - Direct / By Mr. Taylor                    112

1   A    All those people that we -- when we looked at the general

2   ledger, it's that long list of names --

3   Q    Okay.

4   A    -- but not Mr. Hoisager.

5   Q    And then if we look at Exhibit 48, is this the same

6   Schedule C for 2014?

7   A    Yes.

8   Q    And what's the amount listed for wages for 2014 for

9   employees?

10  A    It's zero.  Basically, there's nothing listed.  So by

11  implication, it's nothing.

12          **THE COURT:**  Were the tax returns prepared on the

13  basis of the Debtor's books and records?

14          **THE WITNESS:**  That's my understanding.

15          **THE COURT:**  You don't -- but you don't know that?

16          **THE WITNESS:**  I do not.

17          **THE COURT:**  Okay.

18          **THE WITNESS:**  He had a third-party CPA prepare his

19  tax returns for him.

20  **BY MR. TAYLOR:**

21  Q    Mr. Crisp, do you recall the testimony from Mr. Hoisager

22  in his declaration about the nature of the June 2014 -- what

23  they call "integrated transaction" between AEX and Mr. Hoisager

24  and APC?

25  A    I do.

Return to TOC

1   Q    And what's your understanding of what that involved?

2   A    So the integrated transaction had several pieces.  One,

3   the AEX made a joint interest billing payment to the Debtor on

4   June the 25th in the amount of $2,035,915.46.  The -- from my

5   report and my declaration, I can tell you that that money

6   became available to AEX because the Warrick (phonetic) Prospect

7   was sold on June 24th and AEX received 2.24 million from that

8   sale directly into their bank account.

9         So 2.24 million comes in on June 24th to AEX.  The

10  next day, it pays the Debtor 2,035,915.46.  The very same day,

11  the Debtor writes a check to Mr. Hoisager for $2 million that

12  was recorded as an equity distribution and then we've heard

13  testimony before that goes to what he did with it but staying

14  on what the Debtor did, the next day the Debtor received

15  1,575,055.04, again, as a JIB payment.

16  Q    So what was the net effect on the Debtor from that

17  transaction?

18  A    So what the Debtor got for it was a reduction in its

19  accounts receivable due from AEX of $3,610,970.50.  It received

20  cash of $1,610,970.50.  So its net effect on the Debtor was a

21  loss of an asset of $2 million.  And where did that asset go?

22  It was -- because he distributed $2 million to himself in the

23  middle of this.

24  Q    Okay, thank you.

25        **MR. TAYLOR:**  Pass the witness, Your Honor.

Return to TOC

1       **MR. SIMON:**  Very briefly.

2                    **CROSS EXAMINATION**

3  **BY MR. SIMON:**

4  Q    Mr. Crisp, you don't offer any opinions as to what

5  reasonable compensation would be; do you?

6  A    My reports do not, no.

7  Q    Okay.  And it's also true that the Debtor had been

8  profitable in 2011 and in 2012, correct?

9  A    I think the income statements we just reviewed indicate

10  that they did earn some money in '11 and '12, yes.

11  Q    All right.  And companies, whether they make money or lose

12  money, still have to pay their executives in order to manage

13  them, correct?

14  A    I think most would pay their employees, yes.

15  Q    Okay.  And regardless of whether someone is a W-2 employee

16  or is not considered a W-2 employee, people who do work for

17  corporations are -- generally get paid; is that correct?

18  A    As I said, I think most people that work expect to get

19  paid for their work.

20  Q    All right.  And the Debtor could compensate an executive

21  for doing work?

22  A    I think I answered that, yes.

23  Q    Yeah, okay.  Did you consider -- in the analysis of the

24  integrated transaction, did you consider it in the broader

25  context of the effect it had also on AEX?

**EXCEPTIONAL REPORTING SERVICES, INC**

Return to TOC

1    A    I did.

2    Q    And did you consider it in the context of whether it

3    helped AEX get financing that ultimately benefited the Debtor?

4    A    I did not.

5    Q    Okay.  And you are aware that -- did you ever see the

6    board minutes -- the AEX board minutes of the May 1 AEX board

7    meeting?

8    A    I have not seen any board minutes for AEX, no.

9    Q    Okay.  I don't think we have that.  Yeah, I could probably

10   get that tomorrow.  Okay.  Are you aware that the board --

11   exhibit in evidence.  Are you aware that the board of AEX

12   approved a transaction going forward in which Mr. Hoisager

13   would buy $2 million in stock in AEX?

14   A    The only awareness I have of that transaction is what's

15   disclosed in the 10-K.

16   Q    Okay.  But you didn't look at any of the -- you didn't

17   look at the board minutes from AEX?

18   A    I think I answered that.  No.

19   Q    No.  Okay.  And you are aware that on September the 2nd,

20   2014, AEX entered into a secured note financing facility with

21   Platinum Partners?

22   A    I'm aware that they did a financing with Platinum, yes.

23   Q    Okay.  And you said yesterday that after that financing

24   was secured that AEX then paid approximately $11,244,000 in JIB

25   receivables owed to the Debtor though it actually paid the

Crisp - Cross / By Mr. Simon                    116

1   vendors and lienholders, correct?

2   A    I'm aware of the transaction.  I'd like to -- the 11

3   million I have an issue with.

4   Q    Okay.  Well, did you see Exhibit 4-C1?  Did we talk about

5   that yesterday?

6   A    We talked about it yesterday but the assertion that the

7   entire 11 million was paid on the JIB receivable is not true.

8   I checked that.  The number was more like nine and a half

9   million.

10  Q    And -- now, of course, your own records show that the

11  Debtor's receivables go down by $11 million in September of

12  2020 or in the quarter ending September of 2014, correct?

13          MR. TAYLOR:  Your Honor, we've gone well beyond the

14  scope of my examination of Mr. Crisp at this point.  It was a

15  very limited rebuttal testimony.

16          MR. SIMON:  I've got one more question.

17          THE COURT:  One more question, go ahead.

18  BY MR. SIMON:

19  Q    Did -- you didn't consider the fact that this transaction,

20  the 2 million-dollar transaction, had been enabling Arabella

21  Exploration to get financing to pay its much, much larger debt

22  to the Debtor?

23  A    My analysis was based on the impact on the Debtor.  I also

24  did a small analysis of just that June transaction and its

25  impact on AEX which, by the way, is a net wash.  They paid

Return to TOC

Crisp - Cross / By Mr. Simon                    117

1    money and got relief of antecedent debt.  So that was a wash

2    from June.

3    Q    Did --

4    A    But I didn't look at anything past that.  What happened to

5    the Debtor is what I was focused on.

6    Q    You mean the Debtor in June of 2014?

7    A    Yes.  It lost a 4 million-dollar asset and gained a 2

8    million-dollar asset.

9    Q    Okay.

10            **MR. SIMON:**  Pass the witness, Your Honor.

11            **MR. TAYLOR:**  No further questions for Mr. Crisp, Your

12   Honor.

13            **THE COURT:**  Okay.

14            **MR. TAYLOR:**  And that concludes our rebuttal

15   testimony.

16            **THE COURT:**  Okay.

17            **MR. SIMON:**  I think that's it, Your Honor, but for

18   the rebuttal that we will present tomorrow based upon the

19   exhibit we got today.

20            **MR. TAYLOR:**  And just so I understand, Your Honor,

21   the rebuttal or the testimony that will be coming in tomorrow

22   relates solely to the issues presented about that exhibit we

23   provided today?

24            **THE COURT:**  Right.

25            **MR. TAYLOR:**  Okay.

Return to TOC

118

1    **THE COURT:**  And let me propose something to you that

2    I think will make this whole process a lot more efficient and

3    effective for me.  I propose that instead of coming back

4    tomorrow, we get together again at 2:00 o'clock Thursday

5    afternoon.

6    **MR. SIMON:**  Impossible, Your Honor.  Well --

7    **THE COURT:**  Go ahead.

8    **MR. SIMON:**  Yeah, here's why.  My daughter graduates

9    from college in Austin 9:00 o'clock the next morning.  That

10   afternoon I really do need to go down to Austin and take my

11   parents.

12   **THE COURT:**  Actually we can do this at 9:00 o'clock

13   Thursday morning.

14   **MR. SIMON:**  Okay.

15   **THE COURT:**  You're not going to be an hour in

16   rebutting that.  Yeah -- so 9:00 o'clock Thursday morning.

17   I've been going through this stuff.  I mean, I've been working

18   through it really since the motion for summary judgment was

19   filed and then more intensely now that I have all this

20   information at my fingertips.  I want to spend tomorrow going

21   through it again, really going through what I heard today.

22   And I've noted a number of things where I have

23   questions about where you all are going with your cases.  So

24   there may be a little bit of -- not closing arguments but just

25   questions that I need to get clarified.  And then what I want

**EXCEPTIONAL REPORTING SERVICES, INC**

119

1   to do is give you a roadmap for what I want, as clear a roadmap

2   as I can.

3          One thing that the two of you might explore between

4   now and then is how long it's going to take to get the

5   transcript because we're going to have briefing but it's got to

6   be key to the transcript and I don't know how firm that can be

7   and we can always change the briefing schedule, depending on

8   when that transcript actually comes out but I'd like to kind of

9   get something penciled in at least.

10          **MR. TAYLOR:**  Yeah, that's fine, Your Honor.  I think

11   we can -- I mean, we an order it on an expedited basis and get

12   it fairly quickly, I think.

13          **THE COURT:**  Okay.  Well, you'll be read the first

14   brief.  So --

15          **MR. TAYLOR:**  Yes.  We'll get it done quickly.

16          **THE COURT:**  That's going to be on you.

17          **MR. TAYLOR:**  I'll get my paralegal to reach out to

18   the court reporting service and find out how long it would take

19   to get it on an expedited basis.

20          **THE COURT:**  Okay.

21          **MR. SIMON:**  One -- again, one limitation I have, Your

22   Honor.  There's one event that happens after my -- well, there

23   are two events that happen after my daughter graduates from

24   college.  One is my son graduates from high school but that's

25   just a one-night event.  That's easy.  The more difficult one

Return to TOC

120

```
 1   is from the 2nd to the 13th -- 2nd to the 15th of June, I will

 2   be in Italy on a trip that was planned and paid for long, long

 3   ago.

 4           THE COURT:  Sounds great, I hope you enjoy yourself.

 5           MR. SIMON:  Thank you.  And it is a graduation gift

 6   both for my son and for my daughter.

 7           THE COURT:  And you'll be there until the 15th of

 8   June?

 9           MR. SIMON:  Yes, sir.

10           THE COURT:  Well, Mr. Taylor, your brief won't be due

11   at least until the 15th of June.

12           MR. TAYLOR:  Okay.  That'll be just fine, Your Honor.

13           THE COURT:  And then we'll work from there.

14           MR. TAYLOR:  That's actually good because I have a

15   post-trial brief due in another matter on June 3rd.  So that'll

16   give me some time.  Once I get past that one, I'll do the one

17   here.

18           THE COURT:  Well, I'm glad you're fully employed.

19           MR. TAYLOR:  We're trying.

20           THE COURT:  Okay.  Anything else for today?

21           MR. TAYLOR:  No, thank you, Your Honor.

22           THE COURT:  All right.  We'll see you Thursday

23   morning.  Thank you.

24           MR. TAYLOR:  Thank you.

25           MR. SIMON:  Thank you, Your Honor.
```

Return to TOC

            **THE COURT:** We're adjourned.

        (Proceeding adjourned at 1:33 p.m.)


                    <u>CERTIFICATION</u>




        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.




_____                    <u>May 23, 2022</u>

        Signed                                   Dated


                *TONI HUDSON, TRANSCRIBER*

Return to TOC

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas
## Midland Division

|  | Bankruptcy Case No.: | 15−70098−tmd |
|---|---|---|
|  | Chapter No.: 11 |  |

IN RE: **Arabella Petroleum Company, LLC** ,
Debtor(s)

|  | Adversary Proceeding No.: | 16−07002−tmd |
|---|---|---|
|  | Judge: Tony M. Davis |  |

**Morris D. Weiss**
Plaintiff

v.

**Arabella Exploration Inc. et al.**
Defendant

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript of the proceeding held on **05/17/22** was filed on **05/24/22**. The following deadlines apply:

The parties have until **May 31, 2022** to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is **June 14, 2022**.

If a request for redaction is filed, the redacted transcript is due **June 24, 2022**.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is **August 22, 2022** unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber **Toni Hudson With Exceptional Reporting Services, Inc. 361 949−2988**, or you may view the document at the clerk's office public terminal.

Dated: 5/25/22

Barry D. Knight
Clerk, U. S. Bankruptcy Court
BY: Estella Benitez Jurado

**[Notice of Filing of Transcript (AP)]** [NtcfddlrrAPap]

Return to TOC

S-1/A 1 d302576ds1a.htm S-1/A

**Table of Contents**

As filed with the U.S. Securities and Exchange Commission on November 9, 2022.

Registration No. 333-266143

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 4
## FORM S-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Next Bridge Hydrocarbons, Inc.
### (Exact name of registrant as specified in its Charter)

| | | |
|---|---|---|
| **Nevada** | **1311** | **87-2538731** |
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**6300 Ridglea Place, Suite 950**
**Fort Worth, TX 76116**
**(817) 438-1937**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive office)**

**Corporate Secretary**
**Lucas T. Hawkins**
**6300 Ridglea Place, Suite 950**
**Fort Worth, TX 76116**
**(817) 438-1937**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*With copies to:*

| | |
|---|---|
| **Mark Fitzgerald** | **Jack E. Jacobsen** |
| **Wilson Sonsini Goodrich & Rosati** | **Jason A. Schumacher** |
| **28 State Street, 37 Floor** | **O'Melveny & Myers LLP** |
| **Boston, MA 02109** | **2501 N. Harwood Street, 17 Floor** |
| **617-598-7800** | **Dallas, TX 75201** |
| | **214-647-9270** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |

Emerging Growth company    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act.    ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to Section 8(a), may determine.**

Table of Contents

The information in this prospectus is not complete and may be changed. We may not issue these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

SUBJECT TO COMPLETION DATED NOVEMBER 9, 2022

Prospectus

# Next Bridge Hydrocarbons, Inc.

## 165,523,363 shares of Common Stock
### (par value $0.0001)

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of all the shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next Bridge Hydrocarbons, Inc. (the "Company," "Next Bridge," "we," "us" or "our") held by Meta immediately prior to the Spin-Off. As of immediately prior to the time of the Distribution, Meta holds 165,523,363 shares of Common Stock, which is 100% of the outstanding shares of capital stock of the Company.

At the time of the Spin-Off, Meta will distribute all the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of          , New York City time, on          , 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of Common Stock. The Distribution will be made in book-entry form by a distribution agent. Fractional shares of Common Stock will not be distributed in the Spin-Off.

The Spin-Off will be effective as of          , New York City time, on          , 2022. Immediately after the Spin-Off, the Company will be an independent public reporting company, provided, the Common Stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

None of the Series A Preferred Stockholders are required to vote on or take any other action in connection with the Spin-Off. We are not asking you for a proxy, and we request that you do not send us a proxy. The Series A Preferred stockholders will not be required to pay any consideration for the Common Stock they receive in the Spin-Off; immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.

Meta currently owns all the outstanding shares of Common Stock of the Company, and we have not sought to have the shares of Common Stock traded on any exchange. Accordingly, there is currently no public market for the Common Stock, and there is no current expectation for a public market to develop for the Common Stock.

**In reviewing this Prospectus, you should carefully consider the matters described in the section titled "Risk Factors" beginning on page 7 of this Prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS**

TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

This Prospectus is not an offer to sell, or a solicitation of an offer to buy, any securities.

The date of this Prospectus is            , 2022

**Table of Contents**

Table of Contents

| | |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | i |
| DEFINITIONS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 7 |
| THE SPIN-OFF | 26 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 29 |
| USE OF PROCEEDS | 36 |
| DETERMINATION OF OFFERING PRICE | 36 |
| CAPITALIZATION | 36 |
| BUSINESS | 37 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 47 |
| MANAGEMENT | 58 |
| EXECUTIVE COMPENSATION | 65 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 69 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 70 |
| DESCRIPTION OF OUR CAPITAL STOCK | 74 |
| LEGAL MATTERS | 78 |
| EXPERTS | 78 |
| WHERE YOU CAN FIND MORE INFORMATION | 79 |
| INDEX TO FINANCIAL STATEMENTS | 80 |

Table of Contents

**CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS**

This Prospectus contains certain forward-looking statements and information relating to our business that are based on the beliefs of our management as well as assumptions made by and information currently available to our management. When used in this communication, the words "may," "anticipate," "believe," "estimate," "expect," "intend," "plan," "forecasts," "projections," and similar expressions are intended to identify such forward-looking statements. Forward-looking statements include, without limitation, the statements regarding our strategy, future plans for development and production and other strategic options, future expenses and costs and future liquidity and capital resources. Forward looking statements involve a number of risks, assumptions and uncertainties which may cause actual results to differ materially from those contained in this Prospectus. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Such statements reflect our current views with respect to future events, the outcome of which is subject to certain risks, including, among others:

- general competitive conditions, including actions our competitors may take to grow their businesses;

- changes to payment terms, the discount or margin on products or other terms with our suppliers;

- risks associated with data privacy, information security and intellectual property;

- work stoppages or increases in labor costs;

- our ability to attract and retain employees;

- development costs of our current or future properties;

- timing and success of our drilling activities;

- amount and timing of future production of oil and natural gas;

- our ability to successfully implement our strategic initiatives, including amount, nature and timing of capital expenditures;

- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;

- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;

- operating costs including lease operating expenses, administrative costs and other expenses;

- the volatility of prices and supply of, and demand for, oil and natural gas;

- changes in regulatory requirements and legislation governing our business, including sustainability;

- the amount of our indebtedness and ability to comply with covenants applicable to any future debt financing;

- our ability to access the credit and capital markets to satisfy future capital and liquidity requirements on acceptable terms;

- if we are not able to successfully execute on our future operating plans, we may not be able to continue as a going concern;

- adverse results from litigation, governmental investigations or tax-related proceedings or audits;

- changes in accounting standards;

- impact and cost of energy conservation and other sustainability efforts;

- exploration and development risks, which could lead to environmental damage, injury and loss of life or the destruction of property;

i

Table of Contents

- proximity and capacity of oil, natural gas and other pipelines, transportation and support infrastructure to production facilities;

- availability of consumables and raw materials and drilling and processing equipment;

- adverse weather conditions, natural disasters or other events;

- the ability to successfully estimate the impact of litigation matters;

- our ability to initiate and maintain discussions with third parties regarding strategic options;

- the potential adverse impact on our business resulting from the Spin-Off; and

- the other risks and uncertainties detailed in the section titled "Risk Factors."

Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results or outcomes may vary materially from those described as anticipated, believed, estimated, expected, intended or planned. Subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements in this paragraph. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this Prospectus except to the extent required by law.

ii

Table of Contents

**DEFINITIONS**

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this prospectus. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. All references to "us", "our", "we", or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

iii

**Table of Contents**

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

"**SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

iv

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights certain information contained elsewhere in this Prospectus and may not contain all of the information that is important to you. To understand fully and for a more complete description of the terms and conditions of the Distribution, you should read this Prospectus in its entirety, including the information presented under the section titled "Risk Factors" and the consolidated financial statements and related notes, and the documents to which you are referred. See "Where You Can Find More Information." Except where the context otherwise requires, or where otherwise indicated, references to the "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Oil Corporation, a Texas corporation, Hudspeth Operating, LLC, a Texas limited liability company, and Torchlight Energy, Inc., a Nevada corporation. "Meta" refers to Meta Materials, Inc. and its consolidated subsidiaries.*

**The Company**

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. as a wholly owned subsidiary of Meta, and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022.

*Background*

On December 14, 2020, Meta (formerly known as Torchlight Energy Resources, Inc., "Torchlight") and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Ontario corporations, entered into an Arrangement Agreement (the "Arrangement Agreement") with Metamaterial Inc., an Ontario corporation headquartered in Nova Scotia, Canada, to acquire all of the outstanding common shares of Metamaterial, Inc. by way of a statutory plan of arrangement (the "Arrangement") under the Business Corporations Act (Ontario), on and subject to the terms and conditions of the Arrangement Agreement, as amended. On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed.

In furtherance of the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) declared a dividend, on a one-for-one basis, of shares of Series A Non-Voting Preferred Stock of Meta (the "Series A Preferred Stock") to holders of record of Torchlight's common stock as of June 24, 2021. The holders of the Series A Preferred Stock are entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business. Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets, to us prior to the Spin-Off.

*Business Overview*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in Oklahoma.

We plan to operate our business through our wholly owned subsidiaries transferred to us from Meta, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation, Torchlight Hazel, LLC, a

1

Table of Contents

Texas limited liability company, and Hudspeth Operating, LLC, a Texas limited liability company. In addition, we may consider strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties; however, we are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options. We currently have six full-time employees, and we employ consultants for various roles as needed.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and the Hunton wells in partnership with Kodiak in Central Oklahoma. (the "Oklahoma Properties"). See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

### *Emerging Growth Company Status*

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As an emerging growth company, we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public reporting companies that are not emerging growth companies. These provisions include:

- Exemption from the auditor attestation requirement in the assessment of our internal control over financial reporting; and

- Reduced disclosure of certain financial information requirements related to executive compensation, including the requirements to hold a non-binding advisory vote on executive compensation and to provide information relating to the ratio of total compensation of its Chief Executive Officer to the median of the annual total compensation of all of our employees.

We may take advantage of these exemptions for up to five years or such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.235 billion in annual revenues as of the end of a fiscal year, if we are deemed to be a large-accelerated filer under the rules of the SEC, or if we issue more than $1.235 billion of non-convertible debt over a three-year-period.

The JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public reporting companies. Following the consummation of the Spin-Off, we will elect to avail ourselves of the extended transition period. During the extended transition period, it may be difficult to compare our financial results with the financial results of a public reporting company that complies with accounting pronouncements when effective.

### *Smaller Reporting Company*

We are a "smaller reporting company" as defined by Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a "smaller reporting company," the disclosure we will be required to provide in our SEC filings are less than it would be if we were not considered a "smaller reporting company." Specifically, "smaller reporting companies" are able to provide simplified executive compensation disclosures in their filings; if annual revenue is less than $100 million, may be exempt from the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002 requiring that independent registered public accounting firms provide an attestation report on the effectiveness of internal control over financial reporting; and have certain other decreased disclosure obligations in their SEC filings, including, among other things, being permitted to provide two years of audited financial statements in annual reports rather than three years. Decreased disclosures in our SEC filings due to our status as a "smaller reporting company" may make it harder for investors to analyze our results of operations and financial prospects.

Table of Contents

### Market Opportunity

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

### Regulatory Framework

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of $CO_2$, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the federal Resource Conservation and Recovery Act, Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the federal Occupational Safety and Health Act and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Related to Our Business", including the following risk factors "—*Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "—*Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "—*Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*".

### Corporate Information

Our executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116, and our telephone number is (817) 438-1937. We intend to have an internet website, nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be deemed a part of this prospectus and shall not be incorporated by reference herein.

Return to TOC

APP1-221

Table of Contents

| | |
|---|---|
| | **Summary of the Spin-Off** |
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,523,363 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding immediately prior to the Distribution. |
| | Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled immediately after the Spin-Off. |
| Record Date | The Record Date is the close of business on _____, 2022. |
| Distribution Date | The Distribution Date is _____, 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates, other than upon request. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Distribution Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions: |
| | • the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to the holders of Meta's Series A Preferred Stock; |

4

**Table of Contents**

- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party thereto;

- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;

- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Spin-Off shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Spin-Off;

- all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and

- any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.

The fulfillment of the foregoing conditions will not create any obligation on the part of Meta to effect the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, state "blue sky" laws, or any material approvals that we must obtain, other than the SEC's declaration of the effectiveness of the Registration Statement and applicable filings or notices required in compliance with applicable state securities or "blue sky" laws, in connection with the Spin-Off. Meta has the right not to complete the Spin-Off if, at any time, the Meta board or directors determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable.

| | |
|---|---|
| Trading Market | All of our outstanding shares of Common Stock are currently beneficially owned by Meta and our Common Stock is currently not listed for trading on any stock exchange or market and we have not sought to be traded on any exchange or market. The shares of Common Stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the Common Stock and there is no current expectation for a public market to develop. |
| U.S. Federal Income Tax Consequences to Series A Preferred Stockholders | U.S. federal income tax treatment of the issuance of our Common Stock to holders of the Series A Preferred Stock will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes, and U.S. and non-U.S. holders could be subject to tax as a result of the Spin-Off and the cancellation all shares of the Series A Preferred Stock. Accordingly, holders of Series A Preferred Stock are |

Return to TOC

**Table of Contents**

|  |  |
|---|---|
|  | encouraged to consult their own tax advisors as to the specific U.S. federal, state and local, and non-U.S. tax consequences of the Distribution to such stockholders. |
| Transfer Agent | American Stock Transfer & Trust Company LLC. |
| Risk Factors | Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the Spin-Off. Following the Spin-Off, we will also face risks associated with being an independent company. Accordingly, you should read carefully the information set forth under the heading "Risk Factors." |

6

Return to TOC

[Table of Contents](#)

<div align="center">

**RISK FACTORS**

</div>

*You should carefully consider all of the information in this Prospectus and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off and the ownership of our Common Stock. The risks and uncertainties described below are not the only ones faced by us. Additional risks and uncertainties not presently known or that are currently deemed immaterial also may impair our business operations. If any of the following risks occur, our business, financial condition, operating results and cash flows and the value of our Common Stock could be materially adversely affected.*

**Risks Relating to Our Business**

*We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.*

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this Prospectus, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;

- the success of our development and exploration;

- the demand for oil and natural gas;

- the level of our competition;

- our ability to attract and maintain key management and employees; and

- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

*We have limited capital and will need to raise additional capital in the immediate future.*

Following the Spin-Off, we will require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of

<div align="center">

7

</div>

Table of Contents

our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

### *We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.*

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the three and nine months ended September 30, 2022, we incurred a net loss of $2,164,187 and $4,764,293, respectively, and used cash of $6,067,015 for operating activities for the nine months ended September 30, 2022. At September 30, 2022, we had an accumulated deficit of $72,951,809 and had a working capital deficit of $19,385,284 compared with a working capital deficit of $13,307,453 as of December 31, 2021. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a "going concern" audit qualification. A "going concern" qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

### *There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our Common Stock.*

After the Spin-Off, we may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our Common Stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern. We are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options.

8

Table of Contents

### We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

### Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

### Litigation may adversely affect our business, financial condition, and results of operations.

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Legal Proceedings."

### Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.

Following the Spin-Off, our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual

9

Table of Contents

arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of September 30, 2022, we had leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas expiring in 2022 if we fail to drill five wells as obligated. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of September 30, 2022, we have leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Following the Spin-Off, our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices have historically been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;

- the domestic and foreign supply of oil and natural gas;

- the ability of the members of the Organization of Petroleum Exporting Countries ("OPEC") to agree to and maintain oil price and production controls;

- the price of foreign oil and natural gas;

- domestic governmental regulations and taxes;

- the price and availability of alternative fuel sources;

- weather conditions;

- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and

- worldwide economic conditions.

10

Table of Contents

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year. These trends materially, adversely affected our results of operations, cash flows and financial condition during the last two years.

If oil or natural gas prices reverse again and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

The Company recognized an impairment charge of $2,108,301 in 2020 due to an adjustment required by this ceiling test.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. This technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. Nonetheless, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. We currently have no insurance to cover such losses and liabilities, and even if insurance is obtained, it may not be adequate to cover any losses or liabilities. We cannot predict the

11

Table of Contents

availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

**The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.**

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

**Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.**

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

**We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.**

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

**Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of Common Stock.**

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the recent

12

Table of Contents

development costs related to our Hazel Project were paid by Masterson Hazel Partners LP ("MHP"). We granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing (the "Option Agreement"). The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, and the present value of such reserves was adjusted based on our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;

- pressure or irregularities in geological formations;

- restricted access to land for drilling or to existing pipeline infrastructure;

- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines;

- equipment failures or accidents;

- failure of secondary recovery operations to perform as expected;

- unexpected operational events and drilling conditions;

- declines in oil or natural gas prices;

- limitations in the market for oil or natural gas;

- pipe or cement failures;

- casing collapses;

- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;

- lost or damaged drilling and service tools;

- loss of drilling fluid circulation;

13

Table of Contents

- uncontrollable flows of oil and natural gas, water or drilling fluids;

- blowouts, explosions fires and natural disasters;

- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;

- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and

- title problems or legal disputes regarding leasehold rights.

### *Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.*

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the Environmental Protection Agency and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the Clean Air Act and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the Resource Conservation and Recovery Act which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations in reliance on our contractual relationship with Maverick Operating LLC, who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

### *Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.*

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating

14

Table of Contents

standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

### *Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.*

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

15

Table of Contents

In addition, in November 2016, the U.S. Department of the Interior Bureau of Land Management ("BLM") issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

### *We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.*

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our Common Stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

### *Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.*

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated

16

Table of Contents

reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

### *Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.*

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

### *We may have difficulty distributing production, which could harm our financial condition.*

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

### *The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.*

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

17

Table of Contents

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

### *Our business will suffer if we cannot obtain or maintain necessary licenses.*

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

### *Challenges to our properties may impact our financial condition.*

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

### *We rely on technology to conduct our business, and our technology could become ineffective or obsolete.*

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

### *The loss of key personnel would directly affect our efficiency and profitability.*

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We have entered into employment agreements with certain of our executive officers effective immediately following the Spin-Off. Three of our executives were party to prior employment agreements with one of our subsidiaries, which have been terminated and superseded by the agreements as described in more detail under the heading "Executive Compensation" elsewhere in this Prospectus.

18

Table of Contents

*We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.*

After the Spin-Off we plan to have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and

- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

*Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.*

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor. For additional discussion of our management's business affiliations and the potential conflicts of interest of which our stockholders should be aware, see "Certain Relationships and Related Party Transactions."

*Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.*

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

19

Table of Contents

*Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.*

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

**Risks Relating to the Spin-Off**

*The Spin-Off could result in significant tax liability to Meta and its stockholders.*

The Spin-Off and cancellation of all shares of Meta's Series A Preferred Stock together will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes. Series A Preferred stockholders could be subject to tax as a result of the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock together for U.S. federal income tax purposes for a U.S. holder (as defined further below) will depend on whether the Spin-Off and such cancellation qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Spin-Off and cancellation of all shares of the Series A Preferred Stock together qualify as a sale or exchange of the Series A Preferred Stock, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the Spin-Off and such cancellation together, and such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock for U.S. federal income tax purposes for a non-U.S. holder (as defined further below) likewise will depend on whether the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock, gain recognized from the Spin-Off by a non-U.S. holder generally will not be subject to U.S. federal income taxation. If the Spin-Off and such cancellation together do not qualify as a sale or exchange of Series A Preferred Stock, a non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be subject to any applicable withholding. If a Series A Preferred stockholder is subject to withholding tax in connection with the Spin-Off (including nonresident withholding tax or backup withholding tax, each as described further under the heading "Material U.S. Federal Income Tax Considerations" below), Meta has the right to reduce the amount of Common Stock deliverable to such stockholder in the Spin-Off in order to pay such withholding tax.

Meta will generally recognize gain equal to the fair market value of our Common Stock in excess of Meta's adjusted tax basis in such Common Stock at the time of the Spin-Off. To the extent such gain gives rise to unreimbursed federal, state or other tax liabilities, such liabilities could adversely affect Meta's liquidity or capital reserves.

Table of Contents

See below under the headings "Notes to Unaudited Pro-Forma Condensed Combined Financial Statements" and "Material U.S. Federal Income Tax Considerations" for more information.

### We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.

We believe that, as an independent company, we will be able to, among other things, better focus our financial and operational resources on our specific business, implement and maintain a capital structure designed to meet our specific needs, design and implement corporate strategies and policies that are targeted to our business, more effectively respond to industry dynamics and create effective incentives for our management and employees that are more closely tied to our business performance. However, by separating from Meta, we may be more susceptible to market fluctuations and have less leverage with suppliers, and we may experience other adverse events. In addition, we may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all. The completion of the Spin-Off will also require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business.

### We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and we may experience increased costs after the Spin-Off.

Meta has provided us with various corporate services. Following the Spin-Off, Meta will have no obligation to provide us with assistance other than as described under "Certain Relationships and Related Party Transactions—Agreements with Meta." These arrangements do not account for every service that we have received from Meta in the past. Accordingly, following the Spin-Off, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Meta. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Meta. We may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently or may incur additional costs. If we fail to obtain the services necessary to operate effectively or if we incur greater costs in obtaining these services, our business, financial condition and results of operations may be adversely affected.

### We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.

We derived the historical financial information included in this Prospectus from Meta's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.

- We will enter into certain transactions with Meta that did not exist prior to the Spin-Off, such as the Tax Matters Agreement, which may cause us to incur new costs.

- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we will lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

21

Table of Contents

Following the Spin-Off, we will also be responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

### *Our contracts may contain provisions requiring the consent of third parties in connection with the Spin-Off. If these consents are not obtained, we may be unable to enjoy the benefit of these contracts in the future.*

Our contracts may contain provisions that require the consent of third parties to the Spin-Off. Failure to obtain such consents on commercially reasonable and satisfactory terms may impair our entitlement to the benefit of these contracts in the future.

### *The 2021 Note with Meta contains restrictive covenants that limit our operations.*

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). If we are not in compliance with the covenants of the 2021 Note, or if we are in default under the 2021 Note, it is unlikely that Meta will offer to extend any additional loans or debt financing under the 2021 Note or otherwise, which may affect our business as a going concern. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Prospect as defined in the Security Agreement (defined below), each held by the Pledgor (defined below) or the Pledgor's affiliate. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

### *Our Loan Agreement with Meta contains restrictive covenants that limit our operations.*

As of August 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;

22

Table of Contents

- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;

- our ability to incur additional debt beyond certain limits or encumber our assets; and

- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements with Meta.***

We have negotiated agreements with Meta including the 2021 Note, Loan Agreement, Distribution Agreement and Tax Matters Agreement, while we are still part of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements being negotiated relate to, among other things, loans for working capital, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See "Certain Relationships and Related Party Transactions" for more information.

**Risks Relating to our Common Stock**

***Our Common Stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to hold or trade the stock.***

A significant number of the holders of the Series A Preferred Stock hold such shares in "street name" brokerage accounts. Our shares of Common Stock will not become eligible with DTC to permit our shares of Common Stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our Common Stock, restricting all trades by holders of our Common Stock following the Spin-Off, and the brokerage firms may return all such shares from the brokerage accounts to the beneficial holders.

***The price per share of Meta's Series A Preferred Stock traded on the over-the-counter ("OTC") market under the symbol MMTLP may not accurately reflect the value of a share of our Common Stock that you will receive in the Distribution.***

Before the Distribution, Meta's Series A Preferred Stock was traded on the OTC market under the trading symbol "MMTLP", although such shares of MMTLP were not eligible for broker-dealer quotations. The OTC

23

Table of Contents

market does not constitute an established stock exchange, and as a result, the historical trading prices for the shares of MMTLP may not be a reliable benchmark on which to determine the value of the shares of our Common Stock you will receive in the Distribution.

Additionally, securities of certain companies have recently experienced significant and extreme volatility in stock price due to short sellers of shares of securities, known as a "short squeeze." These short squeezes have caused extreme volatility in both the stock prices of those companies and in the market and have led those companies' securities to trade at a significantly inflated price per share that is disconnected from the underlying value of the company. In particular, if any investors have sold shares of MMTLP short, then in connection with the Distribution such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution. If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share as shown on the OTC market may rise significantly but not be representative of the value of the underlying shares of our Common Stock that you will receive in the Distribution.

### No trading market for our Common Stock is expected to develop.

There is presently no public market for our shares of Common Stock and our shares are not expected to become DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, you may have to hold the shares of Common Stock indefinitely.

### We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

We do not intend to pay cash dividends on our Common Stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our board of directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

### Your percentage ownership in the Company may be diluted in the future, including in our plan to issue our Common Stock for the working interests in our Orogrande Project.

Your percentage ownership in the Company may be diluted in the future because of equity awards that we expect to grant to our directors, officers and other employees and current holders of working interests in our Orogrande Project. Prior to the Spin-Off, we approved an incentive plan that will provide for the grant of Common Stock-based equity awards to our directors, officers and other employees. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

### We may issue preferred stock with terms that could adversely affect the voting power or value of our Common Stock.

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our Common Stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our Common Stock.

24

Table of Contents

**Risks Relating to Our Status as a Public Reporting Company**

*We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our Common Stock.*

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our Common Stock less attractive if we choose to rely on these exemptions.

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million as of the end of the prior June 30th, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates is less than $700 million as of the prior June 30th. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.

*We may be required to file reports with the SEC only for the fiscal year in which the registration statement for the Spin-Off becomes effective and may no longer be subject to the reporting obligations under the Exchange Act thereafter.*

By registering the shares of Common Stock in connection with the Spin-Off, we become subject to the reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. We would be obligated to continue these reporting obligations for subsequent reporting periods if on the last day of our fiscal year in which the Registration Statement of which this prospectus forms a part becomes effective we have more than $10 million in assets and either 2,000 or more record holders or 500 or more record holders who are not "accredited investors." It is unclear whether the number of our record holders following the Spin-Off will meet one or both of these thresholds, in which case, we may become exempt from such reporting requirements after the year ending December 31, 2022. If we were to decide not to continue reporting, you will not have access to updated information regarding our business, financial condition and results of operation. Although we may and intend to continue to file such reports with the SEC, such filings will be voluntary.

25

Table of Contents

# THE SPIN-OFF

## Background

In June 2020 the board of directors of Torchlight began to pursue strategic alternatives for Torchlight due to the permeating financial climate of the oil and gas industry in 2020. In July 2020 Torchlight engaged Roth Capital Partners, LLC as its financial advisor in connection with a strategic transaction. After discussions with various companies, Torchlight began discussions with Metamaterial, Inc. in September 2020 concerning a potential strategic transaction.

After several months of negotiations, in December 2020 Torchlight and Metamaterial, Inc. entered into the Arrangement Agreement. Within the Arrangement Agreement, the oil and gas properties of Torchlight (the "O&G Assets") were effectively allocated to the legacy Torchlight stockholders, which became the Series A Preferred stockholders of Torchlight (which was subsequently renamed "Meta Materials, Inc."). Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock. Pursuant to the Certificate of Designation, upon a sale of the O&G Assets, the proceeds from any such transaction are to be distributed to the Series A Preferred stockholders, or Meta was to pursue a spin-off. In lieu of a sale of the O&G Assets, the Meta board has now determined to pursue the Spin-Off.

## Reasons for the Spin-Off

The Meta board of directors considered the Spin-Off to be strategic so that Meta can concentrate on its core business.

## When and How You Will Receive Shares of Common Stock

Meta will distribute to the holders of its Series A Preferred Stock, as a pro rata dividend, one share of our Common Stock for every share of Series A Preferred Stock outstanding as of           , 2022 (the "Record Date").

Prior to the Spin-Off, Meta will deliver all of the issued and outstanding shares of our Common Stock to the distribution agent. American Stock Transfer & Trust Company LLC (the "Transfer Agent") will serve as distribution agent in connection with the Distribution and as transfer agent and registrar for our Common Stock.

If you own Series A Preferred Stock of Meta as of the close of business on           , 2022, the shares of our Common Stock that you are entitled to receive in the Distribution will be issued to your account as follows:

- *Registered stockholders*. If you own your shares of Series A Preferred Stock directly through Meta's transfer agent, American Stock Transfer & Trust Company LLC, you are a registered stockholder. In this case, the distribution agent will credit the whole number of shares of our Common Stock you receive in the Distribution by way of direct registration in book-entry form to a new account with the Transfer Agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Distribution. You will be able to access information regarding your book-entry account holding our shares at the Transfer Agent.

Commencing on or shortly after the Distribution Date, the Transfer Agent will mail to you an account statement that indicates the number of whole shares of our Common Stock that have been registered in book-entry form in your name. We expect it will take the Transfer Agent up to two weeks after the Distribution Date to complete the distribution of the shares of our Common Stock and mail statements of holdings to all registered stockholders. You or your bank, broker or other nominee may request that the Transfer Agent issue to you a physical stock certificate representing your shares of Common Stock.

- *"Street name" or beneficial stockholders*. Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

26

Table of Contents

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent on or prior to the Record Date such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our Transfer Agent.

If you sell shares of Series A Preferred Stock on or before the Distribution Date, you will not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of Series A Preferred Stock sold. We expect all trading of the shares of Series A Preferred Stock to be suspended as of the Distribution Date.

We are not asking holders of Meta Series A Preferred Stock to take any action in connection with the Spin-Off. No approval of any holders of Meta's capital stock is required for the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Meta Series A Preferred Stock for shares of our Common Stock. As of the Distribution Date, all of the shares of Series A Preferred Stock will be automatically cancelled and the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares.

**Number of Shares You Will Receive**

On the Distribution Date, you will receive one share of our Common Stock for every share of Meta Series A Preferred Stock you hold on the Record Date. No fractional shares of Common Stock will be issued.

**Results of the Spin-Off**

After the Spin-Off, we will be an independent company. Immediately following the Spin-Off, we expect to have approximately 64,000 holders of shares of our Common Stock. In computing the number of holders of record, all broker-dealers and clearing corporation holding shares on behalf of its customers, the holders of the Series A Preferred Stock, is counted as a single shareholder. A significant number of shares of our Common Stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our Common Stock.

We have entered into a Distribution Agreement and certain other agreements with Meta related to the Spin-Off. These agreements will govern the relationship between us and Meta up to and after completion of the Spin-Off and allocate between us and Meta various assets, liabilities, rights and obligations, including employee benefits, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships and Related Party Transactions—Agreements with Meta."

**Conditions to the Spin-Off**

We expect that the separation will be effective on the Distribution Date, provided that the following conditions shall have been satisfied or waived by Meta:

- the Meta board of directors shall have authorized and approved the Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders;

- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party to those agreements;

Return to TOC

Table of Contents

- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;

- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Distribution;

- all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and

- any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.

**Reasons for Furnishing this Prospectus**

We are furnishing this Prospectus solely to provide information to Meta Series A Preferred Stockholders who will receive shares of our Common Stock in the Distribution. You should not construe this Prospectus as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Meta. We believe that the information contained in this Prospectus is accurate as of the date set forth on the cover. Changes to the information contained in this Prospectus may occur after that date, and neither we nor Meta undertake any obligation to update the information except in the normal course of our and Meta's public disclosure obligations and practices and except as required by applicable law.

28

Table of Contents

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

**Certain U.S. Federal Income Tax Consequences of the Spin-Off**

The following is a summary of the material U.S. federal income tax consequences of our separation from Meta, and in particular the distribution by Meta of our Common Stock to the holders of the shares of Series A Preferred Stock (the "Series A Preferred Stockholders") and the cancellation of all shares of the Series A Preferred Stock. For purposes of this section under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off": (i) any references to the "Spin-Off" shall mean only the distribution of shares of our Common Stock by Meta to Series A Preferred Stockholders and the cancellation of all shares of the Series A Preferred Stock, taken together; (ii) references to "Company," "we," "our" and "us" mean only Next Bridge Hydrocarbons, Inc. and not its subsidiaries or other lower-tier entities, except as otherwise indicated; and (iii) references to Meta refer to Meta Materials, Inc. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Code"), the regulations promulgated by the U.S. Treasury Department ("Treasury Regulations"), rulings and other administrative pronouncements issued by the Internal Revenue Service ("IRS"), and judicial decisions, all as currently in effect, and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax consequences described below. We have not sought and do not intend to seek an advance ruling from the IRS regarding any matter discussed herein. The summary is also based upon the assumption that Meta, the Company and their respective subsidiaries and affiliated entities will operate in accordance with their applicable organizational documents or partnership agreements and the agreements and other documents applicable to our separation from Meta. This summary is for general information purposes only, does not address all possible tax considerations that may be material to an investor and does not constitute legal or tax advice. Moreover, this summary does not purport to discuss all aspects of U.S. federal income taxation that may be important to a particular investor in light of its investment or tax circumstances, or to investors subject to special tax rules, such as:

- financial institutions;

- insurance companies;

- broker-dealers;

- regulated investment companies and real estate investment trusts;

- partnerships and trusts;

- persons who hold our stock on behalf of another person as a nominee;

- persons who receive our stock through the exercise of employee stock options or otherwise as compensation;

- persons holding our stock as part of a "straddle," "hedge," "conversion transaction," "synthetic security" or other integrated investment;

- tax-exempt organizations;

and, except to the extent discussed below:

- foreign investors.

This summary assumes that investors hold their Series A Preferred Stock as a capital asset and will hold their Common Stock as a capital asset, which generally means as property held for investment.

For purposes of this discussion under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off," a U.S. holder is a Series A Preferred Stockholder that is for U.S. federal income tax purposes:

- a citizen or resident of the United States,

Table of Contents

- a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any of its states, or the District of Columbia,

- an estate, whose income is subject to U.S. federal income taxation regardless of its source, or

- a trust if (1) a U.S. court is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) it has a valid election to be treated as a U.S. person.

A "non-U.S. holder" is a Series A Preferred Stockholder that is not a U.S. holder and is not an entity treated as a partnership for U.S. federal income tax purposes. If a partnership, entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Series A Preferred Stock, the U.S. federal income tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. An investor that is a partnership and the partners in such partnership should consult their tax advisors about the U.S. federal income tax consequences of the Spin-Off.

THE U.S. FEDERAL INCOME TAX TREATMENT OF THE SPIN-OFF TO STOCKHOLDERS OF META DEPENDS IN SOME INSTANCES ON DETERMINATIONS OF FACT AND INTERPRETATIONS OF COMPLEX PROVISIONS OF U.S. FEDERAL INCOME TAX LAW FOR WHICH NO CLEAR PRECEDENT OR AUTHORITY MAY BE AVAILABLE. IN ADDITION, THE TAX CONSEQUENCES OF THE SPIN-OFF TO ANY PARTICULAR STOCKHOLDER OF META WILL DEPEND ON THE STOCKHOLDER'S PARTICULAR TAX CIRCUMSTANCES. YOU ARE URGED TO CONSULT YOUR TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES TO YOU OF THE SPIN-OFF IN LIGHT OF YOUR PARTICULAR INVESTMENT OR TAX CIRCUMSTANCES.

### Tax Classification of the Spin-Off in General

For U.S. federal income tax purposes, the Spin-Off will not be eligible for treatment as a tax-deferred distribution by Meta with respect to its stock. Accordingly, the Spin-Off will generally be treated as a fully taxable transaction. The discussion below describes the U.S. federal income tax consequences to a U.S. holder and a non-U.S. holder upon the receipt of our Common Stock in the Spin-Off.

Although Meta will ascribe a value to the Common Stock distributed in the Spin-Off, this valuation is not binding on the IRS or any other taxing authority. These taxing authorities could ascribe a higher valuation to the distributed Common Stock, particularly if, following the Spin-Off, those shares of Common Stock trade at prices significantly above the value ascribed to those shares by Meta. Such a higher valuation may affect the Spin-Off distribution amount and thus the U.S. federal income tax consequences of the Spin-Off to Meta's Series A Preferred stockholders. Fractional shares of Common Stock will not be distributed.

Meta will be required to recognize any gain, but will not be permitted to recognize any loss, with respect to the Common Stock that it distributes in the Spin-Off equal to the fair market value of the Common Stock in excess of Meta's adjusted tax basis in the Common Stock.

### Tax Basis and Holding Period of Company Shares Received by Holders of Meta Stock

A Series A Preferred stockholder's tax basis in shares of our Common Stock received in the Spin-Off generally will equal the fair market value of such shares on the date of the Spin-Off, and the holding period for such shares will begin the day after the date of the Spin-Off.

### Tax Treatment of the Spin-Off to U.S. Holders

The following discussion describes the U.S. federal income tax consequences to a U.S. holder of Meta stock upon the receipt of our Common Stock in the Spin-Off.

30

Table of Contents

The treatment of the Spin-Off for U.S. federal income tax purposes for a U.S. holder will depend on whether the Spin-Off qualifies as a sale of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off qualifies as a sale of the Series A Preferred Stock, a U.S. holder will recognize gain or loss as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below. If the Spin-Off does not qualify as a sale of the Series A Preferred Stock, a U.S. holder will be treated as receiving a corporate distribution subject to tax as described below under "—Taxation of the Spin-Off Treated as a Distribution." Whether a distribution qualifies for sale treatment will depend largely on the total number of shares of Meta stock treated as held by a U.S. holder (including any shares constructively owned by a U.S. holder) relative to all of the Meta stock outstanding both before and after the Spin-Off. The Spin-Off generally will be treated as a sale of Series A Preferred Stock (rather than as a corporate distribution) if the Spin-Off: (i) results in a "complete termination" of a U.S. holder's interest in Meta, (ii) is "not essentially equivalent to a dividend" with respect to such U.S. holder or (iii) is a "substantially disproportionate redemption" with respect to such U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder must take into account not only shares of Meta stock actually owned by such U.S. holder, but also shares of Meta stock that are constructively owned by such U.S. holder. A U.S. holder may constructively own, in addition to shares owned directly, shares owned by certain related individuals and entities in which such U.S. holder has an interest or that have an interest in such U.S. holder, as well as any shares such U.S. holder has a right to acquire by exercise of an option. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of Meta stock actually and constructively owned by such U.S. holder are exchanged or (ii) all of the shares of Meta stock actually owned by such U.S. holder are exchanged and such U.S. holder is eligible to waive, and does waive, the attribution of shares owned by certain family members and such U.S. holder does not constructively own any other shares. The Spin-Off of Series A Preferred Stock will not be essentially equivalent to a dividend if the Spin-Off results in a "meaningful reduction" of a U.S. holder's proportionate interest in Meta. Whether the Spin-Off will result in a meaningful reduction in a U.S. holder's proportionate interest in Meta will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over its corporate affairs may constitute such a "meaningful reduction." In order to meet the "substantially disproportionate" test, the percentage of outstanding shares of Meta voting stock actually and constructively owned by a U.S. holder immediately following the Spin-Off must, among other requirements, be less than 80% of the percentage of the outstanding shares of Meta voting stock actually and constructively owned by such U.S. holder immediately before the Spin-Off. Because the Class A Preferred Stock is not voting stock, it is not expected that the "substantially disproportionate" test will be satisfied in respect of the Spin-Off. U.S. holders are urged to consult with their tax advisors as to the tax consequences of the Spin-Off.

If none of the foregoing tests are satisfied, then the Spin-Off will be treated as a corporate distribution and the tax effects will be as described under "—Taxation of the Spin-Off Treated as a Distribution," below.

Meta currently intends to report the Spin-Off as a corporate distribution (including a determination of the portion of the distribution pursuant to the Spin-Off constituting a taxable dividend, assuming that the Spin-Off is treated as a corporate distribution) on IRS Form 1099-DIV after its earnings and profits for the taxable year in which the distribution occurs are calculated. This information may not be available until after U.S. holders file their U.S. federal and state income tax returns for that taxable year, and such U.S. holders may need to file amended tax returns to reflect the amount of the taxable dividend as finally determined. Meta reporting the Spin-Off as a corporate distribution will not preclude a U.S. holder from treating the Spin-Off as a sale of Series A Preferred Stock, if one of the tests described above is satisfied.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a U.S. holder's Series A Preferred Stock does not qualify as a sale of Series A Preferred Stock, such U.S. holder will be treated as receiving a distribution from Meta. A U.S. holder generally will be required to

31

Table of Contents

include in gross income as dividends the amount received in connection with the Spin-Off to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of such current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a U.S. holder's adjusted tax basis in such U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock."

If a U.S. holder is a corporate U.S. holder, dividends paid by Meta to such U.S. holder generally will be eligible for the dividends-received deduction allowed to domestic corporations in respect of dividends received from other domestic corporations so long as such U.S. holder satisfies the holding period requirement for the dividends-received deduction.

If a U.S. holder is a non-corporate U.S. holder, under tax laws currently in effect, dividends generally will be taxed at the preferential applicable long-term capital gains rate so long as such U.S. holder satisfies the holding period requirement (i.e., more than sixty (60) days of ownership, without protection from the risk of loss, during the 121-day period that begins sixty (60) days before the ex-dividend date) and certain other requirements are met (see "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below).

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

If the Spin-Off qualifies as a sale of Series A Preferred Stock, such U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between (i) the fair market value of our Common Stock received by such U.S. holder in the Spin-Off and (ii) such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off.

Any such capital gain or loss generally will be long-term capital gain or loss if a U.S. holder's holding period for the Series A Preferred Stock so disposed of exceeds one (1) year. Long-term capital gains recognized by non-corporate U.S. holders generally will be eligible for taxation at reduced rates. The deductibility of capital losses is subject to limitations.

**Tax Treatment of the Spin-Off to Non-U.S. Holders**

For non-U.S. holders of Series A Preferred Stock, the characterization for U.S. federal income tax purposes of the Spin-Off of such non-U.S. holder's Series A Preferred Stock generally will correspond to the U.S. federal income tax characterization of the Spin-Off of a U.S. holder's Series A Preferred Stock, as described above under "Treatment of the Spin-Off for U.S. Holders" with respect to whether the Spin-Off is a sale or exchange of Series A Preferred Stock or is treated as a distribution.

Non-U.S. holders are urged to consult their own tax advisors as to whether the Spin-Off will be treated as a distribution, or as a sale or exchange, under the Code.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a non-U.S. holder's Series A Preferred Stock does not qualify as a sale or exchange of Series A Preferred Stock, such non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The gross amount of such dividends will be subject to a withholding tax at a rate of 30% unless a non-U.S. holder is eligible for a reduced rate of withholding under an applicable income tax treaty and provides proper certification of such non-U.S. holder's eligibility for such reduced rate. Dividends that are effectively connected with the conduct by a non-U.S. holder of a trade or

32

Table of Contents

business in the United States (and are attributable to a U.S. permanent establishment if an applicable treaty so requires) generally will be subject to U.S. federal income tax at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, may also be subject to an additional branch profits tax at a 30% rate or a lower rate under an applicable tax treaty.

Distributions in excess of current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a non-U.S. holder's adjusted tax basis in such non-U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below.

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

Subject to the discussions of backup withholding and FATCA withholding below, if the Spin-Off of a non-U.S. holder's shares of Series A Preferred Stock qualifies as a sale or exchange of such shares, such non-U.S. holder generally will not be subject to U.S. federal income tax on any gain recognized on such Spin-Off unless:

- such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base that such non-U.S. holder maintains in the United States), in which case such non-U.S. holder generally will be subject to U.S. federal income tax on such gain at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, also may be subject to an additional branch profits tax at a 30% rate or a lower rate provided by an applicable tax treaty;

- such non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, in which case such non-U.S. holder will be subject to a 30% tax on such non-U.S. holder's net capital gain for the year (or lower rate provided by an applicable tax treaty); or

- Meta is or has been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five (5) year period ending on the date of the Spin-Off or the period during which such non-U.S. holder held Series A Preferred Stock, and, in the case where shares of the Series A Preferred Stock are traded on an established securities market, such non-U.S. holder has owned, directly or constructively, more than 5% of the Series A Preferred Stock at any time within the shorter of the five (5) year period or such non-U.S. holder's holding period for the Series A Preferred Stock. Meta does not believe that it is or has been a U.S. real property holding corporation.

Because it may not be certain at the time a non-U.S. holder's Series A Preferred Stock is exchanged whether the Spin-Off will be treated as a sale or exchange or as a distribution, and because such determination will depend in part on such non-U.S. holder's particular circumstances, the applicable withholding agent may not be able to determine whether (or to what extent) such non-U.S. holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, the applicable withholding agent may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the gross amount of any consideration paid to a non-U.S. holder in exchange for such non-U.S. holder's Series A Preferred Stock, unless (i) the applicable withholding agent has established special procedures allowing non-U.S. holders to certify that they are exempt from such withholding tax and (ii) such non-U.S. holder is able to certify that such non-U.S. holder meets the requirements of such exemption (e.g., because such non-U.S. holder is not treated as receiving a dividend under the Section 302 tests described above). However, there can be no assurance that any applicable withholding agent will establish such special certification procedures. Thus, the applicable withholding agent may withhold some portion of our Common Stock otherwise distributable to a non-U.S. holder to satisfy its obligation to withhold tax, except to the extent it estimates that the amount of the proceeds from the Spin-Off will exceed Meta's

33

Table of Contents

current and accumulated earnings and profits. To the extent it is required to withhold tax, the applicable withholding agent may sell the portion of our Common Stock otherwise distributable to non-U.S. holders needed to pay that tax, together with associated expenses. If an applicable withholding agent withholds excess amounts from the amount payable to a non-U.S. holder, such non-U.S. holder generally may obtain a refund of any such excess amounts by timely filing an appropriate claim for refund with the IRS. Non-U.S. holders should consult their own tax advisors regarding the application of the foregoing rules in light of such non-U.S. holder's particular facts and circumstances and any applicable procedures or certification requirements.

### Tax Considerations to U.S. Holders in Respect of Ownership and Disposition of Our Common Stock

*Dividends*. Any dividends paid by the Company out of its current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally will be taxable to a U.S. holder as ordinary dividend income. Corporate U.S. holders should generally be eligible for the dividends received deduction and non-corporate U.S. holders should generally qualify for reduced rates applicable to qualified dividend income, assuming, in each case, that a minimum holding period and certain other generally applicable requirements are satisfied. Dividends in excess of current and accumulated earnings and profits will be treated as a non-taxable return of capital to the extent of the U.S. holder's basis in our Common Stock and thereafter as capital gain. U.S. holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any dividend received from the Company. Dividends received by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

*Sales or Other Dispositions of Our Common Stock*. A U.S. holder will recognize capital gain or loss on the sale or other disposition of our Common Stock in an amount equal to the difference between the U.S. holder's adjusted tax basis in our Common Stock and the amount realized from the disposition. Any gain or loss on a sale or other disposition of our Common Stock generally will be long-term capital gain or loss if the holder has held our Common Stock for more than one year. Deductions for capital losses are subject to limitations. Any gain recognized by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

### Tax Considerations to Non-U.S. Holders in Respect of Ownership and Disposition of Our Common Stock

*Dividends*. Any dividends paid on our Common Stock that are characterized as dividends paid to a non-U.S. holder generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be provided by an applicable income tax treaty. To receive the benefit of a reduced treaty rate, a non-U.S. holder must furnish to the Company or its paying agent a valid IRS Form W-8 (or applicable successor form) certifying such holder's qualification for the reduced rate. This certification must be provided to the Company or its paying agent prior to the payment of dividends and must be updated periodically. If a non-U.S. holder who qualifies for a reduced treaty rate but does not timely provide the Company or the payment agent with the required certification, such non-U.S. holder may be entitled to a credit against their U.S. federal income tax liability or a refund of the tax withheld, which the non-U.S. holder may claim by filing the appropriate claim for refund with the IRS.

Dividends that are treated as "effectively connected" with a trade or business conducted by a non-U.S. holder within the United States (and, if an applicable income tax treaty so provides, are also attributable to a U.S. permanent establishment of such non-U.S. holder) are not subject to withholding tax, provided the non-U.S. holder satisfies certain certification and disclosure requirements. Instead, such dividends, net of specified deductions and credits, are taxed at the same graduated U.S. federal income tax rates applicable to U.S. persons. To the extent a dividend is effectively connected with a U.S. trade or business, non-corporate non-U.S. holders may be eligible for taxation at reduced U.S. federal income tax rates applicable to qualified dividend income. Any such effectively connected dividends received by a non-U.S. holder that is a corporation may, under certain circumstances, be subject to an additional branch profits tax at a 30% rate or such lower rate as specified by an applicable income tax treaty.

34

Table of Contents

*Sales or Other Dispositions of Our Common Stock*. Subject to the discussions under "Information Reporting and Backup Withholding" and "FATCA," below, a non-U.S. holder will generally not be subject to any U.S. federal income tax or withholding tax on any gain realized upon such stock holder's sale or other disposition of our Common Stock. Gain on the sale of our Common Stock may be subject to U.S. net income tax (and in respect of corporate non-U.S. holders, branch profits tax) if the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base of the non-U.S. holder within the United States). Additionally, a non-U.S. holder that is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and meets certain other requirements will be subject to a flat 30% tax on the amount of gain derived from the sale that, together with certain other U.S. source capital gains realized during such year exceed certain U.S. source capital losses realized during such year.

*FATCA*. Pursuant to the Foreign Account Tax Compliance Act, or FATCA, foreign financial institutions (which include most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and any other investment vehicles) and certain other foreign entities must comply with registration and information reporting rules with respect to their U.S. account holders and investors or be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or other foreign entity that does not comply with the FATCA registration and reporting requirements will generally be subject to a 30% withholding tax on "withholdable payments." For this purpose, withholdable payments generally include U.S.-source payments (including U.S.-source dividends), and (subject to the proposed Treasury Regulations discussed below) the gross proceeds from a sale of equity or debt instruments of issuers who are considered U.S. issuers under the FATCA rules. The FATCA withholding tax applies even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain). While withholding under FATCA would also have applied to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations which, if finalized in their present form, would eliminate FATCA withholding on payments of gross proceeds of a disposition of Series A Preferred Stock or our Common Stock entirely. Taxpayers may generally rely on these proposed Treasury Regulations until final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. We will not pay additional amounts in respect of amounts withheld. Investors should consult their tax advisors regarding possible implications of FATCA.

*Information Reporting and Backup Withholding*. In general, information reporting requirements may apply to dividends, sales proceeds or other amounts paid to U.S. holders and non-U.S. holders, unless an exemption applies. Backup withholding tax may apply to amounts subject to reporting if the holder fails to provide an accurate taxpayer identification number or fails to report all interest and dividends required to be shown on its U.S. federal income tax returns. A U.S. holder or non-U.S. holder can claim a credit against its U.S. federal income tax liability for the amount of any backup withholding tax and a refund of any overpayment of taxes, provided that all required information is timely provided to the IRS. U.S. holders and non-U.S. holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for establishing an exemption.

**THE DISCUSSION ABOVE IS A GENERAL SUMMARY. IT DOES NOT COVER ALL TAX MATTERS THAT MAY BE OF IMPORTANCE TO A PARTICULAR STOCKHOLDER. EACH STOCKHOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR ABOUT THE TAX CONSEQUENCES TO IT OF THE SPIN-OFF IN LIGHT OF THE STOCKHOLDER'S OWN CIRCUMSTANCES.**

Table of Contents

## USE OF PROCEEDS

We will not receive any proceeds from the Distribution of the Common Stock in the Spin-Off and any expenses incurred in connection with the Distribution shall be borne by us.

## DETERMINATION OF OFFERING PRICE

Currently, there is no public trading market for our Common Stock and no consideration will be paid for the shares of Common Stock distributed in the Spin-Off.

## CAPITALIZATION

The following table sets forth our cash and capitalization as of September 30, 2022 on (i) an actual basis; and (ii) on a pro forma basis to give effect to the Distribution. The following table should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

| | September 30, 2022 | |
| | Actual As Reported | Pro Forma Adjustments for Distribution |
|---|---|---|
| Cash and cash equivalents | $ 2,108,866 | $ 2,108,866 |
| Short-term debt | $ 21,156,988 | $ 21,156,988 |
| Stockholders' Equity | | |
| Common stock, $0.0001 par value; 500,000,000 shares authorized, 1 share issued and outstanding as reported; 165,523,363 shares issued and outstanding, pro forma as adjusted | 16,552 | 16,552 |
| Preferred stock, $0.0001 par value; 50,000,000 shares authorized, 0 shares issued and outstanding | | |
| Additional paid in capital | 100,846,643 | 100,846,643 |
| Accumulated deficit | (72,951,809) | (73,951,809) |
| Total stockholders' equity | 27,911,386 | 27,911,386 |
| Total capitalization | $ 49,068,374 | $ 48,068,374 |

36

Table of Contents

# BUSINESS

## General

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas. In addition, we may consider various strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties. We operate our business through our wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Oil Corporation, Torchlight Hazel, LLC, and Hudspeth Operating, LLC.

Presently, our primary interests include the oil and natural gas leases for properties of the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in West Texas (the "Hazel Project") and two minor well interests in Oklahoma (the "Oklahoma Properties").

Rich Masterson, our consulting geologist, originated our Orogrande Project, as discussed below, based on his tenure as a geologist since 1974. He is credited with originating the Wolfbone shale play in the Southern Delaware Basin of West Texas and has prepared prospects totaling over 150,000 acres that have been leased, drilled and are currently being developed by Devon Energy Corp., Occidental Petroleum Corporation, Noble Energy, and Samson Oil & Gas Ltd., among others.

The Company has drilled 14 test wells in the Orogrande Project in the basin in order to stay in compliance with the continuous drilling clause under the University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the Orogrande Project properties. Two of the wells were successfully completed for hydrocarbons, while the remaining wells serve as fresh water supply wells, wells we maintain for salt water disposal or wells we expect to be plugged and abandoned.

We satisfied the 2021 drilling obligations in the Orogrande play and, in satisfying our 2021 drilling obligations, we identified new potential pay zones not yet discovered in the Orogrande play.

In addition to the Orogrande Project, we also have an interest in our Hazel Project in Tom Green County and Sterling County, Texas. In August 2020, our subsidiaries entered into the Option Agreement with MHP, under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project. The option to purchase the entire acreage block was extended to September 30, 2021 and at such time MHP determined not to exercise the purchase option; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel, LLC.

Our principal executive offices are located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. The telephone number of our principal executive offices is (817) 438-1937.

## Key Business Attributes

*Experienced People.* Upon completion of the Distribution, we will have six full-time employees and we expect to engage consultants for various roles as needed including high quality exploration and technical partners. We will build on the expertise and experiences of our management team and seek guidance from outside advisors as well as our Board.

37

**Table of Contents**

*Project Focus.* We are focusing primarily on exploitation projects. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Lower Cost Structure.* We will attempt to maintain the lowest possible cost structure, enabling the greatest margins and providing opportunities for investment that would not be feasible for higher cost competitors.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

### Business Processes

We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;

- Operations and Field Activities; and

- Administrative and Finance Management.

*Investment Evaluation and Review.* This process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

### Current Projects

As of September 30, 2022, we had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas and the Oklahoma Properties. See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

### Our Properties

Our principal executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. We currently sublease this office space and believe that the condition and size of our offices are adequate for our current needs.

Table of Contents

The Orogrande Project consists of unevaluated and undeveloped properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas**— | | | | | | |
| Orogrande Project | 134,000 | 89,110 | — | — | 134,000 | 89,110 |
| Hazel Project | 645 | 516 | 645 | 516 | — | — |
| **Oklahoma**— | | | | | | |
| Viking | 640 | 192 | 640 | 192 | — | — |
| Total | 135,285 | 89,818 | 1,285 | 708 | 134,000 | 89,110 |

Investments to support our oil and natural gas properties during the years ended December 31, 2021 and 2020 were $14.7 million and $3.4 million, respectively.

| | Fiscal Year Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Property acquisition costs | $ — | $ — |
| Development costs | 14,664,463 | 3,472,281 |
| Exploratory costs | — | — |
| Totals | $14,664,463 | $3,472,281 |

Property development costs presented above exclude interest capitalized into the full cost pool of $141,048 in 2021 and $2,353,700 in 2020.

The development costs for 2020 include work in the Orogrande and Hazel Projects in West Texas and for 2021 the development costs include work solely in the Orogrande Project. We made progress during 2021 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas, which has not yet resulted in hydrocarbon production. We incurred costs of $14.7 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. No development costs were incurred in 2020 or 2021 for the Oklahoma Properties. During the fiscal years ended December 31, 2021 and 2020, and for the nine months ended September 30, 2022, we drilled development and exploratory net wells as set forth in the table below.

**Drilling Activities**

| | September 30, 2022 | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Hazel Project (Texas) | | | |
| Dry | 0.00 | 1.60 | 0.80 |
| Productive | 0.00 | 0.00 | 0.00 |
| Orogrande Project (Texas) | | | |
| Dry | 0.00 | 0.67[1] | 0.00 |
| Productive | 0.00 | 2.66 | 0.00 |

(1) Represents drilling re-entry to explore more of the formation.

39

Table of Contents

For the nine months ended September 30, 2022 compared to the same period in 2021, investments were as follows:

|  | Nine Months Ended September 30, | |
|  | 2022 | 2021 |
|---|---|---|
| Property acquisition costs | $ — | $ — |
| Development costs | 1,630,137 | 2,502,800 |
| Exploratory costs | — | — |
| Totals | $ 1,630,137 | $ 2,502,800 |

During the nine months ended September 30, 2022, a portion of the costs from development activities were cost carryover related to satisfaction of our drilling obligations for the fiscal year 2021 under the terms of the Purchase Agreement (defined below) at a cost of $1,084,285. Additionally, during the first nine months of 2022, we completed some pre-drilling activity for our upcoming 2022 drilling program, including surveying, permitting, road and pad site work at an aggregate cost of $545,852. We have not yet conducted any drilling activities, but expect to commence drilling activities in November 2022 to satisfy our obligations for the 2022 fiscal year.

|  | September 30, 2022 | | December 31, 2021 | | December 31, 2020 | |
|  | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|
| *Productive Wells* |  |  |  |  |  |  |
| Oil | 5.00 | 2.67 | 5.00 | 2.67 | 5.00 | 2.67 |
| Gas | 4.00 | 2.66 | 4.00 | 2.66 | 1.00 | 0.67 |
| *Test Wells* |  |  |  |  |  |  |
| Salt Water Disposal | 3.00 | 2.13 | 3.00 | 2.13 | 2.00 | 1.33 |
| Fresh Water Supply | 3.00 | 2.00 | 3.00 | 2.00 | 2.00 | 1.33 |
| Plug & Abandon | 5.00 | 3.87 | 5.00 | 3.87 | 4.00 | 3.07 |

With the principal goal of gathering scientific data from a strategy of drilling test wells, all wells were drilled with the intent of being completed and productive for hydrocarbons. We attempted completions on every well, however we were unable to effectuate a successful completion on all of the vertical wells due to various problems. This is not uncommon with early wells of frontier exploration projects. Two horizontal wells were successfully completed for hydrocarbons, however both wells are currently shut-in waiting for hook-up to a gas pipeline. The remaining wells serve as fresh water supply wells, wells we maintain for salt water disposal or wells we expect to be plugged and abandoned. Pipeline hook-ups will occur after we have achieved additional successful wells to justify the cost of tapping into the gas lines.

*Oil and Natural Gas Reserves*

No reserve report was prepared for 2020. Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2021 and 2020, reserves did not include any value for proved undeveloped properties.

We currently have two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the "Producing Hazel Wells"). Production is from the Wolfcamp formation. At December 31, 2021, there were no proved reserves or proved developed nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP. The properties of the Hazel Project and Orogrande Project are operated by Maverick Operating LLC.

40

Table of Contents

The operating expenses reflect a substantial reduction from previous years as electric power is available and water is now disposed of on location after we drilled or converted a well to be used for saltwater disposal. Initial gross oil production from the Flying B Ranch #3H well reached 8,319 Bbl per month and 31,613 Bbl per month of water. The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl, although we will receive no future revenue from these wells until their estimated depletion because all of such revenue, after deducting expenses to produce the oil, is to be received by MHP directly and credited toward the recoupment of drilling costs incurred by MHP.

As of December 31, 2021 and 2020, our proved developed nonproducing reserves related to the Producing Hazel Wells totaled 0 and 0 BOE, respectively, and 0 BOE for the nine months ended September 30, 2022 after giving effect to the obligation to reimburse drilling costs incurred by MHP.

*Production, Price, and Production Cost History*

Oklahoma Properties

During the year ended December 31, 2020, we produced and sold 278 barrels of oil net to our interest at an average sale price of $16.13 per Bbl. We produced and sold 2,012 Mcf of gas net to our interest at an average sales price of $1.20 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $30.02 per BOE. Our depreciation, depletion, and amortization expense was $130.68 per BOE.

During the year ended December 31, 2021, we produced and sold 85 barrels of oil net to our interest at an average sale price of $55.00 per Bbl. We produced and sold 3,586 Mcf of gas net to our interest at an average sales price of $3.17 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.54 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

During the nine months ended September 30, 2021, we produced and sold 85.10 Bbls net to our interest at an average sale price of $54.93 per Bbl. We produced and sold 2,363.44 Mcf of natural gas net to our interest at an average sale price of $1.80 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $14.13 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

During the nine months ended September 30, 2022, we produced and sold 139.57 Bbls net to our interest at an average sale price of $102.62 per Bbl. We produced and sold 2,153 Mcf of natural gas net to our interest at an average sales price of $7.45 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $12.50 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

Hazel Project

During the year ended December 31, 2021, 23,422 barrels of oil net to our interest were sold at an average sale price of approximately $60.00 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of natural gas net to our interest.

| Category | December 31, 2021 Reserves | | | December 31, 2021 Future Net Revenue (M$) | |
| | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
|---|---|---|---|---|---|
| Net Proved Producing | 0 | 0 | 0 | $  0 | $  0 |
| Net Proved Nonproducing | 0 | 0 | 0 | $— | $  — |
| Total Net Proved | 0 | 0 | 0 | $— | $  — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $  — |
| Probable Undeveloped | 0 | 0 | 0 | $— | $  — |

Table of Contents

| Category | December 31, 2020 Reserves | | | December 31, 2020 Future Net Revenue (M$) | |
| | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| --- | --- | --- | --- | --- | --- |
| Net Proved Producing | 0 | 0 | 0 | $— | $        — |
| Net Proved Nonproducing | 0 | 0 | 0 | $— | $        — |
| Total Net Proved | 0 | 0 | 0 | $— | $        — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $        — |
| Probable Undeveloped | | | | $— | $        — |

The net producing reserves from 2020 and 2021 were 0 BOE related to the Producing Hazel Wells due to the obligation to pass revenue through to MHP under the terms of the Option Agreement effective during both periods. There was no reserve value at December 31, 2020 and December 31, 2021, Standardized Measure is not presented.

During the nine months ended September 30, 2022, 65.82 barrels of oil net to our interest were sold at an average sale price of approximately $104.78 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of gas net to our interest. During the nine months ended September 30, 2021, Nil barrels of oil net to our interest were sold and we sold Nil Mcf of gas net to our interest.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

*Intent to Acquire Additional Interests*

Following the Spin-Off, we intend to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). We anticipate offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. We intend to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept our offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. Our decision to enter into these transactions will depend on us and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and our Board receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

***Industry and Business Environment***

We are experiencing a time of fluctuating, but higher oil prices caused by higher demand, lower U.S. supply, turmoil on the world stage and OPEC's policies on production. Unfortunately, this is the cyclical nature of the oil

42

Table of Contents

and natural gas industry. We experience highs and lows that seem to come in cycles. Fortunately, there exists plenty of demand for US onshore oil and natural gas. We believe advances in technology drive the US market and we feel this will drive the development costs down on our exploration and drilling programs while maintaining favorable economics.

### Competition

The oil and natural gas industry is intensely competitive, and we will compete with numerous other companies engaged in the exploration and production of oil and natural gas. Some of these companies have substantially greater resources than we have. Not only do they explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit.

Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

### Marketing and Customers

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

### Governmental Regulation and Environmental Matters

Our operations are subject to various rules, regulations, and limitations impacting the oil and natural gas exploration and production industry as a whole.

#### Regulation of Oil and Natural Gas Production

Our oil and natural gas exploration, production, and related operations, when developed, will be subject to extensive rules and regulations promulgated by federal, state, tribal, and local authorities and agencies. Certain states may also have statutes or regulations addressing conservation matters, including provisions for the unitization or pooling of oil and natural gas properties, the establishment of maximum rates of production from wells, and the regulation of spacing, plugging, and abandonment of such wells. We contract with Maverick Operating LLC who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. Failure to comply with any such rules and regulations can result in substantial penalties. The regulatory burden on the oil and natural gas industry will most likely increase our cost of doing business and may affect our

43

Table of Contents

profitability. Although we believe we are currently in substantial compliance with all applicable laws and regulations, because such rules and regulations are frequently amended or reinterpreted, we are unable to predict the future cost or impact of complying with such laws. Significant expenditures may be required to comply with governmental laws and regulations and may have a material adverse effect on our financial condition and results of operations.

*Environmental Matters*

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;

- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;

- impose substantial liabilities for pollution resulting from operations; or

- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

The Comprehensive Environmental, Response, Compensation, and Liability Act ("CERCLA") and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who disposed of or arranged for the disposal of "hazardous substances" found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The Federal Resource Conservation and Recovery Act ("RCRA") and comparable state statutes govern the disposal of "solid waste" and "hazardous waste" and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of "hazardous substance," state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as "non-hazardous," such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act ("ESA") seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

44

Table of Contents

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the Bureau of Land Management on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

*Climate Change*

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that greenhouse gas emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling greenhouse gas emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

**Legal Proceedings**

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation ("Hudspeth"), filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta has added the manufacturer of one of the tool components that we contend was one of the causes of the tool failure. It was recently disclosed that Cordax is the subsidiary of a Canadian parent company, Cordax who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a Canadian citizen, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. The parties are now engaged in discovery and plan to take depositions of fact and expert witnesses, with counsel for the Company currently identifying and vetting potential expert witnesses. The case is set for trial in April 2023.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final

45

Table of Contents

disposition of the related case currently pending in Harris County, Texas. We are required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement.

In September 2021, Meta received a subpoena from the SEC Division of Enforcement, in a matter captioned *In the Matter of Torchlight Energy Resources, Inc*. The subpoena requests that Meta produce certain documents and information related to, among other things, the merger involving Torchlight and Metamaterial Inc. Meta is cooperating and intends to continue to cooperate with the SEC's investigation. While neither we nor any of the individuals who will serve as directors and officers following the Spin-Off have been named or otherwise involved in the SEC enforcement action, in the event we incur any loss with respect to such action we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

On January 3, 2022, a putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *Maltagliati v. Meta Materials Inc., et al.*, No. 1:21-cv-07203, against Meta, Meta's former Chief Executive Officer, and Meta's former Chief Financial Officer, Torchlight's former Chairman of the Board of Directors, and Torchlight's former Chief Executive Officer. On January 26, 2022, a similar putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *McMillan v. Meta Materials Inc., et al.*, No. 1:22-cv-00463. The McMillan complaint names the same defendants and asserts the same claims on behalf of the same purported class as the Maltagliati complaint. The complaints, purportedly brought on behalf of all purchasers of our publicly traded securities from September 21, 2020 through and including December 14, 2021, assert claims under Sections 10(b) and 20(a) of the Exchange Act arising primarily from a short-seller report and statements related to our business combination with Torchlight. The complaints seek unspecified compensatory damages and reasonable costs and expenses, including attorneys' fees. On April 11, 2022, the Court held a hearing on motions to consolidate the two actions and to appoint a lead plaintiff or lead plaintiffs, but has not yet ruled on the motions. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned *Hines v. Palikaras, et al.*, No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and us (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

46

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes, respectively, beginning on page F-1 below of this Prospectus. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this Prospectus, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

### Overview

Next Bridge Hydrocarbons, Inc. (formerly known as OilCo Holdings, Inc.) was incorporated in the State of Nevada on August 31, 2021 and established a fiscal year end of December 31st.

In connection with the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) and Metamaterial, Inc. contemplated a sale of the O&G Assets or, alternatively, a complete legal and structural separation of the Company, holding the O&G Assets, from Meta following the Arrangement. Meta determined to pursue the structural separation and will distribute all of its equity interest in us, consisting of all of the outstanding shares of our Common Stock, to the Meta Series A Preferred Stockholders on a pro rata basis. Following the Spin-Off, Meta will not own any equity interest in us, and we will operate independently from Meta.

The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of a number of conditions. In addition, subject to the terms of the Arrangement Agreement, Meta has the right not to complete the Spin-Off if, at any time, the Meta Board determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable.

Our consolidated financial statements have been prepared on a stand-alone basis and are derived from the consolidated financial statements and accounting records of Meta. Our consolidated financial statements reflect our financial position, results of operations and cash flows as we were historically managed, in conformity with GAAP. Our financial statements include certain assets and liabilities that have historically been held at the Meta corporate level but are specifically identifiable or otherwise attributable to us.

All intercompany transactions between us and Meta have been included in our financial statements. The intercompany transactions are reflected in our consolidated statements of cash flow as a financing activity and in our consolidated balance sheets as "Notes Payable, Related Party."

The historical costs and expenses reflected in our financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand-alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Following the Spin-Off, we will perform these functions using our own resources or purchased services.

Return to TOC

Table of Contents

*Income Taxes*

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

**RESULTS OF OPERATIONS**

*Historical Results for the Years Ended December 31, 2021 and 2020*

For the year ended December 31, 2021, we had a net loss of $8,238,808 compared to a net loss of $5,749,006 for the year ended December 31, 2020. The difference is primarily due to an increased general and administrative expenses for the year ended December 31, 2021, offset by an impairment loss and a loss on sale of oil and gas property for the year ended December 31, 2020. At December 31, 2021, we had current assets of $2,229,762 and total assets of $47,918,232. As of December 31, 2021, we had current liabilities of $15,537,215. Stockholders' equity was $32,359,080 at December 31, 2021.

*Revenue and Gross Profit*

|  | Year Ended December 31, | | | |
|  | **2020** | **2021** | **Change** | **%** |
|---|---|---|---|---|
| Product sales | $  6,906 | $ 15,904 | $  8,998 | 130.3% |
| Total Revenue | 6,906 | 15,904 | 8,998 | 130.3% |
| Cost of revenue | 87,486 | 76,331 | (11,155) | (12.7)% |
| Gross Profit (Loss) | (80,580) | (60,427) | (20,153) | 25.0% |
| Gross Profit (Loss) percentage | (1,166.8)% | (379.9)% | 223.97% |  |

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2021, we had production revenue of $15,904 compared to $6,906 of production revenue for the year ended December 31, 2020. The change in revenue was primarily due to the increase in oil and natural gas production from 613 BOE for the 2020 period to 683 BOE for the 2021 period, from the Oklahoma Properties, an increase in the average price of oil from $34.48 in 2020 to $55.01 in 2021 and an increase in the average price of natural gas from $1.13 in 2020 to $3.13 in 2021, marginally offset by a decrease in production due to the sale of our Warwink Project in November 2020. Our cost of revenue, consisting of lease operating expenses and production taxes, was $76,331 for the year ended December 31, 2021 compared with $87,486 for the year ended December 31, 2020. Production and revenue are detailed as follows:

48

Table of Contents

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | $ — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | — |
| **Total Q3-2021** | | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Oklahoma** | Q4 - 2021 | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Hazel (TX)** | Q4 - 2021 | 0 | 0 | — | — | — |
| **Total Q4-2021** | | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Total 2021** | | 85 | 3,586 | $ 4,676 | $ 11,228 | $ 15,904 |
| **Average Commodity Price** | | | | $ 55.01 | $ 3.13 | |
| Oklahoma | Q1 - 2020 | 181 | 468 | $ 583 | $ 1,000 | $ 1,583 |
| Hazel (TX) | Q1 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q1 - 2020 | 1,863 | 1,559 | $ 81,530 | $ 1,507 | $ 83,037 |
| **Total Q1-2020** | | 2,044 | 2,027 | $ 82,113 | $ 2,507 | $ 84,620 |
| Oklahoma | Q2 - 2020 | 28 | 448 | $ 774 | $ 156 | $ 930 |
| Hazel (TX) | Q2 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q2 - 2020 | 1,389 | 747 | $ 44,223 | $ 324 | $ 44,547 |
| **Total Q2-2020** | | 1,417 | 1,195 | $ 44,997 | $ 480 | $ 45,477 |
| Oklahoma | Q3 - 2020 | 69 | 1,096 | $ 2,084 | $ 494 | $ 2,578 |
| Hazel (TX) | Q3 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q3 - 2020 | 1,480 | 680 | $ 57,774 | $ 1,370 | $ 59,144 |
| **Total Q3-2020** | | 1,549 | 1,776 | $ 59,858 | $ 1,864 | $ 61,722 |
| Oklahoma | Q4 - 2020 | 0 | 0 | $ 1,042 | $ 773 | $ 1,815 |
| Hazel (TX) | Q4 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q4 - 2020 | 435 | 0 | $ 9,837 | $ 5,519 | $ 15,356 |
| MECO (Sold) | YTD ADJ | 0 | 0 | $ (10,092) | $ (5,519) | $ (15,611) |
| **Total Q4-2020** | | 435 | 0 | $ 787 | $ 773 | $ 1,560 |
| **Sub Total 2020** | | 5,445 | 4,998 | $ 187,755 | $ 5,624 | $ 193,379 |
| **Exclude MECO** | Sold 11/20 | -5,167 | -2,986 | $(183,272) | $ (3,201) | $(186,473) |
| Total 2020 | | 278 | 2,012 | $ 4,483 | $ 2,423 | $ 6,906 |
| **Average Commodity Price** | | | | $ 34.48 | $ 1.13 | |

49

**Table of Contents**

### Expenses for the Years Ended December 31, 2021 and 2022

We recorded depreciation, depletion and amortization expense of $4,642 for the year ended December 31, 2021 compared to $820,814 for the year ended December 31, 2020. Impairment expense recognized was $2,108,301 in 2020 with none for the year ended December 31, 2021.

*Operating Expenses*

| | Year Ended December 31, | | | |
| | 2021 | 2020 | Change | % |
|---|---|---|---|---|
| Operating Expenses | | | | |
| General & Administrative | $8,050,443 | $2,557,975 | $5,472,468 | 214.7% |
| Total operating expenses | $8,050,443 | $2,557,975 | $2,557,975 | 214.7% |

General and Administrative Expenses

Our general and administrative expense for the year ended December 31, 2021 was $8,050,443 compared with $2,557,975 for the year ended December 31, 2020. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2021, compared to 2020, is primarily due to employee bonus compensation and expenses related to the Arrangement Agreement including consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses.

### Historical Results for the Three Months Ended September 30, 2022 and 2021

For the three months ended September 30, 2022, we had a net loss of $2,164,187 compared to a net loss of $895,675 for the three months ended September 30, 2021. The difference is primarily due to increased general and administrative expenses for the three months ended September 30, 2022 offset with an increase in interest expense. At September 30, 2022, we had current assets of $2,331,695 and total assets of $49,650,302. As of September 30, 2022, we had current liabilities of $21,716,979. Stockholders' equity was $27,911,386 at September 30, 2022.

| | Three Months Ended September 30, | | | |
| | 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Product sales | $12,810 | $ 2,963 | $ 9,847 | 332% |
| Total Revenue | 12,810 | 2,963 | 9,847 | 332% |
| Cost of revenue | 15,659 | 41,774 | (26,115) | (63)% |
| Gross Profit (Loss) | $(2,849) | $(38,811) | $ 35,962 | 93% |
| Gross Profit (Loss) percentage | (22)% | (1,310)% | 1,288% | |

50

Table of Contents

For the three months ended September 30, 2022, we had production revenue of $12,810 compared to $2,963 of production revenue for the three months ended September 30, 2021. Our cost of revenue, consisting of lease operating expenses and production taxes, was $15,659 for the three months ended September 30, 2022 compared with $41,774 for the three months ended September 30, 2021. The change in revenue was impacted by an increase in production from the Oklahoma Properties and commodity prices. Production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| Hazel (TX) | Q3 - 2022 | 0 | 0 | $ — | $ — | $ — |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| **Average Commodity Price** | | | | $ 107.79 | $ 9.22 | |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | $ — |
| **Total Q3-2021** | | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Average Commodity Price** | | | | $ 62.66 | $ 2.60 | |

*Expenses for the three months ended September 30, 2022 and 2021*

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2022 | 2021 | Change | % |
| Operating Expenses | | | | |
| General & Administrative | $1,800,472 | $861,316 | $(939,156) | 109% |
| Total operating expenses | $1,800,472 | $861,316 | $(939,156) | 109% |

The change in general & administrative expenses during the three months ended September 30, 2022, compared to the same period in 2021 is related to increases in legal fees, consulting services and investor relations expenses.

As described in "Our Properties—Intent to Acquired Additional Interests" one of the Orogrande Owners, an entity we intend to make an offer to acquire its working interest in the Orogrande Project, is Wolfbone Investments LLC, which is an affiliate of Gregory McCabe, who is also an affiliate of the Company.

### Historical Results for the Nine Months Ended September 30, 2022 and 2021

For the nine months ended September 30, 2022, we had a net loss of $4,764,293 compared to a net loss of $6,088,889 for the nine months ended September 30, 2021. The difference is primarily due to decreased general and administrative expenses for the nine months ended September 30, 2022 offset with a change in interest expense. At September 30, 2022, we had current assets of $2,331,695 and total assets of $49,650,302. As of September 30, 2022, we had current liabilities of $21,716,979. Stockholders' equity was $27,911,386 at September 30, 2022.

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2022 | 2021 | Change | % |
| Product sales | $ 30,214 | $ 8,936 | $ 21,278 | 238% |
| Total Revenue | 30,214 | 8,936 | 21,278 | 238% |
| Cost of Revenue | 57,733 | 80,509 | (22,776) | (28)% |
| Gross Profit (Loss) | $(27,519) | $(71,573) | $ 44,054 | 62% |
| Gross Profit (Loss) percentage | (91)% | (801)% | 710% | |

51

Table of Contents

For the nine months ended September 30, 2022, we had production revenue of $30,214 compared to $8,936 of production revenue for the nine months ended September 30, 2021. Our cost of revenue, consisting of lease operating expenses and production taxes, was $57,733 for the nine months ended September 30, 2022 compared with $80,509 for the nine months ended September 30, 2021. The change in revenue was impacted by an increase in production from the Oklahoma Properties. Production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2022 | 0 | 0 | $ — | $ — | $ — |
| Hazel (TX) | Q1 - 2022 | 0 | 0 | — | — | — |
| **Total Q1-2022** | | 0 | 0 | $ — | $ — | $ — |
| Oklahoma | Q2 - 2022 | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Hazel (TX) | Q2 - 2022 | 0 | 0 | — | — | — |
| **Total Q2-2022** | | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Oklahoma | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| Hazel (TX) | Q3 - 2022 | 0 | 0 | — | — | — |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| **Nine Months ended September 2022** | | 140 | 2,154 | $ 14,323 | $ 15,891 | $ 30,214 |
| **Average Commodity Price** | | | | $ 102.31 | $ 7.38 | |
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,810 | $ 3,502 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,810 | $ 3,502 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | — |
| **Total Q3-2021** | | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Nine Months ended September 2021** | | 85 | 2,364 | $ 4,675 | $ 4,261 | $ 8,936 |
| **Average Commodity Price** | | | | $ 55.00 | $ 1.80 | |

*Expenses for the nine months ended September 30, 2022 and 2021*

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2022 | 2021 | Change | % |
| Operating Expenses | | | | |
| General & Administrative | $3,789,166 | $6,097,917 | $(2,308,751) | (38)% |
| Total operating Expenses | $3,789,166 | $6,097,917 | $(2,308,751) | (38)% |

The change in general & administrative expenses during the nine months ended September 30, 2022, compared to the same period in 2021 is related to reductions in directors fees, consulting services and investor relations expenses.

52

Table of Contents

## LIQUIDITY AND CAPITAL RESOURCES

Liquidity risk is the risk that we will not meet our financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

At December 31, 2021, we had cash and cash equivalents of $1,989,419 compared to $130,504 as of December 31, 2020.

Cash from operating activities for the for the year ended December 31, 2021, was $(7,050,541) compared to $(3,300,589) for the year ended December 31, 2020.

Cash used in operating activities for the year ended December 31, 2021 can be attributed principally to net loss from operations of $8,238,808 adjusted for $4,642 in depreciation, depletion and amortization expense, a decrease in accrued liabilities, and an increase in accounts payable.

Cash used in operating activities during 2020 can be attributed principally to net loss from operations of $5,749,006 adjusted for $820,814 in depreciation, depletion and amortization expense, and $2,108,301 in impairment expense.

Cash used in investing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $14,805,511 compared to $2,271,968. Cash used in investing activities consisted primarily of investments in oil and natural gas properties in 2021 offset by proceeds from the sale of property in 2020.

Cash from financing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $23,714,967 compared to $1,128,451 for the year ended December 31, 2020. Cash from financing activities consisted primarily of contributions from, and a note payable to, Meta.

At September 30, 2022, we had cash and cash equivalents of $2,108,866 compared to $1,989,419 as of December 31, 2021.

Cash flows from operating activities for the nine months ended September 30, 2022 was $(6,067,015) compared to $(6,701,090) for the nine months ended September 30, 2021, an increase of $634,075. Cash flows from operating activities for the nine months ended September 30, 2022 can be primarily attributed to net loss from operations and a decrease in accounts payable.

Cash flows from operating activities for the nine months ended September 30, 2021 can be primarily attributed to net loss from operations of $6,088,889 and a decrease in accrued expenses.

Reference the Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flow in operating activities until such time as we achieve sufficient commercial oil and gas production to cover our operating costs.

Cash flows from investing activities for the nine months ended September 30, 2022 was $(1,630,137) compared to $(2,502,799) for the nine months ended September 30, 2021. Cash flows from investing activities principally consists of investment in oil and natural gas properties in Texas.

Cash flows from financing activities for the nine months ended September 30, 2022 was $7,816,599 as compared to $17,405,166 for the nine months ended September 30, 2021.

Table of Contents

Cash flows from financing activities consists of intercompany loans from Meta for the nine months ended September 30, 2022. For the nine months ended September 30, 2021, cash flows from financing activities also consisted of intercompany loans from Meta. We expect to continue to have cash flow provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments. We do not expect to pay cash dividends on our Common Stock in the foreseeable future.

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. While the revolving commitment under the 2021 Note expires on 2021 Note Maturity Date, as of the date hereof, the full $15 million available under the 2021 Note has been fully drawn.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of common stock of Meta that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone Investments, LLC (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Prospect as defined in the Security Agreement.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to the $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the "Loan Agreement"), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this prospectus, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans are due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described below. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

54

Table of Contents

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

*Contractual Obligations and Other Commitments*

Our most significant contractual obligations relate to the Loan Agreement, the 2021 Note and drilling and development commitments and other lease operating expenses under certain leases for the Orogrande Project.

Our debt obligations include the $15 million principal balance outstanding under the 2021 Note with Meta, which incurs interest at 8% per annum and matures on March 31, 2023. For the nine months ended September 30, 2022, we incurred an interest of $948,099 that is paid in kind. On September 2, 2022, we entered into a Loan Agreement that governs the term loans advanced to us from Meta on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, which is the maximum amount of Meta's commitment under the Loan Agreement. The term loans incur interest at a per annum rate equal to 8% and mature on March 31, 2023. Under both the 2021 Note and the Loan Agreement, if we raise additional capital through debt or equity, or any combination thereof, of at least $30,000,000 before the respective maturity dates, we will be entitled to extend maturity to October 3, 2023 and repay the outstanding balances in six equal monthly installments beginning in April 2023 up to such extended maturity date. In addition, we may be obligated to pay Meta approximately $1 million for costs associated with the Spin-Off. See the discussion under the caption "Certain Relationships and Related Party Transactions—Agreements with Meta—Distribution Agreement—Settlement of Expenses." As of the date of this Prospectus, we do not have any long-term debt obligations.

In addition to our debt commitments, the Orogrande Project leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas are subject to expiration in 2022 if we fail to drill five wells as obligated by the end of the 2022 calendar year. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. In order to fulfill our drilling commitments for 2022, we currently estimate that our capital expenditures needs may be up to $10 million, and to the extent Meta pays any of these capital expenditures on our behalf, our indebtedness to Meta will increase. As such, we will require additional capital, and may not be able to obtain such additional capital when or in the amount necessary to fulfill our commitments under, and maintain our interest in, the leases. We do not yet know what our capital expenditure needs will be to satisfy our drilling commitments for the calendar year 2023. For a discussion of the risks relating to our drilling obligations, see "Risk Factors—Risks Related to Our Business", including the risk factor "—*Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities*". See also Note 4 of the notes to our financial statements as of and for the years ended December 31, 2020 and 2021 included elsewhere in this Prospectus.

Table of Contents

Management believes that currently available resources may not provide sufficient funds to enable us to meet our financing and drilling obligations for the remainder of the 2022 fiscal year and for the 2023 fiscal year. We anticipate that we will continue to incur operating losses and generate negative cash flows from operations for the foreseeable future. As a result, we will need additional capital resources to fund our operations both in the short term and in the long term, prior to achieving break even or positive operating cash flow. While we do not have any committed sources of capital, we expect to continue to opportunistically seek access to additional funds through public or private equity offerings or debt financings, through partnering or other strategic arrangements, including credit application arrangements with our third party servicers, or a combination of the foregoing. We may also seek additional credit support from Meta. Despite our efforts, we may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. We can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

## Critical Accounting Estimates

*Oil and natural gas properties*—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

*Depreciation, depletion, and amortization*—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

*Ceiling test*—Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on

56

**Table of Contents**

the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

*Asset retirement obligations*—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

### Recent Accounting Pronouncements

Our audited financial statements and the accompanying notes thereto found elsewhere in this Prospectus contain a description of recent accounting pronouncements.

57

Table of Contents

## MANAGEMENT

**Executive Officers and Non-Employee Directors Following the Spin-Off**

The following sets forth information regarding individuals who are currently expected to serve as executive officers and non-employee directors immediately after the Spin-Off, including their positions.

| Name | Age | Position |
|------|-----|----------|
| *Executive Officers* | | |
| Clifton DuBose, Jr. | 40 | Chief Executive Officer, Chairman of the Board of Directors |
| Joseph DeWoody | 40 | President, Director |
| Lucas T. Hawkins | 36 | Chief Financial Officer |
| Delvina Oelkers | 36 | Chief Operating Officer |
| *Key Employees* | | |
| Kyle Bradford | 42 | Executive Vice President, Drilling & Construction |
| Daren Rader | 38 | Executive Vice President, Completions & Production |
| *Non-Employee Directors* | | |
| Robert Lance Cook | 65 | Director |
| Mia Pitts | 38 | Director |
| Kristin Whitley | 38 | Director |

*Executive Officers*

**Clifton DuBose, Jr.** has successfully acquired, managed, and/or sold thousands of royalty acres and non-operated working interests in the Permian Basin. Since April 2018, Mr. DuBose has served as co-founder and member of Valor Mineral Management LLC ("Valor"). Valor is a mineral and working interest management firm which uses a proprietary software platform it has developed, known as "mineral.tech." Since August 2016 Mr. DuBose has also served as President of Imperial Royalty Management I, LLC, which is the general partner of a company that owns certain mineral interests, and since August 2016 as the managing member of Korban Resources LLC, a company which invests in oil and gas interests. Mr. DuBose is also an attorney, licensed to practice law in the State of Texas. He earned his law degree from Georgetown Law, in Washington D.C. in 2009 and a BS in Agribusiness from Abilene Christian University in 2004.

**Joseph DeWoody** has served as the founder and partner of several successful minerals-rights companies, including Clear Fork Royalty, since April 2010, and Valor since May 2018. Mr. DeWoody implemented strategic initiatives at Valor, managing 80,000 oil and gas interests in over 2,000,000 gross acres across 32 States, with strong revenue growth since inception developing full P&L, strategy, and business operations. He also developed Valor's proprietary mineral and working interest management software, known as "mineral.tech." Mr. DeWoody has also structured and participated in multiple complex transactions in both operated and non-operated assets. He has managed reporting to partners, including quarterly compilations, annual audit, and contractual calculations and payments. Mr. DeWoody was the 2021 D CEO Energy Services and Technology Executive of the Year and is a life member of American Mensa. He received his BBA and MBA from Baylor University, where he played football. He was appointed to the Texas Board of Professional Geoscientists, and he serves as director of the National Association of Royalty Owners—Texas. He was named one of Oil and Gas Investor Magazine's "Top 20 Under 40" and was featured in the Dallas Business Journal's "Who's Who in Energy."

**Lucas T. Hawkins** is the Co-Founder and has served as Chief Financial Officer of Mammoth Exploration LLC, a private equity backed upstream oil and gas company, since June 2016. Since July 2013, Mr. Hawkins has served as VP—Business Development of Hawkins Exploration, Inc. ("HEI"). HEI is an independently owned oil and gas exploration company focused on the Permian Basin. Mr. Hawkins led, managed and executed numerous acquisitions and subsequent development of oil and gas properties across the Permian Basin. From 2010 to 2011, Mr. Hawkins served as an Associate with The Sterling Group, a middle market private equity group focusing on

58

Table of Contents

industrial, manufacturing and distribution businesses. From 2011 to 2013 Mr. Hawkins served as an Associate with Natural Gas Partners, an energy private equity firm. Mr. Hawkins has a background in energy investment banking and private equity and earned his BBA in Finance and Business Honors from the University of Texas at Austin.

**Delvina Oelkers** served as Asset Manager from March 2016 to March 2019 at Eclipse Resources and as Completions Manager from March 2019 to November 2020 at Montage Resources, in each position where she managed engineering teams, achieving cost and efficiency improvements while implementing innovative technology for substantial reserve recovery. She led her operations team through several successful M&A transactions. Ms. Oelkers designed completions for the Eclipse and Montage Resources Super Lateral Program, including the design and execution of the first world-record-setting "Purple Hayes 1H" Well. As an Asset Manager at Eclipse Resources, Ms. Delvina was responsible for leading the multidisciplinary team to prove-up the asset. By utilizing innovative technologies in design, the first exploratory well produced 35% higher than type curve.

### Key Employees

**Kyle Bradford** has served as general manager of our subsidiary, Hudspeth Operating LLC, since September 2021. Prior to joining the Company, Mr. Bradford in the roles of Director, from February 2019 to November 2020 and VP of Drilling and Completions January 2014 to February 2019 for Eclipse Resources and Montage Resources. He led the drilling and operational teams through the development of the super-lateral program highlighted by the drilling and completion of the world record setting "Purple Hayes 1H". He has a proven track record of implementing technological advancements to reduce costs and increasing operational efficiencies. He previously worked at Chesapeake Energy holding various positions including Senior Operations Engineer Utica Business Unit from April 2012 to January 2014, and Asset Manager of the Appalachian North Business Unit from October 2010 to April 2012. His career started in May 2002 at CNX Gas. He holds a Bachelor of Science in Petroleum Engineering from Marietta College.

**Daren Rader** has 16 years of experience across the MidCon and Appalachian Basins as an engineer and operations leader. From March 2016 to November 2020, Mr. Rader served as a Senior Operations Manager for Montage Resources, and from February 2017 to February 2019, served as an Operations Manager for Blue Ridge Mountain Resources. He was instrumental in creating synergy amongst the field teams through multiple mergers and acquisition transactions. Mr. Rader is highly experienced both in prolific unconventional condensate and natural gas production and completion operations. Mr. Rader has a proven track record as a team leader with a focus on optimizing and streamlining field operations to reduce cost and minimize cycle times. Mr. Rader has been with the Company since September 2021.

### Non-Employee Directors

**Robert Lance Cook** spent 36 years at Shell Oil with final positions of Vice President of Wells Technology and Chief Scientist. Mr. Cook has extensive experience in Deepwater, Arctic, and Unconventional Research & Development and Operations. Mr. Cook is the founder and CEO of Enventure Global Technology, a joint venture between Shell and Halliburton. Mr. Cook has served as the COO of Sirius Well Manufacturing, a joint venture between Shell and CNPC and is a technologist with an extensive patent portfolio. Since retiring from Shell in 2016, Mr. Cook has served as Vice President of Production Operations for WellsX Inc. from 2017 to 2020 and in 2020, he founded and continues to serves as president and chief technology officer of Sage Geosystems Inc.

**Mia Pitts** is currently serving as Senior Counsel at Marsh McLennan Companies (February 2018-current) and previously was a litigator and regulatory compliance lawyer at Freshfields Bruckhaus Deringer (March 2010-March 2016), one of the world's largest and oldest law firms. Ms. Pitts has represented corporate and individual clients in internal, regulatory, civil, and criminal investigations before the U.S. Security and Exchange Commission, Department of Justice, and state attorney generals as well as in shareholder securities litigation, class action litigations, and other private civil allegations and suits. She has also represented independent

Table of Contents

corporate oversight authorities appointed by the federal government, including the DOJ-appointed monitor of a global financial institution and the federal court-appointed receiver of a multi-national firm in an SEC securities fraud matter. Ms. Pitts graduated from Georgetown University Law Center and Barnard College of Columbia University.

**Kristin Whitley, CPA**, began her career in June 2006 as a public accounting with Whitley Penn where she worked for 10 years. While at Whitley Penn she served a variety of clients within the energy and mining industries. In August 2016, Mrs. Whitley joined Vista Minerals, a leading in-basin regional provider of sand to industrial, oil and gas companies, in the role of Chief Accounting Officer and less than a year later was named Chief Financial Officer. While at Vista Minerals, Mrs. Whitley has managed the finance and accounting, human resources, and information technology functions, participating in numerous capital raises, strategic initiatives, contract negotiations, and risk management exercises. Mrs. Whitley is a Certified Public Accountant in the State of Texas. She graduated from The University of Texas at Austin with her BBA and from Texas Christian University's Neeley School of Business with her MBA. In 2019, Mrs. Whitley was named one of *Oil and Gas Investor's* Forty Under 40 in Energy.

## Conflicts of Interest

Nevada law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its directors, officers or stockholders. Our Amended and Restated Articles of Incorporation, to the maximum extent permitted from time to time by Nevada law, renounce any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to our directors, officers or stockholders or their respective affiliates. Our Amended and Restated Articles of Incorporation provide that, to the fullest extent permitted by law neither any director or officer nor his or her affiliates will have any duty to refrain from (i) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (ii) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or officer acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for such director or officer or such person's affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. We do not believe, however, that any fiduciary duties or contractual obligations of our directors or officers arising in the future would materially undermine our ability to operate our business. Our Amended and Restated Articles of Incorporation do not renounce our interest in any business opportunity that is expressly offered to a director or officer solely in his or her capacity as a director or officer of the Company. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our Amended and Restated Articles of Incorporation, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

## Director Independence

It is anticipated that after the Distribution a majority of the members of our Board will meet the criteria for independence as defined by the corporate governance guidelines to be adopted by our Board.

## Corporate Governance Guidelines

The Board has adopted written corporate governance guidelines that serve as a flexible framework within which our Board and its committees operate. The guidelines will be available on our website at www.nextbridgehydrocarbons.com, and are available upon written request to our corporate secretary.

Table of Contents

**Code of Business Conduct and Ethics**

The Board has adopted a written code of ethics that is designed to deter wrongdoing and to promote, among other things:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- the protection of the confidentiality of our non-public information;

- the responsible use of and control over our assets and resources;

- full, fair, accurate, timely and understandable disclosure in reports and documents that we file with the SEC and other regulators and in our other public communications;

- compliance with applicable laws, rules and regulations; and

- accountability for adherence to the code and prompt internal reporting of any possible violation of the code.

The code of conduct and ethics will be available on our *website at www.nextbridgehydrocarbons.com*, and is available upon written request to our corporate secretary.

While the Board oversees risk management, company management is charged with managing risk. Management communicates routinely with the Board and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.

Our Board administers its risk oversight function as a whole by making risk oversight a matter of collective consideration. Much of this work has been delegated to committees, which will meet regularly and report back to the full Board.

**Committees of Our Board**

We have established an audit committee, a compensation committee, a nominating and governance committee and an ESG committee, each of which operate under a written charter that will be available on our website.

In addition, our Board may, from time to time, designate one or more additional committees, which shall have the duties and powers granted to it by our Board.

***Audit Committee***

Upon their appointment to the Board, the members of the Audit Committee will consist of Kristin Whitley, as the chairperson, Mia Pitts and Robert L. Cook, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. Each member of the Audit Committee is financially literate, and Ms. Whitley has accounting and related financial management expertise and satisfies the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment.

The functions of the Audit Committee include:

- oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public;

- review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations;

61

Table of Contents

- select and appoint an independent registered public accounting firm;

- pre-approve all services to be provided to us by our independent registered public accounting firm;

- review related party transactions;

- review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews;

- review and evaluate the qualification, performance, fees and independence of our registered public accounting firm;

- meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters;

- discuss with our independent registered public accounting firm and our management earnings releases prior to their issuance;

- oversee our internal audit function; and

- oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies.

### Compensation Committee

Upon their appointment to the Board, the members of the Compensation Committee will consist of Mia Pitts, as the chairperson, Kristin Whitley and Robert L. Cook, each of whom are independent, "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act).

The functions of our Compensation Committee include:

- setting and reviewing our general policy regarding executive compensation;

- determining the compensation of our Chief Executive Officer and other executive officers;

- approving employment agreements for our Chief Executive Officer and other executive officers;

- reviewing the benefits provided to our Chief Executive Officer and other executive officers;

- overseeing our overall compensation structure, practices and benefits plans;

- administering our executive bonus and equity-based incentive plans; and

- assessing the independence of compensation consultants, legal counsel and other advisors to the Compensation Committee and hiring, approving the fees and overseeing the work of, and terminating the services of such advisors.

### Corporate Governance and Nominating Committee

Upon their appointment to the Board, the members of the Corporate Governance and Nominating Committee will consist of Robert L. Cook, as the chairperson, Kristin Whitley and Mia Pitts, each of whom are independent, "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act).

The functions of our Corporate Governance and Nominating Committee include:

- overseeing our corporate governance practices;

- reviewing and recommending to our Board amendments to our committee charters and other corporate governance guidelines;

Table of Contents

- reviewing and making recommendations to our Board regarding the structure of our various board committees;

- identifying, reviewing and recommending to our Board individuals for election to the Board;

- adopting and reviewing policies regarding the consideration of board candidates proposed by stockholders and other criteria for Board membership; and

- overseeing our Board's annual self-evaluation.

### ESG Committee

Upon their appointment to the Board, the members of the ESG Committee will consist of Joseph DeWoody, as the chairperson, Kristin Whitley and Robert L. Cook.

The functions of our ESG Committee include:

- provide oversight with respect to ESG matters;

- advise and assist the Board with its responsibilities for the oversight of ESG matters; and

- provide oversight with respect to our annual sustainability report, which we plan to make available through our website.

### Board Leadership Structure and Role in Risk Oversight

### Governance Structure

The position of Board chairman is filled by our Chief Executive Officer (the "CEO"). We believe this combined leadership structure is appropriate for us because our Chairman and CEO (i) conveys a singular, cohesive message to our stockholders, employees, industry partners and the investment community, (ii) eliminates any ambiguity as to who is accountable for our performance and (iii) is able to draw on his knowledge of our operations to provide the Board with leadership and properly focus discussions on the issues of greatest importance to the Company and our stockholders. Our directors and management team engage frequently and directly in the flow of information and ideas and we believe our combined leadership structure facilitates the quality, quantity and timeliness of the information flow and communication.

Since our Board chairman is also a member of management, our Board has designated Robert L. Cook, a non-management director, as "Lead Director." The responsibilities of the Lead Director include:

- Coordinating the scheduling of board meetings and preparation of agenda material for board meetings and executive sessions;

- Defining the scope, quality, quantity and timeliness of the flow of information between management and the Board;

- Chairing all meetings of non-management directors and of the executive committee;

- Overseeing the process of hiring, firing, evaluating and compensating the CEO;

- Approving the retention of consultants who report directly to the Board;

- Facilitating communication between the directors and the CEO, and communicating the directors' perspectives and consensus view to the CEO; provided, that the Lead Director may not, in his sole discretion, override the CEO on any matters without majority approval of the Board;

- Assisting the Board and officers in assuring compliance with and implementation of our governance principles;

- Leading the annual evaluation of the chairman;

- Serving as an independent point of contact for stockholders wishing to communicate with the Board;

63

Table of Contents

- Acting as principal liaison between the independent directors and the CEO on sensitive issues; and

- Leading the Board in anticipating and responding to crises.

### The Board's Role in Risk Oversight

The Board oversees that the assets of the Company are properly safeguarded, that the appropriate financial and other controls are maintained, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance. Included in these responsibilities is the Board's oversight of the various risks facing our company. In this regard, our board seeks to understand and oversee critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of our business strategy. The Board recognizes that it is neither possible nor prudent to eliminate all risk. Indeed, purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its objectives.

### Related Party Transactions

The Board has adopted a written policy regarding the approval of related party transactions. At regularly scheduled audit committee meetings, management will recommend any related party transactions that are contemplated, and such transactions will require the audit committee's approval. Generally, a "related party" is each of our executive officers, directors, nominees for director, any stockholder owning greater than five percent of our outstanding shares, including any immediate family member of each of the foregoing, and any entity owned or controlled by any of the foregoing. Transactions that are available to all of our employees generally or totaling less than $5,000 when aggregated with all similar transactions are excluded from the policy.

### Legal Proceedings

None of our current and future directors and executive officers has been involved in legal proceedings that would be material to an evaluation of our management team.

### Director Compensation

We are currently in the process of developing the details regarding the compensation packages of only those directors who are considered independent directors. Following the Spin-Off, we expect to grant each of our directors who are not employed by us or any of our subsidiaries ("non-employee directors") an option to purchase approximately 412,500 shares of our Common Stock. The vesting of these options will be subject to achievement of certain performance-based conditions on substantially the same terms as the options expected to be granted to our named executive officers described below under "Performance-Based Options."

We did not pay any compensation or grant any equity or other incentive awards to any of non-employee directors during the fiscal year ended December 31, 2021, nor did any of our non-employee directors receive any such compensation or awards from Meta or any of our other affiliates for their services during such fiscal year.

64

Table of Contents

## EXECUTIVE COMPENSATION

We are currently in the process of determining the philosophy and design of our compensation plans and programs to be offered to our senior management team, which we expect will incorporate elements of compensation to attract, retain and motivate highly talented individuals of our management team, align the interests of management with the interests of our stockholders and incentivize behaviors that we believe are necessary to enable us to succeed in our mission while upholding our values in a highly competitive marketplace. All decisions with respect to management compensation are made by the Board (and after the Spin-Off, will be made by the Compensation Committee).

### Incentive Compensation Awards

Our executive officers have not historically been paid bonuses or received equity awards, and our Board and Compensation Committee has not yet established a formal compensation policy for the determination of such awards. If our revenue grows and bonuses become affordable and justifiable, we expect to use the following parameters in justifying and quantifying bonuses for our executive officers: (1) the growth in our revenue, (2) the growth in our earnings before interest, taxes, depreciation and amortization, as adjusted ("EBITDA"), and (3) the value of our Common Stock. The Board and Compensation Committee has not adopted specific performance goals and target bonus amounts for any of its fiscal years, but may do so in the future. Subject to approval by the sole stockholder, we also expect that our executive officers will be granted performance-based stock options under our 2022 Plan (described below) in connection with or immediately following the Spin-Off and may be granted additional equity awards in future years under the 2022 Plan or a successor plan. The Compensation Committee will recommend to the Board the size, type and other terms of such equity awards.

### Employment Agreements

In connection with the Spin-Off, we entered into new employment agreements with certain of our named executive officers identified in the Summary Compensation Table below to be effective immediately following the Spin-Off. These agreements do not have a specified term and provide for the executive to receive an annual base salary as follows: Mr. DuBose – $400,000; Mr. DeWoody - $395,000; Mr. Hawkins - $390,000 and Ms. Oelkers - $385,000. Each executive is also eligible for an annual discretionary bonus as determined by the Compensation Committee, with a target bonus equal to 50% of the executive's base salary, and to participate in our benefit plans to be made available to employees generally. If the executive's employment with the Company is terminated by the Company without "cause" or by the executive for "good reason" (as defined in the agreement), the executive will receive severance of 12 months base salary, payable in installments over a 12-month period, a pro-rated amount of the executive's target bonus for the year of termination, payment of the executive's COBRA premiums for 12 months, and 12 months' accelerated vesting of the executive's then-outstanding and unvested equity awards granted by the Company (except that, in the case of Mr. DuBose the cash severance and pro-rated target bonus will be payable only if such termination occurs following the initial 12 months after the Spin-Off). However, if such a termination of the executive's employment occurs in connection with or within 12 months following a change in control of the Company, the executive's cash severance will equal 18 months of base salary (paid in a lump sum together with the pro-rated target bonus), the executive will be entitled to payment of COBRA premiums for 18 months, and the executive's then-outstanding equity awards granted by the Company will be fully vested. In each case, the executive's right to receive these severance benefits is subject to the executive's providing a release of claims to the Company and continued compliance with confidentiality, non-competition, non-solicitation and other covenants in favor of the Company set forth in the employment agreement. Mr. DuBose, Mr. DeWoody and Ms. Oelkers were each party to an employment agreement with Hudspeth Operating, LLC, one of our subsidiaries (as reflected in the Summary Compensation Table below). The agreements between Hudspeth Operating, LLC and Mr. DuBose, Mr. DeWoody and Ms. Oelkers have been superseded by their new employment agreements with us.

65

Table of Contents

**Performance-Based Options**

In connection with the Spin-Off, we expect to grant each of the following executive officers a performance-based stock option under the 2022 Plan described below with respect to the following number of shares: for Mr. DuBose and Ms. Oelkers, an amount equal to three percent (3%) of outstanding shares; and for Mr. DeWoody and Mr. Hawkins, an amount equal to one percent (1%) of outstanding shares (the "Option Percentage"). The exercise price of each of these options will be established at grant based on an implied fair market value of $199,500,000 for the Company's working interest in the Orogrande Project (which is significantly higher than the estimated fair market value of the Company's interest as of the date of the Spin-Off and is intended to create an additional incentive for the executives to increase the value of the Company's working interest above that threshold amount). If the Company increases its working interest in the Orogrande Project while the option is outstanding and subject to compliance with applicable tax laws, the option agreement will provide that the exercise price will increase proportionally based on an implied fair market value of $300,000,000 if the Company's working interest were to increase to 100%. If the executive's interest represented by the option is diluted by an increase in the Company's working interest, the executive may be entitled to an additional option grant to restore their Option Percentage. The vesting of the option will generally be contingent on the optionee's continued employment or service for at least one year following the Spin-Off (or such longer period as provided in the option agreement). Each of these options will have a maximum term of 10 years and will be granted under, and subject to the terms of, the 2022 Plan described below.

**Equity Incentive Plan**

Our Board adopted the 2022 Equity Incentive Plan (the "2022 Plan") to provide an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons. Meta, as the current sole stockholder, approved the 2022 Plan prior to the Spin-Off. The summary of the 2022 Plan below is qualified in its entirety by the full text of the plan document, which is being filed with the SEC as an exhibit to this amendment to the Registration Statement on Form S-1, of which this prospectus is a part and is available through the SEC's internet site at http://www.sec.gov.

Employees, officers, directors and consultants that provide services to us or one of our subsidiaries may be selected to receive awards under the 2022 Plan. Our Compensation Committee will administer the 2022 Plan. The Compensation Committee has broad authority to:

- select participants and determine the types of awards that they are to receive;

- determine the number of shares that are to be subject to awards and the terms and conditions of awards, including the price (if any) to be paid for the shares or the award and establish the vesting conditions (if applicable) of such shares or awards;

- cancel, modify or waive our rights with respect to, or modify, discontinue, suspend or terminate any or all outstanding awards, subject to any required consents;

- construe and interpret the terms of the 2022 Plan and any agreements relating to the plan;

- accelerate or extend the vesting or exercisability or extend the term of any or all outstanding awards subject to any required consent;

- subject to the other provisions of the 2022 Plan, make certain adjustments to an outstanding award and authorize the termination, conversion, substitution or succession of an award; and

- allow the purchase price of an award or shares of our Common Stock to be paid in the form of cash, check or electronic funds transfer, by the delivery of previously-owned shares of our Common Stock or by a reduction of the number of shares deliverable pursuant to the award, by services rendered by the recipient of the award, by notice and third party payment or cashless exercise on such terms as the administrator may authorize or any other form permitted by law.

The number of shares of our Common Stock initially reserved for issuance with respect to awards granted under the 2022 Plan is 50,000,000. The share limit will automatically increase on the first trading day in January of

66

Table of Contents

each year (commencing with January 2023). Any shares subject to awards that are not paid, delivered or exercised before they expire or are canceled or terminated, fail to vest, as well as shares used to pay the purchase or exercise price of awards or related tax withholding obligations, will become available for other award grants under the 2022 Plan. As of the date of this prospectus, no awards have been granted under the 2022 Plan, and the full number of shares reserved under the 2022 Plan is available for award purposes.

Awards under the 2022 Plan may be in the form of incentive or nonqualified stock options, stock appreciation rights, stock bonuses, restricted stock, stock units and other forms of awards including cash awards. Awards under the plan generally will not be transferable other than by will or the laws of descent and distribution, except that the plan administrator may authorize certain transfers.

Nonqualified and incentive stock options may not be granted at prices below the fair market value of the common stock on the date of grant. Incentive stock options must have an exercise price that is at least equal to the fair market value of our Common Stock on the date of grant (or 110% of the fair market value of our Common Stock for incentive stock option grants to any 10% owner of our Common Stock). The maximum term of options and stock appreciation rights granted under the plan is 10 years (or five years for incentive stock option grants to any 10% owner of our Common Stock). These and other awards may also be issued solely or in part for services. Awards are generally paid in shares of our Common Stock or in cash. The plan administrator may provide for the deferred payment of awards and may determine the terms applicable to deferrals.

As is customary in incentive plans of this nature, the number and type of shares available under the 2022 Plan and any outstanding awards, as well as the exercise or purchase prices of awards, will be subject to adjustment in the event of certain reorganizations, mergers, combinations, recapitalizations, stock splits, stock dividends or other similar events that change the number or kind of shares outstanding, and extraordinary dividends or distributions of property to the stockholders. In no case (except due to an adjustment referred to above or any repricing that may be approved by our stockholders) will any adjustment be made to a stock option or stock appreciation right award under the 2022 Plan (by amendment, cancellation and regrant, exchange or other means) that would constitute a repricing of the per-share exercise or base price of the award.

Generally, and subject to limited exceptions set forth in the 2022 Plan, if we dissolve or undergo certain corporate transactions such as a merger, business combination or other reorganization, or a sale of all or substantially all of its assets, all awards then-outstanding under the 2022 Plan will become fully vested or paid, as applicable, and will terminate or be terminated in such circumstances, unless the plan administrator provides for the assumption, substitution or other continuation of the award. The plan administrator also has the discretion to establish other change in control provisions with respect to awards granted under the 2022 Plan. For example, the administrator could provide for the acceleration of vesting or payment of an award in connection with a corporate event that is not described above and provide that any such acceleration shall be automatic upon the occurrence of any such event.

Our Board will have the ability to amend or terminate the 2022 Plan at any time, but no such action will affect any outstanding award in any manner materially adverse to a participant without the consent of the participant. Plan amendments will be submitted to stockholders for their approval as required by applicable law or any applicable listing agency. The 2022 Plan will not be exclusive – our Board and Compensation Committee may grant stock and performance incentives or other compensation, in stock or cash, under other plans or authority.

The 2022 Plan terminates on the tenth anniversary date of the adoption. However, the plan administrator will retain its authority under the 2022 Plan until all outstanding awards are exercised or terminated.

**Benefits**

At this stage of our business, we provide no benefits or prerequisites for our employees other than health insurance and vacation benefits that we believe are generally comparable to those offered by other small private

Table of Contents

and public companies or as may be required by applicable state employment laws. We do not have a 401(k) retirement plan or any other retirement plan for our employees NEOs. We may adopt these plans and confer other fringe benefits for our executive officers in the future.

**Summary Compensation Table—Fiscal Year 2021**

As an emerging growth company, we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined under the Securities Act of 1933, as amended, which require compensation disclosure for our principal executive officer and up to two other executive officers who were employed by our wholly owned subsidiary Hudspeth Operating, LLC as of December 31, 2021 (also referred to as our "named executive officers" or "NEOs"). The table below sets forth the annual compensation for services rendered during 2021 by our named executive officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Tot ($ |
|---|---|---|---|---|---|---|---|---|---|
| Clifton DuBose, Jr.[2] *Chief Executive Officer* | 2021 | 126,667 | — | — | — | — | — | 11,300[1] | 137, |
| Joseph DeWoody[2] *President* | 2021 | 63,333 | — | — | — | — | — | 11,300[1] | 74, |
| Delvina Oelkers[2] *Chief Operating Officer* | 2021 | 121,915 | — | — | — | — | — | 11,300[1] | 133, |

(1)  The amount includes insurance reimbursements paid to Mr. DuBose, Mr. DeWoody and Ms. Oelkers.
(2)  Mr. DuBose, Mr. DeWoody and Ms. Oelkers each commenced employment with one of our subsidiaries, Hudspeth Operating, LLC, on September 7, 2021 each as a general manager.

**Outstanding Equity Awards as of December 31, 2021**

As of December 31, 2021, our NEOs did not hold any outstanding equity awards with respect to our equity securities or equity securities of Meta or any of its affiliated companies.

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

All of the Common Stock is currently beneficially owned by Meta. After the Spin-Off, Meta will not own any of the Common Stock. The following table provides information with respect to the expected beneficial ownership of the Common Stock after giving effect to the Spin-Off by (i) each person who we believe will be a beneficial owner of more than 5% of the outstanding Common Stock, (ii) each of our directors and our NEOs, and (iii) all directors and executive officers as a group. We based the share amounts on each person's beneficial ownership of Series A Preferred Stock as of _____, 2022, unless we indicate some other basis for the share amounts, and assuming a distribution ratio of one share of our Common Stock for each share of Meta's Series A Preferred Stock.

To the extent our directors and officers own Series A Preferred Stock at the time of the Spin-Off, they will participate in the Spin-Off on the same terms as other holders of Series A Preferred Stock.

Except as otherwise noted in the footnotes below, each person or entity identified below has sole voting and investment power with respect to such securities. Following the Spin-Off, we will have outstanding an aggregate of shares of Common Stock based upon shares of Series A Preferred Stock outstanding on _____, 2022 and applying the distribution ratio of one share of our Common Stock for each share of Series A Preferred Stock held as of the Record Date.

| Name of Beneficial Owner | Number of Series A Preferred Stock Beneficially Owned Before Distribution | Percentage of Series A Preferred Stock Beneficially Owned Before Distribution | Number of Common Stock Beneficially Owned After Distribution | Percentage of Common Stock Beneficially Owned After Distribution |
|---|---|---|---|---|
| **5% or More Stockholders** | | | | |
| Gregory McCabe 6015 Green Hill Ct. Midland, TX 79707 | 19,605,348[1] | 11.84% | 19,605,348 | 11.84% |
| **Directors and Executive Officers** | | | | |
| Robert L. Cook | 300,000 | 0.18% | 300,000 | 0.18% |
| Clifton DuBose Jr. | — | — | — | — |
| Joseph DeWoody | — | — | — | — |
| Lucas T. Hawkins | — | — | — | — |
| Delvina Oelkers | — | — | — | — |
| Mia Pitts | — | — | — | — |
| Kristin Whitley | — | — | — | — |
| Kyle Bradford | — | — | — | — |
| Daren Rader | — | — | — | — |
| All officers and directors as a group (9 persons) | 300,000 | 0.18% | 300,000 | 0.18% |

(1)  Represents shares of Series A Preferred Stock owned personally by Mr. McCabe and further includes 797,099 shares out of 19,605,348 shares owned by GMC Exploration, LLC, an entity that is owned 50% by Mr. McCabe.

69

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

With respect to the standards applied by the audit committee when deciding whether to approve a related party transaction, the audit committee shall approve or ratify the transaction if it is on terms believed to be comparable to those that could be obtained in arm's length dealings with an unrelated third party. We believe that the transactions and agreements discussed below (including renewals of any existing agreements) between us and related third parties are at least as favorable to us as could have been obtained from unrelated parties at the time they were entered into.

### Transactions with Stockholder Gregory McCabe

On August 7, 2014, our predecessor entered into a Purchase Agreement (the "Purchase Agreement") with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe that was entered into as a part of the Purchase Agreement (the "Participation Agreement"). As of December 31, 2021, leases covering approximately 134,000 acres remain in effect that are subject to the Participation Agreement. As of September 30, 2022, we had a balance of $165,238 for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande Project pursuant to the terms of the Participation Agreement.

Mr. McCabe also owns a controlling interest in Wolfbone Investments, LLC ("Wolfbone"), the owner of certain properties in the Orogrande Project. On August 6, 2018, we and Hudspeth entered into a Purchase & Settlement Agreement (the "Settlement Agreement") with Founders Oil & Gas Operating, LLC, Wolfbone and MPC, which agreement provided for Founders assigning its 50% working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally, with each entity receiving 25% working interest.

Under that certain Farmout Agreement, by and among Hudspeth, Pandora Energy LP, Founders Oil & Gas, LLC, MPC and Mr. McCabe dated as of September 23, 2015, as amended, future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement. With such $40.5 MM threshold being met, Wolfbone will bear 25% of the costs of the wells drilled in the Orogrande acreage going forward provided that Wolfbone elects to participate in drilling such wells.

Additionally, Mr. McCabe owns a controlling interest in Magdalena Royalties, LLC ("Magdalena"), an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage. Magdalena's overriding royalty interest in the Orogrande acreage, which was obtained prior to, and was not a part of any of the transactions with us or subsidiaries.

Effective April 4, 2016, Torchlight Energy, Inc. ("TEI") acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. As part of that transaction, MPC, TEI, and Imperial Exploration, LLC entered into Participation Agreement effective as of May 1, 2016. MPC and another unrelated working interest owner retained a back-in after payout working interest of 25% in that same acreage, and the interest will be triggered back to MPC upon the proceeds from production equal the costs of developing the project area.

Lastly, on August 13, 2020, our subsidiaries TEI and Torchlight Hazel, LLC (collectively, "Torchlight Subs") entered into the Option Agreement with MHP and MPC. Under the Option Agreement, MHP was obligated to satisfy certain drilling obligations on the Hazel Project. Further, under the terms of the Option Agreement (which was amended in September 2020), MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we

70

Table of Contents

would be obligated to reimburse MHP for its cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option in 2021. Additionally, MPC holds a reversionary interest burdening our proportionate interest in the Hazel Project of 20%.

For a discussion regarding prior transactions and our ongoing relationship with Mr. McCabe and certain entities controlled by Mr. McCabe with respect to the Orogrande Project and Hazel Project, please refer to Note 4 of the notes accompanying the financial statements included elsewhere in this Prospectus.

**Transactions with Meta**

Following the Spin-Off, we and Meta will operate independently, and neither will have any ownership interest in the other. In order to govern the ongoing relationship between us and Meta after the Spin-Off, we and Meta have entered into certain agreements, and under which we and Meta have agreed to indemnify each other against certain liabilities arising from our respective businesses. The following summarizes the material terms of these agreements.

*Assignment of Company Interests*

Pursuant to an Assignment of Company Interests and Stock Power dated as of June 28, 2022 between Meta and us, Meta assigned and conveyed to us one hundred percent (100%) of the equity interest of each of Torchlight Energy, Inc., Torchlight Hazel, LLC and Hudspeth Oil Corporation, such that following such assignment and conveyance, each of such entities became our wholly-owned subsidiaries.

*2021 Note*

In 2021, we entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal monthly installments. If an event of default has occurred and is continuing under the 2021 Note, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is secured by a security interest in 1,515,000 shares of common stock of Meta beneficially owned by Mr. McCabe and by a lien on Wolfbone's 25% working interest in the Orogrande Project.

*Loan Agreement*

We entered into the Loan Agreement with Meta as the lender which governs the unsecured term loans previously advanced to us on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, each bearing interest at 8% per annum. For additional discussion regarding the terms of the Loan Agreement, see the discussion under the heading "Liquidity and Capital Resources" included elsewhere in this Prospectus.

*Distribution Agreement*

We have entered into a Distribution Agreement with Meta. The Distribution Agreement sets forth our agreements with Meta regarding the principal actions to be taken in connection with the Spin-Off. It also sets forth other agreements that govern aspects of our relationship with Meta following the Spin-Off.

71

Table of Contents

*Intercompany Arrangements.* All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Meta, on the other hand, will terminate effective as of the Distribution, except specified agreements and arrangements that are intended to survive the Distribution.

*The Distribution.* The Distribution Agreement governs Meta's and our respective rights and obligations regarding the Distribution. Prior to the Distribution, Meta will deliver all the issued and outstanding shares of our Common Stock to the distribution agent. Following the Distribution Date, the distribution agent will distribute the shares of our Common Stock to Meta stockholders in book-entry form based on the distribution ratio and will not issue any physical stock certificates, other than upon request. The Meta Board will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the Distribution.

*Settlement of Expenses.* Within 90 days after consummation of the Spin-Off, we and Meta have agreed to negotiate the settlement and agreement regarding (i) advances made to us by Meta or expenses paid by Meta on our behalf, whether before or after the Spin-Off and (ii) costs related to the Spin-Off that are to be borne by us. In addition, to the extent Meta signs or guaranties any credit applications with trade creditors on our behalf to allow us to meet our drilling obligations, any amounts drawn under such credit applications would be included in the settlement. All the above mentioned amounts owed by us to Meta are expected to become payable pursuant to a promissory note on terms to be negotiated.

*Conditions.* The Distribution Agreement provides that several conditions must be satisfied or waived by Meta in its sole and absolute discretion before the Distribution can occur. For further information about these conditions, see "The Spin-Off—Conditions to the Spin-Off." The Meta Board may, in its sole and absolute discretion, determine the Record Date and the Distribution Date and may at any time prior to the completion of the Spin-Off decide to abandon or modify the Spin-Off.

*Exchange of Information.* We and Meta have agreed to provide each other with information reasonably necessary to comply with reporting, disclosure, filing or other requirements of any national securities exchange or governmental authority, for use in judicial, regulatory, administrative and other proceedings and to satisfy audit, accounting, litigation and other similar requests. We and Meta have also agreed to use reasonable best efforts to retain such information in accordance with our respective record retention policies as in effect on the date of the Distribution Agreement. Until the end of the first full fiscal year following the Distribution, each party has also agreed to use its reasonable best efforts to assist the other with its financial reporting and audit obligations.

*Termination.* The Meta Board, in its sole and absolute discretion, may terminate the Distribution Agreement at any time prior to the Distribution.

*Release of Claims.* We and Meta have each agreed to release the other and its affiliates, successors and assigns, and all persons that prior to the Distribution have been the other's stockholders, directors, officers, members, agents and employees, and their respective heirs, executors, administrators, successors and assigns, from certain claims against any of them that arise out of or relate to events, circumstances or actions occurring or failing to occur or any conditions existing at or prior to the time of the Distribution other than certain claims against current and former directors and officers of Meta and its predecessor Torchlight.

*Indemnification.* We and Meta have each agreed to indemnify the other and each of the other's current, former and future directors, officers and employees, and each of the heirs, administrators, executors, successors and assigns of any of them, against certain liabilities incurred in connection with the Spin-Off and our and Meta's respective businesses. The Distribution Agreement also specifies procedures regarding claims subject to indemnification, including our entitlement to indemnification with respect to the matters described under "Legal Proceedings" in this Prospectus.

Table of Contents

*Tax Matters Agreement*

The Tax Matters Agreement governs Meta's and our respective rights, responsibilities and obligations with respect to taxes (including taxes arising in the ordinary course of business and taxes incurred as a result of the Spin-Off), tax attributes, tax returns, tax contests and certain other tax matters.

The Tax Matters Agreement allocates responsibility for the preparation and filing of certain tax returns (and the payment of taxes reflected thereon), including Meta's consolidated federal income tax return, tax returns associated with both the Meta business and our business, and tax returns associated with either the Meta business or our business, and provides for certain reimbursements by the parties.

Under the Tax Matters Agreement, we are liable for taxes of Meta attributable to us or our subsidiaries or arising or resulting from the Spin-Off. We will bear liability for any transfer taxes incurred on the Spin-Off.

Each of Meta and the Company agree to indemnify each other against certain taxes allocated to such party under the Tax Matters Agreement, and related out-of-pocket costs and expenses.

We encourage you to read the Tax Matters Agreement carefully.

**Related Party Transactions**

*Policy and Procedures Governing Related Person Transactions*

Our audit committee of the Board will adopt written procedures in evaluating the terms and provisions of proposed related party transactions or agreements in accordance with the Exchange Act, and the fiduciary duties of directors under Nevada law. Our related party transaction procedures will contemplate audit committee review and approval of all new agreements, transactions or courses of dealing with related parties, including any modifications, waivers or amendments to existing related party transactions. We will ensure that the terms of related party transactions are at least as favorable to us as could have been obtained from unrelated parties at the time of the transaction. The audit committee will consider, at a minimum, the nature of the relationship between us and the related party, the history of the transaction (in the case of modifications, waivers or amendments), the terms of the proposed transaction, our rationale for entering into the transaction and the terms of comparable transactions with unrelated third parties. In addition, management and internal audit will annually analyze all existing related party agreements and transactions and review them with the audit committee.

73

Table of Contents

# DESCRIPTION OF OUR CAPITAL STOCK

**General**

Prior to the Distribution Date, Meta, as our sole stockholder, approved and adopted our Amended and Restated Articles of Incorporation, and our Board approved and adopted our Amended and Restated By-laws. The following summarizes information concerning our capital stock, including material provisions of our Amended and Restated Articles of Incorporation, our Amended and Restated By-laws and certain provisions of Nevada law. You are encouraged to read our Amended and Restated Articles of Incorporation and our Amended and Restated By-laws, which have been filed as exhibits to the Registration Statement on Form S-1, of which this Prospectus is a part, for greater detail with respect to these provisions.

The Company was incorporated on August 31, 2021, and 1 share of Common Stock was issued to Meta. Subsequent to the formation of the Company, we have not sold any securities of the Company; provided, that as of July 2022, the Company issued 165,523,362 additional shares of Common Stock to Meta.

**Authorized Capital Stock**

Immediately following the Spin-Off, our authorized capital stock will consist of 500,000,000 shares of Common Stock, par value $0.0001 per share, and 50,000,000 shares of preferred stock, par value $0.0001 per share.

**Common Stock**

***Shares Outstanding***. Immediately following the Spin-Off, we estimate that approximately 165.5 million shares of our Common Stock will be issued and outstanding, based on the approximate number of shares of Series A Preferred Stock outstanding as of August 30, 2022. The actual number of shares of our Common Stock outstanding immediately following the Spin-Off will depend on the actual number of shares of Series A Preferred Stock outstanding on the Record Date.

***Voting Rights***. The holders of our Common Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders. Holders of shares of our Common Stock will not have cumulative voting rights.

***Other Rights***. Subject to the preferential liquidation rights of any preferred stock that may be outstanding, upon our liquidation, dissolution or winding-up, the holders of our Common Stock will be entitled to share ratably in our assets legally available for distribution to our stockholders.

***Fully Paid***. The issued and outstanding shares of our Common Stock are fully paid and non-assessable. Any additional shares of Common Stock that we may issue in the future will also be fully paid and non-assessable.

The holders of our Common Stock will not have preemptive rights or preferential rights to subscribe for shares of our capital stock.

**Preferred Stock**

Our Amended and Restated Articles of Incorporation authorize our Board to designate and issue from time to time one or more series of preferred stock without stockholder approval. If we offer a new series of preferred stock, a more specific description may be filed with the SEC, and the designations and rights of such preferred stock will be described in an accompanying prospectus supplement, including the following terms:

- the series, the number of shares offered, and the liquidation value of the preferred stock;

74

Table of Contents

- the price at which the preferred stock will be issued;

- the dividend rate, the dates on which the dividends will be payable, and other terms relating to the payment of dividends on the preferred stock;

- the liquidation preference of the preferred stock;

- the voting rights of the preferred stock;

- whether the preferred stock is redeemable, or subject to a sinking fund, and the terms of any such redemption or sinking fund;

- whether the preferred stock is convertible, or exchangeable for any other securities, and the terms of any such conversion or exchange; and

- any additional rights, preferences, qualifications, limitations, and restrictions of the preferred stock.

The description of the terms of the preferred stock that will be set forth in an applicable prospectus will not be complete and will be subject to and qualified in its entirety by reference to the certificate of designation relating to the applicable series of preferred stock. The registration statement, of which this prospectus forms a part, will include the certificate of designation as an exhibit or incorporate it by reference.

Undesignated preferred stock may enable our Board to render more difficult or to discourage an attempt to obtain control of us by means of a tender offer, proxy contest, merger, or otherwise and to thereby protect the continuity of our management. The issuance of shares of preferred stock may adversely affect the rights of the holders of our Common Stock. For example, any preferred stock issued may:

- rank senior to our common stock as to dividend rights, liquidation preference, or both;

- have full or limited voting rights; and

- be convertible into shares of common stock or another series of preferred stock.

The issuance of additional preferred stock could adversely affect the voting power, conversion or other rights of holders of Common Stock.

**Certain Provisions of Nevada Law**

**_Combination with Interested Stockholders Statute_**

Sections 78.411 to 78.444 of the Nevada Revised Statutes (N.R.S.), which apply to any Nevada corporation with more than 200 stockholders, prohibits an "interested stockholder" from entering into a "combination" with the corporation for two years, unless certain conditions are met. A "combination" includes:

- any merger of the corporation or any subsidiary of the corporation with an "interested stockholder," or any other entity, whether or not itself an "interested stockholder," which is, or after and as a result of the merger would be, an affiliate or associate of an "interested stockholder;"

- any sales, lease, exchange, mortgage, pledge, transfer, or other disposition in one transaction, or a series of transactions, to or with an "interested stockholder" or any affiliate or associate of an "interested stockholder," of assets of the corporation or any subsidiary of the corporation:

  - having an aggregate market value equal to more than 5% of the aggregate market value of the corporation's assets, determined on a consolidated basis;

  - having an aggregate market value equal to more than 5% of the aggregate market value of all of the outstanding shares of the corporation; or

75

Table of Contents

- representing more than 10% of the earning power or net income, determined on a consolidated basis, of the corporation; or

- the issuance or transfer by the corporation or any subsidiary, of any shares of the corporation or any subsidiary to an "interested stockholder" or any affiliate or associate of an "interested stockholder," having an aggregate market value equal to 5% or more of the aggregate market value of all of the outstanding voting shares of the corporation, except under the exercise of warrants or rights to purchase shares offered, or a dividend or distribution paid or made, pro rata to all stockholders of the resident domestic corporation;

- the adoption of any plan, or proposal for the liquidation or dissolution of the corporation, under any agreement, arrangement or understanding, with the "interested stockholder." or any affiliate or associated of the "interested stockholder;"

- if any of the following actions occurs:

  - a reclassification of the corporation's securities, including, without limitation, any splitting of shares, share dividend, or other distribution of shares with respect to other shares, or any issuance of new shares in exchange for a proportionately greater number of old shares;

  - recapitalization of the corporation;

  - merger of consolidation of the corporation with any subsidiary; or

  - any other transaction, whether or not with or into or otherwise involving the interested stockholder, under any agreement, arrangement or understanding, whether or not in writing, with the interested stockholder or any affiliate or associate of the interested stockholder, which has the immediate and proximate effect of increasing the proportionate share of the outstanding shares of any class or series of voting shares or securities convertible into voting shares of the corporation or any subsidiary of the corporation which is beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder;

- any receipt by an "interested stockholder" or any affiliate or associate of an "interested stockholder" except proportionately as a stockholder of the corporation, of the benefit of any loan, advance, guarantee, pledge or other financial assistance or any tax credit or other tax advantage provided by or through the corporation

An "interested stockholder" is a person who is:

- directly or indirectly, the beneficial owner of 10% or more of the voting power of the outstanding voting shares of the corporation; or

- an affiliate or associate of the corporation, which at any time within two years immediately before the date in question was the beneficial owner, directly or indirectly, of 10% or more of the voting power of the then outstanding shares of the corporation.

A corporation to which the Combinations with Interested Stockholders Statute applies may not engage in a "combination" within two years after the interested stockholder first became an interested stockholder, unless the combination meets all of the requirements of the corporation's articles of incorporation and (i) the combination or the transaction by which the person first became an interested stockholder is approved by the board of directors before the person first became an interested stockholder, or (ii)(a) the combination is approved by the board of directors and (b) at or after that time, the combination is approved at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of the stockholders representing at least sixty percent (60%) of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or the affiliates or associates of the interested stockholder. If this approval is not obtained, the combination may be consummated after the two year period expires if either (i)(a) the combination or transaction

Table of Contents

by which the person first became an interested stockholder is approved by the board of directors before such person first became an interested stockholder, (b) the combination is approved by a majority of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder, or (c) the combination otherwise meets the requirements of the Combination with Interested Stockholders Statute. Alternatively, a combination with an interested stockholder engaged in more than 2 years after the date the person first became an interested stockholder may be permissible if the aggregate amount of cash and the market value of consideration other than cash to be received by holders of shares of common stock and holders of any other class or series of shares meets the minimum requirements set forth in the statue, and prior to the completion of the combination, except in limited circumstances, the interested stockholder has not become the beneficial owner of additional voting shares of the corporation.

*Acquisition of Controlling Interest Statute*

In addition, Nevada's "Acquisition of Controlling Interest Statute," prohibits an acquiror, under certain circumstances, from voting shares of a target corporation's stock after crossing certain threshold ownership percentages, unless the acquiror obtains the approval of the target corporation's stockholders. Sections 78.378 to 78.3793 of the N.R.S. only apply to Nevada corporations with at least 200 stockholders, including at least 100 record stockholders who are Nevada residents, that do business directly or through an affiliated corporation in Nevada and whose articles of incorporation or bylaws in effect 10 days following the acquisition of a controlling interest by an acquiror do not prohibit its application.

We do not intend to "do business" in Nevada within the meaning of the Acquisition of Controlling Interest Statute. Therefore, we believe it is unlikely that this statute will apply to us. The statute specifies three thresholds:

- at least one-fifth but less than one-third;

- at least one-third but less than a majority; and

- a majority or more, of the outstanding voting power. Once an acquiror crosses one of these thresholds, shares which it acquired in the transaction taking it over the threshold (or within ninety days preceding the date thereof) become "control shares" which could be deprived of the right to vote until a majority of the disinterested stockholders restore that right.

A special stockholders' meeting may be called at the request of the acquiror to consider the voting rights of the acquiror's shares. If the acquiror requests a special meeting and gives an undertaking to pay the expenses of said meeting, then the meeting must take place no earlier than 30 days (unless the acquiror requests that the meeting be held sooner) and no more than 50 days (unless the acquiror agrees to a later date) after the delivery by the acquiror to the corporation of an information statement which sets forth the range of voting power that the acquiror has acquired or proposes to acquire and certain other information concerning the acquiror and the proposed control share acquisition.

If no such request for a stockholders' meeting is made, consideration of the voting rights of the acquiror's shares must be taken at the next special or annual stockholders' meeting. If the stockholders fail to restore voting rights to the acquiror, or if the acquiror fails to timely deliver an information statement to the corporation, then the corporation may, if so provided in its articles of incorporation or bylaws in effect on the tenth day following the acquisition, call certain of the acquiror's shares for redemption at the average price paid for such shares by the acquiror.

Our restated articles of incorporation and amended and restated bylaws do not currently permit us to redeem an acquiror's shares under these circumstances, but could be amended to so provide within ten days following the acquisition. The Acquisition of Controlling Interest Statute also provides that in the event the stockholders restore full voting rights to a holder of control shares that owns a majority of the voting stock, then, unless the

Table of Contents

corporation's articles of incorporation or bylaws in effect on the tenth day following the acquisition otherwise provide, all other stockholders who do not vote in favor of restoring voting rights to the control shares may demand payment for the "fair value" of their shares as determined by a court in dissenters rights proceeding pursuant to Chapter 92A of the N.R.S.

### *Limitations of Liability and Indemnification Matters*

Our Amended and Restated Articles of Incorporation contain provisions that limit the liability of our current and former directors for monetary damages to the fullest extent permitted by Nevada law. Nevada law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, unless the presumption that the directors have acted in good faith, on an informed basis, and with a view to the interests of the corporation has been rebutted, in which case directors may be liable for damages resulting from intentional misconduct, fraud or a knowing violation of law. To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

### **Transfer Agent and Registrar**

The transfer agent and registrar for the Common Stock is American Stock Transfer & Trust Company LLC.

### **No Listing**

Our Common Stock is not listed on any securities exchange and will not be eligible for electronic trading through DTC or any other established clearing corporation.

## LEGAL MATTERS

Certain legal matters in connection with the distribution of our Common Stock in the Spin-Off described in this Prospectus will be passed upon for us by O'Melveny & Myers, LLP, Dallas, Texas, and by Woodburn and Wedge, Reno, Nevada, with respect to matters of Nevada law.

## EXPERTS

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, and for each of the fiscal years then ended, appearing in this Prospectus, have been audited by BF Borgers, CPA, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

Estimates of the oil and gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this Prospectus. We have included these estimates in reliance on the authority of such firm as an expert in such matters.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act to register the shares of our Common Stock to be distributed in the Spin-Off. The term registration statement means the original registration statement and any and all amendments thereto, including the exhibits and schedules to the original registration statement and any amendments. This Prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed therewith. For further information with respect to us, reference is made to the registration statement and the exhibits and schedules filed therewith. Statements contained in this Prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement. A copy of the registration statement, along with the exhibits and schedules filed therewith, may be inspected without charge at the SEC's website. The SEC maintains an internet website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

**The information contained on or accessible through our website shall not be deemed to be a part of this Prospectus or the registration statement on Form S-1, of which this Prospectus is a part.**

You may request a copy of any of our filings with the SEC at no cost by writing us at the following address:

<div align="center">

Investor Relations
Next Bridge Hydrocarbons, Inc.
6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116

</div>

We have not authorized anyone to give any information or make any representation about the Spin-Off or of the Company that is different from, or in addition to, that contained in this Prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. If you are in a jurisdiction where offers to sell, or solicitations of offers to purchase, the securities offered by this Prospectus or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this Prospectus does not extend to you. The information contained in this Prospectus speaks only as of the date of this Prospectus unless the information specifically indicates that another date applies.

<div align="center">79</div>

**Table of Contents**

## INDEX TO FINANCIAL STATEMENTS

|  | PAGE |
|---|---|
| **Consolidated Financial Statements (audited)** |  |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2021 and 2020 | F-3 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2021 and 2020 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2021 and 2020 | F-5 |
| **Notes to Consolidated Financial Statements** | F-6 |
|  |  |
| **Condensed Consolidated Financial Statements (unaudited)** |  |
| Consolidated Balance Sheets as of September 30, 2022 and December 31, 2021 | F-21 |
| Consolidated Statements of Operations for the three and nine months ended September 30, 2022 and 2021 | F-22 |
| Consolidated Statements of Stockholders' Equity for the three and nine months ended September 30, 2022 and 2021 | F-24 |
| Consolidated Statements of Cash Flows for the nine months ended September 30, 2022 and 2021 | F-26 |
| **Notes to Unaudited Condensed Consolidated Financial Statements** | F-27 |
|  |  |
| **Pro Forma Combined Financial Statements (unaudited)** |  |
| Combined Statements of Operations for the year ended December 31, 2021 | F-44 |
| Combined Statements of Operations for the nine months ended September 30, 2022 | F-45 |
| Combined Balance Sheets as of September 30, 2022 | F-46 |
| **Notes to Unaudited Pro Forma Combined Financial Statements** | F-47 |

80

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the board of directors of Next Bridge Hydrocarbons, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

**Substantial Doubt about the Company's Ability to Continue as a Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and has a significant accumulated deficit. In addition, the Company continues to experience negative cash flows from operations. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/S/ BF Borgers CPA PC
**BF Borgers CPA PC**
PCAOB ID: 5041
We have served as the Company's auditor since 2022
Lakewood, CO
July 15, 2022

F-1

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Balance Sheets**

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,989,419 | $ 130,504 |
| Accounts receivable, related party | 163,366 | 69,056 |
| Grants and other receivables | 74,310 | 161,064 |
| Prepaid expenses | 2,667 | 103,672 |
| Total current assets | 2,229,762 | 464,296 |
| Oil and natural gas properties, net | 45,663,470 | 30,857,959 |
| Property and equipment | — | 4,549 |
| Other assets | 25,000 | — |
| TOTAL ASSETS | $ 47,918,232 | $ 31,326,804 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,828,326 | $ 708,260 |
| Accrued liabilities | — | 1,213,779 |
| Notes payable, related party | 12,708,889 | — |
| Total current liabilities | 15,537,215 | 1,922,039 |
| Asset retirement obligations | 21,937 | 21,844 |
| Total liabilities | 15,559,152 | 1,943,883 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 25,000,000 shares authorized; 0 issued and outstanding | | |
| Common stock, par value $0.0001; 250,000,000 shares authorized; 1 issued and outstanding | — | — |
| Additional paid-in capital | 100,546,596 | 89,331,629 |
| Accumulated deficit | (68,187,516) | (59,948,708) |
| Total stockholder's equity | 32,359,080 | 29,382,921 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 47,918,232 | $ 31,326,804 |

F-2

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Operations**
**For the Years Ended December 31, 2021 and 2020**

| | 2021 | 2020 |
|---|---|---|
| Oil sales | $ 4,675 | $ 4,484 |
| Natural gas sales | 11,229 | 2,422 |
| **Revenue** | **15,904** | **6,906** |
| **Operating expenses** | | |
| Lease operating expenses | 75,330 | 86,988 |
| Production and ad valorem tax | 1,001 | 498 |
| General and administrative | 8,050,443 | 2,557,975 |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment | — | 2,108,301 |
| Total operating expenses | 8,131,416 | 5,574,576 |
| **Other income (expense)** | | |
| Interest expense | (212,201) | (11,121) |
| Gain (loss) on sale of assets | 1,000 | (170,215) |
| Gain on extinguishment of debt | 77,477 | — |
| Interest income | 10,428 | — |
| Total other income (expense)—net | (123,296) | (181,336) |
| **Loss before income taxes** | (8,238,808) | (5,749,006) |
| Provision for income tax | — | — |
| **Net loss** | **$(8,238,808)** | **$(5,749,006)** |

F-3

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Stockholders' Equity**
**For the Years Ended December 31, 2021 and 2020**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2019** | 1 | $ — | $ 88,203,178 | $(54,199,702) | $34,003,476 |
| Contributions from parent | — | — | 1,128,451 | — | 1,128,451 |
| Net loss | — | — | — | (5,749,006) | (5,749,006) |
| **Balance, December 31, 2020** | 1 | $ — | $ 89,331,629 | $(59,948,708) | $29,382,921 |
| Contributions from parent | — | — | 11,214,967 | — | 11,214,967 |
| Net loss | — | — | — | (8,238,808) | (8,238,808) |
| **Balance, December 31, 2021** | 1 | $ — | $100,546,596 | $(68,187,516) | $32,359,080 |

F-4

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2021 and 2020**

|  | 2021 | 2020 |
|---|---|---|
| **Cash Flows From Operating Activities** |  |  |
| Net loss | $ (8,238,808) | $(5,749,006) |
| Adjustments to reconcile net loss to net cash from operations: |  |  |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment loss | — | 2,108,301 |
| Paid in kind interest | 208,889 | — |
| Change in: |  |  |
| Accounts receivable, related party | (94,310) | (27,684) |
| Grants and other receivables | 86,754 | — |
| Prepaid expenses | 101,005 | (7,666) |
| Accounts payable | 2,120,066 | (617,952) |
| Accrued liabilities | (1,213,779) | 172,603 |
| Other assets | (25,000) | — |
| **Net cash from operating activities** | (7,050,541) | (3,300,590) |
| **Cash Flows From Investing Activities** |  |  |
| Investment in oil and natural gas properties | (14,805,511) | (236,807) |
| Proceeds from sale of oil and natural gas properties | — | 2,508,775 |
| **Net cash from investing activities** | (14,805,511) | 2,271,968 |
| **Cash Flows From Financing Activities** |  |  |
| Contributions from parent | 11,214,967 | 1,128,451 |
| Proceeds from notes payable, related party | 12,500,000 | — |
| **Net cash from financing activities** | 23,714,967 | 1,128,451 |
| **Net increase in cash** | 1,858,915 | 99,829 |
| **Cash—beginning of year** | 130,504 | 30,675 |
| **Cash—end of year** | $ 1,989,419 | $ 130,504 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** |  |  |
| Cash paid for interest | $ — | $ — |
| Cash paid for state franchise tax | $ — | $ — |

F-5

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.   NATURE OF BUSINESS**

Next Bridge Hydrocarbons, Inc., formerly OilCo Holdings, Inc., (the "Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation of Next Bridge Hydrocarbons, Inc. (formerly named OilCo Holdings, Inc.), our subsidiaries were consolidated into the financial statements of our parent, Meta Materials Inc. (formerly named Torchlight Energy Resources, Inc. ("TERI")). All intercompany transactions have been eliminated in the consolidated financial statements of Meta Materials, Inc.

On June 29, 2021, TERI acquired Metamaterial Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

**2.   GOING CONCERN**

At December 31, 2021, the Company had not yet achieved profitable operations. We had a net loss of $8,238,808 for the year ended December 31, 2021. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of December 31, 2021 of $13,307,453. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible; or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

**3.   SIGNIFICANT ACCOUNTING POLICIES**

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

*Use of estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

*Basis of presentation*—The financial statements are presented on a consolidated basis and include all of the accounts of the Company and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC,

Return to TOC

Table of Contents

Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated between the Company and its subsidiaries.

*Risks and uncertainties*—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 and into 2022. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Company's accounting estimates. Although demand and market prices for oil and natural gas have increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

*Concentration of risks*—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

*Fair value of financial instruments*—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.

- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.

- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

F-7

Table of Contents

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents***—Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable***—Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2021 and 2020, no valuation allowance was considered necessary. Bad debt expense for the years ended December 31, 2021 and 2020 was $0 and $15,606, respectively.

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest***—The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the years ended December 31, 2021 and 2020, the Company capitalized $141,048, and $2,353,700 respectively, of interest on unevaluated properties.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at ten percent, net of related realizable tax affects, plus the cost of unproved oil

F-8

Table of Contents

and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- and $2,108,301 for the years ended December 31, 2021 and 2020, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

*Asset retirement obligations*—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

*Income taxes*—Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

*Revenue recognition*—The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale

F-9

Table of Contents

of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on considerations specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Environmental laws and regulations***—The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2021 and 2020.

***Recently adopted accounting pronouncements***—

Effective January 1, 2021, we adopted ASU 2019-12 on a prospective basis. The new standard was issued in December 2019 with the intent of simplifying the accounting for income taxes. The accounting update removes certain exceptions to the general principles in ASC 740 Income Taxes as well as provides simplification by clarifying and amending existing guidance. The adoption of this ASU did not have a material impact on our consolidated financial statements.

In October 2020, the FASB issued ASU 2020-09, Debt- Debt (Topic 470): Amendments to SEC Paragraphs Pursuant to SEC Release No. 33-10762 ("ASU 2020-09"). The amendments in ASU 2020-09 amend rules focused on the provision of material, relevant, and decision-useful information regarding guarantees and other credit enhancements, and eliminate prescriptive requirements that have imposed unnecessary burdens and incentivized issuers of securities with guarantees and other credit enhancements to offer and sell those securities on an unregistered basis. The adopted amendments relate to the financial disclosure requirements for guarantors and issuers of guaranteed securities registered or being registered in Rule 3-10 of Regulation S-X, and affiliates whose securities collateralize securities registered or being registered in Rule 3-16 of Regulation S-X. The amendments in ASU 2020-09 are effective for public business entities for annual periods beginning after December 15, 2020. The Company has evaluated the provisions of ASU 2020-09 and noted no material impact to our consolidated financial statements or disclosures from the adoption of this ASU.

In October 2020, the FASB issued ASU 2020-10, Codification Improvements, which updated various codification topics by clarifying or improving disclosure requirements to align with the SEC's regulations. The

F-10

Table of Contents

amendments in ASU 2020-10 are effective for annual periods beginning after December 15, 2020, for public business entities. The Company adopted ASU 2020-10 on January 1, 2021 and its adoption did not have a material effect on the Company's financial statements and related disclosures.

### Recent accounting pronouncements not yet adopted—

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

## 4.   OIL & NATURAL GAS PROPERTIES

The following table presents the capitalized costs for oil & natural gas properties of the Company:

|  | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Evaluated costs subject to amortization | $          — | $ 15,656,182 |
| Unevaluated costs | 45,663,470 | 29,794,015 |
| Total capitalized costs | 45,663,470 | 45,450,197 |
| Less accumulated depreciation, depletion and amortization | — | (15,656,182) |
| Total oil and natural gas properties | $ 45,663,470 | $ 30,857,959 |

Unevaluated costs as of December 31, 2021 and 2020 include cumulative costs on developing projects including the Orogrande and Hazel Projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of December 31, 2021. As of December 31, 2021, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from

F-11

**Table of Contents**

known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction. As of December 31, 2021, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through December 31, 2021 have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone Investments, LLC ("Wolfbone") and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth

F-12

Table of Contents

and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande Project properties in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the property.

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept our offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

The Orogrande Project ownership as of December 31, 2021 is detailed as follows:

|  | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
|  | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, Torchlight Energy, Inc. ("TEI") acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

F-13

Table of Contents

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel Project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

## 5.  RELATED PARTY BALANCES

As of December 31, 2021 and 2020, related party payables were $-0- and $98,805, respectively, due to our executive officers and directors included in accounts payable on the consolidated balance sheets. Accrued payroll was $-0- and $1,213,779, respectively, consisting of accrued and unpaid compensation due to our executive officers.

F-14

Table of Contents

As of December 31, 2021, and 2020, the Company had a balance of $163,366 and $69,056, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande Project participation and development agreement.

## 6.   COMMITMENTS AND CONTINGENCIES

### Leases

The Company is subject to a sublease for occupancy of its office premises which requires monthly rent payments of $8,300.

### Legal Matters

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company, LLC's claims, and the case is closed.

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by the Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. Gregory McCabe, Meta's former Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, Meta filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500 and

F-15

Table of Contents

recover related attorney's fees. The foreclosure action, Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2021 and 2020, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**7.    STOCKHOLDERS' EQUITY**

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of December 31, 2021, the Company has issued 1 share of common stock and 0 shares of preferred stock.

**8.    INCOME TAXES**

The Company recorded no income tax provision for 2021 and 2020 because of losses incurred.

There are no uncertain tax positions accounted for in this tax provision.

The following is a reconciliation between the federal income tax benefit computed at statutory federal income tax rates and actual income tax provision for the years ended December 31, 2021 and 2020:

|  | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|
| Federal income tax benefit at statutory rate | $ (1,686,283) | $ (1,207,291) |
| Permanent Differences | 390,419 | 308 |
| Annual reconciling adjustment | (451,708) | (19,077) |
| Change in valuation allowance | 1,747,572 | 1,226,060 |
| Provision for income taxes | $          — | $          — |

The tax effects of temporary differences that gave rise to significant portions of deferred tax assets and liabilities at December 31, 2021 and 2020 are as follows:

|  | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Deferred tax assets: |  |  |
| Net operating loss carryforward | $ 12,491,191 | $ 10,335,223 |
| Disallowed interest expense | — | 2,404 |
| Other | 385 | 9,824 |
| Deferred tax liabilities: |  |  |
| Investment in oil and gas properties | (2,765,485) | (2,368,932) |
| Net deferred tax assets and liabilities | 9,726,091 | 7,978,519 |
| Less valuation allowance | (9,726,091) | (7,978,519) |
| Total deferred tax assets and liabilities | $          — | $          — |

F-16

Table of Contents

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $59,481,861 and $49,215,346 at December 31, 2020 and December 31, 2019, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

## 9. PROMISSORY NOTES

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to David A. Straz, Jr. Foundation (the "Straz Foundation") and the David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986 (the "Straz Trust") in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10,

F-17

Table of Contents

2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, a top-off obligation of Meta or Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) Hudspeth sells the entire working interest in the Orogrande Project, (b) as part of such sale, the holders' entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then Meta or Hudspeth must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

F-18

Table of Contents

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share. TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in April 2021.

Convertible Notes Issued in Fourth Quarter 2019

Effective October 31, 2019, TERI issued 10% unsecured convertible promissory notes in the amount of $540,000. Principal and interest were due at maturity on December 3, 2020. The principal and accrued interest on the notes were convertible into shares of common stock at $0.75 per common share at any time after the original issue date. The notes were alternatively convertible, at the election of the holders, into an aggregate 0.367% working interest in our Orogrande Project.

These convertible notes were retired by conversion into TERI common stock in December 2020.

## 10. NOTE PAYABLE, RELATED PARTY

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021

F-19

Table of Contents

Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by shares of common stock in Meta held by one of its stockholders, Wolfbone Investments, LLC, and by a lien on a 25% interest in the Orogrande prospect.

The balance on the loan as of December 31, 2021 is $12,500,000 and the Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company subsequently drew the additional $2,500,000 on the note payable in 2022.

## 11. ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through December 31, 2021:

| | |
|---|---:|
| Asset retirement obligations—December 31, 2020 | $21,844 |
| Accretion expense | 93 |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—December 31, 2021 | $21,937 |

## 12. SUBSEQUENT EVENTS

In July 2022, the Company issued 165,523,362 shares of its common stock to Meta.

On April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, respectively, the Company borrowed as advances to be subject to a loan agreement between the Company and Meta an aggregate amount of borrowings equal to $5.0 million, bearing interest at a per annum rate equal to 8% and which become due and payable on March 31, 2023. See Note 12 of the accompanying notes to the unaudited condensed consolidated financial statements included elsewhere in this prospectus.

F-20

Return to TOC

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 2,108,866 | $ 1,989,419 |
| Accounts receivable, related party | 165,238 | 163,366 |
| Grants and other receivables | 50,970 | 74,310 |
| Prepaid expenses | 6,621 | 2,667 |
| Total current assets | 2,331,695 | 2,229,762 |
| Oil and natural gas properties, net | 47,293,607 | 45,663,470 |
| Other assets | 25,000 | 25,000 |
| TOTAL ASSETS | $ 49,650,302 | $ 47,918,232 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 559,991 | $ 2,828,326 |
| Notes payable, related party | 21,156,988 | 12,708,889 |
| Total current liabilities | 21,716,979 | 15,537,215 |
| Asset retirement obligations | 21,937 | 21,937 |
| Total liabilities | 21,738,916 | 15,559,152 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 25,000,000 and 50,000,000 shares authorized; 0 issued and outstanding | — | — |
| Common stock, par value $0.001; 250,000,000 and 500,000,000 shares authorized; 1 and 165,523,363 issued and outstanding | 16,552 | — |
| Additional paid-in capital | 100,846,643 | 100,546,596 |
| Accumulated deficit | (72,951,809) | (68,187,516) |
| Total stockholder's equity | 27,911,386 | 32,359,080 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 49,650,302 | $ 47,918,232 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-21

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Three Months Ended September 30, 2022 | Three Months Ended September 30, 2021 |
|---|---|---|
| Oil sales | $ 4,635 | $ 1,817 |
| Natural gas sales | 8,175 | 1,146 |
| **Revenue** | **12,810** | **2,963** |
| **Operating expenses** | | |
| Lease operating expenses | 14,880 | 41,561 |
| Production and ad valorem tax | 779 | 213 |
| General and administrative | 1,800,472 | 861,316 |
| Depreciation, depletion and amortization | — | 3,707 |
| Total operating expenses | 1,816,131 | 906,797 |
| **Other income (expense)** | | |
| Interest expense | (360,877) | — |
| Interest income | 11 | 8,159 |
| Total other income (expense) – net | (360,866) | 8,159 |
| **Loss before income taxes** | (2,164,187) | (895,675) |
| Provision for income tax | — | — |
| **Net loss** | **$ (2,164,187)** | **$ (895,675)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-22

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Nine Months Ended September 30, 2022 | Nine Months Ended September 30, 2021 |
|---|---:|---:|
| Oil sales | $ 14,323 | $ 4,675 |
| Natural gas sales | 15,891 | 4,261 |
| **Revenue** | **30,214** | **8,936** |
| **Operating expenses** | | |
| Lease operating expenses | 55,701 | 79,870 |
| Production and ad valorem tax | 2,032 | 639 |
| General and administrative | 3,789,166 | 6,097,917 |
| Depreciation, depletion and amortization | — | 4,642 |
| Total operating expenses | 3,846,899 | 6,183,068 |
| **Other income (expense)** | | |
| Interest expense | (948,099) | (3,312) |
| Gain on extinguishment of debt | — | 77,477 |
| Interest income | 491 | 11,078 |
| Total other income (expense) - net | (947,608) | 85,243 |
| Loss before income taxes | (4,764,293) | (6,088,889) |
| Provision for income tax | — | — |
| **Net loss** | **$ (4,764,293)** | **$ (6,088,889)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-23

**Table of Contents**

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Three Months Ended September 30, 2021** | | | | | |
| **Balance, July 1, 2021** | 1 | $ — | $ 99,665,836 | $(65,141,922) | $34,523,914 |
| Contributions from parent | — | — | 6,007,015 | — | 6,007,015 |
| Net loss | — | — | — | (895,675) | (895,675) |
| **Balance, September 30, 2021** | 1 | $ — | $105,672,851 | $(66,037,597) | $39,635,254 |
| **Three Months Ended September 30, 2022** | | | | | |
| **Balance, July 1, 2022** | 1 | $ — | $100,863,195 | $(70,787,622) | $30,075,573 |
| Contributions from parent | — | — | — | — | — |
| Net loss | — | — | — | (2,164,187) | (2,164,187) |
| Issuance of common stock | 165,523,362 | 16,552 | (16,552) | — | — |
| **Balance, September 30, 2022** | 165,523,363 | $ 16,552 | $100,846,643 | $(72,951,809) | $27,911,386 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-24

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2020** | 1 | $ — | $ 88,267,685 | $(59,948,708) | $28,318,977 |
| Contributions from parent | — | — | 17,405,166 | — | 17,405,166 |
| Net loss | — | — | — | (6,088,889) | (6,088,889) |
| **Balance, September 30, 2021** | 1 | $ — | $105,672,851 | $(66,037,597) | $39,635,254 |
| **Balance, December 31, 2021** | 1 | $ — | $100,546,596 | $(68,187,516) | $32,359,080 |
| Contributions from parent | — | — | 316,599 | — | 316,599 |
| Net loss | — | — | — | (4,764,293) | (4,764,293) |
| Issuance of common stock | 165,523,362 | 16,552 | (16,552) | — | — |
| **Balance, September 30, 2022** | 165,523,363 | $ 16,552 | $100,846,643 | $(72,951,809) | $27,911,386 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-25

Table of Contents

## NEXT BRIDGE HYDROCARBONS, INC.

### UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Nine Months Ended September 30, 2022 | | Nine Months Ended September 30, 2021 | |
|---|---|---|---|---|
| **Cash Flows From Operating Activities** | | | | |
| Net loss | $ | (4,764,293) | $ | (6,088,889) |
| Adjustments to reconcile net loss to net cash from operations: | | | | |
| Depreciation, depletion and amortization | | — | | 4,642 |
| Paid in kind interest | | 948,099 | | — |
| Change in: | | | | |
| Accounts receivable, related party | | (1,872) | | (74,324) |
| Grants and other receivables | | 23,340 | | 110,094 |
| Prepaid expenses | | (3,954) | | 98,696 |
| Accounts payable | | (2,268,335) | | 462,470 |
| Accrued liabilities | | — | | (1,213,779) |
| **Net cash from operating activities** | | (6,067,015) | | (6,701,090) |
| **Cash Flows From Investing Activities** | | | | |
| Investment in oil and natural gas properties | | (1,630,137) | | (2,502,799) |
| **Net cash from investing activities** | | (1,630,137) | | (2,502,799) |
| **Cash Flows From Financing Activities** | | | | |
| Contributions from parent | | 316,599 | | 17,405,166 |
| Proceeds from notes payable, related party | | 7,500,000 | | — |
| **Net cash from financing activities** | | 7,816,599 | | 17,405,166 |
| **Net (decrease) increase in cash** | | 119,447 | | 8,201,277 |
| **Cash—beginning of period** | | 1,989,419 | | 130,504 |
| **Cash—end of period** | $ | 2,108,866 | $ | 8,331,781 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** | | | | |
| Cash paid for interest | $ | — | $ | — |
| Cash paid for state franchise tax | $ | — | $ | — |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-26

Table of Contents

## NEXT BRIDGE HYDROCARBONS, INC.

### NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

**1.    NATURE OF BUSINESS**

Next Bridge Hydrocarbons, Inc. (formerly OilCo Holdings, Inc.) ("the Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation our subsidiaries were consolidated into Meta Materials Inc., an affiliated company. All intercompany transactions have been eliminated in the consolidated financial statements.

On June 29, 2021, our former parent, Torchlight Energy Resources, Inc. ("TERI") acquired Metamaterial, Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

**2.    GOING CONCERN**

At September 30, 2022, the Company had not yet achieved profitable operations. We had a net loss of $4,764,293 for the nine months ended September 30, 2022. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of September 30, 2022 of $19,385,284. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

**3.    SIGNIFICANT ACCOUNTING POLICIES**

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

*Use of estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

*Basis of presentation*—The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated.

Table of Contents

These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

*Risks and uncertainties*—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 to date. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Partnership's accounting estimates. Although demand and market prices for oil and natural gas have recently increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

*Concentration of risks*—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

*Fair value of financial instruments*—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts

F-28

Table of Contents

of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.

- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.

- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** – Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of September 30, 2022 and December 31, 2021, no valuation allowance was considered necessary.

***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the nine months ended September 30, 2022 and 2021, the Company capitalized $-0, and $141,048 respectively, of interest on unevaluated properties.

F-29

**Table of Contents**

***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- for the nine months ended September 30, 2022 and 2021, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

F-30

Table of Contents

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

*Revenue recognition* – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

*Basic and diluted earnings (loss) per share* – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The calculation of diluted earnings per share excludes 0 shares.

*Environmental laws and regulations* – The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of September 30, 2022 and December 31, 2021.

F-31

Table of Contents

*Recent accounting pronouncements not yet adopted—*

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

## 4.    OIL & NATURAL GAS PROPERTIES

The following table presents the capitalized costs for oil & natural gas properties of the Company:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| Evaluated costs subject to amortization | $ — | $ — |
| Unevaluated costs | 47,293,607 | 45,663,470 |
| Total capitalized costs | 47,293,607 | 45,663,470 |
| Less accumulated depreciation, depletion and amortization | — | — |
| Total oil and natural gas properties | $47,293,607 | $ 45,663,470 |

Unevaluated costs as of September 30, 2022 and December 31, 2021 include cumulative costs on developing projects including the Orogrande and Hazel projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of September 30, 2022. As of September 30, 2022, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

F-32

Table of Contents

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

As of September 30, 2022, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, we entered into a Purchase Agreement with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, we purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage,—which he obtained prior to, and was not a part of the August 2014 transaction. As of September 30, 2022, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through September 30, 2022, have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the three months ended September 30, 2022, to further capture and document the scientific base in support of demonstrating the production potential of the property.

F-33

Table of Contents

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project. See Note 9 to these Notes to Unaudited Condensed Consolidated Financial Statements for a discussion of the Conversion Agreement and related contingent liabilities of the Company that become due and payable in the event the Orogrande Project is sold.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept out offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

The Orogrande Project ownership as of September 30, 2022 is detailed as follows:

|  | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
|  | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly-owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

**Table of Contents**

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**5.    RELATED PARTY BALANCES**

As of September 30, 2022 and December 31, 2021, the Company had a balance of $165,238 and $163,366, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande development cost sharing agreement.

**6.    COMMITMENTS AND CONTINGENCIES**

**Leases**

The Company is subject to a sublease agreement on a month-to-month term for occupancy of its office premises which requires monthly rent payments of $1,000.

Table of Contents

**Legal Matters**

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company's, LLC's claims, and the case is closed.

On April 30, 2020, The Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfpone Investments, LLC, a company owned by Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The Company's current Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, the Company filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

On January 3, 2022, a putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned Maltagliati v. Meta Materials Inc., et al., No. 1:21-cv-07203, against Meta, Meta's former Chief Executive Officer, and Meta's former Chief Financial Officer, Torchlight's former Chairman of the Board of Directors, and Torchlight's former Chief Executive Officer. On January 26, 2022, a

F-36

Table of Contents

similar putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned McMillan v. Meta Materials Inc., et al., No. 1:22-cv-00463. The McMillan complaint names the same defendants and asserts the same claims on behalf of the same purported class as the Maltagliati complaint. The complaints, purportedly brought on behalf of all purchasers of our publicly traded securities from September 21, 2020 through and including December 14, 2021, assert claims under Sections 10(b) and 20(a) of the Exchange Act arising primarily from a short-seller report and statements related to our business combination with Torchlight. The complaints seek unspecified compensatory damages and reasonable costs and expenses, including attorneys' fees. On April 11, 2022, the Court held a hearing on motions to consolidate the two actions and to appoint a lead plaintiff or lead plaintiffs, but has not yet ruled on the motions.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned Hines v. Palikaras, et al., No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and us (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of September 30, 2022 and December 31, 2021, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**7. STOCKHOLDERS' EQUITY**

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of September 30, 2022, the Company has issued 165,523,363 shares of common stock and 0 shares of preferred stock.

**8. INCOME TAXES**

The Company recorded no income tax provision at September 30, 2022 and December 31, 2021 because of losses incurred.

The Company estimates its annual effective income tax rate in recording its quarterly provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the nine months ended September 30, 2022 because the Company expects to incur a tax loss in the current year. Similarly, no income tax expense was recognized for the nine months ended September 30, 2021.

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $67,895,119 and $59,481,861 at September 30, 2022 and December 31, 2021, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

F-37

Table of Contents

## 9. PROMISSORY NOTES

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to the Straz Foundation and the Straz Trust in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, the TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10, 2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and

F-38

Table of Contents

property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, a top-off obligation of Meta or Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) Hudspeth sells the entire working interest in the Orogrande Project, (b) as part of such sale, the holders' entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then Meta or Hudspeth must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share. TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

F-39

Table of Contents

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in 2021.

Convertible Notes Issued in Fourth Quarter 2019

Effective October 31, 2019, TERI issued 10% unsecured convertible promissory notes in the amount of $540,000. Principal and interest were due at maturity on December 3, 2020. The principal and accrued interest on the notes were convertible into shares of common stock at $0.75 per common share at any time after the original issue date. The notes were alternatively convertible, at the election of the holders, into an aggregate 0.367% working interest in our Orogrande Project.

These notes payable were retired by conversion into TERI common stock in December 2020.

## 10.  NOTES PAYABLE, RELATED PARTY

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by certain shares of common stock in Meta held by one of its stockholders, Gregory McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone Investments, LLC, an affiliate of Mr. McCabe.

The balance on the loan as of September 30, 2022 and December 31, 2021 is $15,000,000 and $12,500,000, respectively. The Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company incurred interest that is paid in kind of $948,099 for the nine months ended September 30, 2022.

F-40

Table of Contents

On September 2, 2022, we entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022 and August 29, 2022, we borrowed an additional $1.2 million and $1.46 million, respectively, the remaining amount available for borrowing under the Loan Agreement, and resulting in a total of $5.0 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and mature on March 31, 2023 (the "Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

## 11.  ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through September 30, 2022:

| | |
|---|---|
| Asset retirement obligations—December 31, 2021 | $21,937 |
| Accretion expense | — |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—September 30, 2022 | $21,937 |

F-41

Table of Contents

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS**

Next Bridge Hydrocarbons, Inc. (the "Company", "we", "our", "Next Bridge") is a holding company formed to own an interest in, and act as the sole owner of, Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC following the Distribution.

The unaudited pro forma condensed combined balance sheet as of September 30, 2022 (the "pro forma balance sheet"), and the unaudited pro forma condensed combined statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021 (the "pro forma statement of operations," together with the pro forma balance sheet and the corresponding notes hereto, the "pro forma financial statements") present the pro forma financial statements of the Company after giving effect to the transfer and assignment to us by Meta of the three subsidiaries described above and the consummation of the Distribution:

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," using the assumptions set forth in the notes to the pro forma financial statements. The pro forma financial statements have been adjusted to include transaction accounting adjustments in accordance with GAAP, linking the effects of the Distribution to the historical consolidated financial statements of the Company, the accounting predecessor to the Company, and the historical combined financial statements of the Company and its subsidiaries.

Prior to the formation of Next Bridge Hydrocarbons, Inc. (formerly named OilCo Holdings, Inc.), our subsidiaries were consolidated into the financial statements of our parent, Meta Materials Inc. (formerly named Torchlight Energy Resources, Inc. ("TERI")). All intercompany transactions have been eliminated in the consolidated financial statements of Meta Materials, Inc.

On June 29, 2021, TERI acquired Metamaterial Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

The assumptions and estimates used to determine the adjustments are described in the notes to the pro forma financial statements. The final determination of the adjustments will be based on the actuals that exist as of the Distribution Date and, therefore, cannot be made prior to its completion.

The pro forma financial statements have been prepared from the respective historical consolidated financial statements of Next Bridge with respect to the oil and natural gas assets held by Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC, adjusted to give pro forma effect to the Distribution. The pro forma statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021, combine the historical consolidated statements of operations of Next Bridge, giving effect to the Distribution as if it had been consummated on January 1, 2021. The pro forma balance sheet combines the historical consolidated balance sheet of Next Bridge as of September 30, 2022, giving effect to the Distribution as if it had been consummated on September 30, 2022.

The pro forma financial statements are presented to reflect the Distribution and do not represent what the Company's financial position or results of operations would have been had the Distribution occurred on the dates noted above, nor do they project the financial position or results of operations of the Company following the Distribution. The transaction accounting adjustments are based on available information and certain assumptions that management believes are factually supportable and are expected to have a continuing impact on the Company's results of operations with the exception of certain non-recurring charges to be incurred in connection with the Distribution, as further described below. In the opinion of management, all adjustments necessary to present fairly the pro forma financial statements have been made.

The Company anticipates that certain non-recurring charges will be incurred in connection with the Distribution. Any such charge could affect the future results of the Company in the period in which such charges are incurred;

F-42

Table of Contents

however, these costs are not expected to be incurred in any period beyond 12 months from the Distribution Date. Accordingly, the pro forma statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021 reflects the effects of these non-recurring charges.

As a result of the foregoing, the accounting adjustments are preliminary and subject to change as additional information becomes available and additional analysis is performed. The transaction accounting adjustments have been made solely for the purpose of providing the pro forma financial statements presented below.

The pro forma financial statements should be read together with "The Spin-Off," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Certain Relationships and Related Party Transactions," and the annual and interim financial statements and accompanying notes thereto of Next Bridge included elsewhere in this Prospectus.

<div align="center">F-43</div>

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statement of Operations**
**For the Year Ended December 31, 2021**

| | Year Ended December 31, 2021 | Pro Forma Adjustments | Pro Forma Year Ended December 31, 2021 |
|---|---|---|---|
| Oil sales | $ 4,675 | | $ 4,675 |
| Natural gas sales | 11,229 | | 11,229 |
| **Revenue, net** | **15,904** | — | **15,904** |
| **Operating expenses** | | | |
| Lease operating expenses | 75,330 | | 75,330 |
| Production and ad valorem tax | 1,001 | | 1,001 |
| General and administrative | 8,050,443 | 2,131,413(c) | 10,181,856 |
| Depreciation, depletion and amortization | 4,642 | | 4,642 |
| Total operating expenses | 8,131,416 | — | 10,262,829 |
| **Other income (expense)** | | | |
| Interest expense | (212,201) | (400,000)(b) | (612,201) |
| Gain (loss) on sale of assets | 1,000 | | 1,000 |
| Gain on extinguishment of debt | 77,477 | | 77,477 |
| Interest income | 10,428 | | 10,428 |
| Total other expense—net | (123,296) | (400,000) | (523,296) |
| **Loss before income taxes** | (8,238,808) | (2,531,413) | (10,770,221) |
| Provision for income tax | — | | |
| **Net loss** | **$ (8,238,808)** | **$(2,531,413)** | **(10,770,221)** |
| **Basic and Diluted EPS** | $ (8,238,808) | (2,531,413) | $ (.07) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 1 | 165,523,362(a) | 165,523,363 |

F-44

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statements of Operations**
**For the Nine Months Ended September 30, 2022**

| | Nine Months Ended September 30, 2022 | Pro Forma Adjustments | Nine Months Ended September 30, 2022 |
|---|---|---|---|
| Oil Sales | $ 14,323 | $ — | $ 14,323 |
| Natural gas sales | 15,891 | — | 15,891 |
| **Revenue, net** | **30,214** | **—** | **30,214** |
| **Operating expenses (income)** | | | |
| Lease operating expenses | 55,701 | — | 55,701 |
| Production and ad valorem tax | 2,032 | — | 2,032 |
| General and administrative | 3,789,166 | 1,000,000(c) | 4,789,166 |
| Total operating expenses | 3,846,899 | 1,000,000 | 4,846,899 |
| **Other income (expense)** | | | |
| Interest expense | (948,099) | | (948,099) |
| Interest income | 491 | — | 491 |
| Total other expense – net | (947,608) | — | (947,608) |
| **Loss before income taxes** | **(4,764,293)** | **(1,000,000)** | **(5,764,293)** |
| Provision for income tax | — | — | — |
| **Net loss** | **$ (4,764,293)** | **$(1,000,000)** | **$ (5,764,293)** |
| **Basic and Diluted** | $ 0.03 | $ (0.01) | (0.04) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 165,523,363 | — | 165,523,363 |

F-45

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Balance Sheet**
**As of September 30, 2022**

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 2,108,866 | | $ 2,108,866 |
| Accounts receivable, related party | 165,238 | | 165,238 |
| Grants and other receivables | 50,970 | | 50,970 |
| Prepaid expenses | 6,621 | | 6,621 |
| Total current assets | 2,331,695 | | 2,331,695 |
| Oil and natural gas properties, net | 47,293,607 | | 47,293,607 |
| Other assets | 25,000 | | 25,000 |
| TOTAL ASSETS | $ 49,650,302 | | $ 49,650,302 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 559,991 | $ 1,000,000 (c) | $ 1,559,991 |
| Notes payable, related party | 21,156,988 | | 21,156,988 |
| Total current liabilities | 21,716,979 | 1,000,000 | 22,716,979 |
| Asset retirement obligations | 21,937 | | 21,937 |
| Total liabilities | 21,738,916 | 1,000,000 | 22,738,916 |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Preferred stock, par value $0.0001; 25,000,000 and 50,000,000 shares authorized; 0 issued and outstanding | — | — | |
| Common stock, par value $0.001;250,000,000 and 500,000,000 shares authorized; 165,523,363 issued and outstanding | 16,552 | | 16,552 |
| Additional paid-in capital | 100,846,643 | | 100,846,643 |
| Accumulated deficit | (72,951,809) | (1,000,000) (c) | (73,951,809) |
| Total stockholders' equity | 27,911,386 | (1,000,000) | 26,911,386 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 49,650,302 | $ — | $ 49,650,302 |

F-46

Table of Contents

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS**

**NOTE 1—BASIS OF PRESENTATION AND DESCRIPTION OF TRANSACTIONS**

In connection with the Distribution, the Company's common stock will be distributed to the holders of Meta's Series A Preferred Stock on a 1:1 basis.

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," and present the pro forma financial condition and results of operations of the Company based upon the historical financial information of Next Bridge after giving effect to the Distribution and related adjustments set forth in the notes to the pro forma financial statements. The historical consolidated financial statements of Next Bridge were prepared in accordance with U.S. GAAP and shown in U.S. dollars

The pro forma financial statements do not purport to be indicative of the financial position or results of operations of the Company that would have occurred if the Distribution had occurred on the dates indicated, nor are they indicative of Next Bridge's future financial position or results of operations. In addition, future results may vary significantly from those reflected in such statements due to factors discussed under "Risk Factors" included elsewhere in the Prospectus.

**NOTE 2—PRO FORMA ADJUSTMENTS**

The pro forma financial statements have been adjusted to reflect the following:

(a)  Represents the 165,523,362 shares of the Company's common stock issued to Meta in July 2022 and distributed to the holders of the Series A Preferred Stock in the Distribution.

(b)  Represents the Loan Agreement entered into with Meta, including accrued interest expense. As of September 30, 2022, we borrowed advances converted into term loans under the Loan Agreement in the aggregate amount of $5.0 million, the maximum amount available under the Loan Agreement, the proceeds in each case were used for working capital and general corporate purposes. The term loans bears interest at a per annum rate equal to 8%. The Company and Meta intend to enter into an additional promissory note with an estimated principal balance of $1.0 million in respect of costs and expenses incurred in connection with the Distribution which were paid by Meta on behalf of the Company. The Company may enter into additional credit or note payable agreements with Meta in order to secure financing for operations. The amount of this additional commitment is not known.

(c)  Reflects the accrual of non-recurring costs of $1,000,000 related to the Distribution incurred during the quarter ended September 30, 2022. The Company may also enter into credit arrangements with certain contractors in order to secure financing for ongoing operations. The amount of credit arrangements are not known.

(d)  The pro forma amount does not reflect any amounts owed to Meta under the Tax Matters Agreement, including in respect of any taxes incurred by Meta in connection with the Spin-Off. Based on a valuation of the Company's assets as of June 28, 2021, Meta's net operating loss ("NOLs") balance as of June 28, 2021, and certain assumptions relating to the results of Meta's operations since June 28, 2021 through the end of the taxable year that includes the Spin-Off, limitations imposed under applicable law on the utilization of Meta's NOLs and the adjusted tax basis of Meta in the Company's Common Stock, Meta would not be expected to incur a U.S. federal income tax liability in connection with the Spin-Off. Meta's analysis of the tax impact of the Spin-Off is ongoing, however, and Meta may incur a U.S. federal or state income or other tax liability in connection with the Spin-Off by offsetting any such tax liability with a portion of Meta's consolidated NOLs. Any such use of Meta's consolidated NOLs will reduce the aggregate NOLs that the Company would otherwise have retained as shown above in the Company's interim unaudited financial statements as of September 30, 2022. Based on the current estimated value of the Distribution, Meta is estimating that approximately $6.0 million of these NOLs will be used, and the Company's NOLs after the Spin-Off will be reduced by a corresponding amount. The Spin-Off has the potential to limit any U.S. federal and state NOLs owned by the Company. The Company has continued to have a full valuation against any deferred tax asset related to these NOLs.

F-47

Table of Contents

<div align="center">

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

</div>

**Item 13. Other Expenses of Issuance and Distribution.**

The following table sets forth an itemization of all estimated expenses in connection with the issuance and distribution of the securities to be registered:

| Item | Amount |
|------|-------:|
| Registration Statement filing fee | $ 5.11 |
| Accountants fees and expenses | 59,000 |
| Legal fees and expenses | 1,287,000 |
| Printing | 52,000 |
| Transfer and distribution agent fees and expenses | 17,500 |
| Miscellaneous | 20,000 |
| Total | $1,435,505.11 |

**Item 14. Indemnification of Directors and Officers.**

The Company's Amended and Restated Articles of Incorporation and Bylaws provide that, to the fullest extent permitted by the laws of the State of Nevada, any officer or director of the Company, who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he/she is or was or has agreed to serve at the request of the Company as a director, officer, employee or agent of the Company, or while serving as a director or officer of the Corporation, is or was serving or has agreed to serve at the request of the Company as a director, officer, employee or agent (which, for purposes hereof, shall include a trustee, partner or manager or similar capacity) of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, or by reason of any action alleged to have been taken or omitted in such capacity. For the avoidance of doubt, the foregoing indemnification obligation includes, without limitation, claims for monetary damages against indemnitee to the fullest extent permitted under Section 78.7502 and 78:751 of the Nevada Revised Statutes as in existence on the date hereof.

The indemnification provided shall be from and against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by indemnitee or on indemnitee's behalf in connection with such action, suit or proceeding and any appeal therefrom, but shall only be provided if indemnitee acted in good faith and in a manner indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, suit or proceeding, had no reasonable cause to believe indemnitee's conduct was unlawful.

In the case of any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he/she is or was a director, officer, employee or agent of the Company, or while serving as a director or officer of the Company, is or was serving or has agreed to serve at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, no indemnification shall be made in respect of any claim, issue or matter as to which indemnitee shall have been adjudged to be liable to the Company unless, and only to the extent that, the Nevada courts or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnity for such expenses which the Nevada courts or such other court shall deem proper.

The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the indemnitee did not act in good

<div align="center">II-1</div>

Table of Contents

faith and in a manner which indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that indemnitee's conduct was unlawful.

To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

**Item 15. Recent Sales of Unregistered Securities.**

None

**Item 16. Exhibits and Financial Statement Schedules.**

(a) Exhibits.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Distribution Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc.** |
| 3.1 | First Amended and Restated Articles of Incorporation of Next Bridge Hydrocarbons, Inc.** |
| 3.2 | Amended and Restated By-laws of Next Bridge Hydrocarbons, Inc.** |
| 5.1 | Opinion of Woodburn and Wedge** |
| 10.1 | Assignment Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc.** |
| 10.2 | Tax Matters Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc. ** |
| 10.3+ | Executive Employment Agreement of Chief Executive Officer** |
| 10.4+ | Executive Employment Agreement of President** |
| 10.5+ | Executive Employment Agreement of Chief Financial Officer** |
| 10.6+ | Executive Employment Agreement of Chief Operating Officer** |
| 10.7+ | 2022 Equity Incentive Plan of Next Bridge Hydrocarbons, Inc.** |
| 10.8 | Purchase & Settlement Agreement, dated August 6, 2018, between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation, Founders Oil & Gas, LLC, Founders Oil & Gas Operating, LLC, Wolfbone Investments, LLC and McCabe Petroleum Corporation**† |
| 10.9 | Purchase Agreement dated April 4, 2016, by and among McCabe Petroleum Corporation, Torchlight Energy Resources, Inc. and Torchlight Energy, Inc.** |
| 10.10 | Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated August 13, 2020**† |

II-2

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 10.11 | First Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated September 18, 2020**† |
| 10.12 | Second Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated April 15, 2021**† |
| 10.13 | Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated October 1, 2021.** |
| 10.14 | First Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated September 2, 2022.** |
| 10.15 | Loan Agreement between Meta Materials, Inc. and Next Bridge Hydrocarbons, Inc.**† |
| 10.16 | Participation Agreement by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated September 23, 2014** |
| 10.17 | Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated January 5, 2015** |
| 10.18 | Second Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated December 31, 2015** |
| 10.19 | Form of Conversion Agreement, dated March 9, 2020, by and between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation and each of the previous holders of 16% Series C Unsecured Convertible Promissory Notes** |
| 10.20 | Amendment to Tax Matters Agreement, between Next Bridge Hydrocarbons, Inc. and Meta Materials, Inc.** |
| 21.1 | List of subsidiaries of Next Bridge Hydrocarbons, Inc.** |
| 23.1 | Consent of BF Borgers, CPA (independent registered public accountant)* |
| 23.2 | Consent of Woodburn and Wedge (included in Exhibit 5.1)** |
| 23.3 | Consent of Independent Petroleum Engineers** |
| 24.1 | Power of Attorney (Included on the Signature Pages to the Registration Statement)** |
| 99.1 | Report of Independent Petroleum Engineers** |
| 99.2 | Consent of Clifton DuBose, Jr. to be Named as Director** |
| 99.3 | Consent of Joseph DeWoody to be Named as Director** |
| 99.4 | Consent of Mia Pitts to be Named as Director** |
| 99.5 | Consent of Kristin Whitley to be Named as Director** |
| 107 | Filing Fee Table** |

†    Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). The Registrant hereby agrees to furnish a copy of any omitted exhibits and schedules to the SEC upon its request.
+    Indicates a management contract or compensatory plan.
*    Filed herewith.
**    Previously filed, and incorporated herein by reference.

(b) Financial Statement Schedules

No financial statement schedules are provided because the information called for is not required or is shown either in our consolidated financial statements or notes thereto.

II-3

Table of Contents

**Item 17. Undertakings.**

(a)(1) The undersigned registrant hereby undertakes to file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement: (i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933; (ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and (iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) The undersigned registrant hereby undertakes that, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) The undersigned registrant hereby undertakes to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

II-4

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act, Next Bridge Hydrocarbons, Inc. has duly caused this amendment to registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of Fort Worth, Texas, on November 9, 2022.

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Ken Rice
Name: Ken Rice
Title: Chairman and Chief Financial Officer

**SIGNATURES**

Pursuant to the requirements of the Securities Act, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Ken Rice<br>Ken Rice | Chairman and Chief Financial Officer | November 9, 2022 |
| *<br>George Palikaras | President, Director | November 9, 2022 |
| *<br>Robert L. Cook | Director | November 9, 2022 |
| *By: /s/ Ken Rice<br>Attorney-in-fact | | |

II-Signature Page



**Dated: December 22, 2022.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-70098-tmd-11 |
| | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | |
| | § | |
| Debtor. | § | CHAPTER 11 |

| | | |
|---|---|---|
| MORRIS D. WEISS, CHAPTER 11 | § | |
| TRUSTEE FOR ARABELLA | § | |
| PETROLEUM COMPANY, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ARABELLA EXPLORATION INC., | § | |
| ARABELLA EXPLORATION LLC, | § | ADVERSARAY NO. 16-07002-tmd |
| ARABELLA OPERATING LLC, | § | |
| TRANS-TEXAS LAND & TITLE, LLC, | § | |
| PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, | § | |
| PLATINUM LONG TERM GRWOTH | § | |
| VIII, LLC, AND JASON HOISAGER, | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

1

# **MEMORANDUM OPINION**

<u>Contents</u>

I.    FACTS ............................................................................................................................ 3

  A.  Formation of the Debtor and Related Companies ................................................ 3

  B.  Alleged Fraudulent Transfers .............................................................................. 4

     1.  Transfers of Properties from the Debtor to AEX ............................................ 5

     2.  Transfers of Cash from the Debtor to AEX .................................................... 8

     3.  Transfers of Cash from the Debtor to Arabella Operating ............................. 9

     4.  Transfers of Cash from the Debtor to Jason and Molly Hoisager ............... 11

  C.  Breach of Fiduciary Duty to the Debtor ........................................................... 16

  D.  Mr. Hoisager Verses the Debtor's Books and Records ..................................... 18

II.    ANALYSIS ................................................................................................................. 20

  A.  Primer on Fraudulent Transfers ........................................................................ 20

  B.  The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to be Recovered ..................................................................................................... 22

  C.  The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager ......... 23

  D.  The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims .......................................... 28

  E.  The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent Transfers ............................................................................................................. 30

    1. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13, 2013 as Constructively Fraudulent Transfers ................................................. 30

    2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013 as Actual Intent Fraudulent Transfers ...................................................... 31

  F.  Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those Transfers Cannot be Preferential Transfers ................................................................ 35

  G.  Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by the Payments Mr. Hoisager Made Back to the Debtor ..................................... 35

  H.  Mr. Hoisager Breached his Fiduciary Duty to the Debtor ................................ 36

  I.  The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove Common Law Fraud by Clear and Convincing Evidence ........................................... 40

  J.  The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing ................. 41

III.   CONCLUSION .......................................................................................................... 43

    

It is common for the owner of a sole proprietorship to use the company's cash as the owner's personal checking account, taking out money when and as available and using that money for personal expenses. And there is nothing wrong with this as long as the company's creditors are being paid. But if the company becomes insolvent, meaning creditors will not be paid, the owner can face liability for those owner distributions under both fraudulent transfer and fiduciary duty law.

## I.  FACTS

### A.  Formation of the Debtor and Related Companies

Jason Hoisager formed Arabella Petroleum Company, LLC ("the Debtor") in February 2007 to buy and sell oil and gas properties in West Texas.[1] The Debtor also served as the original operator for the wells on these properties under the governing joint operating agreements.[2] Mr. Hoisager was the Debtor's sole owner and manager.[3]

Mr. Hoisager later formed other companies.[4] He formed Arabella Exploration, LLC ("Arabella Exploration") in December 2008,[5] which began operating in 2011 with the acquisition of properties in the Permian Basin.[6] Arabella Exploration, Inc ("AEX") was formed on December 24, 2013, by the reverse merger of Arabella Exploration and Lone Oak, a Cayman Islands corporation.[7] According to Mr. Hoisager, he formed AEX to raise capital to develop oil and gas properties in the Permian Basin.[8] In January 2014, AEX formed Arabella Operating LLC ("Arabella Operating") to take over operating wells previously operated by the Debtor under the

---

[1] J. Hoisager Decl. 3; B. Crisp Decl. 3.
[2] B. Crisp Decl. 3; J. Hoisager Decl. 34-35.
[3] J. Hoisager Decl. 4.
[4] J. Hoisager Decl. 7.
[5] Arabella Exploration, LLC was a Texas LLC. *See* J. Hoisager Decl. 7.
[6] J. Hoisager Decl. 7.
[7] J. Hoisager Decl. 7.
[8] J. Hoisager Decl. 7.

3

joint operating agreements.[9]

Mr. Hoisager owned 100% of Arabella Exploration until the December 2013 merger, when it became a wholly owned subsidiary of AEX.[10] Mr. Hoisager was the manager of Arabella Exploration and the chief executive officer of AEX following the merger.[11] Arabella Operating was also a wholly owned subsidiary of AEX, and Mr. Hoisager was its sole manager.[12] Mr. Hoisager owned 30.4% of the shares of AEX at the time of the merger, with the remainder owned by public shareholders.[13] The parties stipulated that the Debtor became insolvent no earlier than December 31, 2013, a few days after AEX was formed.[14]

### B. Alleged Fraudulent Transfers

The Trustee alleges that from 2011 to 2015, Mr. Hoisager made many fraudulent transfers from the Debtor to himself, his wife, and other entities that he owned or controlled.[15] These alleged fraudulent transfers fall into four broad categories: (1) transfers of properties from the Debtor to AEX;[16] (2) transfers of cash from the Debtor to AEX; (3) transfers of cash from the Debtor to Arabella Operating; and (4) transfers of cash from the Debtor to Mr. Hoisager and his wife, Molly Hoisager.[17] The Trustee also contends that the fraudulent transfers and self-dealing collectively are a breach of fiduciary duty.[18] Mr. Hoisager disputes that he made fraudulent transfers from the Debtor or breached fiduciary duties to the Debtor.[19] He contends that he acted

---

[9] J. Hoisager Decl. 8.

[10] J. Hoisager Decl. 7.

[11] J. Hoisager Decl. 19.

[12] J. Hoisager Decl. 2, 8.

[13] J. Hoisager Decl. 7.

[14] Joint Pre-Trial Order 35, ECF No. 184.

[15] Pl.'s Post-Trial Br. 1-2, ECF No. 210; B. Crisp Decl. 4.

[16] Hereafter both Arabella Exploration, LLC and post-merger Arabella Exploration, Inc., will be referred to as AEX because the post-merger entity would have assumed all liabilities.

[17] Pl.'s Post-Trial Br. 1-2, ECF No. 210; Def.'s. Post-Trial Br. 3, ECF No. 211. Molly Hoisager's status as Mr. Hoisager's wife was uncontested. *See* Joint Pre-Trial Order 27, ECF No. 184.

[18] Pl.'s Post-Trial Br. 23-24, ECF No. 210.

[19] Def.'s Post-Trial Br. 2, ECF No. 211; J. Hoisager Decl. 67.

in good faith at all times and did what he believed to be in the Debtor's best economic interests under the circumstances.[20]

### 1. <u>Transfers of Properties from the Debtor to AEX</u>

In 2012, the Debtor assembled the "Wolfbone I Prospect," which consisted of several Delaware Basin leases.[21] The Debtor entered into the "Wolfbone I PSA" with the purchasers on August 5, 2012.[22] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 93.35% of the working interest in the Wolfbone I Prospect; AEX purchased the remaining 6.65% of the working interest.[23] The assignments of the Wolfbone I leases were executed on October 15, 2012, and were recorded in Reeves County, Texas, on varying dates from 2013 to 2015.[24]

Next, the Debtor assembled the "Wolfbone II Prospect," a second package of Delaware Basin mineral leases.[25] The Debtor and the purchasers of the Wolfbone II Prospect signed the Wolfbone II PSA on March 1, 2013.[26] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 53.54% of the working interests, while AEX purchased the remaining 46.46% of the working interest.[27] The assignments of the Wolfbone II leases were executed on March 1, 2013, and March 15, 2013, and were recorded in Reeves County, Texas, from 2013 to 2015.[28]

Mr. Hoisager asserts that the Debtor transferred the working interests in the Wolfbone Prospects to AEX for rational business purposes. First, the Debtor could not sell the interests to outside investors for a sufficient price, so AEX acted as a buyer of last resort.[29] Second, Mr.

---

[20] J. Hoisager Decl. 67; Def.'s Post-Trial Br. 2, ECF No. 211.
[21] J. Hoisager Decl. 9.
[22] J. Hoisager Decl. 9.
[23] J. Hoisager Decl. 9.
[24] J. Hoisager Decl. 9; Def.'s Ex. D-16; Def.'s Post-Trial Br. 39-41, ECF No. 211; Pl.'s Ex. 77. Mr. Hoisager asserts that the great bulk of the Assignments in terms of amounts or value were recorded on July 18, 2013, and only the Wolfbone I "Scraps" were recorded in 2015. Def.'s Post-Trial Br. 39-40, ECF No. 211.
[25] J. Hoisager Decl. 10.
[26] J. Hoisager Decl. 10.
[27] J. Hoisager Decl. 10.
[28] J. Hoisager Decl. 10-11; Def.'s Ex. 16; Pl.'s Ex. 77.
[29] J. Hoisager Decl. 10.

Hoisager claims that AEX was in a better position than the Debtor to develop the properties, create value, and pay lease-operating expenses.[30] And finally, according to Mr. Hoisager, AEX had "greater access to capital" than did the Debtor,[31] and there was a need to drill before the leases expired.[32] The "access to capital" claim was decisively refuted (1) on cross-examination,[33] (2) by AEX's 10-K dated December 31, 2014,[34] and (3) because the Debtor expended all its capital, and more, drilling the Wolfbone wells anyway.[35]

The Debtor assigned working interests in the Wolfbone I and II Prospects to AEX on the same terms as it made assignments to outside investors, except in one major respect: how the purchase price was paid.[36] Outside purchasers paid in cash.[37] In contrast, AEX paid no cash consideration for the properties.[38]

According to Brian Crisp, the expert for the Trustee, the Debtor received no consideration for the property transfers to AEX.[39] AEX originally booked an increase in joint interest billings due to the Debtor for the transfers;[40] however, Mr. Hoisager recharacterized this paper obligation in December 2013 as a $3 million equity distribution from AEX to Mr. Hoisager, not the Debtor.[41] AEX also provided Mr. Hoisager, not the Debtor, with a promissory note for an additional $3,007,170.[42]

---

[30] J. Hoisager Decl. 45.
[31] J. Hoisager Decl. 45.
[32] J. Hoisager Decl. 45.
[33] 5/17/22 Trial Tr. 96:18-97:22, ECF No. 204.
[34] Def.'s Ex. D-7, PDF 15. *See also* B. Crisp Decl. 7.
[35] J. Rae Decl. 10; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[36] J. Hoisager Decl. 10.
[37] J. Hoisager Decl. 10.
[38] B. Crisp Decl. 13; J. Hoisager Decl. 21.
[39] B. Crisp Decl. 13.
[40] B. Crisp Decl. 13.
[41] B. Crisp Decl. 13.
[42] B. Crisp Decl. 13; Def.'s Post-Trial Br. 100, ECF No. 211.

Mr. Hoisager characterizes the consideration received by the Debtor for the properties quite differently. Mr. Hoisager says he personally loaned the Debtor the about $6 million used to purchase the Wolfbone Prospects, and that he got the money from McCabe Petroleum Corporation ("MPC"), under an oral line of credit.[43] The Debtor thus acquired the Wolfbone leases without paying anything for them, according to Mr. Hoisager, except that the Debtor incurred a liability to Mr. Hoisager for the amounts that he lent.[44] Mr. Hoisager claims that because the Debtor could not find an outside buyer for the Wolfbone leases, it sold them to AEX and AEX assumed the Debtor's obligation to Mr. Hoisager in the amount of $6,014,341.[45] The parties do not dispute that Mr. Hoisager later converted this obligation by AEX into a subordinated promissory note payable to Mr. Hoisager and an equity contribution by Mr. Hoisager to AEX.[46]

The alleged loan between Mr. Hoisager and MPC was not documented by a note or a loan agreement.[47] Nor was a debt to Mr. Hoisager ever recorded on the books and records of the Debtor.[48] Instead, the transactions with MPC were reflected on the Debtor's books and records as "Accounts receivable to McCabe Petroleum Corporation."[49] Post-petition, Mr. Hoisager reclassified those accounts receivables to MPC as capital contributions.[50] He concedes that the accounting for this transaction was not correct.[51] Mr. Hoisager contends that this "non-traditional" accounting resulted from the inexperience of Breann Hall, the Debtor's controller at

---

[43] J. Hoisager Decl. 12-13.
[44] J. Hoisager Decl. 13
[45] J. Hoisager Decl. 21; Def.'s Post-Trial Br. 13, ECF No. 211.
[46] J. Hoisager Decl. 22; Joint Pre-Trial Order 31, ECF No. 184.
[47] J. Hoisager Decl. 14; 5/17/22 Trial Tr. 76:23-25; 97:15-22, ECF No. 204.
[48] 5/16/22 Trial Tr. 105:16-22, ECF No. 203.
[49] J. Hoisager Decl. 14; 5/16/22 Trial Tr. 106:1-4, ECF No. 203.
[50] 5/16/22 Trial Tr. 106:1-107:6, ECF No. 203.
[51] J. Hoisager Decl. 22.

7

the time, and the limitations of the Debtor's accounting software.[52]

## 2. __Transfers of Cash from the Debtor to AEX__

All parties agree that the Debtor made cash payments to AEX of around $6.2 million

between September 2011 and the Petition Date, with $4,952,443 paid after December 31, 2013.[53]

The parties disagree about how to characterize these payments.

Mr. Hoisager testified that all the cash payments the Debtor made to AEX were under the

Debtor's contractual obligations under the joint operating agreements.[54] Under those agreements,

the Debtor operated leases in which AEX owned a portion of the working interest.[55] As the

Debtor, in its capacity as operator, produced revenues, AEX, in its capacity as working interest

owner, earned revenues.[56] By Mr. Hoisager's calculations, AEX earned revenues of $5,619,222

while the Debtor was the operator.[57] According to Mr. Hoisager, the Debtor paid AEX

$5,349,334 of the $5,619,222 that it owed AEX in revenue payments, leaving unpaid revenues of

$269,888.[58] Bill Heyn, acting chief financial officer of AEX and chair of the audit committee,

also testified that the Debtor made no gratuitous payments to AEX and AEX accounted for every

dollar it received.[59] This statement is simply not credible in light of the testimony from Mr.

Crisp.

Mr. Crisp testified that many of the payments to AEX were not revenue payments.[60]

According to Mr. Crisp, the Debtor paid AEX $6.2 million, and total revenues paid after

---

[52] J. Hoisager Decl. 14.
[53] B. Crisp Decl. 4; Pl.'s Post-Trial Br. 13, ECF No. 210; Pl.'s Ex. 78; Joint Pre-Trial Order 35, ECF No. 184.
[54] J. Hoisager Decl. 46; Def.'s Post-Trial Br. 6, ECF No. 211.
[55] J. Hoisager Decl. 19.
[56] J. Hoisager Decl. 19.
[57] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[58] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[59] 5/17/22 Trial Tr. 59:7-60:5, ECF No. 204; 5/19/22 Trial Tr. 5:21-6:17, ECF No. 205.
[60] 5/16/22 Trial Tr. 107:7-108:8, ECF No. 203.

accounting for netting (offsetting revenue due against joint interest billings owed) was $3,270,436.55, so "[t]here's almost $3 million paid to AEX mostly in round dollar[] [amounts] that are not revenue payments."[61] Mr. Crisp noted that revenue payments are typically not in round numbers, but "down to the penny."[62]

Mr. Crisp also testified that it is common industry practice for an operator to net the revenues earned on wells against the joint interest billings owed by that same working interest owner.[63] Here, at the time of each payment from the Debtor to AEX, AEX owed substantial amounts to the Debtor for unpaid joint interest billings, ranging from $16 million in June 2014 to $3.2 million on the Petition Date.[64] But based on Mr. Crisp's analysis, the Debtor netted revenue payments against unpaid joint interest billings only three times.[65]

Mr. Hoisager countered that while the joint operating agreements gave the Debtor, as operator, the right to set off joint interest billings receivables against production payments, the decision whether to do so is discretionary.[66] Further, according to Mr. Hoisager, there is no evidence that the Debtor gave AEX more favorable treatment than the other working interest owners, many of whom owed the Debtor hundreds of thousands of dollars.[67]

### 3.  Transfers of Cash from the Debtor to Arabella Operating

AEX formed Arabella Operating on January 22, 2014, to take over operating wells that the Debtor had operated under then-existing joint operating agreements.[68] According to Mr. Hoisager, the transfer of lease operations from the Debtor to Arabella Operating helped the

---

[61] 5/17/22 Trial Tr. 45:11-16, ECF No. 204.
[62] 5/16/22 Trial Tr. 109:19-110:1, ECF No. 203.
[63] 5/16/22 Trial Tr. 110:17-23, ECF No. 203.
[64] 5/16/22 Trial Tr. 111:4-9, ECF No. 203; Pl.'s Ex. 12A, 17.
[65] 5/16/22 Trial Tr. 112:16-21, ECF No. 203.
[66] 5/17/22 Trial Tr. 85:7-18, ECF No. 204.
[67] Def.'s Post-Trial Br. 55, ECF No. 211.
[68] J. Hoisager Decl. 8.

9

Debtor because the amount of money the Debtor earned as the operator of the leases was not commensurate with the amount of risk from nonpaying or slow-paying working interest owners.[69] It's too bad Mr. Hoisager didn't think of this before the Debtor took on the task of drilling the Wolfbone I and Wolfbone II wells.[70] As discussed below, taking on the expense of drilling the wells while being unable to collect the corresponding joint interest billings appears to be a big reason the Debtor failed.[71] In any event, Arabella Operating became the operator of the Wolfbone leases under the joint operating agreements on January 1, 2015.[72]

      The Debtor made cash payments to Arabella Operating totaling $882,483 after December 31, 2013.[73] Mr. Hoisager testified that the cash payments were simply money held in suspense accounts that were transferred to Arabella Operating when it became operator.[74] So, Mr. Hoisager testified, the money held in those suspense accounts belonged to working interest and royalty interest owners, not the Debtor, meaning that the Debtor had no right to retain that money.[75] Mr. Hoisager also testified that Arabella Operating never made a distribution to him personally, and that, in fact, he loaned Arabella Operating money that it never repaid.[76] This was not refuted by Mr. Crisp.[77] As discussed above, Mr. Crisp offered credible testimony that the transfers to AEX can be distinguished between "round dollar" amounts, which are not revenue payments, and amounts listed to the penny, which are.[78] From this it could be inferred that the round-dollar payments to Arabella Operating are likewise not revenue payments. But despite Mr.

---

[69] J. Hoisager Decl. 8.
[70] See notes 228-234 below and accompanying text.
[71] See notes 228-234 below and accompanying text.
[72] 5/17/22 Trial Tr. 87:2-5, ECF No. 204; Def.'s Post-Trial Br. 4, ECF No. 211.
[73] B. Crisp Decl. 4; Pl.'s Ex. 79 (summary of payments to Arabella Operating).
[74] 5/17/22 Trial Tr. 87:2-9, ECF No. 204.
[75] 5/17/22 Trial Tr. 87:10-18, ECF No. 204.
[76] 5/17/22 Trial Tr. 87:25-88:12, ECF No. 204.
[77] 5/16/22 Trial Tr. 52:2-7, ECF No. 203.
[78] 5/16/22 Trial Tr. 109:19-110:1, 113:15-25, ECF No. 203.

Hoisager's overall lack of credibility, the Trustee did bear the burden of proof, Mr. Crisp did not address these transfers, and so Mr. Hoisager's testimony will stand.

If indeed the transfers to Arabella Operating were transfers of revenue proceeds held in suspense accounts for the benefit of royalty and working interest owners from the Debtor as operator to Arabella Operating as successor operator—and the only evidence in the record establishes this—they are not transfers of property of the estate and the Trustee's fraudulent transfer claim for these transfers fails.

### 4. Transfers of Cash from the Debtor to Jason and Molly Hoisager

The Debtor transferred $6,334,247 to Jason Hoisager and his wife, Molly Hoisager[79] between July 2011 and July 2015; of that amount, $4,180,249 was transferred after December 31, 2012, and $2,803,834 was transferred after December 31, 2013.[80]

The largest distribution to Mr. Hoisager, of $2 million, occurred on June 25, 2014.[81] Mr. Hoisager claims that the Debtor owed him the money from the sale of the Cox Prospect in September 2013.[82] Mr. Hoisager contends that the Debtor had a standard format for every deal with outside promoters who brought in a profitable oil-and-gas deal. Specifically, the party providing the capital would get its money back first, with the profits then split 50/50 between the capital side and the deal side, which was usually the Debtor.[83] According to Mr. Hoisager, he provided the capital to buy the Cox Prospect, so he had a right to recover his capital of $327,964 to repay the loan he had personally borrowed from MPC to purchase the Cox Prospect. Then, the resulting profits were split 50/50 between the Debtor and Mr. Hoisager, with each entitled to

---

[79] Mr. Hoisager testified that he and his wife shared an account. 5/16/22 Trial Tr. 134:22-135:10, ECF No. 203.

[80] J. Hoisager Decl. 48; B. Crisp Decl. 4; Pl.'s Ex. 76.

[81] B. Crisp Decl. 14.

[82] J. Hoisager Decl. 50-52.

[83] J. Hoisager Decl. 50-51.

receive $2,236,017.[84] Mr. Hoisager says the Debtor did not pay Mr. Hoisager the profit share in late 2013 or early 2014 because the funds were unavailable.[85] There was no written agreement for this so-called Cox Prospect "profit split."[86]

Mr. Hoisager also describes the $2 million distribution from the Debtor to him as an "integrated transaction" designed to benefit AEX and the Debtor, and help them pay their creditors.[87] According to Mr. Hoisager, AEX needed to raise capital to support its drilling and development activities and to pay debts, and AEX owed the Debtor millions in joint interest billings under joint operating agreements.[88] So Mr. Hoisager says he devised a strategy where the same funds would satisfy multiple debts.[89]

Under the "integrated transaction," AEX sold the Roark Prospect for $2,240,000 on June 24, 2014.[90] The next day, AEX used the money from the Roark sale to pay the Debtor $2,035,915 in outstanding joint interest billing receivables.[91] Immediately thereafter, the Debtor paid Mr. Hoisager the $2 million it purportedly owed him as the profit split from the sale of the Cox Prospect in September 2013.[92] Mr. Hoisager then used the $2-million distribution to buy equity in AEX for $10.50 per share.[93] He says he bought the stock at about $5 per share above market price to help AEX pay its debts and raise additional capital, and to help the Debtor collect joint interest billing receivables from AEX and turn over operator status to Arabella Operating.[94] Once AEX received the $2 million from Mr. Hoisager, AEX paid $2,017,836 back to the Debtor

---

[84] J. Hoisager Decl. 51.
[85] J. Hoisager Decl. 52.
[86] J. Hoisager Decl. 51.
[87] J. Hoisager Decl. 57.
[88] J. Hoisager Decl. 52-53.
[89] J. Hoisager Decl. 55.
[90] J. Hoisager Decl. 55; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[91] J. Hoisager Decl. 55.
[92] J. Hoisager Decl. 55.
[93] J. Hoisager Decl. 55.
[94] J. Hoisager Decl. 53.

12

over the next several weeks.[95]

Mr. Hoisager attributes his purchase of AEX stock— made possible by the Debtor's distribution to him of $2 million—as also being partly responsible for AEX obtaining $16 million in outside financing from Platinum Partners.[96] Of the funds received by AEX from the outside financing, the Debtor received $11,244,670, net of fees, to pay its creditors.[97] AEX paid the money directly to the Debtor's vendors.[98]

The Trustee disputes that there was any "integrated transaction."[99] The Trustee notes that Mr. Hoisager originally characterized the transaction—incorrectly—as being started by the Debtor, even though it was AEX, not the Debtor, that was the only entity that had funds to start the transaction.[100] Mr. Crisp also testified that the distribution was made when the Debtor had total assets of about $20 million versus total liabilities of about $31 million and had become unable to pay its vendors.[101] And there were no "profits" earned by the Debtor that could justify the payment as a "performance bonus," as Mr. Hoisager had once contended.[102] Finally, Mr. Crisp testified that payments to the Debtor's creditors were made by AEX to remove liens that those creditors had filed or could file against the working interests owned by AEX and others in the Wolfbone I and II wells, which means the payments were of direct benefit to AEX.[103]

---

[95] J. Hoisager Decl. 56-57.
[96] J. Hoisager Decl. 58-59.
[97] J. Hoisager Decl. 58.
[98] J. Hoisager Decl. 58.
[99] Pl.'s Post-Trial Br. 7, ECF No. 210.
[100] Pl.'s Post-Trial Br. 7, ECF No. 210 (In Mr. Hoisager's reply to Trustee's Response to Defendant's MSJ, Mr. Hoisager apologized to the Court for providing an incomplete picture of the transaction. Def.'s Reply Br. in Support 14, ECF No. 171.).
[101] B. Crisp Decl. 14.
[102] B. Crisp Decl. 14.
[103] 5/16/22 Trial Tr. 147:5-148:13, ECF No. 203 (payments were made to lien creditors to assure that AEX could get financing from Platinum). Similarly, the proposed Legacy transaction which Mr. Hoisager and Mr. McCabe held up as a potential benefit to the Debtor would have been of primary benefit to AEX with only an incidental benefit to the Debtor. 5/17/22 Trial Tr. 15:21-19:23, ECF No. 204.

13

Mr. Hoisager categorized much of the remainder of the cash transfers from the Debtor to him as fitting within one of four "buckets": salary, expense reimbursement, performance bonuses, and tax distributions.[104] For the payments categorized as salary, Mr. Hoisager asserts that as the sole executive officer of the Debtor, he was entitled to annual compensation of $300,000.[105] He believed $300,000 to be reasonable based on his board-approved salary with AEX for the same amount.[106] But the Trustee notes that the Debtor's general ledger did not reflect payments to Mr. Hoisager as salary.[107] Instead, substantially all the transfers to Mr. Hoisager were recorded in the Debtor's general ledger as "Owner Distributions."[108] Similarly, in the Statement of Financial Affairs signed by Mr. Hoisager here, the Debtor listed 39 transfers to Mr. Hoisager from August 4, 2014, through May 11, 2015, each with the "Purpose of Withdrawal" description of "Distribution."[109]

Mr. Crisp refuted the idea of a $300,000 annual salary, noting that the payments were made at irregular intervals and in uneven amounts that have no semblance of a regular salary structure.[110] For instance, Mr. Hoisager received $621,415 in cash transfers from the Debtor in 2013, excluding a $535,000 "tax distribution" and a $200,000 "performance bonus" asserted by Mr. Hoisager.[111] And in 2014, Mr. Hoisager received $209,874 in cash transfers from the Debtor, excluding a supposed "performance bonus" of $2,250,000.[112] Given the Debtor's continuing losses, Mr. Crisp found the amounts received by Mr. Hoisager to be outside any reasonable

---

[104] B. Crisp Decl. 15.
[105] J. Hoisager Decl. 62.
[106] J. Hoisager Decl. 62.
[107] B. Crisp Decl. 15.
[108] B. Crisp Decl. 15.
[109] B. Crisp Decl. 15.
[110] B. Crisp Decl. 15; *see also* 5/16/22 Trial Tr. 134:6-37:15, ECF No. 203 (discussing payments made to Mr. Hoisager from April 2013 to May 2015).
[111] B. Crisp Decl. 16.
[112] B. Crisp Decl. 16.

14

industry average.[113]

Mr. Hoisager acknowledged that the Debtor did not pay his salary at regular intervals or in consistent amounts.[114] According to Mr. Hoisager, this is because the Debtor paid him for his work when funds were available.[115] Additionally, Mr. Hoisager attributed the fact that most payments to him were characterized as "owner distributions," regardless of their specific purpose, to the Debtor's "very basic accounting system."[116]

As for the other three categories of transfers to Mr. Hoisager—expense reimbursement, performance bonuses, and tax distributions—Mr. Crisp noted irregularities for each.[117] First, Mr. Crisp testified that none of the transfers were labeled as expense reimbursements in the Debtor's general ledger, and no supporting documents were identified or provided by Mr. Hoisager.[118] Second, the Debtor had no written or defined bonus program[119] and from 2011 to 2015—the time during which the bonuses were paid—the Debtor recorded cumulative net losses of $2,913,662 from asset sales.[120] Third, there was no provision in the Debtor's company agreement allowing distributions to members for tax purposes.[121]

The Trustee also seeks to recover from Mr. Hoisager $690,260 in preferential transfers made to or for the benefit of Hoisager in the one-year period before the petition was filed.[122] Mr. Hoisager concedes that he received $767,161 from the Debtor during the one-year period before the petition date.[123] He also concedes that he was an insider, and that the Debtor was likely

---

[113] B. Crisp Decl. 15.
[114] J. Hoisager Decl. 62.
[115] J. Hoisager Decl. 62.
[116] J. Hoisager Decl. 62-63.
[117] B. Crisp Decl. 16-17.
[118] B. Crisp Decl. 16.
[119] B. Crisp Decl. 16.
[120] B. Crisp Decl. 17.
[121] B. Crisp Decl. 16.
[122] Pl.'s Proposed Findings of Fact and Conclusions of Law 11, ECF No. 185.
[123] J. Hoisager Decl. 66.

15

insolvent during that period.[124] But Mr. Hoisager says that after accounting for payments of up to $25,000 per month, which the Debtor could have paid him in the ordinary course for his $300,000-per-year salary, he received only seven payments—totaling $663,901—which are likely preferential transfers.[125] But he says he contributed $67,550 in the period after July 10, 2014, from his own funds back to the Debtor to help the Debtor meet its obligations.[126] Nowhere in his testimony did Mr. Crisp refute this point. So, Mr. Hoisager concludes, after deducting his contributions of $67,550 from his preferential transfers of $663,901, he is liable for preferential transfers in the amount of $596,351.[127]

Included among the payments made by the Debtor to Mr. Hoisager were payments totaling $822,423 that were in some way booked as "Dove Acres, LLC."[128] Testimony revealed that Mr. Hoisager used this money to buy a property, and build a building on that property, that Mr. Hoisager used personally.[129] The Debtor made these payments throughout 2012 and made the last such payment on April 3, 2013.[130]

### C. __Breach of Fiduciary Duty to the Debtor__

The Trustee also alleges that Mr. Hoisager's fraudulent transfers and self-dealing breach his fiduciary duties to the Debtor.[131] According to the Trustee, as the governing person of the Debtor, Mr. Hoisager owed it fiduciary duties, even if the company was a single or multi-member LLC.[132] The Trustee also claims that as a corporate officer, Mr. Hoisager owed duties to

---

[124] J. Hoisager Decl. 66.
[125] J. Hoisager Decl. 66; Def.'s Post-Trial Br. 88-89, ECF No. 211.
[126] J. Hoisager Decl. 66.
[127] Def.'s Proposed Findings of Fact and Conclusions of Law 35-36, ECF No. 179.
[128] B. Crisp Decl. 12.
[129] 5/16/22 Trial Tr. 140:1-141:6, ECF No. 203.
[130] 5/16/22 Trial Tr. 96:12-99:22, ECF No. 203.
[131] Pl.'s Post-Trial Br. 23, ECF No. 210.
[132] Pl.'s Post-Trial Br. 23, ECF No. 210.

creditors at least as of December 31, 2013, the date on which the Debtor became insolvent.[133] Mr. Hoisager allegedly breached his fiduciary duties by engaging in a concerted pattern of making distributions to himself, his wife, and affiliates or insiders while leaving the Debtor insolvent; making excessive distributions that he now contends were salary or undocumented bonuses; transferring assets to AEX for no reasonably equivalent value; and leaving the Debtor unable to pay its debts.[134]

Mr. Hoisager testified that he acted in good faith at all times in his management of the Debtor.[135] He says he never took for himself properties, contracts, or business opportunities that should have been offered to the Debtor.[136] He testified that the Debtor received equivalent value for the transfers of property to AEX in the form of AEX's assumption of the Debtor's obligation to pay Mr. Hoisager for borrowing the money to buy the properties.[137] And Mr. Hoisager claims that though the Debtor worked diligently to satisfy its vendors and other creditors, neither the Debtor nor Mr. Hoisager ever agreed to become a fiduciary for any of its creditors at any time before the Petition Date.[138] Mr. Hoisager notes that the Debtor's company agreement expressly limits managers' and members' potential liability for breach of fiduciary duty to actions not taken in good faith.[139] As a result, he would not be liable for ordinary negligence or bad judgment in his management of the Debtor.[140] Finally, Mr. Hoisager says that he never committed any act of gross negligence, bad faith, or willful misconduct in his management of the Debtor.[141]

---

[133] Pl.'s Post-Trial Br. 24, ECF No. 210.
[134] Pl.'s Post-Trial Br. 23, ECF No. 210.
[135] J. Hoisager Decl. 67-68.
[136] J. Hoisager Decl. 67.
[137] J. Hoisager Decl. 68.
[138] J. Hoisager Decl. 69.
[139] J. Hoisager Decl. 5.
[140] J. Hoisager Decl. 6.
[141] J. Hoisager Decl. 6.

Return to TOC

D. **Mr. Hoisager Verses the Debtor's Books and Records**

As noted in the facts above, the Trustee has consistently relied on the Debtor's books and records to support his position that Mr. Hoisager made many fraudulent transfers from the Debtor to himself and entities that he controlled. Mr. Crisp testified that substantially all the transfers to Mr. Hoisager were recorded in Debtor's general ledger account as "Owner Distributions," despite Mr. Hoisager's later categorization of the payments as "salary & wages," "expense reimbursements," "performance bonuses," and "tax distributions."[142] Similarly, the Trustee refuted Mr. Hoisager's claim that the Debtor transferred its properties to AEX in exchange for assumption of the Debtor's obligation to Mr. Hoisager by noting that the Debtor never booked a loan due to Mr. Hoisager on its books.[143] Finally, Mr. Crisp reached his conclusion that about $3 million of the payments to AEX were not revenue payments by reviewing the Debtor's general ledger, specifically an account titled "revenue" that recorded revenue transfers to AEX.[144]

In contrast, Mr. Hoisager's explanations for the transfers have been changing and often inconsistent with the books and records, as evidenced by the facts above. To summarize these inconsistencies:

- In 2019, Mr. Hoisager's financial expert characterized the "integrated transaction"—which involved a $2 million payment to Mr. Hoisager—as being a "performance bonus" arising from the sales of the Debtor's properties from 2011 to 2014.[145] But in his motion for partial summary judgment, Mr. Hoisager stated that the Debtor paid him the $2 million as compensation for the sale of the Cox Prospect only.[146]

- Mr. Hoisager also claimed that he personally borrowed the funds necessary to purchase the Wolfbone Prospects from McCabe Petroleum Corporation, and that

---

[142] B. Crisp Dec. 15.
[143] B. Crisp Dec. 17.
[144] 5/17/22 Trial Tr. 38:21-39:20, ECF No. 204.
[145] B. Crisp Decl. 14.
[146] B. Crisp Decl. 14; Mtn for Summ. J. 28, ECF No. 161.

18

the Debtor transferred those properties to AEX in exchange for AEX's assumption of the Debtor's obligation to Mr. Hoisager.[147] Even so, Mr. Hoisager concedes that the Debtor did not document the loan from Mr. Hoisager to the Debtor with promissory notes.[148] And AEX's assumption of the obligation to repay Mr. Hoisager was documented on the Debtor's books as an "Owner Distribution" to Mr. Hoisager.[149] He also acknowledges that the Debtor's general ledger booked the transaction with MPC as "Accounts Receivable McCabe Petroleum Corporation," rather than as a loan from MPC to Mr. Hoisager.[150] He maintains that the entries were not receivables but were instead loans, and that this "non-traditional accounting resulted from the inexperience of Breann Hall, the Debtor's Controller at the time, and the limitations of the Debtor's accounting software."[151] Only after the Petition Date did Mr. Hoisager reclassify all of the activity in "Accounts Receivable—McCabe" to an equity account titled "Hoisager (McCabe) Flow-Thru."[152]

- Similarly, Mr. Hoisager categorized the payments the Debtor made to Mr. Hoisager as compensation, expense reimbursements, performance bonuses, and tax payments.[153] Yet Mr. Hoisager conceded that most payments were simply recorded in Debtor's general ledger account as "owner distributions."[154] He attributes this inconsistency to the "Debtor's very basic accounting system."[155]

Mr. Hoisager testified that the Debtor's "books are a mess";[156] he attributed the problems with the Debtor's books and records to Debtor's bookkeeper, who he says was "inexperienced."[157] But the bookkeeper's successors never went back and made the correct corresponding entries on the Debtor's books.[158] Mr. Hoisager also testified that the quality of the books and records was his responsibility, as the sole member and manager of the Debtor.[159]

Ultimately, Mr. Hoisager's inconsistent, self-serving, and undocumented explanations of how the various transactions and payments should be characterized—including his fanciful

---

[147] J. Hoisager Decl. 12-13, 22.
[148] J. Hoisager Decl. 13.
[149] J. Hoisager Decl. 22.
[150] J. Hoisager Decl. 14.
[151] J. Hoisager Decl. 14.
[152] B. Crisp Dec. 17.
[153] B. Crisp Decl. 15.
[154] 5/16/22 Trial Tr. 125:19-128:4, ECF No. 203.
[155] J. Hoisager Decl. 62-63.
[156] 5/16/22 Trial Tr. 159:18-19, ECF No. 203.
[157] 5/16/22 Trial Tr. 159:15, ECF No. 203.
[158] J. Hoisager Decl. 22.
[159] 5/16/22 Trial Tr. 159:20-25, ECF No. 203.

19

"integrated transaction"—are not credible;[160] instead, the contemporaneously recorded treatment of these transactions in the Debtor's books and records, for which Mr. Hoisager was responsible, should control.

## II.    ANALYSIS

### A.    Primer on Fraudulent Transfers

The Trustee seeks to avoid transfers made by the Debtor under both section 548, which allows the Trustee to avoid transfers that satisfy the elements set forth in that section, and section 544, which allows the Trustee to avoid transfers that satisfy the elements of a fraudulent transfer under state law, here, the Texas Uniform Fraudulent Transfer act, or TUFTA.[161] TUFTA was modeled on section 548, and in their application to the facts here, the two statutes are for all practical purposes identical.[162]

The statutes allow the Trustee to avoid two basic types of fraudulent transfers.[163] The first, which can be called constructively fraudulent transfers, are transfers made by a debtor in exchange for less than reasonably equivalent value at a time when the debtor was either (1) insolvent (meaning the fair salable value of its assets was less than its liabilities), (2) unable to pay its debts as they came due, or (3) had an unreasonably small capital.[164]

---

[160] Indeed, they call into question Mr. Hoisager's overall credibility. A further blow to Mr. Hoisager's credibility happened when he maintained at trial that the Debtor had substantial properties left after the transfers to AEX even though he testified to the opposite during his Rule 2004 exam. 5/16/22 Trial Tr. 131:20-133:18, ECF No. 203. As Mr. McCabe's testimony largely parrots that of Mr. Hoisager, Mr. McCabe was not credible, either.

[161] 11 U.S.C. §§ 548(a), 544(b); Tex. Bus. & Com. Code § 24.005 ("TUFTA").

[162] *See Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 194 (5th Cir. 2013) ("UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore, cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent.").

[163] 11 U.S.C. § 548(a)(1)(A), (B); TUFTA §§ 24.005(a)(1), (a)(2), 24.006(a).

[164] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a); *see also Spring St. Partners-IV, L.P. v. Lam,* 730 F.3d 427, 437 (5th Cir. 2013) (applying § 24.005(a)(2) and § 24.006(a) as parts of the "constructive fraud prong").

Return to TOC

The second basic type, which can be called actual intent fraudulent transfers, are transfers made with actual intent to delay, hinder, or defraud creditors.[165] The intent in question is determined by circumstantial evidence, usually with reference to what are called the "badges of fraud," which will be detailed below.[166]

Two finer points must also be made. First, under these fraudulent conveyance statutes, the Trustee not only can "recover" property fraudulently transferred; he can also "avoid" an obligation fraudulently incurred.[167] Second, a transfer made for or on account of an antecedent debt is by definition for a reasonably equivalent value,[168] and so cannot be a constructively fraudulent transfer, though it might still be an actual intent fraudulent transfer.[169] Thus, if a debtor signs an agreement to make a transfer, the obligation to make the transfer can be avoided as fraudulently incurred, if the other elements are present. But when that debtor makes the transfer under that agreement, that transfer is made for an antecedent debt—the obligation to make the transfer—and so cannot be a constructively fraudulent transfer.

And while transfers made to satisfy antecedent debts cannot be constructively fraudulent transfers, they can be preferences under either section 547 or under TUFTA.[170] That said, the Trustee did not seek to avoid insider preferences under TUFTA, and in the Joint Pre-Trial Order

---

[165] 11 U.S.C. § 548(a)(1)(A); TUFTA § 24.005(a)(1).

[166] *See, e.g., Cipolla v. Roberts (In re Cipolla)*, 541 Fed. App'x. 473, 477 (5th Cir. 2013) ("Among the circumstantial evidence of intent to defraud that a court may look to are the 'badges of fraud' in state fraudulent conveyance laws, including the Texas Uniform Fraudulent Transfer Act ('TUFTA')."); *see also* TUFTA § 24.005(b) (listing factors for "determining actual intent under Subsection (a)(1)").

[167] 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . .or any obligation . . ."); 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law…."); TUFTA § 24.005(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . .if the debtor made the transfer or incurred the obligation . . .").

[168] 11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor . . .").

[169] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp. (In re IFS Financial Corp.)*, 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [Dean] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

[170] 11 U.S.C. §§ 548(d)(2)(A), 547(b); TUFTA § 24.006(b).

he limited his section 547 action to payments made to Mr. Hoisager.[171]

Finally, once a transfer is avoided, the thing avoided, or the value of that thing, can be recovered from the transferee,[172] or from the entity for whose benefit the transfer was made.[173]

**B.** **The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to be Recovered**

A "transfer" of property occurs under fraudulent transfer law when "such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee…."[174] Here, that date of perfection occurred, under Texas law, when each assignment was properly recorded.[175] And so, these transfers were made for or on account of an antecedent debt—specifically, the obligation to make the assignments in the Wolfbone I and Wolfbone II assignment agreements—and so cannot be constructively fraudulent transfers.[176] Still, the Trustee might have avoided these transfers as actual intent fraudulent transfers.[177]

But even if the Trustee could avoid the property transfers as actual intent fraudulent transfers, there is a problem of proof. Nowhere does the Trustee list each property transfer he

---

[171] Joint Pre-Trial Order 13, ECF No. 184.

[172] 11 U.S.C. § 550(a)(1).

[173] *Id*. Interestingly, TUFTA does not appear to allow recovery from "the entity for whose benefit the transfer was made." *See* TUFTA §§ 24.008, 24.009. However, section 550(a) comes into play once a transfer is avoided under section 544, and so the "to or for the benefit of" language applies to transfers avoided under TUFTA as well.

[174] 11 U.S.C. § 548(d)(1).

[175] *Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234, 1237 (5th Cir. 1987) ("For purposes of § 548(d)(1), state law on time of perfection controls."); *Osherow v. Wolf (In re Wolf)*, 2016 WL 4940198, at *22 (Bankr. W.D. Tex. Sept. 15, 2016) (citing numerous cases), *aff'd*, 697 F. App'x 317 (5th Cir. 2017).

[176] 11 U.S.C. § 548(d)(2)(A).

[177] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp.* (*In re IFS Financial Corp.*), 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [*Dean*] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

22

seeks to avoid together with the value he seeks to recover and the basis of that value.

Mr. Crisp's declaration at pages 13-14 highlights the lack of specificity.[178] Mr. Crisp says, based on an AEX 10-K, that AEX sold properties in 2014 for $5.6 million, made a profit of more than $3 million, and that the sold properties "include" some of the properties transferred by the Debtor to AEX.[179] Which properties? Mr. Crisp doesn't say. And does the Trustee seek to recover the value of the properties or just the profit collected by AEX? The Trustee doesn't say. The only specific properties discussed are the Johnson 44 and the Roark, and with these, the Trustee mentions only the profit earned by AEX.[180] There may be a chart somewhere in the Trustee's exhibits, or information in those exhibits from which such a chart could be constructed, but absent a concise presentation of that information in Mr. Crisp's declaration,[181] there is no basis on which to establish a fraudulent-transfer damage award based on the property transfers.

**C.  The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager**

At trial, the Trustee sought recovery of transfers made by the Debtor to AEX and Arabella Operating, not from those entities, but instead from Mr. Hoisager as "the entity for whose benefit" those transfers were made.[182] The transfer beneficiary[183] is a person who, while not the initial transferee, nonetheless receives a benefit as a result of the transfer.[184] The "quintessential" example is when a third-party guarantor has its liability reduced when the debt it

---

[178] B. Crisp Decl. 13-14.

[179] B. Crisp Decl. 13.

[180] B. Crisp Decl. 13-14.

[181] Mr. Crisp does reference Exhibit 31, which lists the properties assigned to AEX, but this exhibit provides no values. B. Crisp Decl. 4. He also references Exhibit 71, but this is a summary of the Debtor's balance sheets. *Id.*

[182] Pl.'s Post-Trial Br. 19-21, ECF No. 210; 11 U.S.C. § 550(a)(1).

[183] Coined by Judge Wedoff in *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005).

[184] *Schechter v. 5841 Bldg. Corp (In re Hansen)*, 341 B.R. 638, 644 (Bankr. N.D. Ill. 2006) (quoting *Bonded Fin. Serv, Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988)).

23

guaranteed is paid through an avoidable transfer from the debtor to the lender.[185] "Benefit occurs without the beneficiary ever holding the money or property, precisely because someone else received it."[186] "The benefit must be 'direct, ascertainable and quantifiable' and must correspond to, or be commensurate with, the value of the property that was transferred."[187] Even with these limitations, courts have found many examples of recoverable benefits beyond the guarantor-guarantee context.[188]

But the Trustee must prove the benefit and must prove that the benefit was quantifiable and commensurate with the property transferred.[189] And here, as discussed below, the Trustee has proven no direct benefit to Mr. Hoisager, and any indirect benefits to Mr. Hoisager as a shareholder, director, or officer, resulting from the transfers of property to AEX and cash to Arabella Operating, without more, are not enough. And because the entity must actually receive a benefit from the transfer, intent to benefit alone is insufficient for recovery under 550(a), contrary to the Trustee's assertions.[190]

---

[185] *Sec. Inv'r Prot. Corp. v. Stratton Oakmont*, 234 B.R. 293, 314 (citing *Bonded Fin. Serv, Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988) (considering a guarantor or debtor to be the "paradigm 'entity for whose benefit such transfer was made'")).

[186] *Id.* at 313.

[187] *Enron Creditors Recovery Corp v. J.P. Morgan Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17, 33 (Bankr. S.D. N.Y. 2009) (citing *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005)), *rev'd on other grounds,* 422 B.R. 423 (S.D. N.Y. 2009); *see also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning benefit of continued business operations was "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received" and so was unrecoverable under Bankruptcy Act); *Faulkner v. Kornman (In re The Heritage Corp)*, 413 B.R. 438, 495 (Bankr. N. D. Tex. 2009) ("Nor is an unquantifiable advantage the sort of 'benefit' contemplated by § 550.").

[188] *See, e.g., Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1313-1315 (11th Cir. 2012) (recipients of loan proceeds benefited from transfer of liens securing the loan); *Gibbons v. Stemcor USA, Inc. (In re B.S. Livingston & Co., Inc.)*, 186 B.R. 841, 864 (D. N.J. 1995) (permitting case to proceed under theory that the promise of lucrative positions at new company in exchange for transfers of debtor's assets was a benefit for purpose of 550(a)); *Merrill. v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 127 (D. Utah 1986) (finding a benefit where debtors' funds used to retain an attorney to form a new company for defendant).

[189] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d at 1293 (Corporation's purchase of likely worthless stock from one shareholder leaving second shareholder as sole owner did not benefit second shareholder enough to impose transfer beneficiary liability because it was not "a quantifiable benefit or one bearing the necessary correspondence to property transferred," citing *Mack v. Newton*, 737 F 2d at 1359-60).

[190] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF 212. For cases rejecting the Trustee's position, see *Terry v. Meredith (In re Meredith)*, 527 F.3d 372, 376-77, n.5 (4th Cir. 2008) (finding that the transferor's "subjective intent

First, the Trustee has not shown a "direct, ascertainable and quantifiable" benefit to Mr. Hoisager.[191] The Trustee did not establish that the salary paid by AEX to Mr. Hoisager was tied to, or the result of, or in any other way commensurate with the transfers from the Debtor.[192] The Trustee also did not prove that the note and equity distributions given to Mr. Hoisager by AEX, although possibly direct, were ascertainable or quantifiable.[193] On the contrary, Mr. Hoisager testified that the note was essentially worthless and that the equity transfer did not increase his holdings in the post-merger AEX.[194] And this testimony is corroborated by the going-concern qualification in AEX's 20-F.[195]

And so, if the Trustee is to recover from Mr. Hoisager, the Trustee must do so based on Mr. Hoisager's status at AEX or Arabella Operating.[196] The court in *In re Hansen* addressed recovery under section 550(a)(1) from shareholders, directors, and officers.[197] Citing "fundamentals" of American corporate law, the *Hansen* court reasoned that "shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property (in which case they would be subsequent transferees under section 550(a)(2)), or a showing can be made to pierce the corporate veil."[198]

---

to benefit . . . is not determinative" and recognizing that "fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but received no benefit from it") (quoting *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570,591 (N.D. Ill. 2005)) and *Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008) (same). *See also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning the same under the Bankruptcy Act).

[191] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005).

[192] *Id.*

[193] *Id.*

[194] J. Hoisager Decl. 25-27.

[195] Def.'s Ex. D-6, 11-12, 123. A form 20-F is used by foreign companies for filing annual reports and other disclosures.

[196] At the time of the transfers and equity contribution, Mr. Hoisager owned 100% of the equity interest in Arabella Exploration. J. Hoisager Decl. 25; Def.'s Ex. D-21. After the merger with Lone Oak, Mr. Hoisager owned 30.4% of the stock in the new AEX. J. Hoisager Decl. 26. Arabella Operating was a wholly owned subsidiary of AEX. J. Hoisager Decl. 8; Def.'s Ex. D-7, 12.

[197] *Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 644-46 (Bankr. N.D. Ill. 2006).

[198] *Id.* at 645-46 (explicitly rejecting *In re McCook*'s holding to the contrary).

25

*Hansen* accords with the Fifth Circuit's discussion in *Mack v. Newton*[199] (a Bankruptcy Act case) and is therefore persuasive.[200]

But here, the Trustee did not prove that Mr. Hoisager actually received direct distributions of the cash transferred to AEX or Arabella Operating. And the Trustee did not preserve veil-piercing theories through the Joint Pre-Trial Order. Even if he had, the Trustee has shown no cause to pierce the corporate veil because he has not shown that Mr. Hoisager was the alter ego of AEX or Arabella Operating,[201] that AEX or Arabella Operating was Mr. Hoisager's "mere instrumentality,"[202] that AEX or Arabella Operating was a "sham" or "shell" corporation,[203] or that Mr. Hoisager otherwise abused the corporate form.[204]

The cases cited by the Trustee as authority for recovering from Mr. Hoisager are not persuasive. In *In re TOUSA*, debtors transferred liens to new lenders who then paid off old lenders.[205] When the liens were avoided, the court found that the paid lenders were the entities

---

[199] *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[200] *Mack v. Newton* denied recovery because the court found the alleged benefit conferred on partners from using proceeds of fraudulent transfer to operate their business to be "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received." 737 F.2d at 1359-60. In accord is *Oscherow v. Nelson & Hensley Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253, 276-78 (Bankr. W.D. Tex. 2011), which cited *Hansen* favorably but found a basis to pierce the veil.

[201] *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) (explaining the "alter ego" theory as an exception to limited liability and noting "our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil").

[202] *Lubrizol Corp. v. Cardinal Const. Co.*, 868 F.2d 767, 769 (5th Cir. 1989) (outlining three elements for finding liability under an "instrumentality" theory: "[the] complete domination of the other corporate entity;" "the control must be wrongful;" and "the control must proximately cause the injury complained of").

[203] *Ledford v. Keen*, 9 F.4th 335, 340-42 (5th Cir. 2021) (denying veil-piercing in part because plaintiff did not rebut directors' evidence that they did not "form [corporation] to avoid liability, use it as a shell to avoid liability, or otherwise abuse the corporate form for their personal benefit;" and explaining that, to support a "sham theory," the plaintiff needed evidence of the directors using the corporation to "perpetrate a fraud, evade an existing obligation . . . circumvent a statute, protect a crime, or justify wrong"); *see also West v. Seiffert (In re Houston Drywall, Inc.)*, 2008 WL 2754526 at *32 (Bankr. S.D. Tex. 2008) (finding general partner, an LLC, to be a "sham corporation" because there was "no separateness" between the LLC and its members, and because allowing the member who directed the malfeasance to hide behind the corporate veil "would unjustly benefit" him).

[204] *See Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 646 (Bankr. N.D. Ill. 2006) ("Most cases in which shareholders or officers have been found responsible under section 550(a)(1) as beneficiaries of corporate transfers have involved some veil-piercing aspect.").

[205] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1301-1302 (11th Cir. 2012).

26

"for whose benefit the transfer [of the liens] was made."[206] But this is no different from the

guarantor situation in that the new lenders received a dollar-for-dollar benefit from the transfers.

Mr. Hoisager did not receive a dollar-for-dollar benefit. The Trustee also cites *In re Green Field*

*Energy*,[207] but in *Green Field*, the court held that neither the defendant's position as owner nor as

manager of the entity receiving the transfer was enough to confer transfer beneficiary liability.[208]

The Trustee cites *In re Buckhead America Corp*[209] for the proposition that "controlling

person of an entity can be the party for whose benefit the transfer was made."[210] But the

Buckhead court was considering a motion to dismiss, and so the court did not need to consider

"the issue of the precise facts which must be proven in order for plaintiff to prevail."[211] Here,

however, the dispute went to trial, and so "the precise facts which must be proven" were at issue.

In his reply brief, the Trustee cites *In re Universal Clearing House*.[212] But *Universal*

*Clearing House* actually agrees with *Hansen* that absent cause to pierce the veil, a shareholder,

director, or officer, is not subject to 550(a)(1) liability because of their status alone.[213] The

Trustee also argues that Mr. Hoisager's salary, and the fact that the transfers kept Mr. Hoisager's

"pyramid" afloat (presumably, AEX and Arabella Operating), establishes benefit to Mr.

Hoisager.[214] But *Bonded Financial Services*[215] rejects the former, and *Mack*, the Fifth Circuit

---

[206] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1314 (11th Cir. 2012).

[207] *Halperin v. Moreno (In re Green Field Energy Services, Inc.)*, 594 B.R. 239 (Bankr. D. Del. 2018).

[208] *Id.* at 288 (Bankr. D. Del. 2018) (finding the trustee's argument insufficient by itself to prove the defendant "received an actual benefit from the . . . transfers").

[209] *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956 (D. Del. 1994).

[210] Pl.'s Post-Trial Br. 21, ECF No. 210.

[211] *Buckhead*, 178 B.R. at 963, n.11.

[212] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF No. 212; *Merrill. v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D. Utah 1986).

[213] *Id.* at 127-29 (finding that initial-transferee corporations were not "sham[s]" or "mere conduit[s]" such that the defendant, who took for value transfers from those corporations, would fall within section 550(a)(1)).

[214] Pl.'s Reply to Def.'s Post-Trial Br. 8-9, ECF No. 212.

[215] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a

27

Bankruptcy Act case, rejects the latter.[216] At most, the Trustee may have recovered the salary and distributions from Mr. Hoisager as a subsequent transferee under section 550(a)(2);[217] however, the Trustee did not argue this.

And so, the Trustee cannot recover either the property or cash transfers made to AEX or the cash transfers made to Arabella Operating from Mr. Hoisager. The cash paid to Mr. Hoisager directly is another matter.

**D.  The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims**

As noted above, the Debtor's insolvency, undercapitalization, or inability to pay debts forms one element of a constructively fraudulent conveyance.[218] In addition, the Debtor's overall financial condition can be important in determining whether the Debtor, through its agent, Mr. Hoisager, had an intent to delay, hinder, or defraud creditors.[219] Indeed, insolvency is one of the enumerated "badges of fraud."[220] Finally, the Debtor's financial condition forms an important backdrop against which to consider the Trustee's breach of fiduciary duty claim.

The parties have stipulated that the Debtor was insolvent as of December 31, 2013.[221] At trial, Mr. Hoisager testified that the Debtor became unable to pay its debts as they came due in early 2014,[222] and this is generally corroborated by the dates of service for the creditors filing vendor liens against the Debtor's properties,[223] as well as by Mr. Crisp's analysis of proofs of

---

benefit from the initial transfer is within this language."); *see also Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009) (dismissing plaintiff's section 550(a)(1) claim that, by pledging company assets to secure DIP financing, former directors benefitted by continuing to receive compensation from the debtor) (citing to *Bonded*).

[216] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988); *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[217] *Bonded*, 838 F.2d at 895 (explaining that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made").

[218] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).

[219] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[220] TUFTA § 24.005(b)(9).

[221] Joint Pretrial Order 35, ECF No. 184.

[222] 5/16/22 Trial Tr. 133:19-23, ECF No. 203.

[223] B. Crisp Decl. 9; Pl.'s Ex. 62.

28

claim filed against the Debtor.[224] Jason Rae, the Trustee's accounting expert, testified to an analysis of the Debtor's capitalization performed by his firm, which concluded that there was a working capital shortfall from December 31, 2013 to June 30, 2015.[225]

So all the available evidence establishes that the financial condition element for a constructively fraudulent transfer is satisfied on the date stipulated for the Debtor's insolvency, or December 31, 2013, and only transfers that took place after that date can be avoided as such.[226] An earlier cut-off date for actual intent fraudulent transfers might be established, if enough badges of fraud (other than insolvency) can be established at the earlier date.

But how did the Debtor slide into this state of insolvency on December 31, 2013? Mr. Crisp included two charts in his declaration,[227] but neither revealed anything about what was happening to the Debtor during 2013. More helpful was Exhibit D-11, a chart prepared by Mr. Crisp, but adopted by Mr. Hoisager in his declaration.[228] Exhibit D-11 reveals a shocking fact: The Debtor's income was over $800,000 for each of 2011 and 2012, but fell to a negative $4.6 million in 2013, and the Debtor continued to lose money thereafter.[229]

Mr. Hoisager's timeline reveals that the Debtor's drilling operations on the Wolfbone I and II wells began in late 2012 and ramped up in 2013.[230] That the Debtor had trouble collecting the joint interest costs of this drilling activity is evident from the bankruptcy schedules.[231] And Mr. Rae testified that the Debtor over spent the approved budget on the first three wells drilled by almost $14 million, $8 million over the amounts committed by the working interest owners.[232]

---

[224] B. Crisp Decl. 9.
[225] J. Rae Decl. 15; Pl.'s Ex. 70.
[226] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).
[227] B. Crisp Decl. 6, 8.
[228] J. Hoisager Decl. 4.
[229] Def.'s Ex. D-11.
[230] Def.'s Post-Trial Br. Ex. A, 1-7, ECF No. 211.
[231] B. Crisp Decl. 5.
[232] J. Rae Decl. 10.

29

The following chart, created from the Debtor's balance sheets, makes it painfully clear that the combination of the Debtor's Wolfbone I and II drilling activities—with the high costs[233] and inability to collect the corresponding joint interest billings—and absurdly large owner distributions, were the biggest contributors to the Debtor's insolvency at the end of 2013.[234]

| Year | Equity | Accounts Receivable | Unbilled Joint Interest Billings | Owner Distributions |
|------|--------|---------------------|----------------------------------|---------------------|
| 2012 | $654,468 | $877,173 | $3,590,262 | −$2,307,685 |
| 2013 | −$12,930,875 | $5,329,376 | $11,550,407 | −$9,589,296 |

## E. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent Transfers

### 1. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13, 2013 as Constructively Fraudulent Transfers

Exhibit 1 to the Trustee's Post-Trial Brief shows all payments made by the Debtor to Mr. Hoisager between December 31, 2013, and the Petition Date.[235] These payments total $2,803,834.[236] Mr. Crisp testified that each payment was reflected in the Debtor's books and records as an "owner distribution," and opined that the Debtor did not receive reasonably equivalent value in exchange.[237] While the "Dove Acres" distributions[238] about which the Trustee complains were made while the Debtor was financial healthy, and so were perfectly benign,[239] owner distributions made while a company is insolvent are quintessential constructively fraudulent transfers.[240] And as noted above, the Debtor's books and records which

---

[233] J. Rae Decl. 10.

[234] Pl.'s Ex. 8, 1-4.

[235] Pl.'s Post-Trial Br. Ex. 1, ECF No. 210.

[236] Pl.'s Ex. 60, 76; B. Crisp Decl. 12.

[237] B. Crisp Decl. 14-20. As noted earlier, Mr. Hoisager's attempts to recharacterize these payments were not credible.

[238] Pl.'s Post-Trial Br. 19, ECF No. 210.

[239] The Debtor was financially healthy, so the distributions are unassailable if ratified by a majority of shareholders. *See, e.g., Gearhart Industries Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 720 (5th Cir. 1984) ("A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by a majority of disinterested directors or the majority of the stockholders.").

[240] See *Mancuso v. Champion (In re Dondi Financial Corp.),* 119 B.R. 106, 111-13 (Bankr. N. D. Tex. 1990), and cases cited therein.

listed these payments as "owner distributions" to Mr. Hoisager must control in the face of Mr. Hoisager's inconsistent and self-serving testimony. Thus, the $2,803,834 in distributions made to Mr. Hoisager after December 31, 2013, are recoverable and the Trustee is entitled to a judgment of at least this amount.

But was there a date earlier than December 31, 2013, on which the Debtor formed an actual intent to delay, hinder, or defraud creditors, so that cash payments made to Mr. Hoisager before December 31, 2013, could be avoided?

### 2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013 as Actual Intent Fraudulent Transfers

As is typical with actual intent fraudulent transfers, there is no direct evidence that Mr. Hoisager intended[241] to delay, defraud, or hinder creditors with the payments of cash to Mr. Hoisager. Mr. Hoisager testified, of course, that the Debtor made no transfers or payments with actual intent to hinder, delay, or defraud any creditor.[242]

Because a debtor will seldom admit that he intended to defraud creditors, intent may also be inferred and established by circumstantial evidence, including analysis of the "badges of fraud."[243] The badges of fraud under the Texas Uniform Fraudulent Transfer Act include

(1) Whether the transfer was to an insider;
(2) Whether the debtor retained possession or control of the property after the transfer;
(3) Whether the transfer was concealed;
(4) Whether the debtor had been sued or threatened with suit before the transfer;
(5) Whether the transfer was substantially all of the debtor's assets;
(6) Whether the debtor absconded after the sale;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset or obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly after the sale;
(10) Whether the transfer occurred shortly before or shortly after the debtor incurred a

---

[241] It is the Debtor's intent that matters. *ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278, 369 (S.D. Tex. 2008). But the intent of a transferee in control of the debtor will be imputed to the debtor. *Id.* at 269-70.

[242] J. Hoisager Decl. 5-6.

[243] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1066-67 (5th Cir. 2008).

"substantial debt;" and

(11) Whether the debtor transferred essential assets to the business to a lienor who transferred the assets to an insider or seller.[244]

The Fifth Circuit has articulated a similar list of "badges" applicable to transfers under the Bankruptcy Code:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of events and transactions under inquiry.[245]

The Trustee seems to suggest a static construct where a badge once present is presumed to have existed for all relevant times. For example, the Trustee makes much of the Dove Acres payments, even though these occurred long before the Debtor had trouble paying creditors. But how can you have an intent to delay, hinder, or defraud creditors who are getting paid? And this is a problem with all multi-factor tests, of which the badges-of-fraud test is just one example. A wooden application of each factor or badge in isolation, without considering how each factor plays out and relates to the other factors over the relevant time period, brings the trier of fact no closer to an understating of the ultimate issue: here, the Debtor's intent, as held by Mr. Hoisager.

This analysis will focus on the last three of the Fifth Circuit's factors for four reasons. First, they encapsulate the other badges of fraud, including the TUFTA badges. Second, they offer a more dynamic construct than that offered by the Trustee, one where timing matters. Third, they compel an inquiry into all the facts and circumstances. Finally, and most importantly,

---

[244] Tex. Bus. & Com. Code §24.005(b).
[245] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Chastant v. Chastant (In re Chastant)*, 873 F. 2d 89, 91 (5th. Cir. 1989) in turn quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

they invite the trier of fact to knit together all the badges that apply into a coherent narrative that examines how Mr. Hoisager's motives were likely affected by the changing financial fortunes of the Debtor over the course of 2013.

To that end, post-trial instructions included a request for a timeline,[246] which would have been responsive to the fourth and sixth of the Fifth Circuit's elements. The Trustee declined this request, possibly because it would undermine his static construct, under which a badge once present is present for all times. Mr. Hoisager did include one,[247] and it has been helpful. It shows:

- that the discussions that ultimately led to establishing AEX as a public company started in July 2013;[248]
- that several leases were assigned by the Debtor to AEX on August 30, 2013;[249]
- that the merger agreement between AEX and Lone Oak was signed in October 2013;[250]
- that the transaction in which AEX "recognized" an equity contribution by Mr. Hoisager happened in December 2013;[251]
- that a re-entry failure involving the SM Prewitt lease—described as "disastrous"—happened on December 11, 2013; [252]
- that the valuable Johnson 44 well assignment to AEX was recorded one day later;[253] and
- that the merger was completed 12 days after that.[254]

In short, the latter half of 2013 was eventful for Mr. Hoisager, the Debtor, and AEX. But what other indicators of intent are there from this time?

First, the Debtor made its first six-digit distribution to Mr. Hoisager in July 2013.[255]

Next, on top of distributions to Mr. Hoisager, the Debtor made large expenditures,

---

[246] 5/19/2022 Trial Tr. 33:16-34:1, ECF No. 205.
[247] Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[248] *See also* W. Heyn Decl. 2.
[249] *See also* Pl.'s Ex. 77.
[250] *See also* W. Heyn Decl. 3.
[251] *See also* Def.'s Ex. 19, PDF 7; B. Crisp Decl. 13.
[252] *See also* J. Hoisager Decl. 38.
[253] *See also* Pl.'s Ex. 77.
[254] *See also* W. Heyn Decl. 3.
[255] Pl.'s Ex. 60, 2.

33

including substantial cost overruns, on the Wolfbone I and II wells[256]—wells in which the Debtor no longer owned a working interest—leading to the Debtor's slide into insolvency. This ship was clearly sinking in 2013, and no one would know that better than Mr. Hoisager.

Next, the Debtor transferred almost 5 million dollars to AEX. These transfers were included on Exhibit 85, used by Mr. Crisp to exclude revenue payments, which would be due under the joint operating agreement, from the claim for cash transfers from the Debtor to AEX.[257] While the parties spent much time debating the accuracy of four entries on Exhibit 85, of far, far more relevance to the timeline analysis is this: by juxtaposing the revenue payments[258] against the joint interest billing receivable owed by AEX to the Debtor,[259] we learn that, beginning in July 2013 (again), the Debtor made substantial revenue payments to AEX at times when the AEX joint interest billings due to the Debtor were substantial, and mostly past due. No prudent operator would have failed to offset those revenue payments against the past due joint interest billings.

Finally, there is Mr. Hoisager's audacious attempt to transition from his role as a sole proprietor, engaging in undocumented transactions with Mr. McCabe, and using the Debtor as his private checking account, to a role as the chief executive officer of a public company.[260]

Taking all these facts together leads to the inescapable conclusion that starting in July 2013, Mr. Hoisager knew the Debtor was foundering, and he was, at the same time, enticed by the prospect of running AEX, a public company. Preferring his new enterprise over the Debtor, Mr. Hoisager emptied the Debtor of available cash and valuable properties, and diverted it all to

---

[256] J. Rae Decl. 10.
[257] 5/17/22 Trial Tr. 46:1-50:17, ECF No. 204.
[258] Pl.'s Ex. 85.
[259] Pl.'s Ex. 12B, 74, 260, 456.
[260] *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014) (fraudulent transfer under TUFTA) ("This list [of badges] is not exclusive and a court may also consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.") (citations omitted).

34

himself, AEX, or later, Arabella Operating. And this, at the least, constitutes an intent to delay, hinder, or defraud the creditors of the Debtor, and so the cutoff date for cash transfers to Mr. Hoisager can be moved back to July 1, 2013. Doing so adds $377,535 to the judgment.[261]

### F.  Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those Transfers Cannot be Preferential Transfers

The Trustee alternatively seeks to recover the cash paid by the Debtor to Mr. Hoisager within one year of the petition date as preferential transfers. But a preferential transfer must be made "for or on account of an antecedent debt,"[262] and as previously discussed, those cash transfers were made for no consideration.

### G.  Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by the Payments Mr. Hoisager Made Back to the Debtor

In the Joint Pre-Trial Order, Mr. Hoisager raises the one satisfaction rule of section 550(d) and claims that payments received by the Trustee under a settlement entered into with the estate of AEX,[263] and payments made pre-petition by Mr. Hoisager to the Debtor, should be credited against any fraudulent transfer award.[264]

More specifically, Mr. Hoisager says the Trustee received $4.8 million from the sale of the Samson Tag Along, $2 million from the sale of the Brigham Tag Along, and $1.4 million from the sale of Wolfbone I and II working interests.[265] But as noted by Judge Hale in In re Provident Properties,[266] "section 550(d) must be applied on a transfer-by-transfer basis…." Here, since the Trustee did not establish a right to recover any of the property transfers, there is nothing against which to credit his recoveries from the AEX estate.

---

[261] Pl.'s Post-Trial Br. Ex 2, ECF No. 210.
[262] 11 U.S.C. § 547(b).
[263] Joint Pre-Trial Order 35, ECF No. 184.
[264] Joint Pre-Trial Order 43-44, ECF No. 184.
[265] Joint Pre-Trial Order 23, ECF No. 184.
[266] *Segner v. Ruthven Oil & Gas (In re Provident Royalties, LLC)*, 581 B.R. 185, 195 (Bankr. N.D. Tex. 2017).

APP1-386

But Mr. Hoisager's payments to the Debtor after July 1, 2013 should reduce his fraudulent transfer liability under section 550(d). The Fifth Circuit held strongly in favor of this offset in *In re DeBerry*.[267] And while the facts there differed materially, the opinion gives no hint that a different set of facts would yield a different result.[268] Mr. Hoisager's uncontroverted testimony is that he contributed $67,550 after July 10, 2014, to support the Debtor's operations, and so this will serve as a credit to the fraudulent transfer judgment.[269]

### H.  Mr. Hoisager Breached his Fiduciary Duty to the Debtor

The Debtor was a Texas limited liability company.[270] Mr. Hoisager was the sole member and manager, and as manager he appointed himself president, secretary, and treasurer.[271] Thus, he owed a fiduciary duty to the Debtor.[272] Texas law allows an LLC to limit this duty to some extent,[273] and the Debtor's company agreement does just that, relieving Mr. Hoisager from "any action taken (or any failure to act) by [him] in good faith on behalf of the company and reasonably believed by [him] to be authorized or within the scope of [his] authority, unless that action (or failure to act) constitutes fraud, gross negligence, bad faith or willful misconduct...."[274]

---

[267] *Whitlock v. Lowe (In re DeBerry),* 945 F. 3d 943, 947 (5th Cir. 2019).

[268] *Id.* ("In matters of statutory interpretation, the text is always the alpha. Here, it's also the omega.").

[269] J. Hoisager Decl. 69.

[270] Def.'s Ex. 2.

[271] Def.'s Ex. 2, PDF 15.

[272] *Katz v. Intel Pharma, LLC,* 2020 WL 3871493 at *2 (S.D. Tex. July 9, 2020) (finding managing member "owed [LLC] fiduciary duties based on agency-law principles") (citing *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex. 2002)); *see also ETRG Invest. v. Hardee (In re Hardee)*, 2013 WL 1084494 at *9 (Bankr. E.D. Tex. 2013) ("Though limited liability companies are not corporations in the strictest sense, and though Texas law implies, but does not explicitly state, that the fiduciary status of corporate officers and directors and the corresponding three broad duties of such corporate officers and directors—the duty of due care, loyalty, and obedience—applies to managers and/or members governing the activities of a limited liability company, the imposition of those duties upon the management of a limited liability company under Texas law is appropriate and warranted.").

[273] Tex. Bus. Org. Code Ann. §§ 7.001(d)(3), 101.401.

[274] Def.'s Ex 2, PDF 8.

36

Mr. Hoisager argues that he owes no duties to creditors unless the company stops operating.[275] The cases cited support this notion, but they also affirm that the duty runs to the corporation and none suggest that the trustee cannot enforce the duty on behalf of the corporation.[276] It seems most likely that Texas would ultimately adopt the Delaware view that the fiduciary duties are always owed to the corporation, but can be enforced by the residual stakeholder.[277] Here, in any event, the creditors are not seeking to enforce the fiduciary duty owed to the corporation. Instead, a trustee has been appointed and stands in the shoes of the Debtor,[278] with the ability to sue to enforce the fiduciary duties owed to the corporation and recover on behalf of the residual stakeholder.[279] And plainly, with the Debtor hopelessly insolvent,[280] the residual stakeholders are the creditors.

The duty imposed on Mr. Hoisager includes a duty of care and a duty of loyalty.[281] The duty of loyalty also includes a duty not to engage in self-dealing.[282] Although Mr. Hoisager has

---

[275] Def.'s Post-Trial Br. 107, ECF No. 211.

[276] *Floyd v. Hefner*, 2006 WL 2844245 at \*16-24, \*31 (S.D. Tex. 2006) (discussing at some length the tension between circuit and district court cases on the issue, and the confusion introduced by *Credit Lyonnais*; and yet allowing the trustee to pursue the breach of duty claims on behalf of the corporation); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at \*31 (Bankr. N.D. Tex. 2020) (stating the duty always runs to corporation but allowing successor to trustee to recover for breach of duty); *Tow v. Bulmalh (In re ATP Oil & Gas Corp.)*, 711 Fed. App'x. 216 (5th Cir. 2017) (stating the same as *Floyd*, but neither the Fifth Circuit nor the District Court appears to have had any issue with the trustee asserting the claims on behalf of the corporation, instead dismissing the claims on other grounds).

[277] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 102-03 (Del. 2007) (holding that creditors have no direct claim, but stating that they can assert a derivative claim if the entity is insolvent); *Torch Liquidating Trust ex rel. Bridge Associates LLC v. Stockstill*, 561 F.3d 377, 385-86 (5th Cir. 2009) (same); *Floyd v Hefner*, 2006 WL 2844245 at \*24 (reasoning that the trustee must show both a violation of a legal obligation and harm *to the corporation* stemming from that violation).

[278] 11 USC § 323 (a), (b) (trustee represents estate and can sue and be sued); 11 USC § 541(a)(1) (estate includes legal or equitable interests of the debtor).

[279] 11 U.S.C. § 323; *Torch*, 561 F.3d at 385-87 (explaining how a trustee in bankruptcy has standing to bring on behalf of the estate a direct suit for breach of fiduciary duties owed to the corporation). The Trustee's standing here is stronger than was the liquidating trustee's standing in *Torch* because the Trustee's standing exists automatically under the Bankruptcy Code, whereas in Torch the liquidating trustee had to satisfy the requirements of section 1123.)

[280] B. Crisp Decl. 5.

[281] *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W. 2d 624, 628 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ).

[282] *Lowry v. Tarbox*, 537 S.W.3d 599, 615 (Tex. App.—San Antonio 2017) (explaining that fiduciaries are

raised the defense of the business judgment rule, that rule does not apply to self-dealing[283] or interested party transactions.[284] Instead, the fiduciary has the burden of proving that the transaction was fair to the corporation.[285]

The actions taken by Mr. Hoisager to drain the Debtor of cash and properties through transfers to himself and AEX are the very epitome of self-dealing[286] and interested party transactions.[287] That Mr. Hoisager took these actions with full knowledge of the Debtor's deteriorating financial condition establishes both bad faith and willful misconduct.

The only real question concerns the measure of damages. According to the Trustee's Post-Trial Brief, Mr. Crisp measured the damages as the unpaid claims against the estate of $11.9 million.[288] But Mr. Crisp does not "measure damages" in his declaration. And such a measure of damages would be speculative—it would require the unlikely finding that but for the transfers, all creditors would have been paid in full, and the record supports no such finding.[289]

But the corporation was certainly damaged by losing the cash transferred with the actual intent to delay, hinder, or defraud creditors. This amount includes not only the amounts of cash

---

not to benefit themselves at the expense of the corporation).

[283] *Lowry v. Tarbox*, 537 S.W.3d 599, 616 (Tex. App.—San Antonio 2017).

[284] *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) (interested party transactions include those where the fiduciary profits personally and those where the fiduciary's corporation transacts with another corporation in which the fiduciary has a significant financial interest).

[285] *Id.* at 110.

[286] *Id.* at 110-11 (director's failure to market company's assets on the open market and subsequent sale to second company in which he had a financial interest was a breach of his duties of loyalty and care).

[287] *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963) ("A director who diverts profits from the corporation in violation of his fiduciary relationship is personally liable even though the profits are acquired by an agency controlled by the director."); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *30-31 (Bankr. N.D. Tex. 2020) (defendant breached fiduciary duty by diverting opportunity from one company to another in which the fiduciary had an interest); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 275 (Bankr. N.D. Ill. 2003) (liquidating a company while transferring business to a new company owned by the fiduciary was a breach of fiduciary duty).

[288] Pl.'s Post-Trial Br. 25, ECF No. 210 (citing Pl.'s Ex. 61 and B. Crisp Decl. 5).

[289] To similar effect is *H. King & Assocs.*, 295 B.R. at 276 (finding that the proper measure of damages for breach of fiduciary duties does not necessarily equal the claims filed in the bankruptcy case).

38

transferred to Mr. Hoisager after July 1, 2013, but also the non-revenue cash transferred to AEX after July 1, 2013. These amounts are recoverable because, even though the cash transfers to AEX cannot be said to be "for or to the benefit of" Mr. Hoisager for purposes of fraudulent conveyance law, they fall squarely within the proscription on unfair interested party transactions.[290]

As noted above, although the parties debated the accounting for revenue v. non-revenue payments to AEX, the payments of revenue to AEX after July 1, 2013, are also damages for breach of fiduciary duty because those payments should have been retained and set off against the outstanding joint interest billings owed by AEX to the Debtor. Non-revenue cash and revenues paid to AEX after July 1, 2013, total $5,542,596.[291]

Finally, although the Trustee failed in his burden to prove the avoidance of the payments to Arabella Operating, Mr. Hoisager failed, in part, to carry his burden to prove the overall fairness of all of the cash payments to Arabella Operating. Mr. Hoisager's testimony that money paid to Arabella Operating was revenue owned by others is credible, without contrary evidence, but only for payments made in uneven amounts, and not for payments made in round dollar

---

[290] *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 514 B.R. 790, 815 (Bankr. N.D. Tex. 2014) (explaining that "'interested' transactions are subject to a higher level of scrutiny"); *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC.*, 566 B.R. 815, 849-50 (W.D. Tex. 2017) (allegation of fraudulent transfers by co-CEOs to themselves and others states a claim for breach of fiduciary duty); *Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.)*, 2002 WL 1792213 at *5 (N.D. Tex. 2002) (fraudulent transfers are a breach of fiduciary duty); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *26, 30 (Bankr. N.D. Tex. 2020) (finding that defendant manager breached his duty of loyalty by causing a fraudulent transfer between two commonly owned companies); *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) ("The duty of loyalty holds officers and directors to an 'extreme measure of candor, unselfishness and good faith,' particularly where there is an interested transaction.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 274-75 (Bankr. N.D. Ill. 2003) (fiduciaries' steering of commercial opportunities from Debtor to new corporation, in which they were financially interested, was a breach of their fiduciary duties).

[291] Pl.'s Ex. 85. The actual total is $5,883,150, but based on rebuttal testimony by Mr. Hoisager, 5/19/22 Trial Tr. 11:3-25:25, ECF No. 205, and Mr. Crisp, *Id.* at 26:12-30:7, the Court believes Ex. 85 overstates the correct numbers by $340,554, consisting of a $107,607 transfer that reversed a mistaken payment, and a $232,947 transfer that was later voided.

amounts.[292]

And so, the Trustee can recover an addition $153,500 from Mr. Hoisager for breaching

his fiduciary duties to the Debtor.

## I.   **The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove Common Law Fraud by Clear and Convincing Evidence**

The Trustee also asks for recovery of exemplary damages under Section 41.003 of the

Texas Civil Practice & Remedies Code.[293] That section permits exemplary damages where the

claimant can prove by clear and convincing evidence that the harm arose from fraud, malice, or

gross negligence.[294] Here, the Trustee seeks to prove that the harm arose from fraud.[295] If fraud is

proven under section 41.003, section 41.008 permits recovery of up to two times economic

damages, with the amount left to the fact finder's discretion.[296] The case cited by the Trustee

discusses punitive damages for breach of fiduciary duty under Illinois law and is thus inapposite.

The problem here is that the Trustee neither pleaded nor proved fraud.

To state a claim for common law fraud in Texas, Plaintiffs must prove that: (1) Defendants made a material representation that was false; (2) Defendants knew that the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Defendants intended to induce Plaintiffs to act upon the representation; and (4) Plaintiffs actually and justifiably relied upon the representation and thereby suffered injury. *In re ACM–Texas, Inc.*, 430 B.R. 371, 410 (Bankr. W.D. Tex. 2010) (citing *Ernst*, 51 S.W.3d at 577); *see also Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) ("A common-law fraud claim requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.") (citations omitted).[297]

---

[292] Of the $882,483 transferred to Arabella Operating after December 31, 2014, $153,500 were payments made in round dollars and $728,983 were payments made in uneven amounts. Pl.'s Ex. 79. *See also* B. Crisp Decl. 4, 15.

[293] Pl.'s Post-Trial Br. 26, ECF No. 210.

[294] Tex. Civ. Prac. & Rem. Code § 41.003.

[295] Pl.'s Post-Trial Br. 26, ECF No. 210 (citing *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 276-77 (Bankr. N.D. Ill. 2003)).

[296] Tex. Civ. Prac. & Rem. Code § 41.008.

[297] *Patek v. Alfaro (In re Primera Energy, LLC)*, 579 B.R. 75, 144 (Bankr. W.D. Tex. 2017), *aff'd sub nom. Alfaro v. Reiley*, 2019 WL 4765385 (W.D. Tex. 2019).

Return to TOC                                                                                    APP1-391

What the trustee has proven is "actual intent to hinder, delay, or defraud" creditors, and has done so by a preponderance of the evidence with reference to badges of fraud. This in no way equates to satisfying the elements of common law fraud by clear and convincing evidence, and so the request for exemplary damages is denied.[298]

### J.  The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing

The Trustee preserved a request for attorney's fees incurred under TUFTA in the Joint Pre-trial order.[299] Under section 24.013 of the Texas Business and Commerce Code, "the court may award costs and reasonable attorney's fees as are equitable and just."[300] The Fifth Circuit has recently discussed awarding fees and costs in a TUFTA cases that involved other issues:

> Under Texas Business and Commerce Code § 24.013, courts presiding over TUFTA cases are empowered to "award costs and reasonable attorney's fees as are equitable and just." On appeal, Hughes concedes that if Pearcy and Thomas prevail on their TUFTA claims, they are entitled to attorney's fees and costs under § 24.013. However, Hughes maintains that Pearcy and Thomas failed properly to segregate recoverable fees, stemming from their attorneys' work on their TUFTA claims, from unrecoverable fees, incurred as a result of their other claims.
>
> Under Texas law, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). However, segregation is not necessary "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are '[intertwined] to the point of being inseparable.'" *Id.* at 311 (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11–12 (Tex. 1991)). This exception is met only where the relevant "legal services advance both recoverable and unrecoverable claims." *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007).[301]

---

[298] Although *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022) could be read to the contrary, there the clear and convincing standard was met, unlike here. Also, in *Husky Int'l Elect., Inc. v Ritz*, 578 U.S. 356, 361-62 (2016) the Supreme Court determined that "actual fraud" as used in 11 U.S.C. § 523 can include fraudulent conveyance schemes that do not require a false representation. But the fraud in section 523 is not the same as Texas common law fraud and so *Husky* is inapposite.

[299] Joint Pre-Trial Order 10, ECF No. 184.

[300] Tex. Bus. & Com. Code § 24.013.

[301] *Thomas v. Hughes*, 27 F.4th at 1019-20.

41

Here, the Trustee has unsuccessfully pursued avoidance of the property transfers and transfers to AEX and Arabella Operating, but successfully pursued avoidance of the cash transfers to Mr. Hoisager as constructive and actual intent fraudulent conveyances. The Trustee has also successfully pursued a breach of fiduciary duty claim that was dependent on the same facts that were proven to support the avoidance of the cash transfers as actual intent fraudulent conveyances.

To recover fees or costs, then, the Trustee generally must separate time spent on the (1) avoidance of the property transfers, (2) avoidance of transfers to AEX and Arabella, and (3) any transfers before July 1, 2013, from time spent on (4) avoidance of cash transfers, and (5) breach of fiduciary duty claims. It seems possible that time spent on categories (4) and (5) may in part be inseparable from time spent on categories (1) and (2). How this happens as a practical matter will depend on how detailed the time records of the Trustee and his counsel have been. And neither side has had an adequate opportunity to brief this somewhat complicated issue, the nature of the judgment is just now becoming known, and the Trustee has not yet proposed a division of time. And so, the Court will enter an order with this memorandum opinion containing a schedule for submitting time records, responses to the time records, and a briefing schedule. Entry of the final judgment will await the outcome of this dispute.

42

III.    **CONCLUSION**

Thus, the Trustee shall recover these amounts on his fraudulent transfer and breach of fiduciary duty claims.

| | Fraudulent Transfer | Breach of Fiduciary Duty |
|---|---|---|
| Properties to AEX | -0- | -0- |
| Cash to AEX | -0- | $5,542,596 |
| Cash to Arabella Operating | -0- | $153,500 |
| Cash to Mr. Hoisager after 12/31/13 | $2,803,834 | $2,803,834 |
| Cash to Mr. Hoisager from 7/1/13 to 12/31/13 | $377,535 | $377,535 |
| Credit | <$67,550> | -0- |
| Attorney's Fees | TBD | -0- |
| Judgment | | $8,887,465 |

Obviously, the awards are duplicative to the extent of the cash paid to Mr. Hoisager, and the Trustee cannot recover those amounts twice.

A briefing schedule will be entered for the attorney's fees issue. After the Court determines the attorney fee issue, it will enter a final judgment. All other relief requested will be denied.

Return to TOC



**Dated: December 22, 2022.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-70098-tmd-11 |
| | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | |
| | § | |
| Debtor. | § | CHAPTER 11 |

_____

| | | |
|---|---|---|
| MORRIS D. WEISS, CHAPTER 11 | § | |
| TRUSTEE FOR ARABELLA | § | |
| PETROLEUM COMPANY, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ARABELLA EXPLORATION INC., | § | |
| ARABELLA EXPLORATION LLC, | § | ADVERSARAY NO. 16-07002-tmd |
| ARABELLA OPERATING LLC, | § | |
| TRANS-TEXAS LAND & TITLE, LLC, | § | |
| PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, | § | |
| PLATINUM LONG TERM GRWOTH | § | |
| VIII, LLC, AND JASON HOISAGER, | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

1

# **MEMORANDUM OPINION**

## Contents

I.     FACTS .................................................................................................................. 3

  A.  Formation of the Debtor and Related Companies .............................................. 3

  B.  Alleged Fraudulent Transfers ............................................................................ 4

     1.  Transfers of Properties from the Debtor to AEX ........................................... 5

     2.  Transfers of Cash from the Debtor to AEX .................................................... 8

     3.  Transfers of Cash from the Debtor to Arabella Operating ............................ 9

     4.  Transfers of Cash from the Debtor to Jason and Molly Hoisager ................ 11

  C.  Breach of Fiduciary Duty to the Debtor ........................................................... 16

  D.  Mr. Hoisager Verses the Debtor's Books and Records .................................... 18

II.    ANALYSIS ....................................................................................................... 20

  A.  Primer on Fraudulent Transfers ....................................................................... 20

  B.  The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to be Recovered ..................................................................................................... 22

  C.  The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager ......... 23

  D.  The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims ......................................... 28

  E.  The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent Transfers .......................................................................................................... 30

    1. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13, 2013 as Constructively Fraudulent Transfers ................................................... 30

    2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013 as Actual Intent Fraudulent Transfers ........................................................... 31

  F.  Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those Transfers Cannot be Preferential Transfers .......................................................... 35

  G.  Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by the Payments Mr. Hoisager Made Back to the Debtor ....................................... 35

  H.  Mr. Hoisager Breached his Fiduciary Duty to the Debtor ................................ 36

  I.  The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove Common Law Fraud by Clear and Convincing Evidence ...................................... 40

  J.  The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing ............... 41

III.   CONCLUSION ................................................................................................. 43

It is common for the owner of a sole proprietorship to use the company's cash as the

owner's personal checking account, taking out money when and as available and using that

money for personal expenses. And there is nothing wrong with this as long as the company's

creditors are being paid. But if the company becomes insolvent, meaning creditors will not be

paid, the owner can face liability for those owner distributions under both fraudulent transfer and

fiduciary duty law.

I.    **FACTS**

    A.    **Formation of the Debtor and Related Companies**

Jason Hoisager formed Arabella Petroleum Company, LLC ("the Debtor") in February

2007 to buy and sell oil and gas properties in West Texas.[1] The Debtor also served as the original

operator for the wells on these properties under the governing joint operating agreements.[2] Mr.

Hoisager was the Debtor's sole owner and manager.[3]

Mr. Hoisager later formed other companies.[4] He formed Arabella Exploration, LLC

("Arabella Exploration") in December 2008,[5] which began operating in 2011 with the acquisition

of properties in the Permian Basin.[6] Arabella Exploration, Inc ("AEX") was formed on

December 24, 2013, by the reverse merger of Arabella Exploration and Lone Oak, a Cayman

Islands corporation.[7] According to Mr. Hoisager, he formed AEX to raise capital to develop oil

and gas properties in the Permian Basin.[8] In January 2014, AEX formed Arabella Operating LLC

("Arabella Operating") to take over operating wells previously operated by the Debtor under the

---

[1] J. Hoisager Decl. 3; B. Crisp Decl. 3.
[2] B. Crisp Decl. 3; J. Hoisager Decl. 34-35.
[3] J. Hoisager Decl. 4.
[4] J. Hoisager Decl. 7.
[5] Arabella Exploration, LLC was a Texas LLC. *See* J. Hoisager Decl. 7.
[6] J. Hoisager Decl. 7.
[7] J. Hoisager Decl. 7.
[8] J. Hoisager Decl. 7.

3

joint operating agreements.[9]

Mr. Hoisager owned 100% of Arabella Exploration until the December 2013 merger, when it became a wholly owned subsidiary of AEX.[10] Mr. Hoisager was the manager of Arabella Exploration and the chief executive officer of AEX following the merger.[11] Arabella Operating was also a wholly owned subsidiary of AEX, and Mr. Hoisager was its sole manager.[12] Mr. Hoisager owned 30.4% of the shares of AEX at the time of the merger, with the remainder owned by public shareholders.[13] The parties stipulated that the Debtor became insolvent no earlier than December 31, 2013, a few days after AEX was formed.[14]

### B. Alleged Fraudulent Transfers

The Trustee alleges that from 2011 to 2015, Mr. Hoisager made many fraudulent transfers from the Debtor to himself, his wife, and other entities that he owned or controlled.[15] These alleged fraudulent transfers fall into four broad categories: (1) transfers of properties from the Debtor to AEX;[16] (2) transfers of cash from the Debtor to AEX; (3) transfers of cash from the Debtor to Arabella Operating; and (4) transfers of cash from the Debtor to Mr. Hoisager and his wife, Molly Hoisager.[17] The Trustee also contends that the fraudulent transfers and self-dealing collectively are a breach of fiduciary duty.[18] Mr. Hoisager disputes that he made fraudulent transfers from the Debtor or breached fiduciary duties to the Debtor.[19] He contends that he acted

---

[9] J. Hoisager Decl. 8.
[10] J. Hoisager Decl. 7.
[11] J. Hoisager Decl. 19.
[12] J. Hoisager Decl. 2, 8.
[13] J. Hoisager Decl. 7.
[14] Joint Pre-Trial Order 35, ECF No. 184.
[15] Pl.'s Post-Trial Br. 1-2, ECF No. 210; B. Crisp Decl. 4.
[16] Hereafter both Arabella Exploration, LLC and post-merger Arabella Exploration, Inc., will be referred to as AEX because the post-merger entity would have assumed all liabilities.
[17] Pl.'s Post-Trial Br. 1-2, ECF No. 210; Def.'s. Post-Trial Br. 3, ECF No. 211. Molly Hoisager's status as Mr. Hoisager's wife was uncontested. *See* Joint Pre-Trial Order 27, ECF No. 184.
[18] Pl.'s Post-Trial Br. 23-24, ECF No. 210.
[19] Def.'s Post-Trial Br. 2, ECF No. 211; J. Hoisager Decl. 67.

in good faith at all times and did what he believed to be in the Debtor's best economic interests under the circumstances.[20]

## 1. <u>Transfers of Properties from the Debtor to AEX</u>

In 2012, the Debtor assembled the "Wolfbone I Prospect," which consisted of several Delaware Basin leases.[21] The Debtor entered into the "Wolfbone I PSA" with the purchasers on August 5, 2012.[22] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 93.35% of the working interest in the Wolfbone I Prospect; AEX purchased the remaining 6.65% of the working interest.[23] The assignments of the Wolfbone I leases were executed on October 15, 2012, and were recorded in Reeves County, Texas, on varying dates from 2013 to 2015.[24]

Next, the Debtor assembled the "Wolfbone II Prospect," a second package of Delaware Basin mineral leases.[25] The Debtor and the purchasers of the Wolfbone II Prospect signed the Wolfbone II PSA on March 1, 2013.[26] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 53.54% of the working interests, while AEX purchased the remaining 46.46% of the working interest.[27] The assignments of the Wolfbone II leases were executed on March 1, 2013, and March 15, 2013, and were recorded in Reeves County, Texas, from 2013 to 2015.[28]

Mr. Hoisager asserts that the Debtor transferred the working interests in the Wolfbone Prospects to AEX for rational business purposes. First, the Debtor could not sell the interests to outside investors for a sufficient price, so AEX acted as a buyer of last resort.[29] Second, Mr.

---

[20] J. Hoisager Decl. 67; Def.'s Post-Trial Br. 2, ECF No. 211.
[21] J. Hoisager Decl. 9.
[22] J. Hoisager Decl. 9.
[23] J. Hoisager Decl. 9.
[24] J. Hoisager Decl. 9; Def.'s Ex. D-16; Def.'s Post-Trial Br. 39-41, ECF No. 211; Pl.'s Ex. 77. Mr. Hoisager asserts that the great bulk of the Assignments in terms of amounts or value were recorded on July 18, 2013, and only the Wolfbone I "Scraps" were recorded in 2015. Def.'s Post-Trial Br. 39-40, ECF No. 211.
[25] J. Hoisager Decl. 10.
[26] J. Hoisager Decl. 10.
[27] J. Hoisager Decl. 10.
[28] J. Hoisager Decl. 10-11; Def.'s Ex. 16; Pl.'s Ex. 77.
[29] J. Hoisager Decl. 10.

Hoisager claims that AEX was in a better position than the Debtor to develop the properties, create value, and pay lease-operating expenses.[30] And finally, according to Mr. Hoisager, AEX had "greater access to capital" than did the Debtor,[31] and there was a need to drill before the leases expired.[32] The "access to capital" claim was decisively refuted (1) on cross-examination,[33] (2) by AEX's 10-K dated December 31, 2014,[34] and (3) because the Debtor expended all its capital, and more, drilling the Wolfbone wells anyway.[35]

The Debtor assigned working interests in the Wolfbone I and II Prospects to AEX on the same terms as it made assignments to outside investors, except in one major respect: how the purchase price was paid.[36] Outside purchasers paid in cash.[37] In contrast, AEX paid no cash consideration for the properties.[38]

According to Brian Crisp, the expert for the Trustee, the Debtor received no consideration for the property transfers to AEX.[39] AEX originally booked an increase in joint interest billings due to the Debtor for the transfers;[40] however, Mr. Hoisager recharacterized this paper obligation in December 2013 as a $3 million equity distribution from AEX to Mr. Hoisager, not the Debtor.[41] AEX also provided Mr. Hoisager, not the Debtor, with a promissory note for an additional $3,007,170.[42]

---

[30] J. Hoisager Decl. 45.
[31] J. Hoisager Decl. 45.
[32] J. Hoisager Decl. 45.
[33] 5/17/22 Trial Tr. 96:18-97:22, ECF No. 204.
[34] Def.'s Ex. D-7, PDF 15. *See also* B. Crisp Decl. 7.
[35] J. Rae Decl. 10; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[36] J. Hoisager Decl. 10.
[37] J. Hoisager Decl. 10.
[38] B. Crisp Decl. 13; J. Hoisager Decl. 21.
[39] B. Crisp Decl. 13.
[40] B. Crisp Decl. 13.
[41] B. Crisp Decl. 13.
[42] B. Crisp Decl. 13; Def.'s Post-Trial Br. 100, ECF No. 211.

6

Mr. Hoisager characterizes the consideration received by the Debtor for the properties quite differently. Mr. Hoisager says he personally loaned the Debtor the about $6 million used to purchase the Wolfbone Prospects, and that he got the money from McCabe Petroleum Corporation ("MPC"), under an oral line of credit.[43] The Debtor thus acquired the Wolfbone leases without paying anything for them, according to Mr. Hoisager, except that the Debtor incurred a liability to Mr. Hoisager for the amounts that he lent.[44] Mr. Hoisager claims that because the Debtor could not find an outside buyer for the Wolfbone leases, it sold them to AEX and AEX assumed the Debtor's obligation to Mr. Hoisager in the amount of $6,014,341.[45] The parties do not dispute that Mr. Hoisager later converted this obligation by AEX into a subordinated promissory note payable to Mr. Hoisager and an equity contribution by Mr. Hoisager to AEX.[46]

The alleged loan between Mr. Hoisager and MPC was not documented by a note or a loan agreement.[47] Nor was a debt to Mr. Hoisager ever recorded on the books and records of the Debtor.[48] Instead, the transactions with MPC were reflected on the Debtor's books and records as "Accounts receivable to McCabe Petroleum Corporation."[49] Post-petition, Mr. Hoisager reclassified those accounts receivables to MPC as capital contributions.[50] He concedes that the accounting for this transaction was not correct.[51] Mr. Hoisager contends that this "non-traditional" accounting resulted from the inexperience of Breann Hall, the Debtor's controller at

---

[43] J. Hoisager Decl. 12-13.
[44] J. Hoisager Decl. 13
[45] J. Hoisager Decl. 21; Def.'s Post-Trial Br. 13, ECF No. 211.
[46] J. Hoisager Decl. 22; Joint Pre-Trial Order 31, ECF No. 184.
[47] J. Hoisager Decl. 14; 5/17/22 Trial Tr. 76:23-25; 97:15-22, ECF No. 204.
[48] 5/16/22 Trial Tr. 105:16-22, ECF No. 203.
[49] J. Hoisager Decl. 14; 5/16/22 Trial Tr. 106:1-4, ECF No. 203.
[50] 5/16/22 Trial Tr. 106:1-107:6, ECF No. 203.
[51] J. Hoisager Decl. 22.

the time, and the limitations of the Debtor's accounting software.[52]

## 2. __Transfers of Cash from the Debtor to AEX__

All parties agree that the Debtor made cash payments to AEX of around $6.2 million between September 2011 and the Petition Date, with $4,952,443 paid after December 31, 2013.[53] The parties disagree about how to characterize these payments.

Mr. Hoisager testified that all the cash payments the Debtor made to AEX were under the Debtor's contractual obligations under the joint operating agreements.[54] Under those agreements, the Debtor operated leases in which AEX owned a portion of the working interest.[55] As the Debtor, in its capacity as operator, produced revenues, AEX, in its capacity as working interest owner, earned revenues.[56] By Mr. Hoisager's calculations, AEX earned revenues of $5,619,222 while the Debtor was the operator.[57] According to Mr. Hoisager, the Debtor paid AEX $5,349,334 of the $5,619,222 that it owed AEX in revenue payments, leaving unpaid revenues of $269,888.[58] Bill Heyn, acting chief financial officer of AEX and chair of the audit committee, also testified that the Debtor made no gratuitous payments to AEX and AEX accounted for every dollar it received.[59] This statement is simply not credible in light of the testimony from Mr. Crisp.

Mr. Crisp testified that many of the payments to AEX were not revenue payments.[60] According to Mr. Crisp, the Debtor paid AEX $6.2 million, and total revenues paid after

---

[52] J. Hoisager Decl. 14.
[53] B. Crisp Decl. 4; Pl.'s Post-Trial Br. 13, ECF No. 210; Pl.'s Ex. 78; Joint Pre-Trial Order 35, ECF No. 184.
[54] J. Hoisager Decl. 46; Def.'s Post-Trial Br. 6, ECF No. 211.
[55] J. Hoisager Decl. 19.
[56] J. Hoisager Decl. 19.
[57] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[58] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[59] 5/17/22 Trial Tr. 59:7-60:5, ECF No. 204; 5/19/22 Trial Tr. 5:21-6:17, ECF No. 205.
[60] 5/16/22 Trial Tr. 107:7-108:8, ECF No. 203.

8

accounting for netting (offsetting revenue due against joint interest billings owed) was $3,270,436.55, so "[t]here's almost $3 million paid to AEX mostly in round dollar[] [amounts] that are not revenue payments."[61] Mr. Crisp noted that revenue payments are typically not in round numbers, but "down to the penny."[62]

Mr. Crisp also testified that it is common industry practice for an operator to net the revenues earned on wells against the joint interest billings owed by that same working interest owner.[63] Here, at the time of each payment from the Debtor to AEX, AEX owed substantial amounts to the Debtor for unpaid joint interest billings, ranging from $16 million in June 2014 to $3.2 million on the Petition Date.[64] But based on Mr. Crisp's analysis, the Debtor netted revenue payments against unpaid joint interest billings only three times.[65]

Mr. Hoisager countered that while the joint operating agreements gave the Debtor, as operator, the right to set off joint interest billings receivables against production payments, the decision whether to do so is discretionary.[66] Further, according to Mr. Hoisager, there is no evidence that the Debtor gave AEX more favorable treatment than the other working interest owners, many of whom owed the Debtor hundreds of thousands of dollars.[67]

### 3.  Transfers of Cash from the Debtor to Arabella Operating

AEX formed Arabella Operating on January 22, 2014, to take over operating wells that the Debtor had operated under then-existing joint operating agreements.[68] According to Mr. Hoisager, the transfer of lease operations from the Debtor to Arabella Operating helped the

---

[61] 5/17/22 Trial Tr. 45:11-16, ECF No. 204.
[62] 5/16/22 Trial Tr. 109:19-110:1, ECF No. 203.
[63] 5/16/22 Trial Tr. 110:17-23, ECF No. 203.
[64] 5/16/22 Trial Tr. 111:4-9, ECF No. 203; Pl.'s Ex. 12A, 17.
[65] 5/16/22 Trial Tr. 112:16-21, ECF No. 203.
[66] 5/17/22 Trial Tr. 85:7-18, ECF No. 204.
[67] Def.'s Post-Trial Br. 55, ECF No. 211.
[68] J. Hoisager Decl. 8.

Debtor because the amount of money the Debtor earned as the operator of the leases was not commensurate with the amount of risk from nonpaying or slow-paying working interest owners.[69] It's too bad Mr. Hoisager didn't think of this before the Debtor took on the task of drilling the Wolfbone I and Wolfbone II wells.[70] As discussed below, taking on the expense of drilling the wells while being unable to collect the corresponding joint interest billings appears to be a big reason the Debtor failed.[71] In any event, Arabella Operating became the operator of the Wolfbone leases under the joint operating agreements on January 1, 2015.[72]

The Debtor made cash payments to Arabella Operating totaling $882,483 after December 31, 2013.[73] Mr. Hoisager testified that the cash payments were simply money held in suspense accounts that were transferred to Arabella Operating when it became operator.[74] So, Mr. Hoisager testified, the money held in those suspense accounts belonged to working interest and royalty interest owners, not the Debtor, meaning that the Debtor had no right to retain that money.[75] Mr. Hoisager also testified that Arabella Operating never made a distribution to him personally, and that, in fact, he loaned Arabella Operating money that it never repaid.[76] This was not refuted by Mr. Crisp.[77] As discussed above, Mr. Crisp offered credible testimony that the transfers to AEX can be distinguished between "round dollar" amounts, which are not revenue payments, and amounts listed to the penny, which are.[78] From this it could be inferred that the round-dollar payments to Arabella Operating are likewise not revenue payments. But despite Mr.

---

[69] J. Hoisager Decl. 8.
[70] See notes 228-234 below and accompanying text.
[71] See notes 228-234 below and accompanying text.
[72] 5/17/22 Trial Tr. 87:2-5, ECF No. 204; Def.'s Post-Trial Br. 4, ECF No. 211.
[73] B. Crisp Decl. 4; Pl.'s Ex. 79 (summary of payments to Arabella Operating).
[74] 5/17/22 Trial Tr. 87:2-9, ECF No. 204.
[75] 5/17/22 Trial Tr. 87:10-18, ECF No. 204.
[76] 5/17/22 Trial Tr. 87:25-88:12, ECF No. 204.
[77] 5/16/22 Trial Tr. 52:2-7, ECF No. 203.
[78] 5/16/22 Trial Tr. 109:19-110:1, 113:15-25, ECF No. 203.

Hoisager's overall lack of credibility, the Trustee did bear the burden of proof, Mr. Crisp did not address these transfers, and so Mr. Hoisager's testimony will stand.

If indeed the transfers to Arabella Operating were transfers of revenue proceeds held in suspense accounts for the benefit of royalty and working interest owners from the Debtor as operator to Arabella Operating as successor operator—and the only evidence in the record establishes this—they are not transfers of property of the estate and the Trustee's fraudulent transfer claim for these transfers fails.

### 4. <u>Transfers of Cash from the Debtor to Jason and Molly Hoisager</u>

The Debtor transferred $6,334,247 to Jason Hoisager and his wife, Molly Hoisager[79] between July 2011 and July 2015; of that amount, $4,180,249 was transferred after December 31, 2012, and $2,803,834 was transferred after December 31, 2013.[80]

The largest distribution to Mr. Hoisager, of $2 million, occurred on June 25, 2014.[81] Mr. Hoisager claims that the Debtor owed him the money from the sale of the Cox Prospect in September 2013.[82] Mr. Hoisager contends that the Debtor had a standard format for every deal with outside promoters who brought in a profitable oil-and-gas deal. Specifically, the party providing the capital would get its money back first, with the profits then split 50/50 between the capital side and the deal side, which was usually the Debtor.[83] According to Mr. Hoisager, he provided the capital to buy the Cox Prospect, so he had a right to recover his capital of $327,964 to repay the loan he had personally borrowed from MPC to purchase the Cox Prospect. Then, the resulting profits were split 50/50 between the Debtor and Mr. Hoisager, with each entitled to

---

[79] Mr. Hoisager testified that he and his wife shared an account. 5/16/22 Trial Tr. 134:22-135:10, ECF No. 203.

[80] J. Hoisager Decl. 48; B. Crisp Decl. 4; Pl.'s Ex. 76.

[81] B. Crisp Decl. 14.

[82] J. Hoisager Decl. 50-52.

[83] J. Hoisager Decl. 50-51.

11

receive $2,236,017.[84] Mr. Hoisager says the Debtor did not pay Mr. Hoisager the profit share in late 2013 or early 2014 because the funds were unavailable.[85] There was no written agreement for this so-called Cox Prospect "profit split."[86]

Mr. Hoisager also describes the $2 million distribution from the Debtor to him as an "integrated transaction" designed to benefit AEX and the Debtor, and help them pay their creditors.[87] According to Mr. Hoisager, AEX needed to raise capital to support its drilling and development activities and to pay debts, and AEX owed the Debtor millions in joint interest billings under joint operating agreements.[88] So Mr. Hoisager says he devised a strategy where the same funds would satisfy multiple debts.[89]

Under the "integrated transaction," AEX sold the Roark Prospect for $2,240,000 on June 24, 2014.[90] The next day, AEX used the money from the Roark sale to pay the Debtor $2,035,915 in outstanding joint interest billing receivables.[91] Immediately thereafter, the Debtor paid Mr. Hoisager the $2 million it purportedly owed him as the profit split from the sale of the Cox Prospect in September 2013.[92] Mr. Hoisager then used the $2-million distribution to buy equity in AEX for $10.50 per share.[93] He says he bought the stock at about $5 per share above market price to help AEX pay its debts and raise additional capital, and to help the Debtor collect joint interest billing receivables from AEX and turn over operator status to Arabella Operating.[94] Once AEX received the $2 million from Mr. Hoisager, AEX paid $2,017,836 back to the Debtor

---

[84] J. Hoisager Decl. 51.
[85] J. Hoisager Decl. 52.
[86] J. Hoisager Decl. 51.
[87] J. Hoisager Decl. 57.
[88] J. Hoisager Decl. 52-53.
[89] J. Hoisager Decl. 55.
[90] J. Hoisager Decl. 55; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[91] J. Hoisager Decl. 55.
[92] J. Hoisager Decl. 55.
[93] J. Hoisager Decl. 55.
[94] J. Hoisager Decl. 53.

12

over the next several weeks.[95]

Mr. Hoisager attributes his purchase of AEX stock— made possible by the Debtor's distribution to him of $2 million—as also being partly responsible for AEX obtaining $16 million in outside financing from Platinum Partners.[96] Of the funds received by AEX from the outside financing, the Debtor received $11,244,670, net of fees, to pay its creditors.[97] AEX paid the money directly to the Debtor's vendors.[98]

The Trustee disputes that there was any "integrated transaction."[99] The Trustee notes that Mr. Hoisager originally characterized the transaction—incorrectly—as being started by the Debtor, even though it was AEX, not the Debtor, that was the only entity that had funds to start the transaction.[100] Mr. Crisp also testified that the distribution was made when the Debtor had total assets of about $20 million versus total liabilities of about $31 million and had become unable to pay its vendors.[101] And there were no "profits" earned by the Debtor that could justify the payment as a "performance bonus," as Mr. Hoisager had once contended.[102] Finally, Mr. Crisp testified that payments to the Debtor's creditors were made by AEX to remove liens that those creditors had filed or could file against the working interests owned by AEX and others in the Wolfbone I and II wells, which means the payments were of direct benefit to AEX.[103]

---

[95] J. Hoisager Decl. 56-57.
[96] J. Hoisager Decl. 58-59.
[97] J. Hoisager Decl. 58.
[98] J. Hoisager Decl. 58.
[99] Pl.'s Post-Trial Br. 7, ECF No. 210.
[100] Pl.'s Post-Trial Br. 7, ECF No. 210 (In Mr. Hoisager's reply to Trustee's Response to Defendant's MSJ, Mr. Hoisager apologized to the Court for providing an incomplete picture of the transaction. Def.'s Reply Br. in Support 14, ECF No. 171.).
[101] B. Crisp Decl. 14.
[102] B. Crisp Decl. 14.
[103] 5/16/22 Trial Tr. 147:5-148:13, ECF No. 203 (payments were made to lien creditors to assure that AEX could get financing from Platinum). Similarly, the proposed Legacy transaction which Mr. Hoisager and Mr. McCabe held up as a potential benefit to the Debtor would have been of primary benefit to AEX with only an incidental benefit to the Debtor. 5/17/22 Trial Tr. 15:21-19:23, ECF No. 204.

Mr. Hoisager categorized much of the remainder of the cash transfers from the Debtor to him as fitting within one of four "buckets": salary, expense reimbursement, performance bonuses, and tax distributions.[104] For the payments categorized as salary, Mr. Hoisager asserts that as the sole executive officer of the Debtor, he was entitled to annual compensation of $300,000.[105] He believed $300,000 to be reasonable based on his board-approved salary with AEX for the same amount.[106] But the Trustee notes that the Debtor's general ledger did not reflect payments to Mr. Hoisager as salary.[107] Instead, substantially all the transfers to Mr. Hoisager were recorded in the Debtor's general ledger as "Owner Distributions."[108] Similarly, in the Statement of Financial Affairs signed by Mr. Hoisager here, the Debtor listed 39 transfers to Mr. Hoisager from August 4, 2014, through May 11, 2015, each with the "Purpose of Withdrawal" description of "Distribution."[109]

Mr. Crisp refuted the idea of a $300,000 annual salary, noting that the payments were made at irregular intervals and in uneven amounts that have no semblance of a regular salary structure.[110] For instance, Mr. Hoisager received $621,415 in cash transfers from the Debtor in 2013, excluding a $535,000 "tax distribution" and a $200,000 "performance bonus" asserted by Mr. Hoisager.[111] And in 2014, Mr. Hoisager received $209,874 in cash transfers from the Debtor, excluding a supposed "performance bonus" of $2,250,000.[112] Given the Debtor's continuing losses, Mr. Crisp found the amounts received by Mr. Hoisager to be outside any reasonable

---

[104] B. Crisp Decl. 15.
[105] J. Hoisager Decl. 62.
[106] J. Hoisager Decl. 62.
[107] B. Crisp Decl. 15.
[108] B. Crisp Decl. 15.
[109] B. Crisp Decl. 15.
[110] B. Crisp Decl. 15; *see also* 5/16/22 Trial Tr. 134:6-37:15, ECF No. 203 (discussing payments made to Mr. Hoisager from April 2013 to May 2015).
[111] B. Crisp Decl. 16.
[112] B. Crisp Decl. 16.

14

industry average.[113]

Mr. Hoisager acknowledged that the Debtor did not pay his salary at regular intervals or in consistent amounts.[114] According to Mr. Hoisager, this is because the Debtor paid him for his work when funds were available.[115] Additionally, Mr. Hoisager attributed the fact that most payments to him were characterized as "owner distributions," regardless of their specific purpose, to the Debtor's "very basic accounting system."[116]

As for the other three categories of transfers to Mr. Hoisager—expense reimbursement, performance bonuses, and tax distributions—Mr. Crisp noted irregularities for each.[117] First, Mr. Crisp testified that none of the transfers were labeled as expense reimbursements in the Debtor's general ledger, and no supporting documents were identified or provided by Mr. Hoisager.[118] Second, the Debtor had no written or defined bonus program[119] and from 2011 to 2015—the time during which the bonuses were paid—the Debtor recorded cumulative net losses of $2,913,662 from asset sales.[120] Third, there was no provision in the Debtor's company agreement allowing distributions to members for tax purposes.[121]

The Trustee also seeks to recover from Mr. Hoisager $690,260 in preferential transfers made to or for the benefit of Hoisager in the one-year period before the petition was filed.[122] Mr. Hoisager concedes that he received $767,161 from the Debtor during the one-year period before the petition date.[123] He also concedes that he was an insider, and that the Debtor was likely

---

[113] B. Crisp Decl. 15.
[114] J. Hoisager Decl. 62.
[115] J. Hoisager Decl. 62.
[116] J. Hoisager Decl. 62-63.
[117] B. Crisp Decl. 16-17.
[118] B. Crisp Decl. 16.
[119] B. Crisp Decl. 16.
[120] B. Crisp Decl. 17.
[121] B. Crisp Decl. 16.
[122] Pl.'s Proposed Findings of Fact and Conclusions of Law 11, ECF No. 185.
[123] J. Hoisager Decl. 66.

insolvent during that period.[124] But Mr. Hoisager says that after accounting for payments of up to $25,000 per month, which the Debtor could have paid him in the ordinary course for his $300,000-per-year salary, he received only seven payments—totaling $663,901—which are likely preferential transfers.[125] But he says he contributed $67,550 in the period after July 10, 2014, from his own funds back to the Debtor to help the Debtor meet its obligations.[126] Nowhere in his testimony did Mr. Crisp refute this point. So, Mr. Hoisager concludes, after deducting his contributions of $67,550 from his preferential transfers of $663,901, he is liable for preferential transfers in the amount of $596,351.[127]

Included among the payments made by the Debtor to Mr. Hoisager were payments totaling $822,423 that were in some way booked as "Dove Acres, LLC."[128] Testimony revealed that Mr. Hoisager used this money to buy a property, and build a building on that property, that Mr. Hoisager used personally.[129] The Debtor made these payments throughout 2012 and made the last such payment on April 3, 2013.[130]

### C. **Breach of Fiduciary Duty to the Debtor**

The Trustee also alleges that Mr. Hoisager's fraudulent transfers and self-dealing breach his fiduciary duties to the Debtor.[131] According to the Trustee, as the governing person of the Debtor, Mr. Hoisager owed it fiduciary duties, even if the company was a single or multi-member LLC.[132] The Trustee also claims that as a corporate officer, Mr. Hoisager owed duties to

---

[124] J. Hoisager Decl. 66.
[125] J. Hoisager Decl. 66; Def.'s Post-Trial Br. 88-89, ECF No. 211.
[126] J. Hoisager Decl. 66.
[127] Def.'s Proposed Findings of Fact and Conclusions of Law 35-36, ECF No. 179.
[128] B. Crisp Decl. 12.
[129] 5/16/22 Trial Tr. 140:1-141:6, ECF No. 203.
[130] 5/16/22 Trial Tr. 96:12-99:22, ECF No. 203.
[131] Pl.'s Post-Trial Br. 23, ECF No. 210.
[132] Pl.'s Post-Trial Br. 23, ECF No. 210.

16

creditors at least as of December 31, 2013, the date on which the Debtor became insolvent.[133]

Mr. Hoisager allegedly breached his fiduciary duties by engaging in a concerted pattern of

making distributions to himself, his wife, and affiliates or insiders while leaving the Debtor

insolvent; making excessive distributions that he now contends were salary or undocumented

bonuses; transferring assets to AEX for no reasonably equivalent value; and leaving the Debtor

unable to pay its debts.[134]

Mr. Hoisager testified that he acted in good faith at all times in his management of the

Debtor.[135] He says he never took for himself properties, contracts, or business opportunities that

should have been offered to the Debtor.[136] He testified that the Debtor received equivalent value

for the transfers of property to AEX in the form of AEX's assumption of the Debtor's obligation

to pay Mr. Hoisager for borrowing the money to buy the properties.[137] And Mr. Hoisager claims

that though the Debtor worked diligently to satisfy its vendors and other creditors, neither the

Debtor nor Mr. Hoisager ever agreed to become a fiduciary for any of its creditors at any time

before the Petition Date.[138] Mr. Hoisager notes that the Debtor's company agreement expressly

limits managers' and members' potential liability for breach of fiduciary duty to actions not

taken in good faith.[139] As a result, he would not be liable for ordinary negligence or bad

judgment in his management of the Debtor.[140] Finally, Mr. Hoisager says that he never

committed any act of gross negligence, bad faith, or willful misconduct in his management of the

Debtor.[141]

---

[133] Pl.'s Post-Trial Br. 24, ECF No. 210.
[134] Pl.'s Post-Trial Br. 23, ECF No. 210.
[135] J. Hoisager Decl. 67-68.
[136] J. Hoisager Decl. 67.
[137] J. Hoisager Decl. 68.
[138] J. Hoisager Decl. 69.
[139] J. Hoisager Decl. 5.
[140] J. Hoisager Decl. 6.
[141] J. Hoisager Decl. 6.

17

**D. Mr. Hoisager Verses the Debtor's Books and Records**

As noted in the facts above, the Trustee has consistently relied on the Debtor's books and records to support his position that Mr. Hoisager made many fraudulent transfers from the Debtor to himself and entities that he controlled. Mr. Crisp testified that substantially all the transfers to Mr. Hoisager were recorded in Debtor's general ledger account as "Owner Distributions," despite Mr. Hoisager's later categorization of the payments as "salary & wages," "expense reimbursements," "performance bonuses," and "tax distributions."[142] Similarly, the Trustee refuted Mr. Hoisager's claim that the Debtor transferred its properties to AEX in exchange for assumption of the Debtor's obligation to Mr. Hoisager by noting that the Debtor never booked a loan due to Mr. Hoisager on its books.[143] Finally, Mr. Crisp reached his conclusion that about $3 million of the payments to AEX were not revenue payments by reviewing the Debtor's general ledger, specifically an account titled "revenue" that recorded revenue transfers to AEX.[144]

In contrast, Mr. Hoisager's explanations for the transfers have been changing and often inconsistent with the books and records, as evidenced by the facts above. To summarize these inconsistencies:

- In 2019, Mr. Hoisager's financial expert characterized the "integrated transaction"—which involved a $2 million payment to Mr. Hoisager—as being a "performance bonus" arising from the sales of the Debtor's properties from 2011 to 2014.[145] But in his motion for partial summary judgment, Mr. Hoisager stated that the Debtor paid him the $2 million as compensation for the sale of the Cox Prospect only.[146]

- Mr. Hoisager also claimed that he personally borrowed the funds necessary to purchase the Wolfbone Prospects from McCabe Petroleum Corporation, and that

---

[142] B. Crisp Dec. 15.
[143] B. Crisp Dec. 17.
[144] 5/17/22 Trial Tr. 38:21-39:20, ECF No. 204.
[145] B. Crisp Decl. 14.
[146] B. Crisp Decl. 14; Mtn for Summ. J. 28, ECF No. 161.

the Debtor transferred those properties to AEX in exchange for AEX's assumption of the Debtor's obligation to Mr. Hoisager.[147] Even so, Mr. Hoisager concedes that the Debtor did not document the loan from Mr. Hoisager to the Debtor with promissory notes.[148] And AEX's assumption of the obligation to repay Mr. Hoisager was documented on the Debtor's books as an "Owner Distribution" to Mr. Hoisager.[149] He also acknowledges that the Debtor's general ledger booked the transaction with MPC as "Accounts Receivable McCabe Petroleum Corporation," rather than as a loan from MPC to Mr. Hoisager.[150] He maintains that the entries were not receivables but were instead loans, and that this "non-traditional accounting resulted from the inexperience of Breann Hall, the Debtor's Controller at the time, and the limitations of the Debtor's accounting software."[151] Only after the Petition Date did Mr. Hoisager reclassify all of the activity in "Accounts Receivable—McCabe" to an equity account titled "Hoisager (McCabe) Flow-Thru."[152]

- Similarly, Mr. Hoisager categorized the payments the Debtor made to Mr. Hoisager as compensation, expense reimbursements, performance bonuses, and tax payments.[153] Yet Mr. Hoisager conceded that most payments were simply recorded in Debtor's general ledger account as "owner distributions."[154] He attributes this inconsistency to the "Debtor's very basic accounting system."[155]

Mr. Hoisager testified that the Debtor's "books are a mess";[156] he attributed the problems with the Debtor's books and records to Debtor's bookkeeper, who he says was "inexperienced."[157] But the bookkeeper's successors never went back and made the correct corresponding entries on the Debtor's books.[158] Mr. Hoisager also testified that the quality of the books and records was his responsibility, as the sole member and manager of the Debtor.[159]

Ultimately, Mr. Hoisager's inconsistent, self-serving, and undocumented explanations of how the various transactions and payments should be characterized—including his fanciful

---

[147] J. Hoisager Decl. 12-13, 22.
[148] J. Hoisager Decl. 13.
[149] J. Hoisager Decl. 22.
[150] J. Hoisager Decl. 14.
[151] J. Hoisager Decl. 14.
[152] B. Crisp Dec. 17.
[153] B. Crisp Decl. 15.
[154] 5/16/22 Trial Tr. 125:19-128:4, ECF No. 203.
[155] J. Hoisager Decl. 62-63.
[156] 5/16/22 Trial Tr. 159:18-19, ECF No. 203.
[157] 5/16/22 Trial Tr. 159:15, ECF No. 203.
[158] J. Hoisager Decl. 22.
[159] 5/16/22 Trial Tr. 159:20-25, ECF No. 203.

19

"integrated transaction"—are not credible;[160] instead, the contemporaneously recorded treatment of these transactions in the Debtor's books and records, for which Mr. Hoisager was responsible, should control.

## II.    ANALYSIS

### A.    Primer on Fraudulent Transfers

The Trustee seeks to avoid transfers made by the Debtor under both section 548, which allows the Trustee to avoid transfers that satisfy the elements set forth in that section, and section 544, which allows the Trustee to avoid transfers that satisfy the elements of a fraudulent transfer under state law, here, the Texas Uniform Fraudulent Transfer act, or TUFTA.[161] TUFTA was modeled on section 548, and in their application to the facts here, the two statutes are for all practical purposes identical.[162]

The statutes allow the Trustee to avoid two basic types of fraudulent transfers.[163] The first, which can be called constructively fraudulent transfers, are transfers made by a debtor in exchange for less than reasonably equivalent value at a time when the debtor was either (1) insolvent (meaning the fair salable value of its assets was less than its liabilities), (2) unable to pay its debts as they came due, or (3) had an unreasonably small capital.[164]

---

[160] Indeed, they call into question Mr. Hoisager's overall credibility. A further blow to Mr. Hoisager's credibility happened when he maintained at trial that the Debtor had substantial properties left after the transfers to AEX even though he testified to the opposite during his Rule 2004 exam. 5/16/22 Trial Tr. 131:20-133:18, ECF No. 203. As Mr. McCabe's testimony largely parrots that of Mr. Hoisager, Mr. McCabe was not credible, either.

[161] 11 U.S.C. §§ 548(a), 544(b); Tex. Bus. & Com. Code § 24.005 ("TUFTA").

[162] *See Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 194 (5th Cir. 2013) ("UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore, cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent.").

[163] 11 U.S.C. § 548(a)(1)(A), (B); TUFTA §§ 24.005(a)(1), (a)(2), 24.006(a).

[164] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a); *see also Spring St. Partners-IV, L.P. v. Lam,* 730 F.3d 427, 437 (5th Cir. 2013) (applying § 24.005(a)(2) and § 24.006(a) as parts of the "constructive fraud prong").

The second basic type, which can be called actual intent fraudulent transfers, are transfers made with actual intent to delay, hinder, or defraud creditors.[165] The intent in question is determined by circumstantial evidence, usually with reference to what are called the "badges of fraud," which will be detailed below.[166]

Two finer points must also be made. First, under these fraudulent conveyance statutes, the Trustee not only can "recover" property fraudulently transferred; he can also "avoid" an obligation fraudulently incurred.[167] Second, a transfer made for or on account of an antecedent debt is by definition for a reasonably equivalent value,[168] and so cannot be a constructively fraudulent transfer, though it might still be an actual intent fraudulent transfer.[169] Thus, if a debtor signs an agreement to make a transfer, the obligation to make the transfer can be avoided as fraudulently incurred, if the other elements are present. But when that debtor makes the transfer under that agreement, that transfer is made for an antecedent debt—the obligation to make the transfer—and so cannot be a constructively fraudulent transfer.

And while transfers made to satisfy antecedent debts cannot be constructively fraudulent transfers, they can be preferences under either section 547 or under TUFTA.[170] That said, the Trustee did not seek to avoid insider preferences under TUFTA, and in the Joint Pre-Trial Order

---

[165] 11 U.S.C. § 548(a)(1)(A); TUFTA § 24.005(a)(1).

[166] *See, e.g., Cipolla v. Roberts (In re Cipolla)*, 541 Fed. App'x. 473, 477 (5th Cir. 2013) ("Among the circumstantial evidence of intent to defraud that a court may look to are the 'badges of fraud' in state fraudulent conveyance laws, including the Texas Uniform Fraudulent Transfer Act ('TUFTA')."); *see also* TUFTA § 24.005(b) (listing factors for "determining actual intent under Subsection (a)(1)").

[167] 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . .or any obligation . . ."); 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law…."); TUFTA § 24.005(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . .if the debtor made the transfer or incurred the obligation . . .").

[168] 11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor . . .").

[169] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp.* (*In re IFS Financial Corp.*), 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [Dean] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

[170] 11 U.S.C. §§ 548(d)(2)(A), 547(b); TUFTA § 24.006(b).

21

he limited his section 547 action to payments made to Mr. Hoisager.[171]

Finally, once a transfer is avoided, the thing avoided, or the value of that thing, can be recovered from the transferee,[172] or from the entity for whose benefit the transfer was made.[173]

**B.  The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to be Recovered**

A "transfer" of property occurs under fraudulent transfer law when "such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee…."[174] Here, that date of perfection occurred, under Texas law, when each assignment was properly recorded.[175] And so, these transfers were made for or on account of an antecedent debt—specifically, the obligation to make the assignments in the Wolfbone I and Wolfbone II assignment agreements—and so cannot be constructively fraudulent transfers.[176] Still, the Trustee might have avoided these transfers as actual intent fraudulent transfers.[177]

But even if the Trustee could avoid the property transfers as actual intent fraudulent transfers, there is a problem of proof. Nowhere does the Trustee list each property transfer he

---

[171] Joint Pre-Trial Order 13, ECF No. 184.

[172] 11 U.S.C. § 550(a)(1).

[173] *Id*. Interestingly, TUFTA does not appear to allow recovery from "the entity for whose benefit the transfer was made." *See* TUFTA §§ 24.008, 24.009. However, section 550(a) comes into play once a transfer is avoided under section 544, and so the "to or for the benefit of" language applies to transfers avoided under TUFTA as well.

[174] 11 U.S.C. § 548(d)(1).

[175] *Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234, 1237 (5th Cir. 1987) ("For purposes of § 548(d)(1), state law on time of perfection controls."); *Osherow v. Wolf (In re Wolf)*, 2016 WL 4940198, at *22 (Bankr. W.D. Tex. Sept. 15, 2016) (citing numerous cases), *aff'd*, 697 F. App'x 317 (5th Cir. 2017).

[176] 11 U.S.C. § 548(d)(2)(A).

[177] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp.* (*In re IFS Financial Corp.*), 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [*Dean*] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

22

seeks to avoid together with the value he seeks to recover and the basis of that value.

Mr. Crisp's declaration at pages 13-14 highlights the lack of specificity.[178] Mr. Crisp says, based on an AEX 10-K, that AEX sold properties in 2014 for $5.6 million, made a profit of more than $3 million, and that the sold properties "include" some of the properties transferred by the Debtor to AEX.[179] Which properties? Mr. Crisp doesn't say. And does the Trustee seek to recover the value of the properties or just the profit collected by AEX? The Trustee doesn't say. The only specific properties discussed are the Johnson 44 and the Roark, and with these, the Trustee mentions only the profit earned by AEX.[180] There may be a chart somewhere in the Trustee's exhibits, or information in those exhibits from which such a chart could be constructed, but absent a concise presentation of that information in Mr. Crisp's declaration,[181] there is no basis on which to establish a fraudulent-transfer damage award based on the property transfers.

C. **The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager**

At trial, the Trustee sought recovery of transfers made by the Debtor to AEX and Arabella Operating, not from those entities, but instead from Mr. Hoisager as "the entity for whose benefit" those transfers were made.[182] The transfer beneficiary[183] is a person who, while not the initial transferee, nonetheless receives a benefit as a result of the transfer.[184] The "quintessential" example is when a third-party guarantor has its liability reduced when the debt it

---

[178] B. Crisp Decl. 13-14.

[179] B. Crisp Decl. 13.

[180] B. Crisp Decl. 13-14.

[181] Mr. Crisp does reference Exhibit 31, which lists the properties assigned to AEX, but this exhibit provides no values. B. Crisp Decl. 4. He also references Exhibit 71, but this is a summary of the Debtor's balance sheets. *Id.*

[182] Pl.'s Post-Trial Br. 19-21, ECF No. 210; 11 U.S.C. § 550(a)(1).

[183] Coined by Judge Wedoff in *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005).

[184] *Schechter v. 5841 Bldg. Corp (In re Hansen)*, 341 B.R. 638, 644 (Bankr. N.D. Ill. 2006) (quoting *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988)).

23

guaranteed is paid through an avoidable transfer from the debtor to the lender.[185] "Benefit occurs without the beneficiary ever holding the money or property, precisely because someone else received it."[186] "The benefit must be 'direct, ascertainable and quantifiable' and must correspond to, or be commensurate with, the value of the property that was transferred."[187] Even with these limitations, courts have found many examples of recoverable benefits beyond the guarantor-guarantee context.[188]

But the Trustee must prove the benefit and must prove that the benefit was quantifiable and commensurate with the property transferred.[189] And here, as discussed below, the Trustee has proven no direct benefit to Mr. Hoisager, and any indirect benefits to Mr. Hoisager as a shareholder, director, or officer, resulting from the transfers of property to AEX and cash to Arabella Operating, without more, are not enough. And because the entity must actually receive a benefit from the transfer, intent to benefit alone is insufficient for recovery under 550(a), contrary to the Trustee's assertions.[190]

---

[185] *Sec. Inv'r Prot. Corp. v. Stratton Oakmont*, 234 B.R. 293, 314 (citing *Bonded Fin. Serv, Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988) (considering a guarantor or debtor to be the "paradigm 'entity for whose benefit such transfer was made'")).

[186] *Id.* at 313.

[187] *Enron Creditors Recovery Corp v. J.P. Morgan Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17, 33 (Bankr. S.D. N.Y. 2009) (citing *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005)), *rev'd on other grounds,* 422 B.R. 423 (S.D. N.Y. 2009); *see also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning benefit of continued business operations was "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received" and so was unrecoverable under Bankruptcy Act); *Faulkner v. Kornman (In re The Heritage Corp)*, 413 B.R. 438, 495 (Bankr. N. D. Tex. 2009) ("Nor is an unquantifiable advantage the sort of 'benefit' contemplated by § 550.").

[188] *See, e.g., Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1313-1315 (11th Cir. 2012) (recipients of loan proceeds benefited from transfer of liens securing the loan); *Gibbons v. Stemcor USA, Inc. (In re B.S. Livingston & Co., Inc.)*, 186 B.R. 841, 864 (D. N.J. 1995) (permitting case to proceed under theory that the promise of lucrative positions at new company in exchange for transfers of debtor's assets was a benefit for purpose of 550(a)); *Merrill. v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 127 (D. Utah 1986) (finding a benefit where debtors' funds used to retain an attorney to form a new company for defendant).

[189] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d at 1293 (Corporation's purchase of likely worthless stock from one shareholder leaving second shareholder as sole owner did not benefit second shareholder enough to impose transfer beneficiary liability because it was not "a quantifiable benefit or one bearing the necessary correspondence to property transferred," citing *Mack v. Newton*, 737 F 2d at 1359-60).

[190] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF 212. For cases rejecting the Trustee's position, see *Terry v. Meredith (In re Meredith)*, 527 F.3d 372, 376-77, n.5 (4th Cir. 2008) (finding that the transferor's "subjective intent

24

First, the Trustee has not shown a "direct, ascertainable and quantifiable" benefit to Mr. Hoisager.[191] The Trustee did not establish that the salary paid by AEX to Mr. Hoisager was tied to, or the result of, or in any other way commensurate with the transfers from the Debtor.[192] The Trustee also did not prove that the note and equity distributions given to Mr. Hoisager by AEX, although possibly direct, were ascertainable or quantifiable.[193] On the contrary, Mr. Hoisager testified that the note was essentially worthless and that the equity transfer did not increase his holdings in the post-merger AEX.[194] And this testimony is corroborated by the going-concern qualification in AEX's 20-F.[195]

And so, if the Trustee is to recover from Mr. Hoisager, the Trustee must do so based on Mr. Hoisager's status at AEX or Arabella Operating.[196] The court in *In re Hansen* addressed recovery under section 550(a)(1) from shareholders, directors, and officers.[197] Citing "fundamentals" of American corporate law, the *Hansen* court reasoned that "shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property (in which case they would be subsequent transferees under section 550(a)(2)), or a showing can be made to pierce the corporate veil."[198]

---

to benefit . . . is not determinative" and recognizing that "fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but received no benefit from it") (quoting *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570,591 (N.D. Ill. 2005)) and *Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008) (same). *See also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning the same under the Bankruptcy Act).

[191] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005).

[192] *Id.*

[193] *Id.*

[194] J. Hoisager Decl. 25-27.

[195] Def.'s Ex. D-6, 11-12, 123. A form 20-F is used by foreign companies for filing annual reports and other disclosures.

[196] At the time of the transfers and equity contribution, Mr. Hoisager owned 100% of the equity interest in Arabella Exploration. J. Hoisager Decl. 25; Def.'s Ex. D-21. After the merger with Lone Oak, Mr. Hoisager owned 30.4% of the stock in the new AEX. J. Hoisager Decl. 26. Arabella Operating was a wholly owned subsidiary of AEX. J. Hoisager Decl. 8; Def.'s Ex. D-7, 12.

[197] *Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 644-46 (Bankr. N.D. Ill. 2006).

[198] *Id.* at 645-46 (explicitly rejecting *In re McCook*'s holding to the contrary).

25

*Hansen* accords with the Fifth Circuit's discussion in *Mack v. Newton*[199] (a Bankruptcy Act case) and is therefore persuasive.[200]

But here, the Trustee did not prove that Mr. Hoisager actually received direct distributions of the cash transferred to AEX or Arabella Operating. And the Trustee did not preserve veil-piercing theories through the Joint Pre-Trial Order. Even if he had, the Trustee has shown no cause to pierce the corporate veil because he has not shown that Mr. Hoisager was the alter ego of AEX or Arabella Operating,[201] that AEX or Arabella Operating was Mr. Hoisager's "mere instrumentality,"[202] that AEX or Arabella Operating was a "sham" or "shell" corporation,[203] or that Mr. Hoisager otherwise abused the corporate form.[204]

The cases cited by the Trustee as authority for recovering from Mr. Hoisager are not persuasive. In *In re TOUSA*, debtors transferred liens to new lenders who then paid off old lenders.[205] When the liens were avoided, the court found that the paid lenders were the entities

---

[199] *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[200] *Mack v. Newton* denied recovery because the court found the alleged benefit conferred on partners from using proceeds of fraudulent transfer to operate their business to be "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received." 737 F.2d at 1359-60. In accord is *Oscherow v. Nelson & Hensley Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253, 276-78 (Bankr. W.D. Tex. 2011), which cited *Hansen* favorably but found a basis to pierce the veil.

[201] *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) (explaining the "alter ego" theory as an exception to limited liability and noting "our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil").

[202] *Lubrizol Corp. v. Cardinal Const. Co.*, 868 F.2d 767, 769 (5th Cir. 1989) (outlining three elements for finding liability under an "instrumentality" theory: "[the] complete domination of the other corporate entity;" "the control must be wrongful;" and "the control must proximately cause the injury complained of").

[203] *Ledford v. Keen*, 9 F.4th 335, 340-42 (5th Cir. 2021) (denying veil-piercing in part because plaintiff did not rebut directors' evidence that they did not "form [corporation] to avoid liability, use it as a shell to avoid liability, or otherwise abuse the corporate form for their personal benefit;" and explaining that, to support a "sham theory," the plaintiff needed evidence of the directors using the corporation to "perpetrate a fraud, evade an existing obligation . . . circumvent a statute, protect a crime, or justify wrong"); *see also West v. Seiffert (In re Houston Drywall, Inc.)*, 2008 WL 2754526 at *32 (Bankr. S.D. Tex. 2008) (finding general partner, an LLC, to be a "sham corporation" because there was "no separateness" between the LLC and its members, and because allowing the member who directed the malfeasance to hide behind the corporate veil "would unjustly benefit" him).

[204] *See Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 646 (Bankr. N.D. Ill. 2006) ("Most cases in which shareholders or officers have been found responsible under section 550(a)(1) as beneficiaries of corporate transfers have involved some veil-piercing aspect.").

[205] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1301-1302 (11th Cir. 2012).

26

"for whose benefit the transfer [of the liens] was made."[206] But this is no different from the guarantor situation in that the new lenders received a dollar-for-dollar benefit from the transfers. Mr. Hoisager did not receive a dollar-for-dollar benefit. The Trustee also cites *In re Green Field Energy*,[207] but in *Green Field*, the court held that neither the defendant's position as owner nor as manager of the entity receiving the transfer was enough to confer transfer beneficiary liability.[208]

The Trustee cites *In re Buckhead America Corp*[209] for the proposition that "controlling person of an entity can be the party for whose benefit the transfer was made."[210] But the Buckhead court was considering a motion to dismiss, and so the court did not need to consider "the issue of the precise facts which must be proven in order for plaintiff to prevail."[211] Here, however, the dispute went to trial, and so "the precise facts which must be proven" were at issue.

In his reply brief, the Trustee cites *In re Universal Clearing House*.[212] But *Universal Clearing House* actually agrees with *Hansen* that absent cause to pierce the veil, a shareholder, director, or officer, is not subject to 550(a)(1) liability because of their status alone.[213] The Trustee also argues that Mr. Hoisager's salary, and the fact that the transfers kept Mr. Hoisager's "pyramid" afloat (presumably, AEX and Arabella Operating), establishes benefit to Mr. Hoisager.[214] But *Bonded Financial Services*[215] rejects the former, and *Mack*, the Fifth Circuit

---

[206] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1314 (11th Cir. 2012).
[207] *Halperin v. Moreno (In re Green Field Energy Services, Inc.)*, 594 B.R. 239 (Bankr. D. Del. 2018).
[208] *Id.* at 288 (Bankr. D. Del. 2018) (finding the trustee's argument insufficient by itself to prove the defendant "received an actual benefit from the . . . transfers").
[209] *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956 (D. Del. 1994).
[210] Pl.'s Post-Trial Br. 21, ECF No. 210.
[211] *Buckhead*, 178 B.R. at 963, n.11.
[212] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF No. 212; *Merrill. v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D. Utah 1986).
[213] *Id.* at 127-29 (finding that initial-transferee corporations were not "sham[s]" or "mere conduit[s]" such that the defendant, who took for value transfers from those corporations, would fall within section 550(a)(1)).
[214] Pl.'s Reply to Def.'s Post-Trial Br. 8-9, ECF No. 212.
[215] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a

Bankruptcy Act case, rejects the latter.[216] At most, the Trustee may have recovered the salary and distributions from Mr. Hoisager as a subsequent transferee under section 550(a)(2);[217] however, the Trustee did not argue this.

And so, the Trustee cannot recover either the property or cash transfers made to AEX or the cash transfers made to Arabella Operating from Mr. Hoisager. The cash paid to Mr. Hoisager directly is another matter.

**D.  The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims**

As noted above, the Debtor's insolvency, undercapitalization, or inability to pay debts forms one element of a constructively fraudulent conveyance.[218] In addition, the Debtor's overall financial condition can be important in determining whether the Debtor, through its agent, Mr. Hoisager, had an intent to delay, hinder, or defraud creditors.[219] Indeed, insolvency is one of the enumerated "badges of fraud."[220] Finally, the Debtor's financial condition forms an important backdrop against which to consider the Trustee's breach of fiduciary duty claim.

The parties have stipulated that the Debtor was insolvent as of December 31, 2013.[221] At trial, Mr. Hoisager testified that the Debtor became unable to pay its debts as they came due in early 2014,[222] and this is generally corroborated by the dates of service for the creditors filing vendor liens against the Debtor's properties,[223] as well as by Mr. Crisp's analysis of proofs of

---

benefit from the initial transfer is within this language."); *see also Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009) (dismissing plaintiff's section 550(a)(1) claim that, by pledging company assets to secure DIP financing, former directors benefitted by continuing to receive compensation from the debtor) (citing to *Bonded*).

[216] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988); *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[217] *Bonded*, 838 F.2d at 895 (explaining that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made").

[218] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).

[219] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[220] TUFTA § 24.005(b)(9).

[221] Joint Pretrial Order 35, ECF No. 184.

[222] 5/16/22 Trial Tr. 133:19-23, ECF No. 203.

[223] B. Crisp Decl. 9; Pl.'s Ex. 62.

28

claim filed against the Debtor.[224] Jason Rae, the Trustee's accounting expert, testified to an analysis of the Debtor's capitalization performed by his firm, which concluded that there was a working capital shortfall from December 31, 2013 to June 30, 2015.[225]

So all the available evidence establishes that the financial condition element for a constructively fraudulent transfer is satisfied on the date stipulated for the Debtor's insolvency, or December 31, 2013, and only transfers that took place after that date can be avoided as such.[226] An earlier cut-off date for actual intent fraudulent transfers might be established, if enough badges of fraud (other than insolvency) can be established at the earlier date.

But how did the Debtor slide into this state of insolvency on December 31, 2013? Mr. Crisp included two charts in his declaration,[227] but neither revealed anything about what was happening to the Debtor during 2013. More helpful was Exhibit D-11, a chart prepared by Mr. Crisp, but adopted by Mr. Hoisager in his declaration.[228] Exhibit D-11 reveals a shocking fact: The Debtor's income was over $800,000 for each of 2011 and 2012, but fell to a negative $4.6 million in 2013, and the Debtor continued to lose money thereafter.[229]

Mr. Hoisager's timeline reveals that the Debtor's drilling operations on the Wolfbone I and II wells began in late 2012 and ramped up in 2013.[230] That the Debtor had trouble collecting the joint interest costs of this drilling activity is evident from the bankruptcy schedules.[231] And Mr. Rae testified that the Debtor over spent the approved budget on the first three wells drilled by almost $14 million, $8 million over the amounts committed by the working interest owners.[232]

---

[224] B. Crisp Decl. 9.
[225] J. Rae Decl. 15; Pl.'s Ex. 70.
[226] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).
[227] B. Crisp Decl. 6, 8.
[228] J. Hoisager Decl. 4.
[229] Def.'s Ex. D-11.
[230] Def.'s Post-Trial Br. Ex. A, 1-7, ECF No. 211.
[231] B. Crisp Decl. 5.
[232] J. Rae Decl. 10.

The following chart, created from the Debtor's balance sheets, makes it painfully clear that the combination of the Debtor's Wolfbone I and II drilling activities—with the high costs[233] and inability to collect the corresponding joint interest billings—and absurdly large owner distributions, were the biggest contributors to the Debtor's insolvency at the end of 2013.[234]

| Year | Equity | Accounts Receivable | Unbilled Joint Interest Billings | Owner Distributions |
|------|--------|---------------------|----------------------------------|---------------------|
| 2012 | $654,468 | $877,173 | $3,590,262 | –$2,307,685 |
| 2013 | –$12,930,875 | $5,329,376 | $11,550,407 | –$9,589,296 |

**E.   The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent Transfers**

**1.   The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13, 2013 as Constructively Fraudulent Transfers**

Exhibit 1 to the Trustee's Post-Trial Brief shows all payments made by the Debtor to Mr. Hoisager between December 31, 2013, and the Petition Date.[235] These payments total $2,803,834.[236] Mr. Crisp testified that each payment was reflected in the Debtor's books and records as an "owner distribution," and opined that the Debtor did not receive reasonably equivalent value in exchange.[237] While the "Dove Acres" distributions[238] about which the Trustee complains were made while the Debtor was financial healthy, and so were perfectly benign,[239] owner distributions made while a company is insolvent are quintessential constructively fraudulent transfers.[240] And as noted above, the Debtor's books and records which

---

[233] J. Rae Decl. 10.

[234] Pl.'s Ex. 8, 1-4.

[235] Pl.'s Post-Trial Br. Ex. 1, ECF No. 210.

[236] Pl.'s Ex. 60, 76; B. Crisp Decl. 12.

[237] B. Crisp Decl. 14-20. As noted earlier, Mr. Hoisager's attempts to recharacterize these payments were not credible.

[238] Pl.'s Post-Trial Br. 19, ECF No. 210.

[239] The Debtor was financially healthy, so the distributions are unassailable if ratified by a majority of shareholders. *See, e.g., Gearhart Industries Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 720 (5th Cir. 1984) ("A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by a majority of disinterested directors or the majority of the stockholders.").

[240] See *Mancuso v. Champion (In re Dondi Financial Corp.),* 119 B.R. 106, 111-13 (Bankr. N. D. Tex. 1990), and cases cited therein.

30

listed these payments as "owner distributions" to Mr. Hoisager must control in the face of Mr. Hoisager's inconsistent and self-serving testimony. Thus, the $2,803,834 in distributions made to Mr. Hoisager after December 31, 2013, are recoverable and the Trustee is entitled to a judgment of at least this amount.

But was there a date earlier than December 31, 2013, on which the Debtor formed an actual intent to delay, hinder, or defraud creditors, so that cash payments made to Mr. Hoisager before December 31, 2013, could be avoided?

### 2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013 as Actual Intent Fraudulent Transfers

As is typical with actual intent fraudulent transfers, there is no direct evidence that Mr. Hoisager intended[241] to delay, defraud, or hinder creditors with the payments of cash to Mr. Hoisager. Mr. Hoisager testified, of course, that the Debtor made no transfers or payments with actual intent to hinder, delay, or defraud any creditor.[242]

Because a debtor will seldom admit that he intended to defraud creditors, intent may also be inferred and established by circumstantial evidence, including analysis of the "badges of fraud."[243] The badges of fraud under the Texas Uniform Fraudulent Transfer Act include

(1) Whether the transfer was to an insider;
(2) Whether the debtor retained possession or control of the property after the transfer;
(3) Whether the transfer was concealed;
(4) Whether the debtor had been sued or threatened with suit before the transfer;
(5) Whether the transfer was substantially all of the debtor's assets;
(6) Whether the debtor absconded after the sale;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset or obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly after the sale;
(10) Whether the transfer occurred shortly before or shortly after the debtor incurred a

---

[241] It is the Debtor's intent that matters. *ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278, 369 (S.D. Tex. 2008). But the intent of a transferee in control of the debtor will be imputed to the debtor. *Id.* at 269-70.
[242] J. Hoisager Decl. 5-6.
[243] *Soza v. Hill (In re Soza),* 542 F.3d 1060, 1066-67 (5th Cir. 2008).

"substantial debt;" and
(11) Whether the debtor transferred essential assets to the business to a lienor who transferred the assets to an insider or seller.[244]

The Fifth Circuit has articulated a similar list of "badges" applicable to transfers under the Bankruptcy Code:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of events and transactions under inquiry.[245]

The Trustee seems to suggest a static construct where a badge once present is presumed to have existed for all relevant times. For example, the Trustee makes much of the Dove Acres payments, even though these occurred long before the Debtor had trouble paying creditors. But how can you have an intent to delay, hinder, or defraud creditors who are getting paid? And this is a problem with all multi-factor tests, of which the badges-of-fraud test is just one example. A wooden application of each factor or badge in isolation, without considering how each factor plays out and relates to the other factors over the relevant time period, brings the trier of fact no closer to an understating of the ultimate issue: here, the Debtor's intent, as held by Mr. Hoisager.

This analysis will focus on the last three of the Fifth Circuit's factors for four reasons. First, they encapsulate the other badges of fraud, including the TUFTA badges. Second, they offer a more dynamic construct than that offered by the Trustee, one where timing matters. Third, they compel an inquiry into all the facts and circumstances. Finally, and most importantly,

---

[244] Tex. Bus. & Com. Code §24.005(b).
[245] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Chastant v. Chastant (In re Chastant)*, 873 F. 2d 89, 91 (5th. Cir. 1989) in turn quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

32

they invite the trier of fact to knit together all the badges that apply into a coherent narrative that examines how Mr. Hoisager's motives were likely affected by the changing financial fortunes of the Debtor over the course of 2013.

To that end, post-trial instructions included a request for a timeline,[246] which would have been responsive to the fourth and sixth of the Fifth Circuit's elements. The Trustee declined this request, possibly because it would undermine his static construct, under which a badge once present is present for all times. Mr. Hoisager did include one,[247] and it has been helpful. It shows:

- that the discussions that ultimately led to establishing AEX as a public company started in July 2013;[248]
- that several leases were assigned by the Debtor to AEX on August 30, 2013;[249]
- that the merger agreement between AEX and Lone Oak was signed in October 2013;[250]
- that the transaction in which AEX "recognized" an equity contribution by Mr. Hoisager happened in December 2013;[251]
- that a re-entry failure involving the SM Prewitt lease—described as "disastrous"—happened on December 11, 2013; [252]
- that the valuable Johnson 44 well assignment to AEX was recorded one day later;[253] and
- that the merger was completed 12 days after that.[254]

In short, the latter half of 2013 was eventful for Mr. Hoisager, the Debtor, and AEX. But what other indicators of intent are there from this time?

First, the Debtor made its first six-digit distribution to Mr. Hoisager in July 2013.[255]

Next, on top of distributions to Mr. Hoisager, the Debtor made large expenditures,

---

[246] 5/19/2022 Trial Tr. 33:16-34:1, ECF No. 205.
[247] Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[248] *See also* W. Heyn Decl. 2.
[249] *See also* Pl.'s Ex. 77.
[250] *See also* W. Heyn Decl. 3.
[251] *See also* Def.'s Ex. 19, PDF 7; B. Crisp Decl. 13.
[252] *See also* J. Hoisager Decl. 38.
[253] *See also* Pl.'s Ex. 77.
[254] *See also* W. Heyn Decl. 3.
[255] Pl.'s Ex. 60, 2.

including substantial cost overruns, on the Wolfbone I and II wells[256]—wells in which the Debtor no longer owned a working interest—leading to the Debtor's slide into insolvency. This ship was clearly sinking in 2013, and no one would know that better than Mr. Hoisager.

Next, the Debtor transferred almost 5 million dollars to AEX. These transfers were included on Exhibit 85, used by Mr. Crisp to exclude revenue payments, which would be due under the joint operating agreement, from the claim for cash transfers from the Debtor to AEX.[257] While the parties spent much time debating the accuracy of four entries on Exhibit 85, of far, far more relevance to the timeline analysis is this: by juxtaposing the revenue payments[258] against the joint interest billing receivable owed by AEX to the Debtor,[259] we learn that, beginning in July 2013 (again), the Debtor made substantial revenue payments to AEX at times when the AEX joint interest billings due to the Debtor were substantial, and mostly past due. No prudent operator would have failed to offset those revenue payments against the past due joint interest billings.

Finally, there is Mr. Hoisager's audacious attempt to transition from his role as a sole proprietor, engaging in undocumented transactions with Mr. McCabe, and using the Debtor as his private checking account, to a role as the chief executive officer of a public company.[260]

Taking all these facts together leads to the inescapable conclusion that starting in July 2013, Mr. Hoisager knew the Debtor was foundering, and he was, at the same time, enticed by the prospect of running AEX, a public company. Preferring his new enterprise over the Debtor, Mr. Hoisager emptied the Debtor of available cash and valuable properties, and diverted it all to

---

[256] J. Rae Decl. 10.
[257] 5/17/22 Trial Tr. 46:1-50:17, ECF No. 204.
[258] Pl.'s Ex. 85.
[259] Pl.'s Ex. 12B, 74, 260, 456.
[260] *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014) (fraudulent transfer under TUFTA) ("This list [of badges] is not exclusive and a court may also consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.") (citations omitted).

himself, AEX, or later, Arabella Operating. And this, at the least, constitutes an intent to delay, hinder, or defraud the creditors of the Debtor, and so the cutoff date for cash transfers to Mr. Hoisager can be moved back to July 1, 2013. Doing so adds $377,535 to the judgment.[261]

### F. Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those Transfers Cannot be Preferential Transfers

The Trustee alternatively seeks to recover the cash paid by the Debtor to Mr. Hoisager within one year of the petition date as preferential transfers. But a preferential transfer must be made "for or on account of an antecedent debt,"[262] and as previously discussed, those cash transfers were made for no consideration.

### G. Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by the Payments Mr. Hoisager Made Back to the Debtor

In the Joint Pre-Trial Order, Mr. Hoisager raises the one satisfaction rule of section 550(d) and claims that payments received by the Trustee under a settlement entered into with the estate of AEX,[263] and payments made pre-petition by Mr. Hoisager to the Debtor, should be credited against any fraudulent transfer award.[264]

More specifically, Mr. Hoisager says the Trustee received $4.8 million from the sale of the Samson Tag Along, $2 million from the sale of the Brigham Tag Along, and $1.4 million from the sale of Wolfbone I and II working interests.[265] But as noted by Judge Hale in In re Provident Properties,[266] "section 550(d) must be applied on a transfer-by-transfer basis…." Here, since the Trustee did not establish a right to recover any of the property transfers, there is nothing against which to credit his recoveries from the AEX estate.

---

[261] Pl.'s Post-Trial Br. Ex 2, ECF No. 210.
[262] 11 U.S.C. § 547(b).
[263] Joint Pre-Trial Order 35, ECF No. 184.
[264] Joint Pre-Trial Order 43-44, ECF No. 184.
[265] Joint Pre-Trial Order 23, ECF No. 184.
[266] *Segner v. Ruthven Oil & Gas (In re Provident Royalties, LLC)*, 581 B.R. 185, 195 (Bankr. N.D. Tex. 2017).

But Mr. Hoisager's payments to the Debtor after July 1, 2013 should reduce his fraudulent transfer liability under section 550(d). The Fifth Circuit held strongly in favor of this offset in *In re DeBerry*.[267] And while the facts there differed materially, the opinion gives no hint that a different set of facts would yield a different result.[268] Mr. Hoisager's uncontroverted testimony is that he contributed $67,550 after July 10, 2014, to support the Debtor's operations, and so this will serve as a credit to the fraudulent transfer judgment.[269]

### H. Mr. Hoisager Breached his Fiduciary Duty to the Debtor

The Debtor was a Texas limited liability company.[270] Mr. Hoisager was the sole member and manager, and as manager he appointed himself president, secretary, and treasurer.[271] Thus, he owed a fiduciary duty to the Debtor.[272] Texas law allows an LLC to limit this duty to some extent,[273] and the Debtor's company agreement does just that, relieving Mr. Hoisager from "any action taken (or any failure to act) by [him] in good faith on behalf of the company and reasonably believed by [him] to be authorized or within the scope of [his] authority, unless that action (or failure to act) constitutes fraud, gross negligence, bad faith or willful misconduct…."[274]

---

[267] *Whitlock v. Lowe (In re DeBerry)*, 945 F. 3d 943, 947 (5th Cir. 2019).

[268] *Id.* ("In matters of statutory interpretation, the text is always the alpha. Here, it's also the omega.").

[269] J. Hoisager Decl. 69.

[270] Def.'s Ex. 2.

[271] Def.'s Ex. 2, PDF 15.

[272] *Katz v. Intel Pharma, LLC,* 2020 WL 3871493 at *2 (S.D. Tex. July 9, 2020) (finding managing member "owed [LLC] fiduciary duties based on agency-law principles") (citing *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex. 2002)); *see also ETRG Invest. v. Hardee (In re Hardee)*, 2013 WL 1084494 at *9 (Bankr. E.D. Tex. 2013) ("Though limited liability companies are not corporations in the strictest sense, and though Texas law implies, but does not explicitly state, that the fiduciary status of corporate officers and directors and the corresponding three broad duties of such corporate officers and directors—the duty of due care, loyalty, and obedience—applies to managers and/or members governing the activities of a limited liability company, the imposition of those duties upon the management of a limited liability company under Texas law is appropriate and warranted.").

[273] Tex. Bus. Org. Code Ann. §§ 7.001(d)(3), 101.401.

[274] Def.'s Ex 2, PDF 8.

36

Mr. Hoisager argues that he owes no duties to creditors unless the company stops operating.[275] The cases cited support this notion, but they also affirm that the duty runs to the corporation and none suggest that the trustee cannot enforce the duty on behalf of the corporation.[276] It seems most likely that Texas would ultimately adopt the Delaware view that the fiduciary duties are always owed to the corporation, but can be enforced by the residual stakeholder.[277] Here, in any event, the creditors are not seeking to enforce the fiduciary duty owed to the corporation. Instead, a trustee has been appointed and stands in the shoes of the Debtor,[278] with the ability to sue to enforce the fiduciary duties owed to the corporation and recover on behalf of the residual stakeholder.[279] And plainly, with the Debtor hopelessly insolvent,[280] the residual stakeholders are the creditors.

The duty imposed on Mr. Hoisager includes a duty of care and a duty of loyalty.[281] The duty of loyalty also includes a duty not to engage in self-dealing.[282] Although Mr. Hoisager has

---

[275] Def.'s Post-Trial Br. 107, ECF No. 211.

[276] *Floyd v. Hefner*, 2006 WL 2844245 at *16-24, *31 (S.D. Tex. 2006) (discussing at some length the tension between circuit and district court cases on the issue, and the confusion introduced by *Credit Lyonnais*; and yet allowing the trustee to pursue the breach of duty claims on behalf of the corporation); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *31 (Bankr. N.D. Tex. 2020) (stating the duty always runs to corporation but allowing successor to trustee to recover for breach of duty); *Tow v. Bulmahn (In re ATP Oil & Gas Corp.)*, 711 Fed. App'x. 216 (5th Cir. 2017) (stating the same as *Floyd*, but neither the Fifth Circuit nor the District Court appears to have had any issue with the trustee asserting the claims on behalf of the corporation, instead dismissing the claims on other grounds).

[277] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 102-03 (Del. 2007) (holding that creditors have no direct claim, but stating that they can assert a derivative claim if the entity is insolvent); *Torch Liquidating Trust ex rel. Bridge Associates LLC v. Stockstill*, 561 F.3d 377, 385-86 (5th Cir. 2009) (same); *Floyd v Hefner*, 2006 WL 2844245 at *24 (reasoning that the trustee must show both a violation of a legal obligation and harm *to the corporation* stemming from that violation).

[278] 11 USC § 323 (a), (b) (trustee represents estate and can sue and be sued); 11 USC § 541(a)(1) (estate includes legal or equitable interests of the debtor).

[279] 11 U.S.C. § 323; *Torch*, 561 F.3d at 385-87 (explaining how a trustee in bankruptcy has standing to bring on behalf of the estate a direct suit for breach of fiduciary duties owed to the corporation). The Trustee's standing here is stronger than was the liquidating trustee's standing in *Torch* because the Trustee's standing exists automatically under the Bankruptcy Code, whereas in Torch the liquidating trustee had to satisfy the requirements of section 1123).

[280] B. Crisp Decl. 5.

[281] *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W. 2d 624, 628 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ).

[282] *Lowry v. Tarbox*, 537 S.W.3d 599, 615 (Tex. App.—San Antonio 2017) (explaining that fiduciaries are

raised the defense of the business judgment rule, that rule does not apply to self-dealing[283] or interested party transactions.[284] Instead, the fiduciary has the burden of proving that the transaction was fair to the corporation.[285]

The actions taken by Mr. Hoisager to drain the Debtor of cash and properties through transfers to himself and AEX are the very epitome of self-dealing[286] and interested party transactions.[287] That Mr. Hoisager took these actions with full knowledge of the Debtor's deteriorating financial condition establishes both bad faith and willful misconduct.

The only real question concerns the measure of damages. According to the Trustee's Post-Trial Brief, Mr. Crisp measured the damages as the unpaid claims against the estate of $11.9 million.[288] But Mr. Crisp does not "measure damages" in his declaration. And such a measure of damages would be speculative—it would require the unlikely finding that but for the transfers, all creditors would have been paid in full, and the record supports no such finding.[289]

But the corporation was certainly damaged by losing the cash transferred with the actual intent to delay, hinder, or defraud creditors. This amount includes not only the amounts of cash

---

not to benefit themselves at the expense of the corporation).

[283] *Lowry v. Tarbox*, 537 S.W.3d 599, 616 (Tex. App.—San Antonio 2017).

[284] *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) (interested party transactions include those where the fiduciary profits personally and those where the fiduciary's corporation transacts with another corporation in which the fiduciary has a significant financial interest).

[285] *Id.* at 110.

[286] *Id.* at 110-11 (director's failure to market company's assets on the open market and subsequent sale to second company in which he had a financial interest was a breach of his duties of loyalty and care).

[287] *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963) ("A director who diverts profits from the corporation in violation of his fiduciary relationship is personally liable even though the profits are acquired by an agency controlled by the director."); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *30-31 (Bankr. N.D. Tex. 2020) (defendant breached fiduciary duty by diverting opportunity from one company to another in which the fiduciary had an interest); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 275 (Bankr. N.D. Ill. 2003) (liquidating a company while transferring business to a new company owned by the fiduciary was a breach of fiduciary duty).

[288] Pl.'s Post-Trial Br. 25, ECF No. 210 (citing Pl.'s Ex. 61 and B. Crisp Decl. 5).

[289] To similar effect is *H. King & Assocs.*, 295 B.R. at 276 (finding that the proper measure of damages for breach of fiduciary duties does not necessarily equal the claims filed in the bankruptcy case).

transferred to Mr. Hoisager after July 1, 2013, but also the non-revenue cash transferred to AEX after July 1, 2013. These amounts are recoverable because, even though the cash transfers to AEX cannot be said to be "for or to the benefit of" Mr. Hoisager for purposes of fraudulent conveyance law, they fall squarely within the proscription on unfair interested party transactions.[290]

As noted above, although the parties debated the accounting for revenue v. non-revenue payments to AEX, the payments of revenue to AEX after July 1, 2013, are also damages for breach of fiduciary duty because those payments should have been retained and set off against the outstanding joint interest billings owed by AEX to the Debtor. Non -revenue cash and revenues paid to AEX after July 1, 2013, total $5,542,596.[291]

Finally, although the Trustee failed in his burden to prove the avoidance of the payments to Arabella Operating, Mr. Hoisager failed, in part, to carry his burden to prove the overall fairness of all of the cash payments to Arabella Operating. Mr. Hoisager's testimony that money paid to Arabella Operating was revenue owned by others is credible, without contrary evidence, but only for payments made in uneven amounts, and not for payments made in round dollar

---

[290] *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 514 B.R. 790, 815 (Bankr. N.D. Tex. 2014) (explaining that "'interested' transactions are subject to a higher level of scrutiny); *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC.*, 566 B.R. 815, 849-50 (W.D. Tex. 2017) (allegation of fraudulent transfers by co-CEOs to themselves and others states a claim for breach of fiduciary duty); *Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.)*, 2002 WL 1792213 at *5 (N.D. Tex. 2002) (fraudulent transfers are a breach of fiduciary duty); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *26, 30 (Bankr. N.D. Tex. 2020) (finding that defendant manager breached his duty of loyalty by causing a fraudulent transfer between two commonly owned companies); *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) ("The duty of loyalty holds officers and directors to an 'extreme measure of candor, unselfishness and good faith,' particularly where there is an interested transaction.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 274-75 (Bankr. N.D. Ill. 2003) (fiduciaries' steering of commercial opportunities from Debtor to new corporation, in which they were financially interested, was a breach of their fiduciary duties).

[291] Pl.'s Ex. 85. The actual total is $5,883,150, but based on rebuttal testimony by Mr. Hoisager, 5/19/22 Trial Tr. 11:3-25:25, ECF No. 205, and Mr. Crisp, *Id.* at 26:12-30:7, the Court believes Ex. 85 overstates the correct numbers by $340,554, consisting of a $107,607 transfer that reversed a mistaken payment, and a $232,947 transfer that was later voided.

39

amounts.[292]

And so, the Trustee can recover an addition $153,500 from Mr. Hoisager for breaching his fiduciary duties to the Debtor.

## I. The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove Common Law Fraud by Clear and Convincing Evidence

The Trustee also asks for recovery of exemplary damages under Section 41.003 of the Texas Civil Practice & Remedies Code.[293] That section permits exemplary damages where the claimant can prove by clear and convincing evidence that the harm arose from fraud, malice, or gross negligence.[294] Here, the Trustee seeks to prove that the harm arose from fraud.[295] If fraud is proven under section 41.003, section 41.008 permits recovery of up to two times economic damages, with the amount left to the fact finder's discretion.[296] The case cited by the Trustee discusses punitive damages for breach of fiduciary duty under Illinois law and is thus inapposite.

The problem here is that the Trustee neither pleaded nor proved fraud.

To state a claim for common law fraud in Texas, Plaintiffs must prove that: (1) Defendants made a material representation that was false; (2) Defendants knew that the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Defendants intended to induce Plaintiffs to act upon the representation; and (4) Plaintiffs actually and justifiably relied upon the representation and thereby suffered injury. *In re ACM–Texas, Inc.*, 430 B.R. 371, 410 (Bankr. W.D. Tex. 2010) (citing *Ernst*, 51 S.W.3d at 577); *see also Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) ("A common-law fraud claim requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.") (citations omitted).[297]

---

[292] Of the $882,483 transferred to Arabella Operating after December 31, 2014, $153,500 were payments made in round dollars and $728,983 were payments made in uneven amounts. Pl.'s Ex. 79. *See also* B. Crisp Decl. 4, 15.

[293] Pl.'s Post-Trial Br. 26, ECF No. 210.

[294] Tex. Civ. Prac. & Rem. Code § 41.003.

[295] Pl.'s Post-Trial Br. 26, ECF No. 210 (citing *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 276-77 (Bankr. N.D. Ill. 2003)).

[296] Tex. Civ. Prac. & Rem. Code § 41.008.

[297] *Patek v. Alfaro (In re Primera Energy, LLC)*, 579 B.R. 75, 144 (Bankr. W.D. Tex. 2017), *aff'd sub nom. Alfaro v. Reiley*, 2019 WL 4765385 (W.D. Tex. 2019).

40

What the trustee has proven is "actual intent to hinder, delay, or defraud" creditors, and has done so by a preponderance of the evidence with reference to badges of fraud. This in no way equates to satisfying the elements of common law fraud by clear and convincing evidence, and so the request for exemplary damages is denied.[298]

### J.  __The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing__

The Trustee preserved a request for attorney's fees incurred under TUFTA in the Joint Pre-trial order.[299] Under section 24.013 of the Texas Business and Commerce Code, "the court may award costs and reasonable attorney's fees as are equitable and just."[300] The Fifth Circuit has recently discussed awarding fees and costs in a TUFTA cases that involved other issues:

> Under Texas Business and Commerce Code § 24.013, courts presiding over TUFTA cases are empowered to "award costs and reasonable attorney's fees as are equitable and just." On appeal, Hughes concedes that if Pearcy and Thomas prevail on their TUFTA claims, they are entitled to attorney's fees and costs under § 24.013. However, Hughes maintains that Pearcy and Thomas failed properly to segregate recoverable fees, stemming from their attorneys' work on their TUFTA claims, from unrecoverable fees, incurred as a result of their other claims.
>
> Under Texas law, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). However, segregation is not necessary "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are '[intertwined] to the point of being inseparable.'" *Id.* at 311 (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11– 12 (Tex. 1991)). This exception is met only where the relevant "legal services advance both recoverable and unrecoverable claims." *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007).[301]

---

[298] Although *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022) could be read to the contrary, there the clear and convincing standard was met, unlike here. Also, in *Husky Int'l Elect., Inc. v Ritz*, 578 U.S. 356, 361-62 (2016) the Supreme Court determined that "actual fraud" as used in 11 U.S.C. § 523 can include fraudulent conveyance schemes that do not require a false representation. But the fraud in section 523 is not the same as Texas common law fraud and so *Husky* is inapposite.

[299] Joint Pre-Trial Order 10, ECF No. 184.

[300] Tex. Bus. & Com. Code § 24.013.

[301] *Thomas v. Hughes*, 27 F.4th at 1019-20.

41

Here, the Trustee has unsuccessfully pursued avoidance of the property transfers and transfers to AEX and Arabella Operating, but successfully pursued avoidance of the cash transfers to Mr. Hoisager as constructive and actual intent fraudulent conveyances. The Trustee has also successfully pursued a breach of fiduciary duty claim that was dependent on the same facts that were proven to support the avoidance of the cash transfers as actual intent fraudulent conveyances.

To recover fees or costs, then, the Trustee generally must separate time spent on the (1) avoidance of the property transfers, (2) avoidance of transfers to AEX and Arabella, and (3) any transfers before July 1, 2013, from time spent on (4) avoidance of cash transfers, and (5) breach of fiduciary duty claims. It seems possible that time spent on categories (4) and (5) may in part be inseparable from time spent on categories (1) and (2). How this happens as a practical matter will depend on how detailed the time records of the Trustee and his counsel have been. And neither side has had an adequate opportunity to brief this somewhat complicated issue, the nature of the judgment is just now becoming known, and the Trustee has not yet proposed a division of time. And so, the Court will enter an order with this memorandum opinion containing a schedule for submitting time records, responses to the time records, and a briefing schedule. Entry of the final judgment will await the outcome of this dispute.

III.    **CONCLUSION**

Thus, the Trustee shall recover these amounts on his fraudulent transfer and breach of

fiduciary duty claims.

| | Fraudulent Transfer | Breach of Fiduciary Duty |
|---|---|---|
| Properties to AEX | -0- | -0- |
| Cash to AEX | -0- | $5,542,596 |
| Cash to Arabella Operating | -0- | $153,500 |
| Cash to Mr. Hoisager after 12/31/13 | $2,803,834 | $2,803,834 |
| Cash to Mr. Hoisager from 7/1/13 to 12/31/13 | $377,535 | $377,535 |
| Credit | <$67,550> | -0- |
| Attorney's Fees | TBD | -0- |
| Judgment | | $8,887,465 |

Obviously, the awards are duplicative to the extent of the cash paid to Mr. Hoisager, and the

Trustee cannot recover those amounts twice.

A briefing schedule will be entered for the attorney's fees issue. After the Court

determines the attorney fee issue, it will enter a final judgment. All other relief requested will be

denied.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ARABELLA PETROLEUM** | § | **Case No. 15-70098-TMD-11** |
| **COMPANY, LLC,** | § | |
| | § | |
| Debtor. | § | **CHAPTER 11** |

| | | |
|---|---|---|
| **MORRIS D. WEISS, CHAPTER 11** | § | |
| **TRUSTEE FOR ARABELLA** | § | |
| **PETROLEUM COMPANY, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **ARABELLA EXPLORATION INC.,** | § | |
| **ARABELLA EXPLORATION LLC,** | § | **Adversary No. 16-07002-TMD** |
| **ARABELLA OPERATING LLC,** | § | |
| **TRANS-TEXAS LAND & TITLE, LLC,** | § | |
| **PLATINUM PARTNERS CREDIT** | § | |
| **OPPORTUNITIES MASTER FUND LP,** | § | |
| **PLATINUM LONG TERM GROWTH** | § | |
| **VIII, LLC, and JASON HOISAGER,** | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF GREG McCABE

## (Direct Testimony)

I, Greg McCabe, under penalty of perjury, pursuant to the laws of the United States of America, hereby declare the following:

1.      My name is Greg McCabe.  I live in Midland Texas.  I am over the age of 18 years. I have never been convicted of a felony, or of any crime involving the making or use of false statements.  Except as otherwise stated, I have personal knowledge of the facts stated in this

1

Declaration and such facts are true and correct. If called to testify at the truth of such facts, I could and would do so competently.

2.      I graduated from Sul Ross University in 1984, with a Bachelor of Science in Geology.

3.      I am a businessman with diverse business interests. I own a portfolio of companies, called McCabe Ventures, which invests in oil and gas interest, real estate, and private equity investments in other companies. McCabe Ventures owns several entities that own or manage oil and gas assets, including McCabe Petroleum Corporation ("MPC"). I am the President and Chief Executive of MPC. I am familiar with its business affairs, and no one is more familiar with them than I am. I am actively involved in the management of MPC.

4.      I am personally acquainted with Jason Hoisager ("Hoisager"). I have known Hoisager for at least fifteen (15) years. MPC has worked together with Hoisager on a large number of oil and gas transactions, some of which were concluded and some of which did not close. That is not unusual in the industry.

5.      In my experience, Hoisager has always dealt honestly and forthrightly with me and with MPC. I have never seen Hoisager act dishonorably in any business transaction or in any other context. I have never seen Hoisager act intentionally to harm the interests of the Debtor, nor act dishonestly with regard to the Debtor.

6.      I am familiar with Arabella Petroleum Company (the "Debtor") in Bankruptcy Case No. 15-70098 (the "Bankruptcy Case"). I am also acquainted with Morris Weiss (the "Trustee"), who was the Chapter 11 Trustee for the Debtor's Estate during the Bankruptcy Case and is now the trustee of the Litigation Trust that emerged from the Bankruptcy Case.

Return to TOC

7.      MPC worked on numerous oil and gas deals with the Debtor before the Bankruptcy Case was filed on July 10, 2015 (the "Petition Date").  These include oil and gas prospects that we called by the following names:

- Blue Grove
- Little Big Horn
- Little Big Horn II
- Little Big Horn III
- County Line
- Mendel
- Lintenra
- South Yadon
- Yadon
- Gomez West
- Carr
- Cooper
- Buckhorn
- Heydrick
- Marrow

8.      MPC is familiar with the Permian Basin, and the Delaware Basin, which lies in the western part of the Permian Basin.  In 2011-2013, MPC was acutely aware of geologic formations in the Delaware Basin known as the Wolfcamp and the Bone Springs, which generally lie at depth between 8,000 and 11,000 feet.  MPC generally believed that those formations had economic potential.  MPC also believed that Hoisager was skilled at identifying valuable oil and gas properties in the Permian Basin and that accordingly, the Debtor had economic potential.  MPC was aware that the Debtor's business model was to acquire oil and gas leases in the Permian Basin, package them in a prospect for investors (a "Prospect"), and to re-sell the working interests to investors or other oil companies for profit.  I had observed that the Debtor had been successful doing so in the past.  In some deals, the Debtor would re-sell the entire Prospect to a single purchaser.  In others deals, the Debtor would slice up the working interests into fractional shares and selling the fractional shares to different investors.

3

9. Beginning in 2011, MPC extended an oral line of credit to Mr. Hoisager, under which Mr. Hoisager could borrow money personally from MPC for the purpose of acquiring oil and gas leases in the Permian Basin for packaging into Prospects and re-sale to investors. MPC was fully aware that the Debtor would take ownership of the leases. However, Hoisager would be personally liable for repayment of the money borrowed, regardless of whether the Debtor repaid him for any funds that he advanced. MPC did not set a specific credit limit, but it reserved the right to approve or not approve any particular advance of funds. MPC did not charge interest to Hoisager and expected to make money on specific transactions with the Debtor or Hoisager rather than interest accrual. Nonetheless, the advances were intended to be loans, not gifts or capital contributions. MPC expected and intended to be repaid in full. MPC does not own and has never owned any interest in the Debtor and did not acquire any equity in the Debtor or management authority over the Debtor in exchange for the loans to Hoisager. The loans to Hoisager were made in a series of advances. In the aggregate, MPC lent Hoisager $9,398,746.84 for the purpose of allowing the Debtor to purchase Delaware Basin leases, principally the Wolfbone I Prospect and the Wolfbone II Prospect. MPC is generally familiar with the two (2) packages of leases that comprised the Debtor's Wolfbone I Prospect and Wolfbone II Prospect.

10. The loans to Hoisager were actual advances of cash from MPC. The loans were not memorialized by promissory notes, MPC kept track of Hoisager loan balance, including loan advances and repayments. Hoisager Trial Exhibit D-18 accurately reflects the loan balance. Hoisager has partially repaid the money he borrowed from MPC, but still owes approximately $3,000,000. MPC fully expected to be repaid in full when it made the loans to Hoisager and still expects to be repaid in full. MPC trusted Hoisager's integrity and good character when it made

4

the loans to him and still trusts his integrity and good character. To my knowledge, Hoisager has never denied owing any of the money he borrowed from MPC.

11.     Most of the deals that MPC has done with the Debtor were land deals that involved purchasing oil and gas leases, something from the landowner, and re-selling the leases or fractions of them to outside investors. Many of the deals were oral. Others were reduced to written agreements. Oral deals were not unusual in the Permian Basin. Whether the deals were oral or written, Hoisager has always honored his word and has never reneged on paying the agreed amount earned from a deal that closed. MPC has done several undocumented deals with the Debtor including:

- Blue Grove
- County Line
- Mendel
- Linterna
- South Yadon
- Yadon
- Gomez West
- Carr
- Cooper
- Buckhorn
- Heydrick
- Marrow

12.     At the times that MPC lent money to Hoisager, MPC understood that the Debtor would use the money to purchase oil and agas leases in the Permian Basin. MPC was not involved in the purchase of specific leases, but MPC was generally aware that the Debtor would use the money borrowed by Hoisager to purchase leases in the Delaware Basin for drilling in the Wolfcamp and Bone Springs formations. MPC understood at the time that the Debtor intended to package the leases together into one or more Prospects, sliced up the working interests into fractional shares, and re-sell shares of the working interests in the leases to outside investors or

other oil companies for a profit. MPC was aware that the Debtor had done so successfully in the past.

13. Though the loan terms were generous in the sense that MPC did not charge interest, Hoisager's obligation to repay MPC was absolute and did not depend upon whether the Debtor made a profit from reselling the oil and gas leases it purchased. However, MPC made these loans for the purpose of making a profit, beyond the mere repayment of principal. MPC expected to earn money on other transactions with the Debtor, such as the acquisition of the Roark Prospect, the Cannon Lease, and the Johnson 6 & 20 Lease, described in greater detail herein below. Those transactions neither benefitted nor harmed the Debtor, but they made money for MPC.

14. MPC understood that the Debtor's business model was to acquire leases, package them into Prospects and re-sell the working interests quickly. MPC understood that the Debtor did not intend to hold working interest for more than a few months. From MPC's perspective, that business model made sense because drilling and operating leases are expensive and capital-intensive propositions and MPC generally understood that the Debtor had limited capital. Oil and gas leases required lessors to drill within a prescribed period of time, usually two (2) to three (3) years. The value of undeveloped oil and gas leases typically declines over time as the deadline to drill approaches. Though other variables can come into play, as a general rule, the longer the Debtor held on to undeveloped leases, the less valuable they became. Furthermore, working interest owners are required to pay all costs of drilling, development, and operations. To the extent that the Debtor held on to working interests, it was exposed to that future liability to the extent other working interest owners decided to drill on a lease in which the Debtor held a working interest. MPC generally understood all of that.

6

15.    MPC was not directly involved in the Debtor's negotiation of the Wolfbone I Purchase and Sale Agreement ("Wolfbone I PSA") or the Wolfbone II Purchase and Sale Agreement (Wolfbone II PSA"), but it was aware of them contemporaneously with their execution. MPC was generally aware that, as part of the Wolfbone I PSA and Wolfbone II PSA, the Debtor agreed to become the Operator for the lease on the subject lands.   By agreeing to become the Operator, the Debtor exposed itself to the economic risks inherent in being a contract Operator, the biggest of which is the potential difficulty of collecting joint interest billings ("JIBs") from the working interest owners.

16.    MPC was generally aware of what the Debtor paid to acquire the underlying Wolfbone I and Wolfbone II leases.  MPC was generally aware that the Debtor was successful in re-selling the Wolfbone I Prospects working interests to outside investors.  MPC became aware that the Debtor was much less successful in re-selling Wolfbone II working interests to outside investors.  In mid-2013, MPC developed an understanding that the Debtor had over-estimated the value of the Wolfbone II Prospect leases to outside investors which reduced or eliminated the Debtor's profit margin. A sister company of MPC, called Wolfbone Investments, LLC was a small working interest owner in both the Wolfbone I and II projects.  The interest was converted into shares of AEX, Inc. ("AEX"), when Wolfbone Investments, LLC contributed its interest in exchange for shares at the closing of the Arabella Exploration, LLC/Lone Oak Acquisition Corp merger in December 2013 that formed AEX.  MPC had advanced funds, under the oral line of credit discussed above, for the Debtor to acquire an oil and gas property that was called the Roark Prospect, or the Roark Lease.  Because I, on behalf of the companies I had been involved in, was actively selling so many mineral acres in the same basin shortly before the Debtor leased the Wolfbone I and Wolfbone II Prospects, I believed that the Debtor knew the market well, and

7

virtually every player in it at the time. I helped the Debtor and Hoisager make contact and market this acreage to groups that I thought might have an interest in acquiring 100% of the leasehold. If a party willing to purchase 100% of the leasehold in the packages existed, I feel highly confident I would have found them, or the Debtor would have.

17.    From its conversation with the Debtor at the time, MPC was generally aware that the Debtor was unable to sell 46.46% of the Wolfbone II working interests to outside investors and instead sold those working interests to Arabella Exploration, LLC, which MPC knew to be 100% owned by Hoisager at the time. MPC was generally aware at the time that Arabella Exploration, LLC did not pay the Debtor in cash for those purchases. MPC subsequently learned in 2013 that the consideration for the purchases was the assumption by Arabella Exploration, LLC of the Debtor's obligation to repay Hoisager the money he advanced to purchase the Wolfbone I and Wolfbone II Prospect Leases. I am familiar with Hoisager Exhibit D-72, which shows the acquisition cost and values of the leaseholds acquired in Wolfbone I and Wolfbone II Prospects. I understand that Hoisager prepared the Exhibit. While I cannot personally testify as to the value of each lease Wolfbone I and Wolfbone II lease purchased by the Debtor, I agree with the concept and the methodology used by Hoisager in Exhibit D-72. I have vast personal experience investing in oil and gas leases, including some of the Debtor's Wolfbone leases. From my experience, all oil and gas leases have a fixed term during which they must be developed, or the lease expires. Sometimes, the deadlines can be extended with the payment of delay rentals, which are often costly, and sometimes the deadlines are fixed and cannot be extended. All things being equal, the value of oil and gas leasehold interests decline over time as the deadline to develop the leases approaches. The Wolfbone I and Wolfbone II leases in which Wolfbone Investments, LLC invested were no different. The leases imposed an obligation to drill and develop in a finite period

8

of time. Their value decline over time as the deadline to drill approached. Every day the leases shown on Hoisager Exhibit D-72 went without development, those leases lost value. The same leases only had value to an entity that had the capital to develop those leases by drilling, completing and producing wells from the leases. Without capital to drill wells, the leases would have simply run through the term and expired. Due to MPC's ongoing lending relationship with Hoisager, and my many business transactions with the Debtor and Hoisager, I was generally aware of the Debtor's economic resources and capabilities. The Debtor did not have the capital to develop the leases, nor did it have access to capital of that size and nature. MPC would not have lent those funds to the Debtor. Given that the Debtor bought the leases themselves with borrowed money, i.e., funds that MPC lent to Hoisager, the Debtor lacked the capital base to borrow additional money to develop the leases. Practically speaking, the Debtor needed to sell those leases to someone else with greater access to capital, or they simply would have expired.

18.     The fact that the Debtor sold a large share of the Wolfbone II working interests to Arabella Exploration, LLC indirectly affected MPC by delaying repayments of the money MPC lent to Hoisager to allow the Debtor to purchase the Wolfbone II Prospect leases. However, Arabella Exploration, LLC's assumption of the Debtor's obligation to repay Hoisager the money that he advanced to allow the Debtor to purchase the Wolfbone I and Wolfbone II Prospect leases did not satisfy, in whole or in part, Hoisager's obligation to repay MPC the money he borrowed. Hoisager remained fully liable for his repayment obligation to MPC, and that liability was not reduced by the Debtor's transfers of properties to Arabella Exploration, LLC ("Arabella Exploration").

19.     In addition to the funds that MPC lent to Hoisager to purchase the Wolfbone I Prospect and the Wolfbone II Prospect, MPC also advanced funds to the Debtor to purchase a lease

9

on section of land in Winkler County, Texas, which became known as the Roark Prospect. Because they were multiple mineral owners on the section, two separate leases were executed, the first on November 1, 2012, and the second on April 10, 2013. Collectively, they comprised the Roark Prospect. The Roark Prospect was not a party of the Debtor's Wolfbone I Prospect or the Wolfbone II Prospect. The opportunity to purchase the Roark Prospect came to me through a personal friend, named Pap Roark, who is a mineral owner in the section and had a relationship with other mineral owners, who also agreed to the leases. All of the money used to purchase the Roark Prospect came from MPC. None of the money came from the Debtor. MPC directed the Debtor to take the Roark Prospect in its name as lessee. The Debtor had a close working relationship with MPC. I believed that the Debtor would accommodate MPC if it could.

20.     Sometime in the summer of 2013, I learned that Hoisager was in discussions with Lone Oak Acquisition Corporation ("Lone Oak") to merge Lone Oak with Arabella Exploration. That combination eventually created AEX. I, acting for MPC, directed the Debtor to transfer the Roark Prospect to Arabella Exploration in anticipation of the impending merger. Once the merger occurred, in exchange for the transfer of the Roark Prospect to Arabella Exploration, MPC received shares of stock in AEX. The Debtor did not spend any of its own funds on the Roark Prospect. The acquisition money came from MPC, though it went through the Debtor's bank account briefly. The Debtor did not benefit from the purchase of the Roark Prospect. Nor was the Debtor harmed by the Roark Prospect transaction. I was comfortable asking the Debtor to engage in this transaction because MPC was the Debtor's ultimate source of financing, through the funds MPC lent to Hoisager. I was aware that, if the Debtor had continued to own the Roark Prospect, the Debtor would have risked incurring future expenses as a working interest owner. Because I was

<div align="center">10</div>

aware of that risk, MPC did not intend for the Debtor to hold the Roark Prospect over the long term, and it did not.

21.     Two (2) other leases were handled the same way.  MPC directed the Debtor to purchase the Cannon Lease and the Johnson 6 and 20 Lease, neither of which was part of the Wolfbone I Prospect or the Wolfbone II Prospect.  As to both leases, MPC advanced the funds to the Debtor, which then purchased the leases from the mineral interest owners.  Prior to the anticipated merger between Lone Oak and Arabella Exploration, I directed the Debtor to transfer the Cannon Lease and the Johnson 6 and 20 Lease to Arabella Exploration.  In exchange, I personally received stock in AEX.  The Debtor did not spend any of its funds on the Cannon Lease or the Johnson 6 and 20 Lease.  All of the money came from MPC, though it briefly went through the Debtor's bank account.  The Debtor did not benefit from the Cannon Lease transaction or the Johnson 6 and 20 Lease transaction.  Nor was the Debtor harmed.  I was comfortable asking the Debtor to engage in this transaction because MPC was the Debtor's ultimate source of financing, through the funds MPC lent to Hoisager.  However, if the Debtor had continued to own two (2) leases, it would have risked incurring future expenses as a working interest owner.  I was aware of that risk and did not intend for the Debtor to hold the Cannon Lease or the Johnson 6 and 20 Lease over the long term, and it did not.

22.     As I previously stated, MPC has participated in several business deals with the Debtor.  I am aware that the Debtor had a standard format for land deals with outside promoters who brought in profitable land deals.  A "land" deal is the purchase and re-sale of a lease or group of undeveloped leases for a profit.  Generally speaking, in a land deal, an outside promoter would bring in a proposed deal.  The deal would require that the promoter or a small group of people to put up the capital to buy leases.  The Debtor (the "Deal Side") would re-sell the leases for a higher

11

price to third party investors for a profit. The sale proceeds would be split as follows: (1) the people who put up the capital to acquire the leases (the "Capital Side") would be repaid the amount of capital they put up; and (2) the resulting profits, i.e., the spread between original purchase price and the resale price, would be split 50/50 between the Deal Side (the Debtor) and the Capital Side (whoever put up the money). MPC participated in transactions like this with the Debtor. Transactions like this were common in the Permian Basin back in 2008-2013 time period. Some were reduced to writing and some were oral. I have seen it both ways. There was nothing unusual at the time about a "land deal" transaction being done as a handshake deal, without a prior written agreement. MPC had participated with the Debtor in at least eight (8) transactions that were 50/50 deals between Deal Side and Capital Side. Those transactions are listed herein below are:

- County Line
- Mendel
- Lintenra
- South Yadon
- Yadon
- Gomez West
- Heydrick
- Marrow

This list does not include many other deals I have been a part of, without the participation of the debtor, under the same terms. Some of the deals listed above were memorialized in writing and many were not.

23. In 2013, MPC learned of a potential land deal that came to be known as the Cox Prospect. Hoisager requested financing for it. MPC wired $327,964.28 directly to the Debtor's bank account, along with other funds, to allow the Debtor to acquire the Cox Prospect leases. From MPC's perspective, the $327,964.28 advance was a loan to Hoisager. MPC lent the money to Hoisager knowing the purpose of the advance. The Debtor acquired the Cox Prospect leases and then resold them to Concho Oil and Gas ("Concho") in September 2013 for a gross sale price of

12

APP1-449

$4,800,000. The Cox Prospect sale was a typical "land deal" and followed the standard format the Debtor used for land deals with an outside promoter who brought in a profitable deal. Since Hoisager borrowed the money personally from MPC and advanced it to the Debtor, he served as the Capital Side. Once the sale of the Cox Prospect to Concho closed, the sale proceeds were first used to repay Hoisager for advancing the funds to purchase the leases. The resulting profits were split 50/50 between the Debtor and Hoisager. Each was entitled to receive $2,236,017.86, representing one half of the net profits after repaying the money borrowed to purchase the leases. From my experience, the Debtor would have paid the same profit split to any outside dealmaker who brought in a similar deal and financed the purchases of the leases.

24.     In the spring and summer of 2015, the Debtor, Arabella Exploration, Inc. ("AEX"), MPC, and Legacy Reserves, Inc. ("Legacy") worked together on a proposed transaction to sell certain assets of Arabella Exploration to Legacy, which was a larger and financially stronger oil company. The terms of the proposed transaction were included in a Purchase and Sale Agreement (the "Legacy PSA"), dated July 1, 2015. (Hoisager Exhibit D-54, Legacy PSA). The proposed Legacy transaction was consciously structured to benefit AEX, Arabella Exploration, LLC, and the Debtor. AEX would have benefitted directly through receipt of cash proceeds in the gross amount of $15,000,000, subject to certain potential deductions, from the sale of certain properties. The Debtor would have benefitted by at least $3,000,000 through the payoff of liens on certain wells that the Debtor had operated. The Debtor's Chapter 11 counsel, Bernard Givens, explained that fact to the Court. Hoisager's Exhibit D-56 is a transcript of the hearing before Judge King in which Mr. Givens explained to the Court that the Debtor would have benefitted by approximately $3,000,000 from the payoff of lien claims on wells. The Debtor would have also benefitted indirectly from the fact that Legacy was a bigger company with greater resources. Legacy was

<div align="center">13</div>

more able to collect other amounts owed to the Debtor by other working interest owners who would not pay. Legacy was far better capitalized to pursue those non-paying parties, and also was detached from past disputes giving them credibility to make the same claims for nonpayment with more success. The collection of those unpaid joint interest billings would have benefitted the Debtor through the underlying Joint Operating Agreements with money flowing back for the purpose of paying vendors.

25.     Though MPC was not named as a party to the Legacy PSA, MPC would have contributed certain of its properties to the transaction. None of the properties that Legacy proposed to buy belonged to the Debtor. Each was titled in the name of Arabella Exploration or MPC. Arabella Exploration and its parent company at the time AEX, were not debtors in bankruptcy in the spring and summer of 2015. AEX did not file its Chapter 11 case until January 2017.

26.     The Debtor, AEX, and MPC worked diligently to close the Legacy transaction. I personally worked directly with Hoisager, in his capacities as Manager of the Debtor and as CEO of AEX, to close the Legacy transaction. I also worked with Bill Heyn, a representative of AEX, Kyle McGraw of Legacy and even Morris Weiss, in his capacity as Trustee of the Debtor. The proposed Legacy transaction failed, due to opposition by the Official Committee of Unsecured Creditors (the "Committee") in the Debtor's Chapter 11 bankruptcy case. Snow Spence Green LLP, counsel for the Committee, wrote to Legacy stating the Committee's position that Arabella Exploration's properties to have been fraudulently transferred by the Debtor. Hoisager's Trial Exibit D-55 is a true and correct copy of the letter from Snow Spence Green to Legacy. After receiving the letter from the Committee's counsel, Legacy withdrew its offer. From my observation, it appeared to me that the proposed Legacy transaction would have closed but for the

Return to TOC

opposition of the Committee and the threat of litigation. The failure of the Legacy transaction deprived the Debtor of at least $3,000,000 in value that otherwise would have gone to its creditors.

27.     At no time did Hoisager say, indicate, or intimate to me any intention or desire for the Debtor to avoid paying its creditors. At no time did I observe Hoisager, or the Debtor, take any action that indicated to me any desire or intention by the Debtor to cheat its creditors, to avoid paying its just debts, or to place its assets beyond the reach of creditors. I witnessed Hoisager take large personal losses so that creditors of the Debtor could be paid amounts they would not have if not for his efforts.

28.     I am not related in any way to Hoisager. Though MPC has done business on many occasions with Hoisager, the Debtor, AEX, and Arabella Exploration, LLC, all of those transactions were conducted at arm's-length. Hoisager and MPC are not general partners in any partnership or joint venture. Hoisager and I are not general partners in any partnership or joint venture. I am not subject to Hoisager's control in any way. Nor is he subject to mine. Neither I, nor MPC has any economic interest in the outcome of the Adversary Proceeding, except that Hoisager still owes MPC some of the money he borrowed to allow the Debtor to purchase leases.

29.     The Trustee previously sued MPC in a different adversary proceeding, alleging that unrelated transfers of leasehold interests to MPC were recoverable as either fraudulent transfers or preferential transfers. While MPC did not believe that the allegations in the Trustee's complaint had any legal or factual merit, the existence of the lawsuit jeopardized a public offering of securities and would have harmed hundreds of small, unrelated investors. I explained this fact to the Trustee. The Trustee told me that he would need time for further investigation and would not dismiss the lawsuit. I was candid with the Trustee about the situation and that MPC did not have the luxury of time because of the impending and imperiled public securities offering, but I was not

15

able to persuade the Trustee to wrap up his investigation sooner or dismiss the lawsuit. Faced with the prospect of a far larger economic loss if the impending security offering were canceled, and the impending financial losses to innocent parties uninvolved with the Debtor, MPC compromised and settled the Adversary Proceeding with no admission of liability for a payment of approximately $2.1 million. While I was not pleased with that outcome, it has not affected my testimony.

Midland, Texas

Greg McCabe
May 10, 2022

DMS 579456

16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ARABELLA PETROLEUM | § | Case No. 15-70098-TMD-11 |
| COMPANY, LLC, | § | |
| | § | |
| Debtor. | § | CHAPTER 11 |

| | | |
|---|---|---|
| MORRIS D. WEISS, CHAPTER 11 | § | |
| TRUSTEE FOR ARABELLA | § | |
| PETROLEUM COMPANY, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ARABELLA EXPLORATION INC., | § | |
| ARABELLA EXPLORATION LLC, | § | Adversary No. 16-07002-TMD |
| ARABELLA OPERATING LLC, | § | |
| TRANS-TEXAS LAND & TITLE, LLC, | § | |
| PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, | § | |
| PLATINUM LONG TERM GROWTH | § | |
| VIII, LLC, and JASON HOISAGER, | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF GREG McCABE

### (Direct Testimony)

I, Greg McCabe, under penalty of perjury, pursuant to the laws of the United States of America, hereby declare the following:

1.      My name is Greg McCabe. I live in Midland Texas. I am over the age of 18 years. I have never been convicted of a felony, or of any crime involving the making or use of false statements. Except as otherwise stated, I have personal knowledge of the facts stated in this

1

Declaration and such facts are true and correct. If called to testify at the truth of such facts, I could and would do so competently.

2.      I graduated from Sul Ross University in 1984, with a Bachelor of Science in Geology.

3.      I am a businessman with diverse business interests. I own a portfolio of companies, called McCabe Ventures, which invests in oil and gas interest, real estate, and private equity investments in other companies. McCabe Ventures owns several entities that own or manage oil and gas assets, including McCabe Petroleum Corporation ("MPC"). I am the President and Chief Executive of MPC. I am familiar with its business affairs, and no one is more familiar with them than I am. I am actively involved in the management of MPC.

4.      I am personally acquainted with Jason Hoisager ("Hoisager"). I have known Hoisager for at least fifteen (15) years. MPC has worked together with Hoisager on a large number of oil and gas transactions, some of which were concluded and some of which did not close. That is not unusual in the industry.

5.      In my experience, Hoisager has always dealt honestly and forthrightly with me and with MPC. I have never seen Hoisager act dishonorably in any business transaction or in any other context. I have never seen Hoisager act intentionally to harm the interests of the Debtor, nor act dishonestly with regard to the Debtor.

6.      I am familiar with Arabella Petroleum Company (the "Debtor") in Bankruptcy Case No. 15-70098 (the "Bankruptcy Case"). I am also acquainted with Morris Weiss (the "Trustee"), who was the Chapter 11 Trustee for the Debtor's Estate during the Bankruptcy Case and is now the trustee of the Litigation Trust that emerged from the Bankruptcy Case.

2

APP1-455

7.    MPC worked on numerous oil and gas deals with the Debtor before the Bankruptcy Case was filed on July 10, 2015 (the "Petition Date"). These include oil and gas prospects that we called by the following names:

- Blue Grove
- Little Big Horn
- Little Big Horn II
- Little Big Horn III
- County Line
- Mendel
- Lintenra
- South Yadon
- Yadon
- Gomez West
- Carr
- Cooper
- Buckhorn
- Heydrick
- Marrow

8.    MPC is familiar with the Permian Basin, and the Delaware Basin, which lies in the western part of the Permian Basin. In 2011-2013, MPC was acutely aware of geologic formations in the Delaware Basin known as the Wolfcamp and the Bone Springs, which generally lie at depth between 8,000 and 11,000 feet. MPC generally believed that those formations had economic potential. MPC also believed that Hoisager was skilled at identifying valuable oil and gas properties in the Permian Basin and that accordingly, the Debtor had economic potential. MPC was aware that the Debtor's business model was to acquire oil and gas leases in the Permian Basin, package them in a prospect for investors (a "Prospect"), and to re-sell the working interests to investors or other oil companies for profit. I had observed that the Debtor had been successful doing so in the past. In some deals, the Debtor would re-sell the entire Prospect to a single purchaser. In others deals, the Debtor would slice up the working interests into fractional shares and selling the fractional shares to different investors.

3

Return to TOC

9. Beginning in 2011, MPC extended an oral line of credit to Mr. Hoisager, under which Mr. Hoisager could borrow money personally from MPC for the purpose of acquiring oil and gas leases in the Permian Basin for packaging into Prospects and re-sale to investors. MPC was fully aware that the Debtor would take ownership of the leases. However, Hoisager would be personally liable for repayment of the money borrowed, regardless of whether the Debtor repaid him for any funds that he advanced. MPC did not set a specific credit limit, but it reserved the right to approve or not approve any particular advance of funds. MPC did not charge interest to Hoisager and expected to make money on specific transactions with the Debtor or Hoisager rather than interest accrual. Nonetheless, the advances were intended to be loans, not gifts or capital contributions. MPC expected and intended to be repaid in full. MPC does not own and has never owned any interest in the Debtor and did not acquire any equity in the Debtor or management authority over the Debtor in exchange for the loans to Hoisager. The loans to Hoisager were made in a series of advances. In the aggregate, MPC lent Hoisager $9,398,746.84 for the purpose of allowing the Debtor to purchase Delaware Basin leases, principally the Wolfbone I Prospect and the Wolfbone II Prospect. MPC is generally familiar with the two (2) packages of leases that comprised the Debtor's Wolfbone I Prospect and Wolfbone II Prospect.

10. The loans to Hoisager were actual advances of cash from MPC. The loans were not memorialized by promissory notes, MPC kept track of Hoisager loan balance, including loan advances and repayments. Hoisager Trial Exhibit D-18 accurately reflects the loan balance. Hoisager has partially repaid the money he borrowed from MPC, but still owes approximately $3,000,000. MPC fully expected to be repaid in full when it made the loans to Hoisager and still expects to be repaid in full. MPC trusted Hoisager's integrity and good character when it made

4

the loans to him and still trusts his integrity and good character. To my knowledge, Hoisager has never denied owing any of the money he borrowed from MPC.

11. Most of the deals that MPC has done with the Debtor were land deals that involved purchasing oil and gas leases, something from the landowner, and re-selling the leases or fractions of them to outside investors. Many of the deals were oral. Others were reduced to written agreements. Oral deals were not unusual in the Permian Basin. Whether the deals were oral or written, Hoisager has always honored his word and has never reneged on paying the agreed amount earned from a deal that closed. MPC has done several undocumented deals with the Debtor including:

- Blue Grove
- County Line
- Mendel
- Linterna
- South Yadon
- Yadon
- Gomez West
- Carr
- Cooper
- Buckhorn
- Heydrick
- Marrow

12. At the times that MPC lent money to Hoisager, MPC understood that the Debtor would use the money to purchase oil and agas leases in the Permian Basin. MPC was not involved in the purchase of specific leases, but MPC was generally aware that the Debtor would use the money borrowed by Hoisager to purchase leases in the Delaware Basin for drilling in the Wolfcamp and Bone Springs formations. MPC understood at the time that the Debtor intended to package the leases together into one or more Prospects, sliced up the working interests into fractional shares, and re-sell shares of the working interests in the leases to outside investors or

<div align="center">5</div>

other oil companies for a profit.  MPC was aware that the Debtor had done so successfully in the past.

13.     Though the loan terms were generous in the sense that MPC did not charge interest, Hoisager's obligation to repay MPC was absolute and did not depend upon whether the Debtor made a profit from reselling the oil and gas leases it purchased.  However, MPC made these loans for the purpose of making a profit, beyond the mere repayment of principal.  MPC expected to earn money on other transactions with the Debtor, such as the acquisition of the Roark Prospect, the Cannon Lease, and the Johnson 6 & 20 Lease, described in greater detail herein below.  Those transactions neither benefitted nor harmed the Debtor, but they made money for MPC.

14.     MPC understood that the Debtor's business model was to acquire leases, package them into Prospects and re-sell the working interests quickly.  MPC understood that the Debtor did not intend to hold working interest for more than a few months.  From MPC's perspective, that business model made sense because drilling and operating leases are expensive and capital-intensive propositions and MPC generally understood that the Debtor had limited capital.  Oil and gas leases required lessors to drill within a prescribed period of time, usually two (2) to three (3) years. The value of undeveloped oil and gas leases typically declines over time as the deadline to drill approaches.  Though other variables can come into play, as a general rule, the longer the Debtor held on to undeveloped leases, the less valuable they became.  Furthermore, working interest owners are required to pay all costs of drilling, development, and operations.  To the extent that the Debtor held on to working interests, it was exposed to that future liability to the extent other working interest owners decided to drill on a lease in which the Debtor held a working interest.  MPC generally understood all of that.

6

APP1-459

15.     MPC was not directly involved in the Debtor's negotiation of the Wolfbone I Purchase and Sale Agreement ("Wolfbone I PSA") or the Wolfbone II Purchase and Sale Agreement (Wolfbone II PSA"), but it was aware of them contemporaneously with their execution. MPC was generally aware that, as part of the Wolfbone I PSA and Wolfbone II PSA, the Debtor agreed to become the Operator for the lease on the subject lands.  By agreeing to become the Operator, the Debtor exposed itself to the economic risks inherent in being a contract Operator, the biggest of which is the potential difficulty of collecting joint interest billings ("JIBs") from the working interest owners.

16.     MPC was generally aware of what the Debtor paid to acquire the underlying Wolfbone I and Wolfbone II leases.  MPC was generally aware that the Debtor was successful in re-selling the Wolfbone I Prospects working interests to outside investors.  MPC became aware that the Debtor was much less successful in re-selling Wolfbone II working interests to outside investors.  In mid-2013, MPC developed an understanding that the Debtor had over-estimated the value of the Wolfbone II Prospect leases to outside investors which reduced or eliminated the Debtor's profit margin. A sister company of MPC, called Wolfbone Investments, LLC was a small working interest owner in both the Wolfbone I and II projects.  The interest was converted into shares of AEX, Inc. ("AEX"), when Wolfbone Investments, LLC contributed its interest in exchange for shares at the closing of the Arabella Exploration, LLC/Lone Oak Acquisition Corp merger in December 2013 that formed AEX.  MPC had advanced funds, under the oral line of credit discussed above, for the Debtor to acquire an oil and gas property that was called the Roark Prospect, or the Roark Lease.  Because I, on behalf of the companies I had been involved in, was actively selling so many mineral acres in the same basin shortly before the Debtor leased the Wolfbone I and Wolfbone II Prospects, I believed that the Debtor knew the market well, and

7

APP1-460

virtually every player in it at the time. I helped the Debtor and Hoisager make contact and market this acreage to groups that I thought might have an interest in acquiring 100% of the leasehold. If a party willing to purchase 100% of the leasehold in the packages existed, I feel highly confident I would have found them, or the Debtor would have.

17.     From its conversation with the Debtor at the time, MPC was generally aware that the Debtor was unable to sell 46.46% of the Wolfbone II working interests to outside investors and instead sold those working interests to Arabella Exploration, LLC, which MPC knew to be 100% owned by Hoisager at the time. MPC was generally aware at the time that Arabella Exploration, LLC did not pay the Debtor in cash for those purchases. MPC subsequently learned in 2013 that the consideration for the purchases was the assumption by Arabella Exploration, LLC of the Debtor's obligation to repay Hoisager the money he advanced to purchase the Wolfbone I and Wolfbone II Prospect Leases. I am familiar with Hoisager Exhibit D-72, which shows the acquisition cost and values of the leaseholds acquired in Wolfbone I and Wolfbone II Prospects. I understand that Hoisager prepared the Exhibit. While I cannot personally testify as to the value of each lease Wolfbone I and Wolfbone II lease purchased by the Debtor, I agree with the concept and the methodology used by Hoisager in Exhibit D-72. I have vast personal experience investing in oil and gas leases, including some of the Debtor's Wolfbone leases. From my experience, all oil and gas leases have a fixed term during which they must be developed, or the lease expires. Sometimes, the deadlines can be extended with the payment of delay rentals, which are often costly, and sometimes the deadlines are fixed and cannot be extended. All things being equal, the value of oil and gas leasehold interests decline over time as the deadline to develop the leases approaches. The Wolfbone I and Wolfbone II leases in which Wolfbone Investments, LLC invested were no different. The leases imposed an obligation to drill and develop in a finite period

8

of time. Their value decline over time as the deadline to drill approached. Every day the leases shown on Hoisager Exhibit D-72 went without development, those leases lost value. The same leases only had value to an entity that had the capital to develop those leases by drilling, completing and producing wells from the leases. Without capital to drill wells, the leases would have simply run through the term and expired. Due to MPC's ongoing lending relationship with Hoisager, and my many business transactions with the Debtor and Hoisager, I was generally aware of the Debtor's economic resources and capabilities. The Debtor did not have the capital to develop the leases, nor did it have access to capital of that size and nature. MPC would not have lent those funds to the Debtor. Given that the Debtor bought the leases themselves with borrowed money, i.e., funds that MPC lent to Hoisager, the Debtor lacked the capital base to borrow additional money to develop the leases. Practically speaking, the Debtor needed to sell those leases to someone else with greater access to capital, or they simply would have expired.

18.    The fact that the Debtor sold a large share of the Wolfbone II working interests to Arabella Exploration, LLC indirectly affected MPC by delaying repayments of the money MPC lent to Hoisager to allow the Debtor to purchase the Wolfbone II Prospect leases. However, Arabella Exploration, LLC's assumption of the Debtor's obligation to repay Hoisager the money that he advanced to allow the Debtor to purchase the Wolfbone I and Wolfbone II Prospect leases did not satisfy, in whole or in part, Hoisager's obligation to repay MPC the money he borrowed. Hoisager remained fully liable for his repayment obligation to MPC, and that liability was not reduced by the Debtor's transfers of properties to Arabella Exploration, LLC ("Arabella Exploration").

19.    In addition to the funds that MPC lent to Hoisager to purchase the Wolfbone I Prospect and the Wolfbone II Prospect, MPC also advanced funds to the Debtor to purchase a lease

9

on section of land in Winkler County, Texas, which became known as the Roark Prospect. Because they were multiple mineral owners on the section, two separate leases were executed, the first on November 1, 2012, and the second on April 10, 2013. Collectively, they comprised the Roark Prospect. The Roark Prospect was not a party of the Debtor's Wolfbone I Prospect or the Wolfbone II Prospect. The opportunity to purchase the Roark Prospect came to me through a personal friend, named Pap Roark, who is a mineral owner in the section and had a relationship with other mineral owners, who also agreed to the leases. All of the money used to purchase the Roark Prospect came from MPC. None of the money came from the Debtor. MPC directed the Debtor to take the Roark Prospect in its name as lessee. The Debtor had a close working relationship with MPC. I believed that the Debtor would accommodate MPC if it could.

20.     Sometime in the summer of 2013, I learned that Hoisager was in discussions with Lone Oak Acquisition Corporation ("Lone Oak") to merge Lone Oak with Arabella Exploration. That combination eventually created AEX. I, acting for MPC, directed the Debtor to transfer the Roark Prospect to Arabella Exploration in anticipation of the impending merger. Once the merger occurred, in exchange for the transfer of the Roark Prospect to Arabella Exploration, MPC received shares of stock in AEX. The Debtor did not spend any of its own funds on the Roark Prospect. The acquisition money came from MPC, though it went through the Debtor's bank account briefly. The Debtor did not benefit from the purchase of the Roark Prospect. Nor was the Debtor harmed by the Roark Prospect transaction. I was comfortable asking the Debtor to engage in this transaction because MPC was the Debtor's ultimate source of financing, through the funds MPC lent to Hoisager. I was aware that, if the Debtor had continued to own the Roark Prospect, the Debtor would have risked incurring future expenses as a working interest owner. Because I was

10

aware of that risk, MPC did not intend for the Debtor to hold the Roark Prospect over the long term, and it did not.

21.     Two (2) other leases were handled the same way.  MPC directed the Debtor to purchase the Cannon Lease and the Johnson 6 and 20 Lease, neither of which was part of the Wolfbone I Prospect or the Wolfbone II Prospect.  As to both leases, MPC advanced the funds to the Debtor, which then purchased the leases from the mineral interest owners.  Prior to the anticipated merger between Lone Oak and Arabella Exploration, I directed the Debtor to transfer the Cannon Lease and the Johnson 6 and 20 Lease to Arabella Exploration.  In exchange, I personally received stock in AEX.  The Debtor did not spend any of its funds on the Cannon Lease or the Johnson 6 and 20 Lease.  All of the money came from MPC, though it briefly went through the Debtor's bank account.  The Debtor did not benefit from the Cannon Lease transaction or the Johnson 6 and 20 Lease transaction.  Nor was the Debtor harmed.  I was comfortable asking the Debtor to engage in this transaction because MPC was the Debtor's ultimate source of financing, through the funds MPC lent to Hoisager.  However, if the Debtor had continued to own two (2) leases, it would have risked incurring future expenses as a working interest owner.  I was aware of that risk and did not intend for the Debtor to hold the Cannon Lease or the Johnson 6 and 20 Lease over the long term, and it did not.

22.     As I previously stated, MPC has participated in several business deals with the Debtor.  I am aware that the Debtor had a standard format for land deals with outside promoters who brought in profitable land deals.  A "land" deal is the purchase and re-sale of a lease or group of undeveloped leases for a profit.  Generally speaking, in a land deal, an outside promoter would bring in a proposed deal.  The deal would require that the promoter or a small group of people to put up the capital to buy leases.  The Debtor (the "Deal Side") would re-sell the leases for a higher

11

APP1-464

price to third party investors for a profit.  The sale proceeds would be split as follows: (1) the people who put up the capital to acquire the leases (the "Capital Side") would be repaid the amount of capital they put up; and (2) the resulting profits, i.e., the spread between original purchase price and the resale price, would be split 50/50 between the Deal Side (the Debtor) and the Capital Side (whoever put up the money).  MPC participated in transactions like this with the Debtor. Transactions like this were common in the Permian Basin back in 2008-2013 time period.  Some were reduced to writing and some were oral. I have seen it both ways.  There was nothing unusual at the time about a "land deal" transaction being done as a handshake deal, without a prior written agreement. MPC had participated with the Debtor in at least eight (8) transactions that were 50/50 deals between Deal Side and Capital Side.  Those transactions are listed herein below are:

- County Line
- Mendel
- Lintenra
- South Yadon
- Yadon
- Gomez West
- Heydrick
- Marrow

This list does not include many other deals I have been a part of, without the participation of the debtor, under the same terms.  Some of the deals listed above were memorialized in writing and many were not.

23.    In 2013, MPC learned of a potential land deal that came to be known as the Cox Prospect.  Hoisager requested financing for it.  MPC wired $327,964.28 directly to the Debtor's bank account, along with other funds, to allow the Debtor to acquire the Cox Prospect leases.  From MPC's perspective, the $327,964.28 advance was a loan to Hoisager.  MPC lent the money to Hoisager knowing the purpose of the advance.  The Debtor acquired the Cox Prospect leases and then resold them to Concho Oil and Gas ("Concho") in September 2013 for a gross sale price of

12

Return to TOC

$4,800,000. The Cox Prospect sale was a typical "land deal" and followed the standard format the Debtor used for land deals with an outside promoter who brought in a profitable deal. Since Hoisager borrowed the money personally from MPC and advanced it to the Debtor, he served as the Capital Side. Once the sale of the Cox Prospect to Concho closed, the sale proceeds were first used to repay Hoisager for advancing the funds to purchase the leases. The resulting profits were split 50/50 between the Debtor and Hoisager. Each was entitled to receive $2,236,017.86, representing one half of the net profits after repaying the money borrowed to purchase the leases. From my experience, the Debtor would have paid the same profit split to any outside dealmaker who brought in a similar deal and financed the purchases of the leases.

24.    In the spring and summer of 2015, the Debtor, Arabella Exploration, Inc. ("AEX"), MPC, and Legacy Reserves, Inc. ("Legacy") worked together on a proposed transaction to sell certain assets of Arabella Exploration to Legacy, which was a larger and financially stronger oil company. The terms of the proposed transaction were included in a Purchase and Sale Agreement (the "Legacy PSA"), dated July 1, 2015. (Hoisager Exhibit D-54, Legacy PSA). The proposed Legacy transaction was consciously structured to benefit AEX, Arabella Exploration, LLC, and the Debtor. AEX would have benefitted directly through receipt of cash proceeds in the gross amount of $15,000,000, subject to certain potential deductions, from the sale of certain properties. The Debtor would have benefitted by at least $3,000,000 through the payoff of liens on certain wells that the Debtor had operated. The Debtor's Chapter 11 counsel, Bernard Givens, explained that fact to the Court. Hoisager's Exhibit D-56 is a transcript of the hearing before Judge King in which Mr. Givens explained to the Court that the Debtor would have benefitted by approximately $3,000,000 from the payoff of lien claims on wells. The Debtor would have also benefitted indirectly from the fact that Legacy was a bigger company with greater resources. Legacy was

13

more able to collect other amounts owed to the Debtor by other working interest owners who would not pay. Legacy was far better capitalized to pursue those non-paying parties, and also was detached from past disputes giving them credibility to make the same claims for nonpayment with more success. The collection of those unpaid joint interest billings would have benefitted the Debtor through the underlying Joint Operating Agreements with money flowing back for the purpose of paying vendors.

25.     Though MPC was not named as a party to the Legacy PSA, MPC would have contributed certain of its properties to the transaction. None of the properties that Legacy proposed to buy belonged to the Debtor. Each was titled in the name of Arabella Exploration or MPC. Arabella Exploration and its parent company at the time AEX, were not debtors in bankruptcy in the spring and summer of 2015. AEX did not file its Chapter 11 case until January 2017.

26.     The Debtor, AEX, and MPC worked diligently to close the Legacy transaction. I personally worked directly with Hoisager, in his capacities as Manager of the Debtor and as CEO of AEX, to close the Legacy transaction. I also worked with Bill Heyn, a representative of AEX, Kyle McGraw of Legacy and even Morris Weiss, in his capacity as Trustee of the Debtor. The proposed Legacy transaction failed, due to opposition by the Official Committee of Unsecured Creditors (the "Committee") in the Debtor's Chapter 11 bankruptcy case. Snow Spence Green LLP, counsel for the Committee, wrote to Legacy stating the Committee's position that Arabella Exploration's properties to have been fraudulently transferred by the Debtor. Hoisager's Trial Exibbit D-55 is a true and correct copy of the letter from Snow Spence Green to Legacy. After receiving the letter from the Committee's counsel, Legacy withdrew its offer. From my observation, it appeared to me that the proposed Legacy transaction would have closed but for the

14

opposition of the Committee and the threat of litigation. The failure of the Legacy transaction deprived the Debtor of at least $3,000,000 in value that otherwise would have gone to its creditors.

27.     At no time did Hoisager say, indicate, or intimate to me any intention or desire for the Debtor to avoid paying its creditors. At no time did I observe Hoisager, or the Debtor, take any action that indicated to me any desire or intention by the Debtor to cheat its creditors, to avoid paying its just debts, or to place its assets beyond the reach of creditors. I witnessed Hoisager take large personal losses so that creditors of the Debtor could be paid amounts they would not have if not for his efforts.

28.     I am not related in any way to Hoisager. Though MPC has done business on many occasions with Hoisager, the Debtor, AEX, and Arabella Exploration, LLC, all of those transactions were conducted at arm's-length. Hoisager and MPC are not general partners in any partnership or joint venture. Hoisager and I are not general partners in any partnership or joint venture. I am not subject to Hoisager's control in any way. Nor is he subject to mine. Neither I, nor MPC has any economic interest in the outcome of the Adversary Proceeding, except that Hoisager still owes MPC some of the money he borrowed to allow the Debtor to purchase leases.

29.     The Trustee previously sued MPC in a different adversary proceeding, alleging that unrelated transfers of leasehold interests to MPC were recoverable as either fraudulent transfers or preferential transfers. While MPC did not believe that the allegations in the Trustee's complaint had any legal or factual merit, the existence of the lawsuit jeopardized a public offering of securities and would have harmed hundreds of small, unrelated investors. I explained this fact to the Trustee. The Trustee told me that he would need time for further investigation and would not dismiss the lawsuit. I was candid with the Trustee about the situation and that MPC did not have the luxury of time because of the impending and imperiled public securities offering, but I was not

able to persuade the Trustee to wrap up his investigation sooner or dismiss the lawsuit. Faced with the prospect of a far larger economic loss if the impending security offering were canceled, and the impending financial losses to innocent parties uninvolved with the Debtor, MPC compromised and settled the Adversary Proceeding with no admission of liability for a payment of approximately $2.1 million. While I was not pleased with that outcome, it has not affected my testimony.

Midland, Texas

Greg McCabe
May 10, 2022

DMS 579456

16

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD TARGGART, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>NEXT BRIDGE HYDROCARBONS, INC., KEN RICE, GEORGE PALIKARAS, ROBERT L. COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T. HAWKINS, DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, and GREGORY MCCABE,<br><br>       Defendants. | Case No.: 1:24-cv-1927<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Todd Targgart ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Next Bridge Hydrocarbons, Inc. ("NBH" or the "Company") with the United States Securities and Exchange Commission ("SEC"), wire and press releases, analyst reports and news articles, information readily obtainable on the Internet, and other available material and data. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.  **NATURE OF THE ACTION**

1.  This is a federal securities class action on behalf all persons or entities that acquired shares of NBH in connection with the Company's spin-off from Meta Materials, Inc.

("Meta Materials") on or around December 14, 2022, and were damaged as a result thereof (the "Class"). Plaintiff, on behalf of the Class, pursues remedies under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77o (the "Securities Act").

2.        NBH dates back several years to an earlier company named Torchlight Energy Resources, Inc. ("Torchlight"). Torchlight was an oil and gas company that operated primarily in the Orogrande Basin in West Texas under the control of Defendant Gregory McCabe.

3.        In June 2021, Torchlight merged into a Canadian company named Metamaterial Technologies Inc. ("Metamaterial"). In connection with the merger, legacy Torchlight shareholders received shares of non-voting Meta Materials preferred stock (the "Preferred Stock"). The Preferred Stock corresponded to the oil and gas assets that Metamaterial acquired from Torchlight during the merger. Holders of the Preferred Stock would be entitled to receive either proceeds from the sale of the oil and gas assets or, if the assets were not sold by a certain date, equity in a spin-off entity created to take ownership of the assets.

4.        Meta Materials did not sell the legacy Torchlight oil and gas assets and, consequently, proceeded with spinning off the oil and gas assets into NBH. To effectuate the spin-off, on July 14, 2022, NBH filed a registration statement on Form S-1 with the SEC, followed by several amendments and a final prospectus (collectively, the "Registration Statement"). The Registration Statement became "effective" on November 18, 2022.

5.        On December 14, 2022, Meta Materials completed the spin-off of the oil and gas assets to NBH and, as a result, holders of Meta Materials' Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

6.        The Registration Statement contained untrue statements of a material fact and/or omitted to state material facts to make the statements therein not misleading. The Registration

Return to TOC

Statement also violated specific disclosure provisions within Regulation S-K, which *inter alia* dictate what must be disclosed by issuers in registration statements. Consequently, Defendants violated Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77o.

7.      Shareholders who received NBH shares as a result of the Registration Statement and Spin-Off have been damaged as a result of Defendants' violations of the Securities Act.

## II.    <u>JURISDICTION AND VENUE</u>

8.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

11.     NBH's shares are not publicly traded and are not eligible for electronic transfer. Upon information and belief, the majority of NBH's shares at all relevant times have been in the possession of NBH's transfer and distribution agent, Equiniti Trust Company, LLC f/k/a American Stock Transfer & Trust Company LLC (the "Transfer Agent"). The Transfer Agent and the majority of NBH's shares are located within this Judicial District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   <u>PARTIES</u>

13.     Plaintiff Todd Targgart acquired NBH shares pursuant and traceable to the

3

Registration Statement and suffered damages as a result thereof.

14.     Defendant NBH describes itself as an energy company engaged in the development of oil and gas properties in the United States. It was incorporated in the State of Nevada on August 31, 2021, and operated as a subsidiary of Meta Materials prior to the Spin-Off. Subsequent to the Spin-Off, NBH operates independently from Meta Materials. NBH currently maintains its principal executive offices at 6300 Ridglea Place, Suite 950, Fort Worth, Texas.

15.     Defendant Ken Rice ("Rice") was NBH's Chairman and Chief Financial Officer when the Registration Statement was initially filed. Rice signed the Registration Statement. Rice also served as Meta Materials' Chief Financial Officer. Rice resigned from NBH following the Spin-Off.

16.     Defendant George Palikaras ("Palikaras") was NBH's President when the Registration Statement was initially filed. Palikaras signed the Registration Statement. Palikaras also served as Meta Materials' Chief Executive Officer. Palikaras resigned from NBH following the Spin-Off.

17.     Defendant Robert L. Cook ("Cook") was one of NBH's directors when the Registration Statement was initially filed. Cook signed the Registration Statement. Cook also served as a director of NBH after the Spin-Off.

18.     Defendant Clifton DuBose, Jr. ("DuBose") was NBH's Chief Executive Officer and Chairman of the Board of Directors prior to and/or after the Spin-Off. Prior to the Spin-Off, DuBose was an employee of Hudspeth Operating, LLC, which was one of NBH's subsidiaries. DuBose was 40 years old at the time of the Spin-Off.

19.     Defendant Joseph DeWoody ("DeWoody") was NBH's President and one of its directors after the Spin-Off. Prior to the Spin-Off, DuBose was an employee of Hudspeth

4

Operating, LLC, which was one of NBH's subsidiaries. DeWoody was 40 years old at the time of the Spin-Off.

20.    Defendant Lucas T. Hawkins ("Hawkins") was NBH's Chief Financial Officer after the Spin-Off. Hawkins was 36 years old at the time of the Spin-Off.

21.    Defendant Delvina Oelkers ("Oelkers") was NBH's Chief Operating Officer after the Spin-Off. Oelkers was 36 years old at the time of the Spin-Off. Prior to the Spin-Off, Oelkers was an employee of Hudspeth Operating, LLC, which was one of NBH's subsidiaries.

22.    Defendant Mia Pitts ("Pitts') was a director of NBH after the Spin-Off. Pitts was 38 years old at the time of the Spin-Off.

23.    Defendant Kristin Whitley ("Whitley") was one of NBH's directors after the Spin-Off. Whitley was 38 years old at the time of the Spin-Off.

24.    Defendant Gregory McCabe ("McCabe") was Chairman of Torchlight's Board of Directors before its merger with Metamaterial. McCabe owned approximately 13.5% of Meta Materials' common stock following the merger. Historically, McCabe has owned and/or controlled the majority of the oil and gas assets owned initially by Torchlight and now by NBH.

25.    Defendants Rice, Palikaras, Cook, DuBose, DeWoody, Hawkins, Oelkers, Pitts, Whitley, and McCabe are sometimes referred to herein collectively as the "Individual Defendants." The Individual Defendants together with NBH are collectively, in whole or in part, referred to herein as the "Defendants."

## IV.    BACKGROUND

26.    Torchlight began operations in the oil and gas industry in 2010. It described its business model as one "focus[ed] on drilling and working interest programs within the United States that have a short window of payback, a high internal rate of return and proven and bookable

5

reserves. We currently have only one interest in an oil and gas project, the Marcelina Creek Field Development . . . . We anticipate being involved in multiple other oil and gas projects moving forward, pending adequate funding."

27.    Between May and August 2020, Torchlight participated in discussions with several entities interested in a reverse-merger. In total, Torchlight engaged in negotiations with five companies. In each instance, the negotiations failed due to issues relating to Torchlight's disposition or sale of its oil and gas assets prior to the consummation of any transaction or disagreements over the valuation of the merging entity.

28.    In September 2020, Torchlight's external investor relations representative, who had been monitoring Torchlight's efforts to pursue strategic alternatives, suggested that representatives of Torchlight have a virtual meeting with Palikaras. On September 4, 2020, McCabe and Torchlight's CEO at the time, John Brda, held a virtual meeting with Palikaras after which they signed a confidentiality agreement and proceeded to negotiate the structure for a transaction.

29.    Similar to Torchlight's previous negotiations, issues arose concerning Torchlight's oil and gas assets, specifically "[Metamaterial's] desire that Torchlight divest the O&G Assets [oil and gas assets], the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base." According to the definitive proxy statement for the merger, these issues were resolved as follows:

> [Metamaterial] then suggested that the parties structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the Combined Company that would be allocated to each party's legacy stockholder

6

base. This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the O&G Assets (including the ability to structure and consummate the divestiture after the closing of the transaction with [Metamaterial]), while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of [Metamaterial's] business on an ongoing basis (which would have a large stockholder base and access to additional capital). The parties agreed to move forward on this basis, and after substantial negotiation, arrived at the 75%/25% ownership split described elsewhere in this proxy statement, with the ultimate Exchange Ratio generally subject to adjustment for shares issued by either company for its own benefit prior to the closing of the transaction to maintain the agreed ownership split.

30.    On December 14, 2020, Metamaterial and Torchlight executed their agreement (referred to as the "Arrangement Agreement") memorializing the terms of the merger. In substance, the Arrangement Agreement was a reverse takeover of Torchlight by Metamaterial in order to facilitate a listing on the NASDAQ and broad access to the U.S. capital markets. Pursuant to the Arrangement Agreement, once Torchlight indirectly acquired all Metamaterial shares, the combined company would be renamed "Meta Materials Inc." and continue Metamaterial's operations.

31.    Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock (the "Certificate of Designation"). Pursuant to the Certificate of Designation, upon a sale of Torchlight's oil and gas assets, the proceeds from any such transaction would be distributed to the Preferred Stock stockholders, or Meta Materials would pursue a spin-off.

32.    On June 28, 2021, Metamaterial and Torchlight completed the merger, as described and agreed to in the Arrangement Agreement. In conjunction with the finalization of the merger, the combined company (*i.e.*, Meta Materials) declared a dividend that provided Torchlight's shareholders as of June 24, 2021 (*i.e.*, the record date) with shares of the Preferred

7

Case 7:24-cv-00318-DC-RCG Document 141-3 Filed 09/03/25 Page 477 of 708

Stock on a one-for-one basis.

33.     Meta Materials and/or Torchlight did not ultimately sell the oil and gas assets. Consequently, Meta Materials proceeded with the Spin-Off.

34.     From October 2021 to December 2022, the Preferred Stock traded on over-the-counter markets under the ticker symbol "MMTLP".

35.     On December 14, 2022, Meta Materials completed the Spin-Off and distributed NBH's equity to the Preferred Stock shareholders as of December 12, 2022 (*i.e.*, the record date). In total, Meta Materials distributed 165,472,241 shares of NBH to the Preferred Stock shareholders.

36.     Immediately prior to the completion of the Spin-Off, McCabe owned and/or beneficially controlled 19,605,348 shares of Preferred Stock. Immediately following the Spin-Off, McCabe owned 12,826,492 shares of NBH. Upon information and belief, McCabe liquidated approximately 6.7 million shares of Preferred Stock on the eve of the Spin-Off. The Preferred Stock traded between $2.90 per share and $11.65 per share during the month before the Spin-Off (the average price was $8.15 per share). Consequently, McCabe's sale of Preferred Stock just prior to the Spin-Off resulted in proceeds of between $19.6 million and $78.9 million.

## V.     THE REGISTRATION STATEMENT

37.     The Registration Statement was negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made not false or misleading.

38.     In the Registration Statement, NBH represented in its financial statements that its oil and gas assets were worth:

- $45,663,480 as of December 31, 2021;

- $46,747,755 as of March 31, 2022; and

- $47,293,607 as of September 30, 2022.

39.     NBH's oil and gas assets were not worth the amounts listed in the immediately preceding paragraph. In truth, NBH's oil and gas assets were at all relevant times substantively worthless.

40.     NBH's predecessor parent company, Meta Materials, continuously tracked the value of the oil and gas assets and had full access to all relevant valuation information. Following the Spin-Off, Meta Materials reported in its filings with the SEC that the value of the oil and gas assets as of the date of the Spin-Off was "not substantive" and therefore increased its reserves on notes payable by NBH to Meta Materials that had historically been secured by the oil and gas assets.

41.     In addition to the foregoing, the Registration Statement violated Item 404 of Regulation S-K, 17 C.F.R. §229.404, by failing to disclose required information pertaining to NBH's transactions with Masterson Hazel Partners, LP ("MHP"), including but not limited to the fact that DuBose serves as CEO of MHP's General Partner, Masterson Hazel Management, LLC, and DuBose's interest in the transactions.

## VI.     CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that acquired shares of NBH in connection with the Company's spin-off from Meta Materials on or around December 14, 2022, and were damaged as a result thereof (previously defined as the "Class"). Excluded from the Class are Defendants, NBH's current and former officers and directors, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and

9

any entity in which the Individual Defendants have or had a controlling interest.

43. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NBH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

44. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Securities Act;

b) whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and operations of NBH; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

47. A class action is superior to all other available methods for the fair and efficient

10

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 11 of the Securities Act Against All Defendants

48.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

49.     This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

50.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

51.     The Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

52.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

53.     By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the Securities Act.

54.     Plaintiff acquired NBH shares pursuant and/or traceable to the Registration Statement.

55.     Plaintiff and the Class have sustained damages.

Return to TOC

56.     When they acquired their NBH shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### Violation of Section 15 of the Securities Act Against the Individual Defendants

57.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

58.     This count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

59.     The Individual Defendants each were control persons of NBH by virtue of their positions as directors and/or senior officers of NBH immediately prior to the IPO. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of NBH.

60.     The Individual Defendants were critical to effecting the Spin-Off, based on their signing and/or their authorization of the signing of the Registration Statement, by participating to execute the Spin-Off, and by having otherwise directed through their authority the processes leading to execution of the Spin-Off.

61.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

12

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages to Plaintiff and members of the Class pursuant to Section 11 of the Securities Act;

C.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


DATED: March 15, 2024               **LEVI & KORSINSKY, LLP**


                                    /s/ Adam M. Apton
                                    Adam M. Apton
                                    33 Whitehall Street, 17th Floor
                                    New York, NY 10004
                                    Tel: (212) 363-7500
                                    Fax: (212) 363-7171

                                    *Attorneys for Plaintiff Todd Targgart*

# CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Todd Targgart, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed a complaint filed in the action and adopt its allegations.

2.     I did not purchase and/or acquire the security that is the subject of this action at the direction of counsel or in order to participate in this action.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My acquisitions of Next Bridge Hydrocarbons, Inc., shares, which are the subject of this litigation, are:

         12/13/2022    16,500 shares exchanged from Meta Materials Preferred Stock (CUSIP 59134N203 to CUSIP 591994371)

5.     Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6.     I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 15, 2024.

Todd Targgart (Mar 15, 2024 06:41 PDT)

Todd Targgart

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN BRDA,
GEORGIOS PALIKARAS,

Defendants.

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

### I.    <u>SUMMARY</u>

1.    Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.    Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3.      To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4.      As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5.      Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

Return to TOC

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6. As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7. Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8. When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

3

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger—Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9.      By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10.     For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.      JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12.     This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13.     Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

4

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

## III.     DEFENDANTS

15.     Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

5

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

## IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

## V.     FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

6

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

7

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.     As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

Return to TOC

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B.   Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26.     To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing—Torchlight's primary asset aside from its oil and gas leases.

27.     Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

**C. Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

10

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32.     By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33.     In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

Return to TOC

34.     Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35.     Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36.     Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

<div align="center">12</div>

37.     Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.     Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.     Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.     Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred

Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the

potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with

negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the

Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate

Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41.     To illustrate, Torchlight's definitive proxy statement described the purported

"reasons" and "factors" that Torchlight's board (including Brda) considered in both approving

the merger and Preferred Dividend and recommending that shareholders approve the same. The

proxy statement repeatedly states that the supposed "reason" for approving and proposing the

Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to

retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false,

or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and

subsequent public filings that the reason—or at least a reason—that Torchlight and Brda

considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze

and/or to temporarily increase Torchlight's stock price.

42.     Similarly, Torchlight's definitive proxy statement also stated that "[t]he

*anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the

Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas

assets] after the consummation of the [merger]." (emphasis added). Again, this statement was

false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy

statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend

was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

14

Return to TOC

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.     Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.     Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

15

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.     The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements—about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

17

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of
Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM
Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to
deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of
the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were
misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false
and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private
communications to select investors, indirect promotion of a short squeeze on social media, and
private coordination with Brda—while simultaneously failing to publicly disclose to the market
his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed
Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing
to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous
Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor
Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot
from a recording of the call and a synopsis of four takeaways from Palikaras' private statements
on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record
Date would "create a short squeeze as there are many short stocks to cover before the merger!!"
Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda
and other members of Meta I's management, angrily demanding that investor relations personnel
contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

18

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

## E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

51.     In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.     Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.     Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

Return to TOC

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

21

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59.     Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60.     For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61.     As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … there will be a **potential jump towards the close**, it's called a short squeeze… (emphasis added).

62.     In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.     For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze... yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.     On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



23

65.     Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.     Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67.     As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

24

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

     ***i.   Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.***

     68.   In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

     69.   Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

<div align="center">25</div>

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

26

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the

Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company will use commercially reasonable efforts to sell the O&G Assets [within six months of the merger closing]. Torchlight stockholders of record as of the Series A Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of Series A Preferred Stock…. Holders of shares of Series A Preferred Stock may receive Asset Sale Dividends from any Asset Sale Transactions consummated [within six months of the merger closing], and may also receive a Spin-Off Dividend of any Remaining Assets that have not been sold in an Asset Sale Transaction [within six months of the merger closing].

74.     These statements were made repeatedly in Torchlight's proxy materials. The

company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half

dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its

preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.     These statements and representations made by Brda in Torchlight's public filings,

proxy statements, and press releases were false and misleading at the time they were made. As

Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas

assets and had taken no actions to lay the groundwork for a sale when the statements were made.

Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for

years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number

of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records

do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise,

during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects

that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.     Without any identified buyers or ongoing negotiations, Brda knew, or was

severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.     In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.     Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity")**. He did not publicly disclose these plans.

79.     Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

28

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80.     By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81.     Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

### ii.   Palikaras made false statements about the value of the Preferred Dividend.

82.     On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83. First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84. Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85. As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86. By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

30

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.     After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.     Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

## G.  Defendants Succeeded In Manipulating The Price Of Torchlight Stock.

89.     As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.     On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

31

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend—which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93.     Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94.     The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95.     Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96.     Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97.     Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

33

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

### H.  Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.    Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99.    Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100.    Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

34

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101.    Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

102.    Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103.    More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104.    Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… *We have two days to take advantage of the squeeze*, today should have been a 5 million share day at 6[.]" (emphasis added).

35

105.    Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106.    Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107.    Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

36

## I. Brda Profited From The Fraudulent Scheme.

108.    Brda profited off his fraudulent scheme and false and misleading statements to investors.

109.    On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.    Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111.    Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

Return to TOC                                                                                                    APP1-520

## VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
***(Against All Defendants)***

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

Return to TOC

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116. With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

*(Against All Defendants)*

118. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119. Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120. Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

Return to TOC

by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

122.     With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]**

*(Against All Defendants)*

124.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

125.     As further described and alleged in paragraphs 39-46 and 67-81 above, Torchlight's proxy statements contained false or misleading statements and/or omissions of material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval via the proxy statements containing false or misleading statements or omissions of material fact.

40

126.     As further described and alleged in paragraphs 82-88 above, Palikaras  solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.     By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.     With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

Return to TOC

129.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**
***(Against Brda)***

130.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.     At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.     As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.     As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

42

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134. By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135. By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136. By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

## FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

*(Against Brda)*

137. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138. As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.    Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

Return to TOC

142.     By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143.     By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII.     PRAYER FOR RELIEF

144.     WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

- Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

- Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

- Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

Return to TOC

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.   **JURY DEMAND**

145.    The SEC demands trial by jury in this action on all issues so triable.


Dated: June 25, 2024                    Respectfully submitted,


/s/ *Patrick Disbennett*
Patrick Disbennett (*pro hac vice* application pending)
Christopher Rogers (*pro hac vice* application pending)

U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

46



**United States Government Accountability Office**

## Report to Congressional Committees

**November 2024**

# SECURITIES REGULATION

# SEC's Oversight of the Financial Industry Regulatory Authority



# GAO Highlights

Highlights of GAO-25-107723, a report to congressional committees

**November 2024**

# SECURITIES REGULATION

## SEC's Oversight of the Financial Industry Regulatory Authority

## Why GAO Did This Study

FINRA, a self-regulatory organization, regulates more than 3,300 securities firms doing business with the public in the U.S. SEC oversees FINRA's operations and programs.

Section 964 of the Dodd-Frank Wall Street Reform and Consumer Protection Act includes a provision for GAO to triennially report on specified aspects of SEC's oversight of FINRA. GAO issued prior reports in May 2012 (GAO-12-625), April 2015 (GAO-15-376), July 2018 (GAO-18-522), and a sensitive report in July 2021 (GAO-21-576SU) that was followed by a public version in December 2021 (GAO-22-105367).

This report examines the (1) extent to which SEC's oversight in fiscal years 2021–2023 included the areas specified in Section 964 and ways in which it incorporated changing risks, and (2) SEC's steps to assess recent changes to its FINRA oversight.

GAO examined case files for SEC reviews of FINRA for fiscal years 2021–2023; reviewed SEC policies, procedures, and analyses; and interviewed SEC and FINRA staff.

View GAO-25-107723. For more information, contact Michael E. Clements at (202) 512-8678 or ClementsM@gao.gov.

## What GAO Found

In fiscal years 2021–2023, the Securities and Exchange Commission (SEC) initiated 21 program inspections of the Financial Industry Regulatory Authority, Inc. (FINRA). These inspections covered eight of the 10 issue areas specified in Section 964 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, including conflicts of interest management and transparency of governance. SEC covered the remaining two areas (former FINRA employees and advertising by FINRA members) in an inspection before 2021, and in a separate review in 2023, respectively. To identify changing risks and priorities for its inspections and examinations, SEC conducts annual planning that incorporates stakeholder input and assesses potential risks. SEC also identifies emerging risks through ongoing monitoring of FINRA, which includes its tips, complaints, and referrals process.



Section 964 Areas Covered in SEC Program Inspections of FINRA Initiated in Fiscal Years 2021–2023

Source: GAO analysis of SEC data. | GAO-25-107723

In 2022, SEC established new outcome-based performance measures and goals in response to a prior GAO recommendation. SEC reported meeting its performance goals. For example, SEC met its target for findings for which FINRA agreed to take corrective action.

This is a public version of a sensitive report GAO issued in July 2024. GAO omitted from this report information that SEC deemed sensitive.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 5 |
| | SEC's Reviews of FINRA in Fiscal Years 2021–2023 Covered Areas Statutorily Specified in the Dodd-Frank Act | 7 |
| | To Assess Its Recent Changes, FSIO Analyzed Its FINRA Findings against New Performance Measures | 9 |
| | Agency Comments and Our Evaluation | 11 |
| Appendix I | U.S. Securities and Exchange Commission | 12 |
| Appendix II | GAO Contact and Staff Acknowledgements | 13 |
| Table | | |
| | Table 1: FSIO Performance Measures and Goals | 10 |
| Figure | | |
| | Figure 1: Section 964 Areas Covered in SEC Program Inspections of FINRA Initiated in Fiscal Years 2021–2023 | 8 |

### Abbreviations

| | |
|---|---|
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| FINRA | Financial Industry Regulatory Authority, Inc. |
| FSIO | FINRA and Securities Industry Oversight |
| SEC | Securities and Exchange Commission |
| TRENDS | Tracking and Reporting Examination National Documentation System |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

November 12, 2024

The Honorable Sherrod Brown
Chairman
The Honorable Tim Scott
Ranking Member
Committee on Banking, Housing, and Urban Affairs
United States Senate

The Honorable Patrick McHenry
Chairman
The Honorable Maxine Waters
Ranking Member
Committee on Financial Services
House of Representatives

The securities industry is generally regulated by direct Securities and Exchange Commission (SEC) regulation and industry self-regulation with SEC oversight. Self-regulatory organizations, such as national securities exchanges and associations, perform much of the day-to-day oversight of the securities markets. SEC oversees self-regulatory organizations to ensure they carry out their regulatory responsibilities—for example, by conducting examinations to improve compliance, prevent fraud, monitor risk, and inform policy.

The Financial Industry Regulatory Authority, Inc. (FINRA) is a self-regulatory organization registered with SEC as a national securities association. It oversees all securities broker-dealers doing business with the public in the United States (more than 3,300 firms as of 2022).[1] FINRA writes rules to govern these firms and their representatives and examines for and enforces broker-dealer compliance with FINRA rules and federal securities laws. In addition, it conducts market surveillance on U.S.-listed equities and U.S.-listed options. Given the scope of FINRA's regulatory responsibilities, ensuring that it carries out these

---

[1]The Securities Exchange Act of 1934 defines a broker as any person engaged in the business of effecting transactions in securities for the account of others, and a dealer as any person engaged in the business of buying and selling securities for his or her own account, through a broker or otherwise. 15 U.S.C. § 78c(a)(4)(A) and 15 U.S.C. § 78c(a)(5)(A). A broker or dealer doing business with the public must be registered with a national securities association. Because FINRA is the only national securities association for the securities industry, all brokers or dealers doing a public business must be FINRA members.

responsibilities is critical to SEC's mission to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation.

Section 964 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) includes a provision for us to evaluate SEC's oversight of national securities associations registered under Section 15A of the Securities Exchange Act of 1934, a provision that applies to FINRA.[2] Specifically, Section 964 identifies 10 areas of SEC's oversight of FINRA for our review:[3]

1. Governance of FINRA, including the identification and management of conflicts of interest.

2. Examinations performed by FINRA, including the expertise of examiners.

3. Executive compensation practices of FINRA.

4. Arbitration services provided by FINRA.

5. Reviews performed by FINRA of advertising by its members.

6. Cooperation with and assistance to state securities regulators by FINRA.

7. Use of funding to support FINRA's mission, including the methods and sufficiency of funding, how FINRA invests funds pending use, and the impact of these aspects on FINRA's regulatory enforcement.

8. Policies on the employment of former employees of FINRA by regulated entities.

9. Effectiveness of FINRA rules.

10. Transparency of FINRA governance and activities.

---

[2]Pub. L. No. 111-203, § 964(a), 124 Stat. 1376, 1910 (2010) (codified at 15 U.S.C. § 78d-9(a)). The National Futures Association is also registered as a national securities association, as specified in Section 15A(k) of the Securities Exchange Act of 1934, but only for the purpose of regulating activities of National Futures Association members registered as brokers or dealers in security futures products under Section 15(b)(11) of the act. Because the Commodity Futures Trading Commission is the association's primary regulator (SEC has limited direct oversight of the association), we do not consider the National Futures Association to fall under the Section 964 provision to evaluate SEC oversight of national securities associations.

[3]Section 964 also states we may include any other issues that have an impact, as determined by the Comptroller General, on the effectiveness of such national securities associations in performing their mission and in dealing fairly with investors and members.

Return to TOC

Section 964 also specifies that we conduct the first of these reviews no later than 2 years after the enactment of the Dodd-Frank Act (which was in 2010) and every 3 years thereafter. We previously issued reports in 2012, 2015, 2018, and 2021.[4] The 2021 report reviewed SEC's use of inspections and examinations to oversee FINRA.

This report examines the (1) extent to which SEC's oversight has included the Section 964 areas since fiscal year 2021 and ways in which SEC incorporated changing risks into this oversight, and (2) steps SEC took to assess recent changes to its FINRA oversight.

This report is a public version of a sensitive report we issued on July 19, 2024.[5] The sensitive report's first objective included information on specific examination and inspection topics. SEC deemed some of this information to be sensitive. Thus, this public report omits certain information related to SEC's inspections and examinations of FINRA and the specific topics covered in those reviews. The sensitive report also included an objective describing specific findings from SEC inspections and examinations of FINRA, as well as information on the significance of those findings. SEC determined that such information is sensitive, and this report therefore omits it.

The sensitive report's third objective included more detailed information on performance metrics and goals for SEC's FINRA and Securities Industry Oversight (FSIO) program, which SEC determined to be sensitive information. Thus, some specific details about FSIO's performance goals and metrics have been omitted from this public report. Finally, the sensitive report included an appendix describing the scope and findings of an inspection that SEC initiated in 2023. SEC determined that this information was sensitive, and this public report therefore omits that appendix. Although the information provided in this report is more

---

[4]GAO, *Securities Regulation: Opportunities Exist to Improve SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-12-625 (Washington, D.C.: May 30, 2012); *Securities Regulation: SEC Can Further Enhance Its Oversight of FINRA*, GAO-15-376 (Washington, D.C.: Apr. 30, 2015); *Securities Regulation: SEC Inspections of Financial Industry Regulatory Authority's Governance Were Consistent with Internal Guidance*, GAO-18-522 (Washington, D.C.: July 18, 2018); and *Securities Regulation: SEC Could Take Further Actions to Help Achieve Its FINRA Oversight Goals*, GAO-22-105367 (Washington, D.C.: Dec. 15, 2021). The December 2021 report was a public version of a sensitive report (GAO-21-576SU) we issued in July 2021. The July 2021 report included certain information that SEC determined was confidential supervisory information.

[5]GAO, *Securities Regulation: SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-24-106965SU (Washington, D.C.: July 19, 2024).

limited, it uses the same methodology as the sensitive report for the objectives included.

To address our first objective, we reviewed case files for the 21 program inspections of FINRA that SEC initiated from fiscal years 2021 (when we completed our last review) through 2023.[6] The files we reviewed included materials such as scoping, planning, and closing memorandums; documentation of findings; and written correspondences between SEC and FINRA. To assess the extent to which these program inspections reflected the Section 964 areas, we reviewed SEC's determinations of Section 964 coverage as recorded in its Tracking and Reporting Examination National Documentation System (TRENDS) database and confirmed the accuracy of those determinations in our independent review of the program inspection documentation.[7] We recorded and compared the results using a data collection instrument.

We also interviewed SEC and FINRA officials and reviewed documentation related to the annual priority planning process for program inspections conducted by FSIO. This documentation included FSIO's risk-based planning framework, its strategic plans, and its inspections and oversight examinations plans.

To address our second objective, we reviewed documentation on policies and procedures FSIO implemented in fiscal year 2023 for categorizing and tracking findings from examinations and inspections. We also reviewed FSIO's April 2024 analysis of its fiscal year 2023 findings and its new outcome-oriented performance measures and goals.[8] In addition, we interviewed SEC officials on FSIO's development and implementation of its new policies and procedures, as well as its steps to assess selection and use of corrective action reviews (which follow up on previous findings).

---

[6]The scope of the case file review was limited to program inspections and did not include other types of SEC examinations and inspections.

[7]To assess the reliability of SEC's TRENDS database, we reviewed previous assessments of the database, as well as the most recent version of the TRENDS user guide. We also interviewed SEC officials about any significant changes or upgrades to the system since 2021. We determined the TRENDS data were reliable for tracking SEC's coverage of the Section 964 areas.

[8]The scope of this analysis was examination and inspections "approved" in fiscal year 2023, which SEC defines as occurring once a "deficiency letter" or a "no further action" letter is sent to FINRA.

Return to TOC                                                                        APP1-536

We conducted this performance audit from July 2023 to July 2024 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. We subsequently worked with SEC from July 2024 to November 2024 to prepare this public version of the original sensitive report. This public version also was prepared in accordance with those standards.

# Background

## SEC Oversight of FINRA

SEC oversees FINRA through its Division of Examinations and Division of Trading and Markets. The Division of Examinations administers SEC's nationwide examination and inspection program for registered self-regulatory organizations, broker-dealers, transfer agents, clearing agencies, investment companies, and investment advisers. The Division of Trading and Markets monitors the securities market and provides oversight of the major securities market participants, including self-regulatory organizations (such as FINRA, credit rating agencies, and clearing agencies). Trading and Markets also oversees FINRA's rulemaking process and reviews and approves or disapproves proposed FINRA rules on behalf of the Commission pursuant to delegated authority.[9]

Within the Division of Examinations, FSIO has responsibility for oversight of FINRA and of the Municipal Securities Rulemaking Board, a self-regulatory organization for the municipal securities market. The Division of Examinations' mission is to improve compliance, prevent fraud, monitor risk, and inform policy.

FSIO's oversight activities fall under six main categories:

- **Program inspections** review FINRA operations and program areas. For example, fiscal year 2023 inspection topics included areas identified in Section 964 such as transparency and conflict of interest management.

---

[9]17 C.F.R. § 200.30-3(a)(12).

Return to TOC

- **Thematic oversight examinations** review particular regulatory areas across a number of FINRA member firm examinations.

- **Broker-dealer oversight examinations** review specific examinations that FINRA conducted of member firms. FSIO typically initiates an oversight examination based on a referral from the Division of Examinations' Broker-Dealer and Exchange Examination Program. For example, this program may alert FSIO when an examination of a broker-dealer uncovers potential deficiencies FINRA did not identify during one of its own examinations. Other SEC offices or outside sources sometimes also make referrals.

- **Corrective action reviews** are inspections intended to follow up on previously identified significant deficiencies and the status of FINRA's corrective actions. FSIO has conducted corrective action reviews since fiscal year 2021. It initiates these reviews based on the findings' level of significance and the appropriateness of a follow-up.

- **Tips, complaints, and referrals** are allegations or statements of concern about suspected violations of securities laws or wrongdoing received by SEC. FSIO reviews those related to FINRA by evaluating facts and circumstances, conducting research, and assessing the underlying issue. The reviews may result in FINRA inspections or examinations or be used for inspection-planning purposes.

- **Monitoring meetings** are held periodically with departments and program offices in FINRA. FSIO identifies specific topics for the meetings based on key risk areas. FSIO receives updates on the operations of the various FINRA programs and discusses with FINRA management current risks, known issues, and ongoing initiatives.

In addition, as part of its oversight function, SEC's Division of Trading and Markets has a process for reviewing rules proposed by FINRA. During this process, SEC staff determine whether the proposed rule is consistent with the requirements of the Securities Exchange Act of 1934.

| FSIO's New Findings Categories and Performance Management | In December 2021, we recommended that SEC establish performance measures for FINRA oversight that reflect leading practices. We also recommended it develop policies and procedures for tracking, identifying, and communicating the significance of examination findings.[10] In June 2022, FSIO fully implemented these recommendations. |

---

[10] GAO-22-105367.

In doing so, FSIO began assigning each of its examination or inspection findings a level that indicates the significance of its impact. As of October 2022 (which was the beginning of fiscal year 2023), FSIO began using these levels in communications to FSIO management at the close of an examination or inspection. FSIO also has used the significance levels internally to track ongoing corrective actions and communicate to management, and as factors in its outcome-based performance measures.[11]

# SEC's Reviews of FINRA in Fiscal Years 2021–2023 Covered Areas Statutorily Specified in the Dodd-Frank Act

## FSIO's Oversight Activities Covered Areas Specified in the Dodd-Frank Act

We reviewed FSIO's 21 program inspections of FINRA initiated in fiscal years 2021–2023.[12] SEC is not required to cover each of the 10 issue areas listed in Section 964, but FSIO officials told us they try to address these areas and consider them during their annual priority planning process. We determined that FSIO covered eight of the 10 issue areas in those inspections (see fig. 1). FSIO covered one of the remaining Section 964 areas (employment of former FINRA employees) in an inspection initiated prior to fiscal year 2021 (and completed in fiscal year 2023).[13] It covered the other area (advertising by FINRA members) in a separate 2023 review.

SEC inspections most commonly addressed the Section 964 area relating to transparency of FINRA governance and activities (nine of 21 inspections).

[11]SEC deemed specific information about the significance levels to be sensitive. As such, this report omits this information.

[12]We did not include broker-dealer oversight examinations, thematic oversight examinations, or corrective action reviews in the scope of our review of SEC's coverage of Section 964 issue areas.

[13]Section 964 defines the former employees issue area as related to policies on the employment of former employees of FINRA by regulated entities.

Return to TOC
APP1-539



**Figure 1: Section 964 Areas Covered in SEC Program Inspections of FINRA Initiated in Fiscal Years 2021–2023**

FINRA = Financial Industry Regulatory Authority, Inc.
SEC = Securities and Exchange Commission

Source: GAO analysis of SEC data. | GAO-25-107723

Twelve of the 21 program inspections addressed multiple Section 964 areas. For example, one review covered four Section 964 areas: coordination with state securities administrators, funding, governance/conflicts of interest management, and transparency.

## FSIO Has Incorporated Changing Risks into Its Oversight of FINRA

FSIO incorporates changing and emerging risks in its annual inspections and oversight examinations plan through its priority planning process and its ongoing monitoring of FINRA.

FSIO has used its priority planning process to identify risks and make decisions on the selection of topics for examinations and inspections in the upcoming fiscal year. FSIO leadership begins this process by soliciting input on potential priorities from other SEC divisions and offices, including the Trading and Markets and Enforcement divisions, other

groups in the Division of Examinations, and FSIO staff and working groups. Based on input collected through this process, FSIO creates a final list of fiscal year priorities.

FSIO also incorporates changing and emerging risks into its oversight through its ongoing monitoring of FINRA, which includes responding to tips, complaints, and referrals.

## To Assess Its Recent Changes, FSIO Analyzed Its FINRA Findings against New Performance Measures

To assess the use of its new significance levels for its FINRA inspection and examination findings, in April 2024 FSIO completed an analysis of its fiscal year 2023 findings and performance. The analysis compared those findings against FSIO's new outcome-oriented performance measures and goals (see table 1).[14] In response to a GAO recommendation, in October 2022 FSIO implemented these measures and goals to improve and better assess its oversight of FINRA.[15]

---

[14]SEC deemed specific details about FSIO's performance measures and goals to be sensitive. As such, the information was omitted from this report.

[15]GAO-22-105367. We recommended that FSIO develop performance measures that reflect leading practices, including measuring progress in achieving its mission, setting targets against which actual performance can be measured, incorporating key elements of its oversight activities, and providing information on the outcomes of program activities related to its stated mission goals and objectives. The recommendation was fully implemented.

**Table 1: FSIO Performance Measures and Goals**

| Performance measures | Performance goals |
| --- | --- |
| Percentage of findings for which FINRA agreed to take corrective action to remedy or address findings at or above a specified significance level | **Goal 1:** FINRA agrees to take corrective action on a targeted percent of findings at or above a specified significance level. |
| Percentage of findings at or above a specified significance level for which FINRA implemented corrective action within a targeted time frame after committing to implement the corrective action. | **Goal 2:** FINRA implements corrective action on a targeted percent of findings at or above a specified significance level within a specified period of time from the date of FINRA's response to the deficiency letter. |
| Percentage of inspections or oversight examinations initiated in response to FSIO's risk-assessment process that resulted in findings at or above a specified significance level. | **Goal 3:** A targeted percent of inspections or oversight examinations identified through the risk-assessment process will result in findings at or above a specified significance level. |

FINRA = Financial Industry Regulatory Authority, Inc.; FSIO = FINRA and Securities Industry Oversight

Source: Securities and Exchange Commission.  |  GAO-25-107723

The April 2024 analysis covered inspections and examinations for which FSIO sent a deficiency letter in fiscal year 2023.[16] The analysis reached the following conclusions:

- **FSIO met performance goals 1 and 3.** FSIO's analysis determined that FINRA agreed to remediate more than the targeted percent of findings for goal 1. Based on this, FSIO concluded that the target for goal 1 seemed appropriately set. FSIO's analysis also showed that it met goal 3's target for certain inspections and examinations resulting in findings. FSIO noted that staff would leverage additional data to inform the appropriateness of this goal's target.

- **FSIO was unable to evaluate goal 2 because there were no findings at or above a specified significance level in fiscal year 2023.** FSIO officials told us they expected such findings would be rare.

FSIO officials also said that once they have accumulated at least one more year of data, they plan to reassess the selection criteria for corrective action reviews, which include references to findings of a particular significance level.

FSIO officials noted that resource constraints are a factor determining how many reviews to conduct.

---

[16]FSIO's analysis included 19 inspections and examinations that were "approved" in fiscal year 2023. An inspection or examination is considered approved after a deficiency letter or a no further action letter is sent to FINRA.

Return to TOC                                                    APP1-542

FSIO has taken steps designed to ensure its new significance levels for findings are applied consistently across examination teams. For instance, prior to implementing the significance levels, FSIO provided training to examiners on how to apply them. In addition, the examination team collectively discusses and assigns significance levels, according to officials, so that no single examiner makes a final determination.

## Agency Comments and Our Evaluation

We provided a draft of this report to SEC for review and comment. In its written comments, reproduced in appendix I, SEC noted that it was pleased that the GAO report found that FSIO incorporated changing risks into its oversight of FINRA and that it analyzed FINRA findings against new performance measures. SEC also emailed comments that identified material that it determined to be nonpublic in three paragraphs of the draft report. We removed the sentences containing this material, which included details about FSIO's priority planning process and its implementation of performance goals and measures.

If you or your staff have any questions about this report, please contact me at (202) 512-8678 or clementsm@gao.gov. GAO staff who made key contributions to this report are listed in appendix II.

Michael E. Clements
Director, Financial Markets and Community Investment

# Appendix I: U.S. Securities and Exchange Commission



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

October 23, 2024

Michael E. Clements
Director
Financial Markets and Community Investment
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Clements:

Thank you for the opportunity to review the U.S. Government Accountability Office's (GAO) draft report concerning the Securities and Exchange Commission's (SEC) oversight of the Financial Industry Regulatory Authority (FINRA). We are pleased that the GAO found that the Division of Examinations' FINRA and Securities Industry Oversight group (FSIO) incorporated changing risks into its oversight of FINRA and that GAO recognized that FSIO analyzed its FINRA findings against new performance measures.

We appreciate the GAO's attention to these important matters and that GAO is not making any recommendations to the SEC.

Sincerely,

**Cassidy,**
**Keith**
Digitally signed by
Cassidy, Keith
Date: 2024.10.23
12:01:27 -04'00'

Keith E. Cassidy
Acting Director
Division of Examinations

# Appendix II: GAO Contact and Staff Acknowledgements

| GAO Contact | Michael E. Clements at (202) 512-8678 or clementsm@gao.gov |
|---|---|
| Staff Acknowledgements | In addition to the contact named above, John Fisher (Assistant Director), Jason Wildhagen (Analyst in Charge), Harry Bernholz, Charlene Lindsay, Marc Molino, Barbara Roesmann, Jessica Sandler, and Farrah Stone made key contributions to this report. |

Return to TOC                    APP1-545

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, X, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet:<br><br>Website: https://www.gao.gov/about/what-gao-does/fraudnet<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Sarah Kaczmarek, Managing Director, KaczmarekS@gao.gov, (202) 512-4800, U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| TODD TARGGART, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § | Case No.  4:24-cv-00767-P |
| v. | § § § | |
| NEXT BRIDGE HYDROCARBONS, INC., ROBERT L.  COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T.  HAWKINS, DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, GREGORY MCCABE, and JOHN BRDA, | § § § § § § § § | |
| Defendants. | § § § | |

---

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY DEFENDANTS NEXT BRIDGE HYDROCARBONS, INC., ROBERT L.
COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T.  HAWKINS,
DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, AND GREGORY MCCABE**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    NBH's Spin-Off. ................................................................................... 2

    B.    The O&G Assets. .................................................................................. 2

    C.    The Registration Statement. ................................................................. 3

    D.    Damages. .............................................................................................. 5

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT .................................................................................................................... 6

    A.    Defendants Argue Incorrectly that Plaintiffs Have Not Been Damaged. .............. 6

    B.    Defendants McCabe, Hawkins, and Oelkers Face Liability under Section 11. ..... 12

    C.    The Registration Statement Contained False Financial Statements, Misrepresented NBH's Internal Audit Controls, and Violated Regulation S-K's Disclosure Rules Concerning Related-Party Transactions. .......................................................... 13

        1.    Plaintiffs only need to satisfy Rule 8(a)(2)'s notice pleading standard. ... 13

        2.    The O&G Assets were not worth $47 million. ......................................... 14

        3.    NBH did not have adequate audit controls in place. ................................. 21

        4.    Defendant McCabe held an undisclosed interest in the Hazel Assets. ..... 23

    D.    NBH's Officers and Directors Are Subject to Control Person Liability. ............. 24

CONCLUSION ................................................................................................................. 25

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) ........................................................................ 9

*Akerman v. Oryx Communications, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ....................................................................... 12

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ....................................................................... 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................ 16

*Aubrey v. Barlin*,
  No. A-10-CA-076-SS, 2011 U.S. Dist. LEXIS 15332 (W.D. Tex. Feb. 16, 2011) ................. 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 6, 17

*Braun v. Eagle Rock Energy Partners, L.P.*,
  223 F. Supp. 3d 644 (S.D. Tex. 2016) ........................................................ 19

*Campton v. Ignite Rest. Grp., Inc.*,
  No. 4:12-2196, 2014 U.S. Dist. LEXIS 1751 (S.D. Tex. Jan. 7, 2014) .................... 11

*Chen v. Missfresh Ltd.*,
  701 F. Supp. 3d 236 (S.D.N.Y. 2023) ........................................................ 19

*Collmer v. U.S. Liquids, Inc.*,
  268 F. Supp. 2d 718 (S.D. Tex. 2001) ........................................................ 14

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) ................................................................... 7, 11

*In re Countrywide Financial Corp. Securities Litigation*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................. 10, 12

*FDIC v. Jacobs*,
  No. 3:13-cv-00084-RCJ-VPC, 2014 U.S. Dist. LEXIS 157449 (D. Nev. Nov. 5, 2014) ......... 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  411 F. Supp. 2d 377 (S.D.N.Y. 2006) ........................................................ 12

Return to TOC

*In re Franklin Bank Corp. Sec. Litigation*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) ..................................... 6

*Freedman v. Value Health, Inc.*,
    190 F.R.D. 33 (D. Conn. 1999) ............................................. 8

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................... 15

*G.A. Thompson & Co., Inc. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ............................................. 25

*Griffin v. GK Intelligent Sys., Inc.*,
    87 F. Supp. 2d 684 (S.D. Tex. 1999) ............................. 24, 25

*Hemmer Grp. v. Sw. Water Co.*,
    527 F. App'x 623 (9th Cir. 2013) ................................... 15, 24

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983) ............................................. 1, 7, 11, 14

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) ............................................. 8

*Home Builders Ass'n v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) ........................................... 6

*Jones v. Cain*,
    600 F.3d 527 (5th Cir. 2010) ........................................... 14

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ........................................... 14

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ........................................... 18

*In re Kosmos Energy Ltd. Sec. Litig.*,
    955 F. Supp. 2d 658 (N.D. Tex. 2013) ............................... 13

*In re Levi Strauss & Co. Sec. Litigation*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................... 11

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ........................ 23

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ........................................... 15

*In re Lottery.com, Inc. Sec. Litig.*,
    715 F. Supp. 3d 506 (S.D.N.Y. 2024) ............................... 21

iii

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................... 14

*Metz v. United Counties Bancorp*,
  61 F. Supp. 2d 364 (D.N.J. 1999) .............................................. 10

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ....................................................... 22

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ....................................... 20

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ....................................... 22

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ......................................................... 7

*In re Netsolve, Inc. Sec. Litig.*,
  185 F. Supp. 2d 684 (W.D. Tex. 2001) ....................................... 24

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
  80 F.4th 158 (2d Cir. 2023) ................................................... 21, 22

*Nykredit Portefølje Admin. v. Propetro Holding Corp.*,
  No. MO:19-CV-217-DC, 2021 U.S. Dist. LEXIS 259633 (W.D. Tex. Sep. 13, 2021) ........... 23

*Obasi Inv., Ltd. v. Tibet Pharms., Inc.*,
  931 F.3d 179 (3d Cir. 2019) ....................................................... 13

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013) ......................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................... 21

*In re Old Banc One Shareholders Securities Litigation*,
  No. 00 C 2100, 2004 U.S. Dist. LEXIS 7563 (N.D. Ill. Apr. 29, 2004) .............................. 9, 10

*P. Stolz Fam. P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ......................................................... 19

*Pappas v. Qutoutiao Inc.*,
  No. 23-1233, 2024 U.S. App. LEXIS 27250 (2d Cir. Oct. 28, 2024) ..................................... 13

*In re Perrigo Co. PLC Sec. Litig.*,
  435 F. Supp. 3d 571 (S.D.N.Y. 2020) ......................................... 20

*Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*,
  777 F. App'x 726 (5th Cir. 2019) ................................................ 23

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) ...................................................................... 21

*In re Safety-Kleen Bondholders Litigation*,
    No. 3:00-1145-17, 2002 U.S. Dist. LEXIS 29490 (D.S.C. June 14, 2002) .............................. 11

*In re Safety-Kleen Corp. Bondholders Litigation*,
    No. L 3:00-1145-17, 2002 U.S. Dist. LEXIS 26735 (D.S.C. Mar. 27, 2002) ......................... 11

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................ 20

*S.E.C. v. Kelly*,
    663 F. Supp. 2d 276 (S.D.N.Y. 2009) ..................................................................... 16

*SEC v. National Student Marketing Corp.*,
    457 F. Supp. 682 (D.D.C. 1978) ............................................................................. 9

*SEC v. World Tree Fin., L.L.C.*,
    43 F.4th 448 (5th Cir. 2022) .............................................................................. 15

*Shoen v. SAC Holding Corp.*,
    137 P.3d 1171 (Nev. 2006) ................................................................................ 13

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023) ....................................................................................... 10

*In re Snap Sec. Litig.*,
    No. 2:17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704 (C.D. Cal. June 7, 2018) ...... 12

*Truk Int'l Fund LP v. Wehlmann*,
    737 F. Supp. 2d 611 (N.D. Tex. 2009) ..................................................................... 21

*In re Unicapital Corp. Sec. Litig.*,
    149 F. Supp. 2d 1353 (S.D. Fla. 2001) .................................................................... 12

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
    No. 15-7658 (MAS)(LHG), 2021 U.S. Dist. LEXIS 180161 (D.N.J. Sep. 21, 2021) ............. 11

*Vandling v. XRC, LLC*,
    No. 3:16-CV-1399-BK, 2019 U.S. Dist. LEXIS 239972 (N.D. Tex. June 10, 2019)............. 14

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ..................................................................... 15

*Verastique v. City of Dall.*,
    106 F.4th 427 (5th Cir. 2024)............................................................................. 17

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019)............................................................................... 6

Return to TOC

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ....................................................................... 19

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ...................................................................................... 12

*Zagami v. Natural Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) ............................................................... 23, 24


**Statutes**

15 U.S.C. §77k ................................................................................................................... 10, 12


**Regulations**

17 C.F.R. §210.4-01 .............................................................................................................. 20

17 C.F.R. §230.145 .......................................................................................................... 9, 11

Return to TOC

## INTRODUCTION

Defendants violated the federal securities laws by filing a false and misleading registration statement with the U.S. Securities and Exchange Commission. The registration statement was filed on behalf of Next Bridge Hydrocarbons Inc. ("NBH"), and was intended to register shares that would be used to complete a spin-off. The registration statement, however, contained false financial statements, misrepresented NBH's internal audit controls, and concealed material related-party transactions. By statute, the mere fact that NBH's registration statement contained false statements means that "[l]iability against [Defendants] is virtually absolute." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

Defendants, led by NBH and its founder and controller Gregory McCabe, take the incredulous position that Plaintiffs' case should be dismissed because shareholders did not suffer any damages. This argument is divorced from reality. NBH's registration statement claimed that its oil and gas assets were worth $47 million (the "O&G Assets"). Investors who bought in on this representation paid upwards of $10/share before the spin-off. NBH later restated its financial statements revealing that the oil and gas assets were worth $0. Logically and legally, NBH's shares cannot be worth the same now as they were at the time of the spin-off. Investors are in no way in the same economic position today as they were before the false and misleading filing.

Plaintiffs allege that the oil and gas assets were worthless at all relevant times. In addition to relying on NBH's restatement of its financial statements, Plaintiffs also point to the fact that NBH's former parent company, Meta Materials, Inc., wrote down loans collateralized by the oil and gas assets. Plaintiffs also rely on internal correspondence by and/or on behalf of NBH and McCabe admitting that they never produced any meaningful quantities of oil and gas. Individually and collectively, these facts all support the conclusion that the oil and gas assets listed in NBH's

registration statement were never worth $47 million. Defendants argue otherwise but fail to appreciate that Plaintiffs' claims are subject to Federal Rule of Civil Procedure 8's lenient "notice pleading" standard. Consequently, Plaintiffs' allegations are more than sufficient to defeat the motion.

The facts in this case are compelling and the law is extremely favorable for Plaintiffs. Respectfully, Plaintiffs request that Defendants' motion be denied in its entirety and that they be permitted to proceed to discovery immediately.

## STATEMENT OF FACTS

### A.    NBH's Spin-Off.

NBH finds its genesis in Torchlight Energy Resources, Inc. ("Torchlight"), a publicly-traded oil and gas company operating primarily in the Orogrande Basin in West Texas. ¶¶2, 26.[1] On June 28, 2021, Torchlight merged with a Canadian technology company named Metamaterial Technologies Inc. ("Metamaterial"). ¶¶3, 32. Pursuant to the terms of the merger, Torchlight shareholders received preferred shares of stock through a special dividend that entitled them to a piece of Torchlight's oil and gas assets if/when they were sold by the combined company, Meta Materials, Inc. ("Meta Materials"). ¶¶3, 29-32. Meta Materials ultimately did not sell the O&G Assets but instead spun them off into NBH. ¶¶4, 33. Consequently, Torchlight's preferred stockholders received shares in NBH instead of proceeds from selling the O&G Assets. ¶5.

### B.    The O&G Assets.

Torchlight's oil and gas assets consisted primarily of oil and natural gas leases in the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Assets"). ¶48.[2] The importance of

---

[1] Citations to "¶__" refer to Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 41).
[2] The O&G Assets also included: minor interests in the Eastern edge of the Midland Basin in West

the Orogrande Assets first emerged in 2019 when, at that time, Torchlight claimed they comprised an estimated 3.7 billion barrels of oil.  ¶49.  Torchlight reiterated this claim over the following years, telling investors that it was focused on developing the Orogrande Assets with an estimated "3.7 billion barrels" of recoverable oil and between "5 and 8 Tcf of gas."  ¶¶50-52 (excerpts of investor presentations and tweets authored by Defendant Brda).

Meta Materials issued the preferred shares for the O&G Assets in June 2021.  ¶¶3, 32.  In October 2021, the shares started trading on over-the-counter markets under the ticker symbol "MMTLP".  ¶34.  Investors understood that the MMTLP shares represented interests in Torchlight's O&G Assets.  ¶34.  Defendant Brda, who was Torchlight's CEO prior to the merger (¶25), told shareholders that they could invest in the O&G Assets by purchasing MMTLP shares because they were "basically the same thing."  ¶34.  The MMTLP shares traded publicly from October 2021 through December 2022.  ¶34.

**C.    <u>The Registration Statement.</u>**

On July 14, 2022, while the preferred shares were trading publicly, NBH filed a registration statement on Form S-1.  ¶4.  On November 18, 2022, the SEC declared the registration statement "effective" (the "Registration Statement").  ¶4.  Unbeknownst to shareholders at the time, the Registration Statement contained the following false and/or materially misleading statements.

<u>The Registration Statement represented that the O&G Assets were worth in excess of $47 million as of September 30, 2022 (¶81)</u>.  The O&G Assets were not worth in excess of $47 million, or anything close to it at any point in time.  Plaintiffs rely on three facts to support this contention. *First*, in its 2023 annual report, NBH restated the value of the O&G Assets to zero ($0).  ¶56.

---

Texas (the "Hazel Assets"); and two minor well interests in Oklahoma (the "Oklahoma Assets").  ¶38.  The Hazel Assets and Oklahoma Assets are not at issue in this case; there is no dispute that at all relevant times they were non-producing and/or did not generate any revenue for NBH.  ¶¶42-47.

Return to TOC                                                                                          APP1-556

Companies restate financial statements to correct material errors, thereby confirming that NBH's financial statements were false when made. ¶¶57-58. *Second*, Meta Materials likewise impaired the value of the O&G Assets in its 2022 annual report immediately following the spin-off. ¶¶62-65. *Third*, the O&G Assets have always been worthless based on the fact that the Orogrande Assets have never demonstrated any capacity to produce oil or gas. The Orogrande Assets comprising the O&G Assets were located miles away from the nearest gas pipeline, had been abandoned by previous owners and co-developers, and did not produce hydrocarbons at any profitable rate. ¶¶66-76. Indeed, according to internal emails, the best well in the Orogrande Assets had been shut-in because it produced only a "[s]kim of oil (not a barrel & none sold) & very little gas." ¶77. The other wells produced only "fresh water" and, at that, "were a nightmare to drill," according to Defendant McCabe. ¶78. Furthermore, records with the Texas Railroad Commission show zero oil and zero natural gas production. ¶79.

The Registration Statement represented that its financial statements fairly presented, in all material respects, NBH's financial position and had been checked by a qualified audit committee (¶¶83-85). NBH's financial statements did not fairly present its financial position. ¶86. Instead, the Registration Statement misstated the value of the O&G Assets on NBH's financial statements, claiming they were worth in excess of $47 million when in fact they were worth $0. Furthermore, the Registration Statement contained a lengthy recitation of the roles and responsibilities belonging to NBH's Audit Committee, including its responsibility for the review of NBH's financial statements to ensure their accuracy, and management's participation in presenting NBH's financial position. These descriptions of NBH's internal processes falsely portrayed the accuracy of its financial statements and audit controls. ¶86.

In violation of Regulation S-K, the Registration Statement concealed Defendant McCabe's

4

<u>financial interest in an agreement that diverted oil and gas revenue away from NBH (the "Option</u>

<u>Agreement") (¶¶89-94)</u>.  Item 404 of Regulation S-K required NBH to disclose certain information

about related-party transactions.  ¶88.  NBH disclosed the Option Agreement but omitted

Defendant McCabe's ful financial interest in it.  Specifically, the Option Agreement required NBH

to give all revenue generated from the Hazel Assets to a third-party entity named Masterson Hazel

Partners, L.P.  ¶¶89, 90.  Absent from the Registration Statement's description of this agreement

was the fact that McCabe held a material interest in Masterson Hazel Partners, L.P.  Likewise, the

Registration Statement did not disclose the amount of money McCabe was receiving under it.

¶¶91-94.

**D.    <u>Damages.</u>**

On December 14, 2022, Meta Materials completed the spin-off of the O&G Assets into

NBH.  ¶¶5, 35.  Plaintiffs received shares in NBH believing that they owned an interest in oil and

gas assets worth over $47 million.  This turned out to be false.  The O&G Assets were in fact worth

$0.  Consequently, the preferred stockholders who received NBH shares in the spin-off ultimately

received shares in a company that was worth substantially less—actually nothing—than what was

represented in the Registration Statement.  This difference in value equates to Plaintiffs' damages

and it can be measured in several different ways, including but not limited to the change in book

value on NBH's balance sheet and/or the difference between what Plaintiffs paid for the shares

(either before the merger or while trading over-the-counter under the "MMTLP" ticker symbol)

and present market value.  *Compare* ¶56 (showing $79.7 million decrease in book value at time of

restatement) *with* ¶¶36-37 (identifying MMTLP stock sales made by Defendants McCabe and Brda

prior to spin-off at prices between $2.90/share and $11.65/share).

Return to TOC                                                                                          APP1-558

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6).  "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief."  *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

A Rule 12(b)(6) motion to dismiss should be denied where the plaintiffs plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In considering a Rule 12(b)(6) motion, "the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff."  *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).  Claims under Sections 11 and 12 are evaluated under Rule 8(a)(2)'s "notice" pleading standard.  *In re Franklin Bank Corp. Sec. Litigation*, 782 F. Supp. 2d 364, 382 (S.D. Tex. 2011).

## ARGUMENT

### A.    Defendants Argue Incorrectly that Plaintiffs Have Not Been Damaged.

Defendants' Rule 12(b)(1) motion is premised upon the absurd notion that Plaintiffs have not sustained any damages.  Defs. Br. at 9-12.  Plaintiffs' damages stem from the fact that Defendants said NBH's O&G Assets were worth $47 million when in reality they were worth $0.  *See* ¶¶81-82.  Instead of owning stock in a company with valuable oil and gas interests, Plaintiffs were left holding shares in what presently amounts to a shell company with no operational assets and no ability to generate revenue.  Contrary to Defendants' argument, Plaintiffs in no way, shape or form are in the "same economic position now as they were before."  Defs. Br. at 10.

Plaintiffs assert claims under the Securities Act, specifically Sections 11, 12(a)(2), and 15. Congress designed the Securities Act as a form of consumer protection "to assure compliance with

the disclosure provisions . . . by imposing a stringent standard of liability on the parties who play

a direct role in a registered offering." *Herman & Maclean*, 459 U.S. at 381-82.  Thus, where a

registration statement contains a misrepresentation or omits required information, "[l]iability

against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.*  This is

why courts do not require plaintiffs "to prove the precise amount of any damages at the pleading

stage.  Indeed, §11 works the other way: It presumes that any diminution in value is attributable to

the alleged misrepresentations, and places the burden on defendants to *disprove* causation."

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 167 (2d Cir. 2012)

(emphasis in original); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir.

2009) ("Once a plaintiff establishes a prima facie case under the Securities Act, loss causation is

presumed."); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("Section 11

does not require a showing of individualized loss causation, because injury and loss are presumed

under §11.").

NBH was materially less valuable at the time of the spin-off than Defendants represented,

namely due to the misrepresented valuation of the O&G Assets.  *See* ¶¶81-82.  Although this

diminution in value translates to damages, Defendants argue that Plaintiffs have no recoverable

losses because they did not pay anything for their NBH shares. Defs. Br. at 9-10.  Defendants are

wrong.  Plaintiffs paid for their NBH shares by buying Meta Materials' preferred stock while it

was trading over-the-counter under the ticker "MMTLP" and/or purchasing Torchlight shares prior

to the merger and holding it through the special dividend (which then gave them the preferred

stock).  Plaintiffs Targgart and Martinez bought thousands of shares of "MMTLP" while it was

trading over-the-counter at various prices (as low as $1.11/share and as high as $12.09/share) on

the basis that it was "basically the same thing" as NBH.  *See* ¶¶12 (Targgart spent approx.

$35,000), 14 (Martinez spent approx. $33,000), 34 (Brda tweet to investors). Plaintiff Limon meanwhile purchased thousands of shares of NBH's predecessor parent company, Torchlight, and held those shares through the merger and special dividend. *See* ¶13. In both scenarios, Plaintiffs paid for shares that were then converted into NBH stock. *See* ¶¶5, 32-35. By claiming Plaintiffs paid nothing for their stock, Defendants ignore the realities of how they came to own their shares.

Defendants also assume incorrectly that Section 11 applies only in cases involving public offering prices, *i.e.*, traditional initial public offerings. Defs. Br. at 9-10. There is no such limitation. In *Freedman v. Value Health, Inc.*, 190 F.R.D. 33 (D. Conn. 1999), the court granted class certification to plaintiffs who acquired shares of stock in a stock-for-stock merger. The plaintiffs consisted of investors who purchased shares of stock on the open market as well as those who received shares in exchange for the shares they already owned. In construing Section 11's damages provisions, the court held that plaintiffs who exchanged their shares in the merger would be "entitled to a measure of damages that relies on the market price . . . of their Diagnostek stock at the time that they exchanged it for shares of Value Health." *Id.* at 35-36. Similarly, Plaintiffs can rely on the purchase prices for their preferred "MMTLP" shares in advance of the spin-off. *See* ¶¶12-14 (including Appendices A & B listing purchase prices).

The Ninth Circuit's decision in *Hildes v. Arthur Andersen LLP*, 734 F.3d 854 (9th Cir. 2013), provides further support. In that case, the plaintiff sought leave to assert a Section 11 claim to recover losses from a stock-for-stock merger. The Ninth Circuit reversed the lower court's decision because the defendants failed to carry their "heavy burden" on the affirmative defense of "negative causation." *Id.* at 860-61. Although the plaintiff owned his shares before the registration statement for the merger was published, he could have "avoided the exchange of shares" had the "accounting irregularities" not been concealed. *Id.* at 861-62. Likewise, Plaintiffs were not

8

"obliged to obtain [NBH] stock at the time the Registration Statement was filed" but instead could

have sold the shares prior to the spin-off's completion while it was trading over-the-counter under

the "MMTLP" ticker symbol. *Id.* at 862-63 (citing *SEC v. National Student Marketing Corp.*, 457

F. Supp. 682 (D.D.C. 1978)). Importantly, Plaintiffs' exchange of "MMTLP" shares for NBH

stock in the spin-off constituted a "sale" under the Securities Act. *See* 17 C.F.R. §230.145

("transfer of assets" subject to Securities Act per Rule 145).

        The Fifth Circuit's decision in *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38

F.3d 211 (5th Cir. 1994), provides yet another example confirming that Section 11 applies

whenever a registration statement contains material misrepresentations, and not strictly in initial

public offerings with public offering prices. In that case, the Fifth Circuit reversed the lower

court's decision on summary judgment, holding that the plaintiffs' "exchange[]" of "units for

stock" constituted a sale for the purposes of stating a claim under Section 11. *Id.* at 224-25. The

Fifth Circuit also rejected the defendants' arguments on injury and causation. Although the

defendants argued that the plaintiffs "actually profited" from the transaction, the court noted it

would be "hesitant to conclude that there has been no injury--or merely speculative injury--to the

plaintiffs" based on the allegations in the complaint. *Id.* at 225 & n.17.

        This concept applies equally to Plaintiffs' Section 12 claim against NBH. In *In re Old

Banc One Shareholders Securities Litigation*, No. 00 C 2100, 2004 U.S. Dist. LEXIS 7563 (N.D.

Ill. Apr. 29, 2004), the plaintiffs sued under Sections 12 and 15 of the Securities Act for misleading

statements in a registration statement issued by the defendants in conjunction with a merger. The

court allowed the plaintiffs to pursue claims on behalf of shareholders who received shares in the

merged company through a stock-for-stock exchange. Importantly, the court held that

shareholders who purchased shares in the pre-merger company *after* the misleading registration

statement was issued, but *before* the exchange occurred, could pursue claims against the defendants because they "suffered an actual loss of the type meant to be protected under Section 12." *Id*. at *19-20.

Defendants' authority does not change the outcome on this issue. They cite *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364 (D.N.J. 1999), when arguing that the absence of an "offering price" precludes Plaintiffs from recovering damages. Defs. Br. at 9-10 (citing 15 U.S.C. §77k(g), 77k(e)). But *Metz* has been distinguished by other courts when addressing the issue at bar. For example, in *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132, 1168 (C.D. Cal. 2008), the court explained that: "The plaintiffs in *Metz* were former employees of a company that disappeared in a merger. Those plaintiffs did not plead anything that suggested 'diminution in the value of the securities involved.' . . . [T]he injuries the *Metz* plaintiffs identified were related only to their employment status and the merger conduct. Therefore, they did not allege anything suggesting an economic loss in the securities' value."

Defendants' reliance on *Metz* is also undermined by the cases cited above that allow plaintiffs to proceed with Section 11 and 12 claims in spite of there being no "offering price," *i.e.*, cases involving stock-for-stock mergers which are nearly identical to the exchange and distribution in NBH's spin-off. Moreover, as the Supreme Court noted in *Slack Technologies*, Section 11's damages provisions are "tie[d] . . . to the *value* of the registered shares alone" and not strictly the *market* price. *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767-68 (2023) (citing 15 U.S.C. 77k(e)) (emphasis added).[3] Indeed, where market price is not available, courts examine the underlying

---

[3] Defendants cite *Slack Technologies* at the end their Rule 12(b)(1) arguments when discussing Plaintiffs' ability to "trace" their shares to the Registration Statement. Defs. Br. at 11-12. Defendants' argument is misguided. Plaintiffs unquestionably received their NBH shares pursuant and traceable to the Registration Statement. NBH shares did not exist prior to the Registration Statement and Plaintiffs received their shares directly from NBH in the spin-off. *See* ¶¶5, 12-15; *see also* Dkt. No. 51, App. 140 (Registration Statement's description of "Distributed Securities").

Return to TOC                                                    APP1-563

value of the security. *See, e.g.*, *Campton v. Ignite Rest. Grp., Inc.*, No. 4:12-2196, 2014 U.S. Dist. LEXIS 1751, at *17-20 (S.D. Tex. Jan. 7, 2014) (plaintiffs adequately alleged damages by showing decrease in value irrespective of stock price).

Defendants' other authorities are equally meritless. *See* Defs. Br. at 11. In *In re Safety-Kleen Corp. Bondholders Litigation*, No. L 3:00-1145-17, 2002 U.S. Dist. LEXIS 26735 (D.S.C. Mar. 27, 2002), the court dismissed the Section 11 claims because the bonds were "unregistered" and therefore not subject to Section 11. *Id.* at *2-3. Moreover, the portion of the case relied on by Defendants was subsequently reversed on reconsideration, thereby allowing the plaintiffs to pursue the defendants for Section 11 damages. *See In re Safety-Kleen Bondholders Litigation*, No. 3:00-1145-17, 2002 U.S. Dist. LEXIS 29490, at *6-9 (D.S.C. June 14, 2002) (allowing plaintiffs to pursue Section 11 claims on behalf of "aftermarket" purchasers of bonds following "exchange and registration"). In *In re Levi Strauss & Co. Sec. Litigation*, 527 F. Supp. 2d 965, 977 (N.D. Cal. 2007), the securities transactions at issue were "exempt from any registration requirements or liability," thereby precluding the plaintiffs from pursuing Section 11 claims. Unlike these cases, NBH registered its stock thereby unquestionably subjecting Defendants to Securities Act liability. *See* 17 C.F.R. §230.145 (SEC Rule 145).

Accepting Defendants' argument would lead to an erroneous result by effectively forcing plaintiffs to plead unnecessary elements. "A prima facie case under [Section] 11 is straightforward, requiring only a showing of a material misrepresentation or omission from a defendant's registration statement." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782 (3d Cir. 2009) (citing *Herman & Maclean*, 459 U.S. at 382). Damages are not an element of the claim. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-7658 (MAS)(LHG), 2021 U.S. Dist. LEXIS 180161, at *27 (D.N.J. Sep. 21, 2021); *accord In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 778

Return to TOC

(N.D. Cal. 2020); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1168.  If anything, absence of damages constitutes an *affirmative* defense that is rarely granted at the pleading stage. *See In re Snap Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704, at *20 (C.D. Cal. June 7, 2018) ("[L]ack of damages in the complaint is an affirmative defense that places a 'heavy burden' of proof on the defense."  (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994))).  "'Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) (quoting *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 340-41 (2d Cir. 1987)).  Viewing Defendants' standing argument for what it truly is— an attempt at proving an affirmative defense on damages—the Court should reject it.

**B.     Defendants McCabe, Hawkins, and Oelkers Face Liability under Section 11.**

Section 11 allows Plaintiffs to sue "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner."  15 U.S.C. §77k(a)(3).  This most certainly includes Defendant McCabe who despite not having signed the Registration Statement, was named in it approximately 50 times.  *See generally* Dkt.  No.  51, App.  130-263.  More importantly, McCabe was at all relevant times the largest shareholder of NBH owning approximately 27.4% of its stock, owned and/or controlled the majority of NBH's O&G Assets, and became NBH's Chairman just six months after the spin-off and its CEO seven months after that.  *See* ¶23; *see also* Declaration of Adam M.  Apton ("Apton Decl."), Exhibit A (Pl. App. 003) & Exhibit B (Pl. App. 008).  These facts render McCabe a liable party under Section 11.  *See In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1366 n.21 (S.D. Fla. 2001) (allowing Section 11 claims against individual who did not sign registration statement but "qualifie[d] as someone named in the registration statement about to become a

Return to TOC

person performing similar functions to a director").

Hawkins and Oelkers served as NBH's CFO and COO. *See* ¶¶19, 20. Consequently, along with McCabe, they controlled NBH's operations, directed NBH's affairs, and owed duties of loyalty and care to NBH's shareholders. *See FDIC v. Jacobs*, No. 3:13-cv-00084-RCJ-VPC, 2014 U.S. Dist. LEXIS 157449, at *13 (D. Nev. Nov. 5, 2014) (citing *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1178 (Nev. 2006)).[4] Their roles within NBH are "similar" to that of the company's directors and, therefore, make them potentially liable under Section 11. *C.f. Obasi Inv., Ltd. v. Tibet Pharms., Inc.*, 931 F.3d 179, 189-90 (3d Cir. 2019) (holding "board observers" not "similar" to directors because they could not "direct and manage the company's affairs" and did not "owe[] duties of care and loyalty," unlike McCabe, Hawkins and Oelkers in NBH).

**C.      The Registration Statement Contained False Financial Statements, Misrepresented NBH's Internal Audit Controls, and Violated Regulation S-K's Disclosure Rules Concerning Related-Party Transactions.**

1.      Plaintiffs only need to satisfy Rule 8(a)(2)'s notice pleading standard.

Section 11 of the Securities Act "requires only notice pleading under Federal Rule of Civil Procedure 8," *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 664 (N.D. Tex. 2013), under which a complaint must raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 U.S. App. LEXIS 27250, at *3 (2d Cir. Oct. 28, 2024) (internal quotations omitted); *see also Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004) ("Section 11 only requires notice

---

[4] NBH was at all relevant times a Nevada corporation. *See* ¶15.

pleading under Fed. R. Civ. P. 8 rather than the detailed pleading mandated by Fed. R. Civ. P. 9(b) or the Private Securities Litigation Reform Act"). Plaintiffs' claims do not rely upon "averments of fraud" and, therefore, are not subject to Rule 9(b). *See* ¶80 ("The Registration Statement was negligently prepared . . . .").

Defendants do not dispute the applicability of Rule 8(a)(2) or otherwise argue that Rule 9(b) should apply to Plaintiffs' allegations. Consequently, Defendants have waived that argument and concede that Plaintiffs' allegations should be evaluated under Rule 8(a)(2). *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."); *Vandling v. XRC, LLC*, No. 3:16-CV-1399-BK, 2019 U.S. Dist. LEXIS 239972, at *10 n.3 (N.D. Tex. June 10, 2019) (refusing to consider argument "raised for the first time" in reply).

    2.   <u>The O&G Assets were not worth $47 million.</u>

The Securities Act "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering" while placing "a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 381-82 (footnotes omitted). Plaintiffs "need only show a material misstatement or omission to establish [their] prima facie case" and liability is "virtually absolute." *Id.* at 382; *see also Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 756 (S.D. Tex. 2001). A representation or omission is material if "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). Materiality is a "fact-specific" inquiry—determining "the significance of the inferences a reasonable investor would draw . . . is peculiarly within the competence of the trier of fact." *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 465 (5th Cir. 2022) (internal quotation marks and citations omitted); *see also In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 649 (S.D. Tex. 2021) ("There is no

bright-line rule" and materiality "requires a fact-intensive inquiry into 'the source, content, and context'") (citation omitted).

The Registration Statement contained financial statements (specifically, a balance sheet) stating that the value of the O&G Assets was $47,293,607 as of September 30, 2022. ¶81. This was incorrect; the value of the O&G Assets at all relevant times was $0. ¶82. Plaintiffs support this allegation with three facts: 1) NBH subsequently wrote down the value of the O&G Assets to $0 as of December 31, 2022; 2) Meta Materials similarly impaired the value of the O&G Assets $0 immediately after the spin-off was effected; and 3) historical data and internal documentation showed that the O&G Assets were worthless because, put simply, there was never produceable oil or gas. ¶82; *see also* ¶¶54-79 (alleging basis for "worthless" valuation). Plaintiffs' allegations easily satisfy Rule 8(a)(2)'s pleading requirements. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) ("[T]his is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a).").

First, Defendants restated NBH's financial statements, thereby conceding that they contained a material error. *See* ¶¶57-58 (citing ASC 250-10-50-7). "By definition, a restatement corrects financial data that was false when made. The complaint adequately alleges the originally reported financial data, the restated financial data, and the difference between the two. The complaint adequately alleges falsity." *Hemmer Grp. v. Sw. Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013); *see also Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) ("The very fact of the restatement and thus comScore's conclusion that the financials were materially misstated at the time [defendant] made alleged misrepresentations 'belies any suggestion that any misstatement or omission was not material.'" (quoting *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009))); *In re Atlas Air Worldwide Holdings, Inc. Sec.*

*Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

Second, Meta Materials similarly impaired the value of the O&G Assets. In conjunction with the spin-off, Meta Materials wrote-off notes secured (collateralized) by the O&G Assets. *See* ¶¶60-65. Thus, in addition to NBH's restatement, Meta Materials likewise recognized and told investors that the value of the O&G Assets was "not substantive." ¶61. In pertinent part, Meta Materials reported in its SEC filings that: "The note receivables have been recognized at their fair value, as of December 14, 2022 [the date of the spin-off]" and "determined that except for the security interest in our shares . . . , the other collateral [the O&G Assets] is not substantive and therefore should not serve as the basis for concluding that the loan is well secured and collateralized." ¶62. Meta Materials' balance sheet reflected a "notes receivable" value of $2.2 million based exclusively on the value of the security interest and without any value assigned to the O&G Assets. ¶¶63-65.

Third, Plaintiffs further support their claim with a detailed synopsis of the history behind the O&G Assets, showing that they never produced oil or gas volumes of value at any point in time and therefore could never have substantiated a $47 million carrying value under any acceptable method of accounting. Indeed, the Orogrande Assets (which comprised the bulk of the O&G Assets) were located far away from all commercial drilling in the Permian Basin and miles from the closest gas pipeline. ¶66. Property records for the Orogrande Assets reflected deeply discounted purchase prices, virtually no commercial interest, and instances in which the properties had been abandoned. ¶¶69-72. NBH's predecessor parent company, Torchlight, attempted to develop the Orogrande Assets but efforts proved unsuccessful and Torchlight's "wildcatting"

16

partner at the time, Founders Oil & Gas LLC, abandoned the project. ¶¶74-75. McCabe's internal correspondence provides the final nail in the coffin showing that the main three wells within the Orogrande Assets (#A35, #A25, and #A39) *never* produced meaningful amounts of oil or gas at any relevant point in time. ¶¶76-78 (McCabe and engineering partner writing in emails that wells produced "fresh water," were a "nightmare to drill," and had been shut-in); *see also* ¶79 (University Lands and Texas Railroad Commission data showing zero oil and gas production).

Rule 8's purpose is "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see Verastique v. City of Dall.*, 106 F.4th 427, 439 (5th Cir. 2024) (" . . . we require only enough details to make the plaintiff's basic claims plausible, not to affirmatively prove them."). Plaintiffs' allegations easily surpass this relatively low threshold. Notwithstanding, Defendants raise a handful of arguments in an attempt to cut this case off at the pleading stage. None has merit.

Defendants first claim NBH's balance sheet never purported to tell investors what the O&G Assets were "worth" but instead simply provided their "carrying value" under the "full-cost method of accounting." Defs. Br. at 13-14. Regardless of how Defendants want to describe it, investors saw NBH's balance sheet with the number $47,293,607 next to the O&G Assets. *See* ¶81; Dkt. No. 51, App. 262 (NBH's balance sheet). Further, the "full-cost method of accounting" allowed NBH to capitalize operating expenses related to locating and drilling new oil and gas reserves. Apton Decl., Exhibit D, ¶¶5-6 (Pl. App. 024-25).[5] However, expenses cannot be

---

[5] Exhibit D is the Declaration of Paul Parsons. Mr. Paul Parsons is a licensed CPA who specializes in oil and gas accounting. Among other things, he runs a private consulting business and teaches at the University of Texas at Austin, McCombs School of Business. Plaintiffs submit the declaration to rebut Defendants' improper and/or premature arguments concerning their "full cost" accounting defense. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018) (defendants are not "permitted to present their own version of the facts at the . . . pleading stage"). If the Court is inclined to consider Defendants' accounting defense at this time, Plaintiffs

capitalized if they were incurred in connection with a "dry hole." *Id.* at ¶¶7-10 (Pl. App. 025-27).

Moreover, NBH was required to conduct "ceiling tests," which effectively capped the value it was

allowed to report on its balance sheet for the O&G Assets. *Id.* at ¶12 (Pl. App. 027-028). NBH did

not adhere to these "ceiling test" rules, thereby resulting in overreporting the value of the O&G

Assets. *Id.* at ¶¶13-16 (Pl. App. 028-029).

Despite raising the "full-cost method of accounting," Defendants do not address the rules

or explain why NBH's balance sheet violated them.  Instead, they claim that the restatement of

NBH's financial statements was driven by "a then-impending lease expiration."  Defs. Br. at 14.

Even if this were true (it is not), the potential expiration of the O&G Assets leases on "December

31, 2024" would not have necessitated a restatement of financial statements for the year ended

December 31, 2022, according to accounting rules.  *See* ¶¶57-59.  Put simply, this alternative

explanation for the restatement defies generally accepted accounting practices and should not be

considered at the pleading stage where Plaintiffs' allegations are to be accepted as true for the

purposes of the motion.  *See Khoja*, 899 F.3d at 998-99 (defendants are not "permitted to present

their own version of the facts at the . . . pleading stage").

Defendants next argue that Plaintiffs' "real argument" concerns a failure to disclose a

"future impairment" caused by lease expirations.  Defs. Br. at 14-16.  Plaintiffs do not make this

allegation.  The complaint clearly focuses on the misstated value of the O&G Assets and not, as

Defendants claim, the risk of a future impairment caused by lease expirations.  *See* ¶¶81-82.[6]

---

respectfully request that it also consider Mr. Parsons' declaration.  Alternatively, Defendants'
motion should be denied pursuant to Federal Rule of Civil Procedure 12(d).  *See* FED. R. CIV. P.
12(d) ("[a]ll parties must be given a reasonable opportunity to present all the material that is
pertinent to the motion").
[6] The closest Plaintiffs come to discussing the expiration of the leases is to note that NBH *extended*
certain of its lease terms on November 7, 2022, which contradicts any notion that they were on the
verge of expiration.  *See* ¶40.

Return to TOC

Moreover, Plaintiffs are not asserting a "fraud-by-hindsight" theory of liability, as described in the cases cited by Defendants. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 225-26 (S.D.N.Y. 2020) (rejecting "fraud by hindsight" theory regarding "loss reserves"); *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013) ("at best, plaintiffs' theory is one of underestimation in hindsight"). Instead, Plaintiffs rely on NBH's restatement of financial statements, which supports the conclusion that the financial statements in the Registration Statement were materially incorrect at the time they were made. *See* ¶¶56-59. Warning language concerning the expiration of leases does not insulate Defendants from liability because, as alleged, the potential expiration of the leases was *not* the reason why the balance sheets should have provided a $0 value for the O&G Assets—it was that the O&G Assets had lacked produceable oil and gas. *See* ¶82.[7] Thus, Defendants' reliance on *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653 (S.D. Tex. 2016), which invokes the "bespeaks caution" doctrine, is misguided. That doctrine applies only to forward-looking statements and not to historical financial statements. *See P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 248 (S.D.N.Y. 2023) ("The bespeaks caution doctrine only applies to forward-looking statements, not historical financial results such as these.").

Defendants' next argument asserts that NBH's restatement does not prove the Registration Statement was false because it only restated financial statements dating back to December 31, 2022 (and not three months earlier to September 30, 2022). Defs. Br. at 16-17. This argument

---

[7] Defendants' reliance on lease expirations does not explain why Meta Materials wrote down the loans based on its determination that the collateral, *i.e.*, the O&G Assets, were "not substantive." ¶¶60-65. Notably, Meta Materials made this determination in its annual report for fiscal 2022, which was filed with the SEC over a year before NBH's restatement.

disregards Plaintiffs' other allegations, namely that Meta Materials marked the O&G Assets as "not substantive" as of the date of the spin-off and that O&G Assets were historically never worth anything due to the fact they did not produce any oil or gas. *See* ¶¶60-79. Defendants' argument also disregards the case law on this point, which uniformly holds that "post-class period data may be relevant to determining what a defendant knew or should have known during the class period." *See*, *e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001).

Defendants' final argument on this point tries to characterize NBH's financial statements as "inactionable opinion statements." Defs. Br. at 17-18. Defendants' argument misses the mark because NBH's financial statements were prepared incorrectly and, as such, are presumed to be misleading and inaccurate. *See* 17 C.F.R. §210.4-01(a)(1) ("[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."); *see also In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) ("Financial statements filed with the SEC which are not consistent with GAAP are presumed misleading."). The "full-cost method of accounting" rules are cut-and-dry when it comes to classifying wells as exploratory or developmental which, in turn, leads to clear determinations as to how NBH should have capitalized and/or amortized its expenses. *See* Apton Decl., Exhibit D, ¶¶6, 10, 12-16 (Pl. App. 025-29). Without any "exercise of judgment" in this regard, the balance sheet did not contain any statements of "opinion." *See In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 587 (S.D.N.Y. 2020) (rejecting *Omnicare* defense because tax liability was "established as a matter of fact" and not subject to "judgment").

The Second Circuit's decision in *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158 (2d Cir. 2023), is instructive on this point. In that case, the Second Circuit held that "the Appellants have plausibly alleged that AmTrust's method of deferring the

recognition of expenses related to bonuses until the bonuses were paid (thus delaying the charge to income) was objectively improper rather than an exercise of subjective judgment. . . .  And the fact that these GAAP standards, together or alone, are subject to misreading, misinterpretation, or misapplication, as happened here, does not necessarily mean that they entail an exercise of subjective judgment." *Id*. at 175.  Consequently, Defendants' failure to correctly account for its O&G Assets leads to the same conclusion—a false statement that did not entail an exercise of subjective judgment. *See In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 543-46 (S.D.N.Y. 2024) (holding "postmerger financial-performance-related statements" false and misleading because "'misreported financial data are false statements of fact'") (collecting cases).

While Defendants attempt to rely on *Omnicare*, the opinion statements at issue in this case are very different.  *Compare Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179-80 (2015) ("We believe our contract arrangements . . . are in compliance with applicable federal and state laws") *with* ¶81 & Dkt.  No.  51, App.  262 (NBH's balance sheet).  They are also very different than the statements at issue in Defendants' other cited authorities.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 477 (S.D.N.Y. 2017) (estimating mineral reserves); *Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 623 (N.D. Tex. 2009) (estimated proved reserves).  Even if the statements at bar were opinions (they are not), Plaintiffs' allegations still support the conclusion that the Registration Statement misled investors to conclude that NBH had a legitimate basis for valuing the O&G Assets at $47 million on its balance sheet.  *See DeCarlo*, 80 F.4th at 174 (statements about revenue from extended warranties actionable opinions because defendants' accounting for revenue was baseless).

3.    <u>NBH did not have adequate audit controls in place.</u>

NBH's description of its Audit Committee functions and management's oversight of its

Return to TOC

internal controls over financial reporting created a misleading impression, namely that the financial statements contained in the Registration Statement had been vetted and "present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with accounting principles generally accepted in the United States." ¶¶83-85. In truth, the financial statements did not fairly and accurately present NBH's financial position and were not in conformance with GAAP. ¶86. "The failure to disclose these problems in the [Registration Statement] could be found by a trier of fact to be an omission that renders misleading the comforting statements in the prospectus about [NBH's audit controls]." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014); *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (holding that a SOX certification "attesting to the accuracy of the reports, the disclosure of any weakness or change in the company's internal controls over financial reporting" was false or misleading where in fact the internal controls were deteriorating).

Defendants respond to this allegation by claiming the statements about NBH's Audit Committee could not have misled anyone because the Registration Statement was published before the Audit Committee was formed. Defs. Br. at 19. This argument is unsupported by the record. Indeed, while NBH's initial registration statement says "We *plan to establish* an audit committee," the final prospectus states "We *have established* an audit committee." *Compare* Dkt. No. 51, App. 065 *with* Dkt. No. 51, App. 197. Furthermore, even in the initial registration statement, NBH states that "Until such committees are established, matters otherwise addressed by such committees will be acted upon by the whole board" thereby communicating to investors that the Audit Committee functions were still being carried out. *See* Dkt. No. 51, App. 065. Thus, the statements at hand are not like the vague "internal processes and procedures" concerning oil spills at issue in *Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019), that were

held inactionable, but instead concrete descriptions of audit oversight and internal controls over financial reporting.  *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006).

      4.    <u>Defendant McCabe held an undisclosed interest in the Hazel Assets.</u>

Item 404 of Regulation S-K required NBH to disclose specific information in the Registration Statement concerning its transactions with related persons.  ¶¶87-88.  In violation of Item 404, the Registration Statement did not disclose that Defendant McCabe held an interest in the Hazel Assets which consisted of NBH's only revenue generating wells.  ¶89.  Specifically, while the Registration Statement disclosed that all revenue generated by the Hazel Assets was paid to Masterson Hazel Partners, LP, it concealed the fact that McCabe was a part owner of that entity.  ¶¶90-93.  Consequently, the Registration Statement violated Item 404 by failing to provide a complete description of McCabe's interests in the Hazel Assets by *inter alia* disclosing his ownership in Masterson Hazel Partners, LP.  ¶94.  The "overriding principle of disclosure" required disclosure of McCabe's full interest in the Hazel Assets agreement.  *See Nykredit Portefølje Admin. v. Propetro Holding Corp.*, No. MO:19-CV-217-DC, 2021 U.S. Dist. LEXIS 259633, at *59 (W.D. Tex. Sep. 13, 2021) (denying motion to dismiss where proxy statement omitted related party transactions); *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008) (requiring disclosure of related party transactions even though transactions might later be found immaterial by jury).

Defendants claim that disclosure was not necessary because McCabe acquired the undisclosed interest through an "Option Agreement" that was entered into prior to "the beginning of [NBH's] last fiscal year."  Defs. Br. at 21.  The date the "Option Agreement" is not determinative, however, because McCabe continued to receive money from NBH under its terms throughout 2021.  Additionally, while Defendants fault Plaintiffs for failing to plead that McCabe's

    

interest exceeded the $120,000 threshold (Defs. Br. at 21), that argument overlooks the materiality of the interest in light of the fact that the Hazel Assets were the *only* revenue producing oil and gas interests owned by NBH.  *See Zagami*, 540 F. Supp. 2d at 711 ("it does not follow that, because certain dollar amounts might be immaterial in one context, they are necessarily immaterial in the context of the present litigation").

**D.**     **NBH's Officers and Directors Are Subject to Control Person Liability.**

Plaintiffs adequately pleaded Section 11 and 12 violations against Defendants, meaning that control person liability under Section 15 attaches.  *See In re Netsolve, Inc.  Sec.  Litig.*, 185 F. Supp. 2d 684, 699 (W.D. Tex. 2001); *Griffin v. GK Intelligent Sys., Inc.*, 87 F. Supp. 2d 684, 689 (S.D. Tex. 1999) (defendants included vice president, chief financial officer and chief administrative officer "had actual power or influence over GK and the ability to control corporate policy").  Each of the Individual Defendants had the power to control, or did control, NBH prior to and during the spin-off.  *See* ¶¶16-23, 113.

"At the pleading stage, Plaintiffs must only show authority to exercise such power, rather than actual exercise of such power.  Here, the complaint sufficiently alleges that the executives were control persons based on their role in the company."  *Hemmer Grp.*, 527 F.  App'x at 627. The complaint confirms that Defendants Cook, DuBose, DeWoody, Pitts, and Whitley were NBH's directors during or immediately after the spin-off (¶¶16-18, 21-22) and Defendants Hawkins and Oelkers served as NBH's CFO and COO (¶¶19-20).  McCabe, meanwhile, controlled NBH's O&G Assets at all relevant times, thereby giving him power to control the company (not to mention he also owned 27.4% of NBH's stock and assumed the positions of Chairman and CEO after the spin-off).  ¶23.  These allegations suffice for establishing control-person liability.  *See Griffin*, 87 F. Supp. 2d at 689; *see also G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945,

958 (5th Cir. 1981) ("control person" liability for a corporate officer who was a 24% stockholder, an officer, a director, and who was involved in the day-to-day operations of the business because he had the "requisite power to directly or indirectly control or influence corporate policy"); *Aubrey v. Barlin*, No. A-10-CA-076-SS, 2011 U.S. Dist. LEXIS 15332, at *15-16 (W.D. Tex. Feb. 16, 2011) (declining to dismiss control person claim at pleading stage where defendant was founder and active owner of corporation).

Defendants try to shift the blame onto Meta Materials' executives. Defs. Br. at 23-24. However, their argument is contradicted by the Registration Statement, which explains that NBH was at all relevant times prior to the spin-off "operated" by or through companies owned and/or controlled by McCabe—Torchlight Energy, Inc., Hudspeth Oil Corporation, Torchlight Hazel, LLC, and Hudspeth Operating, LLC. *See* Dkt. No. 51, App. 173. Consequently, Defendants have no basis for accusing Meta Materials' executives of being responsible for the day-to-day operations and control of NBH's business.

## CONCLUSION

Plaintiffs respectfully request that Defendants' motion be denied in its entirety for the reasons set forth above.

*[Signature blocks on following page]*

25

DATED: November 13, 2024

**MOSES, PALMER & HOWELL, L.L.P.**

/s/ Shayne D. Moses
Shayne D. Moses
State Bar No. 14578980
smoses@mph-law.com
David A. Palmer
State Bar No. 00794416
dpalmer@mph-law.com
Fort Worth Club Building
306 West 7th Street, Suite 504
Fort Worth, Texas 76102
Tel.: (817) 255-9101
Fax: (817) 255-9199
Email: smoses@mph-law.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*admitted pro hac vice*)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs and*
*Lead Counsel for the Class*

26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| - v - | Civ. Action No. 4:24-cv-1048 |
| | Hon. Sean D. Jordan |
| JOHN BRDA, GEORGIOS PALIKARAS, | |
| Defendants. | |

## DEFENDANT JOHN BRDA'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

REQUEST FOR ORAL ARGUMENT ...................................................................... 1

INTRODUCTION ............................................................................................... 1

ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS .................................... 5

I.     Overview of Entities ................................................................................ 5

II.    Public Disclosures ................................................................................... 5

     A.    Announcement of Proposed Merger and Special Dividend..................... 5

     B.    Definitive Agreement............................................................................ 6

     C.    Torchlight Proxy Statements................................................................. 7

III.   The Italian Call and Other Public Information ........................................ 8

IV.   The Dividend Record Date and June 2021 ATM Offering......................... 10

LEGAL STANDARDS ....................................................................................... 11

ISSUES TO BE DECIDED ................................................................................. 12

LEGAL ARGUMENTS ...................................................................................... 12

I.     The SEC Fails to Plead Scheme Liability (Counts I and II)......................... 12

     A.    The Alleged Acts Do Not Constitute Deceptive Conduct. ..................... 13

          i.     The Preferred Share Dividend. ................................................ 15

          ii.    Informal Commentaries Regarding a Potential Short Squeeze................. 17

          iii.   The ATM Offering......................................................................... 18

     B.    Allegations of 'Intent Only' Manipulation Cannot Show Deceptive Conduct..... 20

     C.    The SEC Fails to Allege Scienter. ......................................................... 23

II.    The SEC Fails to Plead An Actionable Misrepresentation........................... 24

     A.    "Commercially Reasonable Efforts" Statements Were Not Materially False. ..... 25

          i.     The SEC has Not Pled the Required State of Mind................................ 25

          ii.    The Forward-Looking Statements are Protected by the Bespeaks Caution Doctrine and are Non-Actionable Puffery. ................................................ 28

          iii.   The Statements Were Not False When Made. ........................................ 30

     B.    Mr. Brda is not a "Maker" of any Statement at the Italian Call........................... 31

III.   The SEC Does Not Plead Any Negligence-Based Theory (Count I). ............. 33

IV.   SEC Fails to Allege a Proxy Fraud Claim (Count III)..................................... 34

V.    The SEC Fails to Sufficiently Allege an Aiding and Abetting Claim. ............. 36

     A.    The Section 13(a) False Filing Claim Fails (Count IV)........................................ 36

B.    The SEC Fails to Allege an Accounting or Internal Controls Violation. ............. 37

       i.    Section 13(b)(2)(A)—Books and Records................................................ 37

      ii.    Section 13(b)(2)(B)—Internal Accounting Controls............................... 38

VI.    Disgorgement And Officer/Director Bar Relief Should Be Stricken. ............................. 39

CONCLUSION.................................................................................................................... 40

# TABLE OF AUTHORTIES

**Page(s)**

**Cases**

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005) ....................................................................24

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ............................................................................23

*Ashland Inc. v. Morgan Stanley & Co.*,
652 F.3d 333 (2d Cir. 2011) .............................................................................29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .......................................................................*passim*

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ......................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .........................................................................................11

*Biesenbach v. Guenther*,
588 F.2d 400 (3d Cir. 1978) .............................................................................23

*Bisel v. Acasti Pharma, Inc.*,
2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022) ...................................................36

*Brady v. Top Ships Inc.*,
2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel*, 806 F.
App'x 64 (2d Cir. 2020) ...............................................................................22, 23

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
748 F.3d 631 (5th Cir. 2014) ..............................................................................9

*Brickman v. Tyco Toys, Inc.*,
731 F. Supp. 101 (S.D.N.Y. 1990) .....................................................................23

*Burback v. Brock*,
2023 WL 4532803 (5th Cir. July 13, 2023) (per curiam) ...................................12

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) ..............................................................................9

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir.
2017) ...............................................................................................................24

*Coates v. Heartland Wireless Commc's, Inc.*,
    55 F. Supp. 2d 628 (N.D. Tex. 1999) ....................................................26

*Dawes v. Imperial Sugar Co.*,
    975 F. Supp. 2d 666 (S.D. Tex. 2013) ...................................................24

*Decks Appeal v. GTE Directories Sales Corp.*,
    81 F.3d 154 (5th Cir. 1996) (table) .......................................................34

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) .................................................................11

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014) ...................................................24

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ..................................................................17

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001) ............................................ *passim*

*Faulkner v. Verizon Commc'ns, Inc.*,
    189 F. Supp. 2d 161 (S.D.N.Y. 2002) ...................................................30

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) .............................................................19

*In re First Am. Fin. Corp.*,
    2021 WL 4807648 (C.D. Cal. Sept. 22, 2021) ......................................30

*Fulton Cnty. Emples. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) (Easterbrook, C.J.) ...............................33

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    639 F. App'x 664 (2d Cir. 2016) ...........................................................32

*Golub v. PPD Corp.*,
    576 F.2d 759 (8th Cir. 1978) .................................................................23

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
    2021 WL 3491779 (D. Del. Aug. 9, 2021) ............................................26

*Gruss v. Curtis Publ'g Co.*,
    534 F.2d 1396 (2d Cir. 1976) ................................................................35

*Gurary v. Winehouse*,
    190 F.3d 37 (2d Cir. 1999) ....................................................................13

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..................................................................29

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).........................38

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018)..................................................19, 20

*Hulliung v. Bolen*,
   548 F. Supp. 2d 336 (N.D. Tex. 2008) ...................................................35, 36

*Hundahl v. United Benefit Life Ins. Co.*,
   465 F. Supp. 1349 (N.D. Tex. 1979) (Higginbotham, J.) .......................................14

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010)..................................................................28

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) .........................................................38

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
   564 U.S. 135 (2011)...................................................................4, 32, 33

*Kademian v. Ladish Co.*,
   792 F.2d 614 (7th Cir. 1986) ................................................................22

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..................................................................27

*Kas v. Fin. Gen. Bankshares, Inc.*,
   796 F.2d 508 (D.C. Cir. 1986) ...............................................................22

*Kas v. First Union Corp.*,
   857 F. Supp. 481 (E.D. Va. 1994) ...........................................................30

*Kraft v. Third Coast Mistream*,
   2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ...........................................14, 16, 19

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
   128 F. Supp. 3d 792 (S.D.N.Y. 2015).........................................................32

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*,
   481 F. Supp. 2d 673 (W.D. Tex. 2006)........................................................10

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..................................................................29

*Lessler v. Little*,
857 F.2d 866 (1st Cir. 1988) ........................................................................23

*Liu v. SEC*,
140 S. Ct. 1936 (2020) ...............................................................................39

*McConville v. SEC*,
465 F.3d 780 (7th Cir. 2006) .......................................................................38

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .................................................................26, 27

*In re Overstock Sec. Litig.*,
119 F.4th 787 (10th Cir. 2024) ............................................................. *passim*

*In re Overstock Sec. Litig.*,
2020 WL 5775845 (D. Utah Sept. 28, 2020)........................................... *passim*

*In re Overstock Sec. Litig.*,
2021 WL 4267920 (D. Utah Sept. 20, 2021), *aff'd*, 119 F.4th 787 (10th Cir.
2024) ........................................................................................................16

*Pedroli v. Bartek*,
2008 WL 901203 (E.D. Tex. Mar. 31, 2008) ...............................................35

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ...............................................................26, 27

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) .........................................................................5

*Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) ................................................................. *passim*

*Rice v. Hamilton Oil Corp.*,
658 F. Supp. 446 (D. Colo. 1987) .................................................................20

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .......................................................................31

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)........................................................................28

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) .......................................................................28

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)........................................................................14, 15, 23

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE vi

*Schmitt v. China XD Plastics Co., Ltd.*,
   698 F. Supp. 3d 474 (E.D.N.Y. 2023) ...................................................................35

*SEC v. Bankatlantic Bancorp, Inc.*,
   2012 WL 1936112 (S.D. Fla. May 29, 2012) ........................................................39

*SEC v. Berry*,
   2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ......................................................39

*SEC v. Coffman*,
   2007 WL 2412808 (D. Colo. Aug. 21, 2007) ........................................................38

*SEC v. Daifotis*,
   2011 WL 2183314 (N.D. Cal. June 6, 2011), *modified on reconsideration on other grounds*, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ................................14

*SEC v. Falstaff Brewing Corp.*,
   629 F.2d 62 (D.C.C. 1980) ..............................................................................35, 36

*SEC v. Felton*,
   2020 WL 7056333 (N.D. Tex. Dec. 2, 2020) .......................................................18

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ..............................................................................34

*SEC v. Fowler*,
   6 F.4th 255 (2d Cir. 2021) ...................................................................................40

*SEC v. Gann*,
   565 F.3d 932 (5th Cir. 2009) ............................................................................3, 13

*SEC v. Gilman*,
   2019 WL 4743431 (N.D. Tex. Sept. 26, 2019) ....................................................33

*SEC v. Ginder*,
   752 F.3d 569 (2d Cir. 2014) ................................................................................34

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................................24

*SEC v. Life Partners Holdings, Inc.*,
   854 F.3d 765 (5th Cir. 2017) ............................................................................4, 36

*SEC v. Lowy*,
   396 F. Supp. 2d 225 (E.D.N.Y. 2003) .................................................................38

*SEC v. Lucent Tech., Inc.*,
   610 F. Supp. 2d 342 (D.N.J. 2009) ................................................................13, 21

Return to TOC

APP1-587

*SEC v. Lyon*,
     529 F. Supp. 2d 444 (S.D.N.Y. 2008) ...................................................................................14

*SEC v. Mapp*,
     240 F. Supp. 3d 569 (E.D. Tex. 2017) ................................................................12, 14, 18, 33

*SEC v. Pentagon Capital Mgmt. PLC*,
     725 F.3d 279 (2d Cir. 2013) ...................................................................................................34

*SEC v. Quan*,
     2013 WL 5566252 (D. Minn. Oct. 8, 2013), *aff'd*, 870 F.3d 754 (8th Cir.
     2017) .......................................................................................................................................21

*SEC v. Rio Tinto PLC*,
     41 F.4th 47 (2d Cir. 2022) ......................................................................................................13

*SEC v. Rio Tinto plc*,
     2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ..............................................................4, 24, 39

*SEC v. Seghers*,
     298 F. App'x 319 (5th Cir. 2008) ...........................................................................................34

*SEC v. Shanahan*,
     646 F.3d 536 (8th Cir. 2011) ..................................................................................................34

*SEC v. Softpoint, Inc.*,
     958 F. Supp. 846 (S.D.N.Y. 1997) ..........................................................................................37

*SEC v. SolarWinds Corp.*,
     --- F.Supp.3d ----, 2024 WL 3461952 (S.D.N.Y. July 18, 2024) ...........................................39

*SEC v. Stanard*,
     2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ...........................................................................37

*SEC v. U.S. Envt'l, Inc.*,
     155 F.3d 107 (2d Cir. 1998)....................................................................................................23

*SEC v. World-Wide Coin Invs., Ltd.*,
     567 F. Supp. 724 (N.D. Ga. 1983) ..............................................................................37, 38, 39

*Selk v. St. Paul Ammonia Prod., Inc.*,
     597 F.2d 635 (8th Cir. 1979) ............................................................................................14, 23

*Shivers v. Amerco*,
     670 F.2d 826 (9th Cir. 1982) ..................................................................................................22

*In re Skechers USA, Inc. Sec. Litig.*,
     444 F. Supp. 3d 498 (S.D.N.Y. 2020).....................................................................................30

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...............................................11

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999)...........................................4, 31

*Thornton v. Micrografx, Inc.*,
    878 F. Supp. 931 (N.D.Tex.1995) .....................................26

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022).............................32, 33

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)......................................................22

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011).............................................19

*Yoshikawa v. Exxon Mobil Corp.*,
    2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) .....................13

**Statutes and Rules**

15 U.S.C. § 77t(e) ....................................................................40

15 U.S.C. § 78m(b)(2) .............................................................37

15 U.S.C. § 78n(a)(1) ..............................................................35

15 U.S.C. § 78u-5 .....................................................................4

Federal Rule of Civil Procedure 9(b) ....................................*passim*

Federal Rule of Civil Procedure 10(c) .........................................1

Federal Rule of Civil Procedure 12(b)(6) ...............................*passim*

S. Rep. No. 95-114 (1977).......................................................37

Return to TOC

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendant John Brda files this Motion to Dismiss ("**Motion**") the Complaint [Dkt. #1] brought by the Securities and Exchange Commission ("**SEC**").[1]

### REQUEST FOR ORAL ARGUMENT

While Mr. Brda believes the SEC's pleading deficiencies are clear, he acknowledges that some of the underlying facts, as alleged in the Complaint, may not be. Mr. Brda submits that oral argument would assist in streamlining the issues before the Court, and he therefore respectfully requests that the Court allow argument. *See* L.R. CV-7(g).

### INTRODUCTION

This is a case in search of a plausible theory. On June 25, 2024, the SEC filed its Complaint against Mr. Brda and Mr. Palikaras ("**Defendants**") alleging Defendants intended to effectuate an unsuccessful short squeeze, to the detriment of short sellers, through a planned and disclosed merger of Torchlight Energy Resources, Inc ("**Torchlight**") with Metamaterial, Inc. ("**Meta I**") resulting in Meta Materials, Inc. ("**Meta II**").[2] The SEC alleges Defendants capitalized on this scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**"). [Compl. ¶ 1.] But these were publicly and fully disclosed corporate actions serving legitimate business purposes for the benefit of *shareholders*. Short sellers, on the other hand, are fundamentally different from traditional investors. They are betting that the company will fail and predict that the market has overvalued the company's shares.

In a change of course and despite a longstanding policy of protecting actual *shareholders* (not short sellers), the SEC filed this action based on a novel scheme liability theory alleging

---

[1] Pursuant to Federal Rule of Civil Procedure 10(c), Mr. Brda joins Defendant Georgios Palikaras' concurrently filed motion to dismiss. The arguments made in Mr. Palikaras' motion are adopted in whole and incorporated herein.

[2] The SEC announced the same day that it and Meta II had reached a settlement agreement as to the claims against Meta II. *See* "SEC Charges Meta Materials and Former CEOs with Market Manipulation, Fraud and Other Violations," Release 2024-77, *available at* https://www.sec.gov/news/press-release/2024-77.

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 1**

violations of: (i) Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**") against Defendants (Counts I and II); (ii) Section 14(a) of the Exchange Act and Rule 14a-9 against Defendants (Count III); and (iii) derivative aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 against Mr. Brda (Counts IV and V). [*See* Compl. ¶¶ 111–43.] The SEC seeks disgorgement plus prejudgment interest, civil money penalties, and an officer/director bar. [*See id.* ¶ 144.] Each of these claims against Mr. Brda, including the relief sought, suffers from numerous, independent infirmities.

*First*, the gravamen of this case is the SEC's novel contention that the former CEOs of Torchlight and Meta I engaged in a scheme to manipulate the market by intending (though ultimately failing) to create a short squeeze of Torchlight stock via the announcement of a special dividend and to "take advantage" of the short squeeze during a pre-merger ATM Offering of Torchlight stock. [Compl. ¶ 42.] But the special dividend was lawful, was issued as announced, its nature was fully and accurately disclosed, and the market understood the potential impacts the special dividend could have on short sellers. *See Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 383 (5th Cir. 2007). Moreover, the SEC does not, and cannot, assert that the short squeeze, upon which its entire theory is based, even occurred. [*See* Compl. ¶ 96.] As a result, the SEC cannot allege facts showing that the market was deceived by Meta II's special dividend—a fundamental element of a manipulation claim. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007).

Nor does the SEC allege facts showing that retail investors in the ATM Offering were deceived. There is no dispute that the ATM Offering, and its terms, were publicly and truthfully

disclosed and that it offered Torchlight shares *at the prevailing market price* that was *indicative of a free market process*—the antithesis of false pricing signals that are characteristic of manipulative conduct. *See In re Overstock Sec. Litig.*, 119 F.4th 787, 802 (10th Cir. 2024) ("Defendants' truthful disclosure of the terms of the upcoming dividend transaction did not deceive investors as to how the market valued Overstock."). The prevailing market prices reflected all publicly available information, including social media chatter of a possible short squeeze. As a matter of law, purchasers in the ATM Offering could not have been deceived or manipulated as to the value of Torchlight stock in these circumstances.

*Second*, the SEC also fails to plead scienter in connection with disclosures that Torchlight would use "commercially reasonable efforts" to sell its oil and gas assets. [Compl. ¶¶ 68–81.] The ATM Offering undisputedly served legitimate business purposes: to ensure that Torchlight's oil and gas assets inured to the benefit of Torchlight legacy shareholders, and to raise capital for the new company. Rather than acknowledge that reality, the SEC's theory of scienter rests on the illogical allegation that Torchlight never intended to sell the assets and instead intended to spin them out into another entity. *See SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). This scienter theory fails because the sale of the assets was Torchlight's longstanding business plan pre-merger and the spin-out entity's plan post-merger. [*See* Compl. ¶¶ 20–21.] Moreover, Torchlight expressly warned through public disclosures that, if a sale of the assets was not consummated, the assets may be spun-out. *Infra* at pp. 6–8. Thus, the challenged statements are forward-looking predictions protected by the statutory safe harbor and the related bespeaks caution doctrine and are non-actionable expressions of corporate optimism. *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 389, 400 (S.D.N.Y. 2001) ("*Faulkner I*") (statements that defendant would "use all commercially reasonable efforts to take" actions to consummate merger "were not actionable

Return to TOC

because they were mere predictions"); *see* 15 U.S.C. § 78u-5. Further, the statements were neither false nor misleading when made. A securities violation cannot be pled with hindsight as a matter of law. *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

*Third*, the SEC's misrepresentation claim based on a statement in a May 2021 call with purported "Italian investors" regarding the potential value of the special dividend suffers from numerous fatal flaws. [Compl. ¶¶ 82–88.] Mr. Brda did not "make" the challenged statement, as required by *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). In addition, the statement was surrounded by express disclaimers and cautionary language, such as the dividend could be worth "zero," the speaker "cannot give you that prediction," and that a specific valuation was "speculative." *Infra* at pp. 8–9. Puffery and opinion statements are not actionable under the securities laws. It also constitutes a forward-looking statement immunized from liability by the bespeaks caution doctrine.

*Finally*, because the primary claims fail, the SEC's claims of aiding and abetting violations of the Exchange Act [Compl. ¶¶ 130–43] necessarily fail as a matter of law. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017); *e.g.*, *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *17, *20 (S.D.N.Y. Mar. 18, 2019) (dismissing derivative aiding and abetting claims).

In short, the SEC's tale of alleged market manipulation and securities violations, spun from an alleged intent to create a short squeeze that did not materialize, was fully disclosed and for legitimate business purposes. Thus, it cannot survive Rule 12(b)(6) scrutiny. Mr. Brda engaged in legitimate corporate actions for the benefit of shareholders that were truthfully and fully disclosed. It is improper to leave Mr. Brda to labor under a cloud of suspicion and to endure costly discovery to refute facially meritless claims. The Motion should be granted.

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 4

## ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[3]

### I.    OVERVIEW OF ENTITIES

On June 28, 2021, Meta I and Torchlight engaged in a reverse merger in which Torchlight acquired Meta I, with the combined company re-named to Meta II.  [Compl. ¶ 19.]  Torchlight was a U.S. corporation, headquartered in Plano, Texas that was listed on the Nasdaq under the ticker symbol "TRCH."  [*Id.* ¶ 17.]  Torchlight engaged in the acquisition, exploration, and development of oil and natural gas properties.  [*Id.*]  Torchlight was co-founded by Mr. Brda, who also served as President and CEO of the company.  [*Id.* ¶ 15.]

Following the merger, Meta II carried on Meta I's business, assumed Torchlight's Nasdaq listing, and its stock traded under the ticker symbol "MMAT."  [*Id.* ¶ 19.]  As part of the merger's terms, Meta II acquired Torchlight's oil and gas assets, including the Orogrande and Hazel projects (the "**O&G Assets**").  [*Id.* ¶¶ 20–21.][4]  Meta II subsequently spun out the O&G Assets into an entity called Next Bridge Hydrocarbons Inc. ("**NBH**") on December 14, 2022.  [Compl. ¶ 80.][5]

### II.    PUBLIC DISCLOSURES

#### A.    Announcement of Proposed Merger and Special Dividend

On September 23, 2020, Torchlight filed an 8-K announcing that it and Meta I entered into a non-binding letter of intent ("**LOI**") for a proposed business combination transaction.  [Compl.

---

[3] The fact section of this Motion discusses—and contains hyperlinks to—several SEC filings.  Mr. Brda acknowledges that these hyperlinked filings are not part of the record.  *See* L.R. CV-10(c).  The hyperlinks are included in case the Court desires to review portions of the filings not specifically discussed in this Motion, not because Mr. Brda believes the Court needs to scour corporate reports in order to dismiss the SEC's claims.  Should the Court wish to make any portion of any SEC filing part of the record, the Court may take judicial notice of such filing pursuant to Federal Rule of Evidence 201.  *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640 n.2 (5th Cir. 2005).

[4] Meta II Form 10-K/A for the fiscal year ended December 31, 2021, filed May 2, 2022, at 8, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000095017022006837/mmat-20211231.htm; Torchlight Form 10-K for the fiscal year ended December 31, 2020, filed March 18, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983521000148/form-10k.htm.

[5] *See* Meta II Form 8-K filed December 15, 2022, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119312522305648/d433696d8k.htm.

Return to TOC    APP1-594

¶ 33.][6]  In the release, Mr. Palikaras highlighted the "significant value" for Meta I "in having a national exchange listing in the United States that will provide better access to the capital markets" and noted that, "[t]his transaction will enhance our ability to pursue a broad range of opportunities.[7] The LOI stated that "Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable" to the O&G Assets.[8]  Neither the Form 8-K, nor the LOI, characterized the form of the special dividend (which was still subject to negotiation).

**B.**     **Definitive Agreement**

On December 14, 2020, Torchlight announced that it and Meta I signed the Definitive Agreement for the merger with the agreement publicly disclosed as an exhibit to Torchlight's SEC filing that day.  [Compl. ¶ 33.][9]  Investors were informed that pursuant to the Definitive Agreement:  (1) Torchlight shareholders would own 25 percent of the resulting combined company; (2) Meta I shareholders would own 75 percent; and (3) that a reverse split was contemplated in order to regain and maintain compliance with Nasdaq listing standards.[10] Torchlight further disclosed that the special dividend would take the form of a preferred share dividend (*i.e.*, not a cash dividend), that would be payable "immediately prior" to the closing of the transaction, indicating that the dividend record date would be a date in close proximity to the merger close.[11]

---

[6]     Torchlight     Form     8-K     filed     September     23,     2020,     *available     at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000245/form-8k.htm.
[7]     Torchlight     Form     8-K     filed     September     23,     2020,     Ex.     99.1,     *available     at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983520000245/form-8k.htm.
[8] Torchlight Form 8-K filed September 23, 2020, at 3 ("Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets.").
[9]     Torchlight     Form     8-K     filed     December     14,     2020,     *available     at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm; Ex. 2.1 (Definitive Agreement), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983520000329/ex2-1.htm.
[10] *Id.*
[11] Torchlight Form 8-K filed December 14, 2020, Ex. 2.1 at 17 (definition of "RTO Acquiror Preferred Stock").

The Definitive Agreement provided that Torchlight would use "commercially reasonable efforts" to sell its O&G Assets.[12]  It specified that the asset sale must occur prior to the earlier of December 31, 2021, or six months from the closing of the merger; otherwise, the combined company would effect a spin-off of those assets, with the preferred shareholders receiving their pro rata equity interest in the spin-off entity.[13]  Torchlight's preliminary and definitive proxy statements reiterated that a sale of the O&G Assets may not occur and in the absence of a sale, any unsold assets may be spun off from Meta II.[14]  In other words, the Definitive Agreement and the preliminary and final proxy statements repeatedly disclosed and warned investors that a spin-out was a potential outcome in the event Torchlight and/or Meta II was unable to sell the assets.

## C.     Torchlight Proxy Statements

On February 4, 2021, Torchlight filed its preliminary proxy statement.  [Compl. ¶ 39.] Among other things, it informed Torchlight shareholders that a special meeting would be held— at a date to be determined—for shareholders to vote on the Torchlight-Meta I merger.[15]  The preliminary proxy statement repeated the 25/75 post-close respective ownership between Torchlight and Meta I shareholders, reminded shareholders of the preferred share dividend that would be paid immediately prior to the merger close, and reiterated that if a sale of the O&G Assets did not occur, then those assets would be spun off from Meta II.[16]

On March 3, 2021, Torchlight received a comment letter from the SEC that its preliminary proxy was under review.[17]  As it worked through the SEC's additional requests and comments,

---

[12] Torchlight Form 8-K filed December 14, 2020.

[13] Torchlight Form 8-K filed December 14, 2020, Ex. 2.1 at Schedule J, Section 3(a).

[14] *See* Torchlight Preliminary Proxy Statement filed February 4, 2021 at 31, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521027524/d117540dprem14a.htm.

[15] *See* Torchlight Preliminary Proxy Statement filed February 4, 2021.

[16] *See id.* at 38.

[17] Letter from SEC to Torchlight filed March 3, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1431959/00000000021002567/filename1.pdf.

Torchlight amended its Definitive Agreement several times to extend the deadlines relating to the merger close.[18]  On May 3, 2021, Torchlight issued a press release announcing a further extension of the merger close deadlines, which also reaffirmed that the dividend record date "will be determined after the [Torchlight] Stockholder Meeting is held."[19]

On May 7, 2021, Torchlight filed its definitive proxy statement.  [Compl. ¶ 39.]  The definitive proxy reminded shareholders that Torchlight would declare and issue a dividend, in the form of preferred shares, payable immediately prior to the merger close.[20]  The proxy also disclosed that the parties expected to close the merger "on or about June 18, 2021," after the shareholder vote on June 11, 2021—though the dividend record date was still "to be determined."[21]

## III.  The Italian Call and Other Public Information

On May 13, 2021, a few days following the filing of the definitive proxy statement, Mr. Palikaras attended a Zoom call with a group of investors in Italy that he believed held shares of Torchlight common stock (the "**Italian Call**").  [Compl. ¶ 61.]  A partial unauthorized audio recording of a portion of this meeting was later posted online in early June 2021 by an unknown individual with the Stocktwits username "KingOneFolle."  [*Id.* ¶ 50.]  The Complaint's selective excerpts of that call include statements made by Mr. Palikaras which, in isolation, allegedly constituted false and misleading statements.  [*Id.* ¶ 61.]

---

[18]  *See, e.g.*, Torchlight Form 8-K filed March 15, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000114/form8-k.htm; Torchlight Form 8-K filed April 1, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000173/form-8k.htm; Torchlight Form 8-K filed April 15, 2021; Torchlight Form 8-K filed May 4, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000251/form-8k.htm.
[19]  Torchlight Form 8-K filed May 4, 2021, Ex. 99.1, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000251/ex99-1.htm.
[20]  *See* Torchlight Definitive Proxy Statement at 31.
[21]  *See id.* at 20 (definition of "Series A Preferred Record Date"), 37 (citing "on or about June 18, 2021" for closing).

But Mr. Palikaras heavily caveated his statements regarding the potential for a short squeeze on the call:[22] (i) "And we believe, or at least we expect, that there will be, *if the market conditions allow*, a potential jump towards the close.  **We don't know by how much, and we don't know if it's going to happen.**" (ii) "And if [a short squeeze] happens, then I mean, if the [Torchlight] stock obviously goes to four dollars, five dollars, whatever it goes to, *or one dollar*.  You know, *if the markets collapse you know, there's always that delta*."; and (iii) "So, it could be very positive, it could be also negative depending on the market conditions."

When Mr. Palikaras received questions relating to the potential value of the preferred share dividend, he responded as follows:  (i) "frankly nobody can predict if this is going to be a one dollar or a twenty-dollar dividend"; (ii) "it could be a dollar to more than twenty dollars"; (iii) "twenty . . . could also be a low number"; (iv) the dividend "could be worth zero"; (v) "it's difficult to predict where it's going to end up"; (v) "I cannot give you that prediction [regarding the dividend price].  I am not part of management of Torchlight, also I'm not an expert in oil and gas assets."; (vi) "we did not want to touch the dividends, because we on the Meta side could not even predict the price of oil six months ago or where this Biden administration would create potentially additional reasons for the assets to be more valuable"; and (vii) "Like honestly, today, I know that whatever it was valued at last year it's more.  That's the only thing I can tell you just based on the price of oil and what the Biden administration has done.  Other than that, *everything else is speculative*."  Ex. A-1.

---

[22] A transcribed copy of the Italian Call recording, upon which the Complaint cites to and relies, is attached as **Exhibit A-1**.  The Court may consider documents attached to a defendant's motion to dismiss if they are both referred to in the complaint and central to the claims.  *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  The Italian Call recording is referenced in in the Complaint and central to the claims.  [*See* Compl. ¶¶ 50, 61, 82–88, 126.]

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 9

Months before the May 2021 Italian Call, the possibility of a short squeeze and speculation about the dividend value had been swirling in the public domain on various social media platforms.[23]

## IV. THE DIVIDEND RECORD DATE AND JUNE 2021 ATM OFFERING

On May 28, 2021, Torchlight filed a shelf registration covering an offering (or series of offerings) not to exceed $250 million in the aggregate.[24]  Once again, the shelf registration disclosed key terms of the merger, including the preferred share dividend structure.[25]  In addition to the terms, the Form S-3 noted that the proceeds would be used for "general corporate purposes," including "additions to [Torchlight's] working capital" and "capital expenditures."[26]  Pursuant to this registration, Torchlight sold shares via the ATM Offering in June 2021.

Torchlight shareholders approved the merger on June 11, 2021.[27]  Later that day, Torchlight's Board of Directors formally declared the preferred dividend, setting June 24, 2021 as the dividend record date.[28]  Torchlight's disclosures as early as December 2020 had already put the public on notice that the dividend would be issued "immediately prior" to the merger close, and the definitive

---

[23] *See, e.g.*, *Torchlight Energy Resources: Special Dividend Likely To Be Of Limited Value*, SEEKING ALPHA (Mar. 10, 2021), http://seekingalpha.com/article/4412814-torchlight-energy-resources-special-dividend-likely-to-be-of-limited-value; @aadiit, REDDIT, r/TRCH, *How will shorts give out preferred shares* (Apr. 20, 2021), https://www.reddit.com/r/TRCH/comments/mv7lx8/how_will_shorts_give_out_preferred_shares/ ("In case of shorting the shorts have to pay dividend.  Is it possible for shorts to issue preferred shares?  If not then we have a OSTK kind of situation here.  The more they short it the bigger the squeeze."); Jordan Belfort (@BamaTrader7), TWITTER (Mar. 15, 2021, 9:31 AM), https://x.com/BamaTrader7/status/1371469212728823815 ("ALL shorts must cover their positions prior to the merger with $MMAT (Metamaterial)."); d ny (@vvsdan999), TWITTER (Jan. 28, 2021, 10:35 PM), https://x.com/vvsdan999/status/1355011545206501382 ("Special dividend, 40%+ of the float is being shorted – shorts will have to cover before the merger"); *Torchlight Energy Resources Stock Appears To Be Significantly Overvalued*, YAHOO FINANCE (Mar. 28, 2021), attached as **Exhibit A-2**.  Mr. Brda respectfully requests the Court take judicial notice of these articles for the limited purpose of the existence of these statements in the public domain.  *See U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006).

[24]    Torchlight    Form    S-3    filed    May    28,    2021,    *available    at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000349/form-s3.htm.

[25] Torchlight Form S-3 filed May 28, 2021, at 10.

[26] *Id.* at 11.

[27]Torchlight    Press    Release    dated    June    25,    2021,    *available    at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm

[28]    Torchlight    8-K    filed    June    16,    2021,    *available    at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000381/form-8k.htm.

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 10**

proxy statement in May 2021 disclosed that the parties expected the merger close to occur on June 18, 2021 or thereabouts.[29]  Then, on June 16, 2021, Torchlight announced a sales agreement with its financial advisor to sell shares at the market.  [Compl. ¶ 106.][30]  And between June 16 and June 24, 2021, Torchlight conducted the ATM Offering, selling common shares for aggregate gross proceeds of approximately $137.5 million.  [Compl. ¶ 106.][31]

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[W]hen the allegations in a complaint . . . [can]not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558 (internal citation omitted).

In addition, "Federal Rule of Civil Procedure 9(b) . . . requires the plaintiffs in securities fraud causes to plead with particularity the circumstances constituting the alleged fraud."  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).  The Fifth Circuit "'interprets Rule 9(b) strictly, requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'"  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338–39 (5th Cir. 2008) (internal citation omitted).  "Put simply, Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue."  *Id.* (internal citation omitted).

---

[29] *See* Torchlight Form 8-K filed December 14, 2020; Torchlight Definitive Proxy Statement.
[30] Torchlight Final Prospectus on Form 424B5 filed June 16, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000383/form-424b5.htm.
[31] Meta II 10-K/A for the year ended December 31, 2021, filed May 2, 2022, at 95.

## ISSUES TO BE DECIDED

The issue to be decided by the Court is whether Plaintiff has stated a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  As set forth in the argument section below, that issue includes the following sub-issues:  (1) whether the Complaint states a cognizable scheme liability theory, (2) whether the Complaint states an actionable misrepresentation or omission, (3) whether the Complaint pled any negligence-based theory, (4) whether the Complaint alleges a Proxy Fraud Claim, (5) whether the Complaint sufficiently alleges an aiding and abetting claim, and (6)whether the Complaint's requested relief should be stricken.

## LEGAL ARGUMENTS

The SEC's five alleged violations each fails to state a claim under Rule 12(b)(6) and 9(b). Thus, dismissal with prejudice is warranted.

## I.    THE SEC FAILS TO PLEAD SCHEME LIABILITY (COUNTS I AND II).

The SEC alleges Mr. Brda violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  [Compl. ¶¶ 112–23.]  The SEC relies on a "market manipulation scheme" liability theory.  [*See id.* ¶ 62.]  This "scheme liability theory [is] recognized by a few courts . . . but not by the Fifth Circuit, itself, which, . . . limit[s] the reach of § 10(b) and Rule 10b–5 to a material misrepresentation or omission where there is a recognized duty to disclose."  *SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008)); *accord Burback v. Brock*, 2023 WL 4532803, at *7 (5th Cir. July 13, 2023) (per curiam) (affirming dismissal despite claim that district court failed to account for "scheme liability" because allegations deemed insufficient on other grounds).  In the Fifth Circuit, "'deception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information

Return to TOC

*to a plaintiff*." *Regents*, 482 F.3d at 384, 391 (holding manipulation is only "conduct that affects the marketplace indirectly can violate § 10(b) only if it constitutes deception") (emphasis added).

In either event, to state a scheme liability claim under Rule 10b-5(a) and (c), the SEC must, at a minimum, "allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter[.]" *SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009); *accord Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *3 (N.D. Tex. Aug. 24, 2023). "[M]isstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." *SEC v. Rio Tinto PLC*, 41 F.4th 47, 49 (2d Cir. 2022). Without more, "a fully disclosed corporate transaction" is not considered manipulative or deceptive. *Overstock*, 119 F.4th at 793. Independently, the SEC also fails to plead scienter or "a mental state embracing intent to deceive, manipulate, or defraud." *Gann*, 565 F.3d at 936 (internal quotation marks omitted). And thus, the SEC's scheme liability claims fail as a matter of law and should be dismissed.

## A. The Alleged Acts Do Not Constitute Deceptive Conduct.

A market manipulation claim "require[s] a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI*, 493 F.3d at 100. "The gravamen of manipulation is deception of investors into believing that [the] prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

In particular, the Fifth Circuit considers whether defendants have engaged in deceptive conduct which has "the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with

Return to TOC

the price itself." *Regents*, 482 F.3d at 390 (citing *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349, 1360 (N.D. Tex. 1979) (Higginbotham, J.)).  As the Supreme Court explained in *Santa Fe Indus., Inc. v. Green*, "'[m]anipulation' is virtually a term of art when used in connection with securities markets" and manipulative practices include "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  430 U.S. 462, 472, 476 (1977).  What differentiates a "manipulation" from other forms of fraud under Section 10(b) is "activity that is outside the 'natural interplay of supply and demand,'" that is, "whether a transaction sends a false pricing signal to the market." *ATSI*, 493 F.3d at 100.  Thus, "[m]anipulation requires that a defendant act directly in the market for the relevant security." *Regents*, 482 F.3d at 390.

The SEC's claim is foreclosed by the Supreme Court, the Fifth Circuit, and district courts unanimously holding there can be no market manipulation absent deception. *Santa Fe*, 430 U.S. at 476; *Regents*, 482 F.3d at 391; *Mapp*, 240 F. Supp. 3d at 586.  And courts have consistently rejected attempts to label publicly disclosed fundamental corporate decisions or transactions as "deceptive conduct."  *See, e.g.*, *Overstock*, 119 F.4th at 802 (corporation's public plan to issue dividend was not deceptive conduct); *SEC v. Lyon*, 529 F. Supp. 2d 444, 445 (S.D.N.Y. 2008) ("The Court finds this characterization of a short sale inaccurate and not reflective of what occurs in the market."); *Kraft v. Third Coast Mistream*, 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) (reduction in dividend with alleged intent to artificially suppress stock price was not market manipulation); *see also Selk v. St. Paul Ammonia Prod., Inc.*, 597 F.2d 635, 637 (8th Cir. 1979) (rejecting Sections 10(b) and 14(a) claims over the "true motivation of corporate management" in pursuing a corporate merger where facts were publicly disclosed); *SEC v. Daifotis*, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011), *modified on reconsideration on other grounds*, 2011 WL

Return to TOC

3295139 (N.D. Cal. Aug. 1, 2011) ("The marketing of an ultra-short bond fund was not inherently deceptive conduct.").

In stark contrast, none of the alleged conduct at issue here—(1) a preferred stock dividend, (2) social media commentaries, and (3) the ATM Offering—carried any indicia of manipulation described above.  None sent "false price signals" to the market.  None injected inaccurate information into the market.  And none created a false impression of how market participants valued Torchlight stock—all essential elements of a market manipulation claim.  The SEC is attempting to fit publicly disclosed corporate conduct into the term "manipulative," a "term of art" that has no application here.  *Santa Fe*, 430 U.S. at 476.

### i.    *The Preferred Share Dividend.*

The announcement and subsequent issuance of the preferred share dividend could not and did not deceive the market, nor was it a sham.  The SEC does not allege that the preferred share dividend was unlawful.  The announcement itself did not "inject[] 'inaccurate information' into the market or otherwise create[] a false impression of market activity" of the preferred share dividend. *Overstock*, 119 F.4th at 802.  Instead, Torchlight accurately and publicly informed the market of its business decision to issue a lawful dividend and accurately described the nature of the dividend:  that owners of Torchlight stock would receive a preferred share dividend for every Torchlight share owned on the dividend record date, shortly before merger close.  Simply stated, Meta II could not manipulate a market with "truthful disclosure of the terms of the upcoming dividend transaction." *Id.* at 803.  While the announcement might have been construed as deceptive if Meta II did not ultimately issue the preferred share dividend but, Meta II *did* issue the dividend.  No one was deceived about the dividend.

The SEC asserts the preferred share dividend was somehow deceptive because it purportedly was designed to cause a squeeze on short sellers.  [*See* Compl. ¶¶ 3, 30–32.]  This argument fails for

two reasons.  *First*, the public record does not substantiate the SEC's view.  Instead, the public record

establishes that the overarching and animating purpose of the preferred share dividend was to provide

a means for the legacy Torchlight shareholders to benefit from the O&G Assets.[32]

    *Second*, the preferred share dividend was not deceptive because the market was aware of the

potential impact of the dividend on short sellers.  The possibility of a short squeeze for short sellers

was merely a "collateral consequence[]" of the lawful preferred share dividend that was "apparent"

in the market.  *In re Overstock Sec. Litig.*, 2020 WL 5775845, at *10 (D. Utah Sept. 28, 2020)

("*Overstock I*") (rejecting argument that the digital dividend supported manipulation claims because

it allegedly was designed "to create short covering"); *In re Overstock Sec. Litig.*, 2021 WL 4267920,

at *10–12 (D. Utah Sept. 20, 2021) ("*Overstock II*"), *aff'd*, 119 F.4th 787 (10th Cir. 2024) (same).

The market was aware that Torchlight was one of the most heavily shorted stocks on the stock market

(*see supra* at p. 10 n.23) and that non-cash dividends could result in short sellers being required to

cover.  *See Overstock II*, 2021 WL 4267920, at *11 (no market manipulation where market "knew

the potential ramifications of" decision to issue unregistered digital dividend).  Torchlight "could

not manipulate the market . . . via a dividend that everyone immediately knew would impact short

sellers." *Id.*; *see also Kraft*, 2021 WL 860987, at *23 (corporate decisions that led to change in stock

price did "not allege a false price signal; the nub of [claim was] that the price signal was accurate,

but just not what it should have been had [the company] made other decisions").

    In sum, the dividend announcement (and issuance) was not deceptive conduct—*even if*

Mr. Brda understood that the dividend might negatively affect short sellers.  The dividend did not

send a "false signal" to the market regarding supply or demand; it did not create the false

---

[32] *See, e.g.*, Torchlight Preliminary Proxy Statement filed February 4, 2021, at 100 (dividend would allow "Torchlight stockholders to maintain a beneficial interest in the O&G Assets"); Torchlight Definitive Proxy Statement filed May 7, 2021, at 109 (same).

Return to TOC

appearance of liquidity; and it did not "deceiv[e] investors as to how other market participants ha[d] valued" Torchlight stock. *ATSI*, 493 F.3d at 100. Therefore, that business decision cannot support a market manipulation scheme claim.

### ii.    *Informal Commentaries Regarding a Potential Short Squeeze.*

The SEC points to certain informal statements—such as Mr. Brda tweeting "a video discussing short squeezes in the contexts of other stocks," [Compl. ¶ 63], Mr. Palikaras' tweet depicting Torchlight shorts with flames [*id.* ¶ 64], his "T plus 2 rule" tweet [*id.* ¶ 90], and an alleged statement made in a March 2021 conference [*see id.* ¶¶ 44, 60]—as evidence of "promoting" a short squeeze. These and other statements regarding a potential short squeeze cannot support a market manipulation claim for several reasons.

*First*, the SEC does not contend that any of the statements were false or misleading because it cannot. The commentaries were nothing more than accurate observations of potential natural consequences resulting from regular market dynamics. Because "estimate[s] of the fair value of . . . assets will vary depending on the particular methodology and assumptions used," "'[t]here may be a range of prices with reasonable claims to being fair market value.'" *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011) (citation omitted).

*Second*, the market could not have been deceived by statements repeating information that was already public knowledge and incorporated into the market's analysis. *See, e.g.*, *Regents*, 482 F.3d at 383 (in an efficient market "the market price reflect[s] all publicly available information").

*Third*, the statements did not have any attributes of market manipulation. They did not send a false pricing signal to the market. They did not inject inaccurate information into the market. And they did not deceive investors into believing that the price of Torchlight security was determined by anything other than the natural interplay of supply and demand. *See Overstock I*, 2020 WL 5775845, at *10.

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 17**

*Fourth*, in the Complaint, the March 2021 conference is devoid of any specificity, which is required to satisfy Rule 9(b). Instead, it relies on an annotated, out-of-context excerpt from a "note-taker" at the conference. [Compl. ¶¶ 44, 60 ("15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing").] This single vague and non-specific allegation cannot support a securities fraud claim. *See Mapp*, 240 F. Supp. 3d at 579 (citing Rule 9(b)). Among others, this out-of-context excerpt begs the question of (i) what stock is the note-taker referring to, (ii) what were the fourteen other price drivers, and (iii) what else did the note-taker write? "Such broad, conclusory allegations simply do not carry weight under Rule 9(b)." *SEC v. Felton*, 2020 WL 7056333, at *6 (N.D. Tex. Dec. 2, 2020) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996)).

*Finally*, the only other communication alleged to have been made by Mr. Brda to investors was a tweet of "a video discussing short squeezes **in the contexts of other stocks**," [Compl. ¶ 63 (emphasis added)], which on its face could not constitute him "act[ing] directly in the market for the relevant security," *i.e.*, Torchlight. *Regents*, 482 F.3d at 390.

### iii. The ATM Offering.

The SEC's claim that the June 2021 ATM Offering somehow constituted deceptive conduct that was part of the purported scheme fares no better. [*See* Compl. ¶¶ 42–45.] The SEC's theory appears to be that Torchlight manipulated the market to "take advantage of the squeeze" by conducting the ATM Offering during the squeeze. [*Id.* ¶ 42.] The SEC, however, does not (and cannot) allege that a short squeeze even actually occurred and thus, its "taking advantage of the squeeze" theory is unmoored to any factual allegation.

This fundamental flaw aside, the ATM Offering could not, by definition, send "false pricing signals" to the market because it offered Torchlight shares at the prevailing market price. *ATSI*, 493 F.3d at 100. Because market manipulation requires deception, courts repeatedly reject

manipulation claims where all relevant conditions were known to the market.  *See, e.g.*, *Kraft*, 2021 WL 860987, at \*23 (no market manipulation where "the market accurately understood the message that [the defendant's] decisions were sending"); *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 118 (S.D.N.Y. 2018) (plaintiffs could not "allege how the [defendants'] authorized short-selling, after the public announcement of [a private investment in public equity transaction], deceived investors or sent a false pricing signal in the market").

Such is the case here.  Torchlight disclosed the terms of the offering (which are not alleged to be false).  Those disclosures provided that the ATM Offering was being made pursuant to the shelf registration statement filed on May 28, 2021, which previously informed the market that Torchlight might sell shares via an offering such as an ATM.[33]  And Torchlight had already disclosed its plan to issue a preferred share dividend before merger close.[34]  Given the accurate disclosures, the SEC cannot show that the market was deceived when Torchlight in fact did as it said and engaged in the ATM Offering.  *See, e.g.*, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 124, 133 (2d Cir. 2011) ("practice of 'support bid[ding],' or using its own capital to place bids in order to prevent the failure of auctions for which it served as sole or lead dealer," was not manipulative where defendant disclosed "that it 'may routinely' place such bids"); *Finn v. Barney*, 471 F. App'x 30, 33 (2d Cir. 2012) ("defendants' disclosures preclude[d] plaintiffs' claim that the defendants' conduct was manipulative").

Nor is there merit in the SEC's speculation that Mr. Brda "took advantage" of the non-existent short squeeze because "a rise or fall in a stock price as a result of such [disclosed] acts is *indicative of a free market process*."  *Hundahl*, 465 F. Supp. at 1362 (emphasis added).  In other words, the prevailing market price of the ATM Offering reflected the market's judgment of the

---

[33] *See generally* Torchlight Form S-3 filed May 28, 2021.
[34] Torchlight Form 8-K filed September 23, 2020.

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 19**

value of Torchlight stock, "consider[ing] whatever was disclosed about the dividend policy" and the offering. *Id.* In short, "by the time the [company sold shares in the ATM Offering], the existence of the [preferred share dividend and the ATM] had already been made public and therefore, the [company was] not acting upon any information that was not available to the investing public at-large." *Hudson Bay*, 309 F. Supp. 3d at 118; *see also Wilson*, 671 F.3d at 132. As a matter of law, Torchlight's sale of securities in the ATM Offering could not be deceptive. *See Overstock*, 119 F.4th at 807 (affirming dismissal with prejudice; no deceptive conduct where terms were disclosed and public not deceived); *Hudson Bay*, 309 F. Supp. 3d at 118 (no deceptive conduct where transactions based on publicly available information and no investors deceived); *Rice v. Hamilton Oil Corp.*, 658 F. Supp. 446, 448 (D. Colo. 1987) ("Plaintiffs cannot reasonably claim that they were deceived by alleged omissions when they had knowledge of the information claimed to be omitted.").

## B.     Allegations of 'Intent Only' Manipulation Cannot Show Deceptive Conduct.

The SEC appears to disregard the well settled legal principles above, basing deceptive conduct solely on Defendants' allegedly manipulative intent. [*See* Compl. ¶ 5 ("Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock . . . .").] That theory finds scant support in the law, appears only in cases involving trading activity (not corporate acts), is inapplicable where the conduct was for legitimate purposes, and runs afoul of longstanding precedent, rejecting liability on intent alone. It simply has no application here.

Even if an "intent-only" approach were viable (it is not), "[l]egitimate business transactions that do not have a deceptive purpose or effect cannot form the basis of scheme liability." *SEC v. Quan*, 2013 WL 5566252, at \*14 (D. Minn. Oct. 8, 2013), *aff'd*, 870 F.3d 754 (8th Cir. 2017); *see*

Return to TOC

APP1-609

*Lucent*, 610 F. Supp. 2d at 360–61 (failure to disclose "real terms" of sales did not support scheme liability claims because the underlying sales were legitimate business transactions; alleged scheme "must involve 'sham' or 'inherently deceptive' transactions"); *see also Overstock I*, 2020 WL 5775845, at *11. Thus, to succeed on its claim, the SEC still must show that the challenged corporate actions lacked a "legitimate" purpose or economic reason. It cannot.

Incidentally, the SEC's theory that Mr. Brda intended to create a short squeeze is inconsistent with its allegations that Torchlight intended to defraud retail investors through the ATM Offering. [Compl. ¶ 97.] If Torchlight wanted to squeeze short sellers as the SEC claims, it would not introduce significant liquidity in the market via the ATM Offering (or an earlier underwritten offering in February 2021) that would allow the shorts to cover their positions and remove the scarcity that causes a short squeeze in the first place.

The Complaint squarely establishes Torchlight's legitimate purpose for issuing the preferred share dividend: to ensure that the benefits of the O&G Assets inured to the benefit of the legacy Torchlight shareholders.[35] Because the dividend had a legitimate purpose, a scheme liability claim based on market manipulation will fail as a matter of law. *See Overstock I*, 2020 WL 5775845, at *10–11 (dismissing market manipulation claim; the "dividend had a legitimate business purpose" "to bolster Overstock's transition away from being only an online retail business"). The informal commentaries regarding a potential short squeeze likewise do not support a claim. As mentioned above, the SEC does not plausibly allege that the statements— which merely repeated information that was already in the market—were false. The ATM Offering had the legitimate business purpose of raising capital. Moreover, to the extent the public

---

[35] *See* Compl. ¶ 25 ("As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing . . . ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders.").

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 21**

was speculating that a short squeeze was occurring, selling shares via the ATM Offering would reduce volatility in the stock price resulting from a squeeze. Decreasing the potential for stock price volatility is a legitimate corporate goal.

The SEC's 'intent-only' theory defies *Virginia Bankshares, Inc. v. Sandberg*, where the Supreme Court refused to extend Section 14(a) liability based "on [executives'] mere disbelief or undisclosed motive." 501 U.S. 1083, 1096 (1991). The Supreme Court warned that imposing liability where investors were not misled about objective, factual details of corporate transactions would "authorize [] litigation confined solely to . . . the 'impurities' of a director's 'unclean heart.'" *Id.* (quoting *Stedman v. Storer*, 308 F. Supp. 881, 887 (S.D.N.Y. 1969)).

Decades of lower court precedent likewise holds that a company is not required to disclose "impure motives for entering [an] allegedly improper transaction"—even where the motive at issue is an alleged intent to artificially alter the stock price. *Kademian v. Ladish Co.*, 792 F.2d 614, 627 (7th Cir. 1986) (dismissing Section 10(b) claims where the defendant intentionally suppressed value of its stock before a merger via a "market freeze" of the shares); *Hundahl*, 465 F. Supp. at 1355 (rejecting claims based on "alleged scheme to manipulate the price of [a] stock" via corporate dividend policy).[36] Similarly, when multiple corporate acts are disclosed and are not deceptive, a plaintiff may not "bootstrap" those acts into a "securities violation." *Kademian*, 792 F.2d at 627. So long as investors are informed about the objective, factual details of corporate transactions, the "federal securities laws do not impose any requirement that officers and directors or courts engage in public psychoanalysis about the real motives of corporate officers and directors for reaching a decision." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[W]here the

---

[36] *See also Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982) ("doubt[ing]" that plaintiff could bring market manipulation claim based on publicly disclosed reverse stock splits, even where intent was allegedly to decrease stock price); *Brady v. Top Ships Inc.*, 2019 WL 3553999, at *7 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel*, 806 F. App'x 64 (2d Cir. 2020) (rejecting claims based on alleged scheme to artificially increase stock price via reverse stock splits).

Return to TOC   APP1-611

failure to disclose involves the 'true' motivations of the directors and so would require a court to probe the business judgment of the directors, *Santa Fe* holds that the claim states no cause of action under the 1934 Act.").[37]  The SEC's claims based on Mr. Brda's alleged "motivations" for the merger, the preferred share dividend, and the ATM Offering—all of which were legitimate business decisions accurately disclosed to the market—are precluded.  [Compl. ¶ 50.][38]

In sum, the SEC does not identify a single element of the purported scheme that lacked a legitimate business purpose or went beyond merely reiterating information that was already present in the market.  The SEC does not plead a market manipulation claim as a matter of law, even if the dubious intent-only theory could apply.

## C.  The SEC Fails to Allege Scienter.

The SEC's alleged claim does not satisfy the heightened standard for pleading scienter— particularized facts that Mr. Brda acted with "a mental state embracing intent to deceive, manipulate, or defraud."  *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019).  "For purposes of 10(b) liability, a defendant must have acted with, at minimum, severe recklessness."  *Id.*  "To withstand a motion to dismiss, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 982.  "The SEC must 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Rio Tinto*, 2019 WL 1244933, at *13 (quoting *SEC v.*

---

[37] *See e.g.*, *Lessler v. Little*, 857 F.2d 866, 876 (1st Cir. 1988) (rejecting Section 10(b) and 14(a) claims over "management's characterization" of information where "all of the relevant *factual* details" were disclosed such that "reasonably intelligent shareholders were made aware of the substance of the proposed transaction"); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) (rejecting claims based on alleged "true purpose" of defendant); *Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 105 (S.D.N.Y. 1990) ("defendants were under no obligation to disclose their 'true' or subjective purpose"); *Selk*, 597 F.2d at 637; *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir. 1978) (rejecting claim that company violated securities laws by failing to disclose "the true motivation" for selling assets).

[38] Further, the "intent-only" theory "improperly conflate[s] conduct with the separate issue of scienter."  *Overstock I*, 2020 WL 5775845, at *11; *see SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998).  Alleging "that defendants' conduct was manipulative because they did not tell shareholders that their conduct was manipulative" is "a classic example of circular reasoning and conclusory pleading."  *Brady*, 2019 WL 3553999, at *8.  The SEC makes just that sort of allegation here.

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 23

*Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014)). The SEC has not plead the requisite scienter to establish scheme liability.

The SEC has not alleged any facts that give rise to any inference of fraudulent intent by Mr. Brda, much less a strong inference. Indeed, Torchlight's full and accurate disclosures of the dividend undermines any inference of scienter. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (defendant's "general and categorical public disclosures also weigh heavily against an inference of scienter"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 577 (D. Md. 2005) (public disclosure "militates against an inference of scienter"). The dividend's overarching legitimate business purpose further defeats any inference of scienter and negligence. There can be no scienter (or even negligence) through the act of repeating truthful information already in the public domain because truthful disclosures inform, rather than deceive, investors. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (public disclosure of truthful information "negates an inference of scienter").

Absent an allegation of scienter on the part of Mr. Brda, backed by particularized facts that satisfy Rule 9(b), the SEC's securities fraud claims against him cannot stand. *See Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 700 (S.D. Tex. 2013) (dismissing securities fraud claim for failure to allege scienter).

## II.    THE SEC FAILS TO PLEAD AN ACTIONABLE MISREPRESENTATION.

"Scheme liability . . . hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). Here, the SEC's allegations blur the line of deceptive acts and alleged misstatements by primarily relying on: (i) the "commercially reasonable efforts" Torchlight and Meta II would take to sell Torchlight's O&G Assets [*see* Compl. ¶¶ 67–81, 114, 120, 126, 132–33]; and (ii) Mr. Palikaras'

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 24

statement at the Italian Call that the dividend could be worth "$1 to $20." [*Id.* ¶¶ 82–88, 114, 120, 126, 132–33.] Neither statement is actionable as to Mr. Brda.

A.   **"Commercially Reasonable Efforts" Statements Were Not Materially False.**

The SEC alleges Mr. Brda misrepresented that Torchlight and Meta II would take "commercially reasonable efforts" to sell Torchlight's O&G Assets. [*See* Compl. ¶¶ 67–81, 114, 120, 126, 132–33.] The SEC contends those statements were false because Torchlight allegedly failed to take any efforts to sell the assets due to an alleged secret intent not to sell. This theory is legally and factually flawed as pled.

First, the SEC has neither pled scienter nor negligence. Second, the statements are not actionable because they were forward looking, protected by the bespeaks caution doctrine, and were non-actionable expressions of corporate optimism. Third, because the SEC cannot plead that any of its proposed steps to sell the assets were "commercially reasonable," it cannot adequately plead falsity. Finally, the public record contains substantial support that Torchlight did undertake appropriate efforts given the prevailing economic conditions.

*i.*   *The SEC has Not Pled the Required State of Mind.*

The SEC's theory of liability hinges on its assertion that Torchlight, through Mr. Brda, never really wanted to sell the O&G Assets and instead, planned to spin out the assets all along, but nonetheless represented it would use "commercially reasonable efforts" to sell the assets within six months of merger close. [*See* Compl. ¶¶ 75–77.] This theory "encounters an immediate first-level problem." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). The SEC's contradictory theory ignores: (i) Torchlight's entire business plan prior to the merger was to develop the O&G Assets for sale, (ii) Mr. Brda would not have obtained a materially different benefit from a spin-out over a sale, and (iii) the spin-out entity's plan was to sell the O&G Assets post-merger. The SEC's theory "does not make a whole lot of sense," *id.*, and is "divorced from

Return to TOC                                                                       APP1-614

common experience." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021). It is insufficient to plead scienter as a matter of law. *See Nguyen*, 962 F.3d at 408 ("Allegations that are implausible do not create a strong inference of scienter."); *Coates v. Heartland Wireless Commc's, Inc.*, 55 F. Supp. 2d 628, 643 (N.D. Tex. 1999) (dismissing complaint where "alleged motive to commit fraud is not plausible as pleaded"); *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995) (concluding that no showing of scienter had been made where defendants allegedly committed fraud to inflate stock price yet waited for weeks while the stock price slid downward before selling their stock). Nor can it support a claim for negligence.

It is undisputed that Torchlight's long-standing business plan prior to the merger was to sell its O&G Assets at commercially reasonable terms to purchasers with sufficient resources to fully develop the land. [*See* Compl. ¶ 20–21.] The SEC pleads no plausible explanation as to why Torchlight would suddenly abandon this original intent after the merger announcement, only to resurrect it post-merger in the spin-off entity whose purpose was to sell the O&G Assets. *See In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL 3491779, at *18 (D. Del. Aug. 9, 2021), *report and recommendation adopted*, 2021 WL 3726014 (D. Del. Aug. 23, 2021) ("the zig-zagging nature of Defendants' alleged mindset suggests a less-than-cogent narrative"). There is none.

The SEC vaguely alleges that Mr. Brda's communications in December 2020 reflected groundwork for a potential spin-out of the O&G Assets into NBH. [*See* Compl. ¶ 78.] Not only does this vague allegation fail to satisfy the heightened pleading standard of fraud, but also the communication does not demonstrate an intent not to sell. Rather, it reflects a potential spin-off

of some or all of the O&G Assets, which Torchlight disclosed was an alternative back-up plan in the event a sale was not consummated within six months after merger close.[39]

Far from showing negligence (let alone fraudulent intent), Torchlight's actions reflected responsible and prudent measures to protect the O&G Assets. The existence of a qualified offer for the O&G Assets at a commercially reasonable price pre-merger would have obviated the need for preparations for a spin-off. But there is no dispute that there was no such qualified offer at that time. The SEC does not allege otherwise and its competing speculation—that Torchlight never intended to sell—"has no basis in logic or common experience" or the Complaint. *Nguyen*, 962 F.3d at 408; *see Prodanova*, 993 F.3d at 1107, 1113 (same).

Equally fatal is the absence of a plausible motive for Mr. Brda to misrepresent the intended disposition of the O&G Assets. "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). The SEC has not sufficiently pled that Mr. Brda obtained a "concrete and personal benefit" from a spin-off, as opposed to a sale, of the O&G Assets different from benefits received by other legacy Torchlight shareholders. Nor did a spin-off provide a "clear financial incentive" to Mr. Brda over a sale. *See Prodanova*, 993 F.3d at 1107 (no scienter where plaintiff's theories did not "provide a clear financial incentive"). Because the SEC has not pled specific facts showing that Torchlight, through Mr. Brda, never intended to sell the O&G Assets, a misrepresentation claim based on the "commercially reasonable efforts" statements is not cognizable.

---

[39] Preliminary Proxy Statement at 31, 35, 38, 47, 90, 101, 125, 151; Definitive Proxy Statement at 31, 49, 50, 97, 110.

ii.    *The Forward-Looking Statements are Protected by the Bespeaks Caution Doctrine and are Non-Actionable Puffery.*

Forward-looking statements accompanied by adequate cautionary language are not actionable as a matter of law under the bespeaks caution doctrine. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Under that well established doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

The "commercially reasonable efforts" statements were forward looking and, on their face, concerned an uncertain future action. Definitive Proxy at 31 ("*will* use commercially reasonable efforts"). The proxy disclosed that use of the word "will" was "intended to identify [a] forward-looking statement" and that "any forward-looking statements are not guarantees of future performance."[40] Investors were informed that the "commercially reasonable efforts" statements were mere predictions, not guarantees of future events. Such statements are not actionable. *See Faulkner I*, 156 F. Supp. 2d at 389, 400 (statements that defendant would "use all commercially reasonable efforts to take" actions to consummate merger "were not actionable because they were mere predictions"). These "generalized, positive statements about the company's . . . future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).

The proxy also contained extensive cautionary language, explicitly and implicitly warning that a sale of the O&G Assets might not occur. It stated "[u]ltimately, the Combined Company may not be able to consummate an Asset Sale Transaction" and identified as a potential risk, "[t]he

---

[40] Investors were informed that forward-looking statements "involve a number of risks and uncertainties, all of which are difficult or impossible to predict accurately and many of which are beyond our control," and thus, "actual results may differ significantly from those expressed in any forward looking statements." Definitive Proxy at 2.

Return to TOC                                                                                      APP1-617

possibility that the Combined Company may not be able to sell all of the O&G Assets[.]" Definitive Proxy at 50, 110.  It disclosed no less than three times that if an asset sale was not consummated, Torchlight could pursue a spin-off of the O&G Assets.[41]  That is precisely what ultimately occurred; Torchlight was unable to sell the O&G Assets during the relevant time period and therefore spun the assets out to NBH.  It is axiomatic that a securities claim does not lie when the company "disclosed the very . . . risks about which [plaintiff] claim[s] to have been misled." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (plaintiff could not establish claim where "substantial indicia of the risk that materialized" were "unambiguously apparent on the face of the disclosures alleged to conceal the very same risk"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) ("The allegedly omitted facts were either disclosed or implied in the offering memoranda.").  The SEC's attempt to overcome Torchlight's ample disclosures by its repeated conclusory statement that Torchlight never intended to sell the O&G Assets, is implausible as shown above and cannot defeat Torchlight's abundant warnings.  As a result, the "commercially reasonable efforts" statements are not actionable as a matter of law under the bespeaks caution doctrine.

In addition, the "commercially reasonable efforts" statements are non-actionable puffery because courts routinely hold that statements that a party will use "commercially reasonable efforts" or "best efforts" are expressions of corporate optimism or puffery that are not actionable. *See*, *e.g.*, *Faulkner I*, 156 F. Supp. 2d at 389, 400 (statement that defendant would "use all commercially reasonable efforts to take" actions to consummate the merger was "not actionable"

---

[41] The proxy provided "[i]n the event that any O&G Assets has not been sold in an Asset Sale Transaction that is consummated prior to the Asset Sale Expiration Date, the Combined Company will, to the extent permitted by applicable law, declare a Spin-Off Dividend to distribute beneficial ownership of the [remaining O&G] Assets to the holders of Series A Preferred Stock."  Definitive Proxy at 31, 49, 97.

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 29

Return to TOC

because they were "statements of opinion"); *Kas v. First Union Corp.*, 857 F. Supp. 481, 484 (E.D. Va. 1994) (because statement that defendants would use "best efforts" to consummate merger at earliest practicable date "were no more than 'expressions of optimism' about the future consummation of the merger, they are not actionable under § 10(b) or Rule 10b-5"); *see also In re First Am. Fin. Corp.*, 2021 WL 4807648, at *4 (C.D. Cal. Sept. 22, 2021) (dismissing claims based on defendant's statement that it would use 'best efforts" to protect customer data).

### iii.    *The Statements Were Not False When Made.*

The SEC attempts to gloss over the non-actionable nature of the "commercially reasonable efforts" statements by contending that Torchlight made no efforts to attempt to sell the O&G Assets because (once again) Mr. Brda always intended to spin off the assets.  As shown in Section III.A(i) *supra*, the SEC cannot plausibly allege that Mr. Brda never intended to sell the assets, which will doom its ability to prove falsity.  *See Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 173 (S.D.N.Y. 2002) ("*Faulkner II*") (allegations that defendant "harbored a secret intent" to ultimately terminate merger agreement was insufficient to plead falsity of statements that it would use "commercially reasonable efforts" to consummate merger).

But even *assuming arguendo* that Torchlight took no action to sell the O&G Assets, that inaction would not necessarily render the statements false when made.  That is because pleading falsity as to the "commercially reasonable" efforts statements requires pleading *particularized facts* showing that *there were commercially reasonable efforts* available, under prevailing market conditions, that Torchlight *did not take.  See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 519 (S.D.N.Y. 2020) (failure to adequately plead falsity for statement that "SG&A expenses would grow at a rate lower than the projected sales growth rate," as even if the court "assume[d] that management was expecting the SG&A expenses to grow at a significant rate," the challenged statements "would not necessarily be false" without additional allegations about expected sales);

Return to TOC

*cf. In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882 (9th Cir. 2012) (dismissing for failure to "allege any specific facts" showing that statement was false).

Without particularized facts alleging that "commercially reasonable efforts" were available, the SEC cannot show that failure to take action was contrary to the challenged statement. *Accord Faulkner I*, 156 F. Supp. 2d at 397 (allegations that defendant fraudulently represented it was taking "commercially reasonable efforts" to consummate a merger were conclusory). Of course, as a matter of law, a securities violation cannot be pled with hindsight of fact. *Stevelman*, 174 F.3d at 85. In other words, the relevant inquiry is not whether "commercially reasonable efforts" were taken, but rather, whether "commercially reasonable efforts" were intended when the statement was made pre-merger in Torchlight's Form 8-K dated September 23, 2020 and leading up to the merger. [*See* Compl. ¶¶ 69–74.] For the foregoing reasons, the "commercially reasonable efforts" statements were not actionable, materially false, or misleading statements when made and cannot support a securities fraud claim.

### B.    Mr. Brda is not a "Maker" of any Statement at the Italian Call.

The SEC alleges Mr. Brda violated Sections 10(b), 17(a), and 14(a), based on Mr. Palikaras' statement at the Italian Call that the dividend could be worth "$1 to $20." [*See* Compl. ¶¶ 82–88, 114, 120, 126, 132–33.] The SEC contends that such statement was false and misleading because it omitted a Meta I employee's internal opinion that the "dividend was never going to be worth more than $1." [*Id.* ¶ 87.] Mr. Brda, however, did not "make" the statement. And even if he had, the statement is non-actionable puffery, non-actionable opinion, and/or a non-actionable forward-looking statement. [*See* Palikaras Motion to Dismiss.]

Even if the Complaint adequately alleged actionable misstatements (it does not), Mr. Brda cannot be primarily liable for statements he did not make. The Supreme Court limited primary liability to the "maker" of a statement, meaning "the person or entity with ultimate authority over

the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *see Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) ("liability for misrepresentations does not extend 'beyond the person or entity that ultimately has authority over the false statement'"). "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus*, 564 U.S. at 142.

Here, Mr. Brda is not a "maker" of the $1–$20 oral statement because Mr. Brda did not make the statement. Rather, the statement was made by Mr. Palikaras, in his capacity as CEO for Meta I, a counterparty to Torchlight. "[I]t is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143. Mr. Brda did not have "ultimate authority" over Meta I or its CEO in May 2021. Torchlight and Meta I remained legally (and factually) separate and distinct entities at the time of the May 2021 Italian Call.

In *Janus*, the Supreme Court held an investment advisor did not have ultimate authority over a speaking fund where the advisor and fund "remain[ed] legally separate entities," the fund's board was independent, and it was "undisputed that the corporate formalities were observed[.]" *Janus*, 564 U.S. at 145–46; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 203–04 (S.D.N.Y. 2022) (similar); *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 809 (S.D.N.Y. 2015) ("Where, as here, the defendants have no role in the business structure of the speaking entity and are instead officers of a separate entity, and there is no allegation that corporate formalities have not been observed, generalized allegations that the defendants had as much authority over the speaking entity's statements as its own officers are insufficient to state plausibly a claim that the separate entity's officers 'made' the speaker's statements.").

While "[i]t is not uncommon for two businesses who engage in a joint venture to attempt to coordinate the statements regarding that joint venture," any obligation of each party "to ensure

that its statements are consistent with the statements of the other does not make each such party the 'maker' of the statements by the other." *Turquoise Hill*, 625 F. Supp. 3d at 207. Rather, "'[u]ltimate authority' is critical." *Id.* Nor would Torchlight's invitation to Mr. Palikaras to attend the Italian Call give rise to ultimate authority. "That line of argument cannot be squared with *Janus* []." *Fulton Cnty. Emples. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012) (Easterbrook, C.J.) (rejecting argument that "by inviting" employees of a third party to speak at the company's quarterly earnings call, the company "effectively 'made' their statements itself"). In short, the SEC cannot rely on the Italian Call to attribute a misrepresentation claim to Mr. Brda.

## III.    The SEC Does Not Plead Any Negligence-Based Theory (Count I).

The SEC's tag-along claim under Section 17(a) based on the same "scheme to manipulate" fails. [*See* Compl. ¶ 113.] "Section 17(a) merely extends Rule 10b–5 liability to cover both buyers *and sellers*, offering *and selling securities*. Section 17(a) does not give the Commission carte blanche to prescribe liability where Rule 10b–5 falls short." *Mapp*, 240 F. Supp. 3d at 586 (dismissing Section 17(a) claim for failure to allege facts to support plausible claim) (emphasis in original). "Like claims for § 10(b) and Rule 10b-5 violations, claims for section 17(a)(1) violations must be supported by allegations of scienter or intent to defraud, whereas claims for violations of sections 17(a)(2) and (a)(3) do not have a scienter requirement." *SEC v. Gilman*, 2019 WL 4743431, at *9 (N.D. Tex. Sept. 26, 2019) (citing *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980)). "Rule 17(a) claims are frequently analyzed under the same framework as Rule 10b-5 claims; however, negligence is sufficient for claims under sections 17(a)(2) and (a)(3)." *Id.*

Because the elements of a Section 17(a)(1) claim are "essentially the same elements" as a Section 10(b) claim, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996), the Section 17(a)(1) claims against Mr. Brda fail for the same reasons applicable to the Section 10(b) claims discussed above. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 33

Return to TOC

Similarly, because Sections 17(a)(2) and (a)(3) are virtually identical to Rule 10b-5(c), a tag-along claim will fail for the same reasons afflicting a Rule 10b-5(c) claim, with the exception of the requisite mental state.  To prove that a defendant violated Section 17(a)(2) or Section 17(a)(3), the SEC must allege "that the defendant acted with negligence," *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008), but here the SEC fails to identify any negligence-based theory against Mr. Brda.  *See Decks Appeal v. GTE Directories Sales Corp.*, 81 F.3d 154, at *2 (5th Cir. 1996) (table) (no "viable cause for negligence" when a party fails "to allege any cognizable duty that could support a negligence claim"); *SEC v. Ginder*, 752 F.3d 569, 576 (2d Cir. 2014) (rejecting negligence-based theories where SEC did not put on evidence of appropriate standard of care, noting "SEC ultimately succumbs to its strategic choice at trial to pursue a theory of scienter or nothing"); *SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011) ("[W]e agree with the district court that the SEC's failure to present any evidence that he nonetheless violated an applicable standard of reasonable care was fatal to its case.").  Notwithstanding the SEC's inability to allege a negligence-based theory, the public record demonstrates that Mr. Brda acted with reasonable care as a matter of law with respect to the merger, the preferred share dividend, and the ATM Offering.

## IV.   SEC Fails to Allege a Proxy Fraud Claim (Count III).

Section 14(a) ("**Proxy Fraud Claim**") applies only to those who "solicit" or "permit the use of name to solicit" a proxy vote.  15 U.S.C. § 78n(a)(1).[42]  "To state a Proxy Fraud Claim, a plaintiff must show that (1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the loss-generating corporate

---

[42] The second prong of Section 14(a) requires "a substantial connection between the use of the person's name and the solicitation effort."  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C.C. 1980).  The Complaint has no allegations to support this prong.

Return to TOC                                                                                          APP1-623

actions." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339 (N.D. Tex. 2008).[43]  "The plain language of Rule 14a-9 requires a plaintiff to show both materiality and a false or misleading statement as a result of the omission.  Omission of information from a proxy statement will violate these provisions if either the SEC regulations specifically require disclosure of the omitted information . . . or the omission makes other statements in the proxy statement materially false or misleading." *Schmitt v. China XD Plastics Co., Ltd.*, 698 F. Supp. 3d 474, 485–86 (E.D.N.Y. 2023).

*First*, the SEC fails to identify any negligence-based theory, let alone one that satisfies Rule 9(b).  *See* Section III supra; *accord Gruss v. Curtis Publ'g Co.*, 534 F.2d 1396, 1403 (2d Cir. 1976) (reversed and remanded with instruction to dismiss complaint; "we cannot sustain the district court's conclusion that failure to [include certain language in the Proxy Statement] constituted negligence by [defendant] – the standard of culpability we have held applicable as a minimum in damage suits for violations of the Proxy Rules").

*Second*, the Proxy Fraud Claim attempts to shoehorn the SEC's scheme liability theory into a Section 14(a) claim by relying on the exact same alleged misrepresentations or omitted material facts: (i) all alleged motives for the merger [Compl. ¶¶ 39–46]; and (ii) Torchlight's "commercially reasonable efforts."  [*Id.* ¶¶ 67–81.][44]  Both of which fail for the reasons set forth above.  *See supra* Sections I.B and II.A.  Further, the Supreme Court has already foreclosed a Proxy Fraud Claim that hinges on the theory the SEC relies.  *See Va. Bankshares*, 501 U.S. at 1096 ("the temptation to rest an otherwise nonexistent § 14(a) action on psychological enquiry alone would threaten just the sort of strike suits and attrition by discovery that *Blue Chip Stamps* sought to discourage").

---

[43] *Pedroli v. Bartek*, 2008 WL 901203, at *3 (E.D. Tex. Mar. 31, 2008) (Rule 9(b) applies to § 14(a) claim for fraud).
[44] To the extent the SEC's Proxy Fraud Claim attempts to attribute any alleged "solicitation" in the Italian Call to Mr. Brda [Compl. ¶¶ 82–88], this fails because Mr. Brda is not a "maker."  *See supra* Section II.B.

*Finally*, the SEC's Proxy Fraud Claim fails to identify an "'essential link" between the proxies at issue and the harm they have alleged . . . *directly authorized* by the proxy solicitation." *Hulling*, 548 F. Supp. 2d at 340 (emphasis in original). Crucially, "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *7 (S.D.N.Y. Sept. 28, 2022). The SEC has not identified any link; its Proxy Fraud Claim fails.

## V. THE SEC FAILS TO SUFFICIENTLY ALLEGE AN AIDING AND ABETTING CLAIM.

The SEC fails to allege elements to state an aiding and abetting claim: "(1) a primary violation of the securities laws; (2) that the aider and abettor had knowledge of this violation and of his or her role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation." *SEC v. Life Partners Holdings*, *Inc.*, 854 F.3d 765, 778 (5th Cir. 2017). The derivative claims fail because there is no primary violation.

### A. The Section 13(a) False Filing Claim Fails (Count IV).

Section 13(a) of the Exchange Act "requires all issuers subject to the Act's registration requirements to submit periodic reports to the Commission containing such information as the Commission may direct through its rules," including, for example, Forms 8-K and 10-K. *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 70 (D.C. Cir.), *cert. denied*, 449 U.S. 1012 (1980). A false-filing claim under Section 13(a) requires allegations that the SEC filings at issue were "materially false." *SEC v. Stanard*, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009). Again, the Section 13(a) claim is tacked onto the SEC's scheme liability theory and relies on the same alleged misrepresentations or omitted material facts regarding Torchlight's "commercially reasonable efforts," [Compl. ¶¶ 67–71; 75–81], which fails for the reasons set forth above.

Return to TOC

APP1-625

**B.** **The SEC Fails to Allege an Accounting or Internal Controls Violation.**

To allege a violation of Section 13(b)(2), the SEC must claim that Mr. Brda failed to keep books and records that "fairly reflect the transactions and dispositions" of its assets or failed to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" in conformity with applicable accounting regulations. 15 U.S.C. § 78m(b)(2)(A)–(B). The touchstone for liability under these provisions is "reasonableness" because "management must exercise judgment" and "must necessarily estimate and evaluate the cost/benefit relationships of the steps to be taken in fulfillment of its responsibilities." S. Rep. No. 95-114, at 8 (1977); *see also SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997); *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 751 (N.D. Ga. 1983).

Here, the SEC fails to allege an accounting violation, much less any inadequacy in Torchlight's internal controls. In support of its claim, the SEC alleges that a series of payments made to stock-support consultants who rendered services to the company were insufficiently recorded by "generic consulting contracts." [Compl. ¶ 140.] The allegation is not that the service was not documented in the books and records, but rather that the contract was too generic.

*i.* ***Section 13(b)(2)(A)—Books and Records.***

Section 13(b)(2)(A), referred to as the books and records provision, "has three basic objectives," none of which are implicated here. *World-Wide Coin*, 567 F. Supp. at 748. To prevail on such a claim, "the SEC must establish that [the defendant] directly or indirectly, falsified or caused to be falsified, any book, record or account that the company was required to maintain under the" Exchange Act. *SEC v. Lowy*, 396 F. Supp. 2d 225, 240 (E.D.N.Y. 2003). Further, the SEC cannot claim a violation "absent proof of a violation" of the accounting standard. *SEC v. Coffman*, 2007 WL 2412808, at *15 (D. Colo. Aug. 21, 2007). The Complaint fails to meet this standard.

Although a reasonableness standard applies, courts routinely dismiss claims where—as here—there are no allegations that a restatement was required or made. *See Harris v. AmTrust Fin. Servs., Inc.,* 135 F. Supp. 3d 155, 172–73 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (dismissing claim of accounting violation "[i]n the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated" applicable accounting standards); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 588 (E.D. Va. 2006). Taken on their own terms, the allegations cannot establish that Torchlight violated any applicable accounting standards. The SEC's allegation is not that Mr. Brda failed to provide the contracts with the consultants to the accounting department or that he falsified the information in the contracts. The crux of the SEC's accounting claim is that the contracts were too generic. This allegation does not pass muster and should be dismissed

### ii.      *Section 13(b)(2)(B)—Internal Accounting Controls.*

Section 13(b)(2)(B) addresses, in part, the internal accounting controls element of a company's control system, and is designed to "give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled." *World-Wide Coin*, 567 F. Supp. at 750. "By its terms, Section 13(b)(2)(B) does not govern *every internal system* a public company uses to guard against unauthorized access to its assets, but only those qualifying as 'internal accounting' controls." *SEC v. SolarWinds Corp.*, --- F.Supp.3d ----, 2024 WL 3461952, at *51 (S.D.N.Y. July 18, 2024). The SEC's internal controls claim should be dismissed for two independent reasons.

First, the Complaint alleges insufficient facts regarding Torchlight's system of internal accounting controls. "Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville*

Return to TOC

*v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006). No facts regarding any such controls are alleged here, rather, the SEC alleges that Torchlight "failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses . . .." [Compl. ¶ 139.] This on its face warrants dismissal. *See, e.g., SEC v. Bankatlantic Bancorp, Inc.*, 2012 WL 1936112, at *24 (S.D. Fla. May 29, 2012) (dismissing claim where there were not "sufficient allegations relating to the types of internal accounting controls contemplated by § 13(b)(2)(B)"). "The mere fact that accounting controls may have been circumvented does not state a claim for a violation of Section 13(b)(2)(B) of the Exchange Act." *Rio Tinto*, 2019 WL 1244933, at *19. Internal controls need only provide "reasonable assurances" of accurate records, not airtight guarantees that withstand any circumvention. *World-Wide Coin*, 567 F. Supp. at 751 (neither SEC nor Congress "intended that the statute should require that each affected issuer install a fail-safe accounting control system").

## VI. DISGORGEMENT AND OFFICER/DIRECTOR BAR RELIEF SHOULD BE STRICKEN.

The Complaint's requested remedies [Compl. ¶ 144]—in particular, disgorgement and officer/director bar—are legally deficient and unsupported by factual allegations, and thus should be stricken at the pleadings stage. *See SEC v. Berry*, 2008 WL 4065865, at *9 (N.D. Cal. Aug. 27, 2008) (striking relief sought at pleadings stage when "allegations in support of [the] request . . . were lacking").

The SEC is seeking a disgorgement order from Mr. Brda. But there is no justification, as pled, for any disgorgement award against Mr. Brda because the SEC cannot tie any alleged ill-gotten gains to the alleged scheme. Disgorgement must be limited to a defendant's ill-gotten gains, namely, the "wrongdoer's net unlawful profits." *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020). Allowing the SEC to obtain excessive "net unlawful profits" violates the "equitable principle that the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 39

Return to TOC

wronged.'" *Id.* The disgorgement amount must "be a reasonable approximation of profits *causally connected to the violation*." *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (emphasis added).

Likewise, the SEC's prayer for an officer and director bar against Mr. Brda is unsupported as pled because the Complaint fails to allege any facts "demonstrat[ing]" Mr. Brda's "unfitness to serve as an officer or director." 15 U.S.C. § 77t(e).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Brda respectfully requests the Court dismiss with prejudice the SEC's Complaint for failure to state a claim upon which relief can be granted.

Dated:  January 17, 2025.

Respectfully submitted,

/s/ Jason S. Lewis

Jason S. Lewis
  Texas Bar No. 24007551
  jason.lewis@us.dlapiper.com
Jason M. Hopkins
  Texas Bar No. 24059969
  jason.hopkins@us.dlapiper.com
Ryan D. Lantry
  Texas Bar No. 24125130
  ryan.lantry@us.dlapiper.com
**DLA PIPER LLP**
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone:  214.743.4546
Facsimile:  214.743.4545

*ATTORNEYS FOR DEFENDANT JOHN BRDA*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing brief on all counsel of record via the Court's CM/ECF

system on January17, 2025.

/s/ Jason S. Lewis

Jason S. Lewis

Return to TOC

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 4:24-cv-01048-SDJ |
| v. | |
| JOHN BRDA, GEORGIOS PALIKARAS, | |
| Defendants. | |

## DEFENDANT GEORGIOS PALIKARAS'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant Georgios Palikaras ("Palikaras"), by and through undersigned counsel, respectfully submits this memorandum in support of his motion, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint filed by the Securities and Exchange Commission ("SEC").

# TABLE OF CONTENTS

Page

I.   STATEMENT OF ISSUES ........................................................................1

II.  RELEVANT FACTUAL BACKGROUND.............................................3

   A.   Defendants and Related Entities. ..................................................3

   B.   Ahead of the Deal, TRCH Publicly Disclosed the Proposed Merger between TRCH and Meta I, along with the Attendant Risks and Considerations. ...................4

   C.   TRCH's Proxy Statements Described the Merger; that the Public Knew a Short Squeeze Might Result; and Others Were Actively Manipulating TRCH's Share Price. ...................5

   D.   The Dividend's Effect on Short Investors was Understood and Discussed Online...................6

   E.   As Would Be Expected, Palikaras Attended an Industry Conference During the Merger Period, But the SEC Does Not Allege Palikaras Made Any Statement.........7

   F.   Palikaras Engaged with a Few TRCH Shareholders on a Single Call in May 2021, which Was Secretly Recorded and Later Disseminated *in Part* by an Unidentified Internet User. ...................7

   G.   TRCH's Disclosures Described Terms and Risks of the June 2021 ATM Offering...................9

   H.   TRCH Shareholders Approved the Merger, and the Dividend Record Date is Disclosed...................11

   I.   The Merger Closes and Meta II Commences Operations, Terminates Palikaras, Settles with the SEC...................11

III.  ARGUMENT AND AUTHORITY ......................................................12

   A.   THE SEC FAILS TO PLEAD THAT PALIKARAS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS UNDER SECTION 10(B) OF THE EXCHANGE ACT, RULE 10B-5 THEREUNDER, OR SECTION 17(A) OF THE SECURITIES ACT ...................12

      1.   The SEC Fails to Allege that Palikaras Made *Any* Misstatement or Omission at the March 2021 Investor Conference. ...................12

      2.   Palikaras's Tweets Contained No Material Misrepresentations or Omissions...................13

         a.   The Shorts Tweets is Neither a Material Misrepresentation Nor Omission. ...................14

         b.   The T+2 Tweet is Neither a Material Misrepresentation Nor Omission. ...................16

         c.   Palikaras Did Not Otherwise Fail to Disclose Information He Had a Duty to Provide. ...................16

i

3.   Palikaras Made Neither Material Misrepresentations Nor Omissions During the Private Investor Call. .............................................................17

   a.   Palikaras's Beliefs About a Short Squeeze Occurring, Possible Purchasers for TRCH's Oil and Gas Assets, and Potential Value of the Dividend Were Opinions, Puffery, and Did Not Alter the Total Mix of Information. .............................................................18

   b.   The SEC's Rule 10b-5(b) Claims Fail Because Palikaras is Not the Maker of the Screenshot or the Incomplete Secret Recording. .............21

   c.   The SEC Cannot Establish Omission Liability under Section 10(b), Rule 10b-5, or Section 17(a) for Palikaras's Alleged Failure to Correct or Address the Screenshot or Incomplete Secret Recording. ......22

B.   THE SEC DOES NOT PLEAD SCHEME LIABILITY AGAINST PALIKARAS .....................23

   1.   The Complaint Does Not Allege Any Actionable Conduct by Palikaras Beyond Alleged Misrepresentations and Omissions. .......................................24

   2.   The SEC's Scheme Liability Claims Against Palikaras Also Fail Because the Details of the Alleged Scheme Were Known and Disclosed....................27

      a.   Details of the Dividend Were Disclosed and Consequence to Short Interests Was Understood. ...........................................................27

      b.   Details of TRCH's ATM Offering Were Also Disclosed......................31

   3.   The SEC's Scheme Liability Claims Against Palikaras also Fail to the Extent They are Based on Allegations Relating to Meta I's Actions. ............32

   4.   The SEC's 10b-5 Claims Fail to Allege Any Connection Between the Private Investor Call and the Purchase or Sale of TRCH Stock. .....................35

C.   THE SECTION 17(A)(2) CLAIMS FAIL TO ALLEGE THAT PALIKARAS OBTAINED MONEY OR PROPERTY "BY MEANS OF" ANY ALLEGED MISREPRESENTATION.........35

D.   THE SEC FAILS TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 14(A)..............37

CONCLUSION........................................................................................................40

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)................................................................................28

*Abrams v. Baker Hughes, Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................17

*In re Adams Golf, Inc. Secs. Litig.*,
381 F.3d 267 (3d Cir. 2004)..................................................................16

*In re ATI Techs., Inc., Sec. Litig.*,
216 F. Supp. 2d 418 (E.D. Pa. 2002) ......................................................9

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................................................15

*Basic Inc. v Levinson*,
485 U.S. 224 (1988)................................................................................17

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ..................................................................15

*Brooks v. United Dev. Funding III, L.P.*,
No. 20-cv-00150-O, 2020 WL 6132230 (N.D. Tex. Apr. 15, 2020)....................3, 7

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
No. 19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ............37

*Chadbourne & Park LLP v. Troice*,
571 U.S. 377 (2014)................................................................................35

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)....................................................17

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ....................................................................30

*Dawes v. Imperial Sugar Co.*,
975 F. Supp. 2d 666 (S.D. Tex. 2013) ...................................................13

*Doyle v. Milton*,
73 F. Supp. 281 (S.D.N.Y. 1947) ..........................................................30

iii

*Ernst & Ernst v. Hochfelder*,
　　425 U.S. 185 (1976) ................................................................................25

*In re Franklin Bank Corp. Sec. Litig.*,
　　782 F. Supp. 2d 364 (S.D. Tex. 2011) ...................................................20

*Funk v. Stryker Corp.*,
　　631 F.3d 777 (5th Cir. 2011) ...................................................................3

*Halperin v. eBanker USA.com, Inc.*,
　　295 F.3d 352 (2d Cir. 2002) ...................................................................16

*Heinze v. Tesco Corp.*,
　　971 F.3d 475 (5th Cir. 2020) ..................................................................38

*Ho v. Duoyuan Glob. Water, Inc.*,
　　887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...................................................29

*Hulliung v. Bolen*,
　　548 F. Supp. 2d 336 (N.D. Tex. 2008) ..................................................37

*In re IBM Corp. Sec. Litig.*,
　　163 F.3d 102 (2d Cir. 1998) ...................................................................20

*Jacobowitz v. Range Res. Corp.*,
　　596 F. Supp. 3d 659 (N.D. Tex. 2022) ..................................................13

*Janus Capital Grp., Inc. v. First Derivative Traders*,
　　564 U.S. 135 (2011) ............................................................2, 21, 22, 29

*Kraft v. Third Coast Mistream*,
　　No. 19 Civ. 9398, 2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ............30

*Krim v. BancTexas Grp., Inc.*,
　　989 F.2d 1435 (5th Cir. 1993) ...............................................................35

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
　　128 F. Supp. 3d 792 (S.D.N.Y. 2015) ...................................................29

*Lain v. Evans*,
　　123 F. Supp. 2d 344 (N.D. Tex. 2000) ..................................................14

*Linenweber v. Sw. Airlines Co.*,
　　693 F. Supp. 3d 661 (N.D. Tex. 2023) ....................................................9

*Lorenzo v. SEC*,
　　872 F.3d 578 (D.C. Cir. 2017), *aff'd*, 139 S.Ct. 1094 (2019) ...............22

iv

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)................................................................................................17

*Pedroli ex rel. Microtune, Inc. v. Bartek*,
    564 F. Supp. 2d 683 (E.D. Tex. 2008)..........................................................37, 38

*Morrison v. Nat'l Austrl. Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................................31

*N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013).................................................................29

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001)................................................................................18

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017)................................................................................16

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007)..................................................................................3

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................................29

*Olkey v Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir 1996).......................................................................................39

*Omnicare, Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................15

*In re Overstock Sec. Litig.*,
    119 F.4th 787 (10th Cir. 2024) ....................................................................*passim*

*In re Overstock Sec. Litig.*,
    2021 WL 4267920 (D. Utah Sept. 20, 2021).............................................*passim*

*In re Overstock Sec. Litig.*,
    No. 19 Civ. 709, 2020 WL 5775845 (D. Utah Sept. 28, 2020) ...................*passim*

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) .........................................................................13, 16

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
    9 F.4th 247 (5th Cir. 2021)....................................................................................3

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)................................................................................31

v

APP1-636

*Pharo v. Smith,*
    621 F.2d 656 (5th Cir. 1980) ........................................................36

*Plotkin v. IP Axess Inc., Etc.,*
    407 F.3d 690 (5th Cir. 2005) ........................................................3

*Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.,*
    482 F.3d 372 (5th Cir. 2007) ...................................................25, 33

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.,*
    905 F.3d 892 (5th Cir. 2018) ........................................................19

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ........................................................32

*SEC v. Bowen,*
    No. 22-CV-1415-S, 2023 WL 6166780 (N.D. Tex. Sept. 21, 2023) ........................13

*SEC v. DiMaria,*
    207 F. Supp 3d 343 (S.D.N.Y. 2016) ........................................................36

*SEC v. Farmer,*
    No. 14-CV-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ........................26, 36

*SEC v. Felton,*
    No. 20-CV-822-G, 2020 WL 7056333 (N.D. Tex. Dec. 2, 2020) ........................13, 29

*SEC v. Hopper,*
    No. Civ.A. H-04-1054, 2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ........................36

*SEC v. Jankovic,*
    15 Civ. 1248, 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ........................36

*SEC v. Killion,*
    No. H-16-621, 2017 WL 7052310 (S.D. Tex. Mar. 24, 2017) ........................26

*SEC v. Mapp,*
    16-CV-00246, 2017 WL 5230358 (E.D. Tex. Nov. 9, 2017) ........................24

*SEC v. Mapp,*
    240 F. Supp. 3d 569 (E.D. Tex. 2017) ...................................................16, 17, 33

*SEC v. Mapp,*
    No. 16-CV-00246, 2017 WL 5177960 (E.D. Tex. Nov. 8, 2017) ........................35, 36

*SEC v. Mercury Interactive, LLC,*
    No. C 07-2822, 2009 WL 2984769 (N.D. Cal Sept. 15, 2009) ........................37

Return to TOC

*SEC v. Mueller,*
No. SA-21-CV-00785, 2024 WL 400897 (W.D. Tex. Jan. 11, 2024) .................................... 25

*SEC v. Narayan,*
No. 16-CV-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ........................... 2, 26, 28

*SEC v. Reynolds,*
No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ................ 18, 19

*SEC v. Rio Tinto plc,*
41 F.4th 47, 52 (2d Cir. 2022) ........................................................................................ 23, 29

*SEC v. Seghers,*
298 F. App'x 319 (5th Cir. 2008) ........................................................................ 1, 14, 16, 24

*SEC v. Stack,*
21-CV-00051, 2021 WL 4777588 (W.D. Tex. Oct. 13, 2021) ............................................. 28

*SEC v. Texas Gulf Sulphur Co.,*
401 F.2d 833 (2d Cir. 1968) .............................................................................................. 35

*SEC v. Verges,*
716 F. Supp. 3d 456 (N.D. Tex. 2024) .......................................................................... 24, 25

*SEC v. Wey,*
246 F. Supp. 3d 894 (S.D.N.Y. 2017) ................................................................................ 36

*SEC v. Zandford,*
535 U.S. 813 (2002) ......................................................................................................... 35

*Set Cap. LLC v. Credit Suisse Grp. AG,*
996 F.3d 64 (2d Cir. 2021) ................................................................................................ 25

*Shandong Yinguang Chem. Indus. Jt. Stock Co., v. Potter,*
607 F.3d 1029 (5th Cir. 2010) ........................................................................................... 19

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,*
365 F.3d 353 .............................................................................................................. 12, 13, 19

*In re Synchrony Fin. Sec. Litig.,*
988 F.3d 157 (2d Cir. 2021) ............................................................................................. 14

*In re Time Warner Inc. Sec. Litig.,*
9 F.3d 259 (2d Cir. 1993) .................................................................................................. 19

*Trust Co. of La. v. N.N.P. Inc.,*
104 F.3d 1478 (5th Cir. 1997) ........................................................................................... 39

Return to TOC

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)......................................................................................39

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................29

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011)......................................................................32

*Yoshikawa v. Exxon Mobile Corp.*,
   No. 21-CV-00194-N, 2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) ...................12

## Statutes

15 U.S.C. § 77q(a)(1)...................................................................................24

15 U.S.C. § 77q(a)(2)............................................................................13, 35

15 U.S.C § 77q(a)(3)...................................................................................24

15 U.S.C. § 78j(b).......................................................................................24

15 U.S.C. § 78n(a)(1)..................................................................................37

## Other Authorities

17 C.F.R. § 240.10b-5.........................................................................*passim*

17 C.F.R. § 240.14a–9.................................................................................39

Return to TOC

# I. STATEMENT OF ISSUES

Palikaras seeks to dismiss all three SEC claims against him:

- First Claim for Relief: for allegedly making fraudulent misrepresentations and omissions, and carrying out a fraudulent scheme, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act");

- Second Claim for Relief: for allegedly making fraudulent misrepresentations and omissions, and carrying out a fraudulent scheme, in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and

- Third Claim for Relief: for allegedly soliciting TRCH shareholder proxies by means of materially misleading statements or omissions in violation of Exchange Act Section 14(a) and Rule 14a-9 thereunder.

In deciding Palikaras's motion dismiss under Rules 9(b) and 12(b)(6), this Court must determine whether the SEC pled facts sufficient to establish that Palikaras made an actionable misrepresentation or omission—or that he can be liable for so-called scheme liability. Numerous bases exist on which the Court can, and should, dismiss the Complaint.

1. Pursuant to Rule 9(b)'s heightened standard for pleading fraud, the Fifth Circuit strictly requires the SEC to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX, Inc.,* 112 F.3d 175, 177–78 (5th Cir. 1997). Should the claims by the SEC be dismissed when allegations against Palikaras are general, not particularized, and rely on impermissible group pleading, which the Fifth Circuit rejects?

2. Section 17(a)(2) and Section 10(b) and Rule 10b-5(b), mandate that Palikaras's alleged statements and omissions must be <u>both</u>: (i) misleading; and (ii) material. To be misleading, a statement, when understood as a whole, must mislead a reasonable investor. *SEC. v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008). Materiality requires a "substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Id*. Importantly, information already known to the market is not material as a matter of law. *See In re Compaq Sec. Litig.,* 848 F.Supp. 1307, 1317 (S.D.Tex., 1993). The SEC bases claims on two tweets by Palikaras. Should the Court dismiss claims premised on these tweets when the Complaint fails to allege they were more than personal opinions or repeated information already digested by, and disussed in, the public domain?

3. The SEC alleges Palikaras provided misleading information during a private call with purported TRCH investors in violation of Section 17(a)(2), Section 10(b) and Rule 10b-5(b), and Section 14(a) and Rule 14a-9. The Complaint contends that Palikaras said TRCH was communicating with potential buyers for its oil and gas assets and that a planned TRCH Dividend could be worth $1-$20. Palikaras was not an officer or employee of

1

TRCH, and the SEC does not allege purported investors on the call purchased or sold TRCH stock in connection with his statements. Did the SEC fail to plead any actionable misrepresentation or omission during that call where Palikaras's alleged statements were generic expressions of opinion, puffery, did not alter the total mix of information available to the public and, therefore, would not have been relied upon by a reasonable investor? Likewise, should such claims be dismissed because the SEC does not plead—as required under Rule 10b-5—that his alleged misrepresentations caused the purported TRCH investors to purchase or sell TRCH stock? Similarly, should the SEC's Section 14(a) claim be dismissed because the SEC failed to plead that Palikaras's alleged statements formed an "essential link" in the underlying merger transaction underpinning this action?

4. To state a claim under Section 17(a)(2), the SEC must sufficiently allege that Palikaras obtained money or property in connection with his alleged misstatements or omissions. Here, the SEC alleges only that the post-merger company where Palikaras served as CEO benefitted financially, not Palikaras himself. Should the SEC's claim be dismissed because it failed to plead facts indicating that Palikaras actually obtained any money or property attributable to his scant few alleged misrepresentations and omissions?

5. Without his knowledge, consent, or authority, third-parties created and disseminated over the internet a screenshot and a modified and incomplete audio recording of the above-referenced private call with purported TRCH investors. The SEC seeks to hold Palikaras liable for the screenshot and audio recording even though only the "maker" of a fraudulent statement can be liable under Rule 10b-5(b). *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 143. Should the Court dismiss the SEC's claims to the extent they are based on a screenshot and audio recording the creation of which Palikaras did not know about or consent to, had no authority regarding whether or how to communicate, and thus was not their "maker"? Similarly, should such claims be dismissed where the SEC failed to identify any duty Palikaras had to correct others' statements?

6. Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) create so-called "scheme liability," which "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement" and "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions." *SEC v. Narayan*, No. 3:16-CV-1417-M, 2017 WL 4652063, at *6-7 (N.D. Tex. Aug. 28, 2017). Should the Court dismiss the SEC's Complaint because it fails to allege that Palikaras performed some inherently deceptive act beyond statements or omissions?

7. Rule 10b-5 and Section 17(a)(1) require the SEC to plead specific facts giving rise to a credible inference that Palikaras acted with scienter. Though the SEC contends Palikaras illicitly intended for a TRCH dividend to cause a short squeeze and thereby drive up TRCH's share price in advance of its forthcoming securities offering, it also contends that one of Palikaras's tweets expressed that very same intent to the market. In addition, judicially noticeable public records establish that the market had already digested other

2

information about the dividend and was actively discussing a possible short squeeze before the earliest date on which Palikaras is alleged to have engaged in wrongdoing. Moreover, TRCH's repeated disclosure of the nature and terms of its forthcoming dividend adequately informed the market, which immediately recognized the likelihood of an impending short squeeze. *See In re Overstock Sec. Litig.*, 119 F.4th 787 (10th Cir. 2024). Should the SEC's claims be dismissed because the SEC has failed to credibly allege that Palikaras acted with scienter and failed to disclose an allegedly deceptive intent?

## II.  RELEVANT FACTUAL BACKGROUND[1]

**A. Defendants and Related Entities.**

Torchlight Energy Resources ("TRCH") was a Texas-based oil and gas exploration company listed on the Nasdaq under the ticker symbol "TRCH." ECF No. 1 ("Compl."), ¶ 17. Brda was TRCH's CEO from 2014 through June 28, 2021. *Id.* ¶ 15. TRCH was known to have a significant number of short interest holders.[2]

Metamaterial, Inc. ("Meta I") was a Canadian nanotechnology company listed on the Canadian Securities Exchange. *Id.* ¶ 18. Palikaras was Meta I's President and CEO from 2011 through June 28, 2021. *Id.* ¶ 16. Meta Materials, Inc. ("Meta II") was created on June 28, 2021, through the merger of TRCH and Meta I. *Id.* ¶ 19. Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia. *Id.* Palikaras served as Meta II's CEO until he was terminated in October 2023. *Id.* ¶ 16. The same day the SEC sued Palikaras, it settled with Meta II for just $1,000,000.[3] The relevant timeline of events is as follows:

---

[1] Background is drawn from the non-conclusory allegations of the Complaint. A court need not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 696 (5th Cir. 2005). Documents incorporated by reference into the Complaint may be considered by this Court. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). The Court may judicially notice publicly-filed documents, including press releases and SEC filings. *See, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (judicial notice of matters of public record); *see also Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021) (judicial notice of SEC filings).

[2] Peter Krauth, *Oil & Gas Explorer Proves Up Exciting Measured Oil and Gas Production from Orogrande Basin Project*, Streetwise Reports (Feb. 25, 2020), https://www.streetwisereports.com/article/2020/02/25/oil-gas-explorer-proves-up-exciting-measured-oil-and-gas-production-from-orogrande-basin-project.html. Courts may judicially notice materials in the public record for noting what the documents state, rather than to prove the truth of their contents. *See, e.g.*, *Brooks v. United Dev. Funding III, L.P.*, No. 20-cv-00150-O, 2020 WL 6132230, at *33 (N.D. Tex. Apr. 15, 2020) (taking judicial notice of website: "it is generally proper to take judicial notice of articles and [w]eb sites published on the internet") (internal quotation marks and citation omitted).

[3] *In re Meta Materials, Inc.*, Securities Act Release No. 11292, Exchange Act Release No. 100415 (June 25, 2024), *available at* https://www.sec.gov/files/litigation/admin/2024/33-11292.pdf (hereinafter "Meta II Settlement Action").

| DATE | EVENT |
|---|---|
| February 25, 2020 | TRCH publicly understood to have significant short interests |
| September 21, 2020 | Merger LOI announced |
| December 14, 2020 | Definitive merger agreement announced |
| February 4, 2021 | TRCH files preliminary proxy describing the merger |
| March 16-18, 2021 | Brda and Palikaras attend virtual investor conference |
| May 7, 2021 | TRCH files definitive proxy statement for the merger |
| May 13, 2021 | TRCH investors speak with Palikaras, call secretly recorded |
| May 28, 2021 | TRCH files registration statement for $250 million offering |
| June 11, 2021 | TRCH shareholders vote to approve merger with Meta I |
| June 13, 2021 | Palikaras posts Shorts Tweet |
| June 14, 2021 | SEC declares TRCH shelf registration statement effective; TRCH announces June 24, 2021 Dividend record date; Palikaras posts T+2 Tweet |
| June 16, 2021 | TRCH files first prospectus supplement for ATM Offering |
| June 18, 2021 | TRCH at the market offering begins |
| June 21, 2021 | TRCH files second prospectus supplement for ATM Offering |
| June 22, 2021 | TRCH shareholders' T+2 deadline |
| June 24, 2021 | TRCH Dividend record date; TRCH at the market offering concludes |
| June 28, 2021 | Meta II is formed |
| December 13, 2022 | SEC sues social media influencers for engaging in a campaign to artificially inflate TRCH stock price |
| June 25, 2024 | SEC sues and settles with Meta II for $1 million; SEC files this action in the Southern District of New York |

## B. Ahead of the Deal, TRCH Publicly Disclosed the Proposed Merger between TRCH and Meta I, along with the Attendant Risks and Considerations.

On September 21, 2020, TRCH and Meta I announced a letter of intent to merge, with TRCH shareholders expected to own twenty-five percent of the resulting company.[4] The merger

---

[4] TRCH, Press Release, dated Sept. 21, 2020 (Form 8-K, Ex. 99.1) (Sept. 23, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000245/form-8k.htm.

4

represented a "strategic shift" for TRCH from oil and gas to cleantech and technology. *Id.* TRCH disclosed a plan to issue a preferred dividend ("Dividend") for legacy shareholders to "retain full value in [TRCH's] oil and gas assets[.]" *Id.* As the Complaint alleges, Palikaras was never an employee, officer, director, or control person of TRCH. Compl. ¶¶ 15-16. He had no authority to cause TRCH to make any disclosure nor could he make disclosures on TRCH's behalf.

On December 14, 2020, TRCH and Meta I announced the signing of a definitive merger agreement.[5] On that date, TRCH further announced its "shareholders on the record date will be entitled to receive a [Dividend]" based on net proceeds of the sale of TRCH's oil and gas assets. *Id.* TRCH explained that the Dividend "will be exempt from registration under all applicable [s]ecurities [l]aws."[6] Hence it was clear as early as December 2020 that the Dividend could not be traded upon issuance, making it difficult for short interests to acquire the Dividend in the market. Public information about the Dividend meant such parties knew they would need to cover their TRCH positions or face difficulty complying with the terms of their short contracts.

**C. TRCH's Proxy Statements Described the Merger; that the Public Knew a Short Squeeze Might Result; and Others Were Actively Manipulating TRCH's Share Price.**

On February 4, 2021, TRCH filed its a preliminary proxy statement relating to the merger.[7] The proxy informed shareholders that TRCH would hold a special meeting to vote on the merger. *Id.* at 26. It also reminded shareholders that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *Id.* at 48. Subsequent preliminary proxy statements reiterated the same message.[8]

---

[5] TRCH, Press Release (Form 8-K, Ex. 99.1) (Dec. 14, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm.
[6] TRCH, Agreement with Meta I (Form 8-K, Ex. 2.1) (Dec. 14, 2020) at 49 & D-5, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm.
[7] TRCH, Preliminary Proxy Statement (PREM14A) (Feb. 4, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521027524/d117540dprem14a.htm.
[8] *See* TRCH, Preliminary Proxy Statement (PRER14A), at 50 (Mar. 23, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521090024/d117540dprer14a.htm; TRCH, Preliminary Proxy Statement (PRER14A), at 50 (Apr. 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521124753/d117540dprer14a.htm.

Return to TOC

At the same time in February 2021—and well before the earliest date on which the SEC alleges any wrongdoing by Palikaras—a group of social media influencers "engaged in a campaign to raise the price" of TRCH's stock," "encouraged buying and holding the stock until the…upcoming merger with another company, Meta [I]," and "promoted the purported benefits of the merger," including the Dividend, as detailed in the SEC's separate enforcement action filed in December 2022.[9] According to the SEC, these "seasoned stock manipulators" claimed to be "robbing f*cking idiots of their money" as they used Twitter and other channels in a long-running scheme that involved, among other things, "a campaign to raise the [share] price of" TRCH . *Id.* at ¶¶ 1, 29, 90

On May 7, 2021, TRCH filed its Definitive Proxy Statement for the merger.[10] It again informed investors that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *Id.* at 48. TRCH further explained that "[n]o market is expected to develop for the [Dividend] in the foreseeable future and holders of the [Dividend] may not be able to find a buyer and sell their shares if they desired to do so." *Id.* TRCH warned that "[f]urther dilution may occur . . . in connection with the [merger]." *Id.* at 168.

**D. The Dividend's Effect on Short Investors was Understood and Discussed Online.**

TRCH's heavily shorted interest became a popular topic on social media platforms, setting off a "meme stock" frenzy and driving up retail interest in TRCH's stock.  In fact, in early March 2021—weeks before the alleged Investor Conference and months before the alleged Private Investor Call, Shorts Tweet, and T+2 Tweet—internet users on Twitter, Reddit, and YouTube were

---

[9] On December 13, 2022, the SEC filed its *Constantin* enforcement action against the eight social media influencers. *See* Complaint, *SEC v. Constantin et al*, 4:22-cv-04306 (S.D. Tex. Dec. 13, 2022), ECF No. 1, at ¶¶ 90-91. It was stayed pending a parallel criminal action styled *USA v. Constantinescu, et al.*, 4:22-cr-00612 (S.D. Tex.). The SEC's action appears stayed. The docket has been inactive since November 2023, though, in March 2024, the court overseeing the criminal action dismissed all charges, holding the government failed to sufficiently allege market manipulation-based securities fraud charges. Order, *Constantinescu*, 4:22-cr-00612 (S.D. Tex. Mar. 20, 2024), ECF No. 628. On April 4, 2024, the government appealed the court's order. *See* Notice of Appeal, *Constantinescu* (S.D. Tex. Apr. 4, 2024), ECF No. 643. The parties' briefing on appeal has been fully submitted, but the matter is held in abeyance by agreement of the parties as of October 22, 2024. *See* Order, *USA v. Constantinescu*, 24-20143 (5th Cir. Oct. 22, 2024).

[10] TRCH, Definitive Proxy Statement (DEFM14A) (May 7, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm (hereinafter "Definitive Proxy Statement").

already discussing the potential for a short squeeze given the Dividend, with one user tweeting: "Selling will drive price down and make it easier for anybody to get access to the special dividend when transaction is complete. If we keep holding, shorts will get burned and SP will rise making it more expensive to get the dividend HOLD!!"[11] Similar messages continued to circulate publicly in March and April 2021.[12]

### E. As Would Be Expected, Palikaras Attended an Industry Conference During the Merger Period, But the SEC Does Not Allege Palikaras Made Any Statement.

Brda, Palikaras, and others attended a virtual investor conference hosted by an investment bank in March 16 -18, 2021 (the "Investor Conference"). Compl. ¶ 60. This is the earliest date on which the SEC contends Palikaras engaged in wrongdoing. And though the SEC takes issue with Palikaras's mere online attendance, the Complaint fails to allege that he made any specific statement or omission at the Investor Conference.

### F. Palikaras Engaged with a Few TRCH Shareholders on a Single Call in May 2021, which Was Secretly Recorded and Later Disseminated *in Part* by an Unidentified Internet User.

According to the SEC, on May 13, 2021, Palikaras spoke with a few individuals believed to be TRCH shareholders (the "Private Investor Call"). *Id.* ¶ 61. The SEC contends that the purpose of the Private Investor Call was to solicit their proxy votes for the merger and encourage them to

---

[11] I Need Money (@I_need_money11), X (F/K/A TWITTER) (Mar. 15, 2021), https://x.com/i_need_money11/status/1371459055194144774?s=46&t=6snUrWh2ie7u1BYXnIRxZA.

[12] Palikaras respectfully requests that the Court judicially notice articles and social media posts published on the Internet for the limited purpose of establishing the existence of statements made rather than to prove the truth of their contents. *See Brooks*, 2020 WL 6132230 at *33-34 (taking judicial notice of articles on the Internet). *See, e.g.*, theWalrus Street (@theWalrusStreet), *The ONLY DD You Need on the Odd Merger between Torchlight Resources $TRCH & Metamaterial $MMATF*, YOUTUBE, (Mar. 1, 2021) https://www.youtube.com/watch?v=FHgduIlmTaQ (discussing TRCH short interest at 7:31 and noting that shorts will have to "close out" before the merger, that this would "drive up the price up" because "you can't short a company that no longer exists"); I Need Money (@I_need_money11), X (F/K/A TWITTER) (Mar. 15, 2021), https://x.com/I_need_money11/status/1371414410321915907 ("When the merger is complete trch won't exist anymore, only Meta will stay. Short positions on trch will have to close and open new short positions in Meta if they really want to short."); Penny Queen (u/Saint_O_Well), REDDIT r/TRCH (Apr. 4, 2021), https://www.reddit.com/r/TRCH/comments/mk6oio/is_there_even_a_short_coverage_mechanism/ ("How are the TRCH shorts going to cover? When someone shorts a stock and there is a dividend, it is paid for by the shorter. The special dividend will not be publicly traded, so they can't just buy it. It also isn't a cash dividend (yet) so they can't just put up the cash AND once the stock switches over they will then be short META, which is a position I wouldn't want to be in.").

hold the common stock of Meta II post-merger. *Id.* ¶ 82. On the call, Palikaras fielded questions about the potential for a short squeeze and the value of the Dividend. *Id.* ¶¶ 61, 83, 84.

Almost a month later, on June 7, 2021, "an anonymous Stocktwits user ('KingOneFolle')" posted a "screenshot" and publicized *his own summary* of the Private Investor Call *and* supposed other meetings involving Brda (*i.e.*, not a summary of Palikaras's statements alone, despite the SEC's allegations to the contrary) as shown in the Screenshot, copied below but excluded from the Complaint (*id.* ¶ 50):



Soon after, on June 11, 2021, an unidentified internet user publicized a partial, manipulated audio recording of the Private Investor Call on social media (the "Incomplete Secret Recording").[13] *Id.* ¶ 86. At that point, the SEC alleges, partial statements from the Incomplete Secret Recording Call became a topic of discussion on social media. *Id.* ¶ 86. Tellingly, while the SEC references the Incomplete Secret Recording throughout the Complaint – and though it is central to the claims against Palikaras – the SEC selectively isolates a few phrases from the wider context of Palikaras's alleged statements on the Incomplete Secret Recording, specifically: (i) that TRCH was speaking to "the right potential buyers" for TRCH's oil and gas assets; and (ii) that based on "the analysis" the potential value of the Dividend "could be" between $1- 20 per share. *Id.* ¶¶ 83-84. But the phrases challenged by the SEC cannot be divorced from the context of the entire call – let alone the context of the entire Incomplete Secret Recording – which shows that Palikaras heavily caveated his statements and noted that any predictions about the Dividend's value and the oil and gas assets were speculative. *See* Brda's Motion to Dismiss at 8-9 and note 22.[14]

### G. TRCH's Disclosures Described Terms and Risks of the June 2021 ATM Offering.

On May 28, 2021, TRCH filed a shelf registration statement covering one or more offerings not to exceed $250 million in the aggregate.[15] It informed investors that net sale proceeds might be used for "general corporate purposes," including capital expenditures, additions to working capital, or reduction of accounts payable or other corporate obligations. *Id.* at 11.TRCH also

---

[13] Among other things, the audio recording is incomplete, disclaimers and forward-looking statements have been omitted, the audio is at times difficult to discern, speakers are not identified by name or role, and there is no indicia of participants' consent to record.

[14] Because the Incomplete Secret Recording is both referred to in the Complaint and central to the claims, the Court may consider the transcript of the Incomplete Secret Recording, attached as Exhibit A-1 to Brda's Motion to Dismiss. *See* Brda Motion to Dismiss at note 22; *see also Linenweber v. Sw. Airlines Co*., 693 F. Supp. 3d 661, 674 (N.D. Tex. 2023) (taking judicial notice of press release and transcript of earning calls where press release and transcript contained statements for which plaintiffs claimed defendants were liable); *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 430 (E.D. Pa. 2002) ("Reference to [conference call transcripts] is necessary to assess defendants' statements in context, and to consider whether statements that are misleading in isolation are accurate or immaterial in their entirety.") That said, Palikaras has grave concern regarding the provenance, chain of custody, authentication, and completeness of the Incomplete Secret Recording. The splicing and editing are apparent from the audio file of the Incomplete Secret Recording, which the SEC has in its possession and can present to the Court. Palikaras reserves the right to challenge the admissibility of the Incomplete Secret Recording at the appropriate time.

[15] TRCH, Registration Statement (S-3) (May 28, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000350/vision_form-s3.htm.

Return to TOC

disclosed that the securities might be sold through underwriters, dealers, or agents "at market prices prevailing at the time of sale." *Id.* at 11-12. Further, TRCH advised investors to review prospectus supplements for offering terms, purchase pricing, and estimated net proceeds to TRCH from sales. *Id.* at 12. The SEC declared this registration statement effective on June 14, 2021.[16]

On June 16, 2021, TRCH filed the first prospectus supplement,[17] and announced entry into a sales agreement with Roth Capital Partners, LLC ("Roth") to sell shares under the registration statement for up to an aggregate offering price of $100 million. *Id.* at 1. TRCH made clear that sales would be at market prices in an "at the market offering" (the "ATM Offering"). *Id.* at S-11; *see also id.* at 1. TRCH explained share price and dilution risks associated with the ATM Offering:

- "Investors who purchase shares in this offering at different times will likely pay different prices, and so may experience different levels of dilution and different outcomes in their investment results." *Id.* at S-9.

- "If you invest in our common stock issued pursuant to this offering, your ownership interest will be immediately diluted to the extent of the difference between the public offering price per share and the as adjusted net tangible book value per share after giving effect to this offering. *Id.* at S-10.

TRCH further disclosed that net sale proceeds would be used for "general corporate purposes" and that, if the merger closed, a portion "may be allocated to [its] oil and gas business." *Id.* at S-9. TRCH also disclosed that it might raise additional capital. *Id.* at S-10.

On June 21, 2021, TRCH filed a second prospectus supplement,[18] disclosing that, as of June 21, 2021, 11,738,345 shares of common stock were sold for approximately $100 million and that TRCH amended the sales agreement with Roth to sell up to an additional $150 million more. *Id.* at 1. Again, TRCH made clear that shares would be sold in the ATM Offering (*id.* at 1, S-8, S-9), and TRCH issued share price and dilution warnings (*id.* at S-9, S-10). TRCH *again* disclosed that net sale proceeds would be used for "general corporate purposes" and that, if the merger

---

[16] TRCH, Notice of Effectiveness (June 14, 2021), *available at*
https://www.sec.gov/Archives/edgar/data/1431959/999999999521002335/xslEFFECTX01/primary_doc.xml.
[17] TRCH, Prospectus (424B5) (June 16, 2021), *available at*
https://www.sec.gov/Archives/edgar/data/1431959/000119983521000383/form-424b5.htm.
[18] TRCH, Prospectus (424B5) (June 21, 2021), *available at*
https://www.sec.gov/Archives/edgar/data/1431959/000119983521000410/form-424b5.htm.

Return to TOC

closed, a portion "may be allocated to [its] oil and gas business." *Id.* at S-9. TRCH raised $137.5 million in the ATM Offering, which took place between Friday, June 18, 2021, and Thursday, June 24, 2021. Compl. ¶ 106.

## H. TRCH Shareholders Approved the Merger, and the Dividend Record Date is Disclosed.

TRCH's May 7, 2021 Definitive Proxy Statement notified shareholders of a June 11, 2021 special meeting to vote on the merger.[19] On June 11, 2021, TRCH's shareholders overwhelmingly approved the merger.[20] On June 13, 2021, Palikaras posted his "Shorts Tweet," a picture of shorts branded with the Meta I and TRCH logos and stating that "[t]o commemorate the $TRCH and $MMAT merger we are thinking of launching a one time, limited edition shorts-in-flames this summer. If we get 500 likes on this post we may actually do it :-) #getyourshorty #BBQseason #SundayRoast." On June 14, 2021, TRCH announced June 24, 2021 as the Dividend record date ("Record Date").[21] To receive the Dividend, an investor had to either hold or place an order to buy TRCH stock by June 22, 2021 to ensure they were shareholders of record as of June 24, 2021 (the "T+2 Rule"). Compl. ¶ 32 n.4. The same day, Palikaras posted his "T+2 Tweet" (and with the Shorts Tweet, the "Tweets") linking to TRCH's own release and saying "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Though the SEC rests much of its case on them, it does not allege that either the Shorts Tweet or T+2 Tweet was materially misleading.

## I. The Merger Closes and Meta II Commences Operations, Terminates Palikaras, Settles with the SEC.

On June 28, 2021, TRCH announced the completion of its merger with Meta I, and Meta II commenced operations and began trading on Nasdaq. *Id.* ¶¶ 19, 107. Meta II terminated Palikaras as President and CEO in October 2023. *Id.* at ¶ 16.

---

[19] Definitive Proxy Statement *supra* note 10.
[20] TRCH, Press Release, dated June 11, 2021 (Form 8-K, Ex 99.1.) (June 16, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000381/ex99-1.htm.
[21] TRCH, Press Release, dated June 13, 2021 (Form 8-K, Ex. 99.2) (June 16, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000381/form-8k.htm.

On June 25, 2024, the SEC settled with Meta II without requiring the company to admit any wrongdoing or pay any disgorgement and imposing a civil penalty of just $1 million.[22]

## III.     ARGUMENT AND AUTHORITY

### A.  THE SEC FAILS TO PLEAD THAT PALIKARAS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS UNDER SECTION 10(B) OF THE EXCHANGE ACT, RULE 10B-5 THEREUNDER, OR SECTION 17(A) OF THE SECURITIES ACT

#### 1.    The SEC Fails to Allege that Palikaras Made *Any* Misstatement or Omission at the March 2021 Investor Conference.

The Complaint insists Defendants (collectively) "met with a series of investors" at the March 2021 virtual Investor Conference hosted annually by an investment bank to bring together a number of companies, investors, and other market participants. Compl. ¶ 60. Defendants (collectively) allegedly "pitched the justification for the merger" and "described . . . the potential for the Preferred Dividend to cause a short squeeze" in "private communications" with investors. *Id.* Relying solely on an unidentified "note-taker" who "recorded Brda telling an investment firm" about the potential for the Dividend to cause a short squeeze (which was already being discussed on social media),[23] the SEC concludes that "*Defendants*" (collectively) "intended to drive interest with these investors in the merger and in buying or retaining [TRCH] stock, without publicly disclosing their plan or belief that a short squeeze would occur." *Id.* This allegation is misleading and also constitutes impermissible group pleading.

The Fifth Circuit has "never adopted the 'group pleading' doctrine," and "[S]ection 10(b) and Rule 10b–5 required plaintiffs to identify the roles of the individual defendants, and describe their involvement." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004;[24] *see also Yoshikawa v. Exxon Mobile Corp.,* No. 21-CV-00194-N, 2023 WL 5489054,

---

[22] Meta II Settlement Action*, supra* note 3.

[23] *See supra* at II.D.

[24] In *Southland*, the Fifth Circuit explained: "Consistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded. While the plaintiffs aver … that the individual defendants 'each controlled the contents of and participated in writing [the defendant's] SEC filings, reports and releases,' this conclusory allegation fails to specify which of these documents is attributable to each individual defendant, let alone which portions or statements within these documents are assignable to each individual defendant." 365 F.3d at 365.

at * 2 (N.D. Tex. Aug. 24, 2023) ("Plaintiffs also must 'distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud.'") (quoting *Southland*, 365 F.3d at 365 and citing *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015)).

The Complaint improperly implies that "Defendants" jointly promoted the short squeeze narrative during the Investor Conference. But the SEC does not allege that Palikaras, himself, actually said (or omitted) *anything* at the Investor Conference. This fails to state a claim against Palikaras under any provision of Section 10(b), Rule 10b-5, or Section 17(a), because it wholly lacks the particularity demanded by Rule 9(b) about what material statement Palikaras made or failed to make at the Investor Conference. *See SEC v. Bowen,* No. 22-CV-1415-S, 2023 WL 6166780, at *7 (N.D. Tex. Sept. 21, 2023) (dismissing fraud claims where allegations "fail[] to provide the who, what, when ,where, and how of the fraud that is required by Rule 9(b)"); *SEC v. Felton*, No. 20-CV-822-G, 2020 WL 7056333, at *5 (N.D. Tex. Dec. 2, 2020) (dismissing fraud claims based on similar allegations where SEC generally claimed the defendant "actively participated" in a scheme but only pointed to "uncontextualized communications").

And this fatal pleading maneuver is no errant mistake. Throught its Complaint, the SEC generically impugns Palikaras by lumping him into allegations collectively about Brda, TRCH, or Meta I's alleged acts and statements, perhaps in an attempt to create an appearance of so-called scheme liability which, as discussed below, is not available in this case where the only specific facts pleaded are about statements Palikaras made or failed to make (including at the Investor Conference). *See, e.g.*, Compl. ¶¶ 29, 47, 51, 52, 55, 60, 67, 88, 89, 91, 92, 96, 97, 103, 104, 107.

## 2. Palikaras's Tweets Contained No Material Misrepresentations or Omissions.

The SEC must show that a statement or omission is both misleading *and* material.  *See* 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b); *see also Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 672 (N.D. Tex. 2022) ("Even if misrepresentations or omissions are pleaded with sufficient specificity and individualization, they must be *material* to properly state a claim.") (emphasis in original). "To be actionable, a misrepresentation or omission of a fact must be *objectively* material." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 687 (S.D. Tex. 2013)

(emphasis added). Courts assess "whether the information disclosed, understood as a whole, would mislead a reasonable potential investor." *SEC v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008) (internal quotation and citation omitted). The SEC cannot allege that either the Shorts Tweet or T+2 Tweet injected materially inaccurate information into the market or deceived investors. In fact, there are no specific allegations that the Tweets resulted in a material increase (or decrease) in the securities' price.

a. **The Shorts Tweets is Neither a Material Misrepresentation Nor Omission.**

The SEC does not allege that Palikaras's Shorts Tweet contained a materially false statement or omission, hence it cannot support a claim under Rule 10b-5(b) or Section 17(a)(2). The SEC does not dispute any statement in the Shorts Tweet itself. Instead, it makes the conclusory assertion that the tweet "impl[ies] that he intended to tout" the short squeeze. Compl. ¶ 65. The SEC alleges Palikaras's Shorts Tweet revealed his belief, or intent, that the Dividend would result in a short squeeze and was meant to promote the "short squeeze theory and encourage investors" to buy TRCH stock (*id.* ¶ 64)—notwithstanding a contradictory argument elsewhere in the Complaint that he *failed* to disclose his intent. *Id*. ¶ 48 (alleging Palikaras "never disclosed" that he "believed" the Dividend would cause a short squeeze). The SEC springboards off the Shorts Tweet to fault Palikaras for "do[ing] nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze." *Id.* ¶ 66. But the Complaint pleads no facts showing the Shorts Tweet was misleading based on any specific content (or omission) within it, and the supposed understanding circulating online based on what the SEC argues the Shorts Tweet *implied* cannot support a material misstatement by Palikaras. His statement is "of the vague and optimistic type that cannot support a securities fraud action ... and contain[s] no concrete factual or material misrepresentation." *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (citation omitted); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) (a material misstatement requires a "concrete description" and a "factual representation," rather than a "vague expression"). Further, the SEC's allegations about how some Twitter

14

commenters interpreted Palikaras's statements fails to plead that a reasonable investor would have interpreted it the same way. *See Omnicare, Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015) ("whether a statement is 'misleading' depends on the perspective of a reasonable investor" because "[t]he inquiry (like the one into materiality) is objective"); *see also Boykin v. K12, Inc.,* 54 F.4th 175, 185 (4th Cir. 2022) (declining to adopt plaintiff's proposed reading of challenged disclosure, despite argument that "[t]wo financial analysts covering the company" read it that way, because "[t]he falsity element of a Rule 10b-5 claim boils down to the reasonable investor's view of [the] statements, [] not any individual investor's reaction").

The Complaint suggests that a statement the SEC does not allege is false was nevertheless a "deceptive marketing and promoting" statement that led the market "to believe a short squeeze would occur and drive the surge." *Id.* ¶ 97. But the SEC overlooks the fact that, by the time Palikaras tweeted on June 14, 2021, the market had already digested and was discussing the likelihood of a short squeeze (and, as noted above, others were actively campaigning to artificially increase the share price of TRCH).[25] The SEC fails to allege that the Shorts Tweet *itself* was materially misleading but rather seeks to impose on Palikaras (i) a duty *not to speak* so as to avoid being misconstrued; or (ii) a duty to *say more* based on how his truthful statements were interpreted by third parties (which would also impose on him a duty to determine how his tweet was interpreted and presumably address *numerous* interpretations). Such duties do not exist and were not pleaded. Indeed, to impose such duties would create an impossible game of interpretational Whack-a-mole on executives like Palikaras that are not contemplated by the securities laws.

In sum and substance, allegations about the Shorts Tweet fail because the statement did not include—and is not alleged to have included—material misrepresentations or omissions; it simply repeated commentaries of a looming short squeeze already in the public domain. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) (dismissing

---

[25] *See supra* at II.C and note 9.

15

securities fraud claims and holding, "[b]ecause the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law") (citation omitted); *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (affirming dismissal of certain claims because defendant had no duty to disclose "information already available in the public domain"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (affirming dismissal where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").

### b. The T+2 Tweet is Neither a Material Misrepresentation Nor Omission.

The SEC points to Palikaras's T+2 Tweet as further evidence he desired a short squeeze and promoted such a narrative but again does not allege the statement *itself* to be false or misleading. Indeed, the T+2 Tweet is a plainly factual statement and an accurate observation of information already in the public domain. Compl. ¶ 90 n.4. There can be no scienter, or even negligence,[26] in repeating truthful information already in the public domain because truthful disclosures inform, rather than deceive, investors. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (disclosure of truthful information weighed against inference of scienter); *Owens*, 789 F.3d at 541 ("[a]dditional transparency ... further negates the inference of scienter.").

### c. Palikaras Did Not Otherwise Fail to Disclose Information He Had a Duty to Provide.

"In a securities fraud omissions case, the defendant must have a duty to speak to be found liable." *SEC v. Mapp*, 240 F. Supp. 3d 569, 580 (E.D. Tex. 2017) (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994)). Absent an affirmative duty, there is no obligation to disclose even material information under the antifraud provisions of

---

[26] Negligence is sufficient for liability under Section 17(a)(2) (misrepresentation or omission) and Section 17(a)(3) (scheme). *Seghers*, 298 F. App'x. at 327. But the SEC fails to plead facts suggesting Palikaras acted negligently; in fact, the Complaint suggest the opposite – Palikaras knew at the time not to share posts on the short squeeze because of a "risk for potentially speculative content." Compl. ¶ 63. For these reasons, and as set out in Brda's Motion to Dismiss, these negligence-based claims should also be dismissed. *See* Brda's Motion to Dismiss at 33-34 (discussing SEC's inability to allege a negligence-based theory).

the federal securities law. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 264 (2024) ("Rule 10b–5(b) does not proscribe pure omissions."); *Basic Inc. v Levinson*, 485 U.S. 224, 239 n.17 (1988) ("[s]ilence, absent a duty to disclose, is not misleading"). Importantly, "a duty to speak the full truth o*n a particular subject* arises when a defendant undertakes to say anything *on that particular subject*." *Mapp*, 240 F. Supp. 3d at 584 (emphasis in original). Put another way, "[a]n omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc*., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011) (internal quotations omitted).

Beyond generically complaining that he did not correct *others'* alleged misstatements or omissions, the SEC does not identify any obligation Palikaras had to make a statement correcting TRCH's public disclosures relating to the Dividend or ATM Offering (nor does it plead he knew or had a basis for believing such disclosure to be wrong). The SEC points to no facts showing why Palikaras would be required to do so —he was not a corporate officer of TRCH (let alone involved in the day-to-day operations of the company), not involved in the negotiations between TRCH and Roth or its other advisors, not a signatory to TRCH's SEC filings, and held no other position that made him uniquely situated to have access to or control over TRCH's internal processes, advice from its legal and financial advisors, or public filings. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (affirming dismissal where pleading "rest[ed] on the inference that defendants must have been aware of the misstatement based on their positions within the company").

### 3. Palikaras Made Neither Material Misrepresentations Nor Omissions During the Private Investor Call.

Using a novel theory contrary to existing precedent, the SEC attempts to hold Palikaras liable for statements created and disseminated by others to an online audience with whom Palikaras never communicated (and never intended to communicate). The Complaint makes no effort to distinguish between what Palikaras stated in the Private Investor Call and how others acting

Return to TOC

beyond his knowledge or control and with their own motivations repackaged and independently communicated information selectively clipped and edited from the Private Investor Call.

During the Private Investor Call, Palikaras allegedly mentioned the potential for a short squeeze (which was already public knowledge at the time as it had been digested by the market and stockholders were regularly commenting on it online), Compl. ¶ 50; opined that the value of the Dividend could be between $1 and $20, *id.* at ¶ 84; and further opined that TRCH was having discussions to find the right buyers for its oil and gas assets. *Id.* at ¶ 83. None of these allegations supports a claim.

> a. **Palikaras's Beliefs About a Short Squeeze Occurring, Possible Purchasers for TRCH's Oil and Gas Assets, and Potential Value of the Dividend Were Opinions, Puffery, and Did Not Alter the Total Mix of Information.**

According to the SEC, Palikaras made two "false and misleading statements" during the Private Investor Call, pointing to his opinion (as a non-representative of TRCH) that the value of TRCH's Dividend "*could* be" between $1 to $20 based on "the analysis" and his understanding that TRCH was speaking to "the right *potential* buyers" for possible sale of its oil and gas assets. Compl. ¶¶ 82-84; 87-88. The SEC cannot maintain misrepresentation or omission claims based on cherry-picked, qualified statements made during the Private Investor Call, especially where those statements were merely expressions of Palikaras's opinions and belief while the market had access to the specific, concrete facts from TRCH's public filings. Palikaras's optimistic generalizations were not worded as guarantees or supported by specific statements of fact. "No reasonable investor would find such generic predictions actually significant and therefore material in their decision making." *SEC v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003)); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (statements worded in the form of "optimistic generalizations" cannot support liability under the securities laws); *SEC v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (dismissing certain claims where statement did not reference "any actual facts upon which an investor might

18

evaluate a business" and noting "[a] reasonable investor relies on common sense and objective facts, not on speculation as to stock price or potential—particularly when that speculation is not accompanied by any substantive information about the business.").

The Complaint states that Palikaras vaguely referred to "the analysis" to support his estimation for what the Dividend range *could* be, not that he determined it would be in that range or even whether he himself had reviewed TRCH's analysis. Similarly, he generally referenced his understanding that TRCH identified quality "potential buyers" for its oil and gas assets, not that particular parties were negotiating anything approaching a transaction. These are high-level opinion statements based on beliefs held at the time as a non-member of TRCH. Such statements are puffery and statements of opinion not actionable under the securities law. *See Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.,* 905 F.3d 892, 901 (5th Cir. 2018) (puffery is "immaterial because [it] do[es] not alter a reasonable investor's assessment of the company's prospects); *Shandong Yinguang Chem. Indus. Jt. Stock Co., v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010) (affirming dismissal and finding "sound financial condition" statement immaterial where the plaintiff failed to plead that the defendant "presented any detailed, corroborating information, facts or figures to support the statement that might entice a reasonable person to attach importance to the statement"); *Reynolds*, 2008 WL 3850550, at *5 ( "Statements 'are non-actionable puffery [if] they are of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation.'") (quoting *Southland*, 365 F.3d at 372).

Moreover, the SEC focuses on Palikaras's statements in a vacuum, ignoring the fact that he was fielding questions from others who may have provided that range to Palikaras as a hypothetical. Regardless, these statements "lack[ed] the sort of definitive positive projections that might later require correction." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Importantly, TRCH reported on the value of its oil and gas assets and the number of outstanding

<div align="center">19</div>

shares *after* Palikaras's statements on the Private Investor Call.[27] The SEC unfairly casts Palikaras in a bad light by alleging that, at the time of this statement, he had "reviewed the investment bank's third-party asset valuation, which implied an estimate asset value of less than $1.00 per share" Compl. ¶ 85. Tellingly, and perhaps because it undermines the claim that Palikaras's reference to "the analysis" gave investors a "misleading impression that his value range was supportable," the Mets II Settlement Action reveals that this was the same investment bank analysis included in TRCH's Definitive Proxy Statement.[28] Contrast with (i) TRCH's publicly filed financial statements which included accounting and valuation methodologies and (ii) the investment bank analysis included in TRCH's proxy filings, no reasonable investor would have credited Palikaras's off-base projections in the Private Investor Call to a handful of individuals believed to be TRCH shareholders. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011) ("Allegations that amount to little more than corporate 'cheerleading' are puffery[.] [P]rojections of future performance not worded as guarantees [ ] are not actionable under federal securities law."); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("[T]here is no duty to update vague statements of optimism or expressions of opinion. There is also no need to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material.") (citations omitted).

---

[27] *See, e.g.*, TRCH Form 10-Q (May 14, 2021) at 13, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983521000292/form-10q.htm; Definitive Proxy Statement, *supra* note 10, at 93.
[28] The Meta II Settlement Action, *see supra* note 3, shows that "a valuation study performed by TRCH's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share." *See* Meta II Settlement Action*, at ¶ 30. The Definitive Proxy Statement includes financial analyses from TRCH's investment bankers, including a value range for the equity value of the oil and gas assets. *See* Definitive Proxy Statement, *supra* note 10, at 111- 116; *id.* at 116 ("Roth assessed the implied equity value of [TRCH's] existing O&G Assets combined with the implied equity value attributable to [TRCH] from Meta to determine a range of implied equity values of $83.5 million to $161.4 million.").

20

### b. The SEC's Rule 10b-5(b) Claims Fail Because Palikaras is Not the Maker of the Screenshot or the Incomplete Secret Recording.

The Complaint contends that, after the Incomplete Secret Recording was published by others acting beyond Palikaras's knowledge or control, a "common refrain on social media" was that Palikaras "estimated the Preferred Dividend would be worth $20 per share." Compl. ¶ 86. As noted above, the SEC does not allege that Palikaras himself made any direct statement to that effect—indeed, he did not. *See* Compl. ¶ 84 (cherry-picking one word-quotation from the call where "Palikaras claimed that, based on 'the analysis,' the value of the Preferred Dividend ***could be*** between $1-$20 per share") (emphasis added).

Under Rule 10b–5, only the "maker of a statement" can be primarily liable for securities fraud. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "[T]he maker of a statement is the person or entity with <u>ultimate authority</u> over the statement, including its content and <u>whether and how to communicate it</u>." *Id.* (emphasis added). Palikaras is not the "maker" of the Screenshot or the Incomplete Secret Recording. Rather, the SEC's allegations hinge on statements made and disseminated by KingOneFolle and an unidentified[29] social media user. Compl. ¶¶ 50, 86. Indeed, the SEC does not allege Palikaras had anything to do with KingOneFolle's decision to create and publish *his own* "synopsis of four takeaways" from alleged meetings with both Palikaras and Brda, including KingOneFolle's opinion that "this news will create a short squeeze as there are many short stocks to cover before the merger!!" Compl. ¶ 50. Similarly, by choosing to record and then circulate an unauthorized, incomplete, and modified recording of the Private Investor Call, the unidentified internet user created a new statement—over which Palikaras exercised no authority and certainly no say in whether or how to communicate it. Hence, that internet user (not Palikaras) is the maker of that statement.[30]

---

[29] The passive voice in the Complaint obscures who posted the Incomplete Secrete Recording. Compl. ¶ 86 (alleging a "partial audio recording…had been posted to social media." But the Meta II Settlement Action reveals the poster was a "Reddit user." Meta II Settlement Action, *supra* note 3, at ¶ 18.

[30] Indeed, the Incomplete Partial Recording does not include, among other things, any of the disclaimers made at the beginning of the call.

Return to TOC

In *Janus*, the government argued that a person who "provides the false or misleading information that another person then puts into the statement" should be liable for the statement. *Janus*, 564 U.S. at 144-145 (quoting the Brief for United States as Amicus Curiae). But the Supreme Court rejected that interpretation, explaining that "participating in the drafting of a false statement" is insufficient to allege a primary violation, even when the defendant provided the information that "was later incorporated into false public statements." *Id.* at 145; *see also id.* at 145 n.8 (noting "[t]his also is not the first time this Court has disagreed with the SEC's broad view of § 10(b) or Rule 10b–5") (citing cases). Maker liability under *Janus* requires "ultimate authority" and "control," including about whether and how to communicate a statement – all of which are lacking here. Cases applying *Janus* look at whether the person preparing or publishing the statement is acting independently or whether a defendant "lacked 'ultimate control' over the statements' content and dissemination." *Lorenzo v. SEC*, 872 F.3d 578, 586 (D.C. Cir. 2017), *aff'd*, 139 S.Ct. 1094 (2019); *id.* at 587 (holding investment banker, who "cut and pasted" and "sent the email messages at the behest of his boss[,]" was not the "maker" of false statements where his boss "retained ultimate authority"). Here, the SEC does not allege that Palikaras "retained" any authority over the creation, content, or dissemination of the Screenshot or the Incomplete Secret Recording. Indeed, he did not. Palikaras was, at best, a participant or provider of information that was incorporated into false public statements by KingOneFolle and the unknown internet user. Thus, under *Janus*, Palikaras is not the maker of those statements as a matter of law.

### c. The SEC Cannot Establish Omission Liability under Section 10(b), Rule 10b-5, or Section 17(a) for Palikaras's Alleged Failure to Correct or Address the Screenshot or Incomplete Secret Recording.

In a further effort to make Palikaras liable for the Screenshot and Incomplete Secret Recording, the SEC contends that Palikaras should be faulted for failing to prevent them from being disseminated by and then reacted to by others on social media. However, the SEC's contention finds no support in the law. The SEC also makes no suggestion how Palikaras, who had no ultimate control, could have corrected the actions of KingOneFolle or the unknown internet

22

user without creating confusion or further market turbulence.[31] The Second Circuit rejected an attempt by the SEC to expand liability premised on such a theory. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 52 (2d Cir. 2022) (rejecting SEC's argument that the defendants failed to prevent misleading statements from being disseminated by others where there was no allegation that the defendants themselves disseminated the statements). Here, the SEC does not plead any facts suggesting that Palikaras consented to (or even knew) he was being recorded, much less that utterances would be recharacterized by others and excerpted, edited, and remade into an altogether new statement by a third party posting it to the internet without his authority or consent.

## B. THE SEC DOES NOT PLEAD SCHEME LIABILITY AGAINST PALIKARAS

The SEC alleges that Brda "conceived, designed, and structured" a fraudulent scheme to artificially inflate TRCH's stock price via the Dividend to create a short squeeze and taking advantage of the inflated price (even though the SEC does not actually allege a short squeeze occurred) by raising capital through the ATM Offering. Compl. ¶ 30. According to the Complaint, Palikaras "failed to disclose" his "private coordination" with Brda, which "concealed Defendants' scheme, plans and intentions." *Id.* ¶¶ 48-48. But the SEC does not plead a market manipulating act by Palikaras and, instead, merely repackages already-deficient claims about what he allegedly said or failed to say (addressed above) as "scheme liability," to argue Palikaras "actively worked with Brda to carry out" a fraudulent scheme from which he did not personally gain. *Id.* ¶¶ 37, 47-49. But because there can be no scheme liability based purely on alleged statements and omissions, such claims should be dismissed.

Exchange Act Section 10(b) makes it unlawful "for any person, directly or indirectly…[t]o use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). In relevant part, Rule 10b-5, makes it unlawful to: (a) "employ any device, scheme, or artifice to defraud"; or (c) "engage in any act, practice, or course of business

---

[31] The SEC also fails to account for the possibility that legal and other advisors may have advised Palikaras not to intervene.

which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Similarly, Securities Act Section 17(a)(1) makes it unlawful to "employ any device, scheme, or artifice to defraud" in the offer or sale of securities, and Section 17(a)(3) prohibits engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. §§ 77q(a)(1), 77q(a)(3). Essentially, the same elements are required under Section 17(a)(1) and (3) as under Section 10(b) and Rule 10b-5, though no showing of scienter is required for Section 17(a)(3). *Seghers*, 298 F. App'x at 327. Rather, negligence is sufficient to plead a violation of Section 17(a)(3). *Id.*

### 1. The Complaint Does Not Allege Any Actionable Conduct by Palikaras Beyond Alleged Misrepresentations and Omissions.

The foregoing provisions of Rule 10b-5 and Section 17(a) create what courts call scheme liability. *SEC v. Mapp*, 16-CV-00246, 2017 WL 5230358, at *4 (E.D. Tex. Nov. 9, 2017) (analyzing first and third prongs of both Section 17(a) and Rule 10b-5 together as "scheme liability" claims). To state a claim for scheme liability, "the SEC must allege sufficient facts for the court to draw the reasonable inference that [Palikaras] (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. Verges*, 716 F. Supp. 3d 456, 466 (N.D. Tex. 2024) (citing *SEC v. Wilson*, 2022 WL 18275941, at *6 (N.D. Tex. Dec. 28, 2022)). The SEC must also meet Rule 9(b)'s heightened pleading standard when attempting to state a scheme liability claim. *Id.* at 474 ("Scheme liability claims are subject to Rule 9(b)'s heightened pleading requirements because they sound in fraud…To satisfy Rule 9(b), the SEC must articulate the precise contours of the alleged scheme to defraud, or the specific acts conducted in furtherance of it.") (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Scheme liability requires more than misrepresentations or omissions; it requires "proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance." *Verges*, 716 F. Supp.

24

3d at 466 (citations omitted); *id.* (noting scheme liability "is appropriate if the defendant has *substantially participated* in scheme to mislead investors even if a material misstatement by another person creates the nexus between the scheme and the securities market") (internal quotation marks and citation omitted) (emphasis added). To plead scheme liability, "[i]t is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Verges*, 716 F. Supp. at 466 (internal quotation marks and citation omitted) (emphasis in original). A manipulative or deceptive act is a "term of art . . . refer[ring] generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity, and connotes intentional or willful *conduct* designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (internal quotation and citation omitted) (emphasis added); *Verges*, 716 F. Supp. 3d at 467 (type of conduct prohibited under the scheme liability provisions includes "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company") (citation omitted).

As the Fifth Circuit has explained, the critical question is whether alleged deceptive conduct has "the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself." *Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (defining market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *SEC v. Mueller*, No. SA-21-CV-00785, 2024 WL 400897, at *19 (W.D. Tex. Jan. 11, 2024) ("To succeed on such a scheme liability theory, a plaintiff must prove that the defendant ... engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.") (internal quotation

Return to TOC

marks and citation omitted). "Scheme liability thus 'hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'" *SEC v. Farmer*, No. 14-CV-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) (quoting *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)). Critically, the SEC only describes Palikaras's supposed participation in the alleged scheme in terms of *statements* he allegedly made (vague allegations that he said *something* (albeit not pleaded) at the Investor Conference; high-level opinions in the Private Investor Call later repackaged and repurposed in the Screenshot and Incomplete Secret Recording; and the Tweets) or failed to make despite no duty to do so. The SEC does not identify—much less with the specificity required under Rule 9(b)—any inherently deceptive *conduct* Palikaras undertook *in addition to* his alleged misstatements and omissions.

And despite the SEC's efforts to recharacterize disclosure-based facts as scheme liability, it is well-settled that misstatements and omissions alone are insufficient to state such a claim. *Narayan* illustrates this principle. There, Judge Lynn carefully considered similar issues in dismissing the SEC's scheme liability claims against two corporate officers where the "core misconduct" involved a co-defendant's (Narayan) misrepresentations to investors. *SEC v. Narayan*, No. 16-CV-1417-M, 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017). Judge Lynn examined "whether the Complaint adequately pleads that" each defendant "did some deceptive act beyond facilitating or covering up" another's acts and found the allegations of an undisclosed finder's fee arrangement were "not an independent deceptive act, apart from Narayan's failure to disclose." *Id.* at *10-11. As Judge Lynn highlighted, "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions." *Id.* at *7; *see also id.* at *4-7 (reviewing authorities from Texas federal district courts, as well as the Second, Eighth, and Ninth Circuits, and highlighting that all have held that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions"); *SEC v. Killion*, No. H-16-621, 2017 WL 7052310, at *9 (S.D. Tex. Mar. 24, 2017) (dismissing scheme liability claims where "no 'scheme' can be discerned" beyond alleged misrepresentations and omissions).

<center>26</center>

## 2. The SEC's Scheme Liability Claims Against Palikaras Also Fail Because the Details of the Alleged Scheme Were Known and Disclosed.

According to the SEC's own Complaint and relevant precedent, the features and potential impact of the Dividend, ATM Offering, and even Palikaras's alleged awareness or belief that a squeeze would result were publicly known and disclosed.

### a. Details of the Dividend Were Disclosed and Consequence to Short Interests Was Understood.

As noted above, TRCH was known to have a significant short interest and was susceptible to stock price manipulation by "seasoned stock manipulators."[32] Commentators on social media and other platforms frequently addressed the impact a merger would have on short interests and, possibly, the price of TRCH stock. TRCH repeatedly disclosed the fact, terms, nature, and risks of the Dividend in SEC filings.[33] Consistently, and in every proxy solicitation filed between the preliminary proxy statements and the Definitive Proxy Statement, TRCH unambiguously informed shareholders that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *See id*. Further, in its Definitive Proxy Statement, TRCH explained that "[n]o market is expected to develop for the [Dividend] in the foreseeable future and holders of the [Dividend] may not be able to find a buyer and sell their shares if they desired to do so." *Id*.

At least one other court considering similar facts previously held that a complaint failed to allege any deception in connection with a company's announcement of a dividend where its nature and terms were disclosed and the market immediately recognized the effect the Dividend might have on short sellers. In *Overstock*, the court was confronted with allegations that said company and its CEO issued a dividend with the knowledge and intent to "cause" a short squeeze, "artificially spike" Overstock's stock price, and "force short sellers of Overstock to cover their positions at inflated prices." *In re Overstock Sec. Litig.*, No. 19 Civ. 709, 2020 WL 5775845, at *4

---

[32] *See supra* at II.C.
[33] *See, e.g.*, Feb. 4, 2021 Preliminary Proxy Statement, *supra* note 7; Mar. 23, 2021 Preliminary Proxy Statement, *supra* note 8, at 50; Apr. 21, 2021 Preliminary Proxy Statement, *supra* note 9, at 50; Definitive Proxy Statement, *supra* note 10.

(D. Utah Sept. 28, 2020) ("*Overstock I*"). Like TRCH, Overstock had significant short seller interest, and it also publicly disclosed the terms of the dividend and its attendant risks, including that (like TRCH's) it would not be registered or resold. *Id.* at *8. In the face of a precipitous drop in Overstock's share price and a short seller's putative class action, the court held that Overstock had no duty "to disclose the impact on short sellers" because it was already "readily apparent" from Overstock's disclosures about the "nature" of the dividend, so there was no "act" giving a "false impression to the marketplace" and thus no deception. *Id.* (citing *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)).

Similarly, because the market was well aware of (and discussing) the short interest in TRCH (a company already vulnerable to market manipulation according to another pending SEC lawsuit),[34] and repeated public statements about the merger, Dividend, and ATM Offering informed the market a squeeze could occur, Palikaras had no obligation to disclose a possible impact on short interests or increase in TRCH's stock price, even if he hoped for, expected, or intended it.[35] And on this point, the SEC noticeably seeks to have it both ways—alleging both that Palikaras failed to disclose TRCH's and Brda's intent to create a short squeeze and drive up TRCH's stock price *while at the same time* alleging that his Shorts Tweet did just that: conveyed a message laying bare his intent for the Dividend to result in a short squeeze.[36] Compl. ¶¶ 64-66.

---

[34] *See supra* at II.C and note 9.

[35] Overstock's CEO, who resigned not long after the dividend was announced, published a blog post in which he allegedly confirmed that he designed the dividend "carefully" and with knowledge that it "put legitimate short sellers in a bind." *In re Overstock Sec. Litig.*, 119 F.4th 787,796-97 (10th Cir. 2024). Despite this fact, the Tenth Circuit affirmed the lower court's finding that there was no deception.

[36] Scheme liability claims under Rule 10b-5 and Section 17(a)(1) require proof of scienter. *Aaron v. SEC*, 446 U.S. 680, 691 (1980). The scienter element requires the SEC to plead that Palikaras acted with "'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *SEC v. Stack*, 21-CV-00051, 2021 WL 4777588, at *4 (W.D. Tex. Oct. 13, 2021), *R. & R. adopted*, No. 21-CV-051, 2022 WL 1546718 (W.D. Tex. Jan. 24, 2022) (quoting *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)). "To plead scienter adequately in the securities law context, Rule 9(b) requires the SEC to set forth specific facts in the complaint that support an inference of fraud." *Narayan*, 2017 WL 4652063 at *11 (internal quotation marks and citations omitted). An "inference of fraud" requires the SEC plead facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *12. In SEC enforcement actions, the scienter inquiry boils down to whether the complaint "sufficiently alleges (1) facts supporting an inference of fraud, and (2) [defendant's] motive to commit fraud." *Id.* at *13. "Motives that are universal to corporations and their officers do not suffice to establish an inference of fraud under Rule 9(b)." *Id.* at *12 (citation omitted). Here, even construing the allegations in the light most favorable to the SEC, the alleged facts are insufficient to support an

Taking the SEC's latter allegation as true, as the Court must, the SEC's position that Palikaras failed to disclose a relationship between the Dividend and Brda's supposed intent should be denied.

To the extent the SEC posits a deception occurred because Palikaras (or non-party Meta I[37] with whom he is sometimes unfairly lumped) failed to disclose Brda or TRCH's own alleged intent to create a short squeeze, that argument fails short for the same reasons. *See Felton*, 2020 WL 7056333, at \*6-7 ("Mere knowledge of another's violation of § 10(b), or even aiding and abetting a violation, is not enough to establish [primary] liability under the Exchange Act…The SEC provides no details on [defendant's] specific activities, when they may have occurred, or how any activities are tied to fraud.") First, Palikaras was not responsible for making or correcting TRCH's alleged misstatements (or omissions) (assuming *arguendo* he knew or believed them to be such*)*, or somehow requiring Meta I to do so as a counterparty to the merger.[38] *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ("Corporate officials . . . are only responsible for revealing

---

"inference of fraud" or a plausible claim that Palikaras had a "motive to commit fraud." *Id.* at \*13. All that is pleaded is that an informed board process at Meta I resulted in the decision to merger with TRCH, effectuated through a legitimate business transaction via the Dividend and ATM Offering that was fully disclosed. *See infra* note 37. And the *Overstock* cases, discussed in detail, *infra* at 30-31, confirm that "a fully disclosed corporate transaction" is not considered manipulative. *In re Overstock Sec. Litig.*, 119 F.4th 787, 793 (10th Cir. 2024). Accordingly, the SEC's claims under Section 10(b) and Section 17(a)(1) should be dismissed for failure to allege scienter.

[37] TRCH and Meta I were legally separate entities, each with its own board of directors. The merger was the result of arm's length negotiations—in fact, "the letter of intent was heavily negotiated" between representatives of TRCH and Meta I, and "their respective financial and legal advisors." Definitive Proxy Statement, *supra* note 10, at 106. It is "undisputed that the corporate formalities were observed[.]" *Janus*, 564 U.S. at 146. As the speaking entity with ultimate authority over its public disclosures, TRCH alone "takes credit – or blame – for what is ultimately said." *Id.* at 143; *see also N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 741 (N.D. Tex. 2013) ("In the context of a public SEC filing, the entity that 'bears the statutory obligation to file' and that the SEC has recorded as filing the document ordinarily 'makes' the statements.") (quoting *Janus*, 564 U.S. at 146-47). Even a "well-recognized and uniquely close relationship between Company A and Company B or evidence that Company A exerts significant influence over Company B" does not make one entity responsible for the other's disclosures where the companies remain "legally separate entities." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 203-04, 206 (S.D.N.Y. 2022) (finding that defendant Rio Tinto, who owned majority stake in defendant Turquoise Hill, did not have ultimate authority over Turquoise Hill's statement when companies enjoyed "own corporate form" and there was "no allegations that corporate formalities were not observed"); *see also Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 809-11 (S.D.N.Y. 2015) (recognizing that under *Janus* the non-maker of a statement, an "officer[] of a separate entity" who held "no role in the business structure of the speaking entity," could not be "primarily liable for alleged misstatements and omissions in the disclosures issued by [the speaking entity]"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) ("Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well.").

[38] Neither in this action nor the prior settled action against Meta II has the SEC ever alleged that Meta I misrepresented or failed to disclose any fact whatsoever. *See Meta II Settlement Action*, *supra* note 3.

those material facts reasonably available to them" and "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others"); *see also City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021) (declining to find scienter with respect to statement made about another company because "[e]xecutives possess only limited information about the internal operations of other corporations"). Second, the intent to cause a short squeeze, where public disclosures make it obvious that a short squeeze would occur, need not be disclosed. *See Doyle v. Milton*, 73 F. Supp. 281, 286 (S.D.N.Y. 1947) (failure of proxy materials to disclose "confession of selfish motive" not a violation of the securities laws where data from which an inference of selfish motive may be drawn is supplied in statement.).

Indeed, Palikaras "could not manipulate the market via truthful statements or via [TRCH's issuance of a] dividend that everyone immediately knew would impact short sellers." *In re Overstock Sec. Litig.*, 2021 WL 4267920, at *11 (D. Utah Sept. 20, 2021) ("*Overstock II*"), *aff'd*, 119 F.4th 787 (10th Cir. 2024)*; see also Overstock I*, 2020 WL 5775845, at *8 ("There is no duty to disclose something so obvious that the entire market immediately understands it."); *Kraft v. Third Coast Mistream*, No. 19 Civ. 9398, 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) (no market manipulation where "the market accurately understood the message that [the defendant's] decisions were sending"). The Tenth Circuit affirmed *Overstock* in November 2024, and held, *inter alia,* that "acting in a manner that results in an artificial price, on its own, is not enough to constitute manipulative conduct" and that "truthful disclosure of the terms of the upcoming dividend transaction did not deceive investors as to how the market valued Overstock." *In re Overstock Sec. Litig.*, 119 F.4th 787, 802-803 (10th Cir. 2024). In affirming the district court decision in *Overstock II*, the Tenth Circuit addressed this very point, agreeing in principle that conduct not inherently manipulative should be considered manipulative when accompanied by manipulative intent so long as there is an element of secrecy, which is lacking here as it was there. *Overstock*, 119 F.4th at 804. Here, the effect of the Dividend was clear: short interests would be forced to cover by the record date. *See Overstock I*, at *10 (noting the market "immediately" recognized a short squeeze could be a "collateral consequence[]" of the Overstock dividend based

on disclosures relating to its nature and terms, which "place[d] short sellers in a pickle by forcing them to cover their short positions"). Indeed, just like in *Overstock,* the market was aware of and discussing the practical effect of the TRCH Dividend on short sellers, and before and apart from Palikaras's alleged statements and omissions. *Id*. (noting that the market's discussion of the impact of dividend on short sellers belies contention that defendants deceived the market).[39] What is more, the SEC's own Complaint argues that at the March 16-18, 2021 Investor Conference, the May 13, 2021 Private Investor Call, and in his June 13, 2021 Shorts Tweet, Palikaras openly discussed the expectation that a short squeeze would result, thus eliminating any element of secrecy.

Thus, in the face of public disclosures about the Dividend, the market's knowledge that a short squeeze could follow, and even the very statements on which the SEC bases its claims against Palikaras are based, there can be no scheme liability.

### b. Details of TRCH's ATM Offering Were Also Disclosed.

TRCH filed at least three statements with the SEC disclosing the terms and various risks in connection with the ATM Offering.[40] In announcing the ATM Offering and later providing additional information about it, TRCH also made clear it was working with a variety of its own legal and financial advisors.

TRCH's shelf registration for the ATM Offering (conducted between June 16 and June 24, 2021) disclosed key terms of the merger, including that TRCH would raise up to $250 million in proceeds.[41] TRCH reiterated the risks involved and cautioned investors about "activities" that

---

[39] In its own guidance, the SEC observes that short squeezes can be and are a natural occurrence. *See* Key Points about Regulation SHO (Mar. 31, 2022), *available at* https://www.sec.gov/investor/pubs/regsho.htm.

[40] *See* May 28, 2021 Registration Statement, *supra* note 16; June 14, 2021 Prospectus, *supra* note 18; June 21, 2021 Prospectus, *supra* note 19. The SEC also alleges that Palikaras failed to disclose TRCH's intent to conduct an ATM Offering. The SEC fails to plead with particularity facts demonstrating Palikaras had a duty to speak on a transaction he was not a party to. Indeed, neither Palikaras nor Meta I were part of the negotiations with Roth, and Palikaras was not a corporate insider at TRCH. In any event, the SEC, had no extraterritorial reach to dictate what and how Meta I, a Canadian company with no registered shares trading on any domestic exchange, should make its disclosures. *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 267 (2010) (holding the Exchange Act does not apply to securities not registered on domestic exchanges); *see also In re Petrobras Sec.*, 862 F.3d 250, 259 (2d Cir. 2017) (extending *Morrison*'s to the Securities Act). Indeed, the SEC has never alleged wrongdoing by Meta I (or any of its other board members or management involved in the merger).

[41] *See* May 28, 2021 Registration Statement, *supra* note 16, at 1 & 10-12 (May 28, 2021); June 16, 2021 Prospectus, *supra* note 18, at 1 & 9-10; June 21, 2021 Prospectus, *supra* note 19, at 1 & 8-10.

31

would affect "the price of the securities" during the ATM Offering, including "purchases to cover syndicate short positions created in connection with the offering." *Id.* at 14. Specifically, TRCH disclosed that the ATM Offering could "affect the market price of the securities, which may be higher than the price that might otherwise prevail in the open market." *Id.* at 14.

Only two days after the SEC declared its registration statement effective, TRCH filed its first prospectus supplement, publicly disclosing it engaged Roth to sell shares in the ATM Offering up to $100 million.[42] TRCH again disclosed the risks, including that investors who bought shares "at different times will likely pay different prices" and "may experience different levels of dilution and different outcomes in their investment results," while TRCH had "discretion, subject to market demand, to vary the timing, prices, and numbers of shares sold." *Id.* at S-9. Thereafter, TRCH filed a second supplemental prospectus, during the ATM Offering, disclosing the sale of 11,738,345 shares of common stock and a plan to sell more for an additional $150 million aggregate offering price.[43] Hence, the only entity with the information and authority to make public disclosures about its own ATM Offering—TRCH (not non-party Meta I nor Palikaras individually)—disclosed the terms in numerous SEC filings. As noted above, truthful disclosures cannot form the basis for scheme liability. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[t]he market is not misled when a transaction's terms are fully disclosed"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("[N]ondisclosure is usually essential to the success of a manipulative scheme.").

Thus, the SEC fails to state a claim for scheme liability under Rule 10b-5(a), Rule 10b-5(c), Section 17(a)(1), and Section 17(a)(3), and such claims against Palikaras must be dismissed.

### 3. The SEC's Scheme Liability Claims Against Palikaras also Fail to the Extent They are Based on Allegations Relating to Meta I's Actions.

In addition to being based solely on statements and omissions and despite fulsome and repeated disclosure about the merger, Dividend, and ATM Offering, the SEC's scheme liability

---

[42] *See* June 16, 2021 Prospectus, *supra* note 18, at 11.
[43] *See* June 21, 2021 Prospectus, *supra* note 19, at 1, 11.

Return to TOC

claims against Palikaras are also flawed insofar as they impute to him the unpleaded (and false) assumption that non-party Meta I was a willing supporter of Brda's alleged plan for TRCH to merge with a strawman company which would, as Brda willed, go along with the alleged scheme, including rejecting his plans for TRCH's oil and gas assets and blindly approving the Dividend. Compl. ¶¶ 26-37.

The SEC skips past the fact that Meta I was an operating corporation, led by a board of directors and publicly traded in Canada. The SEC does not allege that Palikaras asserted singular control over Meta I's board or the company's role in heavily negotiating the merger, just as it does not allege that Palikaras somehow forced Meta I's board of directors *and* shareholders to approve the merger.[44] In short, the SEC cannot establish that Palikaras failed to satisfy a duty to disclose where one did not exist. *See Regents of Univ. of Cal.*, 482 F.3d at 389 (stating that Supreme Court precedent "has established that a device, such as a scheme, is not 'deceptive' unless it involves breach of some duty of candid disclosure"); *Mapp*, 240 F. Supp. 3d at 585 (refusing to recognize scheme liability in the absence of a duty to disclose because "[i]t is clear that the Fifth Circuit requires a breach of a duty to disclose to be liable under Rule 10b–5").

The Complaint implies that Meta I's entry into the merger came about as a result of a simple one-off presentation in September 2020 by Palikaras and Brda to Meta I's Board of Directors. Compl. ¶ 35. The reality is different, even based on the Complaint's plain language and public records at the time. The companies' letter of intent was "heavily negotiated" between the parties, and they considered Meta I's desire for TRCH to divest its oil and gas assets and, at Meta I's suggestion, how to "structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy [TRCH] stockholders[.]"[45] On October 28, 2020, Meta I's legal advisors

---

[44] The SEC's own allegations undermine any theory that Palikaras controlled Meta I's Board and, in fact, demonstrate that the Meta I Board acted independently. According to the Complaint, Brda emailed Palikaras on June 16, 2021, seeking a formal agreement from Meta I to use funds from the ATM Offering to pay TRCH's drilling expense. Compl. ¶ 99. Using ambiguous language, the SEC asserts that Palikaras and Meta I's CFO presented Brda's proposal to the Meta I Board, "writing on or around June 18, 2021" that "Meta I's advisors" "strongly recommended" the arrangement. *Id.* ¶ 101. Howeverl, "Meta I did not formally agree to Brda's demands." *Id.* at ¶ 102.

[45] Definitive Proxy Statement, *supra* note 10, at 106.

33

circulated initial draft merger documents, with "fairly stringent requirements with respect to the process for selling the O&G Assets[.]" *Id.* at 107. Between November 13, 2020 and December 13, 2020, the companies and their separate legal advisors negotiated key points, including the "optimal structure to allocate and distribute the value obtained from the sale of the O&G Assets" before ultimately deciding upon the Dividend. *Id.* Between December 3, 2020 and December 13, 2020, the companies continued to negotiate. *Id.* at 108. On December 14, 2020, the parties executed the merger agreement. *Id.* Faced with these facts, the SEC does not allege that the merger was a sham transaction in which Palikaras forced Meta I to enlist.

The SEC does not allege Palikaras somehow fleeced Meta I (and its advisors) to agree to the merger. Nor does the SEC allege Meta I lacked corporate formalities, that Palikaras controlled Meta I, that Palikaras misled Meta I's board of directors, or that Meta I's board of directors breached fiduciary duties to shareholders. The merger was approved by Meta I's entire board of directors after consideration of financial and legal advice and the exercise of business judgment. Meta I's financial advisor, not Palikaras, advised its board on the merger arrangement, upon which Meta I's board determined that the merger was "fair from a financial point of view, to the Meta Shareholders," and "in the best interests of Meta and the Meta Shareholders" to unanimously recommend to shareholders that they vote in favor of the merger.[46] On March 12, 2021, Meta I shareholders voted to merge.[47] Then, as required under Ontario's Business Corporations Act, the Ontario Superior Court of Justice (Commercial List) issued and entered an order on March 17, 2021 approving the "substantive and procedural fairness" of the merger.[48]

Though it incorporates TRCH's SEC filings in its Complaint, making them fair for the Court's consideration, the SEC omits these important facts from its Complaint. Instead, the SEC suggests that Palikaras was, essentially, an empty vessel who willingly allowed Brda to carry out a complex scheme through him and that he somehow single-handedly caused Meta I and its

---

[46] Agreement with Meta I, *supra* note 6, at 3 & 25.
[47] Definitive Proxy Statement, *supra* note 10, at 103.
[48] *Id.* at 103.

Return to TOC

shareholders to go along. Complaint ¶ 28. But a fair reading of the Complaint and the public records it incorporates show that Meta I, after arms'-length negotiations and with the benefit of outside advice, independently determined proper business reasons supported the merger, with a Dividend for TRCH's legacy shareholders. Thus, the SEC's scheme liability claims against Palikaras cannot be supported by allegations relating to Meta I's actions.

### 4. The SEC's 10b-5 Claims Fail to Allege Any Connection Between the Private Investor Call and the Purchase or Sale of TRCH Stock.

To violate Rule 10b–5, Palikaras's statements about the Dividend and possible buyers for TRCH's oil and gas assets must have been made "in connection with the purchase or sale of any security." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotation marks and citation omitted); *see also Chadbourne & Park LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"); *SEC v. Texas Gulf Sulphur Co*., 401 F.2d 833, 860 (2d Cir. 1968). But the SEC does not allege any such connection and does not plead that attendees at the Private Investor Call who were "believed to be" TRCH shareholders actually were or, if so, that they ever purchased or sold any TRCH shares based on Palikaras's statements. "It is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b–5 claim." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1443 n. 7 (5th Cir. 1993) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)).

### C. THE SECTION 17(A)(2) CLAIMS FAIL TO ALLEGE THAT PALIKARAS OBTAINED MONEY OR PROPERTY "BY MEANS OF" ANY ALLEGED MISREPRESENTATION

Section 17(a)(2) of the Securities Act makes it unlawful "to obtain money or property" by means of any material misrepresentation or omission. 15 U.S.C. § 77q(a)(2). "'It is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus. It must be plausibly alleged that the money

was obtained 'by means of' the false statement.'" *SEC v. Mapp*, No. 16-CV-00246, 2017 WL 5177960, at *6 (E.D. Tex. Nov. 8, 2017) (quoting *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017)).

Some courts have found liability under section 17(a)(2) where a defendant obtains money indirectly, such as through increased compensation. *See, e.g., Farmer*, 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015). But the SEC must nevertheless show how money or property obtained is "attributable to" the defendant's own misstatement or omission. *SEC v. Hopper*, No. Civ.A. H-04-1054, 2006 WL 778640, at *12 n.20 (S.D. Tex. Mar. 24, 2006) ("[I]f any portion of this bonus was attributable to the round-trip trading scheme, the SEC may be able to prevail on its § 17(a)(2) claim against him."); *see also SEC v. Jankovic*, 15 Civ. 1248, 2017 WL 1067788, at *15 (S.D.N.Y. Mar. 21, 2017) (requirement can be met "in a highly roundabout or indirect manner" but "it is essential that the SEC prove that a defendant has obtained . . . money or property himself in order to establish his liability under Section 17(a)(2)") (internal quotation marks and citations omitted).

The SEC argues TRCH's ATM Offering raised $137.5 million, which "primarily benefitted" Meta II (which the SEC agreed to settle with for $1 million)[49] where Palikaras served as CEO. Complaint ¶ 8. However, there is no allegation that Palikaras's Meta II compensation was in any way "attributable to" his handful of alleged statements and omissions, such as in the form of a bonus, the sales of any shares, or otherwise. *Hopper*, 2006 WL 778640, at *12 n.20; *see also Pharo v. Smith*, 621 F.2d 656, 674 (5th Cir. 1980) (affirming dismissal of section 17(a)(2) claim on the ground that the defendant did not "obtain[] any money by means of an untrue statement it uttered…[a]ny fraudulent statements made to induce the stock purchasers were uttered by [the co-defendants]"); *Wey*, 246 F Supp 3d 894, 915 (S.D.N.Y. 2017) ("[I]f the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie"); *SEC v. DiMaria*, 207 F. Supp 3d 343, 358 (S.D.N.Y. 2016) (dismissing 17(a)(2) claim where there was no allegation defendant's "compensation was

---

[49] *See* Meta Settlement Action, *supra* note 3.

Return to TOC

increased in any way, or that he owned (or sold) [the company's] stock that increased in value as a result of the alleged misconduct."). The Complaint is devoid of allegations that Palikaras obtained any money or property, directly or indirectly, "by means of" his alleged misrepresentations or omissions. = Based on this failure to plead, the Section 17(a)(2) claim against Palikaras must be dismissed.

## D. THE SEC FAILS TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 14(A)

Exchange Act Section 14(a) makes it unlawful to solicit proxies from public shareholders without complying with the rules enacted by the SEC. 15 U.S.C. § 78n(a)(1). Rule 14a-9 prohibits the use of proxy statements and other proxy-related communications "containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9. "Rule 9(b) pleading requirements apply to section 14(a) claims that sound in fraud." *Pedroli ex rel. Microtune, Inc. v. Bartek*, 564 F. Supp. 2d 683, 687 (E.D. Tex. 2008). To state a cause of action under Section 14(a) and Rule 14a-9, the SEC must show that the defendant was at least negligent and the following elements: "(1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions." *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 19-CV-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021). The "essential link" required for proxy fraud liability can only be established when the proxy statement at issue *directly authorizes* the loss-generating corporate action." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (emphasis added). This requirement is intended "to prevent corporate management 'from obtaining authorization for corporate action by means of deceptive or inadequate disclosure of proxy solicitation.'" *SEC v. Mercury Interactive, LLC*, No. C 07-2822, 2009 WL 2984769, at *4 (N.D. Cal Sept. 15, 2009) (quoting *J.I. Case Co. v. Borak*, 277 U.S. 426, 431 (1964)).

Of course, Palikaras did not draft, file, or have any control over TRCH's proxy statements. Thus, the SEC bases its claim that Palikaras unlawfully solicited TRCH investor proxies on his alleged one-time discussion during the Private Investor Call in which he provided a high-level opinion based on his understanding that TRCH was communicating with *potential* buyers of its oil and gas interests and what the value of its Dividend *could* be. Compl. ¶ 61; *see also id.* ¶ 126 ("Palikaras solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call"). But the SEC does not plead that Palikaras's two generic statements at issue during that discussion were an "essential link"—much less even relevant to effectuating the merger because the SEC does not, and cannot, allege that the so-called Italian Investors actually were shareholders or were present or represented at the special proxy meeting on June 11, 2021 or that they voted in favor of the merger. *See* SEC's Proposed Substantive Jury Instructions, *SEC v. Wyly et al*, Case No. 10-cv-05760, ECF No. 311, at 37-38 (S.D.N.Y. Apr. 29, 2014) ("a proxy solicitation is an essential link in the accomplishment of a corporate action or transaction *if the votes of the shareholders solicited were required to effect a corporate action or transaction*") (emphasis added). The SEC's inability to plead an "essential link" is fatal to its claim that Palikaras violated Rule 14a-9, especially where the claim depends on an atypical *private* proxy solicitation that does not rely on the publicly filed proxy statement.

As discussed above, Palikaras's alleged misrepresentation during that Private Investor Call that the value of the preferred dividend *could be* worth $1 to $20 was immaterial as a matter of a law. A misstatement is material "only if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th Cir. 2020); *see also Pedroli*, 564 F. Supp. 2d at 687 ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (internal quotation and citation omitted). "[A]n omission is material if there is a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the total mix of information made available."

38

*Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 1997) (internal quotation marks and citation omitted) (emphasis added).

The law is clear that context matters for purposes of determining materiality. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). No reasonable investor would have relied on an oral, off-the-cuff representation by a non-officer of TRCH speculating about what the value of the Dividend *could be*, especially when that anecdotal opinion contradicted any sensible reading of TRCH's own publicly filed disclosures in the market at that time. On multiple occasions post-dating the Private Investor Call, TRCH reported on the value of its oil and gas assets and the number of outstanding shares.[50] In contrast to these publicly filed financial statements, which included accounting and valuation methodologies, no reasonable investor would have credited Palikaras's in-the-moment, off-base opinions or estimates. Indeed, as the SEC alleges, at that time, it may have been difficult to believe that the Dividend would be worth more than $1.00. *See* Compl. ¶¶ 86, 87. The Section 14(a) claims against Palikaras fail as pleaded on materiality grounds because TRCH's actual proxy statement and financial statements included explicit disclosures that contradict Palikaras's imprecise representations on the Italian Investor Call. *See Olkey v Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 4 (2d Cir 1996) (affirming dismissal where "reasonable investors would not have relied on oral assurances when they were contradicted by specific disclosures in the prospectuses"). In addition, Palikaras could not have solicited proxies of TRCH investors not present on the Private Investor Call—that is, because as discussed above, he is not the maker of the Screenshot or the Incomplete Partial Recording, he similarly did not solicit any TRCH shareholders when others made and disseminated those statements outside of his knowledge, consent, or ability to control.[51]

---

[50] *See supra* at 19-20 and accompanying note 27.

[51] While the SEC's factual allegations are accepted as true at this stage, and it is unnecessary for the Court to resolve any factual disputes to grant Palikaras's Motion, it is telling that the SEC's allegations omit the disclaimers and forward-looking statements that were provided at the beginning of the Private Investor Call. It is also telling that the SEC never quotes from the actual PowerPoint presented at the Private Investor Call, as seen in Screenshot.

## **CONCLUSION**

For the foregoing reasons, the SEC fails to state any viable cause of action against Palikaras—nor any basis on which he should be (i) permanently enjoined; (ii) penalized; (iii) broadly prohibited from ever again participating in the issue, offer, purchase or sale of any security but for his own account; and (iv) permanently barred from service as a public company officer or director. Palikaras respectfully requests that this Court grant this Motion to Dismiss, and with prejudice given the inability of the SEC to cure its pleading deficiencies.

Dated: Dallas, Texas
     January 17, 2025

Respectfully submitted,

*/s/ Jessica B. Magee*

Jessica B. Magee
Texas Bar No. 24037757
Michael W. Stockham
Texas Bar No. 24038074
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500 Dallas,
Texas 75201
Tel: (214) 964-9500
Jessica.Magee@hklaw.com
Michael.Stockham@hklaw.com

Kayla Joyce (*PHV motion forthcoming)*
New York Bar No. 6093314
HOLLAND & KNIGHT LLP
787 Seventh Avenue, 31st Floor
New York, New York 10019
Tel:  212-513-3200
Kayla.Joyce@hklaw.com

*Counsel for Georgios Palikaras*

40

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court, which will send notification of such submission to the counsel who have registered with the Court.

/s/ Jessica B. Magee
Jessica B. Magee

Return to TOC

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civ. Action No. 4:24-cv-1048 |
| - v - | Hon. Sean D. Jordan |
| JOHN BRDA, GEORGIOS PALIKARAS, | |
| Defendants. | |

### DECLARATION OF RYAN D. LANTRY
### IN SUPPORT OF DEFENDANT JOHN BRDA'S MOTION TO DISMISS

I, Ryan D. Lantry, in accordance with 28 U.S.C. § 1746, hereby declare and state as follows:

1.      My name is Ryan D. Lantry.  I am over 21 years of age and reside in Dallas, Texas. I am an attorney of the law firm DLA Piper LLP (US) and I am one of the attorneys representing Defendant John Brda in the above-captioned matter.  I submit this declaration voluntarily in support of Defendant John Brda's Motion to Dismiss based on my personal knowledge.

2.      Attached as **Exhibit A-1** is a true and correct copy of a certified transcript of the partial unauthorized audio recording from May 13, 2021, upon which the Complaint cites to and relies upon.

3.      Attached as **Exhibit A-2** is a true and correct copy of the article titled *Torchlight Energy Resources Stock Appears To Be Significantly Overvalued*, Yahoo Finance dated March 28, 2021, which is available in the public domain at https://finance.yahoo.com/news/torchlight-energy-resources-stock-appears-171239430.html (last accessed January 15, 2025).

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge.

Executed this 16th day of January, 2025, in Dallas, Texas.

Ryan D. Lantry

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

|  |  |  |
|---|---|---|
| **JASON HOISAGER,** | § | |
| *Appellant,* | § | |
|  | § | |
| **v.** | § | |
|  | § | |
| **MORRIS D. WEISS, CHAPTER 11** | § | **MO:23-CV-00021** |
| **TRUSTEE for ARABELLA** | § | |
| **PETROLEUM COMPANY, LLC,** | § | |
| *Appellee.* | § | |

## ORDER GRANTING DISMISSAL OF APPEAL

BEFORE THE COURT is Jason Hoisager's unopposed motion to dismiss his appeal.[1] The Court has reviewed his motion and finds that it should be **GRANTED**. Hoisager's appeal in the above-referenced case is hereby **DISMISSED** with prejudice. Each party is to bear his own fees and costs of the appeal. The Clerk of the Court is **DIRECTED** to close the matter.

It is so **ORDERED**.

SIGNED this 16th day of February, 2024.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE

---

[1] ECF No. 14.

```
 1                        ITALIAN CALL

 2

 3

 4

 5                      May 13, 2021

 6     Securities and Exchange Commission v. John Brda et al

 7                   Case No. 442347-000001

 8

 9

10

11

12

13

14

15    Transcribed by: John Smith

16    JOB No.  :          7091577

17

18

19

20

21

22

23

24

25
```

EXHIBIT
A-1

Page 1

```
 1      A P P E A R A N C E S

 2

 3   MR. SIMONA

 4   MR. GEORGE

 5   MR. MARK

 6   MR. FREDERICO

 7

 8      C O N T E N T S

 9

10   MR. SIMONA.........................................3

11   MR. GEORGE.........................................4

12   MR. MARK...........................................4

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

---

```
 1      R E C O R D I N G
 2      MR. SIMONA: Mr. -- Mr. George?
 3      MR. GEORGE: Yes.
 4      MR. SIMONA: Regarding -- if this is possible
 5  use a deep analysis, what is -- how use -- we use
 6  (inaudible) or not. The increase of your
 7  capitalization of Meta Materials, that you pass supply
 8  of 300 million of Canadian dollars, you pass above two
 9  billions of dollars in -- in NASDA stock, and you have
10  -- from yesterday for example, to the next day when
11  finished the merger, you increase your -- your
12  capitalization with an (inaudible).
13      MR. GEORGE: Yes. There will be an exchange
14  ratio of multiplication.
15      MR. SIMONA: Yes.
16      MR. GEORGE: That will increase --
17      MR. SIMONA: But it is a cost (inaudible)
18  justify this larger price to -- is it for you, or?
19      MR. MARK: Yeah, basically the concern,
20  George, is the following, we are going to get a much
21  higher market capitalization in one day, right? As
22  soon as we go into the Nasdaq.
23      MR. GEORGE: Yeah.
24      MR. MARK: And what the question that Simona
25  was asking was, how do you justify that delta in
```

Page 3

---

```
 1  market capitalization in -- in one day? Like -- so
 2  today we quote with 300 million market cap, and then
 3  you go to building.
 4      MR. GEORGE: It's very simple. Yeah. Our
 5  market capitalization today on the Canadian side is
 6  very low compared to where it should be, so if anybody
 7  wanted to buy MMAT stock today, they are gaining a
 8  massive amount because of this exchange ratio that was
 9  negotiated in December last year. The difficulty and
10  the reason why it's not reflected in the market
11  capitalization today is a couple of reasons: Number
12  one, nobody is selling the stock, number two, even if
13  somebody wanted to buy the MMAT stock, it's very
14  difficult because our exchange is the CSE, so the
15  liquidity is not available for -- I would say 90
16  percent of the brokers, they cannot buy our stock, so
17  that is one of the -- I guess mechanically the
18  challenges, and why our stock is still considered a
19  bargain, you know, if you can actually buy it.
20      MR. SIMONA: And -- and for you, you justify
21  this -- this (inaudible) is a -- is either
22  capitalization because you -- you have your -- your
23  doing is -- is closing, and you don't have a
24  possibility to fly for it, and probably yes, if you
25  stay in free market that for nothing, that you have a
```

Page 4

---

```
 1  possibility to have higher chance. You have your --
 2  your brand (inaudible) potentiality and with high
 3  price, the share is correct.
 4      MR. GEORGE: That's correct. And there are
 5  many examples like this, for example, SPAC deals that
 6  have been made recently with startups that have no
 7  revenue, and sometimes one customer valued at 1.5
 8  billion, or more, has been the case, and our case is
 9  much more -- I would say, real in the sense that we
10  have a lot of IP, we have -- as you saw, more than one
11  customer, we are in the growth phase, we've been
12  around for 10 years, and there is also an element of
13  the oil and gas price, which gives another value to
14  the assets of Torchlight that is growing as well, so
15  the market conditions are helping both of us actually
16  achieve a higher value, at least from a market
17  perspective, that's what I see.
18      MR. SIMONA: Okay. I -- I try to -- to
19  translate.
20      MR. GEORGE: And there is one more element to
21  add here, which is the -- let's call it the X factor.
22  If you notice, the Torchlight stock is massively
23  shorted.
24      MR. SIMONA: Yeah.
25      MR. GEORGE: There are not only American
```

Page 5

2 (Pages 2 - 5)

Return to TOC

APP1-685

| | |
|---|---|
| 1  short positions, but also international and naked<br>2  short positions.  This deal is set up not to give a<br>3  cash dividend at closing, so in order for the short<br>4  positions to cover, they have to have the stock on<br>5  their hand because the dividend will be paid out as a<br>6  preferred share, not cash.  As a result, there is no<br>7  physical way for the shorts to cover this stock when<br>8  the time to close, and we believe -- or at least we<br>9  expect that there will be -- if the market conditions<br>10  allow a potential jump towards the close, we don't<br>11  know by how much, and we don't know if it's going to<br>12  happen, but we have seen other stocks that have<br>13  experienced a massive increase towards such an event<br>14  where the shorts have to, you know, it's called a<br>15  short squeeze.<br>16      We are -- if you look at the statistics<br>17  today, we are in the top three percentile globally for<br>18  a short squeeze, and talking about Torchlight.  And if<br>19  that happens, then, I mean, if the stock obviously<br>20  goes to $4, $5, whatever it goes to -- or $1, you<br>21  know, if the markets collapse, you know, there's<br>22  always that delta that's going to be reflected at the<br>23  end when we close the deal for the full<br>24  capitalization.  So it could be very positive, it<br>25  could be also negative depending on the market<div style="text-align:right">Page 6</div> | 1      MR. GEORGE:  As you know, when Torchlight<br>2  decided to sell the business, let's say, to change 180<br>3  degrees, their business model, and find a company like<br>4  us, they looked at many different companies, they<br>5  selected us, we selected them, and today, you know,<br>6  the price of oil from one -- 12-month period, went<br>7  from negative to being, you know, let's say in a good<br>8  momentum.<br>9      MR. SIMONA:  Yeah.<br>10      MR. GEORGE:  So the more time that goes by<br>11  over the next six months, I can tell you that<br>12  Torchlight management is speaking to the right<br>13  potential buyers, that they're top tier, and frankly,<br>14  nobody can predict if this is going to be a -- a $1 or<br>15  a $20 dividend that it's very difficult because buyers<br>16  have their own different motivations, and they'll<br>17  think about the price differently depending on where<br>18  we are in the market.  You have seen that in the<br>19  United States the new President Biden has done some<br>20  additional restrictions in the oil and gas industry.<br>21      MR. SIMONA:  Yeah.<br>22      MR. GEORGE:  And that makes an asset -- or<br>23  the assets that Torchlight has even more valuable.  So<br>24  if you announce a dividend today, you are shooting<br>25  yourself in the foot, as they say.  I believe that the<div style="text-align:right">Page 8</div> |
| 1  conditions.<br>2      MR. SIMONA:  Regarding of this topic, if you<br>3  don't communicate the -- MR. George?<br>4      MR. GEORGE:  Yes.<br>5      MR. SIMONA:  I have a question, sir,<br>6  regarding of this topic, I understand that you want to<br>7  communicate before that to the shareholders assembly<br>8  meeting, the -- the special dividend took -- was seen<br>9  to give to the preferred (inaudible), but you don't<br>10  make the joke of the -- the short people, they joke<br>11  will (inaudible).<br>12      MR. GEORGE:  So --<br>13      MR. SIMONA:  And if -- if the special<br>14  dividend for you, because if -- if it is special<br>15  dividend is about $1, probably many people exit, in<br>16  case you give a dividend (inaudible), probably you --<br>17  you give a possibility shareholders (inaudible) the<br>18  shares.<br>19      MR. GEORGE:  Yeah.  So I understand the<br>20  challenge, let's say.  It is in every document, and<br>21  communication filed officially or even press releases,<br>22  that there will not be a dollar amount press released<br>23  until we sell the assets.  According to the schedule,<br>24  the assets need to be sold in about six months' time.<br>25      MR. SIMONA:  Yeah.<div style="text-align:right">Page 7</div> | 1  dividend will be very exciting for the Torchlight<br>2  shareholders, and my hope is that they'll take it, and<br>3  do whatever they want with it, and maybe buy some<br>4  additional MMAT stock on the future, on the Nasdaq,<br>5  that's my hope, and that's why we did not want to<br>6  touch the dividend, because we on the Meta side could<br>7  not even predict the price of oil six months ago, or<br>8  where the -- this Biden administration would create<br>9  potentially additional reasons for the assets to be<br>10  more valuable.<br>11      MR. SIMONA:  And for you, if (crosstalk).<br>12      MR. GEORGE:  So the -- the -- to conclude the<br>13  (inaudible) conclude that it's -- it's a preferred<br>14  share for a reason, it's not priced, and in order for<br>15  the shorts to deliver this, they have to own the<br>16  stock, they cannot borrow the stock, they can -- they<br>17  cannot short the stock, they have to own the stock to<br>18  participate in the dividend, and so does any other<br>19  normal investor.  And as a result, because of the<br>20  potential is -- if you look at the statistics, you<br>21  know, it could be a dollar to more than $20 according<br>22  to the analysis.  It's, you know, it's -- it's<br>23  difficult to -- to predict where it's going to end up.<br>24      MR. SIMONA:  But if -- if I divide it in a --<br>25  in a three range, this is a -- this range that you<div style="text-align:right">Page 9</div> |

<div style="text-align:right">3 (Pages 6 - 9)</div>

Return to TOC                                                APP1-686

1 give us from a $1 to $20, and if it is a low for
2 example, is a 1 to 5, medium, 5 to 12, and 5 to -- 12
3 to 20, for -- for you we're staying a low, medium
4 height.
5      MR. GEORGE:  I cannot give you that
6 prediction.  I am not part of the management of
7 Torchlight, also I'm not an expert in oil and gas
8 assets.
9      MR. SIMONA:  What if Derek?
10      MR. GEORGE:  Derek may be better suited.  And
11 when I say 20, that could be also a low number, like,
12 honestly, today I know that whatever it was valued at
13 last year, it's more, that's the only thing I can tell
14 you, just based on the price of oil, and what the
15 Biden administration has done.  Other than that,
16 everything else is speculative, so, I don't know,
17 Mark, if you want to add to this?
18      MR. MARK: Yeah.  Just -- just Marco, we -- we
19 can talk more about price, okay?  The -- the price
20 stuff, I -- I don't mean to be disrespectful, but we
21 are putting us in a difficult position, you -- you're
22 not allowed -- you're not allowed -- he's a director
23 of the company, and talk about future price, okay?
24 We've also used a half hour of an hour, and you -- we
25 haven't even started on the company.

Page 10

1      MR. GEORGE:  Frederico, you're -- you're
2 muted.
3      MR. FREDERICO:  No -- no, it's all good --
4 it's so good, Mark, it's good.  No -- no, it's -- it's
5 duty worker, we have --
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1           CERTIFICATE OF TRANSCRIBER
2      I, JOHN SMITH, do hereby certify that this
3 transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14           *John Smith*
15           JOHN SMITH
16
17
18
19
20
21
22
23
24
25

Page 12

4 (Pages 10 - 12)

Return to TOC

APP1-687

## [1 - crosstalk]

| 1 | accurate 12:5 | b | cash 6:3,6 |
|---|---|---|---|
| **1** 6:20 7:15 8:14 10:1,2 | achieve 5:16 | | certificate 12:1 |

**1** 6:20 7:15
 8:14 10:1,2
**1.5** 5:7
**10** 5:12
**12** 8:6 10:2,2
**13** 1:5
**180** 8:2
**18266** 12:14

**2**

**20** 8:15 9:21
 10:1,3,11
**2021** 1:5

**3**

**3** 2:10
**300** 3:8 4:2

**4**

**4** 2:11,12 6:20
**442347-0000...**
 1:7

**5**

**5** 6:20 10:2,2,2

**7**

**7091577** 1:16

**9**

**90** 4:15

**a**

**ability** 12:7
**above** 3:8

**accurate** 12:5
**achieve** 5:16
**action** 12:8,12
**actually** 4:19
 5:15
**add** 5:21 10:17
**additional** 8:20
 9:4,9
**administration**
 9:8 10:15
**ago** 9:7
**al** 1:6
**allow** 6:10
**allowed** 10:22
 10:22
**american** 5:25
**amount** 4:8
 7:22
**analysis** 3:5
 9:22
**announce** 8:24
**anybody** 4:6
**asking** 3:25
**assembly** 7:7
**asset** 8:22
**assets** 5:14 7:23
 7:24 8:23 9:9
 10:8
**attorney** 12:10
**audio** 12:3
**available** 4:15

**b**

**bargain** 4:19
**based** 10:14
**basically** 3:19
**believe** 6:8 8:25
**best** 12:6
**better** 10:10
**biden** 8:19 9:8
 10:15
**billion** 5:8
**billions** 3:9
**borrow** 9:16
**brand** 5:2
**brda** 1:6
**brokers** 4:16
**building** 4:3
**business** 8:2,3
**buy** 4:7,13,16
 4:19 9:3
**buyers** 8:13,15

**c**

**c** 2:1,8 3:1
**call** 1:1 5:21
**called** 6:14
**canadian** 3:8
 4:5
**cap** 4:2
**capitalization**
 3:7,12,21 4:1,5
 4:11,22 6:24
**case** 1:7 5:8,8
 7:16

**cash** 6:3,6
**certificate** 12:1
**certify** 12:2
**challenge** 7:20
**challenges** 4:18
**chance** 5:1
**change** 8:2
**close** 6:8,10,23
**closing** 4:23 6:3
**collapse** 6:21
**commission** 1:6
**communicate**
 7:3,7
**communication**
 7:21
**companies** 8:4
**company** 8:3
 10:23,25
**compared** 4:6
**concern** 3:19
**conclude** 9:12
 9:13
**conditions** 5:15
 6:9 7:1
**considered**
 4:18
**correct** 5:3,4
**cost** 3:17
**counsel** 12:7,10
**couple** 4:11
**cover** 6:4,7
**create** 9:8
**crosstalk** 9:11

Page 1

Return to TOC

[cse - international]

| | | | |
|---|---|---|---|
| **cse**  4:14 | **document**  7:20 | **find**  8:3 | **going**  3:20 6:11 |
| **customer**  5:7 | **doing**  4:23 | **finished**  3:11 |   6:22 8:14 9:23 |
|   5:11 | **dollar**  7:22 | **fly**  4:24 | **good**  8:7 11:3,4 |
| **d** |   9:21 | **following**  3:20 |   11:4 |
| **d**  3:1 | **dollars**  3:8,9 | **foot**  8:25 | **growing**  5:14 |
| **day**  3:10,21 4:1 | **duty**  11:5 | **foregoing**  12:4 | **growth**  5:11 |
| **deal**  6:2,23 | **e** | **frankly**  8:13 | **guess**  4:17 |
| **deals**  5:5 | **e**  2:1,1,8 3:1 | **frederico**  2:6 | **h** |
| **december**  4:9 | **either**  4:21 |   11:1,3 | **half**  10:24 |
| **decided**  8:2 | **element**  5:12 | **free**  4:25 | **hand**  6:5 |
| **deep**  3:5 |   5:20 | **full**  6:23 | **happen**  6:12 |
| **degrees**  8:3 | **employed**  12:8 | **further**  12:9 | **happens**  6:19 |
| **deliver**  9:15 |   12:11 | **future**  9:4 | **height**  10:4 |
| **delta**  3:25 6:22 | **employee**  12:10 |   10:23 | **helping**  5:15 |
| **depending**  6:25 | **et**  1:6 | **g** | **hereto**  12:11 |
|   8:17 | **event**  6:13 | **g**  3:1 | **high**  5:2 |
| **derek**  10:9,10 | **example**  3:10 | **gaining**  4:7 | **higher**  3:21 5:1 |
| **different**  8:4,16 |   5:5 10:2 | **gas**  5:13 8:20 |   5:16 |
| **differently**  8:17 | **examples**  5:5 |   10:7 | **honestly**  10:12 |
| **difficult**  4:14 | **exchange**  1:6 | **george**  2:4,11 | **hope**  9:2,5 |
|   8:15 9:23 |   3:13 4:8,14 |   3:2,3,13,16,20 | **hour**  10:24,24 |
|   10:21 | **exciting**  9:1 |   3:23 4:4 5:4,20 | **i** |
| **difficulty**  4:9 | **exit**  7:15 |   5:25 7:3,4,12 | **inaudible**  3:6 |
| **digital**  12:3 | **expect**  6:9 |   7:19 8:1,10,22 |   3:12,17 4:21 |
| **director**  10:22 | **experienced** |   9:12 10:5,10 |   5:2 7:9,11,16 |
| **disrespectful** |   6:13 |   11:1 |   7:17 9:13 |
|   10:20 | **expert**  10:7 | **give**  6:2 7:9,16 | **increase**  3:6,11 |
| **divide**  9:24 | **f** |   7:17 10:1,5 |   3:16 6:13 |
| **dividend**  6:3,5 | **factor**  5:21 | **gives**  5:13 | **industry**  8:20 |
|   7:8,14,15,16 | **filed**  7:21 | **globally**  6:17 | **interested** |
|   8:15,24 9:1,6 | **financially** | **go**  3:22 4:3 |   12:12 |
|   9:18 |   12:11 | **goes**  6:20,20 | **international** |
| | | |   8:10 |   6:1 |

Return to TOC

**[investor - preferred]**

| | | | |
|---|---|---|---|
| **investor** 9:19 | **management** | **multiplication** | **p** |
| **ip** 5:10 | 8:12 10:6 | 3:14 | **p** 2:1,1 |
| **italian** 1:1 | **marco** 10:18 | **muted** 11:2 | **paid** 6:5 |
| **it's** 4:13 | **mark** 2:5,12 | **n** | **part** 10:6 |
| **j** | 3:19,24 10:17 | | **participate** |
| | 10:18 11:4 | **n** 2:1,8,8 3:1 | 9:18 |
| **job** 1:16 | **market** 3:21 | **naked** 6:1 | **parties** 12:8,11 |
| **john** 1:6,15 | 4:1,2,5,10,25 | **nasda** 3:9 | **pass** 3:7,8 |
| 12:2,15 | 5:15,16 6:9,25 | **nasdaq** 3:22 | **people** 7:10,15 |
| **joke** 7:10,10 | 8:18 | 9:4 | **percent** 4:16 |
| **jump** 6:10 | **markets** 6:21 | **need** 7:24 | **percentile** 6:17 |
| **justify** 3:18,25 | **massive** 4:8 | **negative** 6:25 | **period** 8:6 |
| 4:20 | 6:13 | 8:7 | **perspective** |
| **k** | **massively** 5:22 | **negotiated** 4:9 | 5:17 |
| | **materials** 3:7 | **neither** 12:7 | **phase** 5:11 |
| **know** 4:19 6:11 | **mean** 6:19 | **new** 8:19 | **physical** 6:7 |
| 6:11,14,21,21 | 10:20 | **normal** 9:19 | **position** 10:21 |
| 8:1,5,7 9:21,22 | **mechanically** | **notice** 5:22 | **positions** 6:1,2 |
| 10:12,16 | 4:17 | **number** 4:11 | 6:4 |
| **knowledge** | **medium** 10:2,3 | 4:12 10:11 | **positive** 6:24 |
| 12:6 | **meeting** 7:8 | **o** | **possibility** 4:24 |
| **l** | **merger** 3:11 | | 5:1 7:17 |
| | **meta** 3:7 9:6 | **o** 2:8 3:1 | **possible** 3:4 |
| **larger** 3:18 | **million** 3:8 4:2 | **obviously** 6:19 | **potential** 6:10 |
| **liquidity** 4:15 | **mmat** 4:7,13 | **officially** 7:21 | 8:13 9:20 |
| **look** 6:16 9:20 | 9:4 | **oil** 5:13 8:6,20 | **potentiality** 5:2 |
| **looked** 8:4 | **model** 8:3 | 9:7 10:7,14 | **potentially** 9:9 |
| **lot** 5:10 | **momentum** 8:8 | **okay** 5:18 | **predict** 8:14 |
| **low** 4:6 10:1,3 | **month** 8:6 | 10:19,23 | 9:7,23 |
| 10:11 | **months** 8:11 | **order** 6:3 9:14 | **prediction** 10:6 |
| **m** | 9:7 | **outcome** 12:12 | **preferred** 6:6 |
| | **months'** 7:24 | **own** 8:16 9:15 | 7:9 9:13 |
| **made** 5:6 | **motivations** | 9:17 | |
| **make** 7:10 | 8:16 | | |
| **makes** 8:22 | | | |

Return to TOC

**[prepared - torchlight]**

| | | | |
|---|---|---|---|
| **prepared** 12:3 | **regarding** 3:4 | **shorted** 5:23 | **stay** 4:25 |
| **president** 8:19 | 7:2,6 | **shorts** 6:7,14 | **staying** 10:3 |
| **press** 7:21,22 | **related** 12:7 | 9:15 | **stock** 3:9 4:7,12 |
| **price** 3:18 5:3 | **relative** 12:10 | **side** 4:5 9:6 | 4:13,16,18 |
| 5:13 8:6,17 9:7 | **released** 7:22 | **signature** 12:14 | 5:22 6:4,7,19 |
| 10:14,19,19,23 | **releases** 7:21 | **simona** 2:3,10 | 9:4,16,16,17,17 |
| **priced** 9:14 | **restrictions** | 3:2,4,15,17,24 | **stocks** 6:12 |
| **probably** 4:24 | 8:20 | 4:20 5:18,24 | **stuff** 10:20 |
| 7:15,16 | **result** 6:6 9:19 | 7:2,5,13,25 8:9 | **suited** 10:10 |
| **proceeding** | **revenue** 5:7 | 8:21 9:11,24 | **supply** 3:7 |
| 12:4 | **right** 3:21 8:12 | 10:9 | |
| **proceedings** | | **simple** 4:4 | **t** |
| 12:6 | **s** | **sir** 7:5 | **t** 2:8,8 |
| **putting** 10:21 | **s** 2:1,8 | **six** 7:24 8:11 | **take** 9:2 |
| | **saw** 5:10 | 9:7 | **taken** 12:9 |
| **q** | **schedule** 7:23 | **skills** 12:6 | **talk** 10:19,23 |
| **question** 3:24 | **securities** 1:6 | **smith** 1:15 12:2 | **talking** 6:18 |
| 7:5 | **see** 5:17 | 12:15 | **tell** 8:11 10:13 |
| **quote** 4:2 | **seen** 6:12 7:8 | **sold** 7:24 | **thing** 10:13 |
| | 8:18 | **somebody** 4:13 | **think** 8:17 |
| **r** | **selected** 8:5,5 | **soon** 3:22 | **three** 6:17 9:25 |
| **r** 2:1 3:1,1 | **sell** 7:23 8:2 | **spac** 5:5 | **tier** 8:13 |
| **range** 9:25,25 | **selling** 4:12 | **speaking** 8:12 | **time** 6:8 7:24 |
| **ratio** 3:14 4:8 | **sense** 5:9 | **special** 7:8,13 | 8:10 |
| **real** 5:9 | **set** 6:2 | 7:14 | **today** 4:2,5,7 |
| **reason** 4:10 | **share** 5:3 6:6 | **speculative** | 4:11 6:17 8:5 |
| 9:14 | 9:14 | 10:16 | 8:24 10:12 |
| **reasons** 4:11 | **shareholders** | **squeeze** 6:15,18 | **took** 7:8 |
| 9:9 | 7:7,17 9:2 | **started** 10:25 | **top** 6:17 8:13 |
| **recently** 5:6 | **shares** 7:18 | **startups** 5:6 | **topic** 7:2,6 |
| **record** 12:5 | **shooting** 8:24 | **states** 8:19 | **torchlight** 5:14 |
| **recording** 12:4 | **short** 6:1,2,3,15 | **statistics** 6:16 | 5:22 6:18 8:1 |
| **reflected** 4:10 | 6:18 7:10 9:17 | 9:20 | 8:12,23 9:1 |
| 6:22 | | | 10:7 |

Page 4

Return to TOC   APP1-691

**[touch - yesterday]**

| | |
|---|---|
| **touch**  9:6 | **we've**  5:11 |
| **towards**  6:10 |   10:24 |
|   6:13 | **went**  8:6 |
| **transcribed** | **worker**  11:5 |
|   1:15 | |
| **transcriber** | **x** |
|   12:1 | **x**  5:21 |
| **transcript**  12:3 | **y** |
|   12:5 | **yeah**  3:19,23 |
| **translate**  5:19 |   4:4 5:24 7:19 |
| **true**  12:5 |   7:25 8:9,21 |
| **try**  5:18 |   10:18 |
| **two**  3:8 4:12 | **year**  4:9 10:13 |
| **u** | **years**  5:12 |
| **understand**  7:6 | **yesterday**  3:10 |
|   7:19 | |
| **united**  8:19 | |
| **use**  3:5,5,5 | |
| **used**  10:24 | |
| **v** | |
| **v**  1:6 | |
| **valuable**  8:23 | |
|   9:10 | |
| **value**  5:13,16 | |
| **valued**  5:7 | |
|   10:12 | |
| **w** | |
| **want**  7:6 9:3,5 | |
|   10:17 | |
| **wanted**  4:7,13 | |
| **way**  6:7 | |

Page 5

guru focus

# Torchlight Energy Resources Stock Appears To Be Significantly Overvalued

**GuruFocus.com**
March 28, 2021 • 4 min read

 

- By GF Value

The stock of Torchlight Energy Resources (NAS:TRCH, 30-year Financials) is believed to be significantly overvalued, according to GuruFocus Value calculation. GuruFocus Value is GuruFocus' estimate of the fair value at which the stock should be traded. It is calculated based on the historical multiples that the stock has traded at, the past business growth and analyst estimates of future business performance. If the price of a stock is significantly above the GF Value Line, it is overvalued and its future return is likely to be poor. On the other hand, if it is significantly below the GF Value Line, its future return will likely be higher. At its current price of $1.85 per share and the market cap of $268.8 million, Torchlight Energy Resources stock shows every sign of being significantly overvalued. GF Value for Torchlight Energy Resources is shown in the chart below.

- Warning! GuruFocus has detected 8 Warning Signs with TRCH. Click here to check it out.

- TRCH 15-Year Financial Data

- The intrinsic value of TRCH

- Peter Lynch Chart of TRCH

EXHIBIT
A-2



Torchlight Energy Resources Stock Appears To Be Significantly Overvalued

Because Torchlight Energy Resources is significantly overvalued, the long-term return of its stock is likely to be much lower than its future business growth.

**Link: These companies may deliever higher future returns at reduced risk.**

Investing in companies with poor financial strength has a higher risk of permanent loss of capital. Thus, it is important to carefully review the financial strength of a company before deciding whether to buy its stock. Looking at the cash-to-debt ratio and interest coverage is a great starting point for understanding the financial strength of a company. Torchlight Energy Resources has a cash-to-debt ratio of 0.01, which is in the bottom 10% of the companies in Oil & Gas industry. GuruFocus ranks the overall financial strength of Torchlight Energy Resources at 3 out of 10, which indicates that the financial strength of Torchlight Energy Resources is poor. This is the debt and cash of Torchlight Energy Resources over the past years:



Companies that have been consistently profitable over the long term offer less risk for investors who may want to purchase shares. Higher profit margins usually dictate a better investment compared to a company with lower profit margins. Torchlight Energy Resources has been profitable 0 over the past 10 years. Over the past twelve months, the company had a revenue of $0.2 million and loss of $0.15 a share. Its operating margin is -2237.63%, which ranks in the bottom 10% of the companies in Oil & Gas industry. Overall, the profitability of Torchlight Energy Resources is ranked 1 out of 10, which indicates poor profitability. This is the revenue and net income of Torchlight Energy Resources over the past years:



Torchlight Energy Resources Stock Appears To Be Significantly Overvalued

Growth is probably the most important factor in the valuation of a company. GuruFocus research has found that growth is closely correlated with the long term performance of a company's stock. The faster a company is growing, the more likely it is to be creating value for shareholders, especially if the growth is profitable. The 3-year average annual revenue growth rate of Torchlight Energy Resources is -41.5%, which ranks in the bottom 10% of the companies in Oil & Gas industry. The 3-year average EBITDA growth rate is -145.2%, which ranks in the bottom 10% of the companies in Oil & Gas industry.

Another method of determining the profitability of a company is to compare its return on invested capital to the weighted average cost of capital. Return on invested capital (ROIC) measures how well a company generates cash flow relative to the capital it has invested in its business. The weighted average cost of capital (WACC) is the rate that a company is expected to

pay on average to all its security holders to finance its assets. When the ROIC is higher than the WACC, it implies the company is creating value for shareholders. For the past 12 months, Torchlight Energy Resources's return on invested capital is -10.14, and its cost of capital is 13.22. The historical ROIC vs WACC comparison of Torchlight Energy Resources is shown below:



Torchlight Energy Resources Stock Appears To Be Significantly Overvalued

In summary, the stock of Torchlight Energy Resources (NAS:TRCH, 30-year Financials) shows every sign of being significantly overvalued. The company's financial condition is poor and its profitability is poor. Its growth ranks in the bottom 10% of the companies in Oil & Gas industry. To learn more about Torchlight Energy Resources stock, you can check out its 30-year Financials here.

To find out the high quality companies that may deliever above average returns, please check out GuruFocus High Quality Low Capex Screener.

This article first appeared on GuruFocus.

📧 View Comments (1)

Terms and Privacy Policy    Your Privacy Choices ✓✕    CA Privacy Notice



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TODD TARGGART,

    Plaintiff,

v.                                                      No. 4:24-cv-00767-P

NEXT BRIDGE HYDROCARBONS,
INC., ET AL.,

    Defendants.

## MEMORANDUM OPINION & ORDER

Before the Court are two motions to dismiss: one filed by Defendants Robert L. Cook, Joseph DeWoody, Clifton Dubose, Jr., Lucas T. Hawkins, Gregory McCabe, Next Bridge Hydrocarbons, Inc. (Next Bridge), Delvina Oelkers, Mia Pitts, and Kristin Whitley (collectively, the Original Defendants) (ECF No. 49) and the other filed by Defendant John Brda (ECF No. 52). For the sake of economy, the Court takes up both motions together. After reviewing the motions, the briefs, and the applicable law, the Court will **GRANT** both motions and **DISMISS** Plaintiffs' claims with prejudice.

## BACKGROUND

This is a securities fraud action filed pursuant to Sections 11, 12, and 15 of the Securities Act of 1933 (the Act). Plaintiffs allege Defendants made false or misleading statements leading up to the spinoff of Next Bridge from Meta Materials, Inc., its predecessor company.

The history of this case begins with a former company called Torchlight Energy Resources, Inc. (Torchlight), that owned and operated oil and gas interests in West Texas. In 2020, Torchlight began negotiating a reverse merger with Metamaterial Technologies, Inc. (Metamaterial) to gain access to market capital. Under the structure of the merger, Torchlight shareholders were given, through a special

dividend, non-voting preferred shares in the combined company (the Preferred Shares) that would correspond to Torchlight's oil and gas assets (the Assets). The agreement gave the Torchlight-investors-turned-preferred-shareholders the right to receive the proceeds from the sale of the Assets. Alternatively, if the assets did not sell by a certain date, those Preferred Shareholders would receive equity in a spin-off entity called Meta Materials, Inc. (Meta II) that would own the Assets.[1] Plaintiff Mohammed Limon, a Torchlight investor, came to own all his Preferred Shares through the dividend connected with the merger. Plaintiff Todd Targgart acquired most of his Preferred Shares the same way.

Meta II did not sell the Assets by the set date, so its leadership proceeded to arrange the spinoff. In the spinoff, the holders of Preferred Shares would receive a distribution of shares in the spinoff company, Next Bridge. In July 2022, Next Bridge filed a registration statement on Form S-1 with the Securities and Exchange Commission, followed by several amendments and a final prospectus. The Registration Statement valued the Assets at $47,293,607. Leading up to the spinoff, Meta II's Preferred Shares were traded over the counter[2] under the ticker symbol "MMTLP."

In December 2022, Meta II effectuated the spinoff by distributing shares in Next Bridge to all the holders of the Preferred Shares in Meta. Plaintiffs were among the Preferred Shareholders who received shares of Next Bridge in the spinoff. Targgart purchased a portion of his

---

[1] Importantly, the spinoff was structured as a distribution that would not force the Preferred Shareholders to give up their shares in Meta II. "This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the [Assets] . . . while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of [Meta II]'s business **on an ongoing basis** (which would have a large stockholder base and access to additional capital)." ECF No. 41 ¶ 29 (emphasis added). Thus, Preferred Shareholders would keep their equity in Meta II after the spinoff.

[2] That is, not on centralized exchanges like the New York Stock Exchange.

2

Preferred Shares, and Plaintiff Steven Martinez purchased all of his, in over-the-counter markets in anticipation of the spinoff.

Defendant John Brda played a key role in the plan. Brda, the CEO of Torchlight, spearheaded the search for a company through which Torchlight could gain access to capital markets. It was Brda who "identified and recruited Metamaterial as a merger partner." ECF No. 41 at 36. Leading up to the Torchlight–Metamaterials merger, Brda promoted Torchlight's stock in several venues, including investor meetings, social media posts, and Torchlight press releases. After the merger, Torchlight paid Brda a $1.5 million bonus for his role in conceiving and executing the deal. ECF Nos. 41, 42. When Meta II began preparing for the spinoff and MMTLP was being traded over the counter, Brda continued promoting the stock on his public Twitter account. In those posts, he sometimes described MMTLP and the to-be-created Next Bridge as "basically the same thing." ECF No. 41 at 42. In another post, he referred to Preferred Shareholders as "MMTLP/NBH shareholders." ECF No. 41 at 46. In at least one post, Brda represented that holders of Preferred Shares "hold together 3.2 Billion Barrels of Oil." *Id.*

In March 2023, Next Bridge filed a report for fiscal year 2022, in which it stated the value of the Assets as $79,695,928. Four months later, Next Bridge restated the value of the Assets as zero.

Targgart originally brought this suit in the United States District Court for the Eastern District of New York on behalf of himself and all others who acquired shares of Next Bridge in the spinoff. Plaintiffs bring a claim under Section 11 of the Act against the Original Defendants, alleging the Registration Statement contained false and misleading statements of fact and they acquired shares of Next Bridge traceable to those statements. Plaintiffs next bring a claim under Section 15 of the Act for "controlling person" liability against Defendants Cook, DuBose, DeWoody, Hawkins, Oelkers, Pitts, Whitley, and McCabe. Finally, Plaintiffs allege Brda and Next Bridge offered the Next Bridge shares in a misleading prospectus and related statements in violation of Section 12(a)(2) of the Act. Targgart, Limon, and Martinez became the lead plaintiffs before the district court in New York transferred the case to this Court.

Defendants now move to dismiss all of Plaintiffs' claims. ECF Nos. 49, 52. The Original Defendants argue: (1) Plaintiffs lack standing under Section 11; (2) Defendants McCabe, Hawkins, and Oelkers are not subject to Section 11; and (3) the Registration Statement was not false or misleading. Brda adopts the Original Defendants' arguments and argues, in addition: (4) Plaintiffs lack standing under Section 12(a)(2); (5) Brda is not a statutory seller under Section 12(a)(2); and (6) the 1-year statute of limitations bars Plaintiffs' claims.

## LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Rule 12(b)(6) for "failure to state a claim upon  which relief may be granted." FED. R. CIV. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.* at 679.

## ANALYSIS

Because Brda's Motion incorporates the Original Defendants' arguments, and both motions concern the same set of allegations, the Court takes both up together. Plaintiffs' claims are evaluated in order.

## A. Section 11

Section 11 of the Act imposes strict liability on any issuer, underwriter, or signer of a false registration statement to those who acquired shares traceable to that registration statement. 15 U.S.C. § 77k(a). A successful plaintiff in a Section 11 suit can recover as damages the difference between the purchase price and its value at the time of suit or the amount for which he sold it at a loss. *Id.* § 77k(e). Plaintiffs allege the Registration Statement was misleading and argue the Defendants are strictly liable because the Plaintiffs acquired shares of Next Bridge traceable to the Registration Statement. ECF No. 41 ¶¶ 103, 107.

The text of Section 11 limits recovery to "any person acquiring such security." 15 U.S.C. § 77k(a). Although the word "such" has no antecedent, the surrounding context narrows down the meaning: "Such security" in Section 11 refers to "a security registered under the particular registration statement alleged to contain a falsehood or misleading omission." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023). In other words, the security the plaintiff acquired must be registered under the contested registration statement.

5

Although the Supreme Court settled the meaning of "such security," another term in Section 11(a) remains ambiguous. Neither party has cited—nor has the Court located—any caselaw defining "acquire" with specificity. That is, it is unclear whether the phrase "any person acquiring such security" includes plaintiffs who receive securities as a distribution given to holders of shares in *another* company. To determine whether the statute allows Plaintiffs to sue, therefore, the Court relies on cases involving analogous—but not identical—facts, as well as the language of Section 11(a).

Some evidence seems to support an expansive reading. For one thing, a plaintiff does not necessarily have to purchase shares in an initial public offering (IPO) to sue under Section 11. For example, an "aftermarket plaintiff"—one who acquired his shares in a "private, secondary transactions"—has standing under Section 11. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871–72 (5th Cir. 2003). As long as an aftermarket plaintiff "can trace his shares to the challenged registration statement," Section 11 gives him a right of action. *See id.* at 873. Another example is found in stock-for-stock mergers. A plaintiff can qualify as a "person acquiring such security" by exchanging shares of one company for shares of another instead of paying for shares in cash. *7547 Corp. v. Parker & Parsley Dev. Partners, LP*, 38 F.3d 211, 223 (5th Cir. 1994).

But those extended uses of the term "acquire" are supported by a justification that does not support extending the statute to Plaintiffs here. In the cases of both aftermarket sales and stock-for-stock mergers, the plaintiff has given value for a security issued under the contested registration statement. Because "any person acquiring such security" is limited to "purchasers of shares issued and sold pursuant to the challenged registration statement," courts have used the Act's definition of "sale" to find out who may sue under Section 11. *7547 Corp.*, 38 F.3d at 223. The Act, in turn, defines "sale" as "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). That definition "include[s] exchanges of one security for another." *7547 Corp.*, 38 F.3d at 223. When a shareholder trades his stock in one company for stock in another, he gives value for value and becomes a purchaser with standing to sue under Section 11.

In contrast, the Act's definition of "sale" does not cover the transaction that caused Plaintiffs to own shares of Next Bridge. Although Plaintiffs refer in their response to their "exchange of 'MMTLP' shares for [Next Bridge] stock in the spin-off" (ECF No. 56 at 9), their live pleading says, to the contrary, that Meta II "completed the Spin-Off and distributed [Next Bridge]'s equity to the Preferred Stock shareholders as of December 12, 2022[.]" In other words, Plaintiffs did not give value for their Next Bridge shares. Instead, they paid money for shares of Torchlight or Meta II and later became entitled to a distribution—not a purchase—of Next Bridge shares. In fact, the Registration Statement says so plainly: "We [Next Bridge] are . . . not asking you [Preferred Shareholders] to make any payment or surrender or exchange any of your shares of Meta [II] common stock for shares of our Common Stock." ECF No. 51 at App. 033.[3] In short, the most analogous cases available indicate a Section 11 plaintiff must have given value for the securities issued under the contested registration statement.

An analysis of the text of Section 11 confirms receiving shares in a distribution does not confer standing. Subsection (e) of the statute sets the available damages as:

> such damages as shall represent the difference between **the amount paid for the security** (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

---

[3] At the pleading stage, the Court may take judicial notice of documents in the public record, including documents filed with the Securities and Exchange Commission, such as the Registration Statement. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 639 n.2 (5th Cir. 2005). The Court may consider such documents for their content, not for their truth. *Id.*

7

15 U.S.C. § 77k(e) (emphasis added). The damages provision assumes a plaintiff has "paid" an "amount" for the security and thereby sheds light on what the word "acquire" must mean in subsection (a). It clarifies that the phrase "person acquiring such security" does not include plaintiffs who receive securities as a distribution without giving any other value in exchange.

Although Defendants couch this line of reasoning as an attack on Plaintiffs' Article III standing, that is not the ground on which the Court bases its decision. While it may be true that Plaintiffs come short of stating a cognizable injury necessary to create an Article III case or controversy (the Court does not decide either way), the problem is more fundamental. It is not that Plaintiffs were wronged under the statute but suffered no damages; it is that the statute simply does not apply to them. This Opinion uses the term "standing" not in the sense intended in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (discussing Article III requirement), but in the sense employed by cases like *7547 Corp.*, 38 F.3d at 225. In that context—and the present one—"standing" refers to whether a plaintiff qualifies as a person authorized by Section 11 to bring suit, not to whether a case satisfies the requirements of Article III. It therefore may be more proper to say, as Plaintiffs themselves quote, that "the terms 'purchase' and 'sale' are relevant only to the question of statutory coverage. Therefore there are no 'standing' problems lurking in the case." *Secs. & Exch. Comm'n v. Nat'l Secs., Inc.*, 393 U.S. 453, 467 n.9 (1969); ECF No. 55 at 11.

For that reason, Plaintiffs are wrong in contending that "[a]ccepting Defendants' argument would . . . effectively forc[e] plaintiffs to plead unnecessary elements"—that is, damages. ECF No. 56 at 11. Plaintiffs suing under Section 11 do not have to prove their damages at the pleading stage. But they do have to allege, at the very least, they purchased the relevant securities. They do not claim they purchased shares of Next Bridge; they allege they were distributed the shares as Preferred Shareholders in Meta II. Because of this, they fail to state a claim under Section 11.

## B. Section 12(a)(2)

Plaintiffs also bring a claim against Next Bridge and Brda under Section 12(a)(2) of the Act. Section 12(a)(2) creates a right of action for a purchaser of securities against any person who offers or sells the securities to the purchaser through a prospectus containing misleading statements or omissions. 15 U.S.C. § 77*l*(a)(2). Although the statute explicitly makes relief available to "the person purchasing such security *from him*," a person need not necessarily pass title to the securities to be liable under the statute. A person is also liable if he "successfully solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Solicitations subject to Section 12(a) liability can include publicly disseminated communications, including those posted on social media. *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022).

Plaintiffs allege Brda orchestrated the Spin-Off to create a "short squeeze," driving up the price of Torchlight stock and allowing Torchlight to raise $137 million through its public offering. He used social media—including Twitter, Reddit, and other channels—to promote Torchlight's stock and combat short-sellers. Plaintiffs argue that in so doing, he was in effect promoting Next Bridge's stock because he was already planning to spin the Assets off into a yet-to-be-created entity. Brda took these actions for his own "financial interests," earning a $1.5 million bonus from Torchlight for his efforts. He then used social media to promote MMTLP in preparation for the Next Bridge spinoff.

Plaintiffs' Section 12 claim suffers from the same fatal flaw as their Section 11 claim. To recover under Section 12, plaintiffs must allege they purchased the securities in question. *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727, 734 (5th Cir. 2019). Not only that, but they must allege they purchased them in a public, as opposed to an aftermarket, transaction. *Dartley v. ErgoBilt Inc.*, No. 3:98-cv-1442-M, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). "Sale" in the Section 12 context takes the same meaning it does in Section 11 cases—"every contract of sale or

disposition of a security or interest in a security, *for valu*e." *Lampkin*, 925 F.3d at 734; 15 U.S.C. § 77b(a)(3) (emphasis added). As discussed above, Plaintiffs do not plead they purchased shares of Next Bridge—the shares they allege were issued under a misleading prospectus—although they do try to retroactively reframe their pleadings in their response to Brda's motion to dismiss. ECF No. 55 at 12.

Plaintiffs attempt, unsuccessfully, to evade the straightforward application of Section 12 and the subsequent caselaw. For example, they respond to Brda's citation to *Isquith v. Caremark International, Inc.*, which held a spinoff substantially identical to this one was not a sale of securities. 136 F.3d 531, 534 (7th Cir. 1998); ECF No. 53 at 5–6. In response, Plaintiffs argue *Isquith* "involved [a] scenario[ ] in which the plaintiffs received distributions of shares without surrendering anything in exchange." ECF No. 55 at 12. This case is precisely such a scenario. But they attempt to distinguish *Isquith* on the basis that "Brda solicited shareholders to purchase preferred stock in anticipation of the spin-off." *Id.* That allegation does nothing to negate the proposition that Plaintiffs gave no value for their Next Bridge shares. Nothing in the *Isquith* opinion suggested the court's holding turned on whether the plaintiffs had invested before the spinoff. *See generally* 136 F.3d. Nor do Plaintiffs offer any authority for their implied premise that purchasing shares in one company can constitute a "purchase" of a security distributed to holders of those shares. Plaintiffs come the closest to offering an on-point case in citing *Securities & Exchange Commission v. Datronics Engineers, Inc.*, from the United States Court of Appeals for the Fourth Circuit, in which the Commission found spinoffs to constitute a "sale" under the Act. 490 F.2d 250, 253 (4th Cir. 1973). *Datronics*, which is a non-binding out-of-circuit decision, dealt with Section 5, not Section 11 or 12, of the Act. *Id.* And as the Seventh Circuit remarked in *Isquith*, "[*Datronics*] is inapposite because while the SEC indeed obtained an injunction against spinoffs, their only purpose had been to evade the registration requirements of the securities laws." *Isquith*, 136 F.3d at 536.

Plaintiffs' complaint suffers another defect, which is the flip-side of the same coin: Just as the alleged "purchase" was not in fact a purchase, neither did Brda's alleged "sale" of Next Bridge stock actually pertain to Next Bridge stock at all. To the contrary, Brda's promotional activities— to which Plaintiffs devote several pages in their live pleading—were inviting the public to buy shares, not in Next Bridge, but in *Torchlight and Meta II*. Plaintiffs go into detail about Brda's plan to promote Torchlight to create a "short squeeze" and his subsequent promotion of Meta II stock. They refer to those actions as "promoting Next Bridge." But calling it that does not make it so.

Indeed, Plaintiffs' own pleadings totally belie their characterization. According to the Amended Complaint, when the Torchlight– Metamaterial merger occurred, Plan A was to sell the Assets and distribute the proceeds to the Preferred Shareholders. ECF No. 41 ¶ 31. The company pivoted to Plan B, the spinoff, only after the company failed to sell the Assets. *Id.* ¶¶ 33–34. So Brda's pre-merger activities could not have been a sale of shares in Next Bridge—a company that not only did not exist yet, but was in fact nothing more than a contingency at the time.

Plaintiffs' post-merger pleadings are no better. Between the merger and the spinoff, a Twitter user asked Brda, "Which one would you pick?" between stock in Meta II and Next Bridge. ECF No. 41 ¶ 34. Brda replied, "Why must I choose? Oilco [Next Bridge] and MMTLP [Preferred Shares in Meta II] are basically the same thing." *Id.* In another exchange, Brda smugly explained to a Twitter follower that short sellers would be forced to "cover" by purchasing shares in Next Bridge, which would be impossible since Next Bridge would be private. *Id.* ¶ 145. Later, he urged investors to buy more Preferred Shares. *Id.* ¶ 146. None of that amounts to selling or promoting shares of Next Bridge in the sense required for liability under Section 12. True, *Pinter v. Dahl* extended Section 12 liability beyond those actually passing title to securities to cover sellers who solicit the purchase of securities. 486 U.S. at 642–43. But Plaintiffs would have the Court extend Section 12 even further, so as to encompass "sellers" who merely promote a security by soliciting purchases of a *different* security. Plaintiffs do not point the

11

Court to any case in which a court extended the statute that far. This Court declines to be the first to do so. Plaintiffs have therefore failed to state a claim under Section 12 of the Act.

## C. Section 15

Under Section 15 of the Act, all "controlling persons" of companies liable under Sections 11 or 12 have joint and several liability with the companies they control. 15 U.S.C. § 77*o*(a). Because Plaintiffs have failed to state claims under Sections 11 or 12, they cannot state a claim under Section 15. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 n.33 (5th Cir. 2001) (Section 15 liability derivative of Section 11 and 12 liability).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** both Motions to Dismiss and **DISMISSES** all of Plaintiffs' claims **with prejudice**.

**SO ORDERED** on this **3rd day of July 2025.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE