# Appendix 2 - Table of Contents

| Item | Date | Description | Page |
|------|------|-------------|------|
| 001 | 11-21-1963 | 1963 11 21 - United States v. Zacks 375 U.S. 59 (1963) | 001-007 |
| 002 | 05-15-1978 | 1978 05 15 - SEC v. Sloan, 436 U.S. 103 (1978) | 008-032 |
| 003 | 04-23-1991 | 1991 04 23 - Matter of Monnig?s Dep?t Stores, Inc., 929 F.2d 197 (5th Cir. 1991) | 033-037 |
| 004 | 04-20-1998 | 1998 04 20 SEC v. Cavanagh, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) | 038-116 |
| 005 | 06-21-2007 | 2007 06 21 - Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) | 117-120 |
| 006 | 05-18-2009 | 2009 05 18 - Ashcroft v. Iqbal - 556 U.S. 662 (2009) | 121-159 |
| 007 | 06-22-2020 | 2020 06 22 - Liu v. SEC, 140 S. Ct. 1936 (2020) | 160-193 |
| 008 | 10-27-2023 | 2023 10 27 - Anytime Fitness, LLC v. Thornhill Bros. Fitness, LLC, No. 423-cv-00074, slip op. (N.D. Miss. Oct. 27, 2023) | 194-212 |

# JUSTIA

# United States v. Zacks, 375 U.S. 59 (1963)

Overview    Opinions    Materials

**Argued:**                    **Decided:**
October 21, 1963            November 21, 1963

**Syllabus**

# U.S. Supreme Court

**United States v. Zacks, 375 U.S. 59 (1963)**

**United States v. Zacks**

**No. 44**

**Argued October 21, 1963**

**Decided November 12, 1963**

**375 U.S. 59**

*Syllabus*

In 1952, a taxpayer received royalties on patents all substantial rights under which she had transferred to a manufacturer by way of an exclusive license. She and her husband reported such royalties as ordinary income in their joint return for 1952. This return was filed in 1953; the last payment of taxes thereunder was made in 1953; and a claim for refund was barred in 1956 by §322(b)(1) of the Internal Revenue Code of 1939. By the Act of June 29, 1956, Congress amended the Internal Revenue Code of 1939 so as to add §117(q), providing that amounts received in such circumstances should be taxed as capital gains, rather than as ordinary income, and it made the amendment applicable to tax years beginning after May 31, 1950. In reliance on this amendment, the taxpayers filed in 1958 a claim for a *pro tanto* refund of their 1952 income taxes.

*Held:* Their claim was barred by the statute of limitations generally applicable to tax refund claims. Pp. 375 U. S. 59-70.

150 Ct.Cl. 814, 280 F.2d 829, reversed.

**Show Less**

---

# Opinions

**Opinions & Dissents**

# U.S. Supreme Court

**United States v. Zacks, 375 U.S. 59 (1963)**
**United States v. Zacks**

**No. 44**

**Argued October 21, 1963**

**Decided November 12, 1963**

**375 U.S. 59**

*CERTIORARI TO THE UNITED STATES COURT OF CLAIMS*

*Syllabus*

In 1952, a taxpayer received royalties on patents all substantial rights under which she had transferred to a manufacturer by way of an exclusive license. She and her husband reported such royalties as ordinary income in their joint return for 1952. This return was filed in 1953; the last payment of taxes thereunder was made in 1953; and a claim for refund was barred in 1956 by §322(b)(1) of the Internal Revenue Code of 1939. By the Act of June 29, 1956, Congress amended the Internal Revenue Code of 1939 so as to add §117(q), providing that amounts received in such circumstances should be taxed as capital gains, rather than as ordinary income, and it made the amendment applicable to tax years beginning after May 31, 1950. In reliance on this amendment, the taxpayers filed in 1958 a claim for a *pro tanto* refund of their 1952 income taxes.

*Held:* Their claim was barred by the statute of limitations generally applicable to tax refund claims. Pp. 375 U. S. 59-70.

150 Ct.Cl. 814, 280 F.2d 829, reversed.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question in this case is whether § 117(q) of the Internal Revenue Code of 1939, a 1956 amendment to

Page 375 U. S. 60

the Code which effected retroactive changes in the tax treatment of transfers of patent rights, gives rise to a claim for refund barred by the statute of limitations generally applicable to tax refund claims.

In 1952, Mrs. Zacks received royalties of about $37,000 on patents all substantial rights under which she had transferred by way of an exclusive license to a manufacturing corporation. In accordance with the then prevailing rulings of the Commissioner, the royalties were reported as ordinary income in the 1952 joint federal income tax return filed by Mrs. Zacks and her husband in 1953. The last payment of the taxes due was made in 1953. Under the statute of limitations governing a claim for refund of such taxes, the claim was barred in 1956. § 322(b)(1), Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 322(b)(1), 53 Stat. 91. [Footnote 1] By Act of June 29, 1956, 70 Stat. 404, Congress amended the provisions of the 1939 Code governing the taxability of amounts received in consideration for the transfer of patent rights. The amendment, made applicable to tax years beginning after May 31, 1950, provided that, in the circumstances present here, such amounts should be taxed as capital gains, rather than as ordinary income.

In reliance on this amendment, the taxpayers, on June 23, 1958, filed a claim for a *pro tanto* refund of their 1952

Page 375 U. S. 61

income taxes. No action having been taken on the claim, they then commenced a refund suit in the Court of Claims. The United States asserted as a defense that the suit was barred by limitations under § 7422(a) of Internal Revenue Code of 1954, 26 U.S.C. § 7422(a), 68A Stat. 876. [Footnote 2] The Court of Claims granted the taxpayers' motion to strike this defense, 150 Ct.Cl. 814, 280 F.2d 829, and, other issues in the case being settled by stipulation, entered judgment for the taxpayers.

Because of the recurring importance of the problem in the administration of the tax laws and a conflict between the decision below and those of some of the Courts of Appeals, [Footnote 3] we granted certiorari. 371 U.S. 961. For reasons given hereafter, we hold that the taxpayers' claim was barred by limitations, and accordingly reverse the judgment below.

Section 117(q), here in question, provides in pertinent part:

"TRANSFER OF PATENT RIGHTS --"

"(1) GENERAL RULE. -- A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such

Page 375 U. S. 62

rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are --"

"(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or"

"(B) contingent on the productivity, use, or disposition of the property transferred."

"* * * *"

"(4) APPLICABILITY. -- This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred."

Since our sole concern is the intent of Congress in adding this section to the Code, it is necessary to look to the administrative and legislative background of the enactment. In 1946, the Commissioner of Internal Revenue announced his acquiescence in *Myers,* 6 T.C. 258, in which the Tax Court held, as to a so-called "amateur" inventor, [Footnote 4] that the transfer by exclusive license of all substantial rights under a patent was a sale or exchange of a capital asset, notwithstanding that the consideration for the license was royalties based on a percentage of the selling price of articles sold under the patent, and paid annually. 1946 -- 1 Cum.Bull. 3. On March 20, 1950, the Commissioner reversed his position and announced the withdrawal of his acquiescence in *Myers,* stating that royalties measured or paid as in that case would be taxed as ordinary income. Mim. 6490,

Page 375 U. S. 63

1950-1 Cum.Bull. 9. The new ruling was declared applicable to tax years beginning after May 31, 1950. In the years following 1950, the Commissioner adhered to his new position, despite its rejection by several courts. [Footnote 5] The issue was settled for the future in 1954 by the enactment of § 1235 of the 1954 Code, 26 U.S.C. § 1235, 68A Stat. 329. Section 1235, applicable only prospectively, contains provisions identical in relevant part to those quoted above from § 117(q). [Footnote 6] Thus, prior to May 31, 1950, with exceptions noted hereafter, [Footnote 7] and again from the beginning of 1954, the law has been that for which the taxpayers contend in their refund suit.

In 1955, the Commissioner issued a further ruling declaring that he would adhere to his 1950 ruling for tax years beginning after May 31, 1950, and prior to 1954. Rev.Rule 55-58, 1955-1 Cum.Bull. 97. As a result, the

Page 375 U. S. 64

Commissioner's position was that, during the period from May 31, 1950 to 1954, there was a gap in the consistent application of the law as administratively and judicially established in 1946. It is evident that Congress intended to fill this gap when it enacted § 117(q) in 1956. But we are not able to say that Congress intended thereby to reopen for retroactive adjustment tax years with respect to which refund claims were already barred by limitations.

Section 117(q) does not, in terms, waive the application of the statute of limitations to refund claims then finally barred. On its face, § 117(q) does no more than overrule the Commissioner's position on a matter of substantive law respecting the years 1950-1954. Nor is there anything in the legislative history which suggests that such a waiver is to be implied. On the contrary, such indications as there are suggest that Congress intended only to terminate litigation then pending. Representative Cooper, then Chairman of the House Ways and Means

Return to TOC

Committee, stated on the floor of the House:

"The relief provided by section 1235 [of the 1954 Code] is available only with respect to amounts received in any taxable year to which the 1954 Code applies. As the result of this and the announced policy of the Internal Revenue Service to continue its insistence on its position for years beginning after May 31, 1950, and prior to effective date of the 1954 Code, taxpayers are still confronted with litigation for taxable years falling in this period in order to secure the rights to which the courts, with practical unanimity, have held they are entitled."

"H.R. 6143 [the original version of § 117(q)] eliminates the necessity for such litigation by making the provisions of the 1954 Code available to years beginning after May 31, 1950."

101 Cong.Rec. 12708 (Aug. 1, 1955).

Page 375 U. S. 65

There are other indications that Congress had only this limited intention. It is abundantly clear that Congress is aware of the limitations problem as it affects retroactive tax legislation. On numerous occasions, Congress has included an express provision reopening barred tax years. We need refer here to only a few examples. Section 14 of the Technical Amendments Act of 1958, 26 U.S.C. § 172(f)(3), (4), (g)(3), 72 Stat. 1606, 1611, provided rules for computing net operating loss deductions for tax years starting in 1954 and extending into 1954 and short tax years wholly within 1954. Subsection (c), added to the House bill by the Senate, provided expressly for a six-month period during which barred claims could be made. The addition was explained in the Senate report as follows:

"Your committee did amend the House provision, however, in one respect because 3 years have now elapsed since 1954, and many of the transitional years with which this provision is concerned are now closed years. To prevent relief from being denied in such cases, your committee amends this provision to provide that, if a refund or credit with respect to this provision is prevented on the date of enactment of this bill or within 6 months after that time by the operation of any law or rule of law (except closing agreements or compromises), refund or credit nevertheless is to be allowed if the claim is filed within 6 months of the date of enactment of this bill."

S.Rep. No. 1983, 85th Cong., 2d Sess. 24.

Again, by Act of August 9, 1955, 69 Stat. 607, Congress provided a one-year grace period for filing otherwise barred claims based on § 345 of the Revenue Act of 1951, 65 Stat. 452, 517, a retroactive relief measure affecting trust income accumulated for members of the Armed

Page 375 U. S. 66

Services dying in active service on or after December 7, 1941, and before January 1, 1948. The House report on the bill stated:

"No relief was provided in the 1951 act, however, for cases where refunds or credits were barred by the expiration of the period of limitations, by prior court decisions, or for other similar reasons. Your committee is of the opinion that this failure was an oversight, and it believes that it is only equitable to extend treatment equivalent to that provided in section 345 of the Revenue Act of 1951 to cases where refunds or credits were barred by operation of law or rule of law (other than closing agreements or compromises)."

H.R.Rep. No. 1438, 84th Cong., 1st Sess. 1-2. [Footnote 8]

The most striking evidence of this sort, however, which we think is all but conclusive, is found in § 2 of the very Act here in dispute. That section, retroactively modifying § 106 of the 1939 Code, affected the taxation of payments received by a taxpayer from the United States with

Page 375 U. S. 67

respect to a claim arising out of a construction contract for the Armed Services. Subsection (b) deals with the limitations problem as follows:

"(b) The amendment made by this section shall apply with respect to taxable years ending after December 31, 1948, notwithstanding the operation of any law or rule of law (other than section 3760 of the Internal Revenue Code of 1939 or section 7121 of the Internal Revenue Code of 1954, relating to closing agreements, and other than section 3761 of the Internal Revenue Code of 1939 or section 7122 of the Internal Revenue Code of 1954, relating

to compromises). Notwithstanding the preceding sentence, no claim for credit or refund of any overpayment resulting from the amendment made by this section shall be allowed or made after the period of limitation applicable to such overpayment, except that such period shall not expire before the expiration of one year after the date of the enactment of this Act."

70 Stat. 405. Section 2 went of the Conference Committee without such a provision. The Committee added the provision, but made no comparable addition to § 1, with which we are concerned, or, for that matter, to § 3, which also made retroactive changes in the 1939 Code. It is plain, therefore, that the Congress had the limitations problem in mind at the very time that § 117(q) was enacted. The taxpayers offer no justification for disregarding the difference in this respect between §§ 1 and 2, disrespect for which would render the carefully drawn limitations provisions of the latter section surplusage.

Both the taxpayers and the Government rely on *United States v. Borden Co.,* 308 U. S. 188, 308 U. S. 198, where this Court said:

"It is a cardinal principle of construction that repeals by implication are not favored. When there are

Page 375 U. S. 68

two acts upon the same subject, the rule is to give effect to both if possible."

The correctness of this statement is not to be doubted. But the paucity of its assistance here is illustrated by the fact that both parties rely on it. The taxpayers place the second sentence in italics, and urge that § 117(q) and the general statute of limitations are both given effect if the limitations period is made to run from the date of enactment of § 117(q). The Government presses the first sentence, and urges that the taxpayers' position, in effect, repeals the statute of limitations *pro tanto.* There are difficulties with both of these analyses. Obviously, neither of them does more than cast a conclusion in terms of the general rules isolated from the particular circumstances of this case. Nor can the doctrine that remedial legislation is entitled to liberal construction, upon which the taxpayers also rely, be stretched to expand the reach of a statute of such evident limited purpose as this one.

A more difficult question is presented by the fact that § 117(q) goes beyond the problem created by the Commissioner's vacillation affecting tax years between 1946 and 1954. By treating royalty payments as capital gains without regard to whether the patent rights transferred were capital assets, § 117(q) made the favorable treatment available to professional, as well as amateur, inventors. [Footnote 9] In addition, all royalties are treated as long-term

Page 375 U. S. 69

capital gains whether or not the rights transferred had been held for the requisite period. These provisions made clear changes in the law as it was in 1950 and subsequent years up to 1954. Insofar as they are applicable to years for which most claims for refund were barred in 1956, the Government's position renders the provisions without effect.

It is, of course, our duty to give effect to all portions of a statute if that is possible. *E.g., United States v. Menasche,* 348 U. S. 528, 348 U. S. 538-539. But this general principle is meant to guide the courts in furthering the intent of the legislature, not overriding it. When rigid adherence to the general rule would require disregard of clear indications to the contrary, the rule must yield. Two considerations compel that result here. First, not only the administrative and legislative history of § 117(q), discussed above, but also the selection of May 31, 1950, as the operative date leave no doubt that Congress was primarily concerned to settle the large volume of pending litigation arising out of the Commissioner's 1950 position, reaffirmed in 1955. [Footnote 10] The date selected has no relevance either to the status of professional inventors or to the period for which patent rights must be held. Second, there is a ready explanation for the inclusion of the additional provisions. With irrelevant exceptions, § 117(q) tracks the language of § 1235 of the 1954 Code. Pp. 375 U. S. 61-62 and note 6 *supra.* It was wholly natural for Congress to deal with the pre-1954 period by adopting the language of the 1954 Code on the same subject. The House report on the bill leaves no doubt that this is what actually occurred. H.R.Rep. No. 1607, 84th Cong., 1st Sess. 1-2. It is fair inference that, but for the Commissioner's obduracy respecting amateur inventors, § 117(q) would

Page 375 U. S. 70

not have been conceived. There is nothing to indicate that, for some other reason, Congress in 1956 had second thoughts about its failure in 1954 to make these identical provisions of § 1235 retroactive. To give the provisions in question the controlling weight that is claimed for them on the issue before us would allow the tail to wag the dog. Of course, all of the amendatory provisions of § 117(q) are fully effective with respect to years and claims not barred.

Finally, the taxpayers suggest that, unless the statute of limitations is deemed waived, a premium is placed on taxpayer opposition to administrative rulings, since only those taxpayers who contested the Commissioner's position will now be able to claim a refund. But, in view of the doubt surrounding the rulings involved in this case, emphasized by the cases overruling the Commissioner, this argument has less force than it might in another context. In any event, this problem always attends retroactive legislation of this sort, and acceptance of the taxpayers' argument would lead to the automatic waiver of the statute of limitations in every case. Whether or not this should be done is a matter for Congress to decide. Where Congress has decided otherwise, this Court has but one course.

*Reversed.*

MR. JUSTICE BLACK agrees with the Court of Claims and would affirm its judgment.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

[Footnote 1]

Section 322(b)(1) provides:

"Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer."

Similar provisions are contained in § 6511(a), (b) of the Internal Revenue Code of 1954, 26 U.S.C. § 6511(a), (b), 68A Stat. 808.

[Footnote 2]

Section 7422(a) provides:

"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected with authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

[Footnote 3]

*Compare United States v. Dempster,* 265 F.2d 666 (C.A.6th Cir.), *and Tobin v. United States,* 264 F.2d 845 (C.A.5th Cir.), *with* the decision in this case and *Hollander v. United States,* 248 F.2d 247 (C.A.2d Cir.), involving a similar problem.

[Footnote 4]

One not engaged in holding patent rights "primarily for sale to customers in the ordinary course of his trade or business," 6 T.C. 266, as distinguished from a "professional" inventor who is so engaged.

[Footnote 5]

*See Kronner v. United States,* 110 F. Supp. 730, 126 Ct.Cl. 156; *Allen v. Werner,* 190 F.2d 840 (C.A.5th Cir.). The Commissioner's position was sustained by the Second Circuit in *Bloch v. United States,* 200 F.2d 63.

Prior to 1946, several courts had taken the same position. *Commissioner v. Celanese Corp.,* 78 U.S.App.D.C. 292, 140 F.2d 339; *Commissioner v. Hopkinson,* 126 F.2d 406 (C.A.2d Cir.).

APP2-007

[Footnote 6]

The relevant portions of § 1235 are:

"A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are --"

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or"

"(2) contingent on the productivity, use, or disposition of the property transferred."

[Footnote 7]

Section 1235 of the 1954 Code, and § 117(q) of the 1939 Code which follows § 1235, made changes in the prior law with respect to the status of professional inventors and the "holding period" for both amateur and professional inventors. *See* pp. 375 U. S. 67-69, infra.

[Footnote 8]

For other examples of retroactive tax measures in which express provision was made for the limitations problem, *see* Technical Amendments Act of 1958, §§ 92, 93, 100, 72 Stat. 1606, 1667, 1668, 1673; Act of September 14, 1960, § 5, 74 Stat. 1010, 1013; Revenue Act of 1962, §§ 26, 27, 76 Stat. 960, 1067.

For examples of such measures in which no provision was made to extend the period of limitations, *see* Act of February 11, 1958, 72 Stat. 3; Act of February 11, 1958, 72 Stat. 4; Technical Amendments Act of 1958, § 103, 72 Stat. 1606, 1675; Revenue Act of 1962, § 30, 76 Stat. 960, 1069.

Contrary to fears seemingly entertained by one of the *Amici* in this case, we do not suggest that congressional practice in this regard gives rise to a presumption that, where Congress has not provided expressly for a special limitations period in a retroactive tax statute, the relevant general statute of limitations was intended to apply. The significance of such congressional silence is to be judged on a case-by-case basis, as with all questions of statutory construction.

[Footnote 9]

Such rights would not be capital assets if the patents were held for sale in the ordinary course of business. Internal Revenue Code of 1954, § 1221, 26 U.S.C. § 1221, 68A Stat. 321.

The taxpayers make much of the asserted fact that Mrs. Zacks was a professional inventor, reasoning therefrom that, as to her, at least, § 117(q) clearly established a new right. *Cf. Lorenz v. United States,* 296 F.2d 746, 155 Ct.Cl. 751. The Court of Claims made no finding as to whether Mrs. Zacks was an amateur or professional inventor. Whatever may be the validity and significance in other contexts of the distinction between creation of new rights and clarification of existing rights, we think that distinction is not controlling here, since Congress has evidenced its intent more directly.

[Footnote 10]

The existence of a substantial amount of such litigation is not questioned in this case. Some of it has been collected at pages 35-36 of the Government's brief.

---

## Materials

### Oral Arguments

Oral Argument - October 21, 1963 (Part 2)

Oral Argument - October 21, 1963 (Part 1)

SEC *v.* SLOAN                                    103

Syllabus

# SECURITIES AND EXCHANGE COMMISSION *v.* SLOAN

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 76–1607. Argued March 27–28, 1978—Decided May 15, 1978

The Securities and Exchange Commission (Commission) has the authority under § 12 (k) of the Securities Exchange Act of 1934 (Act) "summarily to suspend trading in any security . . . for a period not exceeding ten days" if "in its opinion the public interest and the protection of investors so require." Acting pursuant to § 12 (k) and its predecessor, the Commission issued a series of summary 10-day orders continuously suspending trading in the common stock of a certain corporation for over a year. Respondent, who owned 13 shares of the stock and who had engaged in substantial purchases and short sales of shares of the stock, filed a petition pursuant to the Act in the Court of Appeals for a review of the orders, contending, *inter alia,* that the "tacking" of the 10-day summary suspension orders exceeded the Commission's authority under § 12 (k). Because shortly after the suit was brought no suspension order remained in effect and the Commission asserted that it had no plans to issue such orders in the foreseeable future, the Commission claimed that the case was moot. The court rejected that claim and upheld respondent's position on the merits. In this Court, the Commission contends that the facts on the record are inadequate to allow a proper resolution of the mootness issue and that in any event it has the authority to issue consecutive 10-day summary suspension orders. *Held:*

1. The case is not moot, since it is "capable of repetition, yet evading review," *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515. Effective judicial review is precluded during the life of the orders because a series of consecutive suspension orders may last no more than 20 days. In view of the numerous violations ascribed to the corporation involved, there is a reasonable probability that its stock will again be subjected to consecutive summary suspension orders; thus, there is a "reasonable expectation that the same complaining party" will be subjected to the same action again. Cf. *Weinstein* v. *Bradford,* 423 U. S. 147. Pp. 108–110.

2. The Commission does not have the authority under § 12 (k), based upon a single set of circumstances, to issue a series of summary orders that would suspend trading in a stock beyond the initial 10-day period,

Syllabus                    436 U. S.

even though the Commission periodically redetermines that such action is required by "the public interest" and for "the protection of investors." Pp. 110–123.

(a) The language of the statute establishes the 10-day period as the maximum time during which stock trading can be suspended for any single set of circumstances. Pp. 111–112.

(b) In view of congressional recognition in other sections of the Act that any long-term sanctions or continuation of summary restrictions must be accompanied by notice and an opportunity for a hearing, the absence of any provision in § 12 (k) for extending summary suspensions beyond the initial 10-day period must be taken as a clear indication that extended summary restrictions are not authorized under § 12 (k). Pp. 112–114.

(c) The statutory pattern leaves little doubt that § 12 (k) is designed to empower the Commission to prepare to deploy such other remedies as injunctive relief or a suspension or revocation of security registration, not to empower the Commission to reissue a summary order absent the discovery of a new manipulative scheme. Pp. 114–115.

(d) Those other remedies are not as unavailable as the Commission claims, as is evidenced by this very case, where the Commission during the first series of suspension orders actually sought an injunction against the corporation involved and certain of its principals and during the second series of suspensions approved the filing of an injunction action against its management. Moreover, though the Commission contends that the suspension of trading is necessary for the dissemination in the marketplace of information about manipulative. schemes, the Commission is at liberty to reveal such information at the end of the 10-day period and let investors make their own judgments. And in any event the mere claim that a broad summary suspension power is necessary cannot persuade the Court to read § 12 (k) more broadly than its language and the statutory scheme reasonably permit. Pp. 115–117.

(e) Though the Commission's view that the Act authorizes successive suspension orders may be entitled to deference, that consideration cannot overcome the clear contrary indications of the statute itself, especially when the Commission has not accompanied its administrative construction with a contemporaneous well-reasoned explanation of its action. *Adamo Wrecking Co.* v. *United States,* 434 U. S. 275, 287–288, n. 5. Pp. 117–119.

(f) There is no convincing indication that Congress has approved the Commission's construction of the Act. Pp. 119–123.

547 F. 2d 152, affirmed.

SEC *v.* SLOAN                                          105

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Powell, and Stevens, JJ., joined. Brennan, J., filed an opinion concurring in the judgment, in which Marshall, J., joined, *post,* p. 123. Blackmun, J., filed an opinion concurring in the judgment, *post,* p. 126.

*Harvey L. Pitt* argued the cause for petitioner. With him on the brief were *Solicitor General McCree, Deputy Solicitor General Jones, Howard E. Shapiro,* and *Frederick B. Wade.*

*Samuel H. Sloan,* respondent, argued the cause and filed a brief *pro se.**

Mr. Justice Rehnquist delivered the opinion of the Court.

Under the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, the Securities and Exchange Commission has the authority "summarily to suspend trading in any security . . . for a period not exceeding ten days" if "in its opinion the public interest and the protection of investors so require." [1]   Acting

---

**Reginald Leo Duff* filed a brief for Canadian Javelin, Ltd., as *amicus curiae* urging affirmance.

[1] This authority is presently found in § 12 (k) of the Act, which was added by amendment in 1975 by Pub. L. 94–29 § 9, 89 Stat. 118.   It provides in pertinent part:

"If in its opinion the public interest and the protection of investors so require, the Commission is authorized summarily to suspend trading in any security (other than an exempted security) for a period not exceeding ten days . . . .   No member of a national securities exchange, broker, or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security in which trading is so suspended." 15 U. S. C. § 78*l* (k) (1976 ed.).

This power was previously found in §§ 15 (c) (5) and 19 (a) (4) of the Act, which for all purposes relevant to this case were substantially identical to the current statute, § 12 (k), except that § 15 (c) (5) authorized summary suspension of trading in securities which were traded in the over-the-counter market, while § 19 (a) (4) permitted summary suspension of trading in securities which were traded on the national exchanges. 15 U. S. C. §§ 78*o* (c) (5) and 78s (a) (4).   Congress consolidated those powers in § 12 (k).

pursuant to this authority the Commission issued a series of consecutive orders suspending trading in the common stock of Canadian Javelin, Ltd. (CJL), for over a year. The Court of Appeals for the Second Circuit held that such a series of suspensions was beyond the scope of the Commission's statutory authority. 547 F. 2d 152, 157–158 (1976). We granted certiorari to consider this important question, 434 U. S. 901 (1977), and, finding ourselves in basic agreement with the Court of Appeals, we affirm. We hold that even though there be a periodic redetermination of whether such action is required by "the public interest" and for "the protection of investors," the Commission is not empowered to issue, based upon a single set of circumstances, a series of summary orders which would suspend trading beyond the initial 10-day period.

I

On November 29, 1973, apparently because CJL had disseminated allegedly false and misleading press releases concerning certain of its business activities, the Commission issued the first of what was to become a series of summary 10-day suspension orders continuously suspending trading in CJL common stock from that date until January 26, 1975. App. 109. During this series of suspensions respondent Sloan, who owned 13 shares of CJL stock and had engaged in substantial purchases and short sales of shares of that stock, filed a petition in the United States Court of Appeals for the Second Circuit challenging the orders on a variety of grounds. On October 15, 1975, the court dismissed as frivolous all respondent's claims, except his allegation that the "tacking" of 10-day summary suspension orders for an indefinite period was an abuse of the agency's authority and a deprivation of due process. It further concluded, however, that in light of two events which had occurred prior to argument, it could not address this question at that time. The first event of significance was the resumption of trading on January 26, 1975.

103                          Opinion of the Court

The second was the commencement of a second series of summary 10-day suspension orders, which was still in effect on October 15. This series had begun on April 29, 1975, when the Commission issued a 10-day order based on the fact that the Royal Canadian Mounted Police had launched an extensive investigation into alleged manipulation of CJL common stock on the American Stock Exchange and several Canadian stock exchanges. App. 11–12. This time 37 separate orders were issued, suspending trading continuously from April 29, 1975, to May 2, 1976. The court thought the record before it on October 15 inadequate in light of these events and dismissed respondent's appeal "without prejudice to his repleading after an administrative hearing before the SEC . . . ," which hearing, though apparently not required by statute or regulation, had been offered by the Commission at oral argument. 527 F. 2d 11, 12 (1975), cert. denied, 426 U. S. 935 (1976).

Thereafter respondent immediately petitioned the Commission for the promised hearing. The hearing was not forthcoming, however, so on April 23, 1976, during the period when the second series of orders was still in effect, respondent brought the present action pursuant to § 25 (a) (1) of the Act, 15 U. S. C. § 78y (a) (1) (1976 ed.), challenging the second series of suspension orders. He argued, among other things, that there was no rational basis for the suspension orders, that they were not supported by substantial evidence in any event, and that the "tacking" of 10-day summary suspension orders was beyond the Commission's authority because the statute specifically authorized suspension "for a period not exceeding ten days." [2] The court held in respondent's favor on this latter point. It first concluded that despite the fact that there had been no 10-day suspension order in effect since May 2,

---

[2] Respondent also argued that the orders violated his due process rights because he was never given notice and an opportunity for a hearing and that § 12 (k) was an unconstitutional delegation of legislative power. The court found it unnecessary to address these issues.

1976, and the Commission had asserted that it had no plans to consider or issue an order against CJL in the foreseeable future, the case was not moot because it was " 'capable of repetition, yet evading review.' "  547 F. 2d, at 158, quoting from *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911).

The court then decided that the statutes which authorized summary suspensions—§ 12 (k) and its predecessors—did not empower the Commission to issue successive orders to curtail trading in a security for a period beyond the initial 10-day period.  547 F. 2d, at 157–158.  We granted certiorari, specifically directing the attention of the parties to the question of mootness, 434 U. S. 901 (1977), to which we now turn.

## II

Respondent argues that this case is not moot because, as the Court of Appeals observed, it is "capable of repetition, yet evading review." [3]  The Commission, on the other hand, does not urge that the case is demonstrably moot, but rather that there simply are not enough facts on the record to allow a proper determination of mootness.  It argues that there is no "reasonable expectation" that respondent will be harmed by further suspensions because, " 'the investing public now ha[ving] been apprised of the relevant facts, the concealment of which had threatened to disrupt the market in CJL stock, there is no reason to believe that it will be necessary to suspend trading again.' "  Brief for Petitioner 15, quoting from Pet. for Cert. 12 n. 7.  Cf. *Weinstein* v. *Bradford,* 423 U. S. 147, 149 (1975).  The Commission concedes, however, that respondent, in his capacity as a diversified investor, might be harmed in the future by the suspension of some other

_____

[3] Respondent also contends that he has suffered collateral legal consequences from the series of suspension orders, and thus the case is not moot. Cf. *Sibron* v. *New York,* 392 U. S. 40, 57 (1968).  We find it unnecessary to address this further contention.

security which he owns.   But it further contends that respondent has not provided enough data about the number or type of securities in his portfolio to enable the Court to determine whether there is a "reasonable" likelihood that any of those securities will be subjected to consecutive summary suspension orders.[4]

Contrary to the Commission's contention, we think even on the record presently before us this case falls squarely within the general principle first enunciated in *Southern Pacific Terminal Co.* v. *ICC, supra,* and further clarified in *Weinstein* v. *Bradford, supra,* that even in the absence of a class action a case is not moot when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the *same complaining party* would be subjected to the same action again." *Weinstein* v. *Bradford, supra,* at 147 (emphasis added).   That the first prong of this test is satisfied is not in dispute.   A series of consecutive suspension orders may last no more than 20 days, making effective judicial review impossible during the life of the orders.   We likewise have no doubt that the second part of the test also has been met here.   CJL has, to put it mildly, a history of sailing close to the wind.[5]   Thus,

---

[4] The Commission contends that to determine the mathematical probability that at least one of the securities held by respondent will be subjected to consecutive suspension orders it is necessary to know, in addition to other information admittedly available in the Commission's own records, the number of publicly traded corporations of which respondent is a shareholder.   This datum cannot be ascertained with any accuracy on this record, however, claims the Commission, because respondent has made various representations regarding that number at various stages of the litigation.   Compare App. 153 with Brief in Response 18.   The Commission adds that the probability could be determined with even greater accuracy if respondent revealed the nature of his portfolio because certain securities—those listed on the New York Stock Exchange, for example—are seldom summarily suspended.

[5] Within the last five years the Commission has twice issued a series of orders, each of which suspended trading in CJL stock for over a year.   In

the Commission's protestations to the contrary notwithstanding, there is a reasonable expectation, within the meaning of *Weinstein* v. *Bradford, supra,* that CJL stock will again be subjected to consecutive summary suspension orders and that respondent, who apparently still owns CJL stock, will suffer the same type of injury he suffered before. This is sufficient in and of itself to satisfy this part of the test. But in addition, respondent owns other securities, the trading of which may also be summarily suspended. As even the Commission admits, this fact can only increase the probability that respondent will again suffer the type of harm of which he is presently complaining. It thus can only buttress our conclusion that there is a reasonable expectation of recurring injury to the same complaining party.

## III

### A

Turning to the merits, we note that this is not a case where the Commission, discovering the existence of a manipulative scheme affecting CJL stock, suspended trading for 10 days and then, upon the discovery of a second manipulative scheme or other improper activity unrelated to the first scheme, ordered a second 10-day suspension.[6] Instead it is a case in which the

the various staff reports given to the Commission in connection with and attached to the second series of orders, the Division of Enforcement indicates in no less than six separate reports that either the Commission or the various stock exchanges view CJL as a "chronic violator." App. 20, 22, 24, 26, 28, 31. And reference is made to "the continuous [CJL] problems." *Id.,* at 61. Furthermore, counsel for the Commission represented at oral argument that there were in fact three separate bases for the second series of suspensions—alleged market manipulation, a change in management of the company, and a failure to file current reports. Tr. of Oral Arg. 17–18.

[6] Neither does the first series of orders appear to be of this type. Rather, like the second series, it appears to be predicated mainly on one major impropriety on the part of CJL and its personnel, which impropriety required the Commission, in its opinion, to issue a year-long series of summary suspension orders to protect investors and for the public interest.

SEC *v.* SLOAN                                    111

103                          Opinion of the Court

Commission issued a series of summary suspension orders lasting over a year on the basis of evidence revealing a single, though likely sizable, manipulative scheme.[7]  Thus, the only question confronting us is whether, even upon a periodic redetermination of "necessity," the Commission is statutorily authorized to issue a series of summary suspension orders based upon a single set of events or circumstances which threaten an orderly market.  This question must, in our opinion, be answered in the negative.

The first and most salient point leading us to this conclusion is the language of the statute.  Section 12 (k) authorizes the Commission "summarily to suspend trading in any security . . . *for a period not exceeding ten days* . . . ."  15 U. S. C. § 78*l* (k) (1976 ed.) (emphasis added).  The Commission would have us read the underscored phrase as a limitation only upon the duration of a single suspension order.  So read, the Commission could indefinitely suspend trading in a security without any hearing or other procedural safeguards as long as it redetermined every 10 days that suspension was required by

———————

[7] As previously indicated, see n. 5, *supra,* the Commission advances three separate reasons for the suspensions, thus implicitly suggesting that perhaps this is a case where the Commission discovered independent reasons to suspend trading after the initial suspension.  We note first that there are doubts whether these "reasons" independently would have justified suspension.  For example, we doubt the Commission regularly suspends trading because of a "change in management."  A suspension might be justified if management steps down under suspicious circumstances, but the suspicious circumstance here is the initial reason advanced for suspension—the manipulative scheme—and thus the change in management can hardly be considered an independent justification for suspension.  More importantly, however, even assuming the existence of three independent reasons for suspension, that leaves 34 suspension orders that were not based on independent reasons and thus the question still remains.  Does the statute empower the Commission to continue to "roll over" suspension orders for the same allegedly improper activity simply upon a redetermination that the continued suspension is "required" by the public interest and for the protection of investors?

Opinion of the Court                    436 U. S.

the public interest and for the protection of investors. While perhaps not an impossible reading of the statute, we are persuaded it is not the most natural or logical one. The duration limitation rather appears on its face to be just that—a maximum time period for which trading can be suspended for any single set of circumstances.

Apart from the language of the statute, which we find persuasive in and of itself, there are other reasons to adopt this construction of the statute. In the first place, the power to summarily suspend trading in a security even for 10 days, without any notice, opportunity to be heard, or findings based upon a record, is an awesome power with a potentially devastating impact on the issuer, its shareholders, and other investors. A clear mandate from Congress, such as that found in § 12 (k), is necessary to confer this power. No less clear a mandate can be expected from Congress to authorize the Commission to extend, virtually without limit, these periods of suspension. But we find no such unmistakable mandate in § 12 (k). Indeed, if anything, that section points in the opposite direction.

Other sections of the statute reinforce the conclusion that in this area Congress considered summary restrictions to be somewhat drastic and properly used only for very brief periods ·of time. When explicitly longer term, though perhaps temporary, measures are to be taken against some person, company, or security, Congress invariably requires the Commission to give some sort of notice and opportunity to be heard. For example, § 12 (j) of the Act authorizes the Commission, as it deems necessary for the protection of investors, to suspend the registration of a security for a period not exceeding 12 months if it makes certain findings *"on the record after notice and opportunity for hearing . . . ."* 15 U. S. C. § 78*l* (j) (1976 ed.) (emphasis added). Another section of the Act empowers the Commission to suspend broker-dealer registration for a period not exceeding 12 months upon certain findings made

only *"on the record after notice and opportunity for hearing."*
§ 78*o* (b)(4) (1976 ed.) (emphasis added). Still another
section allows the Commission, pending final determination
whether a broker-dealer's registration should be revoked, to
temporarily suspend that registration, but only *"after notice
and opportunity for hearing."* § 78*o* (b)(5) (1976 ed.) (em-
phasis added). Former § 15 (b)(6), which dealt with the
registration of broker-dealers, also lends support to the notion
that as a general matter Congress meant to allow the Com-
mission to take summary action only for the period specified
in the statute when that action is based upon any single set
of circumstances. That section allowed the Commission to
summarily postpone the effective date of registration for 15
days, and then, *after appropriate notice and opportunity for
hearing,* to continue that postponement pending final resolu-
tion of the matter.[8] The section which replaced § 15 (b)(6)
even further underscores this general pattern. It requires the
Commission to take some action—either granting the registra-
tion or instituting proceedings to determine whether registra-
tion should be denied—within 45 days. 15 U. S. C. § 78*o* (b)
(1) (1976 ed.). In light of the explicit congressional recogni-
tion in other sections of the Act, both past and present, that
any long-term sanctions or any continuation of summary

---

[8] The former § 15 (b)(6) provided in pertinent part:
"Pending final determination whether any registration under this subsection
shall be denied, the Commission may by order postpone the effective date
of such registration for a period not to exceed fifteen days, but if, after
appropriate notice and opportunity for hearing (which may consist solely
of affidavits and oral arguments), it shall appear to the Commission to be
necessary or appropriate in the public interest or for the protection of
investors to postpone the effective date of such registration until final
determination, the Commission shall so order. Pending final determination
whether any such registration shall be revoked, the Commission shall by
order suspend such registration if, after appropriate notice and opportunity
for hearing, such suspension shall appear to the Commission to be
necessary or appropriate in the public interest or for the protection of
investors. . . ." 15 U. S. C. § 78*o* (b)(6).

restrictions must be accompanied by notice and an opportunity for a hearing, it is difficult to read the silence in § 12 (k) as an authorization for an extension of summary restrictions without such a hearing, as the Commission contends. The more plausible interpretation is that Congress did not intend the Commission to have the power to extend the length of suspensions under § 12 (k) at all, much less to repeatedly extend such suspensions without any hearing.

### B

The Commission advances four arguments in support of its position, none of which we find persuasive. It first argues that only its interpretation makes sense out of the statute. That is, if the Commission discovers a manipulative scheme and suspends trading for 10 days, surely it can suspend trading 30 days later upon the discovery of a second manipulative scheme. But if trading may be suspended a second time 30 days later upon the discovery of another manipulative scheme, it surely could be suspended only 10 days later if the discovery of the second scheme were made on the eve of the expiration of the first order. And, continues the Commission, since nothing on the face of the statute requires it to consider only evidence of new manipulative schemes when evaluating the public interest and the needs of investors, it must have the power to issue consecutive suspension orders even in the absence of a new or different manipulative scheme, as long as the public interest requires it.

This argument is unpersuasive, however, because the conclusion simply does not follow from the various premises. Even assuming the Commission can again suspend trading upon learning of another event which threatens the stability of the market, it simply does not follow that the Commission therefore must necessarily have the power to do so even in the absence of such a discovery. On its face and in the context of this statutory pattern, § 12 (k) is more properly viewed as a

SEC *v.* SLOAN                    115

103                    Opinion of the Court

device to allow the Commission to take emergency action for 10 days while it prepares to deploy its other remedies, such as a temporary restraining order, a preliminary or permanent injunction, or a suspension or revocation of the registration of a security.   The Commission's argument would render unnecessary to a greater or lesser extent all of these other admittedly more cumbersome remedies which Congress has given to it.

Closely related to the Commission's first argument is its second—its construction furthers the statute's remedial purposes.   Here the Commission merely asserts that it "has found that the remedial purposes of the statute require successive suspension of trading in particular securities, in order to maintain orderly and fair capital markets."   Brief for Petitioner 37. Other powers granted the Commission are, in its opinion, simply insufficient to accomplish its purposes.

We likewise reject this argument.   In the first place, the Commission has not made a very persuasive showing that other remedies are ineffective.   It argues that injunctions and temporary restraining orders are insufficient because they take time and evidence to obtain and because they can be obtained only against wrongdoers and not necessarily as a stopgap measure in order to suspend trading simply until more information can be disseminated into the marketplace.   The first of these alleged insufficiencies is no more than a reiteration of the familiar claim of many Government agencies that any semblance of an adversary proceeding will delay the imposition of the result which they believe desirable.   It seems to us that Congress, in weighing the public interest against the burden imposed upon private parties, has concluded that 10 days is sufficient for gathering necessary evidence.

This very case belies the Commission's argument that injunctions cannot be sought in appropriate cases.   At exactly the same time the Commission commenced the first series of suspension orders it also sought a civil injunction against CJL and certain of its principals, alleging violations of the registra-

tion and antifraud provisions of the Securities Act of 1933, violations of the antifraud and reporting provisions of the Securities Exchange Act of 1934, and various other improper practices, including the filing of false reports with the Commission and the dissemination of a series of press releases containing false and misleading information. App. 109. And during the second series of suspension orders, the Commission approved the filing of an action seeking an injunction against those in the management of CJL to prohibit them from engaging in further violations of the Acts. *Id.,* at 101.

The second of these alleged insufficiencies is likewise less than overwhelming. Even assuming that it is proper to suspend trading simply in order to enhance the information in the marketplace, there is nothing to indicate that the Commission cannot simply reveal to the investing public at the end of 10 days the reasons which it thought justified the initial summary suspension and then let the investors make their own judgments.

Even assuming, however, that a totally satisfactory remedy—at least from the Commission's viewpoint—is not available in every instance in which the Commission would like such a remedy, we would not be inclined to read § 12 (k) more broadly than its language and the statutory scheme reasonably permit. Indeed, the Commission's argument amounts to little more than the notion that § 12 (k) *ought* to be a panacea for every type of problem which may beset the marketplace. This does not appear to be the first time the Commission has adopted this construction of the statute. As early as 1961 a recognized authority in this area of the law called attention to the fact that the Commission was gradually carrying over the summary suspension power granted in the predecessors of § 12 (k) into other areas of its statutory authority and using it as a *pendente lite* power to keep in effect a suspension of trading pending final disposition of delisting proceedings. 2 L. Loss, Securities Regulation 854–855 (2d ed. 1961).

The author then questioned the propriety of extending the summary suspension power in that manner, *id.,* at 854, and we think those same questions arise when the Commission argues that the summary suspension power should be available not only for the purposes clearly contemplated by § 12 (k), but also as a solution to virtually any other problem which might occur in the marketplace. We do not think § 12 (k) was meant to be such a cure-all. It provides the Commission with a powerful weapon for dealing with certain problems. But its time limit is clearly and precisely defined. It cannot be judicially or administratively extended simply by doubtful arguments as to the need for a greater duration of suspension orders than it allows. If extension of the summary suspension power is desirable, the proper source of that power is Congress. Cf. *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 744–745 (1973).

The Commission next argues that its interpretation of the statute—that the statute authorizes successive suspension orders—has been both consistent and longstanding, dating from 1944. It is thus entitled to great deference. See *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 719 (1975); *Saxbe* v. *Bustos,* 419 U. S. 65, 74 (1974).

While this undoubtedly is true as a general principle of law, it is not an argument of sufficient force in this case to overcome the clear contrary indications of the statute itself. In the first place it is not apparent from the record that on any of the occasions when a series of consecutive summary suspension orders was issued the Commission actually addressed in any detail the statutory authorization under which it took that action. As we said just this Term in *Adamo Wrecking Co.* v. *United States,* 434 U. S. 275, 287 n. 5 (1978):

> "This lack of specific attention to the statutory authorization is especially important in light of this Court's pronouncement in *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944), that one factor to be considered in giving

weight to an administrative ruling is 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' "

To further paraphrase that opinion, since this Court can only speculate as to the Commission's reasons for reaching the conclusion that it did, the mere issuance of consecutive summary suspension orders, without a concomitant exegesis of the statutory authority for doing so, obviously lacks "power to persuade" as to the existence of such authority. *Ibid.* Nor does the existence of a prior administrative practice, even a well-explained one, relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority.

"The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' *NLRB* v. *Hearst Publications,* 322 U. S. 111, 131; *Unemployment Commission* v. *Aragon,* 329 U. S. 143, 153–154. But the courts are the final authorities on issues of statutory construction, *FTC* v. *Colgate-Palmolive Co.,* 380 U. S. 374, 385, and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' *NLRB* v. *Brown,* 380 U. S. 278, 291." *Volkswagenwerk* v. *FMC,* 390 U. S. 261, 272 (1968).

And this is just such a case—the construction placed on the statute by the Commission, though of long standing, is, for the reasons given in Part III–A of this opinion, inconsistent with the statutory mandate. We explicitly contemplated just this

situation in *FMC* v. *Seatrain Lines, Inc., supra,* at 745, where
we said:

> "But the Commission contends that since it is charged
> with administration of the statutory scheme, its construc-
> tion of the statute over an extended period should be
> given great weight. . . . This proposition may, as a
> general matter, be conceded, although it must be tempered
> with the caveat that an agency may not bootstrap itself
> into an area in which it has no jurisdiction by repeatedly
> violating its statutory mandate."

And our clear duty in such a situation is to reject the adminis-
trative interpretation of the statute.

Finally, the Commission argues that for a variety of reasons
Congress should be considered to have approved the Commis-
sion's construction of the statute as correct. Not only has
Congress re-enacted the summary suspension power without
disapproving the Commission's construction, but the Commis-
sion participated in the drafting of much of this legislation
and on at least one occasion made its views known to Congress
in Committee hearings.[9] Furthermore, at least one Committee

---

[9] In 1963, when Congress was considering the former § 15 (c)(5), which
extended the Commission's summary suspension power to securities traded
in the over-the-counter market, the Commission informed a Subcommittee
of the House Committee on Interstate and Foreign Commerce of its
current administrative practice. One paragraph in the Commission's 30-
page report to the Subcommittee reads as follows:

"Under section 19 (a)(4), the Commission has issued more than one
suspension when, upon reexamination at the end of the 10-day period, it
has determined that another suspension is necessary. At the same time
the Commission has recognized that suspension of trading in a security is
a serious step, and therefore has exercised the power with restraint and has
proceeded with diligence to develop the necessary facts in order that any
suspension can be terminated as soon as possible. The Commission would
follow that policy in administering the proposed new section 15 (c)(5)."
Hearings on H. R. 6789, H. R. 6793, S. 1642 before a Subcommmittee of
the House Committee on Interstate and Foreign Commerce, 88th Cong.,
1st Sess., 219 (1963).

indicated on one occasion that it understood and approved of the Commission's practice.[10]  See *Zuber* v. *Allen,* 396 U. S. 168, 192 (1969); *United States* v. *Correll,* 389 U. S. 299, 305–306 (1967); *Fribourg Navigation Co.* v. *Commissioner,* 383 U. S. 272, 283 (1966).

While we of course recognize the validity of the general principle illustrated by the cases upon which the Commission relies, we do not believe it to be applicable here.  In *Zuber* v. *Allen, supra,* at 192, the Court stated that a contemporaneous administrative construction of an agency's own enabling legislation "is only one input in the interpretational equation.  Its impact carries most weight when the administrators participated in drafting and directly made known their views to Congress in committee hearings."  Here the administrators, so far as we are advised, made no reference at all to their present construction of § 12 (k) to the Congress which drafted the "enabling legislation" here in question—the Securities Exchange Act of 1934.  They made known to at least one Committee their subsequent construction of that section 29 years later, at a time when the attention of the Committee and of the Congress was focused on issues not directly related to

---

[10] The Senate Committee on Banking and Currency, when it reported on the proposed 1964 amendments to the Act, indicated that it understood and did not disapprove of the Commission's practice.  It stated:

"The Commission has consistently construed section 19 (a) (4) as permitting it to issue more than one suspension if, upon reexamination at the end of the 10-day period, it determines that another suspension is necessary.  The committee accepts this interpretation.  At the same time the committee recognizes that suspension of trading in a security is a drastic step and that prolonged suspension of trading may impose considerable hardship on stockholders.  The committee therefore expects that the Commission will exercise this power with restraint and will proceed with all diligence to develop the necessary facts in order that any suspension can be terminated as soon as possible."  S. Rep. No. 379, 88th Cong., 1st Sess., 66–67 (1963).

the one presently before the Court.[11]   Although the section in question was re-enacted in 1964, and while it appears that the Committee Report did recognize and approve of the Commission's practice, this is scarcely the sort of congressional approval referred to in *Zuber, supra.*

We are extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents.   That language in a Committee Report, without additional indication of more widespread congressional awareness, is simply not sufficient to invoke the presumption in a case such as this.   For here its invocation would result in a construction of the statute which not only is at odds with the language of the section in question and the pattern of the statute taken as a whole, but also is extremely far reaching in terms of the virtually untrammeled and unreviewable power it would vest in a regulatory agency.

Even if we were willing to presume such general awareness on the part of Congress, we are not at all sure that such awareness at the time of re-enactment would be tantamount to amendment of what we conceive to be the rather plain meaning of the language of § 12 (k).   On this point the present case differs significantly from *United States* v. *Correll, supra,* at 304, where the Court took pains to point out in relying on a construction of a tax statute by the Commissioner of Internal Revenue that "to the extent that the words chosen by Congress cut in either direction, they tend to support rather than defeat the Commissioner's position . . . ."

Subsequent congressional pronouncements also cast doubt on whether the prior statements called to our attention can be

---

[11] The purpose of the 1964 amendments was merely to grant the Commission the same power to summarily deal with securities traded in the over-the-counter market as it already had to deal with securities traded on national exchanges.   The purpose of the 1975 amendments was simply to consolidate into one section the power formerly contained in two.

taken at face value. When consolidating the former §§ 15 (c) (5) and 19 (a) (4) in 1975, see n. 1, *supra,* Congress also enacted § 12 (j), which allows the Commission "to suspend for a period not exceeding twelve months, or to revoke the registration of a security, if the Commission finds, on the record after notice and opportunity for hearing, that the issuer of such security has failed to comply with any provision of this chapter or the rules and regulations thereunder." 15 U. S. C. § 78*l* (j) (1976 ed.). While this particular power is not new, see 15 U. S. C. § 78s (a) (2), the effect of its exercise was expanded to include a suspension of trading.[12] *"With this change,"* stated the Senate Committee on Banking, Housing and Urban Affairs, *"the Commission is expected to use this section rather than its ten-day suspension power, in cases of extended dura-tion."* S. Rep. No. 94–75, p. 106 (1975) (emphasis added). Thus, even assuming, *arguendo,* that the 1963 statements have more force than we are willing to attribute to them, and that, as ,the Commission argues, § 12 (j) does not cover quite as broad a range of situations as § 12 (k), the 1975 congressional statements would still have to be read as seriously undermin-ing the continued validity of the 1963 statements as a basis upon which to adopt the Commission's construction of the statute.

In sum, had Congress intended the Commission to have the power to summarily suspend trading virtually indefinitely we expect that it could and would have authorized it more clearly than it did in § 12 (k). The sweeping nature of that power supports this expectation. The absence of any truly per-suasive legislative history to support the Commission's view,

---

[12] Under the new provision, when the Commission suspends or revokes the registration of a security, "[n]o . . . broker, or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security the registration of which has been and is suspended or revoked pursuant to the preceding sentence." 15 U. S. C. § 78*l* (j) (1976 ed.).

103                BRENNAN, J., concurring in judgment

and the entire statutory scheme suggesting that in fact the Commission is not so empowered, reinforce our conclusion that the Court of Appeals was correct in concluding no such power exists.   Accordingly, its judgment is

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

Although I concur in much of the Court's reasoning and in its holding that "the Commission is not empowered to issue, based upon a single set of circumstances, a series of summary orders which would suspend trading beyond the initial 10-day period," *ante,* at 106, I cannot join the Court's opinion because of its omissions and unfortunate dicta.

## I

The Court's opinion does not reveal how flagrantly abusive the Security and Exchange Commission's use of its § 12 (k) authority has been.   That section authorizes the Commission "summarily to suspend trading in any security . . . for a period not exceeding ten days . . . ."   15 U. S. C. § 78*l* (k) (1976 ed.).   As the Court says, this language "is persuasive in and of itself" that 10 days is the "maximum time period for which trading can be suspended for any single set of circumstances."   *Ante,* at 112.   But the Commission has used § 12 (k), or its predecessor statutes, see *ante,* at 105 n. 1, to suspend trading in a security for up to 13 *years.*   See App. to Brief for Canadian Javelin, Ltd., as *Amicus Curiae* 1a.   And, although the 13-year suspension is an extreme example, the record is replete with suspensions lasting the better part of a year.   See App. 184–211.   I agree that § 12 (k) is clear on its face and that it prohibits this administrative practice.   But even if § 12 (k) were unclear, a 13-year suspension, or even a 1-year suspension as here, without notice or hearing so obviously violates fundamentals of due process and fair play that no

BRENNAN, J., concurring in judgment          436 U. S.

reasonable individual could suppose that Congress intended to authorize such a thing. See also 15 U. S. C. § 78*l* (j) (1976 ed.) (requiring notice and a hearing before a registration statement can be suspended), discussed *ante*, at 121–122.

Moreover, the SEC's procedural implementation of its § 12 (k) power mocks any conclusion other than that the SEC simply could not care whether its § 12 (k) orders are justified. So far as this record shows, the SEC never reveals the reasons for its suspension orders.[1] To be sure, here respondent was able long after the fact to obtain some explanation through a Freedom of Information Act request, but even the information tendered was heavily excised and none of it even purports to state the reasoning of the Commissioners under whose authority § 12 (k) orders issue.[2] Nonetheless, when the SEC finally

---

[1] The only document made public by the SEC at the time it suspends trading in a security is a "Notice of Suspension of Trading." Numerous copies of this notice are included in the Appendix and each contains only the boilerplate explanation:

"It appearing to the Securities and Exchange Commission that the summary suspension of trading in such securities on such exchange and otherwise than on a national securities exchange is required in the public interest and for the protection of investors; [therefore, trading is suspended]."

See App. 11, 13, 16, 19, 21, 23, 25, 27, 30, 33, 36, 39, 41, 44, 47, 50, 53, 56, 59, 62, 65, 67, 69, 71, 73, 76, 79, 82, 85, 88, 91, 94, 97, 100, 103, 106. The sole exception to this monotonous pattern is the notice which issued after respondent lodged his verified petition with the SEC. That notice recounted the allegations of the petition and stated in some detail why it was necessary to continue the suspension of Canadian Javelin stock. See *id.*, at 109–110.

[2] In each instance, the explanation consists only of memoranda from the SEC's Division of Enforcement *to* the Commission. See, *e. g., id.*, at 12, 14, 15. In at least one instance, the memorandum postdates the public notice of suspension. Compare *id.*, at 11 with *id.*, at 12. In no case is there a memorandum *from* the Commission explaining its action. The Court apparently assumes that the memoranda of the Division of Enforcement adequately explain the Commission's action, although the basis for any such assumption is not apparent. Moreover, since the recommendations

103          Brennan, J., concurring in judgment

agreed to give respondent a hearing on the suspension of Canadian Javelin stock, it required respondent to state, in a verified petition (that is, *under oath*) why he thought the unrevealed conclusions of the SEC to be wrong.[3]  This is obscurantism run riot.

Accordingly, while we today leave open the question whether the SEC could tack successive 10-day suspensions if this were necessary to meet first one and then a different emergent situation, I for one would look with great disfavor on any effort to tack suspension periods unless the SEC concurrently adopted a policy of stating its reasons for each suspension. Without such a statement of reasons, I fear our holding today will have no force since the SEC's administration of its suspension power will be reviewable, if at all, only by the circuitous and time-consuming path followed by respondent here.

## II

In addition, I cannot join the Court's reaffirmation of *Adamo Wrecking*'s increasingly scholastic approach to the use of administrative practice in interpreting federal statutes.  See *ante,* at 117–118.  This reaffirmance is totally unnecessary in this case for, as the Court notes, whatever that administrative construction might be in this case, it is "inconsistent with the statutory mandate," *ante,* at 118, which is clear on the face of the statute.  *Ante,* at 112.

Worse, however, is the Court's insistence that, to be credited, an administrative practice must pay " 'specific attention to the statutory authorization' " under which an agency purports to operate.  *Ante,* at 117, quoting *Adamo Wrecking Co*. v. *United States,* 434 U. S. 275, 287 n. 5 (1978).  As my Brother Stevens

---

portion of each memoranda is excised, presumably as permitted (but not required) by Exemption 5 of the Freedom of Information Act, see *EPA* v. *Mink,* 410 U. S. 73, 89 (1973), there is no statement of reasons in any traditional sense in any of the memoranda.

[3] See Brief for Respondent 19; App. to Brief for Respondent 20a–21a.

noted in dissent in *Adamo,* see *id.,* at 302, *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294 (1933)—perhaps our leading case on the use of administrative practice as a guide to statutory interpretation—says not a word about attention to statutory authority.   Nor does it reduce the value of administrative practice to its "persuasive effect" as the Court would apparently do here.   Instead, as I understand the case, *Norwegian Nitrogen* focuses on the "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion," *id.,* at 315, precisely because their action is itself evidence of assumptions—perhaps unspoken by either the administrators or Congress—brought to a regulatory problem by all involved in its solution.   Indeed, common experience tells us that it is assumptions which everyone shares which often go unspoken because their very obviousness negates the need to set them out.

Therefore, while I do not dispute that well-reasoned administrative opinions which pay scrupulous attention to every jot and tittle of statutory language are more persuasive than unexplained actions—and certainly more in keeping with a norm of administrative action that ought to be encouraged—I cannot dismiss, as the Court apparently does, less well-reasoned, or even unexplained, administrative actions as irrelevant to the meaning of a statute.

MR. JUSTICE BLACKMUN, concurring in the judgment.

I join the Court in its judgment, but I am less sure than the Court is that the Congress has not granted the Securities and Exchange Commission at least some power to suspend trading in a nonexempt security for successive 10-day periods despite the absence of a new set of circumstances.   The Congress' awareness, recognition, and acceptance of the Commission's practice, see *ante,* at 119–120, nn. 9 and 10, at the time of the 1964 amendments, blunts, it seems to me, the original literal language of the statute.   The 1975 Report of the Senate

103                    BLACKMUN, J., concurring in judgment

Banking Committee, stating that the Commission was "expected to use" § 12 (j)'s amended suspension-of-registration provision "in cases of extended duration," *ante,* at 122, certainly demands new circumspection of the Commission, but I do not believe it wholly extinguished Congress' acceptance of restrained use of successive 10-day suspensions when an emergency situation is presented, as for instance, where the Commission is unable adequately to inform the public of the existence of a suspected market manipulation within a single 10-day period. Section 12 (j)'s suspension remedy provides no aid when a nonissuer has violated the securities law, or where the security involved is not registered, or in the interim period before notice and an opportunity for a hearing can be provided and a formal finding of misconduct made on the record.

Here, the Commission indulged in 37 suspension orders, all but the last issued "quite bare of any emergency findings," to borrow Professor Loss' phrase. Beyond the opaque suggestion in an April 1975 Release, No. 11,383, that the Commission was awaiting the "dissemination of information concerning regulatory action by Canadian authorities," shareholders of CJL were given no hint why their securities were to be made nonnegotiable for over a year. Until April 22, 1976, see Release No. 12,361, the SEC provided no opportunity to shareholders to dispute the factual premises of a suspension, and, in the absence of any explanation by the Commission of the basis for its suspension orders, such a right to comment would be useless. As such, I conclude that the use of suspension orders in this case exceeded the limits of the Commission's discretion. Given the 1975 amendments, a year-long blockade of trading without reasoned explanation of the supposed emergency or opportunity for an interim hearing clearly exceeds Congress' intention.

April 23, 1991

# In The Matter Of Monnig's Department Stores, Inc.

Court of Appeals for the Fifth Circuit

**Citations:** 929 F.2d 197
**Full Case Name:** Bankr. L. Rep. P 73,936 in the Matter of Monnig's Department Stores, Inc., Debtor. Monnig's Department Stores, Inc., and Signal Capital Corp. v. Azad Oriental Rugs, Inc.
**Docket Number:** 90-1628

# Combined Opinion

929 F.2d 197 (/opinion/8996652/monnigs-department-stores-inc-v-azad-oriental-rugs-inc-in-re/)

Bankr. L. Rep. P 73,936
In the Matter of MONNIG'S DEPARTMENT STORES, INC., Debtor.
MONNIG'S DEPARTMENT STORES, INC., and Signal Capital Corp., Appellees,
v.
AZAD ORIENTAL RUGS, INC., Appellant.

No. 90-1628
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 23, 1991.

Gregory A. Whittmore, Taylor & Mizell, Dallas, Tex., for appellant.

Joe Colvin, Gilbert & Colvin, Fort Worth, Tex., for Monnig's Dept. Stores, Inc.

Vernon O. Teofan, Larry Chek, Jenkens & Gilchrist, Dallas, Tex., for Signal Capital Corp.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, GARWOOD, and DUHE, Circuit Judges.

GARWOOD, Circuit Judge:

1

Appellant Azad Oriental Rugs, Inc. (Azad) appeals from the district court's reversal of the bankruptcy court's order imposing a constructive trust against Monnig's Department Store (Monnig's), as debtor-in-possession, and Signal Capital Corporation (Signal). We affirm the district court.

Facts and Proceedings Below

2

Until late 1988, Monnig's was a department store with locations in Fort Worth and Tarrant County, Texas. On March 20, 1986, Monnig's entered into a licensing agreement with Azad, whereby Azad was granted the right to use space in Monnig's stores for the sale of oriental rugs in exchange for a commission consisting of 12% of Azad's net sales. The license agreement expired on April 1, 1988, but was renewed on a month-to-month basis by agreement of the parties. All rugs were purchased by Azad and were considered by both Azad and Monnig's to be inventory of Azad; further, Azad was required to provide insurance for damage or liability resulting from the presence of Azad's rugs in Monnig's stores.

3

Under the terms of the license agreement, Azad was to make all sales in Monnig's name and, if the sales were on credit, to use Monnig's credit card charge slips. Each sale of an Azad rug was distinguishable from other sales at Monnig's by a unique department number (7010), an Azad employee number (9999), and a brief description of merchandise sold. At the end of each business day, Azad employees were required to remit to Monnig's all cash and charge slips received from sales of Azad's rugs.[1] Thereafter, on the 20th

day of the following month, Monnig's was required to make payment to Azad in an amount equal to Azad's net sales less applicable sales and excise taxes, and Monnig's 12% commission.2 However, neither the terms of the agreement nor the parties' operations under it restricted in any way Monnig's use of the funds. It was not required, for instance, that Monnig's hold, deposit or disburse the funds in any particular fashion, nor did Monnig's do so, as Azad was plainly aware. Monnig's was not required to and did not segregate the Azad funds, as Azad must have known, nor did Monnig's ever represent that those exact funds would be used for any particular purpose. Monnig's billed and collected on all accounts generated by charge slips remitted daily to it by Azad, and retained all of the proceeds thereof when received, commingling those funds with proceeds from other sales. In the event of an uncollectible account, Monnig's bore the risk of loss. Cash sales of Azad rugs were rung up on the same Monnig's cash registers used for sales of other items, and the cash received was placed in the register and immediately commingled with cash there from the sale of Monnig's items. All proceeds of Azad rug cash and credit sales were deposited in the same Monnig's bank accounts in which proceeds of sales of Monnig's merchandise, and other Monnig's receipts, were deposited, all without any segregation.

4

With respect to the operation of Azad's rug department, Monnig's retained the power to direct the time and place of the rug sales. Additionally, Monnig's retained the power to control the manner of Azad's sale of the rugs; to approve the selection of all persons employed by Azad to sell rugs in Monnig's stores; and to supervise the work of Azad's employees. Monnig's actually exercised these control powers.

5

Other than executing the license agreement with Monnig's, Azad took no action whatever to establish or perfect any lien or claim respecting Monnig's.

6

Several months after Monnig's entered into the licensing arrangement with Azad, Monnig's and Signal entered into a loan and security agreement, which granted Signal a security interest in Monnig's accounts. Under the terms of the security agreement, Monnig's was required to submit a list of accounts receivable to Signal in order to draw down on its revolving loan with Signal. Generally, Monnig's was permitted to borrow under the security agreement up to 85% of eligible accounts. Routinely included within the list of accounts receivable were accounts representing the sale of Azad's rugs.

7

Monnig's deteriorating financial condition caused it to file a petition in bankruptcy pursuant to chapter 11 of the bankruptcy code on June 9, 1988. Thereafter, Monnig's operated its stores as a debtor-in-possession for approximately six months. Subsequent to the filing, Monnig's failed to make any payments to Azad under the license agreement for sales made by Azad during May and June, 1988. In fact, evidence adduced before the bankruptcy court below indicated that Monnig's spent all of the disputed Azad-related funds for business expenses prior to the petition date. The net amount still outstanding and due, as stipulated by the parties, is $35,008.97, representing $14,062.67 due respecting charge sales and $20,496.30 respecting cash sales.

8

On June 20, 1988, Azad filed an adversary proceeding in the bankruptcy court demanding turnover of the outstanding proceeds or imposition of a constructive trust upon the cash and proceeds of accounts arising from Azad's rug sales. The case was tried to the bankruptcy court on briefs, stipulated facts, and the testimony of Monnig's president, Mr. Ralph Cook, on March 9, 1989. The bankruptcy court entered its order and reasons on March 28, granting judgment against Monnig's and Signal in the amount of $35,008.97 based on the court's imposition of a constructive trust against the defendants. Signal promptly filed a motion to amend pursuant to Bankruptcy Rule 7052(b), which was denied by the bankruptcy court on November 3, 1989.

9

Monnig's and Signal appealed the judgment of the bankruptcy court to the district court below. On June 29, 1990, the district court reversed the judgment of the bankruptcy court on the ground that it had improperly imposed a constructive trust under the facts of the case. The district court declined, however, to rule on the priority of Signal's security interest. Azad timely appealed the district court's order, seeking to reinstate the bankruptcy court's imposition of a constructive trust, and also arguing that Signal's security interest in accounts did not attach to Azad's sales proceeds.3 We affirm the district court's judgment.

Discussion

I.

10

On appeal from a judgment in bankruptcy, findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. See Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1308 (/opinion/8940885/richmond-leasing-co-v-capital-bank-na/#1308) (5th Cir.1985). The burden of establishing that a determination is clearly erroneous is stringent; to so conclude, a reviewing court must have a "firm and definite conviction that a mistake has been committed." Wilson v. Huffman (In re Missionary Baptist Foundation of America ), 712 F.2d 206, 209

(/opinion/421733/in-the-matter-of-missionary-baptist-foundation-of-america-inc-debtors/#209) (5th Cir.1983) (quoting United States v. United States Gypsum Co., 333 U.S. 364 (/opinion/104523/united-states-v-united-states-gypsum-co/), 68 S.Ct. 525, 542 (/opinion/104523/united-states-v-united-states-gypsum-co/#542), 92 L.Ed. 746 (/opinion/104523/united-states-v-united-states-gypsum-co/) (1948)). The rigorous standard applied to review of findings of fact does not, however, apply to the bankruptcy court's conclusions of law, which are subject to plenary review. In re Missionary Baptist, 712 F.2d at 209 (/opinion/421733/in-the-matter-of-missionary-baptist-foundation-of-america-inc-debtors/#209).

II.

11

Azad's primary argument in this appeal is that the bankruptcy court correctly imposed a constructive trust respecting the amount Monnig's owed Azad as net proceeds from Azad's rug sales. We disagree.

A. Requisites of a Constructive Trust

12

The controlling law with respect to imposition of a constructive trust in this case is that of Texas. Under Texas law, a constructive trust "is an equitable remedy created by the courts to prevent unjust enrichment." Hudspeth v. Stoker, 644 S.W.2d 92, 94 (/opinion/2456190/hudspeth-v-stoker/#94) (Tex.App.--San Antonio 1982, writ ref'd). Unlike trusts usually encountered under conventional trust doctrine, constructive trusts are not created by an express agreement. Omohundro v. Matthews, 161 Tex. 367 (/opinion/2426123/omohundro-v-matthews/), 341 S.W.2d 401, 405 (/opinion/2426123/omohundro-v-matthews/#405) (1960). Rather, a constructive trust is an equitable device "imposed by law because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property." Id. (/opinion/2426123/omohundro-v-matthews/)

13

Where, as here, there is no formal trust in the traditional sense nor any special legal relationship between the parties, Texas courts generally require the following three elements before applying the equitable remedy of a constructive trust:

14

(1) Breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud. See, e.g., Meadows v. Bierschwale, 516 S.W.2d 125, 128 (/opinion/2459497/meadows-v-bierschwale/#128) (Tex.1974);

15

(2) Unjust enrichment of the wrongdoer. See, e.g., Hudspeth v. Stoker, 644 S.W.2d 92, 94 (/opinion/2456190/hudspeth-v-stoker/#94) (Tex.App.--San Antonio 1982, writ ref'd); and

16

(3) Tracing to an identifiable res. See, e.g., Meadows, supra, at 129 (/opinion/2459497/meadows-v-bierschwale/#129); Peirce v. Sheldon Petroleum Co., 589 S.W.2d 849, 853 (/opinion/1571568/peirce-v-sheldon-petroleum-co/#853) (Tex.Civ.App.--Amarillo 1979, no writ). See also, In re Kennedy & Cohen, Inc., 612 F.2d 963, 966 (/opinion/373452/in-the-matter-of-kennedy-cohen-inc-state-of-wisconsin-v-melvin-reese/#966) (5th Cir.1980) (federal law requires tracing of funds regardless of the state law requirements), cert. denied sub nom. Wisconsin v. Reese, 449 U.S. 833 (/opinion/9028277/wisconsin-v-reese/), 101 S.Ct. 103 (/opinion/9028277/wisconsin-v-reese/), 66 L.Ed.2d 38 (/opinion/9028272/energy-consumers-producers-assn-v-department-of-energy/) (1980).

B. Breach of Fiduciary Relationship

17

In order to justify imposing a constructive trust on property, fraud--either actual or constructive--must be present. Talley v. Howsley, 142 Tex. 81 (/opinion/4160384/talley-v-howsley/), 176 S.W.2d 158, 160 (/opinion/5189183/talley-v-howsley/#160) (1943). Actual fraud usually involves a dishonest purpose or an intent to deceive, while constructive fraud usually involves a breach of trust or confidential relationship. Archer v. Griffith, 390 S.W.2d 735, 740 (/opinion/1664628/archer-v-griffith/#740) (Tex.1964). Confidential relationships arise not only from technical fiduciary relationships, but also from partnerships, joint ventures, and other informal relationships. Thigpen v. Locke, 363 S.W.2d 247, 253 (/opinion/1746605/thigpen-v-locke/#253) (Tex.1962).

18

This Court discussed the relationship necessary (absent actual fraud) for imposition of a constructive trust under Texas law in Harris v. Sentry Title Co., Inc., 715 F.2d 941 (/opinion/423929/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/) (5th Cir.1983), modified on other grounds, 727 F.2d 1368 (/opinion/431667/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/) (5th Cir.1984), cert. denied sub nom. Ward v. Sentry Title Co., 469 U.S. 1037 (/opinion/9051389/ward-v-sentry-title-co/), 105 S.Ct. 514 (/opinion/9051389/ward-v-sentry-title-co/), 83 L.Ed.2d 404 (/opinion/9051389/ward-v-sentry-title-co/) (1984). The Harris court observed:

19

"In recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship prior to and apart from the transaction in question. This relationship may be established through prior joint business ventures, or other types of close, confidence-inducing relationships. It need not arise from a strict, formal fiduciary relationship. However, mere subjective confidence among business associates or the like is insufficient to support a constructive trust." Harris, 715 F.2d at 946 (/opinion/423929/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/#946) (citations omitted) (emphasis added).

20

Whether on undisputed facts a relationship of trust or confidence is sufficiently prior to and apart from the transaction in question to support imposition of a constructive trust is a question of law. Id. at 948 (/opinion/423929/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/#948).

21

The bankruptcy court found that Monnig's and Azad had a fiduciary relationship based on the parties' principal/agent relationship. This finding was apparently premised on Monnig's control over Azad's operations on the premises of Monnig's as well as the retention by Monnig's of sales proceeds and the duty to account for sales. We agree with the district court that this factual finding was not clearly erroneous. However, as there was no evidence or finding of actual fraud, the burden was on Azad to prove by a preponderance of the evidence "that the parties had a long-standing fiduciary or confidential, trusting relationship unrelated to the subject transaction." Harris, 715 F.2d at 948 (/opinion/423929/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/#948) (emphasis added). In modifying its decision, the Harris court made clear its understanding that Texas courts, in the absence of fraud, place almost controlling emphasis upon the requirement that there be a pre-existing confidential relationship between the parties before the transaction or the series of related transactions in question. Harris, 727 F.2d at 1370 (/opinion/431667/larry-d-harris-v-sentry-title-company-inc-v-travis-ward/#1370). Although the evidence in this case showed that the parties dealt with each other for about 27 months, the relationship had its basis only in and solely concerned the license agreement. Accordingly, it would appear that the dealings between Azad and Monnig's have not been shown to be sufficiently long-standing and confidential as to engender the character of relationship necessary to impose a constructive trust.

22

In any event, even if the necessary fiduciary relationship existed, there has been no showing of breach thereof. An analogous case, often-cited by bankruptcy courts in their discussion of constructive trusts, is In re Penn-Dixie Steel Corp., 6 B.R. 817 (/opinion/1538171/thunderbird-motor-freight-lines-inc-v-penn-dixie-steel-corp-in-re/) (Bankr.S.D.N.Y.1980); aff'd 10 B.R. 878 (/opinion/1864732/thunderbird-motor-freight-lines-inc-v-penn-dixie-steel-corp-in-re/) (S.D.N.Y.1981). The facts in Penn-Dixie involved a shipper who utilized a carrier to transport its steel to customers. It appears that under the arrangement the shipper-debtor served as a conduit between the carrier and the customers. The customers prepaid the shipping charges to the debtor, who deposited the money received in its general bank account and used that money to pay the carrier. The carrier asserted that it had an equitable claim to the funds in the debtor's general account because those funds were, at least partially, the result of the payment of shipping charges. The bankruptcy court refused to impress a constructive trust and held instead that the carrier possessed a general unsecured claim. In its decision, the bankruptcy court observed that generally "when the circumstances are such that the recipient of the funds is entitled to use them as his own and can commingle them with his own moneys, a debtor-creditor relationship exists, not a trust." In re Penn-Dixie Steel Corp., 6 B.R. at 823 (/opinion/1538171/thunderbird-motor-freight-lines-inc-v-penn-dixie-steel-corp-in-re/)-24 (citing 4A Collier on Bankruptcy (15th Ed.) p 541.13 at 541-67). See generally, I Scott on Trusts Sec. 12 at 103-139.

23

Similarly, the evidence in the record before us shows that the agreement between Azad and Monnig's did not require a separation of funds by Monnig's. Rather, the license agreement merely required Azad to turn over all receipts from Azad's business to Monnig's according to the method usually employed by Monnig's, which was to commingle the cash proceeds in its general account. Nor was any segregation ever effected. Moreover, the dealings between the parties show that neither party contemplated that receipts from Azad's sales would be segregated into a separate account.[4] The burden of proof in this Circuit clearly rests on the proponent of the constructive trust to show that segregation was required. Rosenberg v. Collins, 624 F.2d 659, 663-64 (/opinion/379522/david-h-rosenberg-trustee-in-bankruptcy-v-charles-e-collins/#663) (5th Cir.1980). Azad has not carried this burden.

24

Hence, as in Penn-Dixie Steel, the relationship of Azad and Monnig's resembles most closely one of creditor and debtor. As the Supreme Court has stated under similar circumstances:

25

"No fund was segregated or set up by special deposit or in any manner.... The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust.... It would be impossible to state all the circumstances in which equity will fasten a constructive trust upon property in order to frustrate a violation of fiduciary

duty. But the mere failure to pay a debt does not belong in that category." McKey v. Paradise, 299 U.S. 119 (/opinion/102704/mckee-v-paradise/), 57 S.Ct. 124, 125 (/opinion/102704/mckee-v-paradise/#125), 81 L.Ed. 75 (/opinion/102704/mckee-v-paradise/) (1936) (citation omitted).

26

Following the teachings of McKey, we hold that to impress a constructive trust there must be at least a wrongdoing greater than the nonpayment of a monetary debt. Monnig's did not agree to, and did not, segregate, or establish a special fund consisting of, the proceeds of Azad rug sales, as Azad obviously knew all along. Paring the license agreement to its essentials, we conclude that Monnig's assumed a simple contractual obligation to pay Azad the net rug sale proceeds on a monthly basis. Monnig's failure to satisfy that debt postpetition cannot be labeled a breach of a fiduciary relationship.5 We accordingly find that Azad has failed as a matter of law to establish the first of the requirements for imposition of a constructive trust.

Conclusion

27

We conclude that there is no evidence of any wrongdoing which would give rise to impression of a constructive trust. The judgment of the district court is therefore

AFFIRMED

1

Paragraph 6 of the license agreement provided as follows:

"6. All receipts from the Licensee's [Azad's] operation shall be turned over to Licensor [Monnig's] at the end of the business day according to the method usually employed by Licensor and shall be held by the Licensor subject to payment as provided in paragraph seven of this agreement. All sales shall be made in the name of the Licensor and shall be recorded on sales forms or other media similar to those used by Licensor in its other departments. Licensor agrees to keep a true and accurate account of all sales transactions received and disbursed which results from Licensee's operations. Both parties shall have the right at reasonable times to examine the other's records relating to the periodic settlements as hereinafter provided. Licensee agrees to accept for credit the full merchandise value of all expired layaway transactions."

↵ 2

Paragraph 7 of the license agreement provided as follows:

"7. At the end of each fiscal month, Licensor shall prepare a statement setting forth the net of the total amount of Licensor's net sales during the month, to be computed in the manner herein provided. Licensor shall retain a sum equal to the percentages of net sales as agreed upon in paragraph four (4). Such statements shall further set forth the total amount of expenditures made by the Licensor for the account of the Licensee during such month, and the total amount of such expenditures which shall be retained by Licensor. The balance of the net sales, after which deductions have been made, shall be payable by the Licensor to Licensee on the 20th day of the following month."

↵ 3

Neither Signal nor Monnig's have appealed the district court's judgment

↵ 4

And, the bankruptcy court made no contrary findings as to any of these matters

↵ 5

At the very least this is true where, as here, there is no actual fraud

↵



# SEC v. Cavanagh, 1 F. Supp. 2d 337 (S.D.N.Y. 1998)

**US District Court for the Southern District of New York - 1 F. Supp. 2d 337 (S.D.N.Y. 1998)**
**April 20, 1998**

---

### 1 F. Supp. 2d 337 (1998)

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**
v.
**Thomas Edward CAVANAGH, U.S. Milestone, Electro-Optical Systems, Corp., George Chachas, Thomas R. Brooksbank, William N. Levy, Optimum Fund, Agira Trading, Ltd., Customer Safety, S.L., Cambiarios, S.L., Construcciones, S.L., Thomas A. Hantges, Cosimo Tacopino, Defendants.**
**Karen Cavanagh, Cromlix, LLC, Donald & Co. Securities Inc., Shbl Associates Europe Ltd., Joseph Falco, Martin Hodas, Bernd Stieghorst, Erin Martin, Anthony S. Luttenberger, Ana P. Lopez, Tamar Lehman, Metropolitan Trade Finance Ltd., Tim Timlin, Carmillo Monastra, Eugene Stricker, Arthur de Acutis, Jean-Pierre Neuhaus, Kenneth C. Kehoe, and Antonio V. Borotto, Relief Defendants.**

No. 98 CIV. 1818(DLC).

### United States District Court, S.D. New York.

April 20, 1998.

**\*338 \*339 \*340 \*341** Larry P. Ellsworth, Mark J. Kreitman, Daniel J. Hurson, Securities and Exchange Commission, Washington, DC, for S.E.C.

Harold Ruvoldt, Fishbein Badillo Wagner Harding, New York, NY, for Cavanagh and U.S. Milestone.

Sanford Remz, Hutchins, Wheeler & Dittmar, Boston, MA, for Electro-Optical Systems Corp.

David Spears, Linda Imes, Richards Spears Kibbe & Orbe, New York, NY, for Chachas.

Irving Einhorn, Los Angeles, CA, for Chachas.

Edward Medvene, Talcott, Lightfoot, Vandevelde, Sadowsky, Medvine & Levine, Los Angeles, CA, for Brooksbank.

Charles J. Hecht, Hecht & Steckman, P.C., New York, NY, for Levy.

Martin Kaplan, Gusrae Kaplan & Bruno, New York, NY, for Tacopino.

Diana D. Parker, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, NY, for Tamar Lehman.

Paul May, Steere & May, New York, NY, for Tim Timlin.

*OPINION*

COTE, District Judge.

This case concerns a scheme through which the defendants reaped millions of dollars in profits at the expense of the American investor by creating active trading in the United States securities market without making the disclosures that were required for the benefit of the investing public by the Securities Act of 1933.

Specifically, in this action, which was filed on March 13, 1998, the Securities and Exchange Commission ("SEC") alleges that the defendants offered and sold securities of Electro-Optical Systems Corporation ("EOSC") in violation of the registration and antifraud provisions of the United States securities laws, codified at 15 U.S.C. §§ 77e ("Section 5") and 77q(a) ("Section 17(a)"), and 15 U.S.C. § 78j(b) ("Section 10(b)"). According to the SEC, the defendants defrauded the public primarily small, on-line investors of at least $5 million over the course of the scheme, the profits of which allegedly have been distributed among the defendants and relief defendants. In the underlying action, the SEC seeks, with respect to each of the defendants, a permanent injunction against future violations of the securities laws, and civil penalties, as provided for under 15 U.S.C. § 78u(d) (3).[1] The SEC also seeks

disgorgement of all proceeds related to the scheme, plus pre-judgment interest, from all of the defendants and relief defendants.

Pending a resolution on the merits, the SEC seeks a preliminary injunction against the defendants and a continued freeze on their assets sufficient to satisfy whatever **\*342** proceeds plus pre-judgment interest and civil penalties, if any, for which the defendants ultimately are found liable. The SEC also seeks a continued freeze on the assets and stock of the relief defendants that are traceable to the allegedly unlawful activities at the heart of this action.

On March 13, 1998, this Court issued a temporary restraining order (the "March 13 Order" or "TRO") which, *inter alia,* suspended trading by the defendants in EOSC stock; froze the assets of the defendants and the accounts of the relief defendants that contained EOSC stock or the proceeds from sales of the stock; ordered an accounting of the defendants' assets; and required the repatriation into the United States of all proceeds from the sales of EOSC stock by the defendants, to be deposited into the registry of the United States District Court for the Southern District of New York.

The March 13 Order also set forth an expedited discovery and briefing schedule for a preliminary injunction hearing, which was modified in subsequent conferences with the parties. By its own terms, the TRO provided that it would remain in effect "pending determination of the Commission's Motion for a Preliminary Injunction." The hearing, which was originally scheduled to begin on March 25, was put over to March 31 at the request of the defendants and the relief defendants who had appeared in the action, each of whom felt that they needed more time to prepare. [2]

In the course of the hearing on the SEC's motion for preliminary relief, the SEC entered into stipulations with several of the defendants and relief defendants that modify the terms of the freeze order. [3] Three defendants also have reached agreements with the SEC disposing entirely of the SEC's motion for preliminary relief insofar as it concerns them. Namely, Cosimo Tacopino ("Tacopino"), the trader at Donald & Co. who placed many of the trades in EOSC shares at issue here, has consented to the Court's entry of a preliminary injunction against future violations of Sections 5, 17(a) and 10(b) against him, and has deposited a total of $352,279.14 in the Court's registry pending a resolution of this case. EOSC, the company whose stock is at issue in this case, has entered into an agreement with the SEC whereby the SEC has withdrawn its motion for preliminary relief against the company. Defendant **\*343** Donald & Co. has entered into an agreement with the SEC providing for a sum of $233,811.07 to be deposited in the Court's registry pending a

APP2-041

resolution of this matter and withdrawing the SEC's motion for a preliminary injunction as to this defendant.

Although all of the defendants have been served, many of them including all of the foreign defendants have failed to appear in this action. Defendant Thomas A. Hantges ("Hantges"); the Spanish entities, Customer Safety, S.L., Cambiarios, S.L., and Construcciones, S.L. (collectively "the Spanish entities"); and the Caribbean entities, Optimum Fund ("Optimum") and Agira Trading ("Agira"), were served but have not appeared. All of the relief defendants have been served, with the exception of the following individuals and entities: Kenneth Kehoe, Erin Martin, SHBL Associates Europe Ltd., Bernd Stieghorst ("Stieghorst"), Metropolitan Trade Finance Ltd., Jean-Pierre Neuhaus, and Carmillo Monastra. The Court does not consider the claims brought by the SEC against those relief defendants who have not been served.

The hearing on the SEC's motion for a preliminary injunction began on March 31, 1998 and continued through April 8, 1998. The Court took direct testimony in the form of affidavits from each of the following witnesses, who were also cross-examined at the hearing: Cameron Funkhauser, who works in the Department of Market regulation of the National Association of Securities Dealers ("NASD"); Galen O'Kane, an investor who bought EOSC shares through the internet; John Chachas, George Chachas' brother and a banker at First Boston; Richard Day ("Day"), the transfer agent for Curbstone Acquisition Corp. ("Curbstone") and EOSC; Ara Proudian ("Proudian"), the trader who bought shares pursuant to an order by Cavanagh on December 19; Jeffrey Bruss ("Bruss"), who prepared a stock report about EOSC in January 1998 for his internet publication, The Future SuperStock; and Richard Tucker, an expert on securities law offered by defendant Cavanagh. The Court also received the affidavits and cross-examination of defendants Thomas Cavanagh ("Cavanagh"), George Chachas ("Chachas"), Thomas Brooksbank ("Brooksbank"), and William Levy ("Levy"), and relief defendant Anthony Luttenberger. Chris Chaleki, an engineer at EOSC, also performed a demonstration of EOSC's product in Court and was subject to cross-examination, although he did not provide an affidavit in advance.

The Court has also received voluminous documentary evidence and deposition testimony in support of, and in opposition to, the SEC's motion. The Court has reviewed all of this evidence carefully, in addition to the legal briefing provided by counsel.

For the reasons set forth below, the Court finds that the SEC has made a proper showing that defendants Chachas, Brooksbank, Hantges, Levy, Cavanagh, U.S. Milestone ("Milestone"), Customer Safety, Cambiarios, Construcciones, Optimum, and Agira violated

Section 5 of the Securities Act of 1933 ("the Securities Act"), and that these defendants may be found liable at trial for disgorgement of proceeds plus penalties for their violations. The Court finds that a preliminary injunction against future violations of Section 5 of the Securities Act is properly entered, however, only with respect to defendants Cavanagh, Milestone, Levy, Chachas, Customer Safety, Construcciones, and Cambiarios, as to each of whom the SEC has established a likelihood of repetition.

The SEC also has made a proper showing that defendants Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas violated Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and that these defendants may be held liable at trial for disgorgement of proceeds and penalties associated with their violations. Because the SEC has demonstrated a likelihood of repetition as to Cavanagh, Milestone, Customer Safety, Construcciones, and Cambiarios, a preliminary injunction against future violations of Sections 17(a) and 10(b) is properly entered against these defendants.

To preserve the status quo pending a final determination of this matter, the Court extends the freeze order contained in the TRO, except with respect to those defendants and relief defendants, set forth above, with whom the SEC has reached agreements in lieu of, **\*344** or modifying, the terms of the freeze order embodied in the TRO. As to those defendants and relief defendants, the terms of their agreements with the SEC shall remain in effect pending the final resolution of this case.

## I. *FINDINGS OF FACT*

The scheme alleged by the SEC involves a broad cast of characters and a complicated series of events. In brief, the SEC alleges that a malevolent investment banker, Cavanagh, and his lawyer, Levy, approached a development stage company, WTS Transnational, Inc. ("WTS"), that had a dire need for capital. These two then set in motion a plan that had little to do with raising funds for WTS, but instead was designed to line their pockets. The scheme called for Cavanagh and his nominees to obtain for pennies a large block of shares of the company just as it merged with a public shell company.[4] Cavanagh and his nominees would then sell the shares into the public market at prices that they would help to inflate. The success of the scheme depended on the participation of the shareholders of the shell company, who would transfer to Cavanagh and his nominees their "affiliate" shares of the shell company.

The recitation of facts that follows sets forth more specific findings about the individuals and entities involved in this scheme and the sequence of events.

### A. The "Cast of Characters"

### 1. The Operating Company

WTS is a Massachusetts corporation with its principal place of business in Massachusetts. WTS was founded in 1990 by Charles Weaver ("Weaver"), a former employee of Texas Instruments and Honeywell, who is now 56 years old. According to the December 23, 1997 Form 8-K filed with the SEC ("December 23 8-K"), WTS

> developed and [was] in the process of producing state-of-the-art fingerprint biometric systems for the information security and access control market segments ... [that would] eliminate obnoxious and manifold passwords or personal identification numbers and replace them with biometric verification of the individual.

Weaver has invoked his Fifth Amendment privilege against self-incrimination and refused to testify in this lawsuit.

As of September 30, 1997, WTS had $10,000 in assets and $655,000 in current liabilities, including $359,000 in accounts payable and $172,000 in deferred compensation. The payroll and related expenses for the nine months ended September 30, 1997 was $31,000.

### 2. The Investment Banker

Milestone, a New York corporation, is an investment banking company specializing in Regulation S offerings.[5] Its principals are Cavanagh and Frank Nicolois ("Nicolois"), each of whom owns 50% of the company. In 1993, Cavanagh was fined $20,000 by the NASD and barred from association with any NASD member in any capacity for failure to provide testimony or to respond to NASD requests for information concerning transactions and activities in which he was involved while employed at a NASD member firm.

### 3. The Lawyer

Since 1991, Levy has been Milestone's attorney and has structured and negotiated the terms of the Regulation S transactions in which Milestone has acted as a distributor. Levy is a securities attorney and the sole lawyer at the law firm of Levy & Levy, in **\*345** Voorhees, New Jersey. He has on occasion brought corporate merger partners together, marrying a blank check company[6] with one that has an operating business.

In 1975, the Second Circuit affirmed the entry of a preliminary injunction against Levy for his participation in a securities fraud that bears remarkable similarities to the instant endeavor. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975). In that prior action, Levy brought together a shell and an operating company, participated in the review and issuance of two misleading communications to the public regarding the merged entity, and facilitated the offering of unregistered shares for sale that did not bear any restrictive legend when they should have. Levy's codefendants created a false appearance of greater interest in the stock of the company than was justified, resulting in an increase of the company's share trading price from 38 cents to as high as $6 within a six month period. *See id.* at 806. Levy was thereafter permanently enjoined from violating the antifraud and registration provisions of the same securities laws upon which the SEC is suing here. *Id.* at 809-10.

### 4. The Broker

During the critical time at issue here, Cavanagh directed significant trading through Tacopino, a registered representative at Donald & Co., which is a registered broker-dealer in New Jersey. Tacopino has invoked his rights under the Fifth Amendment and refused to testify in this action.

### 5. The Shell Company

Curbstone was a blank check or shell corporation that existed for the purpose of merging with a private company with business operations. Its officers and directors during the critical times at issue here were Chachas and Brooksbank.

Chachas is a corporate and securities lawyer with the two partner law firm of Wenthur & Chachas in La Jolla, California. The firm's clients are primarily small, privately-held corporations, for whom Chachas prepares private placement memoranda and files periodic reports. Chachas and Brooksbank were law school classmates and have been friends for the past 10 years.

Brooksbank is an attorney with Brooksbank & Associates in Las Vegas, Nevada. In 1990, Hantges, who is in the securities business and had at that time just attained control of Curbstone, brought Brooksbank into the company with him. Shortly thereafter, Brooksbank asked Chachas to prepare quarterly and annual reports for Curbstone, whose SEC filings were no longer current. Over the succeeding years, Chachas prepared corporate resolutions, drafted amended articles and by-laws, worked with auditors and prepared annual reports for Curbstone.

In early 1996, Brooksbank, Chachas, and Hantges decided to restructure Curbstone and to get it listed on an exchange. Chachas asked Jim Franklin ("Franklin"), a business acquaintance of Chachas from San Diego, for assistance in getting Curbstone listed.

On November 6, 1996, Curbstone filed an S-8 registration statement with the SEC that registered 3,500,000 shares. Day of ARTCO, Curbstone's transfer agent, issued certificates for the registered shares without any restrictive legend. Thereafter the shares were quoted on the NASD electronic quotation medium referred to as the OTC Bulletin Board. Four individuals, Chachas, Brooksbank, Hantges, and Franklin ("the Curbstone Management" or "Management Shareholders"), each held just under 25%, and together held 97.33% or 3,427,506 shares ("the Management Shares") of the Curbstone common stock as of late 1997. Each of the four Curbstone principals had invested approximately $6,000 in setting up and managing the company. It was their hope that from any merger they would collectively receive $125,000 for this collective investment of $24,000 as well as some stock in the new entity for long-term investment purposes.

By late 1997, Chachas and Brooksbank were the sole officers and directors of Curbstone. **\*346** Throughout the course of the transactions at issue here, the Management Shares were treated as one block and all negotiations about the block were managed by Chachas. Thus, although only Brooksbank and Chachas held control positions at Curbstone, in the sense that they were officers and directors, the Court refers to the block of shares held by the four shareholders as the "Management Shares" because for all practical purposes they were one block under the control of Chachas.

**B. *The Events***

**1. Milestone agrees to raise equity for WTS.**

WTS had an idea and needed cash in order to rent space in which it could produce what it called a "pre-production unit" that could be shown to potential customers.[7] Maier Lehman ("Lehman") introduced Cavanagh to WTS representatives at a meeting in New York City on July 15, 1997, that was attended by Lehman and two other persons involved in the search for financing for WTS, Michelle Weiss ("Weiss") and Ari Friedman ("Friedman"). After the merger, Cavanagh gave Lehman, Weiss, and Friedman unlegended[8] Curbstone stock as a "finder's fee" to compensate them for their roles in introducing Milestone to WTS. Not long after the July meeting, Milestone agreed to act as investment banker for WTS.

The initial understanding between WTS and Milestone is set out in a letter of intent "effective" September 22, 1997. Milestone represented that it is in the business of assisting corporations in raising equity capital through private placement of a company's stock. The letter described, *inter alia,* an intent to enter into an agreement whereby Milestone would have the exclusive right to raise $1 million in equity capital for WTS in a private placement offering in exchange for an aggregate of 30% of the WTS common stock, and after raising such funds would have a one year option to raise an additional $3 million for another 10% of the stock. It was expected that half of the $3 million, or $1.5 million, would be provided to WTS within five months of its receiving the initial investment of $1 million. Through this financing arrangement WTS indicated a willingness to give up 40% of its stock ownership in exchange for $4 million.

At this same time Milestone was looking for a shell into which WTS could be merged. Cavanagh asked Levy to locate such a candidate and Levy began to deal directly with WTS. Although Levy was retained by WTS as its counsel on December 12, and represented WTS at the time it was acquired by Curbstone, the initial dealings between Levy and WTS were far from smooth. By November 5, 1997, WTS's Weaver was complaining to Milestone about the status of negotiations with Levy. Specifically, the private placement memorandum that Levy had developed for WTS reflected WTS giving up 40% of its stock for a $1 million investment. While WTS believed that a finder's fee of 10% of the money raised was reasonable to compensate an investment banker for its work, it opposed giving up 10% of the company's equity as a finder's fee, particularly since there was an additional $2.5 to $3 million to raise after the first $1 million had been found. As described in the letter, Levy was pushing for a merger with a shell to coincide with the $1 million investment, although WTS's Weaver didn't understand that those events had to coincide.[9]

The complaints about Levy continued. In a memorandum labelled "status of letter of **\*347** intent," which responded to a proposed letter of intent sent by Levy to WTS on November 7, WTS complained vociferously to Milestone about Levy's proposal. WTS believed that its original understanding with Milestone was fair to all concerned. It contemplated that WTS would give up 40% of its equity in return for an investment of $4 million dollars, $3 million of which would be invested four to six months after the initial investment. WTS planned to use the first $1 million invested in the company to produce "preproduction units that demonstrate performance and actual production costs." With the "hardware" that would result from such work, WTS expected that Milestone would be able to find an investor to place the next $3 million into the company. Although the document is somewhat confusing on this point, it appears that WTS contemplated that Milestone would be compensated for its work by retaining that portion of the 40% in equity that Milestone did not require in order to entice the $4 million investment, or if Milestone did not use any of its own money, it would be entitled to a finder's fee of 10% and legal fees of 5%. Consequently, WTS expected to receive $850,000 of the first $1 million investment.

In contrast, Levy's proposal treated the investors, whom WTS considered a "key" ingredient to its success as a business, "almost [as] an after thought [sic]." [10] Levy wanted WTS to exchange 40% of its equity for $1 million and to give Milestone thereafter the right to raise an additional $3 million for an additional 600,000 shares, which Levy suggested should be priced at $5 per share. Under Levy's plan, 10% of WTS's equity would be used as a finder's fee for Milestone and the investment of $3 million would result in a market capitalization of $53 million. The author pointed out that a finder's fee of 10% was customary and that a market capitalization of $53 million was "*astronomical* at this stage." (Emphasis added.) WTS predicted that the next investor would "rachet" down the $5 per share price. In contrast, WTS estimated that the appropriate market capitalization at the point at which $1 million was invested was approximately $3.4 million, and after an investment of all $4 million, approximately $10 million. [11]

Finally, a Letter of Intent effective November 13, 1997, was executed by Weaver and Nicolois on behalf of WTS and Milestone, respectively. Milestone agreed to use its best efforts to have Milestone or its clients advance to WTS $1 million as a note convertible into 30% of WTS's issued and outstanding common stock. It was also the intention of the parties that WTS would become a wholly-owned subsidiary of a publicly traded company before December 15, 1997, with WTS shareholders receiving 95% of the issued and outstanding capital of the new company and the shell's shareholders retaining 5%. Milestone would then convert its note and receive shares in the new entity "in proportion to its then ownership of WTS." The letter also required WTS to issue 6,054 shares

(amounting to 10% of the entity's outstanding stock) to be registered in the name of Milestone, subject to repurchase by WTS or the new entity if Milestone failed to make an investment of $3 million in the stock of WTS or the new entity. It was contemplated that investors would purchase up to 5,000 shares of WTS for $3 million, with a $1.5 million investment being made by May 31, 1998, and the remaining $1.5 million invested by September 30, 1998.

**\*348** On November 20, 1997, one week after the Letter of Intent was executed, Weiss and Friedman executed a consulting agreement in which Milestone "acknowledged[d]" the consulting services they had rendered in connection with WTS and agreed to issue 150,000 shares of common stock to them in the event that WTS became a publicly traded company as a result of Milestone's efforts in full satisfaction for their consulting services.

**2. Milestone secures a bridge loan.**

As is apparent from the negotiations among Milestone, Levy, and WTS, WTS was in urgent need of $1 million. In November 1997, Cavanagh arranged with Stieghorst, a director of Optimum Fund, a Grand Cayman entity, for the Fund to make a $500,000 bridge loan to WTS, convertible into equity.

In December 1997, and contemporaneous with the acquisition described below, Milestone oversaw a $1 million offering of EOSC shares. Specifically, the Optimum Fund bridge loan was converted into 1,054,241 EOSC shares at a price of $.47 per share, and Agira Trading, of the British Virgin Islands, also invested $500,000 for an identical number of shares at the same price per share. There is no evidence that these Regulation S shares have been sold since they were issued. Milestone was paid $100,000 by EOSC and $30,000 by the investors for these Regulation S offerings.

The December 23 8-K describes the bridge loan as follows:

> [P]rior to Closing, WTS shall have caused the bridge loan in the amount of $500,000 to be converted to common stock of WTS or an additional 500,000 to be invested as equity, and further shall cause immediately following Closing to have an additional $500,000 to be invested and infused into Curbstone.

The "Material Liabilities of WTS" listed in the 8-K include "a bridge loan in the amount of $500,000 from Optimum Fund." There was no other description of the Regulation S transactions or the bridge loan in the December 23 8-K.

**3. Levy finds Curbstone and structures the acquisition.**

In November 1997, Levy selected Curbstone as the WTS merger partner. Levy had met Curbstone's Chachas earlier in 1997, when they were on opposite sides of another transaction in which an operating company represented by Levy merged into a shell owned by Chachas and Brooksbank. By late November, the Curbstone Management, that is its four principal shareholders, had agreed to pursue the transaction. Levy negotiated the terms of the transaction with Chachas, who kept the other three principal shareholders advised of the progress of the talks.

Chachas prepared a draft exchange agreement by marking up the agreement that Levy had used in the prior transaction in which Levy and Chachas had both been involved. According to the terms of the agreement, upon closing the Curbstone shareholders would hold no more than 5% of the fully diluted stock of the new company, *i.e.,* 925,217 shares. The balance of the 3,521,876 shares of Curbstone would be cancelled. All of the WTS shares would be exchanged for 17,547,475 newly issued shares of Curbstone. This would allow WTS management to control the company, and give the Curbstone shareholders an investment opportunity in a company with an operating business. It was also agreed that the officers and directors of Curbstone would all resign and be replaced by WTS personnel. A November 25 draft Acquisition Agreement reflects these terms. This structure resembles the understanding between Weaver and Milestone reflected in the November 13 Letter of Intent, that is, that WTS would give up no more that 5% of its stock for a merger into a shell.

From the beginning of the negotiations, Chachas envisioned two separate payments to the Management Shareholders for their agreement to participate in the merger. As reflected in a document that he drafted in late November, he expected that the four Management Shareholders would receive $125,000 in cash and would be paid $1.2 million by "market makers" for 300,000 of their shares in the new company, priced in **\*349** three equal units at between $3 per share to $5 per share.[12]

By December 1, Chachas was requesting $125,000 in cash at the closing and $2,352 million within six weeks thereafter in return for the sale by the Curbstone Management of a

majority of their shares in the new company. [13] On December 2, 1997, Chachas sent Levy what he characterized as "the only two acceptable alternatives" for closing and "our best and final effort." Under the first alternative, the Curbstone Management would be paid (1) $125,000 in cash at a closing on December 5, and (2) an additional $2,352 million in four installments between December 16, 1997, and March 13, 1998. The latter payment purchased 542,000 shares belonging to Curbstone Management. To insure performance by the purchasers, the Curbstone transfer agent would not release newly issued common stock to WTS or cancel the 2,596,659 shares of Curbstone common stock due to be cancelled until the first installment payment of $450,000 had been received, which was due no later than December 16. The second alternative contemplated an immediate payment of a "$10,000 no [sic] refundable deposit," as well as a December 16 closing, with the $125,000 in cash and first installment payment of $450,000 due at that time. The remainder of the 542,000 shares would be available for purchase in three installments spanning the time between December 16 and March 13, 1998. Under both proposals there would be no change in the Curbstone transfer agent until March 15, 1998, or until all the 542,000 shares had been acquired, whichever occurred first.

Following discussions with Levy on December 3, 1997, Chachas sent Levy a written outline of "the terms for the closing of the Curbstone/WTS acquisition." The acquisition agreement would be signed on December 4 and Curbstone Management would be paid $25,000 as a non-refundable deposit. The closing would occur no later than January 16, or

> when the balance of the $125,000 is payable and the first round of 150,000 shares of Common Stock of Curbstone have [sic] been purchased from the Curbstone shareholders at a net of $3.00 per share and full payment has been received.

The remainder of the 542,000 shares would be made available for purchase in blocks of shares at monthly intervals running to April 17, on which date the final 92,000 shares would be available for purchase at $6 per share. [14] Under this agreement, the transfer agent could be changed after 30 days. [15] The **350** latter sales of 392,000 shares are in the nature of a call option agreement, with the Curbstone Management having no direct control over the exercise of the options.

Over December 2 and 3, Chachas and Levy finally agreed on the following payments to Curbstone Management in exchange for their agreement to acquire WTS:

1) a $25,000 non-refundable payment, which Levy sent to Chachas on December 8;

2) a $100,000 payment for the sale of 2,563,000 Curbstone Management Shares described below, which payment Levy sent to Chachas on December 12;

3) the purchase of 150,000 Curbstone Management Shares for $450,000, or $3 per share, for which payment was made on December 12;

4) An oral agreement that Milestone had an option to purchase in the following three rounds the following Curbstone Management Shares: 150,000 shares at $4 per share by February 13, 1998; 150,000 shares at $5 per share by March 13, 1998; and 92,000 shares at $6 per share by April 17, 1998.

As this list indicates, Chachas, Cavanagh, and Levy decided that the vast majority of the Curbstone Management Shares would not be cancelled. Instead, they arranged a sale for $100,000 of 2,563,000 of the shares that had been slated for cancellation. Although Chachas at first understood that the shares were to be transferred to Milestone, he was later informed that the certificates for the shares were to be issued in the names of three Spanish clients of Milestone ("the Spanish Shares"). Although Chachas presents this arrangement simply as a means by which Curbstone Management could get $100,000 for shares that otherwise would have been cancelled, this critical decision substantially changed the entire transaction, and was essential to the fraud. It afforded Milestone, and those associated with it, the means to profit enormously from the fraud while giving absolutely nothing of value to WTS. Indeed, the arrangement radically transformed the terms of the merger, in that it would no longer be true that all but 5% of the shares of the new entity would be traded for WTS stock. [16] As a result of the decision not to cancel over 2.5 million of the Management Shares, not 5%, but approximately 16% of the EOSC stock was held by Curbstone shareholders or those to whom they sold. In any event, both Milestone and Curbstone Management now had a strong motive to create a market price for the new entity that would allow them to sell the shares covered by the call option agreement and the Spanish Shares for a significant profit. As Brooksbank frankly recognized at the hearing with respect to the option agreements, "if we were going to make any money [out of the merger] this was where it was going to happen." On December 5, Levy sent Chachas by telefax a **351** revision of the exchange agreement that reflected the decision that there would be no cancellation of the Curbstone Management Shares.

**4. Chachas and others execute the "December 5, 1997" stock exchange agreement ("Exchange Agreement") between WTS and Curbstone.**

The Exchange Agreement, which bears the date December 5 on its cover, but was executed by Chachas and Brooksbank on December 8, contains the following terms.[17] Curbstone would deliver to the WTS shareholders 15,488,120[18] shares of authorized, but previously unissued unregistered shares of Curbstone in exchange for all of the issued and outstanding shares of WTS owned by the WTS shareholders. The Exchange Agreement included the representation that those shares given in exchange for the WTS stock had not been registered and would be issued with a restrictive legend. The Agreement further represented that the authorized capital stock of Curbstone consisted of 3,521,876 shares of stock *issued* and outstanding prior to the Closing. The Closing was to be held on or prior to January 16, 1998.

On December 5, Chachas and Brooksbank executed a corporate resolution authorizing Day to issue 17,596,601 restricted shares, which included the 15,488,120 shares described in the final Exchange Agreement as well as 2,108,481 shares divided between Agira and Optimum.[19] Of the 15,488,120 restricted shares to be issued, 500,000 shares were to be issued to Levy, and 2,108,481 were to be issued to Milestone. The certificates for all of these shares were to be delivered to Levy. In addition, the transfer agent was instructed to cancel 33,659 shares of Curbstone held by Curbstone shareholders. As a consequence of the December 5 resolution, there were 21,084,818 issued and outstanding shares of Curbstone. As described below, however, these instructions were not sent to Day until after the Curbstone Management had received $575,000 in cash.

**5. The Spanish Shares move from Curbstone into the market.**

Cavanagh contends that the 2,563,000 Curbstone Management Shares purchased for $100,000 were sold to three clients of Vicente Tur Ortola, an attorney whom Cavanagh had met in Spain in June 1996.[20] According to Cavanagh, Tur Ortola represents groups of investors who want to invest in U.S. publicly traded corporations. While Cavanagh contends that he told Levy in late November that some Milestone clients wanted to purchase Curbstone stock, both Levy and Cavanagh deny negotiating the terms of the transaction between Chachas and Tur Ortola. On the other hand, it is undisputed that Chachas never spoke to Tur Ortola and dealt for all practical purposes solely with Levy. In any event, I find that Cavanagh, through Levy, negotiated these sales with Chachas.

Chachas structured the sale of the Spanish Shares so that it appeared to occur on December 18, immediately after the closing of the acquisition. He fully recognized that, if **352** sold before the closing, these shares were indisputably "control shares." Relying on the fact that the shares had been registered initially in 1996 under an S-8, the Purchase Agreements for the sale of the Spanish Shares drafted by Chachas (there were three identical agreements except for the name of the purchaser) represented that the shares "have been registered securities and will be free of restrictive legend upon delivery." The Agreements further provided that Chachas would hold the shares until "all conditions for the Closing of the Agreement for Exchange of Stock between Curbstone and WTS ... have been satisfied ...." The Purchase Agreements also included a provision that the Curbstone Management Shareholders had the right to repurchase the shares *at the same price* for which they had sold them, in the event that the Closing of the acquisition of WTS by Curbstone was completed on or before January 16, 1998. The Purchase Agreements also contained "representation and warranties" by the purchasers, discussed at greater length below, which provided that the purchasers were accredited investors and had no present agreements to resell the shares.

Chachas provided the Purchase Agreement to Levy with blanks for the number of shares and total purchase price, the name of the purchaser and the date of purchase.[21] It appears that Levy faxed the Purchase Agreements to Milestone on December 5; that Milestone's Nicolois faxed the Agreements to "Vincent Tur" on December 10; and that three such agreements were executed on December 11 on behalf of purchasers, and returned. Chachas contends that he signed the Agreements on December 19.

Although there are three separate agreements, each for the purchase of one-third of the Spanish Shares, it is apparent that the purchase of the entire block was controlled by a single entity.[22] Moreover, as is evident from the date on the account opening statement at Donald & Co., Cavanagh laid the groundwork for reselling these shares into the American securities market on December 11, that is, even before the shares had been paid for.[23] On December 12, Milestone sent the cash $100,000 for purchasing the 2.563 million Spanish Shares to Chachas' escrow account from its escrow account at Levy's law firm. Thus, the Spanish Shares were purchased at a price of less than four cents per share, specifically, $.39.

In a twice-underlined instruction to Day on December 17, Chachas ordered Day to issue 2,353,217 shares to the three Spanish entities "without legend." On December 18, 1997, the stock certificates were issued and sent to Levy. Chachas understood that it was important to both Levy and Cavanagh that any shares sent to Milestone or its clients be unlegended

shares. In documents prepared by Chachas as early as November, Chachas indicated to Levy that 3,510,027 of the 3,521,876 issued Curbstone shares were "free trading" shares. Chachas was acutely aware that there were severe restrictions on the sale of Curbstone Management Shares if sold by affiliates or persons in control of Curbstone. According to Chachas, so long as the Curbstone Management Shares were sold *after* the acquisition, and thus after the four Curbstone Management Shareholders were **353** no longer affiliates or in control of the corporation's operations, the stock could be sold without any restrictions on its being traded in United States securities markets. Among the steps Chachas took to make it appear that the sale of Spanish Shares did occur after the acquisition, were (1) inserting language in the Purchase Agreement making the delivery of the shares contingent on the acquisition; (2) holding the $100,000 paid for the shares in an escrow account until after the acquisition; (3) executing virtually all of the documents associated with the acquisition prior to sending instructions to Day to transfer the Spanish Shares; and (4) issuing instructions to Day directing him to issue the unregistered Curbstone shares to WTS (which were exchanged for the WTS shares and thus effected the merger) prior to transferring the 2,353,217 Curbstone Management Shares to the three Spanish entities. [24]

Levy was fully familiar with Chachas' rationalization that taking the above-described steps would justify the sale of the Curbstone Management Shares without any legend restricting their resale. He testified at the hearing that he conveyed to Cavanagh Chachas' own legal conclusion that the Spanish Shares were "free trading" shares, as well as his concurrence in that judgment. Cavanagh in turn contends that he was entitled to and did rely upon Levy's legal opinion that the Spanish Shares were free trading shares. In any event, all three men knew that the purchase of unlegended Spanish Shares was an essential part of the acquisition of WTS by Curbstone, and that at the time those shares were committed to be sold, and were paid for, they were owned by men who controlled the decision as to whether Curbstone would acquire WTS. [25]

Between December 24 and 26, the Spanish Shares as well as other EOSC shares were deposited into trading accounts at Donald & Co. The 2,713,000 shares so deposited constituted at least 77% of the "market float," that is, 77% of the 3,521,876 shares that were available for trading in the public market. Beginning in late December 1997, Tacopino began systematically liquidating these shares. [26] When these shares are combined **354** with the remaining 392,000 shares tied up by the Option Agreement and the 200,000 shares held by Curbstone Management under a lock-up agreement, Cavanagh controlled approximately 95% of the market float prior to liquidation.

**6. The acquisition is completed.**

On December 12, Levy wire transferred to Chachas $550,000, representing the $100,000 payment for the purchase of the 2,563,000 Spanish Shares and $450,000 for Milestone's exercise of the first round of options to purchase 150,000 shares. In connection with that first amount of money, Levy wrote that the $100,00 was wired "*to complete* the sale of 2,563,000 shares as of December 1, 1997," (emphasis added) the date Chachas had inserted into the agreement to purchase the Spanish shares. Chachas distributed the $550,000 among the four Management Shareholders on December 19. Chachas tendered his resignation as an officer and director of Curbstone on December 12 and wrote to Levy:

> It is my understanding that the agreement between Curbstone and WTS has been fully executed and thus this transaction is closed .... As I indicated previously I will be glad to edgarize [27] and file the 8-K if you need my assistance.

On December 16, 1997, Milestone signed the agreement dated November 20, 1997, that Weiss and Friedman who had introduced Milestone to WTS had sent to Milestone on November 21, 1997. Pursuant to this document, Milestone agreed to convey 150,000 shares of EOSC to the two individuals as full payment for their consulting services.

During this period of time, Chachas obtained a CUSIP number for the new company and was notified that the company would bear the OTC trading symbol of EOSC. On December 16, he confirmed with Levy the appropriate division among the three Spanish entities of the "2,563,000 Free trading [shares] purchased for $100,000." On December 17, 1997, Chachas sent by overnight mail instructions to Day to issue new stock and to cancel and transfer existing stock.

On December 18, Chachas and Brooksbank, acting as the "entire Board of Directors," executed a corporate resolution appointing four WTS employees as directors, accepting their own resignations as officers, and appointing in their stead five WTS employees as officers. On that same day, Day acted on the instructions that Chachas had sent him, completing both the acquisition and the sale of the Spanish Shares.

**7. December 19, 1997 trading moves the EOSC stock price to over $5 per share.**

On December 19, at about 10:22 a.m., before there had been any public announcement of the acquisition, Cavanagh called Proudian, a trader at Alexander, Wescott & Co., and told him to buy 500 shares of EOSC at $7 per share for his client, Optimum Fund.[28] Proudian called Donald & Co, placed **355** the order, and made the trade. A trade at $7 per share reflected a market capitalization for EOSC of $140,000,000. As recently as November, the President of WTS labelled a market capitalization of $53 million after the investment of $4 million (which WTS had yet to receive) "astronomical."

The last trade before this $7 purchase of stock had, of course, occurred before the acquisition that had fundamentally changed the nature of the company. It occurred on November 12, 1997, when the stock had traded around 20 cents per share. Prior to Cavanagh's purchase, the December 19 market maker quotes for the stock were $.50 bid for 5,000 shares and no offer, that is, the market maker would pay $.50 for the stock and was not quoting a price at which it would sell the stock.[29] After Cavanagh's purchase, Donald & Co. immediately changed its market maker quotes to $5 bid for 500 shares and $7 ask. Within minutes a second market maker followed suit.

The second trade in EOSC occurred at 10:53 a.m., when 3,000 shares were purchased at $5.50 per share through a Canadian broker-dealer for the account of Banca del Gottard, Zurich, Switzerland. Jean-Pierre Neuhaus, a Milestone client, who has signatory power over the account that placed the order, soon received 50,000 EOSC shares from Cavanagh out of the Customer Safety account.

Cavanagh orchestrated another purchase of EOSC stock on behalf of Optimum Fund at 11:13 a.m. This time Cavanagh placed a market order for 2,500 shares, which was filled at $5,375. Cavanagh contends that Stieghorst of Optimum Fund was enthusiastic about the stock and wished to own some.[30]

Chachas then placed the fourth and final retail trade of the day: a market order for 100 EOSC shares at 2:10 p.m. The order was filled at $5 7/8 .[31]

The effect of Cavanagh's first trade was to shift the market maker quotes for the EOSC stock. The cumulative effect of these four trades was to set a price for EOSC stock at over $5 per share prior to the public announcement of the acquisition, which occurred at 6:17 p.m. that day. Cavanagh and Chachas each had a substantial motive to move the price of the EOSC stock as high as possible in order to maximize their profits from the sales of Management Shares that they would be making in succeeding weeks. I find that both Cavanagh and Chachas placed their orders with the intent to help establish a market price for EOSC at or above $5 per share.[32]

After the close of business on December 19, Curbstone announced the acquisition, which was reported on the business wire. The terms of the acquisition were reported as follows:

> Curbstone Acquisition Corp., a public company, Friday announced that it had completed the acquisition of 100 percent of the stock of WTS Transnational Corp., a privately **\*356** held company, in exchange for the original issuance of 15,488,120 shares of Curbstone common stock.[33] Curbstone has changed its name to Electro-Optical Systems Corp. The Bulletin Board symbol has been changed to "EOSC." The directors and officers of Curbstone have resigned and have elected the directors and officers of WTS to succeed them.

### 8. Chachas prepares the December 23, 1997 Form 8-K.

At the request of Levy, Chachas prepared the Curbstone Form 8-K,[34] filed on December 23, 1997. According to Chachas, he prepared the 8-K as an accommodation to EOSC, because he knew how to do electronic filing with the SEC (through the Edgar system), and, since the Christmas holidays were approaching, it would have been difficult for the company to find someone else to prepare the filing on short notice.

The 8-K provided the public with its most extensive information to date about WTS and the terms of the Curbstone/WTS merger. It included a copy of the Exchange Agreement, but did not disclose the sale of the Spanish Shares, the option agreement, the transfer of restricted stock to Milestone,[35] or the transfer of restricted stock to Levy. The 8-K indicated, as discussed above, that WTS had received a bridge loan in the amount of $500,000 that was to be converted into equity, and that an additional $500,000 was to be invested in Curbstone immediately after the closing. It did not disclose, however, that Regulation S stock had already been issued in connection with this $1 million investment.

The 8-K indicated that a total of 19,009,996 shares of Curbstone/EOSC stock would be outstanding after the closing. That figure includes the 3,521,876 shares that were represented as issued and outstanding prior to the closing, and the 15,488,120 shares that were represented as being newly issued to WTS. It did not indicate what the architects of the transaction already knew namely, that the total number of outstanding shares was actually closer to 21 million shares. The additional 2.1 million shares had been issued to Agira and Optimum under Regulation S concurrently with the closing.

The 8-K was amended by a filing that EOSC made on February 18, 1998. [36] This filing disclosed the Regulation S sales to Agira and Optimum. It also indicated that the total number of shares outstanding was 21,084,818. [37] The amended 8-K did not, however, cure all of the deficiencies in the December 23 filing. Because the amended 8-K was not the focus of the preliminary injunction hearing, the Court will note only a few brief observations about its failings.

Most importantly, it continued to portray the WTS-Curbstone merger as a stock-for-stock transaction, without disclosing the considerable additional terms of the deal that have been set forth in this Opinion. It also continued to represent, as had the December 23 8-K, that the 15,488,120 shares of Curbstone stock that were issued at the time of **357** the acquisition went directly to WTS shareholders. In fact, according to the transfer agent's records, only 12,022,558 of those shares went to WTS shareholders. 500,000 shares went directly to Levy, and 2,108,481 shares went directly to Milestone. An additional 857,081 shares went to Inversora Dactilar, S.L., the Spanish entity that Cavanagh indicated he had lined up to provide additional financing for EOSC. Finally, the amended 8-K indicated that, to the knowledge of EOSC management, no agreements as to any matters existed amongst the former shareholders and any other shareholders of EOSC. Although it may have been true that EOSC management did not know about the side agreements arranged by Cavanagh, Levy, and Chachas, these agreements certainly did exist and EOSC's attorney, Levy, was their primary architect. [38]

### 9. The Future Superstock picks EOSC.

On January 12, 1998, an internet publication called The Future Superstock released to its subscribers its choice as the "Stock Pick of the Year for 1998" EOSC. It observed, after a lengthy discussion of the company's product plans, that The Future Superstock had set "a price target" of $15 to $18 per share for the EOSC stock over the next three months to a year. Among the data the publication relied upon in making its assessment of the company was its trading history, which was described as having begun on December 19, 1997, and having included a high of $7 per share and a low of $5 per share. On January 24, 1998, this article was publicly released. During the mid-January period, Cavanagh stepped up the pace of his liquidation of EOSC shares and the volume of trading in EOSC stock soared. Lehman, [39] the man responsible for introducing Cavanagh to WTS, was responsible for introducing Bruss, Future Superstock's owner, to EOSC. Bruss, who testified at the hearing,

explained that his investigation of EOSC included studying the EOSC trading history, interviewing its management, and looking at its business plan.

Bruss' prediction that EOSC stock would be trading at $18 per share by the end of the year was extraordinary. That prediction assumed a market capitalization of $378,000,000 for a company that had not yet received even a full $1 million from outside investors and that, as explained below, had not even successfully produced a prototype to show to potential customers. Indeed, on the very day that Bruss first released his article, January 12, EOSC's Weaver was writing an internal memo about "hype," acknowledging that he would rather not say anything until EOSC had a product on the street. According to Weaver, "We do not have a product that we can show today. We will in about four months."

**10. The January 30 EOSC press release falsely describes EOSC's state of production.**

By January 30, however, EOSC abandoned any reticence it had about issuing press releases. It issued a release conveying that EOSC was already selling its new product to a company called ADL Data Systems, Inc. ("ADL"). The release of this statement to the press was orchestrated by Levy and Friedman, one of those responsible for introducing WTS to Cavanagh in the summer of 1997. In late January 1998, Friedman,[40] who also was a client of ADL, suggested to ADL's President David Pollack that Pollack might want to look at, and get distribution rights **\*358** to, EOSC's fingerprint identification unit. Pollack contacted Weaver and began discussions about the fingerprint technology. Shortly thereafter, on January 30, Levy sent a draft letter to Pollack describing an agreement between the two companies. Pollack revised the draft letter to EOSC and sent it to Weaver. Pollack specifically told Levy that the letter was not a purchase order, and that he couldn't purchase what he hadn't evaluated.

Both Pollack and Weaver signed the letter, which concerns a "Proposed Joint Venture." It reads in pertinent part as follows:

> "[A]s per my negotiations with your agent, enclosed please find our Purchase Order for 1,000 units of your Fingerprint Identification System. These units are to be delivered to our office soon after we've had the opportunity to test your evaluation units and the price will be finalized prior to shipment .... [Assuming the success of a field test,] we both agree to enter into a Joint Venture to market

on an exclusive basis these units in the nursing home, long term care facilities, and adult homes and on a non exclusive basis home care agencies ...." [41]

No Purchase Order was attached to the letter.

At the same time that Levy was drafting the letter exchanged between the two CEOs, he was busy drafting a press release for simultaneous distribution. In doing so, he telefaxed copies of his *drafts* of the press release to Lehman, his colleague Michelle Weiss, [42] and Future Superstock's Bruss. [43] The January 30, 1998 press release issued by EOSC reads in pertinent part as follows:

ELECTRO-OPTICAL SYSTEMS CORP. (OTC-Bulletin Board: EOSC) a public company, announced today that it received a Purchase Order from ADL Data Systems, Inc., a leading system integrator and software provider to the nursing home and health care industry, for an initial order of 1,000 Finger Print Verification Units for an undisclosed price. The Purchase Order and accompanying Letter of Agreement state that upon the successful evaluation and testing of these units initially with selected ADL nursing home clients, ADL agrees to market additional units in a joint venture with EOSC to national health care sources. ADL estimates that the first year of the joint venture following the test placement could result in the sale of a minimum of 15,000 units.

The false statements in this press release included the representation that EOSC had received an initial order for 1,000 units from ADL. Levy and other defendants have tried to justify this false statement by testifying that there is an industry practice of "conditional" orders that are subject to the customer's approval of the product and confirmation. The press release does not describe such an arrangement, however, and the evidence is strong that both Levy and Weaver knowingly participated in the dissemination of this false information to the public.

This is perhaps an appropriate point at which to describe in greater detail the technology that EOSC was in the process of developing in January. During the April hearing, the EOSC fingerprint identification technology was demonstrated in court using a computer "mouse" and computer terminal. In the demonstrations, a person was "enrolled" in the list of those granted access to the computer's files by having the person place her thumb on a pad on the mouse three times to permit three different impressions of the person's thumbprint to be

taken. Once enrolled, an enrollee is supposed to have her thumbprint read and recognized by placing her thumb on the mouse's pad again. This entire process was demonstrated with three different new enrollees. The demonstrations underscored how sensitive the *__359__ placement of the individual's thumb on the mouse's pad is. Thus, there was some difficulty getting a good quality print to enroll a person and some difficulty have the computer identify an enrolled person. The technology appears to hold great promise, but clearly remains in the development stage.

The devices on which the process was demonstrated to the Court were not those intended for ADL. EOSC was creating a miniaturized version of the technology for ADL, among other potential customers, and had hoped to have a prototype manufactured by June or July 1998 to hand to prospective customers so that orders could be solicited. The point at which that prototype could be handed to customers would mark the end of the development stage for the product. As of January 30, ADL did not even have mechanical drawings for the prototype. If EOSC had successfully created a prototype to give to ADL and prospective customers by June or July, and had the customers wanted to order the product, EOSC could have been manufacturing it in significant quantities by the end of 1998. While EOSC may yet create a viable product, it has not yet done so and its development of the product was nowhere near the level of completion that was represented in the January 30 press release.

## II. *CONCLUSIONS OF LAW*

### A. *Jurisdiction*

The Court has subject matter jurisdiction over this matter pursuant to Sections 20(d) (1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) (1) and 77v(a), and Section 21(d) (3) (A), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) (3) (A), 78u(e) and 78aa. The Court has personal jurisdiction over all of the defendants and relief defendants under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. *See SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir. 1990); *Bersch v. Drexel Firestone Inc.,* 519 F.2d 974, 998 (2d Cir.1975); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1339-40 (2d Cir.1972). Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

**B.** *Standards for Granting a Preliminary Injunction with SEC as Plaintiff*

Section 21(d) of the Exchange Act provides, in pertinent part:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provisions of this chapter [or] the rule or regulations thereunder ... it may in its discretion bring an action in the proper district court ... to enjoin such acts or practices, and *upon a proper showing* a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d) (emphasis supplied). Thus, to grant a preliminary injunction upon the SEC's request, the Court must find that the SEC has made a "proper showing" of actions by the defendants that violate their statutory obligations. *See Unifund SAL,* 910 F.2d at 1035. In this Circuit, the SEC, unlike a private litigant, need not show risk of irreparable injury to obtain an injunction, nor the unavailability of remedies at law. *Id.* at 1036.[44]

In *Unifund SAL,* the Second Circuit held that the "proper showing" required of the SEC is analogous to the traditional "likelihood of success" standard regularly applied to private litigants. *See id.* at 1037. The SEC's burden of proof varies, however, depending **\*360** upon the nature of the preliminary relief the Commission seeks. Thus,

> a more substantial showing of likelihood of success, both as to violation and risk of recurrence [is required] whenever the relief sought is more than preservation of the status quo. Like any litigant, the Commission [is] obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.

*Id.* at 1039.

The SEC seeks various forms of preliminary relief predicated on an extension of the individual measures embodied in the March 13 Order, namely: (1) a preliminary injunction enjoining the defendants from future violations of the securities laws; (2) an asset freeze; (3) an accounting of the defendants' assets; (4) the repatriation of all monies associated with trades by the defendants in EOSC stock; and (5) a freeze on any further trading by the defendants and relief defendants in EOSC stock. An injunction against future securities violations is among the sanctions noted by the Second Circuit in *Unifund SAL* as having

"grave consequences." 910 F.2d at 1040. The consequences of such an injunction are grave for individuals who are regularly involved in the securities industry, like many of the defendants in this action, because the injunction places them in danger of contempt charges in all future securities transactions. *Id.* The reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud, is also severe for individuals who make their living in the securities industry, such as Chachas, Levy, and Cavanagh. These individuals stand to lose considerable business and respect in their communities if even a preliminary injunction is entered.

Accordingly, to obtain this relief, the SEC must make a substantial showing of likelihood of success as to both a current violation and the risk of repetition. *Id.* In this litigation, the SEC alleges that the defendants engaged in a scheme that violated three distinct portions of the securities laws: Section 5 of the Securities Act, which prohibits the sale of unregistered securities; Section 17(a) of the Securities Act, which generally prohibits fraud in the offer or sale of securities; and Section 10(b) of the Exchange Act, which prohibits manipulative and deceptive devices in connection with the purchase or sale of securities. This Opinion will discuss these theories of relief in turn.

**C. *Claims Under Section 5***

**1. The Sale of the Management Shares**

Section 5 provides, in pertinent part:

> *Unless a registration statement is in effect as to a security, it shall be unlawful for any person,* directly or indirectly

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails *to sell such security* through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a) (emphasis added). It is undisputed that the purpose of Section 5, consistent with the overall purpose of the Securities Act, is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Harwyn Indus.,* 326 F. Supp. 943, 953 (S.D.N.Y.1971) (quoting *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124, 73 S. Ct. 981, 97 L. Ed. 1494 (1953)).

The Securities Act sets forth the types of information that must be included in a registration statement. For example, information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered must be included in the registration statement. *See* 15 U.S.C. §§ 77g and 77aa. *See also SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1098 (2d Cir.1972) (discussing information to be included in a registration statement and prospectus delivered to prospective purchasers); *Harwyn Indus.,* 326 F. Supp. at 953 (discussing the significance of registration to prospective purchasers).

**\*361** To establish a prima facie case for a Section 5 violation, a plaintiff must prove three elements: first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale. *See Neuwirth Investment Fund, Ltd. v. Swanton,* 422 F. Supp. 1187, 1193 n. 8 (S.D.N.Y.1975) (quoting *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 686 (5th Cir.1971)). To prove a violation of Section 5, a plaintiff need not establish scienter. *See SEC v. Universal Major Indus.,* 546 F.2d 1044, 1047 (2d Cir. 1976); *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 859-60 (S.D.N.Y.1997) (Sotomayor, J.).

Here, it is not seriously disputed that the SEC has made out a prima facie case for a violation of Section 5. [45] The main transaction at issue with respect to the Section 5 claim consists of the sale of 2,563,000 shares of Curbstone stock the Spanish Shares by defendants Chachas, Brooksbank, Hantges, and nonparty Franklin on December 12, 1997, to defendants Customer Safety, Cambiarios, and Construcciones. [46] Under the terms of this sale, which was negotiated in the weeks prior to the actual transfer, the Management Shareholders received approximately 3.9 cents a share, resulting in a total payment of $100,000. The Management Shareholders did not register these sales. Many of these shares ultimately were resold to the public, again without registration. [47]

Nevertheless, all of the defendants, but most importantly Chachas, who negotiated the sales on behalf of the Management Shareholders, argue that the sales to the Spanish entities were exempt from Section 5's requirements. Chachas argues that the sales

> did not violate Section 5 because those sales fit clearly within *the exemption afforded by Section 4(1)* of the Securities Act for transactions by any person other than an issuer, underwriter or dealer. The stock that he sold in post-acquisition transactions had been obtained by him while a registration statement was in effect and thus was not restricted. Further, at the time of his first sales and thereafter, *he was no longer an affiliate of the company,* because he had resigned as an officer and director, and because he had carefully structured the transactions of December 18 so that the 15,000,000 new shares of stock were issued to the WTS before his own sale.

(Emphasis added). The SEC claims that the exemption relied upon by the defendants ("the 4(1) exemption") does not apply, because the Management Shareholders were "affiliates," as that term will be defined below, and therefore stood in the shoes of the issuer, at the time of the sale.

The Court finds that the 4(1) exemption does not apply. Section 4(1) of the Securities Act, codified at 15 U.S.C. § 77d, provides, in pertinent part, that "[t]he provisions of section 77e of this title shall not apply to ... transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). The purpose of this exemption is to allow the free trading among individual investors of securities that have already been registered. Thus, a transaction is exempt from Section 5's requirements if it is a trade by an ordinary investor rather than an issuer, underwriter, or dealer. A party seeking to invoke this exemption has the burden **\*362** of proving that the exemption applies.[48] *See Ralston Purina,* 346 U.S. at 126 (1953).

Section 2 of the Securities Act sets forth the definitions of "issuer" and "underwriter." Section 2(4) defines an "issuer" as "any person who issues or proposes to issue any security." 15 U.S.C. § 77b(a) (4). The issuer is generally the company that issues a security. Section 2(11) defines the term "underwriter" as

> *any person who has purchased from an issuer with a view to,* or offers or sells for an issuer in connection with, *the distribution of any security,* or participates

or has a direct or indirect participation in any such undertaking, or participates or has a participating in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a) (11) (emphasis added). For the purposes of the definition of an "underwriter," the term "issuer" is defined as including, "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." *Id.* To establish that a person is "under direct or indirect common control with the issuer," the SEC has generally asked whether the particular person is "in a position to obtain the required signatures of the issuer and its officers and directors on a registration statement." Loss and Seligman, *supra* note 5 at 247.[49]

The SEC claims that Chachas and the Curbstone Management Shareholders were "issuers" under the foregoing definition, or affiliates, when they sold the Spanish shares in that they were under direct or indirect common control with the issuer, Curbstone. The SEC bases this argument on the facts that two of the Management Shareholders, Chachas and Brooksbank, were officers and directors of Curbstone, and that the group collectively controlled 97% of its stock prior to the merger with WTS. Because the SEC maintains that the sale of the Spanish shares occurred *prior* to the completion of the merger with WTS on December 18, it argues that, at the time of the sale, the Management Shareholders were still in control of Curbstone. In the alternative, the SEC argues that, should the Court find that the actual sale occurred after the merger, the Management Shareholders acting through Chachas *offered* to sell their shares prior to the merger, and that such an offer alone constitutes a violation of Section 5.[50]

Chachas concedes that if the sale of the Spanish Shares occurred while he was an affiliate, then the sale would have been unlawful under Section 5.[51] Chachas' testimony and written submissions make clear that he understood the implications of selling the Management Shares before the merger was completed while the Management Shareholders were still affiliates and that he studiously crafted the transactions so as to **\*363** make it appear, at least formally, that the sales occurred after the merger.

The liability of the Management Shareholders, the Spanish entities, and the other defendants who played a substantial role in the sale of the Management Shares thus turns on whether the Management Shareholders were in fact "issuers" within the meaning of Section 2(11) or affiliates or control persons at the time of the sale of the Spanish Shares. Alternatively, these defendants may be found liable if the SEC is correct that an offer to sell occurred prior to the completion of the merger and that such an offer is sufficient to constitute a violation of Section 5.

The defendants (led by Chachas) would focus the Court's attention with respect to the first issue whether the Management Shareholders were affiliates at the time of the actual sale on the exact timing of the events in question. According to Chachas, the Management Shareholders ceased to be in control of Curbstone soon to be renamed EOSC on December 18th, at the moment that Day, the transfer agent for Curbstone, issued the 15.5 million new shares of Curbstone to WTS. At that moment, they contend, the ownership of the Management Shareholders was diluted from 97% to 16.6% of the company. Relying also on the facts that Chachas and Brooksbank had resigned as officers and directors of Curbstone before December 18, and that their resignations were accepted on December 18, Chachas claims that the December 18 transfer of the majority of the shares to WTS constituted the final act necessary to remove all vestiges of control from the Management Shareholders.[52]

If the Court were to separate the sale of the Spanish Shares from the acquisition transaction, I would find that the sale occurred first. Chachas' agreement to acquire WTS was contingent on his prior receipt of $100,000 paid on December 12. As Levy wrote to Chachas on December 12, that payment completed the sale of the Spanish shares as of December 1 the date on the Purchase Agreement for those shares. Only with the receipt of that money did Chachas and Brooksbank resign and issue instructions to the transfer agent. Moreover, according to the December 23 8-K prepared by Chachas, the acquisition did not close until December 18.

When the substance of these events is elevated above this form, however, it is clear that they should be viewed through an "integrated" analysis. Although the Court is unaware of any SEC or court opinion applying the concept of "integration" to the precise question of whether a seller of securities is a control person, the concept has been applied in numerous other contexts covered by the securities laws. As Professors Loss and Seligman have described the rationale for integration:

> [b]ecause securities subject to a transaction exemption are exempted on a transaction-by-transaction basis, the possibility exists that an apparently exempt transaction is actually part of a larger offering for which no exemption is available. *The concept of "integrating" offerings is intended to prevent an issuer from avoiding registration by structuring a transaction in two or more apparently exempt offerings* (or one exempt and one nonexempt offering) when they actually should be considered a single nonexempt transaction.

Loss and Seligman, *supra* note 5 at 278 (emphasis added). *See also SEC v. North American Research and Dev. Corp.,* 424 F.2d 63, 70-71 (2d Cir.1970) (rejecting defendants' attempt to use an exemption under the Securities Act to insulate their distribution **\*364** of stock by analyzing the "substance of the transactions" and finding the purposes of the Securities Act best served by treating separate acts as "jointly conceived and jointly consummated"); Non-Public Offering Exemption, Securities Act Release No. 4552, 1962 WL 3573, at \*3-4 (S.E.C. Nov. 6, 1962) (discussing how the concept of integration could be applied to find public offering where an issuer claimed there were only several private offerings); The Crowell-Collier Publishing Company, Securities Act Release No. 3825, 1957 WL 7724 (S.E.C. Aug. 12, 1957) (same); Securities Act Release No. 4434, 1961 WL 3670, at \*1-2 (S.E.C. Dec. 6, 1961) (discussing how the concept of integration could be applied to find a public offering without exemption where an exemption for a local offering was claimed). *Cf. Universal Major Indus. Corp.,* 546 F.2d at 1047 (approving use of the integrated offering concept although not requiring the SEC to establish its existence in connection with that Section 5 violation). Bearing in mind that the policy objective of the Securities Act is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," *Ralston Purina,* 346 U.S. at 123, and that exemptions should be interpreted "in light of the statutory purpose," *id.,* the Court finds that Chachas' formalistic view of the events in question must be rejected in favor of an integrated analysis.

Applying this analysis, the Court finds that the two allegedly separate transactions *i.e.,* the merger of Curbstone with WTS and the sales of the Spanish Shares should be treated as one, since the documentary and testimonial evidence strongly supports an inference that they were one in the minds of the individuals who structured them. More importantly, however, the Court finds that they should be viewed as one because of their significance when viewed together to the investing public.

As the SEC has explained in the context of analyzing whether an offering of securities is public or private,

> [t]he following factors are relevant to [the] question of integration: whether (1) the different offerings are part of a single plan of financing, (2) the offerings involve issuance of the same class of security, (3) the offerings are made at or about the same time, (4) the same type of consideration is to be received, (5) the offerings are made for the same general purpose.

Securities Act Release No. 33-4552, 1962 WL 3573, at *3. *See also* Loss and Seligman, *supra* note 5 at 278-282. Not all of these factors need be established to justify a finding that transactions claimed to be separate were in fact one integrated transaction. Indeed,

> [n]either the Commission nor the courts have provided express guidance on how to weigh these factors when analyzing an integration problem. A review of the cases and no-action letters strongly suggests that the "single plan of financing" and "same general purpose" factors normally are given greater weight than the other factors.

*Id.* at 280.

Here, the merger between WTS and Curbstone and the sales of the Spanish Shares were so interconnected that one would not have happened without the other. Indeed, the Purchase Agreements entered into between the Spanish entities and the Management Shareholders explicitly provided that the sales would not occur unless and until the merger with WTS was completed. Similarly, Chachas made clear in his correspondence with Levy that the merger with WTS would not go forward until he actually had the cash in his account representing the $100,000 payment for the Spanish Shares and the $450,000 payment for the first round of the options. Although Chachas backed away from this theory of the events during his testimony, the documents that he drafted speak for themselves. In addition, the theory that the transactions were integrated is consistent with the position expressed by Chachas and Brooksbank throughout this proceeding, including their in-court testimony, that the Management Shareholders originally hoped to get $125,000, plus stock, out of any merger that Curbstone entered into with an operating company. The Management Shareholders received the $125,000 they sought in two installments: the $25,000 non-refundable **\*365** cash deposit and the $100,000 payment for the sale of the Spanish Shares. Viewed objectively, and subjectively from the perspective of the Management Shareholders, the merger and the sales of the Spanish Shares therefore were clearly part of a single plan of financing, and shared the same general purpose *i.e.,* to provide the group with its desired investment return.

From the perspective of Levy, Cavanagh, and Milestone, the two events also were part of a single plan of financing and shared a general purpose. These three defendants were interested in bringing about the acquisition of WTS, ever since they had been retained by that company to provide financing. Viewing the facts in the light most favorable to them, Levy, Cavanagh, and Milestone at the very least had an incentive to arrange the Spanish

sales in order to ensure that the Curbstone shareholders went through with the acquisition. Accordingly, Cavanagh and Levy arranged for the Management Shareholders to sell their shares to the Spanish entities. Thus, despite Cavanagh's protestations to the contrary in court, he knew that the merger would not go through unless the sales of the Management Shares were assured and that the two events therefore were part of one larger scheme.

Weighing the evidence according to its probative force, instead of in the light more favorable to Cavanagh, the conclusion is compelling that the sale of the Spanish Shares furthered Cavanagh's consistent effort to gain control of as many shares as possible from the acquisition. Charts Chachas had prepared and sent to Levy during the negotiations of the acquisition reflect vividly how essential it was to Levy and Milestone that the latter obtain a significant number of shares from the acquisition. According to those charts, Milestone intended to use 10% of EOSC's equity (the 2,108,481 shares intended for Optimum and Agira) to raise $1 million, and 2.88% (the 607,081 shares intended for Inversora) to raise $3 million. Thus, although WTS had expected that it would be necessary to use 40% of its equity to raise $4 million, Milestone intended to use just 12.88%. The remainder of the 40% would be split between Milestone and Levy, the former getting 22.16%, the latter 3.56%. Thus, the final chart Chachas prepared, which was sent to Levy on December 5, reflected Milestone getting 2,563,000 or 12.16% of the equity by purchasing the Spanish Shares for $125,000, as well as getting another 2,108,481 shares or 10% of the equity. The final distributions of equity are not very different from these plans. In rounded figures, Curbstone kept 3% of the shares (after the sale of 300,000 shares pursuant to the option agreement); WTS received 57% of the shares; 10% of the equity went to Agira and Optimum for their $1 million investment; 3% of the equity was given to Inversora in return for a promised $3 million investment; 2% of the equity went to Levy; and the balance, roughly 24% of the shares, went to Milestone.

Even more to the point, however, what was essential to Milestone was its control of the "float," that is, the number of shares that could be traded. All of the shares issued by Curbstone for the acquisition were unregistered, were accompanied by a legend on the stock certificate explaining that fact, and therefore were unavailable for resale into the public market. Before Chachas and Levy negotiated the sale of the Spanish Shares to Milestone, those shares were slated for cancellation. At that point in time, therefore, it was expected that the Management Shareholders would have 925,217 shares, 80% of which would be under Milestone's control: 542,000 through the option agreement and 200,000 through a lock-up agreement running until March 15, 1997. Once Milestone negotiated the additional purchase of the Spanish Shares, it increased its control of the float to 95%.[53]

The Court therefore finds that the two events were integrated in the minds of their architects, that they were part of a single plan, and that the events occurred at or about the same time and were made for the same general purpose. Equally as important **\*366** for determining whether a violation of Section 5 has occurred, however, are the implications of these events for investors who ultimately bought or sold the shares that were made available to the public as a result of these transactions. Thus, it is also relevant to ask whether investors received all the information to which they were entitled under the Securities Act before the shares released through this transaction were bought and sold in the public market. *See Ralston Purina,* 346 U.S. at 125 ("the applicability of Section 4(1) should turn on whether the particular class of persons affected need the protection of the Act"); *Universal Major Indus.,* 546 F.2d at 1047 (the inquiry under Section 5 depends "not so much upon the nature of the offering as upon the need for protection of the class of offerees; *i.e.,* whether they have the information which a registration would disclose, or have access to it").

The Court finds that investors did *not* have all the information to which they were entitled concerning the acquisition, and that material information that was uniquely in the possession of the Management Shareholders including, most importantly, information relating to the sales of the Spanish Shares, the option agreement, and the Regulation S transactions was not disclosed. This is precisely the kind of information that control persons are presumed to have, and which the Management Shareholders did not cease to have upon the issuance of 15.5 million new shares to WTS. It would be an odd construction of Section 5 indeed if affiliates of a company, who are limited in their ability to sell their stock to the public precisely because of their presumed superior access to information about the company, suddenly faced no limitations five minutes (or however long it took Day to issue the 15.5 million shares to WTS) after they ceased to be affiliates. To accept Chachas' argument that the literal transfer of majority ownership constitutes the moment at which a former affiliate may sell freely into the market is to ignore the guiding purpose of the Securities Act the protection of "those who do not know market conditions from the overreachings of those who do," *Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943) and the rationale for restrictions on affiliate shares in the first place. *Cf. North American Research and Dev. Corp.,* 424 F.2d at 71 (discouraging a trial court from attributing "undue significance to the date ... when control passed"). *Compare* Rule 144(k) (establishing that certain restrictions under Rule 144 do not apply to the sale of restricted securities when the sale is for the account of a person who has not been an affiliate for *three months*). 17 C.F.R. § 144(k) (emphasis added). *See also* A.A. Sommer, Jr., "Who's `In Control' S.E.C.," 21 *Bus. Law.* 559, 579 (1966) (suggesting a rule that restrictions concerning control persons should no longer be applicable where "a bona fide severance of

participation in or influence over or control of the issuer occurs with no reasonable expectation of its rehabilitation"). To put it another way, if the December 23 8-K prepared by Chachas and filed on behalf of Curbstone and EOSC to report the acquisition had been filed at the time of the acquisition and fully and accurately disclosed all material information relating to the terms of the acquisition, then the Curbstone shareholders would have held no unfair advantage over the American investor, and their loss of control would have immediately allowed them to sell their stock holdings without further registration.

The question of whether a person is in a position of "control" is a question of fact and depends on the totality of the circumstances, including an appraisal of the influence the individual has on the management and policies of a company. *See United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir. 1976). A person can be in a position of control over a corporation even without owning a majority of the voting stock. *Id.* Here, the Court finds that the SEC has amply met its burden of establishing that, for purposes of determining whether a Section 5 violation occurred, the Management Shareholders, acting through Chachas, were in a position of control over the company at the time that their shares were sold to the Spanish entities, even if the certificates comprising the majority ownership of the merged entity were transferred simultaneously or a few moments before the certificates effecting the **\*367** sale of Spanish Shares were transferred. [54] Throughout the days at issue here, the Management Shareholders controlled the decision of whether to acquire WTS and whether to file a registration statement to cover their sale of the Management Shares. They chose to proceed with the former and to omit the latter. [55] Accordingly, the Court finds that the sale of the Spanish Shares was not exempt from registration under Section 4(1), because, for all practical purposes, it was a sale by affiliates.

### 2. The "Offer" of the Management Shares

The Court turns next to the SEC's alternative argument that an offer to sell unregistered securities constitutes a violation of Section 5. The pertinent section provides:

> it shall be unlawful for any person, directly or indirectly ... *to offer to sell* or *offer to buy* ... any security, unless a registration statement has been filed as to such security ....

15 U.S.C. § 77e(c) (emphasis added). The SEC contends that, at a minimum, Chachas offered to sell the Management Shares to the Spanish entities in the two weeks prior to the completion of the merger, while he and the Management Shareholders unequivocally were still affiliates.

Chachas responds that, as an affiliate, he was only engaged in "preliminary negotiations" to sell the shares, apparently in reliance upon the definition of "offer to sell," in which Congress specifically excluded, for purposes of 15 U.S.C. § 77e(c),

> *preliminary negotiations* or agreements between an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer) and any underwriter ....

15 U.S.C. § 77b(a) (3) (emphasis supplied). Accordingly, Chachas characterizes the discussions with Levy and the signing of the Purchase Agreements as "preliminary negotiations" for the sale of the securities. Alternatively, Chachas contends that there was no offer made for the sale of the Management Shares prior to the merger, because the sale of the shares was always conditioned upon the completion of the merger and, in addition, could be rescinded if the Management Shareholders decided for any reason that they did not want to go through with the deal.

The Court finds both of Chachas' arguments meritless. First, the "preliminary negotiations" exemption contained in Section 77b(a) (3) does not insulate all preliminary negotiations prior to a public sale by an issuer or affiliate. Instead, it insulates only those negotiations whereby an issuer or affiliate establishes an arrangement with underwriters, prior to the filing or approval of a registration statement, for the distribution of securities to the public. *See* Loss and Seligman, *supra* note 5 at 80-81. Where no registration statement is contemplated, as was the case here, the exemption for preliminary negotiations is inapplicable.

Second, the Court finds unpersuasive Chachas's reasoning as to why an offer was not made in this case. Citing numerous provisions of *Corbin on Contracts* and the *Restatement of Contracts,* Chachas claims that no offer existed on these facts because the **\*368** Spanish entities were incapable of creating a binding contract through their simple "acceptance" of the terms that had been conveyed to them by Chachas. In essence, Chachas argues that there was no offer because (1) any "contract" that would have been created was subject to the condition precedent that the acquisition occur; and (2) the "contract" would have been

illusory because it gave the Management Shareholders the unilateral right to cancel the transaction without penalty.

Even if the Spanish entities had no legal recourse in the face of cancellation of the transaction, the existence of an "offer" is not undermined whether analyzed under the common law or under the Securities Act. The enforceability of a contract is simply not the touchstone for the existence of an offer.

The Securities Act defines "offers" broadly to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a) (3). This definition has been interpreted as going well beyond the common law concept of an offer. *See Diskin v. Lomasney & Co.,* 452 F.2d 871, 875 (2d Cir. 1971). If Section 5 were concerned only with the creation of legally enforceable contracts for the sale of unregistered securities, Section 77e(c)'s prohibition on offers to sell or offers to buy would not have been included in the statute. Thus, even if the "offer" in this case, once accepted, did not give rise to an enforceable contract, that fact is immaterial for purposes of determining whether the harm with which Section 5 is concerned occurred.

Although the Second Circuit in *Diskin* did not decide "whether or not a dealer can lawfully make a conditional and revocable offer to sell ... if it is made clear that the offer cannot be accepted until the effective date," 452 F.2d at 875, the Court finds that, on the facts of this case, the conditional nature of the Management Shareholders' offer does not preclude a finding that an offer within the meaning of the Act was made. Unlike in *Diskin,* which was concerned with a dealer rather than an issuer, no registration statement was ever contemplated for the sale of these shares. In addition, not only had an offer been made, but money had been received in "acceptance" of the offer. Finally, it was entirely within the power of the offerors in this case to ensure that the conditions that they had attached to their offer were met. By December 8, the merger agreement between WTS and Curbstone had been signed by Chachas, and according to the testimony of Chachas and Brooksbank, only ministerial acts remained to be done after December 12 to ensure the transaction's completion. Thus, the condition precedent contained in the Purchase Agreements, that the merger be completed before the shares would be transferred, hardly injected into the transaction the element of uncertainty that Chachas would have the Court believe. Taking into account the realities of the situation, the Court finds that an offer to sell affiliate shares in fact was made in violation of Section 5, culminating in a sale, as outlined above, of affiliate securities.

**3. The Claimed 4(1) ½ Exemption**

Chachas claims that, even if the Court should find that he made an offer of securities or sold securities while he was an affiliate, an injunction would not be warranted since he did not act with scienter. According to Chachas, he was entitled to and did rely on an exemption known as 4(1) ½, which is not contained in the Securities Act but nevertheless has been recognized implicitly by the SEC and explicitly by commentators. *See, e.g.,* Loss and Seligman, *supra* note 5 at 338; Hicks, *Exempted Transactions Under The Securities Act of 1933* § 9.05 (1992); The Section "4(1) ½" Phenomenon: Private Resales of "Restricted" Securities, 34 *Bus. Law.* 1961 (1979).

The 4(1) ½ exemption, which allows affiliates to sell substantial amounts of their shares to private investors, has been so named because it falls between the cracks of the 4(1) and 4(2) exemptions, which allow, respectively, for private sales among persons who are not issuers, underwriters, or dealers, and for private sales by an issuer. As is the case for an issuer claiming an exemption for a private sale under 4(2), an affiliate claiming a 4(1) ½ exemption has the burden of establishing **\*369** that such sales do not constitute a disguised public distribution.

Here, Chachas claims that, although he did not rely on 4(1) ½ for the ultimate sale of the Management Shares, he believed that his negotiations with the Spanish entities, through Levy and Cavanagh, were exempted from Section 5 because of this provision.[56] During his testimony, Chachas referred to the "reps and warranties" contained in the Purchase Agreements. The portion of the agreements to which Chachas referred provided that

> [t]he Purchaser is investing solely for its own account and has no present agreements to transfer rights to this Subscription Agreement or to the Shares to any other person.

Acknowledging that he did no research on the Spanish entities who signed these agreements, Chachas contends that the aforementioned "reps and warranties" provided sufficient assurance that the shares would not be sold into the public market. According to Chachas, his insertion of these "reps and warranties" into the Purchase Agreements satisfied any due diligence required of him under law.

The Court finds this not to be the case. Although the SEC has never articulated exactly what steps an issuer or affiliate must take to fall within the private placement exemption, the elicitation of bare representations that the buyer does not have any present agreement to

resell is plainly insufficient. As the Commission advised in The Crowell-Collier Publishing Co.,

> An issuer may not establish a claim to an exemption under Section 4(1) [now 4(2)] merely by collecting so-called "investment representations" from a limited group of purchasers if in fact a distribution by such persons occurs. Counsel and their issuer and underwriter clients *cannot base a claim to exemption* from registration under the Securities Act *upon the mere acceptance at face value of representations by purchasers that they take for investment* and disclaim responsibility for investigation and consideration of all relevant facts and circumstances pertinent to a determination that the transactions do not involve a public offering.

Securities Act Release No. 3825, 1957 WL, at *5 (emphasis added).

That a buyer who purported to buy for investment purposes sells to the public within a short period of time is not conclusive of the buyer's intent at the time of purchase from the issuer or affiliate. *See* Loss and Seligman, *supra* note 5 at 329. Nevertheless, such a rapid resale raises a strong inference that the buyer intended to resell, and puts the burden on the affiliate or issuer to demonstrate that it took adequate precautions to ensure that such a resale would not occur. Accordingly, the SEC has noted approvingly of precautions such as placing a legend on the securities alerting the buyer to the restricted character of the securities. *See* 17 C.F.R. § 230.502(d), Regulation D Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933 ("Regulation D") (approving the use of a legend as an indication that the seller has taken reasonable care to ensure that shares sold pursuant to a private placement are not resold into the public). As the Second Circuit observed in affirming a preliminary injunction in 1975 against Levy,

> [g]ranting that it was not an unconditional requirement of a valid private placement at that time, it is clear, and an expert such as Levy must have known, that such *a legend is the single most effective device for preventing resale of restricted shares.*

*SEC v. Management Dynamics,* 515 F.2d at 810 (emphasis supplied).

Another effective device is the issuance of a "stop-transfer order" to the transfer agent for the securities, which would prevent the buyer from reselling without obtaining an opinion by counsel for the issuer as to the legality of the resale. [57]*See* Use of Legends **\*370** and Stop-Transfer Instructions as Evidence of Non-Public Offering, Securities Act Release No. 5121, 1970 WL 10604 (S.E.C. Dec. 30, 1970). In addition, the prudent issuer or affiliate may wish to make inquiries into the financial condition of the buyer to determine, for example,

> whether the amount of securities purchased is unduly large in relation to his or her financial means, or whether he or she borrowed to finance the purchase so that he or she might intend or be forced to resell in the near future in order to repay his loan. Prudence would seem also to dictate some inquiry, before making a sale, into the prospective buyer's record with respect to holding securities for long-term investment in the past.

Loss & Seligman, *supra* note 5 at 334. At the very least, an affiliate who sells under the private placement exemption should know the identity of the buyers who purport to take for investment purposes. *See* The Cro-well-Collier Publishing Co., 1957 WL 7724, at * 5.

Chachas, Levy, and Cavanagh admit that they took none of these precautions.[58] Although it is clear from the investment letter obtained from WTS as part of the Exchange Agreement that at least Chachas and Levy knew how to extract a detailed representation that restricted shares would not be resold, *see* note 57, *supra,* no similar commitment was sought regarding the Spanish Shares. Chachas admitted that he did not know the identity of the buyers until the Purchase Agreements were signed, but conveyed blank Purchase Agreements to Levy and Cavanagh for signature by whomever the purchasers turned out to be. Cavanagh testified that he did no independent research on the Spanish entities, but relied on the representation made by Vicente Tur Ortola, the Spanish lawyer, that these clients were interested in a long-term investment. Thus, none of the defendants who were involved in **\*371** the sale of the Spanish Shares had any knowledge of the financial condition of the purchasers, their corporate structure, the identity of their principals, or their history of investment. Accordingly, Chachas' argument that the offer was covered by the 4(1) ½ exemption because the Spanish entities did not intend to resell must fail.[59]

This argument also appears quite disingenuous in light of the testimony by all of the defendants associated with the transaction, and the early documents drafted by Chachas, that Chachas was informed that the purchaser of the shares whom he initially was told would be Milestone was interested in "free-trading" shares. The argument likewise is

implausible in light of the record demonstrating the efforts made by Chachas to ensure, at least formally, that the Management Shareholders were no longer affiliates at the time of sale. Although Chachas' counsel correctly notes that there is no authority preventing an individual from claiming two different exemptions for a transaction, the Court finds that Chachas' alternative arguments in reality are not different legal arguments so much as they are different factual arguments. Either the evidence demonstrates that Chachas thought that the Spanish Shares were purchased solely for investment purposes—such that he could have offered and sold them even as affiliate shares—or it does not. Chachas has not argued that his understanding of the intent of the purchasers evolved over time. To the contrary, his testimony was clear that he did not know whose name would be on the Purchase Agreements until he received them back after their execution.

More importantly, however, all of the evidence including the testimony by Levy, Cavanagh, and Brooksbank, as well as Chachas' own actions supports a finding that Chachas knew the entire time that the shares had to appear to be freely tradeable at the time of sale, because that was what the purchasers wanted. In short, Chachas knew, or had reason to know, that the purchasers intended to resell to the public. Although Chachas claimed at the hearing that he believed that both exemptions applied, and that he acted out of an excess of caution, the evidence strongly supports that Chachas actually believed that neither exemption applied, but worked to make it appear that the transaction qualified for the 4(1) exemption. He always considered the 4(1) ½ exemption a weak second string in his bow and thus raised it at the hearing belatedly and half-heartedly. Indeed, his testimony made clear that he did not have a solid understanding of the 4(1) ½ exemption and its requirements. The evidence suggests that, instead of structuring the "offer" part of the transaction from the outset so as to fall within the 4(1) ½ exemption, Chachas first considered the possible application of the exemption when Day, the transfer agent, raised questions about the sales of the affiliate shares, and then again when the SEC explained its theory that the offer of the shares violated Section 5.[60]

In sum, the Court finds that the evidence concerning the 4(1) ½ exemption does not indicate that Chachas acted in good faith, even when viewed in the light most favorable to him. There simply is no evidence to support a finding that he either actually or reasonably believed that the Spanish Shares had been purchased with a view to long-term investment rather than with an intent to resell. Having rejected this argument as to why he should not be enjoined against future violations of Section 5, the Court concludes that the SEC has a strong likelihood of proving successfully at trial that Chachas, on **372** behalf of the Management Shareholders, made an offer and a sale of affiliate shares in contravention of

Section 5's requirements, and that he did so in knowing and intentional violation of the requirements of the law.

### 4. The Sale of the Option Shares

In light of the foregoing discussion, the analysis of the oral option agreement can be relatively brief. The terms of the agreement were effectively presented in writing by Chachas to Levy on December 3. The only material modification to those terms was the decision to advance the purchase of the first block of 150,000 shares covered by the options agreement to December 12, when Levy and Cavanagh sent Chachas $450,000. The record does not appear to reflect the date on which the certificates for those shares were transferred, but by later December the shares were apparently deposited in the Cambiarios account and were among the shares Cavanagh sold between late December and the end of January. Thus, Chachas, on behalf of the Management Shareholders, offered to sell and did sell Management Shares through an option agreement while an affiliate. These sales also violate Section 5, for all of the reasons set forth above with respect to the sale of the Spanish Shares.

### 5. The Liability of the Individual Defendants Under Section 5

Under Section 5 of the Securities Act, "any person" is prohibited from selling unregistered securities that are not exempt from registration. 15 U.S.C. §§ 77e(a), (c). This liability extends beyond those who sell stock to all necessary participants in a sale of unregistered stock. *See Softpoint, Inc.,* 958 F. Supp. at 859-60 (finding liability where involvement was clearly necessary and substantial and not simply "de minimus"). *See also Universal Major Indus.,* 546 F.2d at 1046 (finding liability for individual who was indispensable to another's sale of stock). The SEC has demonstrated a substantial likelihood that it will succeed at trial in proving that Cavanagh, Milestone, Cambiarios, Construcciones, Customer Safety, Optimum, Agira, Chachas, Brooksbank, and Hantges violated Section 5 by selling unregistered stock and that Levy was a necessary and substantial participant in those sales.

### 6. The Appropriate Relief for the Section 5 Violations

**a) Freeze order as to the defendants' assets**

Because the Court finds a strong likelihood that the SEC will succeed on the merits in establishing a Section 5 violation, the Court finds that a continued asset freeze is appropriate,[61] in addition to a continuing order providing for an accounting and repatriation of assets. These orders are appropriate to preserve the status quo pending a determination on the merits, and should apply to all proceeds from the defendants' sales of EOSC shares as well as to any shares of EOSC that remain in their custody or control. This includes defendants Chachas, Brooksbank, Hantges, Levy, Cavanagh, Milestone, Customer Safety, Construcciones, and Cambiarios. The Court concludes, for reasons that will be explained below, that all of the Management Shares transferred to Customer Safety, Cambiarios, Construcciones, and Inversora were effectively under the control of Cavanagh and Milestone. Therefore, the amount of the freeze order as it applies to Cavanagh and Milestone shall include the proceeds from the sales of any of those shares, including sales by those who received Customer Safety shares unless those shares or proceeds have already effectively been frozen. As for Optimum and Agira, the Regulation S shares that they received are not subject to the freeze, because there is no evidence that those restricted shares, which appear to have been lawfully acquired, were resold. Any other EOSC shares in their possession, or the proceeds from the sale of any EOSC shares, are nevertheless frozen.[62]

**\*373** In reaching the conclusion that a continued asset freeze is appropriate for the defendants' proceeds and remaining shares in EOSC, the Court relies on the considerations articulated in *Manor Nursing Ctrs.,* 458 F.2d at 1104-6, and *Unifund SAL,* 910 F.2d at 1041-43. In *Manor Nursing Centers,* the Second Circuit analyzed the freeze order imposed by the district court for its consistency with "the goal of compensating investors." *Id.* at 1106. *Unifund SAL* applied the same standard to hold that a freeze order was appropriate "in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty, equal to three times the profits." *Unifund SAL,* 910 F.2d at 1041. Here, the SEC has represented that it will seek a penalty of twice the amount of profits received by each defendant. The Court finds that, with the exception of Cavanagh and Milestone, a freeze on the defendants' proceeds from the sales of EOSC stock, as well as the EOSC stock, will give "the Commission substantial security without unduly burdening the [defendants]." *Id.* at 1042. Although the Commission is statutorily authorized to seek penalties at trial, the Court finds that freezing the amounts sought in penalties would place certain of these defendants at risk of bankruptcy and could therefore jeopardize the long-term interests of those investors who were defrauded. *See Manor Nursing Ctrs.,* 458 F.2d at 1106.

**b) Preliminary Injunction as to Future Violations of Section 5**

Having found a strong likelihood that the SEC will be able to prove a Section 5 violation at trial, the Court turns to the second prong of the *Unifund SAL* test for imposing a preliminary injunction, *i.e.,* whether there is a likelihood of repetition of the forbidden conduct. In deciding this question, it is appropriate to weigh the degree of a defendant's scienter, the sincerity of any assurances that the violation will not be repeated, whether the violation was an isolated one, any acknowledgement by a defendant of the wrongful nature of his conduct, and the defendant's opportunity because of his profession to repeat the violation. *Universal Major Indus.,* 546 F.2d at 1048. Applying these factors, the Court finds that a preliminary injunction against future violations of Section 5 is warranted only as to defendants Levy, Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas.

Although the Court finds that there is a strong likelihood that the SEC will be able to prove at trial that the profits earned by the other defendants associated with this scheme should be disgorged, the Court finds that these defendants are not likely to engage in future violations of Section 5. Brooksbank was only peripherally involved with the transaction, is not involved in the securities industry on a daily basis, and appears to have no history of misconduct. Hantges was even more peripherally involved, and also appears to have no history of misconduct.

Levy and Cavanagh, by contrast, have a history of problems in the securities industry. As noted above, a permanent injunction was entered against Levy in 1975 for his participation in a securities fraud bearing remarkable similarities to this case. That injunction prohibited future violations of both the registration and antifraud provisions of the securities laws. As the Second Circuit held in that very case, "the commission of past illegal conduct is highly suggestive of the likelihood of future violations." *Management Dynamics,* 515 F.2d at 807. Levy also played a major role in structuring this transaction and knew that the transaction would result in the sale of affiliate shares. Although scienter is not necessary to find a violation of Section 5, it is persuasive in determining whether a particular defendant is likely to commit future violations, especially when scienter is combined with the defendant's refusal to provide assurances that future violations will not occur. *See SEC v. Posner,* 16 F.3d 520, 522 (2d Cir.1994). Thus, taking into account Levy's history of misconduct, his indispensable role in the scheme here, his degree of scienter, and his demeanor at the hearing which conveyed a lack of concern with the seriousness of the

charges and a sense of irritation at being asked questions the Court finds that a preliminary injunction is appropriate as to this defendant.

**\*374** Cavanagh has not previously been enjoined by a court, but was fined by the NASD when he was a broker in 1993. According to a contemporaneous news report, Cavanagh was fined $20,000 and barred from association with any NASD member in any capacity. These sanctions were based on findings that Cavanagh failed to provide testimony or to respond to NASD requests for information concerning transactions and activities in which he was involved while employed as a broker at F.N. Wolfe, a NASD firm. Although the Court is unaware of the details of that disciplinary action, the fact that the sanction was entered does not weigh in Cavanagh's favor.

The Court finds that Cavanagh was the impetus behind the overall scheme of which the Section 5 violation was a critical part. *See SEC v. Lorin,* 76 F.3d 458, 461 (2d Cir.1996) ("when the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct") (internal quotations omitted). Cavanagh had ample opportunity to learn that the transaction would result in the sale of affiliate shares, based on his longstanding relationship and frequent communication with Levy. Although Cavanagh has testified that he relied on Levy's advice as his attorney that the shares were freely tradeable, the Court finds that Cavanagh cannot establish a good faith advice-of-counsel defense on the basis of this record. [63] Cavanagh could not reasonably have expected Levy to render an independent opinion as to the legality of the transaction given his personal involvement in structuring it and his financial stake in its completion. *Cf. Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 182 (2d Cir.1976). More importantly, however, the Court finds that it was Cavanagh who made it a *sine qua non* of the acquisition that he receive unlegended shares. The SEC has proven by substantial evidence that Cavanagh was unconcerned with the legality of the transaction, but extremely concerned that he obtain shares that he could readily resell.

At the hearing, Cavanagh, like Levy, did not appear particularly troubled by the gravity of the allegations against him. Thus, taking into account Cavanagh's history, his role in this transaction, and his apparent lack of concern about this action, the Court finds that a preliminary injunction against future violations of Section 5 is appropriate against this defendant. If nothing else, the injunction may inspire a level of caution in Cavanagh that appears to have been missing from his prior business practice. Because Cavanagh is a 50% owner of Milestone, and undertook all of the actions at issue in this case on behalf of Milestone, the preliminary injunction is also properly entered against that corporate defendant. Because, as will be explained below, there is sufficient evidence to find that the

three Spanish entities functioned as alter egos of Cavanagh, it is also appropriate to enjoin them. On the other hand, because the SEC has shown neither that Optimum and Agira were alter egos of Cavanagh, or other sufficient evidence to support an injunction, injunctive relief shall not issue as to these two entities.

Finally, the Court finds that a preliminary injunction against future violations of Section 5 is properly entered against Chachas. Chachas was co-architect with Levy of the Purchase Agreements for the Spanish Shares and the option agreement. As a securities lawyer close to the transaction, he was in the best position among all of the defendants, with the exception of Levy, to know that the transactions did not comply with the requirements of the Securities Act. By virtue of his profession as a securities lawyer, Chachas also is in a position to commit future violations of Section 5 if an injunction is not entered.

**\*375** To avoid the imposition of a preliminary injunction, Chachas claims that the issues of law raised by this transaction are so complex that he could not have been expected to know that his actions were unlawful. The Court finds this argument specious, inasmuch as the complexity arose solely because Chachas did not wish to follow the obligations clearly imposed by Section 5.

The documents drafted by Chachas in the course of the negotiations over the Exchange Agreement suggest that he is not the "Dudley Do-Right" that his attorneys have attempted to characterize him as. Instead, the documents reveal that Chachas had discerned by early December that Cavanagh and Levy had devised a plan to reap enormous profits from the merger with WTS. Rather than withdrawing from the transaction, Chachas set about ensuring that his group would get a generous portion of the profits.

As will be explained further below, the Court does not find that Chachas has made a career out of infractions of the securities laws. He appeared quite chastened at the preliminary injunction hearing, and his demeanor clearly indicated that he understood the seriousness of the charges and their implications for his career. Nevertheless, the Court finds that a preliminary injunction against future violations of Section 5 is warranted against Chachas based on his prominent role in the transaction, his degree of scienter, his opportunity to commit future violations, and his continued protestations of innocence. *See Lorin,* 76 F.3d at 461.

**D. *Claims Under Sections 17(a) and 10(b)***

The SEC alleges that the defendants violated two different statutory prohibitions against fraudulent activity. First, the SEC contends that the defendants violated Section 17(a) of the Securities Act, which is a general prohibition against fraud in the offer or sale of securities. [64] The three categories of activities prohibited by Section 17(a) do not have uniform culpability requirements. While scienter is a requirement to establish a violation of Section 17(a)(1), it is not a necessary element of the latter two categories. *See Aaron v. SEC,* 446 U.S. 680, 697, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980); *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996), *cert. denied,* ____ U.S. ____, 118 S. Ct. 57, 139 L. Ed. 2d 21 (1997). [65]

Second, the SEC alleges that the defendants violated Section 10(b) of the Exchange Act, which prohibits the use of manipulative or deceptive devices in connection with the purchase or sale of securities. [66] Section 10(b) is enforced through SEC Rule 10b-5 ("Rule 10b-5"), which prohibits the use of any device, scheme, or artifice to defraud; any untrue statement or omission of material fact; and any acts, practice, or course of business that operates as a fraud or deceit **\*376** upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. [67] Scienter is a necessary element of a Section 10(b) or Rule 10b-5 violation. *Aaron v. SEC,* 446 U.S. at 691.

The SEC has advanced three separate claims of fraudulent activity: first, that the defendants engaged in a manipulation of the market for shares of EOSC; second, that the 8-K form prepared by Chachas and filed by EOSC on December 23, 1997, contained material omissions; and third, that the defendants are responsible for the January 30, 1998 press release by EOSC that contained a false or misleading statement. Each of these allegations, if true, comes within the expansive prohibitions of Sections 17(a) and 10(b). *See Superintendent of Ins. of N.Y. v. Bankers Life and Cas. Co.,* 404 U.S. 6, 12, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971) ("Section 10(b) must be read flexibly, not technically and restrictively"); *First Jersey Secs., Inc.,* 101 F.3d at 1467 (noting substantial similarity of elements of 10(b) and 17(a) violations).

The defendants dispute that any of the alleged violations occurred. In the alternative, each defendant argues that if a violation occurred, he did not have the knowledge or intent necessary to establish scienter. The Court will address each alleged violation in turn.

**1. "The Market Manipulation"**

The basic aim of the antifraud provisions of the securities laws is

to prevent rigging of the market and to permit operations of the natural law of supply and demand. The theory of a natural, unrigged market is that the competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price.

*First Jersey Secs.,* 101 F.3d at 1466 (internal quotations omitted). Where individuals prevent the law of supply and demand from setting the price for a stock, such activity is sometimes termed a "market manipulation." As the Supreme Court has explained,

"Manipulation" is virtually a term of art when used in connection with the securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

*Sante Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977) (internal quotations omitted). "One of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator." *United States v. Mulheren,* 938 F.2d 364, 370 (2d Cir.1991).

Loss and Seligman set forth the following "simplified composite picture" of a market manipulation:

The group first secures an option to purchase at a price higher than the then market quotation a large block of a stock which possesses actual or potential market appeal and an easily controllable floating supply. It is the task of the pool manager and operator to raise the market price above the option price, and, if the supply on the market remains constant, this can be accomplished only by increasing the demand. The most effective manner of inducing others to purchase is to have a favorable ticker tape record which indicates to prospective purchasers that others consider the security to be underpriced. The manager opens a number of accounts with various brokers and, fortified by a knowledge of the condition of the market obtained from the book of a specialist, enters

> both buying and selling orders with a preponderance of the former so that the
> **377** price is made to rise slowly upon an increasing volume of transactions.

Loss and Seligman, *supra* note 5 at 929-30 (quoting Comment, Market Manipulation and the Securities Exchange Act, 46 Yale L.J. 624, 626-628 (1937)). Here, the Court finds that the defendants have engaged in a fairly classic market manipulation, variations on which are not unknown to the courts of this Circuit. *See, e.g., North American Research and Dev.,* 424 F.2d at 66-67; *Harwyn Indus.,* 326 F. Supp. at 945-46.

The first step in the defendants' market manipulation scheme was to locate a publicly-owned corporation that was an empty shell and to get control of the shell by acquiring substantially all of the shares of the shell's stockholders, tying up other shares in an option agreement and/or a lockup agreement, and cancelling remaining shares. It was essential to the scheme that the shares that were acquired from the shell be unlegended and therefore appear to be freely tradeable. The next step was the acquisition by the shell of an operating company with an asset that could be publicized to create and support market interest in the stock. The owners of the operating company were given restricted stock that could not be sold except through a registration process. As a consequence, the defendants now controlled the float and they funnelled those shares into the custody of a cooperating brokerage house. At that point, through coordinated trading activity on December 19, the defendants set a floor against which the price of the stock of the merged entity would be measured once the acquisition was publicly announced. Over the following weeks, as they systematically sold their shares into the market created by their activity, the defendants and their associates orchestrated public announcements about the company that contained materially false information. Through their control of the public filings by the company, the defendants kept material information about the terms of the acquisition, the price at which they had purchased the shell's shares, and their control of the float from the public.

The defendants contend that there was no market manipulation of the EOSC stock, that they strongly believed in the value of the company, and that a price per share of over $5 was entirely justified. The short answer to this is that the defendants were *sellers* when the stock price was over $5, a price that Cavanagh and Chachas helped to set. A more comprehensive discussion of this issue, however, is warranted.

The evidence clearly establishes that WTS was a legitimate enterprise with a talented management team and an exciting idea for a product. While the company had made great strides in developing the product, as of January 1998, the product was nonetheless still in the development phase and the company would not know for another half yearat a minimum whether it had produced a product for which customers would actually place

orders. If the company did succeed in getting orders, it would need an immediate and substantial cash infusion to begin manufacturing. If the product worked, the company could be fabulously successful. As of January 1998, however, it was difficult to assess the company's chances for success. If anything, the demonstrations of the technology at the hearing indicate that more work needs to be done to design a dependable product that works efficiently. In any event, WTS's Weaver projected that a market capitalization of approximately $10 to $15 million, or between 50 cents to 75 cents per share (with 21 million shares issued), would be a conservative but reasonable valuation of the company at the point that the entire $4 million the money that WTS had hired Milestone to find was invested in the company. Cavanagh did not want to risk waiting, however, for WTS to finish developing, manufacturing, and marketing its product to reap his reward. Nor was he content with the 10% investment banking fee that WTS believed was customary and reasonable. Instead, Cavanagh and Levy located a shell and negotiated purchases of stock that put them in control of the shell. Chachas joined the scheme by arranging sales of unlegended shares, creating an Exchange Agreement that inaccurately described the transaction, filing a materially false and misleading December 23 8-K, and helping through his own trading activity to set the market price at above $5 on December 19. As noted, control **378** of the float was an important element of the scheme, *see Mulheren,* 938 F.2d at 371, and Chachas agreed to give Cavanagh and Milestone such control in return for being richly compensated beyond any prior expectation that he and the Curbstone Management had held for their investment.

Cavanagh denies that he controlled the float in the EOSC stock. Although he contends that the three Spanish entities that purchased the Curbstone Management shares are not under his control, I find that there is a substantial likelihood that the SEC will be able to prove at trial that all of the shares that were sold to these three entities were under the control of, and indeed owned by, Cavanagh and Milestone. Among the evidence that supports this conclusion is the following. Chachas described these shares as belonging to Milestone on the worksheets he sent to Levy during their negotiations. The Spanish entities were designated as the purchasers at the last moment and without any substantive negotiations being conducted with them by Cavanagh, Levy, or Chachas. All three entities opened up trading accounts at the brokerage house suggested by Cavanagh even before the shares were transferred. Customer Safety "immediately agreed" to resell its shares to Cavanagh. Cavanagh continued to hide his control of the Customer Safety shares by having it appear in the brokerage records as if Customer Safety were directing transfers of those shares to Cavanagh's family, friends, and associates. Cavanagh did not even retain a copy of the Promissory Note that he identifies as requiring him to pay for the Customer Safety shares. Indeed, Cavanagh's disposition of the Customer Safety shares is by itself compelling

evidence that he owned all of the shares in the trading accounts of all three entities. Because he owned all of the shares, and was reaping profits of over $4 million from the sales of the Cambiarios shares, he generously gave away the Customer Safety shares, many to repay what he describes as "moral obligations."

The defendants further assert that the $5 stock price, which remained relatively stable over the two and a half months before the SEC acted, is evidence of the market's unmanipulated judgment of the value of EOSC. In this regard they point out that the SEC provided no expert testimony at the hearing regarding the trading activity in EOSC's stock to support its claim of market manipulation. At trial the SEC may more effectively address this pattern of trading, but even without such expert testimony at the hearing it clearly established the following regarding the stock price: (i) WTS's management considered a $5 price per share "astronomical" at this stage of the company's history; (ii) Cavanagh and Chachas manipulated the market on December 19 to set $5 as a base price per share; (iii) the January 12 Future Superstock article was the result of an effort by a Cavanagh associate to create press coverage for the stock, and relied in part on the trading history of the stock in making its extraordinary and irresponsible projection of the company's worth; and (iv) the materially false January 30 press release was orchestrated by Levy and another Cavanagh associate. Thus, although it is unclear at what price the stock would have traded if the natural law of supply and demand had been allowed to set the price, *see First Jersey Secs.,* 101 F.3d at 1466, the SEC has satisfied its burden at this stage of the litigation of showing a substantial likelihood that it would have been far below $5.[68]

### 2. The December 23 8-K Statement

The 8-K statement filed with the SEC on December 23, 1997, disclosed the merger between WTS and Curbstone. This ***379** document, which was prepared by Chachas with the assistance of documents provided to him by Levy, disclosed to the public the most extensive information to that date about WTS and the terms of the Curbstone/WTS merger.

The SEC claims that the 8-K was misleading because it portrayed the merger as a "stock-for-stock" deal and failed to disclose the additional terms of the transaction. According to the SEC, without the disclosure of those additional terms, the material contained in the 8-K was false and misleading. *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 268 (2d Cir.1993). Chachas has responded by arguing that the SEC's 8-K form, which he followed in preparing EOSC's filing, does not require disclosure of private sales of stock. Because the

December 23 filing provided all of the information explicitly required to be disclosed in an 8-K, Chachas claims that it was not misleading. Most importantly, Chachas argues that, if there were material omissions from the 8-K, they were EOSC's responsibility, and not his, to correct.

The Court has reviewed with a fine-toothed comb the 8-K form prepared by Chachas. It has also reviewed the standard 8-K form provided by the SEC to registrants for their use in preparing 8-K filings. Consistent with its finding above that the merger with WTS and the sales of the Management Shares were one integrated transaction, the Court finds that there is a strong likelihood that the SEC will be able to establish at trial that the omission of information from the 8-K regarding these sales, as well as the Regulation S transactions, was material and misleading. [69]

"A duty to disclose arises whenever secret information renders prior public statements materially misleading ...." *Time Warner,* 9 F.3d at 268. The test for materiality in evaluating the omitted information is whether an investor would find the information important. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976). More specifically,

> [a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote [or in this case, whether to purchase a security] .... What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.; accord Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); *First Jersey Secs.,* 101 F.3d at 1466; *Time Warner,* 9 F.3d at 267-68.

The most glaring omission from the 8-K was the failure to mention the option and sales agreements that had already been concluded at the time of the 8-K's filing, between the Management Shareholders, the Spanish entities, and Milestone. In Item 2, the 8-K described the acquisition simply as an exchange of "all of the issued and outstanding stock of WTS ... for 15,488,120 shares of [Curbstone's] common stock." Although the 8-K

disclosed that 3,521,876 shares of Curbstone were issued and outstanding at the time of the merger and prior public filings, namely the November 6, 1996 S-8, disclosed that 97% of these shares were in the hands of the Management Shareholders the 8-K did not inform the public that 2,563,000 of those shares had already been sold for less than 4 cents a share, that 150,000 shares had been sold for $3 per share, that 392,000 additional shares were subject to option agreements at substantially higher, increasing prices in the coming four months, and that each of these sales and agreements were part of the compensation **\*380** paid to the Management Shareholders for the exchange of the stock.

Counsel for Cavanagh argued persuasively in summation that the average investor would not have cared whether those shares were held by four Spaniards rather than four Californians. The Court finds, however, that the average investor *would* care that those shares had been sold immediately by the owners of the old company, because that information would have conveyed that the prior owners had no intention to continue on as major investors in the new company. Regardless of the identity of the prior owners, their immediate exit might have conveyed a message about the new company that an investor would have cared to evaluate.

The average investor also would care a great deal to know the details of the sales of the Management Shares. Specifically, the fact that the bulk of the shares were sold for less than 4 cents a share, but that the sellers had already negotiated options to sell the remainder for $3, $4, and $5 per share at monthly intervals to the same buyers who bought the bulk at 4 cents certainly would have formed an important part of the "total mix of information" available to an investor in determining the price, if any, at which to purchase or sell EOSC stock. This information may even have suggested to an investor, as it has to this Court, that a scheme to inflate the price of the stock was afoot. In any event, there is a strong likelihood that some of these facts "would have assumed actual significance in the deliberations of the reasonable shareholder," *TSC Indus.,* 426 U.S. at 449, regardless of what course that shareholder or investor would have opted to follow based on the information.[70]

Chachas cannot avoid liability for these omissions based on his interpretation of the 8-K as not requiring the disclosure of private sales of stock. It has long been clear that the antifraud provisions not only prohibit the making of false or misleading statements; they also impose an affirmative obligation to set forth information "necessary to make the statements made, in the light of the circumstances under which they are made, not misleading." Rule 10b-5, 17 C.F.R. § 240.10b-5. *Accord, Charles Hughes & Co.,* 139 F.2d at 437 ("The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other."). Given that the

information regarding the merger that was contained in the 8-K conveyed information about only half of the transaction resulting in the creation of EOSC leaving out information about the compensation that the Management Shareholders received in return for acquiring WTS' stock Chachas had an obligation to disclose this other information to ensure that the statements that were made were not misleading. The Court therefore finds unpersuasive Chachas' argument that the 8-K disclosed all necessary information.

The description of the exchange of stock is false for another reason as well. It conveys that the WTS shareholders received 15,488,120 shares of Curbstone's common stock, when they only received 12,022,558 shares. By giving the higher number, the 8-K disguised the fact that Levy, Milestone, and Inversora had each received substantial quantities of EOSC's shares. This omission **381** helped to hide the roles played by Levy and Milestone in the transaction,[71] and kept investors uninformed of the $3 million investment that EOSC expected from Inversora. Obviously, investors would be very interested to know that arrangements had already been made for, and stock issued to fund, an investment of an additional $3 million into the company. It would be just as important, however, for them to understand the level of compensation being received by the investment banker and attorney who negotiated this acquisition. Taken together with the information about the compensation paid to the Curbstone Management for the acquisition, this information about the compensation paid to Cavanagh and Levy for negotiating the acquisition would alert a reasonable investor to the fact that WTS was receiving far less from this deal than one would have expected at least when compared to the compensation received by the Curbstone Management, Milestone and Levy and give them additional reasons to be wary.
[72]

Chachas argues that he may not be held liable for the material omissions in this filing because it was EOSC's responsibility, and not his, to disclose this information. In light of Chachas' intimacy with the details of the transactions at issue, it is disingenuous for him to disclaim liability on the ground that he relied on information provided to him by Levy on behalf of EOSC. The omissions and misleading statements in the 8-K do not pertain to the financial details of WTS. Instead, they pertain to those elements of the acquisition transaction with which Chachas was most familiar, because he negotiated them and/or issued instructions to the transfer agent to effect them.

Moreover, Sections 17(a) and 10(b) are not limited in application to those who are in privity with the entity that is required to make disclosures about material events in its corporate life. By their very terms, these provisions apply to "any person" who makes misleading statements or omits material information in connection with the sale or purchase of a

security which would include an individual who prepared statements as an accommodation to the issuer of the stock provided that scienter is established. Although the responsibility for full disclosure may have rested with EOSC in the first instance, the record in this case strongly suggests that the people at EOSC were unaware of much of this information. In addition, Chachas did not simply transmit information given to him by EOSC to the SEC. To the contrary, he personally drafted the text of the 8-K filing and the misleading Exchange Agreement, which was filed as part of the 8-K. He also had sufficient independent information concerning the transaction to know that the statement he filed on EOSC's behalf was misleading. Based on all of the circumstances, including the fact that Chachas was by profession a securities lawyer, the Court finds that Chachas knew the part that he was playing in a scheme to inflate the price of EOSC's stock. At the very least, he must have known that the 8-K he filed on EOSC's behalf was materially misleading. Either way, he had sufficient scienter to be held liable under Sections 17(a) and 10(b).

### 3. The January 30 Press Release

Finally, as noted above, the Court finds that the January 30, 1998 press release was likewise materially misleading. The release indicates both that EOSC was close to (if it had not yet reached) the final stage of production **\*382** of the unit to be sold to ADL, and that it had a commitment from ADL to purchase a minimum of 1,000 units. Standing alone, the press release therefore constitutes a probable violation of the antifraud provisions. Because the individuals who participated in its drafting, however, are no longer part of this preliminary injunction hearing, were not named as defendants, or in Levy's case were not charged on the fraud count, the Court need not assign responsibility for the misstatements. Nevertheless, the press release is persuasive evidence of the existence of the overall scheme alleged by the SEC, orchestrated by Cavanagh, to keep positive information about the company circulating in the marketplace until the defendants had liquidated their holdings.

### 4. Culpability for Violations of Sections 17(a) and 10(b)

### a) Scienter

To find any of the defendants liable for a Section 17(a) (1) or Section 10(b) violation, the Court must find "knowledge or intentional misconduct" or an "intent to deceive,

manipulate, or defraud" investors. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). *See also First Jersey Secs.,* 101 F.3d at 1467. In the absence of any direct evidence of the defendants' intent, the Court must look to the surrounding circumstances. "Proof of scienter need not be direct, but may be a matter of inference from circumstantial evidence." *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) (internal quotations omitted). *See also Mayer v. Oil Field Sys. Corp.,* 803 F.2d 749, 756 (2d Cir.1986).

Cavanagh has raised the argument that "there is neither an aiding and abetting, nor a conspiracy cause of action in suits brought under § 10(b) or Rule 10b-5." It should be clear that the Court does not find Cavanagh or any defendant liable for a violation of the antifraud provisions on a theory of aiding and abetting or conspiracy. Instead, the SEC has alleged that Cavanagh was a primary violator of the securities laws and the Court finds that Cavanagh was the central figure in the fraudulent scheme. *See First Jersey Secs.,* 101 F.3d at 1471.

The SEC has charged Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, Optimum Fund, and Chachas with violations of Sections 17(a) and 10(b).[73] The SEC has met its burden of proof as to Cavanagh by establishing that he was both the prime architect and principal beneficiary of the scheme. As a result, it has met its burden of proof with respect to Milestone and the three Spanish entities as well. Milestone was the vehicle that Cavanagh used to hold himself out as an investment banker and through which he received restricted shares from the acquisition. Substantial evidence supports the strong inference that the three Spanish entities were used by Cavanagh to receive the unlegended stock that Cavanagh bought for himself from Curbstone Management. Cavanagh liquidated approximately two-thirds of those holdings by the end of January, selling about one-third into the market and giving away another third to family, friends, and others. Indeed, any other construction on these events flies in the face of common sense and strains credulity.

The SEC has not met its burden, however, of proving that Optimum was an intentional participant in the scheme. Optimum invested $500,000 into WTS/EOSC in return for restricted stock that it has not sold. Even if this investment was critical to Cavanagh's overall plan, no fair inference against Optimum can be drawn from this investment. The SEC's case against Optimum thus hinges on its participation in two of the December 19 trades in EOSC stock that established a new benchmark for the stock, followed thereafter by the receipt of 100,000 shares from the Customer Safety account and the sale of many of those shares. The SEC has not shown, however, that Optimum was doing anything more

than relying on Cavanagh's recommendation. As a consequence, **\*383** the request for preliminary relief against Optimum is denied.

The SEC has shown that there is a substantial likelihood that it will be able to prove at trial that Chachas was a knowing and intentional participant in the scheme to defraud. One of the most difficult questions to answer at this stage of the litigation is how much Chachas understood about the entire market manipulation scheme. The most compelling evidence against Chachas, however, lies in the very documents that he authored, including those reflecting his ever more aggressive bargaining positions during the negotiations with Levy, the intricate maneuvers he undertook to "paper over" his violation of Section 5 and his sale of affiliate stock without registration or restrictive legend, and the false and misleading Exchange Agreement and December 23 8-K. His motivation was clear: he hoped to earn over half a million dollars for each of the Management Shareholders. Of course, the shares that Chachas sold, and the structure of those sales, were essential to Cavanagh's conduct of the scheme. Chachas helped Cavanagh gain control of the market by placing control of virtually all of the unlegended stock in Cavanagh's hands. Finally, the scheme's success was furthered by the materially false and misleading 8-K. [74] In sum, even without weighing the credibility of a single witness, the evidence is compelling that Chachas was a knowledgeable and willing participant in the scheme.

### b) Likelihood that the Defendants will Commit Future Violations of the Securities Laws

Based on the Section 5 analysis above, the Court has already ordered the defendants' assets frozen, pending trial, to the extent of all proceeds received in connection with the sale of EOSC stock, as well as any remaining shares owned by the defendants. The Court must now consider whether a preliminary injunction is appropriate against any of the defendants to prevent future violations of the antifraud provisions.

In so doing, the Court bears in mind once again the factors set forth in *Universal Major Industries,* 546 F.2d at 1048. Because the scheme suggests "systematic wrongdoing, rather than an isolated occurrence," *First Jersey Secs.,* 101 F.3d at 1477, and a high degree of scienter on the part of Cavanagh and Milestone, the Court finds that an injunction is particularly appropriate as to these defendants. As noted above in connection with the Court's consideration of the Section 5 injunction, the Court finds that Cavanagh has a history of misconduct, has acknowledged no wrongdoing, and appears unconcerned by the present allegations. Meanwhile, his profession provides him with constant opportunities to commit future violations of the antifraud provisions. For these reasons, the Court has little

hesitation in entering a preliminary injunction against further violations of Sections 17(a) and 10(b) as to Cavanagh and Milestone, and as to Cavanagh's alter egos, Customer Safety, Cambiarios, and Construcciones.

A preliminary injunction against future violations of the antifraud provisions as to Chachas is a closer question. Chachas denies any knowledge of the fraudulent scheme and intentional participation it. *First Jersey Secs.,* 101 F.3d at 1477; *Lorin,* 76 F.3d at 461 (protestations of innocence are properly weighed in favor of injunctive relief). Because of his profession as a securities lawyer, he will have an opportunity to repeat the misconduct that he engaged in here. The extent of his participation and the essential role he played in the scheme also weigh in favor of entry of an injunction. Balanced against these findings are the lack of evidence of any prior violation of these statutes or any other misconduct and Chachas' apparent appreciation of the seriousness of the present charges. Moreover, the Court believes Chachas' assertions that he will not violate the fraud provisions of the securities' statutes in the future, not because **\*384** he has shown remorse, but because the consequences of this litigation have effectively deterred him.

Based on the foregoing considerations, the Court declines to enter a preliminary injunction against future violations of Sections 17(a) and 10(b) against Chachas. Bearing in mind that "the standards of the public interest ... measure the propriety and need for injunctive relief," *Management Dynamics,* 515 F.2d at 808, the Court finds that the public interest will be best served if Chachas is allowed to continue in his profession without the stigma of a preliminary injunction under the fraud statutes. Although a preliminary injunction is a useful device where a court finds that it is necessary to deter future violations, there are cases where an injunction may do more harm than good. Here, the Court finds that the preliminary injunction is not necessary to deter Chachas from future violations. I am influenced in making this judgment by my conclusion that Chachas did not instigate this fraud. Instead, because of greed, he was a willing and active participant in a scheme conceived by Cavanagh and Levy. While the SEC may yet establish at trial that a permanent injunction against Chachas under the antifraud provisions is appropriate, the Court finds that, based on the present record and the Court's present evaluation of the equitable considerations before it, a preliminary injunction against Chachas enjoining future violations of the antifraud provisions would not be in the public interest, and therefore it will not be entered.

### E. *Claims As to the Relief Defendants*

The SEC alleges that each of the relief defendants

> were recipients without consideration of unregistered shares of EOSC in connection with the fraud .... Each of these [relief] defendants profited from the sale of some or all of those shares by obtaining illegal profits under circumstances in which it is not just, equitable or conscionable for them to retain the illegal profits.

The SEC seeks from the relief defendants "the amount of stock and profits by which each has been unjustly enriched as a result of the fraudulent scheme."

It is well established that the securities statutes vest federal courts with jurisdiction over claims against non-violators. *See Deckert v. Independence Shares Corp.,* 311 U.S. 282, 288, 61 S. Ct. 229, 85 L. Ed. 189 (1940); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1351, 1355 (2d Cir.1974). In addition, the Court has the authority

> to grant any and all necessary remedies to ensure that plaintiff can obtain complete relief. Allowing disgorgement from relief defendants if primary defendants have committed securities violations is an accepted use of this power.

*SEC v. Seibald,* 1997 WL 605114, at *7 (S.D.N.Y. Sept.30, 1997) (citations omitted). That the relief defendants named in this action received shares in EOSC at the direction of Cavanagh has not been disputed.

The SEC has effected service on the following relief defendants: Karen Cavanagh; Cromlix, LLC; Donald & Co. Securities; Joseph Falco; Martin Hodas; Anthony Luttenberger; Ana Lopez; Tamar Lehman; Tim Timlin; Eugene Stricker; Arthur Acutis; and Antonio Borotto. Karen Cavanagh is Thomas Cavanagh's wife.[75] Cromlix is a business jointly owned by Karen Cavanagh and Beverly Nicolois, the wife of Cavanagh's business partner, Frank Nicolois. Donald & Co. is the brokerage house through which most of the trades at issue in this case were made, and which houses accounts for many of the defendants and relief defendants. Arthur Luttenberger is a plumber residing in New Jersey who had made investments in the past with Milestone. Tamar Lehman is the wife of Maier Lehman, who introduced Cavanagh to WTS. Tim Timlin is a childhood friend of Cavanagh's.

The remaining individual relief defendants, according to Cavanagh's testimony, like Luttenberger had invested with Milestone in the past and lost money. Cavanagh therefore **\*385** decided to give them shares in EOSC to satisfy what he characterized as a "moral obligation."[76]

The only two relief defendants who participated in the preliminary injunction hearing are Tamar Lehman and Tim Timlin. Tamar Lehman received at least 100,000 shares of EOSC stock from Cavanagh, per her husband's direction. These shares were sold in January 1998. The proceeds were deposited into Tamar Lehman's bank account which, pursuant to the TRO, is frozen. Tamar Lehman contends that she has a legitimate claim to the proceeds from the sales of the stock because she received the shares at her husband's direction and he, in turn, had a legitimate claim to them on account of his having introduced Cavanagh to WTS. According to Tamar Lehman, she was not a "nominee" for Cavanagh, and the funds in her account may not be disgorged by the SEC, because Maier Lehman provided consideration for the shares through his services.[77]

Timlin received 5,000 shares of EOSC stock at Cavanagh's direction. Timlin sold 2,500 of these shares for $12,927 in January 1998. Like Tamar Lehman, Timlin argues that he gave consideration for the shares. According to both Timlin and Cavanagh, the shares were transferred in consideration for loans that Timlin and his father had provided to Cavanagh in years past. Thus, Timlin, like Lehman, claims that he has a legitimate right to the shares and the proceeds from their sale.

The Court finds the arguments advanced by Tamar Lehman and Timlin unavailing. The Court agrees with Tamar Lehman that her right to the shares depends on her husband's right to them, and that she essentially stands in his shoes for purposes of the Court's analysis. The Court also agrees with the proposition advanced by both relief defendants that, in certain circumstances, a relief defendant like a holder in due course in the context of negotiable instruments may have a right to assets that cannot be overcome even by the claim of a defrauded seller or investor. This, however, is not that case.

The critical inquiry in determining whether the relief defendant may retain the assets is whether the relief defendant has "no legitimate claim to [the] contested property." *SEC v. Antar,* 831 F. Supp. 380, 400 (D.N.J. 1993). *See also SEC v. Cherif,* 933 F.2d 403, 414-15 (7th Cir.1991); *Seibald,* 1997 WL 605114, at *7. Here, there is no evidence that Cavanagh had control over Lehman's or Timlin's bank or brokerage accounts. These relief defendants therefore are not mere "shells" for Cavanagh. Nevertheless, the Court finds that Lehman and Timlin do not have a legitimate claim to the EOSC shares they received because no consideration was given for the shares. In short, each received the shares as a gift. In both

cases, the consideration that is alleged to have been given was actually past consideration. It is hornbook contract law that "past consideration is not valid consideration for a promise." *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.,* 101 F.3d 900, 904 (2d Cir. 1996). [78]

At his deposition and at the hearing, Cavanagh made clear that he conceived of his obligation to transfer the shares to Lehman and Timlin as a "moral" obligation rather than a legal obligation. With respect to Lehman, **\*386** Cavanagh stated "No, I didn't think I had to give consideration to [Lehman]." Cavanagh testified that he *wanted* to give Lehman shares as compensation for his role in introducing Cavanagh to WTS, but he consistently stated that there was no agreement between the two men that he would do so. [79] Cavanagh also unilaterally decided how many shares he thought constituted an appropriate fee. Even if the Court found that Lehman and Cavanagh had exchanged promises with respect to Lehman's services, the fact that Cavanagh had complete authority to determine the amount of compensation irrefutably a material term would undermine a finding that an enforceable contract existed. [80]

Similarly, Cavanagh testified at the hearing that he felt he had no legal obligation to repay the loan to Timlin, only a moral obligation. Indeed, Cavanagh used the term "moral obligation" to characterize his reasons for transferring shares to nearly all of the relief defendants, many of whom, as noted above, were investors who had lost money on investments with Cavanagh in the past. With respect to Timlin, Cavanagh contends that he transferred the shares as partial repayment for loans that Timlin and his father had made to Cavanagh from about 1986 to 1991. Cavanagh testified that he had paid back some of the loans, but that he still owed the Timlins money as of January 1998.

There has been no evidence that the Timlins made any demand to Cavanagh for repayment in January 1998, or at any time since the loans were first made in 1986. The Court therefore finds that Cavanagh's unilateral decision to transfer 5,000 shares to Tim Timlin in consideration for the loans is insufficient to establish that Timlin has a legitimate claim to the shares. As the court noted in *Antar,* "[a]s between the [relief] defendants and the victims of fraud, equity dictates that the rights of the victims should control." 831 F. Supp. at 402-03. Accordingly, the Court finds that the shares and proceeds held by Timlin, and the proceeds from sales of EOSC shares held by Lehman, should remain frozen pending a final resolution of this action.

III. *CONCLUSION*

For the reasons set forth above, the Court finds that the SEC has established a substantial likelihood of success in proving that the following defendants violated Section 5 of the Securities Act: Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, Optimum, Agira, Levy, Chachas, Brooksbank and Hantges. Accordingly, the Court orders the assets frozen of these defendants to the extent of all proceeds received from sales of EOSC shares, except with respect to Cavanagh and Milestone. Because the Court has concluded that all of the Management Shares transferred to Customer Safety, Cambiarios, Construcciones, and Inversora were effectively under the control of Cavanagh and Milestone, the amount of the freeze order as it applies to Cavanagh and Milestone shall include the proceeds from the sales of any of those shares, including sales by those who received Customer Safety shares, unless those shares or proceeds have already effectively been frozen.

To the extent that any of the defendants have already reached agreements with the SEC as to the precise dollar amount of their assets that shall remain frozen, those agreements shall remain in force pending a final resolution of this case. Any EOSC shares that remain in the custody or control of these defendants shall remain frozen as well, except for the Regulation S shares received by Optimum and Agira, which are not subject to the freeze. Any defendant that has not already provided a complete accounting of assets must do within five days of the date of this Opinion.

**\*387** The Court enters a preliminary injunction against future violations of Section 5 as to the defendants Levy, Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas.

The Court finds that the SEC has established a substantial likelihood of success in proving that the following defendants violated Sections 17(a) and 10(b): Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas. Accordingly, the Court finds that an asset freeze, with the same terms as outlined above with respect to the Section 5 freeze, is warranted as to these defendants. The Court enters a preliminary injunction against future violations of Sections 17(a) and 10(b) against Cavanagh, Milestone, Customer Safety, Cambiarios, and Construcciones.

The Court orders frozen the assets of the relief defendants who have been served, to the extent of all proceeds from sales of EOSC shares. Any EOSC shares that remain in their custody or control shall remain frozen as well.

The SEC shall submit within three days a proposed final order consistent with this Opinion for the Court's signature. The defendants shall have three days thereafter to submit

objections to the language of the proposed final order.

SO ORDERED.

**NOTES**

[1] The SEC seeks an injunction against future violations of Section 5 as to the following defendants: Thomas Cavanagh, Milestone, EOSC, George Chachas, Thomas Brooksbank, William Levy, Optimum Fund, Agira Trading, Customer Safety, Cambiarios, Construcciones, Thomas Hantges, and Cosimo Tacopino. The SEC seeks an injunction against future violations of Sections 17(a) and 10(b) as to the following defendants: Cavanagh, Milestone, EOSC, Chachas, Optimum Fund, Customer Safety, Cambiarios, Construcciones, and Tacopino.

[2] This delay was agreed to off-the-record during a telephone conference call between the parties and the Court on the Sunday before the hearing initially was to begin. None of the defendants or relief defendants stated at that time any qualification on their consent to an extension of the TRO, nor did any defendant or relief defendant raise an objection to the extension of the TRO pending the Court's determination of the SEC's motion, with the exception of relief defendant Tamar Lehman, who on April 2 first raised her objection to the extension of the TRO beyond April 2. On April 3, Lehman filed an appeal from the TRO to the Second Circuit. Cavanagh and Levy, who joined Lehman in appealing the TRO prior to this Court's issuance of an Opinion, *never* raised any objection at any time to the TRO's continuation pending the Court's ruling on the merits of this motion.

The Court had originally scheduled the hearing to begin on March 25 because of the severity of the measures embodied in the TRO. The defendants and relief defendants consented to an extension of the TRO when they learned that the President of WTS, Charles Weaver, had decided to assert his Fifth Amendment privilege and that other employees of WTS would need to be identified and interviewed. The March 31 hearing date was agreed to by all parties and no length for the hearing was determined in advance.

[3] To date, defendants Levy and Chachas have entered into such agreements with the SEC, which required these defendants to deposit such sums into the Court's registry or counsel's escrow accounts, respectively, as would be necessary to disgorge the full amount of proceeds alleged to have been wrongfully obtained. Levy's agreement, so ordered by the Court on April 2, required him to deposit $170,000 in cash into the Court's registry, plus all 500,000 shares of restricted EOSC stock held by Levy. Chachas' agreement, so ordered by the Court on April 2, required Chachas to deposit $393,000 plus all remaining EOSC

shares owned by Chachas into his lawyer's escrow account pending further order of the Court. Relief defendant Anthony Danna has also reached an agreement with the SEC, so ordered by the Court on March 23, regarding the funds held in his Attorney Trust Account. In addition, EOSC entered into an agreement with the SEC, so ordered by the Court on March 26, agreeing to the release of $30,000 from EOSC's frozen assets. Finally, relief defendant Eugene Stricker has reached an agreement with the SEC, so ordered by the Court on April 14, lifting the freeze on Stricker's assets upon his depositing the sum of $5,250.00, representing all of his trading proceeds for transactions in EOSC stock, in the Court's registry.

[4] The Court uses the words "merged" and "merger" throughout this Opinion as a shorthand, rather than a legal term of art, in describing the transaction between WTS and Curbstone that is at the heart of this case. Strictly speaking, the transaction was a "reverse stock acquisition," whereby WTS was acquired by Curbstone, but WTS' management replaced Curbstone's at the helm of the combined entity.

[5] A Regulation S offering is an offering that is exempt from the registration requirements of the Securities Act because it is made to overseas investors. *See* Offshore Offers and Sales, Securities Act Release No. 6863 (April 24, 1990), 1990 WL 311658 (S.E.C.); 17 C.F.R. §§ 230.901 *et seq. See also* Louis Loss and Joel Seligman, *Fundamentals of Securities Regulation* 160 (3d ed.1995).

[6] A blank check company is a company that has no operating business but exists for the purpose of merging with an operating company.

[7] The pressures on WTS to close a deal for financing are set forth in a letter sent by Weaver to Milestone's Nicolois on November 5, 1997. In that letter, Weaver indicated that the company had already lost one prime opportunity to rent space because of its lack of funds. Weaver stated, "[w]e will not sign for space until we are sure that we have the first $1 million in hand."

[8] So-called "unlegended" stock has no "restrictive legend" on it, meaning that the stock bears no representation on its face that the purchaser is limited in his or her ability to transfer the stock. By contrast, a "legended" share might inform the purchaser that the stock was transferred pursuant to a special type of offering, has not been registered, and may not be sold freely into the public market.

[9] Weaver stated in the November 5 letter, "[i]t was our understanding that the shell was not necessarily required for closing on the $1 million."

[10] Indeed, Weaver's letter responding to the November 7 memorandum by Levy is replete with references to Weaver's disappointment in Levy's proposals, and his diminishing confidence that Milestone had WTS' interests at heart. The subtext of the letter, taken as a whole, is that Weaver suspected Levy and Milestone of unethical behavior that would redound to the harm of innocent investors and WTS. In addition to the passages already quoted in the text of this Opinion, Weaver stated that Levy appeared to have "ignore[d] industry norms in pricing this deal." Weaver further stated that "[a]s our investment banker, we expect [Milestone] to do the things that maximize the value of WTS and watch out for WTS' interest. Our faith is shaken that this indeed happens to be the case." Finally, Weaver stated, "Levy's proposal has also raised a lot of ethical questions about how the 40% equity in WTS will be distributed and utilized to the raise funds for WTS."

[11] Converted into the approximately 21 million shares issued by EOSC, WTS' estimates of the appropriate market capitalization are $.16 per share at the time of the $1 million investment and $.47 per share at the time of the $4 million investment.

[12] At the hearing, Chachas claimed that the reference to "market makers" in this document was an error attributable to Chachas' having "cut and pasted" portions of the document from prior agreements. The Court finds this explanation incredible. The pertinent section, which appeared as "Condition 8" to the merger in this document, reads as follows:

Principals to make available 300,000 shares for purchase by market makers at:

```
100,000 @ net of $3.00 100,000 @ net of $4 per share; and 100,000
@ net of $5.00 per share.
```

These are almost exactly the terms of the option agreements that were incorporated into a December 1 draft agreement and ultimately agreed upon between Chachas and Levy. Instead of selling 100,000 shares in each stage, the Management Shareholders agreed to hold for sale three batches of 150,000 shares at the prices set forth above, in addition to one final batch of 92,000 shares at $6. In addition, Chachas did not claim that any of the seven other conditions listed in this document were mistakes, but acknowledged that they were all part of his understanding of the transaction at that moment in time.

[13] Chachas proposed that the Curbstone Management make available 400,000 shares of the principal shareholders, and 142,000 shares belonging to Dillon Trading, a company owned solely by Chachas and Brooksbank, to be bought in four blocks at prices ranging

from $3 per share to $6 per share. Chachas also proposed that the merger close by December 3, that 300,000 of the shares be purchased no later than December 19, and that the remaining 242,000 shares be purchased no later than January 15.

[14] The letter also committed the Curbstone Management to locking up 200,000 shares until March 15.

[15] The defendants have explained the references in the above-described documents to the Curbstone transfer agent specifically the amount of time he would be retained as the new company's transfer agent as a condition imposed by Chachas in order to give Day an opportunity to prove his worth to the new management team. Any fair reading of these documents, however, indicates that Chachas planned to use his control over the transfer agent as leverage to ensure that Milestone and Levy lived up to their commitments to him. Chachas had confidence that Day, with whom he had a long-standing and close working relationship, would comply with any order he received from Chachas. Day, who testified at the hearing, exercised no independent judgment about any of the actions Chachas directed him to take, relying instead entirely on the instructions he was given by Chachas. Day stated:

I comply with instructions given to me by counsel for the company. If they said do it, I would put the affiliate legend on; and if they said don't put the legend on because they are registered, I would not put it on because they are registered. Otherwise, I would be in a position of second-guessing all of these attorneys.

Day received $20,000 from Curbstone on December 19, far in excess of his customary fees for the work he performed as a transfer agent, and had received 25,000 Curbstone shares in 1996. While Chachas and Day had explanations for each of these payments, they nonetheless serve to demonstrate the nature of the relationship between the two men.

[16] Charts prepared by Chachas during the negotiations of the acquisition all reflect his understanding that the Curbstone shareholders were, collectively, to hold no more than 5% of the EOSC stock. By his calculations, their percentage of shares under the various scenarios fluctuated between 4.3% and 5%. Similarly, the charts reflect the understanding that WTS shareholders were to hold approximately 60% of the shares; their percentage of shares fluctuates between 57.01% and 57.02%. The charts reflect the remaining shares going to Levy (3.56% to 4.73%), to investors in return for $1 million of financing (9.5% to 10%), and to the effort to raise $3 million (2.88% to 9.5%), with Milestone getting the balance, that is, between 14.25% and 22.16%. Thus, from the beginning, Chachas understood that this transaction was intended greatly to enrich both Levy and Milestone.

[17] Chachas apparently did not supply WTS with his signature page, however, until December 18. The WTS shareholders signed between December 2 and 16.

[18] Although the draft merger agreement called for Curbstone to deliver to WTS 17,547,791 shares of previously authorized but unissued stock, the final agreement that was signed reduced that number to 15,488,120.

[19] The stock transfer to Agira represented a Regulation S sale of equity. The transfer to Optimum converted Optimum's earlier bridge loan for $500,000 to an equity investment, again under Regulation S, such that WTS no longer had an obligation to repay the loan.

[20] The Purchase Agreements under which the Spanish Shares were sold reflect a sale of 2,563,000 shares. A sale of this number of shares is also indicated on the documents Chachas prepared during the negotiation of the acquisition transactions. Chachas instructed Day on November 18, however, to transfer only 2,353,217 to the three "Spanish entities." While Customer Safety and Construcciones each received 854,333 shares, Cambiarios received only 644,551 shares. Apparently, a fourth "Spanish entity," Inversora Dactilar, S.L., received 209,783 shares intended for Cambiarios. Inversora received 857,081 restricted shares as a result of an error in Chachas' directions to Day, instead of 647,298 shares as had been intended.

[21] Chachas had originally been told that Milestone would purchase all of the shares. Cavanagh later decided to split the transaction into three units, so that no one purchaser would own over 5% of the EOSC stock, apparently to avoid triggering the reporting requirements under Section 13D of the Exchange Act. Section 13D provides that any person who acquires beneficial ownership of more than 5% of a class of stock in a company must make timely disclosures to the issuer of the stock, the exchange on which the stock is listed, and the SEC. *See* 15 U.S.C. § 78m(d).

[22] The Purchase Agreements, each of which bears the date December 1, 1997, were executed as follows: (1) by Vincente Tur Otola of Alciante, Spain, a Director of Cambiarios S.L., (2) by Benjamin Pineda Lioret, the Director of Customer Safety, S.L. of Alciante, Spain, and (3) by Mr. Lioret on behalf of Construcciones Solariegas, S.L. An account opening form for Cambiarios, at Donald & Co., is dated December 11, 1997. The Donald & Co. new account form for Customer Safety reflects the same fax number, business phone number, and bank reference as the form for Cambiarios.

[23] Cavanagh admits recommending to Tur Ortola that his clients open trading accounts at Donald & Co. with Tacopino; copies of the account opening documents were kept at

Milestone.

[24] Chachas contends, and for purposes of this hearing I accept, that his December 18 written instructions to Day were intended to and did result in Day issuing the unregistered stock to WTS prior to transferring the already issued Curbstone Management Shares to the three Spanish entities. The instructions to Day "with regard to the Closing of the Acquisition of WTS Transnational by Curbstone" included four numbered items: (1) the issuance of 17,596,601 shares; (2) the cancellation of certain shares pursuant to the requirements of the Exchange Agreement; (3) the transfer of 2,563,000 shares; and (4) a request to forward an updated shareholders list. Although there was no explicit instruction to do so, Day testified that he understood that Chachas wanted him to do each task in the exact order listed and that he followed those instructions.

[25] Brooksbank, who was constantly in touch with Chachas about the acquisition and was fully informed of its terms, also understood, from Chachas, that it would be illegal to sell the Curbstone Management Shares before the merger was completed.

[26] 1,004,334 Curbstone/EOSC shares were deposited into the Cambiarios account between December 24 and 26, 1997. These shares apparently include the 644,551 shares sold to Cambiarios under the Purchase Agreement as well as the 150,000 shares sold under the Option Agreement. The source of the remaining 209,783 shares is unclear, but may very well be the 209,783 shares of restricted stock issued in error to Inversora Dactilar. Between December 29 and 31, 102,100 shares were sold for $555,260.07. In January, 724,900 EOSC shares were sold for $3,775,704.03. By the end of the month, only 177,334 shares remained in the account. If the 209,783 shares were restricted Inversora stock, then the January sales from this account included the sales of restricted stock. Before January 14, there was systematic selling of approximately 10,000 to 40,000 shares on almost every trading day. Starting on January 14, two days after the Future Superstock story discussed below was released, the number of shares sold on an almost daily basis increased dramatically.

854,333 EOSC shares were deposited into the Construcciones account on December 26. With the exception of a transfer of 3,000 shares on January 21, 1998, there was no other account activity of moment through the end of January.

854,333 EOSC shares were deposited into the Customer Safety account on December 26. Beginning on January 5, 1998, all but 90,333 of those shares were transferred during January by Cavanagh to his family, friends, and associates. Cavanagh contends that he asked Customer Safety if he could repurchase the 854,333 shares it had just bought for

$.039 per share and that it agreed. At his March 21, 1998, deposition, Cavanagh testified that he had executed a promissory note to purchase the shares at a price of $3 per share, or $2,562,999. The note had not been produced in discovery. That same day, Vincent Tur Ortola telefaxed two promissory notes to Milestone in the sums of $553,000 and $525,000. The notes, which require payment on demand and carry an interest rate of 7%, bear the printed date of December 23, 1997. They make no reference to EOSC shares. Cavanagh testified at the hearing that no demand, and no payment, has been made on the notes.

[27] "Edgar" is the SEC's system of electronic filing.

[28] While Proudian and Cavanagh both describe this order as a "limit order," meaning that Proudian was authorized to buy the stock for Cavanagh at any price up to $7, Proudian understood, and Cavanagh expected based on his extensive prior experience with Proudian, that Proudian would attempt to buy the stock at $7 and not at a lower price. Indeed, the conversation between Proudian and Cavanagh left no doubt that Cavanagh was requesting that the stock be purchased at $7. Defense counsel repeatedly cross-examined Proudian about this portion of his testimony, resulting in some confusion as to what exactly was said during the 30-second conversation between the broker and Cavanagh. Nevertheless, Proudian's testimony revealed that, when Cavanagh first placed the $7 order, Proudian questioned or "rebutted" that order by informing Cavanagh that the stock was trading considerably lower than that price. When Proudian rebutted the order, Proudian testified that Cavanagh "reiterated his initial statement, go to the market and buy the stock at $7 a share." Consequently, Proudian did just that.

[29] The market maker quote came from Donald & Co., which had not acted as a market maker in this stock until December 19.

[30] It is ironic, to say the least, that Cavanagh did not advise Stieghorst that millions of shares of EOSC had just been purchased at less than four cents a share by the Spanish entities, who had already opened trading accounts at Donald & Co., and that the shares might be available to Stieghorst for considerably less money.

[31] This was the second market price purchase of stock that Chachas had made in an internet trading account that he had opened in November 1997 on behalf of himself and Brooksbank for their firm, Dillon Trading, with a company called "E-Trade."

[32] Chachas contends that he was tinkering with his internet trading system and had not checked the market before placing this order. While this is a difficult question to resolve, I believe that the SEC has succeeded in showing that this explanation is not credible. In

reaching this conclusion, I find it particularly persuasive that Chachas had to realize that it was illegal for him to trade in Curbstone stock while in possession of material non-public information about the company. There had been no public announcement of the acquisition at the time that he placed his order, and he did not file the 8-K disclosing the transaction until December 23. Moreover, as described at some length below, the SEC has also met its burden for the purposes of this preliminary injunction hearing of showing that Chachas was a willing and knowledgeable participant in a scheme to defraud, of which this effort to establish a benchmark for the market price of EOSC shares was a crucial component.

[33] This was a materially false description of the terms of the acquisition. The record appears to be silent as to the author of this release.

[34] An 8-K form is required to be filed upon the occurrence of certain enumerated events in the life of a registered company, including a change in control. *See* Form 8-K [1996-1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 31,002 *et seq*.

[35] The 8-K also explicitly represented that no broker was associated with the transaction and that no fee had been paid to a broker. In light of the extensive payments in stock and cash that were made to Cavanagh, this statement was plainly false, whether or not Cavanagh characterized himself as a "broker."

[36] The record is not clear as to who prepared this filing for EOSC. At the hearing, the defendants argued that the Regulation S sales effected on December 19 did not need to be reported in the December 23 8-K because there is a 15 day window before which such sales need not be reported. That date, January 3, 1998, passed without any filing though. In any event, there was a duty to report the Regulation S sales in the December 23 8-K. Because of their omission, the December 23 8-K contained false and misleading information.

[37] The amended 8-K indicated that the total number of Curbstone shares that were outstanding at the time of the merger was 3,488,217 rather than the 3,521,876 indicated in the signed acquisition agreement and the December 8-K. No explanation has ever been given for this discrepancy.

[38] The amended 8-K also contained a number of misleading statements about the status of EOSC's product. Namely, EOSC represented that

[t]he Company *has developed and is in the process of commencing production* of fingerprint biometric systems for the information security and access control market

segments. *After final field testing is completed,* the Company *presently expects to initiate its first commercial shipment of product in the third quarter*

....

(Emphasis added).

[39] Lehman's wife, Tamar, received 100,000 shares of unlegended EOSC stock from Cavanagh in January 1998. The record suggests that an additional 50,000 shares were also transferred to her constituting at total of 150,000 shares but these additional shares do not appear in her Donald & Co. account records. At present, the SEC has confined its allegations concerning the Lehmans to the initial 100,000 shares.

[40] Friedman received 75,000 unlegended EOSC shares from Cavanagh in January 1998.

[41] In answer to an e-mail inquiry of March 11, 1998, Pollack wrote regarding EOSC:

We have not been able to evaluate the units as of yet. The only insight I can provide is that a low cost device with the described capability should be very successful. Whether they can deliver a device that is easy to install and works well reamins [sic] to be seen.

[42] Weiss also received 75,000 unlegended EOSC shares from Cavanagh in January 1998.

[43] There were four drafts of the press release. Drafts were also faxed to Weaver, Pollack, and an Allen Lloyd. Levy testified that he received comments from at least Pollack and Weaver.

[44] Chachas cites *Tom Doherty Assocs. v. Saban Entertainment, Inc.,* 60 F.3d 27, 38 (2d Cir.1995), for the proposition that the SEC must demonstrate a "clear showing" rather than a "proper showing" of entitlement to injunctive relief. This case, and the "clear showing" standard it articulates, are inapposite. In *Doherty Assocs.,* a private litigant sought a preliminary injunction against a producer and distributor of children's books for breach of contract. In that context, the Second Circuit held that the plaintiff had to meet the "clear showing" standard, which "incorporates the primary requirements of irreparable injury ...." *Id.* The Court further stated, "[w]e expect the `clear showing' standard to be infrequently met," *id.,* although it found that it had been met in that case. Here, the SEC, unlike a private litigant, need not demonstrate irreparable injury, and the appropriate standard therefore is a "proper showing."

[45] Although the defendants dispute that they were required to file a registration statement before selling their shares, they do not dispute the fact that they did not do so.

[46] As noted above, the Management Shareholders also negotiated the sales of 542,000 shares pursuant to an option agreement. Although these sales may be analyzed under Section 5 in much the same manner as are the sale of the first 2.5 million shares, the Court will focus its analysis initially on the Spanish shares. This approach is consistent with the manner in which the SEC has framed the case since filing the Complaint.

[47] The exact number of shares that were resold in unclear. Nevertheless, the records from the trading accounts maintained by the Spanish entities at Donald & Co. show that over 800,000 shares were sold from Cambiarios' account into the public market. At least 300,000 other shares, transferred from Customer Safety's account to accounts held by the relief defendants, were also sold into the market.

[48] If the burden were on the SEC, however, I would still find that the 4(1) exemption does not apply.

[49] Henceforth in this opinion, the Court will use the terms "control persons" and "affiliate" interchangeably in the place of the term "issuer," as that term is defined in Section 77b(11), for the purposes of determining who is an "underwriter." The term "affiliate" is defined in Rule 144 as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a) (1). "Control" is defined in Rule 405 as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

[50] In addition, the SEC argues that the sale of the Spanish shares was a sale of unregistered shares because those shares were "restricted" stock, meaning that they could not freely be sold to the public. Chachas contends, however, that the S-8 form filed by Curbstone with the SEC on November 6, 1996, in connection with the issuance of these shares, was sufficient to register them and that consequently the shares were not "restricted" stock. The SEC's view is that the S-8 filing did not "cover the public redistribution of those shares" because it "did not include a resale prospectus." Because I find that Chachas sold the Spanish Shares while an affiliate, it is unnecessary for me also to resolve at present this additional dispute about the status of the shares.

[51] The defendants have not disputed, for purposes of defending against the charge that Chachas sold affiliate securities, that the sale was a public as opposed to a private sale of securities. As will be discussed below, Chachas claims that he believed *during the negotiation stage* that the Spanish entities did not intend to resell into the public market.

[52] Chachas also argues that he and Brooksbank lost all control when they resigned as officers and directors on December 12, or even earlier when they signed the Exchange Agreement on December 8. At that moment, Chachas claims, they were contractually bound to follow through on the acquisition, and all remaining duties that they were to perform were purely ministerial. This argument is unavailing. First, the Court finds that Chachas did not feel that he was contractually bound by the Exchange Agreement as of December 8, but that he was prepared to hold the merger hostage until the payments from Levy were deposited into his account, which occurred on December 12. In addition, as is explained at length below, the Court does not rest its finding that Chachas was a control person solely on his titular duties or his functions performed for the company, but rather on an integrated analysis of the transactions at issue.

[53] Milestone purchased 2,563,000 Spanish Shares, had an option agreement covering 542,000 Management Shares, and a lockup agreement covering another 200,000 shares. Consequently, only 183,000 Management Shares remained beyond Cavanagh's control.

[54] The defendants raised toward the end of the hearing the argument that the Court should only consider half of the Management Shares those owned by Chachas and Brooksbank as control shares, because only these two were officers and directors of Curbstone. This argument misses the point, addressed repeatedly in this Opinion, that Franklin and Hantges had surrendered control over their shares to Chachas for the purpose of negotiating all four shareholders' exit from the company. For all practical purposes, therefore, the shares owned by all four shareholders were one block under the control of Chachas, at all times relevant to the Court's Section 5 analysis. Or, phrased another way, all four men functioned as members of a control group. *Cf. North American Research and Dev. Corp.,* 424 F.2d at 67, 72 (taking functional approach to issue of control).

[55] Chachas testified at the hearing that the decision to proceed with the transaction in the manner that he did was influenced by the cost and delay that would have been associated with filing a registration statement. When asked by the Court if he could not have sold his shares while still an affiliate by filing another registration statement for those shares, Chachas responded, "Yes. That would have been one alternative, but it's very expensive and time consuming."

[56] If the 4(1) ½ exemption actually applied to Chachas' negotiations, it would also exempt the sales of the shares. As already noted, there is no different standard for offers to sell as opposed to sales.

[57] The Exchange Agreement contained several of these approved cautionary measures to ensure that the shares issued to WTS in the merger, which were restricted, would not be sold to the public without registration. For example, the Agreement contained a detailed investment letter from WTS representing, *inter alia,*

1. The Securities, which are being acquired by the undersigned are being acquired for the undersigned's own account and for investment and not with a view to the public resale or distribution thereof.

2. The undersigned will not sell, transfer or otherwise dispose of the securities unless, in the opinion of the Company's counsel, such disposition conforms with applicable securities laws requirements.

3. The undersigned is aware that the Securities are "restricted securities" as that term is defined in Rule 144 (the "Rule") promulgated under the Securities Act of 1933, as amended ....

The undersigned acknowledges and understands that the Securities are unregistered and must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available.

The undersigned further acknowledges that the undersigned is fully aware of the applicable limitations on the resale of the Securities. These restrictions for the most part are set forth in Rule 144 ("the Rule"). The Rule permits sales of "restricted securities" upon compliance with the requirements of such Rule. If and when the Rule is available to the undersigned, the undersigned may make only sales of the Securities in accordance with the terms and conditions of the rule (which may limit the amount of securities that may be sold) ....

Any and all certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefor, shall bear a restrictive legend.

The undersigned further agrees that the Company shall have the right to issue stop-transfer instructions to its transfer agent until such time as sale is permitted under Security Laws and acknowledges that the Company has informed the undersigned of its intention to issue such instructions.

The Exchange Agreement provided that the following legend would appear on all shares issued to WTS:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION FOR THESE SHARES UNDER SUCH ACT OR AN OPINION OR THE COMPANY'S COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SAID ACT.

[58] Chachas argues in his supplemental memorandum of law that "a seller of securities need not meet all the requirements of Sections 4(1) or 4(2) or the SEC regulations that define the safe harbors thereunder [such as Regulation D] in order to rely on the Section 4(1) ½ exemption." While this may be true, Chachas did not in good faith take *any* of the steps recommended by the SEC in Regulation D or its releases on the subject of private placements.

[59] As will be discussed below in connection with the fraud count, the SEC has demonstrated a substantial likelihood of proving at trial that the Spanish entities were Cavanagh's nominees and that both Chachas and Levy understood that to be so.

[60] At the hearing, Day testified that he did raise at one time with Chachas his concern that "a substantial time had gone by from the S[8] registration, raising the question whether or not it would be appropriate to put an affiliate legend on the shares ...." Chachas then "assured" Day that "he wouldn't make any disposition of the shares while he was still an affiliate of the issuer. ..." Day stated that he recalled "a subsequent conversation on that same question while I understood this deal was pending in which George [Chachas] referred to the 4(1) ½ exemption as being a basis on which he would be able to transfer the shares."

[61] For those defendants who have entered into agreements with the SEC in lieu of, or modifying, the asset freeze contained in the TRO, those agreements shall remain in effect pending a final determination of this case.

[62] Optimum received 100,000 of the shares of EOSC stock distributed from the Customer Safety account, and has sold at least 71,500 of those shares. Agira bought and sold 1,500 EOSC shares.

[63] To establish an advice of counsel defense, a defendant "has to show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith." *Markowski v.*

*SEC,* 34 F.3d 99, 105 (2d Cir.1994). *See also United States v. Evangelista,* 122 F.3d 112, 117 (2d Cir.1997), *cert. denied,* ____ U.S. ____, 118 S. Ct. 1048, 140 L. Ed. 2d 112 (1998) ("[r]eliance on advice, offered as a defense, presupposes the defendant's solicitation of advice in good faith") (internal quotations omitted). Even if these elements were satisfied, "reliance is not a complete defense, but only one factor for consideration." *Markowski,* 34 F.3d at 105.

[64] Section 17(a) provides, in pertinent part:

[i]t shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operates a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[65] The SEC has not made clear which subsection of Section 17(a) it believes the defendants violated. Because, as will be explained further below, the Court has no difficulty finding scienter, the Court need not address whether a violation of Section 17(a) (2) or (3) could be established in the absence of scienter.

[66] Section 10(b) provides, in pertinent part:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the use of the mails, or of any facility of any national securities exchange ...

to use or employ, in connection with the purchase or sales of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Return to TOC

15 U.S.C. § 78j(b).

[67] Rule 10b-5 states in full:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[68] The defendants argue that the statements contained in the January 30 press release, even if false, were not material inasmuch as the price of EOSC's stock shifted only slightly. None of the parties presented sufficient evidence to allow the Court to draw the inference that the defendants press. For instance, the record does not contain a complete set of all public statements made about EOSC during this period so that one could ascertain both when specific pieces of information entered the market and what their effect was on the stock price. Moreover, the record does not contain stock price information for this same period of time for the development companies with whom EOSC was competing, or the companies in its industry, or the relevant stock markets so that one could judge the shift of EOSC's stock price against a standard. Finally, there has been no expert analysis of the trading price and trading volume and their interaction.

[69] The 8-K form requires an honest and complete "description of the transaction(s) which resulted in the change of control" of the registered company. Since the Court finds that the sales of the Management Shares were a critical part of the transaction that resulted in the merger with WTS, it is likely that the SEC will be able to prove at trial that the omission of information regarding these agreements rendered the December 23 8-K insufficient on its face.

[70] It is important to note that the SEC has belatedly pursued an argument concerning precisely which forms had to be filed with the SEC, by EOSC and/or the Management Shareholders, before the Management Shares could be sold to the public. According to the SEC, these forms would have required the disclosure of significantly more information than did the 8-K form that was filed on December 23, 1997. Because the issue of which forms

should have been filed was not mentioned in the complaint, nor raised at the hearing until the SEC's summation, the Court will disregard this issue for the purposes of determining whether the SEC is entitled to the preliminary relief it seeks. Nevertheless, the SEC's failure to address which forms should have been filed before the shares were sold and to explain exactly what information that was not contained in the December 23 8-K would have been disclosed through those forms represents a glaring omission. Understanding the information that the defendants would have had to disclose had they complied with the law would greatly assist the Court, and ultimately a jury, in determining the defendants' liability under Sections 5, 17(a), and 10(b). Specifically, a familiarity with the required disclosures would be of great assistance in understanding the defendants' motive for non-compliance. Because scienter is a necessary element of Section 17(a) and Section 10b claims, motive is of particular significance.

[71] The 8-K explicitly represented that no brokers were associated with the merger. Although, at the hearing, Cavanagh declined to characterize his role in the transaction as that of a "broker," it is plain that Milestone, Cavanagh, and/or Levy functioned in this capacity for WTS and Curbstone. Nevertheless, the 8-K does not disclose their involvement, nor the fees that were paid to both Levy and Milestone. Instead, it explicitly represents that there were no brokers involved in the transaction. While the Court is uncertain as to the materiality of this particular misrepresentation, the omission of this information contributes to the overall misimpression of the course of events generated by the 8-K.

[72] Finally, the 8-K gave a false and misleading description of the transactions with Agira and Optimum, as described above. It also did not disclose that, as a consequence of the Regulation S sales to these entities, the outstanding shares of EOSC were 21,084,818 and not 19,009,996, as implied by the 8-K, and that the shares had been purchased at a price of less than 50 cents a share.

[73] The SEC has also claimed that EOSC and Tacopino have violated Sections 17(a) and 10(b). Because of the agreements that these two defendants have reached with the SEC, it is unnecessary to make findings as to whether the SEC has carried its burden of proving a substantial likelihood of success as to the liability of either defendant.

[74] The defendants' argument that investors don't usually read SEC filings misses the point. Analysts and reporters who do read the SEC filings are usually the means by which the information contained in those reports and the inferences that can be drawn from them are disseminated into the marketplace.

[75] Karen Cavanagh does not appear to have received shares in her own name, but only through her company, Cromlix.

[76] Cavanagh personally made the decision to give the shares to all of the relief defendants who were served, with two exceptions. Cavanagh testified that he transferred the shares to Eugene Stricker and Tamar Lehman at the request of Maier Lehman.

[77] Tamar Lehman also argues as a preliminary matter that the shares were freely tradeable and therefore "any profits which Mrs. Lehman received from the sale of these shares did not constitute unlawful profits." The Court need not address this point here, because it has already determined that the SEC has a substantial probability of success in proving that the shares of EOSC stock that Lehman received were affiliate shares, obtained in violation of Section 5.

[78] The Court assumes for the purposes of this analysis that federal common law, rather than New York law applies. In any event, the result would be the same under either law. Where there is "no material difference between the applicable state law or federal common law standards," the Court need not dwell on a choice of law analysis. *Ciaramella v. Reader's Digest Assoc. Inc.,* 131 F.3d 320, 322 (2d Cir.1997).

[79] In contrast, Cavanagh signed an agreement with Weiss and Friedman promising to transfer 75,000 EOSC shares to each of them for their role in the introduction. No such agreement is alleged to have been made orally or in writing with Lehman.

[80] Cavanagh actually did not give Lehman the 100,000 shares, but instead the right to purchase the shares at a price of $3 a share. Since the stock was then trading at about $5 a share, the "fee" paid to Lehman would have been the difference of $2 per share or approximately $200,000. No payment has been made by Lehman for the shares, nor has any payment been demanded by Cavanagh.

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

(Bench Opinion)          OCTOBER TERM, 2006                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TELLABS, INC., ET AL. *v.* MAKOR ISSUES & RIGHTS, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 06–484.  Argued March 28, 2007—Decided June 21, 2007

As a check against abusive litigation in private securities fraud actions, the Private Securities Litigation Reform Act of 1995 (PSLRA) includes exacting pleading requirements. The Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 194, and n. 12. As set out in §21D(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U. S. C. §78u–4(b)(2). Congress left the key term "strong inference" undefined.

Petitioner Tellabs, Inc., manufactures specialized equipment for fiber optic networks. Respondents (Shareholders) purchased Tellabs stock between December 11, 2000, and June 19, 2001. They filed a class action, alleging that Tellabs and petitioner Notebaert, then Tellabs' chief executive officer and president, had engaged in securities fraud in violation of §10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5, and that Notebaert was a "controlling person" under the 1934 Act, and therefore derivatively liable for the company's fraudulent acts. Tellabs moved to dismiss the complaint on the ground that the Shareholders had failed to plead their case with the particularity the PSLRA requires. The District Court agreed, dismissing the complaint without prejudice. The Shareholders then amended their complaint, adding references to 27 confidential sources and making further, more specific, allegations concerning Notebaert's mental state. The District Court again dismissed, this time with prejudice. The Shareholders

Syllabus

had sufficiently pleaded that Notebaert's statements were mislead-
ing, the court determined, but they had insufficiently alleged that he
acted with scienter. The Seventh Circuit reversed in relevant part.
Like the District Court, it found that the Shareholders had pleaded
the misleading character of Notebaert's statements with sufficient
particularity. Unlike the District Court, however, it concluded that
the Shareholders had sufficiently alleged that Notebaert acted with
the requisite state of mind. In evaluating whether the PSLRA's
pleading standard is met, the Circuit said, courts should examine all
of the complaint's allegations to decide whether collectively they es-
tablish an inference of scienter; the complaint would survive, the
court stated, if a reasonable person could infer from the complaint's
allegations that the defendant acted with the requisite state of mind.

*Held:* To qualify as "strong" within the intendment of §21D(b)(2), an
inference of scienter must be more than merely plausible or reason-
able—it must be cogent and at least as compelling as any opposing
inference of nonfraudulent intent. Pp. 6–18.

   (a) Setting a uniform pleading standard for §10(b) actions was
among Congress' objectives in enacting the PSLRA. Designed to curb
perceived abuses of the §10(b) private action, the PSLRA installed
both substantive and procedural controls. As relevant here, §21D(b)
of the PSLRA "impose[d] heightened pleading requirements in
[§10(b) and Rule 10b–5] actions." *Dabit,* 547 U. S., at 81. In the in-
stant case, the District Court and the Seventh Circuit agreed that the
complaint sufficiently specified Notebaert's alleged misleading
statements and the reasons why the statements were misleading.
But those courts disagreed on whether the Shareholders, as required
by §21D(b)(2), "state[d] with particularity facts giving rise to a strong
inference that [Notebaert] acted with [scienter]," §78u–4(b)(2). Con-
gress did not shed much light on what facts would create a strong in-
ference or how courts could determine the existence of the requisite
inference. With no clear guide from Congress other than its "in-
ten[tion] to strengthen existing pleading requirements," H. R. Conf.
Rep., at 41, Courts of Appeals have diverged in construing the term
"strong inference." Among the uncertainties, should courts consider
competing inferences in determining whether an inference of scienter
is "strong"? This Court's task is to prescribe a workable construction
of the "strong inference" standard, a reading geared to the PSLRA's
twin goals: to curb frivolous, lawyer-driven litigation, while preserv-
ing investors' ability to recover on meritorious claims. Pp. 6–10.

   (b) The Court establishes the following prescriptions: *First*, faced
with a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss a
§10(b) action, courts must, as with any motion to dismiss for failure
to plead a claim on which relief can be granted, accept all factual al-

Syllabus

legations in the complaint as true. See *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U. S. 163, 164. *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. But in §21D(b)(2), Congress did not merely require plaintiffs to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"—*i.e.*, a powerful or cogent—inference. To determine whether the plaintiff has alleged facts giving rise to the requisite "strong inference," a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged. Pp. 11–13.

(c) Tellabs contends that when competing inferences are considered, Notebaert's evident lack of pecuniary motive will be dispositive. The Court agrees that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference. The absence of a motive allegation, however, is not fatal for allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety. Tellabs also maintains that several of the Shareholders' allegations are too vague or ambiguous to contribute to a strong inference of scienter. While omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to access all the allegations holistically. Pp. 13–15.

(d) The Seventh Circuit was unduly concerned that a court's comparative assessment of plausible inferences would impinge upon the Seventh Amendment right to jury trial. Congress, as creator of federal statutory claims, has power to prescribe what must be pleaded to state the claim, just as it has power to determine what must be proved to prevail on the merits. It is the federal lawmaker's preroga-

4          TELLABS, INC. *v.* MAKOR ISSUES & RIGHTS, LTD.

Syllabus

tive, therefore, to allow, disallow, or shape the contours of—including the pleading and proof requirements for—§10(b) private actions. This Court has never questioned that authority in general, or suggested, in particular, that the Seventh Amendment inhibits Congress from establishing whatever pleading requirements it finds appropriate for federal statutory claims.  Provided that the Shareholders have satisfied the congressionally "prescribe[d] . . . means of making an issue," *Fidelity & Deposit Co. of Md.* v. *United States*, 187 U. S. 315, 320, the case will fall within the jury's authority to assess the credibility of witnesses, resolve genuine issues of fact, and make the ultimate determination whether Notebaert and, by imputation, Tellabs acted with scienter.  Under this Court's construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial.  A plaintiff alleging fraud under §10(b) must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.  At trial, she must then prove her case by a "preponderance of the evidence."  Pp. 15–17.

   (e) Neither the District Court nor the Court of Appeals had the opportunity to consider whether the Shareholders' allegations warrant "a strong inference that [Notebaert and Tellabs] acted with the required state of mind," 15 U. S. C. §78u–4(b)(2), in light of the prescriptions announced today.  Thus, the case is remanded for a determination under this Court's construction of §21D(b)(2).  P. 18.

437 F. 3d 588, vacated and remanded.

   GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined.  SCALIA, J., and ALITO, J., filed opinions concurring in the judgment.  STEVENS, J., filed a dissenting opinion.

Syllabus

ASHCROFT, FORMER ATTORNEY GENERAL, ET AL.
*v.* IQBAL ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 07–1015.   Argued December 10, 2008—Decided May 18, 2009

Following the September 11, 2001, terrorist attacks, respondent Iqbal, a
Pakistani Muslim, was arrested on criminal charges and detained by
federal officials under restrictive conditions.   Iqbal filed a *Bivens* action
against numerous federal officials, including petitioner Ashcroft, the for-
mer Attorney General, and petitioner Mueller, the Director of the Fed-
eral Bureau of Investigation (FBI).   See *Bivens* v. *Six Unknown Fed.
Narcotics Agents*, 403 U. S. 388.   The complaint alleged, *inter alia*, that
petitioners designated Iqbal a person "of high interest" on account of
his race, religion, or national origin, in contravention of the First and
Fifth Amendments; that the FBI, under Mueller's direction, arrested
and detained thousands of Arab Muslim men as part of its September
11 investigation; that petitioners knew of, condoned, and willfully and
maliciously agreed to subject Iqbal to harsh conditions of confinement
as a matter of policy, solely on account of the prohibited factors and for
no legitimate penological interest; and that Ashcroft was the policy's
"principal architect" and Mueller was "instrumental" in its adoption and
execution.   After the District Court denied petitioners' motion to dis-
miss on qualified-immunity grounds, they invoked the collateral-order
doctrine to file an interlocutory appeal in the Second Circuit.   Affirm-
ing, that court assumed without discussion that it had jurisdiction and
focused on the standard set forth in *Bell Atlantic Corp.* v. *Twombly*,
550 U. S. 544, for evaluating whether a complaint is sufficient to survive
a motion to dismiss.   Concluding that *Twombly*'s "flexible plausibility
standard" obliging a pleader to amplify a claim with factual allegations
where necessary to render it plausible was inapplicable in the context
of petitioners' appeal, the court held that Iqbal's complaint was adequate
to allege petitioners' personal involvement in discriminatory decisions
which, if true, violated clearly established constitutional law.

*Held:*

  1. The Second Circuit had subject-matter jurisdiction to affirm the
District Court's order denying petitioners' motion to dismiss.
Pp. 671–675.

    (a) Denial of a qualified-immunity claim can fall within the narrow
class of prejudgment orders reviewable under the collateral-order doc-

Syllabus

trine so long as the order "turns on an issue of law." *Mitchell* v. *Forsyth*, 472 U. S. 511, 530. The doctrine's applicability in this context is well established; an order rejecting qualified immunity at the motion-to-dismiss stage is a "final decision" under 28 U. S. C. §1291, which vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts." *Behrens* v. *Pelletier*, 516 U. S. 299, 307. Pp. 671–672.

(b) Under these principles, the Court of Appeals had, and this Court has, jurisdiction over the District Court's order. Because the order turned on an issue of law and rejected the qualified-immunity defense, it was a final decision "subject to immediate appeal." *Behrens, supra,* at 307. Pp. 672–675.

2. Iqbal's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination. Pp. 675–687.

(a) This Court assumes, without deciding, that Iqbal's First Amendment claim is actionable in a *Bivens* action, see *Hartman* v. *Moore*, 547 U. S. 250, 254, n. 2. Because vicarious liability is inapplicable to *Bivens* and §1983 suits, see, *e. g., Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 691, the plaintiff in a suit such as the present one must plead that each Government-official defendant, through his own individual actions, has violated the Constitution. Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences"; it involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279. Iqbal must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. Pp. 675–677.

(b) Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, *Twombly*, 550 U. S., at 555, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id.,* at 570. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. Two working principles underlie *Twombly.* First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id.,* at 555. Second, determining whether a complaint states a plausible claim is context specific, requiring the

Syllabus

reviewing court to draw on its experience and common sense. *Id.*, at 556. A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 677–680.

(c) Iqbal's pleadings do not comply with Rule 8 under *Twombly.* Several of his allegations—that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no legitimate penological interest; that Ashcroft was that policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution—are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was based on discriminatory factors. Pp. 680–684.

(d) Three of Iqbal's arguments are rejected. Pp. 684–687.

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied Rule 8, which in turn governs the pleading standard "in all civil actions," Rule 1, the case applies to antitrust and discrimination suits alike, see 550 U. S., at 555–556, and n. 3. P. 684.

(ii) Rule 8's pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion. The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process. *Twombly, supra,* at 559. And because Iqbal's

Syllabus

complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.   Pp. 684–686.

   (iii) Rule 9(b)—which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"—does not require courts to credit a complaint's conclusory statements without reference to its factual context.   Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard.   It does not give him license to evade Rule 8's less rigid, though still operative, strictures.   Pp. 686–687.

   (e) The Second Circuit should decide in the first instance whether to remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint.   P. 687.

490 F. 3d 143, reversed and remanded.

  KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined.  SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post,* p. 687.  BREYER, J., filed a dissenting opinion, *post,* p. 699.

  Former *Solicitor General Garre* argued the cause for petitioners.  With him on the briefs were *Assistant Attorney General Katsas, Deputy Assistant Attorney General Cohn, Curtis E. Gannon, Barbara L. Herwig,* and *Robert M. Loeb. Michael L. Martinez, David E. Bell,* and *Matthew F. Scarlato* filed briefs for Dennis Hasty as respondent under this Court's Rule 12.6 urging reversal.  *Brett M. Schuman, Lauren J. Resnick,* and *Thomas D. Warren* filed briefs for Michael Rolince et al. as respondents under this Court's Rule 12.6 urging reversal.

  *Alexander A. Reinert* argued the cause for respondents. With him on the brief for respondent Javaid Iqbal were *Joan M. Magoolaghan, Elizabeth L. Koob,* and *Rima J. Oken.**

---

  *\*Daniel J. Popeo, Richard A. Samp,* and *Paul J. Larkin, Jr.,* filed a brief for William P. Barr et al. as *amici curiae* urging reversal.

  Briefs of *amici curiae* urging affirmance were filed for the American Association for Justice by *Stephen B. Pershing* and *Les Weisbrod;* for the Japanese American Citizens League et al. by *John E. Higgins;* for National Civil Rights Organizations by *Harold Hongju Koh* and *Cristóbal Joshua Alex;* for Professors of Civil Procedure and Federal Practice by *Allan Ides* and *David L. Shapiro;* for the Sikh Coalition et al. by *Brian E. Robinson;* and for Ibrahim Turkmen et al. by *Michael Winger.*

JUSTICE KENNEDY delivered the opinion of the Court.

Javaid Iqbal (hereinafter respondent) is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials, including John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a claim despite petitioners' official status at the times in question. Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit. The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here. This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights. We hold respondent's pleadings are insufficient.

Opinion of the Court

### I

Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew.   The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor.   By September 18 "the FBI had received more than 96,000 tips or potential leads from the public."   Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11–12 (Apr. 2003), http://www.usdoj.gov/oig/special/0306/full.pdf?bcsi_scan_61073EC0F74759AD=0&bcsi_scan_filename=full.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks in particular or to terrorism in general.   *Id.*, at 1.   Of those individuals, some 762 were held on immigration charges; and a 184-member subset of that group was deemed to be "of 'high interest'" to the investigation.   *Id.*, at 111.   The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world.   *Id.*, at 112–113.

Respondent was one of the detainees.   According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States.   *Iqbal* v. *Hasty*, 490 F. 3d 143, 147–148 (CA2 2007).   Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York.   Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit

Opinion of the Court

(ADMAX SHU). *Id.*, at 148. As the facility's name indicates, the ADMAX SHU incorporates the maximum security conditions allowable under Federal Bureau of Prisons regulations. *Ibid.* ADMAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. *Ibid.*

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. *Id.*, at 149. He then filed a *Bivens* action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners—officials who were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04–CV–1809 (JG)(JA), ¶¶ 10–11, App. to Pet. for Cert. 157a (hereinafter Complaint).

The 21-cause-of-action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his treatment while confined to the ADMAX SHU. The complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailors "kicked him in the stomach, punched him in the face, and dragged him across" his cell without justification, *id.*, ¶ 113, at 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, *id.*, ¶¶ 143–145, at 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," *id.*, ¶ 154, at 184a.

The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners desig-

Opinion of the Court

nated respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." *Id.*, ¶ 47, at 164a. It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.*, ¶ 69, at 168a. Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.*, ¶ 96, at 172a–173a. The pleading names Ashcroft as the "principal architect" of the policy, *id.*, ¶ 10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation," *id.*, ¶ 11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. *Id.*, at 136a–137a (relying on *Conley* v. *Gibson*, 355 U. S. 41 (1957)). Invoking the collateral-order doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544 (2007), which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

Opinion of the Court

The Court of Appeals considered *Twombly*'s applicability to this case. Acknowledging that *Twombly* retired the *Conley* no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings." 490 F. 3d, at 155. It concluded that *Twombly* called for a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Id.*, at 157–158. The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law. *Id.*, at 174.

Judge Cabranes concurred. He agreed that the majority's "discussion of the relevant pleading standards reflect[ed] the uneasy compromise . . . between a qualified immunity privilege rooted in the need to preserve the effectiveness of government as contemplated by our constitutional structure and the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure." *Id.*, at 178 (internal quotation marks and citations omitted). Judge Cabranes nonetheless expressed concern at the prospect of subjecting high-ranking Government officials—entitled to assert the defense of qualified immunity and charged with responding to "a national and international security emergency unprecedented in the history of the American Republic"—to the burdens of discovery on the basis of a complaint as nonspecific as respondent's. *Id.*, at 179. Reluctant to vindicate that concern as a member of the Court of Appeals, *ibid.*, Judge Cabranes urged this Court to address the appropriate pleading standard "at the earliest opportunity," *id.*, at 178. We granted certiorari, 554 U. S. 902 (2008), and now reverse.

Cite as: 556 U. S. 662 (2009)    671

Opinion of the Court

## II

We first address whether the Court of Appeals had subject-matter jurisdiction to affirm the District Court's order denying petitioners' motion to dismiss. Respondent disputed subject-matter jurisdiction in the Court of Appeals, but the court hardly discussed the issue. We are not free to pretermit the question. Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006) (citing *United States* v. *Cotton*, 535 U. S. 625, 630 (2002)). According to respondent, the District Court's order denying petitioners' motion to dismiss is not appealable under the collateral-order doctrine. We disagree.

## A

With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U. S. C. §1291. Though the statute's finality requirement ensures that "interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule," *Johnson* v. *Jones*, 515 U. S. 304, 309 (1995), it does not prevent "review of all prejudgment orders," *Behrens* v. *Pelletier*, 516 U. S. 299, 305 (1996). Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Ibid.* (quoting *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 546 (1949)).

A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class

672    ASHCROFT *v.* IQBAL

Opinion of the Court

of appealable orders despite "the absence of a final judgment." *Mitchell* v. *Forsyth*, 472 U. S. 511, 530 (1985). This is so because qualified immunity—which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights," *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)—is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U. S., at 526. Provided it "turns on an issue of law," *id.*, at 530, a district-court order denying qualified immunity " 'conclusively determine[s]' " that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effectively unreviewable on appeal from a final judgment," *id.*, at 527–528 (citing *Cohen, supra,* at 546). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen*. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of § 1291. *Behrens*, 516 U. S., at 307.

B

Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction." Brief for Respondent Iqbal 15 (hereinafter Iqbal Brief). In other words, respondent

Opinion of the Court

contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman* v. *Moore*, 547 U. S. 250 (2006), the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a First Amendment retaliation claim. *Id.*, at 257, n. 5. Similarly, two Terms ago in *Wilkie* v. *Robbins*, 551 U. S. 537 (2007), the Court considered another interlocutory order denying qualified immunity. The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights. 551 U. S., at 549, n. 4. These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation. Iqbal Brief 15. Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie*, since whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded. In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 51 (1995), and "directly implicated by," *Hartman*, *supra*, at 257, n. 5, the qualified-immunity defense.

Respondent counters that our holding in *Johnson*, 515 U. S. 304, confirms the want of subject-matter jurisdiction here. That is incorrect. The allegation in *Johnson* was that five defendants, all of them police officers, unlawfully beat the plaintiff. *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order

Opinion of the Court

that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine issue of material fact that three of the defendants participated in the beating. *Id.*, at 313.

In finding that order not a "final decision" for purposes of § 1291, the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning "'*on an issue of law*'" are subject to immediate appeal. 515 U. S., at 313. Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson*, it is a "fact-related" legal inquiry. *Id.*, at 314. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.*, at 316. That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. *Ibid.* Finding those concerns predominant, *Johnson* held that the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law. 515 U. S., at 317.

The concerns that animated the decision in *Johnson* are absent when an appellate court considers the disposition of a motion to dismiss a complaint for insufficient pleadings. True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined. Here, however, the order denying petitioners' motion to dismiss falls well within the latter class. Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id.*, at 316. And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency. *Twombly*, 550 U. S., at 557. Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson*

Opinion of the Court

is not implicated here. The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction. We proceed to consider the merits of petitioners' appeal.

III

In *Twombly, supra*, at 553–554, the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

In *Bivens*—proceeding on the theory that a right suggests a remedy—this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 66 (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." 534 U. S., at 68. See also *Wilkie*, 551 U. S., at 549–550. That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, see *Davis* v. *Passman*, 442 U. S. 228 (1979), we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. *Bush* v. *Lucas*, 462 U. S. 367 (1983). Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*.

In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. §1979, 42 U. S. C.

§ 1983." *Hartman*, 547 U. S., at 254, n. 2. Cf. *Wilson* v. *Layne*, 526 U. S. 603, 609 (1999). Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). See *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 691 (1978) (finding no vicarious liability for a municipal "person" under 42 U. S. C. § 1983); see also *Dunlop* v. *Munroe*, 7 Cranch 242, 269 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson* v. *Sichel*, 127 U. S. 507, 515–516 (1888) ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 540–541 (1993) (opinion of KENNEDY, J.) (First Amendment); *Washington* v. *Davis*, 426 U. S. 229, 240 (1976) (Fifth Amendment). Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279 (1979). It instead involves a decisionmaker's undertak-

Opinion of the Court

ing a course of action " 'because of,' not merely 'in spite of,'
[the action's] adverse effects upon an identifiable group."
*Ibid.* It follows that, to state a claim based on a violation of
a clearly established right, respondent must plead sufficient
factual matter to show that petitioners adopted and imple-
mented the detention policies at issue not for a neutral, in-
vestigative reason but for the purpose of discriminating on
account of race, religion, or national origin.

Respondent disagrees. He argues that, under a theory of
"supervisory liability," petitioners can be liable for "knowl-
edge and acquiescence in their subordinates' use of dis-
criminatory criteria to make classification decisions among
detainees." Iqbal Brief 45–46. That is to say, respondent
believes a supervisor's mere knowledge of his subordinate's
discriminatory purpose amounts to the supervisor's violating
the Constitution. We reject this argument. Respondent's
conception of "supervisory liability" is inconsistent with his
accurate stipulation that petitioners may not be held ac-
countable for the misdeeds of their agents. In a § 1983 suit
or a *Bivens* action—where masters do not answer for the
torts of their servants—the term "supervisory liability" is a
misnomer. Absent vicarious liability, each Government of-
ficial, his or her title notwithstanding, is only liable for his or
her own misconduct. In the context of determining whether
there is a violation of a clearly established right to over-
come qualified immunity, purpose rather than knowledge
is required to impose *Bivens* liability on the subordinate
for unconstitutional discrimination; the same holds true for
an official charged with violations arising from his or her
superintendent responsibilities.

## IV

### A

We turn to respondent's complaint. Under Federal Rule
of Civil Procedure 8(a)(2), a pleading must contain a "short
and plain statement of the claim showing that the pleader is

entitled to relief."   As the Court held in *Twombly*, 550 U. S. 544, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555 (citing *Papasan* v. *Allain*, 478 U. S. 265, 286 (1986)).   A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."   550 U. S., at 555.   Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."   *Id.*, at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."   *Id.*, at 570.   A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.   *Id.*, at 556.   The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.   *Ibid.*   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "   *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.   *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).   Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for

Opinion of the Court

a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  490 F. 3d, at 157–158.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach.  There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U. S. C. § 1.  Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 775 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another."  550 U. S., at 551 (internal quotation marks omitted).  The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the

unlawful agreement alleged.  *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8.  In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth.  *Id.,* at 555.  Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce.  The Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.,* at 565–566.  Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.  *Id.,* at 567.  Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.  *Id.,* at 570.

### B

Under *Twombly*'s construction of Rule 8, we conclude that respondent's complaint has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible." *Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  Complaint ¶ 96, App. to Pet. for Cert. 173a–174a.  The complaint alleges that Ashcroft was the "principal architect" of this invidious policy,

Opinion of the Court

*id.*, ¶ 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, *id.*, ¶ 11, at 157a. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U. S., at 555, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney*, 442 U. S., at 279. As such, the allegations are conclusory and not entitled to be assumed true. *Twombly*, 550 U. S., at 554–555. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs' express allegation of a " 'contract, combination or conspiracy to prevent competitive entry,' " *id.*, at 551, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." Complaint ¶ 47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.*, ¶ 69, at 168a. Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

Opinion of the Court

The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests, *Twombly, supra*, at 567, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief. It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC. Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September-11th detainees" in the ADMAX SHU once they were categorized as "of high interest." Complaint ¶ 69, App. to Pet. for Cert. 168a. To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do. Though respondent alleges that various other defendants, who are not before us, may

Opinion of the Court

have labeled him a person "of high interest" for impermissible reasons, his only factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post-September-11 detainees until they were "'cleared' by the FBI." *Ibid.* Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations. He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly*, 550 U. S., at 570.

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here. In *Twombly*, the complaint alleged general wrongdoing that extended over a period of years, *id.*, at 551, whereas here the complaint alleges discrete wrongs—for instance, beatings—by lower level Government actors. The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part. Despite these distinctions, respondent's pleadings do not suffice to state a claim. Unlike in *Twombly*, where the doctrine of *respondeat superior* could bind the corporate defendant, here, as we have noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic. Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind. His pleadings thus do not meet the standard necessary to comply with Rule 8.

Opinion of the Court

It is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief from petitioners.

### C

Respondent offers three arguments that bear on our disposition of his case, but none is persuasive.

### 1

Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. Iqbal Brief 37–38. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. 550 U. S., at 554. That Rule in turn governs the pleading standard "in all civil actions and proceedings in the United States district courts." Fed. Rule Civ. Proc. 1. Our decision in *Twombly* expounded the pleading standard for "all civil actions," *ibid.*, and it applies to antitrust and discrimination suits alike, see 550 U. S., at 555–556, and n. 3.

### 2

Respondent next implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls

Opinion of the Court

placed upon the discovery process. *Twombly, supra,* at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity. The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery." *Siegert* v. *Gilley,* 500 U. S. 226, 236 (1991) (KENNEDY, J., concurring in judgment). There are serious and legitimate reasons for this. If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government. The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic." 490 F. 3d, at 179.

It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even

Opinion of the Court

if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.

3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing Fed. Rule Civ. Proc. 9). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶ 96, App. to Pet. for Cert. 172a–173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.

It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license

SOUTER, J., dissenting

to evade the less rigid—though still operative—strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

## V

We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

This case is here on the uncontested assumption that *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat superior*. The Court apparently rejects this concession and, although it has no bearing on the ma-

SOUTER, J., dissenting

jority's resolution of this case, does away with supervisory liability under *Bivens*. The majority then misapplies the pleading standard under *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544 (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal* v. *Hasty*, 490 F. 3d 143, 147–148 (CA2 2007). He alleges that Federal Bureau of Investigation (FBI) officials carried out a discriminatory policy by designating him as a person "'of high interest'" in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial. *Id.*, at 148. As I will mention more fully below, Iqbal contends that Ashcroft and Mueller were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his First and Fifth Amendment rights.[1]

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stom-

_____

[1] Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud charges. See *Bell* v. *Wolfish*, 441 U. S. 520, 535 (1979).

SOUTER, J., dissenting

ach, punched him in the face, and dragged him across the room." First Amended Complaint in No. 04–CV–1809 (JG) (JA), ¶ 113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks. *Id.*, ¶¶ 187–188, at 189a. According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.*, ¶¶ 136–140, at 181a, verbally berated him as a " 'terrorist' " and " 'Muslim killer,' " *id.*, ¶ 87, at 170a–171a, refused to give him adequate food, *id.*, ¶ 91, at 171a–172a, and intentionally turned on air conditioning during the winter and heating during the summer, *id.*, ¶ 84, at 170a. He claims that prison staff interfered with his attempts to pray and engage in religious study, *id.*, ¶¶ 153–154, at 183a–184a, and with his access to counsel, *id.*, ¶¶ 168, 171, at 186a–187a.

The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed. Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

> "1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate officials is sufficient to state individual-capacity claims against those officials under *Bivens.*

> "2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Pet. for Cert. I.

The Court granted certiorari on both questions. The first is about pleading; the second goes to the liability standard.

SOUTER, J., dissenting

In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to liability under *Bivens.* In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited "'deliberate indifference'" to that discrimination. Pet. for Cert. 29 (quoting *Farmer* v. *Brennan*, 511 U. S. 825, 837 (1994)). Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy Rule 8(a)(2), and in particular whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11–24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.*, at 25–33. This was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens.* In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as

Souter, J., dissenting

being 'of high interest' and they were deliberately indifferent to that discrimination."   Brief for Petitioners 50; see also Reply Brief for Petitioners 21–22.   Iqbal argued that the allegations in his complaint were sufficient under Rule 8(a)(2) and *Twombly*, and conceded that as a matter of law he could not recover under a theory of *respondeat superior*.   See Brief for Respondent Iqbal 46.   Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied Rule 8(a)(2).

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it must *sua sponte* decide the scope of supervisory liability here.   *Ante*, at 675–677.   I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim.   See *Twombly*, 550 U. S., at 557–558. But deciding the scope of supervisory *Bivens* liability in this case is uncalled for.   There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct are grounds for *Bivens* liability.   Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will satisfy Ashcroft and Mueller's own test for supervisory liability.   See *Farmer, supra,* at 842 (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm").   We do not normally override a party's concession, see, *e. g., United States* v. *International Business Machines Corp.,* 517 U. S. 843, 855

SOUTER, J., dissenting

(1996) (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra*, at 694. I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper scope of supervisory liability, much less the full-dress argument we normally require. *Mapp* v. *Ohio*, 367 U. S. 643, 676–677 (1961) (Harlan, J., dissenting). We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals. See *infra*, at 693–694. This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson* v. *Callahan*, 555 U. S. 223, 239 (2009), yet today the majority answers a question with no briefing at all. The attendant risk of error is palpable.

Finally, the Court's approach is most unfair to Iqbal. He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference. By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

## B

The majority, however, does ignore the concession. According to the majority, because Iqbal concededly cannot recover on a theory of *respondeat superior*, it follows that he cannot recover under any theory of supervisory liability. *Ante*, at 677. The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants," "the term 'supervisory liability' is a misnomer," and

that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ibid.* Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects. *Ante,* at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here: *respondeat superior* liability, in which "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment," Restatement (Third) of Agency §2.04 (2005), or no supervisory liability at all. The dichotomy is false. Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate. See, *e. g., Whitfield* v. *Meléndez-Rivera,* 431 F. 3d 1, 14 (CA1 2005) (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett* v. *Eastpointe,* 410 F. 3d 810, 818 (CA6 2005) (same); *Richardson* v. *Goord,* 347 F. 3d 431, 435 (CA2 2003) (same); *Hall* v. *Lombardi,* 996 F. 2d 954, 961 (CA8 1993) (same).

In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, *e. g., Baker* v. *Monroe Twp.,* 50 F. 3d 1186, 1994 (CA3 1995); *Woodward* v. *Worland,* 977 F. 2d 1392, 1400 (CA10 1992); or where supervisors " 'know about the conduct and facilitate it, approve it, condone it, or turn a

blind eye for fear of what they might see,'" *International Action Center* v. *United States*, 365 F. 3d 20, 28 (CADC 2004) (Roberts, J.) (quoting *Jones* v. *Chicago*, 856 F. 2d 985, 992 (CA7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e. g.*, *Hall*, *supra*, at 961; or where the supervisor was grossly negligent, see, *e. g.*, *Lipsett* v. *University of Puerto Rico*, 864 F. 2d 881, 902 (CA1 1988). I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case. The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true." *Ante*, at 681. As I explain below, this conclusion is unsound, but on the majority's understanding of Rule 8(a)(2) pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed.[2]

## II

Given petitioners' concession, the complaint satisfies Rule 8(a)(2). Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of sus-

---

[2] If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra*, at 692, for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

SOUTER, J., dissenting

pects as being 'of high interest' and they were deliberately indifferent to that discrimination."  Brief for Petitioners 50. Iqbal alleges that after the September 11 attacks the FBI "arrested and detained thousands of Arab Muslim men," Complaint ¶ 47, App. to Pet. for Cert. 164a, that many of these men were designated by high-ranking FBI officials as being " 'of high interest,' "  *id.*, ¶¶ 48, 50, at 164a, and that in many cases, including Iqbal's, this designation was made "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity,"  *id.*, ¶ 49, at 164a.  The complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged,"  *id.*, ¶ 10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged,"  *id.*, ¶ 11, at 157a.  According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  *Id.*, ¶ 96, at 172a–173a. The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out.  Actually, the complaint goes further in alleging that Ashcroft and Mueller affirmatively acted to create the discriminatory detention policy.  If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*.  They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command."  Brief for Petitioners 28.  But this response bespeaks a fundamental misunderstanding of the en-

SOUTER, J., dissenting

quiry that *Twombly* demands.   *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true.   We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be.   See 550 U. S., at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id.*, at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke* v. *Williams*, 490 U. S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations").   The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel.   That is not what we have here.

Under *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible.   That is, in *Twombly*'s words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct."   550 U. S., at 564, n. 8.   In *Twombly*, we were faced with allegations of a conspiracy to violate § 1 of the Sherman Act through parallel conduct. The difficulty was that the conduct alleged was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."   *Id.*, at 554.   We held that in that sort of circumstance, "[a]n allegation of parallel conduct is . . . much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.' "   *Id.*, at 557 (brackets omitted).   Here, by contrast, the allegations in the complaint are neither confined to naked legal conclusions nor consistent

SOUTER, J., dissenting

with legal conduct.   The complaint alleges that FBI officials discriminated against Iqbal solely on account of his race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal action.   Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face."  *Id.,* at 570.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly.*  Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in the complaint: that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11," Complaint ¶ 47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001," *id.,* ¶ 69, at 168a.  See *ante,* at 681.  I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity," *ante,* at 683, and that this produced "a disparate, incidental impact on Arab Muslims," *ante,* at 682.  And I agree that the two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allegations linking Ashcroft and Mueller to the discriminatory practices of their subordinates. See Complaint ¶ 10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy);

*id.*, ¶ 11, at 157a (Mueller was "instrumental" in adopting and executing the discriminatory policy); *id.*, ¶ 96, at 172a–173a (Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

    The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true." *Ante*, at 681 (quoting *Twombly*, *supra*, at 555). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See Complaint ¶¶ 47–53, *supra*, at 164a–165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the complaint as a whole, it gives Ashcroft and Mueller "'fair notice of what the . . . claim is and the grounds upon which it

BREYER, J., dissenting

rests.'" *Twombly*, 550 U. S., at 555 (quoting *Conley* v. *Gibson*, 355 U. S. 41, 47 (1957) (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory. For example, the majority takes as true the statement that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Complaint ¶ 69, *supra*, at 168a; see *ante*, at 681. This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of "'high interest'" "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," Complaint ¶¶ 48–50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.*, ¶ 96, at 172a. By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

I respectfully dissent.

JUSTICE BREYER, dissenting.

I agree with JUSTICE SOUTER and join his dissent. I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government." *Ante*, at 685. But I cannot find in that need adequate justification for the Court's interpretation of *Bell*

ASHCROFT *v.* IQBAL

BREYER, J., dissenting

*Atlantic Corp.* v. *Twombly,* 550 U. S. 544 (2007), and Federal Rule of Civil Procedure 8.   The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference.   As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials.   See *Iqbal* v. *Hasty,* 490 F. 3d 143, 158 (2007).   A district court, for example, can begin discovery with lower level Government defendants before determining whether a case can be made to allow discovery related to higher level Government officials.   See *ibid.*   Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate, either in general or in the case before us.   For this reason, as well as for the independently sufficient reasons set forth in JUSTICE SOUTER's opinion, I would affirm the Second Circuit.

(Slip Opinion)          OCTOBER TERM, 2019          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LIU ET AL. *v.* SECURITIES AND EXCHANGE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–1501.  Argued March 3, 2020—Decided June 22, 2020

To punish securities fraud, the Securities and Exchange Commission is
authorized to seek "equitable relief" in civil proceedings, 15 U. S. C.
§78u(d)(5).  In *Kokesh* v. *SEC*, 581 U. S. ___, this Court held that a
disgorgement order in a Securities and Exchange Commission (SEC)
enforcement action constitutes a "penalty" for purposes of the applica-
ble statute of limitations.  The Court did not, however, address
whether disgorgement can qualify as "equitable relief" under
§78u(d)(5), given that equity historically excludes punitive sanctions.

Petitioners Charles Liu and Xin Wang solicited foreign nationals to
invest in the construction of a cancer-treatment center, but, an SEC
investigation revealed, misappropriated much of the funds in violation
of the terms of a private offering memorandum.  The SEC brought a
civil action against petitioners, seeking, as relevant here, disgorge-
ment equal to the full amount petitioners had raised from investors.
Petitioners argued that the disgorgement remedy failed to account for
their legitimate business expenses, but the District Court disagreed
and ordered petitioners jointly and severally liable for the full amount.
The Ninth Circuit affirmed.

*Held*: A disgorgement award that does not exceed a wrongdoer's net prof-
its and is awarded for victims is equitable relief permissible under
§78u(d)(5). Pp. 5–20.

(a) In interpreting statutes that provide for "equitable relief," this
Court analyzes whether a particular remedy falls into "those catego-
ries of relief that were *typically* available in equity."  *Mertens* v. *Hewitt
Associates*, 508 U. S. 248, 256.  Relevant here are two principles of eq-
uity jurisprudence.  Equity practice has long authorized courts to strip
wrongdoers of their ill-gotten gains.  And to avoid transforming that

Syllabus

remedy into a punitive sanction, courts restricted it to an individual wrongdoer's net profits to be awarded for victims. Pp. 5–14.

(1) Whether it is called restitution, an accounting, or disgorgement, the equitable remedy that deprives wrongdoers of their net profits from unlawful activity reflects both the foundational principle that "it would be inequitable that [a wrongdoer] should make a profit out of his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207, and the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged," *Tilghman* v. *Proctor,* 125 U. S. 136, 145–146. The remedy has been a mainstay of equity courts, and is not limited to cases involving a breach of trust or fiduciary duty, see *Root,* 105 U. S., at 214. Pp. 6–9.

(2) To avoid transforming a profits award into a penalty, equity courts restricted the remedy in various ways. A constructive trust was often imposed on wrongful gains for wronged victims. See, *e.g., Burdell* v. *Denig,* 92 U. S. 716, 720. Courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory. See, *e.g., Ambler* v. *Whipple,* 20 Wall. 546, 559. Finally, courts limited awards to the net profits from wrongdoing after deducting legitimate expenses. See, *e.g., Rubber Co.* v. *Goodyear,* 9 Wall. 788, 804. Pp. 9–12.

(3) Congress incorporated these longstanding equitable principles into §78u(d)(5), but courts have occasionally awarded disgorgement in ways that test the bounds of equity practice. Petitioners claim that disgorgement is necessarily a penalty under *Kokesh*, and thus not available at equity. But *Kokesh* expressly declined to reach that question. The Government contends that the SEC's interpretation has Congress' tacit support. But Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. Pp. 12–14.

(b) Petitioners briefly claim that their disgorgement award crosses the bounds of traditional equity practice by failing to return funds to victims, imposing joint-and-several liability, and declining to deduct business expenses from the award. Because the parties did not fully brief these narrower questions, the Court does not decide them here. But certain principles may guide the lower courts' assessment of these arguments on remand. Pp. 14–20.

(1) Section 78u(d)(5) provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies its command that any remedy be "appropriate or necessary for the benefit of investors," and the equitable nature of the profits remedy gen-

Syllabus

erally requires the SEC to return a defendant's gains to wronged investors. The parties, however, do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would be for the benefit of investors and consistent with equitable principles. Pp. 14–17.

(2) Imposing disgorgement liability on a wrongdoer for benefits that accrue to his affiliates through joint-and-several liability runs against the rule in favor of holding defendants individually liable. See *Belknap* v. *Schild*, 161 U. S. 10, 25–26. The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, *e.g.*, *Ambler*, 20 Wall., at 559. On remand, the Ninth Circuit may determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required. Pp. 17–18.

(3) Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account." *Goodyear*, 9 Wall., at 804. When the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions." *Root*, 105 U. S., at 203. Accordingly, courts must deduct legitimate expenses before awarding disgorgement under §78u(d)(5). The District Court below did not ascertain whether any of petitioners' expenses were legitimate. On remand, the lower courts should examine whether including such expenses in a profits-based remedy is consistent with the equitable principles underlying §78u(d)(5). Pp. 18–20.

754 Fed. Appx. 505, vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion.

Cite as: 591 U. S. ____ (2020)                  1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1501

_____

## CHARLES C. LIU, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In *Kokesh* v. *SEC*, 581 U. S. ___ (2017), this Court held that a disgorgement order in a Securities and Exchange Commission (SEC) enforcement action imposes a "penalty" for the purposes of 28 U. S. C. §2462, the applicable statute of limitations.  In so deciding, the Court reserved an ante-cedent question: whether, and to what extent, the SEC may seek "disgorgement" in the first instance through its power to award "equitable relief" under 15 U. S. C. §78u(d)(5), a power that historically excludes punitive sanctions.  The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under §78u(d)(5).  The judg-ment is vacated, and the case is remanded for the courts below to ensure the award was so limited.

I

A

Congress authorized the SEC to enforce the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. §77a *et seq.*, and the Securities Exchange Act of 1934, 48 Stat. 881,

2                          LIU *v.* SEC

Opinion of the Court

as amended, 15 U. S. C. §78a *et seq.*, and to punish securities fraud through administrative and civil proceedings. In administrative proceedings, the SEC can seek limited civil penalties and "disgorgement." See §77h–1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"); see also §77h–1(g) ("Authority to impose money penalties"). In civil actions, the SEC can seek civil penalties and "equitable relief." See, *e.g.*, §78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, . . . any Federal court may grant . . . any equitable relief that may be appropriate or necessary for the benefit of investors"); see also §78u(d)(3) ("Money penalties in civil actions" (quotation modified)).

Congress did not define what falls under the umbrella of "equitable relief." Thus, courts have had to consider which remedies the SEC may impose as part of its §78u(d)(5) powers.

Starting with *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301 (CA2 1971), courts determined that the SEC had authority to obtain what it called "restitution," and what in substance amounted to "profits" that "merely depriv[e]" a defendant of "the gains of . . . wrongful conduct." *Id.*, at 1307–1308. Over the years, the SEC has continued to request this remedy, later referred to as "disgorgement,"[1] and

---

[1] Courts have noted the relatively recent vintage of the term "disgorgement." See, *e.g.*, *SEC* v. *Cavanaugh*, 445 F. 3d 105, 116, n. 24 (CA2 2006). The dissent contends that this recency in terminology alone removes disgorgement from the class of traditional equitable remedies, *post*, at 4 (opinion of THOMAS, J.), despite seeming to recognize disgorgement's parallels to restitution-based awards well within that class, *post*, at 4–5. It is no surprise that the dissent notes such parallels, given this Court's acknowledgment that "disgorgement of improper profits" is "a remedy only for restitution" that is "traditionally considered . . . equitable." *Tull* v. *United States*, 481 U. S. 412, 424 (1987); see also *infra*, at 7.

Opinion of the Court

courts have continued to award it. See *SEC* v. *Commonwealth Chemical Securities, Inc.*, 574 F. 2d 90, 95 (CA2 1978) (explaining that, when a court awards "[d]isgorgement of profits in an action brought by the SEC," it is "exercising the chancellor's discretion to prevent unjust enrichment"); see also *SEC* v. *Blatt*, 583 F. 2d 1325, 1335 (CA5 1978); *SEC* v. *Washington Cty. Util. Dist.*, 676 F. 2d 218, 227 (CA6 1982).

In *Kokesh*, this Court determined that disgorgement constituted a "penalty" for the purposes of 28 U. S. C. §2462, which establishes a 5-year statute of limitations for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." The Court reached this conclusion based on several considerations, namely, that disgorgement is imposed as a consequence of violating public laws, it is assessed in part for punitive purposes, and in many cases, the award is not compensatory. 581 U. S., at ___–___ (slip op., at 7–9). But the Court did not address whether a §2462 penalty can nevertheless qualify as "equitable relief" under §78u(d)(5), given that equity never "lends its aid to enforce a forfeiture or penalty." *Marshall* v. *Vicksburg*, 15 Wall. 146, 149 (1873). The Court cautioned, moreover, that its decision should not be interpreted "as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings." *Kokesh*, 581 U. S., at ___, n. 3 (slip op., at 5, n. 3). This question is now squarely before the Court.

---

The dissent also observes the solid equitable roots of an accounting for profits, *post*, at 3; accord, *infra*, at 6 (discussing the equitable origins of the accounting remedy), a remedy closely resembling disgorgement, see *infra*, at 8–9. In any event, casting aside a form of relief solely "based on the particular label affixed to [it] would 'elevate form over substance,'" *Aetna Health Inc.* v. *Davila*, 542 U. S. 200, 214 (2004), leaving unresolved the question before us: whether the underlying profits-based award conforms to equity practice.

Opinion of the Court

### B

The SEC action and disgorgement award at issue here arise from a scheme to defraud foreign nationals. Petitioners Charles Liu and his wife, Xin (Lisa) Wang, solicited nearly $27 million from foreign investors under the EB–5 Immigrant Investor Program (EB–5 Program). 754 Fed. Appx. 505, 506 (CA9 2018) (case below). The EB–5 Program, administered by the U. S. Citizenship and Immigration Services, permits noncitizens to apply for permanent residence in the United States by investing in approved commercial enterprises that are based on "proposals for promoting economic growth." See USCIS, EB–5 Immigrant Investor Program, https://www.uscis.gov/eb-5. Investments in EB–5 projects are subject to the federal securities laws.

Liu sent a private offering memorandum to prospective investors, pledging that the bulk of any contributions would go toward the construction costs of a cancer-treatment center. The memorandum specified that only amounts collected from a small administrative fee would fund "'legal, accounting and administration expenses.'" 754 Fed. Appx., at 507. An SEC investigation revealed, however, that Liu spent nearly $20 million of investor money on ostensible marketing expenses and salaries, an amount far more than what the offering memorandum permitted and far in excess of the administrative fees collected. 262 F. Supp. 3d 957, 960–964 (CD Cal. 2017). The investigation also revealed that Liu diverted a sizable portion of those funds to personal accounts and to a company under Wang's control. *Id.*, at 961, 964. Only a fraction of the funds were put toward a lease, property improvements, and a proton-therapy machine for cancer treatment. *Id.*, at 964–965.

The SEC brought a civil action against petitioners, alleging that they violated the terms of the offering documents by misappropriating millions of dollars. The District Court

Opinion of the Court

found for the SEC, granting an injunction barring petition-
ers from participating in the EB–5 Program and imposing
a civil penalty at the highest tier authorized. *Id.*, at 975,
976. It also ordered disgorgement equal to the full amount
petitioners had raised from investors, less the $234,899
that remained in the corporate accounts for the project. *Id.*,
at 975–976.

Petitioners objected that the disgorgement award failed
to account for their business expenses. The District Court
disagreed, concluding that the sum was a "reasonable ap-
proximation of the profits causally connected to [their] vio-
lation." *Ibid.* The court ordered petitioners jointly and sev-
erally liable for the full amount that the SEC sought. App.
to Pet. for Cert. 62a.

The Ninth Circuit affirmed. It acknowledged that *Kokesh*
"expressly refused to reach" the issue whether the District
Court had the authority to order disgorgement. 754 Fed.
Appx., at 509. The court relied on Circuit precedent to con-
clude that the "proper amount of disgorgement in a scheme
such as this one is the entire amount raised less the money
paid back to the investors." *Ibid.*; see also *SEC* v. *JT Wal-
lenbrock & Assocs.*, 440 F. 3d 1109, 1113, 1114 (CA9 2006)
(reasoning that it would be "unjust to permit the defendants
to offset . . . the expenses of running the very business they
created to defraud . . . investors").

We granted certiorari to determine whether §78u(d)(5)
authorizes the SEC to seek disgorgement beyond a defend-
ant's net profits from wrongdoing. 589 U. S. ___ (2019).

II

Our task is a familiar one. In interpreting statutes like
§78u(d)(5) that provide for "equitable relief," this Court an-
alyzes whether a particular remedy falls into "those catego-
ries of relief that were *typically* available in equity."
*Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993); see
also *CIGNA Corp.* v. *Amara*, 563 U. S. 421, 439 (2011);

Opinion of the Court

*Montanile* v. *Board of Trustees of Nat. Elevator Industry Health Benefit Plan*, 577 U. S. 136, 142 (2016). The "basic contours of the term are well known" and can be discerned by consulting works on equity jurisprudence. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 217 (2002).

These works on equity jurisprudence reveal two principles. First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy. Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.

### A

Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names. Compare, *e.g.*, 1 D. Dobbs, Law of Remedies §4.3(5), p. 611 (1993) ("Accounting holds the defendant liable for his profits"), with *id.*, §4.1(1), at 555 (referring to "restitution" as the relief that "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"); see also Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *a*, p. 204 (2010) (Restatement (Third)) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits'"); 1 J. Pomeroy, Equity Jurisprudence §101, p. 112 (4th ed. 1918) (describing an accounting as an equitable remedy for the violation of strictly legal primary rights).

No matter the label, this "profit-based measure of unjust enrichment," Restatement (Third) §51, Comment *a*, at 204, reflected a foundational principle: "[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207 (1882). At

Opinion of the Court

the same time courts recognized that the wrongdoer should not profit "by his own wrong," they also recognized the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged." *Tilghman* v. *Proctor*, 125 U. S. 136, 145–146 (1888).

Decisions from this Court confirm that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts. In *Porter* v. *Warner Holding Co.*, 328 U. S. 395 (1946), the Court interpreted a section of the Emergency Price Control Act of 1942 that encompassed a "comprehensiv[e]" grant of "equitable jurisdiction." *Id.*, at 398. "[O]nce [a District Court's] equity jurisdiction has been invoked" under that provision, the Court concluded, "a decree compelling one to disgorge profits . . . may properly be entered." *Id.*, at 398–399.

Subsequent cases confirm the "'protean character' of the profits-recovery remedy." *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 668, n. 1 (2014). In *Tull* v. *United States*, 481 U. S. 412 (1987), the Court described "disgorgement of improper profits" as "traditionally considered an equitable remedy." *Id.*, at 424. While the Court acknowledged that disgorgement was a "limited form of penalty" insofar as it takes money out of the wrongdoer's hands, it nevertheless compared disgorgement to restitution that simply "'restor[es] the status quo,'" thus situating the remedy squarely within the heartland of equity. *Ibid.*[2]

───────────
[2] The dissent acknowledges that this Court has "referred to disgorgement as an equitable remedy in some of its prior decisions." *Post*, at 6 (citing *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998)). While the dissent attempts to discount those cases for having "merely referred to the term" only "in passing," *post*, at 6, those cases expressly "characterized as equitable . . . actions for disgorgement of improper profits" in analyzing whether certain remedies were traditionally available in equity, *Feltner*, 523 U. S., at 352 (citing *Teamsters* v. *Terry*, 494 U. S. 558, 570 (1990) ("characteriz[ing] damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper

Opinion of the Court

In *Great-West*, the Court noted that an "accounting for profits" was historically a "form of equitable restitution." 534 U. S., at 214, n. 2. And in *Kansas* v. *Nebraska*, 574 U. S. 445 (2015), a "'basically equitable'" original jurisdiction proceeding, the Court ordered disgorgement of Nebraska's gains from exceeding its allocation under an interstate water compact. *Id.*, at 453, 475.

Most recently, in *SCA Hygiene Products Aktiebolag* v. *First Quality Baby Products, LLC*, 580 U. S. ___ (2017), the Court canvassed pre-1938 patent cases invoking equity jurisdiction. It noted that many cases sought an "accounting," which it described as an equitable remedy requiring disgorgement of ill-gotten profits. *Id.*, at ___ (slip op., at 11). This Court's "transsubstantive guidance on broad and fundamental" equitable principles, *Romag Fasteners, Inc.* v. *Fossil Group, Inc.*, 590 U. S. ___, ___ (2020) (slip op., at 5), thus reflects the teachings of equity treatises that identify a defendant's net profits as a remedy for wrongdoing.

Contrary to petitioners' argument, equity courts did not limit this remedy to cases involving a breach of trust or of fiduciary duty. Brief for Petitioners 28–29. As petitioners acknowledge, courts authorized profits-based relief in patent-infringement actions where no such trust or special relationship existed. *Id.*, at 29; see also *Root*, 105 U. S., at 214 ("[I]t is nowhere said that the patentee's right to an account is based upon the idea that there is a fiduciary relation created between him and the wrong-doer by the fact of infringement").

Petitioners attempt to distinguish these patent cases by suggesting that an "accounting" was appropriate only because Congress explicitly conferred that remedy by statute in 1870. Brief for Petitioners 29 (citing the Act of July 8, 1870, §55, 16 Stat. 206). But patent law had not previously deviated from the general principles outlined above: This

——————
profits'"); *Tull*, 481 U. S., at 424).

Opinion of the Court

Court had developed the rule that a plaintiff may "recover the amount of . . . profits that the defendants have made by the use of his invention" through "a series of decisions under the patent act of 1836, which simply conferred upon the courts of the United States general equity jurisdiction . . . in cases arising under the patent laws." *Tilghman*, 125 U. S., at 144. The 1836 statute, in turn, incorporated the substance of an earlier statute from 1819 which granted courts the ability to "proceed according to the course and principles of courts of equity" to "prevent the violation of patent-rights." *Root*, 105 U. S., at 193. Thus, as these cases demonstrate, equity courts habitually awarded profits-based remedies in patent cases well before Congress explicitly authorized that form of relief.

### B

While equity courts did not limit profits remedies to particular types of cases, they did circumscribe the award in multiple ways to avoid transforming it into a penalty outside their equitable powers. See *Marshall*, 15 Wall., at 149.

For one, the profits remedy often imposed a constructive trust on wrongful gains for wronged victims. The remedy itself thus converted the wrongdoer, who in many cases was an infringer, "into a trustee, as to those profits, for the owner of the patent which he infringes." *Burdell* v. *Denig,* 92 U. S. 716, 720 (1876). In "converting the infringer into a trustee for the patentee as regards the profits thus made," the chancellor "estimat[es] the compensation due from the infringer to the patentee." *Packet Co.* v. *Sickles*, 19 Wall. 611, 617–618 (1874); see also *Clews* v. *Jamieson*, 182 U. S. 461, 480 (1901) (describing an accounting as involving a "'distribution of the trust moneys among all the beneficiaries who are entitled to share therein'" in an action against the governing committee of a stock exchange).

Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted

Opinion of the Court

wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory.  See *Ambler* v. *Whipple*, 20 Wall. 546, 559 (1874) (ordering an accounting against a partner who had "knowingly connected himself with and aided in . . . fraud").  In *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878), for example, a city engaged contractors to install pavement in a manner that infringed a third party's patent.  The patent holder brought a suit in equity to recover profits from both the city and its contractors.  The Court held that only the contractors (the only parties to make a profit) were responsible, even though the parties answered jointly.  *Id.*, at 140; see also *ibid.* (rejecting liability for an individual officer who merely acted as an agent of the defendant and received a salary for his work).  The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits.  See, *e.g.*, *Belknap* v. *Schild*, 161 U. S. 10, 25–26 (1896) ("The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation"); *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894) (reversing profits award that was based not on what defendant had made from infringement but on what third persons had made from the use of the invention); *Jennings* v. *Carson*, 4 Cranch 2, 21 (1807) (holding that an order requiring restitution could not apply to "those who were not in possession of the thing to be restored" and "had no power over it") (citing *Penhallow* v. *Doane's Administrators*, 3 Dall. 54 (1795) (reversing a restitution award in admiralty that ordered joint damages in excess of what each defendant received)).

Finally, courts limited awards to the net profits from wrongdoing, that is, "the gain made upon any business or investment, when both the receipts and payments are taken into the account."  *Rubber Co.* v. *Goodyear*, 9 Wall.

Opinion of the Court

788, 804 (1870); see also *Livingston* v. *Woodworth*, 15 How. 546, 559–560 (1854) (restricting an accounting remedy "to the actual gains and profits . . . during the time" the infringing machine "was in operation and during no other period" to avoid "convert[ing] a court of equity into an instrument for the punishment of simple torts"); *Seymour* v. *McCormick*, 16 How. 480, 490 (1854) (rejecting a blanket rule that infringing one component of a machine warranted a remedy measured by the full amounts of the profits earned from the machine); *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872) (vacating an accounting that exceeded the profits from infringement alone); *Wooden-Ware Co.* v. *United States,* 106 U. S. 432, 434–435 (1882) (explaining that an innocent trespasser is entitled to deduct labor costs from the gains obtained by wrongfully harvesting lumber).

The Court has carved out an exception when the "entire profit of a business or undertaking" results from the wrongful activity. *Root*, 105 U. S., at 203. In such cases, the Court has explained, the defendant "will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." *Ibid.* In *Goodyear*, for example, the Court affirmed an accounting order that refused to deduct expenses under this rule. The Court there found that materials for which expenses were claimed were bought for the purposes of the infringement and "extraordinary salaries" appeared merely to be "dividends of profit under another name." 9 Wall., at 803; see also *Callaghan* v. *Myers*, 128 U. S. 617, 663–664 (1888) (declining to deduct a defendant's personal and living expenses from his profits from copyright violations, but distinguishing the expenses from salaries of officers in a corporation).

Setting aside that circumstance, however, courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses. Such remedies, when assessed against only culpable actors and for victims, fall

Opinion of the Court

comfortably within "those categories of relief that were *typically* available in equity." *Mertens*, 508 U. S., at 256.

### C

By incorporating these longstanding equitable principles into §78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing. To be sure, the SEC originally endeavored to conform its disgorgement remedy to the common-law limitations in §78u(d)(5). Over the years, however, courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud.[3] The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.

Petitioners go further. They claim that this Court effectively decided in *Kokesh* that disgorgement is necessarily a penalty, and thus not the kind of relief available at equity. Brief for Petitioners 19–20, 22–26. Not so. *Kokesh* expressly declined to pass on the question. 581 U. S., at ___, n. 3 (slip op., at 5, n. 3). To be sure, the *Kokesh* Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles. But that decision has no bearing on the SEC's ability

—————

[3] See, *e.g.*, *SEC* v. *Clark*, 915 F. 2d 439, 441, 454 (CA9 1990) (requiring defendant to disgorge the profits that his stockbroker made from unlawful trades); *SEC* v. *Brown*, 658 F. 3d 858, 860–861 (CA8 2011) (*per curiam*) (ordering joint-and-several disgorgement of funds collected from investors and concluding that "'the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses'"); *SEC* v. *Contorinis*, 743 F. 3d 296, 304–306 (CA2 2014) (requiring defendant to disgorge benefits conferred on close associates).

to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains.

The Government, for its part, contends that the SEC's interpretation of the equitable disgorgement remedy has Congress' tacit support, even if it exceeds the bounds of equity practice. Brief for Respondent 13–21. It points to the fact that Congress has enacted a number of other statutes referring to "disgorgement."

That argument attaches undue significance to Congress' use of the term. It is true that Congress has authorized the SEC to seek "disgorgement" in administrative actions. 15 U. S. C. §77h–1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"). But it makes sense that Congress would expressly name the equitable powers it grants to an agency for use in administrative proceedings. After all, agencies are unlike federal courts where, "[u]nless otherwise provided by statute, all . . . inherent equitable powers . . . are available for the proper and complete exercise of that jurisdiction." *Porter*, 328 U. S., at 398.

Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. The Government argues that under the prior-construction principle, Congress should be presumed to have been aware of the scope of "disgorgement" as interpreted by lower courts and as having incorporated the (purportedly) prevailing meaning of the term into its subsequent enactments. Brief for Respondent 24. But "that canon has no application" where, among other things, the scope of disgorgement was "far from 'settled.'" *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330 (2015).

At bottom, even if Congress employed "disgorgement" as a shorthand to cross-reference the relief permitted by §78u(d)(5), it did not silently rewrite the scope of what the

Opinion of the Court

SEC could recover in a way that would contravene limitations embedded in the statute. After all, such "statutory reference[s]" to a remedy grounded in equity "must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes." *Great-West*, 534 U. S., at 211, n. 1. Accordingly, Congress' own use of the term "disgorgement" in assorted statutes did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity.

### III

Applying the principles discussed above to the facts of this case, petitioners briefly argue that their disgorgement award is unlawful because it crosses the bounds of traditional equity practice in three ways: It fails to return funds to victims, it imposes joint-and-several liability, and it declines to deduct business expenses from the award. Because the parties focused on the broad question whether any form of disgorgement may be ordered and did not fully brief these narrower questions, we do not decide them here. We nevertheless discuss principles that may guide the lower courts' assessment of these arguments on remand.

### A

Section 78u(d)(5) restricts equitable relief to that which "may be appropriate or necessary for the benefit of investors." The SEC, however, does not always return the entirety of disgorgement proceeds to investors, instead depositing a portion of its collections in a fund in the Treasury. See SEC, Division of Enforcement, 2019 Ann. Rep. 16–17, https://www.sec.gov/files/enforcement-annual-report-2019.pdf. Congress established that fund in the Dodd-Frank Wall Street Reform and Consumer Protection Act for disgorgement awards that are not deposited in "disgorgement fund[s]" or otherwise "distributed to victims." 124

Opinion of the Court

Stat. 1844. The statute provides that these sums may be used to pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General. *Ibid.* Here, the SEC has not returned the bulk of funds to victims, largely, it contends, because the Government has been unable to collect them.[4]

The statute provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies the statute's command that any remedy be "appropriate or necessary for the benefit of investors." The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit. After all, the Government has pointed to no analogous common-law remedy permitting a wrongdoer's profits to be withheld from a victim indefinitely without being disbursed to known victims. Cf. *Root*, 105 U. S., at 214–215 (comparing the accounting remedy to a breach-of-trust action, where a court would require the defendant to "refund the amount of profit which they have actually realized").

The Government maintains, however, that the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution. See, *e.g.*, SEC, Report Pursuant to Section 308(C) of the Sarbanes Oxley Act of 2002, p. 3, n. 2 (2003) (taking the position that disgorgement is not intended to make investors whole, but rather to deprive wrongdoers of ill-gotten gains); see also 6 T. Hazen, Law of Securities Regulation §16.18, p. 8 (rev. 7th ed. 2016) (concluding that the remedial nature of the disgorgement remedy does not mean that it is essentially compensatory and

─────────

[4] According to the Government, petitioners "transferred the bulk of their misappropriated funds to China, defied the district court's order to repatriate those funds, and fled the United States." Brief for Respondent 36.

Opinion of the Court

concluding that the "primary function of the remedy is to deny the wrongdoer the fruits of ill-gotten gains"). Under the Government's theory, the very fact that it conducted an enforcement action satisfies the requirement that it is "appropriate or necessary for the benefit of investors."

But the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of §78u(d)(5). Indeed, this Court concluded similarly in *Mertens* when analyzing statutory language accompanying the term "equitable remedy." 508 U. S., at 253 (interpreting the term "appropriate equitable relief"). There, the Court found that the additional statutory language must be given effect since the section "does not, after all, authorize . . . 'equitable relief' *at large*." *Ibid.* As in *Mertens*, the phrase "appropriate or necessary for the benefit of investors" must mean something more than depriving a wrongdoer of his net profits alone, else the Court would violate the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Management Services, Ltd.* v. *Newton*, 587 U. S. ___, ___ (2019) (slip op., at 9) (internal quotation marks omitted).

The Government additionally suggests that the SEC's practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors.[5] Brief for Respondent 37. It is an open question whether, and to what extent, that practice nevertheless satisfies the SEC's obligation to award relief

───────────

[5] We express no view as to whether the SEC has offered adequate proof of failed attempts to return funds to investors here. To the extent that feasibility is relevant at all to equitable principles, we observe that lower courts are well equipped to evaluate the feasibility of returning funds to victims of fraud. See, *e.g.*, *SEC* v. *Lund*, 570 F. Supp. 1397, 1404–1405 (CD Cal. 1983) (appointing a magistrate judge to determine whether it was feasible to locate victims of financial wrongdoing).

Opinion of the Court

"for the benefit of investors" and is consistent with the limitations of §78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by §78u(d)(5) and consistent with equitable principles.

### B

The SEC additionally has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner sometimes seemingly at odds with the common-law rule requiring individual liability for wrongful profits. See, *e.g.*, *SEC* v. *Contorinis*, 743 F. 3d 296, 302 (CA2 2014) (holding that a defendant could be forced to disgorge not only what he "personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients"); *SEC* v. *Clark*, 915 F. 2d 439, 454 (CA9 1990) ("It is well settled that a tipper can be required to disgorge his tippee's profits"); *SEC* v. *Whittemore*, 659 F. 3d 1, 10 (CADC 2011) (approving joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing).

That practice could transform any equitable profits-focused remedy into a penalty. Cf. *Marshall*, 15 Wall., at 149. And it runs against the rule to not impose joint liability in favor of holding defendants "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no

Opinion of the Court

participation." *Belknap*, 161 U. S., at 25–26; see also *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878).

The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, *e.g.*, *Ambler*, 20 Wall., at 559. The historic profits remedy thus allows some flexibility to impose collective liability. Given the wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements—the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.

Here, petitioners were married. 754 Fed. Appx. 505; 262 F. Supp. 3d, at 960–961. The Government introduced evidence that Liu formed business entities and solicited investments, which he misappropriated. *Id.*, at 961. It also presented evidence that Wang held herself out as the president, and a member of the management team, of an entity to which Liu directed misappropriated funds. *Id.*, at 964. Petitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust. Cf. *SEC* v. *Hughes Capital Corp.*, 124 F. 3d 449, 456 (CA3 1997) (finding that codefendant spouse was liable for unlawful proceeds where they funded her "lavish lifestyle"). We leave it to the Ninth Circuit on remand to determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required.

C

Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when

Opinion of the Court

both the receipts and payments are taken into the account." *Goodyear*, 9 Wall., at 804; see also Restatement (Third) §51, Comment *h*, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under §78u(d)(5). A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Tilghman*, 125 U. S., at 145–146; cf. *SEC* v. *Brown*, 658 F. 3d 858, 861 (CA8 2011) (declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).

The District Court below declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme. It is true that when the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions" such as for personal services. *Root*, 105 U. S., at 203. But that exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains "under another name." *Goodyear*, 9 Wall., at 803. Doing so will ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong. *Root*, 105 U. S., at 207.

Although it is not necessary to set forth more guidance addressing the various circumstances where a defendant's expenses might be considered wholly fraudulent, it suffices to note that some expenses from petitioners' scheme went toward lease payments and cancer-treatment equipment. Such items arguably have value independent of fueling a fraudulent scheme. We leave it to the lower court to examine whether including those expenses in a profits-based

20                         LIU *v.* SEC

Opinion of the Court

remedy is consistent with the equitable principles underlying §78u(d)(5).

\*        \*        \*

For the foregoing reasons, we vacate the judgment below and remand the case to the Ninth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 591 U. S. ____ (2020)    1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 18–1501

————

## CHARLES C. LIU, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE THOMAS, dissenting.

The Court correctly declines to affirm the Ninth Circuit's decision upholding the District Court's disgorgement order, but I disagree with the Court's decision to vacate and remand for the lower courts to "limi[t]" the disgorgement award. *Ante,* at 1. Disgorgement can never be awarded under 15 U. S. C. §78u(d)(5). That statute authorizes the Securities and Exchange Commission (SEC) to seek only "equitable relief that may be appropriate or necessary for the benefit of investors," and disgorgement is not a traditional equitable remedy. Thus, I would reverse the judgment of the Court of Appeals.

I

The Securities Exchange Act of 1934, as amended in 2005, allows the SEC to request "equitable relief" in federal district court against those who violate federal securities laws. §78u(d)(5). According to our usual interpretive convention, "equitable relief" refers to forms of equitable relief available in the English Court of Chancery at the time of the founding. Because disgorgement is a creation of the 20th century, it is not properly characterized as "equitable relief," and, hence, the District Court was not authorized to award it under §78u(d)(5).

### A

"This Court has never treated general statutory grants of equitable authority as giving federal courts a freewheeling power to fashion new forms of equitable remedies." *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 3). "Rather, it has read such statutes as constrained by 'the body of law which had been transplanted to this country from the English Court of Chancery' in 1789." *Ibid.* (quoting *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945)). As Justice Story put it, "the settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in [England], as contradistinguished from that of courts of law; subject, of course to the provisions of the acts of congress." *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 654 (1832).

We have interpreted other statutes according to this "settled doctrine." For example, we have read the term "equitable relief" in the Employee Retirement Income Security Act of 1974 to refer to "those categories of relief that were typically available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993) (emphasis deleted). We have done the same for the Judiciary Act of 1789, see, *e.g.*, *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–319 (1999), and for provisions in the Bankruptcy Code, see *Taggart* v. *Lorenzen*, 587 U. S. ___, ___ (2019) (slip op., at 5). There is nothing about §78u(d)(5) that counsels departing from this approach.

### B

Disgorgement is not a traditional form of equitable relief. Rather, cases, legal dictionaries, and treatises establish that it is a 20th-century invention.

As an initial matter, it is not even clear what "disgorgement" means. The majority frankly acknowledges its "'"protean character."'" *Ante*, at 7 (quoting *Petrella* v.

Thomas, J., dissenting

*Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 688, n. 1 (2014)). The difficulty of defining this supposedly traditional remedy is the first sign that it is not a historically recognized equitable remedy. In contrast, an accounting for profits, or accounting—a distinct form of relief that the majority groups with disgorgement—has a well-accepted definition: It compels a defendant to account for, and repay to a plaintiff, those profits that belong to the plaintiff in equity. Bray, Fiduciary Remedies, in The Oxford Handbook of Fiduciary Law 449 (E. Criddle, P. Miller, & R. Sitkoff eds. 2019). The definition of disgorgement, after today's decision, is a remedy that compels each defendant to pay his profits (and sometimes, though it is not clear when, all of his codefendants' profits) to a third-party Government agency (which sometimes, though it is not clear when, passes the money on to victims). This remedy has no basis in historical practice.

No published case appears to have used the term "disgorgement" to refer to equitable relief until the 20th century. Even then, the earliest cases use the word in a "nontechnical" sense, Brief for Law Professors as *Amici Curiae* 22, to describe the action a defendant must take when a party is awarded a traditional equitable remedy such as an accounting for profits or an equitable lien.[1] For example, in *Byrd* v. *Mullinix*, 159 Ark. 310, 251 S. W. 871 (1923), the Supreme Court of Arkansas affirmed the imposition of an equitable lien to prevent a debtor from "put[ting] the money in property which was itself beyond the reach of creditors, and to compel its disgorgement," *id.,* at 316–317, 251 S. W., at 872. Likewise, in *Armstrong* v. *Richards*, 128 Fla. 561, 175 So. 340 (1937), the Supreme Court of Florida referred to "the right of the taxpayer to require an accounting from

——————
[1]An equitable lien is imposed on a defendant's property "as security for a claim on the ground that otherwise the former would be unjustly enriched." Restatement of Restitution §161, p. 650 (1936).

Thomas, J., dissenting

and disgorgement by public officers and those in collusion with them," *id.*, at 564, 175 So., at 341.  In these cases, the term "disgorgement" colloquially described what a defendant was ordered to do, not the remedy itself.

By the 1960s, published opinions began to use "disgorgement" to refer to a remedy in the administrative context.  In *NLRB* v. *Local 176*, 276 F. 2d 583 (CA1 1960), the agency had "applied its . . . remedy of disgorgement of dues, requiring the union to refund to every member who had obtained employment on the Company project the dues which he had paid," *id.*, at 586 (footnote omitted).  The court declined to enforce this part of the agency's order, but not because disgorgement was an impermissible form of relief.  Instead, it found that, in the circumstances of the case, disgorgement "seem[ed] . . . to be an *ex post facto* penalty."  *Ibid.*; see also *NLRB* v. *Local 111*, 278 F. 2d 823, 825 (CA1 1960) (enforcing a disgorgement order from the agency).

By the 1970s, courts started using the term "disgorgement" to describe a judicial remedy in its own right.  When the SEC initially sought this kind of relief under the Securities Exchange Act in *SEC* v. *Texas Gulf Sulphur Co.*, 312 F. Supp. 77 (SDNY 1970), the District Court called it "restitution," *id.*, at 93, and the Court of Appeals called it "[r]estitution of [p]rofits," *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1307 (CA2 1971) (emphasis deleted).  Courts soon substituted the label "disgorgement."  *SEC* v. *Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1105 (CA2 1972); *SEC* v. *Shapiro*, 349 F. Supp. 46, 55 (SDNY 1972).

The late date of these cases is sufficient reason to reject the argument that disgorgement is a traditional equitable remedy.  But it is also telling that, when the SEC began seeking this relief, it did so without any statutory authority.  Prior to 2005, the SEC lacked the power even to seek "equitable relief" in cases like this one.  See §305(b), 116 Stat. 779 (amending the Securities Exchange Act).  The District Court in *Texas Gulf Sulphur* purported to "imply [a] new

remed[y]," based on its "inherent equity power" and a belief
that "the congressional purpose is effectuated by so doing."
312 F. Supp., at 91. But the sources it cited are dubious.
The court relied on *J. I. Case Co.* v. *Borak*, 377 U. S. 426
(1964), a case about implied causes of action that we have
since abrogated. See *Alexander* v. *Sandoval*, 532 U. S. 275,
287 (2001). It also relied on a securities law treatise that
advocated for what it called "restitution" but admitted that
district courts had no express authority to grant the remedy
and that the SEC had never sought this remedy in the past.
3 L. Loss, Securities Regulation 1827–1828 (1961). It is
functionally this same unauthorized remedy that the SEC
and courts now call "disgorgement." The details have var-
ied over time, but the lineage is clear: Disgorgement is "a
relic of the heady days" of courts inserting judicially created
relief into statutes. *Correctional Services Corp.* v. *Malesko*,
534 U. S. 61, 75 (2001) (Scalia, J., concurring).

   Disgorgement as a remedy in its own right is also absent
from legal publications until the 20th century. Leading le-
gal dictionaries did not define the term until the turn of the
20th century. See, *e.g.*, Merriam-Webster's Dictionary of
Law 143 (1996); Black's Law Dictionary 480 (7th ed. 1999).
Nor was disgorgement included in the first Restatement of
Restitution, adopted in 1936. The remedy does not appear
until the Third Restatement, adopted in 2010, which states
that "[r]estitution remedies" that seek "to eliminate profit
from wrongdoing . . . are often called 'disgorgement' or 'ac-
counting.'" 2 Restatement (Third) of Restitution and Un-
just Enrichment §51(4), p. 203. But "Restatement" is an
inapt title for this edition of the treatise. Like many of the
modern Restatements, its "authors have abandoned the
mission of describing the law, and have chosen instead to
set forth their aspirations for what the law ought to be."
*Kansas* v. *Nebraska*, 574 U. S. 445, 475 (2015) (Scalia, J.,
concurring in part and dissenting in part). The inclusion of

Thomas, J., dissenting

"disgorgement" in the Third Restatement, which the majority cites in support of its holding, *ante*, at 6, represents a "'novel extension'" of equity. *Kansas*, *supra*, at 483 (Thomas, J., concurring in part and dissenting in part) (quoting Roberts, Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages, 42 Loyola (LA) L. Rev. 131, 134 (2008)).

I acknowledge that this Court has referred to disgorgement as an equitable remedy in some of its prior decisions. See, *e.g.*, *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998). But these opinions merely referred to the term in passing without considering the question in depth. The history is clear: Disgorgement is not a form of relief that was available in the English Court of Chancery at the time of the founding.

                                    C

The majority's treatment of disgorgement as an equitable remedy threatens great mischief. The term disgorgement itself invites abuse because it is a word with no fixed meaning. The majority sees "parallels" between accounting and disgorgement, *ante*, at 2, n. 1, but parallels are by definition not the same. Even if they were, the traditional remedy of an accounting—which compels a party to repay profits that belong to a plaintiff—has important conceptual limitations that disgorgement does not. An accounting connotes the relationship between a plaintiff and a defendant. In the words of one scholar, "it is an accounting by A to B." Bray, Fiduciary Remedies, at 454. But disgorgement connotes no relationship and so is not naturally limited to net profits and compensation of victims. It simply "is A disgorging." *Ibid.* Further, the traditional remedy of a constructive trust[2] or an equitable lien requires that the "money or prop-

_____

[2] A constructive trust compels a defendant "holding title to property . . . to convey it to another on the ground that he would be unjustly enriched

Thomas, J., dissenting

erty identified as belonging in good conscience to the plaintiff . . . clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 213 (2002). Disgorgement reaches further because it has no tracing requirement. By using a word with no history in equity jurisprudence, the SEC and courts have made it possible to circumvent the careful limitations imposed on other equitable remedies.

One need look no further than the SEC's use of disgorgement to see the pitfalls of the majority's acquiescence in its continued use as a remedy. The order in *Texas Gulf Sulphur* did not depart too far from equitable principles. The award was limited to the defendants' net profits and the funds were held in escrow and were at least partly available to compensate victims, 446 F. 2d, at 1307. It did not take long, however, for a district court to order a defendant to turn over both his profits and the investment "income earned on the proceeds." *Manor Nursing Centers*, 458 F. 2d, at 1105. And in the case before us today, just a half century later, disgorgement has expanded even further. The award is not limited to net profits or even money possessed by an individual defendant when it is imposed jointly and severally. See *ante*, at 5. And not only is it not guaranteed to be used to compensate victims, but the imposition of over $26 million in disgorgement and approximately $8 million in civil monetary penalties in this case seems to ensure that victims will be unable to recover anything in their own actions. As long as courts continue to award "disgorgement," both courts and the SEC will continue to have license to expand their own power.

The majority's decision to tame, rather than reject, disgorgement will also cause confusion in administrative prac-

————————
if he were permitted to retain it." Restatement of Restitution §160, at 640–641.

Thomas, J., dissenting

tice.  As the majority explains, the SEC is expressly author-ized to impose "'disgorgement'" in its in-house tribunals. *Ante*, at 13 (quoting 15 U. S. C. §77h–1(e)).  It is unclear whether the majority's new restrictions on disgorgement will apply to these proceedings as well.  If they do not, the result will be that disgorgement has one meaning when the SEC goes to district court and another when it proceeds in-house.

More fundamentally, by failing to recognize that the problem is disgorgement itself, the majority undermines our entire system of equity.  The majority believes that in-sistence on the traditional rules of equity is unnecessarily formalistic, *ante,* at 3, n. 1, but the Founders accepted fed-eral equitable powers only because those powers depended on traditional forms.  The Constitution was ratified on the understanding that equity was "a precise legal system" with "specific equitable remed[ies]." *Missouri* v. *Jenkins*, 515 U. S. 70, 127 (1995) (Thomas, J., concurring).  "Alt-hough courts of equity exercised remedial 'discretion,' that discretion allowed them to deny or tailor a remedy despite a demonstrated violation of a right, not to expand a remedy beyond its traditional scope." *Trump*, 585 U. S., at ___ (Thomas, J., concurring) (slip op., at 5).  The majority, while imposing some limits, ultimately permits courts to continue expanding equitable remedies.  I would simply hold that the phrase "equitable relief" in §78u(d)(5) does not authorize disgorgement.

## II

After holding that disgorgement is equitable relief, the majority remands for the lower courts to reconsider the dis-gorgement order in this case.  If the majority is going to ac-cept "disgorgement" as an available remedy, it should at least limit the order to be consistent with the traditional rules of equity.  First, the order should be limited to each

THOMAS, J., dissenting

petitioner's profits. Second, the order should not be imposed jointly and severally. Third, the money paid by petitioners should be used to compensate petitioners' victims.

## A

First, the disgorgement order should be limited to "the profits actually made" by each petitioner. *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872); see also *ante*, at 11, 18–20. Defendants in equity traditionally may deduct "allowances . . . for the cost and expense of the business" from the amount of the award. *Root* v. *Railway Co.*, 105 U. S. 189, 215 (1882); see also *Callaghan* v. *Myers*, 128 U. S. 617, 665 (1888); *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 139 (1878); *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 804 (1870). The rationale behind this rule is that "it is not the function of courts of equity to administer punishment." *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co.*, 417 U. S. 703, 717–718, n. 14 (1974) (internal quotation marks omitted); see also 2 J. Story, Commentaries on Equity Jurisprudence §1494, p. 819 (13th ed. 1886). Here, however, the District Court reasoned that "it would be 'unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place.'" 754 Fed. Appx. 505, 509 (CA9 2018) (quoting *SEC* v. *J. T. Wallenbrock & Assocs.*, 440 F. 3d 1109, 1114 (CA9 2006)). On remand, the lower courts should limit the award to each petitioner's profits.

## B

Second, and relatedly, the disgorgement order should not be imposed jointly and severally. The majority analogizes disgorgement to accounting, *ante*, at 6, but this Court has rejected joint and several liability in actions for an accounting. *Elizabeth*, *supra,* at 139–140; *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894); *Belknap* v. *Schild*, 161 U. S.

10, 25–26 (1896).  The majority instructs the lower courts to determine whether petitioners were "partners in wrong-doing," apparently based on a case about the liability of partners.  *Ante,* at 10, 18 (citing *Ambler* v. *Whipple,* 20 Wall. 546 (1874)).  But the liability in that case was premised on the law of partnership, and nothing indicates that petitioners here were legal partners.  The joint and several order in this case is thus at odds with traditional equitable rules.[3]

### C

Finally, the award should be used to compensate victims, not to enrich the Government.  Plaintiffs in equity may claim "that which, *ex aequo et bono* [according to what is equitable and good], is theirs, and nothing beyond this." *Livingston* v. *Woodworth,* 15 How. 546, 560 (1854).  The money ordered to be paid as disgorgement in no sense belongs to the Government, and the majority cites no authority allowing a Government agency to keep equitable relief for a wrong done to a third party.  Requiring the SEC to only "generally" compensate victims, *ante,* at 15, is inconsistent with traditional equitable principles.

Worse still from a practical standpoint, the majority provides almost no guidance to the lower courts about how to resolve this question on remand.  Even assuming that disgorgement is "equitable relief" for purposes of §78u(d)(5) and that the Government may sometimes keep the money,

––––––––––

[3] For its part, respondent cites the joint and several liability in *Jackson* v. *Smith,* 254 U. S. 586, 589 (1921), but the remedy in that case was a constructive trust, see *Smith* v. *Jackson,* 48 App. D. C. 565, 576 (1919). As explained above, there is no tracing requirement in the District Court's order as would be required in a case of constructive trust.  *Supra,* at 6–7.  The Court also allowed joint and several liability in *Belford* v. *Scribner,* 144 U. S. 488 (1892), a copyright case.  But it based its holding on the fact that, under the relevant copyright statute, "both the printer and the publisher are equally liable to the owner of the copyright for an infringement."  *Id.,* at 507; see also *Washingtonian Publishing Co.* v. *Pearson,* 140 F. 2d 465, 467 (CADC 1944).

THOMAS, J., dissenting

the Court should at least do more to identify the circum-
stances in which the Government may keep the money.  In-
stead, the Court asks lower courts to improvise a solution.
If past is prologue, this uncertainty is sure to create oppor-
tunities for the SEC to continue exercising unlawful power.

\*     \*     \*

I would reverse for the straightforward reason that dis-
gorgement is not "equitable relief" within the meaning of
§78u(d)(5).  Because the majority acquiesces in the contin-
ued use of disgorgement under that statute, I respectfully
dissent.



A Neutral
As of: July 15, 2025 9:58 PM Z

### *Anytime Fitness, L.L.C. v. Thornhill Bros. Fitness, L.L.C. (In re Thornhill Bros. Fitness, L.L.C.)*

United States Court of Appeals for the Fifth Circuit

October 27, 2023, Decided

No. 22-30757

**Reporter**

85 F.4th 321 *; 2023 U.S. App. LEXIS 28669 **

IN THE MATTER OF THORNHILL BROTHERS FITNESS, L.L.C., Debtor, ANYTIME FITNESS, L.L.C., Appellant, versus THORNHILL BROTHERS FITNESS, L.L.C.; WILLIAM FLYNN; BILLIE FLYNN, Appellees.

**Prior History: [**1]** Appeal from the United States District Court for the Western District of Louisiana. USDC No. 3:22-CV-2074.

*In re Thornhill Bros. Fitness, LLC, 2022 Bankr. LEXIS 1890 (Bankr. W.D. La., July 8, 2022)*

## Core Terms

executory contract, franchise agreement, assign, rights, bankruptcy court, settlement, partial assignment, bankruptcy judge, confession, provisions, authorize, counterparty, franchise, indemnity

## Case Summary

### Overview

HOLDINGS: [1]-The court held that the Bankruptcy Code, *11 U.S.C.S. § 365(f)*, nor any other portion of Title 11, authorized a bankruptcy court's approval of a debtor's partial assignment of an executory contract; [2]-Because the bankruptcy court's order improperly authorized approval of a debtor's partial assignment of an executory contract, the order was reversed and the case remanded to the bankruptcy court for further proceedings consistent with the court's opinion.

## Outcome

Order reversed; case remanded for further proceedings.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN1* **Standards of Review, Clear Error Review**

The appellate court applies clear error review to the bankruptcy court's factual conclusions and de novo reviews to the bankruptcy court's legal conclusions.

Contracts Law > Types of Contracts > Executory Contracts

Business & Corporate Compliance > Contracts > Types of Contracts > Executory Contracts

*HN2* **Types of Contracts, Executory Contracts**

Return to TOC

APP2-196

The term executory contract refers to a contract that neither party has finished performing.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Existing Defaults

Bankruptcy Law > ... > Executory Contracts & Unexpired Leases > Powers to Assume & Reject > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Unassumable Contracts

### *HN3* Executory Contracts & Unexpired Leases, Assignments

The Bankruptcy Code, *11 U.S.C.S. § 365(a)*, gives special attention to a bankrupt debtor's executory contracts. The Code's initial premise is that a trustee in control of a post-petition debtor may, subject to the court's approval, assume or reject any executory contract of the pre-petition debtor. But to assume an executory contract, the debtor must clear various statutory hurdles. For example, if there has been a default under the contract, the debtor must cure, or provide adequate assurance that the trustee will promptly cure default, and provide adequate assurance of future performance under such contract, *11 U.S.C.S. § 365(b)(1)*, unless the default stems from some exempted origin, see *§ 365(b)(2)*. Exemptions include the mere financial circumstance of insolvency or the happenstance of

bankruptcy. If the debtor successfully assumes an executory contract, then the contract will remain in effect through and then after the completion of the reorganization.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Contracts Law > Types of Contracts > Executory Contracts
Business & Corporate Compliance > Contracts > Types of Contracts > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Unassumable Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Existing Defaults

Bankruptcy Law > Administrative Powers > Utility Services

## *HN4* **Executory Contracts & Unexpired Leases, Assignments**

A debtor in bankruptcy may also assign its rights and obligations under an executory contract to others, but again subject to various statutory hurdles. *11 U.S.C.S. § 365(f)(1)*. The debtor must first assume such contract or lease in accordance with the provisions of this section. *§ 365(f)(2)(A)*. And, even when enabled by a prior assumption, a debtor's power of assignment is not unqualified. The non-bankrupt party to the contract, the erstwhile contractual counterparty of the debtor-assignor, must be given adequate assurance of the assignee's future performance. *§ 365(f)(2)(B)*. Further, assignment can be precluded where applicable law excuses the counterparty from accepting performance by anyone other than the debtor. *§ 365(c)(1)(A)*.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Contracts Law > Types of Contracts > Executory Contracts
Business & Corporate Compliance > Contracts > Types of Contracts > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

Bankruptcy Law > ... > Executory Contracts & Unexpired Leases > Powers to Assume & Reject > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Unassumable Contracts

## *HN5* **Executory Contracts & Unexpired Leases, Assignments**

When it comes to assuming an executory contract, we have been clear that it's all or nothing: An executory contract must be assumed or rejected in its entirety. Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others. A debtor cannot use the Bankruptcy Code, *11 U.S.C.S. § 365*, to create a different deal than the one it had originally.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Return to TOC

Contracts Law > Types of Contracts > Executory Contracts

Business & Corporate Compliance > Contracts > Types of Contracts > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Unassumable Contracts

*HN6* **Executory Contracts & Unexpired Leases, Assignments**

The Bankruptcy Code, *11 U.S.C.S. § 365(f)*, which governs a debtor's ability to assign an executory contract, refers to an executory contract, and uses the phrase such contract five times. After all, a *§ 365(f)* assignment is intended to change only who performs an obligation, not the obligation to be performed. If a debtor could strategically divide up its executory contracts via partial *§ 365(f)* assignments, then the debtor could both change the nature of the contracts' obligations and evade our requirement that it take any retained executory contracts "cum onere," with all their benefits and burdens.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > ... > Executory Contracts & Unexpired Leases > Powers to Assume & Reject > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

**_HN7_** **Executory Contracts & Unexpired Leases, Assignments**

When a trustee relies on the Bankruptcy Code, _11 U.S.C.S. § 365(f)_, to assign an executory contract in bankruptcy, it must assign the contract in whole, not in part.

Business & Corporate Compliance > Bankruptcy > Case Administration > Bankruptcy Court Powers

Bankruptcy Law > Case Administration > Bankruptcy Court Powers

**_HN8_** **Case Administration, Bankruptcy Court Powers**

The Fifth Circuit does not construe any other provision of the Bankruptcy Code to permit circumvention of its interpretation of the Bankruptcy Code, _11 U.S.C.S. § 365(f)_. It's true that the Code contains various catch-all provisions. But the Fifth Circuit has held that those catch-alls do not create substantive powers not committed to the bankruptcy court by some other section. For example, _11 U.S.C.S. § 105_ authorizes a bankruptcy judge to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. _11 U.S.C.S. § 105(a)_. But  the Fifth Circuit has already decided that _§ 105_ does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable. A bankruptcy court's decisions and orders must rest on specific authorization from Title 11, not general efficacy or technocratic desirability, because _§ 105_ does not convey roving commission to do equity. Bankruptcy courts cannot use their equity powers under _§ 105_ to fashion substantive rights and remedies.

Bankruptcy Law > ... > Commencement of Case > Joint Cases > Commencement

Civil Procedure > Settlements > Settlement Agreements > Validity of Agreements

Bankruptcy Law > Procedural Matters > Contested Matters

*HN9* **Joint Cases, Commencement**

In Jackson Brewing, the Fifth Circuit has prescribed a balancing test that governs a bankruptcy court's approval of a *Fed. R. Bankr. P. 9019* compromise. A settlement must reflect (1) the debtor's probability of success in litigation, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise. *Fed. R. Bankr. P. 9019*. In later cases, the court has further refined this test. But the court has never held that obedience to Jackson Brewing substitutes for compliance with Title 11.

Business & Corporate Compliance > Bankruptcy > Case Administration > Bankruptcy Court Powers

Bankruptcy Law > Case Administration > Bankruptcy Court Powers

*HN10* **Case Administration, Bankruptcy Court Powers**

When the Fifth Circuit prescribes tests or other guidance for a bankruptcy court's exercise of discretion, it expects that subsequent bankruptcy court orders will comply with both our precedent and the Bankruptcy Code. An order that clears one hurdle still faces the other.

**Counsel:** For Anytime Fitness, L.L.C., Appellant: David Felicien Waguespack, Esq., Conor Thomas Lutkewitte, Appellant, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, L.L.C., New Orleans, LA.

For Thornhill Brothers Fitness, L.L.C., Appellee: Bradley Loy Drell, Conner L. Dillon, Heather M. Mathews, Esq., Appellee, Gold, Weems, Bruser, Sues & Rundell, Alexandria, LA.

Return to TOC

85 F.4th 321, *321; 2023 U.S. App. LEXIS 28669, **1

For William Flynn, Billie Flynn, Appellees: Patrick S. Garrity, Appellee, Derbes Law Firm, L.L.C., Metairie, LA.

**Judges:** Before RICHMAN, Chief Judge, and SOUTHWICK and OLDHAM, Circuit Judges.

**Opinion**

---

 **[\*323]** PER CURIAM:

The question presented is whether *11 U.S.C. § 365(f)*, or any other portion of Title 11, authorizes a bankruptcy court's approval of a debtor's *partial* assignment of an executory contract. It does not. We reverse the bankruptcy court's contrary order and remand for further proceedings consistent with this opinion.

I.

In November 2019, William Flynn attempted to use an "inversion table" located at an Anytime Fitness franchise location in Port Allen, Louisiana. The equipment allegedly failed, and Flynn suffered neuromuscular injuries. In February 2020, **[\*\*2]** Flynn filed a personal injury suit in Louisiana court against the franchise owner, Thornhill Brothers Fitness, LLC ("Thornhill"). An amended complaint named an additional defendant, franchisor Anytime Fitness, LLC ("Anytime").

Anytime fought the complaint, arguing that the presence of the inversion table at the Thornhill location was unauthorized by the Thornhill-Anytime franchise agreement and that Anytime was, for other various other reasons, not liable for Flynn's injuries. A Louisiana trial court dismissed Anytime with prejudice. An intermediate Louisiana

appellate court affirmed. *See Flynn v. Anytime Fitness, LLC, 360 So.3d 860 (La. App. 1st Cir. 2022)*.

But Flynn's case against Thornhill continued. A Louisiana district court announced that a multi-day jury trial would begin on March 21, 2022. Five days beforehand, at 3:15 PM on March 16, 2022, Thornhill filed a voluntary petition for bankruptcy. The petition disclosed only one significant non-insider liability—Flynn's litigation claim—in an "unknown" amount above $1 million.

Events thereafter moved quickly. By 2:00 PM on Friday, March 18, 2022, or less than 48 hours after the predicate bankruptcy, Thornhill's counsel emailed the bankruptcy court announcing that "much negotiation" had produced a settlement. **[**3]** Counsel requested "a wet signature" from the bankruptcy judge to approve the settlement. That afternoon, the bankruptcy judge sent Thornhill's counsel an SMS message with a photograph of the signed draft order approving the settlement. *See Fed. R. Bankr. P. 9019(a)* (authorizing the bankruptcy court's approval of a debtor's litigation settlements).

The settlement came in the form of several documents. One, which the parties call "the Stipulation," bears emphasis and explanation. The Stipulation gave the Flynns $1 million and resurrected the Flynns' ability to sue Anytime—notwithstanding the previous court order dismissing the Flynns' claims against Anytime with prejudice. Specifically, Thornhill agreed that its insurer would pay the Flynns $1 million plus judicial interest—the maximum amount allowed by the insurance policy. Thornhill also agreed to sign a document dubbed the "Confession of Judgment," to be entered in the Louisiana court where the Flynns' personal injury lawsuit was pending. In this "confession," Thornhill admitted to $7 million in total liability to the Flynns. Then Thornhill agreed to assign all rights it had "against Anytime Fitness LLC" to the Flynns, including any rights arising

Return to TOC

from "the **[**4]** indemnity agreement contained in the Franchise Agreement" between **[*324]** Thornhill and its franchise parent, Anytime. Thornhill otherwise retained the franchise agreement. The upshot: The Flynns recovered at least $1 million and as much as $7 million.

Thornhill also made out like a bandit in the Settlement. The Flynns agreed that Thornhill would remain a defendant in the personal injury lawsuit "in name only." That's because Thornhill need only be included on a jury verdict form "for purposes of recovering against Anytime." The Flynns would in any event "waive the right to pursue" Thornhill.

All of this came as quite a shock to Anytime, which thought it escaped this case when it was dismissed with prejudice in state court. Anytime did not learn about the Settlement until April 1, 2022, two weeks *after* the bankruptcy judge signed it. On April 1, the Flynns filed what Anytime calls the "New Suits" in Louisiana court. In the New Suits, the Flynns argued that Thornhill's "confession," the indemnity provisions of the Thornhill-Anytime franchise agreement, the assignment of Thornhill's rights to Flynn, and the bankruptcy court's approval of all the foregoing together operate to make Anytime liable **[**5]** to the Flynns for the "confessed" amount of $7 million. Anytime obviously confessed to nothing and knew nothing of the confession before the Flynns filed the New Suits. Anytime tried to win another dismissal in state court, but this time its efforts failed. And as of today, Anytime continues to defend against the New Suits.

Anytime then protested in the bankruptcy court, arguing that the approval of the Stipulation, designed to facilitate "recover[y] against Anytime," violated Anytime's notice and hearing rights. *See Fed. R. Bankr. P. 9019(a)* ("On motion by the trustee *and after notice and a hearing*, the court may approve a compromise or settlement" (emphasis added)); *Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 94*

*L. Ed. 865 (1950)* ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). The bankruptcy court vacated its prior order and allowed Anytime a hearing.

But in July 2022, the bankruptcy court entered a new order ratifying the actions it took originally. Anytime appealed that July 2022 order, and the district court affirmed. We have **[\*\*6]** jurisdiction to hear Anytime's continuing appeal under *28 U.S.C. § 158(d)*. We review not the district court opinion but the bankruptcy court's judgment. *HN1* We apply clear error review to the bankruptcy court's factual conclusions and *de novo* review to the bankruptcy court's legal conclusions. *See In re Pratt, 524 F.3d 580, 584 (5th Cir. 2008).*

II.

Anytime raises a variety of objections on appeal. Because we agree with Anytime that that the settlement violated *11 U.S.C. § 365*'s provisions governing the treatment of executory contracts in bankruptcy, we decline to reach Anytime's other arguments.

We first (A) explain the Bankruptcy Code's treatment of executory contracts. Then we (B) describe the Code's all-or-nothing approach to assuming and assigning executory contracts. Last, we (C) explain the bankruptcy court's error.

A.

*HN2* The term "executory contract" refers to a contract that "neither party has finished performing." *Mission Product Holdings, Inc. v. Tempnology, LLC, [\*325] 139 S. Ct. 1652, 1657, 203 L. Ed. 2d 876 (2019)*. The parties to this appeal appear to agree that the Thornhill-Anytime franchise agreement is an executory contract. That acquiescence

Return to TOC

85 F.4th 321, *325; 2023 U.S. App. LEXIS 28669, **6

comports with the views of several of our sister circuits. *See In re Pioneer Ford Sales, Inc., 729 F.2d 27, 28 (1st Cir. 1984)* (Breyer, J.) (treating Ford dealership franchise agreement as executory); *Cinicola v. Scharffenberger, 248 F.3d 110, 124 (3d. Cir. 2001)* (holding sale of a franchise agreement triggered protections of *11 U.S.C. § 365*); *In re A&F Enterprises, Inc. II, 742 F.3d 763, 765-67 (7th Cir. 2014)* (treating IHOP **[\*\*7]** franchises and associated leases as executory); *In re James Cable Partners, LP, 27 F.3d 534, 537 (11th Cir. 1994)* (describing "cable franchise agreement" as "an executory contract"). Although we hesitate to declare that franchise agreements must always and everywhere be treated as executory, it makes sense to consider them executory in the general case, because franchise agreements usually specify ongoing obligations that franchisees and franchisors have to each other.

*HN3* The Bankruptcy Code gives special attention to a bankrupt debtor's executory contracts. The Code's initial premise is that a trustee in control of a post-petition debtor may, "subject to the court's approval," "assume or reject any executory contract" of the pre-petition debtor. *11 U.S.C. § 365(a)*.

But to assume an executory contract, the debtor must clear various statutory hurdles. For example, if there has been a default under the contract, the debtor must "cure[], or provide[] adequate assurance that the trustee will promptly cure . . . default," and provide "adequate assurance of future performance under such contract," *11 U.S.C. § 365(b)(1)*, unless the default stems from some exempted origin, *see id. § 365(b)(2)*. Exemptions include the mere financial circumstance of insolvency or the happenstance of bankruptcy. *Id.* If the debtor **[\*\*8]** successfully assumes an executory contract, then the contract "will remain in effect through and then after the completion of the reorganization." *In re Nat'l Gypsum Co., 208 F.3d 498, 505 (5th Cir. 2000)*.

Return to TOC

_HN4_ A debtor in bankruptcy may also assign its rights and obligations under an executory contract to others, but again subject to various statutory hurdles. _See 11 U.S.C. § 365(f)(1)._ The debtor must first "assume[] such contract or lease in accordance with the provisions of this section." _Id. § 365(f)(2)(A)._ And, even when enabled by a prior assumption, a debtor's power of assignment is not unqualified. The non-bankrupt party to the contract, the erstwhile contractual counterparty of the debtor-assignor, must be given "adequate assurance" of the assignee's "future performance." _Id. § 365(f)(2)(B)._ Further, assignment can be precluded where "applicable law excuses" the counterparty from accepting performance by anyone other than the debtor. _Id. § 365(c)(1)(A)._

B.

But what happens if, say, a debtor wishes to retain only part of an executory contract? May a debtor keep the wheat and not the chaff? No. _HN5_ When it comes to _assuming_ an executory contract, we have been clear that it's all or nothing: "An executory contract must be assumed or rejected in its entirety." _Matter of Provider Meds, LLC, 907 F.3d 845, 851 (5th Cir. 2018)_ (citation omitted). "Where an executory contract **[\*\*9]** contains several agreements, the debtor may not choose to reject some agreements within the contract and not others." _Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996)_ (per curiam) (citation **[\*326]** omitted). A debtor cannot use _§ 365_ to create a different deal than the one it had originally.

Does a different rule apply to assigning an executory contract? In _Provider Meds_, we all but said no, assignments are likewise all-or-nothing. _See 907 F.3d at 851_ (noting assignment can occur only after assumption in entirety and citing _§ 365(f)_). _HN6_ And _§ 365(f)_, which governs a debtor's ability to assign an executory contract, refers to "an executory contract," and uses the phrase "such contract" five times. The words "an" and

85 F.4th 321, *326; 2023 U.S. App. LEXIS 28669, **9

"such" suggest the whole, not the part. And that makes sense. After all, a *§ 365(f)* assignment "is intended to change only who performs an obligation, not the obligation to be performed." *In re Fleming Companies, Inc., 499 F.3d 300, 308 (3d. Cir. 2007)* (quotation and citation omitted). If a debtor could strategically divide up its executory contracts via partial *§ 365(f)* assignments, then the debtor could both change the nature of the contracts' obligations and evade our requirement that it take any retained executory contracts "*cum onere*," with all their benefits and burdens. *Nat'l Gypsum Co., 208 F.3d at 506*.

We reiterate our prior holdings: a debtor assuming an executory contract **[\*\*10]** cannot separate the wheat from the chaff. *HN7* And we make clear that, when a trustee relies on *§ 365(f)* to assign an executory contract in bankruptcy, it must assign the contract in whole, not in part.

Although the plain language of *§ 365(f)* suffices for our holding, other authorities reinforce it.

For example, the Supreme Court has said "*Section 365* reflects a general bankruptcy rule: the estate cannot possess anything more than the debtor itself did outside bankruptcy." *Tempnology, 139 S. Ct. at 1663* (citation omitted). In *Tempnology*, the Court considered the effect of rejection of an executory contract under *§ 365(a)* and *(g)*. And the Court held that a trustee's (or debtor's) rejection of a contract constituted a breach of it, not a rescission. *Id. at 1661*. That is so, the Court explained, because the debtor's contractual counterparty should retain the same rights under *§ 365* in bankruptcy as it would have outside of bankruptcy. *See id. at 1663* ("By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up."); *accord* D. Baird, Elements of Bankruptcy 97 (6th

ed. 2014) (Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy[] appl[y] inside of bankruptcy as well. **[\*\*11]** A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

So too with assignments under *§ 365(f)*. If the trustee (or debtor) could use the Code to assign a fraction of a contract that could not be assigned outside of bankruptcy, the trustee (or debtor) would arrogate to itself property it did not have before the petition. It would likewise derogate the counterparty's contractual rights that would have existed outside of bankruptcy. The all-or-nothing assignment rule under *§ 365(f)* prevents both inequities.

*HN8* We do not construe any other provision of the Code to permit circumvention of our interpretation of *§ 365(f)*. It's true that the Code contains various catch-all provisions. But we have held that those catch-alls do not create substantive powers not committed to the bankruptcy court by some other section. For example, *§ 105* authorizes a bankruptcy judge to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *11 U.S.C. § 105(a)*. But we have already decided that *§ 105* "does not authorize the bankruptcy courts **[\*327]** to create substantive rights that are otherwise unavailable." *United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir. 1986)*. A bankruptcy court's decisions and orders must rest on specific **[\*\*12]** authorization from Title 11, not general efficacy or technocratic desirability, because *§ 105* does not convey "roving commission to do equity." *Id.*; *accord Matter of Ward, 978 F.3d 298, 303 (5th Cir. 2020)* ("[B]ankruptcy courts cannot use their equity powers under *§ 105* to fashion substantive rights and remedies.") (quotation and citation omitted). Our understanding of the Code's catch-alls comports with an ever-lengthening thread of Supreme Court precedent limiting the substantive power of bankruptcy courts. *See N. Pipeline Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50, 88, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982)* (holding unconstitutional part of the "broad grant of judicial power" given to bankruptcy judges by

the Bankruptcy Act of 1978); *Stern v. Marshall, 564 U.S. 462, 503, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011)* (rejecting even "slight encroachments" and "silent approaches" by bankruptcy courts on Article III (quotation omitted)); *Radlax Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645?47, 132 S. Ct. 2065, 182 L. Ed. 2d 967 (2012)* (rejecting reliance on *§ 105* where more specific provisions of Title 11 could be read as controlling).

C.

We turn now to the facts of our case. The franchise agreement forbids assignment without Anytime's consent. Anytime withheld consent. So, if Thornhill wished to assign the contract's indemnity rights to the Flynns, Thornhill must rely on *§ 365(f)*. *See Provider Meds, 907 F.3d at 851* (interpreting *§ 365(f)* to permit assignment despite an anti-assignment provision).

But Thornhill did not assign the entirety of the franchise agreement to the Flynns. Rather, Thornhill **[**13]** assigned rights "applicable under the terms and conditions of the indemnity agreement contained in the franchise agreement." Thornhill otherwise kept the franchise agreement. Since we hold *§ 365(f)* does not encompass such dissection, Thornhill's partial assignment is not authorized by Title 11.

The bankruptcy court bypassed Anytime's *§ 365* objection by noting that Thornhill assigned to the Flynns only whatever rights Thornhill had against Anytime. What if Thornhill had none? If Thornhill lacked any rights to assign, then (suggests Thornhill) the assignment of nothing offended nothing. *Nemo dat quod non habet*. The bankruptcy court accepted this logic. It also declined to interpret the franchise agreement and discern whether the set of assigned rights was empty, reasoning that the job of interpreting the franchise agreement belonged to "another forum."

Return to TOC

We disagree. The job of discerning what if anything can be assigned under *§ 365(f)* decidedly belongs to the bankruptcy judge, the district court, and by extension, us. The bankruptcy court applied *§ 365(f)* to authorize something the Code forbids—the partial assignment of an executory contract. The Flynns then used that partial assignment to revivify its claims against **[**14]** Anytime in the New Suits. If the Louisiana state court were to find assigned indemnity rights were *not* a null set, the state court could not then refuse to honor the unlawful partial assignment. It instead would be bound by the bankruptcy court's unlawful approval of the partial assignment. That's because the bankruptcy court already gave Thornhill a preclusive judgment authorizing that partial assignment. If we were to affirm that judgment, then **[*328]** the *§ 365* toothpaste could not be put back in the tube.

Thornhill separately argues that any defect in the bankruptcy court's order was cured by the order's compliance with *In re Jackson Brewing Co., 624 F.2d 599 (5th Cir. 1980).* **HN9** In *Jackson Brewing*, we prescribed a balancing test that governs a bankruptcy court's approval of a *Rule 9019* compromise. *See id. at 602* (indicating a settlement must reflect (1) "the [debtor's] probability of success in litigation," (2) "[t]he complexity and likely duration of the litigation and any attendant expense, inconvenience and delay," and (3) "[a]ll other factors bearing on the wisdom of the compromise."); *Fed. R. Bankr. P. 9019*. In later cases, we further refined this test. *See In re Age Refining, 801 F.3d 530, 540 (5th Cir. 2015)* (noting that the third, "all other" bucket includes variables like "the best interest of the creditors" and "the extent to which **[**15]** the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."). But we have never held that obedience to *Jackson Brewing* substitutes for compliance with Title 11.

———————————————

* Anytime disputes the proposition that the bankruptcy court's July 2022 order complies with *In re Jackson Brewing Co., 624 F.2d 599 (5th Cir. 1980)*. Because this case can be resolved on other grounds, we do not reach Anytime's argument.

_**HN10**_ On the contrary, when we prescribe tests or other guidance for a bankruptcy court's exercise of discretion, we expect that subsequent bankruptcy court orders will comply with _both_ our precedent _and_ the Bankruptcy Code. An order that clears one hurdle still faces the other. _See In re Moore, 608 F.3d 253, 266 (5th Cir. 2010)_ (requiring that a potential compromise involving an asset sale clear both _11 U.S.C. § 363_ and our requirements for _Rule 9019_). Since the bankruptcy court order at issue here does not satisfy _§ 365_, it does not matter whether it satisfied _Jackson Brewing_.

* * *

We REVERSE the bankruptcy court's July 2022 order and REMAND for further proceedings consistent with this opinion.

---

**End of Document**